# EXHIBIT A-53

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

Filed and Attested by the
Office of Judicial Records
10 NOV 2023 01:23 pm
P. DIXON

| | | |
|---|---|---|
| HOLLI CARTER, et al.,<br>*Plaintiff,*<br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>*Defendants.* | :<br>:<br>:<br>:<br>:<br>: | MARCH TERM, 2022<br>No. 220302588 |
| BRANDY GOODMOND, et al.,<br>*Plaintiff,*<br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>*Defendants.* | :<br>:<br>:<br>:<br>:<br>: | APRIL TERM, 2022<br>No. 220400208 |
| BRANDY GOODMOND, et al.,<br>*Plaintiff,*<br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>*Defendants.* | :<br>:<br>:<br>:<br>:<br>: | APRIL TERM, 2022<br>No. 220400212 |
| JANEE HENDERSON, et al.,<br>*Plaintiff,*<br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>*Defendants.* | :<br>:<br>:<br>:<br>:<br>: | APRIL TERM, 2022<br>No. 220400127 |
| KRISTEN KAJUFFA, et al.,<br>*Plaintiff,*<br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>*Defendants.* | :<br>:<br>:<br>:<br>:<br>: | MARCH TERM, 2022<br>No. 220302978 |
| NAFEESAH MAYS, et al.,<br>*Plaintiff,*<br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>*Defendants.* | :<br>:<br>:<br>:<br>:<br>: | MARCH TERM, 2022<br>No. 220302963 |
| CATHERINE McMILLIAN, et al.,<br>*Plaintiff,* | :<br>: | APRIL TERM, 2022<br>No. 220400140 |

|  | : |  |
| --- | --- | --- |
| v. | : |  |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |  |
| *Defendants.* |  |  |
| DAMEKA MOMENT, et al., | : |  |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400142 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |  |
| *Defendants.* | : |  |
| NYDIA PARKER, et al., | : |  |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302983 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |  |
| *Defendants.* | : |  |
| ALEXANDRIA ROSS, et al., | : |  |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302981 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |  |
| *Defendants.* | : |  |
| LOREN SANDERS, et al., | : |  |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400153 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |  |
| *Defendants.* | : |  |
| SAMAYA SHORT, et al., | : |  |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400159 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |  |
| *Defendants.* | : |  |
| ALICE STILLS, et al., | : |  |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302617 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |  |
| *Defendants.* | : |  |
| CHRISTINA TAYLOR, et al., | : |  |
| *Plaintiff,* | : | MARCH TERM, 2022 |
|  | : | No. 220302606 |

2

|  | : |  |
| --- | --- | --- |
| v. | : |  |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : |  |
| NATISHA THOMAS, et al., *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220400158 |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : |  |
| TRINA WALKER-SAVAGE and CLIFTON ISAIAH SAVAGE, JR., et al., *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220400156 |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : |  |
| JEANNATE WATSON, et al., *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302967 |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : |  |
| GINA WIEGER, et al., *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302614 |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : |  |
| GINA WIEGER, et al., *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302601 |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : |  |
| SHANITA WIGGINS, et al., *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302986 |
| MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : |  |
| MELVENIA WILLIAMS, et al., *Plaintiff,* | : | APRIL TERM, 2022 |

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

|  |  |  |
|---|---|---|
| v. | : | No. 220400141 |
|  | : |  |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |  |
| *Defendants.* |  |  |

## ORDER OF THE COURT

On this _____ day of _____, 2023, upon consideration of defendant Abbott Laboratories' motion to compel and to strike improper objections and insufficient answers to Abbott's discovery requests, its brief in support, and any response thereto, it is hereby ORDERED that:

1.      Plaintiffs' objections to all Standard Form Interrogatories, Interrogatory Nos. 1 through 41, are stricken.

2.      Plaintiffs' insufficient answers to Standard Form Interrogatory Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 39, 40, and 41 are stricken.

3.      Plaintiffs' objections to Supplemental Interrogatory Nos. 42, 48, 51, 52, 55, 56, 57, 58, 59, 60, 61, 62, 64, and 67 are stricken.

4.      Plaintiffs' insufficient answers to Supplemental Interrogatory Nos. 42, 43, 44, 45, 46, 47, 48, 50, 51, 53, and 63 are stricken.

5.      Plaintiffs' objections and insufficient responses to Requests for Production 1, 2, 5, 6, 8, 9, 17, 19, 20, 21, 22, 23, 24, 38, 39, 42, 44, and 45 are stricken.

6.      Plaintiffs are directed to respond to all Interrogatories and Requests for Production identified in paragraphs 1 through 5 above within twenty (20) days of the date of this Order or risk sanctions.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

7.    Plaintiffs are further directed to provide complete sets of relevant medical authorizations for both infant and parent, as well as insurance and education authorizations for the infant and – to the extent parent claims any economic or psychologic injury due to the infant's NEC, employment, and psychiatric authorizations for the parent to Abbott within twenty (20) days of the date of this Order or otherwise obtain the records themselves and produce them to Abbott within twenty (20) days of the date of this Order.

BY THE COURT:

_____

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Sean P. Fahey (PA Bar No. 73305)
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

Ronni E. Fuchs (PA Bar No. 65561)
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

**CAMPBELL CONROY & O'NEIL, P.C.**
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.1900
JONeil@CampbellTrialLawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

**JONES DAY**
Marques Hillman Richeson (admitted *pro hac vice*)
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

Jennifer B. Flannery (PA Bar No. 74546)
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
404.581.8008
jbflannery@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

| | | |
|---|---|---|
| HOLLI CARTER, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302588 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| BRANDY GOODMOND, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400208 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| BRANDY GOODMOND, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400212 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| JANEE HENDERSON, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400127 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| KRISTEN KAJUFFA, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302978 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| NAFEESAH MAYS, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302963 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| CATHERINE McMILLIAN, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| | : | No. 220400140 |

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

| | |
|---|---|
| v. | : |
| | : |
| MEAD JOHNSON & COMPANY, LLC, et al., | |
| *Defendants.* | |

| | |
|---|---|
| DAMEKA MOMENT, et al., | : |
| *Plaintiff,* | : APRIL TERM, 2022 |
| v. | : No. 220400142 |
| | : |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| NYDIA PARKER, et al., | : |
| *Plaintiff,* | : MARCH TERM, 2022 |
| v. | : No. 220302983 |
| | : |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| ALEXANDRIA ROSS, et al., | : |
| *Plaintiff,* | : MARCH TERM, 2022 |
| v. | : No. 220302981 |
| | : |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| LOREN SANDERS, et al., | : |
| *Plaintiff,* | : APRIL TERM, 2022 |
| v. | : No. 220400153 |
| | : |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| SAMAYA SHORT, et al., | : |
| *Plaintiff,* | : APRIL TERM, 2022 |
| v. | : No. 220400159 |
| | : |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| ALICE STILLS, et al., | : |
| *Plaintiff,* | : MARCH TERM, 2022 |
| v. | : No. 220302617 |
| | : |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | : |

| | |
|---|---|
| CHRISTINA TAYLOR, et al., | : |
| *Plaintiff,* | : MARCH TERM, 2022 |
| | : No. 220302606 |

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

| | | |
|---|---|---|
| v. | : | |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | | |
| *Defendants.* | | |
| NATISHA THOMAS, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220400158 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | | |
| TRINA WALKER-SAVAGE and CLIFTON | : | |
| ISAIAH SAVAGE, JR., et al., | : | MARCH TERM, 2022 |
| *Plaintiff,* | : | No. 220400156 |
| | : | |
| v. | : | |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | | |
| JEANNATE WATSON, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302967 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | | |
| GINA WIEGER, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302614 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | | |
| GINA WIEGER, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302601 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | | |
| SHANITA WIGGINS, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302986 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | | |
| MELVENIA WILLIAMS, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |

4

|  |  |
|---|---|
| v. | : No. 220400141 |
| | : |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | |

## DEFENDANT ABBOTT LABORATORIES' MOTION TO COMPEL, AND TO STRIKE IMPROPER OBJECTIONS AND INSUFFICIENT ANSWERS TO ABBOTT'S DISCOVERY REQUESTS

Defendant Abbott Laboratories ("Abbott") files the instant motion after several unsuccessful attempts to obtain discovery from plaintiffs that is critical to the parties' claims and defenses. Plaintiffs' repeated failure to produce medical records, lists of treaters, full and complete authorizations, and to otherwise supplement their deficient discovery responses has stalled this litigation, and prevented Abbott from commencing plaintiffs' depositions—which this Court suggested should occur by the end of this year.

By way of background, in March and April of 2020, plaintiffs filed 29 actions in this Court, alleging their infants, born prematurely and at low birthweights, were injured after they were administered preterm infant nutrition products manufactured by Abbott or Mead Johnson & Company LLC, Mead Johnson Nutrition Company (together, "Mead Johnson") shortly after their birth. Each complaint alleges that the infant suffers from "long-term health effects." *See, e.g., Carter* Compl. ¶ 14. More than half of the infants are now over 10 years old. Regardless of their age, Abbott is entitled to know their current condition, their medical course from the time of birth through the present, and their psychologic and/or educational course. Moreover, because alternative causes of the children's injuries might only be found in parent medical records, these cases place the parents' health at issue as well. Finally, to the extent the parents claim any psychologic injury or wage loss, Abbott is also entitled to those records.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

The cases were removed to federal court and transferred to a Multidistrict Litigation (MDL), where they remained pending for months until they were remanded to this Court. On July 24, 2023, the parties appeared before the Honorable Linda Carpenter for a "one-year status conference" (though the cases had been pending in the MDL for a good portion of that year). At the conference, Judge Carpenter encouraged the parties to move ahead with depositions of the plaintiffs expeditiously. Following the conference, Judge Carpenter issued a Case Management Order that set a discovery cutoff date of June 3, 2024.

On August 9, 2023, two weeks after the conference, Abbott served interrogatories and requests for production of documents on plaintiffs. Plaintiffs requested, and Abbott granted, an extension of time for the responses, but with an understanding that plaintiffs' counsel would be providing authorizations, lists of treaters and records in their possession expeditiously in order to permit Abbott to collect records and prepare for plaintiffs' depositions. Plaintiffs produced none of these records and, on October 11 and 12, 2023, plaintiffs provided significantly deficient responses to the discovery. Exemplar interrogatory responses and request for production responses are attached hereto as Exhibit A and Exhibit B, respectively. Despite several efforts to discuss these deficiencies, plaintiffs failed to respond, necessitating this Court's intervention. Because plaintiffs' actions have, among other things, prevented Abbott from being able to begin plaintiffs' depositions, Abbott files the instant motion to strike plaintiffs' improper objections and insufficient discovery responses and seeks an order requiring plaintiffs to timely provide sufficient responses. In support of its motion, Abbott states the following:

1.      In the above-captioned cases, plaintiffs attack—without basis—specialized infant formulas and fortifiers essential to the survival and development of premature infants in Neonatal Intensive Care Units ("NICUs"). Plaintiffs filed these cases against defendants Mead Johnson,

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

Abbott, and the infants' hospitals of birth (collectively, "defendants"), alleging that medical professionals at the hospital defendants administered Abbott's and/or Mead Johnson's cow's milk-based infant nutrition products to plaintiffs, and that plaintiffs were injured, and suffer long-term health effects, as a result.

2.      Plaintiffs allege seven causes of action, five of which were asserted against Abbott and Mead Johnson: strict products liability design defect (Count I), strict products liability failure to warn (Count II), negligence (Count III), intentional misrepresentation (Count IV), and negligent misrepresentation (Count V). The remaining claims (Counts VI and VII) were asserted against the hospital defendant. The complaints were filed by parents ("plaintiff-parents") on their own behalf, and also as parent and natural guardians of the infant plaintiffs ("plaintiff") (together "plaintiffs").

3.      On July 24, 2024, the Court held a status conference in all actions.  During that conference, the Court expressed a preference that the parties begin taking plaintiffs' depositions before the end of the calendar year.

4.      To that end, on August 9, 2023, Abbott served a set of interrogatories and a set of requests for production on all plaintiffs.  The interrogatories consisted of both Standard Form Interrogatories, propounded pursuant to Phila. Cnty. Loc. R. 4005, as well as supplemental interrogatories.

5.      On August 30, 2023, plaintiffs emailed Abbott, seeking a 4-week extension of time to respond to Abbott's discovery requests.  In that communication, plaintiffs suggested that, if it would help support the extension, plaintiffs would serve as many authorizations as possible by the original September 9 deadline.

6.      That same day, Abbott responded, asking whether plaintiffs could provide authorizations, lists of treaters, and any medical records in their possession.  Abbott followed up

7

the next day, making clear that – in order not to lose time on the collection and analysis of medical records, it would need plaintiffs to provide authorizations, lists of treaters, and any medical records in their possession.

7.     On August 31, plaintiffs responded, agreeing to provide Abbott with the records in their possession, a list of treaters, and medical, education, and insurance authorizations.  Plaintiffs also agreed to supply employment records, if pursuing a wage loss claim,  and psychiatric authorizations, if pursuing a psychiatric injury claim.

8.     Notwithstanding plaintiffs' representations, both the original deadline for plaintiffs' discovery responses and the extension deadline came and went without the provision of any authorizations, treater lists, or medical records.

9.     On  October 11, 2023, plaintiffs provided the deficient set of discovery responses at issue here, along with a very limited number of authorizations. Plaintiffs did not provide a single medical record or treater list.

10.     After reviewing the limited authorizations and discovery responses, Abbott sent an email to plaintiffs on October 16, identifying several significant deficiencies.  *See* Email of 10/16/2023, Ex. C.  Abbott indicated that plaintiffs had wholly failed to hold up their end of the bargain in producing authorizations, treater lists, and medical records in advance of the October 9 deadline.  Abbott also pointed out that, as of October 16, plaintiffs had wholly failed to produce medical records or treater lists for any of the 21 plaintiffs and failed to serve any authorizations for 7 of the 21 plaintiffs.[1]  Abbott also explained that the authorizations received to date were

_____

[1] While plaintiffs initially filed 29 actions, on September 8, plaintiffs filed amended complaints in only 21 of the 29 original actions.  Plaintiffs have indicated they will be voluntarily dismissing the other 8 actions, and accordingly, plaintiffs did not respond to any of Abbott's discovery requests directed to those 8 plaintiffs. Notwithstanding, over two months later, plaintiffs have yet to petition the Court for dismissal of these actions, and indeed, on November 3 and November 7, plaintiffs filed several motions to compel in actions that they had previously

8

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

themselves insufficient, as they pertained to very limited providers and omitted relevant treaters as well as insurance, employment, and education authorizations. *See id.* Finally, with respect to the discovery responses, Abbott notified plaintiffs that they had improperly objected to all Standard Form Interrogatories, in violation of Phila. Cnty. Loc. R. 4005(D), and had only provided limited substantive responses to only approximately 10 of the 68 interrogatories propounded.

11. Abbott received no response to this email communication.

12. On October 26, 2023, without addressing Abbott's issues, plaintiffs produced some additional authorizations, but these still clearly omitted authorizations for relevant treaters. As Abbott pointed out in follow-up communications to plaintiffs' counsel, the authorizations do not include a single infant's pediatrician(s), gastroenterologist(s) or the mother's OB/GYN.

13. In 15 of the 21 cases, plaintiffs provided two or fewer authorizations for each infant, all relating to hospitals. Again, there are no authorizations for doctors who provided ongoing care, or authorizations relating to insurance, psychologic or educational records, or even insurance records (which often serve as the source to identify other care). In all 20 cases in which plaintiffs produced authorizations, plaintiffs provided only *one* authorization for each parent. Plaintiffs failed to provide any authorizations whatsoever in *Wiggins* and failed to produce any infant authorizations whatsoever in *Williams*.

14. On October 27, 2023, Abbott sent plaintiffs a detailed deficiency letter that identified numerous deficiencies in plaintiffs' discovery responses and authorizations. *See* Deficiency Letter, Ex. D. Abbott requested that plaintiffs respond on or before November 3 and

_____

represented would be dismissed. To the extent plaintiffs continue to pursue these actions despite purporting to seek their dismissal, Abbott will move to compel answers to the discovery it has propounded on those plaintiffs.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

either (a) amend or supplement their insufficient discovery responses or (b) provide a date on which the parties can meet and confer during the week of November 6.

15.     Abbott received no response to this deficiency letter.

16.     To date, plaintiffs have failed to respond to Abbott's email communications or deficiency letter, have failed to supplement their discovery responses, and have failed to produce a single list of treaters, or produce a single medical record (as they agreed they would do).

17.     In light of plaintiffs' unwillingness to meet their discovery obligations, the intervention of this Court is necessary to resolve the deficiencies outlined below. Abbott respectfully requests that the Court strike plaintiffs' improper objections and insufficient answers to Abbott's discovery requests for the following reasons:

# I.     MOTION TO STRIKE PLAINTIFFS' IMPROPER AND INSUFFICIENT RESPONSES TO CERTAIN INTERROGATORIES.

18.     Abbott incorporates the foregoing paragraphs as if set forth herein.

19.     Abbott propounded both Standard Form Interrogatories (Interrogatory Nos. 1 through 41) and supplemental interrogatories (Interrogatory Nos. 42 through 68) on plaintiffs.

20.     In total, plaintiffs provided only limited substantive answers to approximately 10 of the 68 interrogatories.

## A.     Standard Form Interrogatories

21.     Pursuant to Phila. Cnty. Loc. Rule 4005, a party may propound "Standard Form Interrogatories" on another party, which have been adopted by the Court.

22.     Rule 4005(D) provides that "[t]he Court will not entertain objections to the standard interrogatories and parties who file such objections will be subject to sanctions including imposition of counsel fees."

23.     Abbott propounded a total of 41 Standard Form Interrogatories in each action.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

24.     Despite the clear instruction of Rule 4005(D), plaintiffs universally objected to each and every one of the Standard Form Interrogatories propounded by Abbott in all 21 cases. Accordingly, all objections to Interrogatory No. 1 through Interrogatory No. 41 should be stricken in all 21 cases.

25.     Moreover, plaintiffs wholly failed to provide any response to at least 26 of the 41 Standard Form Interrogatories.[2]  These include Interrogatory Nos. 2, 3, 5, 7, 8, 9, 10, 11, 12, 14, 15, 16, 17, 18, 19, 20, 24, 28, 29, 33, 34, 35, 36, 37, 39, and 40.

26.     Additionally, with respect to the Standard Form Interrogatories to which plaintiffs "responded," the responses are entirely insufficient.  These include Interrogatory Nos. 4, 6, 13, 21, 23, 25, 26, 27, 30, and 41 (to which plaintiffs responded by referring to incomplete sets of authorizations and unproduced medical records); Nos. 1 and 22 (to which plaintiffs responded by providing incomplete biographical information); and Nos. 31 and 32 (to which only some plaintiffs responded and did so by providing vague and limited information regarding potential witnesses).

**B.    Supplemental Interrogatories**

27.     In addition to the Standard Form Interrogatories, Abbott propounded 27 supplemental interrogatories on each plaintiff.  Plaintiffs outright objected and wholly failed to respond to certain of these interrogatories.  In other instances, plaintiffs' responses to these supplemental interrogatories were wholly insufficient.

28.     First, plaintiffs universally objected to, and failed to provide any response for, 14 of the 27 supplemental interrogatories.  These include Interrogatory Nos. 42, 48, 51, 52, 55, 56,

---

[2] Whereas all 21 plaintiffs failed to respond to 26 of the 41 Standard Form Interrogatories, approximately half of the plaintiffs failed to respond to two additional Standard Form Interrogatory—Nos. 31 and 32—as well.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

57, 58, 59, 60, 61, 62, 64, and 67. These interrogatories seek information relevant—indeed, critical—to these actions.

29. Second, plaintiffs responded to several supplemental interrogatories by suggesting that discovery is "early or ongoing" or that the interrogatory was "premature." These include Interrogatory Nos. 42, 43, 44, 45, 46, 47, 48, 50, 51, 53, and 63. This response is wholly unsupportable. These supplemental interrogatories seek information uniquely within plaintiffs' possession; indeed, much of this information should have been in plaintiffs' possession prior to filing their complaints.

## II. MOTION TO STRIKE PLAINTIFFS' IMPROPER AND INSUFFICIENT RESPONSES TO CERTAIN REQUESTS FOR PRODUCTION.

30. Abbott incorporates the foregoing paragraphs as if set forth herein.

31. Pursuant to Pa. R. Civ. P. 4009.11, Abbott propounded 46 requests for production on plaintiffs in all 21 cases. Plaintiffs' responses to numerous of these requests are insufficient.

32. First, plaintiffs responded to several requests (Request Nos. 1, 6, 9, 17, 38, 39, 42, and 44) by directing Abbott to incomplete sets of authorizations and medical records that have not yet been produced. This response is entirely insufficient. Plaintiffs do not discharge their obligation to respond to these requests by referring to incomplete set of authorizations and medical records that they agreed yet failed to produce.

33. Second, plaintiffs objected to several requests (Request Nos. 1, 2, 5, 19, 21, 22, 23, 24, and 45) as premature. This objection is unsupportable. These requests were timely propounded, and they seek information uniquely within plaintiffs' possession—indeed, the majority seek information that should have been in plaintiffs' possession prior to filing their complaints.

12

34.     Third, plaintiffs objected to several requests (Request Nos. 2, 20, 21, 22, 23, and 24) as seeking "health information protected by state and federal law." This objection is unsupportable. Plaintiffs have brought suit against Abbott claiming physical injury; they have placed their health and related information squarely at issue in this case, and accordingly, they have waived any claim to protection over that information.

35.     Fourth, plaintiffs objected to two requests—Request Nos. 8 and 9—as "not limited in time and scope." This is categorically incorrect. The very terms of both requests make clear they are appropriately temporally limited.

## III. MOTION TO COMPEL PLAINTIFFS TO PROVIDE COMPLETE SETS OF AUTHORIZATIONS FOR ALL INFANTS AND PARENTS OR OTHERWISE PRODUCE THE RELEVANT RECORDS THEMSELVES.

36.     Abbott incorporates the foregoing paragraphs as if set forth herein.

37.     As part of its requests for production, Abbott requested that plaintiffs execute medical, insurance, employment, education, and psychiatric/psychotherapy authorizations for both infant and parent.

38.     On October 11, nearly 45 days after plaintiffs said they would produce authorizations and medical records on a rolling basis, plaintiffs provided Abbott with a very limited number of authorizations for only some of the plaintiffs.

39.     Two weeks later, on October 26, plaintiffs provided another limited set of authorizations.

40.     To date, although plaintiffs provided at least one authorization in 20 of the 21 cases, the authorizations provided remain incomplete.

41.     Plaintiffs' failure to timely provide complete sets of authorizations for all parents and infants is compounded by plaintiffs' deficient discovery responses. In particular, in response to several interrogatories and requests for production, *plaintiffs direct Abbott to the authorizations*

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

*and medical records and fail to provide any substantive information*.  It is entirely inappropriate for plaintiffs to direct Abbott to incomplete authorizations or unproduced medical records in response to Abbott's discovery requests.

42.     Accordingly, Abbott respectfully requests that this Court direct plaintiffs to either provide a complete set of authorizations for all infants and parents or otherwise direct plaintiffs to obtain the medical records themselves for production to Abbott.

WHEREFORE, Abbott respectfully requests that this Court strike plaintiffs' improper and insufficient objections and responses to Abbott's discovery requests and direct plaintiffs to serve complete and accurate responses thereto within 20 days of the entry of the Court's order.

Dated: November 10, 2023

Respectfully Submitted:

/s/ Sean P. Fahey
Sean P. Fahey (PA Bar No. 73305)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

/s/ Joseph E. O'Neil
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
**CAMPBELL CONROY & O'NEIL, P.C.**
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.6388
JONeil@CampbellTrialLawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

/s/ Ronni E. Fuchs
Ronni E. Fuchs (PA Bar No. 65561)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

/s/ Marques Hillman Richeson
Marques Hillman Richeson (admitted *pro hac vice*)
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

14

/s/ Jennifer B. Flannery

Jennifer B. Flannery (PA Bar No. 74546)
**JONES DAY**
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
404.581.8008
jbflannery@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

15

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

| | | |
|---|---|---|
| HOLLI CARTER, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302588 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| BRANDY GOODMOND, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400208 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| BRANDY GOODMOND, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400212 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| JANEE HENDERSON, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400127 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| KRISTEN KAJUFFA, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302978 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| NAFEESAH MAYS, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302963 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| CATHERINE McMILLIAN, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |

| | | |
|---|---|---|
| v. | : | No. 220400140 |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| DAMEKA MOMENT, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400142 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| NYDIA PARKER, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302983 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| ALEXANDRIA ROSS, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302981 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| LOREN SANDERS, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400153 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| SAMAYA SHORT, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400159 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| ALICE STILLS, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302617 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| CHRISTINA TAYLOR, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| | : | No. 220302606 |

2

|  |  |
|---|---|
| v. | : |
|  | : |
| MEAD JOHNSON & COMPANY, LLC, et al.,<br>*Defendants.* | |
| NATISHA THOMAS, et al.,<br>*Plaintiff,*<br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>*Defendants.* | :<br>:<br>:<br>:<br>:    MARCH TERM, 2022<br>   No. 220400158 |
| TRINA WALKER-SAVAGE and CLIFTON<br>ISAIAH SAVAGE, JR., et al.,<br>*Plaintiff,*<br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>*Defendants.* | :<br>:    MARCH TERM, 2022<br>:    No. 220400156<br>:<br>:<br>: |
| JEANNATE WATSON, et al.,<br>*Plaintiff,*<br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>*Defendants.* | :<br>:    MARCH TERM, 2022<br>:    No. 220302967<br>:<br>: |
| GINA WIEGER, et al.,<br>*Plaintiff,*<br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>*Defendants.* | :<br>:    MARCH TERM, 2022<br>:    No. 220302614<br>:<br>: |
| GINA WIEGER, et al.,<br>*Plaintiff,*<br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>*Defendants.* | :<br>:    MARCH TERM, 2022<br>:    No. 220302601<br>:<br>: |
| SHANITA WIGGINS, et al.,<br>*Plaintiff,*<br>v.<br><br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>*Defendants.* | :<br>:    MARCH TERM, 2022<br>:    No. 220302986<br>:<br>: |
| MELVENIA WILLIAMS, et al.,<br>*Plaintiff,* | :<br>:    APRIL TERM, 2022 |

3

|  |  |
|---|---|
| v. | : No. 220400141 |
| | : |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| *Defendants.* | |

### DEFENDANT ABBOTT LABORATORIES' BRIEF IN SUPPORT OF MOTION TO COMPEL, AND TO STRIKE IMPROPER OBJECTIONS AND INSUFFICIENT ANSWERS TO ABBOTT'S DISCOVERY REQUESTS

### MATTER BEFORE THE COURT

The motion of Abbott Laboratories ("Abbott") to compel and to strike improper objections and insufficient answers to Abbott's discovery requests is before this Court. Plaintiffs' discovery responses to Abbott's discovery are entirely deficient, as borne out by a few simple facts:

1. Plaintiffs improperly objected to each and every Standard Form Interrogatory Abbott propounded;

2. Plaintiffs provided *limited* substantive responses to, at most, 10 of the 68 Interrogatories Abbott propounded;

3. Plaintiffs failed to provide a full and complete set of authorizations for any plaintiff in any action;[3] and

4. Plaintiffs failed to produce a single document, let alone a single medical record, in any of the actions.

---

[3] A full and complete set of authorizations would include (1) medical authorizations for all relevant treaters of both parent and infant from the time of birth until the present day, (2) all relevant insurance authorizations, (3) all relevant employment authorizations, (4) all relevant education authorizations, and (5) all relevant psychiatric authorizations.

4

Abbott respectfully requests that this Court strike plaintiffs' improper objections and insufficient responses to Abbott's discovery requests and direct plaintiffs to serve complete and accurate responses thereto within 20 days of the entry of the Court's order.

## STATEMENT OF QUESTIONS INVOLVED

1.    Should the Court grant Abbott's motion to strike and strike plaintiffs' objections to all Standard Form Interrogatories as improper under Phila. Cnty. Loc. R. 4005(D)? Answer: Yes.

2.    Should the Court grant Abbott's motion to strike and strike plaintiffs' insufficient responses to the specified Standard Form Interrogatories? Answer: Yes.

3.    Should the Court grant Abbott's motion to strike and strike plaintiffs' improper objections to the specified supplemental interrogatories? Answer: Yes.

4.    Should the Court grant Abbott's motion to strike and strike plaintiffs' insufficient responses to the specified supplemental interrogatories? Answer: Yes.

5.    Should the Court grant Abbott's motion to strike and strike plaintiffs' improper objections to the specified requests for production? Answer: Yes.

6.    Should the Court grant Abbott's motion to strike and strike plaintiffs' insufficient responses to the specified requests for production? Answer: Yes.

7.    Should the Court grant Abbott's motion to strike and order plaintiffs to provide complete responses to all insufficiently answered interrogatories and requests for production? Answer: Yes.

## INTRODUCTION AND FACTUAL BACKGROUND

Mead Johnson & Company LLC, Mead Johnson Nutrition Company (together, "Mead Johnson") and Abbott develop and manufacture infant nutrition products, including products

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

tailored to address the distinct, special nutritional needs of premature, low birthweight infants.[4] These infants face complex challenges and daunting odds. For one, they typically have underdeveloped or maldeveloped gastrointestinal systems that are not prepared to receive the nutrition necessary for the rapid growth these infants need. This poses a serious challenge for NICU specialists caring for the infants. The best nutrition for a premature infant is the nutrition it would have received in the womb. Once that is no longer possible, everything else falls short. Milk from the infant's mother is the closest natural substitute, but it may not be available or nutritionally sufficient to meet the premature infant's extraordinary needs. The same is true of donor milk. Accordingly, NICU specialists use their judgment to fill the nutritional gap with specialized formula and fortifier products designed to meet the needs of premature, low-birth-weight infants. This litigation targets these life-saving products.

Plaintiffs in these cases allege that the infants developed necrotizing enterocolitis ("NEC"), a leading cause of death in premature infants in NICUs. NEC is an inflammatory gastrointestinal condition that can result in death of intestinal tissue. Indeed, NEC affects up to 8% of infants in NICUs, including infants who receive only human milk, as well as those who receive no "food" at all. Neonatologists are experts in dealing with the risks of NEC and balancing them with numerous other medical risks these premature infants face. They carefully balance these risks regardless of how nutrition is administered, and regardless of whether it consists of the mother's own milk, human donor milk, specialized formula or fortifier, or a combination.

---

[4] Abbott manufactures infant nutrition products under the "Similac" brand name. Mead Johnson manufactures infant nutrition products under the "Enfamil" brand name.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

Plaintiff-parents universally allege that their infants were born prematurely at Philadelphia-area hospitals.  They further allege the infants were administered Similac and/or Enfamil cow's milk-based products by medical professionals at the respective hospital after birth.

Plaintiffs further claim that the infant developed NEC shortly after the administration of Abbott and/or Mead Johnson's product and experienced long-term health effects.  Indeed, ***each and every*** plaintiff alleges that the infant suffers from "long-term health effects."  *See, e.g.*, *Carter* Compl. ¶ 14.  Regardless of their age, Abbott is entitled to know their current condition, their medical course from the time of birth through the present, and their psychologic and/or educational course.[5]  Moreover, because alternative causes of the children's injuries might only be found in parent medical records, these cases place the parents' health at issue as well.  Finally, to the extent the parents claim any psychologic injury or wage loss, Abbott is also entitled to those records.

## PROCEDURAL HISTORY OF THE DISPUTE

On July 24, 2023, the Court held a status conference in all actions.  During that conference, the Court expressed a preference that the parties begin taking plaintiffs' depositions before the end of the calendar year.

To that end, on August 9, 2023, Abbott served a set of interrogatories and a set of requests for production of documents on plaintiffs.  The interrogatories consisted of both Standard Form Interrogatories, propounded pursuant to Phila. Cnty. Loc. R. 4005, as well as supplemental interrogatories.  On August 30, 2023, plaintiffs emailed Abbott, seeking a 4-week extension of the time to respond to Abbott's discovery requests.  In that communication, plaintiffs suggested that,

---

[5] While age is not determinative of Abbott's need for these documents, the need is particularly obvious given that all infants claim long-term injuries and over half of the infants are now over 10 years old.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

if it would help support the extension, plaintiffs would serve as many authorizations as possible by the original September 9 deadline.

That same day, Abbott responded, asking whether plaintiffs could provide authorizations, lists of treaters, and any medical records in their possession. Abbott followed up the next day, making clear that – in order not to lose time on the collection and analysis of medical records, it would need plaintiffs to provide authorizations, lists of treaters, and any medical records in their possession.

On August 31, plaintiffs responded, agreeing to provide Abbott with the records in their possession, a list of treaters, and medical, education, and insurance authorizations. Plaintiffs also agreed to supply employment records, if pursuing a wage loss claim,  and psychiatric authorizations, if pursuing a psychiatric injury claim.

Notwithstanding plaintiffs' representations, both the original deadline for plaintiffs' discovery response, and the extension deadline came and went without the provision of any authorizations, treater lists, or medical records,

On  October 11, 2023, plaintiffs provided the deficient set of discovery responses at issue here, along with a very limited number of authorizations. Plaintiffs did not provide a single medical record or treater list.

After reviewing the limited authorizations and deficient discovery responses, Abbott sent an email to plaintiffs on October 16, identifying several significant deficiencies. *See* Email of 10/16/2023, Ex. C. For starters, plaintiffs had wholly failed to hold up their end of the bargain in producing authorizations, treater lists, and medical records in advance of the October 9 deadline. Indeed, plaintiffs missed the deadline altogether.  Additionally, as of that time, plaintiffs had wholly failed to serve any authorizations for 7 of the 21 plaintiffs, and had wholly failed to produce

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

medical records for any of the 21 plaintiffs.[6]  Importantly, the belated authorizations received to date were also insufficient, insofar as it was clear that authorizations for relevant treaters had been omitted.  *See id.*  Finally, with respect to the discovery responses, plaintiffs had improperly objected to all Standard Form Interrogatories, in violation of Phila. Cnty. Loc. R. 4005(D), and, perhaps more troublingly, had only provided limited substantive responses to approximately 10 of the 68 interrogatories propounded.  Abbott received no response to this email communication.

On October 26, 2023, without addressing Abbott's issues, plaintiffs produced a limited set of additional authorizations, but these still clearly omitted authorizations for relevant treaters.  As Abbott pointed out in subsequent communications to plaintiffs' counsel, the authorizations do not include a single infant's pediatrician(s), gastroenterologist(s) or the mother's OB/GYN.  In 15 of the 21 cases, plaintiffs provided two or fewer authorizations for each infant.  In all 20 cases in which plaintiffs produced authorizations, plaintiffs provided only one authorization for each parent.  Plaintiffs failed to provide any authorizations whatsoever in *Wiggins*, and failed to provide any infant authorizations whatsoever in *Williams*.

On October 27, 2023, Abbott sent plaintiffs a detailed deficiency letter that identified numerous deficiencies in plaintiffs' discovery responses and authorizations.  *See* Deficiency Letter, Ex. D.  Therein, Abbott requested that plaintiffs respond on or before November 3 and either (a) amend or supplement their insufficient discovery responses or (b) provide a date on

---

[6] While plaintiffs initially filed 29 actions, plaintiffs filed amended complaints in only 21 of the 29 original actions on September 8.  Plaintiffs have indicated they will be voluntarily dismissing the other 8 actions, and accordingly, plaintiffs did not respond to any of Abbott's discovery requests directed to those 8 plaintiffs. Notwithstanding, over two months later, plaintiffs have yet to petition the Court for dismissal of any of these actions, and indeed, on November 3 and November 7, plaintiffs filed several motions to compel in actions that they had previously represented would be dismissed.  To the extent plaintiffs continue to pursue these actions despite purporting to seek their dismissal, Abbott will move to compel answers to the discovery it has propounded on those plaintiffs.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

which the parties can meet and confer the week of November 6.  Abbott received no response to this deficiency letter.

## Legal Standard

Pennsylvania Rule of Civil Procedure 4003.1(a) provides that "a party may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party . . . ." *See* Pa. R. Civ. P. 4003.1(a).  Additionally, Rule 4019(a)(1)(i) provides that "[t]he court may, on motion, make an appropriate order if a party fails to serve answers, sufficient answers, or objections to written interrogatories under Rule 4005." *See id.* R. 4019(a)(1)(i).

## I. PLAINTIFFS' OBJECTIONS AND RESPONSES TO ABBOTT'S INTERROGATORIES SHOULD BE STRICKEN AS IMPROPER AND INSUFFICIENT.

Abbott propounded both Standard Form Interrogatories (Interrogatory Nos. 1 through 41) and supplemental interrogatories (Interrogatory Nos. 42 through 68) on plaintiffs.  In total, plaintiffs provided limited substantive responses to only approximately ***10 of the 68 interrogatories***.

Plaintiffs' responses to both types of interrogatories are insufficient and deficient for several reasons, as discussed below.

### A. Standard Form Interrogatories

Pursuant to Phila. Cnty. Loc. Rule 4005, a party may propound "Standard Form Interrogatories" on another party, which have been adopted by the Court.  *See* Phila Cnty. Loc. R. 4005.  Plaintiffs' responses to these Standard Form Interrogatories should be stricken for several reasons, each of which is discussed below.

10

1.   **Plaintiffs improperly objected to each and every Standard Form Interrogatory.**

Rule 4005(D) provides that "[t]he Court will not entertain objections to the standard interrogatories and ***parties who file such objections will be subject to sanctions including imposition of counsel fees***." *See* Phila. Cnty. Loc. R. 4005(D) (emphasis added).

Abbott propounded a total of 41 Standard Form Interrogatories in each case. Despite the clear instruction of Rule 4005(D), plaintiffs universally objected to each and every one of the Standard Form Interrogatories propounded by Abbott in all 21 cases.

Accordingly, all objections to Interrogatory No. 1 through Interrogatory No. 41 should be stricken in all 21 cases.

2.   **Plaintiffs failed entirely to respond to 26 of the 41 Standard Form Interrogatories.**

Plaintiffs' failure to comply with Loc. R. 4005(D) is compounded by the fact that plaintiffs failed to provide any response to at least 26 of the 41 Standard Form Interrogatories.[7] These include Interrogatory Nos. 2, 3, 5, 7, 8, 9, 10, 11, 12, 14, 15, 16, 17, 18, 19, 20, 24, 28, 29, 33, 34, 35, 36, 37, 39, and 40. Plaintiffs' lack of response generally fell into three categories: refusal to respond, offers to meet and confer, and unspecific promises to supplement.

In response to Interrogatory Nos. 3, 18, 19, 20, 24, 28, 29, 39, and 40, plaintiffs outright objected to the interrogatory and provided no further response. This is a wholly inappropriate response to Standard Form Interrogatories, which, by rule, may not be objected to.

In response to Interrogatory Nos. 2, 5, 7, 8, 9, 10, 14, 15, 16, 33, 34, 35, and 36, plaintiffs objected to the interrogatory and offered to meet and confer, providing no substantive response to

---

[7] Whereas all 21 plaintiffs failed to respond to 26 of the 41 Standard Form Interrogatories, approximately half of the plaintiffs failed to respond to two additional Standard Form Interrogatories—Nos. 31 and 32—as well.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

any part of the interrogatory.[8]  Despite plaintiffs' unfounded objections, these requests are highly

relevant and appropriate, including, among others:

- Interrogatory No. 2: If you claim a permanent injury resulting from the treatment, surgery or examination upon which this action is based, describe such injury fully and in detail.

- Interrogatory No. 5: State in detail the injuries or diseases that you allege that you suffered as a result of treatment, surgery or examination upon which this action is based.

- Interrogatory No. 7: Either prior to or subsequent to the treatment, surgery or examination referred to in the complaint, have you ever suffered any injuries, illness or diseases in those portions of the body claimed by you to have been affected by the treatment, surgery or examination referred to in the complaint? If so, state: (a) A description of the injuries or diseases you suffered; (b) The date and place of any accident, if such an injury or disease was caused by an accident; and (c) The names and addresses of all hospitals, doctors or practitioners who rendered treatment or examinations because of any such injuries or diseases.

- Interrogatory No. 10: State whether you, subsequent to the date of the treatment, surgery or examination, have been unable to perform adequately any of your customary occupational duties or social or other activities, stating with particularity (a) the duties and/or activities you have been unable to perform, (b) the periods of time you have been unable to perform, and (c) the names and last known addresses of all persons who have personal knowledge thereof.

- Interrogatory Nos. 14 & 34: Have you given any statement concerning this action or its subject matter? If so, state: (a) The name and last known address of each person to whom a statement was given; (b) When and where each statement was given; and (c) Please consider this a Request to Produce the statements referred to in the above answer.

In response to Interrogatory Nos. 11, 12, 17, and 37, plaintiffs objected to the interrogatory

and responded only that they will supplement their responses with unspecified information at some

unspecified time in the future.  Notwithstanding, these interrogatories seek basic information about

cases that plaintiffs themselves brought, which plaintiffs should have had in their possession prior

to filing their complaints.  For example, Interrogatory Nos. 11 and 12 inquire as to the names and

---

[8] As the procedural history of this dispute demonstrates, plaintiffs' "offer" to meet and confer was nothing more than an effort to placate Abbott.  Abbott attempted to engage plaintiffs in discussions regarding the insufficient responses on October 16 and again on October 27.  Plaintiffs wholly ignored both communications and have never provided availability for a meet and confer.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

locations of witnesses and people with knowledge of the facts concerning the treatment, surgery, examination, condition, or circumstances related to the allegations in the amended complaints. Plaintiffs' suggestion that the investigation as to each of these areas of inquiry is premature strains credulity. Even if some information remains subject to investigation, plaintiffs must provide the information they currently have.

### 3. Plaintiffs' reference to medical authorizations and/or records in response to the Standard Form Interrogatories are insufficient.

In response to several Standard Form Interrogatories (Interrogatory Nos. 4, 6, 13, 21, 23, 25, 26, 27, 30, and 41), plaintiffs responded only by referring to the incomplete medical authorizations and unspecified medical records, none of which have been produced by plaintiffs. . These responses are insufficient.

Where a party responds to an interrogatory by reference to documents, "the answering party must 'specify the records from which the answer may be derived.'" *See Northampton Borough Mun. Auth. v. Remsco Assocs., Inc.*, 22 Pa. D. & C.3d 541, 544 (Ct. Comm. Pls. 1981) (citing Pa. R. Civ. P. 4006(b)). Drawing on Federal Rule of Civil Procedure 33(c), the court in *Northampton Borough* determined that "the specification shall be in sufficient detail to permit the interrogating party to locate and to identify as readily as can the party served, the records from which the answer may be ascertained." *See id.* (quoting Fed. R. Civ. P. 33(c)); *see also id.* (holding reference to "various letters of transmittal of Remsco and the engineer" to be an insufficiently specific reference to documents in response to an interrogatory).

Here, as in *Northampton Borough*, plaintiffs have insufficiently described the records that they claim contains the responsive information. Instead, plaintiffs vaguely reference authorizations and medical records that "***have been or will be produced***." But plaintiffs have yet to produce a single medical record to Abbott. Accordingly, far from identifying a specific portion

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

of a tangible document from which Abbott could glean the requested information, plaintiffs instead refer broadly to unproduced records. This response does not satisfy plaintiffs' obligations under Rule 4006.

Moreover, reference to incomplete authorizations does not constitute an adequate response to these interrogatories. First, plaintiffs have failed to produce a complete set of authorizations in any of the cases. In the 20 cases in which medical authorizations have been produced, plaintiff provided no more than one medical authorization for each parent, which was universally designated for the infant's birth hospital. Plaintiffs have not produced a single authorization for any OB/GYN or any other treating specialist.

As noted above, each plaintiff alleges that the infant suffered long-term health effects resulting from their NEC diagnosis. Yet, when asked about the infants' long-term injuries in Interrogatory No. 23, plaintiffs simply directed Abbott to authorizations. But, in 15 of the 21 of the cases, plaintiffs provided two *or fewer* authorizations for each infant. Plaintiffs have not produced an authorization for any pediatrician, primary care provider, or other treating specialists in any case. Plaintiffs cannot allege, on one hand, that infants suffer long-term health effects, while simultaneously failing to provide Abbott the authorizations necessary to take discovery on those alleged health effects. Beyond the medical authorizations, plaintiffs have not produced a *single* insurance, education, employment, or psychiatric/psychotherapy authorization in *any* of the 21 cases.

Moreover, even if the authorizations were complete (they are not), they are hardly responsive to these interrogatories. To begin, the authorizations do not provide any substantive information besides the name of a single hospital, which is arguably only partially responsive to Interrogatory Nos. 6 and 27 from the above list. Additionally, as described more fully below in

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

section III, plaintiffs have yet to produce a full and complete set of authorizations for any parent or infant, meaning, at best, the authorizations are only partially responsive. Furthermore, plaintiffs have yet to turn over a single medical record in any of the 21 cases.[9] It is entirely inappropriate for plaintiffs to rely on incomplete authorizations or unproduced records in response to the above-listed interrogatories.

> **4. Plaintiffs' "responses" to the Standard Form Interrogatories are insufficient.**

Plaintiffs provided limited substantive responses to no more than four Standard Form Interrogatories, and, in most cases, only two Standard Form Interrogatories. Even in these limited instances where plaintiffs provided a substantive response, the information is still insufficient and incomplete.

In Interrogatory Nos. 1 and 22, Abbott requested "(a) Your full name; (b) Any other names you have used or been known by; (c) Your date and place of birth; (d) Your marital status at the time of the incident; (e) Your present marital status; (f) Your present home address; and (g) Your social security number." In response, plaintiffs universally provided only parent's home address, infant's home address, infant's date and place of birth, and in one instance, infant's date of death. While plaintiffs agreed to produce social security numbers after entry of a protective order, plaintiffs failed to respond to the remaining components of the request and instead objected, in defiance of Rule 4005(D).

Similarly, only 10 of the 21 plaintiffs provided any substantive response to Interrogatory Nos. 31 and 32. These interrogatories sought information about the witnesses and people with

---

[9] Yet, plaintiffs suggested in their response to Pennsylvania Hospital's preliminary objections that they relied on these medical records in preparing their amended complaints.

15

knowledge of the facts concerning the treatment, surgery, examination, condition, or circumstances related to the allegations in the amended complaints.

Eleven of the 21 plaintiffs objected outright to both Interrogatory Nos. 31 and 32, noting only that plaintiff would supplement "if necessary." Six of the 21 plaintiffs responded to Interrogatory No. 32 by providing only the name of the birth hospital and standing on their objections to Interrogatory No. 31. Four of the 21 plaintiffs responded to Interrogatory Nos. 31 and 32 by only providing very limited information on potential witnesses, such as the name of the infants' father and/or grandfather (*Henderson*, *McMillian*), unnamed nurses in the NICU (*Parker*), and unnamed employees of the Children's Hospital of Philadelphia (*Sanders*).

The responses provided to these four interrogatories are facially insufficient, and beyond these very limited answers, plaintiffs provided no other substantive information in response to the Standard Form Interrogatories.

### 5. Plaintiffs' response regarding the ongoing nature of discovery is insufficient.

Plaintiffs universally responded to Interrogatory Nos. 23, 26, and 27 by suggesting that, as discovery is ongoing, "Infant may have additional injuries that are, at this time, not known because Infant is continuing to develop and may face new, or worsened, injuries as time passes."[10] The potentially changing nature of infants' injuries does not relieve plaintiffs of their discovery obligation to respond to these Standard Form Interrogatories and identify any presently known injuries that are responsive thereto. *See Appleman v. Feathers*, 79 Pa. D. & C.4th 353, 360-61 (Ct. Comm. Pls. 2006) ("Referring to the complaint and stating that discovery is ongoing does not constitute full and complete answers.").

---

[10] In one stark example, plaintiff Nafeesah Mays responded to Interrogatory No. 22 and indicated that infant A.R. died on August 15, 2005. Yet, despite infant's passing, plaintiff Mays responded to Interrogatory Nos. 23, 26, and 27 by claiming that "Infant is continuing to develop and may face new, or worsened, injuries as time passes."

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

*    *    *

Accordingly, for the foregoing reasons, Abbott respectfully requests that plaintiffs' objections and responses to all aforementioned Standard Form Interrogatories be stricken and that plaintiffs be ordered to provide full and complete responses to these interrogatories within 20 days of the date of the Court's order.

**B.    Supplemental Interrogatories**

In addition to the Standard Form Interrogatories, Abbott propounded 27 supplemental interrogatories on each plaintiff.  Plaintiffs outright objected and wholly failed to respond to more than half of these interrogatories.  In the other half, plaintiffs' responses were wholly insufficient.

**1.    Plaintiffs universally objected and failed to provide a response to 14 of the 27 supplemental interrogatories.**

Plaintiffs failed to respond to more than half of the supplemental interrogatories Abbott propounded (Interrogatory Nos. 42, 48, 51, 52, 55, 56, 57, 58, 59, 60, 61, 62, 64, and 67).  This non-response is wholly inappropriate.  These interrogatories seek fundamental information that is highly relevant to plaintiffs' claims and Abbott's defenses, including, among others, the identity of the formula product administered to infant (Interrogatory No. 42), what additional/different warnings plaintiffs contend Abbott should have provided regarding its preterm infant nutrition products (Interrogatory No. 48), the date on which infant was diagnosed with NEC (Interrogatory No. 52), the identity of other pregnancies the plaintiff-parent has experienced and whether those infants received preterm infant formula (Interrogatory Nos. 55 and 56), the identity of persons who maintain relevant records (Interrogatory No. 57), infant's non-NEC diagnoses, if any (Interrogatory No. 58), and parent and infant's educational background and employment (Interrogatory Nos. 61 and 62).

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

These issues are central to the case at hand. Plaintiffs themselves placed these questions squarely at issue in this litigation. Plaintiffs allege their infant ingested Abbott's formula, was diagnosed with NEC, and suffered injuries as a result. Abbott is entitled to investigate and test these allegations by requesting fundamental information from plaintiffs regarding the nature of their claims.

### 2. Plaintiffs' response regarding the ongoing nature of discovery is insufficient.

Similar to their response to the Standard Form Interrogatories, plaintiffs objected or responded to several supplemental interrogatories (Interrogatory Nos. 42, 43, 44, 45, 46, 47, 48, 50, 51, 53, and 63), asserting that discovery is "early and ongoing" or that the interrogatory itself was "premature." These objections and responses are unsupportable, as the ongoing nature of discovery does not excuse plaintiffs from satisfying their discovery obligations. *See Appleman*, 79 Pa. D. & C.4th at 360-61 ("Referring to the complaint and stating that discovery is ongoing does not constitute full and complete answers.").

These interrogatories seek basic information about cases that plaintiffs themselves brought, which plaintiffs should have had in their possession prior to filing their complaints. For example, Interrogatory No. 42 simply seeks identification of the product infant was administered. Additionally, Interrogatory No. 50 seeks information regarding the mechanism by which plaintiffs assert Abbott's preterm infant nutrition products allegedly cause NEC. Plaintiffs have initiated these cases and allege these very claims. Plaintiffs cannot continue to avoid answering basic questions that go to the heart of their claims by continuously asserting that their investigation is "ongoing."[11]

---

[11] Plaintiffs also objected to Interrogatory No. 42 as requiring expert opinion. This objection, too, is unsupportable. The information required to respond to Interrogatory No. 42 would be uniquely in plaintiffs' possession or, at worst, readily available to plaintiffs through their medical records. These deficiencies are not cured by any

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

Despite having 60 days to respond to Abbott's discovery requests, plaintiffs nonetheless responded that discovery was ongoing or that the request was premature to additional relevant interrogatories, including:

- Interrogatory No. 43: STATE whether YOU and/or PARENTS saw or read any label, packaging, product guide, or other DOCUMENTS RELATED TO the PRETERM INFANT FORMULA PRODUCTS before they were administered to the INFANT and, if so, IDENTIFY the label, packaging, or product guide, or other DOCUMENTS you saw or read and IDENTIFY the time, place, and manner in which YOU saw or read such materials.

- Interrogatory No. 44: STATE whether YOU and/or PARENTS had any COMMUNICATIONS with any HEALTH CARE PRACTITIONERS regarding the decision to administer any nutrition, including but not limited to breast milk, donor milk, or PRETERM INFANT FORMULA PRODUCTS, to the INFANT and, if so, IDENTIFY all persons with whom YOU and/or PARENTS had such COMMUNICATIONS, the date(s), time, place, and manner of those COMMUNICATIONS, and DESCRIBE the content of those COMMUNICATIONS.

- Interrogatory No. 46: IDENTIFY any gifts, coupons, PRETERM INFANT FORMULA PRODUCTS, or OTHER INFANT FORMULA PRODUCTS that YOU and/or PARENTS received from any HEALTH CARE PROVIDER, including without limitation the PERSON who provided any such items to YOU and/or PARENTS, the date YOU and/or PARENTS received such items, and the substance of any discussions about such items.

To the extent plaintiffs provided any response to these interrogatories, the responses were generic, lacked substantive information, and failed to answer all components of the interrogatories. For example, in response to Interrogatory No. 44, regarding communications with healthcare providers regarding the decision to administer nutrition to infant, including the persons involved, as well as the time, place, manner, and content of the communication, plaintiffs' responses included generic phrases such as:

- "Plaintiff recalls discussing the benefits of feeding premature babies with human milk but does not recall having conversations related to consent to feed her child." (*Goodmond Rya G.*, *Goodmond Ryh G.*);

---

vague promise to supplement at a later date. Rather, plaintiffs have a plain discovery obligation to provide contemporaneous responses to these relevant requests.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

- "Plaintiff recalls signing a consent form for her child to be given formula or fortifier." (*Kajuffa*);

- "Plaintiff recalls being consulted about nutrition . . . ." (*Moment*); and

- "Plaintiff recalls having conversations related to consent to feed her child." (*Taylor*).

In each of these instances, plaintiffs fail to provide basic information that is central to the claims they brought, including the location, time, content, and participants of these conversations.[12] And plaintiffs' failure to produce this basic information has prevented Abbott from being in a position to take plaintiffs' depositions.

<div align="center">*      *      *</div>

Accordingly, for the foregoing reasons, Abbott respectfully requests that plaintiffs' objections and responses to all aforementioned supplemental interrogatories be stricken and that plaintiffs be ordered to provide full and complete responses to these interrogatories within 20 days of the date of the Court's order.

## II. SEVERAL OF PLAINTIFFS' OBJECTIONS AND RESPONSES TO ABBOTT'S REQUESTS FOR PRODUCTION ARE IMPROPER AND INSUFFICIENT, AND THEREFORE, THEY SHOULD BE STRICKEN.

Abbott propounded 46 requests for production on plaintiffs in all 21 cases. Plaintiffs' responses to numerous of these requests are insufficient.

### 1. Plaintiffs' reference to medical authorizations, medical records, or unspecified third-party productions in response to several requests is insufficient.

In response to numerous requests (*e.g.*, Request Nos. 1, 6, 9, 17, 38, 39, 42, and 44), plaintiffs responded only by directing Abbott to incomplete medical authorizations, unproduced medical records, and unspecified third-party productions. For the reasons already discussed above,

---

[12] These same failures and lack of substantive information similarly plague plaintiffs' responses to Interrogatory Nos. 42, 45, 46, 47 and 53.

<div align="center">20</div>

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

this response is entirely insufficient. As described more fully above, plaintiffs failed to provide complete sets of authorizations for any parent or infant and similarly failed to produce a single medical record. In 15 of the 21 of the cases, plaintiffs provided two *or fewer* authorizations for each infant. In 20 cases, plaintiffs provided only *one* authorization for each parent, failing entirely to produce any parent or infant authorization in *Wiggins*. Plaintiffs in no way discharge their discovery obligations by referring to incomplete, unproduced, or unspecified documents.

Moreover, plaintiffs' manner of response, by simply referring to the authorizations, is deficient for yet another reason. In particular, neither the authorizations, nor the medical records that they authorize Abbott to obtain, would result in documents responsive to a majority of these requests, including, for example:

- Request No. 1: All DOCUMENTS and COMMUNICATIONS that support, refute, or relate to any of YOUR allegations in the COMPLAINT.

- Request No. 6: All DOCUMENTS or evidence of any kind supporting each and every act and/or omission by ABBOTT that YOU allege supports the causes of action against ABBOTT in the COMPLAINT.

- Request No. 17: All DOCUMENTS identified in connection with YOUR or INFANT's responses to any Interrogatories in this LAWSUIT, or referenced or used in preparing such responses.

- Request No. 38: All DOCUMENTS that constitute, reflect, refer to, or relate to any articles, journals, notes, news alerts, or other information about PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

- Request No. 39: All DOCUMENTS that constitute, reflect, refer to, or relate to any articles, journals, notes, news alerts, or other information about ABBOTT or any other manufacturer of PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

- Request No. 42: All non-privileged COMMUNICATIONS and DOCUMENTS between YOU and any PERSON related to YOUR decision to initiate this LAWSUIT.

- Request No. 44: All YOUR calendars, journals, or other DOCUMENTS that reflect YOUR daily activities for the ten (10) years preceding the events giving rise to this LAWSUIT to the present.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

**2. Plaintiffs' objection to certain requests as premature is unsupportable and thus insufficient.**

Plaintiffs objected to several requests (Request Nos. 1, 2, 5, 19, 21, 22, 23, 24, and 45) as premature. This objection is unsupportable. These requests were timely propounded, and they seek information uniquely within plaintiffs' possession—indeed, the majority seek information that should have been in plaintiffs' possession prior to filing their complaints.

To provide a stark example, plaintiffs universally objected that it was premature of Abbott to seek authorizations for medical records from plaintiffs. Notwithstanding, plaintiffs responded to eight additional requests by referring Abbott to authorizations and medical records. Plaintiffs cannot have it both ways. Plaintiffs' failure to provide this critical and relevant information, or otherwise authorize Abbott to obtain it itself, prevents Abbott from preparing for the depositions of plaintiffs.

**3. Plaintiffs' objection that certain requests seek health-related information is unsupportable and thus insufficient.**

Plaintiffs objected to several requests, suggesting they sought "health information protected by state and federal law." This objection is unsupportable for multiple reasons. First, plaintiffs have brought suit against Abbott claiming physical injury; they have placed their health and related information squarely at issue in this case, and accordingly, they have waived any claim to protection over that information.

Courts in this Commonwealth have held that "[b]y filing actions for personal injuries, the plaintiff-patients waive their privilege and, in effect, implicitly consent to disclosures by their physicians concerning matters relating to the plaintiff-patients' medical conditions." *See Moses v. Williams*, 549 A.2d 950, 956 (Pa. Super. Ct. 1988). Indeed, courts have similarly found that "privileges protecting records for mental health treatment, drug and alcohol rehabilitation, and communications to psychiatrists/psychologists are waived by filing a personal injury lawsuit

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

placing such conditions at issue." *See Gormley v. Edgar*, 995 A.2d 1197, 1205 (Pa. Super. Ct. 2010) ("[O]ur legislature could not have intended the miscarriage of justice that would result if a plaintiff could file a lawsuit and then deny a defendant relevant evidence that would mitigate defendant's liability.").

Here, plaintiffs, both parents and infants, have squarely placed their physical condition at issue in this litigation, and, by bringing the instant actions for the recovery of damages based on personal injury, they have waived any right to claim a privilege over this critical and central information.

In any event, as each of Request Nos. 20, 21, 22, 23, and 24 makes clear, the authorizations through which Abbott seeks permission to collect this health-related information are HIPAA-compliant.

### 4. Plaintiffs' scope-related objections to Request Nos. 8 and 9 are unsupportable and thus insufficient.

Plaintiffs object to Request Nos. 8 and 9 as "not limited in time and scope." This is categorically incorrect. Request No. 8, by its very terms, seeks documents "in the ten (10) years preceding the events giving rise to this LAWSUIT to the present." In addition, Request No. 9 seeks medical bills, statements, or invoices "for which YOU seek damages in this LAWSUIT." This request is clearly limited to and targeted at documents which detail the amount of plaintiffs' alleged damages. There is no colorable argument that these documents are outside of the temporal scope of this litigation or otherwise "not related or relevant to the issues in this case," as plaintiffs claim.

## III. PLAINTIFFS FAILED TO SATISFY THEIR DISCOVERY OBLIGATIONS BY PROVIDING INCOMPLETE AUTHORIZATIONS.

As part of its requests for production, Abbott requested that plaintiffs execute medical, insurance, employment, education, and psychiatric/psychotherapy authorizations for both infant

and parent. Plaintiffs initially agreed to "serve as many authorizations as possible by 9/8." Plaintiffs also agreed to provide us with the medical records they had, as well as "med, education, [and] insurance auths." Notwithstanding, as of October 9, the date on which plaintiffs' discovery responses were due pursuant to the extension, not one authorization had been received.

On October 11, nearly 45 days after plaintiffs said they would produce authorizations and medical records on a rolling basis, plaintiffs provided Abbott with a very limited number of authorizations for only some of the plaintiffs. Two weeks later, on October 26, plaintiffs provided another limited set of authorizations..

To date, plaintiffs have not provided a complete set of authorizations in any of the 21 actions, insofar as each is (1) missing medical authorizations relating to additional relevant treaters, and (2) missing any and all insurance, education, and psychiatric/psychotherapy authorizations. In particular, for all 20 parents for whom an authorization have been produced, plaintiffs provided only a single authorization, designated for the infant's birth hospital. Plaintiffs did not provide any authorizations directed at other treaters, notably the parent's OB/GYN or other treating specialists. Additionally, plaintiffs did not provide any insurance, employment, education, or psychiatric/psychotherapy authorizations for any parent. Plaintiffs have failed to provide any parent authorization whatsoever in the *Wiggins* action (Case No. 220302986).

Similarly, in 15 of the 21 cases, parents provided two *or fewer* authorizations for each infant. Where plaintiffs did provide two authorizations for an infant, one was universally designated for the birth hospital and another was designated for a different treating hospital. In only rare instances, plaintiffs provided authorizations for more than 2 hospitals. Yet, across all 21 cases, plaintiffs provided no authorizations for other types of treaters, including pediatricians or other treating specialists. Additionally, plaintiffs did not provide any insurance, employment,

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

education, or psychiatric/psychotherapy authorizations for any infant in any case. Plaintiffs have failed to provide any infant authorizations whatsoever in the *Wiggins* (Case No. 220302986) and *Williams* actions (Case No. 220400141).

Plaintiffs' failure to timely provide complete sets of authorizations for all parents and infants is compounded by plaintiffs' deficient discovery responses. In particular, in response to several interrogatories and requests for production, plaintiffs improperly respond by simply directing Abbott to incomplete authorizations and unproduced medical records, and otherwise failing to provide any substantive information. .

Accordingly, Abbott respectfully requests that this Court direct plaintiffs to either provide a complete set of authorizations for all infants and parents or otherwise direct plaintiffs to obtain the medical records themselves for production to Abbott.

## CONCLUSION

For the foregoing reasons, Abbott respectfully requests that this Court strike plaintiffs' improper and insufficient objections and responses to Abbott's discovery requests and direct plaintiffs to serve complete and accurate responses thereto within 20 days of the entry of the Court's order.

Dated: November 10, 2023                    Respectfully Submitted:


/s/ Sean P. Fahey                            /s/ Joseph E. O'Neil
Sean P. Fahey (PA Bar No. 73305)             Joseph E. O'Neil (PA Bar No. 29053)
**TROUTMAN PEPPER HAMILTON**                 Meaghann C. Porth (PA Bar No. 307629)
**SANDERS LLP**                              Ryan J. O'Neil (PA Bar No. 314034)
3000 Two Logan Square                        **CAMPBELL CONROY & O'NEIL, P.C.**
Philadelphia, PA 19103                       1205 Westlakes Drive, Suite 330
215.981.4296                                 Berwyn, PA 19312
Sean.Fahey@troutman.com                      610.964.6388
                                             JONeil@CampbellTrialLawyers.com
                                             MPorth@campbell-trial-lawyers.com
                                             RONeil@campbell-trial-lawyers.com

25

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

/s/ Ronni E. Fuchs
Ronni E. Fuchs (PA Bar No. 65561)
**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

/s/ Marques Hillman Richeson
Marques Hillman Richeson (admitted *pro hac vice*)
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

/s/ Jennifer B. Flannery
Jennifer B. Flannery (PA Bar No. 74546)
**JONES DAY**
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
404.581.8008
jbflannery@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

# EXHIBIT A

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

KLINE & SPECTER, P.C.
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    John P. O'Neill, Esq.
Attorney I.D. Nos. : 77764 / 313702 / 205677
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
tobi.millrood@klinespecter.com
elizabeth.crawford@klinespecter.com
jack.oneill@klinespecter.com

KELLER POSTMAN LLC
By:
    Benjamin J. Whiting, Esq. (*pro hac vice*)
Attorney I.D. No.: IL 6307321
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Telephone: (312) 741-5220
ben.whiting@kellerpostman.com

| | |
|---|---|
| HOLLI CARTER, on her own behalf and as PARENT and NATURAL GUARDIAN OF J.C., A MINOR,<br><br>                                  *Plaintiff*,<br><br>   v.<br><br>MEAD JOHNSON & COMPANY, LLC, ET AL.<br><br>                              *Defendants*. | IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY<br><br>CIVIL TRIAL DIVISION<br><br>MARCH TERM 2022<br>NO. 2588 |

## PLAINTIFF HOLLI CARTER'S RESPONSE TO ABBOTT LABORATORIES' FIRST SET OF INTERROGATORIES DIRECTED TO PLAINTIFF HOLLI CARTER ON HER OWN BEHALF AND ON BEHALF OF HER MINOR CHILD J.C.

    Plaintiff Holli Carter, on her own behalf and as Parent and Natural Guardian of J.C., a

Minor, through counsel, hereby objects and responds to Defendant Abbott Laboratories

Interrogatories, as follows:

1

## GENERAL OBJECTIONS

1.      Plaintiff objects to the Requests to the extent that they seek information that is protected from disclosure by the attorney-client privilege, the attorney work product doctrine or any other recognized privilege.

2.      Plaintiff objects to the Requests to the extent that they require Respondents to search for and produce documents or information that are not within their possession, custody, or control.

3.      Plaintiff objects to the Requests to the extent they seek information or documents that cannot be located by Respondents after reasonably diligent inquiry, are readily available from public sources, or are available to Complaint Counsel from another source or by other means that are more convenient, more appropriate, less burdensome, or less expensive.

4.      Plaintiff objects to the Requests to the extent they seek legal conclusions and/or would require Respondents to reach a legal conclusion in order to prepare a response.

## RESPONSES TO INTERROGATORIES

## STANDARD FORM INTERROGATORIES TO PLAINTIFF HOLLI CARTER

**INTERROGATORY NO. 1 (Medical Malpractice Case Standard Interrogatory No. 1):**

State:

  (a)      Your full name;

  (b)      Any other names you have used or been known by;

  (c)      Your date and place of birth;

  (d)      Your marital status at the time of the incident;

  (e)      Your present marital status;

  (f)      Your present home address; and

2

(g)      Your social security number.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is overbroad and seeks information that is irrelevant and immaterial because it is not limited to the time period or products relevant to the claims and defenses in this case. Subject to and without waiving any objections, Holli Carter resides at 16 Carmen Dr, Cape May Court House, NJ 08210. Once a protective order has been entered in this case, Plaintiffs will duly supplement its response to this interrogatory with additional information.

**INTERROGATORY NO. 2 (Medical Malpractice Case Standard Interrogatory No. 2):**

If you claim a permanent injury resulting from the treatment, surgery or examination upon which this action is based, describe such injury fully and in detail.

**RESPONSE**: Plaintiff objects to this Interrogatory because it seeks information irrelevant and immaterial to the claims and defenses in this case. Without waiving this objection, Plaintiff is willing to meet and confer with Defendant or whether a more limited request would suffice.

**INTERROGATORY NO. 3 (Medical Malpractice Case Standard Interrogatory No. 3):**

Were you ever in the Armed Forces? If so, state: the dates, branch of service, rank at discharge, whether you had any infirmities at discharge, whether you have any claim or are receiving benefits for any infirmities from said service, your Armed Forces service number, and your Veterans "C" number.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is overbroad and seeks information that is irrelevant and immaterial as it is not limited to the time period and not relevant to the claims and defenses in this case. Plaintiff also objects to the extent that the term "infirmities" is vague and/or undefined.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

**INTERROGATORY NO. 4 (Medical Malpractice Case Standard Interrogatory No. 4)**:

State the name and address of your family physician at the time of the treatment, surgery or examination upon which this action is based.

**RESPONSE**: Plaintiff objects to this Interrogatory because the term "upon which this action is based" is vague and/or undefined. Plaintiff further objects that this Interrogatory is incomprehensible. Subject to and without waiving any objections, Plaintiff directs Defendant to the medical authorizations and medical records that have been or will be produced.

**INTERROGATORY NO. 5 (Medical Malpractice Case Standard Interrogatory No. 5):**

State in detail the injuries or diseases that you allege that you suffered as a result of treatment, surgery or examination upon which this action is based.

**RESPONSE**: Plaintiff objects to this Interrogatory because the term "upon which this action is based" is vague and/or undefined. Plaintiff further objects that this Interrogatory is incomprehensible to the extent it is directed to Plaintiff, not Infant. Plaintiff further objects to this Interrogatory because it is overbroad and seeks irrelevant information regarding medical providers and treatment that is unrelated to Infant's injuries. Plaintiff is willing to confer with Defendant about the scope of this Interrogatory.

**INTERROGATORY NO. 6 (Medical Malpractice Case Standard Interrogatory No. 6):**

If you received medical treatment, tests, or examinations (including x-rays) because of injuries or diseases you suffered as a result of the treatment, surgery, or examination referred to in the complaint, state:

      (a)      The name and address of each hospital at which you were treated or examined;

      (b)      The dates on which each such treatment or examination at

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

a hospital was rendered and the charges by the hospital

for each;

(c)     The name and address of each doctor or practitioner by whom

you were treated or examined;

(d)     The dates on which each such treatment or examination by

a doctor or practitioner was rendered and the charges for

each;

(e)     The identity of all reports regarding any medical treatment

or examination, setting forth the author and date of such

reports; and

(f)     Please consider this as a request to produce copies of all

reports referred to in the above answer.

RESPONSE: Plaintiff objects to this Interrogatory as incomprehensible to the extent it is directed to Plaintiff, not Infant. Plaintiff further objects to this Interrogatory because it is overbroad and may seek irrelevant information regarding medical providers and treatment that is unrelated to Infant's injuries. Plaintiff also objects that the Interrogatory is compound and overly burdensome in that it requires a narrative response and is more properly the subject of a document production request.

Subject to and without waiving any objections, Plaintiff directs Defendant to the medical authorizations and medical records that have been or will be produced.

**INTERROGATORY NO. 7 (Medical Malpractice Case Standard Interrogatory No. 7):**

Either prior to or subsequent to the treatment, surgery or examination referred to in the complaint, have you ever suffered any injuries, illness or diseases in those portions of the body

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

claimed by you to have been affected by the treatment, surgery or examination referred to in the complaint?

        If so, state:

(a)     A description of the injuries or diseases you suffered;

(b)     The date and place of any accident, if such an injury or disease was caused by an accident; and

(c)     The names and addresses of all hospitals, doctors or practitioners who rendered treatment or examinations because of any such injuries or diseases.

**RESPONSE**: Plaintiff objects to this Interrogatory as incomprehensible to the extent it is directed to Plaintiff, not Infant. Plaintiff further objects to this Interrogatory because it is overbroad and may seek irrelevant information regarding medical providers and treatment that is unrelated to Infant's injuries. Plaintiff also objects that the Interrogatory is compound and overly burdensome in that it requires a narrative response and is more properly the subject of a document production request. Plaintiff is willing to confer with Defendant about the scope of this Interrogatory.

**<u>INTERROGATORY NO. 8</u> (Medical Malpractice Case Standard Interrogatory No. 8):**

For the period of three years immediately preceding the date of the treatment, surgery or examination referred to in the complaint, state:

(a)     The name and address of each of your employers or, if you were self-employed during that period, each of your business addresses and the name of the business while self-employed;

(b)     The dates of commencement and termination of each of your periods of

employment or self-employment;

(c)    A detailed description of the nature of your occupation and the services performed by you in each employment or self-employment; and

(d)    Your average weekly earnings from each employment or self- employment; the average number of hours worked by you per week in each employment or self-employment; and the amount of income from employment or self-employment reported on your Federal Income Tax Return for each year.

**RESPONSE**: Plaintiff objects to this Interrogatory because it seeks information irrelevant and immaterial to the claims and defenses in this case. Plaintiff also objects that the Interrogatory is compound and overly burdensome.

Plaintiff objects to this Interrogatory because it is overbroad and seeks information that is irrelevant and immaterial as it is not limited to the time period relevant to the claims and defenses in this case. Plaintiff is willing to confer with Defendant about the scope of this Interrogatory.

**INTERROGATORY NO. 9 (Medical Malpractice Case Standard Interrogatory No. 9):**

If you have engaged in one or more gainful occupations subsequent to the date of the treatment, surgery or examination referred to in the complaint, state:

(a)    The name and address of each of your employers or, if you were self-employed, each of your business addresses and the name of the business while self- employed;

(b)    The dates of commencement and termination of each of your periods of employment or self-employment;

(c)    A detailed description of the nature of your occupation and the services performed by you in each employment or self-employment;

7

(d)  The wage, salary or rate of earnings received by you in each employment or self-employment and the amount of income reported on your Federal Income Tax Return for each year subsequent to the accident; and

(e)  The dates of all absences from your occupation, the reasons therefor and the amount of any earnings lost by you because of such absences.

**RESPONSE**: Plaintiff objects to this Interrogatory because it seeks information irrelevant and immaterial to the claims and defenses in this case. Plaintiff also objects that the Interrogatory is compound and overly burdensome.

Plaintiff objects to this Interrogatory because it is overbroad and seeks information that is irrelevant and immaterial as it is not limited to the time period relevant to the claims and defenses in this case. Plaintiff is willing to confer with Defendant about the scope of this Interrogatory.

**INTERROGATORY NO. 10 (Medical Malpractice Case Standard Interrogatory No. 10):**

State whether you, subsequent to the date of the treatment, surgery or examination, have been unable to perform adequately any of your customary occupational duties or social or other activities, stating with particularity (a) the duties and/or activities you have been unable to perform, (b) the periods of time you have been unable to perform, and (c) the names and last known addresses of all persons who have personal knowledge thereof.

**RESPONSE**: Plaintiff objects to this Interrogatory as incomprehensible to the extent it is directed to Plaintiff, not Infant. Plaintiff also objects that the Interrogatory is compound and overly burdensome. Plaintiff is willing to confer with Defendant about the scope of this Interrogatory.

**INTERROGATORY NO. 11 (Medical Malpractice Case Standard Interrogatory No. 11):**

State the name and last known address of each person who (a) was a witness to the treatment, surgery or examination through sight or hearing and/or (b) has knowledge of facts

8

concerning the happening of the treatment, surgery or examination or conditions or circumstances at the time of the treatment, surgery or examination prior to, after, or at the time of the accident, excepting those persons who acquired such knowledge during the course of this litigation.

        **RESPONSE**: Plaintiff objects to this Interrogatory to the extent it is premature.

        Subject to the foregoing objections, as discovery is ongoing, Plaintiff will supplement the response to this Interrogatory.

**INTERROGATORY NO. 12 (Medical Malpractice Case Standard Interrogatory No. 12):**

        With respect to each person identified in the answer to interrogatory 11(a), state that person's exact location and activity at the time of the treatment, surgery or examination.

        **RESPONSE**: Plaintiff objects to this Interrogatory to the extent it is premature.

        Subject to the foregoing objections, as discovery is ongoing, Plaintiff will supplement the response to this Interrogatory.

**INTERROGATORY NO. 13 (Medical Malpractice Case Standard Interrogatory No. 13):**

        Have you or anyone acting on your behalf obtained from any person any statement concerning this action or its subject matter? If so, state:

        (a)     The name and last known address of each such person;

        (b)     When, where, by whom and to whom each statement was made, and whether it was reduced to writing or otherwise recorded;

        (c)     The name and address of any person who has custody of any such statements that were reduced to writing or otherwise recorded; and

        (d)     Please consider this a Request to Produce those statements referred to in the above answer.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is vague. Plaintiff objects to this Interrogatory because it seeks opinions or contentions relating to fact, or the application of law to facts, as to which discovery has yet to be completed, and requires Plaintiff to anticipate or assume factual information that has not been established or that may be forthcoming in discovery. Plaintiff also objects that this Interrogatory is premature because discovery is ongoing. Plaintiff further objects that this Interrogatory seeks premature disclosure of expert opinion.

Subject to and without waiving said objections, Plaintiff directs Defendant to all relevant documents that will be produced during the course of discovery. As discovery is ongoing, Plaintiff will supplement Plaintiff's response to this Interrogatory.

**INTERROGATORY NO. 14 (Medical Malpractice Case Standard Interrogatory No. 14):**

Have you given any statement concerning this action or its subject matter? If so, state:

    (a)    The name and last known address of each person to whom a statement was given;

    (b)    When and where each statement was given; and

    (c)    Please consider this a Request to Produce the statements referred to in the above answer.

**RESPONSE**: Plaintiff objects to this Interrogatory because the term "any statement concerning this action or its subject matter" is overbroad and vague. Plaintiff is willing to confer with Defendant about the scope of this Interrogatory.

**INTERROGATORY NO. 15 (Medical Malpractice Case Standard Interrogatory No. 15):**

Do you know of the existence of any photographs, diagrams or models of the surrounding area or the areas of the treatment, surgery or examination or any other matters or things involved in this treatment, surgery or examination.

If the answer is in the affirmative, state:

10

(a)     The date(s) when such photographs, diagrams or models were made;

(b)     The name and address of the party making them;

(c)     Where they were made;

(d)     The object(s) or subject(s) each photograph, diagram or model represents; and

(e)     Please consider this a request to produce the photographs, diagrams and/or models referred to in the above answer.

**RESPONSE**: Plaintiff objects to this Interrogatory because the Interrogatory is vague. Plaintiff is willing to confer with Defendant about the scope of this Interrogatory.

**<u>INTERROGATORY NO. 16</u> (Medical Malpractice Case Standard Interrogatory No. 16):**

(a)     Have you, or anyone on your behalf, conducted any investigations of the treatment, surgery or examination which is the subject matter of the complaint?

(b)     If the answer to (a) is in the affirmative, state:

(1)     the name, address, and employer of all persons who conducted any investigations;

(2)     The dates of the investigation;

(3)     The dates of any reports of any investigations and the identity of the persons who have possession thereof; and

(4)     Please consider this a request to produce your investigation reports, except those portions which are protected from discovery by Pennsylvania Rule of Civil Procedure 4003.3.

11

**RESPONSE**: Plaintiff objects to this Interrogatory because the term "any investigations of the treatment, surgery or examination" is overbroad and vague. Plaintiff further objects based upon attorney-client privilege and the attorney work product doctrine. Plaintiff is willing to confer with Defendant about the scope of this Interrogatory.

**INTERROGATORY NO. 17 (Medical Malpractice Case Standard Interrogatory No. 17):**

    (a)    State the name and address of each person whom you expect to call as expert witnesses at trial and state the subject matter on which the expert is expected to testify.

    (b)    For each such expert, state, or have the expert state, the substance of the facts and opinions to which the expert is expected to testify and summarize the grounds for each such opinion. (Experts' reports containing the same information may be attached in lieu of an answer.)

    (c)    If the expert is employed and/or self-employed, identify the employer and the nature of employment hereof.

    (d)    Identify all documents submitted to the expert and all products and/or locales inspected by the expert in connection with preparations for his/her testimony.

    (e)    Set forth the qualifications of each expert, listing the schools attended, years of attendance, degrees received, experience in any particular field of specialization or expertise, all publications authored, including the title of the work and the book in which it was printed giving the date of publication.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is premature. Plaintiff also objects to the extent that she does not yet know the identities of the experts likely to be called at

trial. Further, the Interrogatory is premature to the extent that Plaintiff does not yet have sufficient information to enable an expert to analyze and formulate a comprehensive opinion with respect to the facts and issues involved in this action. Plaintiff acknowledges her affirmative duty to identify the expert witnesses, including rebuttal witnesses, as soon as feasible.

Subject to the foregoing, Plaintiff will amend and/or supplement this response.

**INTERROGATORY NO. 18 (Medical Malpractice Case Standard Interrogatory No. 18):**

State the specific facts known to you or anyone acting on your behalf upon which you base each claim of negligence or malpractice alleged in this action.

**RESPONSE**: Plaintiff objects to this Interrogatory as premature because discovery is ongoing, and documents related to this Interrogatory are in Defendant's possession and have not yet been produced to Plaintiff. Plaintiff further objects that this Interrogatory improperly seeks legal conclusions. Plaintiff also objects to this Interrogatory to the extent that it seeks opinions or contentions relating to fact, or the application of law to facts, as to which discovery has yet to be completed, and requires Plaintiff to anticipate or assume factual information that has not been established or that may be forthcoming in discovery. Plaintiff reserves the right amend this response.

**INTERROGATORY NO. 19 (Medical Malpractice Case Standard Interrogatory No. 19):**

(a)     Were the injuries you allege in this action caused in part by sickness, disease, abnormality or injury other than the injuries you claim resulted from the treatment, surgery or examination upon which this action is based?

(b)     If so, state specifically the nature of each such sickness, disease, abnormality or injury and how each affected you.

(c)     Are there any medical, x-rays, hospital or other reports which indicate the

13

nature of each such sickness, disease or abnormality or injury and how each affected you.

(d)     If so, where and when was each report made and what is the name and present or last known address of the person who made each such report and each such person who has custody or possession of each such report or any copy thereof?

(e)     Have you been furnished with any such information in any way other than by the documents referred to in this interrogatory? If so, how, when and where and by whom?

**RESPONSE**: Plaintiff objects to this Interrogatory as incomprehensible to the extent it is directed to Plaintiff, not Infant. Plaintiff further objects to this Interrogatory because it is overbroad and may seek irrelevant information regarding medical providers and treatment that is unrelated to Infant's injuries. Plaintiff also objects that the Interrogatory is compound and overly burdensome in that it requires a narrative response and is more properly the subject of a document production request. Plaintiff also objects that the Interrogatory requires expert opinion.

**<u>INTERROGATORY NO. 20</u> (Product Liability Standard Interrogatory No. 1):**

Identify all instruction, operating, repair, maintenance and safety manuals regarding the product actually involved in the accident and any other documents which describe the product and its use stating: titles, dates of publication, general description and amendments thereto and identify the persons who have custody thereof.

**RESPONSE:** Plaintiff objects to this Interrogatory as premature because discovery is ongoing, and documents related to this Interrogatory are in Defendant's possession and have not yet been produced to Plaintiff. Plaintiff further objects that this Interrogatory improperly seeks

<div align="center">14</div>

legal conclusions. Plaintiff also objects to this Interrogatory to the extent that it seeks opinions or contentions relating to fact, or the application of law to facts, as to which discovery has yet to be completed, and requires Plaintiff to anticipate or assume factual information that has not been established or that may be forthcoming in discovery.

**INTERROGATORY NO. 21 (Personal Injury Case Standard Interrogatory No. 3):**

If you have incurred any bills or expenses in connection with the injuries or diseases which you suffered because of the accident referred to in the complaint, and such bills or expenses are not otherwise listed in answer to these interrogatories, set forth the amount of each such bill or expense, the service for which the bill or expense was incurred, and the identity of the person who rendered the bill or who was involved in the expense.

**RESPONSE:** Plaintiff objects to this Interrogatory because it seeks opinions or contentions relating to fact, or the application of law to facts, as to which discovery has yet to be completed, and requires Plaintiff to anticipate or assume factual information that has not been established or that may be forthcoming in discovery. Plaintiff also objects that this Interrogatory is premature because discovery is ongoing. Plaintiff further objects that this Interrogatory seeks premature disclosure of expert opinion.

Subject to and without waiving said objections, Plaintiff directs Defendant to all relevant documents that will be produced during the course of discovery. As discovery is ongoing, Plaintiff will supplement Plaintiff's response to this Interrogatory.

**STANDARD FORM INTERROGATORIES TO PLAINTIFF J.C.**

**INTERROGATORY NO. 22 (Medical Malpractice Case Standard Interrogatory No. 1):**

State:

(a)     Your full name;

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

(b)      Any other names you have used or been known by;

(c)      Your date and place of birth;

(d)      Your marital status at the time of the incident;

(e)      Your present marital status;

(f)      Your present home address; and

(g)      Your social security number.

**RESPONSE**: H.C. was born on October 6, 2014, at Pennsylvania Hospital. H.C. resides at 16 Carmen Dr, Cape May Court House, NJ 08210.

Plaintiff will provide H.C.'s social security number after this Court enters a protective order for this litigation.

**INTERROGATORY NO. 23 (Medical Malpractice Case Standard Interrogatory No. 2):**

If you claim a permanent injury resulting from the treatment, surgery or examination upon which this action is based, describe such injury fully and in detail.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is premature. Plaintiff also objects that the interrogatory is vague as to "treatment" and "examination." Plaintiff further objects that this Interrogatory seeks premature disclosure of expert opinion.

Subject to and without waiving any objections, Plaintiff directs Defendant to the medical authorizations and medical records that have been or will be produced. Plaintiff further refers Defendant to any documents produced by and/or that will be produced by Defendant or any third-party in this case.

As discovery is ongoing, Plaintiff will supplement the response to this Interrogatory. In addition, Plaintiff and Infant may have additional injuries that are, at this time, not known because Infant is continuing to develop and may face new, or worsened, injuries as time passes.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

**INTERROGATORY NO. 24 (Medical Malpractice Case Standard Interrogatory No. 3):**

Were you ever in the Armed Forces? If so, state: the dates, branch of service, rank at discharge, whether you had any infirmities at discharge, whether you have any claim or are receiving benefits for any infirmities from said service, your Armed Forces service number, and your Veterans "C" number.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is overbroad and seeks information that is irrelevant and immaterial as it is not limited to the time period and not relevant to the claims and defenses in this case. Plaintiff also objects to the extent that the term "infirmities" is vague and/or undefined.

**INTERROGATORY NO. 25 (Medical Malpractice Case Standard Interrogatory No. 4):**

State the name and address of your family physician at the time of the treatment, surgery or examination upon which this action is based.

**RESPONSE**: Plaintiff objects to this Interrogatory because the term "upon which this action is based" is vague and/or undefined. Plaintiff further objects that this Interrogatory is incomprehensible. Subject to and without waiving any objections, Plaintiff directs Defendant to the medical authorizations and medical records that have been or will be produced.

**INTERROGATORY NO. 26 (Medical Malpractice Case Standard Interrogatory No. 5):**

State in detail the injuries or diseases that you allege that you suffered as a result of treatment, surgery or examination upon which this action is based.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is premature. Plaintiff further objects that this Interrogatory seeks premature disclosure of expert opinion. Plaintiff further objects to this Interrogatory as compound and overly burdensome in that it requires a narrative response and is more properly the subject of a document production request.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

Subject to and without waiving any objections, Plaintiff directs Defendant to the medical authorizations and medical records that have been or will be produced. Plaintiff further refers Defendant to any documents produced by and/or that will be produced by Defendant or any third-party in this case.

As discovery is ongoing, Plaintiff will supplement the response to this Interrogatory. In addition, Plaintiff and Infant may have additional injuries that are, at this time, not known because Infant is continuing to develop and may face new, or worsened, injuries as time passes.

**INTERROGATORY NO. 27 (Medical Malpractice Case Standard Interrogatory No. 6):**

If you received medical treatment, tests, or examinations (including x-rays) because of injuries or diseases you suffered as a result of the treatment, surgery, or examination referred to in the complaint, state:

(a)    The name and address of each hospital at which you were treated or examined;

(b)    The dates on which each such treatment or examination at a hospital was rendered and the charges by the hospital for each;

(c)    The name and address of each doctor or practitioner by whom you were treated or examined;

(d)    The dates on which each such treatment or examination by a doctor or practitioner was rendered and the charges for each;

(e)    The identity of all reports regarding any medical treatment or examination, setting forth the author and date of such reports; and

(f)    Please consider this as a request to produce copies of all reports referred to in the above answer.

18

**RESPONSE**: Plaintiff objects to this Interrogatory because it is premature. Plaintiff further objects that this Interrogatory seeks premature disclosure of expert opinion. Plaintiff further objects to this Interrogatory as compound and overly burdensome in that it requires a narrative response and is more properly the subject of a document production request.

Subject to and without waiving any objections, Plaintiff directs Defendant to the medical authorizations and medical records that have been or will be produced. Plaintiff further refers Defendant to any documents produced by and/or that will be produced by Defendant or any third-party in this case.

As discovery is ongoing, Plaintiff will supplement the response to this Interrogatory. In addition, Plaintiff and Infant may have additional injuries that are, at this time, not known because Infant is continuing to develop and may face new, or worsened, injuries as time passes.

**INTERROGATORY NO. 28 (Medical Malpractice Case Standard Interrogatory No. 7):**

Either prior to or subsequent to the treatment, surgery or examination referred to in the complaint, have you ever suffered any injuries, illness or diseases in those portions of the body claimed by you to have been affected by the treatment, surgery or examination referred to in the complaint?

If so, state:

    (a)    A description of the injuries or diseases you suffered;

    (b)    The date and place of any accident, if such an injury or disease was caused by an accident; and

    (c)    The names and addresses of all hospitals, doctors or practitioners who rendered treatment or examinations because of any such injuries or diseases.

19

**RESPONSE**: Plaintiff objects to this Interrogatory because it is overbroad and may seek irrelevant information regarding medical providers and treatment that is unrelated to Infant's injuries. Plaintiff further objects that the Interrogatory is compound and overly burdensome in that it requires a narrative response and is more properly the subject of a document production request.

**INTERROGATORY NO. 29 (Medical Malpractice Case Standard Interrogatory No. 9):**

If you have engaged in one or more gainful occupations subsequent to the date of the treatment, surgery or examination referred to in the complaint, state:

    (a)    The name and address of each of your employers or, if you were self-employed, each of your business addresses and the name of the business while self- employed;

    (b)    The dates of commencement and termination of each of your periods of employment or self-employment;

    (c)    A detailed description of the nature of your occupation and the services performed by you in each employment or self-employment;

    (d)    The wage, salary or rate of earnings received by you in each employment or self-employment and the amount of income reported on your Federal Income Tax Return for each year subsequent to the accident; and

    (e)    The dates of all absences from your occupation, the reasons therefor and the amount of any earnings lost by you because of such absences.

**RESPONSE**: Plaintiff objects to this Interrogatory because it seeks information irrelevant and immaterial to the claims and defenses in this case. Plaintiff also objects that the Interrogatory is compound and overly burdensome.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

Plaintiff objects to this Interrogatory because it is overbroad and seeks information that is irrelevant and immaterial as it is not limited to the time period relevant to the claims and defenses in this case.

**INTERROGATORY NO. 30 (Medical Malpractice Case Standard Interrogatory No. 10):**

State whether you, subsequent to the date of the treatment, surgery or examination, have been unable to perform adequately any of your customary occupational duties or social or other activities, stating with particularity (a) the duties and/or activities you have been unable to perform, (b) the periods of time you have been unable to perform, and (c) the names and last known addresses of all persons who have personal knowledge thereof.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is vague as to "unable to perform adequately any of her customary social or other activities." Plaintiff further objects that this Interrogatory seeks premature disclosure of expert opinions.

Subject to and without waiving any objections, Plaintiff directs Defendant to the medical authorizations and medical records that have been or will be produced. Plaintiff further refers Defendant to any documents produced by and/or that will be produced by Defendant or any third-party in this case. As discovery is ongoing, Plaintiff will supplement the response to this Interrogatory.

**INTERROGATORY NO. 31 (Medical Malpractice Case Standard Interrogatory No. 11):**

State the name and last known address of each person who (a) was a witness to the treatment, surgery or examination through sight or hearing and/or (b) has knowledge of facts concerning the happening of the treatment, surgery or examination or conditions or circumstances at the time of the treatment, surgery or examination prior to, after, or at the time of the accident, excepting those persons who acquired such knowledge during the course of this litigation.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

**RESPONSE**: Plaintiff objects to this Interrogatory because it is vague as to "has knowledge of facts concerning the happening of the incident, treatment, surgery or examination or conditions or circumstances." Plaintiff also objects that this Interrogatory to the extent it seeks information outside of Plaintiff's knowledge.

**INTERROGATORY NO. 32 (Medical Malpractice Case Standard Interrogatory No. 12):**

With respect to each person identified in the answer to interrogatory 11(a), state that person's exact location and activity at the time of the treatment, surgery or examination.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is vague as to "has knowledge of facts concerning the happening of the incident, treatment, surgery or examination or conditions or circumstances." Plaintiff also objects to this Interrogatory to the extent it seeks information outside of Plaintiff's knowledge.

Subject to and without waiving any objections, Pennsylvania Hospital. Plaintiff will supplement the response to this interrogatory, if needed.

**INTERROGATORY NO. 33 (Medical Malpractice Case Standard Interrogatory No. 13):**

Have you or anyone acting on your behalf obtained from any person any statement concerning this action or its subject matter? If so, state:

(a)     The name and last known address of each such person;

(b)     When, where, by whom and to whom each statement was made, and whether it was reduced to writing or otherwise recorded;

(c)     The name and address of any person who has custody of any such statements that were reduced to writing or otherwise recorded; and

(d)     Please consider this a Request to Produce those statements referred to in the above answer.

22

**RESPONSE**: Plaintiff objects to this Interrogatory because it is vague as to "any statement concerning this action or its subject matter." Plaintiff further objects to the extent the Interrogatory is overbroad and not limited in time or scope. Plaintiff also objects to this interrogatory because it seeks information protected by the attorney-client privilege and work product doctrine. Plaintiff also objects to this Interrogatory to the extent it seeks information outside of Plaintiff's knowledge. Plaintiff is willing to confer with Defendant about the scope of this interrogatory.

**INTERROGATORY NO. 34 (Medical Malpractice Case Standard Interrogatory No. 14):**

Have you given any statement concerning this action or its subject matter? If so, state:

      (a)    The name and last known address of each person to whom a statement was given;

      (b)    When and where each statement was given; and

      (c)    Please consider this a Request to Produce the statements referred to in the above answer.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is vague as to "any statement concerning this action or its subject matter." Plaintiff further objects to the extent the Interrogatory is overbroad and not limited in time or scope. Plaintiff also objects to this interrogatory because it seeks information protected by the attorney-client privilege and work product doctrine. Plaintiff also objects to this Interrogatory to the extent it seeks information outside of Plaintiff's knowledge. Plaintiff is willing to confer with Defendant about the scope of this interrogatory.

**INTERROGATORY NO. 35 (Medical Malpractice Case Standard Interrogatory No. 15):**

Do you know of the existence of any photographs, diagrams or models of the surrounding area or the areas of the treatment, surgery or examination or any other matters or things involved in this treatment, surgery or examination.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

If the answer is in the affirmative, state:

    (a)    The date(s) when such photographs, diagrams or models were made;

    (b)    The name and address of the party making them;

    (c)    Where they were made;

    (d)    The object(s) or subject(s) each photograph, diagram or model represents; and

    (e)    Please consider this a request to produce the photographs, diagrams and/or models referred to in the above answer.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is vague as to "any other matters or things involved in this treatment, surgery or examination." Plaintiff further objects to the extent the Interrogatory is overbroad and not limited in time or scope. Plaintiff also objects to this Interrogatory to the extent it seeks information outside of Plaintiff's knowledge. Plaintiff is willing to confer with Defendant about the scope of this interrogatory.

**<u>INTERROGATORY NO. 36</u> (Medical Malpractice Case Standard Interrogatory No. 16):**

    (a)    Have you, or anyone on your behalf, conducted any investigations of the treatment, surgery or examination which is the subject matter of the complaint?

    (b)    If the answer to (a) is in the affirmative, state:

        (1)    the name, address, and employer of all persons who conducted any investigations;

        (2)    The dates of the investigation;

        (3)    The dates of any reports of any investigations and the identity of the persons who have possession thereof; and

(4)    Please consider this a request to produce your investigation reports, except those portions which are protected from discovery by Pennsylvania Rule of Civil Procedure 4003.3.

**RESPONSE**: Plaintiff objects to this Interrogatory because the term "any investigations of the treatment, surgery or examination" is vague. Plaintiff further objects based upon attorney-client privilege and the attorney work product doctrine. Plaintiff is willing to confer with Defendant about the scope of this interrogatory.

**INTERROGATORY NO. 37 (Medical Malpractice Case Standard Interrogatory No. 17):**

(a)    State the name and address of each person whom you expect to call as expert witnesses at trial and state the subject matter on which the expert is expected to testify.

(b)    For each such expert, state, or have the expert state, the substance of the facts and opinions to which the expert is expected to testify and summarize the grounds for each such opinion. (Experts' reports containing the same information may be attached in lieu of an answer.)

(c)    If the expert is employed and/or self-employed, identify the employer and the nature of employment hereof.

(d)    Identify all documents submitted to the expert and all products and/or locales inspected by the expert in connection with preparations for his/her testimony.

(e)    Set forth the qualifications of each expert, listing the schools attended, years of attendance, degrees received, experience in any particular field of specialization or expertise, all publications authored, including the title of

the work and the book in which it was printed giving the date of publication.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is premature. Plaintiff also objects to the extent that she does not yet know the identities of each of the experts likely to be called at trial. Further, because discovery is just beginning in this litigation, the Interrogatory is premature to the extent that Plaintiff does not yet have sufficient information to enable an expert to finalize a comprehensive opinion with respect to the facts and issues involved in this action.

Subject to the foregoing, Plaintiff will amend and/or supplement this response.

**INTERROGATORY NO. 38 (Medical Malpractice Case Standard Interrogatory No. 18):**

State the specific facts known to you or anyone acting on your behalf upon which you base each claim of negligence or malpractice alleged in this action.

**RESPONSE**: Plaintiff objects to this Interrogatory as premature because discovery is ongoing, and documents related to this Interrogatory are in Defendant's possession and have not yet been produced to Plaintiff. Plaintiff further objects that this Interrogatory improperly seeks legal conclusions. Plaintiff also objects to this Interrogatory to the extent that it seeks opinions or contentions relating to fact, or the application of law to facts, as to which discovery has yet to be completed, and requires Plaintiff to anticipate or assume factual information that has not been established or that may be forthcoming in discovery.

Subject to these objections, Plaintiff directs Defendant to the complaint filed in this case. Plaintiff reserves the right amend this response.

**INTERROGATORY NO. 39 (Medical Malpractice Case Standard Interrogatory No. 19):**

(a)     Were the injuries you allege in this action caused in part by sickness, disease, abnormality or injury other than the injuries you claim resulted from the treatment, surgery or examination upon which this action is based?

26

(b) If so, state specifically the nature of each such sickness, disease, abnormality or injury and how each affected you.

(c) Are there any medical, x-rays, hospital or other reports which indicate the nature of each such sickness, disease or abnormality or injury and how each affected you.

(d) If so, where and when was each report made and what is the name and present or last known address of the person who made each such report and each such person who has custody or possession of each such report or any copy thereof?

(e) Have you been furnished with any such information in any way other than by the documents referred to in this interrogatory? If so, how, when and where and by whom?

**RESPONSE**: Plaintiff objects to this Interrogatory because it is overbroad and may seek irrelevant information regarding medical providers and treatment that is unrelated to Infant's injuries. Plaintiff also objects that the Interrogatory is compound and overly burdensome in that it requires a narrative response and is more properly the subject of a document production request. Plaintiff also objects that the Interrogatory requires expert opinion.

**INTERROGATORY NO. 40 (Product Liability Case Standard Interrogatory No. 1):**

Identify all instruction, operating, repair, maintenance and safety manuals regarding the product actually involved in the accident and any other documents which describe the product and its use stating: titles, dates of publication, general description and amendments thereto and identify the persons who have custody thereof.

**RESPONSE:** Plaintiff objects to this Interrogatory as premature because discovery is ongoing, and documents related to this Interrogatory are in Defendant's possession and have not yet been produced to Plaintiff. Plaintiff reserves the right amend this response.

**INTERROGATORY NO. 41 (Personal Injury Case Standard Interrogatory No. 3):**

If you have incurred any bills or expenses in connection with the injuries or diseases which you suffered because of the accident referred to in the complaint, and such bills or expenses are not otherwise listed in answer to these interrogatories, set forth the amount of each such bill or expense, the service for which the bill or expense was incurred, and the identity of the person who rendered the bill or who was involved in the expense.

**RESPONSE:** Plaintiff objects to this Interrogatory because it seeks opinions or contentions relating to fact, or the application of law to facts, as to which discovery has yet to be completed, and requires Plaintiff to anticipate or assume factual information that has not been established or that may be forthcoming in discovery. Plaintiff also objects that this Interrogatory is premature because discovery is ongoing. Plaintiff further objects that this Interrogatory seeks premature disclosure of expert opinion.

Subject to and without waiving said objections, Plaintiff directs Defendant to all relevant documents that will be produced during the course of discovery. As discovery is ongoing, Plaintiff will supplement Plaintiff's response to this Interrogatory.

<div align="center">

**SUPPLEMENTAL INTERROGATORIES TO PLAINTIFFS
HOLLI CARTER AND J.C.**

</div>

**INTERROGATORY NO. 42:**

IDENTIFY all PRETERM INFANT FORMULA PRODUCTS administered to the INFANT prior to the INFANT'S alleged necrotizing enterocolitis ("NEC") diagnosis, including the full product name, manufacturer name of any IDENTIFIED PRETERM INFANT FORMULA

PRODUCTS, the date(s) on which each identified PRETERM INFANT FORMULA PRODUCT was allegedly administered to the INFANT, the approximate dosage/amount consumed on each of the dates each PRETERM INFANT FORMULAPRODUCT was allegedly administered to the INFANT, and the identity of any HEALTH CARE PROVIDER who administered the PRETERM INFANT FORMULA PRODUCT to the INFANT. If the PRETERM INFANT FORMULA PRODUCT was administered to the INFANT by someone other than a HEALTH CARE PROVIDER, STATE as much and IDENTIFY the administering individual.

**RESPONSE**: Plaintiff objects to this Request as premature. Plaintiff further objects to this Request as it requires expert testimony. Discovery is early and ongoing, and Plaintiff reserves the right to amend and/or supplement this Answer.

**INTERROGATORY NO. 43:**

STATE whether YOU and/or PARENTS saw or read any label, packaging, product guide, or other DOCUMENTS RELATED TO the PRETERM INFANT FORMULA PRODUCTS before they were administered to the INFANT and, if so, IDENTIFY the label, packaging, or product guide, or other DOCUMENTS you saw or read and IDENTIFY the time, place, and manner in which YOU saw or read such materials.

**RESPONSE**: Plaintiff does not remember seeing any packaging and has no other responsive information related to this Interrogatory. Discovery is early and ongoing, and Plaintiff reserves the right to amend and/or supplement this Answer.

**INTERROGATORY NO. 44:**

STATE whether YOU and/or PARENTS had any COMMUNICATIONS with any HEALTH CARE PRACTITIONERS regarding the decision to administer any nutrition, including but not limited to breast milk, donor milk, or PRETERM INFANT FORMULA PRODUCTS, to

29

the INFANT and, if so, IDENTIFY all persons with whom YOU and/or PARENTS had such COMMUNICATIONS, the date(s), time, place, and manner of those COMMUNICATIONS, and DESCRIBE the content of those COMMUNICATIONS.

**RESPONSE**: Plaintiff does not recall having conversations related to consent to feed her child. Discovery is early and ongoing, and Plaintiff reserves the right to amend and/or supplement this Answer.

**INTERROGATORY NO. 45:**

IDENTIFY any DOCUMENTS YOU and/or PARENTS received from any HEALTH CARE PROVIDER RELATING TO infant nutrition, any PRETERM INFANT FORMULA PRODUCTS, and any OTHER INFANT FORMULA PRODUCTS, including without limitation the name or title of the DOCUMENT, the PERSON who provided the DOCUMENT to YOU and/or PARENTS, the date YOU and/or PARENTS received the DOCUMENT, and the substance of any discussions about the DOCUMENT.

**RESPONSE:** Plaintiff does not recall seeing any documents responsive to this Interrogatory. Discovery is early and ongoing, and Plaintiff reserves the right to amend and/or supplement this Answer.

**INTERROGATORY NO. 46:**

IDENTIFY any gifts, coupons, PRETERM INFANT FORMULA PRODUCTS, or OTHER INFANT FORMULA PRODUCTS that YOU and/or PARENTS received from any HEALTH CARE PROVIDER, including without limitation the PERSON who provided any such items to YOU and/or PARENTS, the date YOU and/or PARENTS received such items, and the substance of any discussions about such items.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

**RESPONSE:** Plaintiff does not recall seeing any materials responsive to this Interrogatory. Discovery is early and ongoing, and Plaintiff reserves the right to amend and/or supplement this Answer.

**INTERROGATORY NO. 47:**

IDENTIFY any and all advertising RELATING TO infant nutrition, any PRETERM INFANT FORMULA PRODUCTS, and any OTHER INFANT FORMULA PRODUCTS that YOU and/or PARENTS saw at or before the time the INFANT was allegedly diagnosed with NEC, including without limitation the date(s), time, place, and manner YOU and/or PARENTS saw the advertising, and the substance of the advertising.

**RESPONSE**: Plaintiff recalls seeing promotional posters relating to infant formula products. Discovery is early and ongoing, and Plaintiff reserves the right to amend and/or supplement this Answer.

**INTERROGATORY NO. 48:**

If YOU contend that ABBOTT should have provided different, additional, and/or other instructions and warnings relating to the use of the PRETERM INFANT FORMULA PRODUCTS, please IDENTIFY what different, additional, or other instructions and warnings ABBOTT should have given, and why it should have given those different, additional, or other instructions.

**RESPONSE**: Plaintiff objects to this Interrogatory as premature because discovery is ongoing, and documents related to this Interrogatory are in Defendant's possession and have not yet been produced to Plaintiff. Plaintiff further objects that this Interrogatory improperly seeks legal conclusions. Plaintiff also objects to this Interrogatory to the extent that it seeks opinions or contentions relating to fact, or the application of law to facts, as to which discovery has yet to be

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

completed, and requires Plaintiff to anticipate or assume factual information that has not been established or that may be forthcoming in discovery. Plaintiff reserves the right amend this response.

**INTERROGATORY NO. 49:**

DESCRIBE how and when YOU and/or PARENTS first believed there to be a connection between PRETERM INFANT FORMULA PRODUCTS and NEC, including the source(s) from which YOU and/or PARENTS learned of such information, a DESCRIPTION of the information relayed or cited by each source, and the date(s) on which YOU and/or PARENTS heard or spoke to those sources.

**RESPONSE**: Plaintiff objects based upon attorney-client privilege and the attorney work-product doctrine. Plaintiff refers Defendant to the amended complaint.

**INTERROGATORY NO. 50:**

IDENTIFY, with particularity, the mechanism(s) or interaction(s) unique to PRETERM INFANT FORMULA PRODUCTS that YOU allege cause or otherwise increase the risk for development of NEC, including the sources(s) from which YOU and/or PARENTS learned of the mechanism(s) or interaction(s), a DESCRIPTION of the information relayed or cited by each source, the date(s) on which YOU and/or PARENTS heard or spoke to these sources, and the results of any confirmatory testing that YOU and/or PARENTS are aware RELATED TO the unique mechanism or interaction.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is premature. Plaintiff also objects to the extent that she does not yet know the identities of the experts likely to be called at trial. Further, the Interrogatory is premature to the extent that Plaintiff does not yet have sufficient information to enable an expert to analyze and formulate a comprehensive opinion with respect to

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

the facts and issues involved in this action. Plaintiff acknowledges her affirmative duty to identify the expert witnesses, including rebuttal witnesses, as soon as feasible.

Subject to the foregoing, Plaintiff will amend and/or supplement this response.

**INTERROGATORY NO. 51:**

STATE whether donor milk, breast milk, or OTHER INFANT FORMULA PRODUCTS were available to be administered to INFANT at the time INFANT was in the Neonatal Intensive Care Unit. If yes, IDENTIFY which milk or formula products were available to be administered to INFANT and whether any such products were actually administered to INFANT.

**RESPONSE:** Plaintiff objects that this Interrogatory is directed to the wrong party. Discovery is early and ongoing, and Plaintiff reserves the right to amend and/or supplement this Answer.

**INTERROGATORY NO. 52:**

STATE the date on which INFANT was diagnosed with NEC, whether such diagnosis was made during the INFANT's admission in the Neonatal Intensive Care Unit, and whether any HEALTH CARE PROVIDER suggested any cause of INFANT's NEC. To the extent INFANT has not been diagnosed with NEC, so STATE.

**RESPONSE:** Plaintiff directs Defendant to her response to Request for Production No. 1.

**INTERROGATORY NO. 53:**

IDENTIFY all PERSONS, including HEALTH CARE PROVIDERS and any other PERSON, with whom YOU and/or PARENTS have had any COMMUNICATION(S) regarding the cause(s) of INFANT's NEC and DESCRIBE the contents of those COMMUNICATION(S). DESCRIBE the contents of all COMMUNICATIONS that YOU IDENTIFY.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

**RESPONSE**: Plaintiff does not recall being told by healthcare providers that NEC is related to prematurity. Discovery is early and ongoing, and Plaintiff reserves the right to amend and/or supplement this Answer.

**INTERROGATORY NO. 54:**

STATE whether YOU and/or PARENTS had any COMMUNICATIONS with any PERSONS, including but not limited to any manufacturer of PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS, and if so, IDENTIFY all persons with whom YOU and/or PARENTS had such COMMUNICATIONS, the date(s), time, place, and manner of those COMMUNICATIONS, and DESCRIBE the content of those COMMUNICATIONS.

**RESPONSE**: Plaintiff objects that this Interrogatory is vague and overbroad because it seeks all communications ever had by the Infant and the Parent. Plaintiff is willing to discuss an appropriately scoped Interrogatory.

**INTERROGATORY NO. 55:**

IDENTIFY any and all pregnancies that INFANT's mother has experienced, and for each pregnancy, STATE the date of conception, IDENTIFY whether the pregnancy resulted in an abortion, a miscarriage, a stillbirth, or a live birth, and for still- and/or live-births, STATE the name, birthdate, birth weight, and the gestational week at birth for each child, and IDENTIFY any and all breast milk, donor milk, PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS that were fed or administered to each child.

**RESPONSE**: Plaintiff objects to this Interrogatory because it seeks information irrelevant and immaterial to the claims and defenses in this case. Plaintiff also objects that the Interrogatory is compound and overly burdensome.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

Plaintiff objects to this Interrogatory because it is overbroad and seeks information that is irrelevant and immaterial as it is not limited to the time period relevant to the claims and defenses in this case.

**INTERROGATORY NO. 56:**

For each child IDENTIFIED in Interrogatory No. 55 above, IDENTIFY all PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS administered to each child, including the full product name and manufacturer name of any such products and the dates of administration.

**RESPONSE**: Plaintiff directs Defendant to her response to Interrogatory No. 55.

**INTERROGATORY NO. 57:**

IDENTIFY all PERSONS, including HEALTH CARE PROVIDERS and any other PERSON, who maintains or who has maintained any MEDICAL RECORDS regarding the provision of any medical care to YOU or INFANT, and IDENTIFY any COMMUNICATIONS you have had with those IDENTIFIED PERSONS.

**RESPONSE:** Plaintiff directs Defendant to her response to Request for Production No. 1.

**INTERROGATORY NO. 58:**

IDENTIFY all non-NEC diagnoses that INFANT has received from time of birth through the present. For each diagnosis, IDENTIFY the condition diagnosed, the date of diagnosis, the HEALTH CARE PROVIDER who rendered the diagnosis, any course of treatment undertaken for the condition, and the identity of any HEALTHCARE PROVIDER who administered that course of treatment.

**RESPONSE:** Plaintiff directs Defendant to her response to Request for Production No. 1.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

**INTERROGATORY NO. 59:**

STATE whether YOU and/or PARENTS ever purchased PRETERM INFANT FORMULA PRODUCTS from any online site or retail store. For each product purchased, IDENTIFY the product name, manufacturer name, date of purchase, and location of purchase. Purchase records of the specified products may be produced in lieu of a written response.

**RESPONSE:** Plaintiff objects to this Interrogatory because it seeks information irrelevant and immaterial to the claims and defenses in this case. Plaintiff also objects that the Interrogatory is compound and overly burdensome.

Plaintiff objects to this Interrogatory because it is overbroad and seeks information that is irrelevant and immaterial as it is not limited to the time period relevant to the claims and defenses in this case.

**INTERROGATORY NO. 60:**

IDENTIFY each home address where YOU have resided and provide the dates YOU lived at the address and IDENTIFY the persons, if any, who lived with YOU for the ten (10) years preceding the events giving rise to this LAWSUIT to the present. If INFANT has not resided with YOU at any time during that period, IDENTIFY the address(es) where INFANT has resided, provide the dates INFANT lived at the address and IDENTIFY the persons, if any, who lived with INFANT.

**RESPONSE**: Plaintiff objects to this Interrogatory because it seeks information irrelevant and immaterial to the claims and defenses in this case. Plaintiff also objects that the Interrogatory is compound and overly burdensome.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

Plaintiff objects to this Interrogatory because it is overbroad and seeks information that is irrelevant and immaterial as it is not limited to the time period relevant to the claims and defenses in this case.

**INTERROGATORY NO. 61:**

IDENTIFY YOUR educational background, identifying all high school, secondary schools, colleges, and vocational training schools that YOU have attended. IDENTIFY INFANT's educational background, including all primary schools, secondary schools, colleges, and vocational training schools that INFANT has attended.

**RESPONSE:** Plaintiff objects to this Interrogatory because it seeks information irrelevant and immaterial to the claims and defenses in this case. Plaintiff also objects that the Interrogatory is compound and overly burdensome.

Plaintiff objects to this Interrogatory because it is overbroad and seeks information that is irrelevant and immaterial as it is not limited to the time period relevant to the claims and defenses in this case.

**INTERROGATORY NO. 62:**

IDENTIFY any position of employment that YOU or INFANT have held during the ten (10) years preceding the events giving rise to this LAWSUIT to the present, whether full-time or part-time, and DESCRIBE each position of employment, including the name of the employer, compensation received, location, and dates (range) of the employment.

**RESPONSE**: Plaintiff objects to this Interrogatory because it seeks information irrelevant and immaterial to the claims and defenses in this case. Plaintiff also objects that the Interrogatory is compound and overly burdensome.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

Plaintiff objects to this Interrogatory because it is overbroad and seeks information that is irrelevant and immaterial as it is not limited to the time period relevant to the claims and defenses in this case.

**INTERROGATORY NO. 63:**

Apart from the present LAWSUIT, DESCRIBE any prior legal proceedings in which YOU or INFANT have been a party (including administrative charges, unemployment claims, and bankruptcy petitions) including the court which handled the proceeding, the case name, the civil action or docket number associated with the legal proceeding, a description of the claims asserted in the legal proceeding, and the final result, outcome, or adjudication of the claims (e.g. whether dismissed by parties, dismissed by court, judgment granted in favor of a party).

**RESPONSE**: Plaintiff does not recall any prior legal proceeding responsive to this Interrogatory. Discovery is early and ongoing, and Plaintiff reserves the right to amend and/or supplement this Answer.

**INTERROGATORY NO. 64:**

IDENTIFY all social media accounts (e.g. LinkedIn, Facebook, MySpace, Twitter, Tumbler, Pinterest, Instagram, Snapchat, etc.) and electronic accounts (including but not limited to e-mail, text messages, or messaging accounts, such as Gmail, Yahoo, Comcast, Verizon, iChat, Apple FaceTime, AOL Instant Messenger, BlackBerry Messenger, chat rooms) that YOU or INFANT have created, hosted, maintained, used and/or had access to at any time during the period of two years prior to the INFANT's birth through the present.

**RESPONSE**: Plaintiff objects to this Interrogatory because it seeks information irrelevant and immaterial to the claims and defenses in this case. Plaintiff also objects that the Interrogatory is compound and overly burdensome.

Plaintiff objects to this Interrogatory because it is overbroad and seeks information that is irrelevant and immaterial as it is not limited to the time period relevant to the claims and defenses in this case.

**INTERROGATORY NO. 65:**

IDENTIFY and itemize any damages YOU seek to recover from ABBOTT in this LAWSUIT (on behalf of YOU or others, including the INFANT), whether economic, non-economic, punitive or other and DESCRIBE each element of damage or component of recovery that YOU are seeking from ABBOTT, STATE the specific dollar amounts YOU are claiming, the manner in which each amount was computed, the dates(s) each such loss or damage was incurred, the name of the person, firm and/or company to whom such amounts are owed, whether the expense and/or loss in question has been paid and, if so, by whom it was so paid.

**RESPONSE**: Plaintiff objects to this Interrogatory because it seeks opinions or contentions relating to fact, or the application of law to facts, as to which discovery has yet to be completed, and requires Plaintiff to anticipate or assume factual information that has not been established or that may be forthcoming in discovery. Plaintiff also objects that this Interrogatory is premature because discovery is ongoing. Plaintiff further objects that this Interrogatory seeks premature disclosure of expert opinion.

Subject to and without waiving said objections, Plaintiff directs Defendant to all relevant documents that will be produced during the course of discovery. As discovery is ongoing, Plaintiff will supplement Plaintiff's response to this Interrogatory.

**INTERROGATORY NO. 66:**

IDENTIFY every life, health, or disability insurance company or government entity (including Medicare and Medicaid) to which YOU or INFANT or anyone on his behalf, ever

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

applied for insurance coverage, and include the type of insurance for which she applied, the date she applied, the identity of any agency or broker through which such application was made, whether a policy was issued or denied, and, if issued, any policy numbers assigned to her/him.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is not limited in time or scope.

Subject to and without waiving said objections, Plaintiff directs Defendant to all relevant documents produced during the course of discovery. As discovery is ongoing, Plaintiff will supplement this response.

## INTERROGATORY NO. 67:

IDENTIFY all persons with whom YOU and/or PARENTS have communicated for the purpose of considering, investigating, pursuing, arranging, or obtaining LITIGATION FUNDING and for any such third-party PERSON or entity: STATE the date(s) YOU had such COMMUNICATIONS; STATE the amount of payments or cash advances YOU have received from such third-party PERSON or entity; STATE the IDENTITY of any DOCUMENTS that YOU provided to any such third-party PERSON or entity; STATE any facts or information YOU shared with such third-party PERSON or entity relating to the above-captioned litigation including, but not limited to, impressions of YOUR likelihood of receiving a monetary reward; and STATE the results of any evaluation, assessment, valuation, and/or other analysis by such third party PERSON or entity of the claims asserted against ABBOTT in the COMPLAINT, any claims that were contemplated against ABBOTT but not asserted in the COMPLAINT, and/or any claims contemplated by YOU against any other third party, including but not limited to other manufacturers of PRETERM INFANT FORMULA PRODUCTS and HEALTH CARE PRACTITIONERS, that YOU believe may have been responsible for YOUR alleged INJURIES

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

and the INFANT's alleged INJURIES.

**RESPONSE:** Plaintiff objects to this Request on the ground that it seeks information that is irrelevant and immaterial to Plaintiff's claims.

## INTERROGATORY NO. 68:

For each expert identified in response to Interrogatory Nos. 17 and 37, STATE the following information:

      (a)     The amount of any compensation to be paid to the expert;

      (b)     Any and all cases in which the expert witness has testified, either at deposition or trial, within the last four (4) years; and

      (c)     A list of all publications authored by the expert witness over the last ten (10) years.

**RESPONSE**: Plaintiff objects to this Interrogatory because it is premature. Plaintiff also objects to the extent that she does not yet know the identities of the experts likely to be called at trial. Further, the Interrogatory is premature to the extent that Plaintiff does not yet have sufficient information to enable an expert to analyze and formulate a comprehensive opinion with respect to the facts and issues involved in this action. Plaintiff acknowledges her affirmative duty to identify the expert witnesses, including rebuttal witnesses, as soon as feasible.

Subject to the foregoing, Plaintiff will amend and/or supplement this response.

          Respectfully submitted,

          KLINE & SPECTER, P.C.

          By: /s/ Tobias L. Millrood
          Tobias L. Millrood, Esq.

Dated: October 12, 2023

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

# EXHIBIT B

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

KLINE & SPECTER, P.C.
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    John P. O'Neill, Esq.
Attorney I.D. Nos. : 77764 / 313702 / 205677
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
tobi.millrood@klinespecter.com
elizabeth.crawford@klinespecter.com
jack.oneill@klinespecter.com

KELLER POSTMAN LLC
By:
    Benjamin J. Whiting, Esq. (*pro hac vice*)
Attorney I.D. No.: IL 6307321
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Telephone: (312) 741-5220
ben.whiting@kellerpostman.com

| | |
|---|---|
| HOLLI CARTER, ON HER OWN BEHALF AND AS PARENT AND NATURAL GUARDIAN OF J.C., A MINOR,<br><br>                  *Plaintiff*,<br><br>   v.<br><br>MEAD JOHNSON & COMPANY, LLC, ET AL.<br><br>                 *Defendants*. | **IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY**<br><br>**CIVIL TRIAL DIVISION**<br><br>**MARCH TERM 2022**<br>**NO.  2588** |

**PLAINTIFF'S RESPONSE TO ABBOTT LABORATORIES' FIRST REQUESTS FOR PRODUCTION DIRECTED TO PLAINTIFF HOLLI CARTER, ON HER OWN BEHALF AND ON BEHALF OF HER MINOR CHILD J.C.**

    Plaintiff Holli Carter, on her own behalf and as Parent and Natural Guardian of J.C., a

Minor, through counsel, hereby objects and responds to Defendant Abbott Laboratories' Requests

for Production, as follows:

1

## GENERAL OBJECTIONS

1. Plaintiff objects to the Requests to the extent that they seek information that is protected from disclosure by the attorney-client privilege, the attorney work product doctrine or any other recognized privilege.

2. Plaintiff objects to the Requests to the extent that they require Respondents to search for and produce documents or information that are not within their possession, custody, or control.

3. Plaintiff objects to the Requests to the extent they seek information or documents that cannot be located by Respondents after reasonably diligent inquiry, are readily available from public sources, or are available to Complaint Counsel from another source or by other means that are more convenient, more appropriate, less burdensome, or less expensive.

4. Plaintiff objects to the Requests to the extent they seek legal conclusions and/or would require Respondents to reach a legal conclusion in order to prepare a response.

## ANSWERS TO REQUESTS FOR PRODUCTION

## REQUESTS FOR PRODUCTION

## REQUEST FOR PRODUCTION NO. 1:

All DOCUMENTS and COMMUNICATIONS that support, refute, or relate to any of YOUR allegations in the COMPLAINT.

**RESPONSE:** Plaintiff objects to this Request for Production because it is premature. Plaintiff further objects to the extent that relevant documents are in the possession, custody, and control of Defendants. Plaintiff objects to this Request because the term "support, refute, or relate to any of YOUR allegations in the COMPLAINT" is overbroad, vague, and unduly burdensome.

2

Plaintiff further objects based upon attorney-client privilege and the attorney work product doctrine.

Subject to the foregoing objections, see Plaintiff's Authorizations. Plaintiff is producing Authorizations on the condition that Defendants have agreed to comply with all applicable HIPAA regulations. The parties are working toward an agreeable Protective Order that would cover these Authorizations and records as well. Plaintiff reserves the right to amend and/or supplement this response.

**REQUEST FOR PRODUCTION NO. 2:**

All DOCUMENTS that constitute, refer to, or relate in any way to COMMUNICATIONS related to any INJURIES or medical conditions claimed in the COMPLAINT.

**RESPONSE**: Plaintiff objects to this Request for Production because it is premature. Plaintiff further objects to the extent that relevant documents are in the possession, custody, and control of Defendants. Plaintiff also objects that this request seeks health information protected by state and federal law and may exceed the scope of discovery. Plaintiff further objects based upon attorney-client privilege and the attorney work product doctrine.

Subject to the foregoing objections, once a protective order has been entered in this litigation, Plaintiff will at the appropriate time produce documents in Plaintiff's possession, custody, or control that are responsive to this request. Plaintiff reserves the right to amend and/or supplement this response.

**REQUEST FOR PRODUCTION NO. 3:**

All DOCUMENTS (including, but not limited to, email or other electronic forms) containing, reflecting, or relating to any COMMUNICATIONS between YOU and any treating physician and/or other HEALTH CARE PRACTITIONER whom YOU intend to call as a witness

3

to offer any medical opinion in this action.

**RESPONSE:** Plaintiff refers Defendant to her response to Request No. 2.

## REQUEST FOR PRODUCTION NO. 4:

All DOCUMENTS produced to YOU by any third-party in response to a subpoena or other formal or informal request for DOCUMENTS related to this LAWSUIT.

**RESPONSE:** At this time, Plaintiff has no documents responsive to this request.

## REQUEST FOR PRODUCTION NO. 5:

Any written or recorded statements obtained by YOU in connection with the allegations of the COMPLAINT or regarding any facts underlying the allegations of the COMPLAINT.

**RESPONSE:** Plaintiff objects to this Request for Production because it is overbroad and vague and is premature. Plaintiff also objects to this Request for Production because it seeks statements protected by attorney-client privilege and the work product doctrine.

Subject to the foregoing objections, once a protective order has been entered in this litigation, Plaintiff will produce any documents in Plaintiff's possession, custody, or control that are responsive to this request.

## REQUEST FOR PRODUCTION NO. 6:

All DOCUMENTS or evidence of any kind supporting each and every act and/or omission by ABBOTT that YOU allege supports the causes of action against ABBOTT in the COMPLAINT.

**RESPONSE:** In response, Plaintiff refers Defendant to her response to Request No. 1.

## REQUEST FOR PRODUCTION NO. 7:

Each of the PARENTS' federal, state, and local income tax returns for the ten (10) years preceding the events giving rise to this LAWSUIT to the present, whether filed individually or

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

jointly, including all attachments, schedules, and Wage or Earnings Statements (Forms W-2). To the extent INFANT has independently filed any federal, state, or local income tax return since birth, provide those returns as well, including all attachments, schedules, and Wages or Earnings Statements (Forms W-2).

**RESPONSE:** Plaintiff objects to this Request for Production because it seeks confidential tax records, which are deemed to be private communications with the government.

Subject to the foregoing objections, once a protective order has been entered in this litigation, Plaintiff will produce any documents in Plaintiff's possession, custody, or control that are responsive to this request.

## REQUEST FOR PRODUCTION NO. 8:

All DOCUMENTS which refer or relate to any welfare benefits or claims, worker's compensation benefits or claims, social security benefits or claims, health or disability benefits or claims, or any other governmental benefits or claims that were provided to or made by or on behalf of YOU, PARENTS, or INFANT in the ten (10) years preceding the events giving rise to this LAWSUIT to the present.

**RESPONSE:** Plaintiff objects to this Request for Production because it is overbroad and not limited in time or scope, and calls for the production of documents that are not related or relevant to the issues in this case.

Subject to the foregoing objections, once a protective order has been entered in this litigation, Plaintiff will produce any documents in Plaintiff's possession, custody, or control that are responsive to this request.

## REQUEST FOR PRODUCTION NO. 9:

All medical bills, statements, or invoices from any hospital, medical facility, doctor,

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

therapist, social worker, counselor, psychologist, or other physical or mental health care provider for goods or services for which YOU seek damages in this LAWSUIT, and any other bills, statements, or invoices, of any nature, for which YOU seek damages.

**RESPONSE:** Plaintiff objects to this Request for Production because it is overbroad and not limited in time or scope, and calls for the production of documents that are not related or relevant to the issues in this case.

Subject to the foregoing objections, see Plaintiff's Authorizations. Plaintiff is producing Authorizations on the condition that Defendants have agreed to comply with all applicable HIPAA regulations. The parties are working toward an agreeable Protective Order that would cover these Authorizations and records as well. Plaintiff reserves the right to amend and/or supplement this response.

**REQUEST FOR PRODUCTION NO. 10:**

All DOCUMENTS supporting or in any way relating to YOUR claim for damages in this LAWSUIT, including but not limited to medical and hospital expenses, burial and funeral expenses, mental anguish, pain, suffering, loss of earnings, earning capacity, society, support, services, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, education, solace, companionship, and prospective inheritance.

**RESPONSE:** In response, Plaintiff refers Defendant to her response to Request No. 2.

**REQUEST FOR PRODUCTION NO. 11:**

All DOCUMENTS that constitute, refer to, or relate to any out-of-pocket expenses which YOU contend are RELATED TO any INJURY as alleged in this LAWSUIT.

**RESPONSE:** In response, Plaintiff refers Defendant to her response to Request No. 2.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

**REQUEST FOR PRODUCTION NO. 12:**

All DOCUMENTS reflecting, referring to, or relating to any claim, lawsuit, and/or legal proceeding for alleged personal injuries in which YOU, PARENTS, or INFANT were involved in the ten (10) years preceding the events giving rise to this LAWSUIT to the present, including, but not limited to, copies of claim forms, statements, correspondence, depositions or sworn testimony of any type given by YOU and/or PARENTS related to any claim, including claims to governmental agencies or under the terms of an insurance policy, lawsuit, or proceeding.

**RESPONSE:** Plaintiff objects to this Request because it is compound, overbroad, and seeks information irrelevant and immaterial to the claims and defenses in this case.

Subject to and without waiving any objections, at this time, Plaintiff does not recall being involved in a prior lawsuit or litigation relating to Infant's diagnosis of, or treatment for, NEC or NEC-like symptoms. Plaintiff notes that there are multiple parties in this litigation. Beyond that, Plaintiff is willing to confer with Defendant about the scope of this Request.

**REQUEST FOR PRODUCTION NO. 13:**

All DOCUMENTS relating to monetary payments received by YOU, PARENTS, or INFANT from any person, entity, or governmental body as a result of the INJURIES or medical conditions claimed in the COMPLAINT.

**RESPONSE:** In response, Plaintiff refers Defendant to her response to Request No. 2.

**REQUEST FOR PRODUCTION NO. 14:**

Any insurance lien letter or correspondence related to the allegations of the COMPLAINT or regarding any facts underlying the allegations of the COMPLAINT.

**RESPONSE:** In response, Plaintiff refers Defendant to her response to Request No. 2.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

**REQUEST FOR PRODUCTION NO. 15:**

All DOCUMENTS relating to any liens or any subrogation interest or claims held or asserted against YOU or PARENTS by any third-party.

**RESPONSE:** In response, Plaintiff refers Defendant to her response to Request No. 2.

**REQUEST FOR PRODUCTION NO. 16:**

Any contract or DOCUMENT evidencing an agreement of compromise, settlement, release, covenant not to sue, "Mary Carter" agreement, or any other kind of settlement, agreement, understanding, or deal which any party or potential party to this LAWSUIT has with any other person, firm, corporation, party, or potential party with respect to the events associated with the subject matter of this LAWSUIT. This Request includes any past, present, and future settlements, deals, agreements, arrangements, understandings, or conduct by or between YOU, YOUR attorneys, agents, or representatives and any other person, entity, or such person's or entity's attorneys whatsoever, including any agreements to produce or withhold any evidence, exhibits, witnesses, or testimony.

**RESPONSE:** At this time, Plaintiff has no documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 17:**

All DOCUMENTS identified in connection with YOUR or INFANT's responses to any Interrogatories in this LAWSUIT, or referenced or used in preparing such responses.

**RESPONSE:** In response, Plaintiff refers Defendant to her response to Request No. 1.

**REQUEST FOR PRODUCTION NO. 18:**

All DOCUMENTS referenced, cited, consulted, or used in preparing the COMPLAINT.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

**RESPONSE:** Plaintiff objects to this Request as overbroad and vague. Plaintiff further objects based upon attorney-client privilege and the attorney work product doctrine. Plaintiff is willing to confer with Defendant about the scope of this Request.

**REQUEST FOR PRODUCTION NO. 19:**

All DOCUMENTS YOU intend to introduce as exhibits at trial.

**RESPONSE:** Plaintiff objects to this Request as premature. Plaintiff further objects at this time based upon attorney-client privilege and the attorney work product doctrine.

**REQUEST FOR PRODUCTION NO. 20:**

The attached HIPAA-compliant Authorization to Disclose Medical Information and Authorization to Disclose Psychiatric Records and Psychotherapy Notes Information signed by YOU or INFANT for any hospital, medical facility, doctor, pharmacy, therapist, social worker, counselor, psychologist, or other physical or mental health care provider that has treated INFANT. Exhibit A includes the authorizations to be signed by YOU or INFANT if INFANT is not a minor and has capacity to sign the authorizations; Exhibit B includes the authorizations to be signed by YOU on behalf of INFANT if INFANT is a minor and/or does not have capacity to sign the authorizations).

**RESPONSE:** Plaintiff objects to this Request for Production because it is premature and may exceed the scope of discovery. Plaintiff further objects to the extent that relevant documents are in the possession, custody, and control of Defendants. Plaintiff also objects that this request seeks health information protected by state and federal law.

Subject to the foregoing objections, see Plaintiff's Authorizations. Plaintiff is producing Authorizations on the condition that Defendants have agreed to comply with all applicable HIPAA regulations. The parties are working toward an agreeable Protective Order that would cover these

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

Authorizations and records as well. Plaintiff reserves the right to amend and/or supplement this response.

**REQUEST FOR PRODUCTION NO. 21:**

The attached HIPAA-compliant Authorization to Disclose Medical Information (signed by YOU) directed to each hospital, medical facility, doctor, pharmacy, therapist, social worker, or other physical or mental health care provider that treated YOU in the ten (10) years preceding the events giving rise to this LAWSUIT to the present (Exhibit A).

**RESPONSE:** Plaintiff objects to this Request for Production because it is premature and may exceed the scope of discovery. Plaintiff further objects to the extent that relevant documents are in the possession, custody, and control of Defendants. Plaintiff also objects that this request seeks health information protected by state and federal law.

Subject to the foregoing objections, see Plaintiff's Authorizations. Plaintiff is producing Authorizations on the condition that Defendants have agreed to comply with all applicable HIPAA regulations. The parties are working toward an agreeable Protective Order that would cover these Authorizations and records as well. Plaintiff reserves the right to amend and/or supplement this response.

**REQUEST FOR PRODUCTION NO. 22:**

The attached HIPAA-compliant Authorization to Disclose Psychiatric Records and Psychotherapy Notes Information authorization (signed by YOU) directed to each hospital, medical facility, medical practitioner, doctor, pharmacy, therapist, social worker, or other physical or mental health care provider (including any psychiatric or psychological practitioner or facility)

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

who treated YOU on or after INFANT's date of birth for any psychiatric, psychological, and/or emotional injuries for which YOU seek recovery in the COMPLAINT (Exhibit A).

**RESPONSE:** Plaintiff objects to this Request for Production because it is premature and may exceed the scope of discovery. Plaintiff further objects to the extent that relevant documents are in the possession, custody, and control of Defendants. Plaintiff also objects that this request seeks health information protected by state and federal law.

Subject to the foregoing objections, see Plaintiff's Authorizations. Plaintiff is producing Authorizations on the condition that Defendants have agreed to comply with all applicable HIPAA regulations. The parties are working toward an agreeable Protective Order that would cover these Authorizations and records as well. Plaintiff reserves the right to amend and/or supplement this response.

**REQUEST FOR PRODUCTION NO. 23:**

The attached Authorization to Release Insurance Information, Authorization to Release Education Information and Authorization to Release Employment Information signed by YOU or INFANT directed to each insurance company, educational institution and employer identified in response to ABBOTT's Interrogatories to PLAINTIFF and any amendments thereto (Exhibits A and B).

**RESPONSE:** Plaintiff objects to this Request for Production because it is premature and may exceed the scope of discovery. Plaintiff further objects to the extent that relevant documents are in the possession, custody, and control of Defendants. Plaintiff also objects that this request seeks health information protected by state and federal law.

Subject to the foregoing objections, see Plaintiff's Authorizations. Plaintiff is producing Authorizations on the condition that Defendants have agreed to comply with all applicable HIPAA

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

regulations. The parties are working toward an agreeable Protective Order that would cover these Authorizations and records as well. Plaintiff reserves the right to amend and/or supplement this response.

**REQUEST FOR PRODUCTION NO. 24:**

To the extent YOU identified in your Interrogatory Responses any twin or other sibling of the INFANT carried in the same pregnancy, the attached HIPAA-compliant Authorization to Disclose Medical Information and Authorization to Disclose Psychiatric Records and Psychotherapy Notes Information (signed by YOU or the sibling of the INFANT on his or her own behalf) directed to each hospital, medical facility, doctor, pharmacy, therapist, social worker, counselor, psychologist, or other physical or mental health care provider that treated INFANT's sibling (Exhibits A and B).

**RESPONSE:** Plaintiff objects to this Request for Production because it is premature and may exceed the scope of discovery. Plaintiff further objects to the extent that relevant documents are in the possession, custody, and control of Defendants. Plaintiff also objects that this request seeks health information protected by state and federal law.

Subject to the foregoing objections, once a protective order has been entered in this litigation, Plaintiff will at the appropriate time execute relevant authorizations for records. Plaintiff reserves the right to amend and/or supplement this response.

**REQUEST FOR PRODUCTION NO. 25:**

All DOCUMENTS that constitute, refer to, or relate to INFANT's personal medical history and/or treatment throughout INFANT's lifetime, including any MEDICAL RECORDS, correspondence with HEALTH CARE PRACTITIONERS, research on health conditions, and personal notes.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

**RESPONSE:** Plaintiff refers Defendant to her response to Request No. 2.

**REQUEST FOR PRODUCTION NO. 26:**

All DOCUMENTS that constitute, refer to, or relate to YOUR personal medical history and/or treatment in the ten (10) years preceding the events giving rise to this LAWSUIT to the present, including any MEDICAL RECORDS, correspondence with HEALTH CARE PRACTITIONERS, research on health conditions, and personal notes.

**RESPONSE:** Plaintiff refers Defendant to her response to Request No. 2.

**REQUEST FOR PRODUCTION NO. 27:**

All DOCUMENTS and COMMUNICATIONS, including those sent through a patient-portal system, between YOU and any HEALTH CARE PRACTITIONER, or any PERSON acting on behalf of or assisting a HEALTH CARE PRACTITIONER, in the ten (10) years preceding the events giving rise to this LAWSUIT to the present relating to YOUR personal medical history and/or treatment or INFANT's personal medical history and/or treatment.

**RESPONSE:** Plaintiff refers Defendant to her response to Request No. 2.

**REQUEST FOR PRODUCTION NO. 28:**

All DOCUMENTS and COMMUNICATIONS that constitute, refer to, or relate to YOUR use of, or treatment for, drugs or alcohol.

**RESPONSE:** Plaintiff refers Defendant to her response to Request No. 2.

**REQUEST FOR PRODUCTION NO. 29:**

All DOCUMENTS and COMMUNICATIONS from health, medical, disability, and life insurance providers, including, but not limited to, private providers, COBRA, Medicaid, and any plan of supplemental insurance from which INFANT has received insurance coverage.

**RESPONSE:** Plaintiff refers Defendant to her response to Request No. 2.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

**REQUEST FOR PRODUCTION NO. 30:**

All DOCUMENTS and COMMUNICATIONS from health, medical, disability, and life insurance providers, including, but not limited to, private providers, COBRA, Medicaid, and any plan of supplemental insurance from which YOU have received insurance coverage.

**RESPONSE:** Plaintiff refers Defendant to her response to Request No. 2.

**REQUEST FOR PRODUCTION NO. 31:**

All DOCUMENTS that EVIDENCE YOUR and/or PARENTS' purchase of or payment for, or contemplated purchase of or contemplated payment for, any PRETERM INFANT FORMULA PRODUCTS and/or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:** Plaintiff refers Defendant to her response to Request No. 2.

**REQUEST FOR PRODUCTION NO. 32:**

All DOCUMENTS that constitute MARKETING that YOU and/or PARENTS saw or read about PRETERM INFANT FORMULA PRODUCTS and/or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:** Plaintiff has no documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 33:**

All DOCUMENTS that constitute, contain, refer to, or relate to any packaging or labeling that YOU and/or PARENTS reviewed for PRETERM INFANT FORMULA PRODUCTS and/or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:** Plaintiff has no documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 34:**

All DOCUMENTS that constitute, contain, refer to, or relate to any COMMUNICATIONS between YOU and ABBOTT.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

**RESPONSE:** Plaintiff has no documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 35:**

All DOCUMENTS that constitute, contain, refer to, or relate to any COMMUNICATIONS between YOU and any seller, manufacturer, or supplier of PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:** Plaintiff has no documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 36:**

All DOCUMENTS that constitute, contain, refer to, or relate to any COMMUNICATIONS between YOU and any governmental or public agency about PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:** Plaintiff has no documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 37:**

All DOCUMENTS that constitute, contain, refer to, or relate to any COMMUNICATIONS between YOU and any governmental or public agency about ABBOTT or any other manufacturer of PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:** Plaintiff has no documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 38:**

All DOCUMENTS that constitute, reflect, refer to, or relate to any articles, journals, notes, news alerts, or other information about PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:** Plaintiff refers Defendant to her response to Request No. 1.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

**REQUEST FOR PRODUCTION NO. 39:**

All DOCUMENTS that constitute, reflect, refer to, or relate to any articles, journals, notes, news alerts, or other information about ABBOTT or any other manufacturer of PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:** Plaintiff refers Defendant to her response to Request No. 1.

**REQUEST FOR PRODUCTION NO. 40:**

All DOCUMENTS and COMMUNICATIONS contained within YOUR, PARENTS' or INFANT's social media accounts that constitute, refer to, or relate to ABBOTT or any other manufacturer of PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:** Plaintiff has no documents responsive to this request. As discovery is ongoing, Plaintiff will supplement this request if needed.

**REQUEST FOR PRODUCTION NO. 41:**

All DOCUMENTS and COMMUNICATIONS contained within YOUR, PARENTS' or INFANT'S social media accounts that constitute, refer to, or relate to INFANT or any alleged INJURY.

**RESPONSE:** Plaintiff objects to this Request as vague and overbroad because it seeks all social media posts and documents related to Plaintiff's child. As discovery is ongoing, Plaintiff will supplement this request if needed.

**REQUEST FOR PRODUCTION NO. 42:**

All non-privileged COMMUNICATIONS and DOCUMENTS between YOU and any PERSON related to YOUR decision to initiate this LAWSUIT.

**RESPONSE:** Plaintiff refers Defendant to her response to Request No. 1.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

**REQUEST FOR PRODUCTION NO. 43:**

All DOCUMENTS and COMMUNICATIONS relating to LITIGATION FUNDING IN CONNECTION WITH this LAWSUIT.

**RESPONSE:** Plaintiff objects to this Request on the ground that it seeks information that is irrelevant and immaterial to Plaintiff's claims.

**REQUEST FOR PRODUCTION NO. 44:**

All YOUR calendars, journals, or other DOCUMENTS that reflect YOUR daily activities for the ten (10) years preceding the events giving rise to this LAWSUIT to the present.

**RESPONSE**: Plaintiff objects that this Request is overbroad because it seeks ten years of information and contains no limitation for subject matter or relevance. Plaintiff also refers Defendant to her response to Request No. 1.

**REQUEST FOR PRODUCTION NO. 45:**

For each expert identified in response to Abbott's First Set of Interrogatories to Plaintiffs, produce ALL DOCUMENTS and/or COMMUNICATIONS that reflect or contain facts or data they generated, created, or considered, along with all notes, files, literature, and other DOCUMENTS and things created, received, examined, or considered by the witness.

**RESPONSE**: Plaintiff objects to this Request because it is premature. Plaintiff also objects to the extent that she does not yet know the identities of the experts likely to be called at trial. Further, because discovery is just beginning in this litigation, the Request is premature to the extent that Plaintiff does not yet have sufficient information to enable an expert to finalize a comprehensive opinion with respect to the facts and issues involved in this action.

Subject to the foregoing, Plaintiff will amend and/or supplement this response.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

**REQUEST FOR PRODUCTION NO. 46:**

All DOCUMENTS that constitute, reflect, reference, or relate in any way to any tests or analyses that YOU or any experts identified in response to Abbott's First Set of Interrogatories, consultants, other retained agents, or anyone acting on YOUR behalf have performed on or with PRETERM INFANT FORMULA PRODUCTS. This Request includes but is not limited to any draft or final protocols, all data collected or generated, all photographs or videotapes taken or made, and all DOCUMENTS reflecting or recording the results and interpretations of these tests or analyses.

**RESPONSE**: Plaintiff refers Defendant to her response to Request No. 45.

Respectfully submitted,

KLINE & SPECTER, P.C.
By: /s/ Tobias L. Millrood
Tobias L. Millrood, Esq.

Dated: October 12, 2023

18

# EXHIBIT C

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

| | |
|---|---|
| **From:** | Fuchs, Ronni E. <Ronni.Fuchs@Troutman.com> |
| **Sent:** | Monday, October 16, 2023 4:04 PM |
| **To:** | Timothy Burke |
| **Cc:** | Fahey, Sean P. |
| **Subject:** | RE: NEC Phila Cases |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Tim,

I am writing to let you know that the authorizations and responses to discovery are entirely inadequate, and not consistent with what plaintiffs agreed to provide. In August, Abbott served discovery, which included requests for lists of treating physicians and blank authorizations. We granted plaintiffs an extension of time to respond to our discovery with the understanding that plaintiffs would be providing us with records in your possession, and authorizations sufficient to permit record collection. In fact, in an August email exchange (included below) regarding plaintiffs' request that Abbott provide a four week extension on discovery responses, Tobi said that plaintiffs would be providing us with records you have, and – on a rolling basis – with lists of treaters, medical, education, and insurance authorizations. He also stated that plaintiffs would provide employment records (if seeking a wage loss claim) and psychiatric authorizations (if claiming emotional injury). We received nothing until last week. And what we received was not what we were told we would receive.

First, we did not receive *any* medical records. Second, we did not receive *any* authorizations for 7 cases of the 21 in which amended complaints were filed; in 14 cases, we received authorizations to permit collection of parent records from the birth hospital only; and, in only 12 cases, we received authorizations to permit collection of child records from birth hospitals and, at most, one or two other hospitals. Your discovery responses do not list any treaters, but just refer us to the authorizations. Surely, you are not suggesting that these children did not have pediatric or other medical care, or that the mothers received no obstetric care other than in the birth hospital?

As you know, the Court entered a schedule requiring all discovery to be completed by the beginning of June 2024 and suggested we begin plaintiffs' depositions as soon as possible. The process we were discussing, where you provide either lists of treaters and blank authorizations (or even a reasonably complete set of designated authorizations) for all 21 cases, along with records in your possession, would have given us a chance to meet that deadline. But we cannot do so with what you provided.

I also ask you to review the discovery responses. The majority of the interrogatories were Standard Form Interrogatories propounded pursuant to Local Rule 4005. Despite the prohibition on objections to standard form interrogatories, plaintiffs objected to each of them. Moreover, plaintiffs only provided substantive information in response about 10 of the 68 interrogatories for each plaintiff (limited to information such as the infant's address, date of birth, and hospital of birth). We will send you a letter detailing the deficiencies in plaintiffs' responses, but I ask that we have a call later this week about these issues.

Finally, when we spoke, you indicated you were surprised that defendants filed preliminary objections to the amended complaints. I want to make it clear that defendants' preliminary objections are not filed to preserve the record but because plaintiffs did not address the critical deficiencies in the initial pleadings. For example, Judge Carpenter pointed out during the last status conference that plaintiffs had not identified the formula products administered to each infant, suggesting that plaintiffs amend their complaints to identify the product administered or otherwise explain why such identification was not possible. But universally across the amended complaints, plaintiffs use the exact same phrasing as

1

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

had appeared in the initial complaints regarding the product used: "Abbott and/or Mead Johnson," without explaining why product identification is impossible in any case. Likewise, even with the benefit of amendment, plaintiffs still failed to plead the existence of a misrepresentation by either Mead Johnson or Abbott, let alone whether any plaintiff saw, heard, or relied on any such misrepresentation to their detriment. These are just two examples of substantive deficiencies that existed in the initial complaints and have not been remedied in plaintiffs' pleadings.

Please let me know when you are available to discuss plaintiffs' responses to discovery.

--Ronni

**Ronni E. Fuchs**
**Partner**
Direct: 609.951.4183 | Mobile: 267.907.3719 | Internal: 812-4183
ronni.fuchs@troutman.com

**troutman** **pepper**
301 Carnegie Center
Suite 400
Princeton, NJ 08540
troutman.com

Troutman Pepper is a Mansfield Certified Plus Firm

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

# EXHIBIT D

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

Troutman Pepper Hamilton Sanders LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103



troutman.com

**Ronni E. Fuchs**
D 609.951.4183
Ronni.Fuchs@Troutman.com

October 27, 2023

**VIA E-MAIL**

Tobi Millrood
Tobi.Millrood@klinespecter.com

Timothy Burke
Timothy.Burke@klinespecter.com

Re:     ***Preterm Infant Nutrition Litigation (PCCP Case Numbers PCCP Case Nos.
220302583, 220302588, 220302594, 220302601, 220302606, 220302614, 220302617,
220302963, 220302967, 220302969, 220302978, 220302981, 220302983, 220302986,
220400127, 220400136, 220400138, 220400140, 220400141, 220400142, 220400145,
220400153, 220400156, 220400158, 220400159, 220400162, 220400208, 220400212,
and 220400216) Discovery Deficiency Letter***

Counsel:

I write on behalf of Defendant Abbott Laboratories ("Abbott").  This letter pertains to Plaintiffs'
deficient Responses to Abbott's First Set of Interrogatories ("INTs"), Plaintiffs' deficient
Responses to Abbott's First Set of Requests for Production of Documents ("RFPs"), and the
limited Authorizations that Plaintiffs have provided to date.[1]  Abbott propounded these INTs and
RFPs on August 9, 2023, and agreed to Plaintiffs' request for an extension of time to respond
until October 9, 2023.  In the discussion regarding the extension, Abbott made clear that it would
grant the extension but that it needed authorizations, lists of treaters, and any records in Plaintiffs'
possession sooner than October 9 in order to prepare for Plaintiffs' depositions.  In response, on
August 31st, you said "[w]e will provide you with records we have. We will assemble a list of
treaters. We will supply med, education, insurance auths. We will supply employment records if
a wage loss claim is pursued and psych auth if we are claiming psych injury."

Despite that assurance, Abbott received nothing – no records, authorizations, or lists of treaters
prior to October 9.  On October 11 and 12, Plaintiffs provided responses to INTs and RFPs, with
a small set of authorizations for about half of the cases.  On October 16, 2023, Abbott informed
Plaintiffs of the significant deficiencies in its responses, including missing authorizations,
incomplete sets of authorizations, lack of treater lists and lack of any records from Plaintiffs.  We

---

[1] Abbott uses the term "Plaintiffs" to refer to all Plaintiffs across the 21 cases in which Amended
Complaints have been filed.  We understand that you will be filing petitions for the dismissal of the eight
cases in which Amended Complaints were not filed.

<span style="color:red">Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444</span>



received no response until October 26, when we received limited authorizations in most (but not all) of the remaining cases. At the Case Management Conference before Judge Carpenter in July 2023, there was discussion about beginning to take Plaintiffs' depositions by the end of this year. This was always going to be challenging, but in light of Plaintiffs' failure to produce any medical records, sufficient authorizations to permit the collection of records, or meaningful responses to written discovery, Plaintiffs have almost ensured that Defendants will not be in a position even to begin these depositions this calendar year.

As discussed below and in our October 16th email to you, Plaintiffs' responses are deficient, and we request that they be promptly supplemented no later than November 3, 2023. If you disagree and believe that any response is not deficient, we request a telephonic meet and confer. Please let us know your availability for a call during the week of November 6. We appreciate Plaintiffs' anticipated cooperation in resolving these deficiencies.

## I.    Authorizations

In **Request for Production Nos. 20-24**, Abbott requested signed medical, insurance, employment, education, and psychiatric/psychotherapy authorizations for both Infant and Parent, to permit Abbott to begin the collection of relevant medical records. Plaintiffs corresponded with Abbott in late August, seeking an extension of time to respond to the discovery. Abbott agreed to provide Plaintiffs with a 30-day extension of time to respond to the discovery, but with an agreement that Plaintiffs would be providing Abbott with (1) signed authorizations, (2) lists of treaters, and (3) medical records in Plaintiffs' possession.

Yet, it was not until October 11, 2023 that Plaintiffs first provided Abbott with any authorizations – and then, only in about half of the cases. Plaintiffs then provided limited authorizations in seven additional cases on October 26, 2023 (after Abbott sent correspondence following up). Plaintiffs' delay in providing even these limited authorizations – and continued delay in providing **full and complete** authorizations – prevented Abbott from adequately preparing to take Plaintiffs' depositions by the end of this year.

The medical authorizations provided are "designated" authorizations; that is, they are directed to single specific entities and therefore cannot be used to collect records from any additional providers. Abbott requested Plaintiffs to provide blank authorizations along with lists of treaters. This would have permitted Abbott to efficiently collect records. Instead, by providing authorizations for only limited providers, Plaintiffs have ensured further delay in the collection of records.

Beyond the reasons noted above, the authorizations are deficient in several other respects:

***First***, with regard to Infant authorizations that have been produced, Plaintiffs provided a single authorization in five cases, which was directed to the Infant's birth hospital. As discussed with the Court in July, the birth records do not provide information about the child's ongoing course or current condition. In ten more cases, Plaintiffs provided only two authorizations, one directed to the Infant's birth hospital and one additional hospital. In three cases, Plaintiffs provided authorizations for three or more hospitals, which consisted of the Infant's birth hospital and two or more additional hospitals. Plaintiff provided an authorization for pediatric care in only one case. In no other instance did Plaintiffs provide any medical authorizations for the Infant's pediatrician,

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

**Deficiency Letter**
**October 27, 2023**
Page 3



GI treating physician, or any other medical provider.  Plaintiffs also did not provide any insurance, education, or psychiatric/psychotherapy authorizations.  ***Plaintiffs failed to produce any Infant authorizations in Wiggins* and *Williams.***

***Second***, with regard to Parent authorizations that have been produced, Plaintiff-Parents provided only one authorization in 19 cases – that for the birth hospital.  Plaintiffs did not provide any authorizations for Plaintiff-Parents' obstetrician/ gynecologist or any other treaters.  Plaintiffs also did not provide any insurance, employment, or psychiatric/psychotherapy authorizations. ***Plaintiffs failed to produce any Parent authorizations in Wiggins*.**

Finally, Plaintiffs failed to produce lists of treaters or a single medical record in their possession. Abbott expects Plaintiffs to produce (1) ***full and complete*** authorizations in ***all*** 21 cases, (2) lists of treaters, and (3) all medical records in Plaintiffs possession, no later than November 3, 2023.

## II.    Interrogatories (INTs)

Plaintiffs' responses to Abbott's INTs are almost entirely deficient.  Abbott first discusses deficiencies in the Standard INT responses, before reviewing deficiencies in the Supplemental INT responses.  As a threshold issue, Plaintiffs failed to verify any of their INT responses as required by Pa. R. Civ. P. 4006(a)(1).

### A.    Standard Interrogatories Pursuant to Phila. Cnty. Loc. R. 4005 (INT Nos. 1 through 41)

***First***, Plaintiffs improperly objected to each and every Standard INT.  Abbott propounded 21 Standard INTs on each Infant and Parent.  Abbott clearly indicated in the introductory paragraph that these INTs were propounded pursuant to Phila. Cnty. Loc. R. 4005.  Additionally, Abbott even cited the Standard Interrogatory category and Interrogatory Number next to each Standard INT.

Pursuant to the plain text of that rule, "The Court will not entertain objections to the standard interrogatories ***and parties who file such objections will be subject to sanctions*** including imposition of counsel fees." *See* Phila. Cnty. Loc. R. 4005(D) (emphasis added).  Notwithstanding this clear instruction and caution, Plaintiffs universally objected to each and every one of the Standard INTs that Abbott propounded in all 21 cases.

The failure to comply with Loc. R. 4005(D) is compounded by the fact that, in response to at least 26 of the 42 Standard INTs, Plaintiffs provided absolutely no response at all.[2]  These non-responses fall into three categories: refusal to respond, offers to meet and confer, and unspecific promises to supplement.  Each type of non-response is discussed below.

In response to **INT Nos. 3, 18, 19, 20, 24, 28, 29, 39, and 40**, Plaintiffs outright objected to the Standard INT and provided no further response.  This is an especially inappropriate response to Standard INTs, which, by rule, may not be objected to.

---

[2] About half of the Plaintiffs failed to respond to Standard INTs 31 and 32 as well.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

**Deficiency Letter**
**October 27, 2023**
Page 4



In response to **INT Nos. 2, 5, 7, 8, 9, 10, 14, 15, 16, 33, 34, 35, and 36**, Plaintiffs objected to the Standard INT and offered to meet and confer. Plaintiffs provided absolutely no other substantive response to any part of the INTs that Plaintiffs did not find objectionable. Despite Plaintiffs' unfounded objections, these requests are highly relevant and appropriate, including:

- **INT No. 2**: If you claim a permanent injury resulting from the treatment, surgery or examination upon which this action is based, describe such injury fully and in detail.

- **INT No. 5**: State in detail the injuries or diseases that you allege that you suffered as a result of treatment, surgery or examination upon which this action is based.

- **INT No. 7**: Either prior to or subsequent to the treatment, surgery or examination referred to in the complaint, have you ever suffered any injuries, illness or diseases in those portions of the body claimed by you to have been affected by the treatment, surgery or examination referred to in the complaint? If so, state: (a) A description of the injuries or diseases you suffered; (b) The date and place of any accident, if such an injury or disease was caused by an accident; and (c) The names and addresses of all hospitals, doctors or practitioners who rendered treatment or examinations because of any such injuries or diseases.

- **INT No. 10**: State whether you, subsequent to the date of the treatment, surgery or examination, have been unable to perform adequately any of your customary occupational duties or social or other activities, stating with particularity (a) the duties and/or activities you have been unable to perform, (b) the periods of time you have been unable to perform, and (c) the names and last known addresses of all persons who have personal knowledge thereof.

- **INT Nos. 14 & 34**: Have you given any statement concerning this action or its subject matter? If so, state: (a) The name and last known address of each person to whom a statement was given; (b) When and where each statement was given; and (c) Please consider this a Request to Produce the statements referred to in the above answer.

In response to **INT Nos. 11, 12, 17, and 37**, Plaintiffs objected to the INTs and responded only that they will supplement their responses with unspecified information at some unspecified time in the future. This response is wholly inappropriate. These INTs seek basic information about cases that Plaintiffs themselves brought, which Plaintiffs should have had in their possession prior to filing their complaints.

Moreover, the information responsive to each of these interrogatories is uniquely within Plaintiffs' possession and relevant to the cases. For example, **INT Nos. 11 and 12** inquire as to the names and locations of witnesses and people with knowledge of the facts concerning the treatment, surgery, examination, condition, or circumstances related to the allegations in the Amended Complaints. Plaintiffs' suggestion that the investigation as to each of these areas of inquiry is premature strains credulity. Even if some information remains subject to investigation, Plaintiffs must provide the information they currently have.



*Second*, with respect to the Standard INTs to which Plaintiffs arguably "responded," the responses are overwhelmingly deficient. In response to **INT Nos. 4, 6, 13, 21, 23, 25, 26, 27, 30, and 41**, Plaintiffs generically refer to medical authorizations, medical records, and/or other unspecified productions by Defendants or third parties. These responses are wholly insufficient. To begin, the authorizations do not provide any substantive information besides the name of a single hospital, which is arguably only partially responsive to **INT Nos. 6 and 27** from the above list. Further, Plaintiffs have yet to turn over a single medical record in any of the 21 cases, despite suggesting in their response to Pennsylvania Hospital's preliminary objections that they relied on these records in preparing their Amended Complaints. *See* Pls. Resp. to Penn POs, at pg. 13. Lastly, Plaintiffs' vague reference to "all relevant documents that will be produced during the course of discovery" is wholly insufficient.

*Third*, Plaintiffs provided substantive information in response to no more than four Standard INTs, and, in most cases, only two Standard INTs. In **INT Nos. 1 and 22**, Abbott requested "(a) Your full name; (b) Any other names you have used or been known by; (c) Your date and place of birth; (d) Your marital status at the time of the incident; € Your present marital status; (f) Your present home address; and (g) Your social security number." In response, Plaintiffs provided only Parent's home address, Infant's home address, Infant's date and place of birth, and in one instance, Infant's date of death. While Plaintiffs agreed to produce social security numbers after entry of a protective order, Plaintiffs failed to respond to the remaining components of the request and instead, objected in defiance of Rule 4005(D).

Similarly, only 10 of the 21 Plaintiffs provided any substantive response to **INT Nos. 31 and 32**. **INT Nos. 31 and 32** sought information about the witnesses and people with knowledge of the facts concerning the treatment, surgery, examination, condition, or circumstances related to the allegations in the Amended Complaints. Eleven of the 21 Plaintiffs objected outright to both **INT Nos. 31 and 32**, noting only that Plaintiff would supplement "if necessary." Six of the 21 Plaintiffs responded to **INT No. 32** by providing only the name of the birth hospital and standing on their objections to **INT No. 31**. Four of the 21 Plaintiffs responded to **INT Nos. 31 and 32** by only providing very limited information on potential witnesses, such as the name of the Infants' father and/or grandfather (*Henderson*, *McMillian*), unnamed nurses in the NICU (*Parker*), and unnamed employees of the Children's Hospital of Philadelphia (*Sanders*). Beyond these very limited answers, Plaintiffs provided no other substantive information in response to the Standard INTs.

*Fourth*, Plaintiffs responded to Standard **INT Nos. 23, 26, and 27** by suggesting that, as discovery is ongoing, "Infant may have additional injuries that are, at this time, not known because Infant is continuing to develop and may face new, or worsened, injuries as time passes." The potentially changing nature of Infants' injuries does not relieve Plaintiffs of their discovery obligation to respond to this Standard INT and identify any presently known injuries that are responsive thereto. Moreover, Plaintiff Mays responded to **INT No. 22** and indicated that Infant A.R. died on August 15, 2005. Yet, despite Infant's passing, Plaintiff Mays responded to **INT Nos. 23, 26, and 27** by claiming that "Infant is continuing to develop and may face new, or worsened, injuries as time passes."

Abbott requests that Plaintiffs amend and supplement their deficient INT responses, and withdraw all objections, so as to cure the deficiencies indicated above, no later than November 3, 2023.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

**Deficiency Letter**
**October 27, 2023**
Page 6



B.    <u>Supplemental Interrogatories</u>

Abbott also propounded 27 Supplemental INTs on Plaintiffs.  Much like the Standard INTs, Plaintiffs responded with a mixture of pure objections, offers to meet and confer, vague references to authorizations and medical records not yet produced, and extraordinarily limited substantive information.  Each deficiency is reviewed below.

***First***, Plaintiffs objected or responded to several INTs, asserting that discovery is "early and ongoing" or "premature" (**INT Nos. 42, 43, 44, 45, 46, 47, 48, 50, 51, 53, and 63**).  This objection is unfounded and does not excuse Plaintiffs from satisfying their discovery obligations.  These INTs seek basic information about cases that Plaintiffs themselves brought, which Plaintiffs should have had in their possession prior to filing their complaints.  Additionally, Plaintiffs' failure to produce this basic information has prevented Defendants from being in a position to take Plaintiffs' depositions.

For example, **INT No. 42** simply seeks identification of the product Infant was administered. Plaintiffs cannot continue to avoid answering basic questions that go to the heart of their claims by continuously asserting that their investigation is "ongoing."[3]

Moreover, Abbott served these requests on August 9, 2023.  Despite an extension to October 9, 2023, Plaintiffs provided substantively deficient responses.  These requests sought information that is particularly and uniquely within Plaintiffs' possession.  For example:

- STATE whether YOU and/or PARENTS saw or read any label, packaging, product guide, or other DOCUMENTS RELATED TO the PRETERM INFANT FORMULA PRODUCTS before they were administered to the INFANT and, if so, IDENTIFY the label, packaging, or product guide, or other DOCUMENTS you saw or read and IDENTIFY the time, place, and manner in which YOU saw or read such materials. (**INT No. 43**)

- STATE whether YOU and/or PARENTS had any COMMUNICATIONS with any HEALTH CARE PRACTITIONERS regarding the decision to administer any nutrition, including but not limited to breast milk, donor milk, or PRETERM INFANT FORMULA PRODUCTS, to the INFANT and, if so, IDENTIFY all persons with whom YOU and/or PARENTS had such COMMUNICATIONS, the date(s), time, place, and manner of those COMMUNICATIONS, and DESCRIBE the content of those COMMUNICATIONS. (**INT No. 44**).

- IDENTIFY any gifts, coupons, PRETERM INFANT FORMULA PRODUCTS, or OTHER INFANT FORMULA PRODUCTS that YOU and/or PARENTS received from any HEALTH CARE PROVIDER, including without limitation the PERSON who provided any such items

---

[3] Plaintiffs also objected to **INT No. 42** as requiring expert opinion.  This objection, too, is unsupportable. The information required to respond **INT No. 42** would be uniquely in Plaintiffs' possession or, at worst, readily available to Plaintiffs through their medical records.  These deficiencies are not cured by any vague promise to supplement at a later date.  Rather, Plaintiffs have a plain discovery obligation to provide contemporaneous responses to these relevant requests.

<span style="color:red">Certification Due Date: 11/20/2023</span>
<span style="color:red">Response Date: 11/27/2023</span>
<span style="color:red">Case ID: 220302606</span>
<span style="color:red">Control No.: 23112444</span>

**Deficiency Letter**
**October 27, 2023**
Page 7



---

to YOU and/or PARENTS, the date YOU and/or PARENTS received such items, and the substance of any discussions about such items. (**INT No. 46**)

To the extent Plaintiffs provided any response to these interrogatories, the responses were wholly generic, lacking substantive information, and failed to answer all components of the INTs. For example, in response to **INT No. 44** about communications with HCPs regarding the decision to administer nutrition to Infant, including the persons involved, as well as the time, place, manner, and content of the communication, Plaintiffs' responses included generic phrases such as:

- "Plaintiff recalls discussing the benefits of feeding premature babies with human milk but does not recall having conversations related to consent to feed her child." (*Goodmond Rya G.*, *Goodmond Ryh G.*);

- "Plaintiff recalls signing a consent form for her child to be given formula or fortifier." (*Kajuffa*);

- "Plaintiff recalls being consulted about nutrition . . . ." (*Moment*); and

- "Plaintiff recalls having conversations related to consent to feed her child." (*Taylor*).

In each of these instances, Plaintiffs fail to provide basic information that is central to the claims they brought, including the location, time, content, and participants of these conversations.[4]

***Second***, Plaintiffs universally objected and failed to provide any further response to 14 of the 27 Supplemental INTs. (**INT Nos. 42, 48, 51, 52, 55, 56, 57, 58, 59, 60, 61, 62, 64, and 67**). Plaintiffs' failure to provide any responses to these INTs is wholly unacceptable. These INTs seek information that is highly relevant to Plaintiffs' claims and Abbott's defenses, including, among others, the identity of the formula product administered to Infant (**INT No. 42**), what additional/different warnings Plaintiffs contend Abbott should have provided regarding its preterm infant nutrition products (**INT No. 48**), the date on which Infant was diagnosed with NEC (**INT No. 52**), the identity of other pregnancies the Plaintiff-Parent has experienced and whether those Infants received preterm Infant formula (**INT Nos. 55 and 56**), the identity of persons who maintain relevant records (**INT No. 57**), Infant's non-NEC diagnoses, if any (**INT No. 58**), and Parent and Infant's educational background and employment (**INT Nos. 61 and 62**). These issues are central to the case at hand. Plaintiffs themselves placed these questions squarely at issue in this litigation. Plaintiffs have alleged their Infant ingested Abbott's formula; Plaintiffs have alleged their Infant was diagnosed with NEC; and Plaintiffs have alleged that there are alternative forms of nutrition available. Abbott is entitled to investigate and test these allegations by requesting information from Plaintiffs regarding these allegations, and Plaintiffs' claim that discovery is "ongoing" in no way relieves them of their obligation to provide complete and accurate responses to these INTs that detail the information presently known to Plaintiffs.

---

[4] Note that these same failures and lack of substantive information similarly plague Plaintiffs' responses to **INT Nos. 42, 45, 46, 47 and 53**.

Certification Due Date: 11/20/2023
Response Date: 11/27/2023
Case ID: 220302606
Control No.: 23112444

**Deficiency Letter**
**October 27, 2023**
Page 8



Abbott requests that Plaintiffs amend and supplement their deficient responses, and withdraw all unsupportable objections, so as to cure the deficiencies described above, no later than November 3, 2023.

### III.     Requests for Production of Documents (RFPs)

All Plaintiffs across all 21 cases provided identical deficient responses to each of the 46 Requests for Production propounded by Abbott. The deficiencies in Plaintiffs' responses to these RFPs are detailed below.

***First***, in response to **RFP Nos. 1, 6, 9, 17, 38, 39, 42, and 44**, Plaintiffs directed Abbott to unspecified medical authorizations, medical records that have been **or will be** produced, and, in some instances, third-party productions. To date, Plaintiffs have not produced a single medical record to Abbott. Even in the cases in which Plaintiffs provided Infant authorizations, Plaintiffs generally provided authorizations for only the Infant's birth hospital and one other treating hospital, entirely omitting authorizations for pediatricians and other treaters. For Parents, Plaintiffs generally only provided authorizations for the Infant's birth hospital, omitting any OB/GYN or other treaters. Plaintiffs also failed to provide any insurance, educational, employment, or psychiatric/psychotherapy authorizations. Accordingly, in light of Plaintiffs' failure to timely provide Abbott with complete authorizations for all 21 cases, Plaintiffs' referral to those limited set of authorizations in an effort to respond to the above-mentioned RFPs is wholly insufficient.

Moreover, Plaintiffs' manner of response, by simply referring to the authorizations, is deficient for yet another reason. In particular, neither the authorizations, nor the medical records that they authorize Abbott to obtain, would result in documents responsive to a majority of these requests, including, for example:

- **RFP No. 1**: All DOCUMENTS and COMMUNICATIONS that support, refute, or relate to any of YOUR allegations in the COMPLAINT.

- **RFP No. 6**: All DOCUMENTS or evidence of any kind supporting each and every act and/or omission by ABBOTT that YOU allege supports the causes of action against ABBOTT in the COMPLAINT.

- **RFP No. 17**: All DOCUMENTS identified in connection with YOUR or INFANT's responses to any Interrogatories in this LAWSUIT, or referenced or used in preparing such responses.

- **RFP No. 38**: All DOCUMENTS that constitute, reflect, refer to, or relate to any articles, journals, notes, news alerts, or other information about PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

- **RFP No. 39**: All DOCUMENTS that constitute, reflect, refer to, or relate to any articles, journals, notes, news alerts, or other information about ABBOTT or any other manufacturer of PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

**Deficiency Letter**
**October 27, 2023**
Page 9



- **RFP No. 42**: All non-privileged COMMUNICATIONS and DOCUMENTS between YOU and any PERSON related to YOUR decision to initiate this LAWSUIT.

- **RFP No. 44**: All YOUR calendars, journals, or other DOCUMENTS that reflect YOUR daily activities for the ten (10) years preceding the events giving rise to this LAWSUIT to the present.

*Second*, in response to **RFP Nos. 1, 2, 5, 19, 21, 22, 23, 24, and 45,** Plaintiffs objected to each RFP as "premature." This objection is unsupportable. The information responsive to each of these RFPs is uniquely within Plaintiffs' possession. These RFPs seek basic information, much of which Plaintiffs should have had in their possession at the time the Initial Complaints were filed, and none of which requires any lengthy investigation to uncover. To provide a stark example, Plaintiffs universally objected that it was premature of Abbott to seek authorizations for medical records from Plaintiffs. Notwithstanding, Plaintiffs responded to eight additional RFPs by referring Abbott to those very authorizations and medical records. Plaintiffs cannot have it both ways. Plaintiffs' failure to provide this critical and relevant information, or otherwise authorize Abbott to obtain it itself, prevents Abbott from preparing for the depositions of Plaintiffs.

*Third*, in response to **RFP Nos. 2, 20, 21, 22, 23, and 24**, Plaintiffs objected to each RFP as seeking "health information protected by state and federal law." This objection is unsupportable for several reasons. Plaintiffs have brought suit against Abbott claiming physical injury; they have placed their health and related information squarely at issue in this case, and accordingly, they have waived any claim to protection over that information. Moreover, as each of **RFP Nos. 20, 21, 22, 23, and 24** makes clear, the authorizations through which Abbott seeks permission to collect this information are HIPAA-compliant.

*Fourth*, Plaintiffs object to **RFP Nos. 8 and 9** as "not limited in time and scope." This is categorically incorrect. **RFP No. 8**, by its very terms, seeks documents "in the ten (10) years preceding the events giving rise to this LAWSUIT to the present." In addition, **RFP No. 9** seeks medical bills, statements, or invoices "for which YOU seek damages in this LAWSUIT." This request is clearly limited to and targeted at documents which detail the amount of Plaintiffs' alleged damages. There is no colorable argument that these documents are outside of the temporal scope of this litigation or otherwise "not related or relevant to the issues in this case" as Plaintiffs claim.

Abbott requests that Plaintiffs amend and supplement their deficient responses, and withdraw all unsupportable objections, so as to cure the deficiencies indicated above, no later than November 3, 2023.

<div align="center">*    *    *</div>

**Deficiency Letter**
**October 27, 2023**
Page 10



It is Abbott's hope that the parties can resolve most, if not all, of the above deficiencies, or at least significantly narrow the issues that will need to be raised with the Court. Abbott requests a prompt response to this letter by November 3, 2023 and, in the absence of remediation of all deficiencies, a meet and confer during the week of November 6.

Very truly yours,

Ronni E. Fuchs

cc:     All counsel of record (via email)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I will serve a true and correct copy of the foregoing in accordance with Pa. R. Civ. P. 440 on all parties not served electronically. All other parties will be electronically served by the court in accordance with Pa. R. Civ. P. 205.4(g).


Dated: November 10, 2023          */s/ Ronni E. Fuchs*
                                        Ronni E. Fuchs

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Ronni E. Fuchs, hereby certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts, that require filing confidential information and documents differently than non-confidential information and documents.

*/s/ Ronni E. Fuchs*

# EXHIBIT A-54

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION - CIVIL**

Filed and Attested by the
Office of Judicial Records
10 NOV 2023 09:06 pm
P. DIVON

| | |
|---|---|
| TERRAINE ABDULLAH, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : <br> : MARCH TERM, 2022 <br> : No. 220302583 <br> : <br> : |
| HOLLI CARTER, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : <br> : MARCH TERM, 2022 <br> : No. 220302588 <br> : <br> : |
| SHONDERA DRAYTON, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : <br> : MARCH TERM, 2022 <br> : No. 220302594 <br> : <br> : |
| JANEE HENDERSON, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : <br> : APRIL TERM, 2022 <br> : No. 220400127 <br> : <br> : |
| DELQUAN HINES, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | APRIL TERM, 2022 <br> No. 220400136 |
| SHEMIKA JOHNSON, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | : <br> : APRIL TERM, 2022 <br> : No. 220400162 <br> : <br> : |
| CATHERINE McMILLIAN, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., <br> Defendants. | APRIL TERM, 2022 <br> No. 220400140 |
| DAMEKA MOMENT, et al., <br> Plaintiff, <br> v. <br> MEAD JOHNSON & COMPANY, LLC, et al., | : <br> : APRIL TERM, 2022 <br> : No. 220400142 <br> : |

|  |  |
|---|---|
| Defendants. | : |

| | |
|---|---|
| LOREN SANDERS, et al., | : |
|     Plaintiff, | :   APRIL TERM, 2022 |
|     v. | :   No. 220400153 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
|     Defendants. | : |

| | |
|---|---|
| SAMAYA SHORT, et al., | : |
|     Plaintiff, | :   APRIL TERM, 2022 |
|     v. | :   No. 220400159 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
|     Defendants. | : |

| | |
|---|---|
| ALICE STILLS, et al., | : |
|     Plaintiff, | :   MARCH TERM, 2022 |
|     v. | :   No. 220302617 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
|     Defendants. | : |

| | |
|---|---|
| CHRISTINA TAYLOR, et al., | : |
|     Plaintiff, | :   MARCH TERM, 2022 |
|     v. | :   No. 220302606 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
|     Defendants. | : |

| | |
|---|---|
| NATISHA THOMAS, et al., | : |
|     Plaintiff, | :   MARCH TERM, 2022 |
|     v. | :   No. 220400158 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
|     Defendants. | : |

| | |
|---|---|
| TRINA WALKER-SAVAGE and CLIFTON | : |
| ISAIAH SAVAGE, JR., et al., | :   MARCH TERM, 2022 |
|     Plaintiff, | :   No. 220400156 |
|     v. | : |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
|     Defendants. | : |

| | |
|---|---|
| ROBERT WHITFIELD, et al., | : |
|     Plaintiff, | :   APRIL TERM, 2022 |
|     v. | :   No. 220400145 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
|     Defendants. | : |

| | |
|---|---|
| GINA WIEGER, et al., | : |
|     Plaintiff, | :   MARCH TERM, 2022 |
|     v. | :   No. 220302614 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
|     Defendants. | : |

| | |
|---|---|
| GINA WIEGER, et al., | : |

| | | |
|---|---|---|
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302601 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

MELVENIA WILLIAMS, et al., : 
    Plaintiff, : APRIL TERM, 2022
v. : No. 220400141
MEAD JOHNSON & COMPANY, LLC, et al., :
Defendants. :

IVYANN WITHERSPOON, et al., :
    Plaintiff, : APRIL TERM, 2022
v. : No. 220400138
MEAD JOHNSON & COMPANY, LLC, et al., :
Defendants. :

**Attorney Certification of Good Faith**
**Pursuant to Phila.Civ.R. * 208.2(e)**

The undersigned counsel for movant hereby certifies and attests that:

√ a.    He or she has had the contacts described below with opposing counsel or unrepresented party regarding discovery matter contained in the foregoing discovery motion in an effort to resolve the specific discovery dispute(s) at issue and, further, that despite all counsel's good faith attempts to resolve the dispute(s), counsel have been unable to do so.

Description:

On August 17, 2023, Plaintiff's Counsel emailed Defense Counsel indicating the need to depose Defendant's Corporate Designee.

On September 27, 2023, Plaintiff's Counsel emailed Defense Counsel to follow up on the August 17, 2023, request to depose Defendant's Corporate Designee because Defendants never provided dates for said deposition.

On October 11, 2023, Plaintiff's Counsel emailed Defense Counsel a Notice of Deposition to depose Defendant's Corporate Designee on November 1, 2023, because Defendants never provided dates for said deposition.

On October 30, 2023, Defendants emailed Plaintiffs refusing to produce Defendant's Corporate Designee for deposition on November 1, 2023.

To date, Defense counsel has not provided any available dates for the deposition of Defendant's Corporate Designee.  On October 30., 2023 Counsel for Defendant advised Plaintiffs' Counsel that they are working diligently to obtain the information requested via

discovery and the corporate designee notices and will in contact regarding promptly rescheduling these depositions, but it has failed to do so to date.

_ b.  He or she has made good faith but unsuccessful efforts described below to contact opposing counsel or unrepresented party in effort to resolve the discovery dispute.

Description:

N/A. See above.

CERTIFIED TO THE COURT BY:

**KLINE & SPECTER, P.C.**

Date: November 10, 2023          By:     */s/ John P. O'Neill*
                                         JOHN P.  O'NEILL, ESQUIRE
                                         TIMOTHY A. BURKE, ESQUIRE
                                         Attorney ID Nos. 205677 / 320927
                                         KLINE & SPECTER, P.C.
                                         1525 Locust Street
                                         Philadelphia, PA 19102
                                         Tel: (215) 772-1000
                                         Fax: (215) 772-1359

                                         *Attorneys for Plaintiffs*

**_Note: The Signature of Respondent's Counsel is Not Required_**

# EXHIBIT A-55

*Filed and Attested by the*
*Office of Judicial Records*
*27 NOV 2023 04:41 pm*
*M. TIERNEY*

| | |
|---|---|
| Holli Carter, on her own behalf and as Parent and Natural Guardian of J.C., a minor : Plaintiff : v. : MEAD JOHNSON & COMPANY, LLC, et al. : Defendants. : | MARCH TERM, 2022 NO. 220302588 |
| TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor, : Plaintiffs, : v. : MEAD JOHNSON & COMPANY, LLC, et al., : Defendants. : | MARCH TERM 2022 NO. 220302583 |
| Shondera Drayton, on her own behalf and as Parent and Natural Guardian of A.D., a minor, : Plaintiffs : v. : MEAD JOHNSON & COMPANY, LLC, et al. : Defendants. : | MARCH TERM, 2022 NO. 220302594 |
| Gina Wieger, on her own behalf and as Parent and Natural Guardian of M.P., a minor, : Plaintiffs, : v. : Mead Johnson & Company, LLC, et al., : Defendants. : | MARCH TERM, 2022 NO. 220302614 |
| Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a minor, : Plaintiffs, : v. : MEAD JOHNSON & COMPANY, LLC, et al. : Defendants. : | MARCH TERM, 2022 NO. 220302601 |
| Alice Stills, on her own behalf and as Parent and Natural Guardian of M.E., a minor, : Plaintiffs, : v. : MEAD JOHNSON & COMPANY, LLC, et al.. : Defendants. : | MARCH TERM, 2022 NO. 220302617 |
| Christina Taylor, on her own behalf and as Parent and Natural Guardian of I.H., a minor, : Plaintiff, : v. : MEAD JOHNSON & COMPANY, LLC, et al., : Defendants. : | MARCH TERM, 2022 NO. 220302606 |

## **ORDER**

**AND NOW**, this _____ day of _____ 2023, upon consideration of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine's Response to Plaintiffs' Motion to Compel the Deposition of Corporate Designee, it is hereby **ORDERED**, **ADJUDGED,** and **DECREED** that Plaintiffs' Motion to Compel the Deposition of Corporate Designee is **DENIED**.

_____
                                                                                                                                  J.

**BURNS WHITE LLC**
By:    **James A. Young, Esq.**
       **Richard S. Margulies, Esq.**
       **Susan R. Engle, Esq.**
       Attorney ID Nos. 00213/62306/81671
1880 John F. Kennedy Boulevard, 10th Floor
Philadelphia, PA 19103
215-587-1625/1628
jayoung@burnswhite.com
rsmargulies@burnswhite.com

*Attorneys For Defendants,*
*The Pennsylvania Hospital of the University of*
*Pennsylvania Health System d/b/a*
*Pennsylvania Hospital and The Trustees of the*
*University of Pennsylvania d/b/a Penn*
*Medicine*

| | |
|---|---|
| Holli Carter, on her own behalf and as Parent and Natural Guardian of J.C., a minor<br>          Plaintiff<br>    v.<br>MEAD JOHNSON & COMPANY, LLC, et al.<br>          Defendants. | MARCH TERM, 2022<br>NO. 220302588 |
| TERRAINE ABDULLAH, on her own behalf and as Parent and Natural Guardian of H.S., a Minor,<br>          Plaintiffs,<br>    v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>          Defendants. | MARCH TERM 2022<br>NO. 220302583 |
| Shondera Drayton, on her own behalf and as Parent and Natural Guardian of A.D., a minor,<br>          Plaintiffs<br>    v.<br>MEAD JOHNSON & COMPANY, LLC, et al.<br>          Defendants. | MARCH TERM, 2022<br>NO. 220302594 |
| Gina Wieger, on her own behalf and as Parent and Natural Guardian of M.P., a minor,<br>          Plaintiffs,<br>    v.<br>Mead Johnson & Company, LLC, et al.,<br>          Defendants. | MARCH TERM, 2022<br>NO. 220302614 |
| Gina Wieger, on her own behalf and as Parent and Natural Guardian of S.P., a minor,<br>          Plaintiffs,<br>    v.<br>MEAD JOHNSON & COMPANY, LLC, et al.<br>          Defendants. | MARCH TERM, 2022<br>NO. 220302601 |

| | |
|---|---|
| Alice Stills, on her own behalf and as Parent and Natural Guardian of M.E., a minor,<br><br>         Plaintiffs,<br>      v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>         Defendants. | :<br>:<br>:<br>:<br>:<br>:   MARCH TERM, 2022<br>:   NO. 220302617<br>:<br>: |
| Christina Taylor, on her own behalf and as Parent and Natural Guardian of I.H., a minor,<br><br>         Plaintiff,<br>      v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>         Defendants. | :<br>:<br>:<br>:   MARCH TERM, 2022<br>:   NO. 220302606<br>:<br>:<br>: |

### DEFENDANTS, THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM D/B/A PENNSYLVANIA HOSPITAL AND THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA D/B/A PENN MEDICINE, RESPONSE TO PLAINTIFFS' MOTION TO COMPEL THE DEPOSITION OF CORPORATE DESIGNEE

Defendants, The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine (hereinafter "Responding Defendants"), by and through their counsel, Burns White LLC, hereby file the instant Response to Plaintiffs' Motion to Compel the Deposition of Corporate Designee, and aver in support as follows:

1. It is admitted that this paragraph summarizes the allegations made in Plaintiffs' Complaints. The substance of the allegations is denied.

2. It is admitted that this paragraph summarizes the allegations made in Plaintiffs' Complaints. The substance of the allegations is denied.

3. Admitted.

4. Admitted that Exhibit "A" was sent to defense counsel.

5. Admitted that Exhibit "B" was sent to defense counsel.

6. Admitted that Exhibit "C" was sent to defense counsel.

7. Denied as stated. It is admitted that defense counsel send the email marked as Exhibit

Case ID: 220302606<br>Control No.: 23110845

"D."  It is denied that Responding Defendant refused to produce a witness.  The deposition was unilaterally noticed and Responding Defendant was not able to coordinate a witness on such short notice without regard for the schedules of all counsel and the witness.

8.  Denied.  Responding Defendant has provided dates for two of its three clients, and has advised Plaintiffs' counsel that it is actively working to schedule the last of the depositions.  It is expected a date will be agreed upon by all parties imminently.

9.  Admitted.

10. Denied.

WHEREFORE, Defendants request that this Honorable Court sustain Defendants' Objections to Plaintiff's Motion to Compel and enter the attached proposed Order.

Respectfully submitted,

**BURNS WHITE LLC**

BY:  */s/ Susan R. Engle*
JAMES A. YOUNG, ESQ.
RICHARD S. MARGULIES, ESQ.
SUSAN R. ENGLE, ESQ.

*Attorneys for Defendants,*
*The Pennsylvania Hospital of the University*
*of Pennsylvania Health System d/b/a*
*Pennsylvania Hospital and The Trustees of*
*the University of Pennsylvania d/b/a Penn*
*Medicine*

## <u>CERTIFICATE OF SERVICE</u>

I, Susan R. Engle, Esquire, do hereby certify that on this day I caused a true and correct copy of the foregoing Response of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine to Plaintiffs' Motion to Compel the Deposition of Corporate Designee to be served via the electronic filing system to all counsel of record.

BY: <u>*/s/ Susan R. Engle*     </u>

Dated: November 27, 2023

Case ID: 220302606
Control No.: 23110845

# EXHIBIT A-56

PHILADELPHIA COURT OF COMMON PLEAS
# PETITION/MOTION COVER SHEET

| CONTROL NUMBER: |
|---|
| 23122873 |
| **(RESPONDING PARTIES MUST INCLUDE THIS NUMBER ON ALL FILINGS)** |

## FOR COURT USE ONLY

| ASSIGNED TO JUDGE: | ANSWER/RESPONSE DATE: |
|---|---|
| | 01/02/2024 |

*Do not send Judge courtesy copy of Petition/Motion/Answer/Response. Status may be obtained online at http://courts.phila.gov*

March ____ Term, 2022
*Month* — *Year*
No. ____ 02606

Name of Filing Party:
MEAD JOHNSON & COMPANY LLC-DFT
MEAD JOHNSON NUTRITION COMPANY-DFT

TAYLOR ETAL VS MEAD JOHNSON & COMPANY,
LLC ETAL

Has another petition/motion been decided in this case? ☒ Yes ☐ No
Is another petition/motion pending? ☒ Yes ☐ No
*If the answer to either question is yes, you must identify the judge(s):*
HON. LINDA CARPENTER

**INDICATE NATURE OF DOCUMENT FILED:**
☐ Petition *(Attach Rule to Show Cause)* ☒ Motion
☐ Answer to Petition ☐ Response to Motion

| TYPE OF PETITION/MOTION (see list on reverse side) | PETITION/MOTION CODE (see list on reverse side) |
|---|---|
| MOT-FOR ADMISSION PRO HAC VICE | MTPHV |

ANSWER / RESPONSE FILED TO (Please insert the title of the corresponding petition/motion to which you are responding):

| I. CASE PROGRAM | II. PARTIES *(required for proof of service)* |
|---|---|
| DAY FORWARD/MAJOR JURY PROGRAM | *(Name, address and* **telephone number** *of all counsel of record and unrepresented parties. Attach a stamped addressed envelope for each attorney of record and unrepresented party.)* |
| Name of Judicial Team Leader: JUDGE LINDA CARPENTER | JAMES A YOUNG |
| Applicable Petition/Motion Deadline: N/A | BURNS WHITE LLC 1880 JOHN F. KENNEDY BOULEVARD 10TH FLOOR , PHILADELPHIA PA 19103 |
| Has deadline been previously extended by the Court: N/A | SEAN P FAHEY |
| | TROUTMAN PEPPER 3000 TWO LOGAN SQ 18TH AND ARCH STREETS , PHILADELPHIA PA 19103-2799 |
| | KENNETH A MURPHY |
| | TUCKER LAW GROUP, LLC 1801 MARKET STREET SUITE 2500 , PHILADELPHIA PA 19103-6996 |
| | MARQUES HILLMAN RICHESON |
| | JONES DAY 901 LAKESIDE AVENUE NORTH POINT , CLEVELAND OH 44114 |

**III. OTHER**

By filing this document and signing below, the moving party certifies that this motion, petition, answer or response along with all documents filed, will be served upon all counsel and unrepresented parties as required by rules of Court (see PA. R.C.P. 206.6, Note to 208.2(a), and 440). Furthermore, moving party verifies that the answers made herein are true and correct and understands that sanctions may be imposed for inaccurate or incomplete answers.

_____ December 12, 2023 KENNETH A. MURPHY _____
*(Attorney Signature/Unrepresented Party)* *(Date)* *(Print Name)* *(Attorney I.D. No.)*

**The Petition, Motion and Answer or Response, if any, will be forwarded to the Court after the Answer/Response Date.**
**No extension of the Answer/Response Date will be granted even if the parties so stipulate.**

30-1061B E-File# 2312024963
12-DEC-23 15:39:01

FILED
12 DEC 2023 02:54 pm
Civil Administration
A. CLARKE

| | |
|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** | : **COURT OF COMMON PLEAS** |
| | : **PHILADELPHIA COUNTY** |
| | : |
| | : **MARCH TERM, 2022** |
| Plaintiff, | : **No. 2606** |
| v. | : |
| | : |
| **MEAD JOHNSON & COMPANY, LLC, et al.**, | : |
| | : |
| | : |
| Defendants. | : |

## ORDER

**AND NOW**, this _____ day of _____, 2023, upon consideration of the Motion for Admission Pro Hac Vice of Evan Glassman, Esquire, to Represent Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company, it is hereby **ORDERED** that the Motion is **GRANTED**. This Court hereby admits Evan Glassman, Esquire, pro hac vice in this case on behalf of Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company.

**BY THE COURT**:

_____
J.

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Heather R. Olson, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA  19103
(215) 875-0609
kmurphy@tlgattorneys.com
holson@tlgattorneys.com

**ATTORNEYS FOR DEFENDANTS MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON NUTRITION COMPANY**

| | |
|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| Plaintiff, | **MARCH TERM, 2022 No. 2606** |
| v. | |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | |
| Defendants. | |

**MOTION FOR ADMISSION *PRO HAC VICE* OF EVAN GLASSMAN, ESQUIRE, TO REPRESENT MEAD JOHNSON DEFENDANTS**

Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, the "Mead Johnson Defendants"), by and through their counsel, Tucker Law Group, LLC, hereby move this Court for an order pursuant to Pa. R. C. P. 1012.1(b) and (e), Rule 301 of the Pennsylvania Bar Admission Rules, and the Pennsylvania Interest on Lawyer Trust Account Regulations for pro hac vice Admission (204 Pa. Code § 81.501 et seq.) admitting Evan Glassman, Esquire, to the bar of this Court, p*ro hac vice*, for the purpose of representing the Mead Johnson Defendants, and aver the following in support thereof:

1. Mr. Glassman is a member of the law firm of with Steptoe & Johnson, LLP ("Steptoe") and a resident in its New York office, located at 1114 Avenue of the Americas, New York, NY 10036. Mr. Glassman has an attorney-client relationship

with Mead Johnson & Company, LLC and Mead Johnson Nutrition Company, and has special skills, knowledge and experience relating to this case. The efficient administration, prosecution and resolution of this case will be materially advanced by the admission *pro hac vice* of Mr. Glassman.  A Verification Statement from Mr. Glassman, is attached hereto as Exhibit A.

2.     Mr. Glassman is a member in good standing in the state of New York and has been admitted to practice since 1994.  See Exhibit A.

3.     Mr. Glassman's law firm serves as national counsel for the Mead Johnson Defendants.  He is familiar with the complex, technical issues presented in this matter, and his participation in this case will help clarify the issues before the Court. See Exhibit A.

4.     The Mead Johnson Defendants have specifically requested that Mr. Glassman be permitted to participate in this matter and represent its interests in this matter.  See Exhibit A.

5.     Mr. Glassman is not presently suspended or disbarred in any Court, nor is he currently subject to any disciplinary proceedings by any organization to discipline attorneys at law. Further, Mr. Glassman has never received any public discipline, including, but not limited to, suspension or disbarment by any organization with the authority to discipline attorneys at law.  Exhibit A.

6.     Mr. Glassman is familiar with Pennsylvania Bar Admission Rule 301 and has agreed to abide by the Rules of Professional Conduct applicable to Pennsylvania lawyers. Mr. Glassman will abide by the Rules of Court, including all disciplinary rules and, if this motion is granted, he will serve as associate counsel with Kenneth

Case ID: 220302606
Control No.: 23122873

Murphy, Esquire, counsel of record for the Mead Johnson Defendants in this matter.

7.    Mr. Glassman has applied to the Pennsylvania Interest on Lawyers' Trust Account Board (Pennsylvania IOLTA Board) and paid the appropriate fee required under 204 Pa. Code § 81.503. to be admitted pro hac vice.  Our office received a copy of the fee payment certification letter from the IOLTA Board, a copy of which is attached as Exhibit B.

8.    Mr. Glassman will be associated with Kenneth Murphy, Esquire of Tucker Law Group, LLC at all stages of this action.  Mr. Murphy, after reasonable investigation, believes that Mr. Glassman is a reputable and competent attorney and recommends that he be considered for admission *pro hac vice*. A true Verification Statement from Mr. Murphy pursuant to Pa. R. C. P. 1012.1(d)(2) is attached hereto as Exhibit C.

9.    Kenneth Murphy, Esquire, of Tucker Law Group, LLC is a member in good standing of the Bar of the Commonwealth of Pennsylvania. Tucker Law Group and Mr. Murphy will be counsel of record for the Mead Johnson Defendants and will continue to participate fully in this litigation and will sign, serve, and accept service of all papers on the Mead Johnson Defendants' behalf.

10.   All the requirements to satisfy the applicable rules of Court are met.

11.   There is no good cause for denial of this motion.

4

**WHEREFORE**, it is respectfully requested that this Court enter the attached Order granting Evan Glassman, Esquire leave to appear as counsel *pro hac vice* for Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Date: December 12, 2023

/s/ Kenneth A. Murphy
Kenneth A. Murphy, Esquire
Heather R. Olson, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 875-0609
(215) 559-6209 – fax
kmurphy@tlgattorneys.com
holson@tlgattorneys.com

5

## CERTIFICATE OF SERVICE

I, Kenneth A. Murphy, Esquire certify that on this date, I caused a copy of the foregoing Motion for *Pro Hac Vice* of Evan Glassman to be electronically filed through the Court's ECF System and that such filing generates a notice of that constitutes service on all counsel of record.

**TUCKER LAW GROUP, LLC**

Date:  December 12, 2023                    /s/ Kenneth A. Murphy
                                                        Kenneth A. Murphy, Esquire

6

Case ID: 220302606
Control No.: 23122873

# EXHIBIT A

Case ID: 220302606
Control No.: 23122873

## VERIFICATION OF EVAN GLASSMAN, ESQUIRE

I, Evan Glassman, Esquire, hereby submit this Verification Statement in support of the attached Motion for Admission *pro hac vice* to represent Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, the "Mead Johnson Defendants"), in this action in the Court of Common Pleas of Philadelphia County, Pennsylvania.  In support of this Motion made pursuant to pursuant to Pa. R. C. P. 1012.1(b) and (e), Rule 301 of the Pennsylvania Bar Admission Rules, and the Pennsylvania Interest on Lawyer Trust Account Regulations for pro hac vice Admission (204 Pa. Code § 81.501 et seq.), I swear and affirm that the following is true and correct based upon my personal knowledge:

1. I am a member of the law firm Steptoe and Johnson and resident in its New York office, located at 1114 Avenue of the Americas, New York, NY 10036. Telephone: (212) 506-3909; email address: eglassman@steptoe.com.

2. I have been licensed to practice law in the following jurisdictions with the corresponding bar license number: State of New York (#2616142). Additionally, I have been admitted to practice in the following courts: U.S. District Court Eastern District of New York, U.S. District Court Southern District of New York, U.S. District Court Northern District of New York, U.S. District Court Northern District of Illinois, U.S. Court of Appeals First Circuit, and U.S. Court of Appeals Second Circuit.

3. I am a member in good standing of all Bar(s) to which I am admitted.

4. With respect to each jurisdiction identified in Paragraph 2 above, I have never been suspended, disbarred, or otherwise disciplined by any court, nor am I the subject of any disciplinary proceedings.

5. I am involved in the following pending actions in the Philadelphia County Court of Common Pleas in which I am applying for admission *pro hac vice:*

| Case Name | Case Number |
|---|---|
| Wiggins, et al. v. Mead Johnson & Company, LLC, et al. | 220302586 |
| Carter, at al. v. Mead Johnson & Company, LLC, et al. | 220302588 |
| Abdullah, et al. v. Mead Johnson & Company, LLC, et al. | 220302583 |
| Henderson, et al. v. Mead Johnson & Company, LLC, et al. | 220400127 |
| Kajuffa, et al. v. Mead Johnson & Company, LLC, et al. | 220302978 |
| Mays, et al. v. Mead Johnson & Company, LLC, et al. | 220302963 |
| Parker, et al. v. Mead Johnson & Company, LLC, et al. | 220302983 |
| Stills, et al. v. Mead Johnson & Company, LLC, et al. | 220302617 |
| Drayton, et al. v. Mead Johnson & Company, LLC, et al. | 220302594 |
| Sanders, et al. v. Mead Johnson & Company, LLC, et al. | 220400153 |
| Wieger, et al. v. Mead Johnson & Company, LLC, et al. | 220302601 |
| Wieger, et al. v. Mead Johnson & Company, LLC, et al. | 220302614 |
| Ross, et al. v. Mead Johnson & Company, LLC, et al. | 220302981 |

6. If admitted, I agree to comply with and be bound by the applicable statues, case law, and procedural rules of the Commonwealth of Pennsylvania, including the Pennsylvania Rules of Professional Conduct.

7.  I do not have any pending *pro hac vice* admissions that I have applied for in any other court jurisdictions.

8.  If admitted, I agree to subject myself to the jurisdiction of the Pennsylvania courts and the Pennsylvania Disciplinary Board with respect to acts or omissions occurring during my appearance in this matter for which admission *pro hac vice* is sought.

9.  I respectfully submit that there is a good cause for my admission *pro hac vice* based upon my personal knowledge.

10. Further, I have consented to the appointment of Kenneth A. Murphy, Esquire, of Tucker Law Group, LLC, as the agent upon whom services of process shall be made for all actions, including disciplinary actions, that may arise out of the practice of law in this matter for which admission *pro hac vice* is being sought.

I declare under the penalty of perjury the foregoing is true and correct. I hereby state that the facts above are true and correct to the best of my knowledge, information, and belief. I understand that statements herein are made subject to the penalties of 18 Pa. CS § 4904 (relating to unsworn falsification to authorities).


Date: December 12, 2023                    /s/ Evan Glassman
                                           Evan Glassman, Esquire

# EXHIBIT B

Case ID: 220302606
Control No.: 23122873



SUPREME COURT OF PENNSYLVANIA
# PENNSYLVANIA INTEREST ON
# LAWYERS TRUST ACCOUNT BOARD

December 12, 2023

EVAN GLASSMAN, Esq.
STEPTOE LLP
1114 AVENUE OF THE AMERICAS
NEW YORK, NY 10036

SENT TO EVAN GLASSMAN VIA Email: EGLASSMAN@STEPTOE.COM

Dear Attorney GLASSMAN:

This letter serves as the fee payment certification referenced in 204 Pa Code §81.503 and acknowledges receipt of the $375.00 fee paid by Online Payment on this date related to your pursuit for admission *pro hac vice* in the case identified as TAYLOR v. MEAD JOHNSON & COMPANY, LLC et al, no. 220302606, filed in Court of Common Pleas of Philadelphia County.

You should refer to Pa Rule of Civil Procedure 1012.1, local court rules, and other regulations of 204 Pa Code §81.501 et. seq. concerning additional requirements related to seeking *pro hac vice* admission.

Sincerely,

Stephanie S. Libhart
Executive Director

cc: KENNETH ALONZO MURPHY, Esq.

    kmurphy@tlgattorneys.com

Pennsylvania Judicial Center
601 Commonwealth Ave., Ste. 2400
PO Box 62445, Harrisburg, PA 17106-2445
717/238-2001 · 888/PA-IOLTA (724-6582) · 717/238-2003 FAX
paiolta@pacourts.us · www.paiolta.org

Administering Pennsylvania's Interest On Lawyers Trust Account (IOLTA) Program

Case ID: 220302606
Control No.: 23122873

# EXHIBIT C

Case ID: 220302606
Control No.: 23122873

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Heather R. Olson, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 875-0609
kmurphy@tlgattorneys.com

**ATTORNEYS FOR MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON NUTRITION COMPANY**

|  |  |  |
|---|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** | : | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
|  | : | |
|  | : | **MARCH TERM, 2022** |
| Plaintiff, | : | **No. 2606** |
| v. | : | |
|  | : | |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : | |
|  | : | |
| Defendants. | : | |

## VERIFICATION OF KENNETH A. MURPHY, ESQUIRE

COMMONWEALTH OF PENNSYLVANIA     )
                                            ) ss:
COUNTY OF PHILADELPHIA                 )

      I, Kenneth A. Murphy, hereby submit this Verification Statement in support of the attached Motion to Admit Evan Glassman, Esquire *pro hac vice* to represent Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, the Mead Johnson Defendants), in this matter.

      1.       I am a Partner at Tucker Law Group, LLC, Ten Penn Center, 1801 Market Street, Suite 2500, Philadelphia, PA 19103.

      2.       I have been licensed to practice law in the following jurisdictions with the corresponding bar license number: The Commonwealth of Pennsylvania (#58162), the State of New Jersey (#047641992). Additionally, I have been

Case ID: 220302606
Control No.: 23122873

admitted to practice in the following courts: U.S. District Court, Eastern District of Pennsylvania, U.S. Court of Appeals, D.C. Circuit, U.S. Court of Appeals, Third Circuit.

3.  I am a member in good standing of the Bar of the Commonwealth of Pennsylvania and the other courts to which I am admitted.

4.  I am licensed to practice law in all the jurisdictions that I have been admitted and am counsel of record representing the Mead Johnson Defendants in this matter.

5.  I hereby certify and affirm that after reasonable investigation and on personal knowledge, I believe that Evan Glassman, is a reputable and competent attorney, and I am in a position to recommend that this candidate be admitted *pro hac vice* for practice in the Commonwealth of Pennsylvania to represent the Mead Johnson Defendants in this matter.

6.  I am not currently acting as the sponsor of any other candidate for admission pro hac vice in Pennsylvania.

7.  If applicable, at the conclusion of this matter, I affirm that any proceeds from the settlement of this cause of action in which Mr. Glassman is granted admission *pro hac vice* shall be received, held, distributed, and accounted for in accordance with Rule 301 of the Pennsylvania Rules of Professional Conduct, including the IOLTA provisions thereof, if applicable.

I declare under the penalty of perjury the foregoing is true and correct. I hereby state that the facts above are true and correct to the best of my knowledge, information, and belief. I understand that statements herein are made subject to the penalties of 18 Pa. CS §4904 (relating to unsworn falsification to authorities).

**TUCKER LAW GROUP, LLC**

By:     /s/ Kenneth A. Murphy____
Kenneth A. Murphy, Esquire

Date: December 12, 2023

# EXHIBIT A-57

**FILED**
12 DEC 2023 02:54 pm
Civil Administration
A. CLARKE

| | |
|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** | : **COURT OF COMMON PLEAS** |
| | : **PHILADELPHIA COUNTY** |
| | : |
| | : **MARCH TERM, 2022** |
| Plaintiff, | : **No. 2606** |
| v. | : |
| | : |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : |
| | : |
| Defendants. | : |

## ORDER

**AND NOW**, this _18th_ day of _JANUARY_, 2023, upon consideration of

the Motion for Admission Pro Hac Vice of Evan Glassman, Esquire, to Represent

Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company, it

is hereby **ORDERED** that the Motion is **GRANTED**. This Court hereby admits Evan

Glassman, Esquire, pro hac vice in this case on behalf of Defendants, Mead Johnson &

Company, LLC and Mead Johnson Nutrition Company.

**BY THE COURT:**

_____ J.

220302606-Taylor Etal Vs Mead Johnson



22030260600106

Case ID: 220302606
Control No.: 23122873

# EXHIBIT A-58

**COURT OF COMMON PLEAS OF PHILADELPHIA**
**TRIAL DIVISION – CIVIL**

*Filed and Attested by the*
*Office of Judicial Records*
*22 JAN 2024 03:13 pm*
*E. HAURIN*

| | | |
|---|---|---|
| TERRAINE ABDULLAH, *on her own behalf and as Parent and Natural Guardian of H.S., a Minor*, | : : : | |
| Plaintiffs, | : : | Case No.: 220302583 |
| v. | : : : | **JURY TRIAL DEMANDED** |
| MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, | : : : : : : : : : : : | |
| Defendants. | : : | |
| HOLLI CARTER, *on her own behalf and as Parent and Natural Guardian of J.C., a Minor*, | : : : | |
| Plaintiffs, | : : | Case No.: 220302588 |
| v. | : : : | **JURY TRIAL DEMANDED** |
| MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, | : : : : : : : : : : | |
| Defendants. | : : | |
| SHONDERA DRAYTON, *on her own behalf and as Parent and Natural Guardian of* A.D.*, a Minor*, | : : : | |
| Plaintiffs, | : : | Case No.: 220302594 |
| v. | : : : | **JURY TRIAL DEMANDED** |

Page 1

Case ID: 220302606
Control No.: 24014683

MEAD JOHNSON & COMPANY LLC; MEAD : 
JOHNSON NUTRITION COMPANY; ABBOTT : 
LABORATORIES; THE PENNSYLVANIA : 
HOSPITAL OF THE UNIVERSITY OF : 
PENNSYLVANIA HEALTH SYSTEM, *d/b/a* : 
PENNSYLVANIA HOSPITAL; and THE : 
TRUSTEES OF THE UNIVERSITY OF : 
PENNSYLVANIA, *d/b/a* PENN MEDICINE, : 
: 
Defendants. :

---

BRANDY GOODMOND, *on her own behalf and as* : 
*Parent and Natural Guardian of* RYA G.*, a Minor,* : 
: Case No.: 220400208
: 
Plaintiffs, : 
: **JURY TRIAL DEMANDED**
v. : 
: 
MEAD JOHNSON & COMPANY LLC; MEAD : 
JOHNSON NUTRITION COMPANY; : 
ABBOTT : 
LABORATORIES; THOMAS JEFFERSON : 
UNIVERSITY HOSPITALS, INC., *d/b/a* THOMAS : 
JEFFERSON UNIVERSITY HOSPITAL, and : 
THOMAS JEFFERSON UNIVERSITY, *d/b/a*, : 
JEFFERSON HEALTH SYSTEM, : 
: 
Defendants. :

---

BRANDY GOODMOND, *on her own behalf and as* : 
*Parent and Natural Guardian of* RYH G.*, a Minor,* : 
: Case No.: 220400212
: 
Plaintiffs, : 
: **JURY TRIAL DEMANDED**
v. : 
: 
MEAD JOHNSON & COMPANY LLC; MEAD : 
JOHNSON NUTRITION COMPANY; ABBOTT : 
LABORATORIES; THOMAS JEFFERSON : 
UNIVERSITY HOSPITALS, INC., *d/b/a* THOMAS : 
JEFFERSON UNIVERSITY HOSPITAL, and : 
THOMAS JEFFERSON UNIVERSITY, *d/b/a*, : 
JEFFERSON HEALTH SYSTEM, : 
: 
Defendants. :

---

TONYA GRAY, *on her own behalf and as Parent and* :

Page 2

Case ID: 220302606
Control No.: 24014683

*Natural Guardian of* J.M.*, a Minor,*

          Plaintiffs,

v.

MEAD JOHNSON & COMPANY LLC; MEAD
JOHNSON NUTRITION COMPANY; ABBOTT
LABORATORIES; THOMAS JEFFERSON
UNIVERSITY HOSPITALS, INC., *d/b/a* THOMAS
JEFFERSON UNIVERSITY HOSPITAL, and
THOMAS JEFFERSON UNIVERSITY, *d/b/a,*
JEFFERSON HEALTH SYSTEM,

          Defendants.

Case No.: 220400216

**JURY TRIAL DEMANDED**

---

JANEE HENDERSON, *on her own behalf and as
Parent and Natural Guardian of* S.C.*, a Minor,*

          Plaintiffs,

v.

MEAD JOHNSON & COMPANY LLC; MEAD
JOHNSON NUTRITION COMPANY; ABBOTT
LABORATORIES; THE TRUSTEES OF THE
UNIVERSITY OF PENNSYLVANIA, *d/b/a* THE
HOSPITAL OF THE UNIVERSITY OF
PENNSYLVANIA; and THE TRUSTEES OF THE
UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN
MEDICINE,

          Defendants.

Case No.: 220400127

**JURY TRIAL DEMANDED**

---

SHEMIKA JOHNSON, *on her own behalf and as
Parent and Natural Guardian of* W.J.*, a Minor,*

          Plaintiffs,

v.

MEAD JOHNSON & COMPANY LLC; MEAD
JOHNSON NUTRITION COMPANY; ABBOTT
LABORATORIES; THE TRUSTEES OF THE
UNIVERSITY OF PENNSYLVANIA, *d/b/a* THE
HOSPITAL OF THE UNIVERSITY OF

Case No.: 220400162

**JURY TRIAL DEMANDED**

Page 3

Case ID: 220302606
Control No.: 24014683

PENNSYLVANIA; and THE TRUSTEES OF THE : \
UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN :\
MEDICINE, :
:

      Defendants. :

KRISTEN KAJUFFA, *on her own behalf and as* :\
*Parent and Natural Guardian of* B.K.*, a Minor*, :
:   Case No.: 220302978
      Plaintiffs, :
: **JURY TRIAL DEMANDED**
v. :
:

MEAD JOHNSON & COMPANY LLC; MEAD :\
JOHNSON NUTRITION COMPANY; ABBOTT :\
LABORATORIES; TEMPLE UNIVERSITY :\
HEALTH SYSTEM, *d/b/a* TEMPLE UNIVERSITY :\
HOSPITAL, :
:

      Defendants. :

NAFEESAH MAYS, *on her own behalf and as Parent* :\
*and Natural Guardian of* A.R.*, a Minor*, :
:   Case No.: 220302963
      Plaintiffs, :
: **JURY TRIAL DEMANDED**
v. :
:

MEAD JOHNSON & COMPANY LLC; MEAD :\
JOHNSON NUTRITION COMPANY; ABBOTT :\
LABORATORIES; ALBERT EINSTEIN MEDICAL :\
CENTER, *a/k/a* EINSTEIN MEDICAL CENTER, and :\
ALBERT EINSTEIN HEALTHCARE NETWORK, :\
*d/b/a*, EINSTEIN HEALTHCARE NETWORK, :
:

      Defendants. :

CATHERINE MCMILLIAN, *on her own behalf and as* :\
*Parent and Natural Guardian of* T.M.*, a Minor*, :
:   Case No.: 220400140
      Plaintiffs, :
: **JURY TRIAL DEMANDED**
v. :
:

MEAD JOHNSON & COMPANY LLC; MEAD :

Case ID: 220302606
Control No.: 24014683

JOHNSON NUTRITION COMPANY; ABBOTT
LABORATORIES; THE TRUSTEES OF THE
UNIVERSITY OF PENNSYLVANIA, *d/b/a* THE
HOSPITAL OF THE UNIVERSITY OF
PENNSYLVANIA; and THE TRUSTEES OF THE
UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN
MEDICINE,

          Defendants.

:
:
:
:
:
:
:
:
:

---

DAMEKA MOMENT, *on her own behalf and as*
*Parent and Natural Guardian of* A.M., *a Minor,*

          Plaintiffs,

v.

MEAD JOHNSON & COMPANY LLC; MEAD
JOHNSON NUTRITION COMPANY; ABBOTT
LABORATORIES; THE TRUSTEES OF THE
UNIVERSITY OF PENNSYLVANIA, *d/b/a* THE
HOSPITAL OF THE UNIVERSITY OF
PENNSYLVANIA; and THE TRUSTEES OF THE
UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN
MEDICINE,

          Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No.: 220400142

**JURY TRIAL DEMANDED**

---

NYDIA PARKER, *on her own behalf and as Parent*
*and Natural Guardian of* M.H., *a Minor,*

          Plaintiffs,

v.

MEAD JOHNSON & COMPANY LLC; MEAD
JOHNSON NUTRITION COMPANY; ABBOTT
LABORATORIES; TEMPLE UNIVERSITY
HEALTH SYSTEM, *d/b/a* TEMPLE UNIVERSITY
HOSPITAL,

          Defendants.

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Case No.: 220302983

**JURY TRIAL DEMANDED**

---

ALEXANDRIA ROSS, *on her own behalf and as*
*Parent and Natural Guardian of* B.M., *a Minor,*

:
:
:

Case No.: 220302981

Page 5

Case ID: 220302606
Control No.: 24014683

|  | : |  |
| --- | --- | --- |
| Plaintiffs, | : | **JURY TRIAL DEMANDED** |
|  | : |  |
| v. | : |  |
|  | : |  |
|  | : |  |
| MEAD JOHNSON & COMPANY LLC; MEAD | : |  |
| JOHNSON NUTRITION COMPANY; ABBOTT | : |  |
| LABORATORIES; TEMPLE UNIVERSITY | : |  |
| HEALTH SYSTEM, *d/b/a* TEMPLE UNIVERSITY | : |  |
| HOSPITAL, | : |  |
|  | : |  |
| Defendants. | : |  |

LOREN SANDERS, *on her own behalf and as Parent and Natural Guardian of* Q.S*., a Minor*,

              Plaintiffs,

v.

MEAD JOHNSON & COMPANY LLC; MEAD
JOHNSON NUTRITION COMPANY; ABBOTT
LABORATORIES; THE TRUSTEES OF THE
UNIVERSITY OF PENNSYLVANIA, *d/b/a* THE
HOSPITAL OF THE UNIVERSITY OF
PENNSYLVANIA; and THE TRUSTEES OF THE
UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN
MEDICINE,

              Defendants.

Case No.: 220400153

**JURY TRIAL DEMANDED**

SAMAYA SHORT, *on her own behalf and as Parent and Natural Guardian of* S.M*., a Minor*,

              Plaintiffs,

v.

MEAD JOHNSON & COMPANY LLC; MEAD
JOHNSON NUTRITION COMPANY; ABBOTT
LABORATORIES; THE TRUSTEES OF THE
UNIVERSITY OF PENNSYLVANIA, *d/b/a* THE
HOSPITAL OF THE UNIVERSITY OF
PENNSYLVANIA; and THE TRUSTEES OF THE
UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN
MEDICINE,

Case No.: 220400159

**JURY TRIAL DEMANDED**

Case ID: 220302606
Control No.: 24014683

|  |  |  |
|---|---|---|
| Defendants. | : | |
| ALICE STILLS, *on her own behalf and as Parent and Natural Guardian of* M.E.*, a Minor,* | : : : | Case No.: 220302617 |
| Plaintiffs, | : : | **JURY TRIAL DEMANDED** |
| v. | : : | |
| MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, | : : : : : : : : : | |
| Defendants. | : | |
| CHRISTINA TAYLOR, *on her own behalf and as Parent and Natural Guardian of* I.H.*, a Minor,* | : : : | Case No.: 220302606 |
| Plaintiffs, | : : | **JURY TRIAL DEMANDED** |
| v. | : : | |
| MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, | : : : : : : : : : | |
| Defendants. | : | |
| NATISHA THOMAS, *on her own behalf and as Parent and Natural Guardian of* R.T.*, a Minor,* | : : : | Case No.: 220400158 |
| Plaintiffs, | : : | **JURY TRIAL DEMANDED** |
| v. | : : | |
| MEAD JOHNSON & COMPANY LLC; MEAD | : | |

Page 7

Case ID: 220302606
Control No.: 24014683

JOHNSON NUTRITION COMPANY; ABBOTT   :
LABORATORIES; THE TRUSTEES OF THE   :
UNIVERSITY OF PENNSYLVANIA, *d/b/a* THE  :
HOSPITAL OF THE UNIVERSITY OF   :
PENNSYLVANIA; and THE TRUSTEES OF THE  :
UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN  :
MEDICINE,   :
  :
        Defendants.   :

---

TRINA WALKER-SAVAGE and CLIFTON ISAIAH :
WALKER-SAVAGE, JR.,   :
  :
                         :  Case No.: 220400156
  :
        Plaintiffs,   :
  :  **JURY TRIAL DEMANDED**
v.   :
  :
MEAD JOHNSON & COMPANY LLC; MEAD   :
JOHNSON NUTRITION COMPANY; ABBOTT   :
LABORATORIES; THE TRUSTEES OF THE   :
UNIVERSITY OF PENNSYLVANIA, *d/b/a* THE  :
HOSPITAL OF THE UNIVERSITY OF   :
PENNSYLVANIA; and THE TRUSTEES OF THE  :
UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN  :
MEDICINE,   :
  :
        Defendants.   :

---

JEANNATE WATSON, *on her own behalf and as* :
*Parent and Natural Guardian of* B.L.*, a Minor*,  :
  :
                         :  Case No.: 220302967
  :
        Plaintiffs,   :
  :  **JURY TRIAL DEMANDED**
v.   :
  :
MEAD JOHNSON & COMPANY LLC; MEAD   :
JOHNSON NUTRITION COMPANY; ABBOTT   :
LABORATORIES; ALBERT EINSTEIN MEDICAL :
CENTER, *a/k/a* EINSTEIN MEDICAL CENTER, and :
ALBERT EINSTEIN HEALTHCARE NETWORK,  :
*d/b/a*, EINSTEIN HEALTHCARE NETWORK,   :
  :
        Defendants.   :

---

GINA WIEGER, *on her own behalf and as Parent and* :
*Natural Guardian of* M.P.*, a Minor*,   :

---

Case ID: 220302606
Control No.: 24014683

| | |
|---|---|
| Plaintiffs, | : Case No.: 220302614 |
| | : |
| | : **JURY TRIAL DEMANDED** |
| v. | : |
| | : |
| MEAD JOHNSON & COMPANY LLC; MEAD | : |
| JOHNSON NUTRITION COMPANY; ABBOTT | : |
| LABORATORIES; THE PENNSYLVANIA | : |
| HOSPITAL OF THE UNIVERSITY OF | : |
| PENNSYLVANIA HEALTH SYSTEM, *d/b/a* | : |
| PENNSYLVANIA HOSPITAL; and THE | : |
| TRUSTEES OF THE UNIVERSITY OF | : |
| PENNSYLVANIA, *d/b/a* PENN MEDICINE, | : |
| | : |
| Defendants. | : |

| | |
|---|---|
| GINA WIEGER, *on her own behalf and as Parent and* | : |
| *Natural Guardian of* S.P.*, a Minor,* | : |
| | : Case No.: 220302601 |
| Plaintiffs, | : |
| | : **JURY TRIAL DEMANDED** |
| v. | : |
| | : |
| MEAD JOHNSON & COMPANY LLC; MEAD | : |
| JOHNSON NUTRITION COMPANY; ABBOTT | : |
| LABORATORIES; THE PENNSYLVANIA | : |
| HOSPITAL OF THE UNIVERSITY OF | : |
| PENNSYLVANIA HEALTH SYSTEM, *d/b/a* | : |
| PENNSYLVANIA HOSPITAL; and THE | : |
| TRUSTEES OF THE UNIVERSITY OF | : |
| PENNSYLVANIA, *d/b/a* PENN MEDICINE, | : |
| | : |
| Defendants. | : |

| | |
|---|---|
| SHANITA WIGGINS, *on her own behalf and as* | : |
| *Parent and Natural Guardian of* T.B.*, a Minor,* | : |
| | : Case No.: 220302986 |
| Plaintiffs, | : |
| | : **JURY TRIAL DEMANDED** |
| v. | : |
| | : |
| MEAD JOHNSON & COMPANY LLC; MEAD | : |
| JOHNSON NUTRITION COMPANY; ABBOTT | : |
| LABORATORIES; TEMPLE UNIVERSITY | : |
| HEALTH SYSTEM, *d/b/a* TEMPLE UNIVERSITY | : |
| HOSPITAL, | : |

Case ID: 220302606
Control No.: 24014683

|  | : |  |
| ---- | --- | --- |
| Defendants. | : |  |

| | : | |
| MELVENIA WILLIAMS, *on her own behalf and as Parent and Natural Guardian of* R.W.*, a Minor,* | : | |
| | : | Case No.: 220400141 |
| Plaintiffs, | : | |
| | : | **JURY TRIAL DEMANDED** |
| v. | : | |
| | : | |
| MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* THE HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

| | : | |
| IVYANN WITHERSPOON, *on her own behalf and as Parent and Natural Guardian of* A.H., *a Minor,* | : | |
| | : | Case No.: 220400138 |
| Plaintiffs, | : | |
| | : | **JURY TRIAL DEMANDED** |
| v. | : | |
| | : | |
| MEAD JOHNSON & COMPANY LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* THE HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

## [PROPOSED] STIPULATED PROTECTIVE ORDER

To expedite the flow of discovery material, facilitate the prompt resolution of disputes over confidentiality, adequately protect material entitled to be kept confidential, and ensure

Case ID: 220302606
Control No.: 24014683

that protection is afforded only to material so entitled, plaintiffs in the above-captioned litigation ("Plaintiffs") and defendants Mead Johnson & Company, LLC, Mead Johnson Nutrition Company; Abbott Laboratories; Albert Einstein Medical Center, a/k/a Einstein Medical Center; Albert Einstein Healthcare Network, d/b/a, Einstein Healthcare Network; Mead Johnson & Company LLC; Mead Johnson Nutrition Company; Temple University Health System, d/b/a Temple University Hospital; The Pennsylvania Hospital of the University of Pennsylvania Health System, d/b/a Pennsylvania Hospital; The Trustees of the University Of Pennsylvania, d/b/a Penn Medicine; The Trustees of the University of Pennsylvania, d/b/a The Hospital of the University of Pennsylvania; Thomas Jefferson University Hospitals, Inc., d/b/a Thomas Jefferson University Hospital; Thomas Jefferson University, d/b/a, Jefferson Health System ("Defendants"), by and through their respective counsel, and pursuant to Pa. R.C.P. No. 4012, hereby stipulate and agree to the terms of this Stipulated Protective Order as follows:

IT IS HEREBY STIPULATED, subject to the approval of the Court that:

1. **APPLICABILITY OF THE PROTECTIVE ORDER.** This Stipulated Order Governing the Designation and Handling of Confidential Materials (hereinafter "Order") shall govern for pre-trial purposes the handling of documents, depositions, deposition exhibits, interrogatory responses, responses to requests for admissions, responses to requests for production of documents, and all other discovery obtained pursuant to the Pennsylvania Rules of Civil Procedure and Rules of Evidence by or from a Party in connection with the Action (this information hereinafter referred to as "Discovery Material"). Except where federal law applies, Pennsylvania law and rules shall govern this order. All references to "Party," "Receiving Party," "Producing Party" or "Designating Party" throughout this Order are intended to include Non-parties.

Case ID: 220302606
Control No.: 24014683

The Parties acknowledge that this Order does not confer blanket protections on all disclosures, responses to discovery, or testimony and that the protection it affords extends only to the information or items that are entitled to protection under the terms of this Order and any other applicable law. Furthermore, the Parties acknowledge that neither this Order—nor the confidentiality designations thereunder—constitutes a ruling by this Court that any specific information is, in fact, confidential.

2.      **OTHER DEFINITIONS**

   a.  **Action**: The above-captioned actions and any other Pennsylvania Court action coordinated with them for any purposes, including discovery purposes, and any other related actions in the Philadelphia Court of Common Pleas, provided additional or different Parties to those actions agree to be bound by the terms of this Order, and those other courts that enter this Order or a substantively identical order in reciprocal fashion.

   b.  **Party**: any party to this Action.

   c.  **Non-party**: any individual, corporation, association, or other natural person or entity that is not a Party to this Action.

   d.  **Receiving Party**: a Party or Non-party that receives Discovery Material from a Producing Party.

   e.  **Producing Party**: a Party or Non-party that produces Discovery Material in this Action.

   f.  **Designating Party**: a Party or Non-party that designates information or items that it produces in disclosures or in responses to discovery or provides in the form of deposition testimony as Covered Information (as defined

Case ID: 220302606
Control No.: 24014683

below).  The Designating Party bears the burden of establishing good cause for the protection of all such information or items.

g.  **Challenging Party**: a Party that elects to initiate a challenge to a Designating Party's confidentiality designation.

h.  **TIFF**: A widely used and supported graphic file format for storing bit-mapped images, with many different compression formats and resolutions.

i.  **Native Format**: An electronic document's associated file structure defined by the original creating application.  For example, the native format of an Excel workbook is a .xls or .xslx file.

3.  **DESIGNATION OF MATERIAL AS "CONFIDENTIAL" OR "HIGHLY CONFIDENTIAL"**.  Any Producing Party may designate Discovery Material as "Confidential" or "Highly Confidential" under the terms of this Order if the Producing Party in good faith reasonably believes that such Discovery Material contains non-public, confidential, personal, proprietary or commercially sensitive information that requires protections provided in this Order (hereinafter referred to as "Confidential Material" or "Highly Confidential Material" as set forth below).  Confidential Material and Highly Confidential Material are collectively defined as "Covered Information."

a.  **"Confidential Material."**  "Confidential Material" means material or information that constitutes, reflects, discloses or contains (i) information protected from disclosure by any applicable State or federal statute or regulation;  (ii) research, design, development, financial, technical, marketing, planning, manufacturing or commercial information that the Designating Party has maintained as confidential, as such terms are used in

Case ID: 220302606
Control No.: 24014683

Pa. R.C.P. 4012(a)(9), and any applicable case law interpreting these rules; and (iii) trade secrets as defined by the Restatement of Torts § 757 comment. Confidential Material shall also include any Protected Data (defined below). For avoidance of all doubt, all medical records produced in this case shall be designated Confidential and treated as personal health information ("PHI") in accordance with the Health Insurance Portability and Accountability Act ("HIPAA").

(i) **"Protected Data."** Protected Data shall refer to any information that a Party believes in good faith to be subject to federal, state, or foreign Data Protection Laws or other regulatory privacy obligations, including but not limited to Personal Health Information ("PHI") and Personally Identifiable Information ("PII"). Protected Data constitutes highly sensitive materials requiring special protection. Examples of such Data Protection Laws include, without limitation, The Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 et seq. (financial information); The Health Insurance Portability and Accountability Act and the regulations thereunder, 45 CFR Part 160 and Subparts A and E of Part 164 (medical information); and the *General Data Protection Regulation (GDPR)*: Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016 on the protection of natural persons with regard to the processing

Case ID: 220302606
Control No.: 24014683

of personal data and on the free movement of such data, and repealing Directive 95/46/EC (General Data Protection Regulation), OJ 2016 L 119/1. Certain Protected Data may compel alternative or additional protections beyond those afforded Confidential Material, in which event the Parties shall meet and confer in good faith, and, if unsuccessful, shall move the Court for appropriate relief.

b. **"Highly Confidential Material."** For purposes of this Order, Highly Confidential Material shall include, but is not limited to, Confidential Material as defined herein containing non-public product design, development, research, or testing information or extremely sensitive, highly confidential, non-public information, consisting either of trade secrets or proprietary or other highly confidential business, financial, regulatory, research, marketing, manufacturing, or other strategic information (including without limitation information regarding business plans, technical data, and non-public designs), the disclosure of which would create a substantial risk of competitive or business injury to the Producing Party. It is possible that Defendants may view certain Highly Confidential Information as requiring additional protections beyond those afforded Highly Confidential Material, in which event the Parties shall meet and confer in good faith about potential additional protections, and, if unsuccessful, Defendants shall move the Court for appropriate relief before producing the information.

(i). Certain Highly Confidential Information that contains trade secrets or

Page 15

Case ID: 220302606
Control No.: 24014683

proprietary or other highly confidential business, financial, regulatory, research, marketing, manufacturing or other strategic information that, if shared with Defendants' competitors (including each other) would result in competitive harm, will bear the additional designation "Highly Confidential – Outside Counsel Only." Material designated by one Defendant as "Highly Confidential – Outside Counsel Only" shall be afforded the same protections afforded to documents designated as "Highly Confidential," and in addition, shall not be made available to the other Defendants' in-house counsel or other current employees, absent written agreement by the Producing Party or by order of the Court after *in camera* review.

4.      **MARKING OF DOCUMENTS.** The designation of Discovery Material as Confidential Material or Highly Confidential Material for purposes of this Order shall be made in the following manner:

a. **TIFF Documents.** In the case of documents or other materials containing Covered Information produced in TIFF format (apart from depositions or other pre-trial testimony), designation shall be made by affixing the legend "Confidential" or "Highly Confidential" to all pages in each document containing any Confidential Material or Highly Confidential Material respectively.

b. **Native Documents.** With respect to documents or materials containing Covered Information produced in Native Format, the Designating Party shall include the highest level of confidentiality designation in the filename and/or on a slip sheet placeholder produced along with the native document.

c. **Designating Depositions.** With respect to any deposition, confidential

Case ID: 220302606
Control No.: 24014683

treatment may be invoked on the record (before the deposition or proceeding is concluded) or within twenty-one (21) days following receipt of the transcript by identifying the specific portions of the testimony as to which protection is sought and the level of protection sought (Confidential or Highly Confidential). If that right is invoked, the deposition transcripts shall be treated as Confidential or Highly Confidential, as appropriate, for 21 days following receipt of the transcript. After the expiration of that period, the transcript shall be treated only as specific portions are actually designated.

d. **Non-Written Materials.** Any non-text Covered Information (e.g., videotape, audio tape, computer disk, etc.) may be designated as such by labeling the outside of such material as "Confidential" or "Highly Confidential." In the event a Receiving Party generates any "hard copy" transcription or printout from any such designated non-written materials, the person who generates such "hard copy" transcription or printout shall take reasonable steps to maintain the confidentiality of such materials and properly identify and stamp each page of such material as "Confidential" or "Highly Confidential" consistent with the original designation by the Producing Party.

5.          **ADVERSE EVENT PROTECTIONS**. To protect against unauthorized disclosure of Confidential Information, and to comply with all applicable state and federal laws and regulations, the producing party will redact from produced documents, materials and other things, the following items: the names, street addresses, Social Security numbers, tax identification numbers, and other personal identifying information of patients and individuals in clinical studies or adverse event reports (unless the above-referenced information relates to named plaintiffs in

Case ID: 220302606
Control No.: 24014683

these Actions, except that Social Security numbers and tax identification numbers of named plaintiffs will be redacted as to any documents produced in accordance with this provision). Moreover, no disclosure of Confidential Information will be required to the extent that it is prohibited by an executed research or clinical trial consent form or applicable state and federal law and regulations. Other general identifying information, however, such as patient or health provider numbers, health provider names, and adverse event reporter names, may not be redacted unless required by state or federal law. Nothing in this paragraph shall require any Party to produce personal identifying information or personal health information in a manner that does not comply with federal or state law. Further, nothing in this agreement prevents either party from moving this court to compel the production of redacted information. Pursuant to 21 C.F.R. §§ 314.430(e) & (f) and 20.63.(f), the names and other information which would identify any patients who were reported as experiencing adverse events that are not redacted shall be treated as Confidential, regardless of whether the document containing such names is designated as Confidential.

6.      **DISCLOSURE OF COVERED INFORMATION.**  The failure to designate Covered Information does not constitute a waiver of such claim and may be remedied by prompt supplemental written notice upon discovery of the disclosure, with the effect that such Covered Information will be subject to the protections of this Order.  The Receiving Party shall exercise good faith efforts to ensure that copies made of Covered Information produced to it, and copies made by others who obtained such Covered Information directly or indirectly from the Receiving Party, include the appropriate confidentiality legend, to the same extent that the Covered Information has been marked with the appropriate confidentiality legend by the Producing Party.

7.      **MATERIALS PREPARED BASED UPON COVERED INFORMATION.** Any notes, lists, memoranda, indices, compilations, or other materials prepared

Case ID: 220302606
Control No.: 24014683

or based on an examination of Covered Information, that quote from or paraphrase Covered Information with such specificity that the Covered Information can be identified shall be accorded the same status of confidentiality as the underlying Covered Information from which they are made, and to the extent those materials are disclosed to other Parties or Non-parties, or produced or filed in this matter, shall be designated with the appropriate confidentiality legend, and shall be subject to all of the terms of this Protective Order.

8.     **NOTICE TO NON-PARTIES.**  Any Party issuing a subpoena to a Non-party shall include a reference to this Protective Order with an offer to provide a copy to the Non-party upon request.

9.     **GOOD-FAITH BELIEF.**  For purposes of this Order, the Designating Party bears the burden of establishing the appropriate designation of all such Discovery Material. The designation of any Discovery Material as "Confidential" or "Highly Confidential" pursuant to this Order shall constitute the verification by the Designating Party and its counsel that the material constitutes "Confidential" or "Highly Confidential" as defined above.

If at any time prior to the trial of these Actions, a Designating Party realizes that previously produced Discovery Material should be designated as "Confidential" or "Highly Confidential" the Designating Party may so designate by advising all other Parties in writing and by producing replacement documents or material with the appropriate "Confidential" or "Highly Confidential" designation as described above.  The designated documents or material will thereafter be treated as "Confidential" or "Highly Confidential" pursuant to this Order. Upon receipt of such designation in writing and re-production of the material with the "Confidential" or "Highly Confidential" legend, the Parties and other persons subject to this Order shall take reasonable and appropriate steps to notify any and all recipients of the

Case ID: 220302606
Control No.: 24014683

Discovery Material about the protected status of the newly designated "Confidential" or "Highly Confidential" Discovery Material and to retrieve the newly designated "Confidential" or "Highly Confidential" Discovery Material from any person who is not permitted by this Order to have Confidential Information.

10. **PERSONS AUTHORIZED TO RECEIVE CONFIDENTIAL MATERIAL.** Confidential Material may be disclosed only to the following "Qualified Persons":

    a. the Court, including attorneys, employees, judges, magistrates, secretaries, special masters, stenographic reporters, staff, transcribers and all other personnel necessary to assist the Court in its function, and the jury (and any appellate court or other court (and their personnel) before which the Parties appear in this Action);

    b. mediators or other individuals engaged or consulted in settlement of all or part of this Action;

    c. Court reporters, stenographers, and videographers retained to record testimony taken in this Action and those persons, if any, specifically engaged for the limited purpose of making photocopies of documents or otherwise assisting in e-discovery;

    d. counsel for the Parties other than in-house counsel, and such counsel's employees who have responsibility for the preparation and trial of the Action;

    e. in-house counsel for the Parties, and such in-house counsel's employees who have responsibility for the preparation and trial of the Action;

    f. Parties and employees or former employees of a Party to this Order but only to the extent that the specifically named individual Party's or employee's or

Case ID: 220302606
Control No.: 24014683

former employee's assistance or testimony is necessary to this Action;

g.  litigation support services, including outside copying services, court reporters, stenographers or companies engaged in the business of supporting computerized or electronic litigation discovery or trial preparation, retained by a Party or its counsel, provided that they execute Exhibit A as described in Paragraph 12 of this Order;

h.  any individual expert, consultant, investigator, or expert consulting firm retained by counsel of record in connection with this Action to the extent necessary for the individual expert, consultant, investigator, or expert consulting firm to prepare a written opinion, to prepare to testify, or to assist counsel of record in the prosecution or defense of this Action, provided, however, that: (i) the disclosure shall be made only to an individual expert, or to members, partners, employees or agents of an expert consulting firm as the expert consulting firm shall designate as the persons who will undertake the engagement on behalf of the expert consulting firm (the "Designated Expert Personnel"); (ii) the individual expert or Designated Expert Personnel use the information solely in connection with this Action; (iii) the individual and/or a representative of each expert consulting firm sign the Attestation attached on Exhibit A on behalf of any Designated Expert Personnel associated with that firm; (iv) absent notice and consent of the Designating Party or on application to and order of the Court, excluding any retention for this Action, the individual expert and each of the Designated Expert Personnel is neither a current nor former (within the past three years from the date of this Order) employee of

Case ID: 220302606
Control No.: 24014683

any Party or any entity which directly competes with any of the Defendants as to infant formula; and (v) the terms of Paragraph 17 of this Order are satisfied;

i. Any person (i) who created, authored, received or reviewed such Covered Information; (ii) is or was a custodian of the Covered Information; (iii) is identified on such Covered Information; or (iv) is or was an employee of the Producing Party and is reasonably believed to have knowledge of the matters in the Covered Information (provided that any former employee agrees to be bound by the provisions of the Order by signing a copy of Exhibit A prior to being shown any Covered Information);

j. Any employees of Defendants who are involved with the receipt, review, evaluation, and/or reporting of adverse event reports and other patient-related information to governmental and regulatory agencies to whom Defendants are legally obligated to report such information, and the governmental and regulatory agencies to whom Defendants report such information.

k. witnesses at depositions or who are noticed for depositions to whom disclosure is in good faith reasonably necessary to conduct the Action, with the limitations that (i) witnesses shall not retain a copy of documents containing Confidential or Highly Confidential Information, except witnesses may retain a copy of all exhibits marked at their depositions in connection with review of the transcripts; (ii) pages of transcribed deposition testimony or exhibits to depositions that are designated as Confidential or Highly Confidential Information pursuant to the process set out in this Order must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Order; (iii)

Case ID: 220302606
Control No.: 24014683

witnesses noticed for depositions who are shown Confidential or Highly Confidential Information in advance of their deposition must agree to be bound by the provisions of the Order by signing a copy of Exhibit A prior to being shown Confidential or Highly Confidential Information; and (iv) witnesses at depositions must either sign a copy of Exhibit A or, if they refuse, receive an admonition that he or she will be subject to sanctions, including contempt, for violating the terms of the Protective Order.

l.   mock jurors who have agreed to be bound by the provisions of the Order by signing a copy of Exhibit A;

m.   auditors and insurers of the Parties; and

n.   any other person as may be designated by written agreement by the Producing Party or by order of the Court.

11.     **PERSONS AUTHORIZED TO RECEIVE HIGHLY CONFIDENTIAL MATERIAL.** Except as specifically provided for in this or subsequent Court orders, Highly Confidential Material, or their contents may be disclosed, summarized, described, or otherwise communicated or made available in whole or in part only to "Qualified Persons" (defined in Paragraph 10). Highly Confidential Material produced by one Defendant may not be shown to employees of any other infant formula manufacturer (other than those encompassed by Paragraph 10(e)), absent written agreement by the Producing Party or by order of the Court after *in camera* review. Highly Confidential Material that are contracts between a Defendant and one organizational customer (e.g., hospitals, but not to include retailer or consumer purchasers of Defendants' products) may not be shown to a different organizational customer of Defendants, unless the deponent is reasonably believed to have knowledge of the matter in that particular

Case ID: 220302606
Control No.: 24014683

Highly Confidential document, absent written agreement by the Producing Party or by order of the Court after *in camera* review. Further, the Producing Party may seek emergency relief at a deposition if a Highly Confidential Document is presented to a witness and the Producing Party believes in good faith that immediate protection is appropriate.

12.     **EXECUTING THE NON-DISCLOSURE AGREEMENT.** Each person as identified in Paragraphs 11(b), (c), (g), (h), (k) and 12(a) to whom Covered Information is disclosed shall execute a non-disclosure agreement in the form annexed hereto as Exhibit A before receiving Covered Information. Copies of the executed Exhibit A shall be retained by counsel disclosing Covered Information to such person. Consistent with Paragraph 17, a non-disclosure agreement executed by a consultant shall not be available to any other Party except on a court order following a showing of exceptional circumstances.

13.     **CHALLENGING CONFIDENTIALITY DESIGNATIONS.** A Party objecting in good faith to the designation of any material as Confidential or Highly Confidential shall give written notice including a brief statement of the basis for the objection to the Designating Party after receiving such material. Upon receipt of the written objection, counsel for the Designating Party shall, within ten (10) business days, provide a written response to the objecting Party explaining the basis and supporting authority for the designation. The Parties shall meet and confer in good faith to attempt to resolve the dispute without resort to Court intervention. If the objecting Party and the Designating Party cannot resolve their dispute through such meet and confer discussions, within 15 business days after the Parties have reached an impasse after meet and confer efforts, the Challenging Party shall move the Court for an order modifying or removing such designation. The Designating Party shall have 14 business days to file a response. The challenging party shall have 7 days to file a reply. The Designating Party has the burden of

Case ID: 220302606
Control No.: 24014683

establishing that the document is entitled to protection. Any material so designated shall remain Confidential or Highly Confidential, and shall be subject to all restrictions on its disclosure and use set forth in this Order until one of the following occurs: (1) the Designating Party withdraws such designation in writing; or (2) the Court rules that the challenged material should be re-designated. In either event, the Designating Party shall reproduce copies of the re-designated material with the appropriate confidentiality designations at the Designating Party's expense within ten business days.

14. **SUBPOENA FOR COVERED INFORMATION.** If any Party has obtained Covered Information under the terms of this Order and receives a request to produce such Covered Information by subpoena or other compulsory process commanding the production of such Covered Information, such Party shall promptly notify the Designating Party, including in such notice the date set for the production of such subpoenaed information. Prior to the response date, the Designating Party shall provide written notice of any intent to seek a protective order. Upon receipt of such notice, the Party or person receiving the subpoena shall inform the person seeking the protected discovery material that such information is subject to the foregoing Order. No production or other disclosure of such information pursuant to the subpoena or other process shall occur until the deadline for the Designating Party to respond to written notice of the subpoena.

If the Designating Party informs the Party served with the subpoena that it has filed a motion seeking a protective order from the court where the subpoena or order issued, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" before a determination by that court, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material—and nothing

Case ID: 220302606
Control No.: 24014683

in these provisions should be construed as authorizing or encouraging a Receiving Party in this action to disobey a lawful directive from another court.

15. **USE OF DISCOVERY MATERIAL.** Covered Information shall be used solely for purposes of prosecuting, defending or attempting to resolve this Action, including any appeal (subject to any coordination order that is entered).

16. **REDACTIONS ALLOWED.**

a. Any Producing Party may redact from documents (i) matter that the Producing Party claims is privileged information; or (ii) any Protected Data. The Producing Party shall mark each redaction with a legend stating "REDACTED," and specify the basis for the redaction as appropriate, consistent with the privilege logging provisions of the stipulated order regarding the disclosure of privileged information. Where a document consists of more than one page, at least each page on which information has been redacted shall be so marked. If counsel for the Producing Party agrees or if the Court orders that documents initially redacted shall not be subject to redaction or shall receive alternative treatment, and the documents are subsequently produced in unredacted form, then those unredacted documents shall continue to receive the protections and treatment afforded to documents bearing the confidentiality designation assigned to it by the Producing Party.

b. In addition to the foregoing, the following shall apply to redactions of Protected Data:

i. Any Party may redact Protected Data that it claims, in good faith, requires protections under the terms of this Order. Protected Data,

Case ID: 220302606
Control No.: 24014683

however, shall not be redacted from documents to the extent it directly relates to or identifies an individual named as a Party in connection with the subject matter of this Action. Protected Data of an individual named as a Party shall otherwise receive the same protections and treatment afforded to other Protected Data under this Protective Order.

    ii.  Protected Data shall be redacted from any public filing not filed under seal.

c.  The right to challenge and process for challenging the designation of redactions shall be the same as the right to challenge and process for challenging the designation of Covered Information as set forth in Paragraph 13.

d.  Nothing herein precludes any Party from seeking the other Parties' consent or an order allowing the Party to redact nonresponsive matter from otherwise responsive documents on a case-by-case basis.

17.    **PRIVILEGED MATERIALS.** With respect to documents designated as privileged and included in a privilege log in another jurisdiction, those documents need not be added to a separate or additional privilege log in this Action. For those documents that have not previously been logged as privileged, any party intending to assert a privilege over such documents shall generate a privilege log compliant with the Pennsylvania Rules of Civil Procedure.

18.    **EXPERT MATERIALS.** As to Plaintiffs and Defendants, a testifying expert's work product and communications between a Party's attorney and testifying expert, including

Case ID: 220302606
Control No.: 24014683

drafts of any reports or disclosures, are protected from discovery except to the extent that the communication (i) relates to compensation for the expert's study or testimony; (ii) identifies facts or data that the Party's attorney provided and that the expert considered in forming the opinions to be expressed; or (iii) identifies assumptions that the Party's attorney provided and that the expert relied on in forming the opinions to be expressed. This paragraph, however, shall not be construed to relieve either Party of the obligation to respond to Pennsylvania Rule of Civil Procedure 4005 interrogatories. It will also not be construed to relieve the expert from producing any data analyses, formulas, or other information relied upon, considered, or generated by the testifying expert in forming his or her opinions. The identity, opinions, and work product of a consultant are discoverable only to the extent specified in under Pennsylvania law.

19.     **EXCLUSION OF INDIVIDUALS FROM DEPOSITIONS.**  Counsel shall have the right to exclude any person who is not authorized by this Order to receive documents or information designated as Covered Information from any deposition where testimony regarding Covered Information or the use of Covered Information is likely to arise.

20.     **SECURITY OF COVERED INFORMATION.**  Any person in possession of another Party's Covered Information shall exercise the same care with regard to the storage, custody, or use of Covered Information as they would apply to their own material of the same or comparable sensitivity. Receiving Parties must take reasonable precautions to protect Covered Information from loss, misuse and unauthorized access, disclosure, alteration and destruction, including but not limited to:

a.  Covered Information in electronic format shall be maintained in a secure litigation support site(s) that applies standard industry practices regarding data

Case ID: 220302606
Control No.: 24014683

security, including but not limited to application of access control rights to those persons entitled to access Covered Information under this Order;

b. To whatever extent the software tracks user access, an audit trail of use and access to litigation support site(s), to the extent the litigation support software tracks user access, shall be maintained while this Action, including any appeals, is pending;

c. Any Covered Information downloaded from the litigation support site(s) in electronic format shall be stored only on device(s) (e.g. laptop, tablet, smartphone, thumb drive, portable hard drive) that are password protected and/or encrypted with access limited to persons entitled to access Covered Information under this Order. If the user is unable to password protect and/or encrypt the device, then the Covered Information shall be password protected and/or encrypted at the file level.

d. Covered Information in paper format is to be maintained in a secure location with access limited to persons entitled to access Covered Information under this Order; and

e. Summaries of Covered Information, including any lists, memorandum, indices or compilations prepared or based on an examination of Covered Information, that quote from or paraphrase Covered Information in a manner that enables it to be identified shall be accorded the same status of confidentiality as the underlying Covered Information.

f. If the recipient of Covered Information is shipping data in electronic format, the recipient shall encrypt the data prior to shipping and provide the encryption

Case ID: 220302606
Control No.: 24014683

key in separate correspondence. If hard copy documents are shipped, the Receiving Party will ship the documents using secure packaging tape via Federal Express or UPS and retain a tracking number for the materials. If the Receiving Party learns at any time that the Covered Information has been retrieved or viewed by unauthorized parties during shipment, it will immediately notify the Producing Party and take all reasonable measures to retrieve the improperly disclosed materials.

g.   If the Receiving Party discovers a breach of security[1] relating to the Covered Information of a Producing Party, the Receiving Party shall: (1) provide written notice to the Producing Party of the breach within 48 hours of the Receiving Party's discovery of the breach; (2) investigate the effects of the breach, undertake reasonable, industry-standard actions to remediate the effects of the breach, and provide the Producing Party with assurance reasonably satisfactory to the Receiving Party that the breach shall not recur; and (3) provide sufficient information about the breach that the Producing Party can ascertain the size and scope of the breach. The Receiving Party agrees to cooperate with the Producing Party or law enforcement in investigating any such security incident.

21.      **USE IN FILINGS AND COURT PROCEEDINGS.** Any Party seeking to file or attach to a filing or introduce at a court proceeding any documents designated as "Confidential" or "Highly Confidential" shall comply with the Court's procedures for filing under seal.

---

[1] Breach is defined to include, but is not limited to, the confirmed or suspected: (i) disclosure or use of Covered Information by or to an unauthorized person; and/or (ii) the loss, theft or hacking of a device containing Covered Information.

Case ID: 220302606
Control No.: 24014683

22. **IMPROPER DISCLOSURE OF COVERED INFORMATION.** Disclosure of Covered Information other than in accordance with the terms of this Order may subject a Party to such sanctions and remedies as the Court may deem appropriate.

23. **FINAL TERMINATION.** Upon termination of the Action, including, for example, a voluntary dismissal or an exhaustion of any and all appeals, counsel for each Party shall, upon request of the Producing Party, return all Covered Information, including any copies, excerpts and summaries thereof, or shall destroy the same at the option of the Receiving Party and provide written confirmation of destruction, and shall purge all such information from all machine-readable media on which the Covered Information resides. Notwithstanding the foregoing, counsel for each Party and the in-house counsel of each Defendant designated under Paragraph 10(e) may retain all pleadings, briefs, memoranda, exhibits to any pleading, discovery responses, deposition transcripts, deposition exhibits, expert reports, motions, trial exhibits, and other documents filed with the Court that refer to or incorporate Covered Information, and will continue to be bound by this Order with respect to all such retained information. Further, attorney work- product materials that contain Covered Information need not be destroyed, but, if they are not destroyed, the person in possession of the attorney work-product will continue to be bound by this Order with respect to all such retained information.

24. **PROTECTIVE ORDER REMAINS IN FORCE.** This Protective Order shall remain in force and effect until modified, superseded, or terminated by consent of the Parties or by order of the Court made upon reasonable written notice. Unless otherwise ordered or agreed upon by the Parties, this Protective Order shall survive the termination of this Action. The Court retains jurisdiction even after termination of this Action to enforce this Protective Order and to make such amendments, modifications, deletions and additions to this Protective Order as the

Case ID: 220302606
Control No.: 24014683

Court may from time to time deem appropriate.

25. **MODIFYING THIS ORDER.** Nothing in this Protective Order shall be construed to prohibit the Parties from agreeing to modify any provision of this Order or seeking relief from the Court. Nor shall anything in this Order or any Party's compliance herewith be construed as a waiver of any Party's rights under applicable law.

**APPROVED BY:**

**PLAINTIFFS:**

By: */s/ Timothy A. Burke*
**KLINE & SPECTER**
Thomas Kline
Tobi Millrood
Elizabeth Crawford
Timothy Burke

**KELLER POSTMAN**
Ben Whiting *(Pro Hac Vice)*
Mark Weinstein

**DEFENDANTS:**

**Abbott Laboratories**

By: */s/ Sean P. Fahey*
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Sean P. Fahey
Ronni E. Fuchs

**CAMPBELL CONROY & O'NEIL, P.C.**
Joseph E. O'Neil
Ryan O'Neil

**JONES DAY**
Marques Hillman Richeson *(Pro Hac Vice)*
Jennifer B. Flannery

Case ID: 220302606
Control No.: 24014683

**Mead Johnson & Company, LLC and Mead Johnson Nutrition Company**

By: */s/ Kenneth A. Murphy*
**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy
Heather R. Olson

**WELSH & RECKER, P.C.**
Catherine M. Recker
Amy B. Carver
Richard D. Walk, III

**The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine**

By: */s/ Richard S. Margulies*
**BURNS WHITE LLC**
Richard S. Margulies
James A. Young
Susan R. Engle

By: */s/ Gabor Ovari*
**MARSHALL DENNEHEY WARNER COLEMAN GOGGIN**
Gabor Ovari
Kathleen Karmer

**Temple University Health System, Inc. d/b/a/ Temple University Hospital**

By: */s/ Richard S. Margulies*
**BURNS WHITE LLC**
Richard S. Margulies
James A. Young
Susan R. Engle

**Albert Einstein Medical Center a/k/a Einstein Medical Center and Albert Einstein Healthcare Network d/b/a Einstein Healthcare Network**

Case ID: 220302606
Control No.: 24014683

By: */s/ Brooke Scicchitano*
**ECKERT SEAMANS CHERIN &
MELLOT**
Donald J. Brooks, Jr.
Brooke Scicchitano

**Thomas Jefferson University Hospitals, Inc.,
d/b/a Thomas Jefferson University Hospital
and Thomas Jefferson University d/b/a
Jefferson Health System**

By: */s/ Brooke Scicchitano*
**ECKERT SEAMANS CHERIN &
MELLOT**
Donald J. Brooks, Jr.
Brooke Scicchitano

**IT IS SO ORDERED:**

**DATED:** _____

_____ J.

Case ID: 220302606
Control No.: 24014683

**EXHIBIT A**

**ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND**

I, _____ [ *print or type full name*], of

_____ [*print or type full address*],

have read and understand the Stipulated Protective Order that was issued by the Philadelphia Court

of Common Pleas on _____ [*insert date*] in the Action, as

defined in Paragraph 2(a) of the Protective Order.

I agree to comply with and to be bound by all the terms of this Stipulated Protective Order.

In compliance with this Order, I will not disclose in any manner any information or item that is

subject to this Stipulated Protective Order to any person or entity except in strict compliance with

the provisions of this Order.

I further agree to submit to the jurisdiction of the Philadelphia Court of Common Pleas for the

purpose of enforcing the terms of this Stipulated Protective Order, even if such enforcement

proceedings occur after termination of this action.

I declare under penalty of perjury under the laws of the Commonwealth of Pennsylvania

that the foregoing is true and correct. Signed this _____ day of _____

20_____, at _____ [*insert city and*

*state where sworn and signed*].

Signature:_____

# EXHIBIT A-59

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CIVIL TRIAL DIVISION

Taylor

v.

Mead Johnson

:
:
:
:
:

CASE NO. 220302606

CONTROL NO. 24014683

### ORDER

AND NOW, this 24th day of January, 2024 upon consideration of the Stipulation filed to the above-captioned Control No., it is hereby **ORDERED** that said Stipulation is an agreement between the parties as to matters of confidentiality which shall govern the parties' conduct in this matter. Jurisdiction will be relinquished upon final disposition of the trial court.

BY THE COURT:

CARPENTER, J.

220302606-Taylor Etal Vs Mead Johnson

22030260600110

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**CIVIL TRIAL DIVISION**

Taylor                                      :        CASE NO. 220302606
                                            :
        v.                                  :        CONTROL NO. 24014683
                                            :
Mead Johnson                                :
                                            :

## ORDER

AND NOW, this 24th day of January, 2024 upon consideration of the

Stipulation filed to the above-captioned Control No., it is hereby **ORDERED** that said

Stipulation is an agreement between the parties as to matters of confidentiality which shall

govern the parties' conduct in this matter. Jurisdiction will be relinquished upon final

disposition of the trial court.

BY THE COURT:

_____
CARPENTER, J.

220302606-Taylor Etal Vs Mead Johnson

22030260600110

# EXHIBIT A-60

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Heather R. Olson, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 875-0609
kmurphy@tlgattorneys.com

**ATTORNEYS FOR MEAD JOHNSON &**
**COMPANY, LLC AND MEAD**
**JOHNSON NUTRITION COMPANY**

*Filed and Attested by the Office of Judicial Records 28 FEB 2024 11:45 am S. GILLIAM*

| | |
|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** : | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| Plaintiff, : | **MARCH TERM, 2022** |
| v. : | **No. 2606** |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** : | |
| Defendants. : | |

## WITHDRAWAL OF APPEARANCE

**TO THE PROTHONOTARY:**

Kindly withdraw the appearance of Heather R. Olson, Esquire as counsel for

Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company in

the above-referenced matter.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Dated: February 14, 2024

/s/ Heather R. Olson
Heather R. Olson, Esquire
*Counsel for Defendants, Mead Johnson &*
*Company, LLC and Mead Johnson Nutrition*
*Company*

## **CERTIFICATE OF COMPLIANCE**

I certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania, Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.


Dated:  February 14, 2024                              /s/ Heather R. Olson
                                                                  Heather R. Olson, Esquire

## CERTIFICATE OF SERVICE

I, Heather R. Olson, Esquire, hereby certify that I caused to be served a true and correct copy of the foregoing document to all counsel of record via the Court's electronic filing system.

/s/ Heather R. Olson
Heather R. Olson, Esquire

Dated: February 14, 2024

Case ID: 220302606

# EXHIBIT A-61

Christina Taylor, on her own behalf and as Parent and Natural Guardian of I.H., a minor

                Plaintiff

v.

MEAD JOHNSON & COMPANY, LLC, et al.

                Defendants.

COURT OF COMMON PLEAS
PHILADELPHIA

CIVIL DIVISION

MARCH TERM, 2022
NO. 2606

*Filed and Attested by the Office of Judicial Records 20 MAR 2023 01:38 pm G. IMPERATO*

## ORDER

**AND NOW**, this 20th day of March 2023, upon consideration of the Preliminary Objections of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine to Plaintiffs' Complaint, and any Response thereto, it is hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that all claims against Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine are hereby **DISMISSED** with prejudice.

*MOOT.*
*Amended Complaint*
*filed on 9/8/2023.*

**BY THE COURT:**



                            J.

220302606-Taylor Etal Vs Mead Johnson

22030260600113

Case ID: 220302606
Control No.: 23062111

# EXHIBIT A-62

**Filed and Attested by the Office of Judicial Records 15 JUN 2023 06:57 pm C. PERRY**

| | |
|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** | : |
| | : |
| | : |
| Plaintiff, | : |
| v. | : |
| | : |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : |
| | : |
| | : |
| Defendants. | : |

**PHILADELPHIA COUNTY COURT OF COMMON PLEAS**

**MARCH TERM, 2022**
**No. 220302606**

## ORDER

**AND NOW**, this 20th day of March 2023, upon consideration of the Preliminary Objections of Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, "Mead Johnson" or "Moving Defendants") to Plaintiffs' Complaint, and any Response thereto, it is hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that all claims against Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company are hereby DISMISSED with prejudice.

**BY THE COURT:**

_____ J.

*Moot. Amended Complaint filed Sept. 2023. Objections to Amended Complaint to be resolved under those Control numbers.*

220302606-Taylor Etal Vs Mead Johnson

22030260600114

Case ID: 220302606
Control No.: 23063377

# EXHIBIT A-63

Christina Taylor, on her own behalf and as Parent and Natural Guardian of I.H., a minor

Plaintiff

v.

MEAD JOHNSON & COMPANY, LLC, et al.

Defendants.

COURT OF COMMON PLEAS
PHILADELPHIA COUNTY

CIVIL DIVISION

MARCH TERM, 2022
NO. 2606

*Filed and Attested by the Office of Judicial Records*
*27 SEP 2023 02:23 pm*
*GILLIAM*

## ORDER

**AND NOW**, this 20th day of March 2023, upon consideration of the Preliminary Objections of Defendants The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine to Plaintiffs' Amended Complaint, and any Response thereto, it is hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that ~~all claims against~~ Defendants the Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine ~~are hereby **DISMISSED** with prejudice.~~

*Plaintiff shall file an Amended Complaint as to* *Setting forth the specific facts upon which this Medical Malpractice claim derives as to the Hospital defendants*

**BY THE COURT:**

_____ J.

220302606-Taylor Etal Vs Mead Johnson

22030260600115

Case ID: 220302606
Control No.: 23096274

COPIES SENT PURSUANT TO Pa.R.C.P. 236(b) E. HAURIN 03/22/2024

# EXHIBIT A-64

## IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
### FIRST JUDICIAL DISTRICT OF PENSYLVANIA
### CIVIL TRIAL DIVISION

| | | |
|---|---|---|
| **TERRAINE ABDULLAH, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | : <br> : | **CASE ID. NO.: 220302583** |
| **HOLLI CARTER, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | : <br> : | **CASE ID. NO.: 220302588** |
| **SHONDRA DRAYTON, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | : <br> : | **CASE ID. NO.: 230302594** |
| **BRANDY GOODMOND, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | : <br> : | **CASE ID. NO.: 20400208** |
| **BRANDY GOODMOND, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | : <br> : | **CASE ID. NO.: 220400212** |
| **TONYA GRAY, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | : <br> : | **CASE ID. NO.: 220400216** |
| **KATRINA GREENE, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | : <br> : | **CASE ID. NO.: 230900803** |
| **JANEE HENDERSON, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | : <br> : | **CASE ID. NO.: 220400127** |
| **DELQUAN HINES, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | : <br> : | **CASE ID. NO.: 220400136** |
| **ROCHELLE HOLLINGSWORTH, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | : <br> : | **CASE ID. NO.: 230900791** |
| **SHEMIKA JOHNSON, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | : <br> : | **CASE ID. NO.: 220400162** |
| **KRISTEN KAJUFFA, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | : <br> : | **CASE ID. NO.: 220302978** |
| **NAFEESAH MAYS, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | : <br> : | **CASE ID. NO.: 220302963** |

ORDER-Taylor Etal Vs Mead Johnson



22030260600116

| | | |
|---|---|---|
| **CATHERINE McMILLIAN, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | :<br>: | **CASE ID. NO.: 220400140** |
| **DAMEKA MOMENT, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | :<br>: | **CASE ID. NO.: 220400142** |
| **ERICA PADILLA, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | :<br>: | **CASE ID. NO.: 220302969** |
| **NYDIA PARKER, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | :<br>: | **CASE ID. NO.: 220302983** |
| **ALEXANDRIA ROSS, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | :<br>: | **CASE ID. NO.: 220302981** |
| **LOREN SANDERS, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | :<br>: | **CASE ID. NO.: 220400153** |
| **SAMAYA SHORT, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | :<br>: | **CASE ID. NO.: 220400159** |
| **ALICE STILLS, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | :<br>: | **CASE ID. NO.: 220302617** |
| **CHRISTINE TAYLOR, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | :<br>: | **CASE ID. NO.: 220302606** |
| **NATISHA THOMAS, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | :<br>: | **CASE ID. NO.: 220400158** |
| **NIKIA TUCKER, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | :<br>: | **CASE ID. NO.: 230900867** |
| **TRINA WALKER-SAVAGE and CLIFTON and**<br>**ISAIAH SAVAGE, JR., et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | :<br>:<br>: | **CASE ID. NO.: 220400156** |
| **JEANNATE WATSON, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | :<br>: | **CASE ID. NO.: 220302967** |
| **ROBERT WHITFIELD, et al**<br>vs.<br>**MEAD JOHNSON & COMPANY, LLC, et al** | :<br>: | **CASE ID. NO.: 220400145** |

| GINA WIEGER, et al | : | CASE ID. NO.: 220302614 |
| vs. | : | |
| MEAD JOHNSON & COMPANY, LLC, et al | | |

| GINA WIEGER, et al | : | CASE ID. NO.: 220302601 |
| vs. | : | |
| MEAD JOHNSON & COMPANY, LLC, et al | | |

| SHANITA WIGGINS, et al | : | CASE ID. NO.: 220302986 |
| vs. | : | |
| MEAD JOHNSON & COMPANY, LLC, et al | | |

| STEPHANIE WILKERSON, et al | : | CASE ID. NO.: 230900730 |
| vs. | : | |
| MEAD JOHNSON & COMPANY, LLC, et al | | |

| MELVENIA WILLIAMS, et al | : | CASE ID. NO.: 220400141 |
| vs. | : | |
| MEAD JOHNSON & COMPANY, LLC, et al | | |

| IVYANN WITHERSPOON, et al | : | CASE ID. NO.: 220400138 |
| vs. | : | |
| MEAD JOHNSON & COMPANY, LLC, et al | | |

## ORDER

**AND NOW**, this 21ˢᵗ day of March 2024, it is hereby **ORDERED** that:

1. the preliminary objections filed to the following control numbers shall be the coordinating control numbers for all the above-captioned cases: **23096781, 23096740** and **23062552**;

2. all documents, replies, sur-replies or other materials that any party submits to the Court for decision as to any outstanding preliminary objections shall be filed, as appropriate, to the above control numbers;

3. the parties are to confirm that all materials that the parties are submitting for Court consideration are filed within ten (10) days of this Order, and a courtesy copy delivered to Felicia Brown in Room 231, City Hall, Philadelphia, PA 19107; and

4. the Court's Order and decision as to all outstanding objections will be filed to the above control numbers and shall control the objections filed to the above-captioned matters, as the "coordinating control number" as is relevant.

BY THE COURT,

J.

# EXHIBIT A-65

| | |
|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** | **COURT OF COMMON PLEAS** : **PHILADELPHIA COUNTY** : **MARCH TERM, 2022** : **No. 2606** |
| Plaintiff, | : |
| v. | : |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : |
| Defendants. | : |

*Filed and Attested by the Office of Judicial Records 28 SEP 2023 02:58 pm G. IMPERATO*

## ORDER

**AND NOW,** this 22 day of _____March_____ 2023, upon consideration of the

Preliminary Objections of Defendants Mead Johnson & Company, LLC and Mead

Johnson Nutrition Company (collectively, "Mead Johnson" or "Moving Defendants") to

Plaintiffs' Amended Complaint, and any Response thereto, it is hereby **ORDERED** that

the Preliminary Objections are ~~SUSTAINED~~.  It is further ~~**ORDERED**~~ that all claims

against Defendants ~~Mead Johnson & Company, LLC~~ and Mead Johnson Nutrition

~~Company are hereby~~ **DISMISSED** with prejudice.

*Will be Decided under the "Coordinators Control number". This Control number is Moot.*

**BY THE COURT:**

_____ J.

220302606-Taylor Etal Vs Mead Johnson

22030260600118

Case ID: 220302606
Control No.: 23096740

# EXHIBIT A-66

**FILED**
01 APR 2024 11:00 am
Civil Administration
T. FOBBS

| | |
|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| **Plaintiff,** | **MARCH TERM, 2022** |
| **v.** | **No. 2606** |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | |
| **Defendants.** | |
| **KATRINA GREENE, on her own behalf and as Parent and Natural Guardian of L.R., a Minor,** | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| Plaintiff, | **SEPTEMBER TERM, 2023** |
| v. | **No. 0803** |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | |
| Defendants. | |

## ORDER

**AND NOW,** this ____ day of _____ 2024, upon consideration of the Preliminary Objections of Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, "Mead Johnson") to Plaintiff's Complaint, and any Response thereto, it is hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that all claims against Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company are hereby **DISMISSED** with prejudice.

**BY THE COURT:**

_____
J.

| | |
|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** : | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| : | |
| **Plaintiff,** : | **MARCH TERM, 2022** |
| **v.** : | **No. 2606** |
| : | |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** : | |
| **Defendants.** : | |
| **KATRINA GREENE, on her own behalf and as Parent and Natural Guardian of L.R., a Minor,** : | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| : | |
| **Plaintiff,** : | **SEPTEMBER TERM, 2023** |
| **v.** : | **No. 0803** |
| : | |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** : | |
| **Defendants.** : | |

## <u>ORDER</u>

**AND NOW**, this ___ day of _____, 2024, upon consideration of the Preliminary Objections of Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, "Mead Johnson") to Plaintiff's Complaint, and any Response thereto, it is hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that:

1.  Count I of Plaintiff's Complaint is **DISMISSED** with prejudice;

2.  Count II of Plaintiff's Complaint is **DISMISSED** with prejudice;

3.  Count III of Plaintiff's Complaint is **DISMISSED** with prejudice;

4.  Count IV of Plaintiff's Complaint is **DISMISSED** with prejudice;

5.  Count V of Plaintiff's Complaint is **DISMISSED** with prejudice;

6.  Plaintiff's Complaint is **STRICKEN** for lack of specificity;

Case ID: 220302606
Control No.: 23096781

7. Plaintiff's claims for punitive damages as to Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company are **DISMISSED** with prejudice, along with all allegations of oppressive, reckless, malicious and/or fraudulent conduct;

8. Plaintiff Katrina Greene's claims in her own right are **DISMISSED** with prejudice; and

9. Plaintiff's Complaint is **STRICKEN** for lack of an appropriate verification.

**BY THE COURT:**

_____
                                                    J.

3

Case ID: 220302606
Control No.: 23096781

<u>**NOTICE TO PLEAD:**</u>

<u>**To Plaintiff:**</u> **You are hereby notified to file a written response to the enclosed Preliminary Objections within twenty (20) days from service hereof or a judgement may be entered against you.**

<u>**/s/ Kenneth A. Murphy**</u>
**Attorney for Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company**

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA  19103
(215) 875-0609
kmurphy@tlgattorneys.com

**ATTORNEYS FOR DEFENDANTS MEAD JOHNSON & COMPANY, LLC, AND MEAD JOHNSON NUTRITION COMPANY**

**WELSH & RECKER, P.C.**
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire
306 Walnut Street
Philadelphia, PA  19106
215-972-6430
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

| | | |
|---|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** | : : : | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| | : | |
| **Plaintiff,** | : : | **MARCH TERM, 2022 No. 2606** |
| **v.** | : : | |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : : : | |
| | : | |
| **Defendants.** | : | |

4

Case ID: 220302606
Control No.: 23096781

| | |
|---|---|
| KATRINA GREENE, on her own behalf and as Parent and Natural Guardian of L.R., a Minor, | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| Plaintiff, | SEPTEMBER TERM, 2023 No. 0803 |
| v. | |
| MEAD JOHNSON & COMPANY, LLC, et al., | |
| Defendants. | |

**PRELIMINARY OBJECTIONS OF DEFENDANTS MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON NUTRITION COMPANY TO PLAINTIFF'S COMPLAINT**

Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (hereinafter "Mead Johnson") hereby preliminarily object to Plaintiff's Complaint, and, in support thereof, aver as follows:

I. **INTRODUCTION**

1. The case before the Court involves speculative and unsupported allegations by Plaintiff that the minor Plaintiff, L.R., developed a condition known as necrotizing enterocolitis ("NEC") resulting from her alleged ingestion of "Similac and/or Enfamil cow's milk-based products" manufactured and sold by Mead Johnson and/or defendant Abbott Laboratories ("Abbott"). Plaintiff fails to identify the particular product that L.R. purportedly ingested, and the entirety of Plaintiff's claims rest on the unsubstantiated conclusion that the product or products consumed by L.R. are unreasonably dangerous. Plaintiff acknowledges that premature infants such as L.R. have an inherent high risk of developing NEC. The Complaint is otherwise devoid of factual support for Plaintiff's claim that Mead Johnson's product caused L.R. to develop NEC.  Plaintiff alleges only that L.R. was born on a certain date; *may* have been provided one of Defendants' pre-term infant feeding products; and, at some point,

5

developed NEC. But, Plaintiff has failed to identify which Mead Johnson product the infant received, if any; what else the infant was fed; when L.R. ingested the product; when L.R. was diagnosed with NEC; what treatment was provided for that condition; or what short- or long term-injury L.R., now twelve years old, allegedly sustained. Nowhere in the complaint does Plaintiff allege how cow's milk, or cow's milk-based products (of which Mead Johnson sells multiple varieties for different purposes), purportedly *cause* NEC, or how the facts of L.R.'s case square with any mechanism of action. Pennsylvania's procedural rules do not allow for such gaps in logic and omissions of material facts in a complaint. Accordingly, Plaintiff's Complaint should be dismissed.

2. Plaintiff instituted this action after filing a writ of summons on September 8, 2023 naming Mead Johnson, Abbott, the Pennsylvania Hospital of the University of Pennsylvania and the Trustees of the University of Pennsylvania ("HUP") as defendants. Notably, Mead Jonson has not been served with any complaint in this case via regular mail or otherwise.

3. This case mirrors the complaints filed in twenty-three other cases in this Court against Mead Johnson, Abbott, HUP, and other hospitals in Philadelphia based on claims relating to alleged ingestion of cow's milk-based products by premature infants following their birth. In each complaint, Plaintiffs have made the same unsupported allegations about a product that a minor may or may not have received while providing no scientific support that any such product causes NEC.

4. Plaintiffs in those cases, including Plaintiff here, allege that "upon information and belief" the Plaintiff-minors, including L.R., developed NEC, a gastrointestinal disorder that occurs in premature infants, caused by either Mead

Case ID: 220302606
Control No.: 23096781

Johnson's products "and/or" the products of co-defendant Abbott. *See* Plaintiff's Complaint, attached as Exhibit "A" at ¶ 1, 13.

5.     In addition to asserting product liability claims against Mead Johnson and Abbott, as the infant formula manufacturers, Plaintiff has brought claims against The Pennsylvania Hospital of the University of Pennsylvania and The Trustees of the University of Pennsylvania alleging liability on theories of failure to warn and corporate liability.

6.     The factual background regarding the Plaintiff-minor's birth, diagnosis and injuries are limited to four (4) paragraphs in the Complaint.

7.     Plaintiff avers that L.R. was born prematurely August 17, 2011 and that "[u]pon information and belief L.R. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital from shortly after her birth." *Id.*, ¶¶ 11–12.

8.     Plaintiff further alleges that "upon information and belief" L.R. developed NEC shortly after first ingesting the Defendant manufacturers' products. *Id.*, ¶ 13.

9.     Plaintiff generally alleges that L.R. "suffered injuries, including but not limited to, a diagnosis of NEC, ongoing gastrointestinal issues, and she continues to suffer long term health effects," with no specific description of those alleged injuries or long-term health effects. *Id.*, ¶ 14.

10.     Mead Johnson Preliminarily Objects to Plaintiff's Complaint for the reasons stated below and as more fully set forth in the accompanying Memorandum of Law, which is incorporated herein by reference.

Case ID: 220302606
Control No.: 23096781

## II.     ARGUMENT

### A.     DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS I, II, III, IV, & V

11.     To survive preliminary objections, Plaintiff must aver sufficient facts, together with the documents and exhibits attached thereto, to make out a *prima facie* case as to all elements of the cause of action. *Northern Forests II, Inc. v. Keta Realty Co.*, 130 A.3d 19, 35 (Pa. Super. 2015).  They have failed to do so with respect to all counts against Mead Johnson on the issue of whether cow's milk-based products are unreasonably dangerous.

12.     The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.,* 718 A.2d 305, 307 (Pa. Super. 1998). "A product is defective when it is not safe for its intended use, *i.e.*, the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id*. at 308. Whether a product is "unreasonably dangerous" is a question of law. *Id*.

13.     Plaintiff alleges in Counts I and II of the  Complaint that Mead Johnson, "as [one of] the manufacturers and/or sellers of the products at issue in this litigation," owed Plaintiff and the public a duty to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous and to warn of unreasonable risk of harm posed by their products.  Exhibit "A" at ¶ 97.

14.     Plaintiff similarly allege in Count III (Negligence) that Mead Johnson, owed Plaintiff and the "consuming public in general" a duty to exercise reasonable care to design, test, manufacture, inspect, and distribute products that were free of unreasonable risk of harm, and in in Count IV (Intentional Misrepresentation) and Count

8

V (Negligent Misrepresentation) that they owed Plaintiff and the public a duty to provide truthful, accurate, and fulsome information about their cow's milk-based products. Exhibit "A" at ¶ 115.

15.    Each count brought against Mead Johnson therefore rests on Plaintiff's theory that cow's milk-based products are unreasonably dangerous, and for strict liability purposes in Counts I & II, defective.

16.    In fact, Mead Johnson's cow's milk-based products are regulated by FDA and legally marketed for use in pre-term infants.  Moreover, in Plaintiff's own Complaint she acknowledges that "[p]reterm and low-birth-weight infants are *especially susceptible* to NEC." *See* Exhibit "A" at ¶ 16 (emphasis added).

17.    In support of her theories and claims, Plaintiff offers only vague references to unidentified "[e]xtensive scientific research, including numerous randomized controlled trials" that purportedly prove Mead Johnson's cow's milk-based products cause NEC in preterm and low-birth-weight infants.  Plaintiff neither cites specifically to any randomized trial or consensus statement, nor does she offer an explanation of the purported mechanism of action by which cow's milk-based formula products allegedly cause NEC.

18.    Given that Plaintiff has offered nothing but the bald assertion that there is "extensive scientific research" that Mead Johnson's products cause NEC, she has failed to adequately allege that the products are unreasonably dangerous.  Accordingly she has failed to state claims for defective design and failure-to-warn.  Counts I through V should be stricken.

**B.    DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS IV & V**

Case ID: 220302606
Control No.: 23096781

19.     Plaintiff's claims for intentional and negligent misrepresentation (Counts IV and V) fail because Plaintiff fails to plead her allegations with particularity as required by Pa. R. Civ. P. 1019(b). Specifically, Plaintiff does not allege that she received and relied upon any particular false representation from Mead Johnson. *See Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) (setting forth the elements of intentional and negligent misrepresentation and noting that both require a false representation upon which the plaintiff ultimately relied).

20.     Intentional misrepresentation requires: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Bortz*, 729 A.2d at 560 (citing *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994)).

21.     Negligent misrepresentation similarly requires a false representation and reliance, "though the speaker need not know his or her words are untrue." *Id.* at 561.

22.     To adequately plead a claim for fraud, Pennsylvania law requires that "(1) the pleadings must adequately explain the nature of the claim to the opposing party so as to permit the preparation of a defense, and (2) they must be sufficient to convince the court that the averments are not merely subterfuge." *Pezzano v. Mosesso*, 2014 WL 5421587, at *5 (Pa. Commw. Oct. 24, 2014) (quoting *Martin v. Lancaster Battery Co., Inc.*, 606 A.2d 444, 448 (Pa. 1992)). Plaintiff's complaint fails on the first prong.

23.     Plaintiff does not allege any specific representation upon which they relied. Nor does she identify the allegedly defective Mead Johnson product that L.R.

10

Case ID: 220302606
Control No.: 23096781

received. Ex. A, at ¶ 49 (alleging that Mead Johnson "markets and sells **multiple products** specifically targeting premature infants). Instead, the complaint is devoid of any allegation that L.R. received *any* Mead Johnson product at all. *See*; ¶ 104 (alleging that "Abbott **and/or** Mead Johnson's products were fed") (emphasis added). Plaintiff cannot claim reliance on an alleged misrepresentation when there is no identified product to misrepresent. *Kepner v. Tine*, No. 835 EDA 2015, 2015 Pa. Super. Unpub. LEXIS 4257, at *6 (Pa. Super. Nov. 25, 2015) (affirming dismissal of a fraudulent misrepresentation claim for failure to plead a particular misrepresentation). And, crucially, Mead Johnson is left wondering which, if any, product they should defend and what alleged "misrepresentations" to contest. *Pezzano*, 2014 WL 5421587, at *5.

24.     Pennsylvania law demands more. *See* Pa. R. Civ. P. 1019(b).  Other courts around the country have dismissed similar misrepresentation claims for lack of specificity.  *E.g.*, Ex. B, *In re Mead Johnson Product Cases*, CJC-23-005257, at 6–8 (Cal. Sup. Ct. July 7, 2023); *Casino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1469 (Cal. Ct. App. 2014) ("[W]hen a plaintiff asserts fraud against a corporation, the plaintiff must allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.") (internal quotation marks omitted); *Peterson v. Clark Lake Homes Inc.*, 2022 WL 16910578, at *4 (Minn. Ct. App. (Nov. 14, 2022) (requiring identification of the "who, what, when, where, and how" for a claim of fraud).

25.     Moreover, failure to allege any relationship between a specific misrepresentation (which they do not identify), a specific product (which they do not identify), and an injury means there can be no inference of proximate causation. *See*

Case ID: 220302606
Control No.: 23096781

*Kepner*, No. 835 EDA 2015, 2015 Pa. Super. Unpub. LEXIS 4257, at *6 (requiring a particular misrepresentation); *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 969 (Pa. Super. Ct. 1985) (affirming dismissal of negligence claim where plaintiff failed to properly identify the product or its manufacturer). Causation is a hallmark of any tort action in Pennsylvania, including misrepresentation. *Bortz*, 729 A.2d at 560 (citing *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994)). *See also Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 524 (W.D. Pa. 2003) ("Proof of causation is a necessary element in a products liability action. Absent a causal relationship between the defendant's product and the plaintiff's injury the defendant cannot be held liable on a theory of negligence, strict product liability, or misrepresentation") (applying Pennsylvania law) (citing *O'Brien v. Sofamar, S.N.C.*, No. CIV. A. 96–8015, 1999 WL 239414 (E.D. Pa.1999)). Absent identification of the manufacturer of the allegedly defective product, "there can be no allegations of . . . legal causation, and hence there can be no liability." *Cummins*, 495 A.2d at 968–69 (citing *Hamil v. Bashline*, 392 A.2d 1280 (Pa. 1978)).

      26.    Thus, Plaintiff's intentional and negligent misrepresentation claims against Mead Johnson must be dismissed.

      **C.    MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES**

      27.    Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading. Plaintiff's failure to specify the nature of the products ingested and injuries sustained serves as an alternative ground on which all of their claims should be stricken.

Case ID: 220302606
Control No.: 23096781

28.     A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the Complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (citations omitted).

29.     Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A,2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted) (emphasis added).

30.     Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent**

Case ID: 220302606
Control No.: 23096781

**should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.").

31.     As noted above, Plaintiff's Complaint is facially deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case, each of which are uniquely within her competence:

- Plaintiff's allegation that "upon information and belief," the minor was fed Similac and/or Enfamil shortly after her birth (Exhibit "A," at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide Mead Johnson with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products;

- Plaintiff has failed to identify which of the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names were ingested by the minor. *Id*. at ¶¶ 48-49;

- Plaintiff does not describe the period of time in which such products were ingested, when the minor was allegedly diagnosed with NEC, or what treatment was provided for that condition;

- Plaintiff does not specify the nature of the injuries and "long-term health effects" that are alleged to have resulted from the diagnosis of NEC.

32.     Furthermore, Plaintiff's damages claim is not stated with particularity and is amorphous, vague, and open-ended. Pursuant to Pennsylvania pleading

14

Case ID: 220302606
Control No.: 23096781

requirements, Mead Johnson should not be compelled to defend a claim for which the statement of injury is unspecified and subject to change.

33.     These omissions are fatal defects in Plaintiff's Complaint. Therefore, Plaintiff's Complaint should be stricken in its entirety.

**D.     <u>MOTION TO STRIKE PLAINTIFF'S CLAIMS FOR PUNITIVE DAMAGES</u>**

34.     In the *Ad Damnum* clauses of Counts I, II, III, IV, and V of her Complaint, Plaintiff makes baseless accusations that Mead Johnson engaged in oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages. *See* Exhibit "A," pp. 26, 29, 32, 35, and 38.

35.     Punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987).

36.     Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death. *See, e.g., Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff

Case ID: 220302606
Control No.: 23096781

alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages.")

37.     Here, the Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Mead Johnson. Read most generously, Plaintiff's Complaint alleges that Mead Johnson failed to warn co-defendant HUP of a risk of NEC associated with its legally-marketed cow's milk-based product – a risk about which Plaintiff alleges that HUP was already aware.  *See* Compl. ¶¶ 86-92.  And with respect to L.R.'s care, Plaintiff merely alleges that "upon information and belief" L.R. may have been given a product sold by Mead Johnson absent any context to indicate that such a product was inappropriate based on the specific issues involved in L.R.'s medical care and condition following birth.

38.     For example, the Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

39.     Plaintiff's allegations of oppressive, malicious and similar conduct must be rejected as mere boilerplate.  Indeed, the fact that Plaintiffs in these cases have filed

Case ID: 220302606
Control No.: 23096781

numerous lawsuits against at least four other hospitals in Philadelphia based on identical claims belies the contention that Mead Johnson engaged in outrageous or malicious conduct in allegedly selling a cow's milk-based product that was used to feed the Plaintiff-minor.

40.     The facts underlying Plaintiff's bare assertions of oppressive, reckless, malicious and fraudulent conduct do not come close to meeting the requisite standard under Pennsylvania law that would permit an award of punitive damages. Absent specific factual allegations to justify the claim that Mead Johnson's actions as they pertain to Plaintiff's particular facts and circumstances were extreme and outrageous, there is no basis for an award of punitive damages in this case, and Plaintiff's claims for such must be stricken from the Complaint pursuant to Rule 1028(a)(3).

### E.     MOTION TO STRIKE PLAINTIFF-PARENT'S CLAIMS

41.     The Court should strike Plaintiff-parent's claims to recover damages in her own right and as the parent and natural guardian of L.R.

42.     In each count of the complaint, Plaintiff-parent alleges that she "suffered significant emotional distress, loss of income, and/or other harms" and that "[h]er life has been significantly affected by the Injured Infant's injuries."  Ex. A, ¶¶ 105, 113, 122, 131, and 141.

43.     This is insufficient.  Plaintiff-Parent fails to meet the pleading requirements of Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

Case ID: 220302606
Control No.: 23096781

44. Plaintiff-parent plainly does not allege any claim in separate counts or state any cause of action. Rather, the claims are incorporated in a single, tagalong paragraphs at the end of the existing counts.

45. Additionally, Plaintiff-parent does not complain of any physical injury. It is well established that "no cause of action exists for negligence that results solely in economic damages unaccompanied by physical injury or property damage." *Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 985 A.2d 840, 841 n.3 (Pa. 2009) (citing *Adams v. Copper Beach Townhome Comtys., L.P.*, 816 A.2d 301, 305 (Pa. Super. 2003)); *Miller v. Evenflo Co., Inc.*, 2009 WL 10689606, at *4 (W.D. Pa. Dec. 21, 2009) (dismissing plaintiff-parents' tort claims where only physical injury was to minor plaintiff). So too for claims sounding in strict products liability. *Schmidt v. Boardman Co.*, 11 A.3d 924, 953 (Pa. 2011) ("We would hold that, for purposes of a strict products liability claim, a plaintiff's recovery for emotional distress is limited to that which is proximately caused by contemporaneous physical impact").

**F.     MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR FAILURE TO COMPLY WITH Pa.R.C.P. 1024**

46. Finally, Pennsylvania Rule of Civil Procedure 1024(a) requires verification of every pleading containing a factual averment based upon the signer's personal knowledge or information and belief.

47. Rule 1024(c) requires that the verification be made by one or more of the parties filing the pleading.

48. In this case, the Complaint is bereft of <u>any</u> verification. *See* Exhibit "A."

49. Accordingly, the Complaint should be stricken for lack of an appropriate verification.

Case ID: 220302606
Control No.: 23096781

WHEREFORE, Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company respectfully request that this Honorable Court sustain the instant Preliminary Objections and enter the attached proposed Order.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Dated:  April 1, 2024

/s/ Kenneth A. Murphy
Kenneth A. Murphy, Esquire

**WELSH & RECKER, P.C.**

/s/ Catherine M. Recker
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire

**Attorneys for Defendants,**
**Mead Johnson & Company, LLC and**
**Mead Johnson Nutrition Company**

19

Case ID: 220302606
Control No.: 23096781

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA  19103
(215) 875-0609
kmurphy@tlgattorneys.com

**ATTORNEYS FOR DEFENDANTS
MEAD JOHNSON & COMPANY, LLC,
AND MEAD JOHNSON NUTRITION
COMPANY**

**WELSH & RECKER, P.C.**
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire
306 Walnut Street
Philadelphia, PA  19106
215-972-6430
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

| | |
|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor**<br><br>**Plaintiff,**<br>**v.**<br><br>**MEAD JOHNSON & COMPANY, LLC, et al.,**<br><br>**Defendants.** | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY**<br><br>**MARCH TERM, 2022 No. 2606** |
| **KATRINA GREENE, on her own behalf and as Parent and Natural Guardian of L.R., a Minor,**<br><br>Plaintiff,<br>v.<br><br>**MEAD JOHNSON & COMPANY, LLC, et al.,**<br><br>Defendants. | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY**<br><br>**SEPTEMBER TERM, 2023 No. 0803** |

**MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY OBJECTIONS OF
DEFENDANTS MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON
NUTRITION COMPANY TO PLAINTIFF'S COMPLAINT**

I.      **MATTER BEFORE THE COURT**

Preliminary Objections of Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, "Mead Johnson") to Plaintiff's Complaint.

The case before the Court involves speculative and unsupported allegations by Plaintiff that minor Plaintiff, L.R., developed a condition known as necrotizing enterocolitis ("NEC") following her alleged ingestion of "Similac and/or Enfamil cow's milk-based products" manufactured and sold by Mead Johnson and/or Abbott Laboratories ("Abbott"). Plaintiff fails to identify the particular product that L.R. purportedly ingested, and the entirety of her claims rest on the unsubstantiated conclusion that the product or products consumed by L.R. are unreasonably dangerous. Plaintiff acknowledges that premature infants such as L.R. have an inherent high risk of developing NEC. The Complaint is otherwise devoid of factual support for Plaintiff's claim that Mead Johnson's product caused L.R. to develop NEC.  Plaintiff alleges only that L.R. was born on a certain date; *may* have been provided one of Defendants' pre-term infant feeding products; and, at some point, developed NEC.  But, Plaintiff has failed to identify which, if any, Mead Johnson product the infant received; what else the infant was fed; when L.R. ingested the product; when L.R. was diagnosed with NEC; what treatment was provided for that condition; or what short- or long term- injury L.R., now twelve years old, allegedly sustained. Nowhere does Plaintiff allege how cow's milk, or cow's milk-based products (of which Mead Johnson sells multiple varieties for different purposes), purportedly *cause* NEC, or how the facts of L.R.'s case square with any mechanism of action.  Pennsylvania's procedural rules do not allow for such gaps in

Case ID: 220302606
Control No.: 23096781

logic and omissions of material facts in a complaint. Accordingly, Plaintiff's Complaint should be dismissed.

## II. <u>STATEMENT OF QUESTIONS PRESENTED</u>

1.      Whether this Honorable Court should dismiss Count I of Plaintiff's Complaint "Strict Liability for Design Defect" cause of action with prejudice because Plaintiff's Complaint does not support the claim that cow's milk-based products are unreasonably dangerous, and Mead Johnson cannot be held liable for a defective design?

*Suggested Answer in the affirmative.*

2.      Whether this Honorable Court should dismiss Count II of Plaintiff's Complaint "Strict Liability for Failure to Warn" cause of action with prejudice because Plaintiff's Complaint does not support the claim that cow's milk-based products are unreasonably dangerous, and Mead Johnson cannot be held liable for failure-to-warn?

*Suggested Answer in the affirmative.*

3.      Whether this Honorable Court should dismiss Count III of Plaintiff's Complaint "Negligence" cause of action with prejudice on the basis of absence of proof of an unreasonably dangerous product?

*Suggested Answer in the affirmative.*

4.      Whether this Honorable Court should dismiss Count IV of Plaintiff's Complaint "Intentional Misrepresentation" cause of action with prejudice on the basis of absence of proof of an unreasonably dangerous product, and failure to plead any specific representation allegedly relied upon by Plaintiff?

*Suggested Answer in the affirmative.*

Case ID: 220302606
Control No.: 23096781

5.      Whether this Honorable Court should dismiss Count V of Plaintiff's Complaint "Negligent Misrepresentation" cause of action with prejudice on the basis of absence of proof of an unreasonably dangerous product, and failure to plead any specific representation allegedly relied upon by Plaintiff?

*Suggested Answer in the affirmative.*

6.      Whether this Honorable Court should strike Plaintiff's Complaint in its entirety for insufficient specificity of the facts and alleged injuries?

*Suggested Answer in the affirmative.*

7.      Whether this Honorable Court should strike Plaintiff's claims for punitive damages as to Mead Johnson because the Complaint fails to plead facts providing a basis for an award of punitive damages?

*Suggested Answer in the affirmative.*

8.      Whether this Honorable Court should strike Plaintiff's Complaint for failure to provide a client verification as required by Pa.R.C.P. 1024?

*Suggested Answer in the affirmative.*

## III.    <u>INTRODUCTION AND FACTUAL BACKGROUND</u>

There have now been more than 30 nearly identical lawsuits filed by parents on behalf of their prematurely born children against Mead Johnson, Abbott, and various Pennsylvania healthcare systems alleging that exposure to preterm formula and human milk fortifier—products found in neonatal intensive care units throughout the country— caused a disease known as necrotizing enterocolitis, a common syndrome in infants born prematurely.

4

Case ID: 220302606
Control No.: 23096781

Each complaint, including L.R.'s, alleges that the plaintiff-minors ingested either Mead Johnson's products "and/or" the products of co-defendant Abbott. *See* Plaintiff's Complaint, attached as Exhibit "A" at ¶ 1, 13. Many of the allegations of the Complaint are pled "upon information and belief," including the allegations that Plaintiff-minors actually received infant formula or fortifier, and that they developed NEC shortly after being fed with infant formula or fortifier. As discussed in detail below, Plaintiff's claims against Mead Johnson are legally and factually deficient.

Mead Johnson manufactures and sells products, including those under the brand name "Enfamil," to help meet the nutritional needs of infants. *Id.* ¶ 4. Some of these products are designed to be fed to premature or low-birth-weight infants who have special nutritional needs at birth. *Id.* ¶ 49. These products include formulas, which are given to infants who are not fed breast milk, and fortifiers, which are used to supplement pumped breast milk with additional nutrients. *See id.* ¶ 53 (photo of Enfamil Human Milk Fortifier: "For premature and low-birth-weight infants fed breast milk"). Some Enfamil products, particularly those intended to be fed to premature or low-birth-weight infants, are intended to be used only under the supervision of a physician. *See id.* (photo of Enfamil Human Milk Fortifier: "To be used only under the supervision of a physician"). Co-defendant Abbott also sells formulas and fortifiers meant to be fed to premature or low-birth-weight infants under the brand name "Similac." *Id.* at ¶¶ 48, 53. Plaintiff avers that Abbott sells at least seven types of products directed to preterm and/or low birth weight infants, six of which use the name Similac, and that Mead Johnson sells eight types of infant formulas and fortifiers using the Enfamil brand name. Id., ¶¶ 48–49.

Case ID: 220302606
Control No.: 23096781

Infant formulas and fortifiers for pre-term and low-birth-weight infants are regulated by the FDA. Mead Johnson is required to submit information about its pre-term products, including their ingredients, to the FDA, 21 C.F.R. § 107.50(b)(3), and the FDA is required to review that submission. The FDA may also impose changes to such a product's composition or labeling. *Id.* § 107(d)(1).

The formula and fortifier products identified by Plaintiff as being manufactured by Mead Johnson are made using ingredients derived from cow's milk. Ex. A at ¶ 12. Although Plaintiff aver that "Cow's Milk-Based Feeding Products Are Known to Cause NEC," she offers only a single sentence to support that proposition. *Id.* at ¶ 16. Citing unidentified "extensive scientific research, including numerous randomized trials," Plaintiff alleges that it has been "confirmed" that bovine-based products "cause NEC in preterm and low-birth-weight infants."[1] *Id.*

Moreover, Plaintiff's Complaint provides scant information regarding L.R.'s own circumstances. Plaintiff avers that L.R. was born prematurely on August 17, 2011 and that "[u]pon information and belief L.R. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital shortly after her birth." *Id.* at ¶ 12. Plaintiff further alleges that "upon information and belief" L.R. developed NEC shortly after first ingesting Mead Johnson and/or Co-Defendant Abbott's products. *Id.*, ¶ 13. Plaintiff provides no details regarding her condition following birth other than that she developed NEC on an unidentified date. Further, Plaintiff alleges no facts as to whether Plaintiff-parent provided breast milk to L.R., whether she had the opportunity to use donor milk,

---

[1] Taken to their logical conclusion, Plaintiff's allegations, if true, would mean that doctors, hospitals, FDA, and formula companies around the country are actively engaged in administering, approving, and selling products designed specifically for preterm infants *that have been "confirmed"* to cause an often fatal disease in those same infants. Plaintiff offers no evidence for this conspiracy.

6

Case ID: 220302606
Control No.: 23096781

and if L.R. actually received a cow's milk product, what it was, how much, and for how long.  Finally, the Complaint is silent as to the nature and extent of L.R.'s alleged injuries other than a vague reference to "long term health effects." *Id*. ¶ 14.

Further, the Complaint does not provide any details whatsoever regarding communications between Plaintiff-parent and medical providers at HUP regarding the allegations that L.R. may have been fed with Mead Johnson and/or Abbott cow's milk-based products in the hospital. Plaintiff concedes in the Complaint that mothers are encouraged by their healthcare professionals to breastfeed. *Id.* ¶ 52. But Plaintiff does not provide any information regarding discussions between Plaintiff-parent and any health care providers at HUP related to breastfeeding and/or using cow's milk-based products in this case. As noted, Plaintiff plead that Plaintiff-minor ingested formula "on information and belief" only, and similarly plead "on information and belief" that Plaintiff-minor developed NEC as a result.

## IV. <u>ARGUMENT</u>

### A. DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS I, II, III, IV & V

Pursuant to Pa.R.C.P. 1028(a)(4), a party may file preliminary objections to a complaint, in the nature of a demurrer, for legal insufficiency in a pleading. A court should grant a demurrer where, accepting as true all well pled facts, a legal cause of action cannot be maintained upon those facts. Pa.R.C.P. 1028(a)(4); *See also, Willet v. Pennsylvania Med. Catastrophe Loss Funds,* 702 A.2d 850, 853 (Pa. 1997). In this case, Counts I, II, III, IV, and V of Plaintiff's Complaint should be stricken pursuant to this Rule, as Plaintiff has failed to plead with sufficient detail to survive the pleading stage that Mead Johnson's cow's milk-based products were unreasonably dangerous.

Case ID: 220302606
Control No.: 23096781

To survive preliminary objections, Plaintiff must aver sufficient facts, together with the documents and exhibits attached thereto, to make out a *prima facie* case as to all elements of the cause of action. *Northern Forests II, Inc. v. Keta Realty Co.*, 130 A.3d 19, 35 (Pa. Super. 2015). "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.,* 718 A.2d 305, 307 (Pa. Super. 1998). "A product is defective when it is not safe for its intended use, *i.e.*, the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id*. at 308. Whether a product is "unreasonably dangerous" is a question of law. *Id*.

Plaintiff alleges in Counts I and II of her Complaint that Mead Johnson, "as the manufacturers and/or sellers of the products at issue in this litigation," owed Plaintiff and the public a duty to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous and to warn of unreasonable risk of harm posed by their products. Plaintiff similarly alleges in Count III (Negligence) that Mead Johnson, owed Plaintiff and the public a duty to exercise reasonable care to design, test, manufacture, inspect, and distribute products that were free of unreasonable risk of harm, and in Count IV (Intentional Misrepresentation) and Count V (Negligent Misrepresentation) that Mead Johnson owed Plaintiff and the public a duty to provide truthful, accurate, and fulsome information about their cow's milk-based products. Each count brought against Mead Johnson therefore rests on Plaintiff's theory that cow's milk-based products are unreasonably dangerous, and for strict liability purposes in Counts I & II, defective.

In fact, Mead Johnson's cow's milk-based products are regulated by FDA and legally marketed for use in pre-term infants. Moreover, in Plaintiff's own Complaint she

Case ID: 220302606
Control No.: 23096781

acknowledges that "[p]reterm and low-birth-weight infants are *especially susceptible* to NEC." *See* Exhibit "A" at ¶ 16 (emphasis added).

In support of her theories and claims, Plaintiff offers only vague references to unidentified "[e]xtensive scientific research, including numerous randomized controlled trials" that purportedly prove Mead Johnson's cow's milk-based products cause NEC in preterm and low-birth-weight infants. Plaintiff neither cites specifically to any randomized trial or consensus statement nor offer an explanation of the purported method of action by which cow's milk-based formula products allegedly cause NEC.

Moreover, as *Weiner* notes, a plaintiff must aver sufficient facts demonstrating the Mead Johnson's products are unreasonably dangerous **for their intended use**, triggering Mead Johnson's duty to warn. The only factual reference Plaintiff makes with regard to intended use is to marketing campaigns, where Defendant Manufacturers allegedly advertised that "cow's milk-based products are necessary for proper growth and development of preterm infants." *See* Exhibit "A" at ¶ 54. She has not averred sufficient facts to demonstrate that cow's milk-based products are unreasonably dangerous for this purpose.

Consequently, Counts I through V should be stricken with prejudice or failure to state a claim.

### B. DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS IV & V

Plaintiff's claims for intentional and negligent misrepresentation (Counts IV and V) fail because Plaintiff does not allege that she received and relied upon any specific representation from Mead Johnson. *See Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) (setting forth the elements of intentional and negligent misrepresentation and noting that

9

Case ID: 220302606
Control No.: 23096781

both require a false representation upon which the plaintiff ultimately relied). The complaint not only fails to identify the allegedly defective Mead Johnson product that L.R. received, it fails even to allege that L.R. received *any* Mead Johnson product. *See* Ex. A, Compl. ¶ 49 (alleging that Mead Johnson "markets and sells **multiple products** specifically targeting premature infants); ¶ 104 (alleging that "Abbott **and/or** Mead's products were fed") (emphasis added). Plaintiff cannot claim reliance on an alleged misrepresentation when there is no identified product to misrepresent. *Kepner v. Tine*, No. 835 EDA 2015, 2015 Pa. Super. Unpub. LEXIS 4257, at *6 (Pa. Super. Nov. 25, 2015) (affirming dismissal of a fraudulent misrepresentation claim for failure to plead a particular misrepresentation).

Pennsylvania law demands more. *See* Pa. R. Civ. P. 1019(b). Other courts around the country have dismissed similar misrepresentation claims for lack of specificity. *E.g.*, Ex. B, *In re Mead Johnson Product Cases*, CJC-23-005257, at 6–8 (Cal. Sup. Ct. July 7, 2023); *Casino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1469 (Cal. Ct. App. 2014) ("[W]hen a plaintiff asserts fraud against a corporation, the plaintiff must allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.") (internal quotation marks omitted); *Peterson v. Clark Lake Homes Inc.*, 2022 WL 16910578, at *4 (Minn. Ct. App. (Nov. 14, 2022) (requiring identification of the "who, what, when, where, and how" for a claim of fraud).

Intentional misrepresentation requires: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it;

Case ID: 220302606
Control No.: 23096781

(5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Bortz*, 729 A.2d at 560 (citing *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994)).

Negligent misrepresentation similarly requires a false representation and reliance, "though the speaker need not know his or her words are untrue." *Id.* at 561. Here, Plaintiff's misrepresentation claims fail because they fail to sufficiently allege any relationship between a specific misrepresentation (which they do not identify), a specific product (which they do not identify), and an injury. *See Kepner*, No. 835 EDA 2015, 2015 Pa. Super. Unpub. LEXIS 4257, at *6 (requiring a particular misrepresentation); *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 969 (Pa. Super. Ct. 1985) (affirming dismissal of negligence claim where plaintiff failed to properly identify the product or its manufacturer). Causation is a hallmark of any tort action in Pennsylvania. *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 524 (W.D. Pa. 2003) ("Proof of causation is a necessary element in a products liability action. Absent a causal relationship between the defendant's product and the plaintiff's injury the defendant cannot be held liable on a theory of negligence, strict product liability, or misrepresentation") (applying Pennsylvania law) (citing *O'Brien v. Sofamar*, S.N.C., No. CIV. A. 96–8015, 1999 WL 239414 (E.D. Pa.1999)). Absent identification of the manufacturer of the allegedly defective product, "there can be no allegations of . . . legal causation, and hence there can be no liability." *Cummins*, 495 A.2d at 968–69 (citing *Hamil v. Bashline*, 392 A.2d 1280 (Pa. 1978)). Plaintiff's intentional and negligent misrepresentation claims against Mead Johnson must therefore be dismissed.

### C. MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES

11

Case ID: 220302606
Control No.: 23096781

Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading. Plaintiff's failure to specify the nature of the products ingested and injuries sustained serves as an alternative ground on which all of her claims should be stricken.

A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the Complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (citations omitted). Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A,2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted) (emphasis added).

Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put

Case ID: 220302606
Control No.: 23096781

the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

As noted above, Plaintiff's Complaint is facially deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case, each of which are uniquely within her competence. Specifically, Plaintiff's description of the material facts relating to the minor's care and treatment, diagnosis and injuries is limited to four paragraphs, which are utterly insufficient to enable defendants to prepare their defenses. *See* Exhibit "A," ¶¶ 11-14. Plaintiff's allegation that "upon information and belief," the minor was fed Similac and/or Enfamil shortly after her birth (*Id*. at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide Mead Johnson with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products. Further, Plaintiff has failed to allege which of the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names L.R. *Id*. at ¶¶ 48-49. Plaintiff's Complaint further fails to provide a description of the material facts as to the period of time in which such products were ingested, when the minor was allegedly diagnosed with NEC and what treatment was provided for that condition.

Case ID: 220302606
Control No.: 23096781

In short, Plaintiff's Complaint is inconsistent with the requirements of the Pennsylvania Rules of Civil Procedure as to the necessary specificity for the description of the facts and alleged injuries sustained. The facts in the Complaint are pleaded almost entirely "on information and belief." These omissions are fatal defects in Plaintiff's Complaint. Therefore, Plaintiff's Complaint should be stricken in its entirety.

### D. MOTION TO STRIKE PLAINTIFF'S CLAIMS FOR PUNITIVE DAMAGES

As in the other infant formula cases, in the *Ad Damnum* clauses of Counts I, II, III, IV, and V of the Complaint, Plaintiff makes baseless accusations that Mead Johnson engaged in oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages. *See* Exhibit "A," pp. 25, 28, 31, 34, and 37. However, the Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Mead Johnson. Accordingly, Plaintiff's claims for punitive damages should be stricken.

Punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987). An award of punitive damages must be supported by evidence of

14

Case ID: 220302606
Control No.: 23096781

conduct more serious than the mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp. 85, 99 (M.D. Pa. 1984).

Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death. *See, e.g., Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages.").

Here, the Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Mead Johnson. Read most generously, Plaintiff's Complaint alleges that Mead Johnson failed to warn co-defendant HUP of a risk of NEC associated with its legally-marketed cow's milk-based product – a risk about which Plaintiff also alleges that HUP was already aware. *See* Compl. ¶¶ 86–92. And with respect to L.R.'s care, Plaintiff merely alleges that "upon information and belief" L.R. may have been given a product sold by Mead Johnson absent any context to indicate that such a product was inappropriate based on the specific issues involved in L.R.'s

15

medical care and condition following birth.  For example, the Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

Plaintiff's allegations of oppressive, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA reviews Mead Johnson's pre-term infant feeding products and has not restricted the use of cow's milk-based products for such infants. Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least four other hospitals in Philadelphia based on identical claims belies the contention that Mead Johnson engaged in outrageous or malicious conduct in allegedly in allegedly selling a cow's milk-based product that was used to feed the Plaintiff-minor. Absent specific factual allegations to justify the claim that Mead Johnson's actions as they pertain to Plaintiff's particular facts and circumstances were extreme and outrageous, there is no basis for an award of punitive damages in this case, and Plaintiff's claims for such must be stricken from the Complaint pursuant to Rule 1028(a)(3).

### E.    MOTION TO STRIKE PLAINTIFF-PARENT'S CLAIMS

The Court should strike Plaintiff-parent's claims to recover damages in her own right and as the parent and natural guardian of L.R., both because they are inadequately pled and because she has not suffered physical injury.

In each count of the complaint, Plaintiff-parent alleges that she "suffered significant emotional distress, loss of income, and/or other harms" and that "[h]er life has been significantly affected by the Injured Infant's injuries."  See Ex. A, ¶¶ 105, 113,

Case ID: 220302606
Control No.: 23096781

122, 131, and 141.  This is insufficient.  Plaintiff-Parent fails to meet the pleading requirements of Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

Plaintiff-parent plainly does not allege any claim in separate counts or state any cause of action. Rather, the claims are incorporated in a single, tagalong paragraphs at the end of the existing counts.

Additionally, Plaintiff-parent does not complain of any physical injury. It is well established that "no cause of action exists for negligence that results solely in economic damages unaccompanied by physical injury or property damage." *Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 985 A.2d 840, 841 n.3 (Pa. 2009) (citing *Adams v. Copper Beach Townhome Comtys., L.P.*, 816 A.2d 301, 305 (Pa. Super. 2003)); *Miller v. Evenflo Co., Inc.*, 2009 WL 10689606, at *4 (W.D. Pa. Dec. 21, 2009) (dismissing plaintiff-parents' tort claims where only physical injury was to minor plaintiff)  So too for claims sounding in strict products liability. *Schmidt v. Boardman Co.*, 11 A.3d 924, 953 (Pa. 2011) ("We would hold that, for purposes of a strict products liability claim, a plaintiff's recovery for emotional distress is limited to that which is proximately caused by contemporaneous physical impact").

### F.    MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR FAILURE TO COMPLY WITH Pa.R.C.P. 1024

Pennsylvania Rule of Civil Procedure 1024(a) requires verification of every pleading containing a factual averment based upon the signer's personal knowledge or information and belief. Rule 1024(c) requires that the verification be made by one or

17

Case ID: 220302606
Control No.: 23096781

more of the parties filing the pleading. In this case, the complaint lacks <u>any</u> verification. *See* Exhibit "A." Accordingly, the Complaint should be stricken for lack of an appropriate verification.

**V.    REQUESTED RELIEF**

For the foregoing reasons, Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company respectfully request that this Honorable Court sustain their Preliminary Objections and enter the attached Order.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Dated:  April 1, 2024

/s/ Kenneth A. Murphy
Kenneth A. Murphy, Esquire

**WELSH & RECKER, P.C.**

/s/ Catherine M. Recker
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire

**Attorneys for Defendants,
Mead Johnson & Company, LLC and
Mead Johnson Nutrition Company**

18

## <u>CERTIFICATE OF SERVICE</u>

I, Kenneth A. Murphy, Esquire, do hereby certify that on this day I caused a true and correct copy of the foregoing Preliminary Objections of Defendants Mead Johnson & Company and Mead Johnson Nutrition Company to Plaintiff's Complaint, and accompanying Memorandum of Law, to be served via electronic filing, on the following counsel of record, addressed as follows:

**Kline & Specter, P.C.**
Thomas R. Kline, Esquire
Tobias Millrood, Esquire
Elizabeth Crawford, Esquire
Melissa Merk, Esquire
Timothy A. Burke, Esquire
Helen Lawless, Esquire
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
tom.kline@klinespecter.com
tobi.millrood@klinespecter.com
melissa.merk@klinespecter.com
elissa.crawford@klinespecter.com
timothy.burke@klinespecter.com
helen.lawless@klinespecter.com
*Attorneys for Plaintiffs*

**Burns White, LLC**
James Young, Esquire
Richard Margulies, Esquire
Susan R. Engle, Esquire
1880 John F. Kennedy Blvd., 10th Floor
Philadelphia, PA 19103
jayoung@burnswhite.com
rsmargulies@burnswhite.com
sengle@burnswhite.com
*Counsel for Defendants, The Trustees of the University of Pennsylvania d/b/a The Hospital of the University of Pennsylvania and The Trustees of the University of Pennsylvania d/b/a Penn Medicine*

**Campbell Conroy & O'Neil, PC**
Joseph E. O'Neil, Esquire
Meghann C. Porth, Esquire
Ryan J. O'Neil, Esquire

19

Case ID: 220302606
Control No.: 23096781

1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
joneil@campbelltriallawyers.com
mporth@campbelltriallawyers.com
roneil@campbelltriallawyers.com
*Attorneys for Defendant, Abbott Laboratories*

**Jones Day**
Jennifer B. Flannery, Esquire
Marques Hillman Richeson
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
jbflannery@jonesday.com
mhricheson@jonesday.com
*Attorneys for Defendant, Abbott Laboratories*

**Troutman Pepper Hamilton Sanders, LLP**
Sean P. Fahey, Esquire
Ronni E. Fuchs, Esquire
3000 Two Logan Square
Philadelphia, PA 19103
sean.fahey@troutman.com
ronni.fuchs@troutman.com
*Attorneys for Defendant, Abbott Laboratories*

By:     /s/ Kenneth A. Murphy
Kenneth A. Murphy, Esquire


Dated: April 1, 2024

20

Case ID: 220302606
Control No.: 23096781

# EXHIBIT A

Case ID: 220302606
Control No.: 23096781



*Filed and Attested by the Office of Judicial Records 16 OCT 2023 06:20 pm C. PERRY*

**KLINE & SPECTER, P.C.**
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 320927
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Timothy.Burke@klinespecter.com

| | |
|---|---|
| KATRINA GREENE, on her own behalf and as Parent and Natural Guardian of L.R., a Minor, | : IN THE COURT OF COMMON PLEAS<br>: PHILADELPHIA COUNTY<br>:<br>: CIVIL TRIAL DIVISION |
| *Plaintiff*, | :<br>: SEPTEMBER TERM 2023 |
| v. | : NO. 0803 |
| MEAD JOHNSON & COMPANY, LLC<br>ILLINOIS CORPORATION SERVICE CO.<br>801 ADLAI STEVENSON DRIVE<br>SPRINGFIELD, IL 62702 | :<br>:<br>:<br>: |
| MEAD JOHNSON NUTRITION COMPANY<br>ILLINOIS CORPORATION SERVICE CO.<br>801 ADLAI STEVENSON DRIVE<br>SPRINGFIELD, IL 62702 | :<br>:<br>:<br>:<br>: |
| ABBOTT LABORATORIES<br>CT CORPORATION SYSTEM<br>208 SO. LASALLE STREET, SUITE 814<br>CHICAGO, IL 60604 | :<br>:<br>:<br>:<br>: |
| PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM D/B/A PENNSYLVANIA HOSPITAL<br>3400 CIVIC CENTER BLVD<br>PHILADELPHIA, PA 19104 | :<br>:<br>:<br>:<br>: |
| THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE | :<br>:<br>: |

133 SOUTH 36TH STREET            :
PHILADELPHIA, PA 19104                      :
                                            :
                    *Defendants.*           :


# COMPLAINT IN CIVIL ACTION
## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.<br><br>YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.<br><br><div align="center">PHILADELPHIA BAR ASSOCIATION<br>LAWYER REFERRAL AND INFORMATION SERVICE<br>ONE READING CENTER<br>PHILADELPHIA, PA 19107<br>TELEPHONE: (215) 238-1701</div> | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas las páginas siguientes, usted tiene viente (20) dias de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puese perder dinero o sus propiedades u ostros derechos importantes para usted.<br><br>LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICO, VAYA EN PERSONA O LLAME POR TELEPHONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.<br><br>ASOCIACION DE LICENCIADOS DE FILADELFIA<br><div align="center">Servicio De Referencia E Información Legal<br>One Reading Center<br>Filadelfia, Pennsylvania 19107<br>Telephono: (215) 238-1701</div> |

**KLINE & SPECTER, P.C.**
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 320927
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Timothy.Burke@klinespecter.com

| | |
|---|---|
| KATRINA GREENE, on her own behalf and as Parent and Natural Guardian of L.R., a Minor,<br><br>                *Plaintiff*,<br><br>    v.<br><br>MEAD JOHNSON & COMPANY, LLC<br>ILLINOIS CORPORATION SERVICE CO.<br>801 ADLAI STEVENSON DRIVE<br>SPRINGFIELD, IL 62702<br><br>MEAD JOHNSON NUTRITION COMPANY<br>ILLINOIS CORPORATION SERVICE CO.<br>801 ADLAI STEVENSON DRIVE<br>SPRINGFIELD, IL 62702<br><br>ABBOTT LABORATORIES<br>CT CORPORATION SYSTEM<br>208 SO. LASALLE STREET, SUITE 814<br>CHICAGO, IL 60604<br><br>PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM D/B/A PENNSYLVANIA HOSPITAL<br>3400 CIVIC CENTER BLVD<br>PHILADELPHIA, PA 19104<br><br>THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE<br>133 SOUTH 36TH STREET<br>PHILADELPHIA, PA 19104 | **IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY**<br><br>**CIVIL TRIAL DIVISION**<br><br>**SEPTEMBER TERM 2023**<br>**NO. 0803** |

1

Case ID: 230900808
Control No.: 23096781

*Defendants.*          :

## COMPLAINT

Plaintiff brings this Complaint and Demand for Jury Trial (the "Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania d/b/a Penn Medicine and Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively "Penn Medicine" or "Pennsylvania Hospital" or "Defendant Hospital"), together "Defendants." Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

### I.     INTRODUCTION

1.     This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Pennsylvania Hospital. Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner. This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products. As a result, the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2.     Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and

2

Case ID: 230900808
Control No.: 23096781

supplied without adequate warning to the Injured Infant at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II.    PARTIES

3.     Plaintiff Katrina Greene is a natural adult person and a resident of Pennsylvania.  Ms. Greene is the parent and natural guardian of L.R., a minor.  Ms. Greene's address is 2811 W Sedgely Avenue, Philadelphia, Pennsylvania 19121.

4.     Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware. Its principal place of business is Illinois.  Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company.  Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.     Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois.  Its principal place of business is in Illinois.  Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

6.     Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania.   Its principal place of business is Philadelphia, Pennsylvania. Pennsylvania Hospital is a registered name of The Pennsylvania Hospital of the University of Pennsylvania Health System.  The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of

3

Case ID: 230900608
Control No.: 23096781

Pennsylvania.

7.      Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania. Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

## III.      JURISDICTION AND VENUE

8.      This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931. Defendants conduct authorized business in the Commonwealth of Pennsylvania.  They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.      Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

10.      This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

## IV.      FACTUAL ALLEGATIONS

### L.R.'s NEC Diagnosis

11.      L.R. was born prematurely at Pennsylvania Hospital in Philadelphia, Pennsylvania on

4

Case ID: 230900808
Control No.: 23096781

August 17, 2011.

12.     At birth, L.R.'s gestational age was approximately 31 weeks and she weighed 1843 grams. Upon information and belief, L.R. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital after her birth.

13.     Upon information and belief, L.R. developed NEC after ingesting Defendant Manufacturers' products.

14.     L.R.'s diagnosis of NEC occurred during her course of treatment at Defendant Hospital's NICU. L.R. suffered injuries, including but not limited to, a diagnosis of NEC, ongoing gastrointestinal issues, and she continues to suffer other long-term health effects.

### Cow's Milk-Based Feeding Products Are Known to Cause NEC

15.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants. NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die. Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis. Up to 30 percent of NEC-diagnosed infants die from the disease.

16.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems. Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

### Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist

17.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition. For example, in addition to the mother's own milk, an

5

established network delivers pasteurized donor breast milk to hospitals nationwide. Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

18.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.

19.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the breast milk they could otherwise receive.   This displacement only increases infants' vulnerability to NEC.

20.     Breast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

21.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

22.     Despite the scientific consensus that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings.    Instead, they have continued to sell their unreasonably dangerous products.    In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge. And, in fact, the Defendant Manufacturers offer contracts to hospitals—which the hospitals accept—that actually *prevent* the health care providers from offering alternative products—even safer ones— on pain of risking the hospital's advantageous formula pricing strategy.

Case ID: 230900606
Control No.: 23096781

### *Ms. Greene Discovers Her Claim*

23.     Because of the Defendants' concealment and misrepresentations, described more fully herein, Ms. Greene did not know, and had no reason to know or suspect, that L.R.'s NEC could have been caused by the Defendant Manufacturers' products.

24.     Once Ms. Greene learned of the direct connection between the Defendant Manufacturers' products and NEC , she contacted an attorney thereafter.

### *Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and Would Not Have Revealed a Factual Basis Earlier Because Defendants Hid the Cause of NEC from Ms. Greene*

25.     Despite exercising reasonable diligence, Ms. Greene was unable to have made the discovery earlier via a reasonable investigation because the Defendants in this litigation concealed the wrongful cause of L.R.'s injuries.

26.     Not one person at Penn Medicine informed Ms. Greene that the Defendant Manufacturers' formula products could have caused L.R.'s injuries.  Penn Medicine's response at the time did not give Ms. Greene any reason to suspect any wrongdoing on the part of the Defendants.

27.     Ms. Greene is a layperson with no medical background or training that would have given her any reason to doubt the response she received from Penn Medicine's health care providers at the time

28.     Given that Penn Medicine's health care providers were in charge of the care of her newborn infant, Ms. Greene had no reason to doubt their word.

29.     Additionally, the risk of necrotizing enterocolitis was not disclosed on the labeling or packaging of *any* of the Defendant Manufacturers' products.

30.     What is more, necrotizing enterocolitis is a disease that can occur in children who are *not* fed the Defendant Manufacturers' products, and the Defendant Manufacturers have worked to

Case ID: 230900808
Control No.: 23096781

mislead parents into a false sense of security about the use of those products. Publicly disseminated materials from each Defendant Manufacturer disguise the role their products play in causing the disease—and affirmatively say, even today, that their products are safe and do not cause NEC. In fact, some publicly disseminated materials from the formula manufacturers even suggest that formula may help *reduce* the risk of this terrible and potentially fatal disease.

31. For example, Abbott's website stays that "[t]he specific cause of NEC is unknown, but it's most often seen in very low birth weight premature babies," and that "about 10% of babies who are born prematurely develop NEC." The website suggests that "new preliminary studies" suggest for the first time that "NEC prevention may . . . be possible" with the use of human milk oligosaccharides to "dramatically curb intestinal inflammation" and reduce the risk of NEC. Abbott states that these human milk oligosaccharides are found in "certain Similac formulas" although they are "not currently available in Similac's premature infant formulas."[1] Likewise, the website for Mead Johnson's products states that necrotizing enterocolitis is "one of the most common and serious intestinal disease[s] among premature babies." And it deflects responsibility from Mead Johnson's products: "Necrotizing enterocolitis happens when tissue in the small or large intestine is injured or inflamed."[2]

32. Because of the misleading information distributed by the Defendant Manufacturers, as further detailed herein, any research conducted by Ms. Greene immediately after L.R.'s diagnosis, or at any time prior to seeing an advertisement, would not have led a reasonable person to suspect that the Defendant Manufacturers' products could have caused L.R.'s injuries.

---

[1] The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (last visited July 28, 2023).

[2] Special Feeding Concerns for Preemies, https://www.enfamil.com/articles/special-feeding-concerns-for-preemies/ (last visited July 29, 2023).

8

Case ID: 230900808
Control No.: 23096781

33.     Ms. Greene also did not know, and had no reason to know or suspect, that Penn Medicine breached its duty of care by distributing the Defendant Manufacturers' products to L.R. Not only was Ms. Greene unaware that the Defendant Manufacturers' products caused L.R.'s injuries and death, but the Defendant Manufacturers' distribution agreements with Penn Medicine—which allowed Penn Medicine to secure sweetheart deals for otherwise expensive premature infant formula in exchange for product placement and access to the hospital staff—were also not public or knowable to Ms. Greene, nor could any reasonable investigation outside of litigation have uncovered the terms of those agreements.

***Despite Exercising Reasonable Diligence, the Defendants' Fraudulently Concealed the Risks of NEC from Defendant Manufacturers' Products to Divert, Prevent, and Mislead Plaintiff Regarding the Cause of Her Child's NEC Diagnosis***

34.     In addition to the averments above, the Defendants have acted in concert to fraudulently convey false and misleading information concerning the risk of NEC, and potentially death, caused by Defendant Manufacturers' preterm infant formula products.

35.     The Defendants' actions as set forth herein constitute knowing misrepresentation, omission, suppression, and concealment of material facts, made with the intent that Plaintiff would rely upon such concealment, suppression, or omission, in connection with the use of Defendants' preterm infant products.

36.     Plaintiff did not know, and could not learn, the truth concerning the uses, risks and benefits of Defendant Manufacturers' preterm infant products due to Defendants' deliberate misrepresentations and concealment, suppression and omission of material facts and important information regarding the risks of NEC, and potentially death, from the products.

37.     Moreover, Defendant Hospital further participated in the intentional concealment—on information and belief, it allowed the Defendant Manufacturers' sales representatives into its

9

hospital to provide samples and free products that did not warn of their serious dangers, and to provide "education" to its NICU staff that was incomplete as to the true risks of feeding their patients the Defendant Manufacturers' products.

38. Additionally, Defendant Hospital failed to inform Ms. Greene that the Defendant Manufacturers' products caused Plaintiff's child's NEC.

39. Defendant Hospital was aware that the Defendant Manufacturers' products caused NEC in premature infants. Defendant Hospital was also aware that the Defendant Manufacturers did not provide warnings on their products. However, Defendant Hospital did not warn Ms. Greene of the risks of the products. Instead, and notwithstanding the sweetheart deal Defendant Hospital agreed to in exchange for preterm infant formula at little to no cost, Defendant Hospital repeatedly informed Ms. Greene that it would do everything it could possibly do to keep her infant safe. Though this was clearly not true given the known risks of preterm formula for babies like L.R., it was enough for Ms. Greene to trust that Defendant Hospital was providing preterm formula in the best interest of her child.

40. Defendants' affirmative acts of fraud and concealment, as averred herein, diverted, prevented, and/or mislead Plaintiff from discovering the medical cause of her child's NEC diagnosis.

41. Plaintiff was not put on inquiry notice until she learned of the direct connection between the Defendant Manufacturers' products and NEC at a later time and contacted an attorney thereafter.

***The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products***

Case ID: 230900608
Control No.: 23096781

42.    Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

43.    Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

44.    Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message.

45.    Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

46.    While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears—

11

Case ID: 230900606
Control No.: 23096781

that the nutrition they are supplying to their child will not provide the best chance of survival—while wholly failing to warn that their products come with a significantly increased risk of NEC.

47.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

48.     Abbott markets and sells multiple products specifically targeting preterm and low-birthweight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC. At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

49.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant

Case ID: 230900608
Control No.: 23096781

Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

50.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

51.     Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

Case ID: 230900606
Control No.: 23096781

52.     Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers.  The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

53.     Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products.   The packaging appears as:

14

Case ID: 230900806
Control No.: 23096781




54.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice.   This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

55.     The Defendant Manufacturers have also designed powerful marketing campaigns to both the general public and health care providers at hospitals like Pennsylvania Hospital.   The Defendant Manufacturers know that sales made to hospitals are key drivers of brand loyalty and

15

thus are a key opportunity to drive better downstream business—*i.e.*, retail purchases by parents after they have left the hospital. On information and belief, the Defendant Manufacturers know that the products used in a hospital's NICU are related to getting and keeping the overall hospital contracts. And the Defendant Manufacturers know that just like any celebrity endorsement, when the mothers of newborn infants see medical professionals using a certain brand, the mothers are more likely to continue to purchase that same brand after discharge. The Defendant Manufacturers are thus heavily motivated to ensure that NICU departments are using their products.

56.     Abbott and Mead Johnson focus their sales teams and training heavily on hospital NICU departments. They train their sales representatives how to increase the number of babies on their formula and they emphasize the need to be the dominant formula manufacturer in the NICU so they can own that profitable ground and secure a great return on their substantial investment in NICU formula and other products.

57.     To leverage hospitals' NICUs and secure babies in the hospital and at retail, the Manufacturer Defendants pull out all the stops to convince hospitals, including Defendant Hospital, to purchase their products. For example: Abbott and Mead Johnson provide samples of their products to hospitals for free.

58.     On information and belief, to get the hospitals on board with supplying their formula for premature infants, Abbott and Mead Johnson work with hospitals to secure contracts that have special pricing discounts if a certain level of the formula-fed babies in the hospital receive just that one manufacturer's products; similar to a restaurant being a Coke or Pepsi restaurant. And notwithstanding the increased risk of the Defendant Manufacturers' products for the hospitals' most fragile patients—the preterm infants—the decision makers at these hospitals seek out these types of contracts to better the hospitals' own bottom lines.

Case ID: 230900808
Control No.: 23096781

59.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective company's own formula products to give to the preterm infants.  The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

60.     Prior to L.R.'s birth, Abbott sent sales representatives to Defendant Hospital.  Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Abbott's products were safe to give to preterm infants like L.R.  Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants.

61.     Prior to L.R.'s birth, Mead Johnson sent sales representatives to Defendant Hospital. Those sales representatives provided information about Mead Johnson's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Mead Johnson's products were safe to give to preterm infants like L.R.  Mead Johnson maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Mead Johnson's products could cause NEC in preterm infants.

Case ID: 230900608
Control No.: 23096781

62.     Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like L.R.

*The Defendant Manufacturers' Inadequate Warnings*

63.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants. Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

64.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

65.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

66.     Mead cites no medical literature or research to guide the use of its products.

67.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

68.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

Case ID: 230900806
Control No.: 23096781

69.     Mead Johnson failed to provide, and continues to fail to provide, a full accounting of the risk of NEC as documented by underrepresenting and misrepresenting the risk to the public and the medical community.

70.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.  Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

71.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

72.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

73.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

74.     Despite knowing of studies documenting an increased risk of NEC from its products, Abbott did not act to make parents or the medical community aware of those risks, and instead took steps to conceal or prevent those risks from becoming public.  Despite knowing that its

Case ID: 230900806
Control No.: 23096781

products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### *Penn Medicine's Failure to Warn*

86.     On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  It knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition.  However, instead of warning of the dangers, or supplying breast milk-based feeding products to preterm infants like the Injured Infant, Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning.

87.     To that end, Penn Medicine has participated in studies designed to increase the use of donor milk while, at the same time, reducing formula feeding in neonates.    The University of Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research into the risks associated with feeding formula to premature infants.   It recently partnered with the National Institute of Nursing Research to publish clinical determinations based on its experience "changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral feed tolerance and more rapid weaning from intravenous nutrition. . . .

Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the incidence and severity of . . . necrotizing enterocolitis (NEC)."

88.     Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration.

Case ID: 230900606
Control No.: 23096781

The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

89.     Finally, medical providers and staff at Penn Medicine have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition.   In an internal newsletter from 2012 touting donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet, quoting a staff lactation consultant:

> Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

90.     These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

91.     Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities.   As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries.   This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

21

92.     Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers.  On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free and/or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff.  These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff.  This arrangement dovetails with the Defendant Manufacturers' own marketing strategies" and use of salespersons.

### *Safer Alternative Designs*

93.     The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants.   The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

94.     Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk.  This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

95.     On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

Case ID: 230900606
Control No.: 23096781

**CAUSES OF ACTION**
**COUNT I: STRICT LIABILITY FOR DESIGN DEFECT**
**(Against Abbott and Mead)**

96.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

97.     Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

98.     Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

99.     Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations.   Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

100.    The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products.  The risks of feeding those products to the Injured Infant outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

101.    Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

102.    Abbott's and Mead's products contained cow's milk at the time they left the manufacturing

23

Case ID: 230900606
Control No.: 23096781

facility.

103.     Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

104.     Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

105.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

        WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

        a.     For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

        b.     For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

        c.     For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

        d.     For punitive damages in excess of $50,000 and this Court's arbitrational

Case ID: 230900808
Control No.: 23096781

limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.      For interest as permitted by law;

f.      For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.      For such other and further relief as the Court deems proper.

## COUNT II: STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott and Mead)

106.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

107.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

108.    Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses. By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death. The failure to warn makes the products at issue in this litigation unreasonably dangerous.

109.    Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured

Case ID: 230900606
Control No.: 23096781

Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks. Among other risks, the Defendant Manufacturers:

    a.    Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

    b.    Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

    c.    Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

    d.    "Black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

    e.    Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

    f.    Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

    g.    Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

Case ID: 230900806
Control No.: 23096781

h. Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

110. Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

111. As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

112. The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products. Had the Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

113. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-

27

economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.     For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.     For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.     For interest as permitted by law;

f.     For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.     For such other and further relief as the Court deems proper.

### COUNT III: NEGLIGENCE
### (Against Abbott and Mead)

114.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

115.     Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

116.     At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

Case ID: 230900808
Control No.: 23096781

117.     Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

118.     Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

> a.     Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or
>
> b.     Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or
>
> c.     Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or
>
> d.     Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or
>
> e.     Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or
>
> f.     Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided

Case ID: 230900806
Control No.: 23096781

information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.   Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.   Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

119.   In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

120.   As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

121.   Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

122.   As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

Case ID: 230900808
Control No.: 23096781

a.　　For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.　　For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.　　For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.　　For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.　　For interest as permitted by law;

f.　　For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.　　For such other and further relief as the Court deems proper.

**COUNT IV:  INTENTIONAL MISREPRESENTATION**
**(Against Abbott and Mead)**

123.　Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

124.　At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

125.　Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this

31

Case ID: 230900608
Control No.: 23096781

litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

126.    Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

127.    Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

        a.      That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

        b.      That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

        c.      That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

        d.      That cow's milk-based products were safe for premature infants; and/or

        e.      That cow's milk-based products were necessary for optimum growth; and/or

        f.      That cow's milk-based products were similar or equivalent to breast milk; and/or

Case ID: 230900808
Control No.: 23096781

g.    That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.    That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.    Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

128.    Abbott and Mead had actual knowledge, or, at a minimum, a reckless indifference, to whether the aforementioned misrepresentations were false. The Defendant Manufacturers' misrepresentations were intended to, and in fact did, mislead physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their infant products to babies, including the Injured Infant.

129.    The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them. The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

130.    As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

131.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss

33

Case ID: 230900606
Control No.: 23096781

of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

    a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e.    For interest as permitted by law;

    f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

    g.    For such other and further relief as the Court deems proper.

### COUNT V:  NEGLIGENT MISREPRESENTATIONS
#### (Against Abbott and Mead)

132.   Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth

Case ID: 230900606
Control No.: 23096781

herein.

133. At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

134. Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

135. In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

136. Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

      a.     That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

      b.     That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

      c.     That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

35

     d.     That cow's milk-based products were safe for premature infants; and/or

     e.     That cow's milk-based products were necessary for optimum growth; and/or

     f.     That cow's milk-based products were similar or equivalent to breast milk; and/or

     g.     That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

     h.     That their products were based on up-to-date science, which made them safe for premature infants; and/or

     i.     Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

137.   Abbott and Mead were negligent or careless in not determining those representations to be false.

138.   The Defendant Manufacturers' misrepresentations were intended to and did in fact induce physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their products to babies, including the Injured Infant.

139.   The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

Case ID: 230900808
Control No.: 23096781

140.        As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

141.        As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

    a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

    e.    For interest as permitted by law;

    f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

Case ID: 230900806
Control No.: 23096781

g.      For such other and further relief as the Court deems proper.

### COUNT VI:  FAILURE TO WARN
#### (Against Penn Medicine and Pennsylvania Hospital)

142.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

143.    Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

144.    At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

145.    Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their treatment of the Injured Infant.

146.    Penn Medicine and Pennsylvania Hospital negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

147.    Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals

38

Case ID: 230900808
Control No.: 23096781

and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

148. Penn Medicine and Pennsylvania Hospital also knowingly, and intentionally, allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

149. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

150. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

      a.    Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

      b.    Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

      c.    Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

Case ID: 230900606
Control No.: 23096781

     d.     Failing to provide its healthcare professionals and medical staff with the well- researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

     e.     Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

     f.     Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

     g.     Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

151.    Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

152.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

153.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably

Case ID: 230900808
Control No.: 23096781

dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

154.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

155.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine's conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's

41

Case ID: 230900606
Control No.: 23096781

oppressive, outrageous, reckless, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

### COUNT VII:  CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Penn Medicine and Pennsylvania Hospital)

156.  Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

157.  At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff.   Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant.   Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

158.  Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

159.  At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

Case ID: 230900808
Control No.: 23096781

160.     Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff.   These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

161.     Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

162.     Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

163.     Penn Medicine and Pennsylvania Hospital  knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

164.     Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

Case ID: 230900808
Control No.: 23096781

a.  Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted the use of cow's milk-based products for feeding premature babies; and/or

b.  Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

c.  Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d.  Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

e.  Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well- established studies that link cow's milk-based products to NEC and death in premature infants; and/or

f.  Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

44

Case ID: 230900606
Control No.: 23096781

g.     Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants; and/or

h.     Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

165.   A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

166.   Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

167.   As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of

Case ID: 230900808
Control No.: 23096781

developing NEC and significant injuries.

168.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent, reckless, and outrageous conduct the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

169.        In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including the Injured Infant.

170.        Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

171.        Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly, and outrageously breached its duty by:

a.    Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

b.    Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

c.    Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d.    Failing to oversee its healthcare professionals and medical staff to restrict

46

Case ID: 230900608
Control No.: 23096781

their feeding of cow's milk-based products to premature babies; and/or

e.  Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

f.  Failing to provide its healthcare professionals and medical staff with the well- researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g.  Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h.  Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i.  Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

172.    A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of

47

Case ID: 230900806
Control No.: 23096781

the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

173.    A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

174.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

175.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

176.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.    Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of

48

Case ID: 230900606
Control No.: 23096781

enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

c.   For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.   For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.   For interest as permitted by law;

f.   For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.   For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

177.   Plaintiff hereby demands a jury trial for all claims triable.

Dated: October 16, 2023

Respectfully submitted,

**KLINE & SPECTER, P.C.**

By:   /s/ Timothy A. Burke
Tobias L. Millrood, Esq.
Elizabeth A. Crawford, Esq.
Timothy A. Burke, Esq.

49

CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2023, I electronically filed the foregoing document with the Clerk of the Court using Electronic Efiling and that the foregoing document is being served on all counsel of record or parties registered to receive Electronic Filing.


/s/ Timothy A. Burke
Timothy A. Burke, Esq.

50

# EXHIBIT A-67

**FILED**
01 APR 2024 11:04 am
Civil Administration
D. KIM

| | |
|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** | **COURT OF COMMON PLEAS** <br> **PHILADELPHIA COUNTY** |
| **Plaintiff,** <br> **v.** | **MARCH TERM, 2022** <br> **No. 2606** |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | |
| **Defendants.** | |
| **ROCHELLE HOLLINGSWORTH, on her own behalf and as Parent and Natural Guardian of G.O., a Minor,** | **COURT OF COMMON PLEAS** <br> **PHILADELPHIA COUNTY** |
| Plaintiff, <br> v. | **SEPTEMBER TERM, 2023** <br> **No. 0791** |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | |
| Defendants. | |

## ORDER

**AND NOW,** this ___ day of _____ 2024, upon consideration of the Preliminary Objections of Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, "Mead Johnson") to Plaintiff's Complaint, and any Response thereto, it is hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that all claims against Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company are hereby **DISMISSED** with prejudice.

**BY THE COURT:**

_____
J.

| | |
|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** | : **COURT OF COMMON PLEAS**<br>: **PHILADELPHIA COUNTY**<br>: |
| **Plaintiff,**<br>**v.** | : **MARCH TERM, 2022**<br>: **No. 2606**<br>: |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | :<br>:<br>: |
| **Defendants.** | : |
| **ROCHELLE HOLLINGSWORTH, on her own behalf and as Parent and Natural Guardian of G.O., a Minor,** | : **COURT OF COMMON PLEAS**<br>: **PHILADELPHIA COUNTY**<br>: |
| Plaintiff, | : **SEPTEMBER TERM, 2023**<br>: **No. 0791** |
| v. | : |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | :<br>:<br>: |
| Defendants. | : |

## <u>ORDER</u>

**AND NOW**, this ___ day of _____, 2024, upon consideration of the Preliminary Objections of Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, "Mead Johnson") to Plaintiff's Complaint, and any Response thereto, it is hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that:

1. Count I of Plaintiff's Complaint is **DISMISSED** with prejudice;

2. Count II of Plaintiff's Complaint is **DISMISSED** with prejudice;

3. Count III of Plaintiff's Complaint is **DISMISSED** with prejudice;

4. Count IV of Plaintiff's Complaint is **DISMISSED** with prejudice;

5. Count V of Plaintiff's Complaint is **DISMISSED** with prejudice;

6.      Plaintiff's Complaint is **STRICKEN** for lack of specificity;

7.      Plaintiff's claims for punitive damages as to Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company are **DISMISSED** with prejudice, along with all allegations of oppressive, reckless, malicious and/or fraudulent conduct;

8.      Plaintiff Rochelle Hollingsworth's claims in her own right are **DISMISSED** with prejudice; and

9.      Plaintiff's Complaint is **STRICKEN** for lack of an appropriate verification.

**BY THE COURT:**

_____
                                                              J.

Case ID: 220302606
Control No.: 23096781

<u>NOTICE TO PLEAD:</u>

**<u>To Plaintiff:</u> You are hereby notified to file a written response to the enclosed Preliminary Objections within twenty (20) days from service hereof or a judgement may be entered against you.**

**/s/ Kenneth A. Murphy**
**Attorney for Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company**

**ATTORNEYS FOR DEFENDANTS MEAD JOHNSON & COMPANY, LLC, AND MEAD JOHNSON NUTRITION COMPANY**

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 875-0609
kmurphy@tlgattorneys.com

**WELSH & RECKER, P.C.**
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire
306 Walnut Street
Philadelphia, PA 19106
215-972-6430
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

| | |
|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** : | **COURT OF COMMON PLEAS** |
| : | **PHILADELPHIA COUNTY** |
| : | |
| **Plaintiff,** : | **MARCH TERM, 2022** |
| **v.** : | **No. 2606** |
| : | |
| : | |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** : | |
| : | |
| **Defendants.** : | |

Case ID: 220302606
Control No.: 23096781

| | |
|---|---|
| **ROCHELLE HOLLINGSWORTH, on her own behalf and as Parent and Natural Guardian of G.O., a Minor,** | : **COURT OF COMMON PLEAS** <br> : **PHILADELPHIA COUNTY** <br> : <br> : **SEPTEMBER TERM, 2023** |
| Plaintiff, | : **No. 0791** |
| v. | : <br> : |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : <br> : <br> : |
| Defendants. | : |

### PRELIMINARY OBJECTIONS OF DEFENDANTS MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON NUTRITION COMPANY TO PLAINTIFF'S COMPLAINT

Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (hereinafter "Mead Johnson") hereby preliminarily object to Plaintiff's Complaint, and, in support thereof, aver as follows:

**I.**   **INTRODUCTION**

1.      The case before the Court involves speculative and unsupported allegations by Plaintiff that the minor Plaintiff, G.O., developed a condition known as necrotizing enterocolitis ("NEC") resulting from his alleged ingestion of "Similac and/or Enfamil cow's milk-based products" manufactured and sold by Mead Johnson and/or defendant Abbott Laboratories ("Abbott"). Plaintiff fails to identify the particular product that G.O. purportedly ingested, and the entirety of Plaintiff's claims rest on the unsubstantiated conclusion that the product or products consumed by G.O. are unreasonably dangerous. Plaintiff acknowledges that premature infants such as G.O. have an inherent high risk of developing NEC. The Complaint is otherwise devoid of factual support for Plaintiff's claim that Mead Johnson's product caused G.O. to develop NEC.  Plaintiff alleges only that G.O. was born on a certain date; *may* have been provided one of Defendants' pre-term infant feeding products; and, at some point,

developed NEC.  But Plaintiff has failed to identify which Mead Johnson product the infant received, if any; what else the infant was fed; when G.O. ingested the product; when G.O. was diagnosed with NEC; what treatment was provided for that condition; or what short- or long term- injury G.O., now 9 years old, allegedly sustained. Nowhere in the complaint does Plaintiff allege how cow's milk, or cow's milk-based products (of which Mead Johnson sells multiple varieties for different purposes), purportedly *cause* NEC, or how the facts of G.O.'s case square with any mechanism of action. Pennsylvania's procedural rules do not allow for such gaps in logic and omissions of material facts in a complaint.  Accordingly, Plaintiff's Complaint should be dismissed.

2.     Plaintiff instituted this action after filing a writ of summons on September 8, 2023 naming Mead Johnson, Abbott, Jefferson Abington Hospital ("Jefferson Abington"), and Thomas Jefferson University as defendants.  Notably, Mead Jonson has not been served with any complaint in this case via regular mail or otherwise.

3.     This case mirrors the complaints filed in twenty-three other cases in this Court against Mead Johnson, Abbott, Jefferson Abington, and other hospitals in Pennsylvania based on claims relating to alleged ingestion of cow's milk-based products by premature infants following their birth.  In each complaint, Plaintiffs have made the same unsupported allegations about a product that a minor may or may not have received while providing no scientific support that any such product causes NEC.

4.     Plaintiffs in those cases, including Plaintiff here, allege that "upon information and belief" the Plaintiff-minors, including G.O., developed NEC, a gastrointestinal disorder that occurs in premature infants, caused by either Mead

Johnson's products "and/or" the products of co-defendant Abbott. *See* Plaintiff's Complaint, attached as Exhibit "A" at ¶ 1, 12.

5.    In addition to asserting product liability claims against Mead Johnson and Abbott, as the infant formula manufacturers, Plaintiff has brought claims against Jefferson Abington and Thomas Jefferson University alleging liability on theories of failure to warn and corporate liability.

6.    The factual background regarding the Plaintiff-minor's birth, diagnosis and injuries are limited to four (4) paragraphs in the Complaint.

7.    Plaintiff avers that G.O. was born prematurely June 26, 2014 and that "[u]pon information and belief, G.O. was fed Similac and/or Enfamil cow's milk-based products by staff at Jefferson Abington after his birth." *Id*., ¶¶ 11–12.

8.    Plaintiff further alleges that "upon information and belief" G.O. developed NEC shortly after first ingesting the Defendant manufacturers' products. *Id*., ¶ 13.

9.    Plaintiff generally alleges that G.O. "suffered injuries, including but not limited to, a diagnosis of NEC, surgery on his intestines, gastrointestinal issues, and he continues to suffer long term health effects," with no specific description of those alleged injuries or long-term health effects. *Id*., ¶ 14.

10.    Mead Johnson Preliminarily Objects to Plaintiff's Complaint for the reasons stated below and as more fully set forth in the accompanying Memorandum of Law, which is incorporated herein by reference.

## II.    ARGUMENT

### A.    DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS I, II, III, IV, & V

Case ID: 220302606
Control No.: 23096781

11.    To survive preliminary objections, Plaintiff must aver sufficient facts,
together with the documents and exhibits attached thereto, to make out a *prima facie*
case as to all elements of the cause of action. *Northern Forests II, Inc. v. Keta Realty
Co.*, 130 A.3d 19, 35 (Pa. Super. 2015).  Plaintiff has failed to do so with respect to all
counts against Mead Johnson on the issue of whether cow's milk-based products are
unreasonably dangerous.

12.    The threshold inquiry in all products liability cases is whether there is a
defect which rendered the product unreasonably dangerous." *Weiner v. American
Honda Motor Co., Inc.,* 718 A.2d 305, 307 (Pa. Super. 1998). "A product is defective
when it is not safe for its intended use, *i.e.*, the product left the supplier's control lacking
any element necessary to make it safe for its intended use." *Id*. at 308. Whether a
product is "unreasonably dangerous" is a question of law. *Id*.

13.    Plaintiff alleges in Counts I and II of the  Complaint that Mead Johnson,
"as [one of] the manufacturers and/or sellers of the products at issue in this litigation,"
owed Plaintiff and the public a duty to manufacture, sell, and distribute their products in
a manner that was not unreasonably dangerous and to warn of unreasonable risk of
harm posed by their products.  Exhibit "A" at ¶ 91.

14.    Plaintiff similarly alleges in Count III (Negligence) that Mead Johnson,
owed Plaintiff and the "consuming public in general" a duty to exercise reasonable care
to design, test, manufacture, inspect, and distribute products that were free of
unreasonable risk of harm, and in in Count IV (Intentional Misrepresentation) and Count
V (Negligent Misrepresentation) that they owed Plaintiff and the public a duty to provide

Case ID: 220302606
Control No.: 23096781

truthful, accurate, and fulsome information about their cow's milk-based products. Exhibit "A" at ¶ 109.

15.     Each count brought against Mead Johnson therefore rests on Plaintiff's theory that cow's milk-based products are unreasonably dangerous, and for strict liability purposes in Counts I & II, defective.

16.     In fact, Mead Johnson's cow's milk-based products are regulated by FDA and legally marketed for use in pre-term infants.  Moreover, in Plaintiff's own Complaint Plaintiff acknowledges that "[p]reterm and low-birth-weight infants are *especially susceptible* to NEC." *See* Exhibit "A" at ¶ 16 (emphasis added).

17.     In support of these theories and claims, Plaintiff offers only vague references to unidentified "[e]xtensive scientific research, including numerous randomized controlled trials" that purportedly prove Mead Johnson's cow's milk-based products cause NEC in preterm and low-birth-weight infants.  Plaintiff neither cites specifically to any randomized trial or consensus statement, nor does Plaintiff offer an explanation of the purported mechanism of action by which cow's milk-based formula products allegedly cause NEC.

18.     Given that Plaintiff has offered nothing but the bald assertion that there is "extensive scientific research" that Mead Johnson's products cause NEC, Plaintiff has failed to adequately allege that the products are unreasonably dangerous.  Accordingly Plaintiff fails to state claims for defective design and failure-to-warn.  Counts I through V should be stricken.

**B.     DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS IV & V**

Case ID: 220302606
Control No.: 23096781

19.     Plaintiff's claims for intentional and negligent misrepresentation (Counts IV and V) fail because Plaintiff fails to plead these allegations with particularity as required by Pa. R. Civ. P. 1019(b). Specifically, Plaintiff does not allege receipt and reliance upon any particular false representation from Mead Johnson. *See Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) (setting forth the elements of intentional and negligent misrepresentation and noting that both require a false representation upon which the plaintiff ultimately relied).

20.     Intentional misrepresentation requires: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance."  *Bortz*, 729 A.2d at 560 (citing *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994)).

21.     Negligent misrepresentation similarly requires a false representation and reliance, "though the speaker need not know his or her words are untrue."  *Id.* at 561.

22.     To adequately plead a claim for fraud, Pennsylvania law requires that "(1) the pleadings must adequately explain the nature of the claim to the opposing party so as to permit the preparation of a defense, and (2) they must be sufficient to convince the court that the averments are not merely subterfuge." *Pezzano v. Mosesso*, 2014 WL 5421587, at *5 (Pa. Commw. Oct. 24, 2014) (quoting *Martin v. Lancaster Battery Co., Inc.*, 606 A.2d 444, 448 (Pa. 1992)). Plaintiff's complaint fails on the first prong.

23.     Plaintiff does not allege any specific representation upon which they relied. Nor does she identify the allegedly defective Mead Johnson product that G.O.

Case ID: 220302606
Control No.: 23096781

received. Ex. A, at ¶ 49 (alleging that Mead Johnson "markets and sells **multiple products** specifically targeting premature infants). Instead, the complaint is devoid of any allegation that G.O. received *any* Mead Johnson product at all. *See*; ¶ 98 (alleging that "Abbott **and/or** Mead's products were fed") (emphasis added). Plaintiff cannot claim reliance on an alleged misrepresentation when there is no identified product to misrepresent. *Kepner v. Tine*, No. 835 EDA 2015, 2015 Pa. Super. Unpub. LEXIS 4257, at *6 (Pa. Super. Nov. 25, 2015) (affirming dismissal of a fraudulent misrepresentation claim for failure to plead a particular misrepresentation). And, crucially, Mead Johnson is left wondering which, if any, product they should defend and what alleged "misrepresentations" to contest. *Pezzano*, 2014 WL 5421587, at *5.

24.     Pennsylvania law demands more. *See* Pa. R. Civ. P. 1019(b).  Other courts around the country have dismissed similar misrepresentation claims for lack of specificity.  *E.g.*, Ex. B, *In re Mead Johnson Product Cases*, CJC-23-005257, at 6–8 (Cal. Sup. Ct. July 7, 2023); *Casino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1469 (Cal. Ct. App. 2014) ("[W]hen a plaintiff asserts fraud against a corporation, the plaintiff must allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.") (internal quotation marks omitted); *Peterson v. Clark Lake Homes Inc.*, 2022 WL 16910578, at *4 (Minn. Ct. App. (Nov. 14, 2022) (requiring identification of the "who, what, when, where, and how" for a claim of fraud).

25.     Moreover, failure to allege any relationship between a specific misrepresentation (which they do not identify), a specific product (which they do not identify), and an injury means there can be no inference of proximate causation. *See*

*Kepner*, No. 835 EDA 2015, 2015 Pa. Super. Unpub. LEXIS 4257, at *6 (requiring a particular misrepresentation); *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 969 (Pa. Super. Ct. 1985) (affirming dismissal of negligence claim where plaintiff failed to properly identify the product or its manufacturer). Causation is a hallmark of any tort action in Pennsylvania, including misrepresentation. *Bortz*, 729 A.2d at 560 (citing *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994)). *See also Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 524 (W.D. Pa. 2003) ("Proof of causation is a necessary element in a products liability action. Absent a causal relationship between the defendant's product and the plaintiff's injury the defendant cannot be held liable on a theory of negligence, strict product liability, or misrepresentation") (applying Pennsylvania law) (citing *O'Brien v. Sofamar, S.N.C.*, No. CIV. A. 96–8015, 1999 WL 239414 (E.D. Pa.1999)). Absent identification of the manufacturer of the allegedly defective product, "there can be no allegations of . . . legal causation, and hence there can be no liability." *Cummins*, 495 A.2d at 968–69 (citing *Hamil v. Bashline*, 392 A.2d 1280 (Pa. 1978)).

26.     Thus, Plaintiff's intentional and negligent misrepresentation claims against Mead Johnson must be dismissed.

### C.     MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES

27.     Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading. Plaintiff's failure to specify the nature of the products ingested and injuries sustained serves as an alternative ground on which all of their claims should be stricken.

28.     A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the Complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (citations omitted).

29.     Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A,2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted) (emphasis added).

30.     Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent**

Case ID: 220302606
Control No.: 23096781

**should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.").

31.     As noted above, Plaintiff's Complaint is facially deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case, each of which are uniquely within her competence:

- Plaintiff's allegation that "upon information and belief," the minor was fed Similac and/or Enfamil shortly after his birth (Exhibit "A," at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide Mead Johnson with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products;

- Plaintiff has failed to identify which of the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names were ingested by the minor. *Id*. at ¶¶ 48–49;

- Plaintiff does not describe the period of time in which such products were ingested, when the minor was allegedly diagnosed with NEC, or what treatment was provided for that condition;

- Plaintiff does not specify the nature of the injuries and "long-term health effects" that are alleged to have resulted from the diagnosis of NEC.

32.     Furthermore, Plaintiff's damages claim is not stated with particularity and is amorphous, vague, and open-ended. Pursuant to Pennsylvania pleading

requirements, Mead Johnson should not be compelled to defend a claim for which the statement of injury is unspecified and subject to change.

33.     These omissions are fatal defects in Plaintiff's Complaint. Therefore, Plaintiff's Complaint should be stricken in its entirety.

**D.     MOTION TO STRIKE PLAINTIFF'S CLAIMS FOR PUNITIVE DAMAGES**

34.     In the *Ad Damnum* clauses of Counts I, II, III, IV, and V of her Complaint, Plaintiff makes baseless accusations that Mead Johnson engaged in oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages. *See* Exhibit "A," pp. 26, 29, 32, 35, and 38.

35.     Punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987).

36.     Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death. *See, e.g., Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff

Case ID: 220302606
Control No.: 23096781

alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages.")

37.     Here, the Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Mead Johnson. Read most generously, Plaintiff's Complaint alleges that Mead Johnson failed to warn co-defendant Jefferson Abington of a risk of NEC associated with its legally-marketed cow's milk-based product – a risk about which Plaintiff alleges that Jefferson Abington was already aware.  *See* Compl. ¶¶ 75–86.  And with respect to G.O.'s care, Plaintiff merely alleges that "upon information and belief" G.O. may have been given a product sold by Mead Johnson absent any context to indicate that such a product was inappropriate based on the specific issues involved in G.O.'s medical care and condition following birth.

38.     For example, the Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

39.     Plaintiff's allegations of oppressive, malicious and similar conduct must be rejected as mere boilerplate.  Indeed, the fact that Plaintiffs in these cases have filed

numerous lawsuits against at least four other hospitals in Philadelphia based on identical claims belies the contention that Mead Johnson engaged in outrageous or malicious conduct in allegedly selling a cow's milk-based product that was used to feed the Plaintiff-minor.

40.     The facts underlying Plaintiff's bare assertions of oppressive, reckless, malicious and fraudulent conduct do not come close to meeting the requisite standard under Pennsylvania law that would permit an award of punitive damages. Absent specific factual allegations to justify the claim that Mead Johnson's actions as they pertain to Plaintiff's particular facts and circumstances were extreme and outrageous, there is no basis for an award of punitive damages in this case, and Plaintiff's claims for such must be stricken from the Complaint pursuant to Rule 1028(a)(3).

### E.     MOTION TO STRIKE PLAINTIFF-PARENT'S CLAIMS

41.     The Court should strike Plaintiff-parent's claims to recover damages in her own right and as the parent and natural guardian of G.O.

42.     In each count of the complaint, Plaintiff-parent alleges that she "suffered significant emotional distress, loss of income, and/or other harms" and that "[h]er life has been significantly affected by the Injured Infant's injuries."  Ex. A, ¶¶ 99, 107, 116, 125, and 135.

43.     This is insufficient.  Plaintiff-Parent fails to meet the pleading requirements of Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

44.     Plaintiff-parent plainly does not allege any claim in separate counts or state any cause of action. Rather, the claims are incorporated in a single, tagalong paragraphs at the end of the existing counts.

45.     Additionally, Plaintiff-parent does not complain of any physical injury. It is well established that "no cause of action exists for negligence that results solely in economic damages unaccompanied by physical injury or property damage." *Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 985 A.2d 840, 841 n.3 (Pa. 2009) (citing *Adams v. Copper Beach Townhome Comtys., L.P.*, 816 A.2d 301, 305 (Pa. Super. 2003)); *Miller v. Evenflo Co., Inc.*, 2009 WL 10689606, at *4 (W.D. Pa. Dec. 21, 2009) (dismissing plaintiff-parents' tort claims where only physical injury was to minor plaintiff). So too for claims sounding in strict products liability. *Schmidt v. Boardman Co.*, 11 A.3d 924, 953 (Pa. 2011) ("We would hold that, for purposes of a strict products liability claim, a plaintiff's recovery for emotional distress is limited to that which is proximately caused by contemporaneous physical impact").

### F.     MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR FAILURE TO COMPLY WITH Pa.R.C.P. 1024

46.     Finally, Pennsylvania Rule of Civil Procedure 1024(a) requires verification of every pleading containing a factual averment based upon the signer's personal knowledge or information and belief.

47.     Rule 1024(c) requires that the verification be made by one or more of the parties filing the pleading.

48.     In this case, the complaint lacks any verification. *See* Exhibit "A."

49.     Accordingly, the Complaint should be stricken for lack of an appropriate verification.

Case ID: 220302606
Control No.: 23096781

WHEREFORE, Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company respectfully request that this Honorable Court sustain the instant Preliminary Objections and enter the attached proposed Order.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Dated: April 1, 2024

/s/ Kenneth A. Murphy
Kenneth A. Murphy, Esquire

**WELSH & RECKER, P.C.**

/s/ Catherine M. Recker
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire

**Attorneys for Defendants,**
**Mead Johnson & Company, LLC and**
**Mead Johnson Nutrition Company**

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 875-0609
kmurphy@tlgattorneys.com

**ATTORNEYS FOR DEFENDANTS
MEAD JOHNSON & COMPANY, LLC,
AND MEAD JOHNSON NUTRITION
COMPANY**

**WELSH & RECKER, P.C.**
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire
306 Walnut Street
Philadelphia, PA 19106
215-972-6430
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

| | | |
|---|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** | : | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| | : | |
| **Plaintiff,** | : | **MARCH TERM, 2022** |
| **v.** | : | **No. 2606** |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : | |
| | : | |
| **Defendants.** | : | |
| **ROCHELLE HOLLINGSWORTH, on her own behalf and as Parent and Natural Guardian of G.O., a Minor,** | : | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| | : | |
| Plaintiff, | : | **SEPTEMBER TERM, 2023** |
| v. | : | **No. 0791** |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY OBJECTIONS OF
DEFENDANTS MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON
NUTRITION COMPANY TO PLAINTIFF'S COMPLAINT**

I.       **MATTER BEFORE THE COURT**

Preliminary Objections of Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, "Mead Johnson") to Plaintiff's Complaint.

The case before the Court involves speculative and unsupported allegations by Plaintiff that minor Plaintiff, G.O., developed a condition known as necrotizing enterocolitis ("NEC") following her alleged ingestion of "Similac and/or Enfamil cow's milk-based products" manufactured and sold by Mead Johnson and/or Abbott Laboratories ("Abbott"). Plaintiff fails to identify the particular product that G.O. purportedly ingested, and the entirety of the claims rest on the unsubstantiated conclusion that the product or products consumed by G.O. are unreasonably dangerous. Plaintiff acknowledges that premature infants such as G.O. have an inherent high risk of developing NEC. The Complaint is otherwise devoid of factual support for Plaintiff's claim that Mead Johnson's product caused G.O. to develop NEC. Plaintiff alleges only that G.O. was born on a certain date; *may* have been provided one of Defendants' pre-term infant feeding products; and, at some point, developed NEC. But, Plaintiff has failed to identify which, if any, Mead Johnson product the infant received; what else the infant was fed; when G.O. ingested the product; when G.O. was diagnosed with NEC; what treatment was provided for that condition; or what short- or long term- injury G.O., now 9 years old, allegedly sustained. Nowhere does Plaintiff allege how cow's milk, or cow's milk-based products (of which Mead Johnson sells multiple varieties for different purposes), purportedly *cause* NEC, or how the facts of G.O.'s case square with any mechanism of action.  Pennsylvania's procedural rules do

Case ID: 220302606
Control No.: 23096781

not allow for such gaps in logic and omissions of material facts in a complaint. Accordingly, Plaintiff's Complaint should be dismissed.

## II.     **STATEMENT OF QUESTIONS PRESENTED**

1.     Whether this Honorable Court should dismiss Count I of Plaintiff's Complaint "Strict Liability for Design Defect" cause of action with prejudice because Plaintiff's Complaint does not support the claim that cow's milk-based products are unreasonably dangerous, and Mead Johnson cannot be held liable for a defective design?

*Suggested Answer in the affirmative.*

2.     Whether this Honorable Court should dismiss Count II of Plaintiff's Complaint "Strict Liability for Failure to Warn" cause of action with prejudice because Plaintiff's Complaint does not support the claim that cow's milk-based products are unreasonably dangerous, and Mead Johnson cannot be held liable for failure-to-warn?

*Suggested Answer in the affirmative.*

3.     Whether this Honorable Court should dismiss Count III of Plaintiff's Complaint "Negligence" cause of action with prejudice on the basis of absence of proof of an unreasonably dangerous product?

*Suggested Answer in the affirmative.*

4.     Whether this Honorable Court should dismiss Count IV of Plaintiff's Complaint "Intentional Misrepresentation" cause of action with prejudice on the basis of absence of proof of an unreasonably dangerous product, and failure to plead any specific representation allegedly relied upon by Plaintiff?

*Suggested Answer in the affirmative.*

5.      Whether this Honorable Court should dismiss Count V of Plaintiff's Complaint "Negligent Misrepresentation" cause of action with prejudice on the basis of absence of proof of an unreasonably dangerous product, and failure to plead any specific representation allegedly relied upon by Plaintiff?

*Suggested Answer in the affirmative.*

6.      Whether this Honorable Court should strike Plaintiff's Complaint in its entirety for insufficient specificity of the facts and alleged injuries?

*Suggested Answer in the affirmative.*

7.      Whether this Honorable Court should strike Plaintiff's claims for punitive damages as to Mead Johnson because the Complaint fails to plead facts providing a basis for an award of punitive damages?

*Suggested Answer in the affirmative.*

8.      Whether this Honorable Court should strike Plaintiff's Complaint for failure to provide a client verification as required by Pa.R.C.P. 1024?

*Suggested Answer in the affirmative.*

## III.  <u>INTRODUCTION AND FACTUAL BACKGROUND</u>

There have now been more than 30 nearly identical lawsuits filed by parents on behalf of their prematurely born children against Mead Johnson, Abbott, and various Pennsylvania healthcare systems alleging that exposure to preterm formula and human milk fortifier—products found in neonatal intensive care units throughout the country—caused a disease known as necrotizing enterocolitis, a common syndrome in infants born prematurely.

Each complaint, including G.O.'s, alleges that the plaintiff-minors ingested either Mead Johnson's products "and/or" the products of co-defendant Abbott. *See* Plaintiff's Complaint, attached as Exhibit "A" at ¶ 1, 12. Many of the allegations of the Complaint are pled "upon information and belief," including the allegations that Plaintiff-minors actually received infant formula or fortifier, and that they developed NEC shortly after being fed with infant formula or fortifier.  As discussed in detail below, Plaintiff's claims against Mead Johnson are legally and factually deficient.

Mead Johnson manufactures and sells products, including those under the brand name "Enfamil," to help meet the nutritional needs of infants.  *Id.* ¶ 49.  Some of these products are designed to be fed to premature or low-birth-weight infants who have special nutritional needs at birth.  *Id.* ¶ 49.  These products include formulas, which are given to infants who are not fed breast milk, and fortifiers, which are used to supplement pumped breast milk with additional nutrients.  *See id.* ¶ 53 (photo of Enfamil Human Milk Fortifier: "For premature and low-birth-weight infants fed breast milk").  Some Enfamil products, particularly those intended to be fed to premature or low-birth-weight infants, are intended to be used only under the supervision of a physician.  *See id.* (photo of Enfamil Human Milk Fortifier: "To be used only under the supervision of a physician").  Co-defendant Abbott also sells formulas and fortifiers meant to be fed to premature or low-birth-weight infants under the brand name "Similac."  *Id.* at ¶¶ 48, 53. Plaintiff avers that Abbott sells at least seven types of products directed to preterm and/or low birth weight infants, six of which use the name Similac, and that Mead Johnson sells eight types of infant formulas and fortifiers using the Enfamil brand name. Id., ¶¶ 48–49.

Case ID: 220302606
Control No.: 23096781

Infant formulas and fortifiers for pre-term and low-birth-weight infants are regulated by the FDA. Mead Johnson is required to submit information about its pre-term products, including their ingredients, to the FDA, 21 C.F.R. § 107.50(b)(3), and the FDA is required to review that submission. The FDA may also impose changes to such a product's composition or labeling. *Id.* § 107(d)(1).

The formula and fortifier products identified by Plaintiff as being manufactured by Mead Johnson are made using ingredients derived from cow's milk. Ex. A at ¶ 12. Although Plaintiff avers that "Cow's Milk-Based Feeding Products Are Known to Cause NEC," she offers only a single sentence to support that proposition. *Id.* at ¶ 16. Citing unidentified "extensive scientific research, including numerous randomized trials," Plaintiff alleges that it has been "confirmed" that bovine-based products "cause NEC in preterm and low-birth-weight infants."[1] *Id.*

Moreover, Plaintiff's Complaint provides scant information regarding G.O.'s own circumstances. Plaintiff avers that G.O. was born prematurely on June 26, 2014 and that "[u]pon information and belief G.O. was fed Similac and/or Enfamil cow's milk-based products by staff at Jefferson Abington after his birth." *Id.* at ¶ 12. Plaintiff further alleges that "upon information and belief" G.O. developed NEC shortly after first ingesting Mead Johnson and/or Co-Defendant Abbott's products. *Id.* ¶ 12. Plaintiff provides no details regarding her condition following birth other than that she developed NEC on an unidentified date. Further, Plaintiff alleges no facts as to whether Plaintiff-parent provided breast milk to G.O., whether she had the opportunity to use donor milk,

---

[1] Taken to their logical conclusion, Plaintiff's allegations, if true, would mean that doctors, hospitals, FDA, and formula companies around the country are actively engaged in administering, approving, and selling products designed specifically for preterm infants *that have been "confirmed"* to cause an often fatal disease in those same infants. Plaintiff offers no evidence for this conspiracy.

and if G.O. actually received a cow's milk product, what it was, how much, and for how long.  Finally, the Complaint is silent as to the nature and extent of G.O.'s alleged injuries other than a vague reference to "long term health effects." *Id*. ¶ 14.

Further, the Complaint does not provide any details whatsoever regarding communications between Plaintiff-parent and medical providers at Jefferson Abington regarding the allegations that G.O. may have been fed with Mead Johnson and/or Abbott cow's milk-based products in the hospital. Plaintiff concedes in the Complaint that mothers are encouraged by their healthcare professionals to breastfeed. *Id*. ¶ 49. But Plaintiff does not provide any information regarding discussions between Plaintiff-parent and any health care providers at Jefferson Abington related to breastfeeding and/or using cow's milk-based products in this case. As noted, Plaintiff plead that Plaintiff-minor ingested formula "on information and belief" only, and similarly plead "on information and belief" that Plaintiff-minor developed NEC as a result.

## IV.    ARGUMENT

### A.    DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS I, II, III, IV & V

Pursuant to Pa.R.C.P. 1028(a)(4), a party may file preliminary objections to a complaint, in the nature of a demurrer, for legal insufficiency in a pleading. A court should grant a demurrer where, accepting as true all well pled facts, a legal cause of action cannot be maintained upon those facts. Pa.R.C.P. 1028(a)(4); *See also, Willet v. Pennsylvania Med. Catastrophe Loss Funds,* 702 A.2d 850, 853 (Pa. 1997). In this case, Counts I, II, III, IV, and V of Plaintiff's Complaint should be stricken pursuant to this Rule, as Plaintiff has failed to plead with sufficient detail to survive the pleading stage that Mead Johnson's cow's milk-based products were unreasonably dangerous.

To survive preliminary objections, Plaintiff must aver sufficient facts, together with the documents and exhibits attached thereto, to make out a *prima facie* case as to all elements of the cause of action. *Northern Forests II, Inc. v. Keta Realty Co.*, 130 A.3d 19, 35 (Pa. Super. 2015). "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.,* 718 A.2d 305, 307 (Pa. Super. 1998). "A product is defective when it is not safe for its intended use, *i.e.*, the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id*. at 308. Whether a product is "unreasonably dangerous" is a question of law. *Id*.

Plaintiff alleges in Counts I and II of her Complaint that Mead Johnson, "as the manufacturers and/or sellers of the products at issue in this litigation," owed Plaintiff and the public a duty to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous and to warn of unreasonable risk of harm posed by their products. Plaintiff similarly alleges in Count III (Negligence) that Mead Johnson, owed Plaintiff and the public a duty to exercise reasonable care to design, test, manufacture, inspect, and distribute products that were free of unreasonable risk of harm, and in Count IV (Intentional Misrepresentation) and Count V (Negligent Misrepresentation) that Mead Johnson owed Plaintiff and the public a duty to provide truthful, accurate, and fulsome information about their cow's milk-based products. Each count brought against Mead Johnson therefore rests on Plaintiff's theory that cow's milk-based products are unreasonably dangerous, and for strict liability purposes in Counts I & II, defective.

In fact, Mead Johnson's cow's milk-based products are regulated by FDA and legally marketed for use in pre-term infants. Moreover, in Plaintiff's own Complaint she

Case ID: 220302606
Control No.: 23096781

acknowledges that "[p]reterm and low-birth-weight infants are *especially susceptible* to NEC." *See* Exhibit "A" at ¶ 16 (emphasis added).

In support of her theories and claims, Plaintiff offers only vague references to unidentified "[e]xtensive scientific research, including numerous randomized controlled trials" that purportedly prove Mead Johnson's cow's milk-based products cause NEC in preterm and low-birth-weight infants. Plaintiff neither cites specifically to any randomized trial or consensus statement nor offer an explanation of the purported method of action by which cow's milk-based formula products allegedly cause NEC.

Moreover, as *Weiner* notes, a plaintiff must aver sufficient facts demonstrating the Mead Johnson's products are unreasonably dangerous **for their intended use**, triggering Mead Johnson's duty to warn. The only factual reference Plaintiff makes with regard to intended use is to marketing campaigns, where Defendant Manufacturers allegedly advertised that "cow's milk-based products are necessary for proper growth and development of preterm infants." *See* Exhibit "A" at ¶ 54. She has not averred sufficient facts to demonstrate that cow's milk-based products are unreasonably dangerous for this purpose.

Consequently, Counts I through V should be stricken with prejudice or failure to state a claim.

**B.    DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS IV & V**

Plaintiff's claims for intentional and negligent misrepresentation (Counts IV and V) fail because Plaintiff does not allege that she received and relied upon any specific representation from Mead Johnson. *See Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) (setting forth the elements of intentional and negligent misrepresentation and noting that

Case ID: 220302606
Control No.: 23096781

both require a false representation upon which the plaintiff ultimately relied). The complaint not only fails to identify the allegedly defective Mead Johnson product that G.O. received, it fails even to allege that G.O. received *any* Mead Johnson product. *See* Ex. A, Compl. ¶ 49 (alleging that Mead Johnson "markets and sells **multiple products** specifically targeting premature infants); ¶ 98 (alleging that "Abbott **and/or** Mead Johnson's products were fed") (emphasis added). Plaintiff cannot claim reliance on an alleged misrepresentation when there is no identified product to misrepresent. *Kepner v. Tine*, No. 835 EDA 2015, 2015 Pa. Super. Unpub. LEXIS 4257, at *6 (Pa. Super. Nov. 25, 2015) (affirming dismissal of a fraudulent misrepresentation claim for failure to plead a particular misrepresentation).

Pennsylvania law demands more. *See* Pa. R. Civ. P. 1019(b). Other courts around the country have dismissed similar misrepresentation claims for lack of specificity. *E.g.*, Ex. B, *In re Mead Johnson Product Cases*, CJC-23-005257, at 6–8 (Cal. Sup. Ct. July 7, 2023); *Casino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1469 (Cal. Ct. App. 2014) ("[W]hen a plaintiff asserts fraud against a corporation, the plaintiff must allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.") (internal quotation marks omitted); *Peterson v. Clark Lake Homes Inc.*, 2022 WL 16910578, at *4 (Minn. Ct. App. (Nov. 14, 2022) (requiring identification of the "who, what, when, where, and how" for a claim of fraud).

Intentional misrepresentation requires: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it;

Case ID: 220302606
Control No.: 23096781

(5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Bortz*, 729 A.2d at 560 (citing *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994)).

Negligent misrepresentation similarly requires a false representation and reliance, "though the speaker need not know his or her words are untrue." *Id.* at 561. Here, Plaintiff's misrepresentation claims fail because they fail to sufficiently allege any relationship between a specific misrepresentation (which they do not identify), a specific product (which they do not identify), and an injury. *See Kepner*, No. 835 EDA 2015, 2015 Pa. Super. Unpub. LEXIS 4257, at *6 (requiring a particular misrepresentation); *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 969 (Pa. Super. Ct. 1985) (affirming dismissal of negligence claim where plaintiff failed to properly identify the product or its manufacturer). Causation is a hallmark of any tort action in Pennsylvania. *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 524 (W.D. Pa. 2003) ("Proof of causation is a necessary element in a products liability action. Absent a causal relationship between the defendant's product and the plaintiff's injury the defendant cannot be held liable on a theory of negligence, strict product liability, or misrepresentation") (applying Pennsylvania law) (citing *O'Brien v. Sofamar*, S.N.C., No. CIV. A. 96–8015, 1999 WL 239414 (E.D. Pa.1999)). Absent identification of the manufacturer of the allegedly defective product, "there can be no allegations of . . . legal causation, and hence there can be no liability." *Cummins*, 495 A.2d at 968–69 (citing *Hamil v. Bashline*, 392 A.2d 1280 (Pa. 1978)). Plaintiff's intentional and negligent misrepresentation claims against Mead Johnson must therefore be dismissed.

**C.    MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES**

Case ID: 220302606
Control No.: 23096781

Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading. Plaintiff's failure to specify the nature of the products ingested and injuries sustained serves as an alternative ground on which all of her claims should be stricken.

A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the Complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (citations omitted). Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A,2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted) (emphasis added).

Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put

the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

As noted above, Plaintiff's Complaint is facially deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case, each of which are uniquely within her competence. Specifically, Plaintiff's description of the material facts relating to the minor's care and treatment, diagnosis and injuries is limited to four paragraphs, which are utterly insufficient to enable defendants to prepare their defenses. *See* Exhibit "A," ¶¶ 11-14. Plaintiff's allegation that "upon information and belief," the minor was fed Similac and/or Enfamil shortly after her birth (*Id.* at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide Mead Johnson with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products. Further, Plaintiff has failed to allege which of the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names G.O. *Id.* at ¶¶ 48-49. Plaintiff's Complaint further fails to provide a description of the material facts as to the period of time in which such products were ingested, when the minor was allegedly diagnosed with NEC and what treatment was provided for that condition.

In short, Plaintiff's Complaint is inconsistent with the requirements of the Pennsylvania Rules of Civil Procedure as to the necessary specificity for the description of the facts and alleged injuries sustained. The facts in the Complaint are pleaded almost entirely "on information and belief." These omissions are fatal defects in Plaintiff's Complaint. Therefore, Plaintiff's Complaint should be stricken in its entirety.

**D.** **MOTION TO STRIKE PLAINTIFF'S CLAIMS FOR PUNITIVE DAMAGES**

As in the other infant formula cases, in the *Ad Damnum* clauses of Counts I, II, III, IV, and V of the Complaint, Plaintiff makes baseless accusations that Mead Johnson engaged in oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages. *See* Exhibit "A," pp. 25, 28, 31, 34, and 37. However, the Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Mead Johnson. Accordingly, Plaintiff's claims for punitive damages should be stricken.

Punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987). An award of punitive damages must be supported by evidence of

Case ID: 220302606
Control No.: 23096781

conduct more serious than the mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp. 85, 99 (M.D. Pa. 1984).

Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death. *See, e.g., Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages.").

Here, the Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Mead Johnson. Read most generously, Plaintiff's Complaint alleges that Mead Johnson failed to warn co-defendant Jefferson Abington of a risk of NEC associated with its legally-marketed cow's milk-based product – a risk about which Plaintiff also alleges that Jefferson Abington was already aware. *See* Compl. ¶¶ 75–86. And with respect to G.O.'s care, Plaintiff merely alleges that "upon information and belief" G.O. may have been given a product sold by Mead Johnson absent any context to indicate that such a product was inappropriate based on the

Case ID: 220302606
Control No.: 23096781

specific issues involved in G.O.'s medical care and condition following birth. For example, the Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

Plaintiff's allegations of oppressive, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA reviews Mead Johnson's pre-term infant feeding products and has not restricted the use of cow's milk-based products for such infants. Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least four other hospitals in Philadelphia based on identical claims belies the contention that Mead Johnson engaged in outrageous or malicious conduct in allegedly in allegedly selling a cow's milk-based product that was used to feed the Plaintiff-minor. Absent specific factual allegations to justify the claim that Mead Johnson's actions as they pertain to Plaintiff's particular facts and circumstances were extreme and outrageous, there is no basis for an award of punitive damages in this case, and Plaintiff's claims for such must be stricken from the Complaint pursuant to Rule 1028(a)(3).

### E. MOTION TO STRIKE PLAINTIFF-PARENT'S CLAIMS

The Court should strike Plaintiff-parent's claims to recover damages in her own right and as the parent and natural guardian of G.O., both because they are inadequately pled and because she has not suffered physical injury.

In each count of the complaint, Plaintiff-parent alleges that she "suffered significant emotional distress, loss of income, and/or other harms" and that "[h]er life has been significantly affected by the Injured Infant's injuries." See Ex. A, ¶¶ 99, 107,

Case ID: 220302606
Control No.: 23096781

116, 125, and 134.  This is insufficient.  Plaintiff-Parent fails to meet the pleading

requirements of Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint
> shall state the cause of action, any special damage, and the demand for relief of
> each plaintiff in a separate count, preceded by a heading naming the parties to
> the causes of action therein set forth.

Plaintiff-parent plainly does not allege any claim in separate counts or state any cause

of action. Rather, the claims are incorporated in a single, tagalong paragraphs at the

end of the existing counts.

Additionally, Plaintiff-parent does not complain of any physical injury. It is well

established that "no cause of action exists for negligence that results solely in economic

damages unaccompanied by physical injury or property damage." *Excavation Techs.,*

*Inc. v. Columbia Gas Co. of Pa.*, 985 A.2d 840, 841 n.3 (Pa. 2009) (citing *Adams v.*

*Copper Beach Townhome Comtys., L.P.*, 816 A.2d 301, 305 (Pa. Super. 2003)); *Miller*

*v. Evenflo Co., Inc.*, 2009 WL 10689606, at *4 (W.D. Pa. Dec. 21, 2009) (dismissing

plaintiff-parents' tort claims where only physical injury was to minor plaintiff).  So too for

claims sounding in strict products liability. *Schmidt v. Boardman Co.*, 11 A.3d 924, 953

(Pa. 2011) ("We would hold that, for purposes of a strict products liability claim, a

plaintiff's recovery for emotional distress is limited to that which is proximately caused

by contemporaneous physical impact").

### F.    MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR FAILURE TO COMPLY WITH Pa.R.C.P. 1024

Pennsylvania Rule of Civil Procedure 1024(a) requires verification of every

pleading containing a factual averment based upon the signer's personal knowledge or

information and belief. Rule 1024(c) requires that the verification be made by one or

Case ID: 220302606
Control No.: 23096781

more of the parties filing the pleading. In this case, the complaint lacks <u>any</u> verification.

*See* Exhibit "A." Accordingly, the Complaint should be stricken for lack of an appropriate

verification.

## V.     **REQUESTED RELIEF**

For the foregoing reasons, Defendants Mead Johnson & Company, LLC and

Mead Johnson Nutrition Company respectfully request that this Honorable Court sustain

their Preliminary Objections and enter the attached Order.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Dated:  April 1, 2024

/s/ Kenneth A. Murphy
Kenneth A. Murphy, Esquire

**WELSH & RECKER, P.C.**

/s/ Catherine M. Recker
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire

**Attorneys for Defendants,
Mead Johnson & Company, LLC and
Mead Johnson Nutrition Company**

## **CERTIFICATE OF SERVICE**

I, Kenneth A. Murphy, Esquire, do hereby certify that on this day I caused a true and correct copy of the foregoing Preliminary Objections of Defendants Mead Johnson & Company and Mead Johnson Nutrition Company to Plaintiff's Complaint, and accompanying Memorandum of Law, to be served via electronic filing, on the following counsel of record, addressed as follows:

**Kline & Specter, P.C.**
Thomas R. Kline, Esquire
Tobias Millrood, Esquire
Elizabeth Crawford, Esquire
Melissa Merk, Esquire
Timothy A. Burke, Esquire
Helen Lawless, Esquire
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
tom.kline@klinespecter.com
tobi.millrood@klinespecter.com
melissa.merk@klinespecter.com
elissa.crawford@klinespecter.com
timothy.burke@klinespecter.com
helen.lawless@klinespecter.com
*Attorneys for Plaintiffs*

**Campbell Conroy & O'Neil, PC**
Joseph E. O'Neil, Esquire
Meghann C. Porth, Esquire
Ryan J. O'Neil, Esquire
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
joneil@campbelltriallawyers.com
mporth@campbelltriallawyers.com
roneil@campbelltriallawyers.com
*Attorneys for Defendant, Abbott Laboratories*

**Jones Day**
Jennifer B. Flannery, Esquire
Marques Hillman Richeson
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
jbflannery@jonesday.com

mhricheson@jonesday.com
*Attorneys for Defendant, Abbott Laboratories*

**Troutman Pepper Hamilton Sanders, LLP**
Sean P. Fahey, Esquire
Ronni E. Fuchs, Esquire
3000 Two Logan Square
Philadelphia, PA 19103
sean.fahey@troutman.com
ronni.fuchs@troutman.com
*Attorneys for Defendant, Abbott Laboratories*

**Eckert Seamans Cherin Mellot**
Donald Brooks, Jr., Esquire
Brooke A. Scicchitano, Esquire
50 S. 16th Street, 22nd Floor
Philadelphia, PA 19102
dbrooks@eckertseamans.com
bscicchitano@eckertseamans.com
*Attorneys for Defendant, Thomas Jefferson University Hospitals, Inc. d/b/a Thomas Jefferson University Hospital and Thomas Jefferson University d/b/a Jefferson Health System*

By:     /s/ Kenneth A. Murphy
        Kenneth A. Murphy, Esquire

Dated: April 1, 2024

Case ID: 220302606
Control No.: 23096781

# EXHIBIT A

Case ID: 220302606
Control No.: 23096781



*Filed and Attested by the Office of Judicial Records 16 OCT 2023 06:23 pm E. HAURIN*

**KLINE & SPECTER, P.C.**
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 320927
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Timothy.Burke@klinespecter.com

|  |  |  |
|---|---|---|
| ROCHELLE HOLLINGSWORTH, on her own behalf and as Parent and Natural Guardian of G.O., a Minor, | : : : : : | **IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY** <br><br> **CIVIL TRIAL DIVISION** |
| | : : : | **SEPTEMBER TERM 2023** |
| *Plaintiff,* | : : | **NO. 0791** |
| v. | : : | |
| MEAD JOHNSON & COMPANY, LLC ILLINOIS CORPORATION SERVICE CO. 801 ADLAI STEVENSON DRIVE SPRINGFIELD, IL 62702 | : : : : : | |
| MEAD JOHNSON NUTRITION COMPANY ILLINOIS CORPORATION SERVICE CO. 801 ADLAI STEVENSON DRIVE SPRINGFIELD, IL 62702 | : : : : : | |

ABBOTT LABORATORIES
CT CORPORATION SYSTEM
208 SO. LASALLE STREET, SUITE 814
CHICAGO, IL 60604

ABINGTON MEMORIAL HOSPITAL d/b/a
JEFFERSON ABINGTON HOSPITAL
1200 OLD YORK ROAD
ABINGTON, PA 19001

THOMAS JEFFERSON UNIVERSITY d/b/a
JEFFERSON HEALTH SYSTEM,

1015 WALNUT STREET
PHILADELPHIA, PA 19107

*Defendants.*

## COMPLAINT IN CIVIL ACTION
## <u>NOTICE TO DEFEND</u>

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.<br><br>YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.<br><br><div align="center">PHILADELPHIA BAR ASSOCIATION<br>LAWYER REFERRAL AND INFORMATION SERVICE<br>ONE READING CENTER<br>PHILADELPHIA, PA 19107<br>TELEPHONE: (215) 238-1701</div> | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas las páginas siguientes, usted tiene viente (20) dias de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puese perder dinero o sus propiedades u ostros derechos importantes para usted.<br><br>LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICO, VAYA EN PERSONA O LLAME POR TELEPHONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.<br><br>ASOCIACION DE LICENCIADOS DE FILADELFIA<br><div align="center">Servicio De Referencia E Información Legal<br>One Reading Center<br>Filadelfia, Pennsylvania 19107<br>Telephono: (215) 238-1701</div> |

KLINE & SPECTER, P.C.
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 205677
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Timothy.Burke@klinespecter.com

| | |
|---|---|
| ROCHELLE HOLLINGSWORTH, on her own behalf and as Parent and Natural Guardian of G.O., a Minor, | :    **IN THE COURT OF COMMON PLEAS** <br> :    **PHILADELPHIA COUNTY** <br> : <br> :    **CIVIL TRIAL DIVISION** <br> : |
| *Plaintiff*, | :    **SEPTEMBER TERM 2023** <br> :    **NO. 0791** |
| v. | : |
| MEAD JOHNSON & COMPANY, LLC <br> ILLINOIS CORPORATION SERVICE CO. <br> 801 ADLAI STEVENSON DRIVE <br> SPRINGFIELD, IL 62702 | : <br> : <br> : <br> : <br> : |
| MEAD JOHNSON NUTRITION COMPANY <br> ILLINOIS CORPORATION SERVICE CO. <br> 801 ADLAI STEVENSON DRIVE <br> SPRINGFIELD, IL 62702 | : <br> : <br> : <br> : <br> : |
| ABBOTT LABORATORIES <br> CT CORPORATION SYSTEM <br> 208 SO. LASALLE STREET, SUITE 814 <br> CHICAGO, IL 60604 | |
| ABINGTON MEMORIAL HOSPITAL d/b/a <br> JEFFERSON ABINGTON HOSPITAL <br> 1200 OLD YORK ROAD <br> ABINGTON, PA 19001 | |
| THOMAS JEFFERSON UNIVERSITY d/b/a <br> JEFFERSON HEALTH SYSTEM, <br> 1015 WALNUT STREET <br> PHILADELPHIA, PA 19107 | |

1

|  |
|---|
| *Defendants.* |

## COMPLAINT

Plaintiff brings this Complaint and Demand for Jury Trial (the "Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and Abington Memorial Hospital d/b/a Jefferson Abington Hospital ("Jefferson Abington") and Thomas Jefferson University d/b/a Jefferson Health System (together, "Jefferson" or "Defendant Hospital"), together "Defendants." Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

### I.      INTRODUCTION

1.      This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Jefferson Abington. Jefferson Abington, managed by Jefferson Health System, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner.   This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products.    As a result, the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2.      Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and

2

Case ID: 230900506
Control No.: 23096781

supplied without adequate warning to the Injured Infant at Jefferson Abington, operated by Defendant Jefferson Health System.

## II.     PARTIES

3.      Plaintiff Rochelle Hollingsworth is a natural adult person and a resident of South Carolina. Ms. Hollingsworth is the parent and natural guardian of G.O., a minor.  Ms. Hollingsworth's address is 206 Roundtree Road, Blythewood, South Carolina 29016.

4.      Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware. Its principal place of business is Illinois.  Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company.  Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.      Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois.  Its principal place of business is in Illinois.  Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

6.      Defendant Thomas Jefferson University is a corporation, incorporated under the laws of the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania.  Thomas Jefferson University manages Jefferson Abington located in Abington, Pennsylvania.

7.      Defendant Jefferson Abington Hospital is a corporation, incorporated under the laws of the Commonwealth of Pennsylvania.  Its principal place of business is Abington, Pennsylvania.

Case ID: 230900506
Control No.: 23096781

### III. JURISDICTION AND VENUE

8.     This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931. Defendants conduct authorized business in the Commonwealth of Pennsylvania. They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.     Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

10.     This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

### IV. FACTUAL ALLEGATIONS

#### *G.O.'s NEC Diagnosis*

11.     G.O. was born prematurely at Jefferson Abington in Abington, Pennsylvania on June 26, 2014.

12.     At birth, G.O.'s gestational age was approximately 32 weeks and he weighed 1474 grams. Upon information and belief, G.O. was fed Similac and/or Enfamil cow's milk-based products by staff at Jefferson Abington after his birth.

13.     Upon information and belief, G.O. developed NEC after ingesting Defendant

Case ID: 230900506
Control No.: 23096781

Manufacturers' products.

14.     G.O.'s diagnosis of NEC occurred during his course of treatment at Defendant Hospital's NICU.  G.O. suffered injuries, including but not limited to, a diagnosis of NEC, surgery on his intestines, and gastrointestinal injuries, and he continues to suffer other long-term health effects.

### Cow's Milk-Based Feeding Products Are Known to Cause NEC

15.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.   NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.   Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.   Up to 30 percent of NEC-diagnosed infants die from the disease.

16.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.   Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

### Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist

17.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition.   For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide.  Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

18.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.

5

19.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the breast milk they could otherwise receive.   This displacement only increases infants' vulnerability to NEC.

20.     Breast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

21.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

22.     Despite the scientific consensus that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings.   Instead, they have continued to sell their unreasonably dangerous products.   In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge.  And, in fact, the Defendant Manufacturers offer contracts to hospitals—which the hospitals accept—that actually *prevent* the health care providers from offering alternative products—even safer ones— on pain of risking the hospital's advantageous formula pricing strategy.

### Ms. Hollingsworth Discovers Her Claim

23.     Because of the Defendants' concealment and misrepresentations, described more fully herein, Ms. Hollingsworth did not know, and had no reason to know or suspect, that G.O.'s NEC could have been caused by the Defendant Manufacturers' products.

6

24.     Once Ms. Hollingsworth learned of the direct connection between the Defendant Manufacturers' products and NEC , she contacted an attorney thereafter.

***Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and
Would Not Have Revealed a Factual Basis Earlier
Because Defendants Hid the Cause of NEC from Ms. Hollingsworth***

25.     Despite exercising reasonable diligence, Ms. Hollingsworth was unable to have made the discovery earlier via a reasonable investigation because the Defendants in this litigation concealed the wrongful cause of G.O.'s injuries.

26.     Not one person at Jefferson informed Ms. Carter that the Defendant Manufacturers' formula products could have caused G.O.'s injuries.  Jefferson's response at the time did not give Ms. Hollingsworth any reason to suspect any wrongdoing on the part of the Defendants.

27.     Ms. Hollingsworth is a layperson with no medical background or training that would have given her any reason to doubt the response she received from Jefferson's health care providers at the time

28.     Given that Jefferson's health care providers were in charge of the care of her newborn infant, Ms. Hollingsworth had no reason to doubt their word.

29.     Additionally, the risk of necrotizing enterocolitis was not disclosed on the labeling or packaging of *any* of the Defendant Manufacturers' products.

30.     What is more, necrotizing enterocolitis is a disease that can occur in children who are *not* fed the Defendant Manufacturers' products, and the Defendant Manufacturers have worked to mislead parents into a false sense of security about the use of those products.  Publicly disseminated materials from each Defendant Manufacturer disguise the role their products play in causing the disease—and affirmatively say, even today, that their products are safe and do not

Case ID: 230900506
Control No.: 23096781

cause NEC. In fact, some publicly disseminated materials from the formula manufacturers even suggest that formula may help *reduce* the risk of this terrible and potentially fatal disease.

31.     For example, Abbott's website stays that "[t]he specific cause of NEC is unknown, but it's most often seen in very low birth weight premature babies," and that "about 10% of babies who are born prematurely develop NEC." The website suggests that "new preliminary studies" suggest for the first time that "NEC prevention may . . . be possible" with the use of human milk oligosaccharides to "dramatically curb intestinal inflammation" and reduce the risk of NEC. Abbott states that these human milk oligosaccharides are found in "certain Similac formulas" although they are "not currently available in Similac's premature infant formulas."[1] Likewise, the website for Mead Johnson's products states that necrotizing enterocolitis is "one of the most common and serious intestinal disease[s] among premature babies." And it deflects responsibility from Mead Johnson's products: "Necrotizing enterocolitis happens when tissue in the small or large intestine is injured or inflamed."[2]

32.     Because of the misleading information distributed by the Defendant Manufacturers, as further detailed herein, any research conducted by Ms. Hollingsworth immediately after G.O.'s diagnosis, or at any time prior to seeing an advertisement, would not have led a reasonable person to suspect that the Defendant Manufacturers' products could have caused G.O.'s injuries.

33.     Ms. Hollingsworth also did not know, and had no reason to know or suspect, that Jefferson breached its duty of care by distributing the Defendant Manufacturers' products to G.O. Not only was Ms. Hollingsworth unaware that the Defendant Manufacturers' products caused G.O.'s

---

[1] The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (last visited July 28, 2023).

[2] Special Feeding Concerns for Preemies, https://www.enfamil.com/articles/special-feeding-concerns-for-preemies/ (last visited July 29, 2023).

Case ID: 230900506
Control No.: 23096781

injuries and death, but the Defendant Manufacturers' distribution agreements with Jefferson—which allowed Jefferson to secure sweetheart deals for otherwise expensive premature infant formula in exchange for product placement and access to the hospital staff—were also not public or knowable to Ms. Hollingsworth, nor could any reasonable investigation outside of litigation have uncovered the terms of those agreements.

### *Despite Exercising Reasonable Diligence, the Defendants' Fraudulently Concealed the Risks of NEC from Defendant Manufacturers' Products to Divert, Prevent, and Mislead Plaintiff Regarding the Cause of Her Child's NEC Diagnosis*

34.     In addition to the averments above, the Defendants have acted in concert to fraudulently convey false and misleading information concerning the risk of NEC, and potentially death, caused by Defendant Manufacturers' preterm infant formula products.

35.     The Defendants' actions as set forth herein constitute knowing misrepresentation, omission, suppression, and concealment of material facts, made with the intent that Plaintiff would rely upon such concealment, suppression, or omission, in connection with the use of Defendants' preterm infant products.

36.     Plaintiff did not know, and could not learn, the truth concerning the uses, risks and benefits of Defendant Manufacturers' preterm infant products due to Defendants' deliberate misrepresentations and concealment, suppression and omission of material facts and important information regarding the risks of NEC, and potentially death, from the products.

37.     Moreover, Defendant Hospital further participated in the intentional concealment—on information and belief, it allowed the Defendant Manufacturers' sales representatives into its hospital to provide samples and free products that did not warn of their serious dangers, and to provide "education" to its NICU staff that was incomplete as to the true risks of feeding their patients the Defendant Manufacturers' products.

9

38. Additionally, Defendant Hospital failed to inform Ms. Hollingsworth that the Defendant Manufacturers' products caused Plaintiff's child's NEC.

39. Defendant Hospital was aware that the Defendant Manufacturers' products caused NEC in premature infants. Defendant Hospital was also aware that the Defendant Manufacturers did not provide warnings on their products. However, Defendant Hospital did not warn Ms. Hollingsworth of the risks of the products. Instead, and notwithstanding the sweetheart deal Defendant Hospital agreed to in exchange for preterm infant formula at little to no cost, Defendant Hospital repeatedly informed Ms. Hollingsworth that it would do everything it could possibly do to keep her infant safe. Though this was clearly not true given the known risks of preterm formula for babies like G.O., it was enough for Ms. Hollingsworth to trust that Defendant Hospital was providing preterm formula in the best interest of her child.

40. Defendants' affirmative acts of fraud and concealment, as averred herein, diverted, prevented, and/or mislead Plaintiff from discovering the medical cause of her child's NEC diagnosis.

41. Plaintiff was not put on inquiry notice until she learned of the direct connection between the Defendant Manufacturers' products and NEC at a later time and contacted an attorney thereafter.

### *The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products*

42. Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

43. Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk

10

Case ID: 230900506
Control No.: 23096781

formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

44. Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message.

45. Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

46. While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears— that the nutrition they are supplying to their child will not provide the best chance of survival— while wholly failing to warn that their products come with a significantly increased risk of NEC.

47. For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe

11

Case ID: 230900506
Control No.: 23096781

alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

48.     Abbott markets and sells multiple products specifically targeting preterm and low-birthweight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC. At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

49.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that

Case ID: 230900506
Control No.: 23096781

of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

50.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

51.     Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

52.     Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers. The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact

Case ID: 230900506
Control No.: 23096781

breastfeeding rates.

53.     Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products.   The packaging appears as:



54.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first

Case ID: 230900596
Control No.: 23096781

choice. This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

55. The Defendant Manufacturers have also designed powerful marketing campaigns to both the general public and health care providers at hospitals like Jefferson Abington. The Defendant Manufacturers know that sales made to hospitals are key drivers of brand loyalty and thus are a key opportunity to drive better downstream business—*i.e.*, retail purchases by parents after they have left the hospital. On information and belief, the Defendant Manufacturers know that the products used in a hospital's NICU are related to getting and keeping the overall hospital contracts. And the Defendant Manufacturers know that just like any celebrity endorsement, when the mothers of newborn infants see medical professionals using a certain brand, the mothers are more likely to continue to purchase that same brand after discharge. The Defendant Manufacturers are thus heavily motivated to ensure that NICU departments are using their products.

56. Abbott and Mead Johnson focus their sales teams and training heavily on hospital NICU departments. They train their sales representatives how to increase the number of babies on their formula and they emphasize the need to be the dominant formula manufacturer in the NICU so they can own that profitable ground and secure a great return on their substantial investment in NICU formula and other products.

57. To leverage hospitals' NICUs and secure babies in the hospital and at retail, the Manufacturer Defendants pull out all the stops to convince hospitals, including Defendant Hospital, to purchase their products. For example: Abbott and Mead Johnson provide samples of their products to hospitals for free.

15

58.     On information and belief, to get the hospitals on board with supplying their formula for premature infants, Abbott and Mead Johnson work with hospitals to secure contracts that have special pricing discounts if a certain level of the formula-fed babies in the hospital receive just that one manufacturer's products; similar to a restaurant being a Coke or Pepsi restaurant.  And notwithstanding the increased risk of the Defendant Manufacturers' products for the hospitals' most fragile patients—the preterm infants—the decision makers at these hospitals seek out these types of contracts to better the hospitals' own bottom lines.

59.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective company's own formula products to give to the preterm infants.  The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

60.     Prior to G.O.'s birth, Abbott sent sales representatives to Defendant Hospital.  Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Abbott's products were safe to give to preterm infants like G.O.  Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants.

61.     Prior to G.O.'s birth, Mead Johnson sent sales representatives to Defendant Hospital. Those sales representatives provided information about Mead Johnson's products to Defendant

Case ID: 230900506
Control No.: 23096781

Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Mead Johnson's products were safe to give to preterm infants like G.O. Mead Johnson maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed. These sales representatives did not disclose that Mead Johnson's products could cause NEC in preterm infants.

62.     Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like G.O.

### The Defendant Manufacturers' Inadequate Warnings

63.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants. Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

64.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

65.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

66.     Mead cites no medical literature or research to guide the use of its products.

67.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

Case ID: 2023L000506
Control No.: 23096781

68.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

69.     Mead Johnson failed to provide, and continues to fail to provide, a full accounting of the risk of NEC as documented by underrepresenting and misrepresenting the risk to the public and the medical community.

70.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.  Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

71.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

72.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

73.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

18

74.     Despite knowing of studies documenting an increased risk of NEC from its products, Abbott did not act to make parents or the medical community aware of those risks, and instead took steps to conceal or prevent those risks from becoming public.  Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### *Jefferson's Failure to Warn*

75.     On information and belief, Jefferson was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  They knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition.  However, instead of warning of those dangers, or supplying breast milk-based feeding products to preterm infants like the Injured Infants, the Hospital Defendants have continued to source, distribute, and supply the Defendant Manufacturers' products in their hospitals without any adequate warning.

76.     As of 2014, only 41% of nurses at one Jefferson NICU stated that they were comfortable providing donor breast milk to an infant in the NICU.  Although Jefferson has introduced exclusive human milk products, it limited its efforts based upon "budgetary constraints."  Use of exclusive human milk products continues to be limited notwithstanding evidence from Jefferson showing that use of exclusive human milk or human milk products reduced feeding intolerance and NEC in the NICU.  That evidence demonstrates that Jefferson knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

Case ID: 230900506
Control No.: 23096781

77.     Finally, medical providers and staff at Jefferson have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition.  In an article in the Philadelphia Inquirer, dated December 21, 2014, the director of hospital pediatrics at Thomas Jefferson University Hospital acknowledged that human milk is crucial to assuring that infants get necessary bacteria in their gastrointestinal tracts, noting that "NEC seems to result from a lack of proper gut-flora transport from mother to child[.]"  These statements demonstrate that Jefferson knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

78.     Although Jefferson knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities.  As a result, the Injured Infants were fed the Defendant Manufacturers' cow's milk-based products at Jefferson, causing their injuries.  This occurred even though hospitals across the country warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

79.     Jefferson's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers.   On information and belief, Jefferson received the Defendant Manufacturers' cow's milk-based products for free or at a significant discount and granted their sales representatives access to Jefferson's healthcare professionals and medical staff.  These sales representatives have provided deceptive information that Jefferson reasonably knew or should have known would ultimately reach parents through those staff.  This arrangement dovetails with

Case ID: 230900506
Control No.: 23096781

the Defendant Manufacturers' own marketing strategy, which aims to "sell and service" healthcare professionals and medical staff as a means of converting them into "extra salespersons."

### *Safer Alternative Designs*

87.    The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants.   The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

88.    Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk.  This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

89.    On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

### **CAUSES OF ACTION**
### **COUNT I:  STRICT LIABILITY FOR DESIGN DEFECT**
### **(Against Abbott and Mead)**

90.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

91.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

92.    Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff

Case ID: 230900506
Control No.: 23096781

Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

93.    Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations.    Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

94.    The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products.  The risks of feeding those products to the Injured Infant outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

95.    Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

96.    Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

97.    Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

98.    Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

22

99.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.      For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.      For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.      For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.      For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.      For interest as permitted by law;

f.      For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.      For such other and further relief as the Court deems proper.

**COUNT II:  STRICT LIABILITY FOR FAILURE TO WARN**
**(Against Abbott and Mead)**

23

Case ID: 230900506
Control No.: 23096781

100.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

101.     Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

102.     Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses.     By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death.     The failure to warn makes the products at issue in this litigation unreasonably dangerous.

103.          Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks.     Among other risks, the Defendant Manufacturers:

       a.     Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

       b.     Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

24

Case ID: 230900506
Control No.: 23096781

c.     Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d.     "Black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

e.     Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.     Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.     Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.     Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

104.    Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

105.    As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers'

Case ID: 230900506
Control No.: 23096781

products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

106.    The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products.    Had the Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

107.        As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational

Case ID: 230900596
Control No.: 23096781

limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.      For interest as permitted by law;

f.      For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.      For such other and further relief as the Court deems proper.

## COUNT III:  NEGLIGENCE
### (Against Abbott and Mead)

108.      Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

109.      Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

110.      At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

111.      Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

112.      Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty

27

by:

  a. Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

  b. Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

  c. Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

  d. Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

  e. Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

  f. Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

  g. Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

  h. Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based

<div align="center">28</div>

Case ID: 230900506
Control No.: 23096781

products.

113.     In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

114.     As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

115.     Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

116.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.     For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.     For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.     For past, present, and future out-of-pocket costs, lost income and/or lost

29

revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

## COUNT IV: INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

117.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

118.    At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

119.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

120.    Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

30

121.    Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

a.      That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b.      That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c.      That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d.      That cow's milk-based products were safe for premature infants; and/or

e.      That cow's milk-based products were necessary for optimum growth; and/or

f.      That cow's milk-based products were similar or equivalent to breast milk; and/or

g.      That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.      That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.      Omitting the material fact that their products significantly increased the risk

31

Case ID: 2309005006
Control No.: 23096781

of NEC in premature infants.

122.    Abbott and Mead had actual knowledge, or, at a minimum, a reckless indifference, to whether the aforementioned misrepresentations were false.   The Defendant Manufacturers' misrepresentations were intended to, and in fact did, mislead physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their infant products to babies, including the Injured Infant.

123.    The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them.  The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging.   Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

124.    As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

125.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of

Case ID: 230900506
Control No.: 23096781

enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

**COUNT V:  NEGLIGENT MISREPRESENTATIONS**
**(Against Abbott and Mead)**

126.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

127.  At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

128.  Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

33

129.    In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

130.    Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

a.      That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b.      That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c.      That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d.      That cow's milk-based products were safe for premature infants; and/or

e.      That cow's milk-based products were necessary for optimum growth; and/or

f.      That cow's milk-based products were similar or equivalent to breast milk; and/or

g.      That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing

34

NEC, serious injury, and death; and/or

h.      That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.      Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

131.    Abbott and Mead were negligent or careless in not determining those representations to be false.

132.    The Defendant Manufacturers' misrepresentations were intended to and did in fact induce physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their products to babies, including the Injured Infant.

133.    The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging.   Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

134.    As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

135.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

Case ID: 230900506
Control No.: 23096781

a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

### COUNT VI:  FAILURE TO WARN
### (Against Jefferson)

136.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

137.  Jefferson Health System and Jefferson Abington as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of

36

unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

138.    At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Jefferson Health System and Jefferson Abington in their intended manner and for their intended purpose.

139.    Jefferson Health System and Jefferson Abington employed or contracted with the healthcare professionals and medical staff at Jefferson Abington, managing these individuals during their treatment of the Injured Infant.

140.    Jefferson Health System and Jefferson Abington negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

141.    Moreover, at all relevant times, Jefferson Health System and Jefferson Abington knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Jefferson Abington.   The Defendant Manufacturers' sales representatives were encouraged to interact with Jefferson Abington's healthcare professionals and medical staff.   These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Jefferson Abington's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

142.    Jefferson Health System and Jefferson Abington also knowingly, and intentionally, allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Jefferson Abington's healthcare professionals and medical

Case ID: 230900506
Control No.: 23096781

staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

143.    Jefferson Health System and Jefferson Abington knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

144.    Nonetheless, Jefferson Health System and Jefferson Abington acted negligently, outrageously, and recklessly, and breached its duty by:

  a.    Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

  b.    Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

  c.    Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

  d.    Failing to provide its healthcare professionals and medical staff with the well- researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

  e.    Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

  f.    Failing to provide statistical evidence showing the magnitude of increased

38

risk of NEC in premature infants associated with cow's milk-based products; and/or

g.  Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Jefferson Abington's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

145.  Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

146.  Jefferson Health System and Jefferson Abington knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

147.  Had Jefferson Health System and Jefferson Abington exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

148.  As a direct and proximate result of Jefferson Health System and Jefferson Abington's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk- based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-

Case ID: 230900506
Control No.: 23096781

based products, which caused and/or increased the risk of developing NEC and significant injuries.

149.    As a further direct and proximate result of Jefferson Health System and Jefferson Abington's  failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Jefferson Health System and Jefferson Abington, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Jefferson Health System's conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Jefferson Health System and Jefferson Abington's oppressive, outrageous, reckless, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

40

      g.     For such other and further relief as the Court deems proper.

<div align="center">

**COUNT VII: CORPORATE LIABILITY OF HEALTH-CARE PROVIDER**
**(Against Jefferson)**

</div>

150.    Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

151.    At all relevant times, Jefferson Health System and Jefferson Abington owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Jefferson Abington staff. Specifically, Jefferson Health System and Jefferson Abington had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant. Further, Jefferson Health System and Jefferson Abington owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

152.    Jefferson Health System and Jefferson Abington owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

153.    At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Jefferson Health System and Jefferson Abington in their intended manner and for their intended purpose.

154.    Moreover, at all relevant times, Jefferson Health System and Jefferson Abington knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Jefferson Abington. The Defendant Manufacturers' sales representatives were encouraged to interact with Jefferson Abington's healthcare professionals and

<div align="center">41</div>

medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Jefferson Abington's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

155. Jefferson Health System and Jefferson Abington also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Jefferson Abington's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

156. Jefferson Health System and Jefferson Abington knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

157. Jefferson Health System and Jefferson Abington knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

158. Nonetheless, Jefferson Health System and Jefferson Abington acted negligently, outrageously, and recklessly, and breached its duty by:

> a. Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted the use of cow's milk-based products for feeding premature babies; and/or

Case ID: 230900506
Control No.: 23096781

b.  Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

c.  Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d.  Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

e.  Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well- established studies that link cow's milk-based products to NEC and death in premature infants; and/or

f.  Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

g.  Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to Jefferson Abington's healthcare professionals and

Case ID: 230900506
Control No.: 23096781

medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants; and/or

h. Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

159. A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

160. Had Jefferson Health System and Jefferson Abington exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

161. As a direct and proximate result of Jefferson Health System and Jefferson Abington failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

162. As a further direct and proximate result of Jefferson Health System and Jefferson Abington negligent, reckless, and outrageous conduct the Plaintiff Parent suffered significant emotional

Case ID: 230900506
Control No.: 23096781

distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

163.     In the alternative, Jefferson Health System and Jefferson Abington owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Jefferson Abington's care, including the Injured Infant.

164.     Jefferson Health System and Jefferson Abington employed or contracted with the healthcare professionals and medical staff at Jefferson Abington and was responsible for overseeing those individuals during their treatment of the Injured Infant.

165.     Nonetheless, Jefferson Health System and Jefferson Abington acted negligently, recklessly, and outrageously breached its duty by:

  a.     Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

  b.     Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

  c.     Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

  d.     Failing to oversee its healthcare professionals and medical staff to restrict their feeding of cow's milk-based products to premature babies; and/or

  e.     Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an

45

Case ID: 230900506
Control No.: 23096781

informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

f. Failing to provide its healthcare professionals and medical staff with the well- researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g. Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h. Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i. Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

166. A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

Case ID: 230900506
Control No.: 23096781

167.     A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

168.     Had Jefferson Health System and Jefferson Abington exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

169.     As a direct and proximate result of Jefferson Health System and Jefferson Abington's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

170.     As a further direct and proximate result of Jefferson Health System and Jefferson Abington's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   His life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Jefferson Health System and Jefferson Abington, individually, jointly and severally, as follows:

a.     For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.     For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Jefferson Health System and

Case ID: 230900506
Control No.: 23096781

Jefferson Abington's conduct;

c.     For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.     For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Jefferson Health System's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.     For interest as permitted by law;

f.     For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.     For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

171.   Plaintiff hereby demands a jury trial for all claims triable.


Dated: October 16, 2023

Respectfully submitted,

**KLINE & SPECTER, P.C.**


By:     /s/ Timothy A. Burke
Tobias L. Millrood, Esq.
Elizabeth A. Crawford, Esq.
Timothy A. Burke, Esq.

48

CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2023, I electronically filed the foregoing document with the Clerk of the Court using Electronic Efiling and that the foregoing document is being served on all counsel of record or parties registered to receive Electronic Filing.


/s/ Timothy A. Burke
Timothy A. Burke, Esq

Case ID: 230900506
Control No.: 23096781

# EXHIBIT A-68

**FILED**
01 APR 2024 11:08 am
Civil Administration
T. FOBBS

| | |
|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** | **COURT OF COMMON PLEAS**<br>**PHILADELPHIA COUNTY** |
| Plaintiff, | **MARCH TERM, 2022**<br>**No. 2606** |
| v. | |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | |
| Defendants. | |
| **NIKIA TUCKER, on her own behalf and as Parent and Natural Guardian of N.B., a Minor,** | **COURT OF COMMON PLEAS**<br>**PHILADELPHIA COUNTY** |
| Plaintiff, | **SEPTEMBER TERM, 2023**<br>**No. 0867** |
| v. | |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | |
| Defendants. | |

## ORDER

**AND NOW,** this ____ day of _____ 2024, upon consideration of the Preliminary Objections of Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, "Mead Johnson") to Plaintiff's Complaint, and any Response thereto, it is hereby **ORDERED** that the Preliminary Objections are **SUSTAINED.** It is further **ORDERED** that all claims against Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company are hereby **DISMISSED** with prejudice.

**BY THE COURT:**

_____
                                                    J.

1

Case ID: 220302606
Control No.: 23096781

|  |  |
|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** | : **COURT OF COMMON PLEAS**<br>: **PHILADELPHIA COUNTY**<br>: |
| Plaintiff, | : **MARCH TERM, 2022**<br>: **No. 2606** |
| v. | : <br>: |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : <br>: <br>: |
| Defendants. | : |
| **NIKIA TUCKER, on her own behalf and as Parent and Natural Guardian of N.B., a Minor,** | : **COURT OF COMMON PLEAS**<br>: **PHILADELPHIA COUNTY**<br>: |
| Plaintiff, | : **SEPTEMBER TERM, 2023**<br>: **No. 0867** |
| v. | : <br>: |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : <br>: <br>: |
| Defendants. | : |

## ORDER

**AND NOW**, this ____ day of _____, 2024, upon consideration of the

Preliminary Objections of Defendants Mead Johnson & Company, LLC and Mead

Johnson Nutrition Company (collectively, "Mead Johnson") to Plaintiff's Complaint, and

any Response thereto, it is hereby **ORDERED** that the Preliminary Objections are

**SUSTAINED**. It is further **ORDERED** that:

1.   Count I of Plaintiff's Complaint is **DISMISSED** with prejudice;

2.   Count II of Plaintiff's Complaint is **DISMISSED** with prejudice;

3.   Count III of Plaintiff's Complaint is **DISMISSED** with prejudice;

4.   Count IV of Plaintiff's Complaint is **DISMISSED** with prejudice;

5.   Count V of Plaintiff's Complaint is **DISMISSED** with prejudice;

2

6.      Plaintiff's Complaint is **STRICKEN** for lack of specificity;

7.      Plaintiff's claims for punitive damages as to Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company are **DISMISSED** with prejudice, along with all allegations of oppressive, reckless, malicious and/or fraudulent conduct; and

8.      Plaintiff Nikia Tucker's claims in her own right are **DISMISSED** with prejudice.

**BY THE COURT:**

_____
                                                                J.

3

Case ID: 220302606
Control No.: 23096781

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 875-0609
kmurphy@tlgattorneys.com

**WELSH & RECKER, P.C.**
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire
306 Walnut Street
Philadelphia, PA 19106
215-972-6430
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

**NOTICE TO PLEAD:**

**To Plaintiff:** **You are hereby notified to file a written response to the enclosed Preliminary Objections within twenty (20) days from service hereof or a judgement may be entered against you.**

**/s/ Kenneth A. Murphy**
**Attorney for Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company**

**ATTORNEYS FOR DEFENDANTS MEAD JOHNSON & COMPANY, LLC, AND MEAD JOHNSON NUTRITION COMPANY**

| | |
|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** | : **COURT OF COMMON PLEAS**<br>: **PHILADELPHIA COUNTY**<br>:<br>: **MARCH TERM, 2022**<br>: **No. 2606** |
| Plaintiff, | : |
| v. | : |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : |
| | : |
| Defendants. | : |
| **NIKIA TUCKER, on her own behalf and as Parent and Natural Guardian of N.B., a Minor,** | : **COURT OF COMMON PLEAS**<br>: **PHILADELPHIA COUNTY**<br>:<br>: **SEPTEMBER TERM, 2023** |
| Plaintiff, | : **No. 0867** |
| v. | : |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : |
| | : |
| Defendants. | : |

**PRELIMINARY OBJECTIONS OF DEFENDANTS MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON NUTRITION COMPANY TO PLAINTIFF'S COMPLAINT**

1

Case ID: 220302606
Control No.: 23096781

Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (hereinafter "Mead Johnson") hereby preliminarily object to Plaintiff's Complaint, and, in support thereof, aver as follows:

## I.    <u>INTRODUCTION</u>

1.    The case before the Court involves speculative and unsupported allegations by Plaintiff that the minor Plaintiff, N.B., developed a condition known as necrotizing enterocolitis ("NEC") resulting from her alleged ingestion of "Similac and/or Enfamil cow's milk-based products" manufactured and sold by Mead Johnson and/or defendant Abbott Laboratories ("Abbott"). Plaintiff fails to identify the particular product that N.B. purportedly ingested, and the entirety of Plaintiff's claims rest on the unsubstantiated conclusion that the product or products consumed by N.B. are unreasonably dangerous. Plaintiff acknowledges that premature infants such as N.B. have an inherent high risk of developing NEC. The Complaint is otherwise devoid of factual support for Plaintiff's claim that Mead Johnson's product caused N.B. to develop NEC. Plaintiff alleges only that N.B. was born on a certain date; *may* have been provided one of Defendants' pre-term infant feeding products; and, at some point, developed NEC. But, Plaintiff has failed to identify which Mead Johnson product the infant received, if any; what else the infant was fed; when N.B. ingested the product; when N.B. was diagnosed with NEC; what treatment was provided for that condition; or what short- or long term- injury N.B., now almost two years old, allegedly sustained. Nowhere in the complaint does Plaintiff allege how cow's milk, or cow's milk-based products (of which Mead Johnson sells multiple varieties for different purposes), purportedly *cause* NEC, or how the facts of N.B.'s case square with any mechanism of

2

action. Pennsylvania's procedural rules do not allow for such gaps in logic and omissions of material facts in a complaint. Accordingly, Plaintiff's Complaint should be dismissed.

2.      On September 8, 2023, Plaintiff instituted this action by issuing a writ of summons, to defendants Mead Johnson, Abbott, Albert Einstein Medical Center a/k/a Einstein Medical Center, Albert Einstein Healthcare Network a/k/a Einstein Healthcare Network (the Einstein defendants are collectively referred to as "AEMC" herein). Notably, plaintiff did not file her Complaint until February 7, 2024, after the Court issued a Rule to show cause why the case should not have been non-prossed for failure to file a complaint in a timely manner. Dkt. No. 230900867.

3.      This case mirrors the complaints filed in the twenty-nine other pending[1] cases in this Court against Mead Johnson, Abbott, AEMC, and other hospitals in Philadelphia based on claims relating to alleged ingestion of cow's milk-based products by premature infants following their birth. In each complaint, Plaintiffs have made the same unsupported allegations about a product that a minor may or may not have received while providing no scientific support that any such product causes NEC.

4.      Plaintiffs in those cases, including Plaintiff here, allege that "upon information and belief" the Plaintiff-minors, including N.B., developed NEC, a gastrointestinal disorder that occurs in premature infants, caused by either Mead Johnson's products "and/or" the products of co-defendant Abbott. *See* Plaintiff's Complaint, attached as Exhibit "A" at ¶ 1, 13.

---

[1] Plaintiffs have filed for discontinuance in four matters, and three of these discontinuances have been granted. These cases are not included in the total.

Case ID: 220302606
Control No.: 23096781

5.     In addition to asserting product liability claims against Mead Johnson and Abbott, as the infant formula manufacturers, Plaintiff has brought claims against AEMC alleging liability on theories of failure to warn and corporate liability.

6.     The factual background regarding the Plaintiff-minor's birth, diagnosis and injuries are limited to four (4) paragraphs in the Complaint. ¶¶ 11–14.

7.     Plaintiff avers that N.B. was born prematurely on May 15, 2022 and that "[u]pon information and belief N.B. was fed Similac and/or Enfamil cow's milk-based products by staff at [AEMC] after her birth." *Id*., ¶¶ 11–12.

8.     Plaintiff further alleges that "upon information and belief" N.B. developed NEC shortly after first ingesting the Defendant manufacturers' products. *Id*., ¶ 13.

9.     Plaintiff generally alleges that N.B. "suffered injuries, including but not limited to, a diagnosis of NEC, treatment with antibiotics and surgery, bowel perforation, gastrointestinal issues, developmental delays, feeding difficulties and growth issues, and she continues to suffer other long-term health effects," with no specific description of those alleged injuries or long-term health effects. *Id*., ¶ 14.

10.    Mead Johnson Preliminarily Objects to Plaintiff's Complaint for the reasons stated below and as more fully set forth in the accompanying Memorandum of Law, which is incorporated herein by reference.

## II.    ARGUMENT

### A.    DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS I, II, III, IV, & V

11.    To survive preliminary objections, Plaintiff must aver sufficient facts, together with the documents and exhibits attached thereto, to make out a *prima facie* case as to all elements of the cause of action. *See, e.g., Northern Forests II, Inc. v. Keta*

4

*Realty Co.*, 130 A.3d 19, 35 (Pa. Super. 2015). They have failed to do so with respect to all counts against Mead Johnson on the issue of whether cow's milk-based products are unreasonably dangerous.

12. The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.,* 718 A.2d 305, 307 (Pa. Super. 1998). "A product is defective when it is not safe for its intended use, *i.e.*, the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id*. at 308. Whether a product is "unreasonably dangerous" is a question of law. *Id*.

13. Plaintiff alleges in Counts I and II of the Complaint that Mead Johnson, "as [one of] the manufacturers and/or sellers of the products at issue in this litigation," owed Plaintiff and the public a duty to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous and to warn of unreasonable risk of harm posed by their products. Exhibit A at ¶ 100.

14. Plaintiff similarly allege in Count III (Negligence) that Mead Johnson, owed Plaintiff and the "consuming public in general" a duty to exercise reasonable care to design, test, manufacture, inspect, and distribute products that were free of unreasonable risk of harm, and in in Count IV (Intentional Misrepresentation) and Count V (Negligent Misrepresentation) that they owed Plaintiff and the public a duty to provide truthful, accurate, and fulsome information about their cow's milk-based products. Exhibit A at ¶¶ 108, 118,127.

Case ID: 220302606
Control No.: 23096781

15.     Each count brought against Mead Johnson therefore rests on Plaintiff's theory that cow's milk-based products are unreasonably dangerous, and for strict liability purposes in Counts I & II, defective.

16.     In fact, Mead Johnson's cow's milk-based products are regulated by FDA and legally marketed for use in pre-term infants.  Moreover, in Plaintiff's own Complaint she acknowledges that "[p]reterm and low-birth-weight infants are *especially susceptible* to NEC." *See* Exhibit A at ¶ 16 (emphasis added).

17.     In support of her theories and claims, Plaintiff offers only vague references to unidentified "[e]xtensive scientific research, including numerous randomized controlled trials" that purportedly prove Mead Johnson's cow's milk-based products cause NEC in preterm and low-birth-weight infants. Plaintiff neither cites specifically to any randomized trial or consensus statement, nor does she offer an explanation of the purported mechanism of action by which the cow's milk-based formula products allegedly cause NEC.

18.     Given that Plaintiff has offered nothing but the bald assertion that there is "extensive scientific research" that Mead Johnson's products cause NEC, she has failed to adequately allege that the products are unreasonably dangerous.  Accordingly, she has failed to state claims for defective design and failure-to-warn.  Counts I through V should be stricken.

**B.     DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS IV & V**

19.     Plaintiff's claims for intentional and negligent misrepresentation (Counts IV and V respectively) also fail because Plaintiff fails to plead her allegations with

6

Case ID: 220302606
Control No.: 23096781

particularity as required by Pa. R. Civ. P. 1019(b). Specifically, Plaintiff does not allege

that she received and relied upon any particular false representation from Mead

Johnson. *See Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) (setting forth the elements of

intentional and negligent misrepresentation and noting that both require a false

representation upon which the plaintiff ultimately relied).

20.     Intentional misrepresentation requires: "(1) a representation; (2) which is

material to the transaction at hand; (3) made falsely with knowledge of its falsity or

recklessness as to whether it is true or false; (4) with the intent of misleading another

into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting

injury was proximately caused by the reliance."  *Bortz*, 729 A.2d at 560 (citing *Gibbs v.

Ernst*, 647 A.2d 882, 889 (Pa. 1994)).

21.     Negligent misrepresentation similarly requires a false representation and

reliance, "though the speaker need not know his or her words are untrue."  *Id.* at 561.

22.     To adequately plead a claim for fraud, Pennsylvania law requires that "(1)

the pleadings must adequately explain the nature of the claim to the opposing party

sufficient to permit the preparation of a defense, and (2) they must be sufficient to

convince the court that the averments are not merely subterfuge." *Pezzano v. Mosesso*,

2014 WL 5421587, at *5 (Pa. Commw. Oct. 24, 2014) (quoting *Martin v. Lancaster

Battery Co., Inc.*, 606 A.2d 444, 448 (Pa. 1992)). Plaintiff's Complaint fails on the first

prong.

23.     Plaintiff does not allege any specific representation upon which they

relied. Nor does she identify the allegedly defective Mead Johnson product that N.B.

received. Exhibit A, at ¶ 30 (alleging that Mead Johnson "markets and sells ***multiple***

7

Case ID: 220302606
Control No.: 23096781

***products*** specifically targeting premature infants). Instead, the Complaint is devoid of any allegation that N.B. received *any* Mead Johnson product at all. *See*; ¶ 97 (alleging that "Abbott ***and/or*** Mead Johnson's products were fed") (emphasis added). Plaintiff cannot claim reliance on an alleged misrepresentation when there is no identified product to misrepresent. *Kepner v. Kepner, No. 835 EDA 2015, 2015 WL 7283034, at *3 (Pa. Super. Ct. Nov. 18, 2015)* (affirming dismissal of a fraudulent misrepresentation claim for failure to plead a particular misrepresentation). As a result, Mead Johnson cannot reasonably assess which, if any, product it should defend and what alleged "misrepresentations" to contest. *Pezzano*, 2014 WL 5421587, at *5.

24.      Pennsylvania law demands more. Pa. R. Civ. P. 1019(b). *See Presbyterian Med. Ctr. v. Budd*, 832 A.2d 1066, 1073 (Pa. Super. 2003)(affirming order sustaining preliminary objections to complaint when the plaintiff failed to "establish every element of its fraud claim with sufficient particularity"). This requirement is followed by other courts around the country, which have dismissed similar misrepresentation claims for lack of specificity[2]. *See, e.g.*, *In re Mead Johnson Prod. Cases*, CJC-23-005257, at 5– 13 (Cal. Sup. Ct. February 16, 2024)[3](attached hereto as Exhibit B); *Casino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1469 (Cal. Ct. App. 2014) ("[W]hen a plaintiff asserts fraud against a corporation, the plaintiff must allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.") (internal quotation marks omitted); *Peterson v. Clark Lake Homes Inc.*, 2022 WL 16910578, at *4 (Minn. Ct. App. (Nov. 14,

---

[2] A Plaintiff alleging similar claims against Mead Johnson in Illinois voluntarily dismissed its purported intentional misrepresentation and negligent representation claims on the eve of trial. A copy of Plaintiff's Notice of Voluntary Dismissal in *Watson v. Mead Johnson Co.* (St. Clair County, IL Case No. 21-L-1032) is attached hereto as Exhibit C.
[3] The Court adopted the tentative ruling as its final order at a hearing on February 22, 2024.

Case ID: 220302606
Control No.: 23096781

2022) (requiring identification of the "who, what, when, where, and how" for a claim of fraud).

25.　　Moreover, failure to allege any relationship between a specific misrepresentation (which they do not identify), a specific product (which they do not identify), and an injury means there can be no inference of proximate causation. *See Kepner*, No. 835 EDA 2015, 2015 Pa. Super. Unpub. LEXIS 4257, at *6 (requiring a particular misrepresentation); *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 969 (Pa. Super. Ct. 1985) (affirming dismissal of negligence claim where plaintiff failed to properly identify the product or its manufacturer). Causation is a hallmark of any tort action in Pennsylvania, including misrepresentation. *Bortz*, 729 A.2d at 560 (citing *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994)). *See also Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 524 (W.D. Pa. 2003) ("Proof of causation is a necessary element in a products liability action. Absent a causal relationship between the defendant's product and the plaintiff's injury the defendant cannot be held liable on a theory of negligence, strict product liability, or misrepresentation") (applying Pennsylvania law) (citing *O'Brien v. Sofamar, S.N.C.*, No. CIV. A. 96–8015, 1999 WL 239414 (E.D. Pa.1999)). Absent identification of the manufacturer of the allegedly defective product, "there can be no allegations of . . . legal causation, and hence there can be no liability." *Cummins*, 495 A.2d at 968–69 (citing *Hamil v. Bashline*, 392 A.2d 1280 (Pa. 1978)).

26.　　Based on the foregoing, Plaintiff's intentional and negligent misrepresentation claims against Mead Johnson must be dismissed.

Case ID: 220302606
Control No.: 23096781

### C. MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES

27.     Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading.  Plaintiff's failure to specify the nature of the products ingested and injuries sustained serves as an alternative ground on which all of their claims should be stricken.

28.     It is a well-established matter of law that a plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the Complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The Univ. of Pa.*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (citations omitted).

29.     Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A,2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted) (emphasis added).

10

Case ID: 220302606
Control No.: 23096781

30.    It is also well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975).  *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.").

31.    As noted above, Plaintiff's Complaint is facially deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case, each of which are uniquely within her competence:

- Plaintiff's allegation that "upon information and belief," the minor was fed Similac and/or Enfamil shortly after her birth (Exhibit "A," at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide Mead Johnson with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products;

- Plaintiff has failed to identify which of the numerous products sold by Abbott and/or Mead Johnson under the Similac and Enfamil brand names were allegedly ingested by the minor. *Id*. at ¶¶ 29-30;

11

Case ID: 220302606
Control No.: 23096781

- Plaintiff does not describe the period of time in which such products were purportedly ingested, when the minor was allegedly diagnosed with NEC, or what treatment was provided for that condition;

- Plaintiff does not specify the nature of the injuries and "long-term health effects" that are alleged to have resulted from the diagnosis of NEC.

32.     Furthermore, Plaintiff's damages claim is not stated with particularity and is amorphous, vague, and open-ended. Pursuant to Pennsylvania pleading requirements, Mead Johnson should not be compelled to defend a claim for which the statement of injury is unspecified and subject to change. *Miller v. Perrige at* 476, 479–80

33.     These omissions are fatal defects in Plaintiff's Complaint. Therefore, Plaintiff's Complaint should be stricken in its entirety.

**D.     MOTION TO STRIKE PLAINTIFF'S CLAIMS FOR PUNITIVE DAMAGES**

34.     In the *Ad Damnum* clauses of Counts I, II, III, IV, and V of her Complaint, Plaintiff makes baseless accusations that Mead Johnson engaged in oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages. *See* Exhibit A, pp. 21, 24, 27, 31, and 34.

35.     Punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence,

Case ID: 220302606
Control No.: 23096781

mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097

(Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987).

36.    Where the facts as averred show nothing more than negligence, a lapse in

judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and

claims for punitive damages, often at the pleadings stage of litigation and even if the

complaint alleged severe injuries or death. *See, e.g., Brownawell v. Bryan*, 40 Pa. D. &

C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff

alleged that a physician negligently performed a spinal fusion surgery that left the

plaintiff with severe neurological defects, and noting that "**the mere pleading of**

**outrageous conduct** does not, of course, satisfy the requirement stating facts which, if

proven, would form a basis for a jury concluding that the conduct was such that an

award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11

(contentions that physician failed to prescribe antibiotics, order certain tests or request

an infectious disease consult constituted "nothing more than ordinary negligence and

are insufficient to support an award of punitive damages.")

37.    Here, the Complaint contains no specific allegations of conduct that would

permit recovery of punitive damages as to Mead Johnson. Read most generously,

Plaintiff's Complaint alleges that Mead Johnson failed to warn co-defendant AEMC of a

risk of NEC associated with its legally-marketed cow's milk-based product – a risk about

which Plaintiff alleges that AEMC was already aware. *See* Exhibit A at ¶¶ 44-51 & 56.

And with respect to N.B.'s care, Plaintiff merely alleges that "upon information and

belief" N.B. may have been given a product sold by Mead Johnson absent any context

Case ID: 220302606
Control No.: 23096781

to indicate that such a product was inappropriate based on the specific issues involved in N.B.'s medical care and condition following birth.

38.     For example, the Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

39.     Plaintiff's allegations of oppressive, malicious and similar conduct must be rejected as mere boilerplate.  Indeed, the fact that Plaintiffs in these cases have filed numerous lawsuits against at least four other hospitals in Philadelphia[4] based on identical claims belies the contention that Mead Johnson engaged in outrageous or malicious conduct in allegedly selling a cow's milk-based product that was used to feed the Plaintiff-minor.

40.     The facts underlying Plaintiff's bare assertions of oppressive, reckless, malicious and fraudulent conduct do not come close to meeting the requisite standard under Pennsylvania law that would permit an award of punitive damages. Absent specific factual allegations to justify the claim that Mead Johnson's actions as they pertain to Plaintiff's particular facts and circumstances were extreme and outrageous, there is no basis for an award of punitive damages in this case, and Plaintiff's claims for such must be stricken from the Complaint pursuant to Rule 1028(a)(3).

---

[4] These include the Pennsylvania Hospital of the University of Pennsylvania University, Thomas Jefferson University Hospital, Inc., the Hospital of the University of Pennsylvania; Abington Memorial Hospital; and Temple University Hospital.

Case ID: 220302606
Control No.: 23096781

E.      __MOTION TO STRIKE PLAINTIFF-PARENT'S CLAIMS__

41.      Finally, The Court should strike Plaintiff-parent's claims to recover damages in her own right and as the parent and natural guardian of N.B.

42.      In each count of the Complaint, Plaintiff-parent alleges that she "suffered significant emotional distress, loss of income, and/or other harms" and that "[h]er life has been significantly affected by the Injured Infant's injuries." Exhibit A, ¶¶ 98, 106, 115, 124, and 134.

43.      This is insufficient. Plaintiff-Parent fails to meet the pleading requirements of Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e),
> the complaint shall state the cause of action, any special
> damage, and the demand for relief of each plaintiff in a
> separate count, preceded by a heading naming the parties to
> the causes of action therein set forth.

44.      Plaintiff-parent plainly does not allege any claim in separate counts or state any cause of action. Rather, the claims are incorporated in a single, tagalong paragraphs at the end of the existing counts.

45.      Additionally, Plaintiff-parent does not complain of any physical injury. It is well established that "no cause of action exists for negligence that results solely in economic damages unaccompanied by physical injury or property damage." *Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 985 A.2d 840, 841 n.3 (Pa. 2009) (citing *Adams v. Copper Beach Townhome Comtys., L.P.*, 816 A.2d 301, 305 (Pa. Super. 2003)); *Miller v. Evenflo Co., Inc.*, 2009 WL 10689606, at *4 (W.D. Pa. Dec. 21, 2009) (dismissing plaintiff-parents' tort claims where only physical injury was to minor plaintiff). So too for claims sounding in strict products liability. *Schmidt v. Boardman Co.*, 11 A.3d

15

924, 953 (Pa. 2011) ("We would hold that, for purposes of a strict products liability claim, a plaintiff's recovery for emotional distress is limited to that which is proximately caused by contemporaneous physical impact").

WHEREFORE, Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company respectfully request that this Honorable Court sustain the instant Preliminary Objections and enter the attached proposed Order.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Dated:  April 1, 2024

/s/ Kenneth A. Murphy
Kenneth A. Murphy, Esquire

**WELSH & RECKER, P.C.**
/s/ Catherine M. Recker
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire

16

Case ID: 220302606
Control No.: 23096781

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA  19103
(215) 875-0609
kmurphy@tlgattorneys.com

**ATTORNEYS FOR DEFENDANTS MEAD JOHNSON & COMPANY, LLC, AND MEAD JOHNSON NUTRITION COMPANY**

**WELSH & RECKER, P.C.**
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire
306 Walnut Street
Philadelphia, PA  19106
215-972-6430
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

| | |
|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| Plaintiff, | **MARCH TERM, 2022** |
| v. | **No. 2606** |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | |
| Defendants. | |
| **NIKIA TUCKER, on her own behalf and as Parent and Natural Guardian of N.B., a Minor,** | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| Plaintiff, | **SEPTEMBER TERM, 2023** |
| v. | **No. 0867** |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY OBJECTIONS OF DEFENDANTS MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON NUTRITION COMPANY TO PLAINTIFF'S COMPLAINT**

1

Case ID: 220302606
Control No.: 23096781

I.   **MATTER BEFORE THE COURT**

Preliminary Objections of Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, "Mead Johnson") to Plaintiff's Complaint.

The case before the Court involves speculative and unsupported allegations by Plaintiff that minor Plaintiff, N.B., developed a condition known as necrotizing enterocolitis ("NEC") following her alleged ingestion of "Similac and/or Enfamil cow's milk-based products" manufactured and sold by Mead Johnson and/or Abbott Laboratories ("Abbott"). Plaintiff fails to identify the particular product that N.B. purportedly ingested, and the entirety of her claims rest on the unsubstantiated conclusion that the product or products consumed by N.B. are unreasonably dangerous. Plaintiff acknowledges that premature infants such as N.B. have an inherent high risk of developing NEC. The Complaint is otherwise devoid of factual support for Plaintiff's claim that Mead Johnson's product caused N.B. to develop NEC.  Plaintiff alleges only that N.B. was born on a certain date; *may* have been provided one of Defendants' pre-term infant feeding products; and, at some point, developed NEC.  But, Plaintiff has failed to identify which, if any, Mead Johnson product the infant received; what else the infant was fed; when N.B. ingested the product; when N.B. was diagnosed with NEC; what treatment was provided for that condition; or what short- or long term- injury N.B., now almost 2 years old, allegedly sustained. Nowhere does Plaintiff allege how cow's milk, or cow's milk-based products (of which Mead Johnson sells multiple varieties for different purposes), purportedly *cause* NEC, or how the facts of N.B.'s case square with any mechanism of action.  Pennsylvania's procedural rules do not allow for such gaps in

Case ID: 220302606
Control No.: 23096781

logic and omissions of material facts in a complaint. Accordingly, Plaintiff's Complaint should be dismissed.

## II. <u>STATEMENT OF QUESTIONS PRESENTED</u>

1.    Whether this Honorable Court should dismiss Count I of Plaintiff's Complaint "Strict Liability for Design Defect" cause of action with prejudice because Plaintiff's Complaint does not support the claim that cow's milk-based products are unreasonably dangerous, and Mead Johnson cannot be held liable for a defective design?

*Suggested Answer in the affirmative.*

2.    Whether this Honorable Court should dismiss Count II of Plaintiff's Complaint "Strict Liability for Failure to Warn" cause of action with prejudice because Plaintiff's Complaint does not support the claim that cow's milk-based products are unreasonably dangerous, and Mead Johnson cannot be held liable for failure-to-warn?

*Suggested Answer in the affirmative.*

3.    Whether this Honorable Court should dismiss Count III of Plaintiff's Complaint "Negligence" cause of action with prejudice on the basis of absence of proof of an unreasonably dangerous product?

*Suggested Answer in the affirmative.*

4.    Whether this Honorable Court should dismiss Count IV of Plaintiff's Complaint "Intentional Misrepresentation" cause of action with prejudice on the basis of absence of proof of an unreasonably dangerous product, and failure to plead any specific representation allegedly relied upon by Plaintiff?

*Suggested Answer in the affirmative.*

3

Case ID: 220302606
Control No.: 23096781

5.      Whether this Honorable Court should dismiss Count V of Plaintiff's Complaint "Negligent Misrepresentation" cause of action with prejudice on the basis of absence of proof of an unreasonably dangerous product, and failure to plead any specific representation allegedly relied upon by Plaintiff?

*Suggested Answer in the affirmative.*

6.      Whether this Honorable Court should strike Plaintiff's Complaint in its entirety for insufficient specificity of the facts and alleged injuries?

*Suggested Answer in the affirmative.*

7.      Whether this Honorable Court should strike Plaintiff's claims for punitive damages as to Mead Johnson because the Complaint fails to plead facts providing a basis for an award of punitive damages?

*Suggested Answer in the affirmative.*

III.    <u>**INTRODUCTION AND FACTUAL BACKGROUND**</u>

There have now been more than 30 nearly identical lawsuits filed by parents on behalf of their prematurely born children against Mead Johnson, Abbott, and various Pennsylvania healthcare systems alleging that exposure to preterm formula and human milk fortifier—products found in neonatal intensive care units throughout the country—caused a disease known as necrotizing enterocolitis, a common syndrome in infants born prematurely.

Each complaint, including N.B.'s, alleges that the plaintiff-minors ingested either Mead Johnson's products "and/or" the products of co-defendant Abbott. *See* Plaintiff's Complaint, attached as Exhibit A at ¶ 1, 13. Many of the allegations of the Complaint are pled "upon information and belief," including the allegations that Plaintiff-minors

4

Case ID: 220302606
Control No.: 23096781

actually received infant formula or fortifier, and that they developed NEC shortly after being fed with infant formula or fortifier. As discussed in detail below, Plaintiff's claims against Mead Johnson are legally and factually deficient.

Mead Johnson manufactures and sells products, including those under the brand name "Enfamil," to help meet the nutritional needs of infants. *Id.* ¶ 4. Some of these products are designed to be fed to premature or low-birth-weight infants who have special nutritional needs at birth. *Id.* ¶ 30. These products include formulas, which are given to infants who are not fed breast milk, and fortifiers, which are used to supplement pumped breast milk with additional nutrients. *See Id.* ¶ 34 (photo of Enfamil Human Milk Fortifier: "For premature and low-birth-weight infants fed breast milk"). Some Enfamil products, particularly those intended to be fed to premature or low-birth-weight infants, are intended to be used only under the supervision of a physician. *See Id.* (photo of Enfamil Human Milk Fortifier: "To be used only under the supervision of a physician"). Co-defendant Abbott also sells formulas and fortifiers meant to be fed to premature or low-birth-weight infants under the brand name "Similac." *Id.* at ¶¶ 29, 34. Plaintiff avers that Abbott sells at least seven types of products directed to preterm and/or low birth weight infants, six of which use the name Similac, and that Mead Johnson sells seven types of infant formulas and fortifiers using the Enfamil brand name. *Id.*, ¶¶ 29–30.

Infant formulas and fortifiers for pre-term and low-birth-weight infants are regulated by the FDA. Mead Johnson is required to submit information about its pre-term products, including their ingredients, to the FDA, 21 C.F.R. § 107.50(b)(3), and the

Case ID: 220302606
Control No.: 23096781

FDA is required to review that submission. The FDA may also impose changes to such a product's composition or labeling. *Id.* § 107(d)(1).

The formula and fortifier products identified by Plaintiff as being manufactured by Mead Johnson are made using ingredients derived from cow's milk. Exhibit A at ¶ 12. Although Plaintiff avers that "Cow's Milk-Based Feeding Products Are Known to Cause NEC," she offers only a single sentence to support that proposition. *Id.* at ¶ 16. Citing unidentified "extensive scientific research, including numerous randomized trials," Plaintiff alleges that it has been "confirmed" that bovine-based products "cause NEC in preterm and low-birth-weight infants."[1] *Id.*

Moreover, Plaintiff's Complaint provides scant information regarding N.B.'s own circumstances. Plaintiff avers that N.B. was born prematurely on May 15, 2022 and that "[u]pon information and belief N.B. was fed Similac and/or Enfamil cow's milk-based products by staff at [AEMC] after her birth." *Id.* at ¶ 12. Plaintiff further alleges that "upon information and belief" N.B. developed NEC shortly after first ingesting Mead Johnson and/or Co-Defendant Abbott's products. *Id.*, ¶ 13. Plaintiff provides no details regarding her condition following birth other than that she developed NEC on an unidentified date. Finally, Plaintiff alleges no facts as to whether Plaintiff-parent provided breast milk to N.B., whether she had the opportunity to use donor milk, and if N.B. actually received a cow's milk product, what it was, how much, and for how long.

---

[1] Taken to their logical conclusion, Plaintiff's allegations, if true, would mean that doctors, hospitals, FDA, and formula companies around the country are actively engaged in administering, approving, and selling products designed specifically for preterm infants *that has been "confirmed"* to cause an often fatal disease in those same infants. It is thus unsurprising that Plaintiff offers no evidence for this conspiracy theory.

Case ID: 220302606
Control No.: 23096781

Further, the Complaint does not provide any details whatsoever regarding communications between Plaintiff-parent and medical providers at AEMC regarding the allegations that N.B. may have been fed with Mead Johnson and/or Abbott cow's milk-based products in the hospital. Plaintiff concedes in the Complaint that mothers are encouraged by their healthcare professionals to breastfeed. *Id.* ¶ 33. But Plaintiff does not provide any information regarding discussions between Plaintiff-parent and any health care providers at AEMC related to breastfeeding and/or using cow's milk-based products in this case. As noted, Plaintiff plead that Plaintiff-minor ingested formula "on information and belief" only, and similarly plead "on information and belief" that Plaintiff-minor developed NEC as a result.

## IV. ARGUMENT

### A. DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS I, II, III, IV & V

Pursuant to Pa.R.C.P. 1028(a)(4), a party may file preliminary objections to a complaint, in the nature of a demurrer, for legal insufficiency in a pleading. A court should grant a demurrer where, accepting as true all well pled facts, a legal cause of action cannot be maintained upon those facts. Pa.R.C.P. 1028(a)(4); *See also, Willet v. Pennsylvania Med. Catastrophe Loss Funds,* 702 A.2d 850, 853 (Pa. 1997). In this case, Counts I, II, III, IV, and V of Plaintiff's Complaint should be stricken pursuant to this Rule, as Plaintiff has failed to plead with sufficient detail to survive the pleading stage that Mead Johnson's cow's milk-based products were unreasonably dangerous.

To survive preliminary objections, Plaintiff must aver sufficient facts, together with the documents and exhibits attached thereto, to make out a *prima facie* case as to all elements of the cause of action. *Northern Forests II, Inc. v. Keta Realty Co.*, 130 A.3d

7

19, 35 (Pa. Super. 2015). "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. Am. Honda Motor Co., Inc.,* 718 A.2d 305, 307 (Pa. Super. 1998). "A product is defective when it is not safe for its intended use, *i.e.*, the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* at 308. Whether a product is "unreasonably dangerous" is a question of law. *Id.*

Plaintiff alleges in Counts I and II of her Complaint that Mead Johnson, "as the manufacturers and/or sellers of the products at issue in this litigation," owed Plaintiff and the public a duty to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous and to warn of unreasonable risk of harm posed by their products. Exhibit A at ¶¶ 91,92, 100, and 101. Plaintiff similarly alleges in Count III (Negligence) that Mead Johnson, owed Plaintiff and the public a duty to exercise reasonable care to design, test, manufacture, inspect, and distribute products that were free of unreasonable risk of harm, and in Count IV (Intentional Misrepresentation) and Count V (Negligent Misrepresentation) that Mead Johnson owed Plaintiff and the public a duty to provide truthful, accurate, and fulsome information about their cow's milk-based products. Exhibit A at ¶¶ 108, 118, and 127. Each count brought against Mead Johnson therefore rests on Plaintiff's theory that cow's milk-based products are unreasonably dangerous, and for strict liability purposes in Counts I & II, defective.

In fact, Mead Johnson's cow's milk-based products are regulated by FDA and legally marketed for use in pre-term infants. See, e.g., 21 C.F.R. § 107. Moreover, in Plaintiff's own Complaint she acknowledges that "[p]reterm and low-birth-weight infants are *especially susceptible* to NEC." *See* Exhibit A at ¶ 16 (emphasis added).

Case ID: 220302606
Control No.: 23096781

In support of her theories and claims, Plaintiff offers only vague references to unidentified "[e]xtensive scientific research, including numerous randomized controlled trials" that purportedly prove Mead Johnson's cow's milk-based products cause NEC in preterm and low-birth-weight infants. Plaintiff neither cites specifically to any randomized trial or consensus statement nor offer an explanation of the purported method of action by which cow's milk-based formula products allegedly cause NEC.

Moreover, as *Weiner* notes, a plaintiff must aver sufficient facts demonstrating the Mead Johnson's products are unreasonably dangerous **for their intended use**, triggering Mead Johnson's duty to warn. *Weiner*, at 308. The only factual reference Plaintiff makes with regard to intended use is to marketing campaigns, where Defendant Manufacturers allegedly advertised that "cow's milk-based products are necessary for proper growth and development of preterm infants." *See* Exhibit A at ¶ 35. She has not averred sufficient facts to demonstrate that cow's milk-based products are unreasonably dangerous for this purpose.

Consequently, Counts I through V should be stricken with prejudice or failure to state a claim.

### B. DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS IV & V

Plaintiff's claims for intentional and negligent misrepresentation (Counts IV and V) fail because Plaintiff does not allege that she received and relied upon any specific representation from Mead Johnson. *See Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) (setting forth the elements of intentional and negligent misrepresentation and noting that both require a false representation upon which the plaintiff ultimately relied). The Complaint not only fails to identify the allegedly defective Mead Johnson product that

Case ID: 220302606
Control No.: 23096781

N.B. received, it fails even to allege that N.B. received *any* Mead Johnson product. *See* Exhibit A at ¶ 30 (alleging that Mead Johnson "markets and sells **multiple products** specifically targeting premature infants); ¶ 97 (alleging that "Abbott **and/or** Mead Johnson's products were fed") (emphasis added). Plaintiff cannot claim reliance on an alleged misrepresentation when there is no identified product to misrepresent. *Kepner v. Kepner,* No. 835 EDA 2015, 2015 WL 7283034, at *3 (Pa. Super. Ct. Nov. 18, 2015) (affirming dismissal of a fraudulent misrepresentation claim for failure to plead a particular misrepresentation).

Pennsylvania law demands more. Pa. R. Civ. P. 1019(b). *See Presbyterian Med. Ctr. v. Budd*, 832 A.2d 1066, 1073 (Pa. Super. 2003)( Affirming order sustaining preliminary objections to complaint when the plaintiff failed to "establish every element of its fraud claim with sufficient particularity"). Other courts around the country have dismissed similar misrepresentation[2] claims for lack of specificity. *E.g.*, Exhibit B, *In re Mead Johnson Prod. Cases*, CJC-23-005257, at 5-13 (Cal. Sup. Ct. February 16, 2024)[3]; *Casino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1469 (Cal. Ct. App. 2014) ("[W]hen a plaintiff asserts fraud against a corporation, the plaintiff must allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.") (internal quotation marks omitted); *Peterson v. Clark Lake Homes Inc.*, 2022 WL 16910578, at *4 (Minn. Ct. App. (Nov. 14, 2022) (requiring identification of the "who, what, when, where, and how" for a claim of fraud).

---

[2]  A Plaintiff alleging similar claims against Mead Johnson in Illinois voluntarily dismissed its purported intentional misrepresentation and negligent representation claims on the eve of trial. A copy of Plaintiff's Notice of Voluntary Dismissal in *Watson v. Mead Johnson Co.* (St. Clair County, IL Case No. 21-L-1032) is attached hereto as Exhibit C.
[3]  The Court adopted the tentative ruling as its final order at a hearing on February 22, 2024.

Case ID: 220302606
Control No.: 23096781

Intentional misrepresentation requires: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Bortz*, 729 A.2d at 560 (citing *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994)).

Negligent misrepresentation similarly requires a false representation and reliance, "though the speaker need not know his or her words are untrue." *Id.* at 561. Here, Plaintiff's misrepresentation claims fail because they fail to sufficiently allege any relationship between a specific misrepresentation (which they do not identify), a specific product (which they do not identify), and an injury. *See Kepner*, No. 835 EDA 2015, 2015 Pa. Super. Unpub. LEXIS 4257, at *6 (requiring a particular misrepresentation); *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 969 (Pa. Super. Ct. 1985) (affirming dismissal of negligence claim where plaintiff failed to properly identify the product or its manufacturer). Causation is a hallmark of any tort action in Pennsylvania. *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 524 (W.D. Pa. 2003) ("Proof of causation is a necessary element in a products liability action. Absent a causal relationship between the defendant's product and the plaintiff's injury the defendant cannot be held liable on a theory of negligence, strict product liability, or misrepresentation") (applying Pennsylvania law) (citing *O'Brien v. Sofamar*, S.N.C., No. CIV. A. 96–8015, 1999 WL 239414 (E.D. Pa.1999)). Absent identification of the manufacturer of the allegedly defective product, "there can be no allegations of . . . legal causation, and hence there can be no liability." *Cummins*, 495 A.2d at 968–69 (citing

11

Case ID: 220302606
Control No.: 23096781

*Hamil v. Bashline*, 392 A.2d 1280 (Pa. 1978)).  Plaintiff's intentional and negligent misrepresentation claims against Mead Johnson must therefore be dismissed.

### C.    MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES

Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading.  Plaintiff's failure to specify the nature of the products ingested and injuries sustained serves as an alternative ground on which all of her claims should be stricken.

A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the Complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The Univ. of Pa.*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (citations omitted). Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

Case ID: 220302606
Control No.: 23096781

*Baker v. Rangos*, 324 A,2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted) (emphasis added).

Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

As noted above, Plaintiff's Complaint is facially deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case, each of which are uniquely within her competence. Specifically, Plaintiff's description of the material facts relating to the minor's care and treatment, diagnosis and injuries is limited to four paragraphs, which are utterly insufficient to enable defendants to prepare their defenses. *See* Exhibit "A," ¶¶ 11-14. Plaintiff's allegation that "upon information and belief," the minor was fed Similac and/or Enfamil shortly after her birth (*Id*. at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide Mead Johnson with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products. Further, Plaintiff has failed to allege which of the numerous products sold by Abbott and Mead Johnson under the Similac

Case ID: 220302606
Control No.: 23096781

and Enfamil brand names N.B. *Id.* at ¶¶ 29-30. Plaintiff's Complaint further fails to provide a description of the material facts as to the period of time in which such products were ingested, when the minor was allegedly diagnosed with NEC and what treatment was provided for that condition.

In short, Plaintiff's Complaint is inconsistent with the requirements of the Pennsylvania Rules of Civil Procedure as to the necessary specificity for the description of the facts and alleged injuries sustained. The facts in the Complaint are pleaded almost entirely "on information and belief." These omissions are fatal defects in Plaintiff's Complaint. Therefore, Plaintiff's Complaint should be stricken in its entirety.

**D.** **MOTION TO STRIKE PLAINTIFF'S CLAIMS FOR PUNITIVE DAMAGES**

As in the other infant formula cases, in the *Ad Damnum* clauses of Counts I, II, III, IV, and V of the Complaint, Plaintiff makes baseless accusations that Mead Johnson engaged in oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages. *See* Exhibit "A," pp. 21, 24, 27, 31, and 34. However, the Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Mead Johnson. Accordingly, Plaintiff's claims for punitive damages should be stricken.

Punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). Punitive damages may

14

not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987). An award of punitive damages must be supported by evidence of conduct more serious than the mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp. 85, 99 (M.D. Pa. 1984).

Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death. *See, e.g., Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages.").

Here, the Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Mead Johnson. Read most generously, Plaintiff's Complaint alleges that Mead Johnson failed to warn co-defendant AEMC of a risk of NEC associated with its legally-marketed cow's milk-based product – a risk about which

15

Case ID: 220302606
Control No.: 23096781

Plaintiff also alleges that AEMC was already aware. *See* Exhibit A at ¶¶ 44-51 & 56. And with respect to N.B.'s care, Plaintiff merely alleges that "upon information and belief" N.B. may have been given a product sold by Mead Johnson absent any context to indicate that such a product was inappropriate based on the specific issues involved in N.B.'s medical care and condition following birth. For example, the Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

Plaintiff's allegations of oppressive, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA reviews Mead Johnson's pre-term infant feeding products and has not restricted the use of cow's milk-based products for such infants. Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least four other hospitals in Philadelphia based on identical claims belies the contention that Mead Johnson engaged in outrageous or malicious conduct in allegedly in allegedly selling a cow's milk-based product that was used to feed the Plaintiff-minor. Absent specific factual allegations to justify the claim that Mead Johnson's actions as they pertain to Plaintiff's particular facts and circumstances were extreme and outrageous, there is no basis for an award of punitive damages in this case, and Plaintiff's claims for such must be stricken from the Complaint pursuant to Rule 1028(a)(3).

### E.    MOTION TO STRIKE PLAINTIFF-PARENT'S CLAIMS

The Court should strike Plaintiff-parent's claims to recover damages in her own right and as the parent and natural guardian of N.B., both because they are inadequately pled and because she has not suffered physical injury.

Case ID: 220302606
Control No.: 23096781

In each count of the complaint, Plaintiff-parent alleges that she "suffered significant emotional distress, loss of income, and/or other harms" and that "[h]er life has been significantly affected by the Injured Infant's injuries." See Ex. A, ¶¶ 98, 106, 115, 124, and 134. This is insufficient. Plaintiff-Parent fails to meet the pleading requirements of Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

Plaintiff-parent plainly does not allege any claim in separate counts or state any cause of action. Rather, the claims are incorporated in a single, tagalong paragraphs at the end of the existing counts.

Additionally, Plaintiff-parent does not complain of any physical injury. It is well established that "no cause of action exists for negligence that results solely in economic damages unaccompanied by physical injury or property damage." *Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 985 A.2d 840, 841 n.3 (Pa. 2009) (citing *Adams v. Copper Beach Townhome Comtys., L.P.*, 816 A.2d 301, 305 (Pa. Super. 2003)); *Miller v. Evenflo Co., Inc.*, 2009 WL 10689606, at *4 (W.D. Pa. Dec. 21, 2009) (dismissing plaintiff-parents' tort claims where only physical injury was to minor plaintiff). So too for claims sounding in strict products liability. *Schmidt v. Boardman Co.*, 11 A.3d 924, 953 (Pa. 2011) ("We would hold that, for purposes of a strict products liability claim, a plaintiff's recovery for emotional distress is limited to that which is proximately caused by contemporaneous physical impact").

17

## V.     <u>REQUESTED RELIEF</u>

For the foregoing reasons, Defendants Mead Johnson & Company, LLC and

Mead Johnson Nutrition Company respectfully request that this Honorable Court sustain

their Preliminary Objections and enter the attached Order.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Dated:  April 1, 2024

<u>/s/ Kenneth A. Murphy</u>
Kenneth A. Murphy, Esquire

**WELSH & RECKER, P.C.**

<u>/s/ Catherine M. Recker</u>
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire

**Attorneys for Defendants,**
**Mead Johnson & Company, LLC and**
**Mead Johnson Nutrition Company**

18

Case ID: 220302606
Control No.: 23096781

## CERTIFICATE OF SERVICE

I, Kenneth A. Murphy, Esquire, do hereby certify that on this day I caused a true and correct copy of the foregoing Preliminary Objections of Defendants Mead Johnson & Company and Mead Johnson Nutrition Company to Plaintiff's Complaint, and accompanying Memorandum of Law, to be served via electronic filing, on the following counsel of record, addressed as follows:

**Kline & Specter, P.C.**
Thomas R. Kline, Esquire
Tobias Millrood, Esquire
Elizabeth Crawford, Esquire
Melissa Merk, Esquire
Timothy A. Burke, Esquire
Helen Lawless, Esquire
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
tom.kline@klinespecter.com
tobi.millrood@klinespecter.com
melissa.merk@klinespecter.com
elissa.crawford@klinespecter.com
timothy.burke@klinespecter.com
helen.lawless@klinespecter.com
*Attorneys for Plaintiffs*

**Eckert Seamans Cherin Mellott, LLC**
Donald J. Brooks, Esquire
Brooke Scicchitano, Esquire
Two Liberty Place, 22nd Floor, 50 South 16th Street
Philadelphia, PA 19102
dbrooks@eckertseamans.com
bscicchitano@eckertseamans.com
*Attorneys for Defendants, Albert Einstein Medical Center a/k/a Einstein Medical Center,
Albert Einstein Healthcare Network a/k/a Einstein Healthcare Network*

**Campbell Conroy & O'Neil, PC**
Joseph E. O'Neil, Esquire
Meghann C. Porth, Esquire
Ryan J. O'Neil, Esquire
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
joneil@campbelltriallawyers.com

mporth@campbelltriallawyers.com
roneil@campbelltriallawyers.com
*Attorneys for Defendant, Abbott Laboratories*

**Jones Day**
Jennifer B. Flannery, Esquire
Marques Hillman Richeson
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
jbflannery@jonesday.com
mhricheson@jonesday.com
*Attorneys for Defendant, Abbott Laboratories*

**Troutman Pepper Hamilton Sanders, LLP**
Sean P. Fahey, Esquire
Ronni E. Fuchs, Esquire
3000 Two Logan Square
Philadelphia, PA 19103
sean.fahey@troutman.com
ronni.fuchs@troutman.com
*Attorneys for Defendant, Abbott Laboratories*

By:     /s/ Kenneth A. Murphy
          Kenneth A. Murphy, Esquire

Dated: April 1, 2024

2

# EXHIBIT A

Case ID: 220302606
Control No.: 23096781

*Filed and Attested by the Office of Judicial Records 07 FEB 2024 04:35 pm C. PERRY*

**KLINE & SPECTER, P.C.**
BY:

TOBIAS L. MILLROOD, ESQ.
ELIZABETH A. CRAWFORD, ESQ.
JOHN P. O'NEILL, ESQ.
TIMOTHY A. BURKE, ESQ.
ATTORNEY I.D. NOS.: 77764 / 313702 / 205677 / 320927
125 LOCUST STREET, 19TH FLOOR
PHILADELPHIA, PA 19102
TELEPHONE: (215) 772-1000
TOBI.MILLROOD@KLINESPECTER.COM
ELIZABETH.CRAWFORD@KLINESPECTER.COM
JACK.ONEILL@KLINESPECTER.COM
TIMOTHY.BURKE@KLINESPECTER.COM

Benjamin Whiting, Esq. (pro hac vice)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Telephone: (312) 741-5220
Fax: (312) 971-3502
ben.whiting@kellerpostman.com

| | |
|---|---|
| Nikia Tucker, on her own behalf and as Parent and Natural Guardian of N.B., a Minor<br>1445 Benner Street<br>Philadelphia, PA 19149<br><div align="right">*Plaintiff,*</div><br>v.<br><br>Mead Johnson & Company, LLC<br>CT Corporation System<br>1635 Market Street<br>Philadelphia, PA 19107<br><br>Mead Johnson Nutrition Company<br>Corporation Service Company<br>2595 Interstate Drive, Ste 103<br>Harrisburg, PA 17110<br><br>Abbott Laboratories<br>CT Corporation System<br>1635 Market Street<br>Philadelphia, PA 19107<br><br>Albert Einstein Medical Center a/k/a Einstein Medical Center | : **IN THE COURT OF COMMON PLEAS**<br>: **PHILADELPHIA COUNTY**<br>:<br>: **CIVIL TRIAL DIVISION**<br>:<br>: **SEPTEMBER TERM 2023**<br>: **NO. 0867**<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

Case ID: 230900867
Control No.: 23096781

5501 Old York Road                                 :
Philadelphia, PA 19141                             :
                                                   :
Albert Einstein Healthcare Network d/b/a           :
Einstein Healthcare Network                        :
5501 Old York Road                                 :
Philadelphia, PA 19141                             :
                                                   :
     *Defendants.*                              :

## COMPLAINT IN CIVIL ACTION
### NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.<br><br>YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.<br><br>PHILADELPHIA BAR ASSOCIATION<br>LAWYER REFERRAL AND INFORMATION SERVICE<br>ONE READING CENTER<br>PHILADELPHIA, PA 19107<br>TELEPHONE: (215) 238-1701 | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas las páginas siguientes, usted tiene viente (20) dias de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puese perder dinero o sus propiedades u ostros derechos importantes para usted.<br><br>LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICO, VAYA EN PERSONA O LLAME POR TELEPHONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.<br><br>ASOCIACION DE LICENCIADOS DE FILADELFIA<br>Servicio De Referencia E Información Legal<br>One Reading Center<br>Filadelfia, Pennsylvania 19107<br>Telephono: (215) 238-1701 |

Case ID: 230900805
Control No.: 23096781

**KLINE & SPECTER, P.C.**
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    John P. O'Neill, Esq.
    Timothy A. Burke, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 205677 /
320927
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com

Benjamin Whiting, Esq. (pro hac vice)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Telephone: (312) 741-5220
Fax: (312) 971-3502
ben.whiting@kellerpostman.com

| | |
|---|---|
| NIKIA TUCKER, on her own behalf and as Parent and Natural Guardian of N.B., a Minor<br>1445 Benner Street<br>Philadelphia, PA 19149<br>                       *Plaintiff,*<br>    v.<br><br>MEAD JOHNSON & COMPANY, LLC<br>CT Corporation System<br>1635 Market Street<br>Philadelphia, PA 19107<br><br>MEAD JOHNSON NUTRITION COMPANY<br>Corporation Service Company<br>2595 Interstate Drive, Ste 103<br>Harrisburg, PA 17110<br><br>ABBOTT LABORATORIES<br>CT Corporation System<br>1635 Market Street<br>Philadelphia, PA 19107 | **IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY**<br><br>**CIVIL TRIAL DIVISION**<br><br>**SEPTEMBER TERM, 2023**<br><br>**NO. 0867** |

| | |
|---|---|
| ALBERT EINSTEIN MEDICAL CENTER a/k/a | : |
| EINSTEIN MEDICAL CENTER | : |
| 5501 Old York Road | : |
| Philadelphia, PA 19141 | : |
| | : |
| ALBERT EINSTEIN HEALTHCARE NETWORK d/b/a | : |
| EINSTEIN HEALTHCARE NETWORK | : |
| 5501 Old York Road | : |
| Philadelphia, PA 19141 | : |
| | : |
| *Defendants.* | : |

## **COMPLAINT**

Plaintiff brings this Complaint and Demand for Jury Trial against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and Albert Einstein Medical Center and Albert Einstein Healthcare Network (together, "Einstein"), together "Defendants." Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

### I.      INTRODUCTION

1.      This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Albert Einstein Medical Center. Albert Einstein Medical Center, managed by the Albert Einstein Healthcare Network, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner. This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products. As a result, the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2

2.      Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infant at Albert Einstein Medical Center, owned and operated by the Albert Einstein Healthcare Network.

## II.      PARTIES

3.      Plaintiff Nikia Tucker is a natural adult person and a resident of Pennsylvania.  Ms. Tucker is the parent and natural guardian of N.B., a minor.  Ms. Tucker's address is 1445 Benner Street, Philadelphia, Pennsylvania 19149.

4.      Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware. Its principal place of business is Illinois.  Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company.  Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.      Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois.  Its principal place of business is in Illinois.  Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

6.      Defendant Albert Einstein Medical Center is a corporation, incorporated under the laws of the Commonwealth of Pennsylvania.   Its principal place of business is in Philadelphia, Pennsylvania.

Case ID: 230900805
Control No.: 23096781

7.  Defendant Albert Einstein Healthcare Network is a corporation, incorporated under the laws of the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania.  At all times relevant, Albert Einstein Healthcare Network owned and managed Defendant Albert Einstein Medical Center, located in Philadelphia, Pennsylvania.

### III.    JURISDICTION AND VENUE

8.  This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931. Defendants conduct authorized business in the Commonwealth of Pennsylvania.  They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.  Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

10.  This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

### IV.    FACTUAL ALLEGATIONS

#### *N.B.'s NEC Diagnosis*

11.  N.B. was born prematurely at Albert Einstein Medical Center in Philadelphia, Pennsylvania on May 15, 2022.

4

12.     At birth, N.B.'s gestational age was approximately 34 weeks and she weighed 2013 grams. Upon information and belief, N.B. was fed Similac and/or Enfamil cow's milk-based products by staff at Albert Einstein Medical Center after her birth.

13.     Upon information and belief, N.B. developed NEC after ingesting Defendant Manufacturers' products.

14.     N.B.'s diagnosis of NEC occurred during her course of treatment at Defendant Hospital's NICU.  N.B. suffered injuries, including but not limited to, a diagnosis of NEC, treatment with antibiotics and surgery, bowel perforation, gastrointestinal issues, developmental delays, feeding difficulties, and growth issues, and she continues to suffer other long-term health effects.

### Cow's Milk-Based Feeding Products Are Known to Cause NEC

15.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.   NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.   Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.   Up to 30 percent of NEC-diagnosed infants die from the disease.

16.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.   Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

### Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist

17.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition.   For example, in addition to the mother's own milk, an

5

Case ID: 230900805
Control No.: 23096781

established network delivers pasteurized donor breast milk to hospitals nationwide. Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

18.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.

19.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the breast milk they could otherwise receive.   This displacement only increases infants' vulnerability to NEC.

20.     Breast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

21.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

22.     Despite the scientific consensus that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings.   Instead, they have continued to sell their unreasonably dangerous products.   In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge. And, in fact, the Defendant Manufacturers offer contracts to hospitals—which the hospitals accept—that actually *prevent* the health care providers from offering alternative products—even safer ones— on pain of risking the hospital's advantageous formula pricing strategy.

Case ID: 230900806
Control No.: 23096781

***The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-
Based Infant Products***

23.     Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

24.     Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

25.     Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message.

26.     Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

27.     While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears—

Case ID: 230900805
Control No.: 23096781

that the nutrition they are supplying to their child will not provide the best chance of survival—while wholly failing to warn that their products come with a significantly increased risk of NEC.

28.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

29.     Abbott markets and sells multiple products specifically targeting preterm and low-birthweight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC. At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

30.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant

Case ID: 230900806
Control No.: 23096781

Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

31.    One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

32.    Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

Case ID: 230900806
Control No.: 23096781

33.     Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers.  The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

34.     Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products.   The packaging appears as:

10

Case ID: 230900805
Control No.: 23096781





35.　　The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice.　This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

36.　　The Defendant Manufacturers have also designed powerful marketing campaigns to both the general public and health care providers at hospitals like Einstein.　The Defendant Manufacturers know that sales made to hospitals are key drivers of brand loyalty, and thus are a

Case ID: 230900805
Control No.: 23096781

key opportunity to drive better downstream business—*i.e.*, retail purchases by parents after they have left the hospital. On information and belief, the Defendant Manufacturers know that the formula products used in a hospital's NICU are related to getting and keeping the overall hospital contracts. And the Defendant Manufacturers know that, just like any celebrity endorsement, when mothers of newborn infants see medical professionals using a certain brand, the mothers are more likely to continue to purchase that same brand after discharge. The Defendant Manufacturers are thus heavily motivated to ensure that NICU departments are using their products.

37. Abbott and Mead Johnson focus their sales teams and training heavily on hospital NICU departments. They train their sales representatives how to increase the number of babies on their formula, and they emphasize the need to be the dominant formula manufacturer in the NICU so they can own that profitable ground and secure a great return on its substantial investment in NICU formula and other products.

38. To leverage hospitals' NICUs and secure babies in the hospital and at retail, the Manufacturer Defendants pull out all the stops to convince hospitals, including Defendant Hospital, to purchase their products. For example: Abbott and Mead Johnson provide samples of their products to hospitals for free.

39. On information and belief, to get the hospitals on board with supplying their formula for premature infants, Abbott and Mead Johnson work with hospitals to secure contracts that have special pricing discounts if a certain level of the formula-fed babies in the hospital receive just that one manufacturer's products; similar to a restaurant being a Coke or Pepsi restaurant. And notwithstanding the increased risk of the Defendant Manufacturers' products for the hospitals' most fragile patients—the preterm infants—the decision makers at these hospitals seek out these types of contracts to better the hospitals' own bottom lines.

12

40.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective companies' own formula products to give to the preterm infants.  The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

41.     Prior to N.B.'s birth, Abbott sent sales representatives to Defendant Hospital.  Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Abbott's products were safe to give to preterm infants like N.B.  Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants.

42.     Prior to N.B.'s birth, Mead Johnson sent sales representatives to Defendant Hospital.  Those sales representatives provided information about Mead Johnson's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets.  This information indicated that Mead Johnson's products were safe to give to preterm infants like N.B.  Mead Johnson maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Mead Johnson's products could cause NEC in preterm infants.

13

43.     Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like N.B.

### *The Defendant Manufacturers' Inadequate Warnings*

44.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants.  Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

45.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

46.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

47.     Mead cites no medical literature or research to guide the use of its products.

48.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk.  Mead likewise did not provide instructions or guidance for how to avoid NEC.

49.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

Case ID: 230900865
Control No.: 23096781

50.     Mead Johnson failed to provide, and continues to fail to provide, a full accounting of the risk of NEC as documented, by underrepresenting and misrepresenting the risk to the public and the medical community.

51.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.  Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

52.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

53.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

54.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

55.     Despite knowing of studies documenting an increased risk of NEC from its products, Abbott did not act to make parents or the medical community aware of those risks, and instead took steps to conceal or prevent those risks from becoming public.  Despite knowing that its

Case ID: 230900805
Control No.: 23096781

products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### *Einstein's Failure to Warn*

56.     On information and belief, Einstein was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  They knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition.  However, instead of warning of those dangers, or supplying breast milk-based feeding products to preterm infants like the Injured Infant, the Hospital Defendants have continued to source, distribute, and supply the Defendant Manufacturers' products in their hospitals without any adequate warning.

57.     Medical providers and staff at Einstein have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition.  One staff member acknowledged that "premature babies that are feed breast milk are less likely to develop something called necrotizing enterocolitis" and stated that "we know that babies that are fed breast milk are less likely to have that problem." These statements demonstrate that Einstein knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

58.     Nonetheless, Einstein has yet to transition to an exclusive breast milk-based diet for preterm patients that would obviate the need to warn parents of the risks posed by the Defendant Manufacturers' products.

Case ID: 230900805
Control No.: 23096781

59.     Although Einstein knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities.  As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Einstein, causing their injuries.  This occurred even though hospitals across the country warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

60.     Einstein's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers.   On information and belief, Einstein received the Defendant Manufacturers' cow's milk-based products for free or at a significant discount, and granted their sales representatives access to Einstein's healthcare professionals and medical staff.  These sales representatives have provided deceptive information that Einstein reasonably knew or should have known would ultimately reach parents through those staff.  This arrangement dovetails with the Defendant Manufacturers' own marketing strategy, which aims to "sell and service" healthcare professionals and medical staff as a means of converting them into "extra salespersons."

61.     On information and belief, at the time the Injured Infant was born, Maternity staff "were like walking advertisements for baby formula," with staff noting that "Nurses wore buttons or lanyards with the name of a formula manufacturer on them," among other practices boosting formula use, notwithstanding knowledge in the medical community that human milk could reduce infections including necrotizing enterocolitis.  Einstein's staff "got in the way" of mothers wishing to provide their own milk to their babies.

Case ID: 230900805
Control No.: 23096781

62.     These statements demonstrate that Einstein knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

63.     Although Einstein knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities.   As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Albert Einstein Medical Center, causing their injuries.   This occurred even though hospitals across the country, including Einstein, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

64.     Einstein's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers.   On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free and/or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff.   These sales representatives have provided deceptive information that Einstein reasonably knew or should have known would ultimately reach parents through those staff.   This arrangement dovetails with the Defendant Manufacturers' own marketing strategies" and use of salespersons.

### *Safer Alternative Designs*

86.     The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants.   The Defendant Manufacturers could have used

Case ID: 230900806
Control No.: 23096781

pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

87.     Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk. This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

88.     On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

<u>**CAUSES OF ACTION**</u>
**COUNT I: STRICT LIABILITY FOR DESIGN DEFECT**
**(Against Abbott and Mead)**

89.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

90.     Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

91.     Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

92.     Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was

19

Case ID: 230900805
Control No.: 23096781

therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations. Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

93. The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products. The risks of feeding those products to the Injured Infant outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

94. Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

95. Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

96. Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

97. Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

98. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

Case ID: 230900805
Control No.: 23096781

a.     For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.     For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.     For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.     For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.     For interest as permitted by law;

f.     For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.     For such other and further relief as the Court deems proper.

### COUNT II:  STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott and Mead)

99.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

100.     Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of

Case ID: 230900805
Control No.: 23096781

their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

101.    Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses.    By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death.    The failure to warn makes the products at issue in this litigation unreasonably dangerous.

102.    Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks.    Among other risks, the Defendant Manufacturers:

      a.    Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

      b.    Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

      c.    Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

      d.    "Black box"-type warning that their cow's milk-based products are known

<div align="center">22</div>

Case ID: 230900805
Control No.: 23096781

to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

e.  Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.  Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.  Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.  Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

103.  Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

104.  As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

105.  The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products.   Had the

23

Case ID: 230900806
Control No.: 23096781

Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

106.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.     For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.     For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.     For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.     For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.     For interest as permitted by law;

f.     For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

Case ID: 230900805
Control No.: 23096781

g.      For such other and further relief as the Court deems proper.

**COUNT III:  NEGLIGENCE**
**(Against Abbott and Mead)**

107.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

108.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

109.    At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

110.    Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

111.    Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

a.      Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

b.      Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

25

Case ID: 230900805
Control No.: 23096781

c. Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d. Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

e. Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f. Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g. Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h. Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

112. In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring,

26

Case ID: 230900805
Control No.: 23096781

prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

113.    As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

114.    Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

115.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

      a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

      b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

      c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

      d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent,

Case ID: 230900805
Control No.: 23096781

and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

## COUNT IV:  INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

116.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

117.    At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

118.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

119.    Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

120.    Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

a.    That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were

28

unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b.  That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c.  That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d.  That cow's milk-based products were safe for premature infants; and/or

e.  That cow's milk-based products were necessary for optimum growth; and/or

f.  That cow's milk-based products were similar or equivalent to breast milk; and/or

g.  That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.  That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.  Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

121.  Abbott and Mead had actual knowledge, or, at a minimum, a reckless indifference, to whether the aforementioned misrepresentations were false. The Defendant Manufacturers' misrepresentations were intended to, and in fact did, mislead physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their infant products to babies, including

29

Case ID: 230900805
Control No.: 23096781

the Injured Infant.

122.    The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them.  The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging.    Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

123.    As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

124.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning

Case ID: 230900605
Control No.: 23096781

capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

**COUNT V:  NEGLIGENT MISREPRESENTATIONS**
**(Against Abbott and Mead)**

125.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

126.    At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

127.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

128.    In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

129.    Specifically, upon information and belief, Abbott and Mead made the following false

31

statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

a. That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b. That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c. That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d. That cow's milk-based products were safe for premature infants; and/or

e. That cow's milk-based products were necessary for optimum growth; and/or

f. That cow's milk-based products were similar or equivalent to breast milk; and/or

g. That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h. That their products were based on up-to-date science, which made them safe for premature infants; and/or

i. Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

Case ID: 230900865
Control No.: 23096781

130.    Abbott and Mead were negligent or careless in not determining those representations to be false.

131.    The Defendant Manufacturers' misrepresentations were intended to and did in fact induce physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their products to babies, including the Injured Infant.

132.    The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging.   Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

133.        As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

134.        As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

      a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

      b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers'

Case ID: 230900805
Control No.: 23096781

conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

## COUNT VI: FAILURE TO WARN
### (Against Albert Einstein Medical Center and Albert Einstein Healthcare Network)

135. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

136. Einstein as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

137. At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Einstein in their intended manner and for their intended purpose.

34

Case ID: 230900805
Control No.: 23096781

138.    Einstein employed or contracted with the healthcare professionals and medical staff at Albert Einstein Medical Center, managing these individuals during their treatment of the Injured Infant.

139.    Einstein negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

140.    Moreover, at all relevant times, Einstein knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Albert Einstein Medical Center.    The Defendant Manufacturers' sales representatives were encouraged to interact with Albert Einstein Medical Center's healthcare professionals and medical staff.    These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Albert Einstein Medical Center's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

141.    Einstein also knowingly, and intentionally, allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Albert Einstein Medical Center's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

142.    Einstein knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

143.    Nonetheless, Einstein acted negligently, outrageously, and recklessly, and breached its

Case ID: 230900805
Control No.: 23096781

duty by:

a.      Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

b.      Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

c.      Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

d.      Failing to provide its healthcare professionals and medical staff with the well- researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

e.      Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

f.      Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

g.      Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Albert Einstein Medical Center's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

144.    Reasonable hospitals under the same or similar circumstances would have warned of the

36

above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

145.    Einstein knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

146.    Had Einstein exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

147.    As a direct and proximate result of Einstein's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk- based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

148.    As a further direct and proximate result of Einstein's failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Albert Einstein Medical Center and Albert Einstein Healthcare Network, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of

Case ID: 230900805
Control No.: 23096781

enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Einstein's conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Einstein's oppressive, outrageous, reckless, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

**COUNT VII:  CORPORATE LIABILITY OF HEALTH-CARE PROVIDER**
**(Against Albert Einstein Medical Center and Albert Einstein Healthcare Network)**

149.    Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

150.    At all relevant times, Einstein owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Albert Einstein Medical Center staff. Specifically, Einstein had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant.   Further, Einstein owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

151.    Einstein owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt,

Case ID: 230900805
Control No.: 23096781

and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

152.    At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Einstein in their intended manner and for their intended purpose.

153.    Moreover, at all relevant times, Einstein knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Albert Einstein Medical Center.    The Defendant Manufacturers' sales representatives were encouraged to interact with Albert Einstein Medical Center's healthcare professionals and medical staff.    These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Albert Einstein Medical Center's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

154.    Einstein also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Albert Einstein Medical Center's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

155.    Einstein knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury,

Case ID: 230900605
Control No.: 23096781

and death for premature infants.

156.    Einstein knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

157.    Nonetheless, Einstein acted negligently, outrageously, and recklessly, and breached its duty by:

a.      Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted the use of cow's milk-based products for feeding premature babies; and/or

b.      Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

c.      Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d.      Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

e.      Failing to formulate, adopt, and enforce adequate rules and policies to

Case ID: 230900805
Control No.: 23096781

provide its healthcare professionals and medical staff with the well-researched and well- established studies that link cow's milk-based products to NEC and death in premature infants; and/or

f.      Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

g.      Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to Albert Einstein Medical Center's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants; and/or

h.      Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

158.    A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

159.    Had Einstein exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant

Case ID: 230900805
Control No.: 23096781

would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

160. As a direct and proximate result of Einstein's failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

161. As a further direct and proximate result of Einstein's negligent, reckless, and outrageous conduct the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

162. In the alternative, Einstein owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Albert Einstein Medical Center's care, including the Injured Infant.

163. Einstein employed or contracted with the healthcare professionals and medical staff at Albert Einstein Medical Center and was responsible for overseeing those individuals during their treatment of the Injured Infant.

164. Nonetheless, Einstein acted negligently, recklessly, and outrageously breached its duty by:

   a. Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

   b. Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

   c. Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature

42

Case ID: 230900806
Control No.: 23096781

babies like the Injured Infant; and/or

d.     Failing to oversee its healthcare professionals and medical staff to restrict their feeding of cow's milk-based products to premature babies; and/or

e.     Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

f.     Failing to provide its healthcare professionals and medical staff with the well- researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g.     Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h.     Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i.     Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

Case ID: 230900805
Control No.: 23096781

165.     A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

166.     A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

167.     Had Einstein exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

168.     As a direct and proximate result of Einstein's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

169.     As a further direct and proximate result of Einstein's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Albert Einstein Medical Center and Albert Einstein Healthcare Network, individually, jointly and severally, as follows:

   a.     For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

   b.     For damages for past, present, and future emotional distress, loss of

Case ID: 230900805
Control No.: 23096781

enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Einstein's conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Einstein's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

170.  Plaintiff hereby demands a jury trial for all claims triable.

Dated: February 7, 2024

Respectfully submitted,

**KLINE & SPECTER, P.C.**

By:     /s/ Tobias L. Millrood
         Tobias L. Millrood, Esq.
         Elizabeth A. Crawford, Esq.
         John P. O'Neill, Esq.
         Timothy A. Burke, Esq.

         Benjamin Whiting, Esq. (*pro hac vice*)
         **KELLER POSTMAN LLC**
         150 N. Riverside Plaza, Suite 4100
         Chicago, IL 60606
         Telephone: (312) 741-5220
         Fax: (312) 971-3502

45

ben.whiting@kellerpostman.com

Case ID: 230900865
Control No.: 23096781

## VERIFICATION

I, Nikia Tucker, verify that the statements made in Plaintiff's Complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements made herein are subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities.

Dated: _____, 2024    By: _____

2/6/2024

DocuSigned by:

236B6849CAF24B0...

# EXHIBIT B

Case ID: 220302606
Control No.: 23096781

E-SERVICE
72070228
Feb 16 2024
02:45PM
File & ServeXpress

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN FRANCISCO

DEPARTMENT 304

| | |
|---|---|
| COORDINATED PROCEEDINGS SPECIAL TITLE (RULE 3.550) | JUDICIAL COUNCIL COORDINATION PROCEEDING No. 5257 |
| | Case No. CJC-23-005257 |
| MEAD JOHNSON PRODUCT CASES | TENTATIVE RULING ON (1) ABBOTT LABORATORIES'S DEMURRER TO PLAINTIFFS' FURTHER AMENDED COMPLAINTS; AND (2) MEAD JOHNSON & CO., LLC'S AND MEAD JOHNSON NUTRITION COMPANY'S DEMURRER BY JOINDER IN ABBOTT LABORATORIES'S DEMURRER TO JULY 31, 2023 AMENDED COMPLAINTS |

THIS DOCUMENT RELATES TO:

*Barnes v. Mead Johnson & Company, LLC, et al.*

*Cribb v. Mead Johnson & Company, LLC, et al.*

*Diaz v. Mead Johnson & Company, LLC, et al.*

*Eberhart v. Mead Johnson & Company, LLC, et al.*

*Gillespie v. Mead Johnson & Company, LLC, et al.*

*Hartwick v. Mead Johnson & Company, LLC, et al.*

*Johnson v. Mead Johnson & Company, LLC, et al.*

Case ID: 220302606
Control No.: 23096781

*Johnson-Merrida v. Mead Johnson & Company, LLC, et al.*

*Madison v. Mead Johnson & Company, LLC, et al.*

*Markel v. Mead Johnson & Company, LLC, et al.*

*Martinez v. Abbott Laboratories, et al.*

*McKinney v. Mead Johnson & Company, LLC, et al.*

*Miles v. Mead Johnson & Company, LLC, et al.*

*Najrabi v. Mead Johnson & Company, LLC, et al.*

*Nash v. Mead Johnson & Company, LLC, et al.*

*Nelmes v. Mead Johnson & Company, LLC, et al.*

*Pantoja v. Mead Johnson & Company, LLC, et al.*

*Roesler v. Mead Johnson & Company, LLC, et al.*

*Seeley v. Mead Johnson & Company, LLC, et al.*

*Springer-Ayeni v. Abbott Laboratories, et al.*

*Thomas v. Mead Johnson & Company, LLC, et al.*

*Tracy v. Mead Johnson & Company, LLC, et al.*

*Viera v. Mead Johnson & Company, LLC, et al.*

*Ward v. Mead Johnson & Company, LLC, et al.*

*Woods v. Mead Johnson & Company, LLC, et al.*

*Yang v. Mead Johnson & Company, LLC, et al.*

Case ID: 220302606
Control No.: 23096781

**TENTATIVE RULING**

The Court's tentative ruling is to sustain Defendant Abbott Laboratories's Demurrer to Plaintiffs' Further Amended Complaints and Mead Johnson & Co., LLC's and Mead Johnson Nutrition Company's Demurrer by Joinder in Abbott Laboratories's Demurrer to July 31, 2023 Amended Complaints. The parties may stipulate to the tentative ruling by sending a joint email to ComplexLit@sftc.org. Should the parties not stipulate to the tentative ruling, then the Court will hold a hearing on February 22, 2024 at 1:30 p.m.

**BACKGROUND**

In this coordinated proceeding, Plaintiffs are parents or representatives of their minor children or of the estates of their minor children ("Injured Infants"), who filed actions against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, Abbott Laboratories, and various hospitals and medical centers.[1]

Plaintiffs allege that the Injured Infants consumed Defendant Manufacturers' cow's milk-based products and developed necrotizing enterocolitis ("NEC"). Plaintiffs allege that the Injured Infants sustained injuries with lifelong effects or passed away. Plaintiffs seek to state causes of action for strict products liability based on design defect and failure to warn, negligence, intentional misrepresentation, negligent misrepresentation, survival, wrongful death, and medical expenses against Defendant Manufacturers.

On July 12, 2023, the Court sustained Abbott's Demurrer to Amended Complaints with leave to amend. (Jul. 12, 2023 Order, 2, 11.) The Court found that Plaintiffs did not plead their misrepresentation claims with particularity. (*Id.* at 7-10.) In particular, the Court found that Plaintiffs failed to allege with particularity what misrepresentations Abbott allegedly made and also failed to allege reliance, as none of the Plaintiffs alleged they actually saw and relied on any specific misrepresentations. . (*Id.*) Following entry of the Court's order, Plaintiffs filed further amended complaints.

Abbott now demurs to twenty-six complaints on the ground that Plaintiffs still fail to allege

---

[1] Defendants Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories are referred to collectively as "Defendant Manufacturers" or individually as "Mead Johnson" or "Abbott" in the amended complaints and briefing.

Case ID: 220302606
Control No.: 23096781

sufficient facts to state causes of action for intentional misrepresentation and negligent misrepresentation.[2]

(Demurrer, 1-8.)  Additionally, Abbott demurs to twenty-three of those complaints on the grounds that the

Plaintiff is not a proper plaintiff and does not plead sufficient facts to state a claim for purely economic

losses. (*Id*.)[3]   Similarly, Abbott demurs to two complaints, *Martinez v. Abbott Laboratories, et al.* and

*Springer-Ayeni v. Abbott Laboratories, et al.*, on the grounds that the Plaintiff is not a proper plaintiff and

does not plead sufficient facts to state a claim for purely economic losses or emotional distress.  (*Id.* at 4,

7.)  Mead Johnson joins Abbott's demurrer.  (Joinder, 2; Joinder Opening Brief, 2-3.)  Plaintiffs oppose

the demurrer.

## LEGAL STANDARD

A demurrer lies where "the pleading does not state facts sufficient to constitute a cause of action."

(Code Civ. Proc. § 430.10(e).)  A demurrer admits "all material facts properly pleaded, but not

contentions, deductions, or conclusions of fact or law."  (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318.)

The complaint is given a reasonable interpretation, reading it as a whole and its parts in their context.

---

[2] (1) *Barnes v. Mead Johnson & Company, LLC, et al.*; (2) *Cribb v. Mead Johnson & Company, LLC, et al.*; (3) *Diaz v. Mead Johnson & Company, LLC, et al.*; (4) *Eberhart v. Mead Johnson & Company, LLC, et al.*; (5) *Gillespie v. Mead Johnson & Company, LLC, et al.*; (6) *Hartwick v. Mead Johnson & Company, LLC, et al.*; (7) *Johnson v. Mead Johnson & Company, LLC, et al.*; (8) *Johnson-Merrida v. Mead Johnson & Company, LLC, et al.*; (9) *Madison v. Mead Johnson & Company, LLC, et al.*; (10) *Markel v. Mead Johnson & Company, LLC, et al.*; (11) *Martinez v. Abbott Laboratories, et al.*; (12) *McKinney v. Mead Johnson & Company, LLC, et al.*; (13) *Miles v. Mead Johnson & Company, LLC, et al.*; (14) *Najrabi v. Mead Johnson & Company, LLC, et al.*; (15) *Nash v. Mead Johnson & Company, LLC, et al.*; (16) *Nelmes v. Mead Johnson & Company, LLC, et al.*; (17) *Pantoja v. Mead Johnson & Company, LLC, et al.*; (18) *Roesler v. Mead Johnson & Company, LLC, et al.*; (19) *Seeley v. Mead Johnson & Company, LLC, et al.*; (20) *Springer-Ayeni v. Abbott Laboratories, et al.*; (21) *Thomas v. Mead Johnson & Company, LLC, et al.*; (22) *Tracy v. Mead Johnson & Company, LLC, et al.*; (23) *Viera v. Mead Johnson & Company, LLC, et al.*; (24) *Ward v. Mead Johnson & Company, LLC, et al.*; (25) *Woods v. Mead Johnson & Company, LLC, et al.*; and (26) *Yang v. Mead Johnson & Company, LLC, et al.*

[3] (1) *Barnes v. Mead Johnson & Company, LLC, et al.*; (2) *Diaz v. Mead Johnson & Company, LLC, et al.*; (3) *Eberhart v. Mead Johnson & Company, LLC, et al.*; (4) *Gillespie v. Mead Johnson & Company, LLC, et al.*; (5) *Hartwick v. Mead Johnson & Company, LLC, et al.*; (6) *Johnson-Merrida v. Mead Johnson & Company, LLC, et al.*; (7) *Madison v. Mead Johnson & Company, LLC, et al.*; (8) *Martinez v. Abbott Laboratories, et al.*; (9) *McKinney v. Mead Johnson & Company, LLC, et al.*; (10) *Miles v. Mead Johnson & Company, LLC, et al.*; (11) *Najrabi v. Mead Johnson & Company, LLC, et al.*; (12) *Nash v. Mead Johnson & Company, LLC, et al.*; (13) *Nelmes v. Mead Johnson & Company, LLC, et al.*; (14) *Pantoja v. Mead Johnson & Company, LLC, et al.*; (15) *Roesler v. Mead Johnson & Company, LLC, et al.*; (16) *Seeley v. Mead Johnson & Company, LLC, et al.*; (17) *Springer-Ayeni v. Abbott Laboratories, et al.*; (18) *Thomas v. Mead Johnson & Company, LLC, et al.*; (19) *Tracy v. Mead Johnson & Company, LLC, et al.*; (20) *Viera v. Mead Johnson & Company, LLC, et al.*; (21) *Ward v. Mead Johnson & Company, LLC, et al.*; (22) *Woods v. Mead Johnson & Company, LLC, et al.*; and (23) *Yang v. Mead Johnson & Company, LLC, et al.*

*Mead Johnson Product Cases*  JCCP 5257
Tentative Ruling on Defendant Manufacturers' Demurrers to Further Amended Complaints

Case ID: 220302606
Control No.: 23096781

1  (*Id.*)  The Court accepts as true, and liberally construes, all properly pleaded allegations of material fact,

2  as well as those facts which may be implied or reasonably inferred from those allegations; its sole

3  consideration is whether the plaintiff's complaint is sufficient to state a cause of action under any legal

4  theory.  (*O'Grady v. Merchant Exchange Prods., Inc.* (2019) 41 Cal.App.5th 771, 776-777.)

## DISCUSSION

### I.  Plaintiffs Do Not Allege Sufficient Facts To State Causes Of Action For Misrepresentation.

Abbott argues that Plaintiffs' amended complaints fail to remedy the deficiencies identified by the

Court in its July 10, 2023 and July 12, 2023 Orders.  (Opening Brief, 1, 4; Reply, 1; Joinder Opening

Brief, 5.)  In particular, Abbott contends that Plaintiffs' amended complaints continue to include generic

allegations that lack specificity regarding any purportedly false statements and reliance.  (Opening Brief,

1, 4; Reply, 1; see Opening Brief, 2-3, 5-7; Reply, 2-3; Joinder Opening Brief, 5-9; Joinder Reply, 3-5, 7-

8.)  Abbott further contends that Plaintiffs "have alleged no basis for an affirmative duty to disclose

specific information by Abbott."  (Reply, 1; see *id.* at 3-4; Joinder Opening Brief, 7 fn. 4; Joinder Reply,

6-7.)  The Court agrees.

"The essential elements of . . . intentional misrepresentation are: (a) misrepresentation (false

representation, concealment, or nondisclosure); (b) knowledge of falsity (or scienter); (c) intent to

defraud, i.e., to induce reliance; (d) actual and justifiable reliance; and (e) resulting damage."  (*Berry v.

Frazier* (2023) 90 Cal.App.5th 1258, 1268; see *Aton Center, Inc. v. United Healthcare Ins. Co.* (2023) 93

Cal.App.5th 1214, 1245.)  The elements of negligent misrepresentation are the same, except no scienter or

intent to defraud is required.  (*Nissan Motor Acceptance Cases* (2021) 63 Cal.App.5th 793, 823.)

Fraud must be pled with particularity, which "necessitates pleading *facts* which show how, when,

where, to whom, and by what means the false representations were made."  (*State ex rel. Edelweiss Fund,

LLC v. JPMorgan Chase & Company* (2023) 90 Cal.App.5th 1119, 1136-1137, quoting *Lazar v. Superior

Court* (1996) 12 Cal.4th 631, 645 (cleaned up); see also *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th

167, 184 [negligent misrepresentation must also be pled with specificity].)  General and conclusory

allegations are insufficient.  (*Lauckhart v. El Macero Homeowners Assn.* (2023) 92 Cal.App.5th 889,

903.)

- 5 -

*Mead Johnson Product Cases*  JCCP 5257
Tentative Ruling on Defendant Manufacturers' Demurrers to Further Amended Complaints

Case ID: 220302606
Control No.: 23096781

### A. Plaintiffs Do Not Allege Misrepresentations With The Requisite Specificity.

To allege misrepresentation against a corporation, "the plaintiff must 'allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.'" (*Cansino v. Bank of America* (2014) 224 Cal.App.4th 1462, 1469, quoting *Tarmann v. State Farm Mut. Auto. Ins. Co*. (1991) 2 Cal.App.4th 153, 157.) However, "[l]ess specificity is required when it appears from the nature of the allegations that the defendant must necessarily possess full information concerning the facts of the controversy." (*Committee On Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 217 (cleaned up).)

Here, Plaintiffs allege the Defendant Manufacturers sell "multiple products specifically targeting preterm and low-birth weight infants." (*Tracy* Second Amended Complaint ("SAC") ¶¶ 50-51.)[4] Plaintiffs allege the Defendant Manufacturers "aggressively marketed [] cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk." (*Id*. ¶ 43; see, e.g., *id*. ¶¶ 49 [statements on Abbott's website ignore the existence of donor milk and human milk-based formula], 50, [Abbott's advertisements emphasize "the products' purported ability to assist underdeveloped babies"], 51 [Mead Johnson's advertisements emphasize "the purported similarities between its formula and breast milk."].) Plaintiffs allege this aggressive "marketing approach includes targeting the parents of preterm infants before they deliver and while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are safe and necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding." (*Id*. ¶ 44.) Plaintiffs allege that "[n]one of the Defendant Manufacturer's marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC." (*Id*.; see also *id*. ¶ 48 ["the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears—that the nutrition they are supplying to their child will not provide the best chance of survival—while wholly failing to warn that their products come with a significantly increased risk of NEC."].)

In addition to advertisements, Plaintiffs allege the Defendant Manufacturers have relationships

---

[4] For ease of reference and due to the same or similar allegations across all complaints, the Court uses the SAC in *Tracy* as an exemplar.

Case ID: 220302606
Control No.: 23096781

1    with hospitals to "create brand loyalty under the guise of a 'medical blessing,' in hopes that new parents

2    continue to use formula after they leave the hospital." (*Id.* ¶ 54; see, e.g., ¶¶ 58-59 ["focus sales teams

3    and trainings heavily on hospital NICU departments" and provide free samples], 62-63 [sales

4    representatives provided information about Defendant Manufacturers' products to hospitals indicating the

5    products were safe for preterm infants].) In particular, Plaintiffs allege the Defendant Manufacturers offer

6    free formula, coupons, and gift baskets "to parents before their infants' discharge from the NICU or

7    hospital," which sends "confusing signals to parents who are simultaneously being encouraged to

8    breastfeed by their healthcare professionals." (*Id.* ¶¶ 53-54.) Plaintiffs allege that the Defendant

9    Manufacturers' goal of developing relationships with hospitals "was to ensure that the Defendant

10   Manufacturers and key people at the hospital would be sending a shared message that the preterm infant

11   formula products were safe and without risk." (*Id.* ¶ 61.) Plaintiffs allege the Defendant Manufacturers

12   "believed and intended that the misrepresentations that its sales representatives shared with [the

13   hospitals'] staff would be used to make feeding decisions for preterm infants" such as the Injured Infants

14   here. (*Id.* ¶ 64.)

15          Plaintiffs further allege the Defendant Manufacturers made "false statements of material fact on an

16   ongoing and repeated basis." (*Id.* ¶¶ 130, 140.) In particular, that their products: (a) were safe and

17   beneficial for premature infants; (b) were necessary to the growth and nutrition of premature infants; (c)

18   have no serious side effects; (d) were safe for premature infants; (e) were necessary for optimum growth;

19   (f) were similar or equivalent to breast milk; (g) were safe and more like breast milk than other infant

20   products and that they removed the harmful ingredients of cow's milk; and (h) were based on up-to-date

21   science, making them safe. (*Id.*) Additionally, Plaintiffs allege the Defendant Manufacturers omitted "the

22   material fact that their products significantly increased the risk of NEC in premature infants." (*Id.* ¶¶

23   130.i, 140.i; see, e.g., *id.* ¶ 38 ["Publicly disseminated materials from each Defendant Manufacturer

24   disguise the role their products play in causing [NEC] and affirmatively say, even today that their

25   products are perfectly safe. In fact, some publicly disseminated materials from the formula manufacturers

26   even suggested that formula may help *reduce* the risk of" NEC (emphasis in original)].) Plaintiffs allege

27   the Defendant Manufacturers' "powerful misleading marketing campaigns . . deceive parents into

28

Case ID: 220302606
Control No.: 23096781

1  believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based

2  products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are

3  necessary for proper growth and development of preterm infants; and (4) physicians consider the

4  Defendant Manufacturers' cow's milk-based products to be a first choice." (*Id*. ¶ 56.)

5        Plaintiffs' allegations of misrepresentation remain insufficient.  First, Plaintiffs must plead

6  misrepresentations with particularity to place the Defendant Manufacturers on notice of "certain definite

7  charges which can be intelligently met" and "to enable the court to determine whether, on the facts

8  pleaded, there is any foundation, prima facie at least, for the charge of fraud." (*Tenet Healthsystem*

9  *Desert, Inc. v. Blue Cross of California* (2016) 245 Cal.App.4th 821, 838, quoting *Committee On*

10  *Children's Television, Inc.*, 35 Cal.3d at 216-217 (cleaned up).)  Plaintiffs do not allege they saw or heard

11  any of the alleged misrepresentations.  Rather, Plaintiffs allege that the Defendant Manufacturers'

12  advertising and marketing campaigns generally targeted parents and hospitals.  Indeed, Plaintiffs'

13  opposition brief states that the purported misrepresentations were made to "hospitals, health care

14  professionals, parents, and others, as recorded in the Defendant Manufacturers' documents" – not to

15  Plaintiffs themselves.  (Opposition, 8.)

16        In *Committee On Children's Television, Inc.*, the defendants objected to the complaint on the

17  ground that it did "not indicate that any particular child relied upon or ever saw any particular television

18  advertisement.  They point[ed] out that although the complaint does assert that each of the adult plaintiffs

19  purchased General Foods' products at a Safeway Store, it does not state which advertisements they, or

20  their children, saw and relied upon."  (35 Cal.3d at 218.)  The Court reasoned that "[a] specific statement

21  of the advertisements seen and relied upon by the individual plaintiffs would serve to demonstrate both

22  that they possess a valid cause of action in their individual capacity and that they are proper

23  representatives for the class plaintiffs.  The realistic setting of the case, however, may make such specific

24  pleading impossible."  (*Id*. at 218-219.)  The Court concluded that the "Plaintiffs should be able to base

25  their cause of action upon an allegation that they acted in response to an advertising campaign even if they

26  cannot recall the specific advertisements."  (*Id*. at 219; but see *Mirkin v. Wasserman* (1993) 5 Cal.4th

27  1082, 1099 [the *Committee On Children's Television* opinion recognized "simply, that children cannot be

28

- 8 -

*Mead Johnson Product Cases*  JCCP 5257
Tentative Ruling on Defendant Manufacturers' Demurrers to Further Amended Complaints

Case ID: 220302606
Control No.: 23096781

expected to convey representations about products with precision.  Indeed, the opinion says exactly this in explaining why the plaintiffs did not need to set out in their complaint the precise language of each allegedly false advertisement."].)  Similarly, "it should be sufficient that defendant makes a misrepresentation to one group intending to influence the behavior of the ultimate purchaser, and that he succeeds in this plan."  (*Id*. at 219.)

Although Plaintiffs correctly note that less specificity suffices "when it appears from the nature of the allegations that the defendant must necessarily possess full information concerning the facts of the controversy," here, Plaintiffs' amended complaints are devoid of allegations regarding *any* misrepresentation made *to Plaintiffs*.  (See Opposition, 5-8.)

Second, Plaintiffs do not sufficiently allege a theory of indirect misrepresentation.  Plaintiffs argue the pleadings "here include multiple allegations about the significant work that the Defendant Manufacturers did in order to feed their misrepresentations to the Injured Infants' health care providers and ensure that those providers would convey the meaning and message that the Defendant Manufacturers' products were safe."  (Opposition, 10.)  Plaintiffs' argument is similar to the argument the plaintiffs raised in *Mirkin*, that "they need not, in order to state a cause of action for deceit, plead that the alleged misrepresentations were communicated to them directly by defendants.  Instead, . . . indirect communication suffices."  (*Mirkin*, 5 Cal.4th at 1093, 1095.)  However, "[w]hile the principle is valid, it does not help these plaintiffs, who cannot plead that the alleged misrepresentations ever came to their attention."  (*Id*.)  "A representation made to one person with the intention that it shall reach the ears of another, and be acted upon" *must actually reach the other person*.  (*Id*. at 1097 (cleaned up))  Here, Plaintiffs do not allege that anyone in the NICUs or hospitals, whether it be a physician, nurse, or other hospital staff member, made any misrepresentation to Plaintiffs.

Lastly, the Defendant Manufacturers had no affirmative duty to disclose that would give rise to a claim for fraudulent omission.  (See also Opposition, 8-9.)  "[T]here are four circumstances in which nondisclosure or concealment may constitute actionable fraud:  (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant had exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4)

Case ID: 220302606
Control No.: 23096781

1    when the defendant makes partial representations but also suppresses some material facts." (*Burch v.*

2    *CertainTeed Corp.* (2019) 34 Cal.App.5th 341, 349 (cleaned up); *Bigler-Engler v. Breg, Inc.* (2017) 7

3    Cal.App.5th 276, 311.) "[I]n the absence of a fiduciary relationship between the parties, the law

4    presupposes the existence of some other relationship between the plaintiff and defendant in which a duty

5    to disclose can arise." (*Gilead Tenofovir Cases* (2024) 98 Cal.App.5th 911, 317 Cal.Rptr.3d 133, 167.)

6    "This relationship has been described as a transaction, such as that between seller and buyer, employer

7    and prospective employee, doctor and patient, or parties entering into any kind of contractual

8    arrangement." (*Burch*, 34 Cal.App.5th 349-350 (cleaned up).)

9         Plaintiffs argue they "specifically pleaded that Defendant Manufacturers knew the dangers of

10   giving cows' milk-based products to preterm infants, which the Plaintiff Parents did not know, and

11   actively concealed this information from Plaintiffs through their marketing campaigns and direct

12   interaction with the public and hospital staff." (Opposition, 9.) However, the "transaction must

13   necessarily arise from direct dealings between the plaintiff and the defendant; it cannot arise between the

14   defendant and the public at large." (*Gilead Tenofovir Cases*, 317 Cal.Rptr.3d at 167.) No such

15   transaction existed here as Plaintiffs do not plead they had any direct dealings with the Defendant

16   Manufacturers. (See, e.g., *Bigler-Engler*, 7 Cal.App.5th at 312 ["Where, as here, a sufficient relationship

17   or transaction does not exist, no duty to disclose arises even when the defendant speaks"].) Rather,

18   Plaintiffs' direct dealings were with the hospitals and other health care providers.

19         Accordingly, Defendant Manufacturers' demurrers are sustained without leave to amend on this

20   ground.

21       **B.**      **Plaintiffs Do Not Sufficiently Allege Reliance On Any Purported Misrepresentation.**

22         California law is "settled that a plaintiff, to state a cause of action for deceit based on a

23   misrepresentation, must plead that he or she actually relied on the misrepresentation." (*Mirkin*, 5 Cal.4th

24   at 1088.) "To allege actual reliance on misrepresentations with the required specificity for a fraud count,

25   the plaintiff must plead that he believed the representations to be true … and that in reliance thereon (or

26   induced thereby) he entered into a transaction." (*Chapman v. Skype, Inc.* (2013) 220 Cal.App.4th 217,

27   231-232, quoting *Beckwith v. Dahl* (2012) 205 Cal.App.4th 1039, 1063 (cleaned up); see *Small*, 30

28

- 10 -

*Mead Johnson Product Cases* JCCP 5257
Tentative Ruling on Defendant Manufacturers' Demurrers to Further Amended Complaints

Case ID: 220302606
Control No.: 23096781

Cal.4th at 184 [negligent misrepresentation must also be pled with specificity].)[5]  The plaintiff must allege that the reliance was reasonable by showing that (1) the matter was material in the sense that a reasonable person would find it important in determining how he or she would act and (2) it was reasonable for the plaintiff to have relied on the misrepresentation.  (*Hoffman v. 162 North Wolfe LLC* (2014) 228 Cal.App.4th 1178, 1194.)

Here, Plaintiffs allege that they were "not aware that [Defendant Manufacturers'] misrepresentations were false and justifiably relied on them." (*Tracy* ¶ 133.)  Plaintiffs allege that the "misrepresentations induced [them] to allow [the Injured Infants] to be fed Abbott's and Mead Johnson's infant products, in reliance on all the messaging [they] received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging." (*Id.*; but see *id.* ¶¶ 132, 142 ["The Defendant Manufacturers' misrepresentations were intended to, and in fact did, induce *physicians and medical staff*, including [Injured Infants'] physicians and medical staff, to provide their infant products to babies, including [Injured Infants]." (emphasis added)].)  Again, Plaintiffs' general allegations are insufficient to plead reliance.  None of the Plaintiffs allege they actually saw *and* relied upon any misrepresentations.  Nor do Plaintiffs identify the specific representations upon which each Plaintiff relied.

Additionally, Plaintiffs' amended complaints continue to raise a fundamental issue with reliance.  Specifically, Plaintiffs allege (now on information and belief) that the "Hospital Defendants' staff provided the Defendant Manufacturers' products to the Injured Infants directly, and concealed from the Plaintiff Parents relevant information about those feedings, including that they had the ability to request for their children other, non-cow's milk-based options." (*Id.* ¶ 90.)  "A plaintiff establishes [actual] reliance when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct

---

[5] Plaintiffs' argument that reliance does not have to be direct but can be inferred at the pleading stage is misplaced.  (Opposition, 9-11.)  There is no "presumption" of actual reliance, which a plaintiff must both plead and prove.  (*Mirkin*, 5 Cal.4th at 1091-1093.)  Plaintiffs' cases address the evidence required to *prove* actual reliance, not the requirement that it be pled.  In *Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, for example, the court held that a plaintiff smoker was not required to prove that he heard and actually relied on a specific false representation in the defendant's advertising to establish actual reliance where he recalled the ads and "remembered their themes with fair certainty." (*Id.* at 1663.)  Thus, the court held,  substantial evidence supported the jury's conclusion that plaintiff actually relied upon defendant's advertising.  (*Id.*; see also *Bullock v. Philip Morris, Inc.* (2008) 159 Cal.App.4th 655, 676-677 [same].)  Neither case relieved a plaintiff of the fundamental requirement that she plead actual reliance.

*Mead Johnson Product Cases*  JCCP 5257
Tentative Ruling on Defendant Manufacturers' Demurrers to Further Amended Complaints

Case ID: 220302606
Control No.: 23096781

1   which altered his or her legal relations, and when without such misrepresentation or nondisclosure he or

2   she would not, in all reasonable probability, have entered into the contract or other transaction."

3   (*Hoffman*, 228 Cal.App.4th at 1193 (cleaned up).)  Therefore, if "relevant information about [] feedings"

4   was concealed from Plaintiffs and Plaintiffs do not identify any particular misrepresentations made to

5   them, then Plaintiffs cannot allege reliance.  (See, e.g., *Davis v. Abbott Labs* (C.D. Cal. 2021) 562

6   F.Supp.3d 585, 588 [granting motion to dismiss negligent misrepresentation claim, applying California

7   law, where there were "no allegations in the FAC that indicate Plaintiff relied on any of Defendant's

8   alleged misrepresentations.  HMF [Similac Human Milk Fortifier] would have been administered by Baby

9   Anderson's physician in the NICU, and no allegations suggest that Plaintiff specifically chose HMF to be

10  administered to her son after relying on Defendant's representation that HMF was safe.  The factual

11  allegations do not plausibly suggest that Plaintiff relied on anything other than the doctor's judgment and

12  assessment that HMF was a proper supplement for Baby Anderson at the time he was admitted to the

13  NICU.  If Plaintiff relied on the NICU physician to administer the HMF while Baby Anderson was in the

14  hospital, it is unclear how Plaintiff could rely on any representations made by Defendant."]; *Ferry v.*

15  *Mead Johnson & Co., LLC* (D. Conn. 2021) 514 F.Supp.3d 418, 450-451 [dismissing claims for

16  intentional and negligent misrepresentation where, among other things, plaintiff did not allege that

17  infant's parents or doctors ever looked at Mead Johnson's website, did not allege that parents or doctors

18  relied on any of the defendants' representations, and did not allege facts giving rise to a strong inference

19  of scienter (applying Connecticut law)]; *Hunte v. Abbott Laboratories, Inc.* (D. Conn. 2021) 556

20  F.Supp.3d 70, 87-88, 90-93 [same].)[6]

21       Furthermore, even if Plaintiffs had pled a theory of indirect misrepresentation, Plaintiffs must

22  plead justifiable reliance upon any indirect misrepresentation.  (*Mirkin*, 5 Cal.4th at 1096.)  "The rule is

23  typically stated in such language as this: A representation made to one person with the intention that it

24  shall reach the ears of another, and be acted upon by him, *and which does reach him, and is acted upon by*

25  *him to his injury,* gives the person so acting upon it the same right to relief or redress as if it had been

26

27  

28

---

[6] These federal cases granted motions to dismiss similar misrepresentation claims in nearly identical cases against Defendant Manufacturers, and were cited both in the Court's July 12, 2023 Order and in Defendants' opening brief.  (July 12, 2023 Order, 10; Opening Brief, 7.)  Plaintiffs nevertheless do not address them.

Case ID: 220302606
Control No.: 23096781

1  made to him directly." (*Id*. at 1097 (cleaned up).)  Plaintiffs have not made any such allegations here.

2  Accordingly, Defendants' demurrers are sustained without leave to amend as to Plaintiffs'

3  intentional misrepresentation and negligent misrepresentation claims.

4  ## II.  Parent Plaintiffs Cannot Recover Purely Economic Losses.

5  Abbott argues that Parent Plaintiffs fail to plead "a cognizable individual injury" because they

6  cannot recover for purely economic losses.[7]  (Opening Brief, 1, 3, 7-9; Reply, 1, 6-7; see also Joinder

7  Opening Brief, 5 fn. 2.)[8]  The Court agrees.

8  As a threshold matter, Plaintiffs argue that the Defendant Manufacturers waived the right to demur

9  on the grounds that Plaintiffs are not proper plaintiffs and cannot recover purely economic losses because

10  Defendant Manufacturers could have raised the same grounds in their prior demurrer.  (Opposition, 12,

11  citing Code Civ. Proc. § 430.41(b).)  The Court disagrees.  Generally, "[a] party demurring to a pleading

12  that has been amended after a demurrer to an earlier version of the pleading was sustained shall not demur

13  to any portion of the amended complaint, cross-complaint, or answer on grounds that could have been

14  raised by demurrer to the earlier version of the complaint, cross-complaint, or answer."  (§ 430.41(b).)  In

15  other words,

16  > If, after a demurrer is sustained with leave to amend, plaintiff files an amended complaint, it is
17  > treated as a *new* pleading.  Defendant is therefore entitled to respond to the amended pleading as
18  > he or she did to the original—including by filing another demurrer.  However, before filing the
    > demurrer, defendant must renew the meet and confer process relating to the second pleading.  And
19  > defendant will not be able to raise in the successive demurrer any issues that could have been, but

20  [7] "Parent Plaintiffs" refer to the parent Plaintiffs in the following complaints: (1) *Barnes v. Mead Johnson & Company, LLC, et al.*; (2) *Diaz v. Mead Johnson & Company, LLC, et al.*; (3) *Eberhart v. Mead*
21  *Johnson & Company, LLC, et al.*; (4) *Gillespie v. Mead Johnson & Company, LLC, et al.*; (5) *Hartwick v. Mead Johnson & Company, LLC, et al.*; (6) *Johnson-Merrida v. Mead Johnson & Company, LLC, et al.*;
22  (7) *Madison v. Mead Johnson & Company, LLC, et al.*; (8) *Martinez v. Abbott Laboratories, et al.*; (9) *McKinney v. Mead Johnson & Company, LLC, et al.*; (10) *Miles v. Mead Johnson & Company, LLC, et*
23  *al.*; (11) *Najrabi v. Mead Johnson & Company, LLC, et al.*; (12) *Nash v. Mead Johnson & Company, LLC, et al.*; (13) *Nelmes v. Mead Johnson & Company, LLC, et al.*; (14) *Pantoja v. Mead Johnson &*
24  *Company, LLC, et al.*; (15) *Roesler v. Mead Johnson & Company, LLC, et al.*; (16) *Seeley v. Mead Johnson & Company, LLC, et al.*; (17) *Springer-Ayeni v. Abbott Laboratories, et al.*; (18) *Thomas v.*
25  *Mead Johnson & Company, LLC, et al.*; (19) *Tracy v. Mead Johnson & Company, LLC, et al.*; (20) *Viera v. Mead Johnson & Company, LLC, et al.*; (21) *Ward v. Mead Johnson & Company, LLC, et al.*; (22)
26  *Woods v. Mead Johnson & Company, LLC, et al.*; and (23) *Yang v. Mead Johnson & Company, LLC, et al.*
27  [8] Abbott does not demur to Plaintiffs' cause of action for medical expenses.  (Reply, 1 fn. 1, 6.)  That is
28  the only item of economic loss Plaintiffs address in their opposition.  (Opposition, 11-12.)  Thus, Abbott's demurrer on this ground is unopposed.  (See Reply, 6-7.)

Case ID: 220302606
Control No.: 23096781

were not, raised in the first demurrer.

(Cal. Prac. Guide Civ. Pro. Before Trial Ch. 7(I)-A, Demurrers ¶ 7:139 (cleaned up), citing § 430.41(a), (b).)  However, a party's waiver based on its failure to demur does not apply when the party's objection is "that the pleading does not state facts sufficient to constitute a cause of action."  (Code Civ. Proc. § 430.80(a).)  Here, Defendant Manufacturers demur on the ground that the pleadings do not state facts sufficient to constitute a cause of action.  (Demurrer, 1-8; Joinder Opening Brief, 3; see Code Civ. Proc. ¶ 410.10(e).)  Additionally, Defendant Manufacturers have "not previously answered or demurred to any of the complaints that were originally part of the *Erday* case (*McKinney*, *Najrabi*, *Nash*, *Pantoja*, *Seeley*, *Ward* and *Yang*) or to *Springer-Ayeni* or *Martinez*."  (Reply, 6 fn. 7.)  Therefore, Defendant Manufacturers did not waive their right to demur here.  Accordingly, the Court will reach the merits of demurrers as to purely economic losses.

Parent Plaintiffs fail to allege sufficient facts to state a cause of action for strict products liability (design defect and failure to warn), negligence, intentional misrepresentation, and negligent misrepresentation against the Defendant Manufacturers because they do not allege that they personally suffered any physical injury.  (See, e.g., *Tracy* SAC ¶¶ 1 [Injured Infant "was seriously injured, resulting in [] long-term health effects and accompanying harm to [the] mother."], 40 ["Because of the misleading information distributed by the Defendant Manufacturers, . . . any research conducted by [parent] immediately after [Injured Infant's] injury, or at any time prior to seeing an attorney advertisement, would not have led a reasonable person to suspect that the Defendant Manufacturers' products could have caused [Injured Infant's] injuries."], 107 [Defendant Manufacturers' "products were fed to [Injured Infant], which directly and proximately caused [] NEC and led to [] injuries."], 108 ["As a further direct result, [parent] has suffered loss of income and/or other harms.  [Parent's] life has been significantly affected by [Injured Infant's] injuries."].)  Rather, Parent Plaintiffs seek to recover for their children's injuries.

Parent Plaintiffs cannot recover purely economic losses.  "The economic loss rule provides that, "in general, there is no recovery in tort for negligently inflicted 'purely economic losses,' meaning financial harm unaccompanied by physical or property damage."  (*Dhital v. Nissan North America, Inc.* (2022) 84 Cal.App.5th 828, 837, quoting *Sheen v. Wells Fargo Bank, N.A.* (2022) 12 Cal.5th 905, 922; see *Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 482 ["recovery under the doctrine of strict liability

- 14 -

Case ID: 220302606
Control No.: 23096781

is limited solely to physical harm to person or property.  Damages available under strict products liability do not include economic loss . . . without any claim of personal injury or damages to other property."]; *Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 398 ["no tort duty to guard against purely economic losses."]; *Moore v. Centrelake Medical Group, Inc.* (2022) 83 Cal.App.5th 515, 537 [finding the trial court did not err in applying economic loss rule to sustain the defendant's demurrer to negligence claim].)

As the Injured Infants suffered the alleged personal injuries, the failure to plead a recoverable injury by Parent Plaintiffs, in their individual capacities, cannot be cured through amendment.  Therefore, Defendant Manufacturers' demurrers as to the Parent Plaintiffs' individual claims for strict products liability (design defect and failure to warn), negligence, intentional misrepresentation, and negligent misrepresentation are sustained without leave to amend, except as to *Nelmes*.  On September 6, 2023, the individual claims of Plaintiffs Leanne Nelmes and Joshua Nelmes, the parents of Landon Nelmes, were dismissed.  Accordingly, Defendants' demurrers are moot as to *Nelmes*.

## III. The Parent Plaintiffs In *Martinez* And *Springer-Ayeni* May Not Recover Emotional Distress Damages.

Abbott contends that the parent Plaintiffs in *Martinez* and *Springer-Ayeni* cannot recover emotional distress damages because they did not allege "they were contemporaneously aware that their child was being injured as required" under *Thing v. La Chusa* (1989) 48 Cal.3d 644.  (Opening Brief, 8 fn. 8; see Reply, 1, 4-6; Joinder Reply, 8 fn. 5.)  Plaintiffs argue they sufficiently alleged emotional distress because "they suffered in witnessing their child consume Defendant Manufacturers' products, and subsequently decline from NEC," which was foreseeable.  (Opposition, 11.)  The Court disagrees.[9]

*Thing* supplies the controlling standard governing when a plaintiff may recover emotional distress damages for the injury or death of a relative.[10]  The Court recognized that foreseeability is insufficient:

---

[9] Defendant Manufacturers' demurrers are procedurally improper because "a demurrer cannot rightfully be sustained to part of a cause of action or to a particular type of damage or remedy."  (*Kong v. City of Hawaiian Gardens Redevelopment Agency* (2002) 108 Cal.App.4th 1028, 1047.)  The proper vehicle to raise the issue would have been a motion to strike.  However, because Plaintiffs have not objected on that ground, and the issues have been fully briefed, the Court will deem the demurrer a motion to strike and rule on it accordingly.

[10] Without mentioning *Thing*, Plaintiffs rely upon two earlier cases, *Dillon v. Legg* (1968) 68 Cal.2d 728 and *Ochoa v. Superior Court* (1985) 39 Cal.3d 159 that were significantly narrowed and clarified in *Thing*.  (Opposition, 11.)

Case ID: 220302606
Control No.: 23096781

"The merely negligent actor does not owe a duty the law will recognize to make monetary amends to all persons who may have suffered emotional distress on viewing or learning about the injurious consequences of his conduct." (48 Cal.3d at 668.) Rather, the Court adopted a three-part test:

> [A] plaintiff may recover damages for emotional distress caused by observing the negligently inflicted injury of a third person if, but only if, said plaintiff: (1) is closely related to the injury victim; (2) is present at the scene of the injury producing event at the time it occurs and is then aware that it is causing injury to the victim; and (3) as a result suffers emotional distress—a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstances.

(*Id.* at 667-668 (cleaned up); see also, e.g., *Bird v. Saenz* (2002) 28 Cal.4th 910, 915 [holding, applying *Thing* test, that plaintiffs did not have viable claims as bystanders for negligent infliction of emotional distress arising out of alleged medical malpractice directed to their close relative where they were not contemporaneously aware of the surgical procedure or any error in the diagnosis and treatment of relative's injury].)

Here, Plaintiffs' claims for emotional distress damages fail on the second prong of the test, which requires that the plaintiff have had "a contemporaneous sensory awareness of the causal connection between the negligent conduct and the resulting injury." (*Golstein v. Superior Court* (1990) 223 Cal.App.3d 1415, 1427-1428 [trial court properly sustained demurrer to cause of action for negligent infliction of emotional distress by parents of nine-year-old boy who died as a result of the negligent administration of an overdose of radiation while undergoing treatment for curable cancer because parents were unaware during the radiation therapy of the excessive irradiation].) Ms. Martinez admits she "did not know, and had no reason to know or suspect, that Anthony's NEC could have been caused by the Defendant Manufacturers' products" until she saw an attorney advertisement on Instagram in July 2022," almost three years after Anthony's death. (*Martinez* FAC ¶¶ 14, 31-32.) Likewise, Ms. Springer-Ayeni admits she "did not know, and had no reason to know or suspect, that E.R.S.'s NEC could have been caused by the Defendant Manufacturers' products" until "she saw an attorney advertisement on Facebook on or about September 2, 2021," more than thirteen years after E.R.S.'s death. (*Springer-Ayeni* FAC ¶¶ 13, 29-30.) Under the circumstances, the parent Plaintiffs in *Martinez* and *Springer-Ayeni* cannot recover emotional distress damages because they lacked any contemporaneous awareness of the alleged causal connection between Defendant Manufacturers' products to their children's injury and death. (See also,

- 16 -

Case ID: 220302606
Control No.: 23096781

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

e.g., *Fortman v. Förvaltningsbolaget Insulan AB* (2013) 212 Cal.App.4th 830, 845 [plaintiff could not recover for emotional distress when she witnessed the death of her brother while they were scuba diving because she was not aware at the time that his death was caused by a defective product manufactured by defendant]; *Morton v. Thousand Oaks Surgical Hospital* (2010) 187 Cal.App.4th 926, 931-935 [trial court properly sustained demurrer without leave to amend to cause of action for NIED from medical malpractice where plaintiffs failed to allege that they knew and appreciated the medical circumstances affecting their mother during postsurgical recovery].)  "When as here, [plaintiffs] witnessed the injury, but did not meaningfully comprehend that the company's defective product caused the injury, she cannot satisfy the second *Thing* requirement." (*Fortman*, 212 Cal.App.4th at 832.)  Accordingly, the Court strikes Plaintiffs' prayer for emotional distress damages in *Martinez* and *Springer-Ayeni* without leave to amend.

- 17 -

Case ID: 220302606
Control No.: 23096781

# EXHIBIT C

Case ID: 220302606
Control No.: 23096781

Electronically Filed
Kinnis Williams, Sr.
Circuit Clerk
Angela Gladney
21L1032
St. Clair County
2/8/2024 3:57 PM
26335883

### IN THE CIRCUIT COURT OF THE
### TWENTIETH JUDICIAL CIRCUIT
### ST. CLAIR COUNTY, ILLINOIS

JASMINE WATSON, on behalf of )
Herself and as representative of the )
Estate of CHANCE DEAN, )
       )
       Plaintiffs, )
vs. )    Cause No. 21-L-1032
       )
MEAD JOHNSON & COMPANY, LLC et al., )
       )
       Defendants. )

## <u>NOTICE OF VOLUNTARY DISMISSAL</u>

Plaintiff, Jasmine Watson, on behalf of herself and as representative of the Estate of Chance

Dean, Deceased, moves this Court, pursuant to 735 ILCS 5/2-1009(a) of the Illinois Code of Civil

Procedure, to voluntarily dismiss Counts IV (Intentional Misrepresentation) and V (Negligent

Representation) of her Complaint without prejudice. In support hereof, Plaintiff states that this

notice is given made prior to commencement of trial.

WHEREFORE, Plaintiff prays for a voluntary dismissal of Counts IV and V of her

Complaint without prejudice.

Respectfully submitted,

*/s/ David Cates*
David Cates (#6289198)
THE CATES LAW FIRM, LLC
216 West Pointe Drive, Suite A
Swansea, IL 62226
Telephone: (618) 277-3644
Facsimile: (618) 277-7882
dcates@cateslaw.com

## **PROOF OF SERVICE**

I hereby certify that on February 8, 2024 electronically filed the above document with the Clerk of the Court using the e-filing system which automatically forwards a copy to the attorneys of record.

*/s/Robin Matney*

# EXHIBIT A-69

FILED
01 APR 2024 11:10 am
Civil Administration
T. FOBBS

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA  19103
(215) 875-0609
kmurphy@tlgattorneys.com

**WELSH & RECKER, P.C.**
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire
306 Walnut Street
Philadelphia, PA  19106
215-972-6430
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

**ATTORNEYS FOR DEFENDANTS MEAD JOHNSON & COMPANY, LLC, AND MEAD JOHNSON NUTRITION COMPANY**

| | | |
|---|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** | : | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| | : | |
| | : | **MARCH TERM, 2022** |
| Plaintiff, | : | **No. 2606** |
| v. | : | |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| **NIKIA TUCKER, on her own behalf and as Parent and Natural Guardian of N.B., a Minor,** | : | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| | : | |
| | : | **SEPTEMBER TERM, 2023** |
| Plaintiff, | : | **No. 0867** |
| v. | : | |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : | |
| | : | |
| Defendants. | : | |

**MEAD JOHNSON & COMPANY'S REPLY IN SUPPORT OF PRELIMINARY OBJECTIONS TO PLAINTIFF'S COMPLAINT**

1

Case ID: 220302606
Control No.: 23096781

The Plaintiff's response confirms that her claims must be dismissed. Plaintiff and other similarly situated plaintiffs in these cases have filed dozens of nearly identical complaints alleging that their children were given "Similac and/or Enfamil" branded formula and/or fortifier, which caused them to develop necrotizing enterocolitis ("NEC").[1] Pennsylvania is a fact-pleading state, and Plaintiff's complaint does not plead sufficient facts. In this product liability case, Plaintiff has failed to plead even the product that she claims caused the alleged injury. Nor has Plaintiff adequately pled that this *class of products* is causally associated with NEC. While plaintiff has provided "general notice" that she believes *some product*—from either Mead Johnson & Company ("Mead Johnson") "and/or" Abbott Laboratories ("Abbott")— caused N.B. to develop NEC, she has wholly failed to meet her burden to put Mead Johnson on notice about which of its many products is the alleged culprit. Further, Plaintiff has failed to plead the basic elements of the causes of action she claims to assert. Plaintiff's claims should therefore be dismissed.

## I. Plaintiffs' Claims Should Be Dismissed Because They Fail To Allege That A Specific Product Caused The Injury

Pennsylvania law gives plaintiffs the burden of "summariz[ing] the essential facts to support the claim." *McShea v. City of Phila.*, 606 Pa. 88, 96, 995 A.2d 334 (2010). In a case alleging that plaintiff was injured by ingesting a specific product, the identity of that product undoubtedly qualifies as an essential fact. *Baker v. Rangos*, 324 A,2d 498, 505–06 (Pa. Super. 1974) (requiring plaintiff to allege "all of the facts a plaintiff will eventually have to prove in order to recover"). Numerous courts have held as much. *E.g.*, *Gay v.

---

[1] Necrotizing enterocolitis or NEC is a tragic syndrome that affects 2-5% of premature infants. It affects approximately 10% of all babies weighing less than 3½ pounds. See https://www.cincinnatichildrens.org/health/n/nec.

Case ID: 220302606
Control No.: 23096781

*A. O. Smith Corp.*, 545 F. Supp. 3d 255, 262 (W.D. Pa. 2021) (granting summary judgment in asbestos case where plaintiff "never cited a specific instance when he could recall working with an asbestos-containing GE product"); *In re McNeil Consumer Healthcare, Mktg. & and Sales Pracs. Litig.*, 2011 WL 2802854, at **9–10 (E.D. Pa. July 15, 2011) ("[P]laintiffs fail to allege any personal harm arising [from Defendant's alleged wrongs]. This deficiency follows from the plaintiffs' failure to allege which particular products they purchased.").

But instead of identifying a specific product by its name, Plaintiff merely identifies "Similac and/or Enfamil," two different trademarks from two different companies. Compl. at ¶¶ 12, 29, & 30. Similac is a trademark for a line of products sold by Defendant Abbott, while Enfamil is a trademark for a line of products sold by Defendant Mead Johnson. By using the intentionally ambiguous phrase "and/or," Plaintiff fails even to identify which Defendant manufactured the product at issue, and therefore fails to allege sufficient facts to state a claim against either Defendant.

"Similac and/or Enfamil" are not product names. They are *brand umbrellas* that contain a variety of *product lines*, which themselves contain multiple *products*. Plaintiff's own complaint admits that "Mead markets and sells multiple products." *Id.* at ¶ 30. She then identifies *seven separate* products. *Id.* Likewise, Plaintiff acknowledges that "Abbott markets and sells multiple products" and then identifies *seven different* products. *Id.* at ¶ 29. All told, Plaintiffs' "product identification" spans *fourteen unique products* across two different manufacturers. And these are not even all of the products under the "Similac

3

Case ID: 220302606
Control No.: 23096781

and/or Enfamil" brand names.[2]   Moreover, some of these products are formulas, which are fed to infants as substitutes for breastmilk, and some are fortifiers, which are used to *supplement* breastmilk.  According to Plaintiffs' allegations, N.B. may have received any one "and/or" a combination of these products.  As is the case with virtually every product liability action, it is not enough to merely allege the brand name of a product line.  Plaintiff must allege the actual product.  The suggestion that merely identifying the umbrella brand of fourteen separate products manufactured by two different companies is sufficient identification is wholly unfounded.

Plaintiff's allegations are boilerplate.  This is all the more clear because each of the twenty-eight NEC-based complaints currently pending in the Philadelphia County Court of Common Pleas in connection with this litigation uses *identical* language when referring to the products plaintiffs were allegedly given: "Similac and/or Enfamil." Plaintiff's failure to identify with specificity the products that N.B. was fed is fundamental and is fatal to each of her claims.

## II.    Plaintiff Does Not Adequately Plead That Cow-Based Feeding Products Cause NEC.

Plaintiff's "entire section titled '***Cow's Milk-Based Feeding Products Are Known to Cause NEC***'" in her complaint spans *six sentences*, none of which contain a citation or reference.  Pls. Resp. 5 (emphasis in original); Compl. at ¶¶ 15–16.  The first four sentences describe NEC generally, the fifth sentence provides that preterm infants are "especially susceptible to NEC because of their underdeveloped digestive systems."  *Id.* at ¶ 16.  It is only in the sixth and final sentence where Plaintiff says, with no supporting

---

[2] *See* https://hcp.meadjohnson.com/s/products/category/a4K4J000001uk3DUAQ/hospital-feeding-system (listing nine different hospital feeding products).

Case ID: 220302606
Control No.: 23096781

allegation, that "[e]xtensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants." *Id*. Plaintiff cites no studies for this proposition—unsurprisingly, given that to Mead Johnson's knowledge, there are no studies showing that cow's milk-based feeding products cause NEC.

These bald assertions are insufficient to withstand a preliminary objection. *See* Pa. R. Civ. P. 1019(b); *Weiner v. Am. Honda Motor Co., Inc.*, 718 A.2d 305, 307 (Pa. Super. 1998) ("The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous."). Plaintiff has provided no study definitively showing that any of defendants' products *cause* NEC because there is no such study. At best, Plaintiff can offer studies showing that breastmilk has a protective effect against NEC. This information is uncontroversial, well-known, and actively promoted by defendant. *See* Promoting Breast Milk, MeadJohnson.com, https://hcp.meadjohnson.com/s/hcpm-subpage/a4b4J000000JFeAQAW/human-milk (last visited Oct. 23, 2023) ("Breast milk is naturally perfect for infants, providing unique benefits to mother and baby" and listing some "key components and benefits" of breast milk). Plaintiff's claims should be dismissed for these reasons and the reasons more fully articulated in Mead Johnson's preliminary objections.

### III.    Parent-Plaintiff's Claims Should Be Dismissed.

In her response, Plaintiff, for the first time, alleges negligent infliction of emotional distress. Pls. Resp. Mem. 13. As Plaintiff herself admits, any plaintiff "alleging NIED must also assert a physical manifestation of the emotional harm." Pls. Resp. Mem. 15. She is not wrong. "Physical injury must be averred to sustain a cause of action for negligent

Case ID: 220302606
Control No.: 23096781

inflication of emotional distress." *Armstrong v. Paoli Memorial Hosp.*, 633 A.2d 605, 609 (Pa. Super. Ct. 1993) (collecting cases); *see also* Restatement (Second) of Torts § 463A. Indeed, as Mead Johnson argued in its preliminary objections, "[n]o cause of action exists for negligence that results solely in economic damages unaccompanied by physical injury or property damage." Prelim. Obj. 15 (quoting *Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 985 A.2d 840, 841 n.3 (Pa. 2009)); *see also Miller v. Evenflo Co., Inc.*, 2009 WL 10689606, at \*4 (W.D. Pa. Dec. 21, 2009) (dismissing plaintiff-parents' tort claims where only physical injury was to minor plaintiff).

The parent-plaintiff here alleges *no physical injury.* She states for the first time only in her response that N.B.'s injuries caused her to suffer "physical manifestations including depression and other harms." Pls. Resp. Mem. 15. Arguments are not allegations, and parent-plaintiff's claims must therefore be dismissed. *Armstrong*, 633 A.2dat 609 (Pa. Super. Ct. 1993); *Banyas v. Lower Bucks Hosp.*, 437 A.2d 1236, 1239–40 (Pa. Super. 1981) ("[G]iven the restrictions that our courts have consistently imposed on recovery for this tort, we would err in finding a cause of action without an allegation of bodily harm.").

## IV. Plaintiffs' Misrepresentation Claim Should Be Dismissed For Failure To Allege Specificity And Reliance (Counts IV and V).

Any claim for misrepresentation, whether negligent or intentional, requires plaintiff to plead the alleged fraud with specificity. *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999). And as Pennsylvania's supreme court has explained, "[a]verments of fraud are meaningless epithets unless sufficient facts are set forth which will permit an inference that the claim is not without foundation[.]" *Bata v. Cent.-Penn Nat. Bank of Phila.*, 224

Case ID: 220302606
Control No.: 23096781

A.2d 174, 179 (Pa. 1966); *see also* Pa. R. Civ. P. 1019(b) ("Averments of fraud . . . shall be averred with particularity.").

In her response, Plaintiff points to bald, generic assertions that Mead Johnson representatives did not warn of the risk of NEC—a risk for which Plaintiff offers no evidence other than her *ipse dixit*. This is a far cry from the "exact statements or actions plaintiff alleges constitute the fraudulent misrepresentation." *Youndt v. First Nat'l Bank*, 868 A.2d 539, 545 (Pa. Super. Ct. 2005). And nothing that Plaintiff points to in her opposition comes remotely close to meeting this threshold. Plaintiff does not—and cannot—quote any Mead Johnson representative, as she did not hear any Mead Johnson representative make any kind of representation. Nor does Plaintiff point to any specific misrepresentation that Mead Johnson allegedly made. And, finally, Plaintiff does not even identify any allegations in her response supporting the proposition that Plaintiff's healthcare providers relied on Mead Johnson's purported misrepresentation. These failures doom her claims of misrepresentation. *See, e.g.*, Prelim. Obj. Ex. B *In re Mead Johnson Product Cases*, CJC-23-005257, at 5–13 (Cal. Sup. Ct. February 16, 2024); *Scott v. Bimbo Bakeries, USA, Inc.*, Civ. A. No. 10-3154, 2012 WL 645905, at *6 (E.D. Pa. Feb. 29, 2012) (dismissing misrepresentation claim for failing to "allege when these alleged misrepresentations were made, who made them, or how they were communicated"); *Casino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1469 (Cal. Ct. App. 2014) ("[W]hen a plaintiff asserts fraud against a corporation, the plaintiff must allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.") (internal quotation marks omitted); *Peterson v. Clark Lake Homes Inc.*, A22-0398, 2022

Case ID: 220302606
Control No.: 23096781

WL 16910578, at *4 (Minn. Ct. App. (Nov. 14, 2022) (requiring identification of the "who, what, when, where, and how" for a claim of fraud); *Black v. Cmty. Educ. Ctrs., Inc.*, Civ. A. No. 12-6102, 2014 WL 859313, at *6 (E.D. Pa. Mar. 4, 2014) (dismissing fraud claims for lack of specificity).

## V. Plaintiff's Punitive Damages Claims Should Be Struck.

Merely pleading outrageous conduct is insufficient to maintain a claim for punitive damages. *See Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985). ("The mere pleading of outrageous conduct does not, of course, satisfy the requirement of stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award for punitive damages was warranted.") "Punitive damages are an extreme remedy available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)).

For the reasons stated above and in Mead Johnson's Preliminary Objections, Plaintiff's complaint is devoid of any allegation or evidence that would enable her to maintain a claim for punitive damages. At best, Plaintiff alleges that Mead Johnson failed to warn physicians of a risk Plaintiff also alleges the physicians already knew. Compl. at ¶¶ 48–51 & 56. This is insufficient to maintain a claim for punitive damages.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Dated:  April 1, 2024

/s/ Kenneth A. Murphy
Kenneth A. Murphy, Esquire

**WELSH & RECKER, P.C.**

/s/ Catherine M. Recker

8

Case ID: 220302606
Control No.: 23096781

Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire

**Attorneys for Defendants,**
**Mead Johnson & Company, LLC and**
**Mead Johnson Nutrition Company**

9

## CERTIFICATE OF SERVICE

I, Kenneth A. Murphy, Esquire, do hereby certify that on this day I caused a true and correct copy of the foregoing Preliminary Objections of Defendants Mead Johnson & Company and Mead Johnson Nutrition Company to Plaintiffs' Complaint, and accompanying Memorandum of Law, to be served via electronic filing, on the following counsel of record, addressed as follows:

**Kline & Specter, P.C.**
Thomas R. Kline, Esquire
Tobias Millrood, Esquire
Elizabeth Crawford, Esquire
Melissa Merk, Esquire
Timothy A. Burke, Esquire
Helen Lawless, Esquire
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
tom.kline@klinespecter.com
tobi.millrood@klinespecter.com
melissa.merk@klinespecter.com
elissa.crawford@klinespecter.com
timothy.burke@klinespecter.com
helen.lawless@klinespecter.com
*Attorneys for Plaintiffs*

**Burns White, LLC**
James Young, Esquire
Richard Margulies, Esquire
Susan R. Engle, Esquire
1880 John F. Kennedy Blvd., 10th Floor
Philadelphia, PA 19103
jayoung@burnswhite.com
rsmargulies@burnswhite.com
sengle@burnswhite.com
*Counsel for Defendants, The Trustees of the University of Pennsylvania d/b/a The Hospital of the University of Pennsylvania and The Trustees of the University of Pennsylvania d/b/a Penn Medicine*

**Campbell Conroy & O'Neil, PC**
Joseph E. O'Neil, Esquire
Meghann C. Porth, Esquire
Ryan J. O'Neil, Esquire

Case ID: 220302606
Control No.: 23096781

1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
joneil@campbelltriallawyers.com
mporth@campbelltriallawyers.com
roneil@campbelltriallawyers.com
*Attorneys for Defendant, Abbott Laboratories*

**Jones Day**
Jennifer B. Flannery, Esquire
Marques Hillman Richeson
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
jbflannery@jonesday.com
mhricheson@jonesday.com
*Attorneys for Defendant, Abbott Laboratories*

**Troutman Pepper Hamilton Sanders, LLP**
Sean P. Fahey, Esquire
Ronni E. Fuchs, Esquire
3000 Two Logan Square
Philadelphia, PA 19103
sean.fahey@troutman.com
ronni.fuchs@troutman.com
*Attorneys for Defendant, Abbott Laboratories*

**Eckert Seamans Cherin Mellot**
Donald Brooks, Jr., Esquire
Brooke A. Scicchitano, Esquire
50 S. 16th Street, 22nd Floor
Philadelphia, PA 19102
dbrooks@eckertseamans.com
bscicchitano@eckertseamans.com
*Attorneys for Defendant, Thomas Jefferson University Hospitals, Inc d/b/a Thomas Jefferson University Hospital and Thomas Jefferson University d/b/a Jefferson Health System*

By: /s/ Kenneth A. Murphy
Kenneth A. Murphy, Esquire

Dated: April 1, 2024

2

Case ID: 220302606
Control No.: 23096781

# EXHIBIT A-70

**FILED**
01 APR 2024 11:15 am
Civil Administration
T. FOBBS

| | | |
|---|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** | : | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| | : | |
| | : | **MARCH TERM, 2022** |
| Plaintiff, | : | **No. 2606** |
| v. | : | |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : | |
| | : | |
| Defendants. | : | |
| **STEPHANIE WILKERSON, on her own behalf and as Parent and Natural Guardian of M.F., a Minor,** | : | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| | : | |
| | : | **SEPTEMBER TERM, 2023** |
| Plaintiff, | : | **No. 0730** |
| v. | : | |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : | |
| | : | |
| Defendants. | : | |

## ORDER

**AND NOW,** this \_\_\_ day of _____ 2024, upon consideration of the Preliminary Objections of Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, "Mead Johnson") to Plaintiff's Complaint, and any Response thereto, it is hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that all claims against Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company are hereby **DISMISSED** with prejudice.

**BY THE COURT:**

_____
J.

| | |
|---|---|
| **CHRISTINA TAYLOR**, on her own behalf and as Parent and Natural Guardian of I.H., a Minor | : **COURT OF COMMON PLEAS**<br>: **PHILADELPHIA COUNTY**<br>:<br>: **MARCH TERM, 2022** |
| Plaintiff, | : **No. 2606** |
| v. | : |
| **MEAD JOHNSON & COMPANY, LLC,** et al., | :<br>:<br>:<br>: |
| Defendants. | : |
| **STEPHANIE WILKERSON**, on her own behalf and as Parent and Natural Guardian of M.F., a Minor, | : **COURT OF COMMON PLEAS**<br>: **PHILADELPHIA COUNTY**<br>:<br>: **SEPTEMBER TERM, 2023** |
| Plaintiff, | : **No. 0730** |
| v. | : |
| **MEAD JOHNSON & COMPANY, LLC,** et al., | :<br>:<br>:<br>: |
| Defendants. | : |

## ORDER

**AND NOW**, this ___ day of _____, 2024, upon consideration of the Preliminary Objections of Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, "Mead Johnson") to Plaintiff's Complaint, and any Response thereto, it is hereby **ORDERED** that the Preliminary Objections are **SUSTAINED**. It is further **ORDERED** that:

1. Count I of Plaintiff's Complaint is **DISMISSED** with prejudice;

2. Count II of Plaintiff's Complaint is **DISMISSED** with prejudice;

3. Count III of Plaintiff's Complaint is **DISMISSED** with prejudice;

4. Count IV of Plaintiff's Complaint is **DISMISSED** with prejudice;

5. Count V of Plaintiff's Complaint is **DISMISSED** with prejudice;

6. Plaintiff's Complaint is **STRICKEN** for lack of specificity;

7.     Plaintiff's claims for punitive damages as to Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company are **DISMISSED** with prejudice, along with all allegations of oppressive, reckless, malicious and/or fraudulent conduct;

8.     Plaintiff Stephanie Wilkerson's claims in her own right are **DISMISSED** with prejudice; and

9.     Plaintiff's Complaint is **STRICKEN** for lack of an appropriate verification.

**BY THE COURT:**

_____
                                                     J.

Case ID: 220302606
Control No.: 23096781

**NOTICE TO PLEAD:**

**To Plaintiff:** You are hereby notified to file a written response to the enclosed Preliminary Objections within twenty (20) days from service hereof or a judgement may be entered against you.

**/s/ Kenneth A. Murphy**
**Attorney for Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company**

**ATTORNEYS FOR DEFENDANTS MEAD JOHNSON & COMPANY, LLC, AND MEAD JOHNSON NUTRITION COMPANY**

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA  19103
(215) 875-0609
kmurphy@tlgattorneys.com

**WELSH & RECKER, P.C.**
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire
306 Walnut Street
Philadelphia, PA  19106
215-972-6430
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

| | |
|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** | : **COURT OF COMMON PLEAS** |
| | : **PHILADELPHIA COUNTY** |
| | : |
| | : **MARCH TERM, 2022** |
| Plaintiff, | : **No. 2606** |
| v. | : |
| | : |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : |
| | : |
| | : |
| Defendants. | : |

Case ID: 220302606
Control No.: 23096781

| | |
|---|---|
| **STEPHANIE WILKERSON, on her own behalf and as Parent and Natural Guardian of M.F., a Minor,** | : **COURT OF COMMON PLEAS** |
| | : **PHILADELPHIA COUNTY** |
| | : |
| | : **SEPTEMBER TERM, 2023** |
| Plaintiff, | : **No. 0730** |
| v. | : |
| | : |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : |
| | : |
| | : |
| Defendants. | : |

### PRELIMINARY OBJECTIONS OF DEFENDANTS MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON NUTRITION COMPANY TO PLAINTIFF'S COMPLAINT

Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (hereinafter "Mead Johnson") hereby preliminarily object to Plaintiff's Complaint, and, in support thereof, aver as follows:

## I.   __INTRODUCTION__

1.      The case before the Court involves speculative and unsupported allegations by Plaintiff that the minor Plaintiff, M.F., developed a condition known as necrotizing enterocolitis ("NEC") resulting from his alleged ingestion of "Similac and/or Enfamil cow's milk-based products" manufactured and sold by Mead Johnson and/or defendant Abbott Laboratories ("Abbott"). Plaintiff fails to identify the particular product that M.F. purportedly ingested, and the entirety of Plaintiff's claims rest on the unsubstantiated conclusion that the product or products consumed by M.F. are unreasonably dangerous. Plaintiff acknowledges that premature infants such as M.F. have an inherent high risk of developing NEC. The Complaint is otherwise devoid of factual support for Plaintiff's claim that Mead Johnson's product caused M.F. to develop NEC.  Plaintiff alleges only that M.F. was born on a certain date; *may* have been provided one of Defendants' pre-term infant feeding products; and, at some point,

developed NEC. But Plaintiff has failed to identify which Mead Johnson product the infant received, if any; what else the infant was fed; when M.F. ingested the product; when M.F. was diagnosed with NEC; what treatment was provided for that condition; or what short- or long term- injury M.F., now almost 8 years old, allegedly sustained. Nowhere in the complaint does Plaintiff allege how cow's milk, or cow's milk-based products (of which Mead Johnson sells multiple varieties for different purposes), purportedly *cause* NEC, or how the facts of M.F.'s case square with any mechanism of action. Pennsylvania's procedural rules do not allow for such gaps in logic and omissions of material facts in a complaint. Accordingly, Plaintiff's Complaint should be dismissed.

2.      Plaintiff instituted this action after filing a writ of summons on September 8, 2023 naming Mead Johnson, Abbott, Pennsylvania Hospital of the University of Pennsylvania ("HUP"), and the Trustees of the University of Pennsylvania as defendants. Notably, Mead Jonson has not been served with any complaint in this case via regular mail or otherwise.

3.      This case mirrors the complaints filed in twenty-three other cases in this Court against Mead Johnson, Abbott, HUP, and other hospitals in Pennsylvania based on claims relating to alleged ingestion of cow's milk-based products by premature infants following their birth. In each complaint, Plaintiffs have made the same unsupported allegations about a product that a minor may or may not have received while providing no scientific support that any such product causes NEC.

4.      Plaintiffs in those cases, including Plaintiff here, allege that "upon information and belief" the Plaintiff-minors, including M.F., developed NEC, a

gastrointestinal disorder that occurs in premature infants, caused by either Mead

Johnson's products "and/or" the products of co-defendant Abbott. *See* Plaintiff's

Complaint, attached as Exhibit "A" at ¶ 1, 12.

5.      In addition to asserting product liability claims against Mead Johnson and

Abbott, as the infant formula manufacturers, Plaintiff has brought claims against HUP

and the Trustees of the University of Pennsylvania alleging liability on theories of failure

to warn and corporate liability.

6.      The factual background regarding the Plaintiff-minor's birth, diagnosis and

injuries are limited to four (4) paragraphs in the Complaint.

7.      Plaintiff avers that M.F. was born prematurely December 17, 2015 and that

"[u]pon information and belief, M.F. was fed Similac and/or Enfamil cow's milk-based

products by staff at Pennsylvania Hospital after his birth." *Id.*, ¶¶ 11–12.

8.      Plaintiff further alleges that "upon information and belief" M.F. developed

NEC shortly after first ingesting the Defendant manufacturers' products. *Id.*, ¶ 13.

9.      Plaintiff generally alleges that M.F. "suffered injuries, including but not

limited to, a diagnosis of NEC, surgery on his intestines, gastrointestinal issues, and he

continues to suffer long term health effects," with no specific description of those alleged

injuries or long-term health effects. *Id.*, ¶ 14.

10.     Mead Johnson Preliminarily Objects to Plaintiff's Complaint for the

reasons stated below and as more fully set forth in the accompanying Memorandum of

Law, which is incorporated herein by reference.

## II.     ARGUMENT

### A.     DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS I, II, III, IV, & V

11.     To survive preliminary objections, Plaintiff must aver sufficient facts, together with the documents and exhibits attached thereto, to make out a *prima facie* case as to all elements of the cause of action. *Northern Forests II, Inc. v. Keta Realty Co.*, 130 A.3d 19, 35 (Pa. Super. 2015).  Plaintiff has failed to do so with respect to all counts against Mead Johnson on the issue of whether cow's milk-based products are unreasonably dangerous.

12.     The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.,* 718 A.2d 305, 307 (Pa. Super. 1998). "A product is defective when it is not safe for its intended use, *i.e.*, the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id*. at 308. Whether a product is "unreasonably dangerous" is a question of law. *Id*.

13.     Plaintiff alleges in Counts I and II of the  Complaint that Mead Johnson, "as [one of] the manufacturers and/or sellers of the products at issue in this litigation," owed Plaintiff and the public a duty to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous and to warn of unreasonable risk of harm posed by their products.  Exhibit "A" at ¶ 97.

14.     Plaintiff similarly alleges in Count III (Negligence) that Mead Johnson, owed Plaintiff and the "consuming public in general" a duty to exercise reasonable care to design, test, manufacture, inspect, and distribute products that were free of unreasonable risk of harm, and in in Count IV (Intentional Misrepresentation) and Count

V (Negligent Misrepresentation) that they owed Plaintiff and the public a duty to provide truthful, accurate, and fulsome information about their cow's milk-based products. Exhibit "A" at ¶¶ 115, 125, 134.

15.     Each count brought against Mead Johnson therefore rests on Plaintiff's theory that cow's milk-based products are unreasonably dangerous, and for strict liability purposes in Counts I & II, defective.

16.     In fact, Mead Johnson's cow's milk-based products are regulated by FDA and legally marketed for use in pre-term infants.  Moreover, in Plaintiff's own Complaint Plaintiff acknowledges that "[p]reterm and low-birth-weight infants are *especially susceptible* to NEC." *See* Exhibit "A" at ¶ 16 (emphasis added).

17.     In support of these theories and claims, Plaintiff offers only vague references to unidentified "[e]xtensive scientific research, including numerous randomized controlled trials" that purportedly prove Mead Johnson's cow's milk-based products cause NEC in preterm and low-birth-weight infants.  Plaintiff neither cites specifically to any randomized trial or consensus statement, nor does Plaintiff offer an explanation of the purported mechanism of action by which cow's milk-based formula products allegedly cause NEC.

18.     Given that Plaintiff has offered nothing but the bald assertion that there is "extensive scientific research" that Mead Johnson's products cause NEC, Plaintiff has failed to adequately allege that the products are unreasonably dangerous.  Accordingly Plaintiff fails to state claims for defective design and failure-to-warn.  Counts I through V should be stricken.

**B.     DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS IV & V**

19.      Plaintiff's claims for intentional and negligent misrepresentation (Counts IV and V) fail because Plaintiff fails to plead these allegations with particularity as required by Pa. R. Civ. P. 1019(b). Specifically, Plaintiff does not allege receipt and reliance upon any particular false representation from Mead Johnson. *See Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) (setting forth the elements of intentional and negligent misrepresentation and noting that both require a false representation upon which the plaintiff ultimately relied).

20.      Intentional misrepresentation requires: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Bortz*, 729 A.2d at 560 (citing *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994)).

21.      Negligent misrepresentation similarly requires a false representation and reliance, "though the speaker need not know his or her words are untrue." *Id.* at 561.

22.      To adequately plead a claim for fraud, Pennsylvania law requires that "(1) the pleadings must adequately explain the nature of the claim to the opposing party so as to permit the preparation of a defense, and (2) they must be sufficient to convince the court that the averments are not merely subterfuge." *Pezzano v. Mosesso*, 2014 WL 5421587, at *5 (Pa. Commw. Oct. 24, 2014) (quoting *Martin v. Lancaster Battery Co., Inc.*, 606 A.2d 444, 448 (Pa. 1992)). Plaintiff's complaint fails on the first prong.

23.      Plaintiff does not allege any specific representation upon which they relied. Nor does she identify the allegedly defective Mead Johnson product that M.F.

Case ID: 220302606
Control No.: 23096781

received. Ex. A, at ¶ 49 (alleging that Mead Johnson "markets and sells **multiple products** specifically targeting premature infants). Instead, the complaint is devoid of any allegation that M.F. received *any* Mead Johnson product at all. *See id.* at ¶ 100 (alleging that "Abbott ***and/or*** Mead's products were fed") (emphasis added). Plaintiff cannot claim reliance on an alleged misrepresentation when there is no identified product to misrepresent. *Kepner v. Tine*, No. 835 EDA 2015, 2015 Pa. Super. Unpub. LEXIS 4257, at *6 (Pa. Super. Nov. 25, 2015) (affirming dismissal of a fraudulent misrepresentation claim for failure to plead a particular misrepresentation). And, crucially, Mead Johnson is left wondering which, if any, product they should defend and what alleged "misrepresentations" to contest. *Pezzano*, 2014 WL 5421587, at *5.

24.     Pennsylvania law demands more. *See* Pa. R. Civ. P. 1019(b).  Other courts around the country have dismissed similar misrepresentation claims for lack of specificity.  *E.g.*, Ex. B, *In re Mead Johnson Product Cases*, CJC-23-005257, at 6–8 (Cal. Sup. Ct. July 7, 2023); *Casino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1469 (Cal. Ct. App. 2014) ("[W]hen a plaintiff asserts fraud against a corporation, the plaintiff must allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.") (internal quotation marks omitted); *Peterson v. Clark Lake Homes Inc.*, 2022 WL 16910578, at *4 (Minn. Ct. App. (Nov. 14, 2022) (requiring identification of the "who, what, when, where, and how" for a claim of fraud).

25.     Moreover, failure to allege any relationship between a specific misrepresentation (which they do not identify), a specific product (which they do not identify), and an injury means there can be no inference of proximate causation. *See*

Case ID: 220302606
Control No.: 23096781

*Kepner*, No. 835 EDA 2015, 2015 Pa. Super. Unpub. LEXIS 4257, at *6 (requiring a

particular misrepresentation); *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963,

969 (Pa. Super. Ct. 1985) (affirming dismissal of negligence claim where plaintiff failed

to properly identify the product or its manufacturer). Causation is a hallmark of any tort

action in Pennsylvania, including misrepresentation. *Bortz*, 729 A.2d at 560 (citing

*Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994)). *See also Soldo v. Sandoz Pharms.*

*Corp.*, 244 F. Supp. 2d 434, 524 (W.D. Pa. 2003) ("Proof of causation is a necessary

element in a products liability action. Absent a causal relationship between the

defendant's product and the plaintiff's injury the defendant cannot be held liable on a

theory of negligence, strict product liability, or misrepresentation") (applying

Pennsylvania law) (citing *O'Brien v. Sofamar, S.N.C.*, No. CIV. A. 96–8015, 1999 WL

239414 (E.D. Pa.1999)).  Absent identification of the manufacturer of the allegedly

defective product, "there can be no allegations of . . . legal causation, and hence there

can be no liability." *Cummins*, 495 A.2d at 968–69 (citing *Hamil v. Bashline*, 392 A.2d

1280 (Pa. 1978)).

     26.    Thus, Plaintiff's intentional and negligent misrepresentation claims against

Mead Johnson must be dismissed.

     **C.**    **MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES**

     27.    Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in

the nature of a motion to strike for insufficient specificity in a pleading.  Plaintiff's failure

to specify the nature of the products ingested and injuries sustained serves as an

alternative ground on which all of their claims should be stricken.

28.    A plaintiff's Complaint is required to provide a defendant with notice of

what the plaintiff's claims are and the grounds upon which they rest, and the Complaint

must also formulate the issues by summarizing the facts essential to support the claims.

*Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352

(Pa. Super. 1983) (citations omitted).

29.    Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material

facts on which a cause of action or defense is based shall be stated in a concise and

summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a)
> is to require the pleader to disclose the material facts
> sufficient to enable the adverse party to prepare his case. **A
> complaint therefore must do more than give the
> defendant fair notice of what the plaintiff's claim is and
> the grounds upon which it rests. It should formulate the
> issues by fully summarizing the material facts. Material
> facts are ultimate facts, i.e., those facts essential to
> support the claim. Evidence from which such facts may
> be inferred not only need not but should not be alleged.
> Allegations will withstand challenge under 1019(a) if (1)
> they contain averments of all of the facts a plaintiff will
> eventually have to prove in order to recover, and (2) they
> are sufficiently specific so as to enable defendant to
> prepare his defense.**

*Baker v. Rangos*, 324 A,2d 498, 505-506 (Pa. Super. 1974) (citations and

internal quotations omitted) (emphasis added).

30.    Further, it is well established that, with regard to the description of injuries

sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put

the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99

A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature,**

**location and duration of the injuries suffered, and injuries that are permanent**

Case ID: 220302606
Control No.: 23096781

**should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.").

31.     As noted above, Plaintiff's Complaint is facially deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case, each of which are uniquely within her competence:

- Plaintiff's allegation that "upon information and belief," the minor was fed Similac and/or Enfamil after his birth (Exhibit "A," at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide Mead Johnson with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products;

- Plaintiff has failed to identify which of the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names were ingested by the minor. *Id*. at ¶¶ 48–49;

- Plaintiff does not describe the period of time in which such products were ingested, when the minor was allegedly diagnosed with NEC, or what treatment was provided for that condition;

- Plaintiff does not specify the nature of the injuries and "long-term health effects" that are alleged to have resulted from the diagnosis of NEC.

32.     Furthermore, Plaintiff's damages claim is not stated with particularity and is amorphous, vague, and open-ended. Pursuant to Pennsylvania pleading

Case ID: 220302606
Control No.: 23096781

requirements, Mead Johnson should not be compelled to defend a claim for which the statement of injury is unspecified and subject to change.

33.     These omissions are fatal defects in Plaintiff's Complaint. Therefore, Plaintiff's Complaint should be stricken in its entirety.

**D.     MOTION TO STRIKE PLAINTIFF'S CLAIMS FOR PUNITIVE DAMAGES**

34.     In the *Ad Damnum* clauses of Counts I, II, III, IV, and V of her Complaint, Plaintiff makes baseless accusations that Mead Johnson engaged in oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages. *See* Exhibit "A," pp. 25, 28, 31, 34, and 37.

35.     Punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987).

36.     Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death. *See, e.g., Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff

Case ID: 220302606
Control No.: 23096781

alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages.")

37. Here, the Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Mead Johnson. Read most generously, Plaintiff's Complaint alleges that Mead Johnson failed to warn co-defendant HUP of a risk of NEC associated with its legally-marketed cow's milk-based product – a risk about which Plaintiff alleges that HUP was already aware. *See* Compl. ¶¶ 86–92. And with respect to M.F.'s care, Plaintiff merely alleges that "upon information and belief" M.F. may have been given a product sold by Mead Johnson absent any context to indicate that such a product was inappropriate based on the specific issues involved in M.F.'s medical care and condition following birth.

38. For example, the Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

39. Plaintiff's allegations of oppressive, malicious and similar conduct must be rejected as mere boilerplate. Indeed, the fact that Plaintiffs in these cases have filed

numerous lawsuits against at least four other hospitals in Philadelphia based on identical claims belies the contention that Mead Johnson engaged in outrageous or malicious conduct in allegedly selling a cow's milk-based product that was used to feed the Plaintiff-minor.

40.     The facts underlying Plaintiff's bare assertions of oppressive, reckless, malicious and fraudulent conduct do not come close to meeting the requisite standard under Pennsylvania law that would permit an award of punitive damages. Absent specific factual allegations to justify the claim that Mead Johnson's actions as they pertain to Plaintiff's particular facts and circumstances were extreme and outrageous, there is no basis for an award of punitive damages in this case, and Plaintiff's claims for such must be stricken from the Complaint pursuant to Rule 1028(a)(3).

### E.     MOTION TO STRIKE PLAINTIFF-PARENT'S CLAIMS

41.     The Court should strike Plaintiff-parent's claims to recover damages in her own right and as the parent and natural guardian of M.F.

42.     In each count of the complaint, Plaintiff-parent alleges that she "suffered significant emotional distress, loss of income, and/or other harms" and that "[h]er life has been significantly affected by the Injured Infant's injuries."  Ex. A, ¶¶ 105, 113, 122, 131, and 141.

43.     This is insufficient.  Plaintiff-Parent fails to meet the pleading requirements of Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint shall state the cause of action, any special damage, and the demand for relief of each plaintiff in a separate count, preceded by a heading naming the parties to the causes of action therein set forth.

44.     Plaintiff-parent plainly does not allege any claim in separate counts or state any cause of action. Rather, the claims are incorporated in a single, tagalong paragraphs at the end of the existing counts.

45.     Additionally, Plaintiff-parent does not complain of any physical injury. It is well established that "no cause of action exists for negligence that results solely in economic damages unaccompanied by physical injury or property damage." *Excavation Techs., Inc. v. Columbia Gas Co. of Pa.*, 985 A.2d 840, 841 n.3 (Pa. 2009) (citing *Adams v. Copper Beach Townhome Comtys., L.P.*, 816 A.2d 301, 305 (Pa. Super. 2003)); *Miller v. Evenflo Co., Inc.*, 2009 WL 10689606, at *4 (W.D. Pa. Dec. 21, 2009) (dismissing plaintiff-parents' tort claims where only physical injury was to minor plaintiff). So too for claims sounding in strict products liability. *Schmidt v. Boardman Co.*, 11 A.3d 924, 953 (Pa. 2011) ("We would hold that, for purposes of a strict products liability claim, a plaintiff's recovery for emotional distress is limited to that which is proximately caused by contemporaneous physical impact").

**F.     MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR FAILURE TO COMPLY WITH Pa.R.C.P. 1024**

46.     Finally, Pennsylvania Rule of Civil Procedure 1024(a) requires verification of every pleading containing a factual averment based upon the signer's personal knowledge or information and belief.

47.     Rule 1024(c) requires that the verification be made by one or more of the parties filing the pleading.

48.     In this case, the complaint lacks any verification. *See* Exhibit "A."

49.     Accordingly, the Complaint should be stricken for lack of an appropriate verification.

WHEREFORE, Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company respectfully request that this Honorable Court sustain the instant Preliminary Objections and enter the attached proposed Order.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Dated:  April 1, 2024

/s/ Kenneth A. Murphy
Kenneth A. Murphy, Esquire

**WELSH & RECKER, P.C.**

/s/ Catherine M. Recker
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire

**Attorneys for Defendants,**
**Mead Johnson & Company, LLC and**
**Mead Johnson Nutrition Company**

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA  19103
(215) 875-0609
kmurphy@tlgattorneys.com

**WELSH & RECKER, P.C.**
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire
306 Walnut Street
Philadelphia, PA  19106
215-972-6430
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

**ATTORNEYS FOR DEFENDANTS
MEAD JOHNSON & COMPANY, LLC,
AND MEAD JOHNSON NUTRITION
COMPANY**

| | |
|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor**<br><br>Plaintiff,<br><br>v.<br><br>**MEAD JOHNSON & COMPANY, LLC, et al.,**<br><br>Defendants. | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY**<br><br>**MARCH TERM, 2022<br>No. 2606** |
| **STEPHANIE WILKERSON, on her own behalf and as Parent and Natural Guardian of M.F., a Minor,**<br><br>Plaintiff,<br><br>v.<br><br>**MEAD JOHNSON & COMPANY, LLC, et al.,**<br><br>Defendants. | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY**<br><br>**SEPTEMBER TERM, 2023<br>No. 0730** |

**MEMORANDUM OF LAW IN SUPPORT OF PRELIMINARY OBJECTIONS OF
DEFENDANTS MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON
NUTRITION COMPANY TO PLAINTIFF'S COMPLAINT**

I.    **MATTER BEFORE THE COURT**

Preliminary Objections of Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, "Mead Johnson") to Plaintiff's Complaint.

The case before the Court involves speculative and unsupported allegations by Plaintiff that minor Plaintiff, M.F., developed a condition known as necrotizing enterocolitis ("NEC") following her alleged ingestion of "Similac and/or Enfamil cow's milk-based products" manufactured and sold by Mead Johnson and/or Abbott Laboratories ("Abbott"). Plaintiff fails to identify the particular product that M.F. purportedly ingested, and the entirety of the claims rest on the unsubstantiated conclusion that the product or products consumed by M.F. are unreasonably dangerous. Plaintiff acknowledges that premature infants such as M.F. have an inherent high risk of developing NEC. The Complaint is otherwise devoid of factual support for Plaintiff's claim that Mead Johnson's product caused M.F. to develop NEC.  Plaintiff alleges only that M.F. was born on a certain date; *may* have been provided one of Defendants' pre-term infant feeding products; and, at some point, developed NEC.  But, Plaintiff has failed to identify which, if any, Mead Johnson product the infant received; what else the infant was fed; when M.F. ingested the product; when M.F. was diagnosed with NEC; what treatment was provided for that condition; or what short- or long term- injury M.F., now almost 8 years old, allegedly sustained. Nowhere does Plaintiff allege how cow's milk, or cow's milk-based products (of which Mead Johnson sells multiple varieties for different purposes), purportedly *cause* NEC, or how the facts of M.F.'s case square with any mechanism of action.  Pennsylvania's procedural rules

Case ID: 220302606
Control No.: 23096781

do not allow for such gaps in logic and omissions of material facts in a complaint. Accordingly, Plaintiff's Complaint should be dismissed.

## II. <u>STATEMENT OF QUESTIONS PRESENTED</u>

1. Whether this Honorable Court should dismiss Count I of Plaintiff's Complaint "Strict Liability for Design Defect" cause of action with prejudice because Plaintiff's Complaint does not support the claim that cow's milk-based products are unreasonably dangerous, and Mead Johnson cannot be held liable for a defective design?

*Suggested Answer in the affirmative.*

2. Whether this Honorable Court should dismiss Count II of Plaintiff's Complaint "Strict Liability for Failure to Warn" cause of action with prejudice because Plaintiff's Complaint does not support the claim that cow's milk-based products are unreasonably dangerous, and Mead Johnson cannot be held liable for failure-to-warn?

*Suggested Answer in the affirmative.*

3. Whether this Honorable Court should dismiss Count III of Plaintiff's Complaint "Negligence" cause of action with prejudice on the basis of absence of proof of an unreasonably dangerous product?

*Suggested Answer in the affirmative.*

4. Whether this Honorable Court should dismiss Count IV of Plaintiff's Complaint "Intentional Misrepresentation" cause of action with prejudice on the basis of absence of proof of an unreasonably dangerous product, and failure to plead any specific representation allegedly relied upon by Plaintiff?

*Suggested Answer in the affirmative.*

5.      Whether this Honorable Court should dismiss Count V of Plaintiff's Complaint "Negligent Misrepresentation" cause of action with prejudice on the basis of absence of proof of an unreasonably dangerous product, and failure to plead any specific representation allegedly relied upon by Plaintiff?

*Suggested Answer in the affirmative.*

6.      Whether this Honorable Court should strike Plaintiff's Complaint in its entirety for insufficient specificity of the facts and alleged injuries?

*Suggested Answer in the affirmative.*

7.      Whether this Honorable Court should strike Plaintiff's claims for punitive damages as to Mead Johnson because the Complaint fails to plead facts providing a basis for an award of punitive damages?

*Suggested Answer in the affirmative.*

8.      Whether this Honorable Court should strike Plaintiff's Complaint for failure to provide a client verification as required by Pa.R.C.P. 1024?

*Suggested Answer in the affirmative.*

## III.     **INTRODUCTION AND FACTUAL BACKGROUND**

There have now been more than 30 nearly identical lawsuits filed by parents on behalf of their prematurely born children against Mead Johnson, Abbott, and various Pennsylvania healthcare systems alleging that exposure to preterm formula and human milk fortifier—products found in neonatal intensive care units throughout the country—caused a disease known as necrotizing enterocolitis, a common syndrome in infants born prematurely.

Each complaint, including M.F.'s, alleges that the plaintiff-minors ingested either Mead Johnson's products "and/or" the products of co-defendant Abbott. *See* Plaintiff's Complaint, attached as Exhibit "A" at ¶ 1, 12. Many of the allegations of the Complaint are pled "upon information and belief," including the allegations that Plaintiff-minors actually received infant formula or fortifier, and that they developed NEC shortly after being fed with infant formula or fortifier. As discussed in detail below, Plaintiff's claims against Mead Johnson are legally and factually deficient.

Mead Johnson manufactures and sells products, including those under the brand name "Enfamil," to help meet the nutritional needs of infants. *Id.* ¶ 49. Some of these products are designed to be fed to premature or low-birth-weight infants who have special nutritional needs at birth. *Id.* ¶ 49. These products include formulas, which are given to infants who are not fed breast milk, and fortifiers, which are used to supplement pumped breast milk with additional nutrients. *See id.* ¶ 53 (photo of Enfamil Human Milk Fortifier: "For premature and low-birth-weight infants fed breast milk"). Some Enfamil products, particularly those intended to be fed to premature or low-birth-weight infants, are intended to be used only under the supervision of a physician. *See id.* (photo of Enfamil Human Milk Fortifier: "To be used only under the supervision of a physician"). Co-defendant Abbott also sells formulas and fortifiers meant to be fed to premature or low-birth-weight infants under the brand name "Similac." *Id.* at ¶¶ 48, 53. Plaintiff avers that Abbott sells at least seven types of products directed to preterm and/or low birth weight infants, six of which use the name Similac, and that Mead Johnson sells eight types of infant formulas and fortifiers using the Enfamil brand name. *Id.*, ¶¶ 48–49.

Case ID: 220302606
Control No.: 23096781

Infant formulas and fortifiers for pre-term and low-birth-weight infants are regulated by the FDA. Mead Johnson is required to submit information about its pre-term products, including their ingredients, to the FDA, 21 C.F.R. § 107.50(b)(3), and the FDA is required to review that submission. The FDA may also impose changes to such a product's composition or labeling. *Id.* § 107(d)(1).

The formula and fortifier products identified by Plaintiff as being manufactured by Mead Johnson are made using ingredients derived from cow's milk. Ex. A at ¶ 12. Although Plaintiff avers that "Cow's Milk-Based Feeding Products Are Known to Cause NEC," she offers only a single sentence to support that proposition. *Id.* at ¶ 16. Citing unidentified "extensive scientific research, including numerous randomized trials," Plaintiff alleges that it has been "confirmed" that bovine-based products "cause NEC in preterm and low-birth-weight infants."[1] *Id.*

Moreover, Plaintiff's Complaint provides scant information regarding M.F.'s own circumstances. Plaintiff avers that M.F. was born prematurely on December 17, 2015 and that "[u]pon information and belief M.F. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital after his birth." *Id.* at ¶ 12. Plaintiff further alleges that "upon information and belief" M.F. developed NEC shortly after first ingesting Mead Johnson and/or Co-Defendant Abbott's products. *Id.* ¶ 13. Plaintiff provides no details regarding her condition following birth other than that she developed NEC on an unidentified date. Further, Plaintiff alleges no facts as to whether Plaintiff-parent provided breast milk to M.F., whether she had the opportunity to use donor milk,

---

[1] Taken to their logical conclusion, Plaintiff's allegations, if true, would mean that doctors, hospitals, FDA, and formula companies around the country are actively engaged in administering, approving, and selling products designed specifically for preterm infants *that have been "confirmed"* to cause an often fatal disease in those same infants. Plaintiff offers no evidence for this conspiracy.

and if M.F. actually received a cow's milk product, what it was, how much, and for how long. Finally, the Complaint is silent as to the nature and extent of M.F.'s alleged injuries other than a vague reference to "long term health effects." *Id*. ¶ 14.

Further, the Complaint does not provide any details whatsoever regarding communications between Plaintiff-parent and medical providers at HUP regarding the allegations that M.F. may have been fed with Mead Johnson and/or Abbott cow's milk-based products in the hospital. Plaintiff concedes in the Complaint that mothers are encouraged by their healthcare professionals to breastfeed. *Id.* ¶ 52. But Plaintiff does not provide any information regarding discussions between Plaintiff-parent and any health care providers at HUP related to breastfeeding and/or using cow's milk-based products in this case. As noted, Plaintiff plead that Plaintiff-minor ingested formula "on information and belief" only, and similarly plead "on information and belief" that Plaintiff-minor developed NEC as a result.

## IV.  ARGUMENT

### A.  DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS I, II, III, IV & V

Pursuant to Pa.R.C.P. 1028(a)(4), a party may file preliminary objections to a complaint, in the nature of a demurrer, for legal insufficiency in a pleading. A court should grant a demurrer where, accepting as true all well pled facts, a legal cause of action cannot be maintained upon those facts. Pa.R.C.P. 1028(a)(4); *See also, Willet v. Pennsylvania Med. Catastrophe Loss Funds,* 702 A.2d 850, 853 (Pa. 1997). In this case, Counts I, II, III, IV, and V of Plaintiff's Complaint should be stricken pursuant to this Rule, as Plaintiff has failed to plead with sufficient detail to survive the pleading stage that Mead Johnson's cow's milk-based products were unreasonably dangerous.

To survive preliminary objections, Plaintiff must aver sufficient facts, together with the documents and exhibits attached thereto, to make out a *prima facie* case as to all elements of the cause of action. *Northern Forests II, Inc. v. Keta Realty Co.*, 130 A.3d 19, 35 (Pa. Super. 2015). "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. American Honda Motor Co., Inc.,* 718 A.2d 305, 307 (Pa. Super. 1998). "A product is defective when it is not safe for its intended use, *i.e.*, the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id*. at 308. Whether a product is "unreasonably dangerous" is a question of law. *Id*.

Plaintiff alleges in Counts I and II of her Complaint that Mead Johnson, "as the manufacturers and/or sellers of the products at issue in this litigation," owed Plaintiff and the public a duty to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous and to warn of unreasonable risk of harm posed by their products. Plaintiff similarly alleges in Count III (Negligence) that Mead Johnson, owed Plaintiff and the public a duty to exercise reasonable care to design, test, manufacture, inspect, and distribute products that were free of unreasonable risk of harm, and in Count IV (Intentional Misrepresentation) and Count V (Negligent Misrepresentation) that Mead Johnson owed Plaintiff and the public a duty to provide truthful, accurate, and fulsome information about their cow's milk-based products. Each count brought against Mead Johnson therefore rests on Plaintiff's theory that cow's milk-based products are unreasonably dangerous, and for strict liability purposes in Counts I & II, defective.

In fact, Mead Johnson's cow's milk-based products are regulated by FDA and legally marketed for use in pre-term infants. Moreover, in Plaintiff's own Complaint she

Case ID: 220302606
Control No.: 23096781

acknowledges that "[p]reterm and low-birth-weight infants are *especially susceptible* to NEC." *See* Exhibit "A" at ¶ 16 (emphasis added).

In support of her theories and claims, Plaintiff offers only vague references to unidentified "[e]xtensive scientific research, including numerous randomized controlled trials" that purportedly prove Mead Johnson's cow's milk-based products cause NEC in preterm and low-birth-weight infants. Plaintiff neither cites specifically to any randomized trial or consensus statement nor offer an explanation of the purported method of action by which cow's milk-based formula products allegedly cause NEC.

Moreover, as *Weiner* notes, a plaintiff must aver sufficient facts demonstrating the Mead Johnson's products are unreasonably dangerous **for their intended use**, triggering Mead Johnson's duty to warn. The only factual reference Plaintiff makes with regard to intended use is to marketing campaigns, where Defendant Manufacturers allegedly advertised that "cow's milk-based products are necessary for proper growth and development of preterm infants." *See* Exhibit "A" at ¶ 54. She has not averred sufficient facts to demonstrate that cow's milk-based products are unreasonably dangerous for this purpose.

Consequently, Counts I through V should be stricken with prejudice or failure to state a claim.

**B.    DEMURRER FOR FAILURE TO STATE A CLAIM AS TO COUNTS IV & V**

Plaintiff's claims for intentional and negligent misrepresentation (Counts IV and V) fail because Plaintiff does not allege that she received and relied upon any specific representation from Mead Johnson. *See Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) (setting forth the elements of intentional and negligent misrepresentation and noting that

Case ID: 220302606
Control No.: 23096781

both require a false representation upon which the plaintiff ultimately relied). The complaint not only fails to identify the allegedly defective Mead Johnson product that M.F. received, it fails even to allege that M.F. received *any* Mead Johnson product. *See* Ex. A, Compl. ¶ 49 (alleging that Mead Johnson "markets and sells **multiple products** specifically targeting premature infants); ¶ 100 (alleging that "Abbott **and/or** Mead Johnson's products were fed") (emphasis added). Plaintiff cannot claim reliance on an alleged misrepresentation when there is no identified product to misrepresent. *Kepner v. Tine*, No. 835 EDA 2015, 2015 Pa. Super. Unpub. LEXIS 4257, at *6 (Pa. Super. Nov. 25, 2015) (affirming dismissal of a fraudulent misrepresentation claim for failure to plead a particular misrepresentation).

Pennsylvania law demands more. *See* Pa. R. Civ. P. 1019(b). Other courts around the country have dismissed similar misrepresentation claims for lack of specificity. *E.g.*, Ex. B, *In re Mead Johnson Product Cases*, CJC-23-005257, at 6–8 (Cal. Sup. Ct. July 7, 2023); *Casino v. Bank of Am.*, 224 Cal. App. 4th 1462, 1469 (Cal. Ct. App. 2014) ("[W]hen a plaintiff asserts fraud against a corporation, the plaintiff must allege the names of the persons who made the allegedly fraudulent representations, their authority to speak, to whom they spoke, what they said or wrote, and when it was said or written.") (internal quotation marks omitted); *Peterson v. Clark Lake Homes Inc.*, 2022 WL 16910578, at *4 (Minn. Ct. App. (Nov. 14, 2022) (requiring identification of the "who, what, when, where, and how" for a claim of fraud).

Intentional misrepresentation requires: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it;

(5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Bortz*, 729 A.2d at 560 (citing *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994)).

Negligent misrepresentation similarly requires a false representation and reliance, "though the speaker need not know his or her words are untrue." *Id.* at 561. Here, Plaintiff's misrepresentation claims fail because they fail to sufficiently allege any relationship between a specific misrepresentation (which they do not identify), a specific product (which they do not identify), and an injury. *See Kepner*, No. 835 EDA 2015, 2015 Pa. Super. Unpub. LEXIS 4257, at *6 (requiring a particular misrepresentation); *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 969 (Pa. Super. Ct. 1985) (affirming dismissal of negligence claim where plaintiff failed to properly identify the product or its manufacturer). Causation is a hallmark of any tort action in Pennsylvania. *Soldo v. Sandoz Pharms. Corp.*, 244 F. Supp. 2d 434, 524 (W.D. Pa. 2003) ("Proof of causation is a necessary element in a products liability action. Absent a causal relationship between the defendant's product and the plaintiff's injury the defendant cannot be held liable on a theory of negligence, strict product liability, or misrepresentation") (applying Pennsylvania law) (citing *O'Brien v. Sofamar*, S.N.C., No. CIV. A. 96–8015, 1999 WL 239414 (E.D. Pa.1999)). Absent identification of the manufacturer of the allegedly defective product, "there can be no allegations of . . . legal causation, and hence there can be no liability." *Cummins*, 495 A.2d at 968–69 (citing *Hamil v. Bashline*, 392 A.2d 1280 (Pa. 1978)). Plaintiff's intentional and negligent misrepresentation claims against Mead Johnson must therefore be dismissed.

**C.    MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR INSUFFICIENT SPECIFICITY AS TO THE FACTS AND ALLEGED INJURIES**

Case ID: 220302606
Control No.: 23096781

Pursuant to Pa.R.C.P. 1028(a)(3), a party may file preliminary objections in the nature of a motion to strike for insufficient specificity in a pleading. Plaintiff's failure to specify the nature of the products ingested and injuries sustained serves as an alternative ground on which all of her claims should be stricken.

A plaintiff's Complaint is required to provide a defendant with notice of what the plaintiff's claims are and the grounds upon which they rest, and the Complaint must also formulate the issues by summarizing the facts essential to support the claims. *Alpha Tau Omega Fraternity v. The University of Pennsylvania*, 464 A.2d 1349, 1352 (Pa. Super. 1983) (citations omitted). Pennsylvania Rule of Civil Procedure 1019(a) provides that "the material facts on which a cause of action or defense is based shall be stated in a concise and summary form." Pa.R.C.P. 1019(a). As the Superior Court has noted,

> Rule 1019(a) requires fact pleading. The purpose of 1019(a) is to require the pleader to disclose the material facts sufficient to enable the adverse party to prepare his case. **A complaint therefore must do more than give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. It should formulate the issues by fully summarizing the material facts. Material facts are ultimate facts, i.e., those facts essential to support the claim. Evidence from which such facts may be inferred not only need not but should not be alleged. Allegations will withstand challenge under 1019(a) if (1) they contain averments of all of the facts a plaintiff will eventually have to prove in order to recover, and (2) they are sufficiently specific so as to enable defendant to prepare his defense.**

*Baker v. Rangos*, 324 A,2d 498, 505-506 (Pa. Super. 1974) (citations and internal quotations omitted) (emphasis added).

Further, it is well established that, with regard to the description of injuries sustained by a plaintiff, the Complaint must be stated with sufficient particularity to put

Case ID: 220302606
Control No.: 23096781

the defendant on notice of evidence that may be produced at trial. *Kelly v. Martino*, 99 A.2d 901 (Pa. 1953). **A plaintiff's Complaint must set forth the extent, nature, location and duration of the injuries suffered, and injuries that are permanent should be stated specifically.** *Miller v. Perrige*, 71 Pa. D. & C.2d 476, 479–80 (Pa. Com. Pl. 1975). *See, also, Kopan v. Hawk*, 14 Pa. D. & C.2d 713, 714 (Pa. Com. Pl. 1958) ("A catchall averment of "other injuries" is nothing more than a generalized averment under which any injuries whatever could be proved at the trial. Defendant would have no knowledge in advance of the trial of what they are.")

As noted above, Plaintiff's Complaint is facially deficient with regard to the specificity of the allegations of the relevant facts and injuries at issue in this case, each of which are uniquely within her competence. Specifically, Plaintiff's description of the material facts relating to the minor's care and treatment, diagnosis and injuries is limited to four paragraphs, which are utterly insufficient to enable defendants to prepare their defenses. *See* Exhibit "A," ¶¶ 11-14. Plaintiff's allegation that "upon information and belief," the minor was fed Similac and/or Enfamil shortly after her birth (*Id*. at ¶ 12) does not comply with the fact-pleading requirements of Rule 1019(a), since such allegations do not provide Mead Johnson with appropriate notice of the facts as to whether the minor actually ingested cow's milk-based products. Further, Plaintiff has failed to allege which of the numerous products sold by Abbott and Mead Johnson under the Similac and Enfamil brand names M.F. *Id*. at ¶¶ 48-49. Plaintiff's Complaint further fails to provide a description of the material facts as to the period of time in which such products were ingested, when the minor was allegedly diagnosed with NEC and what treatment was provided for that condition.

In short, Plaintiff's Complaint is inconsistent with the requirements of the Pennsylvania Rules of Civil Procedure as to the necessary specificity for the description of the facts and alleged injuries sustained. The facts in the Complaint are pleaded almost entirely "on information and belief." These omissions are fatal defects in Plaintiff's Complaint. Therefore, Plaintiff's Complaint should be stricken in its entirety.

D.    **MOTION TO STRIKE PLAINTIFF'S CLAIMS FOR PUNITIVE DAMAGES**

As in the other infant formula cases, in the *Ad Damnum* clauses of Counts I, II, III, IV, and V of the Complaint, Plaintiff makes baseless accusations that Mead Johnson engaged in oppressive, reckless, malicious and/or fraudulent conduct that allegedly justify an award of punitive damages. *See* Exhibit "A," pp. 25, 28, 31, 34, and 37. However, the Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Mead Johnson. Accordingly, Plaintiff's claims for punitive damages should be stricken.

Punitive damages can be awarded only for conduct involving some element of outrage. *Hutchinson v. Luddy*, 582 Pa. 114, 870 A.2d 766 (2005). For that reason, Pennsylvania Supreme Court decisions establish that "punitive damages are an 'extreme remedy' available in only the most exceptional matters." *Wagner v. Onofrey*, 2006 Pa. Dist. & Cnty. Dec. LEXIS 333, *11 (Pa. Com. Pl. 2006) (citing *Phillips v. Cricket Lighters*, 584 Pa. 179, 188, 883 A.2d 439, 445 (2005)). Punitive damages may not be awarded for misconduct that constitutes ordinary negligence such as inadvertence, mistake and errors of judgment. *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985); *McDaniel v. Merck, Sharp & Dohme*, 533 A.2d 436, 437 (Pa. Super. 1987). An award of punitive damages must be supported by evidence of

Case ID: 220302606
Control No.: 23096781

conduct more serious than the mere commission of the underlying tort. *Allstate Ins. Co. v. A.M. Pugh Assoc., Inc.*, 604 F. Supp. 85, 99 (M.D. Pa. 1984).

Where the facts as averred show nothing more than negligence, a lapse in judgment, or mere inadvertence, courts in Pennsylvania have dismissed pleas and claims for punitive damages, often at the pleadings stage of litigation and even if the complaint alleged severe injuries or death. *See, e.g., Brownawell v. Bryan*, 40 Pa. D. & C.3d 604, 606 (Pa. Com. Pl. 1985) (dismissing punitive damages claim where a plaintiff alleged that a physician negligently performed a spinal fusion surgery that left the plaintiff with severe neurological defects, and noting that "**the mere pleading of outrageous conduct** does not, of course, satisfy the requirement stating facts which, if proven, would form a basis for a jury concluding that the conduct was such that an award of punitive damages was warranted.") (emphasis added); *Wagner*, *supra* at *11 (contentions that physician failed to prescribe antibiotics, order certain tests or request an infectious disease consult constituted "nothing more than ordinary negligence and are insufficient to support an award of punitive damages.").

Here, the Complaint contains no specific allegations of conduct that would permit recovery of punitive damages as to Mead Johnson. Read most generously, Plaintiff's Complaint alleges that Mead Johnson failed to warn co-defendant HUP of a risk of NEC associated with its legally-marketed cow's milk-based product – a risk about which Plaintiff also alleges that HUP was already aware. *See* Compl. ¶¶ 86–92. And with respect to M.F.'s care, Plaintiff merely alleges that "upon information and belief" M.F. may have been given a product sold by Mead Johnson absent any context to indicate that such a product was inappropriate based on the specific issues involved in M.F.'s

Case ID: 220302606
Control No.: 23096781

medical care and condition following birth.  For example, the Complaint gives no indication of whether Plaintiff-parent refused or was unable to provide breast milk and provides no information as to discussions between her and any health care providers regarding the purported use of cow's milk-based products.

Plaintiff's allegations of oppressive, malicious and similar conduct must be rejected as mere boilerplate. As discussed above, the FDA reviews Mead Johnson's pre-term infant feeding products and has not restricted the use of cow's milk-based products for such infants. Indeed, the fact that Plaintiffs have filed numerous lawsuits against at least four other hospitals in Philadelphia based on identical claims belies the contention that Mead Johnson engaged in outrageous or malicious conduct in allegedly in allegedly selling a cow's milk-based product that was used to feed the Plaintiff-minor. Absent specific factual allegations to justify the claim that Mead Johnson's actions as they pertain to Plaintiff's particular facts and circumstances were extreme and outrageous, there is no basis for an award of punitive damages in this case, and Plaintiff's claims for such must be stricken from the Complaint pursuant to Rule 1028(a)(3).

### E.    <u>MOTION TO STRIKE PLAINTIFF-PARENT'S CLAIMS</u>

The Court should strike Plaintiff-parent's claims to recover damages in her own right and as the parent and natural guardian of M.F., both because they are inadequately pled and because she has not suffered physical injury.

In each count of the complaint, Plaintiff-parent alleges that she "suffered significant emotional distress, loss of income, and/or other harms" and that "[h]er life has been significantly affected by the Injured Infant's injuries."  See Ex. A, ¶¶ 105, 113,

122, 131, and 141.  This is insufficient.  Plaintiff-Parent fails to meet the pleading

requirements of Pa.R.C.P. 1020(b), which provides as follows:

> If persons join as plaintiffs under Rules 2228, 2229(a) or (e), the complaint
> shall state the cause of action, any special damage, and the demand for relief of
> each plaintiff in a separate count, preceded by a heading naming the parties to
> the causes of action therein set forth.

Plaintiff-parent plainly does not allege any claim in separate counts or state any cause

of action. Rather, the claims are incorporated in a single, tagalong paragraphs at the

end of the existing counts.

Additionally, Plaintiff-parent does not complain of any physical injury. It is well

established that "no cause of action exists for negligence that results solely in economic

damages unaccompanied by physical injury or property damage." *Excavation Techs.,*

*Inc. v. Columbia Gas Co. of Pa.*, 985 A.2d 840, 841 n.3 (Pa. 2009) (citing *Adams v.*

*Copper Beach Townhome Comtys., L.P.*, 816 A.2d 301, 305 (Pa. Super. 2003)); *Miller*

*v. Evenflo Co., Inc.*, 2009 WL 10689606, at *4 (W.D. Pa. Dec. 21, 2009) (dismissing

plaintiff-parents' tort claims where only physical injury was to minor plaintiff)  So too for

claims sounding in strict products liability. *Schmidt v. Boardman Co.*, 11 A.3d 924, 953

(Pa. 2011) ("We would hold that, for purposes of a strict products liability claim, a

plaintiff's recovery for emotional distress is limited to that which is proximately caused

by contemporaneous physical impact").

### F.    MOTION TO STRIKE PLAINTIFF'S COMPLAINT FOR FAILURE TO COMPLY WITH Pa.R.C.P. 1024

Pennsylvania Rule of Civil Procedure 1024(a) requires verification of every

pleading containing a factual averment based upon the signer's personal knowledge or

information and belief. Rule 1024(c) requires that the verification be made by one or

Case ID: 220302606
Control No.: 23096781

more of the parties filing the pleading. In this case, the complaint lacks <u>any</u> verification. *See* Exhibit "A." Accordingly, the Complaint should be stricken for lack of an appropriate verification.

## V.    **REQUESTED RELIEF**

For the foregoing reasons, Defendants Mead Johnson & Company, LLC and Mead Johnson Nutrition Company respectfully request that this Honorable Court sustain their Preliminary Objections and enter the attached Order.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Dated:  April 1, 2024                    /s/ Kenneth A. Murphy
                                                Kenneth A. Murphy, Esquire

**WELSH & RECKER, P.C.**

/s/ Catherine M. Recker
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire

**Attorneys for Defendants,**
**Mead Johnson & Company, LLC and**
**Mead Johnson Nutrition Company**

## **CERTIFICATE OF SERVICE**

I, Kenneth A. Murphy, Esquire, do hereby certify that on this day I caused a true and correct copy of the foregoing Preliminary Objections of Defendants Mead Johnson & Company and Mead Johnson Nutrition Company to Plaintiff's Complaint, and accompanying Memorandum of Law, to be served via electronic filing, on the following counsel of record, addressed as follows:

**Kline & Specter, P.C.**
Thomas R. Kline, Esquire
Tobias Millrood, Esquire
Elizabeth Crawford, Esquire
Melissa Merk, Esquire
Timothy A. Burke, Esquire
Helen Lawless, Esquire
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
tom.kline@klinespecter.com
tobi.millrood@klinespecter.com
melissa.merk@klinespecter.com
elissa.crawford@klinespecter.com
timothy.burke@klinespecter.com
helen.lawless@klinespecter.com
*Attorneys for Plaintiffs*

**Burns White, LLC**
James Young, Esquire
Richard Margulies, Esquire
Susan R. Engle, Esquire
1880 John F. Kennedy Blvd., 10th Floor
Philadelphia, PA 19103
jayoung@burnswhite.com
rsmargulies@burnswhite.com
sengle@burnswhite.com
*Counsel for Defendants, The Trustees of the University of Pennsylvania d/b/a The Hospital of the University of Pennsylvania and The Trustees of the University of Pennsylvania d/b/a Penn Medicine*

**Campbell Conroy & O'Neil, PC**
Joseph E. O'Neil, Esquire
Meghann C. Porth, Esquire
Ryan J. O'Neil, Esquire

1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
joneil@campbelltriallawyers.com
mporth@campbelltriallawyers.com
roneil@campbelltriallawyers.com
*Attorneys for Defendant, Abbott Laboratories*

**Jones Day**
Jennifer B. Flannery, Esquire
Marques Hillman Richeson
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
jbflannery@jonesday.com
mhricheson@jonesday.com
*Attorneys for Defendant, Abbott Laboratories*

**Troutman Pepper Hamilton Sanders, LLP**
Sean P. Fahey, Esquire
Ronni E. Fuchs, Esquire
3000 Two Logan Square
Philadelphia, PA 19103
sean.fahey@troutman.com
ronni.fuchs@troutman.com
*Attorneys for Defendant, Abbott Laboratories*

By:      /s/ Kenneth A. Murphy
            Kenneth A. Murphy, Esquire

Dated: April 1, 2024

# EXHIBIT A

Case ID: 220302606
Control No.: 23096781

**KLINE & SPECTER, P.C.**
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    Philip Pasquarello, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 320927/
326263
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.Crawford@klinespecter.com
Timothy.Burke@klinespecter.com
Philip.Pasquarello@klinespecter.com

*Filed and Attested by the
Office of Judicial Records
16 OCT 2023 06:30 pm
A. STAMATO*

| | |
|---|---|
| STEPHANIE WILKERSON, on her own behalf and as Parent and Natural Guardian of M.F., a Minor, | : **IN THE COURT OF COMMON PLEAS**<br>: **PHILADELPHIA COUNTY**<br>: |
| *Plaintiff,* | : **CIVIL TRIAL DIVISION**<br>: |
| v. | : **SEPTEMBER TERM 2023**<br>: **NO. 0730** |
| MEAD JOHNSON & COMPANY, LLC<br>ILLINOIS CORPORATION SERVICE CO.<br>801 ADLAI STEVENSON DRIVE<br>SPRINGFIELD, IL 62702 | :<br>:<br>:<br>: |
| MEAD JOHNSON NUTRITION COMPANY<br>ILLINOIS CORPORATION SERVICE CO.<br>801 ADLAI STEVENSON DRIVE<br>SPRINGFIELD, IL 62702 | :<br>:<br>:<br>: |
| ABBOTT LABORATORIES<br>CT CORPORATION SYSTEM<br>208 SO. LASALLE STREET, SUITE 814<br>CHICAGO, IL 60604 | :<br>:<br>:<br>: |
| PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF<br>PENNSYLVANIA HEALTH SYSTEM D/B/A<br>PENNSYLVANIA HOSPITAL<br>3400 CIVIC CENTER BLVD<br>PHILADELPHIA, PA 19104 | :<br>:<br>:<br>:<br>: |
| THE TRUSTEES OF THE UNIVERSITY OF | :<br>: |

PENNSYLVANIA d/b/a PENN MEDICINE     :
133 SOUTH 36TH STREET     :
    PHILADELPHIA, PA 19104     :
         *Defendants.*     :
                             :

## COMPLAINT IN CIVIL ACTION
## <u>NOTICE TO DEFEND</u>

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.<br><br>YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.<br><br>PHILADELPHIA BAR ASSOCIATION<br>LAWYER REFERRAL AND INFORMATION SERVICE<br>ONE READING CENTER<br>PHILADELPHIA, PA 19107<br>TELEPHONE: (215) 238-1701 | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas las páginas siguientes, usted tiene viente (20) dias de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puese perder dinero o sus propiedades u ostros derechos importantes para usted.<br><br>LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICO, VAYA EN PERSONA O LLAME POR TELEPHONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.<br><br>ASOCIACION DE LICENCIADOS DE FILADELFIA<br>Servicio De Referencia E Información Legal<br>One Reading Center<br>Filadelfia, Pennsylvania 19107<br>Telephono: (215) 238-1701 |

**KLINE & SPECTER, P.C.**

By:

    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    Philip Pasquarello, Esq.

Attorney I.D. Nos.: 77764 / 313702 / 320927/
326263
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.Crawford@klinespecter.com
Timothy.Burke@klinespecter.com
Philip.Pasquarello@klinespecter.com

| | |
|---|---|
| STEPHANIE WILKERSON, on her own behalf and as Parent and Natural Guardian of M.F., a Minor, | : **IN THE COURT OF COMMON PLEAS** <br> : **PHILADELPHIA COUNTY** <br> : <br> : **CIVIL TRIAL DIVISION** <br> : |
|                 *Plaintiff*, | : **SEPTEMBER TERM 2023** <br> : **NO. 0730** |
|    v. | : |
| MEAD JOHNSON & COMPANY, LLC <br> ILLINOIS CORPORATION SERVICE CO. <br> 801 ADLAI STEVENSON DRIVE <br> SPRINGFIELD, IL 62702 | : <br> : <br> : <br> : |
| MEAD JOHNSON NUTRITION COMPANY <br> ILLINOIS CORPORATION SERVICE CO. <br> 801 ADLAI STEVENSON DRIVE <br> SPRINGFIELD, IL 62702 | : <br> : <br> : <br> : |
| ABBOTT LABORATORIES <br> CT CORPORATION SYSTEM <br> 208 SO. LASALLE STREET, SUITE 814 <br> CHICAGO, IL 60604 | : <br> : <br> : <br> : |
| PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM D/B/A PENNSYLVANIA HOSPITAL <br> 3400 CIVIC CENTER BLVD <br> PHILADELPHIA, PA 19104 | : <br> : <br> : <br> : <br> : <br> : |

1

Case ID: 230900506
Control No.: 23096781

THE TRUSTEES OF THE UNIVERSITY OF :
PENNSYLVANIA d/b/a PENN MEDICINE :
133 SOUTH 36TH STREET :
    PHILADELPHIA, PA 19104 :
                  *Defendants.*

## COMPLAINT

Plaintiff brings this Complaint and Demand for Jury Trial (the "Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania d/b/a Penn Medicine and Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively "Penn Medicine" or "Pennsylvania Hospital" or "Defendant Hospital"), together "Defendants." Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

## I.    INTRODUCTION

1. This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Pennsylvania Hospital. Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner. This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products. As a result, the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2. Plaintiff brings these causes of action against Defendants to recover for injuries that are the

2

direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infant at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II. PARTIES

3.     Plaintiff Stephanie Wilkerson is a natural adult person and a resident of Pennsylvania.  Ms. Wilkerson is the parent and natural guardian of M.F., a minor.  Ms. Wilkerson's address is 4406 Overbrook Avenue, Philadelphia, Pennsylvania 19131.

4.     Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware. Its principal place of business is Illinois.  Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company.  Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.     Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois.  Its principal place of business is in Illinois.  Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

6.     Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania.   Its principal place of business is Philadelphia, Pennsylvania. Pennsylvania Hospital is a registered name of The Pennsylvania

3

Hospital of the University of Pennsylvania Health System. The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of Pennsylvania.

7.      Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania. Its principal place of business is Philadelphia, Pennsylvania. Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

### III.      JURISDICTION AND VENUE

8.      This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931. Defendants conduct authorized business in the Commonwealth of Pennsylvania. They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.      Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

10.      This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

### IV.      FACTUAL ALLEGATIONS

Case ID: 230900506
Control No.: 23096781

### *M.F.'s NEC Diagnosis*

11.     M.F. was born prematurely at Pennsylvania Hospital in Philadelphia, Pennsylvania on December 17, 2015.

12.     At birth, M.F.'s gestational age was approximately 32 weeks and he weighed 1559 grams. Upon information and belief, M.F. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital after his birth.

13.     Upon information and belief, M.F. developed NEC after ingesting Defendant Manufacturers' products.

14.     M.F.'s diagnosis of NEC occurred during his course of treatment at Defendant Hospital's NICU. M.F. suffered injuries, including but not limited to, a diagnosis of NEC, surgical treatment, growth issues, neurological injuries, short bowel syndrome, and gastrointestinal issues, and he continues to suffer other long-term health effects.

### *Cow's Milk-Based Feeding Products Are Known to Cause NEC*

15.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.   NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.   Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.   Up to 30 percent of NEC-diagnosed infants die from the disease.

16.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.   Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

5

### *Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist*

17.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition.   For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide.  Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

18.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.

19.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the breast milk they could otherwise receive.   This displacement only increases infants' vulnerability to NEC.

20.     Breast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

21.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

22.     Despite the scientific consensus that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings.    Instead, they have continued to sell their unreasonably dangerous products.    In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge. And, in fact,

Case ID: 230900506
Control No.: 23096781

the Defendant Manufacturers offer contracts to hospitals—which the hospitals accept—that actually *prevent* the health care providers from offering alternative products—even safer ones—on pain of risking the hospital's advantageous formula pricing strategy.

### *Ms. Wilkerson Discovers Her Claim*

23. Because of the Defendants' concealment and misrepresentations, described more fully herein, Ms. Wilkerson did not know, and had no reason to know or suspect, that M.F.'s NEC could have been caused by the Defendant Manufacturers' products.

24. Once Ms. Wilkerson learned of the direct connection between the Defendant Manufacturers' products and NEC , she contacted an attorney thereafter.

### *Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and Would Not Have Revealed a Factual Basis Earlier Because Defendants Hid the Cause of NEC from Ms. Wilkerson*

25. Despite exercising reasonable diligence, Ms. Wilkerson was unable to have made the discovery earlier via a reasonable investigation because the Defendants in this litigation concealed the wrongful cause of M.F.'s injuries.

26. Not one person at Penn Medicine informed Ms. Wilkerson that the Defendant Manufacturers' formula products could have caused M.F.'s injuries. Penn Medicine's response at the time did not give Ms. Wilkrson any reason to suspect any wrongdoing on the part of the Defendants.

27. Ms. Wilkerson is a layperson with no medical background or training that would have given her any reason to doubt the response she received from Penn Medicine's health care providers at the time

28. Given that Penn Medicine's health care providers were in charge of the care of her newborn infant, Ms. Wilkerson had no reason to doubt their word.

7

29.     Additionally, the risk of necrotizing enterocolitis was not disclosed on the labeling or packaging of *any* of the Defendant Manufacturers' products.

30.     What is more, necrotizing enterocolitis is a disease that can occur in children who are *not* fed the Defendant Manufacturers' products, and the Defendant Manufacturers have worked to mislead parents into a false sense of security about the use of those products.   Publicly disseminated materials from each Defendant Manufacturer disguise the role their products play in causing the disease—and affirmatively say, even today, that their products are safe and do not cause NEC. In fact, some publicly disseminated materials from the formula manufacturers even suggest that formula may help *reduce* the risk of this terrible and potentially fatal disease.

31.     For example, Abbott's website stays that "[t]he specific cause of NEC is unknown, but it's most often seen in very low birth weight premature babies," and that "about 10% of babies who are born prematurely develop NEC."  The website suggests that "new preliminary studies" suggest for the first time that "NEC prevention may . . . be possible" with the use of human milk oligosaccharides to "dramatically curb intestinal inflammation" and reduce the risk of NEC. Abbott states that these human milk oligosaccharides are found in "certain Similac formulas" although they are "not currently available in Similac's premature infant formulas."[1]  Likewise, the website for Mead Johnson's products states that necrotizing enterocolitis is "one of the most common and serious intestinal disease[s] among premature babies."  And it deflects responsibility from Mead Johnson's products: "Necrotizing enterocolitis happens when tissue in the small or large intestine is injured or inflamed."[2]

---

[1] The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (last visited July 28, 2023).

[2] Special Feeding Concerns for Preemies, https://www.enfamil.com/articles/special-feeding-concerns-for-preemies/ (last visited July 29, 2023).

Case ID: 230900506
Control No.: 23096781

32.     Because of the misleading information distributed by the Defendant Manufacturers, as further detailed herein, any research conducted by Ms. Wilkerson immediately after M.F.'s diagnosis, or at any time prior to seeing an advertisement, would not have led a reasonable person to suspect that the Defendant Manufacturers' products could have caused M.F.'s injuries.

33.     Ms. Wilkerson also did not know, and had no reason to know or suspect, that Penn Medicine breached its duty of care by distributing the Defendant Manufacturers' products to M.F. Not only was Ms. Wilkerson unaware that the Defendant Manufacturers' products caused M.F.'s injuries and death, but the Defendant Manufacturers' distribution agreements with Penn Medicine—which allowed Penn Medicine to secure sweetheart deals for otherwise expensive premature infant formula in exchange for product placement and access to the hospital staff—were also not public or knowable to Ms. Wilkerson, nor could any reasonable investigation outside of litigation have uncovered the terms of those agreements.

***Despite Exercising Reasonable Diligence, the Defendants' Fraudulently Concealed the Risks of NEC from Defendant Manufacturers' Products to Divert, Prevent, and Mislead Plaintiff Regarding the Cause of Her Child's NEC Diagnosis***

34.     In addition to the averments above, the Defendants have acted in concert to fraudulently convey false and misleading information concerning the risk of NEC, and potentially death, caused by Defendant Manufacturers' preterm infant formula products.

35.     The Defendants' actions as set forth herein constitute knowing misrepresentation, omission, suppression, and concealment of material facts, made with the intent that Plaintiff would rely upon such concealment, suppression, or omission, in connection with the use of Defendants' preterm infant products.

36.     Plaintiff did not know, and could not learn, the truth concerning the uses, risks and benefits of Defendant Manufacturers' preterm infant products due to Defendants' deliberate

9

misrepresentations and concealment, suppression and omission of material facts and important information regarding the risks of NEC, and potentially death, from the products.

37.     Moreover, Defendant Hospital further participated in the intentional concealment—on information and belief, it allowed the Defendant Manufacturers' sales representatives into its hospital to provide samples and free products that did not warn of their serious dangers, and to provide "education" to its NICU staff that was incomplete as to the true risks of feeding their patients the Defendant Manufacturers' products.

38.     Additionally, Defendant Hospital failed to inform Ms. Wilkerson that the Defendant Manufacturers' products caused Plaintiff's child's NEC.

39.     Defendant Hospital was aware that the Defendant Manufacturers' products caused NEC in premature infants. Defendant Hospital was also aware that the Defendant Manufacturers did not provide warnings on their products. However, Defendant Hospital did not warn Ms. Wilkerson of the risks of the products. Instead, and notwithstanding the sweetheart deal Defendant Hospital agreed to in exchange for preterm infant formula at little to no cost, Defendant Hospital repeatedly informed Ms. Wilkerson that it would do everything it could possibly do to keep her infant safe. Though this was clearly not true given the known risks of preterm formula for babies like M.F., it was enough for Ms. Wilkerson to trust that Defendant Hospital was providing preterm formula in the best interest of her child.

40.     Defendants' affirmative acts of fraud and concealment, as averred herein, diverted, prevented, and/or mislead Plaintiff from discovering the medical cause of her child's NEC diagnosis.

Case ID: 230900506
Control No.: 23096781

41.     Plaintiff was not put on inquiry notice until she learned of the direct connection between the Defendant Manufacturers' products and NEC at a later time and contacted an attorney thereafter.

### The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products

42.     Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

43.     Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

44.     Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message.

45.     Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

Case ID: 230900506
Control No.: 23096781

46.    While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears—that the nutrition they are supplying to their child will not provide the best chance of survival—while wholly failing to warn that their products come with a significantly increased risk of NEC.

47.    For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

48.    Abbott markets and sells multiple products specifically targeting preterm and low-birthweight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC. At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

Case ID: 230900506
Control No.: 23096781

49.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

50.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

51.     Formula manufacturers have long used their relationships with hospitals and the discharge

Case ID: 230900500
Control No.: 23096781

process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

52.     Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers. The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

53.     Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products. The packaging appears as:

Case ID: 230900506
Control No.: 23096781




54.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice.   This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

55.     The Defendant Manufacturers have also designed powerful marketing campaigns to both the general public and health care providers at hospitals like Pennsylvania Hospital.   The Defendant Manufacturers know that sales made to hospitals are key drivers of brand loyalty and

15

Case ID: 230900506
Control No.: 23096781

thus are a key opportunity to drive better downstream business—*i.e.*, retail purchases by parents after they have left the hospital. On information and belief, the Defendant Manufacturers know that the products used in a hospital's NICU are related to getting and keeping the overall hospital contracts. And the Defendant Manufacturers know that just like any celebrity endorsement, when the mothers of newborn infants see medical professionals using a certain brand, the mothers are more likely to continue to purchase that same brand after discharge. The Defendant Manufacturers are thus heavily motivated to ensure that NICU departments are using their products.

56.     Abbott and Mead Johnson focus their sales teams and training heavily on hospital NICU departments. They train their sales representatives how to increase the number of babies on their formula and they emphasize the need to be the dominant formula manufacturer in the NICU so they can own that profitable ground and secure a great return on their substantial investment in NICU formula and other products.

57.     To leverage hospitals' NICUs and secure babies in the hospital and at retail, the Manufacturer Defendants pull out all the stops to convince hospitals, including Defendant Hospital, to purchase their products. For example: Abbott and Mead Johnson provide samples of their products to hospitals for free.

58.     On information and belief, to get the hospitals on board with supplying their formula for premature infants, Abbott and Mead Johnson work with hospitals to secure contracts that have special pricing discounts if a certain level of the formula-fed babies in the hospital receive just that one manufacturer's products; similar to a restaurant being a Coke or Pepsi restaurant. And notwithstanding the increased risk of the Defendant Manufacturers' products for the hospitals' most fragile patients—the preterm infants—the decision makers at these hospitals seek out these types of contracts to better the hospitals' own bottom lines.

Case ID: 230900506
Control No.: 23096781

59.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective company's own formula products to give to the preterm infants.  The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

60.     Prior to M.F.'s birth, Abbott sent sales representatives to Defendant Hospital.  Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Abbott's products were safe to give to preterm infants like M.F.  Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants.

61.     Prior to M.F.'s birth, Mead Johnson sent sales representatives to Defendant Hospital. Those sales representatives provided information about Mead Johnson's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Mead Johnson's products were safe to give to preterm infants like M.F.  Mead Johnson maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Mead Johnson's products could cause NEC in preterm infants.

Case ID: 230900506
Control No.: 23096781

62.     Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like M.F.

### *The Defendant Manufacturers' Inadequate Warnings*

63.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants.  Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

64.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

65.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

66.     Mead cites no medical literature or research to guide the use of its products.

67.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk.  Mead likewise did not provide instructions or guidance for how to avoid NEC.

68.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

18

69.     Mead Johnson failed to provide, and continues to fail to provide, a full accounting of the risk of NEC as documented by underrepresenting and misrepresenting the risk to the public and the medical community.

70.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.  Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

71.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

72.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

73.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

74.     Despite knowing of studies documenting an increased risk of NEC from its products, Abbott did not act to make parents or the medical community aware of those risks, and instead took steps to conceal or prevent those risks from becoming public.  Despite knowing that its

19

Case ID: 230900506
Control No.: 23096781

products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### *Penn Medicine's Failure to Warn*

86.     On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  It knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition.  However, instead of warning of the dangers, or supplying breast milk-based feeding products to preterm infants like the Injured Infant, Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning.

87.     To that end, Penn Medicine has participated in studies designed to increase the use of donor milk while, at the same time, reducing formula feeding in neonates.   The University of Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research into the risks associated with feeding formula to premature infants.   It recently partnered with the National Institute of Nursing Research to publish clinical determinations based on its experience "changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral feed tolerance and more rapid weaning from intravenous nutrition. . . .

Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the incidence and severity of . . . necrotizing enterocolitis (NEC)."

88.     Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration.

Case ID: 230900506
Control No.: 23096781

The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

89.     Finally, medical providers and staff at Penn Medicine have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition.   In an internal newsletter from 2012 touting donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet, quoting a staff lactation consultant:

> Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

90.     These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

91.     Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities.   As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries.   This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

Case ID: 230900506
Control No.: 23096781

92.    Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers.  On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free and/or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff.  These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff.  This arrangement dovetails with the Defendant Manufacturers' own marketing strategies" and use of salespersons.

### *Safer Alternative Designs*

93.    The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants.   The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

94.    Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk.  This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

95.    On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

Case ID: 230900506
Control No.: 23096781

## CAUSES OF ACTION
## COUNT I:  STRICT LIABILITY FOR DESIGN DEFECT
### (Against Abbott and Mead)

96.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

97.     Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

98.     Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

99.     Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations.   Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

100.    The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products.  The risks of feeding those products to the Injured Infant outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

101.    Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

102.    Abbott's and Mead's products contained cow's milk at the time they left the manufacturing

Case ID: 230900506
Control No.: 23096781

facility.

103.    Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

104.    Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

105.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational

Case ID: 230900506
Control No.: 23096781

limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

## COUNT II:  STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott and Mead)

106.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

107.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

108.    Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses.    By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death.    The failure to warn makes the products at issue in this litigation unreasonably dangerous.

109.    Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured

25

Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks.    Among other risks, the Defendant Manufacturers:

      a.     Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

      b.     Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

      c.     Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

      d.     "Black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

      e.     Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

      f.     Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

      g.     Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

Case ID: 230900506
Control No.: 23096781

       h.     Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

110. Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

111. As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

112. The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products. Had the Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

113. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

       a.     For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

       b.     For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-

Case ID: 230900506
Control No.: 23096781

economic losses sustained as a result of the Defendants Manufacturers'
conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost
revenue, and/or lost profits, and/or lost business opportunity, lost earning
capacity, and costs related to medical or mental health treatment which have
or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational
limit resulting from the Defendants Manufacturers' oppressive, fraudulent,
and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection
with this action; and

g. For such other and further relief as the Court deems proper.

## COUNT III:  NEGLIGENCE
### (Against Abbott and Mead)

114.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set
forth herein.

115.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this
litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to
exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of
unreasonable risk of harm to users, when such products are used in their intended manner and for
their intended purpose.

116.    At all times relevant to this action, the Injured Infant's healthcare professionals and medical
staff used the products at issue in their intended manner and for their intended purpose.

28

117.     Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

118.     Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

     a.    Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

     b.    Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

     c.    Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

     d.    Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

     e.    Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

     f.    Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided

Case ID: 230900506
Control No.: 23096781

information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.  Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.  Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

119.  In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

120.  As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

121.  Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

122.  As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

Case ID: 230900506
Control No.: 23096781

a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

## COUNT IV: INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

123.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

124.  At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

125.  Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this

31

Case ID: 230900506
Control No.: 23096781

litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

126. Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

127. Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

a. That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b. That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c. That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d. That cow's milk-based products were safe for premature infants; and/or

e. That cow's milk-based products were necessary for optimum growth; and/or

f. That cow's milk-based products were similar or equivalent to breast milk; and/or

Case ID: 230900506
Control No.: 23096781

g.    That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.    That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.    Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

128.    Abbott and Mead had actual knowledge, or, at a minimum, a reckless indifference, to whether the aforementioned misrepresentations were false.   The Defendant Manufacturers' misrepresentations were intended to, and in fact did, mislead physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their infant products to babies, including the Injured Infant.

129.    The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them.  The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging.   Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

130.    As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

131.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss

33

of income, and/or other harms.    Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

### COUNT V:  NEGLIGENT MISREPRESENTATIONS
### (Against Abbott and Mead)

132.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth

34

Case ID: 230900506
Control No.: 23096781

herein.

133. At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

134. Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

135. In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

136. Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

  a. That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

  b. That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

  c. That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

35

    d.      That cow's milk-based products were safe for premature infants; and/or

    e.      That cow's milk-based products were necessary for optimum growth; and/or

    f.      That cow's milk-based products were similar or equivalent to breast milk; and/or

    g.      That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

    h.      That their products were based on up-to-date science, which made them safe for premature infants; and/or

    i.      Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

137.    Abbott and Mead were negligent or careless in not determining those representations to be false.

138.    The Defendant Manufacturers' misrepresentations were intended to and did in fact induce physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their products to babies, including the Injured Infant.

139.    The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

36

Case ID: 230900506
Control No.: 23096781

140.     As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

141.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.     For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.     For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.     For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.     For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.     For interest as permitted by law;

f.     For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

Case ID: 230900506
Control No.: 23096781

g.      For such other and further relief as the Court deems proper.

### COUNT VI:  FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

142.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

143.    Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

144.    At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

145.    Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their treatment of the Injured Infant.

146.    Penn Medicine and Pennsylvania Hospital negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

147.    Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals

38

and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

148. Penn Medicine and Pennsylvania Hospital also knowingly, and intentionally, allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

149. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

150. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

   a.   Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

   b.   Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

   c.   Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

Case ID: 230900506
Control No.: 23096781

d.   Failing to provide its healthcare professionals and medical staff with the well- researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

e.   Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

f.   Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

g.   Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

151.   Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

152.   Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

153.   Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably

40

Case ID: 230900506
Control No.: 23096781

dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

154.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

155.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.    Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine's conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's

Case ID: 230900506
Control No.: 23096781

oppressive, outrageous, reckless, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

### COUNT VII: CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Penn Medicine and Pennsylvania Hospital)

156. Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

157. At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff. Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant. Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

158. Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

159. At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

Case ID: 230900506
Control No.: 23096781

160.     Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff.   These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

161.     Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

162.     Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

163.     Penn Medicine and Pennsylvania Hospital  knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

164.     Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

Case ID: 230900506
Control No.: 23096781

a.      Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted the use of cow's milk-based products for feeding premature babies; and/or

b.      Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

c.      Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d.      Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

e.      Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well- established studies that link cow's milk-based products to NEC and death in premature infants; and/or

f.      Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

44

Case ID: 230900506
Control No.: 23096781

g. Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants; and/or

h. Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

165. A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

166. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

167. As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of

Case ID: 230900506
Control No.: 23096781

developing NEC and significant injuries.

168. As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent, reckless, and outrageous conduct the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

169. In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including the Injured Infant.

170. Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

171. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly, and outrageously breached its duty by:

  a.   Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

  b.   Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

  c.   Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

  d.   Failing to oversee its healthcare professionals and medical staff to restrict

Case ID: 230900506
Control No.: 23096781

their feeding of cow's milk-based products to premature babies; and/or

e.    Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

f.    Failing to provide its healthcare professionals and medical staff with the well- researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g.    Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h.    Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i.    Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

172.    A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of

Case ID: 230900506
Control No.: 23096781

the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

173. A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

174. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

175. As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

176. As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. His life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of

Case ID: 230900506
Control No.: 23096781

enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

### DEMAND FOR JURY TRIAL

177.    Plaintiff hereby demands a jury trial for all claims triable.

Dated: October 16, 2023

Respectfully submitted,

**KLINE & SPECTER, P.C.**

By:    /s/ Timothy A. Burke
       Tobias L. Millrood, Esq.
       Elizabeth A. Crawford, Esq.
       Timothy A. Burke, Esq.
       Philip Pasquarello, Esq.

49

Case ID: 230900506
Control No.: 23096781

CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2023, I electronically filed the foregoing document with the Clerk of the Court using Electronic Efiling and that the foregoing document is being served on all counsel of record or parties registered to receive Electronic Filing.

/s/ Timothy A. Burke
Timothy A. Burke, Esq.