# EXHIBIT A-73

**FILED**
01 APR 2024 04:20 pm
**Civil Administration**
T. FOBBS

| | |
|---|---|
| **TROUTMAN PEPPER HAMILTON SANDERS LLP** | **CAMPBELL CONROY & O'NEIL, P.C.** |
| Sean P. Fahey (PA Bar No. 73305) | Joseph E. O'Neil (PA Bar No. 29053) |
| 3000 Two Logan Square | Meaghann C. Porth (PA Bar No. 307629) |
| Philadelphia, PA 19103 | Ryan J. O'Neil (PA Bar No. 314034) |
| 215.981.4296 | 1205 Westlakes Drive, Suite 330 |
| Sean.Fahey@troutman.com | Berwyn, PA 19312 |
| | 610.964.1900 |
| Ronni E. Fuchs (PA Bar No. 65561) | JONeil@campbell-trial-lawyers.com |
| 301 Carnegie Center, Suite 400 | MPorth@campbell-trial-lawyers.com |
| Princeton, NJ 08540 | RONeil@campbell-trial-lawyers.com |
| 609.951.4183 | |
| Ronni.Fuchs@troutman.com | **JONES DAY** |
| | Marques Hillman Richeson (admitted *pro hac vice*) |
| | 901 Lakeside Avenue |
| | Cleveland, OH 44114 |
| | 216.586.7195 |
| | mhricheson@jonesday.com |
| | |
| | *Attorneys for Defendant Abbott Laboratories* |

| | | |
|---|---|---|
| CHRISTINA TAYLOR, *on her own behalf and as Parent and Natural Guardian of* I.H.*, a Minor*, | : | PHILADELPHIA COUNTY |
| | : | COURT OF COMMON PLEAS |
| Plaintiffs, | : | TRIAL DIVISION |
| | : | |
| v. | : | |
| | : | |
| MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, | : | MARCH TERM, 2022 |
| | : | No. 220302606 |
| | : | |
| | : | |
| | : | |
| | : | |
| Defendants. | : | |

**PRAECIPE TO SUPPLEMENT PRELIMINARY OBJECTION BRIEFING PURSUANT TO COURT ORDER**

Case ID: 220302606
Control No.: 23096781

WHEREAS on March 21, 2024, this Court Ordered that "all documents, replies, sur-replies, or other materials that any party submits to the Court for decision as to any outstanding preliminary objections shall be filed, as appropriate, to the [coordinating] control numbers"; and

WHEREAS the Court further ordered that the Coordinating Control Number regarding Abbott Laboratories' ("Abbott") preliminary objections is Control No. 23096781 in the above-captioned action;

Abbott, by and through its counsel, hereby re-files the enclosed copies of briefing on the Preliminary Objections filed by Abbott in the following cases:

1. *Greene et al. v. Mead Johnson et al., Case No. 230900803*
2. *Hollingsworth et al. v. Mead Johnson et al., Case No. 230900791*
3. *Tucker et al. v. Mead Johnson et al., Case No. 230900867*
4. *Wilkerson et al. v. Mead Johnson et al., Case No. 230900730*

Dated: April 1, 2024

/s/ Sean P. Fahey
Sean P. Fahey (PA Bar No. 73305)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com


/s/ Ronni E. Fuchs
Ronni E. Fuchs (PA Bar No. 65561)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com


/s/ Joseph E. O'Neil
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
**CAMPBELL CONROY & O'NEIL, P.C.**
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.6388
JONeil@campbell-trial-lawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com


/s/ Marques Hillman Richeson
Marques Hillman Richeson (admitted *pro hac vice*)
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

**<u>CERTIFICATE OF SERVICE</u>**

      I hereby certify that I will serve a true and correct copy of the foregoing in accordance with Pa. R. Civ. P. 440 on all parties not served electronically. All other parties will be electronically served by the court in accordance with Pa. R. Civ. P. 205.4(g).


Dated: April 1, 2024                         */s/ Ronni E. Fuchs*
                                       Ronni E. Fuchs

**FILED**
01 APR 2024 04:20 pm
**Civil Administration**
T. FOBBS

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

Filed and Attested by the
Office of Judicial Records
27 FEB 2024 02:58 pm
C. PERRY

| | |
|---|---|
| NIKIA TUCKER, *on her own behalf and as Parent and Natural Guardian of* N.B., *a Minor*, | : |
| *Plaintiff,* | : SEPTEMBER TERM, 2023 |
| | : No. 00867 |
| v. | : |
| MEAD JOHNSON & COMPANY, LLC, MEAD | : |
| JOHNSON NUTRITION COMPANY, ABBOTT | : |
| LABORATORIES, ALBERT EINSTEIN | : |
| MEDICAL CENTER *a/k/a* EINSTEIN MEDICAL | : |
| CENTER, *and* ALBERT EINSTEIN | : |
| HEALTHCARE NETWORK *d/b/a* EINSTEIN | : |
| HEALTHCARE NETWORK. | : |
| *Defendants.* | : |
| | : |

## ORDER OF THE COURT

On this _____ day of _____, 2024, upon consideration of defendant Abbott

Laboratories' preliminary objections to plaintiffs' complaint, its brief in support, and any response

thereto, it is hereby ORDERED that defendant Abbott Laboratories' preliminary objections to

plaintiffs' complaint are SUSTAINED. It is further ORDERED that Counts I through V of

plaintiffs' complaint are DISMISSED as to Abbott Laboratories.


BY THE COURT:


_____

**<u>NOTICE TO PLEAD</u>**

To: Plaintiffs

You are hereby notified to file a written response to the enclosed Preliminary Objections within twenty (20) days from service hereof or a judgment may be entered against you.

/s/ *Sean P Fahey*

*Counsel for Defendant Abbott Laboratories*

**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Sean P. Fahey (PA Bar No. 73305)
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

Ronni E. Fuchs (PA Bar No. 65561)
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

**CAMPBELL CONROY & O'NEIL, P.C.**
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.1900
JONeil@ campbell-trial-lawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

**JONES DAY**
Marques Hillman Richeson (admitted *pro hac vice*)
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

| | |
|---|---|
| NIKIA TUCKER, *on her own behalf and as Parent and Natural Guardian of* N.B., *a Minor*,          *Plaintiff,*<br><br>    v.<br><br>MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, ALBERT EINSTEIN MEDICAL CENTER *a/k/a* EINSTEIN MEDICAL CENTER, *and* ALBERT EINSTEIN HEALTHCARE NETWORK *d/b/a* EINSTEIN HEALTHCARE NETWORK.<br>         *Defendants.* | :   SEPTEMBER TERM, 2023<br>:   No. 00867<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## <u>DEFENDANT ABBOTT LABORATORIES' PRELIMINARY OBJECTIONS TO PLAINTIFF'S COMPLAINT</u>

In March and April of 2020, plaintiffs filed 29 nearly identical actions in this Court, alleging their infants, born prematurely and at low birthweights, were injured after they were administered preterm infant nutrition products manufactured by Abbott Laboratories ("Abbott") or Mead Johnson & Company LLC, Mead Johnson Nutrition Company (together, "Mead Johnson") shortly after their birth. The instant action, filed more than two years later by the same counsel, presents the same claims in nearly-identical form on behalf of an additional claimant.[1] Pursuant to Rules 1028(a)(3) and 1028(a)(4) of the Pennsylvania Rules of Civil Procedure,

---

[1] During a case management conference in the 29 cases held before the Honorable Linda Carpenter on July 24, 2023, the Court recognized patent deficiencies in the original complaints. While the above-captioned case had not been filed at the time of the conference, plaintiff's counsel had the benefit of the Court's insights concerning the deficiencies in the pleadings. Notwithstanding, the instant complaint suffers from the same deficiencies identified by the Court.

Case ID: 230900867<br>Control No.: 24020082

Abbott's preliminary objections should be sustained, and all claims against Abbott should be dismissed. In support of its preliminary objections, Abbott states the following:

1.    In the above-captioned lawsuit, plaintiffs attack—without basis—specialized infant formulas and fortifiers essential to the survival and development of premature infants in Neonatal Intensive Care Units ("NICUs"). Plaintiffs filed this action against defendants Mead Johnson, Abbott, and the infant's hospital of birth (collectively, "defendants"), alleging that medical professionals at the hospital defendant administered Abbott's and/or Mead Johnson's cow's milk-based preterm infant nutrition products to the preterm infant, and that the preterm infant was injured as a result.

2.    Plaintiffs allege seven causes of action, five of which were asserted against Abbott and Mead Johnson: strict products liability design defect (Count I), strict products liability failure to warn (Count II), negligence (Count III), intentional misrepresentation (Count IV), and negligent misrepresentation (Count V). The remaining claims (Counts VI and VII) were asserted against the hospital defendant. The complaint was filed by parent ("plaintiff-parent") on her own behalf, and also as a parent and natural guardian of the preterm infant plaintiff ("plaintiff") (together "plaintiffs").

3.    Plaintiffs' complaint is subject to dismissal, in whole or in part, for the reasons set forth below.

## I.   PRELIMINARY OBJECTION FOR LEGAL INSUFFICIENCY OF ALL CLAIMS.

4.    Abbott incorporates the foregoing paragraphs as if set forth herein.

5.    Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

6.    "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. Am. Honda Motor Co., Inc.*, 718

<div align="center">3</div>

Case ID: 230900605
Control No.: 23096082

A.2d 305, 307 (Pa. Super. Ct. 1998). Plaintiffs must allege sufficient facts demonstrating that Abbott's products were unreasonably dangerous for their intended use, triggering a duty to warn.

7.      Plaintiffs' complaint is devoid of any *facts* showing that Abbott's preterm infant nutrition products are "unreasonably dangerous" when administered to premature and low birth weight infants.

8.      Accordingly, this preliminary objection should be sustained, and all Counts against Abbott should be dismissed.

## II. PRELIMINARY OBJECTION FOR LEGAL INSUFFICIENCY OF PLAINTIFFS' STRICT LIABILITY CLAIMS.

9.      Abbott incorporates the foregoing paragraphs as if set forth herein.

10.     Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

11.     Counts I and II are strict liability claims that require plaintiffs to identify the specific product that allegedly caused plaintiff's injury. *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 968 (Pa. Super. Ct. 1985) (Pennsylvania "imposes liability for physical harm caused to the user only upon that person who sold a product in a defective condition. A plaintiff must therefore at least *designate* the product alleged to be defective in order to recover from the one who sells it.") (emphasis added).

12.     Plaintiffs fail to do so. Instead, they simply allege, without referring to any medical records containing product identification information, that "Abbott's and/or Mead [Johnson]'s products" were administered to plaintiff and caused plaintiff's injuries. *See* Compl. ¶ 97.

13.     Accordingly, this preliminary objection should be sustained, and Counts I and II against Abbott should be dismissed.

Case ID: 230900805
Control No.: 23096081

## III. PRELIMINARY OBJECTION FOR LEGAL INSUFFICIENCY OF PLAINTIFFS' NEGLIGENCE CLAIM.

14.     Abbott incorporates the foregoing paragraphs as if set forth herein.

15.     Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

16.     Count III is a claim for negligence, requiring plaintiffs to identify the product that injured them and to allege a reasonably close causal connection between Abbott's conduct with respect to that product and the resulting injuries to plaintiffs. *See Cummins*, 495 A.2d at 968. Because plaintiffs fail to identify the specific product giving rise to their claims, they also fail to establish a causal connection between Abbott's conduct and their injuries.

17.     Accordingly, this preliminary objection should be sustained, and Count III against Abbott should be dismissed.

## IV. PRELIMINARY OBJECTION FOR INSUFFICIENT SPECIFICITY IN PLEADING PLAINTIFFS' MISREPRESENTATION CLAIMS.

18.     Abbott incorporates the foregoing paragraphs as if set forth herein.

19.     Pursuant to Pa. R. Civ. P. 1028(a)(3), a preliminary objection may be filed by any party to a pleading regarding insufficient specificity in a pleading.

20.     Counts IV and V are claims for intentional and negligent misrepresentation; these fraud-based claims are subject to heightened pleading requirements under Pa. R. Civ. P. 1019(b). Plaintiffs fail to allege with particularity that they saw, heard, or were otherwise exposed to any purported misrepresentations made by Abbott. They also do not specifically allege who made the supposed misrepresentations, or when they supposedly did so. Moreover, plaintiffs cannot plausibly allege reliance on misrepresentations to which they were not exposed.

21.     Accordingly, this preliminary objection should be sustained, and Counts IV and V against Abbott should be dismissed.

Case ID: 230900805
Control No.: 24096082

## V. PRELIMINARY OBJECTION FOR INSUFFICIENT SPECIFICITY IN DIFFERENTIATING BETWEEN DEFENDANTS THROUGHOUT COMPLAINT.

22.     Abbott incorporates the foregoing paragraphs as if set forth herein.

23.     Pursuant to Pa. R. Civ. P. 1028(a)(3), a preliminary objection may be filed by any party to a pleading regarding insufficient specificity in a pleading.

24.     In the unnumbered paragraph of the complaint appearing before paragraph 1, plaintiffs collectively refer to Abbott and Mead Johnson as "the Defendant Manufacturers" without explaining what relationship, if any, exists between these corporations, or why the acts of Mead Johnson should be attributed to Abbott, or vice versa. *See* Compl. 1.

25.     Paragraphs 1 and 13 of the complaint generally allege that plaintiff was given "the Defendant Manufacturers' cow's milk-based" products, without specifying which product from which manufacturer was administered to plaintiff. *Id.* ¶¶ 1, 13.

26.     Paragraph 13 of the complaint generally alleges that plaintiff developed necrotizing enterocolitis ("NEC") after being administered the Defendant Manufacturers' products, again without specifying which product from which manufacturer was administered. *Id.* ¶ 13.

27.     Paragraph 35 of the complaint alleges that "Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents," without specifying any particular act of deception by any individual defendant, and without providing any details surrounding when plaintiffs saw the allegedly misleading marketing campaigns. *Id.* ¶ 35.

28.     Across Counts I through V of the complaint, plaintiffs allege wrongful conduct by Abbott and/or Mead Johnson without differentiating between the defendants, or specifying each defendant's distinct role in each claim. *See* Compl., Counts I-V.

29.     Because plaintiffs have lumped Abbott and Mead Johnson together without differentiating between the distinct alleged acts or omissions of these distinct corporations, Abbott

Case ID: 230900805
Control No.: 24096082

lacks clarity regarding its alleged role in these cases. Plaintiffs' allegations are thus insufficiently pled under Rule 1028(a)(3).

30.     Accordingly, all claims against Abbott should be dismissed, or in the alternative, all paragraphs in which plaintiffs fail to differentiate between defendants should be stricken,[2] and this preliminary objection should be sustained.

## VI. PRELIMINARY OBJECTION REGARDING PLAINTIFFS' REQUEST FOR PUNITIVE DAMAGES.

31.     Abbott incorporates the foregoing paragraphs as if set forth herein.

32.     Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

33.     Pursuant to Pa. R. Civ. P. 1028(a)(3), a preliminary objection may be filed by any party to a pleading regarding insufficient specificity in a pleading.

34.     Without sufficient basis, plaintiffs demand punitive damages from Abbott in the *ad damnum* clause of each of Counts I through V.

35.     Plaintiffs' demands for punitive damages in Counts III and V are legally insufficient, as these Counts plainly sound in negligence and punitive damages are not available for claims of "ordinary negligence" under Pennsylvania law. *See Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985) (citing RESTATEMENT OF TORTS (SECOND) § 908, comment e).

36.     Additionally, plaintiffs' demands for punitive damages in Counts I through V are insufficiently specific. Plaintiffs make conclusory allegations that Abbott's conduct was "malicious" without providing any factual support for the same. *See Whiting v. Nationwide Ins.*

---

[2] For example, in the complaint, plaintiffs fail to differentiate between defendants in each of the following paragraphs: 1–2, 12–13, 19, 21–26, 32–43, 56–64, 86, and 89–134.

Case ID: 230900805
Control No.: 24096082

*Co.*, 9 Pa. D. & C.3d 789, 792 (1979) (dismissing plaintiffs' punitive damages request where "factual averments in support of . . . conclusory allegations are totally lacking").

37.     Accordingly, Abbott respectfully requests that plaintiffs' demands for punitive damages in each of Counts I through V be stricken.

WHEREFORE, pursuant to Pa. R. Civ. P. 1028(a)(3), and (a)(4), Abbott respectfully requests that this Court sustain these preliminary objections and dismiss Counts I, II, III, IV, and V against Abbott.

Dated: February 27, 2024

Respectfully Submitted:

*/s/ Sean P. Fahey*
Sean P. Fahey (PA Bar No. 73305)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

*/s/ Ronni E. Fuchs*
Ronni E. Fuchs (PA Bar No. 65561)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

*/s/ Joseph E. O'Neil*
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
**CAMPBELL CONROY & O'NEIL, P.C.**
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.6388
JONeil@ campbell-trial-lawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

*/s/ Marques Hillman Richeson*
Marques Hillman Richeson (admitted *pro hac vice*)
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

8

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

| | |
|---|---|
| NIKIA TUCKER, *on her own behalf and as Parent and Natural Guardian of* N.B., *a Minor*,           *Plaintiff,* : : : | SEPTEMBER TERM, 2023 No. 00867 |
|     v. | : |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, ALBERT EINSTEIN MEDICAL CENTER *a/k/a* EINSTEIN MEDICAL CENTER, *and* ALBERT EINSTEIN HEALTHCARE NETWORK *d/b/a* EINSTEIN HEALTHCARE NETWORK.           *Defendants.* | : : : : : : : : |

**DEFENDANT ABBOTT LABORATORIES' BRIEF IN SUPPORT OF**
**PRELIMINARY OBJECTIONS TO PLAINTIFFS' COMPLAINT**

**MATTER BEFORE THE COURT**

The preliminary objections of Abbott Laboratories ("Abbott") to plaintiffs' complaint are before this Court. Under Pennsylvania Rules of Civil Procedure 1028(a)(3) and 1028(a)(4), Abbott respectfully requests that this Court dismiss Counts I, II, III, IV, and V of the complaint for insufficient specificity, legal insufficiency of pleading, and/or failure to conform to a rule of court.

**STATEMENT OF QUESTIONS INVOLVED**

1.    Should the Court sustain Abbott's preliminary objections to the complaint and dismiss all claims against Abbott (Counts I-V) as legally insufficient for failure to properly plead the product at issue is unreasonably dangerous? Answer: Yes.

2.    Should the Court sustain Abbott's preliminary objections to the complaint and dismiss the strict liability claims (Counts I and II) as legally insufficient? Answer: Yes.

Case ID: 230900865
Control No.: 23096081

3.      Should the Court sustain Abbott's preliminary objections to the complaint and dismiss the negligence claim (Count III) as legally insufficient? Answer: Yes.

4.      Should the Court sustain Abbott's preliminary objections to the complaint and dismiss the intentional and negligent misrepresentation claims (Counts IV and V) as insufficiently pled? Answer: Yes.

5.      Should the Court sustain Abbott's preliminary objections and dismiss the complaint as insufficiently pled for failure to properly differentiate between the manufacturer defendants, or alternatively, strike all paragraphs in which plaintiffs fail to differentiate between those defendants? Answer: Yes.

6.      Should the Court sustain Abbott's preliminary objections to the complaint and strike plaintiffs' requests for punitive damages in Counts I through V as both legally insufficient and lacking sufficient specificity? Answer: Yes.

## INTRODUCTION AND FACTUAL BACKGROUND

Mead Johnson & Company LLC, Mead Johnson Nutrition Company (together, "Mead Johnson") and Abbott develop and manufacture preterm and term infant nutrition products, including products tailored to address the distinct and uniquely complex nutritional needs of premature, low birthweight infants.[3] These preterm infants face complex challenges and daunting odds. For one, they typically have underdeveloped or maldeveloped gastrointestinal systems that are not prepared to receive the nutrition necessary for the rapid growth these preterm infants need. This poses a serious challenge for NICU specialists caring for the preterm infants. The best nutrition for a premature infant is the nutrition it would have received in the womb. Once that is

---

[3] Abbott manufactures term and preterm infant nutrition products under the "Similac" brand name. Compl. ¶ 5. Mead Johnson manufactures term and preterm infant nutrition products under the "Enfamil" brand name. *Id.* ¶ 4.

10

Case ID: 230900805
Control No.: 24096081

no longer possible, everything else falls short. Milk from the preterm infant's mother is the closest natural substitute, but it may not be available or nutritionally sufficient to meet the premature infant's extraordinary needs. The same is true of donor milk. Accordingly, NICU specialists use their judgment to fill the nutritional gap with specialized formula and fortifier products designed to meet the needs of premature, low-birth-weight infants. This litigation targets these life-saving products.

The preterm infant in this case allegedly developed necrotizing enterocolitis ("NEC"), a leading cause of death in premature infants in NICUs. NEC is an inflammatory gastrointestinal condition that can result in death of intestinal tissue. Plaintiffs admit that premature infants' underdevelopment makes them "especially susceptible to NEC." *See* Compl. ¶ 16. Indeed, NEC affects up to 8% of infants in NICUs, including infants who receive only human milk, as well as those who receive no "food" at all. Neonatologists are experts in dealing with the risks of NEC and balancing them with numerous other medical risks these premature infants face. They carefully balance these risks regardless of how nutrition is administered, and regardless of whether it consists of the mother's own milk, human donor milk, specialized formula or fortifier, or a combination.

Plaintiff-parent alleges that her infant was born prematurely at Albert Einstein Medical Center. *See id.* ¶ 11. The complaint alleges "upon information and belief" that, after birth, the preterm infant was administered "Similac and/or Enfamil cow's milk-based products" by medical professionals at the respective hospital. *Id.* ¶ 12. Plaintiffs further claim that the preterm infant developed NEC shortly after the administration of Abbott and/or Mead Johnson's preterm products and experienced long-term health effects. *Id.* ¶¶ 13-14.

11

Plaintiffs allege that Abbott and/or Mead Johnson manufactured and sold their preterm infant nutrition products knowing they were unreasonably dangerous and not suited for their intended use because they purportedly cause NEC, and that Abbott and/or Mead Johnson failed to warn plaintiffs and the public of this potential harm. *See, e.g, id.* ¶ 22. According to plaintiffs, Abbott and Mead Johnson also made false statements of material fact "on an ongoing and repeated basis" to consumers, physicians, and medical staff in their advertising and marketing materials prior to the time their preterm infants were administered preterm infant nutrition products. *Id.* ¶ 120.

Plaintiffs brought five claims against Abbott and Mead Johnson: strict products liability design defect (Count I), strict products liability failure to warn (Count II), negligence (Count III), intentional misrepresentation (Count IV), and negligent misrepresentation (Count V). Plaintiffs also bring failure to warn (Count VI) and corporate liability (Count VII) claims against the hospital at which their infant was born.

A case management conference was held before the Honorable Linda Carpenter on July 24, 2023 regarding the initial set of 29 cases, in which plaintiffs were represented by the same plaintiffs' counsel as here. While the above-captioned case had not yet been filed as of the date of this conference, plaintiff had the benefit of the Court's insights concerning the deficiencies in the complaints. In particular, the Court recognized during the conference that the original 29 plaintiffs had all failed to identify which manufacturers' preterm infant formula product was administered to each preterm infant.

The same is true in the instant complaint. Although plaintiffs acknowledge that Abbott and Mead Johnson sell many different products, there are no allegations in the complaint identifying any preterm infant nutrition product sold by Abbott as the specific product that was

Case ID: 230900805
Control No.: 24096082

administered to the preterm infant. Further, there are no allegations indicating that plaintiffs saw, heard, were otherwise exposed to, or relied upon the allegedly false representations made by Abbott and/or Mead Johnson about their preterm infant nutrition products. These pleading deficiencies, among others, are fatal to their claims.

## ARGUMENT

Plaintiffs' claims are legally insufficient, lack sufficient specificity, and/or fail to conform to a rule of court because:

- plaintiffs do not sufficiently allege that the preterm infant nutrition product(s) at issue are unreasonably dangerous;

- plaintiffs never identify the preterm infant nutrition product administered to their preterm infant;

- plaintiffs do not plead with specificity that any misrepresentations were made to them;

- plaintiffs impermissibly lump Abbott and Mead Johnson together without distinguishing the conduct purportedly attributable to each; and

- plaintiffs fail to plead their requests for punitive damages with the requisite legal sufficiency and factual specificity.

Accordingly, all claims against Abbott should be dismissed.

## <u>Legal Standard</u>

Pennsylvania is a fact-pleading jurisdiction. *See generally* Pa. R. Civ. P. 1019. A complaint must therefore set forth the material facts upon which a claim is based. Pa. R. Civ. P. 1019(a). Indeed, "[t]he purpose of the pleadings is to place the defendants on notice of the claims upon which they will have to defend." *Carlson v. Cmty. Ambulance Servs.*, 824 A.2d 1228 (Pa. Super. Ct. 2003) (quoting *Yacoub v. Lehigh Valley Med.*, 805 A.2d 579, 588 (Pa. Super. 2002)). So the

Case ID: 230900805
Control No.: 24096082

"complaint must give the defendants fair notice of the plaintiff's claims and a summary of the material facts that support those claims." *Carlson*, 824 A.2d at 1228.

To that end, Rule 1028 of the Pennsylvania Rules of Civil Procedure provides that a party may file preliminary objections asserting that a pleading is insufficiently specific. Pa. R. Civ. P. 1028(a)(3). When assessing whether a pleading is sufficiently specific, the relevant question is "whether the complaint is sufficiently clear to enable the defendant to prepare [its] defense, or whether the plaintiff[']s complaint informs the defendant with accuracy and completeness of the specific basis on which recovery is sought so that [the defendant] may know without question upon what grounds to make [its] defense." *Rambo v. Greene*, 906 A.2d 1232 (Pa. Super. Ct. 2006).

Rule 1028 of the Pennsylvania Rules of Civil Procedure also provides that a party may file preliminary objections asserting that the pleading is legally deficient. Pa. R. Civ. P. 1028(a)(4). Generally, where a legal deficiency is "apparent on the face of the complaint," it "is needless to prolong proceedings when the matter can be correctly and quickly decided on preliminary objections in the nature of a demurrer." *Wurth v. City of Phila.*, 584 A.2d 403, 407 (Pa. Commw. Ct. 1990).

"Preliminary objections in the nature of [a] demurrer test the legal sufficiency of the plaintiff's complaint." *Sexton v. PNC Bank*, 792 A.2d 602, 604 (Pa. Super. Ct. 2002). The question presented by the demurrer is whether, on the facts alleged, no recovery is possible. *Presbyterian Med. Ctr. v. Budd*, 832 A.2d 1066, 1070 (Pa. Super. Ct. 2003) (citation omitted). In answering this question, the court is "precluded from considering any conclusions of law or inferences which are not supported by the factual allegations contained in the complaint." *Hart v. O'Malley*, 647 A.2d 542, 553 (Pa. Super. Ct. 1994). Thus, a plaintiff cannot maintain a cause of action by stating conclusions of law, argumentative allegations, and expressions of opinion. *Neill v. Eberle*, 620

Case ID: 230900805
Control No.: 24096082

A.2d 673, 675 (Pa. Commw. Ct. 1993). And a court "may not supply a fact missing [from] the complaint" in order to cure a defective pleading. *Hart*, 647 A.2d at 553.

## I. PLAINTIFFS FAIL TO PLEAD FACTS SUFFICIENT TO SHOW AN UNREASONABLY DANGEROUS DEFECT, AS REQUIRED FOR COUNTS I-V.

Pursuant to Pa. R. Civ. P. 1028(a)(4), Abbott demurs to Counts I-V of plaintiffs' complaint. "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. Am. Honda Motor Co.*, 718 A.2d 305, 307 (Pa. Super. Ct. 1998). "A product is defective when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* at 308.[4] Plaintiffs' complaint fails to allege sufficient facts demonstrating that Abbott's cow's milk-based preterm infant nutrition products were unreasonably dangerous for their intended use.

Plaintiffs merely allege that "[e]xtensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants," without any *facts* to support this bald assertion. Compl. ¶ 16. Nor have they alleged any *facts* supporting a "scientific consensus that . . . cow's milk-based products present a dire threat to the health and development of preterm infants" or that cow's milk-based preterm infant nutrition products "cause NEC and greatly increase the likelihood that a baby will develop NEC." *Id.* ¶¶ 21-22; *see also Orange Stones Co. v. City of Reading*, 87 A.3d 1014,

---

[4] The law of product liability within Pennsylvania has developed under the principles outlined in Section 402A of the Second Restatement of Torts. *High v. Penn. Supply, Inc.*, 154 A.3d 341 (Pa. Super. Ct. 2017). Specifically, Section 402(A) provides: "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if the seller is engaged in the business of selling such a product, and it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. The rule stated in Subsection (1) applies although the seller has exercised all possible care in the preparation and sale of his product, and the user or consumer has not bought the product from or entered into any contractual relation with the seller." RESTATEMENT OF TORTS (SECOND) § 402(A).

Case ID: 230900805
Control No.: 23096082

1025 (Pa. Commw. Ct. 2014) (holding that "[b]lind suspicions and unsupported accusations simply do not state a cause of action pursuant to any theory of tort recovery" under Pennsylvania law).

Instead, plaintiffs simply allege that "[b]reast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC." Compl. ¶ 20. The mere fact that human breast milk may lower the risk of NEC is not equivalent to a showing that cow's milk-based preterm infant nutrition products ***cause*** NEC. As plaintiffs acknowledge, all premature, low birth weight infants, including those who are administered human breast milk exclusively, are especially susceptible and at high risk of developing NEC by the very nature of their being born prematurely. *Id.* ¶ 16.

Thus, plaintiffs' complaint is devoid of facts sufficient to show that Abbott's products are unreasonably dangerous, and their claims against Abbott are insufficient as a matter of law.

## II. PLAINTIFFS FAIL TO SUFFICIENTLY PLEAD THEIR STRICT LIABILITY CLAIMS (COUNTS I–II)

### A. Plaintiffs' Complaint Fails to Identify the Specific Product That Allegedly Caused the Preterm Infant's Injuries

Plaintiffs fail to allege sufficient facts to support their strict liability claims (Counts I and II) because plaintiffs' complaint fails to identify the specific preterm infant nutrition product that allegedly caused their preterm infant's injuries. *See* Pa. R. Civ. P. 1028(a)(4). It is well-settled that, in order to plead a strict liability claim in Pennsylvania, the "plaintiff must [] at least designate the product alleged to be defective[.]" *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 969 (Pa. Super. Ct. 1985). "Absent such identification, there can be no allegations of duty, breach of duty, or legal causation, and hence there can be no liability." *Mellon v. Barre-Nat'l Drug Co.*, 636 A.2d 187, 191–92 (Pa. Super. Ct. 1993).

Plaintiffs' complaint fails to identify the specific preterm infant nutrition product they maintain caused their alleged injuries. Instead, plaintiffs broadly allege that Abbott and Mead Johnson manufacture and sell cow's milk-based infant feeding products under the Similac or

16

Enfamil brand names, Compl. ¶¶ 4-5, and surmise "upon information and belief" that their preterm infant was administered "Similac and/or Enfamil" products. *Id.* ¶ 12. These allegations are plainly insufficient. As plaintiffs acknowledge, Abbott and Mead Johnson manufacture, sell, and market different products—both preterm and term—under different brands names. *See, e.g.*, *id.* ¶¶ 4-5; *id.* ¶¶ 29-30 (describing multiple Abbott products and multiple Mead Johnson products). They also acknowledge that, similar to a restaurant offering Coke or Pepsi, the hospital defendants use either Similac **_or_** Enfamil in their respective NICUs. *Id.* ¶ 22; *id.* ¶ 39. Yet, plaintiffs fail to identify which product from which manufacturer was allegedly administered to their preterm infant. As such, even viewing the complaint in the light most favorable to plaintiffs, their strict liability claims fail for lack of product identification. *See Cummins*, 495 A.2d at 968–69 (holding that the plaintiff's failure to identify the offending product was "a fatal deficiency to his [strict liability] claim" and that "the complaint [could] not adequately aver the requisite connection between the [defendants] and the defective product"); *Klein v. Council of Chem. Assocs.*, 587 F. Supp. 213, 221 (E.D. Pa. 1984) (dismissing strict liability claim where plaintiffs did not identify the specific product sold or distributed by the defendants that caused the plaintiffs' harm).

**B.    Plaintiffs Are Not Excused from Satisfying the Product Identification Requirement**

In an effort to evade their pleading obligations, plaintiffs' complaint seeks to hold Abbott and Mead Johnson "jointly and severally" liable for their claims alleged in Counts I-V. No Pennsylvania court has applied any such theory of alternative liability to excuse a product liability plaintiff from identifying the specific product they claim caused their alleged harm. *See, e.g.*, *Cummins*, 495 A.2d at 970 (affirming an order sustaining preliminary objections to a complaint that sought to allege a theory of enterprise liability premised on a bald averment that members of the tire and rim assembly industry collaborated in the "intentional manufacture, promotion and distribution of a generically similar defective device with the knowledge that a safer [] device was

17

available"); *Skipworth by Williams v. Lead Indus. Ass'n, Inc.*, 690 A.2d 169, 174–75 (Pa. 1997) (holding that plaintiffs failed to establish a concert of action where they were unable to identify the manufacturer of the lead pigment that caused alleged injuries); *Burnside v. Abbott Lab.*, 505 A.2d 973, 982 (Pa. Super. Ct. 1985) (holding Pennsylvania law forecloses cause of action for concerted action where plaintiff is "unable to isolate a particular manufacturer as the causative agent of his injuries").

Abbott and Mead Johnson likewise cannot be held jointly and severally liable as a matter of law. "While there is some authority that a single cause of action may be pled against two or more defendants who are alleged to be jointly and severally liable, that cannot be the case where the factual background underlying each defendant's liability is different." *Bouchon v. Citizen Care, Inc.*, 176 A.3d 244, 258 (Pa. Super. Ct. 2017) (citing *Gen. State Auth'y v. Lawrie and Green*, 356 A.2d 851, 854 (Pa. Commw. Ct. 1976)). Here, because Abbott and Mead Johnson manufacture different products at different locations, with different manufacturing processes, using different formulations and different ingredients, and market their products differently, plaintiffs have no basis for asserting joint and several liability. *See Cummins*, 495 A.2d at 972 (preliminary objections properly sustained as to complaint seeking to impose industry-wide liability where plaintiffs failed to allege that manufacturers placed fungible products with "identical" qualities on the market). For all these reasons, plaintiffs cannot be excused from satisfying their requirement to identify the specific product that allegedly caused harm.

## III.  PLAINTIFFS FAIL TO SUFFICIENTLY PLEAD A NEGLIGENCE CLAIM (COUNT III).

Plaintiffs' negligence claim fails for the same reason as their strict-liability claims: they simply fail to identify the product that allegedly caused their injuries. To state a negligence-based products liability claim, "the plaintiff must identify the defendant as the manufacturer or seller of

18

*the offending product* before a plaintiff's injuries may be found to be proximately caused by the negligence of the defendant." *Long v. Krueger, Inc.*, 686 F. Supp. 514, 517 (E.D. Pa. 1988) (citing *Cummins*, 495 A.2d at 967). "Absent such identification, there can be no allegations of duty, breach of duty or legal causation, and hence there can be no liability." *Cummins*, 495 A.2d at 967–68.

As noted above, plaintiffs allege only "upon information and belief" that their preterm infant was administered "Similac and/or Enfamil" products and developed NEC shortly thereafter. *See, e.g.*, Compl. ¶¶ 12-13. Plaintiffs do not, however, identify the exact preterm infant nutrition product (if any) manufactured by Abbott giving rise to their claims. Accordingly, they "cannot allege a casual [sic] connection between conduct of the defendants and [plaintiff's] injuries." *Klein*, 587 F. Supp. at 223; *see also Cummins*, 495 A.2d at 967 (affirming dismissal of negligence claim where plaintiff failed to identify a specific product and the identity of the manufacturer, supplier, or seller of the product; and therefore did not establish a causal connection between his injury and the defendants' conduct).

## IV. PLAINTIFFS FAIL TO PLEAD THEIR INTENTIONAL AND NEGLIGENT MISREPRESENTATION CLAIMS (COUNTS IV–V) WITH SUFFICIENT PARTICULARITY.

Plaintiffs' complaint lacks sufficient specificity regarding their misrepresentation claims. In particular, plaintiffs fail to allege with any specificity that they saw or heard any Abbott representation, let alone a misrepresentation. Nor do plaintiffs allege any facts to support justifiable reliance on any purported statement by Abbott.

"Averments of fraud are meaningless epithets unless sufficient facts are set forth which will permit an inference that the claim is not without foundation[.]" *Bata v. Cent.-Penn Nat. Bank of Philadelphia*, 224 A.2d 174, 179 (Pa. 1966). To protect against generalized and unsupported accusations of fraud, the Pennsylvania Rules of Civil Procedure requires each element of fraud be "averred with particularity." *Presbyterian Med. Ctr.*, 832 A.2d at 1072-1073 (citing Pa. R. Civ. P.

19

1019(b)). "Merely alleging fraud as a legal conclusion adds nothing if it is not based upon facts clearly and explicitly set forth as constituting such fraud." *Dwyer v. Rothman*, 431 A.2d 1035, 1037 (Pa. Super. Ct. 1981) (citing *Hornsby v. Lohmeyer*, 72 A.2d 294 (Pa. 1950)).

To state a claim for intentional misrepresentation, plaintiffs must plead: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) that the resulting injury was proximately caused by the reliance. *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) (internal citation omitted). Similarly, to state a claim for negligent misrepresentation, plaintiffs must plead facts showing (1) a misrepresentation of a material fact; (2) that the representor either knew or should have known of the misrepresentation; (3) that the representor intended the representation to induce another to act; and (4) that injury resulted to the party acting in justifiable reliance on the misrepresentation. *See id.* at 561. The complaint fails in multiple ways to plead these elements with specificity.

***First***, "at the very least, a plaintiff must set forth the *exact* statements or actions plaintiff alleges constitute the fraudulent misrepresentations." *Youndt v. First Nat'l Bank*, 868 A.2d 539, 545 (Pa. Super. Ct. 2005) (internal citations and quotations omitted) (emphasis added). While plaintiffs generally allege that Abbott made false representations in its marketing materials, plaintiffs do not allege that Abbott made any of these representations directly to them, or that they read, saw, heard, or were otherwise exposed to any specific product label or any other specific representation from Abbott before their preterm infant was administered Abbott's preterm infant nutrition products. Accordingly, plaintiffs fail to plead facts showing that their infants' injuries were caused by their reliance on Abbott's representations. *See, e.g.*, *Rivello v. N.J. Auto. Full Ins.*

Case ID: 230900805
Control No.: 24096082

*Underwriting Ass'n*, 638 A.2d 253, 257 (Pa. Super. Ct. 1994) (affirming dismissal of misrepresentation claim where plaintiff failed to sufficiently allege justifiable reliance on the alleged misrepresentation or that his injury was proximately caused by the alleged misrepresentation); *Youndt*, 868 A.2d 539 (holding that fraud claim failed where plaintiff did not plead all elements with particularity); *Feudale v. Aqua Pa., Inc.*, 122 A.3d 462, 466 n.5 (Pa. Commw. Ct. 2015) (concluding that plaintiff had failed to "allege[ ] any justifiable reliance on his part on the [alleged false representation], nor could he, as the alleged false representation was not made to him, but instead to [a third party]"); *Feingold v. Unitrin Direct*, Civ. A. No. 12-1250, 2012 WL 3866945, at *6 (E.D. Pa. Sept. 6, 2012) (dismissing negligent misrepresentation claim where plaintiff could not allege that he justifiably relied on the defendants' promises).

*Second*, plaintiffs do not identify when the alleged misrepresentations were made, who made them, or how they were communicated. As such, the allegations in the complaint cannot plausibly support plaintiffs' intentional or negligent misrepresentation claims. *See, e.g.*, *Dwyer*, 431 A.2d at 1037 (affirming lower court's decision sustaining preliminary objections to plaintiff's intentional misrepresentation claim where plaintiff did not allege what facts were misrepresented, what false information was given, nor in what way he was "tricked"); *Presbyterian Med. Ctr.*, 832 A.2d at 1073 (affirming order sustaining preliminary objections to complaint where plaintiff failed to "establish every element of its fraud claim with sufficient particularity"); *Bethpage Fed. Credit Union*, 2019 WL 5303904, at *2 (sustaining preliminary objections to fraud and negligent misrepresentation claims due to plaintiff's failure to satisfy Rule 1019(b)'s particularity requirements); *Black v. Cmty. Educ. Ctrs., Inc.*, Civ. A. No. 12-6102, 2014 WL 859313, at *6 (E.D. Pa. Mar. 4, 2014) (finding plaintiff's claims of misrepresentation and fraud failed because she did not allege the instances of mischaracterization with specificity); *Scott v. Bimbo Bakeries,*

Case ID: 230900805
Control No.: 24096082

*USA, Inc.*, Civ. A. No. 10-3154, 2012 WL 645905, at *6 (E.D. Pa. Feb. 29, 2012) (dismissing negligent misrepresentation claim where plaintiffs did not "allege when these alleged misrepresentations were made, who made them, or how they were communicated").

## V.  PLAINTIFFS' FAILURE TO DIFFERENTIATE CLAIMS BETWEEN ABBOTT AND MEAD JOHNSON WARRANTS DISMISSAL OF COUNTS I–V.

Plaintiffs' complaint fails to differentiate between Abbott and Mead Johnson. Rule 1019(a) of the Pennsylvania Rules of Civil Procedure provides that a complaint must set forth the material facts upon which a claim is based. Pa. R. Civ. P. 1019(a). And "even under the most liberal notice pleading requirements," that means that "a plaintiff must differentiate between defendants." *Coyne v. Holy Fam. Apartments*, Civ. A. No. 19-4583, 2020 WL 2063475, at *4 (E.D. Pa. Apr. 29, 2020); *see also Bouchon v. Citizen Care, Inc.*, 176 A.3d 244, 260 (Pa. Super. Ct. 2017) (affirming dismissal of complaint where several paragraphs of the complaint did not differentiate between the defendants in averring the conduct and claims).

Ignoring this clear law, plaintiffs' complaint is riddled with allegations about the conduct of "Defendant Manufacturers," or "Abbott and/or Mead Johnson." *See, e.g.,* Compl. ¶¶ 1–2, 12–13, 19, 21–26, 32–43, 56–64, 86, and 89–134. But the complaint does not allege any facts establishing which specific preterm infant nutrition product from which specific manufacturer gave rise to plaintiffs' claims. Abbott is left to guess what role plaintiffs believe it played in the events at issue, placing a burden on Abbott that is not contemplated or condoned by Pennsylvania's fact pleading rules. Because plaintiffs fail to distinguish between defendants in their complaint, all claims against Abbott should be dismissed, or alternatively, the paragraphs in which plaintiffs fail to differentiate between defendants should be stricken.

Case ID: 230900805
Control No.: 24096082

## VI. PLAINTIFFS' REQUESTS FOR PUNITIVE DAMAGES LACK THE REQUISITE LEGAL SUFFICIENCY AND FACTUAL SPECIFICITY AND FAIL TO PLEAD A LEGALLY SUFFICIENT BASIS FOR PUNITIVE DAMAGES

Plaintiffs' requests for punitive damages should be stricken because their demands are both legally and factually insufficient, and fail to clear the high bar for punitive damages under Pennsylvania law. In Pennsylvania, "'[p]unitive damages' are damages other than compensatory or nominal damages awarded against a person to punish him for his outrageous conduct." *See Focht v. Rabada*, 268 A.2d 157, 159 (Pa. Super. Ct. 1970) (quoting RESTATEMENT OF TORTS § 908(1)). "As the name suggests, punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct." *Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005); *see also Phillips v. Cricket Lighters*, 883 A.2d 439, 446 (Pa. 2005) ("Punitive damages may be appropriately awarded only when the plaintiff has established that the defendant has acted in an outrageous fashion due to either the defendant's evil motive or his reckless indifference to the rights of others.").

To support a request for punitive damages, the plaintiff must sufficiently allege that "(1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Luddy*, 870 A.2d at 772. Conduct is "willful" when "the actor desired to bring about the result that followed, or at least was aware that it was substantially certain to ensue." *Evans v. Philadelphia Transp. Co.*, 212 A.2d 440, 443 (Pa. 1965). Moreover, "reckless indifference," interchangeable with "wanton" misconduct, occurs when "the actor has intentionally done an act of an unreasonable character, in disregard to a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow."

23

*McClellan v. Health Maintenance Org. of Pa.*, 604 A.2d 1053, 1061 (Pa. Super. Ct. 1992); *see also Smith v. Brown*, 423 A.2d 743, 745 (Pa. Super. Ct. 1980) (quoting Evans, 212 A.2d at 443).

To begin, plaintiffs' requests for punitive damages with respect to Count III (negligence) and Count V (negligent misrepresentation) are wholly improper because Pennsylvania law makes clear that "[p]unitive damages may not be awarded for misconduct which constitutes ordinary negligence . . . ." *See Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985) (citing RESTATEMENT OF TORTS (SECOND) § 908, comment e)). Here, by plaintiffs' own admission, Counts III and V sound plainly in ordinary negligence, and the accompanying demands for punitive damages are thus legally insufficient. *See* Compl. ¶ 110 ("Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and Plaintiff Parent."); *id.* ¶ 130 ("Abbott and Mead were negligent or careless in not determining those representations to be false.").

Plaintiffs' requests for punitive damages in each of Counts I through V also fail because they are pleaded with insufficient specificity. Plaintiffs make no effort to provide factual support for their requests for punitive damages against Abbott. Instead, plaintiffs baldly and repeatedly demand judgment "[f]or punitive damages . . . resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct . . . ." *See* Compl. at Count I (prayer for relief); *id.* at Count II (prayer for relief); *id.* at Count III (prayer for relief); *id.* at Count VI (prayer for relief); *id.* at Count V (prayer for relief). Nowhere do plaintiffs support these conclusory assertions of "malicious" conduct with any allegations of fact.

24

At most, plaintiffs allege that Abbott "knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC," *see, e.g.*, Compl. ¶ 94, but such allegations are woefully insufficient. Plaintiffs cannot merely incant the word "knowledge" and make it so; rather, plaintiffs must provide factual support for their bald assertions. *See Whiting v. Nationwide Ins. Co.*, 9 Pa. D. & C.3d 789, 792 (1979) (dismissing plaintiffs' punitive damages request where "factual averments in support of . . . conclusory allegations are totally lacking"). Plaintiffs fail to do so here.

For all these reasons, Abbott respectfully requests that this Court strike plaintiffs' requests for punitive damages as conclusory, lacking the requisite factual specificity, and legally insufficient.

## CONCLUSION

For the foregoing reasons, Abbott's preliminary objections to plaintiffs' complaint should be sustained, and plaintiffs' claims against Abbott should be dismissed.

Dated: February 27, 2024          Respectfully Submitted:

*/s/ Sean P. Fahey*
Sean P. Fahey (PA Bar No. 73305)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

*/s/ Ronni E. Fuchs*
Ronni E. Fuchs (PA Bar No. 65561)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

*/s/ Joseph E. O'Neil*
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
**CAMPBELL CONROY & O'NEIL, P.C.**
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.6388
JONeil@campbell-trial-lawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

/s/ Marques Hillman Richeson
Marques Hillman Richeson (admitted *pro hac vice*)
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

Case ID: 230900805
Control No.: 24026081

# EXHIBIT A

Case ID: 230900605
Control No.: 23096081

KLINE & SPECTER, P.C.
BY:

TOBIAS L. MILLROOD, ESQ.
ELIZABETH A. CRAWFORD, ESQ.
JOHN P. O'NEILL, ESQ.
TIMOTHY A. BURKE, ESQ.
ATTORNEY I.D. NOS.: 77764 / 313702 / 205677 /
320927
125 LOCUST STREET, 19TH FLOOR
PHILADELPHIA, PA 19102
TELEPHONE: (215) 772-1000
TOBI.MILLROOD@KLINESPECTER.COM
ELIZABETH.CRAWFORD@KLINESPECTER.COM
JACK.ONEILL@KLINESPECTER.COM
TIMOTHY.BURKE@KLINESPECTER.COM

Benjamin Whiting, Esq. (pro hac vice)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Telephone: (312) 741-5220
Fax: (312) 971-3502
ben.whiting@kellerpostman.com

*Filed and Attested by the Office of Judicial Records 07 FEB 2024 12:14 pm C. SMITH*

| | |
|---|---|
| Nikia Tucker, on her own behalf and as Parent and Natural Guardian of N.B., a Minor<br>1445 Benner Street<br>Philadelphia, PA 19149<br>*Plaintiff*,<br><br>v.<br><br>Mead Johnson & Company, LLC<br>CT Corporation System<br>1635 Market Street<br>Philadelphia, PA 19107<br><br>Mead Johnson Nutrition Company<br>Corporation Service Company<br>2595 Interstate Drive, Ste 103<br>Harrisburg, PA 17110<br><br>Abbott Laboratories<br>CT Corporation System<br>1635 Market Street<br>Philadelphia, PA 19107<br><br>Albert Einstein Medical Center a/k/a Einstein Medical Center | **IN THE COURT OF COMMON PLEAS**<br>**PHILADELPHIA COUNTY**<br><br>**CIVIL TRIAL DIVISION**<br><br>**SEPTEMBER TERM 2023**<br>**NO. 0730** |

| | |
|---|---|
| 5501 Old York Road | : |
| Philadelphia, PA 19141 | : |
| | : |
| Albert Einstein Healthcare Network d/b/a | : |
| Einstein Healthcare Network | : |
| 5501 Old York Road | : |
| Philadelphia, PA 19141 | : |
| | : |
| *Defendants.* | : |

## COMPLAINT IN CIVIL ACTION
## <u>NOTICE TO DEFEND</u>

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

PHILADELPHIA BAR ASSOCIATION
LAWYER REFERRAL AND INFORMATION
SERVICE
ONE READING CENTER
PHILADELPHIA, PA 19107
TELEPHONE: (215) 238-1701 | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas las páginas siguientes, usted tiene viente (20) dias de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puese perder dinero o sus propiedades u ostros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICO, VAYA EN PERSONA O LLAME POR TELEPHONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

ASOCIACION DE LICENCIADOS DE FILADELFIA
Servicio De Referencia E Información Legal
One Reading Center
Filadelfia, Pennsylvania 19107
Telephono: (215) 238-1701 |

**KLINE & SPECTER, P.C.**
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    John P. O'Neill, Esq.
    Timothy A. Burke, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 205677 / 320927
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com

Benjamin Whiting, Esq. (pro hac vice)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
Telephone: (312) 741-5220
Fax: (312) 971-3502
ben.whiting@kellerpostman.com

| | |
|---|---|
| NIKIA TUCKER, on her own behalf and as Parent and Natural Guardian of N.B., a Minor<br>1445 Benner Street<br>Philadelphia, PA 19149<br>             *Plaintiff,*<br>    v.<br><br>MEAD JOHNSON & COMPANY, LLC<br>CT Corporation System<br>1635 Market Street<br>Philadelphia, PA 19107<br><br>MEAD JOHNSON NUTRITION COMPANY<br>Corporation Service Company<br>2595 Interstate Drive, Ste 103<br>Harrisburg, PA 17110<br><br>ABBOTT LABORATORIES<br>CT Corporation System<br>1635 Market Street<br>Philadelphia, PA 19107 | **IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY**<br><br>**CIVIL TRIAL DIVISION**<br><br>**SEPTEMBER TERM, 2023**<br><br>**NO. 0867** |

Case ID: 230900867<br>Control No.: 23096081

ALBERT EINSTEIN MEDICAL CENTER a/k/a      :
EINSTEIN MEDICAL CENTER                   :
5501 Old York Road                        :
Philadelphia, PA 19141                    :
                                          :
ALBERT EINSTEIN HEALTHCARE NETWORK d/b/a  :
EINSTEIN HEALTHCARE NETWORK               :
5501 Old York Road                        :
Philadelphia, PA 19141                    :
                                          :
                          *Defendants.*   :

## COMPLAINT

Plaintiff brings this Complaint and Demand for Jury Trial against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and Albert Einstein Medical Center and Albert Einstein Healthcare Network (together, "Einstein"), together "Defendants." Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

### I.      INTRODUCTION

1.      This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Albert Einstein Medical Center. Albert Einstein Medical Center, managed by the Albert Einstein Healthcare Network, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner. This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products. As a result, the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2

2.      Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infant at Albert Einstein Medical Center, owned and operated by the Albert Einstein Healthcare Network.

## II.      PARTIES

3.      Plaintiff Nikia Tucker is a natural adult person and a resident of Pennsylvania.  Ms. Tucker is the parent and natural guardian of N.B., a minor.  Ms. Tucker's address is 1445 Benner Street, Philadelphia, Pennsylvania 19149.

4.      Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware. Its principal place of business is Illinois.  Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company.  Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.      Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois.  Its principal place of business is in Illinois.  Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

6.      Defendant Albert Einstein Medical Center is a corporation, incorporated under the laws of the Commonwealth of Pennsylvania.   Its principal place of business is in Philadelphia, Pennsylvania.

3

7. Defendant Albert Einstein Healthcare Network is a corporation, incorporated under the laws of the Commonwealth of Pennsylvania. Its principal place of business is Philadelphia, Pennsylvania. At all times relevant, Albert Einstein Healthcare Network owned and managed Defendant Albert Einstein Medical Center, located in Philadelphia, Pennsylvania.

### III. JURISDICTION AND VENUE

8. This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931. Defendants conduct authorized business in the Commonwealth of Pennsylvania. They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9. Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

10. This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

### IV. FACTUAL ALLEGATIONS

#### *N.B.'s NEC Diagnosis*

11. N.B. was born prematurely at Albert Einstein Medical Center in Philadelphia, Pennsylvania on May 15, 2022.

Case ID: 230900565
Control No.: 23096081

12.     At birth, N.B.'s gestational age was approximately 34 weeks and she weighed 2013 grams. Upon information and belief, N.B. was fed Similac and/or Enfamil cow's milk-based products by staff at Albert Einstein Medical Center after her birth.

13.     Upon information and belief, N.B. developed NEC after ingesting Defendant Manufacturers' products.

14.     N.B.'s diagnosis of NEC occurred during her course of treatment at Defendant Hospital's NICU.  N.B. suffered injuries, including but not limited to, a diagnosis of NEC, treatment with antibiotics and surgery, bowel perforation, gastrointestinal issues, developmental delays, feeding difficulties, and growth issues, and she continues to suffer other long-term health effects.

### Cow's Milk-Based Feeding Products Are Known to Cause NEC

15.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.   NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.   Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.   Up to 30 percent of NEC-diagnosed infants die from the disease.

16.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.   Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

### Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist

17.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition.   For example, in addition to the mother's own milk, an

5

established network delivers pasteurized donor breast milk to hospitals nationwide. Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

18.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.

19.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the breast milk they could otherwise receive.   This displacement only increases infants' vulnerability to NEC.

20.     Breast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

21.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

22.     Despite the scientific consensus that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings.   Instead, they have continued to sell their unreasonably dangerous products.   In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge. And, in fact, the Defendant Manufacturers offer contracts to hospitals—which the hospitals accept—that actually *prevent* the health care providers from offering alternative products—even safer ones— on pain of risking the hospital's advantageous formula pricing strategy.

6

*The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products*

23.     Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

24.     Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

25.     Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message.

26.     Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

27.     While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears—

7

Case ID: 230900565
Control No.: 24096082

that the nutrition they are supplying to their child will not provide the best chance of survival—while wholly failing to warn that their products come with a significantly increased risk of NEC.

28. For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

29. Abbott markets and sells multiple products specifically targeting preterm and low-birthweight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC. At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

30. Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant

8

Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

31.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

32.     Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

9

33.     Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers.  The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

34.     Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products.   The packaging appears as:

10

Case ID: 230900565
Control No.: 24096082




35.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice.   This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

36.     The Defendant Manufacturers have also designed powerful marketing campaigns to both the general public and health care providers at hospitals like Einstein.   The Defendant Manufacturers know that sales made to hospitals are key drivers of brand loyalty, and thus are a

Case ID: 230900505
Control No.: 24096082

key opportunity to drive better downstream business—*i.e.*, retail purchases by parents after they have left the hospital.  On information and belief, the Defendant Manufacturers know that the formula products used in a hospital's NICU are related to getting and keeping the overall hospital contracts.  And the Defendant Manufacturers know that, just like any celebrity endorsement, when mothers of newborn infants see medical professionals using a certain brand, the mothers are more likely to continue to purchase that same brand after discharge.  The Defendant Manufacturers are thus heavily motivated to ensure that NICU departments are using their products.

37.     Abbott and Mead Johnson focus their sales teams and training heavily on hospital NICU departments.  They train their sales representatives how to increase the number of babies on their formula, and they emphasize the need to be the dominant formula manufacturer in the NICU so they can own that profitable ground and secure a great return on its substantial investment in NICU formula and other products.

38.     To leverage hospitals' NICUs and secure babies in the hospital and at retail, the Manufacturer Defendants pull out all the stops to convince hospitals, including Defendant Hospital, to purchase their products.  For example: Abbott and Mead Johnson provide samples of their products to hospitals for free.

39.     On information and belief, to get the hospitals on board with supplying their formula for premature infants, Abbott and Mead Johnson work with hospitals to secure contracts that have special pricing discounts if a certain level of the formula-fed babies in the hospital receive just that one manufacturer's products; similar to a restaurant being a Coke or Pepsi restaurant.  And notwithstanding the increased risk of the Defendant Manufacturers' products for the hospitals' most fragile patients—the preterm infants—the decision makers at these hospitals seek out these types of contracts to better the hospitals' own bottom lines.

Case ID: 230900565
Control No.: 24096082

40.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective companies' own formula products to give to the preterm infants.  The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

41.     Prior to N.B.'s birth, Abbott sent sales representatives to Defendant Hospital.  Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Abbott's products were safe to give to preterm infants like N.B.  Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants.

42.     Prior to N.B.'s birth, Mead Johnson sent sales representatives to Defendant Hospital.  Those sales representatives provided information about Mead Johnson's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets.  This information indicated that Mead Johnson's products were safe to give to preterm infants like N.B.  Mead Johnson maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Mead Johnson's products could cause NEC in preterm infants.

Case ID: 230900565
Control No.: 24096082

43.     Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like N.B.

### The Defendant Manufacturers' Inadequate Warnings

44.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants. Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

45.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

46.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

47.     Mead cites no medical literature or research to guide the use of its products.

48.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

49.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

Case ID: 230900566
Control No.: 24096082

50.     Mead Johnson failed to provide, and continues to fail to provide, a full accounting of the risk of NEC as documented, by underrepresenting and misrepresenting the risk to the public and the medical community.

51.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.  Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

52.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

53.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

54.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

55.     Despite knowing of studies documenting an increased risk of NEC from its products, Abbott did not act to make parents or the medical community aware of those risks, and instead took steps to conceal or prevent those risks from becoming public.  Despite knowing that its

Case ID: 230900505
Control No.: 23096082

products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### *Einstein's Failure to Warn*

56.    On information and belief, Einstein was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  They knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition.  However, instead of warning of those dangers, or supplying breast milk-based feeding products to preterm infants like the Injured Infant, the Hospital Defendants have continued to source, distribute, and supply the Defendant Manufacturers' products in their hospitals without any adequate warning.

57.    Medical providers and staff at Einstein have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition.  One staff member acknowledged that "premature babies that are feed breast milk are less likely to develop something called necrotizing enterocolitis" and stated that "we know that babies that are fed breast milk are less likely to have that problem." These statements demonstrate that Einstein knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

58.    Nonetheless, Einstein has yet to transition to an exclusive breast milk-based diet for preterm patients that would obviate the need to warn parents of the risks posed by the Defendant Manufacturers' products.

Case ID: 230900566
Control No.: 24096082

59.     Although Einstein knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities.  As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Einstein, causing their injuries.  This occurred even though hospitals across the country warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

60.     Einstein's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers.   On information and belief, Einstein received the Defendant Manufacturers' cow's milk-based products for free or at a significant discount, and granted their sales representatives access to Einstein's healthcare professionals and medical staff.  These sales representatives have provided deceptive information that Einstein reasonably knew or should have known would ultimately reach parents through those staff.  This arrangement dovetails with the Defendant Manufacturers' own marketing strategy, which aims to "sell and service" healthcare professionals and medical staff as a means of converting them into "extra salespersons."

61.     On information and belief, at the time the Injured Infant was born, Maternity staff "were like walking advertisements for baby formula," with staff noting that "Nurses wore buttons or lanyards with the name of a formula manufacturer on them," among other practices boosting formula use, notwithstanding knowledge in the medical community that human milk could reduce infections including necrotizing enterocolitis.  Einstein's staff "got in the way" of mothers wishing to provide their own milk to their babies.

17

62.     These statements demonstrate that Einstein knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

63.     Although Einstein knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities.   As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Albert Einstein Medical Center, causing their injuries.   This occurred even though hospitals across the country, including Einstein, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

64.     Einstein's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers.     On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free and/or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff.   These sales representatives have provided deceptive information that Einstein reasonably knew or should have known would ultimately reach parents through those staff.   This arrangement dovetails with the Defendant Manufacturers' own marketing strategies" and use of salespersons.

### *Safer Alternative Designs*

86.     The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants.   The Defendant Manufacturers could have used

18

pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

87.    Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk.  This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

88.    On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

<div align="center">

**CAUSES OF ACTION**
**COUNT I:  STRICT LIABILITY FOR DESIGN DEFECT**
**(Against Abbott and Mead)**

</div>

89.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

90.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

91.    Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

92.    Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was

<div align="center">19</div>

therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations. Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

93. The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products. The risks of feeding those products to the Injured Infant outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

94. Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

95. Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

96. Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

97. Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

98. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

Case ID: 230900565
Control No.: 24096081

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

## COUNT II: STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott and Mead)

99.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

100.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of

Case ID: 230900565
Control No.: 23096082

their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

101.    Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses.    By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death.    The failure to warn makes the products at issue in this litigation unreasonably dangerous.

102.        Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks.    Among other risks, the Defendant Manufacturers:

    a.    Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

    b.    Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

    c.    Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

    d.    "Black box"-type warning that their cow's milk-based products are known

Case ID: 230900505
Control No.: 24096082

to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

e.  Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.  Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.  Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.  Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

103.  Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

104.  As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

105.  The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products.  Had the

Case ID: 230900565
Control No.: 24096031

Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

106.        As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

Case ID: 230900505
Control No.: 23096081

g.      For such other and further relief as the Court deems proper.

## COUNT III:  NEGLIGENCE
### (Against Abbott and Mead)

107.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

108.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

109.    At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

110.    Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

111.    Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

a.      Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

b.      Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

Case ID: 230900566
Control No.: 24096081

c.      Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d.      Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

e.      Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.      Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.      Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.      Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

112.    In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring,

Case ID: 230900565
Control No.: 24096082

prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

113.    As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

114.    Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

115.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent,

Case ID: 230900565
Control No.: 23096082

and/or malicious conduct, as permitted by law;

e.      For interest as permitted by law;

f.      For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.      For such other and further relief as the Court deems proper.

### COUNT IV: INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

116. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

117. At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

118. Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

119. Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

120. Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

a.      That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were

28

unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b.     That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c.     That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d.     That cow's milk-based products were safe for premature infants; and/or

e.     That cow's milk-based products were necessary for optimum growth; and/or

f.     That cow's milk-based products were similar or equivalent to breast milk; and/or

g.     That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.     That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.     Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

121.    Abbott and Mead had actual knowledge, or, at a minimum, a reckless indifference, to whether the aforementioned misrepresentations were false. The Defendant Manufacturers' misrepresentations were intended to, and in fact did, mislead physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their infant products to babies, including

29

Case ID: 230900505
Control No.: 24096081

the Injured Infant.

122. The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them. The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

123. As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

124. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning

Case ID: 230900565
Control No.: 24096082

capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

### COUNT V:  NEGLIGENT MISREPRESENTATIONS
### (Against Abbott and Mead)

125.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

126.    At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

127.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

128.    In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

129.    Specifically, upon information and belief, Abbott and Mead made the following false

31

Case ID: 230900565
Control No.: 23096082

statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

a. That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b. That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c. That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d. That cow's milk-based products were safe for premature infants; and/or

e. That cow's milk-based products were necessary for optimum growth; and/or

f. That cow's milk-based products were similar or equivalent to breast milk; and/or

g. That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h. That their products were based on up-to-date science, which made them safe for premature infants; and/or

i. Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

Case ID: 240900565
Control No.: 24096082

130.    Abbott and Mead were negligent or careless in not determining those representations to be false.

131.    The Defendant Manufacturers' misrepresentations were intended to and did in fact induce physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their products to babies, including the Injured Infant.

132.    The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging.   Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

133.        As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

134.        As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

   a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

   b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers'

Case ID: 230900565
Control No.: 23096082

conduct;

c.　　For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.　　For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.　　For interest as permitted by law;

f.　　For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.　　For such other and further relief as the Court deems proper.

## COUNT VI: FAILURE TO WARN
### (Against Albert Einstein Medical Center and Albert Einstein Healthcare Network)

135.　Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

136.　Einstein as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

137.　At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Einstein in their intended manner and for their intended purpose.

34

138.    Einstein employed or contracted with the healthcare professionals and medical staff at Albert Einstein Medical Center, managing these individuals during their treatment of the Injured Infant.

139.    Einstein negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

140.    Moreover, at all relevant times, Einstein knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Albert Einstein Medical Center.   The Defendant Manufacturers' sales representatives were encouraged to interact with Albert Einstein Medical Center's healthcare professionals and medical staff.    These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Albert Einstein Medical Center's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

141.    Einstein also knowingly, and intentionally, allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Albert Einstein Medical Center's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

142.    Einstein knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

143.    Nonetheless, Einstein acted negligently, outrageously, and recklessly, and breached its

Case ID: 230900565
Control No.: 24096082

duty by:

    a.  Failing to warn that cow's milk-based products significantly increase the
        risk of NEC, severe injury, and death in those babies; and/or

    b.  Failing to warn that cow's milk-based products are unsafe and/or
        contraindicated for premature infants like the Injured Infant; and/or

    c.  Failing to warn or instruct its healthcare professionals and medical staff
        on the information that should be provided to parents in order to make an
        informed choice about whether to allow their babies to be fed the Defendant
        Manufacturers' products, notwithstanding their substantial risk; and/or

    d.  Failing to provide its healthcare professionals and medical staff with the
        well- researched and well-established studies that link cow's milk-based
        products to NEC and death in premature infants; and/or

    e.  Failing to provide a warning in a method reasonably calculated/expected to
        reach the parents of newborns; and/or

    f.  Failing to provide statistical evidence showing the magnitude of increased
        risk of NEC in premature infants associated with cow's milk-based
        products; and/or

    g.  Failing to prevent the Defendant Manufacturers' sales representatives from
        misrepresenting to Albert Einstein Medical Center's healthcare
        professionals and medical staff that premature babies would not grow
        adequately with human milk and human milk products and that use of donor
        milk was not advised for premature infants.

144.    Reasonable hospitals under the same or similar circumstances would have warned of the

36

above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

145.    Einstein knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

146.    Had Einstein exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

147.    As a direct and proximate result of Einstein's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk- based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

148.    As a further direct and proximate result of Einstein's failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Albert Einstein Medical Center and Albert Einstein Healthcare Network, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of

Case ID: 230900565
Control No.: 24096082

enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Einstein's conduct;

c.   For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.   For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Einstein's oppressive, outrageous, reckless, and/or malicious conduct, as permitted by law;

e.   For interest as permitted by law;

f.   For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.   For such other and further relief as the Court deems proper.

## COUNT VII: CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Albert Einstein Medical Center and Albert Einstein Healthcare Network)

149.   Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

150.   At all relevant times, Einstein owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Albert Einstein Medical Center staff. Specifically, Einstein had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant.   Further, Einstein owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

151.   Einstein owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt,

38

and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

152. At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Einstein in their intended manner and for their intended purpose.

153. Moreover, at all relevant times, Einstein knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Albert Einstein Medical Center. The Defendant Manufacturers' sales representatives were encouraged to interact with Albert Einstein Medical Center's healthcare professionals and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Albert Einstein Medical Center's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

154. Einstein also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Albert Einstein Medical Center's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

155. Einstein knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury,

Case ID: 230900507
Control No.: 24096082

and death for premature infants.

156.     Einstein knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

157.     Nonetheless, Einstein acted negligently, outrageously, and recklessly, and breached its duty by:

> a.      Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted the use of cow's milk-based products for feeding premature babies; and/or
>
> b.      Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or
>
> c.      Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or
>
> d.      Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or
>
> e.      Failing to formulate, adopt, and enforce adequate rules and policies to

40

Case ID: 230900565
Control No.: 24096082

provide its healthcare professionals and medical staff with the well-researched and well- established studies that link cow's milk-based products to NEC and death in premature infants; and/or

f.       Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

g.       Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to Albert Einstein Medical Center's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants; and/or

h.       Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

158.    A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

159.    Had Einstein exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant

Case ID: 230900565
Control No.: 23096031

would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

160.    As a direct and proximate result of Einstein's failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

161.    As a further direct and proximate result of Einstein's negligent, reckless, and outrageous conduct the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

162.    In the alternative, Einstein owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Albert Einstein Medical Center's care, including the Injured Infant.

163.    Einstein employed or contracted with the healthcare professionals and medical staff at Albert Einstein Medical Center and was responsible for overseeing those individuals during their treatment of the Injured Infant.

164.    Nonetheless, Einstein acted negligently, recklessly, and outrageously breached its duty by:

    a.    Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

    b.    Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    c.    Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature

Case ID: 230900565
Control No.: 24096082

babies like the Injured Infant; and/or

d.     Failing to oversee its healthcare professionals and medical staff to restrict their feeding of cow's milk-based products to premature babies; and/or

e.     Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

f.     Failing to provide its healthcare professionals and medical staff with the well- researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g.     Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h.     Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i.     Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

43

Case ID: 230900565
Control No.: 24096081

165.    A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

166.    A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

167.    Had Einstein exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

168.    As a direct and proximate result of Einstein's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

169.    As a further direct and proximate result of Einstein's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Albert Einstein Medical Center and Albert Einstein Healthcare Network, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of

44

enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Einstein's conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Einstein's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

170.    Plaintiff hereby demands a jury trial for all claims triable.

Dated: February 7, 2024

Respectfully submitted,

**KLINE & SPECTER, P.C.**

By:    /s/ Tobias L. Millrood
        Tobias L. Millrood, Esq.
        Elizabeth A. Crawford, Esq.
        John P. O'Neill, Esq.
        Timothy A. Burke, Esq.

        Benjamin Whiting, Esq. (*pro hac vice*)
        **KELLER POSTMAN LLC**
        150 N. Riverside Plaza, Suite 4100
        Chicago, IL 60606
        Telephone: (312) 741-5220
        Fax: (312) 971-3502

Case ID: 230900565
Control No.: 24096081

ben.whiting@kellerpostman.com

Case ID: 230900565
Control No.: 24096081

DocuSign Envelope ID: 981995B8-7D34-4258-91E1-67844E83FD5A

## VERIFICATION

I, Nikia Tucker, verify that the statements made in Plaintiff's Complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements made herein are subject to the penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities.

2/6/2024

Dated: _____, 2024                By: _____

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I will serve a true and correct copy of the foregoing in accordance with Pa. R. Civ. P. 440 on all parties not served electronically. All other parties will be electronically served by the court in accordance with Pa. R. Civ. P. 205.4(g).

Dated: February 27, 2024          */s/ Ronni E. Fuchs*

                                         Ronni E. Fuchs

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Ronni E. Fuchs, hereby certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts, that require filing confidential information and documents differently than non-confidential information and documents.

*/s/ Ronni E. Fuchs*

FILED
01 APR 2024 04:20 pm
Civil Administration
T. FOBBS

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

| | |
|---|---|
| NIKIA TUCKER, *on her own behalf and as Parent* : *and Natural Guardian of* N.B., *a Minor*, :                *Plaintiff,* :      v. : MEAD JOHNSON & COMPANY, LLC, MEAD : JOHNSON NUTRITION COMPANY, ABBOTT : LABORATORIES, ALBERT EINSTEIN : MEDICAL CENTER *a/k/a* EINSTEIN MEDICAL : CENTER, *and* ALBERT EINSTEIN : HEALTHCARE NETWORK *d/b/a* EINSTEIN : HEALTHCARE NETWORK. :                *Defendants.* : : | SEPTEMBER TERM, 2023 No. 00867 |

## ABBOTT LABORATORIES' REPLY IN SUPPORT OF PRELIMINARY OBJECTIONS TO PLAINTIFFS' COMPLAINT

Plaintiffs' response only confirms that Abbott's preliminary objections should be sustained, and that the claims against Abbott should be dismissed.[1] Rather than addressing the obvious pleading defects, plaintiffs seek to justify them. Plaintiffs fail to identify the specific product that allegedly caused their infant's injuries, fail to differentiate between the product manufacturers, and fail to allege facts showing that plaintiffs saw, heard, or were otherwise exposed to purportedly false representations made by Abbott about its products, let alone that plaintiffs relied upon any such representations. Plaintiffs' response brief in no way justifies their

---

[1] Plaintiffs make a number of flawed claims and arguments in their response brief, all of which Abbott denies. For purposes of brevity, however, Abbott focuses this reply on a few dispositive issues, as well as claims and arguments that plaintiffs raised for the very first time. Abbott hereby incorporates and preserves all arguments made in its opening brief, including that plaintiffs failed to plead facts sufficient to show an unreasonably dangerous defect, and failed to plead a legally sufficient basis for punitive damages.

failure to plead the essential elements of their causes of action. For these reasons, all of plaintiffs' claims against Abbott should be dismissed.

## I. Plaintiffs' Strict Liability and Negligence Claims (Count I-III) Should Be Dismissed For Failure to Identify the Specific Product That Allegedly Caused Infant's Injuries

Plaintiffs do not deny that they must identify the specific product that caused infant's injuries under Pennsylvania law. Nor could they. Pennsylvania courts have uniformly upheld the product identification requirement, confirming that to state a products liability claim, a plaintiff must allege that a *particular product* of a *particular defendant manufacturer* caused their injuries. *See Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 968–69 (1985) (holding that plaintiff's failure to identify the offending product was "a fatal deficiency to [strict liability] claim"); *Mellon v. Barre-Nat'l Drug Co.*, 636 A.2d 187, 191 (Pa. Super. Ct. 1993) (holding a defendant must be identified as the manufacturer, distributor, or seller of the offending product before the injuries suffered by the plaintiff may be found to be proximately caused by some negligent act or omission of the defendant).

During a status conference in July 2023 involving other NEC cases, which plaintiffs' counsel attended, the court recognized that the sort of "and/or" pleading plaintiffs engage in here amounted to a failure to adequately identify the products administered to the infant. Despite having the benefit of the court's guidance on this point, plaintiffs made no attempt to plead which product was administered to the infant.

Instead, plaintiffs allege that the infant was administered "Similac and/or Enfamil" products. *See* Compl. ¶ 12. These allegations are insufficient. As plaintiffs themselves recognize, "Similac" and "Enfamil" are the brand names used by Abbott and Mead Johnson to market and sell *multiple* preterm infant nutrition products. *See* Compl. ¶¶ 4-5, 29-30. In fact, these are brands that apply to a large category of preterm and term nutrition products. Because plaintiffs fail to

Case ID: 220302606
Control No.: 23096781

specifically allege which of the many products sold under the "Similac" and "Enfamil" brand names were administered to their infant, their strict liability and negligence claims against Abbott fail for lack of product identification. *See Klein v. Council of Chem. Assocs.*, 587 F. Supp. 213, 221 (E.D. Pa. 1984) (dismissing strict liability claim where plaintiffs did not identify the specific product sold or distributed by the defendants that caused the plaintiffs' harm).

Plaintiffs contend in their response brief that a plaintiff may be somehow excused from satisfying Pennsylvania's product identification requirement where future discovery might lead a plaintiff to this information. This is a misreading of Pennsylvania law. As courts have made clear, plaintiffs cannot escape their obligation to identify the specific product from the specific manufacturer that allegedly caused harm by mere pronouncements of their future "inten[t] to conduct extensive industry-wide discovery." *Klein*, 587 F. Supp. at 221 (holding that plaintiffs cannot rely on theories of alternative liability or joint and several liability to excuse them from identifying the specific product they claim caused their injuries); *see also* Abbott's Preliminary Objections at 16-18. This is particularly true in instances involving separate manufacturers, one of whom may not be a proper defendant. *See* Section III, infra. And the present "inability of plaintiffs to name specific products" is plaintiffs' own fault—a result of "plaintiffs' failure to investigate." *Klein*, 587 F. Supp. at 222

There is no excuse for this critical pleading failure. A "plaintiff is not excused from pleading the facts necessary to sustain [her] cause of action on the ground that the facts were known to the defendant and not to the plaintiff," particularly where, as is the case here, plaintiff has not availed herself of available discovery. *Gross v. United Engineers & Constructors Inc.*, 302 A.2d 370, 372 (1973) (affirming the trial court's dismissal for want of specificity in pleading where it found that plaintiff failed to pursue available discovery or amend the complaint). Because plaintiffs

3

Case ID: 220302606
Control No.: 23096781

do not—and cannot—provide any principled justification for their failure to identify the specific product that allegedly caused harm, plaintiffs' strict liability and negligence claims should be dismissed.

## II. Plaintiffs' Intentional and Negligent Misrepresentation Claims (Counts IV–V) Should Be Dismissed For Failure to Plead with Particularity

Plaintiffs' misrepresentation claims likewise warrant dismissal because plaintiffs have failed to plead specific facts supporting such fraud-based claims. Despite plaintiffs' counsel having the benefit of hearing the concerns the court expressed at a July conference in other NEC cases, plaintiffs fail to allege with any specificity that they saw or heard any Abbott representation, let alone a specific misrepresentation. Nor do plaintiffs allege any facts to support justifiable reliance on any purported statement by Abbott.

While plaintiffs generally allege that Abbott representatives did not warn hospital defendant's staff of the risk of NEC, *see* Pl.'s Memo. of Law at 8, such generalized allegations do not come anywhere close to satisfying Pennsylvania's heightened pleading requirements for fraud. *See* Pa. R. Civ. P. 1019(b). Tellingly, plaintiffs cannot identify any actual statement made by any particular Abbott representative to any particular hospital staff member—and any such statement would not have been made to plaintiffs in any event. *See Feudale v. Aqua Pa., Inc.*, 122 A.3d 462, 466 n.5 (Pa. Commw. Ct. 2015) (concluding that plaintiff failed to "allege[ ] any justifiable reliance on his part on the [alleged false representation], nor could he, as the alleged false representation was not made to him, but instead to [a third party]").

Indeed, plaintiffs have not alleged that Abbott made any representations directly to them, or that they read, saw, heard, or were otherwise exposed to any specific product label or any other specific representation from Abbott before their infant was administered Abbott's products. *See Youndt v. First Nat'l Bank*, 868 A.2d 539, 545 (Pa. Super. Ct. 2005) (holding, "at the very least, a

4

plaintiff must set forth the exact statements or actions plaintiff alleges constitute the fraudulent misrepresentations"). Further, even if alleged misrepresentations to hospitals could provide the basis for a cognizable claim (they do not), plaintiffs have not alleged with specificity when these statements were made, who made them, to whom, and how they were communicated. These factual deficiencies are fatal to plaintiffs' misrepresentation claims.

### III. Plaintiffs' Claims Should Be Dismissed For Failure to Differentiate Between Abbott and Mead Johnson

Plaintiffs concede that their complaint fails to differentiate between Abbott and Mead Johnson. *See* Pl.'s Memo. of Law at 10 ("Plaintiffs' Complaints do often refer to both Abbott and Mead throughout their complaint in tandem."). But, plaintiffs contend that they are not required to differentiate their claims because their complaint alleges that Abbott and Mead Johnson "engaged in nearly identical conduct." *Id.* In making this argument, plaintiffs wholly misconstrue Pennsylvania law.

Pursuant to Rule 1020(a), plaintiffs are required to plead distinct, differentiated, and separate causes of action against defendants who, as here, are not jointly and severally liable. *See Bouchon v. Citizen Care, Inc.*, 176 A.3d 244, 260–61 (2017).[2] Because Abbott and Mead Johnson are direct competitors who manufacture different products at different locations, using different formulations and different ingredients, and market their products differently, plaintiffs have no basis for asserting joint and several liability as a matter of law. *See* Abbott's Preliminary Objections at 22. Plaintiffs nonetheless lump Abbott and Mead Johnson together without

---

[2] *See also Gen. State Auth. v. Lawrie & Green*, 356 A.2d 851, 854 (1976) (holding that, although the plaintiff's allegations made clear that the form of action may be identical against both defendants, Rule 1020(a) required dismissal because the plaintiff relied upon separate and distinct conduct to support their respective causes of action); *Bassaro v. de Levie*, 236 A.3d 1069 (Pa. Super. Ct. 2020) (holding that a plaintiff must state clearly in a separate count each individual cause of action asserted against each individual defendant, including the facts pertaining to every element of that count).

Case ID: 220302606
Control No.: 23096781

differentiating between the distinct acts or omissions of these distinct corporations, and the distinct products they manufacture. As a result, Abbott lacks clarity regarding its alleged role in this case, and whether it is even a proper party. Accordingly, plaintiffs' claims against Abbott should be dismissed.

## **CONCLUSION**

For all these reasons, as well as those set forth in Abbott's opening brief, which is expressly incorporated herein, Abbott's preliminary objections should be sustained, and all claims against Abbott should be dismissed.


Dated: March 27, 2024                                       Respectfully Submitted:


*/s/ Sean P. Fahey*                                         */s/ Joseph E. O'Neil*
Sean P. Fahey (PA Bar No. 73305)                            Joseph E. O'Neil (PA Bar No. 29053)
**TROUTMAN PEPPER HAMILTON**                                Meaghann C. Porth (PA Bar No. 307629)
**SANDERS LLP**                                             Ryan J. O'Neil (PA Bar No. 314034)
3000 Two Logan Square                                       **CAMPBELL CONROY & O'NEIL, P.C.**
Philadelphia, PA 19103                                      1205 Westlakes Drive, Suite 330
215.981.4296                                                Berwyn, PA 19312
Sean.Fahey@troutman.com                                     610.964.6388
                                                            JONeil@CampbellTrialLawyers.com
*/s/ Ronni E. Fuchs*                                        MPorth@campbell-trial-lawyers.com
Ronni E. Fuchs (PA Bar No. 65561)                           RONeil@campbell-trial-lawyers.com
**TROUTMAN PEPPER HAMILTON**
**SANDERS LLP**                                             */s/ Marques Hillman Richeson*
301 Carnegie Center, Suite 400                              Marques Hillman Richeson (admitted *pro hac*
Princeton, NJ 08540                                         *vice*)
609.951.4183                                                **JONES DAY**
Ronni.Fuchs@troutman.com                                    901 Lakeside Avenue
                                                            Cleveland, OH 44114
                                                            216.586.7195
                                                            mhricheson@jonesday.com
                                                            *Attorneys for Defendant Abbott Laboratories*

6

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I will serve a true and correct copy of the foregoing in accordance with Pa. R. Civ. P. 440 on all parties not served electronically. All other parties will be electronically served by the court in accordance with Pa. R. Civ. P. 205.4(g).

Dated: March 27, 2024                        */s/ Ronni E. Fuchs*
                                             Ronni E. Fuchs

**<u>CERTIFICATE OF COMPLIANCE</u>**

I, Ronni E. Fuchs, hereby certify that this filing complies with the provisions of the Public

Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and

Trial Courts, that require filing confidential information and documents differently than non-

confidential information and documents.

<u>*/s/ Ronni E. Fuchs*</u>
Ronni E. Fuchs

**FILED**
01 APR 2024 04:20 pm
**Civil Administration**
T. FOBBS

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

Filed and Attested by the
Office of Judicial Records
06 NOV 2023 02:09 pm
G. IMPERATO

| | |
|---|---|
| KATRINA GREENE, on her own behalf and as Parent and Natural Guardian of L.R., a Minor, | : |
| *Plaintiff,* | : SEPTEMBER TERM, 2023 |
| v. | : No. 230900803 |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a/* PENNSYLVANIA HOSPITAL, *and* THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE. | : : : : : : : : : |
| *Defendants.* | : |

## ORDER OF THE COURT

On this ____ day of _____, 2023, upon consideration of defendant Abbott

Laboratories' preliminary objections to plaintiffs' complaint, its brief in support, and any response

thereto, it is hereby ORDERED that defendant Abbott Laboratories' preliminary objections to

plaintiffs' complaint are SUSTAINED. It is further ORDERED that Counts I through V of

plaintiffs' complaint are DISMISSED as to Abbott Laboratories.


BY THE COURT:


_____

**NOTICE TO PLEAD**

To: Plaintiffs

You are hereby notified to file a written response to the enclosed Preliminary Objections within twenty (20) days from service hereof or a judgment may be entered against you.


/s/ *Sean P. Fahey*
*Counsel for Defendant Abbott Laboratories*


**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Sean P. Fahey (PA Bar No. 73305)
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

Ronni E. Fuchs (PA Bar No. 65561)
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

**CAMPBELL CONROY & O'NEIL, P.C.**
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.1900
JONeil@CampbellTrialLawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

**JONES DAY**
Marques Hillman Richeson (*pro hac vice forthcoming*)
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

Jennifer B. Flannery (PA Bar No. 74546)
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
404.581.8008
jbflannery@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

| | |
|---|---|
| KATRINA GREENE, on her own behalf and as Parent and Natural Guardian of L.R., a Minor, *Plaintiff*, | : SEPTEMBER TERM, 2023 |
| v. | : No. 230900803 |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL, *and* THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE. *Defendants.* | : : : : : : : : : : |

## DEFENDANT ABBOTT LABORATORIES' PRELIMINARY OBJECTIONS TO PLAINTIFF'S COMPLAINT

In March and April of 2020, plaintiffs filed 29 nearly identical actions in this Court, alleging their infants, born prematurely and at low birthweights, were injured after they were administered preterm infant nutrition products manufactured by Abbott Laboratories ("Abbott") or Mead Johnson & Company LLC, Mead Johnson Nutrition Company (together, "Mead Johnson") shortly after their birth. The instant action, filed more than two years later by the same counsel, presents the same claims in nearly-identical form on behalf of an additional claimant.[1] Pursuant to Rules 1028(a)(2), 1028(a)(3) and 1028(a)(4) of the Pennsylvania Rules of Civil

---

[1] During a case management conference in the 29 cases held before the Honorable Linda Carpenter on July 24, 2023, the Court recognized patent deficiencies in the original complaint. While the above-captioned case had not been filed at the time of the conference, plaintiff's counsel had the benefit of this Court's insights concerning the deficiencies in the pleadings. Notwithstanding, the instant complaint suffers from the same deficiencies identified by the Court.

2

Procedure, Abbott's preliminary objections should be sustained, and all claims against Abbott should be dismissed. In support of its preliminary objections, Abbott states the following:

1.    In the above-captioned lawsuit, plaintiffs attack—without basis—specialized infant formulas and fortifiers essential to the survival and development of premature infants in Neonatal Intensive Care Units ("NICUs"). Plaintiffs filed this action against defendants Mead Johnson, Abbott, and the infant's hospital of birth (collectively, "defendants"), alleging that medical professionals at the hospital defendant administered Abbott's and/or Mead Johnson's cow's milk-based infant nutrition products to plaintiff, and that plaintiff was injured as a result.

2.    Plaintiffs allege seven causes of action, five of which were asserted against Abbott and Mead Johnson: strict products liability design defect (Count I), strict products liability failure to warn (Count II), negligence (Count III), intentional misrepresentation (Count IV), and negligent misrepresentation (Count V). The remaining claims (Counts VI and VII) were asserted against the hospital defendant. The complaint was filed by parent ("plaintiff-parent") on her own behalf, and also as a parent and natural guardian of the infant plaintiff ("plaintiff") (together "plaintiffs").

3.    Plaintiffs' complaint is subject to dismissal, in whole or in part, for the reasons set forth below.

## I.   PRELIMINARY OBJECTION FOR LEGAL INSUFFICIENCY OF ALL CLAIMS.

4.    Abbott incorporates the foregoing paragraphs as if set forth herein.

5.    Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

6.    "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. Am. Honda Motor Co., Inc.*, 718 A.2d 305, 307 (Pa. Super. Ct. 1998). Plaintiffs must allege sufficient facts demonstrating that Abbott's products were unreasonably dangerous for their intended use, triggering a duty to warn.

Case ID: 230900606
Control No.: 23096785

7.      Plaintiffs' complaint is devoid of any **_facts_** showing that Abbott's preterm infant nutrition products are "unreasonably dangerous" when administered to premature and low birth weight infants.

8.      Accordingly, this preliminary objection should be sustained, and all Counts against Abbott should be dismissed.

## II.  PRELIMINARY OBJECTION FOR LEGAL INSUFFICIENCY OF PLAINTIFFS' STRICT LIABILITY CLAIMS.

9.      Abbott incorporates the foregoing paragraphs as if set forth herein.

10.     Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

11.     Counts I and II are strict liability claims that require plaintiffs to identify the specific product that allegedly caused plaintiff's injury. _Cummins v. Firestone Tire & Rubber Co._, 495 A.2d 963, 968 (Pa. Super. Ct. 1985) (Pennsylvania "imposes liability for physical harm caused to the user only upon that person who sold a product in a defective condition. A plaintiff must therefore at least _designate_ the product alleged to be defective in order to recover from the one who sells it.") (emphasis added).

12.     Plaintiffs fail to do so. Instead, they simply allege, without referring to any medical records containing product identification information, that "Abbott's and/or Mead [Johnson]'s products" were administered to plaintiff and caused plaintiff's injuries. _See_ Compl. ¶ 104.

13.     Accordingly, this preliminary objection should be sustained, and Counts I and II against Abbott should be dismissed.

## III. PRELIMINARY OBJECTION FOR LEGAL INSUFFICIENCY OF PLAINTIFFS' NEGLIGENCE CLAIM.

14.     Abbott incorporates the foregoing paragraphs as if set forth herein.

4

15.     Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

16.     Count III is a claim for negligence, requiring plaintiffs to identify the product that injured them and to allege a reasonably close causal connection between Abbott's conduct with respect to that product and the resulting injuries to plaintiffs. *See Cummins*, 495 A.2d at 968. Because plaintiffs fail to identify the specific product giving rise to their claims, they also fail to establish a causal connection between Abbott's conduct and their injuries.

17.     Accordingly, this preliminary objection should be sustained, and Count III against Abbott should be dismissed.

## IV. PRELIMINARY OBJECTION FOR INSUFFICIENT SPECIFICITY IN PLEADING PLAINTIFFS' MISREPRESENTATION CLAIMS.

18.     Abbott incorporates the foregoing paragraphs as if set forth herein.

19.     Pursuant to Pa. R. Civ. P. 1028(a)(3), a preliminary objection may be filed by any party to a pleading regarding insufficient specificity in a pleading.

20.     Counts IV and V are claims for intentional and negligent misrepresentation; these fraud-based claims are subject to heightened pleading requirements under Pa. R. Civ. P. 1019(b). Plaintiffs fail to allege with particularity that they saw, heard, or were otherwise exposed to any purported misrepresentations made by Abbott. They also do not specifically allege who made the supposed misrepresentations, or when they supposedly did so. Moreover, plaintiffs cannot plausibly allege reliance on misrepresentations to which they were not exposed.

21.     Accordingly, this preliminary objection should be sustained, and Counts IV and V against Abbott should be dismissed.

## V. PRELIMINARY OBJECTION FOR INSUFFICIENT SPECIFICITY IN DIFFERENTIATING BETWEEN DEFENDANTS THROUGHOUT COMPLAINT.

22.     Abbott incorporates the foregoing paragraphs as if set forth herein.

Case ID: 230900606
Control No.: 23096785

23. Pursuant to Pa. R. Civ. P. 1028(a)(3), a preliminary objection may be filed by any party to a pleading regarding insufficient specificity in a pleading.

24. In the unnumbered paragraph of the complaint appearing before paragraph 1, plaintiffs collectively refer to Abbott and Mead Johnson as "the Defendant Manufacturers" without explaining what relationship, if any, exists between these corporations, or why the acts of Mead Johnson should be attributed to Abbott, or vice versa. *See* Compl. 1.

25. Paragraphs 1 and 13 of the complaint generally allege that plaintiff was given "the Defendant Manufacturers' cow's milk-based" products, without specifying which product from which manufacturer was administered to plaintiff. *Id.* ¶¶ 1, 13.

26. Paragraph 14 of the complaint generally alleges that plaintiff developed necrotizing enterocolitis ("NEC") shortly after being administered the Defendant Manufacturers' products, again without specifying which product from which manufacturer was administered. *Id.* ¶ 14.

27. Paragraph 54 of the complaint alleges that "Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents," without specifying any particular act of deception by any individual defendant, and without providing any details surrounding when plaintiffs saw the allegedly misleading marketing campaigns. *Id.* ¶ 54.

28. Across Counts I through V of the complaint, plaintiffs allege wrongful conduct by Abbott and/or Mead Johnson without differentiating between the defendants, or specifying each defendant's distinct role in each claim. *See* Compl., Counts I-V.

29. Because plaintiffs have lumped Abbott and Mead Johnson together without differentiating between the distinct acts or omissions of these distinct corporations, Abbott lacks clarity regarding its alleged role in these cases. Plaintiffs' allegations are thus insufficiently pled under Rule 1028(a)(3).

6

Case ID: 230900806
Control No.: 23096785

30. Accordingly, all claims against Abbott should be dismissed, or in the alternative, all paragraphs in which plaintiffs fail to differentiate between defendants should be stricken,[2] and this preliminary objection should be sustained.

## VI. PRELIMINARY OBJECTION REGARDING PLAINTIFF-PARENT'S TIME-BARRED CLAIMS

31. Abbott incorporates the foregoing paragraphs as if set forth herein.

32. Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

33. Pennsylvania law establishes a two-year statute of limitations for negligent, intentional, or otherwise tortious conduct. *See* 42 Pa. Cons. Stat. § 5524(2) & (7).

34. While the statute of limitations began running on plaintiff-parent's claims on or around the date of the infant-plaintiffs' birth, August 17, 2011, plaintiff-parent's case was not initiated by writ of summons until September 8, 2023—over 10 years after the statute of limitations period had expired.

35. Plaintiff-parent's claims in this case are thus time-barred. Moreover, plaintiffs have not alleged sufficient facts to support any application of the discovery rule.

36. Accordingly, plaintiff-parent's claims should be dismissed, and this preliminary objection should be sustained.

## VII. PRELIMINARY OBJECTION REGARDING PLAINTIFFS' REQUEST FOR PUNITIVE DAMAGES.

37. Abbott incorporates the foregoing paragraphs as if set forth herein.

38. Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

---

[2] For example, in the complaint, plaintiffs fail to differentiate between defendants in each of the following paragraphs: 1–2, 12–13, 19, 21–26, 29–30, 32–44, 46, 52, 54–59, 62, 86, 89–93, and 96–141.

Case ID: 230900606
Control No.: 23096785

39.     Pursuant to Pa. R. Civ. P. 1028(a)(3), a preliminary objection may be filed by any party to a pleading regarding insufficient specificity in a pleading.

40.     Without sufficient basis, plaintiffs demand punitive damages from Abbott in the *ad damnum* clause of each of Counts I through V.

41.     Plaintiffs' demands for punitive damages in Counts III and V are legally insufficient, as these Counts plainly sound in negligence and punitive damages are not available for claims of "ordinary negligence" under Pennsylvania law. *See Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985) (citing RESTATEMENT OF TORTS (SECOND) § 908, comment e).

42.     Additionally, plaintiffs' demands for punitive damages in Counts I through V are insufficiently specific. Plaintiffs make bare allegations that Abbott's conduct was "malicious" without providing any factual support for the same. *See Whiting v. Nationwide Ins. Co.*, 9 Pa. D. & C.3d 789, 792 (1979) (dismissing plaintiffs' punitive damages request where "factual averments in support of . . . conclusory allegations are totally lacking").

43.     Accordingly, Abbott respectfully requests that plaintiffs' demands for punitive damages in each of Counts I through V be stricken.

## VIII. PRELIMINARY OBJECTION REGARDING PLAINTIFFS' FAILURE TO VERIFY THEIR COMPLAINT.

44.     Abbott incorporates the foregoing paragraphs as if set forth herein.

45.     Pursuant to Pa. R. Civ. P. 1028(a)(2), a preliminary objection may be filed by any party to a pleading regarding a party's failure to conform to a rule of court.

46.     Pa. R. Civ. P. 1024(a) provides that "[e]very pleading containing an averment of fact not appearing of record in the action . . . shall state that the averment . . . is true upon the signer's personal knowledge or information and belief and shall be verified. *See* Pa. R. Civ. P. 1024(a).

8

47. Rule 1024(c) provides that the verification "shall be made by one or more of the parties filing the pleading," unless a qualifying exception applies. *See id.* R. 1024(c). In the event the verification is signed by someone other than the filing party, the verification must set forth "the reason why the verification is not made by a party." *See id.*

48. Here, plaintiffs' complaint is neither verified by plaintiffs themselves nor by their counsel.

49. Plaintiffs failed to conform to Rule 1024(c) and, accordingly, Abbott respectfully requests that this Court strike the complaint.

WHEREFORE, pursuant to Pa. R. Civ. P. 1028(a)(2), 1028(a)(3), and (a)(4), Abbott respectfully requests that this Court sustain these preliminary objections and dismiss Counts I, II, III, IV, and V against Abbott.

Dated: November 6, 2023                          Respectfully Submitted:

/s/ Sean P. Fahey                                /s/ Joseph E. O'Neil
Sean P. Fahey (PA Bar No. 73305)                 Joseph E. O'Neil (PA Bar No. 29053)
**TROUTMAN PEPPER HAMILTON**                     Meaghann C. Porth (PA Bar No. 307629)
**SANDERS LLP**                                  Ryan J. O'Neil (PA Bar No. 314034)
3000 Two Logan Square                            **CAMPBELL CONROY & O'NEIL, P.C.**
Philadelphia, PA 19103                           1205 Westlakes Drive, Suite 330
215.981.4296                                     Berwyn, PA 19312
Sean.Fahey@troutman.com                          610.964.6388
                                                 JONeil@CampbellTrialLawyers.com
                                                 MPorth@campbell-trial-lawyers.com
                                                 RONeil@campbell-trial-lawyers.com

/s/ Ronni E. Fuchs                               /s/ Marques Hillman Richeson
Ronni E. Fuchs (PA Bar No. 65561)                Marques Hillman Richeson (*pro hac vice*
**TROUTMAN PEPPER HAMILTON**                     *forthcoming*)
**SANDERS LLP**                                  **JONES DAY**
301 Carnegie Center, Suite 400                   901 Lakeside Avenue
Princeton, NJ 08540                              Cleveland, OH 44114
609.951.4183                                     216.586.7195
Ronni.Fuchs@troutman.com                         mhricheson@jonesday.com

<center>9</center>

/s/ Jennifer B. Flannery
Jennifer B. Flannery (PA Bar No. 74546)
**JONES DAY**
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
404.581.8008
jbflannery@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

10

Case ID: 230900606
Control No.: 23096785

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

| | |
|---|---|
| KATRINA GREENE, on her own behalf and as Parent and Natural Guardian of L.R., a Minor, *Plaintiff,* v. MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL, *and* THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE. *Defendants.* | : : : : : : : : : : : : : : SEPTEMBER TERM, 2023 No. 230900803 |

## DEFENDANT ABBOTT LABORATORIES' BRIEF IN SUPPORT OF PRELIMINARY OBJECTIONS TO PLAINTIFFS' COMPLAINT

### MATTER BEFORE THE COURT

The preliminary objections of Abbott Laboratories ("Abbott") to plaintiffs' complaint are before this Court. Under Pennsylvania Rules of Civil Procedure 1028(a)(2), 1028(a)(3) and 1028(a)(4), Abbott respectfully requests that this Court dismiss Counts I, II, III, IV, and V of the complaint for insufficient specificity, legal insufficiency of pleading, and/or failure to conform to a rule of court.

### STATEMENT OF QUESTIONS INVOLVED

1.      Should the Court sustain Abbott's preliminary objections to the complaint and dismiss all claims against Abbott (Counts I-V) as legally insufficient for failure to properly plead the product at issue is unreasonably dangerous? Answer: Yes.

11

2.      Should the Court sustain Abbott's preliminary objections to the complaint and dismiss the strict liability claims (Counts I and II) as legally insufficient? Answer: Yes.

3.      Should the Court sustain Abbott's preliminary objections to the complaint and dismiss the negligence claim (Count III) as legally insufficient? Answer: Yes.

4.      Should the Court sustain Abbott's preliminary objections to the complaint and dismiss the intentional and negligent misrepresentation claims (Counts IV and V) as insufficiently pled? Answer: Yes.

5.      Should the Court sustain Abbott's preliminary objections and dismiss the complaint as insufficiently pled for failure to properly differentiate between the manufacturer defendants, or alternatively, strike all paragraphs in which plaintiffs fail to differentiate between those defendants? Answer: Yes.

6.      Should the Court sustain Abbott's preliminary objections to the complaint and dismiss plaintiff-parents' claims as time-barred? Answer: Yes.

7.      Should the Court sustain Abbott's preliminary objections to the complaint and strike plaintiffs' requests for punitive damages in Counts I through V as both legally insufficient and lacking sufficient specificity? Answer: Yes.

8.      Should the Court sustain Abbott's preliminary objections to the complaint and strike plaintiffs' unverified complaint for failure to conform to a rule of court? Answer: Yes.

## INTRODUCTION AND FACTUAL BACKGROUND

Mead Johnson & Company LLC, Mead Johnson Nutrition Company (together, "Mead Johnson") and Abbott develop and manufacture infant nutrition products, including products

12

Case ID: 230900606
Control No.: 23096785

tailored to address the distinct nutritional needs of premature, low birthweight infants.[3] These infants face complex challenges and daunting odds. For one, they typically have underdeveloped or maldeveloped gastrointestinal systems that are not prepared to receive the nutrition necessary for the rapid growth these infants need. This poses a serious challenge for NICU specialists caring for the infants. The best nutrition for a premature infant is the nutrition it would have received in the womb. Once that is no longer possible, everything else falls short. Milk from the infant's mother is the closest natural substitute, but it may not be available or nutritionally sufficient to meet the premature infant's extraordinary needs. The same is true of donor milk. Accordingly, NICU specialists use their judgment to fill the nutritional gap with specialized formula and fortifier products designed to meet the needs of premature, low-birth-weight infants. This litigation targets these life-saving products.

The infant in this case allegedly developed necrotizing enterocolitis ("NEC"), a leading cause of death in premature infants in NICUs. NEC is an inflammatory gastrointestinal condition that can result in death of intestinal tissue. Plaintiffs admit that premature infants' underdevelopment makes them "especially susceptible to NEC." *See* Compl. ¶ 16. Indeed, NEC affects up to 8% of infants in NICUs, including infants who receive only human milk, as well as those who receive no "food" at all. Neonatologists are experts in dealing with the risks of NEC and balancing them with numerous other medical risks these premature infants face. They carefully balance these risks regardless of how nutrition is administered, and regardless of whether it consists of the mother's own milk, human donor milk, specialized formula or fortifier, or a combination.

---

[3] Abbott manufactures infant nutrition products under the "Similac" brand name. Compl. ¶ 5. Mead Johnson manufactures infant nutrition products under the "Enfamil" brand name. *Id.* ¶ 4.

Case ID: 230900606
Control No.: 23096785

Plaintiff-parent alleges that her infant was born prematurely at Pennsylvania Hospital. *See id.* ¶ 11. The complaint alleges "upon information and belief" that infant was administered "Similac and/or Enfamil cow's milk-based products" by medical professionals at the respective hospital after birth. *Id.* ¶ 12. Plaintiffs further claim that infant developed NEC shortly after the administration of Abbott and/or Mead Johnson's product and experienced long-term health effects. *Id.* ¶¶ 13-14.

Plaintiffs allege that Abbott and/or Mead Johnson manufactured and sold their products knowing they were unreasonably dangerous and not suited for their intended use because they purportedly cause NEC, and that Abbott and/or Mead Johnson failed to warn plaintiffs and the public of this potential harm. *See, e.g, id.* ¶ 22. According to plaintiffs, Abbott and Mead Johnson also made false statements of material fact "on an ongoing and repeated basis" to consumers, physicians, and medical staff in their advertising and marketing materials prior to the time their infants were administered preterm infant nutrition products. *Id.* ¶ 127.

Plaintiffs brought five claims against Abbott and Mead Johnson: strict products liability design defect (Count I), strict products liability failure to warn (Count II), negligence (Count III), intentional misrepresentation (Count IV), and negligent misrepresentation (Count V). Plaintiffs also bring failure to warn (Count VI) and corporate liability (Count VII) claims against the hospital at which their infant was born.

A case management conference was held before the Honorable Linda Carpenter on July 24, 2023 regarding the initial set of 29 cases, in which plaintiffs were represented by the same plaintiffs' counsel as here. While the above-captioned case had not yet been filed as of the date of this conference, plaintiff had the benefit of this Court's insights concerning the deficiencies in the

Case ID: 230900606
Control No.: 23096785

complaints. In particular, the Court recognized during the conference that the original 29 plaintiffs had all failed to identify which manufacturers' product was administered to each infant.

The same is true in the instant complaint. Although plaintiffs acknowledge that Abbott and Mead Johnson sell many different products, there are no allegations in the complaint identifying any product sold by Abbott as the specific product that was administered to any specific infant. Further, there are no allegations indicating that plaintiffs saw, heard, or were otherwise exposed to the allegedly false representations made by Abbott and/or Mead Johnson about their products. These pleading deficiencies, among others, are fatal to their claims.

## ARGUMENT

Plaintiffs' claims are legally insufficient, lack sufficient specificity, and/or fail to conform to a rule of court because:

- plaintiffs do not sufficiently allege that the product(s) at issue are unreasonably dangerous;

- plaintiffs never identify the product administered to their infant;

- plaintiffs do not plead with specificity that any misrepresentations were made to them;

- plaintiffs impermissibly lump Abbott and Mead Johnson together without distinguishing the conduct purportedly attributable to each;

- plaintiff-parent's claims are barred by the statute of limitations;

- plaintiffs fail to plead their requests for punitive damages with the requisite legal sufficiency and factual specificity; and

- plaintiffs' complaint is not verified.

Accordingly, all claims against Abbott should be dismissed.

15

Case ID: 230900606
Control No.: 23096485

**<u>Legal Standard</u>**

Pennsylvania is a fact-pleading jurisdiction. *See generally* Pa. R. Civ. P. 1019. A complaint must therefore set forth the material facts upon which a claim is based. Pa. R. Civ. P. 1019(a). Indeed, "[t]he purpose of the pleadings is to place the defendants on notice of the claims upon which they will have to defend." *Carlson v. Cmty. Ambulance Servs.*, 824 A.2d 1228 (Pa. Super. Ct. 2003) (quoting *Yacoub v. Lehigh Valley Med.*, 805 A.2d 579, 588 (Pa. Super. 2002)). So the "complaint must give the defendants fair notice of the plaintiff's claims and a summary of the material facts that support those claims." *Carlson*, 824 A.2d at 1228.

To that end, Rule 1028 of the Pennsylvania Rules of Civil Procedure provides that a party may file preliminary objections asserting that a pleading is insufficiently specific. Pa. R. Civ. P. 1028(a)(3). When assessing whether a pleading is sufficiently specific, the relevant question is "whether the complaint is sufficiently clear to enable the defendant to prepare [its] defense, or whether the plaintiff[']s complaint informs the defendant with accuracy and completeness of the specific basis on which recovery is sought so that [the defendant] may know without question upon what grounds to make [its] defense." *Rambo v. Greene*, 906 A.2d 1232 (Pa. Super. Ct. 2006).

Rule 1028 of the Pennsylvania Rules of Civil Procedure also provides that a party may file preliminary objections asserting that the pleading is legally deficient. Pa. R. Civ. P. 1028(a)(4). Generally, where a legal deficiency is "apparent on the face of the complaint," it "is needless to prolong proceedings when the matter can be correctly and quickly decided on preliminary objections in the nature of a demurrer." *Wurth v. City of Phila.*, 584 A.2d 403, 407 (Pa. Commw. Ct. 1990).

"Preliminary objections in the nature of [a] demurrer test the legal sufficiency of the plaintiff's complaint." *Sexton v. PNC Bank*, 792 A.2d 602, 604 (Pa. Super. Ct. 2002). The question presented by the demurrer is whether, on the facts alleged, no recovery is possible. *Presbyterian*

Case ID: 230900806
Control No.: 23096485

*Med. Ctr. v. Budd*, 832 A.2d 1066, 1070 (Pa. Super. Ct. 2003) (citation omitted). In answering this question, the court is "precluded from considering any conclusions of law or inferences which are not supported by the factual allegations contained in the complaint." *Hart v. O'Malley*, 647 A.2d 542, 553 (Pa. Super. Ct. 1994). Thus, a plaintiff cannot maintain a cause of action by stating conclusions of law, argumentative allegations, and expressions of opinion. *Neill v. Eberle*, 620 A.2d 673, 675 (Pa. Commw. Ct. 1993). And a court "may not supply a fact missing [from] the complaint" in order to cure a defective pleading. *Hart*, 647 A.2d at 553.

## I.  PLAINTIFFS FAIL TO PLEAD FACTS SUFFICIENT TO SHOW AN UNREASONABLY DANGEROUS DEFECT, AS REQUIRED FOR COUNTS I-V.

Pursuant to Pa. R. Civ. P. 1028(a)(4), Abbott demurs to Counts I-V of plaintiffs' complaint. "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. Am. Honda Motor Co.*, 718 A.2d 305, 307 (Pa. Super. Ct. 1998). "A product is defective when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* at 308.[4] Plaintiffs' complaint fails to allege sufficient facts demonstrating that Abbott's cow's milk-based products were unreasonably dangerous for their intended use.

Plaintiffs merely allege that "[e]xtensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants," without any ***facts*** to support this bald assertion. Compl. ¶

---

[4] The law of product liability within Pennsylvania has developed under the principles outlined in Section 402A of the Second Restatement of Torts. *High v. Penn. Supply, Inc.*, 154 A.3d 341 (Pa. Super. Ct. 2017). Specifically, Section 402(A) provides: "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if the seller is engaged in the business of selling such a product, and it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. The rule stated in Subsection (1) applies although the seller has exercised all possible care in the preparation and sale of his product, and the user or consumer has not bought the product from or entered into any contractual relation with the seller." RESTATEMENT OF TORTS (SECOND) § 402(A).

Case ID: 230900606
Control No.: 23096785

16. Nor have they alleged any ***facts*** supporting a "scientific consensus that . . . cow's milk-based products present a dire threat to the health and development of preterm infants" or that cow's milk-based products "cause NEC and greatly increase the likelihood that a baby will develop NEC." *Id.* ¶¶ 21-22; *see also Orange Stones Co. v. City of Reading*, 87 A.3d 1014, 1025 (Pa. Commw. Ct. 2014) (holding that "[b]lind suspicions and unsupported accusations simply do not state a cause of action pursuant to any theory of tort recovery" under Pennsylvania law).

Instead, plaintiffs simply allege that "[b]reast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC." Compl. ¶ 20. The mere fact that human breast milk may lower the risk of NEC is not equivalent to a showing that cow's milk-based products ***cause*** NEC. As plaintiffs acknowledge, all premature, low birth weight infants, including those who are administered human breast milk exclusively, are especially susceptible and at high risk of developing NEC. *Id.* ¶ 16. Indeed, plaintiffs even concede that NEC is "a disease that can occur in children who are *not* fed the Defendant Manufacturers' products" at all. *Id.* ¶ 30 (emphasis in original).

Thus, plaintiffs' complaint is devoid of facts sufficient to show that Abbott's products are unreasonably dangerous, and their claims against Abbott are insufficient as a matter of law.

## II. PLAINTIFFS FAIL TO SUFFICIENTLY PLEAD THEIR STRICT LIABILITY CLAIMS (COUNTS I–II)

### A. Plaintiffs' Complaint Fails to Identify the Specific Product That Allegedly Caused the Infants' Injuries

Plaintiffs fail to allege sufficient facts to support their strict liability claims (Counts I and II) because plaintiffs' complaint fails to identify the specific product that caused their injuries. *See* Pa. R. Civ. P. 1028(a)(4). It is well-settled that, in order to plead a strict liability claim in Pennsylvania, the "plaintiff must [] at least designate the product alleged to be defective[.]" *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 969 (Pa. Super. Ct. 1985). "Absent such

18

Case ID: 230900606
Control No.: 23096785

identification, there can be no allegations of duty, breach of duty, or legal causation, and hence there can be no liability." *Mellon v. Barre-Nat'l Drug Co.*, 636 A.2d 187, 191–92 (Pa. Super. Ct. 1993).

Plaintiffs' complaint fails to identify the specific product they maintain caused their alleged injuries. Instead, plaintiffs broadly allege that Abbott and Mead Johnson manufacture and sell cow's milk-based infant feeding products under the Similac or Enfamil brand names, Compl. ¶¶ 4-5, and surmise "upon information and belief" that their infant was administered "Similac and/or Enfamil" products. *Id.* ¶ 12. These allegations are plainly insufficient. As plaintiffs acknowledge, Abbott and Mead Johnson manufacture, sell, and market different products under different brands names. *See, e.g.*, *id.* ¶¶ 4-5; *id.* ¶¶ 48–49 (describing multiple Abbott products and multiple Mead Johnson products). They also acknowledge that, similar to a restaurant offering Coke or Pepsi, the hospital defendants use either Similac **or** Enfamil in their respective NICUs. *Id.* ¶ 22; *id.* ¶ 58. Yet, plaintiffs fail to identify which product from which manufacturer was allegedly administered to their infant. As such, even viewing the complaint in the light most favorable to plaintiffs, their strict liability claims fail for lack of product identification. *See Cummins*, 495 A.2d at 968–69 (holding that the plaintiff's failure to identify the offending product was "a fatal deficiency to his [strict liability] claim" and that "the complaint [could] not adequately aver the requisite connection between the [defendants] and the defective product"); *Klein v. Council of Chem. Assocs.*, 587 F. Supp. 213, 221 (E.D. Pa. 1984) (dismissing strict liability claim where plaintiffs did not identify the specific product sold or distributed by the defendants that caused the plaintiffs' harm).

**B. Plaintiffs Are Not Excused from Satisfying the Product Identification Requirement**

In an effort to evade their pleading obligations, plaintiffs' complaint seeks to hold Abbott and Mead Johnson "jointly and severally" liable for their claims alleged in Counts I-V. Plaintiffs also allege that Abbott, Mead Johnson, and the hospital defendants "acted in concert" to

Case ID: 230900606
Control No.: 23095785

"fraudulently convey false and misleading information concerning the risk of NEC . . . caused by Defendant Manufacturers' preterm infant formula products." Compl. ¶ 34.

No Pennsylvania court has applied any such theory of alternative liability to excuse a product liability plaintiff from identifying the specific product they claim caused their alleged harm. *See, e.g.*, *Cummins*, 495 A.2d at 970 (affirming an order sustaining preliminary objections to a complaint that sought to allege a theory of enterprise liability premised on a bald averment that members of the tire and rim assembly industry collaborated in the "intentional manufacture, promotion and distribution of a generically similar defective device with the knowledge that a safer [] device was available"); *Skipworth by Williams v. Lead Indus. Ass'n, Inc.*, 690 A.2d 169, 174–75 (Pa. 1997) (holding that plaintiffs failed to establish a concert of action where they were unable to identify the manufacturer of the lead pigment that caused alleged injuries); *Burnside v. Abbott Lab.*, 505 A.2d 973, 982 (Pa. Super. Ct. 1985) (holding Pennsylvania law forecloses cause of action for concerted action where plaintiff is "unable to isolate a particular manufacturer as the causative agent of his injuries").

Abbott and Mead Johnson likewise cannot be held jointly and severally liable as a matter of law. "While there is some authority that a single cause of action may be pled against two or more defendants who are alleged to be jointly and severally liable, that cannot be the case where the factual background underlying each defendant's liability is different." *Bouchon v. Citizen Care, Inc.*, 176 A.3d 244, 258 (Pa. Super. Ct. 2017) (citing *Gen. State Auth'y v. Lawrie and Green*, 356 A.2d 851, 854 (Pa. Commw. Ct. 1976)). Here, because Abbott and Mead Johnson manufacture different products at different locations, with different manufacturing processes, using different formulations and different ingredients, and market their products differently, plaintiffs have no basis for asserting joint and several liability. *See Cummins*, 495 A.2d at 972 (preliminary

Case ID: 230900806
Control No.: 23096785

objections properly sustained as to complaint seeking to impose industry-wide liability where plaintiffs failed to allege that manufacturers placed fungible products with "identical" qualities on the market).  For all these reasons, plaintiffs cannot be excused from satisfying their requirement to identify the specific product that allegedly caused harm.

## III.  PLAINTIFFS FAIL TO SUFFICIENTLY PLEAD A NEGLIGENCE CLAIM (COUNT III).

Plaintiffs' negligence claim fails for the same reason as their strict-liability claims do: they simply fail to identify the product that allegedly caused their injuries. To state a negligence-based products liability claim, "the plaintiff must identify the defendant as the manufacturer or seller of *the offending product* before a plaintiff's injuries may be found to be proximately caused by the negligence of the defendant." *Long v. Krueger, Inc.*, 686 F. Supp. 514, 517 (E.D. Pa. 1988) (citing *Cummins*, 495 A.2d at 967). "Absent such identification, there can be no allegations of duty, breach of duty or legal causation, and hence there can be no liability." *Cummins*, 495 A.2d at 967–68.

As noted above, plaintiffs allege only "upon information and belief" that their infant was administered "Similac and/or Enfamil" products and developed NEC shortly thereafter. *See, e.g.*, Compl. ¶¶ 4-5; *id.* ¶ 12. Plaintiffs do not, however, identify the exact product (if any) made by Abbott giving rise to their claims. Accordingly, they "cannot allege a casual [sic] connection between conduct of the defendants and [plaintiff's] injuries." *Klein*, 587 F. Supp. at 223; *see also Cummins*, 495 A.2d at 967 (affirming dismissal of negligence claim where plaintiff failed to identify a specific product and the identity of the manufacturer, supplier, or seller of the product; and therefore did not establish a causal connection between his injury and the defendants' conduct).

Case ID: 230900606
Control No.: 23096485

## IV. PLAINTIFFS FAIL TO PLEAD THEIR INTENTIONAL AND NEGLIGENT MISREPRESENTATION CLAIMS (COUNTS IV–V) WITH SUFFICIENT PARTICULARITY.

Plaintiffs' complaint lacks sufficient specificity regarding their misrepresentation claims. In particular, plaintiffs fail to allege with any specificity that they saw or heard any Abbott representation, let alone a misrepresentation. Nor do plaintiffs allege any facts to support justifiable reliance on any purported statement by Abbott.

"Averments of fraud are meaningless epithets unless sufficient facts are set forth which will permit an inference that the claim is not without foundation[.]" *Bata v. Cent.-Penn Nat. Bank of Philadelphia*, 224 A.2d 174, 179 (Pa. 1966). To protect against generalized and unsupported accusations of fraud, the Pennsylvania Rules of Civil Procedure requires each element of fraud be "averred with particularity." *Presbyterian Med. Ctr.*, 832 A.2d at 1072-1073 (citing Pa. R. Civ. P. 1019(b)). "Merely alleging fraud as a legal conclusion adds nothing if it is not based upon facts clearly and explicitly set forth as constituting such fraud." *Dwyer v. Rothman*, 431 A.2d 1035, 1037 (Pa. Super. Ct. 1981) (citing *Hornsby v. Lohmeyer*, 72 A.2d 294 (Pa. 1950)).

To state a claim for intentional misrepresentation, plaintiffs must plead: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) that the resulting injury was proximately caused by the reliance. *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) (internal citation omitted). Similarly, to state a claim for negligent misrepresentation, plaintiffs must plead facts showing (1) a misrepresentation of a material fact; (2) that the representor either knew or should have known of the misrepresentation; (3) that the representor intended the representation to induce another to act; and (4) that injury resulted to the party acting in justifiable reliance on the

Case ID: 230900806
Control No.: 23096785

misrepresentation. *See id.* at 561. The complaint fails in multiple ways to plead these elements with specificity.

      ***First***, "at the very least, a plaintiff must set forth the *exact* statements or actions plaintiff alleges constitute the fraudulent misrepresentations." *Youndt v. First Nat'l Bank*, 868 A.2d 539, 545 (Pa. Super. Ct. 2005) (internal citations and quotations omitted) (emphasis added). While plaintiffs generally allege that Abbott made false representations in its marketing materials, plaintiffs do not allege that Abbott made any of these representations directly to them, or that they read, saw, heard, or were otherwise exposed to any specific product label or any other specific representation from Abbott before their infant was administered Abbott's products. Accordingly, plaintiffs fail to plead facts showing that their infants' injuries were caused by their reliance on Abbott's representations. *See, e.g.*, *Rivello v. N.J. Auto. Full Ins. Underwriting Ass'n*, 638 A.2d 253, 257 (Pa. Super. Ct. 1994) (affirming dismissal of misrepresentation claim where plaintiff failed to sufficiently allege justifiable reliance on the alleged misrepresentation or that his injury was proximately caused by the alleged misrepresentation); *Youndt*, 868 A.2d 539 (holding that fraud claim failed where plaintiff did not plead all elements with particularity); *Feudale v. Aqua Pa., Inc.*, 122 A.3d 462, 466 n.5 (Pa. Commw. Ct. 2015) (concluding that plaintiff had failed to "allege[ ] any justifiable reliance on his part on the [alleged false representation], nor could he, as the alleged false representation was not made to him, but instead to [a third party]"); *Feingold v. Unitrin Direct*, Civ. A. No. 12-1250, 2012 WL 3866945, at *6 (E.D. Pa. Sept. 6, 2012) (dismissing negligent misrepresentation claim where plaintiff could not allege that he justifiably relied on the defendants' promises).

      ***Second***, plaintiffs do not identify when the alleged misrepresentations were made, who made them, or how they were communicated. As such, the allegations in the complaint cannot

Case ID: 230900606
Control No.: 23095785

plausibly support plaintiffs' intentional or negligent misrepresentation claims. *See, e.g.*, *Dwyer*, 431 A.2d at 1037 (affirming lower court's decision sustaining preliminary objections to plaintiff's intentional misrepresentation claim where plaintiff did not allege what facts were misrepresented, what false information was given, nor in what way he was "tricked"); *Presbyterian Med. Ctr.*, 832 A.2d at 1073 (affirming order sustaining preliminary objections to complaint where plaintiff failed to "establish every element of its fraud claim with sufficient particularity"); *Bethpage Fed. Credit Union*, 2019 WL 5303904, at *2 (sustaining preliminary objections to fraud and negligent misrepresentation claims due to plaintiff's failure to satisfy Rule 1019(b)'s particularity requirements); *Black v. Cmty. Educ. Ctrs., Inc.*, Civ. A. No. 12-6102, 2014 WL 859313, at *6 (E.D. Pa. Mar. 4, 2014) (finding plaintiff's claims of misrepresentation and fraud failed because she did not allege the instances of mischaracterization with specificity); *Scott v. Bimbo Bakeries, USA, Inc.*, Civ. A. No. 10-3154, 2012 WL 645905, at *6 (E.D. Pa. Feb. 29, 2012) (dismissing negligent misrepresentation claim where plaintiffs did not "allege when these alleged misrepresentations were made, who made them, or how they were communicated").

## V. PLAINTIFFS' FAILURE TO DIFFERENTIATE CLAIMS BETWEEN ABBOTT AND MEAD JOHNSON WARRANTS DISMISSAL OF COUNTS I–V.

Plaintiffs' complaint fails to differentiate between Abbott and Mead Johnson. Rule 1019(a) of the Pennsylvania Rules of Civil Procedure provides that a complaint must set forth the material facts upon which a claim is based. Pa. R. Civ. P. 1019(a). And "even under the most liberal notice pleading requirements," that means that "a plaintiff must differentiate between defendants." *Coyne v. Holy Fam. Apartments*, Civ. A. No. 19-4583, 2020 WL 2063475, at *4 (E.D. Pa. Apr. 29, 2020); *see also Bouchon v. Citizen Care, Inc.*, 176 A.3d 244, 260 (Pa. Super. Ct. 2017) (affirming dismissal of complaint where several paragraphs of the complaint did not differentiate between the defendants in averring the conduct and claims).

24

Ignoring this clear law, plaintiffs' complaint is riddled with allegations about the conduct of "Defendant Manufacturers," or "Abbott and/or Mead Johnson." *See, e.g.*, Compl. ¶¶ 1–2, 12–13, 19, 21–26, 29–30, 32–44, 46, 52, 54–59, 62, 86, 89–93, and 96–141. But the complaint does not allege any facts establishing which specific product from which specific manufacturer gave rise to plaintiffs' claims. Abbott is left to guess what role plaintiffs believe it played in the events at issue, placing a burden on Abbott that is not contemplated or condoned by Pennsylvania's fact pleading rules. Because plaintiffs fail to distinguish between defendants in their complaint, all claims against Abbott should be dismissed, or alternatively, the paragraphs in which plaintiffs fail to differentiate between defendants should be stricken.

## VI. PLAINTIFF-PARENT'S CLAIMS ARE TIME-BARRED AND SHOULD BE DISMISSED

Plaintiff-parent's claims are time-barred by Pennsylvania law, which sets a two-year statute of limitations on actions to recover damages for personal injury based on negligent, intentional, or otherwise tortious conduct. *See* 42 Pa. Cons. Stat. § 5524(2) & (7).

The statute of limitations on plaintiff-parent's claims began to run shortly after infant's birth date, when the infant allegedly developed NEC. Accordingly, plaintiff-parent's claims are time-barred because, although she alleges an infant birth date of August 17, 2011, and although she alleges that her infant developed NEC shortly thereafter when administered Abbott and/or Mead Johnson's products, this lawsuit was not filed September 8, 2023—over ten years after the limitations period expired. Consequently, plaintiff-parent's claims are time-barred and must be dismissed. *See, e.g.*, *Hathi v. Krewstown Park Apartments*, 561 A.2d 1261, 1263 (Pa. Super. Ct. 1989); *Sayers v. Heritage Valley Md. Grp., Inc.*, 247 A.3d 1155, 1159-63 (Pa. Super. Ct. 2021).

Plaintiffs' invocation of the discovery rule does not save plaintiff-parents' untimely claims. For example, plaintiffs point to a 2020 Abbott article as purported evidence of concealment, in an

25

attempt to explain their delay in filing their complaint, but the article offers them no support. *See* Compl. ¶ 31.

*First*, the complaint does not allege that plaintiffs actually relied on this Abbott article. Indeed, the complaint does not allege that plaintiffs actually read or were even aware of any specific statement made by Abbott.

*Second*, the cited article was published on July 22, 2020. That is years after the statute of limitations expired on these plaintiff-parent's claims, which makes it impossible for any plaintiff to have been lulled "into a false sense of security about the use of [Abbott's] products" by the article at the time of the alleged injury. *See, e.g.*, *id.* ¶ 30.

*Third*, no reasonable person could have been misled by the article. In portions of the article omitted by plaintiffs, Abbott strongly encourages the use of breastmilk with premature infants, for reasons that include protection against NEC:

> If your baby is born prematurely, understanding that mother's own breastmilk is best for your baby is key to delivering not only nutrients, but also HMOs and other immune-protective factors. And since breastmilk protects against NEC, work closely with your baby's physician and dietician to understand how to support a good breastmilk supply, so that your preterm baby gets as much breastmilk as possible.

The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (July 22, 2020). Needless to say, the actual document controls over the misleading excerpts cited in the complaint, neither of which can save plaintiff-parent's untimely claims.[5]

---

[5] The only other statements attributed to Abbott in the complaint are (1) allegations that Abbott's website at one point stated: "for infants who aren't breastfed . . . infant formula is the only appropriate, safe alternative to meet babies' nutritional needs" and (2) a statement concerning a singular product, NeoSure, that "[d]uring her first full year, feed her Similac Neosure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." *See, e.g.*, Compl. ¶¶ 47-48. Again, however, the complaint fails to allege that plaintiff-parent actually

Case ID: 230900806
Control No.: 23096785

## VII. PLAINTIFFS' REQUESTS FOR PUNITIVE DAMAGES LACK THE REQUISITE LEGAL SUFFICIENCY AND FACTUAL SPECIFICITY AND FAIL TO PLEAD A LEGALLY SUFFICIENT BASIS FOR PUNITIVE DAMAGES

Plaintiffs' requests for punitive damages should be stricken, as their demands are both legally and factually insufficient, and fail to clear the high bar for punitive damages under Pennsylvania law. In Pennsylvania, "'[p]unitive damages' are damages other than compensatory or nominal damages awarded against a person to punish him for his outrageous conduct." *See Focht v. Rabada*, 268 A.2d 157, 159 (Pa. Super. Ct. 1970) (quoting RESTATEMENT OF TORTS § 908(1)). "As the name suggests, punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct." *Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005); *see also Phillips v. Cricket Lighters*, 883 A.2d 439, 446 (Pa. 2005) ("Punitive damages may be appropriately awarded only when the plaintiff has established that the defendant has acted in an outrageous fashion due to either the defendant's evil motive or his reckless indifference to the rights of others.").

To support a request for punitive damages, the plaintiff must sufficiently allege that "(1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Luddy*, 870 A.2d at 772. Conduct is "willful" when "the actor desired to bring about the result that followed, or at least was aware that it was substantially certain to ensue." *Evans v. Philadelphia Transp. Co.*, 212 A.2d 440, 443 (Pa. 1965). Moreover, "reckless indifference," interchangeable with "wanton" misconduct, occurs when "the actor has intentionally done an act of an unreasonable character, in disregard to a risk known to him or so obvious that he must be taken to

---

read or was aware of these statements, that the statements are themselves misleading, or even that any infant was fed NeoSure as opposed to something else.

Case ID: 230900606
Control No.: 23096785

have been aware of it, and so great as to make it highly probable that harm would follow." *McClellan v. Health Maintenance Org. of Pa.*, 604 A.2d 1053, 1061 (Pa. Super. Ct. 1992); *see also Smith v. Brown*, 423 A.2d 743, 745 (Pa. Super. Ct. 1980) (quoting Evans, 212 A.2d at 443).

To begin, plaintiffs' requests for punitive damages with respect to Count III (negligence) and Count V (negligent misrepresentation) are wholly improper. As Pennsylvania law makes clear, "[p]unitive damages may not be awarded for misconduct which constitutes ordinary negligence . . . ." *See Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985) (citing RESTATEMENT OF TORTS (SECOND) § 908, comment e)). Here, by plaintiffs' own admission, Counts III and V sound plainly in ordinary negligence, and the accompanying demands for punitive damages are thus legally insufficient. *See* Compl. ¶ 117 ("Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and Plaintiff Parent."); *id.* ¶ 137 ("Abbott and Mead were negligent or careless in not determining those representations to be false.").

Plaintiffs' requests for punitive damages in each of Counts I through V also fail because they are pleaded with insufficient specificity. Plaintiffs make no effort to provide factual support for their requests for punitive damages against Abbott. Instead, plaintiffs baldly and repeatedly demand judgment "[f]or punitive damages . . . resulting from the Defendant' Manufacturers' oppressive, fraudulent, and/or malicious conduct . . . ." *See* Compl. at Count I (prayer for relief); *id.* at Count II (prayer for relief); *id.* at Count III (prayer for relief); *id.* at Count VI (prayer for relief); *id.* at Count V (prayer for relief). Nowhere do plaintiffs support these bald assertions of "malicious" conduct with any allegations of fact.

28

Case ID: 230900806
Control No.: 23096785

At most, plaintiffs allege that Abbott "knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC," *see, e.g.*, Compl. ¶ 99, but such allegations are woefully insufficient. Plaintiffs cannot merely incant the word "knowledge" and make it so; rather, plaintiffs must provide factual support for their bald assertions. *See Whiting v. Nationwide Ins. Co.*, 9 Pa. D. & C.3d 789, 792 (1979) (dismissing plaintiffs' punitive damages request where "factual averments in support of . . . conclusory allegations are totally lacking"). Plaintiffs fail to do so here.

For all these reasons, Abbott respectfully requests that this Court strike plaintiffs' requests for punitive damages as wholly conclusory, lacking the requisite factual specificity, and legally insufficient.

## VIII. PLAINTIFFS FAIL TO VERIFY THEIR COMPLAINT UNDER RULE 1024(C)

Finally, plaintiffs' complaints should also be stricken because they are not verified. Rule 1024 mandates that "[e]very pleading containing an averment of fact not appearing of record in the action . . . shall state that the averment . . . is true upon the signer's personal knowledge or information and belief and shall be verified." *See* Pa. R. Civ. P. 1024(a). Subsection (c) of the Rule also explicitly mandates that:

> [t]he verification shall be made by one or more of the parties filing the pleading unless all the parties (1) lack sufficient knowledge or information, or (2) are outside the jurisdiction of the court and the verification of none of them can be obtained within the time allowed for filing the pleading. In such cases, the verification may be made by any person having sufficient knowledge or information and belief and shall set forth the source of the person's information as to matters not stated upon his or her own knowledge and the reason why the verification is not made by a party.

*Id.* at 1024(c).

Plaintiffs wholly failed to verify their complaint, and therefore, it should be stricken for failure to comply with Pa. R. Civ. P. 1028(a)(2) and 1024(c).

29

Case ID: 230900606
Control No.: 23096785

## CONCLUSION

For the foregoing reasons, Abbott's preliminary objections to plaintiffs' complaint should be sustained, and plaintiffs' claims against Abbott should be dismissed.

Dated: November 6, 2023     Respectfully Submitted:

/s/ Sean P. Fahey
Sean P. Fahey (PA Bar No. 73305)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

/s/ Ronni E. Fuchs
Ronni E. Fuchs (PA Bar No. 65561)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

/s/ Joseph E. O'Neil
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
**CAMPBELL CONROY & O'NEIL, P.C.**
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.6388
JONeil@CampbellTrialLawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

/s/ Marques Hillman Richeson
Marques Hillman Richeson (*pro hac vice forthcoming*)
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

/s/ Jennifer B. Flannery
Jennifer B. Flannery (PA Bar No. 74546)
**JONES DAY**
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
404.581.8008
jbflannery@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

30

## **CERTIFICATE OF SERVICE**

       I hereby certify that I will serve a true and correct copy of the foregoing in accordance with Pa. R. Civ. P. 440 on all parties not served electronically. All other parties will be electronically served by the court in accordance with Pa. R. Civ. P. 205.4(g).


Dated: November 6, 2023                     */s/ Ronni E. Fuchs*
                                        Ronni E. Fuchs

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Ronni E. Fuchs, hereby certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts, that require filing confidential information and documents differently than non-confidential information and documents.

*/s/ Ronni E. Fuchs*

Case ID: 230900606
Control No.: 23096785

# EXHIBIT A

Case ID: 230900808
Control No.: 23096785

**KLINE & SPECTER, P.C.**
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 320927
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Timothy.Burke@klinespecter.com

*Filed and Attested by the*
*Office of Judicial Records*
*16 OCT 2023 06:20 pm*
*C. PERRY*

|  |  |  |
|---|---|---|
| KATRINA GREENE, on her own behalf and as Parent and Natural Guardian of L.R., a Minor, | : : : : | **IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
|  | : | **CIVIL TRIAL DIVISION** |
| *Plaintiff*, | : : | **SEPTEMBER TERM 2023** |
| v. | : | **NO. 0803** |
| MEAD JOHNSON & COMPANY, LLC ILLINOIS CORPORATION SERVICE CO. 801 ADLAI STEVENSON DRIVE SPRINGFIELD, IL 62702 | : : : : : |  |
| MEAD JOHNSON NUTRITION COMPANY ILLINOIS CORPORATION SERVICE CO. 801 ADLAI STEVENSON DRIVE SPRINGFIELD, IL 62702 | : : : : : : |  |
| ABBOTT LABORATORIES CT CORPORATION SYSTEM 208 SO. LASALLE STREET, SUITE 814 CHICAGO, IL 60604 | : : : : : |  |
| PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM D/B/A PENNSYLVANIA HOSPITAL 3400 CIVIC CENTER BLVD PHILADELPHIA, PA 19104 | : : : : : : |  |
| THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE | : : : |  |

Case ID: 230900808
Control No.: 23096785

133 SOUTH 36TH STREET       :
PHILADELPHIA, PA 19104       :
       :
*Defendants.*       :


# COMPLAINT IN CIVIL ACTION
## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.<br><br>YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.<br><br>PHILADELPHIA BAR ASSOCIATION<br>LAWYER REFERRAL AND INFORMATION SERVICE<br>ONE READING CENTER<br>PHILADELPHIA, PA 19107<br>TELEPHONE: (215) 238-1701 | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas las páginas siguientes, usted tiene viente (20) dias de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puese perder dinero o sus propiedades u ostros derechos importantes para usted.<br><br>LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICO, VAYA EN PERSONA O LLAME POR TELEPHONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.<br><br>ASOCIACION DE LICENCIADOS DE FILADELFIA<br>Servicio De Referencia E Información Legal<br>One Reading Center<br>Filadelfia, Pennsylvania 19107<br>Telephono: (215) 238-1701 |

**KLINE & SPECTER, P.C.**
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 320927
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Timothy.Burke@klinespecter.com

| | |
|---|---|
| KATRINA GREENE, on her own behalf and as Parent and Natural Guardian of L.R., a Minor, | :    **IN THE COURT OF COMMON PLEAS** |
| | :    **PHILADELPHIA COUNTY** |
| | : |
| *Plaintiff*, | :    **CIVIL TRIAL DIVISION** |
| | : |
| v. | :    **SEPTEMBER TERM 2023** |
| | :    **NO. 0803** |
| MEAD JOHNSON & COMPANY, LLC | : |
| ILLINOIS CORPORATION SERVICE CO. | : |
| 801 ADLAI STEVENSON DRIVE | : |
| SPRINGFIELD, IL 62702 | : |
| | : |
| MEAD JOHNSON NUTRITION COMPANY | : |
| ILLINOIS CORPORATION SERVICE CO. | : |
| 801 ADLAI STEVENSON DRIVE | : |
| SPRINGFIELD, IL 62702 | : |
| | : |
| ABBOTT LABORATORIES | : |
| CT CORPORATION SYSTEM | : |
| 208 SO. LASALLE STREET, SUITE 814 | : |
| CHICAGO, IL 60604 | : |
| | : |
| PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM D/B/A PENNSYLVANIA HOSPITAL | : |
| 3400 CIVIC CENTER BLVD | : |
| PHILADELPHIA, PA 19104 | : |
| | : |
| THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE | : |
| 133 SOUTH 36TH STREET | : |
| PHILADELPHIA, PA 19104 | : |
| | : |

1

Case ID: 230900608
Case ID: 230900803
Control No.: 23096785
Control No.: 23096781

*Defendants.* :

## COMPLAINT

Plaintiff brings this Complaint and Demand for Jury Trial (the "Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania d/b/a Penn Medicine and Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively "Penn Medicine" or "Pennsylvania Hospital" or "Defendant Hospital"), together "Defendants." Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

### I. INTRODUCTION

1. This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Pennsylvania Hospital. Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner. This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products. As a result, the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2. Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and

2

supplied without adequate warning to the Injured Infant at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II.    PARTIES

3.    Plaintiff Katrina Greene is a natural adult person and a resident of Pennsylvania.  Ms. Greene is the parent and natural guardian of L.R., a minor.  Ms. Greene's address is 2811 W Sedgely Avenue, Philadelphia, Pennsylvania 19121.

4.    Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware. Its principal place of business is Illinois.  Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company.  Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.    Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois.  Its principal place of business is in Illinois.  Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

6.    Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania.   Its principal place of business is Philadelphia, Pennsylvania. Pennsylvania Hospital is a registered name of The Pennsylvania Hospital of the University of Pennsylvania Health System.  The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of

3

Case ID: 230900806
Control No.: 23096785

Pennsylvania.

7.      Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania. Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

### III.      JURISDICTION AND VENUE

8.      This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931. Defendants conduct authorized business in the Commonwealth of Pennsylvania.   They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.      Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

10.     This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

### IV.      FACTUAL ALLEGATIONS

#### L.R.'s NEC Diagnosis

11.     L.R. was born prematurely at Pennsylvania Hospital in Philadelphia, Pennsylvania on

4

August 17, 2011.

12.     At birth, L.R.'s gestational age was approximately 31 weeks and she weighed 1843 grams. Upon information and belief, L.R. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital after her birth.

13.     Upon information and belief, L.R. developed NEC after ingesting Defendant Manufacturers' products.

14.     L.R.'s diagnosis of NEC occurred during her course of treatment at Defendant Hospital's NICU. L.R. suffered injuries, including but not limited to, a diagnosis of NEC, ongoing gastrointestinal issues, and she continues to suffer other long-term health effects.

### Cow's Milk-Based Feeding Products Are Known to Cause NEC

15.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.   NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.   Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.   Up to 30 percent of NEC-diagnosed infants die from the disease.

16.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.   Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

### Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist

17.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition.   For example, in addition to the mother's own milk, an

5

established network delivers pasteurized donor breast milk to hospitals nationwide. Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

18.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.

19.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the breast milk they could otherwise receive. This displacement only increases infants' vulnerability to NEC.

20.     Breast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

21.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

22.     Despite the scientific consensus that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings. Instead, they have continued to sell their unreasonably dangerous products. In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge. And, in fact, the Defendant Manufacturers offer contracts to hospitals—which the hospitals accept—that actually *prevent* the health care providers from offering alternative products—even safer ones— on pain of risking the hospital's advantageous formula pricing strategy.

Case ID: 230900808
Control No.: 23096785

### *Ms. Greene Discovers Her Claim*

23.     Because of the Defendants' concealment and misrepresentations, described more fully herein, Ms. Greene did not know, and had no reason to know or suspect, that L.R.'s NEC could have been caused by the Defendant Manufacturers' products.

24.     Once Ms. Greene learned of the direct connection between the Defendant Manufacturers' products and NEC , she contacted an attorney thereafter.

### *Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and Would Not Have Revealed a Factual Basis Earlier Because Defendants Hid the Cause of NEC from Ms. Greene*

25.     Despite exercising reasonable diligence, Ms. Greene was unable to have made the discovery earlier via a reasonable investigation because the Defendants in this litigation concealed the wrongful cause of L.R.'s injuries.

26.     Not one person at Penn Medicine informed Ms. Greene that the Defendant Manufacturers' formula products could have caused L.R.'s injuries.  Penn Medicine's response at the time did not give Ms. Greene any reason to suspect any wrongdoing on the part of the Defendants.

27.     Ms. Greene is a layperson with no medical background or training that would have given her any reason to doubt the response she received from Penn Medicine's health care providers at the time

28.     Given that Penn Medicine's health care providers were in charge of the care of her newborn infant, Ms. Greene had no reason to doubt their word.

29.     Additionally, the risk of necrotizing enterocolitis was not disclosed on the labeling or packaging of *any* of the Defendant Manufacturers' products.

30.     What is more, necrotizing enterocolitis is a disease that can occur in children who are *not* fed the Defendant Manufacturers' products, and the Defendant Manufacturers have worked to

Case ID: 230900808
Control No.: 23096785

mislead parents into a false sense of security about the use of those products. Publicly disseminated materials from each Defendant Manufacturer disguise the role their products play in causing the disease—and affirmatively say, even today, that their products are safe and do not cause NEC. In fact, some publicly disseminated materials from the formula manufacturers even suggest that formula may help *reduce* the risk of this terrible and potentially fatal disease.

31.     For example, Abbott's website stays that "[t]he specific cause of NEC is unknown, but it's most often seen in very low birth weight premature babies," and that "about 10% of babies who are born prematurely develop NEC." The website suggests that "new preliminary studies" suggest for the first time that "NEC prevention may . . . be possible" with the use of human milk oligosaccharides to "dramatically curb intestinal inflammation" and reduce the risk of NEC. Abbott states that these human milk oligosaccharides are found in "certain Similac formulas" although they are "not currently available in Similac's premature infant formulas."[1] Likewise, the website for Mead Johnson's products states that necrotizing enterocolitis is "one of the most common and serious intestinal disease[s] among premature babies." And it deflects responsibility from Mead Johnson's products: "Necrotizing enterocolitis happens when tissue in the small or large intestine is injured or inflamed."[2]

32.     Because of the misleading information distributed by the Defendant Manufacturers, as further detailed herein, any research conducted by Ms. Greene immediately after L.R.'s diagnosis, or at any time prior to seeing an advertisement, would not have led a reasonable person to suspect that the Defendant Manufacturers' products could have caused L.R.'s injuries.

---

[1] The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (last visited July 28, 2023).

[2] Special Feeding Concerns for Preemies, https://www.enfamil.com/articles/special-feeding-concerns-for-preemies/ (last visited July 29, 2023).

Case ID: 230900608
Control No.: 23096785

33.     Ms. Greene also did not know, and had no reason to know or suspect, that Penn Medicine breached its duty of care by distributing the Defendant Manufacturers' products to L.R. Not only was Ms. Greene unaware that the Defendant Manufacturers' products caused L.R.'s injuries and death, but the Defendant Manufacturers' distribution agreements with Penn Medicine—which allowed Penn Medicine to secure sweetheart deals for otherwise expensive premature infant formula in exchange for product placement and access to the hospital staff—were also not public or knowable to Ms. Greene, nor could any reasonable investigation outside of litigation have uncovered the terms of those agreements.

***Despite Exercising Reasonable Diligence, the Defendants' Fraudulently Concealed the Risks of NEC from Defendant Manufacturers' Products to Divert, Prevent, and Mislead Plaintiff Regarding the Cause of Her Child's NEC Diagnosis***

34.     In addition to the averments above, the Defendants have acted in concert to fraudulently convey false and misleading information concerning the risk of NEC, and potentially death, caused by Defendant Manufacturers' preterm infant formula products.

35.     The Defendants' actions as set forth herein constitute knowing misrepresentation, omission, suppression, and concealment of material facts, made with the intent that Plaintiff would rely upon such concealment, suppression, or omission, in connection with the use of Defendants' preterm infant products.

36.     Plaintiff did not know, and could not learn, the truth concerning the uses, risks and benefits of Defendant Manufacturers' preterm infant products due to Defendants' deliberate misrepresentations and concealment, suppression and omission of material facts and important information regarding the risks of NEC, and potentially death, from the products.

37.     Moreover, Defendant Hospital further participated in the intentional concealment—on information and belief, it allowed the Defendant Manufacturers' sales representatives into its

Case ID: 230900608
Control No.: 23091785

hospital to provide samples and free products that did not warn of their serious dangers, and to provide "education" to its NICU staff that was incomplete as to the true risks of feeding their patients the Defendant Manufacturers' products.

38.    Additionally, Defendant Hospital failed to inform Ms. Greene that the Defendant Manufacturers' products caused Plaintiff's child's NEC.

39.    Defendant Hospital was aware that the Defendant Manufacturers' products caused NEC in premature infants. Defendant Hospital was also aware that the Defendant Manufacturers did not provide warnings on their products. However, Defendant Hospital did not warn Ms. Greene of the risks of the products. Instead, and notwithstanding the sweetheart deal Defendant Hospital agreed to in exchange for preterm infant formula at little to no cost, Defendant Hospital repeatedly informed Ms. Greene that it would do everything it could possibly do to keep her infant safe. Though this was clearly not true given the known risks of preterm formula for babies like L.R., it was enough for Ms. Greene to trust that Defendant Hospital was providing preterm formula in the best interest of her child.

40.    Defendants' affirmative acts of fraud and concealment, as averred herein, diverted, prevented, and/or mislead Plaintiff from discovering the medical cause of her child's NEC diagnosis.

41.    Plaintiff was not put on inquiry notice until she learned of the direct connection between the Defendant Manufacturers' products and NEC at a later time and contacted an attorney thereafter.

### *The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products*

10

42.    Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

43.    Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

44.    Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message.

45.    Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

46.    While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears—

11

Case ID: 230900808
Control No.: 23096785

that the nutrition they are supplying to their child will not provide the best chance of survival—while wholly failing to warn that their products come with a significantly increased risk of NEC.

47.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

48.     Abbott markets and sells multiple products specifically targeting preterm and low-birthweight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC. At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

49.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant

Case ID: 230900808
Control No.: 23095485

Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

50.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

51.     Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

Case ID: 230900808
Control No.: 230967485

52.     Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers. The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

53.     Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products. The packaging appears as:

14





54. The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice. This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

55. The Defendant Manufacturers have also designed powerful marketing campaigns to both the general public and health care providers at hospitals like Pennsylvania Hospital. The Defendant Manufacturers know that sales made to hospitals are key drivers of brand loyalty and

15

thus are a key opportunity to drive better downstream business—*i.e.*, retail purchases by parents after they have left the hospital. On information and belief, the Defendant Manufacturers know that the products used in a hospital's NICU are related to getting and keeping the overall hospital contracts. And the Defendant Manufacturers know that just like any celebrity endorsement, when the mothers of newborn infants see medical professionals using a certain brand, the mothers are more likely to continue to purchase that same brand after discharge. The Defendant Manufacturers are thus heavily motivated to ensure that NICU departments are using their products.

56.     Abbott and Mead Johnson focus their sales teams and training heavily on hospital NICU departments. They train their sales representatives how to increase the number of babies on their formula and they emphasize the need to be the dominant formula manufacturer in the NICU so they can own that profitable ground and secure a great return on their substantial investment in NICU formula and other products.

57.     To leverage hospitals' NICUs and secure babies in the hospital and at retail, the Manufacturer Defendants pull out all the stops to convince hospitals, including Defendant Hospital, to purchase their products. For example: Abbott and Mead Johnson provide samples of their products to hospitals for free.

58.     On information and belief, to get the hospitals on board with supplying their formula for premature infants, Abbott and Mead Johnson work with hospitals to secure contracts that have special pricing discounts if a certain level of the formula-fed babies in the hospital receive just that one manufacturer's products; similar to a restaurant being a Coke or Pepsi restaurant. And notwithstanding the increased risk of the Defendant Manufacturers' products for the hospitals' most fragile patients—the preterm infants—the decision makers at these hospitals seek out these types of contracts to better the hospitals' own bottom lines.

16

Case ID: 230900808
Control No.: 230967485

59.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective company's own formula products to give to the preterm infants.  The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

60.     Prior to L.R.'s birth, Abbott sent sales representatives to Defendant Hospital.  Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Abbott's products were safe to give to preterm infants like L.R.  Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants.

61.     Prior to L.R.'s birth, Mead Johnson sent sales representatives to Defendant Hospital. Those sales representatives provided information about Mead Johnson's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Mead Johnson's products were safe to give to preterm infants like L.R.  Mead Johnson maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Mead Johnson's products could cause NEC in preterm infants.

Case ID: 230900808
Control No.: 23096785

62.     Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like L.R.

*The Defendant Manufacturers' Inadequate Warnings*

63.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants.  Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

64.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

65.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

66.     Mead cites no medical literature or research to guide the use of its products.

67.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk.  Mead likewise did not provide instructions or guidance for how to avoid NEC.

68.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

Case ID: 230900808 230906785
Control No.: 23096785 23096785

69.     Mead Johnson failed to provide, and continues to fail to provide, a full accounting of the risk of NEC as documented by underrepresenting and misrepresenting the risk to the public and the medical community.

70.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.  Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

71.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

72.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

73.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

74.     Despite knowing of studies documenting an increased risk of NEC from its products, Abbott did not act to make parents or the medical community aware of those risks, and instead took steps to conceal or prevent those risks from becoming public.  Despite knowing that its

19

Case ID: 230900808
Control No.: 23096785

products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### *Penn Medicine's Failure to Warn*

86.     On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  It knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition.  However, instead of warning of the dangers, or supplying breast milk-based feeding products to preterm infants like the Injured Infant, Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning.

87.     To that end, Penn Medicine has participated in studies designed to increase the use of donor milk while, at the same time, reducing formula feeding in neonates.    The University of Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research into the risks associated with feeding formula to premature infants.   It recently partnered with the National Institute of Nursing Research to publish clinical determinations based on its experience "changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral feed tolerance and more rapid weaning from intravenous nutrition. . . .

Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the incidence and severity of . . . necrotizing enterocolitis (NEC)."

88.     Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration.

Case ID: 230900808
Control No.: 23096785

The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

89.     Finally, medical providers and staff at Penn Medicine have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition.   In an internal newsletter from 2012 touting donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet, quoting a staff lactation consultant:

> Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

90.     These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

91.     Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities.   As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries.   This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

21

92.     Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers.  On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free and/or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff.  These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff.  This arrangement dovetails with the Defendant Manufacturers' own marketing strategies" and use of salespersons.

### *Safer Alternative Designs*

93.     The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants.   The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

94.     Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk.  This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

95.     On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

Case ID: 230900808
Control No.: 23096785

**CAUSES OF ACTION**
**COUNT I: STRICT LIABILITY FOR DESIGN DEFECT**
**(Against Abbott and Mead)**

96.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

97.     Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

98.     Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

99.     Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations.   Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

100.    The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products.  The risks of feeding those products to the Injured Infant outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

101.    Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

102.    Abbott's and Mead's products contained cow's milk at the time they left the manufacturing

23

Case ID: 230900808
Control No.: 23096785

facility.

103.    Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

104.    Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

105.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

    a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

    c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

    d.    For punitive damages in excess of $50,000 and this Court's arbitrational

Case ID: 230900808
Control No.: 23096785

limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

## COUNT II:  STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott and Mead)

106.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

107.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

108.    Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses.    By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death.    The failure to warn makes the products at issue in this litigation unreasonably dangerous.

109.    Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured

25

Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks.    Among other risks, the Defendant Manufacturers:

    a.    Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

    b.    Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

    c.    Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

    d.    "Black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

    e.    Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

    f.    Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

    g.    Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

Case ID: 230900808
Case ID: 230901785
Control No.: 23096785
Control No.: 23096481

      h.      Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

110.    Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

111.    As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

112.    The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products. Had the Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

113.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

      a.      For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

      b.      For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-

Case ID: 230900808
Control No.: 230976785

economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.      For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.      For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.      For interest as permitted by law;

f.      For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.      For such other and further relief as the Court deems proper.

### COUNT III:  NEGLIGENCE
### (Against Abbott and Mead)

114.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

115.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

116.    At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

28

117.    Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

118.    Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

    a.    Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

    b.    Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

    c.    Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

    d.    Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

    e.    Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

    f.    Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided

Case ID: 230900608
Control No.: 23096785

information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g. Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h. Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

119. In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

120. As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

121. Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

122. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

Case ID: 230900608
Control No.: 23096785

a.     For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.     For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.     For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.     For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.     For interest as permitted by law;

f.     For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.     For such other and further relief as the Court deems proper.

## COUNT IV: INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

123.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

124.     At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

125.     Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this

31

Case ID: 230900808
Control No.: 23096785

litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

126.    Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

127.    Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

> a.    That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or
>
> b.    That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or
>
> c.    That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or
>
> d.    That cow's milk-based products were safe for premature infants; and/or
>
> e.    That cow's milk-based products were necessary for optimum growth; and/or
>
> f.    That cow's milk-based products were similar or equivalent to breast milk; and/or

32

Case ID: 230900808
Control No.: 23096785

      g.     That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

      h.     That their products were based on up-to-date science, which made them safe for premature infants; and/or

      i.     Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

128.    Abbott and Mead had actual knowledge, or, at a minimum, a reckless indifference, to whether the aforementioned misrepresentations were false. The Defendant Manufacturers' misrepresentations were intended to, and in fact did, mislead physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their infant products to babies, including the Injured Infant.

129.    The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them. The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

130.    As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

131.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss

Case ID: 230900808
Control No.: 23096785

of income, and/or other harms.    Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

### COUNT V:  NEGLIGENT MISREPRESENTATIONS
#### (Against Abbott and Mead)

132.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth

Case ID: 230900808 230900785
Control No.: 23096785 23096781

herein.

133.    At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

134.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

135.    In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

136.    Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

  a.    That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

  b.    That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

  c.    That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

35

Case ID: 230900808
Control No.: 23096785

d.   That cow's milk-based products were safe for premature infants; and/or

e.   That cow's milk-based products were necessary for optimum growth; and/or

f.   That cow's milk-based products were similar or equivalent to breast milk; and/or

g.   That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.   That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.   Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

137.   Abbott and Mead were negligent or careless in not determining those representations to be false.

138.   The Defendant Manufacturers' misrepresentations were intended to and did in fact induce physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their products to babies, including the Injured Infant.

139.   The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

36

140.     As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

141.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.     For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.     For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.     For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.     For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.     For interest as permitted by law;

f.     For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

Case ID: 230900808
Control No.: 23096785

g.      For such other and further relief as the Court deems proper.

## COUNT VI:  FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

142.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

143.    Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

144.    At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

145.    Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their treatment of the Injured Infant.

146.    Penn Medicine and Pennsylvania Hospital negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

147.    Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals

Case ID: 230900808
Control No.: 23096785

and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

148. Penn Medicine and Pennsylvania Hospital also knowingly, and intentionally, allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

149. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

150. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

      a.    Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

      b.    Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

      c.    Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

Case ID: 230900808
Control No.: 23096785

    d.      Failing to provide its healthcare professionals and medical staff with the well- researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

    e.      Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

    f.      Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

    g.      Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

151.    Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

152.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

153.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably

Case ID: 230900808
Control No.: 23096785

dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

154.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

155.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine's conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's

Case ID: 230900806
Control No.: 23096785

oppressive, outrageous, reckless, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

## COUNT VII: CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Penn Medicine and Pennsylvania Hospital)

156.    Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

157.    At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff. Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant. Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

158.    Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

159.    At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

42

160. Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital. The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

161. Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

162. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

163. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

164. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

Case ID: 230900808
Control No.: 23096785

a.      Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted the use of cow's milk-based products for feeding premature babies; and/or

b.      Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

c.      Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d.      Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

e.      Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well- established studies that link cow's milk-based products to NEC and death in premature infants; and/or

f.      Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

Case ID: 230900808 230900808
Control No.: 23096485 23096485

g.   Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants; and/or

h.   Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

165.   A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

166.   Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

167.   As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of

Case ID: 230900808
Control No.: 23096785

developing NEC and significant injuries.

168.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent, reckless, and outrageous conduct the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

169.        In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including the Injured Infant.

170.        Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

171.        Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly, and outrageously breached its duty by:

>   a.    Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or
>
>   b.    Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or
>
>   c.    Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or
>
>   d.    Failing to oversee its healthcare professionals and medical staff to restrict

46

their feeding of cow's milk-based products to premature babies; and/or

e.    Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

f.    Failing to provide its healthcare professionals and medical staff with the well- researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g.    Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h.    Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i.    Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

172.    A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of

47

the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

173.    A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

174.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

175.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

176.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.    Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

    a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.    For damages for past, present, and future emotional distress, loss of

48

Case ID: 230900806
Control No.: 23096785

enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

c.     For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.     For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.     For interest as permitted by law;

f.     For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.     For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

177.    Plaintiff hereby demands a jury trial for all claims triable.

Dated: October 16, 2023

Respectfully submitted,

**KLINE & SPECTER, P.C.**

By:    /s/ Timothy A. Burke
            Tobias L. Millrood, Esq.
            Elizabeth A. Crawford, Esq.
            Timothy A. Burke, Esq.

Case ID: 230900808
Control No.: 23096785

CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2023, I electronically filed the foregoing document

with the Clerk of the Court using Electronic Efiling and that the foregoing document is being

served on all counsel of record or parties registered to receive Electronic Filing.


/s/ Timothy A. Burke
Timothy A. Burke, Esq.

50

FILED
04 DEC 2023 04:00 pm
Civil Administration
C. KREWELL

# IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
### TRIAL DIVISION – CIVIL

| | |
|---|---|
| ROCHELLE HOLLINGSWORTH, on her own behalf and as Parent and Natural Guardian of G.O., a Minor, | : SEPTEMBER TERM, 2023 <br> : No. 230900791 |
| *Plaintiff,* | : |
| v. | : |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, ABINGTON MEMORIAL HOSPITAL *d/b/a* JEFFERSON ABINGTON HOSPITAL, *and* THOMAS JEFFERSON UNIVERSITY *d/b/a* JEFFERSON HEALTH SYSTEM. | : <br> : <br> : <br> : <br> : <br> : <br> : |
| *Defendants.* | : |

## ABBOTT LABORATORIES' REPLY IN SUPPORT OF
## PRELIMINARY OBJECTIONS TO PLAINTIFFS COMPLAINT

Plaintiffs' response only confirms that Abbott's preliminary objections should be sustained, and that the claims against Abbott should be dismissed.[1] Rather than addressing the obvious pleading defects plaintiffs seek to justify them. Plaintiffs fail to identify the specific product that allegedly caused their infant's injuries, fail to differentiate between the product manufacturers, and fail to allege facts showing that plaintiffs saw, heard, or were otherwise exposed to purportedly false representations made by Abbott about its products, let alone that plaintiffs relied upon any such representations. Plaintiffs' response brief in no way justifies their failure to plead the essential elements of their causes of action, nor can plaintiff-parent save her

---

[1] Plaintiffs make a number of flawed claims and arguments in their response brief, all of which Abbott denies. For purposes of brevity, however, Abbott focuses this reply on a few dispositive issues, as well as claims and arguments that plaintiffs raised for the very first time. Abbott hereby incorporates and preserves all arguments made in its opening brief, including that plaintiffs failed to plead facts sufficient to show an unreasonably dangerous defect, and failed to plead a legally sufficient basis for punitive damages.

untimely claims by invoking the term "negligent infliction of emotional distress" for the very first time in plaintiffs' opposition. For these reasons, all of plaintiffs' claims against Abbott should be dismissed.

**I.      Plaintiffs' Strict Liability and Negligence Claims (Count I-III) Should Be Dismissed For Failure to Identify the Specific Product That Allegedly Caused Infant's Injuries**

Plaintiffs do not deny that they must identify the specific product that caused infant's injuries under Pennsylvania law. Nor could they. Pennsylvania courts have uniformly upheld the product identification requirement, confirming that to state a products liability claim, a plaintiff must allege that a ***particular product*** of a ***particular defendant manufacturer*** caused their injuries. *See Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 968–69 (1985) (holding that plaintiff's failure to identify the offending product was "a fatal deficiency to [strict liability] claim"); *Mellon v. Barre-Nat'l Drug Co.*, 636 A.2d 187, 191 (Pa. Super. Ct. 1993) (holding a defendant must be identified as the manufacturer, distributor, or seller of the offending product before the injuries suffered by the plaintiff may be found to be proximately caused by some negligent act or omission of the defendant).

During a status conference in July 2023 involving other NEC cases, which plaintiffs' counsel attended, the court recognized that the sort of "and/or" pleading plaintiffs engage in here amounted to a failure to adequately identify the products administered to their infants.  Despite having the benefit of the court's guidance on this point, plaintiff made no attempt to plead which product was administered to her infant.

Instead, plaintiffs allege that their infants were administered "Similac and/or Enfamil" products. *See* Compl. ¶ 12. These allegations are insufficient. As plaintiffs themselves recognize, "Similac" and "Enfamil" are the brand names used by Abbott and Mead Johnson to market and sell ***multiple*** preterm infant nutrition products. *See* Compl. ¶¶ 4-5, 48-49. In fact, these are brands

2

that apply to a large category of preterm and term nutrition products. Because plaintiffs fail to specifically allege which of the many products sold under the "Similac" and "Enfamil" brand names were administered to their infant, their strict liability and negligence claims against Abbott fail for lack of product identification. *See Klein v. Council of Chem. Assocs.*, 587 F. Supp. 213, 221 (E.D. Pa. 1984) (dismissing strict liability claim where plaintiffs did not identify the specific product sold or distributed by the defendants that caused the plaintiffs' harm).

Plaintiffs contend in their response brief that a plaintiff may be somehow excused from satisfying Pennsylvania's product identification requirement where future discovery might lead a plaintiff to this information. This is a misreading of Pennsylvania law. As courts have made clear, plaintiffs cannot escape their obligation to identify the specific product from the specific manufacturer that allegedly caused harm by mere pronouncements of their future "inten[t] to conduct extensive industry-wide discovery." *Klein*, 587 F. Supp. at 221 (holding that plaintiffs cannot rely on theories of alternative liability or joint and several liability to excuse them from identifying the specific product they claim caused their injuries); *see also* Abbott's Preliminary Objections at 8-11. This is particularly true in instances involving separate manufacturers, one of whom may not be a proper defendant. *See* Section III, infra. And the present "inability of plaintiffs to name specific products" is plaintiffs' own fault—a result of "plaintiffs' failure to investigate." *Klein*, 587 F. Supp. at 222

There is no excuse for this critical pleading failure. A "plaintiff is not excused from pleading the facts necessary to sustain [her] cause of action on the ground that the facts were known to the defendant and not to the plaintiff," particularly where, as is the case here, plaintiff has not availed herself of available discovery. *Gross v. United Engineers & Constructors Inc.*, 302 A.2d 370, 372 (1973) (affirming the trial court's dismissal for want of specificity in pleading where it

3

Case ID: 230900506
Control No.: 23096560

found that plaintiff failed to pursue available discovery or amend the complaint). Because plaintiffs do not—and cannot—provide any principled justification for their failure to identify the specific product that allegedly caused harm, plaintiffs' strict liability and negligence claims should be dismissed.

## II. Plaintiffs' Intentional and Negligent Misrepresentation Claims (Counts IV–V) Should Be Dismissed For Failure to Plead with Particularity

Plaintiffs' misrepresentation claims likewise warrant dismissal because plaintiffs have failed to plead specific facts supporting such fraud-based claims. Despite plaintiffs' counsel having the benefit of hearing the concerns the court expressed at a July conference in other NEC cases, plaintiffs fail to allege with any specificity that they saw or heard any Abbott representation, let alone a specific misrepresentation. Nor do plaintiffs allege any facts to support justifiable reliance on any purported statement by Abbott.

While plaintiffs generally allege that Abbott representatives did not warn hospital defendant's staff of the risk of NEC, *see* Pl.'s Memo. of Law at 9 (citing Compl. ¶¶ 60-62, 72), such generalized allegations do not come anywhere close to satisfying Pennsylvania's heightened pleading requirements for fraud. *See* Pa. R. Civ. P. 1019(b). Tellingly, plaintiffs cannot identify any actual statement made by any particular Abbott representative to any particular hospital staff member—and any such statement would not have been made to plaintiffs in any event. *See Feudale v. Aqua Pa., Inc.*, 122 A.3d 462, 466 n.5 (Pa. Commw. Ct. 2015) (concluding that plaintiff failed to "allege[ ] any justifiable reliance on his part on the [alleged false representation], nor could he, as the alleged false representation was not made to him, but instead to [a third party]").

Indeed, plaintiffs have not alleged that Abbott made any representations directly to them, or that they read, saw, heard, or were otherwise exposed to any specific product label or any other specific representation from Abbott before their infant was administered Abbott's products. *See*

4

Case ID: 230900506
Control No.: 23095560

*Youndt v. First Nat'l Bank*, 868 A.2d 539, 545 (Pa. Super. Ct. 2005) (holding, "at the very least, a plaintiff must set forth the exact statements or actions plaintiff alleges constitute the fraudulent misrepresentations"). Further, even if alleged misrepresentations to hospitals could provide the basis for a cognizable claim (they do not), plaintiffs have not alleged with specificity when these statements were made, who made them, to whom, and how they were communicated. These factual deficiencies are fatal to plaintiffs' misrepresentation claims.

## III. Plaintiffs' Claims Should Be Dismissed For Failure to Differentiate Between Abbott and Mead Johnson

Plaintiffs concede that their complaint fails to differentiate between Abbott and Mead Johnson. *See* Pl.'s Memo. of Law at 10 ("Plaintiffs' Complaints do often refer to both Abbott and Mead throughout their complaint in tandem"). But, plaintiffs contend that they are not required to differentiate their claims because their complaint alleges that Abbott and Mead Johnson "engaged in nearly identical conduct." *Id.* In making this argument, plaintiffs wholly misconstrue Pennsylvania law.

Pursuant to Rule 1020(a), plaintiffs are required to plead distinct, differentiated, and separate causes of action against defendants who, as here, are not jointly and severally liable. *See Bouchon v. Citizen Care, Inc.*, 176 A.3d 244, 260–61 (2017).[2] Because Abbott and Mead Johnson are direct competitors who manufacture different products at different locations, using different formulations and different ingredients, and market their products differently, plaintiffs have no basis for asserting joint and several liability as a matter of law. *See* Abbott's Preliminary

---

[2] *See also Gen. State Auth. v. Lawrie & Green*, 356 A.2d 851, 854 (1976) (holding that, although the plaintiff's allegations made clear that the form of action may be identical against both defendants, Rule 1020(a) required dismissal because the plaintiff relied upon separate and distinct conduct to support their respective causes of action); *Bassaro v. de Levie*, 236 A.3d 1069 (Pa. Super. Ct. 2020) (holding that a plaintiff must state clearly in a separate count each individual cause of action asserted against each individual defendant, including the facts pertaining to every element of that count).

5

Case ID: 230900596
Control No.: 23096560

Objections at 14-15. Plaintiffs nonetheless lump Abbott and Mead Johnson together without differentiating between the distinct acts or omissions of these distinct corporations, and the distinct products they manufacture. As a result, Abbott lacks clarity regarding its alleged role in this case, and whether it is even a proper party. Accordingly, plaintiffs' claims against Abbott should be dismissed.

## IV. Plaintiffs' Complaint Does Not Allege Viable Negligent Infliction of Emotional Distress Claims on Behalf of Plaintiff-Parent

In the response, plaintiff-parent seeks to save her untimely claims by arguing for the first time in that she has stated negligent infliction of emotional distress (NIED) claims under a "bystander" theory. *See* Pl.'s Memo. of Law at 12-17. In Pennsylvania, a bystander can recover for NIED only if: (1) the plaintiff was located near the scene of the accident; (2) the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident; and (3) the plaintiff and the victim were closely related. *See Huddleston v. Infertility Ctr. of Am.*, 700 A.2d 453, 462 (Pa. Super. Ct. 1997). In addition to these three elements, a physical injury must be averred to sustain a cause of action for NIED. *See Armstrong v. Paoli Mem'l Hosp.*, 633 A.2d 605, 609 (Pa. Super. Ct. 1993); *Abadie v. Riddle Mem'l Hosp.*, 589 A.2d 1143, 1145 (Pa. Super. Ct. 1991).

Here, as a threshold matter, plaintiffs fail to comply with the Rule 1020(a) requirement that "each cause of action" be set forth in a "separate count containing a demand for relief." Further, even if plaintiff-parent had specifically set forth a NIED claim in the complaint (she did not), these newly minted NIED claims would have failed as a matter of law. Plaintiff-parent does not allege that she suffered any physical injury. Moreover, plaintiff-parent does not allege any facts showing that she suffered "a direct emotional impact" from the "contemporaneous observance" of her infants developing NEC. Under these circumstances, Pennsylvania courts routinely dismiss NIED

6

Case ID: 230900506
Control No.: 23096560

claims. *See, e.g.*, *Mazzagatti v. Everingham by Everingham*, 516 A.2d 672, 679 (1986) (holding where plaintiff has no contemporaneous sensory perception of the injury, any claimed emotional distress results more from the particular emotional makeup of the plaintiff rather than from the nature of defendant's actions); *Tackett v. Encke*, 509 A.2d 1310, 1312 (Pa. Super. Ct. 1986) (preliminary objections to parent's claim for NIED damages properly sustained where parent did not witness a "discrete and identifiable traumatic event," but rather was injured emotionally by witnessing, over time, her son's reaction to a pulmonary fat embolism). Accordingly, plaintiff-parent's improperly-pled, time-barred NIED claims should be dismissed.

<u>**CONCLUSION**</u>

For all these reasons, as well as those set forth in Abbott's opening brief, which is expressly incorporated herein, Abbott's preliminary objections should be sustained, and all claims against Abbott should be dismissed.

7

Case ID: 230900506
Control No.: 23096560

Dated: December 4, 2023                     Respectfully Submitted:


/s/ Sean P. Fahey

Sean P. Fahey (PA Bar No. 73305)
**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com


/s/ Ronni E. Fuchs

Ronni E. Fuchs (PA Bar No. 65561)
**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com


/s/ Joseph E. O'Neil

Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
**CAMPBELL CONROY & O'NEIL, P.C.**
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.6388
JONeil@CampbellTrialLawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com


/s/ Marques Hillman Richeson

Marques Hillman Richeson (admitted *pro hac vice*)
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com
*Attorneys for Defendant Abbott Laboratories*

8

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I will serve a true and correct copy of the foregoing in accordance with Pa. R. Civ. P. 440 on all parties not served electronically. All other parties will be electronically served by the court in accordance with Pa. R. Civ. P. 205.4(g).

Dated: December 4, 2023                    */s/ Ronni E. Fuchs*
                                           Ronni E. Fuchs

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Ronni E. Fuchs, hereby certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts, that require filing confidential information and documents differently than non-confidential information and documents.

*/s/ Ronni E. Fuchs*
Ronni E. Fuchs

FILED
01 APR 2024 04:20 pm
Civil Administration
T. FOBBS

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

Filed and Attested by the
Office of Judicial Records
06 NOV 2023 02:07 pm
S. GILLIAM

| | |
|---|---|
| ROCHELLE HOLLINGSWORTH, on her own behalf and as Parent and Natural Guardian of G.O., a Minor, | : SEPTEMBER TERM, 2023 : No. 230900791 |
| *Plaintiff,* | : |
| v. | : |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, ABINGTON MEMORIAL HOSPITAL *d/b/a* JEFFERSON ABINGTON HOSPITAL, *and* THOMAS JEFFERSON UNIVERSITY *d/b/a* JEFFERSON HEALTH SYSTEM. | : : : : : : : |
| *Defendants.* | : |

**ORDER OF THE COURT**

On this _____ day of _____, 2023, upon consideration of defendant Abbott Laboratories' preliminary objections to plaintiffs' complaint, its brief in support, and any response thereto, it is hereby ORDERED that defendant Abbott Laboratories' preliminary objections to plaintiffs' complaint are SUSTAINED. It is further ORDERED that Counts I through V of plaintiffs' complaint are DISMISSED as to Abbott Laboratories.

BY THE COURT:

_____

<u>**NOTICE TO PLEAD**</u>

To: Plaintiffs

You are hereby notified to file a written response to the enclosed Preliminary Objections within twenty (20) days from service hereof or a judgment may be entered against you.


/s/ _Sean P Fahey_

*Counsel for Defendant Abbott Laboratories*


**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Sean P. Fahey (PA Bar No. 73305)
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

Ronni E. Fuchs (PA Bar No. 65561)
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

**CAMPBELL CONROY & O'NEIL, P.C.**
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.1900
JONeil@CampbellTrialLawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

**JONES DAY**
Marques Hillman Richeson (*pro hac vice forthcoming*)
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

Jennifer B. Flannery (PA Bar No. 74546)
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
404.581.8008
jbflannery@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

Case: 1:24-cv-11764 Document #: 1-8 Filed: 10/31/24 Page 190 of 702 PageID #:2731

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

| | | |
|---|---|---|
| ROCHELLE HOLLINGSWORTH, on her own | : | |
| behalf and as Parent and Natural Guardian of G.O., | : | SEPTEMBER TERM, 2023 |
| a Minor, | : | No. 230900791 |
| *Plaintiff,* | : | |
| v. | : | |
| MEAD JOHNSON & COMPANY, LLC, MEAD | : | |
| JOHNSON NUTRITION COMPANY, ABBOTT | : | |
| LABORATORIES, ABINGTON MEMORIAL | : | |
| HOSPITAL *d/b/a* JEFFERSON ABINGTON | : | |
| HOSPITAL, *and* THOMAS JEFFERSON | : | |
| UNIVERSITY *d/b/a* JEFFERSON HEALTH | : | |
| SYSTEM. | : | |
| *Defendants.* | : | |

**<u>DEFENDANT ABBOTT LABORATORIES' PRELIMINARY OBJECTIONS</u>**
**<u>TO PLAINTIFF'S COMPLAINT</u>**

In March and April of 2020, plaintiffs filed 29 nearly identical actions in this Court, alleging their infants, born prematurely and at low birthweights, were injured after they were administered preterm infant nutrition products manufactured by Abbott Laboratories ("Abbott") or Mead Johnson & Company LLC, Mead Johnson Nutrition Company (together, "Mead Johnson") shortly after their birth. The instant action, filed more than two years later by the same counsel, presents the same claims in nearly-identical form on behalf of an additional claimant.[1] Pursuant to Rules 1028(a)(2), 1028(a)(3) and 1028(a)(4) of the Pennsylvania Rules of Civil

---

[1] During a case management conference in the 29 cases held before the Honorable Linda Carpenter on July 24, 2023, the Court recognized patent deficiencies in the original complaints. While the above-captioned case had not been filed at the time of the conference, plaintiff's counsel had the benefit of this Court's insights concerning the deficiencies in the pleadings. Notwithstanding, the instant complaint suffers from the same deficiencies identified by the Court.

2

Control No.: 23095560

Procedure, Abbott's preliminary objections should be sustained, and all claims against Abbott should be dismissed. In support of its preliminary objections, Abbott states the following:

1.  In the above-captioned lawsuit, plaintiffs attack—without basis—specialized infant formulas and fortifiers essential to the survival and development of premature infants in Neonatal Intensive Care Units ("NICUs"). Plaintiffs filed this action against defendants Mead Johnson, Abbott, and the infant's hospital of birth (collectively, "defendants"), alleging that medical professionals at the hospital defendant administered Abbott's and/or Mead Johnson's cow's milk-based infant nutrition products to plaintiff, and that plaintiff was injured as a result.

2.  Plaintiffs allege seven causes of action, five of which were asserted against Abbott and Mead Johnson: strict products liability design defect (Count I), strict products liability failure to warn (Count II), negligence (Count III), intentional misrepresentation (Count IV), and negligent misrepresentation (Count V). The remaining claims (Counts VI and VII) were asserted against the hospital defendant. The complaint was filed by parent ("plaintiff-parent") on her own behalf, and also as a parent and natural guardian of the infant plaintiff ("plaintiff") (together "plaintiffs").

3.  Plaintiffs' complaint is subject to dismissal, in whole or in part, for the reasons set forth below.

## I. PRELIMINARY OBJECTION FOR LEGAL INSUFFICIENCY OF ALL CLAIMS.

4.  Abbott incorporates the foregoing paragraphs as if set forth herein.

5.  Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

6.  "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. Am. Honda Motor Co., Inc.*, 718 A.2d 305, 307 (Pa. Super. Ct. 1998). Plaintiffs must allege sufficient facts demonstrating that Abbott's products were unreasonably dangerous for their intended use, triggering a duty to warn.

Case ID: 230900506
Control No.: 23096560

7.      Plaintiffs' complaint is devoid of any ***facts*** showing that Abbott's preterm infant nutrition products are "unreasonably dangerous" when administered to premature and low birth weight infants.

8.      Accordingly, this preliminary objection should be sustained, and all Counts against Abbott should be dismissed.

## II. PRELIMINARY OBJECTION FOR LEGAL INSUFFICIENCY OF PLAINTIFFS' STRICT LIABILITY CLAIMS.

9.      Abbott incorporates the foregoing paragraphs as if set forth herein.

10.     Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

11.     Counts I and II are strict liability claims that require plaintiffs to identify the specific product that allegedly caused plaintiff's injury. *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 968 (Pa. Super. Ct. 1985) (Pennsylvania "imposes liability for physical harm caused to the user only upon that person who sold a product in a defective condition. A plaintiff must therefore at least *designate* the product alleged to be defective in order to recover from the one who sells it.") (emphasis added).

12.     Plaintiffs fail to do so. Instead, they simply allege, without referring to any medical records containing product identification information, that "Abbott's and/or Mead [Johnson]'s products" were administered to plaintiff and caused plaintiff's injuries. *See* Compl. ¶ 98.

13.     Accordingly, this preliminary objection should be sustained, and Counts I and II against Abbott should be dismissed.

## III. PRELIMINARY OBJECTION FOR LEGAL INSUFFICIENCY OF PLAINTIFFS' NEGLIGENCE CLAIM.

14.     Abbott incorporates the foregoing paragraphs as if set forth herein.

4

Case ID: 230900506
Control No.: 23096560

15.     Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

16.     Count III is a claim for negligence, requiring plaintiffs to identify the product that injured them and to allege a reasonably close causal connection between Abbott's conduct with respect to that product and the resulting injuries to plaintiffs. *See Cummins*, 495 A.2d at 968. Because plaintiffs fail to identify the specific product giving rise to their claims, they also fail to establish a causal connection between Abbott's conduct and their injuries.

17.     Accordingly, this preliminary objection should be sustained, and Count III against Abbott should be dismissed.

## IV. PRELIMINARY OBJECTION FOR INSUFFICIENT SPECIFICITY IN PLEADING PLAINTIFFS' MISREPRESENTATION CLAIMS.

18.     Abbott incorporates the foregoing paragraphs as if set forth herein.

19.     Pursuant to Pa. R. Civ. P. 1028(a)(3), a preliminary objection may be filed by any party to a pleading regarding insufficient specificity in a pleading.

20.     Counts IV and V are claims for intentional and negligent misrepresentation; these fraud-based claims are subject to heightened pleading requirements under Pa. R. Civ. P. 1019(b). Plaintiffs fail to allege with particularity that they saw, heard, or were otherwise exposed to any purported misrepresentations made by Abbott. They also do not specifically allege who made the supposed misrepresentations, or when they supposedly did so. Moreover, plaintiffs cannot plausibly allege reliance on misrepresentations to which they were not exposed.

21.     Accordingly, this preliminary objection should be sustained, and Counts IV and V against Abbott should be dismissed.

## V. PRELIMINARY OBJECTION FOR INSUFFICIENT SPECIFICITY IN DIFFERENTIATING BETWEEN DEFENDANTS THROUGHOUT COMPLAINT.

22.     Abbott incorporates the foregoing paragraphs as if set forth herein.

Case ID: 230900596
Control No.: 23096560

23. Pursuant to Pa. R. Civ. P. 1028(a)(3), a preliminary objection may be filed by any party to a pleading regarding insufficient specificity in a pleading.

24. In the unnumbered paragraph of the complaint appearing before paragraph 1, plaintiffs collectively refer to Abbott and Mead Johnson as "the Defendant Manufacturers" without explaining what relationship, if any, exists between these corporations, or why the acts of Mead Johnson should be attributed to Abbott, or vice versa. *See* Compl. 1.

25. Paragraphs 1 and 13 of the complaint generally allege that plaintiff was given "the Defendant Manufacturers' cow's milk-based" products, without specifying which product from which manufacturer was administered to plaintiff. *Id.* ¶¶ 1, 13.

26. Paragraph 14 of the complaint generally alleges that plaintiff developed necrotizing enterocolitis ("NEC") shortly after being administered the Defendant Manufacturers' products, again without specifying which product from which manufacturer was administered. *Id.* ¶ 14.

27. Paragraph 54 of the complaint alleges that "Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents," without specifying any particular act of deception by any individual defendant, and without providing any details surrounding when plaintiffs saw the allegedly misleading marketing campaigns. *Id.* ¶ 54.

28. Across Counts I through V of the complaint, plaintiffs allege wrongful conduct by Abbott and/or Mead Johnson without differentiating between the defendants, or specifying each defendant's distinct role in each claim. *See* Compl., Counts I-V.

29. Because plaintiffs have lumped Abbott and Mead Johnson together without differentiating between the distinct acts or omissions of these distinct corporations, Abbott lacks clarity regarding its alleged role in these cases. Plaintiffs' allegations are thus insufficiently pled under Rule 1028(a)(3).

6

Case ID: 230900596
Control No.: 23096560

30.     Accordingly, all claims against Abbott should be dismissed, or in the alternative, all paragraphs in which plaintiffs fail to differentiate between defendants should be stricken,[2] and this preliminary objection should be sustained.

## VI. PRELIMINARY OBJECTION REGARDING PLAINTIFF-PARENT'S TIME-BARRED CLAIMS

31.     Abbott incorporates the foregoing paragraphs as if set forth herein.

32.     Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

33.     Pennsylvania law establishes a two-year statute of limitations for negligent, intentional, or otherwise tortious conduct. *See* 42 Pa. Cons. Stat. § 5524(2) & (7).

34.     While the statute of limitations began running on plaintiff-parent's claims on or around the date of the infant-plaintiffs' birth, June 26, 2014, plaintiff-parent's case was not initiated by writ of summons until September 8, 2023—over seven years after the statute of limitations period had expired.

35.     Plaintiff-parent's claims in this case are thus time-barred. Moreover, plaintiffs have not alleged sufficient facts to support any application of the discovery rule.

36.     Accordingly, plaintiff-parent's claims should be dismissed, and this preliminary objection should be sustained.

## VII. PRELIMINARY OBJECTION REGARDING PLAINTIFFS' REQUEST FOR PUNITIVE DAMAGES.

37.     Abbott incorporates the foregoing paragraphs as if set forth herein.

38.     Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

---

[2] For example, in the complaint, plaintiffs fail to differentiate between defendants in each of the following paragraphs: 1–2, 12–13, 19, 21–26, 29–30, 32–44, 46, 52, 54–59, 62, 75, 77–87, and 90–135.

Case ID: 230900596
Control No.: 23096560

39.     Pursuant to Pa. R. Civ. P. 1028(a)(3), a preliminary objection may be filed by any party to a pleading regarding insufficient specificity in a pleading.

40.     Without sufficient basis, plaintiffs demand punitive damages from Abbott in the *ad damnum* clause of each of Counts I through V.

41.     Plaintiffs' demands for punitive damages in Counts III and V are legally insufficient, as these Counts plainly sound in negligence and punitive damages are not available for claims of "ordinary negligence" under Pennsylvania law. *See Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985) (citing RESTATEMENT OF TORTS (SECOND) § 908, comment e).

42.     Additionally, plaintiffs' demands for punitive damages in Counts I through V are insufficiently specific. Plaintiffs make bare allegations that Abbott's conduct was "malicious" without providing any factual support for the same. *See Whiting v. Nationwide Ins. Co.*, 9 Pa. D. & C.3d 789, 792 (1979) (dismissing plaintiffs' punitive damages request where "factual averments in support of . . . conclusory allegations are totally lacking").

43.     Accordingly, Abbott respectfully requests that plaintiffs' demands for punitive damages in each of Counts I through V be stricken.

## VIII. PRELIMINARY OBJECTION REGARDING PLAINTIFFS' FAILURE TO VERIFY THEIR COMPLAINT.

44.     Abbott incorporates the foregoing paragraphs as if set forth herein.

45.     Pursuant to Pa. R. Civ. P. 1028(a)(2), a preliminary objection may be filed by any party to a pleading regarding a party's failure to conform to a rule of court.

46.     Pa. R. Civ. P. 1024(a) provides that "[e]very pleading containing an averment of fact not appearing of record in the action . . . shall state that the averment . . . is true upon the signer's personal knowledge or information and belief and shall be verified. *See* Pa. R. Civ. P. 1024(a).

8

47.     Rule 1024(c) provides that the verification "shall be made by one or more of the parties filing the pleading," unless a qualifying exception applies. *See id.* R. 1024(c). In the event the verification is signed by someone other than the filing party, the verification must set forth "the reason why the verification is not made by a party." *See id.*

48.     Here, plaintiffs' complaint is neither verified by plaintiffs themselves nor by their counsel.

49.     Plaintiffs failed to conform to Rule 1024(c) and, accordingly, Abbott respectfully requests that this Court strike the complaint.

WHEREFORE, pursuant to Pa. R. Civ. P. 1028(a)(2), 1028(a)(3), and (a)(4), Abbott respectfully requests that this Court sustain these preliminary objections and dismiss Counts I, II, III, IV, and V against Abbott.


Dated: November 6, 2023                               Respectfully Submitted:

*/s/ Sean P. Fahey*                                   */s/ Joseph E. O'Neil*
Sean P. Fahey (PA Bar No. 73305)                      Joseph E. O'Neil (PA Bar No. 29053)
**TROUTMAN PEPPER HAMILTON**                          Meaghann C. Porth (PA Bar No. 307629)
**SANDERS LLP**                                       Ryan J. O'Neil (PA Bar No. 314034)
3000 Two Logan Square                                 **CAMPBELL CONROY & O'NEIL, P.C.**
Philadelphia, PA 19103                                1205 Westlakes Drive, Suite 330
215.981.4296                                          Berwyn, PA 19312
Sean.Fahey@troutman.com                               610.964.6388
                                                      JONeil@CampbellTrialLawyers.com
                                                      MPorth@campbell-trial-lawyers.com
                                                      RONeil@campbell-trial-lawyers.com


*/s/ Ronni E. Fuchs*                                  */s/ Marques Hillman Richeson*
Ronni E. Fuchs (PA Bar No. 65561)                     Marques Hillman Richeson (*pro hac vice*
**TROUTMAN PEPPER HAMILTON**                          *forthcoming*)
**SANDERS LLP**                                       **JONES DAY**
301 Carnegie Center, Suite 400                        901 Lakeside Avenue
Princeton, NJ 08540                                   Cleveland, OH 44114
609.951.4183                                          216.586.7195
Ronni.Fuchs@troutman.com                              mhricheson@jonesday.com

Case ID: 230900506
Control No.: 23096560

/s/ Jennifer B. Flannery
Jennifer B. Flannery (PA Bar No. 74546)
**JONES DAY**
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
404.581.8008
jbflannery@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

10

Case ID: 230900596
Control No.: 23096560

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

| | |
|---|---|
| ROCHELLE HOLLINGSWORTH, on her own behalf and as Parent and Natural Guardian of G.O., a Minor, : : : | SEPTEMBER TERM, 2023 No. 230900791 |
| *Plaintiff,* : | |
| v. : : | |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, ABINGTON MEMORIAL HOSPITAL *d/b/a* JEFFERSON ABINGTON HOSPITAL, *and* THOMAS JEFFERSON UNIVERSITY *d/b/a* JEFFERSON HEALTH SYSTEM. : : : : : : : | |
| *Defendants.* : | |

**DEFENDANT ABBOTT LABORATORIES' BRIEF IN SUPPORT OF**
**PRELIMINARY OBJECTIONS TO PLAINTIFFS' COMPLAINT**

**MATTER BEFORE THE COURT**

The preliminary objections of Abbott Laboratories ("Abbott") to plaintiffs' complaint are before this Court. Under Pennsylvania Rules of Civil Procedure 1028(a)(2), 1028(a)(3) and 1028(a)(4), Abbott respectfully requests that this Court dismiss Counts I, II, III, IV, and V of the complaint for insufficient specificity, legal insufficiency of pleading, and/or failure to conform to a rule of court.

**STATEMENT OF QUESTIONS INVOLVED**

1.     Should the Court sustain Abbott's preliminary objections to the complaint and dismiss all claims against Abbott (Counts I-V) as legally insufficient for failure to properly plead the product at issue is unreasonably dangerous? Answer: Yes.

11

Case ID: 230900506
Control No.: 23096560

2.      Should the Court sustain Abbott's preliminary objections to the complaint and dismiss the strict liability claims (Counts I and II) as legally insufficient? Answer: Yes.

3.      Should the Court sustain Abbott's preliminary objections to the complaint and dismiss the negligence claim (Count III) as legally insufficient? Answer: Yes.

4.      Should the Court sustain Abbott's preliminary objections to the complaint and dismiss the intentional and negligent misrepresentation claims (Counts IV and V) as insufficiently pled? Answer: Yes.

5.      Should the Court sustain Abbott's preliminary objections and dismiss the complaint as insufficiently pled for failure to properly differentiate between the manufacturer defendants, or alternatively, strike all paragraphs in which plaintiffs fail to differentiate between those defendants? Answer: Yes.

6.      Should the Court sustain Abbott's preliminary objections to the complaint and dismiss plaintiff-parents' claims as time-barred? Answer: Yes.

7.      Should the Court sustain Abbott's preliminary objections to the complaint and strike plaintiffs' requests for punitive damages in Counts I through V as both legally insufficient and lacking sufficient specificity? Answer: Yes.

8.      Should the Court sustain Abbott's preliminary objections to the complaint and strike plaintiffs' unverified complaint for failure to conform to a rule of court? Answer: Yes.

## INTRODUCTION AND FACTUAL BACKGROUND

Mead Johnson & Company LLC, Mead Johnson Nutrition Company (together, "Mead Johnson") and Abbott develop and manufacture infant nutrition products, including products

Case ID: 230900506
Control No.: 23096560

tailored to address the distinct nutritional needs of premature, low birthweight infants.[3] These infants face complex challenges and daunting odds. For one, they typically have underdeveloped or maldeveloped gastrointestinal systems that are not prepared to receive the nutrition necessary for the rapid growth these infants need. This poses a serious challenge for NICU specialists caring for the infants. The best nutrition for a premature infant is the nutrition it would have received in the womb. Once that is no longer possible, everything else falls short. Milk from the infant's mother is the closest natural substitute, but it may not be available or nutritionally sufficient to meet the premature infant's extraordinary needs. The same is true of donor milk. Accordingly, NICU specialists use their judgment to fill the nutritional gap with specialized formula and fortifier products designed to meet the needs of premature, low-birth-weight infants. This litigation targets these life-saving products.

The infant in this case allegedly developed necrotizing enterocolitis ("NEC"), a leading cause of death in premature infants in NICUs. NEC is an inflammatory gastrointestinal condition that can result in death of intestinal tissue. Plaintiffs admit that premature infants' underdevelopment makes them "especially susceptible to NEC." *See* Compl. ¶ 16. Indeed, NEC affects up to 8% of infants in NICUs, including infants who receive only human milk, as well as those who receive no "food" at all. Neonatologists are experts in dealing with the risks of NEC and balancing them with numerous other medical risks these premature infants face. They carefully balance these risks regardless of how nutrition is administered, and regardless of whether it consists of the mother's own milk, human donor milk, specialized formula or fortifier, or a combination.

---

[3] Abbott manufactures infant nutrition products under the "Similac" brand name. Compl. ¶ 5. Mead Johnson manufactures infant nutrition products under the "Enfamil" brand name. *Id.* ¶ 4.

Case ID: 2309005960
Control No.: 23096560

Plaintiff-parent alleges that her infant was born prematurely at Jefferson Abington Hospital. *See id.* ¶ 11. The complaint alleges "upon information and belief" that infant was administered "Similac and/or Enfamil cow's milk-based products" by medical professionals at the respective hospital after birth. *Id.* ¶ 12. Plaintiffs further claim that infant developed NEC shortly after the administration of Abbott and/or Mead Johnson's product and experienced long-term health effects. *Id.* ¶¶ 13-14.

Plaintiffs allege that Abbott and/or Mead Johnson manufactured and sold their products knowing they were unreasonably dangerous and not suited for their intended use because they purportedly cause NEC, and that Abbott and/or Mead Johnson failed to warn plaintiffs and the public of this potential harm. *See, e.g, id.* ¶ 22. According to plaintiffs, Abbott and Mead Johnson also made false statements of material fact "on an ongoing and repeated basis" to consumers, physicians, and medical staff in their advertising and marketing materials prior to the time their infants were administered preterm infant nutrition products. *Id.* ¶ 121.

Plaintiffs brought five claims against Abbott and Mead Johnson: strict products liability design defect (Count I), strict products liability failure to warn (Count II), negligence (Count III), intentional misrepresentation (Count IV), and negligent misrepresentation (Count V). Plaintiffs also bring failure to warn (Count VI) and corporate liability (Count VII) claims against the hospital at which their infant was born.

A case management conference was held before the Honorable Linda Carpenter on July 24, 2023 regarding the initial set of 29 cases, in which plaintiffs were represented by the same plaintiffs' counsel as here. While the above-captioned case had not yet been filed as of the date of this conference, plaintiff had the benefit of this Court's insights concerning the deficiencies in the

Case ID: 230900596
Control No.: 23096360

complaints. In particular, the Court recognized during the conference that the original 29 plaintiffs had all failed to identify which manufacturers' product was administered to each infant.

The same is true in the instant complaint. Although plaintiffs acknowledge that Abbott and Mead Johnson sell many different products, there are no allegations in the complaint identifying any product sold by Abbott as the specific product that was administered to any specific infant. Further, there are no allegations indicating that plaintiffs saw, heard, or were otherwise exposed to the allegedly false representations made by Abbott and/or Mead Johnson about their products. These pleading deficiencies, among others, are fatal to their claims.

## ARGUMENT

Plaintiffs' claims are legally insufficient, lack sufficient specificity, and/or fail to conform to a rule of court because:

- plaintiffs do not sufficiently allege that the product(s) at issue are unreasonably dangerous;

- plaintiffs never identify the product administered to their infant;

- plaintiffs do not plead with specificity that any misrepresentations were made to them;

- plaintiffs impermissibly lump Abbott and Mead Johnson together without distinguishing the conduct purportedly attributable to each;

- plaintiff-parent's claims are barred by the statute of limitations;

- plaintiffs fail to plead their requests for punitive damages with the requisite legal sufficiency and factual specificity; and

- plaintiffs' complaint is not verified.

Accordingly, all claims against Abbott should be dismissed.

15

Case ID: 230900506
Control No.: 23096560

**Legal Standard**

Pennsylvania is a fact-pleading jurisdiction. *See generally* Pa. R. Civ. P. 1019. A complaint must therefore set forth the material facts upon which a claim is based. Pa. R. Civ. P. 1019(a). Indeed, "[t]he purpose of the pleadings is to place the defendants on notice of the claims upon which they will have to defend." *Carlson v. Cmty. Ambulance Servs.*, 824 A.2d 1228 (Pa. Super. Ct. 2003) (quoting *Yacoub v. Lehigh Valley Med.*, 805 A.2d 579, 588 (Pa. Super. 2002)). So the "complaint must give the defendants fair notice of the plaintiff's claims and a summary of the material facts that support those claims." *Carlson*, 824 A.2d at 1228.

To that end, Rule 1028 of the Pennsylvania Rules of Civil Procedure provides that a party may file preliminary objections asserting that a pleading is insufficiently specific. Pa. R. Civ. P. 1028(a)(3). When assessing whether a pleading is sufficiently specific, the relevant question is "whether the complaint is sufficiently clear to enable the defendant to prepare [its] defense, or whether the plaintiff[']s complaint informs the defendant with accuracy and completeness of the specific basis on which recovery is sought so that [the defendant] may know without question upon what grounds to make [its] defense." *Rambo v. Greene*, 906 A.2d 1232 (Pa. Super. Ct. 2006).

Rule 1028 of the Pennsylvania Rules of Civil Procedure also provides that a party may file preliminary objections asserting that the pleading is legally deficient. Pa. R. Civ. P. 1028(a)(4). Generally, where a legal deficiency is "apparent on the face of the complaint," it "is needless to prolong proceedings when the matter can be correctly and quickly decided on preliminary objections in the nature of a demurrer." *Wurth v. City of Phila.*, 584 A.2d 403, 407 (Pa. Commw. Ct. 1990).

"Preliminary objections in the nature of [a] demurrer test the legal sufficiency of the plaintiff's complaint." *Sexton v. PNC Bank*, 792 A.2d 602, 604 (Pa. Super. Ct. 2002). The question presented by the demurrer is whether, on the facts alleged, no recovery is possible. *Presbyterian*

16

Case ID: 230900506
Control No.: 23095560

*Med. Ctr. v. Budd*, 832 A.2d 1066, 1070 (Pa. Super. Ct. 2003) (citation omitted). In answering this question, the court is "precluded from considering any conclusions of law or inferences which are not supported by the factual allegations contained in the complaint." *Hart v. O'Malley*, 647 A.2d 542, 553 (Pa. Super. Ct. 1994). Thus, a plaintiff cannot maintain a cause of action by stating conclusions of law, argumentative allegations, and expressions of opinion. *Neill v. Eberle*, 620 A.2d 673, 675 (Pa. Commw. Ct. 1993). And a court "may not supply a fact missing [from] the complaint" in order to cure a defective pleading. *Hart*, 647 A.2d at 553.

## I. PLAINTIFFS FAIL TO PLEAD FACTS SUFFICIENT TO SHOW AN UNREASONABLY DANGEROUS DEFECT, AS REQUIRED FOR COUNTS I-V.

Pursuant to Pa. R. Civ. P. 1028(a)(4), Abbott demurs to Counts I-V of plaintiffs' complaint. "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. Am. Honda Motor Co.*, 718 A.2d 305, 307 (Pa. Super. Ct. 1998). "A product is defective when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* at 308.[4] Plaintiffs' complaint fails to allege sufficient facts demonstrating that Abbott's cow's milk-based products were unreasonably dangerous for their intended use.

Plaintiffs merely allege that "[e]xtensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants," without any *facts* to support this bald assertion. Compl. ¶

---

[4] The law of product liability within Pennsylvania has developed under the principles outlined in Section 402A of the Second Restatement of Torts. *High v. Penn. Supply, Inc.*, 154 A.3d 341 (Pa. Super. Ct. 2017). Specifically, Section 402(A) provides: "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if the seller is engaged in the business of selling such a product, and it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. The rule stated in Subsection (1) applies although the seller has exercised all possible care in the preparation and sale of his product, and the user or consumer has not bought the product from or entered into any contractual relation with the seller." RESTATEMENT OF TORTS (SECOND) § 402(A).

Case ID: 230900506
Control No.: 23096560

16. Nor have they alleged any ***facts*** supporting a "scientific consensus that . . . cow's milk-based products present a dire threat to the health and development of preterm infants" or that cow's milk-based products "cause NEC and greatly increase the likelihood that a baby will develop NEC." *Id.* ¶¶ 21-22; *see also Orange Stones Co. v. City of Reading*, 87 A.3d 1014, 1025 (Pa. Commw. Ct. 2014) (holding that "[b]lind suspicions and unsupported accusations simply do not state a cause of action pursuant to any theory of tort recovery" under Pennsylvania law).

Instead, plaintiffs simply allege that "[b]reast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC." Compl. ¶ 20. The mere fact that human breast milk may lower the risk of NEC is not equivalent to a showing that cow's milk-based products ***cause*** NEC. As plaintiffs acknowledge, all premature, low birth weight infants, including those who are administered human breast milk exclusively, are especially susceptible and at high risk of developing NEC. *Id.* ¶ 16. Indeed, plaintiffs even concede that NEC is "a disease that can occur in children who are *not* fed the Defendant Manufacturers' products" at all. *Id.* ¶ 30 (emphasis in original).

Thus, plaintiffs' complaint is devoid of facts sufficient to show that Abbott's products are unreasonably dangerous, and their claims against Abbott are insufficient as a matter of law.

## II. PLAINTIFFS FAIL TO SUFFICIENTLY PLEAD THEIR STRICT LIABILITY CLAIMS (COUNTS I–II)

### A. Plaintiffs' Complaint Fails to Identify the Specific Product That Allegedly Caused the Infants' Injuries

Plaintiffs fail to allege sufficient facts to support their strict liability claims (Counts I and II) because plaintiffs' complaint fails to identify the specific product that caused their injuries. *See* Pa. R. Civ. P. 1028(a)(4). It is well-settled that, in order to plead a strict liability claim in Pennsylvania, the "plaintiff must [] at least designate the product alleged to be defective[.]" *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 969 (Pa. Super. Ct. 1985). "Absent such

18

identification, there can be no allegations of duty, breach of duty, or legal causation, and hence there can be no liability." *Mellon v. Barre-Nat'l Drug Co.*, 636 A.2d 187, 191–92 (Pa. Super. Ct. 1993).

Plaintiffs' complaint fails to identify the specific product they maintain caused their alleged injuries. Instead, plaintiffs broadly allege that Abbott and Mead Johnson manufacture and sell cow's milk-based infant feeding products under the Similac or Enfamil brand names, Compl. ¶¶ 4-5, and surmise "upon information and belief" that their infant was administered "Similac and/or Enfamil" products. *Id.* ¶ 12. These allegations are plainly insufficient. As plaintiffs acknowledge, Abbott and Mead Johnson manufacture, sell, and market different products under different brands names. *See, e.g.*, *id.* ¶¶ 4-5; *id.* ¶¶ 48–49 (describing multiple Abbott products and multiple Mead Johnson products). They also acknowledge that, similar to a restaurant offering Coke or Pepsi, the hospital defendants use either Similac **_or_** Enfamil in their respective NICUs. *Id.* ¶ 22; *id.* ¶ 58. Yet, plaintiffs fail to identify which product from which manufacturer was allegedly administered to their infant. As such, even viewing the complaint in the light most favorable to plaintiffs, their strict liability claims fail for lack of product identification. *See Cummins*, 495 A.2d at 968–69 (holding that the plaintiff's failure to identify the offending product was "a fatal deficiency to his [strict liability] claim" and that "the complaint [could] not adequately aver the requisite connection between the [defendants] and the defective product"); *Klein v. Council of Chem. Assocs.*, 587 F. Supp. 213, 221 (E.D. Pa. 1984) (dismissing strict liability claim where plaintiffs did not identify the specific product sold or distributed by the defendants that caused the plaintiffs' harm).

**B. Plaintiffs Are Not Excused from Satisfying the Product Identification Requirement**

In an effort to evade their pleading obligations, plaintiffs' complaint seeks to hold Abbott and Mead Johnson "jointly and severally" liable for their claims alleged in Counts I-V. Plaintiffs also allege that Abbott, Mead Johnson, and the hospital defendants "acted in concert" to

19

"fraudulently convey false and misleading information concerning the risk of NEC . . . caused by Defendant Manufacturers' preterm infant formula products." Compl. ¶ 34.

No Pennsylvania court has applied any such theory of alternative liability to excuse a product liability plaintiff from identifying the specific product they claim caused their alleged harm. *See, e.g.*, *Cummins*, 495 A.2d at 970 (affirming an order sustaining preliminary objections to a complaint that sought to allege a theory of enterprise liability premised on a bald averment that members of the tire and rim assembly industry collaborated in the "intentional manufacture, promotion and distribution of a generically similar defective device with the knowledge that a safer [] device was available"); *Skipworth by Williams v. Lead Indus. Ass'n, Inc.*, 690 A.2d 169, 174–75 (Pa. 1997) (holding that plaintiffs failed to establish a concert of action where they were unable to identify the manufacturer of the lead pigment that caused alleged injuries); *Burnside v. Abbott Lab.*, 505 A.2d 973, 982 (Pa. Super. Ct. 1985) (holding Pennsylvania law forecloses cause of action for concerted action where plaintiff is "unable to isolate a particular manufacturer as the causative agent of his injuries").

Abbott and Mead Johnson likewise cannot be held jointly and severally liable as a matter of law. "While there is some authority that a single cause of action may be pled against two or more defendants who are alleged to be jointly and severally liable, that cannot be the case where the factual background underlying each defendant's liability is different." *Bouchon v. Citizen Care, Inc.*, 176 A.3d 244, 258 (Pa. Super. Ct. 2017) (citing *Gen. State Auth'y v. Lawrie and Green*, 356 A.2d 851, 854 (Pa. Commw. Ct. 1976)). Here, because Abbott and Mead Johnson manufacture different products at different locations, with different manufacturing processes, using different formulations and different ingredients, and market their products differently, plaintiffs have no basis for asserting joint and several liability. *See Cummins*, 495 A.2d at 972 (preliminary

Case ID: 230900506
Control No.: 23096560

objections properly sustained as to complaint seeking to impose industry-wide liability where plaintiffs failed to allege that manufacturers placed fungible products with "identical" qualities on the market). For all these reasons, plaintiffs cannot be excused from satisfying their requirement to identify the specific product that allegedly caused harm.

## III. PLAINTIFFS FAIL TO SUFFICIENTLY PLEAD A NEGLIGENCE CLAIM (COUNT III).

Plaintiffs' negligence claim fails for the same reason as their strict-liability claims do: they simply fail to identify the product that allegedly caused their injuries. To state a negligence-based products liability claim, "the plaintiff must identify the defendant as the manufacturer or seller of *the offending product* before a plaintiff's injuries may be found to be proximately caused by the negligence of the defendant." *Long v. Krueger, Inc.*, 686 F. Supp. 514, 517 (E.D. Pa. 1988) (citing *Cummins*, 495 A.2d at 967). "Absent such identification, there can be no allegations of duty, breach of duty or legal causation, and hence there can be no liability." *Cummins*, 495 A.2d at 967–68.

As noted above, plaintiffs allege only "upon information and belief" that their infant was administered "Similac and/or Enfamil" products and developed NEC shortly thereafter. *See, e.g.*, Compl. ¶¶ 4-5; *id.* ¶ 12. Plaintiffs do not, however, identify the exact product (if any) made by Abbott giving rise to their claims. Accordingly, they "cannot allege a casual [sic] connection between conduct of the defendants and [plaintiff's] injuries." *Klein*, 587 F. Supp. at 223; *see also Cummins*, 495 A.2d at 967 (affirming dismissal of negligence claim where plaintiff failed to identify a specific product and the identity of the manufacturer, supplier, or seller of the product; and therefore did not establish a causal connection between his injury and the defendants' conduct).

Case ID: 230900506
Control No.: 23096560

## IV. PLAINTIFFS FAIL TO PLEAD THEIR INTENTIONAL AND NEGLIGENT MISREPRESENTATION CLAIMS (COUNTS IV–V) WITH SUFFICIENT PARTICULARITY.

Plaintiffs' complaint lacks sufficient specificity regarding their misrepresentation claims. In particular, plaintiffs fail to allege with any specificity that they saw or heard any Abbott representation, let alone a misrepresentation. Nor do plaintiffs allege any facts to support justifiable reliance on any purported statement by Abbott.

"Averments of fraud are meaningless epithets unless sufficient facts are set forth which will permit an inference that the claim is not without foundation[.]" *Bata v. Cent.-Penn Nat. Bank of Philadelphia*, 224 A.2d 174, 179 (Pa. 1966). To protect against generalized and unsupported accusations of fraud, the Pennsylvania Rules of Civil Procedure requires each element of fraud be "averred with particularity." *Presbyterian Med. Ctr.*, 832 A.2d at 1072-1073 (citing Pa. R. Civ. P. 1019(b)). "Merely alleging fraud as a legal conclusion adds nothing if it is not based upon facts clearly and explicitly set forth as constituting such fraud." *Dwyer v. Rothman*, 431 A.2d 1035, 1037 (Pa. Super. Ct. 1981) (citing *Hornsby v. Lohmeyer*, 72 A.2d 294 (Pa. 1950)).

To state a claim for intentional misrepresentation, plaintiffs must plead: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) that the resulting injury was proximately caused by the reliance. *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) (internal citation omitted). Similarly, to state a claim for negligent misrepresentation, plaintiffs must plead facts showing (1) a misrepresentation of a material fact; (2) that the representor either knew or should have known of the misrepresentation; (3) that the representor intended the representation to induce another to act; and (4) that injury resulted to the party acting in justifiable reliance on the

Case ID: 230900606
Control No.: 23096560

misrepresentation. *See id.* at 561. The complaint fails in multiple ways to plead these elements with specificity.

 **First**, "at the very least, a plaintiff must set forth the *exact* statements or actions plaintiff alleges constitute the fraudulent misrepresentations." *Youndt v. First Nat'l Bank*, 868 A.2d 539, 545 (Pa. Super. Ct. 2005) (internal citations and quotations omitted) (emphasis added). While plaintiffs generally allege that Abbott made false representations in its marketing materials, plaintiffs do not allege that Abbott made any of these representations directly to them, or that they read, saw, heard, or were otherwise exposed to any specific product label or any other specific representation from Abbott before their infant was administered Abbott's products. Accordingly, plaintiffs fail to plead facts showing that their infants' injuries were caused by their reliance on Abbott's representations. *See, e.g.*, *Rivello v. N.J. Auto. Full Ins. Underwriting Ass'n*, 638 A.2d 253, 257 (Pa. Super. Ct. 1994) (affirming dismissal of misrepresentation claim where plaintiff failed to sufficiently allege justifiable reliance on the alleged misrepresentation or that his injury was proximately caused by the alleged misrepresentation); *Youndt*, 868 A.2d 539 (holding that fraud claim failed where plaintiff did not plead all elements with particularity); *Feudale v. Aqua Pa., Inc.*, 122 A.3d 462, 466 n.5 (Pa. Commw. Ct. 2015) (concluding that plaintiff had failed to "allege[ ] any justifiable reliance on his part on the [alleged false representation], nor could he, as the alleged false representation was not made to him, but instead to [a third party]"); *Feingold v. Unitrin Direct*, Civ. A. No. 12-1250, 2012 WL 3866945, at *6 (E.D. Pa. Sept. 6, 2012) (dismissing negligent misrepresentation claim where plaintiff could not allege that he justifiably relied on the defendants' promises).

 **Second**, plaintiffs do not identify when the alleged misrepresentations were made, who made them, or how they were communicated. As such, the allegations in the complaint cannot

Case ID: 230900506
Control No.: 23096560

plausibly support plaintiffs' intentional or negligent misrepresentation claims. *See, e.g.*, *Dwyer*, 431 A.2d at 1037 (affirming lower court's decision sustaining preliminary objections to plaintiff's intentional misrepresentation claim where plaintiff did not allege what facts were misrepresented, what false information was given, nor in what way he was "tricked"); *Presbyterian Med. Ctr.*, 832 A.2d at 1073 (affirming order sustaining preliminary objections to complaint where plaintiff failed to "establish every element of its fraud claim with sufficient particularity"); *Bethpage Fed. Credit Union*, 2019 WL 5303904, at *2 (sustaining preliminary objections to fraud and negligent misrepresentation claims due to plaintiff's failure to satisfy Rule 1019(b)'s particularity requirements); *Black v. Cmty. Educ. Ctrs., Inc.*, Civ. A. No. 12-6102, 2014 WL 859313, at *6 (E.D. Pa. Mar. 4, 2014) (finding plaintiff's claims of misrepresentation and fraud failed because she did not allege the instances of mischaracterization with specificity); *Scott v. Bimbo Bakeries, USA, Inc.*, Civ. A. No. 10-3154, 2012 WL 645905, at *6 (E.D. Pa. Feb. 29, 2012) (dismissing negligent misrepresentation claim where plaintiffs did not "allege when these alleged misrepresentations were made, who made them, or how they were communicated").

## V. PLAINTIFFS' FAILURE TO DIFFERENTIATE CLAIMS BETWEEN ABBOTT AND MEAD JOHNSON WARRANTS DISMISSAL OF COUNTS I–V.

Plaintiffs' complaint fails to differentiate between Abbott and Mead Johnson. Rule 1019(a) of the Pennsylvania Rules of Civil Procedure provides that a complaint must set forth the material facts upon which a claim is based. Pa. R. Civ. P. 1019(a). And "even under the most liberal notice pleading requirements," that means that "a plaintiff must differentiate between defendants." *Coyne v. Holy Fam. Apartments*, Civ. A. No. 19-4583, 2020 WL 2063475, at *4 (E.D. Pa. Apr. 29, 2020); *see also Bouchon v. Citizen Care, Inc.*, 176 A.3d 244, 260 (Pa. Super. Ct. 2017) (affirming dismissal of complaint where several paragraphs of the complaint did not differentiate between the defendants in averring the conduct and claims).

24

Ignoring this clear law, plaintiffs' complaint is riddled with allegations about the conduct of "Defendant Manufacturers," or "Abbott and/or Mead Johnson." *See, e.g.,* Compl. ¶¶ 1–2, 12–13, 19, 21–26, 29–30, 32–44, 46, 52, 54–59, 62, 75, 77–87, and 90–135. But the complaint does not allege any facts establishing which specific product from which specific manufacturer gave rise to plaintiffs' claims. Abbott is left to guess what role plaintiffs believe it played in the events at issue, placing a burden on Abbott that is not contemplated or condoned by Pennsylvania's fact pleading rules. Because plaintiffs fail to distinguish between defendants in their complaint, all claims against Abbott should be dismissed, or alternatively, the paragraphs in which plaintiffs fail to differentiate between defendants should be stricken.

## VI.   PLAINTIFF-PARENT'S CLAIMS ARE TIME-BARRED AND SHOULD BE DISMISSED

Plaintiff-parent's claims are time-barred by Pennsylvania law, which sets a two-year statute of limitations on actions to recover damages for personal injury based on negligent, intentional, or otherwise tortious conduct. *See* 42 Pa. Cons. Stat. § 5524(2) & (7).

The statute of limitations on plaintiff-parent's claims began to run shortly after infant's birth date, when the infant allegedly developed NEC.  Accordingly, plaintiff-parent's claims are time-barred because, although she alleges an infant birth date of June 26, 2014, and although she alleges that her infant developed NEC shortly thereafter when administered Abbott and/or Mead Johnson's products, this lawsuit was not filed September 8, 2023—over seven years after the limitations period expired. Consequently, plaintiff-parent's claims are time-barred and must be dismissed. *See, e.g.*, *Hathi v. Krewstown Park Apartments*, 561 A.2d 1261, 1263 (Pa. Super. Ct. 1989); *Sayers v. Heritage Valley Md. Grp., Inc.*, 247 A.3d 1155, 1159-63 (Pa. Super. Ct. 2021).

Plaintiffs' invocation of the discovery rule does not save plaintiff-parents' untimely claims. For example, plaintiffs point to a 2020 Abbott article as purported evidence of concealment, in an

Case ID: 230900596
Control No.: 23096560

attempt to explain their delay in filing their complaint, but the article offers them no support. *See* Compl. ¶ 31.

*First*, the complaint does not allege that plaintiffs actually relied on this Abbott article. Indeed, the complaint does not allege that plaintiffs actually read or were even aware of any specific statement made by Abbott.

*Second*, the cited article was published on July 22, 2020. That is years after the statute of limitations expired on these plaintiff-parent's claims, which makes it impossible for any plaintiff to have been lulled "into a false sense of security about the use of [Abbott's] products" by the article at the time of the alleged injury. *See, e.g.*, *id.* ¶ 30.

*Third*, no reasonable person could have been misled by the article. In portions of the article omitted by plaintiffs, Abbott strongly encourages the use of breastmilk with premature infants, for reasons that include protection against NEC:

> If your baby is born prematurely, understanding that mother's own breastmilk is best for your baby is key to delivering not only nutrients, but also HMOs and other immune-protective factors. And since breastmilk protects against NEC, work closely with your baby's physician and dietician to understand how to support a good breastmilk supply, so that your preterm baby gets as much breastmilk as possible.

The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (July 22, 2020). Needless to say, the actual document controls over the misleading excerpts cited in the complaint, neither of which can save plaintiff-parent's untimely claims.[5]

---

[5] The only other statements attributed to Abbott in the complaint are (1) allegations that Abbott's website at one point stated: "for infants who aren't breastfed . . . infant formula is the only appropriate, safe alternative to meet babies' nutritional needs" and (2) a statement concerning a singular product, NeoSure, that "[d]uring her first full year, feed her Similac Neosure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." *See, e.g.*, Compl. ¶¶ 47-48. Again, however, the complaint fails to allege that plaintiff-parent actually

26

Case ID: 230900506
Control No.: 23096560

## VII. PLAINTIFFS' REQUESTS FOR PUNITIVE DAMAGES LACK THE REQUISITE LEGAL SUFFICIENCY AND FACTUAL SPECIFICITY AND FAIL TO PLEAD A LEGALLY SUFFICIENT BASIS FOR PUNITIVE DAMAGES

Plaintiffs' requests for punitive damages should be stricken, as their demands are both legally and factually insufficient, and fail to clear the high bar for punitive damages under Pennsylvania law. In Pennsylvania, "'[p]unitive damages' are damages other than compensatory or nominal damages awarded against a person to punish him for his outrageous conduct." *See Focht v. Rabada*, 268 A.2d 157, 159 (Pa. Super. Ct. 1970) (quoting RESTATEMENT OF TORTS § 908(1)). "As the name suggests, punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct." *Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005); *see also Phillips v. Cricket Lighters*, 883 A.2d 439, 446 (Pa. 2005) ("Punitive damages may be appropriately awarded only when the plaintiff has established that the defendant has acted in an outrageous fashion due to either the defendant's evil motive or his reckless indifference to the rights of others.").

To support a request for punitive damages, the plaintiff must sufficiently allege that "(1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Luddy*, 870 A.2d at 772. Conduct is "willful" when "the actor desired to bring about the result that followed, or at least was aware that it was substantially certain to ensue." *Evans v. Philadelphia Transp. Co.*, 212 A.2d 440, 443 (Pa. 1965). Moreover, "reckless indifference," interchangeable with "wanton" misconduct, occurs when "the actor has intentionally done an act of an unreasonable character, in disregard to a risk known to him or so obvious that he must be taken to

---

read or was aware of these statements, that the statements are themselves misleading, or even that any infant was fed NeoSure as opposed to something else.

Case ID: 230900506
Control No.: 23096560

have been aware of it, and so great as to make it highly probable that harm would follow." *McClellan v. Health Maintenance Org. of Pa.*, 604 A.2d 1053, 1061 (Pa. Super. Ct. 1992); *see also Smith v. Brown*, 423 A.2d 743, 745 (Pa. Super. Ct. 1980) (quoting Evans, 212 A.2d at 443).

To begin, plaintiffs' requests for punitive damages with respect to Count III (negligence) and Count V (negligent misrepresentation) are wholly improper. As Pennsylvania law makes clear, "[p]unitive damages may not be awarded for misconduct which constitutes ordinary negligence . . . ." *See Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985) (citing RESTATEMENT OF TORTS (SECOND) § 908, comment e)). Here, by plaintiffs' own admission, Counts III and V sound plainly in ordinary negligence, and the accompanying demands for punitive damages are thus legally insufficient. *See* Compl. ¶ 111 ("Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and Plaintiff Parent."); *id.* ¶ 131 ("Abbott and Mead were negligent or careless in not determining those representations to be false.").

Plaintiffs' requests for punitive damages in each of Counts I through V also fail because they are pleaded with insufficient specificity. Plaintiffs make no effort to provide factual support for their requests for punitive damages against Abbott. Instead, plaintiffs baldly and repeatedly demand judgment "[f]or punitive damages . . . resulting from the Defendant' Manufacturers' oppressive, fraudulent, and/or malicious conduct . . . ." *See* Compl. at Count I (prayer for relief); *id.* at Count II (prayer for relief); *id.* at Count III (prayer for relief); *id.* at Count VI (prayer for relief); *id.* at Count V (prayer for relief). Nowhere do plaintiffs support these bald assertions of "malicious" conduct with any allegations of fact.

28

At most, plaintiffs allege that Abbott "knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC," *see, e.g.*, Compl. ¶ 93, but such allegations are woefully insufficient. Plaintiffs cannot merely incant the word "knowledge" and make it so; rather, plaintiffs must provide factual support for their bald assertions. *See Whiting v. Nationwide Ins. Co.*, 9 Pa. D. & C.3d 789, 792 (1979) (dismissing plaintiffs' punitive damages request where "factual averments in support of . . . conclusory allegations are totally lacking"). Plaintiffs fail to do so here.

For all these reasons, Abbott respectfully requests that this Court strike plaintiffs' requests for punitive damages as wholly conclusory, lacking the requisite factual specificity, and legally insufficient.

## VIII. PLAINTIFFS FAIL TO VERIFY THEIR COMPLAINT UNDER RULE 1024(C)

Finally, plaintiffs' complaints should also be stricken because they are not verified. Rule 1024 mandates that "[e]very pleading containing an averment of fact not appearing of record in the action . . . shall state that the averment . . . is true upon the signer's personal knowledge or information and belief and shall be verified." *See* Pa. R. Civ. P. 1024(a). Subsection (c) of the Rule also explicitly mandates that:

> [t]he verification shall be made by one or more of the parties filing the pleading unless all the parties (1) lack sufficient knowledge or information, or (2) are outside the jurisdiction of the court and the verification of none of them can be obtained within the time allowed for filing the pleading. In such cases, the verification may be made by any person having sufficient knowledge or information and belief and shall set forth the source of the person's information as to matters not stated upon his or her own knowledge and the reason why the verification is not made by a party.

*Id.* at 1024(c).

Plaintiffs wholly failed to verify their complaint, and therefore, it should be stricken for failure to comply with Pa. R. Civ. P. 1028(a)(2) and 1024(c).

29

Case ID: 230900506
Control No.: 23096560

## CONCLUSION

For the foregoing reasons, Abbott's preliminary objections to plaintiffs' complaint should be sustained, and plaintiffs' claims against Abbott should be dismissed.

Dated: November 6, 2023     Respectfully Submitted:

*/s/ Sean P. Fahey*
Sean P. Fahey (PA Bar No. 73305)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

*/s/ Ronni E. Fuchs*
Ronni E. Fuchs (PA Bar No. 65561)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

*/s/ Joseph E. O'Neil*
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
**CAMPBELL CONROY & O'NEIL, P.C.**
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.6388
JONeil@CampbellTrialLawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

*/s/ Marques Hillman Richeson*
Marques Hillman Richeson (*pro hac vice forthcoming*)
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

*/s/ Jennifer B. Flannery*
Jennifer B. Flannery (PA Bar No. 74546)
**JONES DAY**
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
404.581.8008
jbflannery@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

30

## **CERTIFICATE OF SERVICE**

I hereby certify that I will serve a true and correct copy of the foregoing in accordance with Pa. R. Civ. P. 440 on all parties not served electronically. All other parties will be electronically served by the court in accordance with Pa. R. Civ. P. 205.4(g).


Dated: November 6, 2023                    */s/ Ronni E. Fuchs*
                                             Ronni E. Fuchs

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Ronni E. Fuchs, hereby certify that this filing complies with the provisions of the Public

Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and

Trial Courts, that require filing confidential information and documents differently than non-

confidential information and documents.

*/s/ Ronni E. Fuchs*

# EXHIBIT A

Case ID: 230900596
Control No.: 23096560



*Filed and Attested by the
Office of Judicial Records
16 OCT 2023 06:23 pm
E. HAURIN*

**KLINE & SPECTER, P.C.**
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 320927
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Timothy.Burke@klinespecter.com

| | |
|---|---|
| ROCHELLE HOLLINGSWORTH, on her own behalf and as Parent and Natural Guardian of G.O., a Minor, | : **IN THE COURT OF COMMON PLEAS**<br>: **PHILADELPHIA COUNTY**<br>:<br>: **CIVIL TRIAL DIVISION**<br>: |
|                          *Plaintiff*, | : **SEPTEMBER TERM 2023**<br>: **NO. 0791** |
|     v. | : |
| MEAD JOHNSON & COMPANY, LLC<br>ILLINOIS CORPORATION SERVICE CO.<br>801 ADLAI STEVENSON DRIVE<br>SPRINGFIELD, IL 62702 | :<br>:<br>:<br>: |
| MEAD JOHNSON NUTRITION COMPANY<br>ILLINOIS CORPORATION SERVICE CO.<br>801 ADLAI STEVENSON DRIVE<br>SPRINGFIELD, IL 62702 | :<br>:<br>:<br>: |
| ABBOTT LABORATORIES<br>CT CORPORATION SYSTEM<br>208 SO. LASALLE STREET, SUITE 814<br>CHICAGO, IL 60604 | |
| ABINGTON MEMORIAL HOSPITAL d/b/a<br>JEFFERSON ABINGTON HOSPITAL<br>1200 OLD YORK ROAD<br>ABINGTON, PA 19001 | |
| THOMAS JEFFERSON UNIVERSITY d/b/a<br>JEFFERSON HEALTH SYSTEM, | |

1015 WALNUT STREET
PHILADELPHIA, PA 19107

*Defendants.*

## COMPLAINT IN CIVIL ACTION
## <u>NOTICE TO DEFEND</u>

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.<br><br>YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.<br><br>PHILADELPHIA BAR ASSOCIATION LAWYER REFERRAL AND INFORMATION SERVICE<br>ONE READING CENTER<br>PHILADELPHIA, PA 19107<br>TELEPHONE: (215) 238-1701 | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas las páginas siguientes, usted tiene viente (20) dias de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puese perder dinero o sus propiedades u ostros derechos importantes para usted.<br><br>LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICO, VAYA EN PERSONA O LLAME POR TELEPHONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.<br><br>ASOCIACION DE LICENCIADOS DE FILADELFIA<br>Servicio De Referencia E Información Legal<br>One Reading Center<br>Filadelfia, Pennsylvania 19107<br>Telephono: (215) 238-1701 |

Case ID: 230900596
Control No.: 23096560

KLINE & SPECTER, P.C.
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 205677
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Timothy.Burke@klinespecter.com

| | |
|---|---|
| ROCHELLE HOLLINGSWORTH, on her own behalf and as Parent and Natural Guardian of G.O., a Minor,<br><br>                   *Plaintiff*,<br><br>    v.<br><br>MEAD JOHNSON & COMPANY, LLC<br>ILLINOIS CORPORATION SERVICE CO.<br>801 ADLAI STEVENSON DRIVE<br>SPRINGFIELD, IL 62702<br><br>MEAD JOHNSON NUTRITION COMPANY<br>ILLINOIS CORPORATION SERVICE CO.<br>801 ADLAI STEVENSON DRIVE<br>SPRINGFIELD, IL 62702<br><br>ABBOTT LABORATORIES<br>CT CORPORATION SYSTEM<br>208 SO. LASALLE STREET, SUITE 814<br>CHICAGO, IL 60604<br><br>ABINGTON MEMORIAL HOSPITAL d/b/a<br>JEFFERSON ABINGTON HOSPITAL<br>1200 OLD YORK ROAD<br>ABINGTON, PA 19001<br><br>THOMAS JEFFERSON UNIVERSITY d/b/a<br>JEFFERSON HEALTH SYSTEM,<br>1015 WALNUT STREET<br>PHILADELPHIA, PA 19107 | **IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY**<br><br>**CIVIL TRIAL DIVISION**<br><br>**SEPTEMBER TERM 2023**<br>**NO. 0791** |

1

Case ID: 230900791
Control No.: 23096560

_Defendants._

## **COMPLAINT**

Plaintiff brings this Complaint and Demand for Jury Trial (the "Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and Abington Memorial Hospital d/b/a Jefferson Abington Hospital ("Jefferson Abington") and Thomas Jefferson University d/b/a Jefferson Health System (together, "Jefferson" or "Defendant Hospital"), together "Defendants." Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

### I. INTRODUCTION

1. This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Jefferson Abington. Jefferson Abington, managed by Jefferson Health System, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner. This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products. As a result, the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2. Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and

2

Case ID: 230900596
Control No.: 23096560

supplied without adequate warning to the Injured Infant at Jefferson Abington, operated by Defendant Jefferson Health System.

## II.    PARTIES

3.    Plaintiff Rochelle Hollingsworth is a natural adult person and a resident of South Carolina. Ms. Hollingsworth is the parent and natural guardian of G.O., a minor.  Ms. Hollingsworth's address is 206 Roundtree Road, Blythewood, South Carolina 29016.

4.    Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware. Its principal place of business is Illinois.  Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company.  Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.    Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois.  Its principal place of business is in Illinois.  Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

6.    Defendant Thomas Jefferson University is a corporation, incorporated under the laws of the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania.  Thomas Jefferson University manages Jefferson Abington located in Abington, Pennsylvania.

7.    Defendant Jefferson Abington Hospital is a corporation, incorporated under the laws of the Commonwealth of Pennsylvania.  Its principal place of business is Abington, Pennsylvania.

Case ID: 230900596
Control No.: 23096560

### III. JURISDICTION AND VENUE

8.      This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931. Defendants conduct authorized business in the Commonwealth of Pennsylvania. They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.      Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

10.     This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

### IV. FACTUAL ALLEGATIONS

#### *G.O.'s NEC Diagnosis*

11.     G.O. was born prematurely at Jefferson Abington in Abington, Pennsylvania on June 26, 2014.

12.     At birth, G.O.'s gestational age was approximately 32 weeks and he weighed 1474 grams. Upon information and belief, G.O. was fed Similac and/or Enfamil cow's milk-based products by staff at Jefferson Abington after his birth.

13.     Upon information and belief, G.O. developed NEC after ingesting Defendant

4

Case ID: 230900596
Control No.: 23096560

Manufacturers' products.

14.     G.O.'s diagnosis of NEC occurred during his course of treatment at Defendant Hospital's NICU.  G.O. suffered injuries, including but not limited to, a diagnosis of NEC, surgery on his intestines, and gastrointestinal injuries, and he continues to suffer other long-term health effects.

### Cow's Milk-Based Feeding Products Are Known to Cause NEC

15.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.   NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.   Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.   Up to 30 percent of NEC-diagnosed infants die from the disease.

16.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.   Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

### Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist

17.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition.   For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide.  Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

18.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.

5

19.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the breast milk they could otherwise receive.   This displacement only increases infants' vulnerability to NEC.

20.     Breast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

21.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

22.     Despite the scientific consensus that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings.   Instead, they have continued to sell their unreasonably dangerous products.   In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge.  And, in fact, the Defendant Manufacturers offer contracts to hospitals—which the hospitals accept—that actually *prevent* the health care providers from offering alternative products—even safer ones— on pain of risking the hospital's advantageous formula pricing strategy.

### Ms. Hollingsworth Discovers Her Claim

23.     Because of the Defendants' concealment and misrepresentations, described more fully herein, Ms. Hollingsworth did not know, and had no reason to know or suspect, that G.O.'s NEC could have been caused by the Defendant Manufacturers' products.

Case ID: 230900596
Control No.: 23096560

24.     Once Ms. Hollingsworth learned of the direct connection between the Defendant Manufacturers' products and NEC , she contacted an attorney thereafter.

***Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and Would Not Have Revealed a Factual Basis Earlier Because Defendants Hid the Cause of NEC from Ms. Hollingsworth***

25.     Despite exercising reasonable diligence, Ms. Hollingsworth was unable to have made the discovery earlier via a reasonable investigation because the Defendants in this litigation concealed the wrongful cause of G.O.'s injuries.

26.     Not one person at Jefferson informed Ms. Carter that the Defendant Manufacturers' formula products could have caused G.O.'s injuries.  Jefferson's response at the time did not give Ms. Hollingsworth any reason to suspect any wrongdoing on the part of the Defendants.

27.     Ms. Hollingsworth is a layperson with no medical background or training that would have given her any reason to doubt the response she received from Jefferson's health care providers at the time

28.     Given that Jefferson's health care providers were in charge of the care of her newborn infant, Ms. Hollingsworth had no reason to doubt their word.

29.     Additionally, the risk of necrotizing enterocolitis was not disclosed on the labeling or packaging of *any* of the Defendant Manufacturers' products.

30.     What is more, necrotizing enterocolitis is a disease that can occur in children who are *not* fed the Defendant Manufacturers' products, and the Defendant Manufacturers have worked to mislead parents into a false sense of security about the use of those products.  Publicly disseminated materials from each Defendant Manufacturer disguise the role their products play in causing the disease—and affirmatively say, even today, that their products are safe and do not

Case ID: 230900596
Control No.: 23096560

cause NEC. In fact, some publicly disseminated materials from the formula manufacturers even suggest that formula may help *reduce* the risk of this terrible and potentially fatal disease.

31.     For example, Abbott's website stays that "[t]he specific cause of NEC is unknown, but it's most often seen in very low birth weight premature babies," and that "about 10% of babies who are born prematurely develop NEC."  The website suggests that "new preliminary studies" suggest for the first time that "NEC prevention may . . . be possible" with the use of human milk oligosaccharides to "dramatically curb intestinal inflammation" and reduce the risk of NEC. Abbott states that these human milk oligosaccharides are found in "certain Similac formulas" although they are "not currently available in Similac's premature infant formulas."[1]  Likewise, the website for Mead Johnson's products states that necrotizing enterocolitis is "one of the most common and serious intestinal disease[s] among premature babies."  And it deflects responsibility from Mead Johnson's products: "Necrotizing enterocolitis happens when tissue in the small or large intestine is injured or inflamed."[2]

32.     Because of the misleading information distributed by the Defendant Manufacturers, as further detailed herein, any research conducted by Ms. Hollingsworth immediately after G.O.'s diagnosis, or at any time prior to seeing an advertisement, would not have led a reasonable person to suspect that the Defendant Manufacturers' products could have caused G.O.'s injuries.

33.     Ms. Hollingsworth also did not know, and had no reason to know or suspect, that Jefferson breached its duty of care by distributing the Defendant Manufacturers' products to G.O.  Not only was Ms. Hollingsworth unaware that the Defendant Manufacturers' products caused G.O.'s

---

[1] The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (last visited July 28, 2023).

[2] Special Feeding Concerns for Preemies, https://www.enfamil.com/articles/special-feeding-concerns-for-preemies/ (last visited July 29, 2023).

Case ID: 230900596
Control No.: 23095560

injuries and death, but the Defendant Manufacturers' distribution agreements with Jefferson—which allowed Jefferson to secure sweetheart deals for otherwise expensive premature infant formula in exchange for product placement and access to the hospital staff—were also not public or knowable to Ms. Hollingsworth, nor could any reasonable investigation outside of litigation have uncovered the terms of those agreements.

### *Despite Exercising Reasonable Diligence, the Defendants' Fraudulently Concealed the Risks of NEC from Defendant Manufacturers' Products to Divert, Prevent, and Mislead Plaintiff Regarding the Cause of Her Child's NEC Diagnosis*

34.     In addition to the averments above, the Defendants have acted in concert to fraudulently convey false and misleading information concerning the risk of NEC, and potentially death, caused by Defendant Manufacturers' preterm infant formula products.

35.     The Defendants' actions as set forth herein constitute knowing misrepresentation, omission, suppression, and concealment of material facts, made with the intent that Plaintiff would rely upon such concealment, suppression, or omission, in connection with the use of Defendants' preterm infant products.

36.     Plaintiff did not know, and could not learn, the truth concerning the uses, risks and benefits of Defendant Manufacturers' preterm infant products due to Defendants' deliberate misrepresentations and concealment, suppression and omission of material facts and important information regarding the risks of NEC, and potentially death, from the products.

37.     Moreover, Defendant Hospital further participated in the intentional concealment—on information and belief, it allowed the Defendant Manufacturers' sales representatives into its hospital to provide samples and free products that did not warn of their serious dangers, and to provide "education" to its NICU staff that was incomplete as to the true risks of feeding their patients the Defendant Manufacturers' products.

Case ID: 230900596
Control No.: 23096560

38.   Additionally, Defendant Hospital failed to inform Ms. Hollingsworth that the Defendant Manufacturers' products caused Plaintiff's child's NEC.

39.   Defendant Hospital was aware that the Defendant Manufacturers' products caused NEC in premature infants. Defendant Hospital was also aware that the Defendant Manufacturers did not provide warnings on their products. However, Defendant Hospital did not warn Ms. Hollingsworth of the risks of the products. Instead, and notwithstanding the sweetheart deal Defendant Hospital agreed to in exchange for preterm infant formula at little to no cost, Defendant Hospital repeatedly informed Ms. Hollingsworth that it would do everything it could possibly do to keep her infant safe.  Though this was clearly not true given the known risks of preterm formula for babies like G.O., it was enough for Ms. Hollingsworth to trust that Defendant Hospital was providing preterm formula in the best interest of her child.

40.   Defendants' affirmative acts of fraud and concealment, as averred herein, diverted, prevented, and/or mislead Plaintiff from discovering the medical cause of her child's NEC diagnosis.

41.   Plaintiff was not put on inquiry notice until she learned of the direct connection between the Defendant Manufacturers' products and NEC at a later time and contacted an attorney thereafter.

***The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products***

42.   Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

43.   Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk

10

Case ID: 230900596
Control No.: 23096560

formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

44.     Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message.

45.     Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

46.     While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears— that the nutrition they are supplying to their child will not provide the best chance of survival— while wholly failing to warn that their products come with a significantly increased risk of NEC.

47.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe

Case ID: 230900596
Control No.: 23096560

alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

48.     Abbott markets and sells multiple products specifically targeting preterm and low-birthweight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC. At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

49.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that

12

of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

50.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

51.     Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

52.     Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers. The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact

Case ID: 230900596
Control No.: 23095560

breastfeeding rates.

53.     Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products.   The packaging appears as:



54.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first

14

choice. This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

55.     The Defendant Manufacturers have also designed powerful marketing campaigns to both the general public and health care providers at hospitals like Jefferson Abington. The Defendant Manufacturers know that sales made to hospitals are key drivers of brand loyalty and thus are a key opportunity to drive better downstream business—*i.e.*, retail purchases by parents after they have left the hospital. On information and belief, the Defendant Manufacturers know that the products used in a hospital's NICU are related to getting and keeping the overall hospital contracts. And the Defendant Manufacturers know that just like any celebrity endorsement, when the mothers of newborn infants see medical professionals using a certain brand, the mothers are more likely to continue to purchase that same brand after discharge. The Defendant Manufacturers are thus heavily motivated to ensure that NICU departments are using their products.

56.     Abbott and Mead Johnson focus their sales teams and training heavily on hospital NICU departments. They train their sales representatives how to increase the number of babies on their formula and they emphasize the need to be the dominant formula manufacturer in the NICU so they can own that profitable ground and secure a great return on their substantial investment in NICU formula and other products.

57.     To leverage hospitals' NICUs and secure babies in the hospital and at retail, the Manufacturer Defendants pull out all the stops to convince hospitals, including Defendant Hospital, to purchase their products. For example: Abbott and Mead Johnson provide samples of their products to hospitals for free.

Case ID: 230900596
Control No.: 23096560

58. On information and belief, to get the hospitals on board with supplying their formula for premature infants, Abbott and Mead Johnson work with hospitals to secure contracts that have special pricing discounts if a certain level of the formula-fed babies in the hospital receive just that one manufacturer's products; similar to a restaurant being a Coke or Pepsi restaurant. And notwithstanding the increased risk of the Defendant Manufacturers' products for the hospitals' most fragile patients—the preterm infants—the decision makers at these hospitals seek out these types of contracts to better the hospitals' own bottom lines.

59. On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective company's own formula products to give to the preterm infants. The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

60. Prior to G.O.'s birth, Abbott sent sales representatives to Defendant Hospital. Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Abbott's products were safe to give to preterm infants like G.O. Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed. These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants.

61. Prior to G.O.'s birth, Mead Johnson sent sales representatives to Defendant Hospital. Those sales representatives provided information about Mead Johnson's products to Defendant

16

Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Mead Johnson's products were safe to give to preterm infants like G.O. Mead Johnson maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed. These sales representatives did not disclose that Mead Johnson's products could cause NEC in preterm infants.

62.    Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like G.O.

### The Defendant Manufacturers' Inadequate Warnings

63.    Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants. Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

64.    The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

65.    Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

66.    Mead cites no medical literature or research to guide the use of its products.

67.    Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

17

Case ID: 230900596
Control No.: 23096560

68.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

69.     Mead Johnson failed to provide, and continues to fail to provide, a full accounting of the risk of NEC as documented by underrepresenting and misrepresenting the risk to the public and the medical community.

70.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.  Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

71.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

72.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

73.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

18

74.     Despite knowing of studies documenting an increased risk of NEC from its products, Abbott did not act to make parents or the medical community aware of those risks, and instead took steps to conceal or prevent those risks from becoming public.  Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### *Jefferson's Failure to Warn*

75.     On information and belief, Jefferson was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  They knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition.  However, instead of warning of those dangers, or supplying breast milk-based feeding products to preterm infants like the Injured Infants, the Hospital Defendants have continued to source, distribute, and supply the Defendant Manufacturers' products in their hospitals without any adequate warning.

76.     As of 2014, only 41% of nurses at one Jefferson NICU stated that they were comfortable providing donor breast milk to an infant in the NICU.  Although Jefferson has introduced exclusive human milk products, it limited its efforts based upon "budgetary constraints."  Use of exclusive human milk products continues to be limited notwithstanding evidence from Jefferson showing that use of exclusive human milk or human milk products reduced feeding intolerance and NEC in the NICU.  That evidence demonstrates that Jefferson knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

Case ID: 230900596
Control No.: 23096560

77.     Finally, medical providers and staff at Jefferson have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition. In an article in the Philadelphia Inquirer, dated December 21, 2014, the director of hospital pediatrics at Thomas Jefferson University Hospital acknowledged that human milk is crucial to assuring that infants get necessary bacteria in their gastrointestinal tracts, noting that "NEC seems to result from a lack of proper gut-flora transport from mother to child[.]" These statements demonstrate that Jefferson knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

78.     Although Jefferson knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities. As a result, the Injured Infants were fed the Defendant Manufacturers' cow's milk-based products at Jefferson, causing their injuries. This occurred even though hospitals across the country warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

79.     Jefferson's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers. On information and belief, Jefferson received the Defendant Manufacturers' cow's milk-based products for free or at a significant discount and granted their sales representatives access to Jefferson's healthcare professionals and medical staff. These sales representatives have provided deceptive information that Jefferson reasonably knew or should have known would ultimately reach parents through those staff. This arrangement dovetails with

20

the Defendant Manufacturers' own marketing strategy, which aims to "sell and service" healthcare professionals and medical staff as a means of converting them into "extra salespersons."

### *Safer Alternative Designs*

87.     The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants.   The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

88.     Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk.  This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

89.     On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

### **CAUSES OF ACTION**
### **COUNT I:  STRICT LIABILITY FOR DESIGN DEFECT**
### **(Against Abbott and Mead)**

90.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

91.     Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

92.     Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff

Case ID: 2309007565
Control No.: 23096560

Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

93.     Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations.    Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

94.     The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products.  The risks of feeding those products to the Injured Infant outweighed the benefits.  An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

95.     Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

96.     Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

97.     Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

98.     Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

Case ID: 230900696
Control No.: 23096560

99.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

**COUNT II:  STRICT LIABILITY FOR FAILURE TO WARN**
**(Against Abbott and Mead)**

23

Case ID: 230900596
Control No.: 23096560

100.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

101.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

102.    Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses.    By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death.    The failure to warn makes the products at issue in this litigation unreasonably dangerous.

103.        Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks.    Among other risks, the Defendant Manufacturers:

> a.    Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or
>
> b.    Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

24

Case ID: 230900706
Control No.: 23096560

c.  Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d.  "Black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

e.  Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.  Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.  Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.  Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

104.  Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

105.  As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers'

Case ID: 230900606
Control No.: 23096560

products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

106.    The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products.    Had the Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

107.       As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational

Case ID: 230900596
Control No.: 23096560

limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

## COUNT III: NEGLIGENCE
### (Against Abbott and Mead)

108.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

109.  Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

110.  At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

111.  Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

112.  Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty

27

Case ID: 230900706
Control No.: 23096560

by:

a.   Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

b.   Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

c.   Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d.   Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

e.   Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.   Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.   Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.   Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based

28

Case ID: 230900596
Control No.: 23096560

products.

113.     In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

114.     As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

115.     Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

116.     As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

        a.     For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

        b.     For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

        c.     For past, present, and future out-of-pocket costs, lost income and/or lost

Case ID: 230900596
Control No.: 23096560

revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.     For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.     For interest as permitted by law;

f.     For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.     For such other and further relief as the Court deems proper.

## COUNT IV:  INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

117.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

118.    At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

119.    Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

120.    Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

Case ID: 230900596
Control No.: 23096560

121.     Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

     a.    That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

     b.    That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

     c.    That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

     d.    That cow's milk-based products were safe for premature infants; and/or

     e.    That cow's milk-based products were necessary for optimum growth; and/or

     f.    That cow's milk-based products were similar or equivalent to breast milk; and/or

     g.    That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

     h.    That their products were based on up-to-date science, which made them safe for premature infants; and/or

     i.    Omitting the material fact that their products significantly increased the risk

Case ID: 2309005796
Control No.: 23095560

of NEC in premature infants.

122.    Abbott and Mead had actual knowledge, or, at a minimum, a reckless indifference, to whether the aforementioned misrepresentations were false. The Defendant Manufacturers' misrepresentations were intended to, and in fact did, mislead physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their infant products to babies, including the Injured Infant.

123.    The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them. The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

124.    As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

125.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of

Case ID: 230900596
Control No.: 23096560

enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

**COUNT V:  NEGLIGENT MISREPRESENTATIONS**
**(Against Abbott and Mead)**

126.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

127.  At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

128.  Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

33

129.    In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

130.    Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

    a.    That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

    b.    That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

    c.    That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

    d.    That cow's milk-based products were safe for premature infants; and/or

    e.    That cow's milk-based products were necessary for optimum growth; and/or

    f.    That cow's milk-based products were similar or equivalent to breast milk; and/or

    g.    That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing

34

Case ID: 230900596
Control No.: 23096560

NEC, serious injury, and death; and/or

h.      That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.      Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

131.    Abbott and Mead were negligent or careless in not determining those representations to be false.

132.    The Defendant Manufacturers' misrepresentations were intended to and did in fact induce physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their products to babies, including the Injured Infant.

133.    The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging.   Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

134.        As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

135.        As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

Case ID: 230900590
Control No.: 23096560

a.      For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.      For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.      For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.      For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.      For interest as permitted by law;

f.      For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.      For such other and further relief as the Court deems proper.

## COUNT VI: FAILURE TO WARN
### (Against Jefferson)

136. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

137. Jefferson Health System and Jefferson Abington as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of

36

unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

138.  At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Jefferson Health System and Jefferson Abington in their intended manner and for their intended purpose.

139.  Jefferson Health System and Jefferson Abington employed or contracted with the healthcare professionals and medical staff at Jefferson Abington, managing these individuals during their treatment of the Injured Infant.

140.  Jefferson Health System and Jefferson Abington negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

141.  Moreover, at all relevant times, Jefferson Health System and Jefferson Abington knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Jefferson Abington.   The Defendant Manufacturers' sales representatives were encouraged to interact with Jefferson Abington's healthcare professionals and medical staff.   These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Jefferson Abington's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

142.  Jefferson Health System and Jefferson Abington also knowingly, and intentionally, allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Jefferson Abington's healthcare professionals and medical

37

Case ID: 230900596
Control No.: 23096560

staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

143.    Jefferson Health System and Jefferson Abington knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

144.    Nonetheless, Jefferson Health System and Jefferson Abington acted negligently, outrageously, and recklessly, and breached its duty by:

>    a.    Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or
>
>    b.    Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or
>
>    c.    Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or
>
>    d.    Failing to provide its healthcare professionals and medical staff with the well- researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or
>
>    e.    Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or
>
>    f.    Failing to provide statistical evidence showing the magnitude of increased

38

risk of NEC in premature infants associated with cow's milk-based products; and/or

g.     Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Jefferson Abington's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

145.    Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

146.    Jefferson Health System and Jefferson Abington knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

147.    Had Jefferson Health System and Jefferson Abington exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

148.    As a direct and proximate result of Jefferson Health System and Jefferson Abington's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk- based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-

39

Case ID: 230900596
Control No.: 230950560

based products, which caused and/or increased the risk of developing NEC and significant injuries.

149.    As a further direct and proximate result of Jefferson Health System and Jefferson Abington's  failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Jefferson Health System and Jefferson Abington, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Jefferson Health System's conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Jefferson Health System and Jefferson Abington's oppressive, outrageous, reckless, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

40

g.     For such other and further relief as the Court deems proper.

## COUNT VII:  CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Jefferson)

150.    Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

151.    At all relevant times, Jefferson Health System and Jefferson Abington owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Jefferson Abington staff.    Specifically, Jefferson Health System and Jefferson Abington had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant.    Further, Jefferson Health System and Jefferson Abington owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

152.    Jefferson Health System and Jefferson Abington owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

153.    At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Jefferson Health System and Jefferson Abington in their intended manner and for their intended purpose.

154.    Moreover, at all relevant times, Jefferson Health System and Jefferson Abington knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Jefferson Abington.    The Defendant Manufacturers' sales representatives were encouraged to interact with Jefferson Abington's healthcare professionals and

41

medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Jefferson Abington's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

155. Jefferson Health System and Jefferson Abington also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Jefferson Abington's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

156. Jefferson Health System and Jefferson Abington knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

157. Jefferson Health System and Jefferson Abington knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

158. Nonetheless, Jefferson Health System and Jefferson Abington acted negligently, outrageously, and recklessly, and breached its duty by:

      a. Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted the use of cow's milk-based products for feeding premature babies; and/or

Case ID: 230900596
Control No.: 23096560

b. Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

c. Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d. Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

e. Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well- established studies that link cow's milk-based products to NEC and death in premature infants; and/or

f. Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

g. Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to Jefferson Abington's healthcare professionals and

Case ID: 230900596
Control No.: 23096560

medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants; and/or

h.  Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

159.  A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

160.  Had Jefferson Health System and Jefferson Abington exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

161.  As a direct and proximate result of Jefferson Health System and Jefferson Abington failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

162.  As a further direct and proximate result of Jefferson Health System and Jefferson Abington negligent, reckless, and outrageous conduct the Plaintiff Parent suffered significant emotional

Case ID: 230900596
Control No.: 23096560

distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

163.     In the alternative, Jefferson Health System and Jefferson Abington owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Jefferson Abington's care, including the Injured Infant.

164.     Jefferson Health System and Jefferson Abington employed or contracted with the healthcare professionals and medical staff at Jefferson Abington and was responsible for overseeing those individuals during their treatment of the Injured Infant.

165.     Nonetheless, Jefferson Health System and Jefferson Abington acted negligently, recklessly, and outrageously breached its duty by:

a.     Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

b.     Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

c.     Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d.     Failing to oversee its healthcare professionals and medical staff to restrict their feeding of cow's milk-based products to premature babies; and/or

e.     Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an

45

informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

f. Failing to provide its healthcare professionals and medical staff with the well- researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g. Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h. Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i. Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

166. A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

Case ID: 230900596
Control No.: 23096560

167.    A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

168.    Had Jefferson Health System and Jefferson Abington exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

169.    As a direct and proximate result of Jefferson Health System and Jefferson Abington's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

170.    As a further direct and proximate result of Jefferson Health System and Jefferson Abington's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   His life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Jefferson Health System and Jefferson Abington, individually, jointly and severally, as follows:

    a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

    b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Jefferson Health System and

47

Jefferson Abington's conduct;

c.      For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.      For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Jefferson Health System's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.      For interest as permitted by law;

f.      For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.      For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

171.    Plaintiff hereby demands a jury trial for all claims triable.

Dated: October 16, 2023

                            Respectfully submitted,

                            **KLINE & SPECTER, P.C.**

                By:     /s/ Timothy A. Burke
                        Tobias L. Millrood, Esq.
                        Elizabeth A. Crawford, Esq.
                        Timothy A. Burke, Esq.

Case ID: 230900596
Control No.: 23096560

CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2023, I electronically filed the foregoing document

with the Clerk of the Court using Electronic Efiling and that the foregoing document is being

served on all counsel of record or parties registered to receive Electronic Filing.


/s/ Timothy A. Burke

Timothy A. Burke, Esq

Case ID: 230900596
Control No.: 23096560

FILED
04 DEC 2023 04:00 pm
Civil Administration
C. KREWELL

# IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
### TRIAL DIVISION – CIVIL

| | |
|---|---|
| ROCHELLE HOLLINGSWORTH, on her own behalf and as Parent and Natural Guardian of G.O., a Minor, : : : | SEPTEMBER TERM, 2023 No. 230900791 |
| *Plaintiff,* : | |
| v. : | |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, ABINGTON MEMORIAL HOSPITAL *d/b/a* JEFFERSON ABINGTON HOSPITAL, *and* THOMAS JEFFERSON UNIVERSITY *d/b/a* JEFFERSON HEALTH SYSTEM. : : : : : : : | |
| *Defendants.* : | |

## ABBOTT LABORATORIES' REPLY IN SUPPORT OF
## PRELIMINARY OBJECTIONS TO PLAINTIFFS COMPLAINT

Plaintiffs' response only confirms that Abbott's preliminary objections should be sustained, and that the claims against Abbott should be dismissed.[1] Rather than addressing the obvious pleading defects plaintiffs seek to justify them. Plaintiffs fail to identify the specific product that allegedly caused their infant's injuries, fail to differentiate between the product manufacturers, and fail to allege facts showing that plaintiffs saw, heard, or were otherwise exposed to purportedly false representations made by Abbott about its products, let alone that plaintiffs relied upon any such representations. Plaintiffs' response brief in no way justifies their failure to plead the essential elements of their causes of action, nor can plaintiff-parent save her

---

[1] Plaintiffs make a number of flawed claims and arguments in their response brief, all of which Abbott denies. For purposes of brevity, however, Abbott focuses this reply on a few dispositive issues, as well as claims and arguments that plaintiffs raised for the very first time. Abbott hereby incorporates and preserves all arguments made in its opening brief, including that plaintiffs failed to plead facts sufficient to show an unreasonably dangerous defect, and failed to plead a legally sufficient basis for punitive damages.

untimely claims by invoking the term "negligent infliction of emotional distress" for the very first time in plaintiffs' opposition. For these reasons, all of plaintiffs' claims against Abbott should be dismissed.

**I.     Plaintiffs' Strict Liability and Negligence Claims (Count I-III) Should Be Dismissed For Failure to Identify the Specific Product That Allegedly Caused Infant's Injuries**

Plaintiffs do not deny that they must identify the specific product that caused infant's injuries under Pennsylvania law. Nor could they. Pennsylvania courts have uniformly upheld the product identification requirement, confirming that to state a products liability claim, a plaintiff must allege that a ***particular product*** of a ***particular defendant manufacturer*** caused their injuries. *See Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 968–69 (1985) (holding that plaintiff's failure to identify the offending product was "a fatal deficiency to [strict liability] claim"); *Mellon v. Barre-Nat'l Drug Co.*, 636 A.2d 187, 191 (Pa. Super. Ct. 1993) (holding a defendant must be identified as the manufacturer, distributor, or seller of the offending product before the injuries suffered by the plaintiff may be found to be proximately caused by some negligent act or omission of the defendant).

During a status conference in July 2023 involving other NEC cases, which plaintiffs' counsel attended, the court recognized that the sort of "and/or" pleading plaintiffs engage in here amounted to a failure to adequately identify the products administered to their infants. Despite having the benefit of the court's guidance on this point, plaintiff made no attempt to plead which product was administered to her infant.

Instead, plaintiffs allege that their infants were administered "Similac and/or Enfamil" products. *See* Compl. ¶ 12. These allegations are insufficient. As plaintiffs themselves recognize, "Similac" and "Enfamil" are the brand names used by Abbott and Mead Johnson to market and sell ***multiple*** preterm infant nutrition products. *See* Compl. ¶¶ 4-5, 48-49. In fact, these are brands

2

that apply to a large category of preterm and term nutrition products. Because plaintiffs fail to specifically allege which of the many products sold under the "Similac" and "Enfamil" brand names were administered to their infant, their strict liability and negligence claims against Abbott fail for lack of product identification. *See Klein v. Council of Chem. Assocs.*, 587 F. Supp. 213, 221 (E.D. Pa. 1984) (dismissing strict liability claim where plaintiffs did not identify the specific product sold or distributed by the defendants that caused the plaintiffs' harm).

Plaintiffs contend in their response brief that a plaintiff may be somehow excused from satisfying Pennsylvania's product identification requirement where future discovery might lead a plaintiff to this information. This is a misreading of Pennsylvania law. As courts have made clear, plaintiffs cannot escape their obligation to identify the specific product from the specific manufacturer that allegedly caused harm by mere pronouncements of their future "inten[t] to conduct extensive industry-wide discovery." *Klein*, 587 F. Supp. at 221 (holding that plaintiffs cannot rely on theories of alternative liability or joint and several liability to excuse them from identifying the specific product they claim caused their injuries); *see also* Abbott's Preliminary Objections at 8-11. This is particularly true in instances involving separate manufacturers, one of whom may not be a proper defendant. *See* Section III, infra. And the present "inability of plaintiffs to name specific products" is plaintiffs' own fault—a result of "plaintiffs' failure to investigate." *Klein*, 587 F. Supp. at 222

There is no excuse for this critical pleading failure. A "plaintiff is not excused from pleading the facts necessary to sustain [her] cause of action on the ground that the facts were known to the defendant and not to the plaintiff," particularly where, as is the case here, plaintiff has not availed herself of available discovery. *Gross v. United Engineers & Constructors Inc.*, 302 A.2d 370, 372 (1973) (affirming the trial court's dismissal for want of specificity in pleading where it

3

Case ID: 230900596
Control No.: 23096560

found that plaintiff failed to pursue available discovery or amend the complaint). Because plaintiffs do not—and cannot—provide any principled justification for their failure to identify the specific product that allegedly caused harm, plaintiffs' strict liability and negligence claims should be dismissed.

## II. Plaintiffs' Intentional and Negligent Misrepresentation Claims (Counts IV–V) Should Be Dismissed For Failure to Plead with Particularity

Plaintiffs' misrepresentation claims likewise warrant dismissal because plaintiffs have failed to plead specific facts supporting such fraud-based claims. Despite plaintiffs' counsel having the benefit of hearing the concerns the court expressed at a July conference in other NEC cases, plaintiffs fail to allege with any specificity that they saw or heard any Abbott representation, let alone a specific misrepresentation. Nor do plaintiffs allege any facts to support justifiable reliance on any purported statement by Abbott.

While plaintiffs generally allege that Abbott representatives did not warn hospital defendant's staff of the risk of NEC, *see* Pl.'s Memo. of Law at 9 (citing Compl. ¶¶ 60-62, 72), such generalized allegations do not come anywhere close to satisfying Pennsylvania's heightened pleading requirements for fraud. *See* Pa. R. Civ. P. 1019(b). Tellingly, plaintiffs cannot identify any actual statement made by any particular Abbott representative to any particular hospital staff member—and any such statement would not have been made to plaintiffs in any event. *See Feudale v. Aqua Pa., Inc.*, 122 A.3d 462, 466 n.5 (Pa. Commw. Ct. 2015) (concluding that plaintiff failed to "allege[ ] any justifiable reliance on his part on the [alleged false representation], nor could he, as the alleged false representation was not made to him, but instead to [a third party]").

Indeed, plaintiffs have not alleged that Abbott made any representations directly to them, or that they read, saw, heard, or were otherwise exposed to any specific product label or any other specific representation from Abbott before their infant was administered Abbott's products. *See*

4

Case ID: 230900506
Control No.: 23096560

*Youndt v. First Nat'l Bank*, 868 A.2d 539, 545 (Pa. Super. Ct. 2005) (holding, "at the very least, a plaintiff must set forth the exact statements or actions plaintiff alleges constitute the fraudulent misrepresentations"). Further, even if alleged misrepresentations to hospitals could provide the basis for a cognizable claim (they do not), plaintiffs have not alleged with specificity when these statements were made, who made them, to whom, and how they were communicated. These factual deficiencies are fatal to plaintiffs' misrepresentation claims.

## III. Plaintiffs' Claims Should Be Dismissed For Failure to Differentiate Between Abbott and Mead Johnson

Plaintiffs concede that their complaint fails to differentiate between Abbott and Mead Johnson. *See* Pl.'s Memo. of Law at 10 ("Plaintiffs' Complaints do often refer to both Abbott and Mead throughout their complaint in tandem"). But, plaintiffs contend that they are not required to differentiate their claims because their complaint alleges that Abbott and Mead Johnson "engaged in nearly identical conduct." *Id.* In making this argument, plaintiffs wholly misconstrue Pennsylvania law.

Pursuant to Rule 1020(a), plaintiffs are required to plead distinct, differentiated, and separate causes of action against defendants who, as here, are not jointly and severally liable. *See Bouchon v. Citizen Care, Inc.*, 176 A.3d 244, 260–61 (2017).[2] Because Abbott and Mead Johnson are direct competitors who manufacture different products at different locations, using different formulations and different ingredients, and market their products differently, plaintiffs have no basis for asserting joint and several liability as a matter of law. *See* Abbott's Preliminary

___

[2] *See also Gen. State Auth. v. Lawrie & Green*, 356 A.2d 851, 854 (1976) (holding that, although the plaintiff's allegations made clear that the form of action may be identical against both defendants, Rule 1020(a) required dismissal because the plaintiff relied upon separate and distinct conduct to support their respective causes of action); *Bassaro v. de Levie*, 236 A.3d 1069 (Pa. Super. Ct. 2020) (holding that a plaintiff must state clearly in a separate count each individual cause of action asserted against each individual defendant, including the facts pertaining to every element of that count).

Case ID: 230900596
Control No.: 23096560

Objections at 14-15. Plaintiffs nonetheless lump Abbott and Mead Johnson together without differentiating between the distinct acts or omissions of these distinct corporations, and the distinct products they manufacture. As a result, Abbott lacks clarity regarding its alleged role in this case, and whether it is even a proper party. Accordingly, plaintiffs' claims against Abbott should be dismissed.

### IV. Plaintiffs' Complaint Does Not Allege Viable Negligent Infliction of Emotional Distress Claims on Behalf of Plaintiff-Parent

In the response, plaintiff-parent seeks to save her untimely claims by arguing for the first time in that she has stated negligent infliction of emotional distress (NIED) claims under a "bystander" theory. *See* Pl.'s Memo. of Law at 12-17. In Pennsylvania, a bystander can recover for NIED only if: (1) the plaintiff was located near the scene of the accident; (2) the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident; and (3) the plaintiff and the victim were closely related. *See Huddleston v. Infertility Ctr. of Am.*, 700 A.2d 453, 462 (Pa. Super. Ct. 1997). In addition to these three elements, a physical injury must be averred to sustain a cause of action for NIED. *See Armstrong v. Paoli Mem'l Hosp.*, 633 A.2d 605, 609 (Pa. Super. Ct. 1993); *Abadie v. Riddle Mem'l Hosp.*, 589 A.2d 1143, 1145 (Pa. Super. Ct. 1991).

Here, as a threshold matter, plaintiffs fail to comply with the Rule 1020(a) requirement that "each cause of action" be set forth in a "separate count containing a demand for relief." Further, even if plaintiff-parent had specifically set forth a NIED claim in the complaint (she did not), these newly minted NIED claims would have failed as a matter of law. Plaintiff-parent does not allege that she suffered any physical injury. Moreover, plaintiff-parent does not allege any facts showing that she suffered "a direct emotional impact" from the "contemporaneous observance" of her infants developing NEC. Under these circumstances, Pennsylvania courts routinely dismiss NIED

Case ID: 230900506
Control No.: 23096560

claims. *See, e.g., Mazzagatti v. Everingham by Everingham*, 516 A.2d 672, 679 (1986) (holding where plaintiff has no contemporaneous sensory perception of the injury, any claimed emotional distress results more from the particular emotional makeup of the plaintiff rather than from the nature of defendant's actions); *Tackett v. Encke*, 509 A.2d 1310, 1312 (Pa. Super. Ct. 1986) (preliminary objections to parent's claim for NIED damages properly sustained where parent did not witness a "discrete and identifiable traumatic event," but rather was injured emotionally by witnessing, over time, her son's reaction to a pulmonary fat embolism). Accordingly, plaintiff-parent's improperly-pled, time-barred NIED claims should be dismissed.

## **CONCLUSION**

For all these reasons, as well as those set forth in Abbott's opening brief, which is expressly incorporated herein, Abbott's preliminary objections should be sustained, and all claims against Abbott should be dismissed.

Case ID: 230900506
Control No.: 23096560

Dated: December 4, 2023

Respectfully Submitted:

/s/ Sean P. Fahey
Sean P. Fahey (PA Bar No. 73305)
**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

/s/ Ronni E. Fuchs
Ronni E. Fuchs (PA Bar No. 65561)
**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

/s/ Joseph E. O'Neil
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
**CAMPBELL CONROY & O'NEIL, P.C.**
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.6388
JONeil@CampbellTrialLawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

/s/ Marques Hillman Richeson
Marques Hillman Richeson (admitted *pro hac
vice*)
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com
*Attorneys for Defendant Abbott Laboratories*

8

Case ID: 230900506
Control No.: 23096560

## **CERTIFICATE OF SERVICE**

I hereby certify that I will serve a true and correct copy of the foregoing in accordance with Pa. R. Civ. P. 440 on all parties not served electronically. All other parties will be electronically served by the court in accordance with Pa. R. Civ. P. 205.4(g).

Dated: December 4, 2023                    */s/ Ronni E. Fuchs*
                                           Ronni E. Fuchs

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Ronni E. Fuchs, hereby certify that this filing complies with the provisions of the Public

Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and

Trial Courts, that require filing confidential information and documents differently than non-

confidential information and documents.

/s/ Ronni E. Fuchs
Ronni E. Fuchs

FILED
01 APR 2024 04:20 pm
Civil Administration
T. FOBBS

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

Filed and Attested by the
Office of Judicial Records
06 NOV 2023 02:04 pm
S. GILLIAM

| | |
|---|---|
| STEPHANIE WILKERSON, on her own behalf and as Parent and Natural Guardian of M.F., a Minor, : *Plaintiff*, : v. : MEAD JOHNSON & COMPANY, LLC, MEAD : JOHNSON NUTRITION COMPANY, ABBOTT : LABORATORIES, PENNSYLVANIA HOSPITAL : OF THE UNIVERSITY OF PENNSYLVANIA : HEALTH SYSTEM, *d/b/a/* PENNSYLVANIA : HOSPITAL, *and* THE TRUSTEES OF THE : UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN : MEDICINE. : *Defendants*. : | SEPTEMBER TERM, 2023 No. 230900730 |

**ORDER OF THE COURT**

On this _____ day of _____, 2023, upon consideration of defendant Abbott

Laboratories' preliminary objections to plaintiffs' complaint, its brief in support, and any response

thereto, it is hereby ORDERED that defendant Abbott Laboratories' preliminary objections to

plaintiffs' complaint are SUSTAINED. It is further ORDERED that Counts I through V of

plaintiffs' complaint are DISMISSED as to Abbott Laboratories.

BY THE COURT:

_____

## NOTICE TO PLEAD

To: Plaintiffs

You are hereby notified to file a written response to the enclosed Preliminary Objections within twenty (20) days from service hereof or a judgment may be entered against you.

/s/ *Sean P Fahey*

*Counsel for Defendant Abbott Laboratories*

**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Sean P. Fahey (PA Bar No. 73305)
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

Ronni E. Fuchs (PA Bar No. 65561)
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

**CAMPBELL CONROY & O'NEIL, P.C.**
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.1900
JONeil@CampbellTrialLawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

**JONES DAY**
Marques Hillman Richeson (*pro hac vice forthcoming*)
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

Jennifer B. Flannery (PA Bar No. 74546)
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
404.581.8008
jbflannery@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

| | |
|---|---|
| STEPHANIE WILKERSON, on her own behalf and as Parent and Natural Guardian of M.F., a Minor, | :    SEPTEMBER TERM, 2023 |
|          *Plaintiff,* | :    No. 230900730 |
|     v. | : |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL, *and* THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE. | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |
|          *Defendants.* | : |

## DEFENDANT ABBOTT LABORATORIES' PRELIMINARY OBJECTIONS TO PLAINTIFF'S COMPLAINT

In March and April of 2020, plaintiffs filed 29 nearly identical actions in this Court, alleging their infants, born prematurely and at low birthweights, were injured after they were administered preterm infant nutrition products manufactured by Abbott Laboratories ("Abbott") or Mead Johnson & Company LLC, Mead Johnson Nutrition Company (together, "Mead Johnson") shortly after their birth. The instant action, filed more than two years later by the same counsel, presents the same claims in nearly-identical form on behalf of an additional claimant.[1] Pursuant to Rules 1028(a)(3) and 1028(a)(4) of the Pennsylvania Rules of Civil Procedure,

---

[1] During a case management conference in the 29 cases held before the Honorable Linda Carpenter on July 24, 2023, the Court recognized patent deficiencies in the original complaints. While the above-captioned case had not been filed at the time of the conference, plaintiff's counsel had the benefit of this Court's insights concerning the deficiencies in the pleadings. Notwithstanding, the instant complaint suffers from the same deficiencies identified by the Court.

Abbott's preliminary objections should be sustained, and all claims against Abbott should be dismissed. In support of its preliminary objections, Abbott states the following:

1.     In the above-captioned lawsuit, plaintiffs attack—without basis—specialized infant formulas and fortifiers essential to the survival and development of premature infants in Neonatal Intensive Care Units ("NICUs"). Plaintiffs filed this action against defendants Mead Johnson, Abbott, and the infant's hospital of birth (collectively, "defendants"), alleging that medical professionals at the hospital defendant administered Abbott's and/or Mead Johnson's cow's milk-based infant nutrition products to plaintiff, and that plaintiff was injured as a result.

2.     Plaintiffs allege seven causes of action, five of which were asserted against Abbott and Mead Johnson: strict products liability design defect (Count I), strict products liability failure to warn (Count II), negligence (Count III), intentional misrepresentation (Count IV), and negligent misrepresentation (Count V). The remaining claims (Counts VI and VII) were asserted against the hospital defendant. The complaint was filed by parent ("plaintiff-parent") on her own behalf, and also as a parent and natural guardian of the infant plaintiff ("plaintiff") (together "plaintiffs").

3.     Plaintiffs' complaint is subject to dismissal, in whole or in part, for the reasons set forth below.

## I.  PRELIMINARY OBJECTION FOR LEGAL INSUFFICIENCY OF ALL CLAIMS.

4.     Abbott incorporates the foregoing paragraphs as if set forth herein.

5.     Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

6.     "The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. Am. Honda Motor Co., Inc.*, 718

3

A.2d 305, 307 (Pa. Super. Ct. 1998). Plaintiffs must allege sufficient facts demonstrating that Abbott's products were unreasonably dangerous for their intended use, triggering a duty to warn.

7.     Plaintiffs' complaint is devoid of any ***facts*** showing that Abbott's preterm infant nutrition products are "unreasonably dangerous" when administered to premature and low birth weight infants.

8.     Accordingly, this preliminary objection should be sustained, and all Counts against Abbott should be dismissed.

## II.  PRELIMINARY OBJECTION FOR LEGAL INSUFFICIENCY OF PLAINTIFFS' STRICT LIABILITY CLAIMS.

9.     Abbott incorporates the foregoing paragraphs as if set forth herein.

10.     Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

11.     Counts I and II are strict liability claims that require plaintiffs to identify the specific product that allegedly caused plaintiff's injury. *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 968 (Pa. Super. Ct. 1985) (Pennsylvania "imposes liability for physical harm caused to the user only upon that person who sold a product in a defective condition. A plaintiff must therefore at least *designate* the product alleged to be defective in order to recover from the one who sells it.") (emphasis added).

12.     Plaintiffs fail to do so. Instead, they simply allege, without referring to any medical records containing product identification information, that "Abbott's and/or Mead [Johnson]'s products" were administered to plaintiff and caused plaintiff's injuries. *See* Compl. ¶ 104.

13.     Accordingly, this preliminary objection should be sustained, and Counts I and II against Abbott should be dismissed.

4

Case ID: 230900506
Control No.: 23096587

## III. PRELIMINARY OBJECTION FOR LEGAL INSUFFICIENCY OF PLAINTIFFS' NEGLIGENCE CLAIM.

14.     Abbott incorporates the foregoing paragraphs as if set forth herein.

15.     Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

16.     Count III is a claim for negligence, requiring plaintiffs to identify the product that injured them and to allege a reasonably close causal connection between Abbott's conduct with respect to that product and the resulting injuries to plaintiffs. *See Cummins*, 495 A.2d at 968. Because plaintiffs fail to identify the specific product giving rise to their claims, they also fail to establish a causal connection between Abbott's conduct and their injuries.

17.     Accordingly, this preliminary objection should be sustained, and Count III against Abbott should be dismissed.

## IV. PRELIMINARY OBJECTION FOR INSUFFICIENT SPECIFICITY IN PLEADING PLAINTIFFS' MISREPRESENTATION CLAIMS.

18.     Abbott incorporates the foregoing paragraphs as if set forth herein.

19.     Pursuant to Pa. R. Civ. P. 1028(a)(3), a preliminary objection may be filed by any party to a pleading regarding insufficient specificity in a pleading.

20.     Counts IV and V are claims for intentional and negligent misrepresentation; these fraud-based claims are subject to heightened pleading requirements under Pa. R. Civ. P. 1019(b). Plaintiffs fail to allege with particularity that they saw, heard, or were otherwise exposed to any purported misrepresentations made by Abbott. They also do not specifically allege who made the supposed misrepresentations, or when they supposedly did so. Moreover, plaintiffs cannot plausibly allege reliance on misrepresentations to which they were not exposed.

21.     Accordingly, this preliminary objection should be sustained, and Counts IV and V against Abbott should be dismissed.

5

## V. PRELIMINARY OBJECTION FOR INSUFFICIENT SPECIFICITY IN DIFFERENTIATING BETWEEN DEFENDANTS THROUGHOUT COMPLAINT.

22.     Abbott incorporates the foregoing paragraphs as if set forth herein.

23.     Pursuant to Pa. R. Civ. P. 1028(a)(3), a preliminary objection may be filed by any party to a pleading regarding insufficient specificity in a pleading.

24.     In the unnumbered paragraph of the complaint appearing before paragraph 1, plaintiffs collectively refer to Abbott and Mead Johnson as "the Defendant Manufacturers" without explaining what relationship, if any, exists between these corporations, or why the acts of Mead Johnson should be attributed to Abbott, or vice versa. *See* Compl. 1.

25.     Paragraphs 1 and 13 of the complaint generally allege that plaintiff was given "the Defendant Manufacturers' cow's milk-based" products, without specifying which product from which manufacturer was administered to plaintiff. *Id.* ¶¶ 1, 13.

26.     Paragraph 14 of the complaint generally alleges that plaintiff developed necrotizing enterocolitis ("NEC") shortly after being administered the Defendant Manufacturers' products, again without specifying which product from which manufacturer was administered. *Id.* ¶ 14.

27.     Paragraph 54 of the complaint alleges that "Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents," without specifying any particular act of deception by any individual defendant, and without providing any details surrounding when plaintiffs saw the allegedly misleading marketing campaigns. *Id.* ¶ 54.

28.     Across Counts I through V of the complaint, plaintiffs allege wrongful conduct by Abbott and/or Mead Johnson without differentiating between the defendants, or specifying each defendant's distinct role in each claim. *See* Compl., Counts I-V.

29.     Because plaintiffs have lumped Abbott and Mead Johnson together without differentiating between the distinct acts or omissions of these distinct corporations, Abbott lacks

Case ID: 230900506
Control No.: 23096587

clarity regarding its alleged role in these cases. Plaintiffs' allegations are thus insufficiently pled under Rule 1028(a)(3).

30.    Accordingly, all claims against Abbott should be dismissed, or in the alternative, all paragraphs in which plaintiffs fail to differentiate between defendants should be stricken,[2] and this preliminary objection should be sustained.

## VI. PRELIMINARY OBJECTION REGARDING PLAINTIFF-PARENT'S TIME-BARRED CLAIMS

31.    Abbott incorporates the foregoing paragraphs as if set forth herein.

32.    Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

33.    Pennsylvania law establishes a two-year statute of limitations for negligent, intentional, or otherwise tortious conduct. *See* 42 Pa. Cons. Stat. § 5524(2) & (7).

34.    While the statute of limitations began running on plaintiff-parent's claims on or around the date of the infant-plaintiffs' birth, December 17, 2015, plaintiff-parent's case was not initiated by writ of summons until September 8, 2023—nearly six years after the statute of limitations period had expired.

35.    Plaintiff-parent's claims in this case are thus time-barred. Moreover, plaintiffs have not alleged sufficient facts to support any application of the discovery rule.

36.    Accordingly, plaintiff-parent's claims should be dismissed, and this preliminary objection should be sustained.

## VII. PRELIMINARY OBJECTION REGARDING PLAINTIFFS' REQUEST FOR PUNITIVE DAMAGES.

37.    Abbott incorporates the foregoing paragraphs as if set forth herein.

---

[2] For example, in the complaint, plaintiffs fail to differentiate between defendants in each of the following paragraphs: 1–2, 12–13, 19, 21–26, 29–30, 32–44, 46, 52, 54–59, 62, 86, 89–93, and 96–141.

7

Case ID: 230900506
Control No.: 23096587

38.     Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

39.     Pursuant to Pa. R. Civ. P. 1028(a)(3), a preliminary objection may be filed by any party to a pleading regarding insufficient specificity in a pleading.

40.     Without sufficient basis, plaintiffs demand punitive damages from Abbott in the *ad damnum* clause of each of Counts I through V.

41.     Plaintiffs' demands for punitive damages in Counts III and V are legally insufficient, as these Counts plainly sound in negligence and punitive damages are not available for claims of "ordinary negligence" under Pennsylvania law. *See Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985) (citing RESTATEMENT OF TORTS (SECOND) § 908, comment e).

42.     Additionally, plaintiffs' demands for punitive damages in Counts I through V are insufficiently specific. Plaintiffs make bare allegations that Abbott's conduct was "malicious" without providing any factual support for the same. *See Whiting v. Nationwide Ins. Co.*, 9 Pa. D. & C.3d 789, 792 (1979) (dismissing plaintiffs' punitive damages request where "factual averments in support of . . . conclusory allegations are totally lacking").

43.     Accordingly, Abbott respectfully requests that plaintiffs' demands for punitive damages in each of Counts I through V be stricken.

WHEREFORE, pursuant to Pa. R. Civ. P. 1028(a)(3) and (a)(4), Abbott respectfully requests that this Court sustain these preliminary objections and dismiss Counts I, II, III, IV, and V against Abbott.

8

Dated: November 6, 2023

Respectfully Submitted:

/s/ Sean P. Fahey
Sean P. Fahey (PA Bar No. 73305)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

/s/ Joseph E. O'Neil
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
**CAMPBELL CONROY & O'NEIL, P.C.**
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.6388
JONeil@CampbellTrialLawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

/s/ Ronni E. Fuchs
Ronni E. Fuchs (PA Bar No. 65561)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

/s/ Marques Hillman Richeson
Marques Hillman Richeson (*pro hac vice forthcoming*)
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

/s/ Jennifer B. Flannery
Jennifer B. Flannery (PA Bar No. 74546)
**JONES DAY**
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
404.581.8008
jbflannery@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

9

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

| | |
|---|---|
| STEPHANIE WILKERSON, on her own behalf and as Parent and Natural Guardian of M.F., a Minor, : : : | SEPTEMBER TERM, 2023 No. 230900730 |
|              *Plaintiff,* : | |
|    v. : | |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL, *and* THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE. : : : : : : : : | |
|              *Defendants.* | |

**DEFENDANT ABBOTT LABORATORIES' BRIEF IN SUPPORT OF**
**PRELIMINARY OBJECTIONS TO PLAINTIFFS' COMPLAINT**

**MATTER BEFORE THE COURT**

The preliminary objections of Abbott Laboratories ("Abbott") to plaintiffs' complaint are before this Court. Under Pennsylvania Rules of Civil Procedure 1028(a)(3) and 1028(a)(4), Abbott respectfully requests that this Court dismiss Counts I, II, III, IV, and V of the complaint for insufficient specificity and/or legal insufficiency of pleading.

**STATEMENT OF QUESTIONS INVOLVED**

1.    Should the Court sustain Abbott's preliminary objections to the complaint and dismiss all claims against Abbott (Counts I-V) as legally insufficient for failure to properly plead the product at issue is unreasonably dangerous? Answer: Yes.

2.    Should the Court sustain Abbott's preliminary objections to the complaint and dismiss the strict liability claims (Counts I and II) as legally insufficient? Answer: Yes.

10

Case ID: 230900506
Control No.: 23096587

3.     Should the Court sustain Abbott's preliminary objections to the complaint and dismiss the negligence claim (Count III) as legally insufficient? Answer: Yes.

4.     Should the Court sustain Abbott's preliminary objections to the complaint and dismiss the intentional and negligent misrepresentation claims (Counts IV and V) as insufficiently pled? Answer: Yes.

5.     Should the Court sustain Abbott's preliminary objections and dismiss the complaint as insufficiently pled for failure to properly differentiate between the manufacturer defendants, or alternatively, strike all paragraphs in which plaintiffs fail to differentiate between those defendants? Answer: Yes.

6.     Should the Court sustain Abbott's preliminary objections to the complaint and dismiss plaintiff-parents' claims as time-barred? Answer: Yes.

7.     Should the Court sustain Abbott's preliminary objections to the complaint and strike plaintiffs' requests for punitive damages in Counts I through V as both legally insufficient and lacking sufficient specificity? Answer: Yes.

## INTRODUCTION AND FACTUAL BACKGROUND

Mead Johnson & Company LLC, Mead Johnson Nutrition Company (together, "Mead Johnson") and Abbott develop and manufacture infant nutrition products, including products tailored to address the distinct nutritional needs of premature, low birthweight infants.[3] These infants face complex challenges and daunting odds. For one, they typically have underdeveloped or maldeveloped gastrointestinal systems that are not prepared to receive the nutrition necessary for the rapid growth these infants need. This poses a serious challenge for NICU specialists caring

---

[3] Abbott manufactures infant nutrition products under the "Similac" brand name. Compl. ¶ 5. Mead Johnson manufactures infant nutrition products under the "Enfamil" brand name. *Id.* ¶ 4.

Case ID: 230900506
Control No.: 23096587

for the infants. The best nutrition for a premature infant is the nutrition it would have received in the womb. Once that is no longer possible, everything else falls short. Milk from the infant's mother is the closest natural substitute, but it may not be available or nutritionally sufficient to meet the premature infant's extraordinary needs. The same is true of donor milk. Accordingly, NICU specialists use their judgment to fill the nutritional gap with specialized formula and fortifier products designed to meet the needs of premature, low-birth-weight infants. This litigation targets these life-saving products.

The infant in this case allegedly developed necrotizing enterocolitis ("NEC"), a leading cause of death in premature infants in NICUs. NEC is an inflammatory gastrointestinal condition that can result in death of intestinal tissue. Plaintiffs admit that premature infants' underdevelopment makes them "especially susceptible to NEC." *See* Compl. ¶ 16. Indeed, NEC affects up to 8% of infants in NICUs, including infants who receive only human milk, as well as those who receive no "food" at all. Neonatologists are experts in dealing with the risks of NEC and balancing them with numerous other medical risks these premature infants face. They carefully balance these risks regardless of how nutrition is administered, and regardless of whether it consists of the mother's own milk, human donor milk, specialized formula or fortifier, or a combination.

Plaintiff-parent alleges that her infant was born prematurely at Pennsylvania Hospital. *See id.* ¶ 11. The complaint alleges "upon information and belief" that infant was administered "Similac and/or Enfamil cow's milk-based products" by medical professionals at the respective hospital after birth. *Id.* ¶ 12. Plaintiffs further claim that infant developed NEC shortly after the administration of Abbott and/or Mead Johnson's product and experienced long-term health effects. *Id.* ¶¶ 13-14.

Case ID: 230900506
Control No.: 23095587

Plaintiffs allege that Abbott and/or Mead Johnson manufactured and sold their products knowing they were unreasonably dangerous and not suited for their intended use because they purportedly cause NEC, and that Abbott and/or Mead Johnson failed to warn plaintiffs and the public of this potential harm. *See, e.g, id.* ¶ 22. According to plaintiffs, Abbott and Mead Johnson also made false statements of material fact "on an ongoing and repeated basis" to consumers, physicians, and medical staff in their advertising and marketing materials prior to the time their infants were administered preterm infant nutrition products. *Id.* ¶ 127.

Plaintiffs brought five claims against Abbott and Mead Johnson: strict products liability design defect (Count I), strict products liability failure to warn (Count II), negligence (Count III), intentional misrepresentation (Count IV), and negligent misrepresentation (Count V). Plaintiffs also bring failure to warn (Count VI) and corporate liability (Count VII) claims against the hospital at which their infant was born.

A case management conference was held before the Honorable Linda Carpenter on July 24, 2023 regarding the initial set of 29 cases, in which plaintiffs were represented by the same plaintiffs' counsel as here. While the above-captioned case had not yet been filed as of the date of this conference, plaintiff had the benefit of this Court's insights concerning the deficiencies in the complaints. In particular, the Court recognized during the conference that the original 29 plaintiffs had all failed to identify which manufacturers' product was administered to each infant.

The same is true in the instant complaint. Although plaintiffs acknowledge that Abbott and Mead Johnson sell many different products, there are no allegations in the complaint identifying any product sold by Abbott as the specific product that was administered to any specific infant. Further, there are no allegations indicating that plaintiffs saw, heard, or were otherwise

Case ID: 230900506
Control No.: 23096587

exposed to the allegedly false representations made by Abbott and/or Mead Johnson about their products. These pleading deficiencies, among others, are fatal to their claims.

<div align="center">

**ARGUMENT**

</div>

Plaintiffs' claims are legally insufficient, lack sufficient specificity, and/or fail to conform to a rule of court because:

- plaintiffs do not sufficiently allege that the product(s) at issue are unreasonably dangerous;

- plaintiffs never identify the product administered to their infant;

- plaintiffs do not plead with specificity that any misrepresentations were made to them;

- plaintiffs impermissibly lump Abbott and Mead Johnson together without distinguishing the conduct purportedly attributable to each;

- plaintiff-parent's claims are barred by the statute of limitations; and

- plaintiffs fail to plead their requests for punitive damages with the requisite legal sufficiency and factual specificity;

Accordingly, all claims against Abbott should be dismissed.

<div align="center">

**Legal Standard**

</div>

Pennsylvania is a fact-pleading jurisdiction. *See generally* Pa. R. Civ. P. 1019. A complaint must therefore set forth the material facts upon which a claim is based. Pa. R. Civ. P. 1019(a). Indeed, "[t]he purpose of the pleadings is to place the defendants on notice of the claims upon which they will have to defend." *Carlson v. Cmty. Ambulance Servs.*, 824 A.2d 1228 (Pa. Super. Ct. 2003) (quoting *Yacoub v. Lehigh Valley Med.*, 805 A.2d 579, 588 (Pa. Super. 2002)). So the "complaint must give the defendants fair notice of the plaintiff's claims and a summary of the material facts that support those claims." *Carlson*, 824 A.2d at 1228.

Case ID: 230900506
Control No.: 23096587

To that end, Rule 1028 of the Pennsylvania Rules of Civil Procedure provides that a party may file preliminary objections asserting that a pleading is insufficiently specific. Pa. R. Civ. P. 1028(a)(3). When assessing whether a pleading is sufficiently specific, the relevant question is "whether the complaint is sufficiently clear to enable the defendant to prepare [its] defense, or whether the plaintiff[']s complaint informs the defendant with accuracy and completeness of the specific basis on which recovery is sought so that [the defendant] may know without question upon what grounds to make [its] defense." *Rambo v. Greene*, 906 A.2d 1232 (Pa. Super. Ct. 2006).

Rule 1028 of the Pennsylvania Rules of Civil Procedure also provides that a party may file preliminary objections asserting that the pleading is legally deficient. Pa. R. Civ. P. 1028(a)(4). Generally, where a legal deficiency is "apparent on the face of the complaint," it "is needless to prolong proceedings when the matter can be correctly and quickly decided on preliminary objections in the nature of a demurrer." *Wurth v. City of Phila.*, 584 A.2d 403, 407 (Pa. Commw. Ct. 1990).

"Preliminary objections in the nature of [a] demurrer test the legal sufficiency of the plaintiff's complaint." *Sexton v. PNC Bank*, 792 A.2d 602, 604 (Pa. Super. Ct. 2002). The question presented by the demurrer is whether, on the facts alleged, no recovery is possible. *Presbyterian Med. Ctr. v. Budd*, 832 A.2d 1066, 1070 (Pa. Super. Ct. 2003) (citation omitted). In answering this question, the court is "precluded from considering any conclusions of law or inferences which are not supported by the factual allegations contained in the complaint." *Hart v. O'Malley*, 647 A.2d 542, 553 (Pa. Super. Ct. 1994). Thus, a plaintiff cannot maintain a cause of action by stating conclusions of law, argumentative allegations, and expressions of opinion. *Neill v. Eberle*, 620 A.2d 673, 675 (Pa. Commw. Ct. 1993). And a court "may not supply a fact missing [from the] complaint" in order to cure a defective pleading. *Hart*, 647 A.2d at 553.

Case ID: 230900506
Control No.: 23096587

# I. PLAINTIFFS FAIL TO PLEAD FACTS SUFFICIENT TO SHOW AN UNREASONABLY DANGEROUS DEFECT, AS REQUIRED FOR COUNTS I-V.

Pursuant to Pa. R. Civ. P. 1028(a)(4), Abbott demurs to Counts I-V of plaintiffs' complaint.

"The threshold inquiry in all products liability cases is whether there is a defect which rendered the product unreasonably dangerous." *Weiner v. Am. Honda Motor Co.*, 718 A.2d 305, 307 (Pa. Super. Ct. 1998). "A product is defective when it is not safe for its intended use, i.e., the product left the supplier's control lacking any element necessary to make it safe for its intended use." *Id.* at 308.[4] Plaintiffs' complaint fails to allege sufficient facts demonstrating that Abbott's cow's milk-based products were unreasonably dangerous for their intended use.

Plaintiffs merely allege that "[e]xtensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants," without any ***facts*** to support this bald assertion. Compl. ¶ 16. Nor have they alleged any ***facts*** supporting a "scientific consensus that . . . cow's milk-based products present a dire threat to the health and development of preterm infants" or that cow's milk-based products "cause NEC and greatly increase the likelihood that a baby will develop NEC." *Id.* ¶¶ 21-22; *see also Orange Stones Co. v. City of Reading*, 87 A.3d 1014, 1025 (Pa. Commw. Ct. 2014) (holding that "[b]lind suspicions and unsupported accusations simply do not state a cause of action pursuant to any theory of tort recovery" under Pennsylvania law).

---

[4] The law of product liability within Pennsylvania has developed under the principles outlined in Section 402A of the Second Restatement of Torts. *High v. Penn. Supply, Inc.*, 154 A.3d 341 (Pa. Super. Ct. 2017). Specifically, Section 402(A) provides: "One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if the seller is engaged in the business of selling such a product, and it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold. The rule stated in Subsection (1) applies although the seller has exercised all possible care in the preparation and sale of his product, and the user or consumer has not bought the product from or entered into any contractual relation with the seller." RESTATEMENT OF TORTS (SECOND) § 402(A).

Case ID: 230900506
Control No.: 23096587

Instead, plaintiffs simply allege that "[b]reast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC." Compl. ¶ 20. The mere fact that human breast milk may lower the risk of NEC is not equivalent to a showing that cow's milk-based products ***cause*** NEC. As plaintiffs acknowledge, all premature, low birth weight infants, including those who are administered human breast milk exclusively, are especially susceptible and at high risk of developing NEC. *Id.* ¶ 16. Indeed, plaintiffs even concede that NEC is "a disease that can occur in children who are *not* fed the Defendant Manufacturers' products" at all. *Id.* ¶ 30 (emphasis in original).

Thus, plaintiffs' complaint is devoid of facts sufficient to show that Abbott's products are unreasonably dangerous, and their claims against Abbott are insufficient as a matter of law.

## II. PLAINTIFFS FAIL TO SUFFICIENTLY PLEAD THEIR STRICT LIABILITY CLAIMS (COUNTS I–II)

### A. Plaintiffs' Complaint Fails to Identify the Specific Product That Allegedly Caused the Infants' Injuries

Plaintiffs fail to allege sufficient facts to support their strict liability claims (Counts I and II) because plaintiffs' complaint fails to identify the specific product that caused their injuries. *See* Pa. R. Civ. P. 1028(a)(4). It is well-settled that, in order to plead a strict liability claim in Pennsylvania, the "plaintiff must [] at least designate the product alleged to be defective[.]" *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 969 (Pa. Super. Ct. 1985). "Absent such identification, there can be no allegations of duty, breach of duty, or legal causation, and hence there can be no liability." *Mellon v. Barre-Nat'l Drug Co.*, 636 A.2d 187, 191–92 (Pa. Super. Ct. 1993).

Plaintiffs' complaint fails to identify the specific product they maintain caused their alleged injuries. Instead, plaintiffs broadly allege that Abbott and Mead Johnson manufacture and sell cow's milk-based infant feeding products under the Similac or Enfamil brand names, Compl. ¶¶

17

Case ID: 230900506
Control No.: 23096587

4-5, and surmise "upon information and belief" that their infant was administered "Similac and/or Enfamil" products. *Id.* ¶ 12. These allegations are plainly insufficient. As plaintiffs acknowledge, Abbott and Mead Johnson manufacture, sell, and market different products under different brands names. *See, e.g.*, *id.* ¶¶ 4-5; *id.* ¶¶ 48–49 (describing multiple Abbott products and multiple Mead Johnson products). They also acknowledge that, similar to a restaurant offering Coke or Pepsi, the hospital defendants use either Similac ***or*** Enfamil in their respective NICUs. *Id.* ¶ 22; *id.* ¶ 58. Yet, plaintiffs fail to identify which product from which manufacturer was allegedly administered to their infant. As such, even viewing the complaint in the light most favorable to plaintiffs, their strict liability claims fail for lack of product identification. *See Cummins*, 495 A.2d at 968–69 (holding that the plaintiff's failure to identify the offending product was "a fatal deficiency to his [strict liability] claim" and that "the complaint [could] not adequately aver the requisite connection between the [defendants] and the defective product"); *Klein v. Council of Chem. Assocs.*, 587 F. Supp. 213, 221 (E.D. Pa. 1984) (dismissing strict liability claim where plaintiffs did not identify the specific product sold or distributed by the defendants that caused the plaintiffs' harm).

## B. Plaintiffs Are Not Excused from Satisfying the Product Identification Requirement

In an effort to evade their pleading obligations, plaintiffs' complaint seeks to hold Abbott and Mead Johnson "jointly and severally" liable for their claims alleged in Counts I-V. Plaintiffs also allege that Abbott, Mead Johnson, and the hospital defendants "acted in concert" to "fraudulently convey false and misleading information concerning the risk of NEC . . . caused by Defendant Manufacturers' preterm infant formula products." Compl. ¶ 34.

No Pennsylvania court has applied any such theory of alternative liability to excuse a product liability plaintiff from identifying the specific product they claim caused their alleged harm. *See, e.g.*, *Cummins*, 495 A.2d at 970 (affirming an order sustaining preliminary objections to a complaint that sought to allege a theory of enterprise liability premised on a bald averment

18

that members of the tire and rim assembly industry collaborated in the "intentional manufacture, promotion and distribution of a generically similar defective device with the knowledge that a safer [] device was available"); *Skipworth by Williams v. Lead Indus. Ass'n, Inc.*, 690 A.2d 169, 174–75 (Pa. 1997) (holding that plaintiffs failed to establish a concert of action where they were unable to identify the manufacturer of the lead pigment that caused alleged injuries); *Burnside v. Abbott Lab.*, 505 A.2d 973, 982 (Pa. Super. Ct. 1985) (holding Pennsylvania law forecloses cause of action for concerted action where plaintiff is "unable to isolate a particular manufacturer as the causative agent of his injuries").

Abbott and Mead Johnson likewise cannot be held jointly and severally liable as a matter of law. "While there is some authority that a single cause of action may be pled against two or more defendants who are alleged to be jointly and severally liable, that cannot be the case where the factual background underlying each defendant's liability is different." *Bouchon v. Citizen Care, Inc.*, 176 A.3d 244, 258 (Pa. Super. Ct. 2017) (citing *Gen. State Auth'y v. Lawrie and Green*, 356 A.2d 851, 854 (Pa. Commw. Ct. 1976)). Here, because Abbott and Mead Johnson manufacture different products at different locations, with different manufacturing processes, using different formulations and different ingredients, and market their products differently, plaintiffs have no basis for asserting joint and several liability. *See Cummins*, 495 A.2d at 972 (preliminary objections properly sustained as to complaint seeking to impose industry-wide liability where plaintiffs failed to allege that manufacturers placed fungible products with "identical" qualities on the market). For all these reasons, plaintiffs cannot be excused from satisfying their requirement to identify the specific product that allegedly caused harm.

Case ID: 230900506
Control No.: 23096587

## III.  PLAINTIFFS FAIL TO SUFFICIENTLY PLEAD A NEGLIGENCE CLAIM (COUNT III).

Plaintiffs' negligence claim fails for the same reason as their strict-liability claims do: they simply fail to identify the product that allegedly caused their injuries. To state a negligence-based products liability claim, "the plaintiff must identify the defendant as the manufacturer or seller of *the offending product* before a plaintiff's injuries may be found to be proximately caused by the negligence of the defendant." *Long v. Krueger, Inc.*, 686 F. Supp. 514, 517 (E.D. Pa. 1988) (citing *Cummins*, 495 A.2d at 967). "Absent such identification, there can be no allegations of duty, breach of duty or legal causation, and hence there can be no liability." *Cummins*, 495 A.2d at 967–68.

As noted above, plaintiffs allege only "upon information and belief" that their infant was administered "Similac and/or Enfamil" products and developed NEC shortly thereafter. *See, e.g.*, Compl. ¶¶ 4-5; *id.* ¶ 12. Plaintiffs do not, however, identify the exact product (if any) made by Abbott giving rise to their claims. Accordingly, they "cannot allege a casual [sic] connection between conduct of the defendants and [plaintiff's] injuries." *Klein*, 587 F. Supp. at 223; *see also Cummins*, 495 A.2d at 967 (affirming dismissal of negligence claim where plaintiff failed to identify a specific product and the identity of the manufacturer, supplier, or seller of the product; and therefore did not establish a causal connection between his injury and the defendants' conduct).

## IV.  PLAINTIFFS FAIL TO PLEAD THEIR INTENTIONAL AND NEGLIGENT MISREPRESENTATION CLAIMS (COUNTS IV–V) WITH SUFFICIENT PARTICULARITY.

Plaintiffs' complaint lacks sufficient specificity regarding their misrepresentation claims. In particular, plaintiffs fail to allege with any specificity that they saw or heard any Abbott representation, let alone a misrepresentation. Nor do plaintiffs allege any facts to support justifiable reliance on any purported statement by Abbott.

Case ID: 230900506
Control No.: 23096587

"Averments of fraud are meaningless epithets unless sufficient facts are set forth which will permit an inference that the claim is not without foundation[.]" *Bata v. Cent.-Penn Nat. Bank of Philadelphia*, 224 A.2d 174, 179 (Pa. 1966). To protect against generalized and unsupported accusations of fraud, the Pennsylvania Rules of Civil Procedure requires each element of fraud be "averred with particularity." *Presbyterian Med. Ctr.*, 832 A.2d at 1072-1073 (citing Pa. R. Civ. P. 1019(b)). "Merely alleging fraud as a legal conclusion adds nothing if it is not based upon facts clearly and explicitly set forth as constituting such fraud." *Dwyer v. Rothman*, 431 A.2d 1035, 1037 (Pa. Super. Ct. 1981) (citing *Hornsby v. Lohmeyer*, 72 A.2d 294 (Pa. 1950)).

To state a claim for intentional misrepresentation, plaintiffs must plead: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) that the resulting injury was proximately caused by the reliance. *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) (internal citation omitted). Similarly, to state a claim for negligent misrepresentation, plaintiffs must plead facts showing (1) a misrepresentation of a material fact; (2) that the representor either knew or should have known of the misrepresentation; (3) that the representor intended the representation to induce another to act; and (4) that injury resulted to the party acting in justifiable reliance on the misrepresentation. *See id.* at 561. The complaint fails in multiple ways to plead these elements with specificity.

***First***, "at the very least, a plaintiff must set forth the *exact* statements or actions plaintiff alleges constitute the fraudulent misrepresentations." *Youndt v. First Nat'l Bank*, 868 A.2d 539, 545 (Pa. Super. Ct. 2005) (internal citations and quotations omitted) (emphasis added). While plaintiffs generally allege that Abbott made false representations in its marketing materials,

21

plaintiffs do not allege that Abbott made any of these representations directly to them, or that they read, saw, heard, or were otherwise exposed to any specific product label or any other specific representation from Abbott before their infant was administered Abbott's products. Accordingly, plaintiffs fail to plead facts showing that their infants' injuries were caused by their reliance on Abbott's representations. *See, e.g.*, *Rivello v. N.J. Auto. Full Ins. Underwriting Ass'n*, 638 A.2d 253, 257 (Pa. Super. Ct. 1994) (affirming dismissal of misrepresentation claim where plaintiff failed to sufficiently allege justifiable reliance on the alleged misrepresentation or that his injury was proximately caused by the alleged misrepresentation); *Youndt*, 868 A.2d 539 (holding that fraud claim failed where plaintiff did not plead all elements with particularity); *Feudale v. Aqua Pa., Inc.*, 122 A.3d 462, 466 n.5 (Pa. Commw. Ct. 2015) (concluding that plaintiff had failed to "allege[ ] any justifiable reliance on his part on the [alleged false representation], nor could he, as the alleged false representation was not made to him, but instead to [a third party]"); *Feingold v. Unitrin Direct*, Civ. A. No. 12-1250, 2012 WL 3866945, at *6 (E.D. Pa. Sept. 6, 2012) (dismissing negligent misrepresentation claim where plaintiff could not allege that he justifiably relied on the defendants' promises).

**Second**, plaintiffs do not identify when the alleged misrepresentations were made, who made them, or how they were communicated. As such, the allegations in the complaint cannot plausibly support plaintiffs' intentional or negligent misrepresentation claims. *See, e.g.*, *Dwyer*, 431 A.2d at 1037 (affirming lower court's decision sustaining preliminary objections to plaintiff's intentional misrepresentation claim where plaintiff did not allege what facts were misrepresented, what false information was given, nor in what way he was "tricked"); *Presbyterian Med. Ctr.*, 832 A.2d at 1073 (affirming order sustaining preliminary objections to complaint where plaintiff failed to "establish every element of its fraud claim with sufficient particularity"); *Bethpage Fed. Credit*

Case ID: 230900506
Control No.: 23096587

*Union*, 2019 WL 5303904, at \*2 (sustaining preliminary objections to fraud and negligent misrepresentation claims due to plaintiff's failure to satisfy Rule 1019(b)'s particularity requirements); *Black v. Cmty. Educ. Ctrs., Inc.*, Civ. A. No. 12-6102, 2014 WL 859313, at \*6 (E.D. Pa. Mar. 4, 2014) (finding plaintiff's claims of misrepresentation and fraud failed because she did not allege the instances of mischaracterization with specificity); *Scott v. Bimbo Bakeries, USA, Inc.*, Civ. A. No. 10-3154, 2012 WL 645905, at \*6 (E.D. Pa. Feb. 29, 2012) (dismissing negligent misrepresentation claim where plaintiffs did not "allege when these alleged misrepresentations were made, who made them, or how they were communicated").

## V. PLAINTIFFS' FAILURE TO DIFFERENTIATE CLAIMS BETWEEN ABBOTT AND MEAD JOHNSON WARRANTS DISMISSAL OF COUNTS I–V.

Plaintiffs' complaint fails to differentiate between Abbott and Mead Johnson. Rule 1019(a) of the Pennsylvania Rules of Civil Procedure provides that a complaint must set forth the material facts upon which a claim is based. Pa. R. Civ. P. 1019(a). And "even under the most liberal notice pleading requirements," that means that "a plaintiff must differentiate between defendants." *Coyne v. Holy Fam. Apartments*, Civ. A. No. 19-4583, 2020 WL 2063475, at \*4 (E.D. Pa. Apr. 29, 2020); *see also Bouchon v. Citizen Care, Inc.*, 176 A.3d 244, 260 (Pa. Super. Ct. 2017) (affirming dismissal of complaint where several paragraphs of the complaint did not differentiate between the defendants in averring the conduct and claims).

Ignoring this clear law, plaintiffs' complaint is riddled with allegations about the conduct of "Defendant Manufacturers," or "Abbott and/or Mead Johnson." *See, e.g.,* Compl. ¶¶ 1–2, 12–13, 19, 21–26, 29–30, 32–44, 46, 52, 54–59, 62, 86, 89–93, and 96–141. But the complaint does not allege any facts establishing which specific product from which specific manufacturer gave rise to plaintiffs' claims. Abbott is left to guess what role plaintiffs believe it played in the events at issue, placing a burden on Abbott that is not contemplated or condoned by Pennsylvania's fact

Case ID: 230900506
Control No.: 23096587

pleading rules. Because plaintiffs fail to distinguish between defendants in their complaint, all claims against Abbott should be dismissed, or alternatively, the paragraphs in which plaintiffs fail to differentiate between defendants should be stricken.

## VI.   PLAINTIFF-PARENT'S CLAIMS ARE TIME-BARRED AND SHOULD BE DISMISSED

Plaintiff-parent's claims are time-barred by Pennsylvania law, which sets a two-year statute of limitations on actions to recover damages for personal injury based on negligent, intentional, or otherwise tortious conduct. *See* 42 Pa. Cons. Stat. § 5524(2) & (7).

The statute of limitations on plaintiff-parent's claims began to run shortly after infant's birth date, when the infant allegedly developed NEC. Accordingly, plaintiff-parent's claims are time-barred because, although she alleges an infant birth date of December 17, 2015, and although she alleges that her infant developed NEC shortly thereafter when administered Abbott and/or Mead Johnson's products, this lawsuit was not filed September 8, 2023—nearly six years after the limitations period expired. Consequently, plaintiff-parent's claims are time-barred and must be dismissed. *See, e.g.*, *Hathi v. Krewstown Park Apartments*, 561 A.2d 1261, 1263 (Pa. Super. Ct. 1989); *Sayers v. Heritage Valley Md. Grp., Inc.*, 247 A.3d 1155, 1159-63 (Pa. Super. Ct. 2021).

Plaintiffs' invocation of the discovery rule does not save plaintiff-parents' untimely claims. For example, plaintiffs point to a 2020 Abbott article as purported evidence of concealment, in an attempt to explain their delay in filing their complaint, but the article offers them no support. *See* Compl. ¶ 31.

*First*, the complaint does not allege that plaintiffs actually relied on this Abbott article. Indeed, the complaint does not allege that plaintiffs actually read or were even aware of any specific statement made by Abbott.

24

Case ID: 230900506
Control No.: 23096587

*Second*, the cited article was published on July 22, 2020. That is years after the statute of limitations expired on these plaintiff-parent's claims, which makes it impossible for any plaintiff to have been lulled "into a false sense of security about the use of [Abbott's] products" by the article at the time of the alleged injury. *See, e.g.*, *id.* ¶ 30.

*Third*, no reasonable person could have been misled by the article. In portions of the article omitted by plaintiffs, Abbott strongly encourages the use of breastmilk with premature infants, for reasons that include protection against NEC:

> If your baby is born prematurely, understanding that mother's own breastmilk is best for your baby is key to delivering not only nutrients, but also HMOs and other immune-protective factors. And since breastmilk protects against NEC, work closely with your baby's physician and dietician to understand how to support a good breastmilk supply, so that your preterm baby gets as much breastmilk as possible.

The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (July 22, 2020). Needless to say, the actual document controls over the misleading excerpts cited in the complaint, neither of which can save plaintiff-parent's untimely claims.[5]

## VII. PLAINTIFFS' REQUESTS FOR PUNITIVE DAMAGES LACK THE REQUISITE LEGAL SUFFICIENCY AND FACTUAL SPECIFICITY AND FAIL TO PLEAD A LEGALLY SUFFICIENT BASIS FOR PUNITIVE DAMAGES

Plaintiffs' requests for punitive damages should be stricken, as their demands are both legally and factually insufficient, and fail to clear the high bar for punitive damages under

---

[5] The only other statements attributed to Abbott in the complaint are (1) allegations that Abbott's website at one point stated: "for infants who aren't breastfed . . . infant formula is the only appropriate, safe alternative to meet babies' nutritional needs" and (2) a statement concerning a singular product, NeoSure, that "[d]uring her first full year, feed her Similac Neosure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." *See, e.g.*, Compl. ¶¶ 47-48. Again, however, the complaint fails to allege that plaintiff-parent actually read or was aware of these statements, that the statements are themselves misleading, or even that any infant was fed NeoSure as opposed to something else.

Case ID: 230900506
Control No.: 23096587

Pennsylvania law. In Pennsylvania, "'[p]unitive damages' are damages other than compensatory or nominal damages awarded against a person to punish him for his outrageous conduct." *See Focht v. Rabada*, 268 A.2d 157, 159 (Pa. Super. Ct. 1970) (quoting RESTATEMENT OF TORTS § 908(1)). "As the name suggests, punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct." *Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005); *see also Phillips v. Cricket Lighters*, 883 A.2d 439, 446 (Pa. 2005) ("Punitive damages may be appropriately awarded only when the plaintiff has established that the defendant has acted in an outrageous fashion due to either the defendant's evil motive or his reckless indifference to the rights of others.").

To support a request for punitive damages, the plaintiff must sufficiently allege that "(1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Luddy*, 870 A.2d at 772. Conduct is "willful" when "the actor desired to bring about the result that followed, or at least was aware that it was substantially certain to ensue." *Evans v. Philadelphia Transp. Co.*, 212 A.2d 440, 443 (Pa. 1965). Moreover, "reckless indifference," interchangeable with "wanton" misconduct, occurs when "the actor has intentionally done an act of an unreasonable character, in disregard to a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." *McClellan v. Health Maintenance Org. of Pa.*, 604 A.2d 1053, 1061 (Pa. Super. Ct. 1992); *see also Smith v. Brown*, 423 A.2d 743, 745 (Pa. Super. Ct. 1980) (quoting Evans, 212 A.2d at 443).

To begin, plaintiffs' requests for punitive damages with respect to Count III (negligence) and Count V (negligent misrepresentation) are wholly improper. As Pennsylvania law makes clear, "[p]unitive damages may not be awarded for misconduct which constitutes ordinary

Case ID: 230900506
Control No.: 23095587

negligence . . . ." *See Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985) (citing RESTATEMENT OF TORTS (SECOND) § 908, comment e)). Here, by plaintiffs' own admission, Counts III and V sound plainly in ordinary negligence, and the accompanying demands for punitive damages are thus legally insufficient. *See* Compl. ¶ 117 ("Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and Plaintiff Parent.");*id.* ¶ 137 ("Abbott and Mead were negligent or careless in not determining those representations to be false.").

Plaintiffs' requests for punitive damages in each of Counts I through V also fail because they are pleaded with insufficient specificity. Plaintiffs make no effort to provide factual support for their requests for punitive damages against Abbott. Instead, plaintiffs baldly and repeatedly demand judgment "[f]or punitive damages . . . resulting from the Defendant' Manufacturers' oppressive, fraudulent, and/or malicious conduct . . . ." *See* Compl. at Count I (prayer for relief); *id.* at Count II (prayer for relief); *id.* at Count III (prayer for relief); *id.* at Count VI (prayer for relief); *id.* at Count V (prayer for relief). Nowhere do plaintiffs support these bald assertions of "malicious" conduct with any allegations of fact.

At most, plaintiffs allege that Abbott "knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC," *see, e.g.*, Compl. ¶ 99, but such allegations are woefully insufficient. Plaintiffs cannot merely incant the word "knowledge" and make it so; rather, plaintiffs must provide factual support for their bald assertions. *See Whiting v. Nationwide Ins. Co.*, 9 Pa. D. & C.3d 789, 792 (1979) (dismissing

Case ID: 230900506
Control No.: 23096587

plaintiffs' punitive damages request where "factual averments in support of . . . conclusory allegations are totally lacking"). Plaintiffs fail to do so here.

For all these reasons, Abbott respectfully requests that this Court strike plaintiffs' requests for punitive damages as wholly conclusory, lacking the requisite factual specificity, and legally insufficient.

## CONCLUSION

For the foregoing reasons, Abbott's preliminary objections to plaintiffs' complaint should be sustained, and plaintiffs' claims against Abbott should be dismissed.

Dated: November 6, 2023                    Respectfully Submitted:


/s/ Sean P. Fahey
Sean P. Fahey (PA Bar No. 73305)
**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

/s/ Ronni E. Fuchs
Ronni E. Fuchs (PA Bar No. 65561)
**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

/s/ Joseph E. O'Neil
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
**CAMPBELL CONROY & O'NEIL, P.C.**
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.6388
JONeil@CampbellTrialLawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

/s/ Marques Hillman Richeson
Marques Hillman Richeson (*pro hac vice
forthcoming*)
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

Case ID: 230900506
Control No.: 23096587

s/s/ *Jennifer B. Flannery*
Jennifer B. Flannery (PA Bar No. 74546)
**JONES DAY**
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
404.581.8008
jbflannery@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

29

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I will serve a true and correct copy of the foregoing in accordance with Pa. R. Civ. P. 440 on all parties not served electronically. All other parties will be electronically served by the court in accordance with Pa. R. Civ. P. 205.4(g).

Dated: November 6, 2023          */s/ Ronni E. Fuchs*
                                 Ronni E. Fuchs

### CERTIFICATE OF COMPLIANCE

I, Ronni E. Fuchs, hereby certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts, that require filing confidential information and documents differently than non-confidential information and documents.

/s/ Ronni E. Fuchs

# EXHIBIT A

Case ID: 230900506
Control No.: 23096587

**KLINE & SPECTER, P.C.**
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    Philip Pasquarello, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 320927/
326263
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.Crawford@klinespecter.com
Timothy.Burke@klinespecter.com
Philip.Pasquarello@klinespecter.com



*Filed and Attested by the*
*Office of Judicial Records*
*16 OCT 2023 06:30 pm*
*A. STAMATO*

| | |
|---|---|
| STEPHANIE WILKERSON, on her own behalf and as Parent and Natural Guardian of M.F., a Minor,<br><br>*Plaintiff*,<br><br>   v.<br><br>MEAD JOHNSON & COMPANY, LLC<br>ILLINOIS CORPORATION SERVICE CO.<br>801 ADLAI STEVENSON DRIVE<br>SPRINGFIELD, IL 62702<br><br>MEAD JOHNSON NUTRITION COMPANY<br>ILLINOIS CORPORATION SERVICE CO.<br>801 ADLAI STEVENSON DRIVE<br>SPRINGFIELD, IL 62702<br><br>ABBOTT LABORATORIES<br>CT CORPORATION SYSTEM<br>208 SO. LASALLE STREET, SUITE 814<br>CHICAGO, IL 60604<br><br>PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM D/B/A PENNSYLVANIA HOSPITAL<br>3400 CIVIC CENTER BLVD<br>PHILADELPHIA, PA 19104<br><br>THE TRUSTEES OF THE UNIVERSITY OF | **IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY**<br><br>**CIVIL TRIAL DIVISION**<br><br>**SEPTEMBER TERM 2023 NO. 0730** |

Case ID: 230900730
Control No.: 23096587

PENNSYLVANIA d/b/a PENN MEDICINE  :
133 SOUTH 36TH STREET :
    PHILADELPHIA, PA 19104 :
            *Defendants.* :
             :

# COMPLAINT IN CIVIL ACTION
## NOTICE TO DEFEND

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

PHILADELPHIA BAR ASSOCIATION
LAWYER REFERRAL AND INFORMATION SERVICE
ONE READING CENTER
PHILADELPHIA, PA 19107
TELEPHONE: (215) 238-1701 | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas las páginas siguientes, usted tiene viente (20) dias de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puese perder dinero o sus propiedades u ostros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO IMMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICO, VAYA EN PERSONA O LLAME POR TELEPHONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

ASOCIACION DE LICENCIADOS DE FILADELFIA
Servicio De Referencia E Información Legal
One Reading Center
Filadelfia, Pennsylvania 19107
Telephono: (215) 238-1701 |

**KLINE & SPECTER, P.C.**
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    Philip Pasquarello, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 320927/
326263
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.Crawford@klinespecter.com
Timothy.Burke@klinespecter.com
Philip.Pasquarello@klinespecter.com

| | |
|---|---|
| STEPHANIE WILKERSON, on her own behalf and as Parent and Natural Guardian of M.F., a Minor,<br><br>                     *Plaintiff*,<br><br>     v.<br><br>MEAD JOHNSON & COMPANY, LLC<br>ILLINOIS CORPORATION SERVICE CO.<br>801 ADLAI STEVENSON DRIVE<br>SPRINGFIELD, IL 62702<br><br>MEAD JOHNSON NUTRITION COMPANY<br>ILLINOIS CORPORATION SERVICE CO.<br>801 ADLAI STEVENSON DRIVE<br>SPRINGFIELD, IL 62702<br><br>ABBOTT LABORATORIES<br>CT CORPORATION SYSTEM<br>208 SO. LASALLE STREET, SUITE 814<br>CHICAGO, IL 60604<br><br>PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM D/B/A PENNSYLVANIA HOSPITAL<br>3400 CIVIC CENTER BLVD<br>PHILADELPHIA, PA 19104 | **IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY**<br><br>**CIVIL TRIAL DIVISION**<br><br>**SEPTEMBER TERM 2023<br>NO. 0730** |

1

Case ID: 230900730
Control No.: 23096587

THE TRUSTEES OF THE UNIVERSITY OF          :
PENNSYLVANIA d/b/a PENN MEDICINE           :
133 SOUTH 36TH STREET                      :
     PHILADELPHIA, PA 19104          :
                *Defendants.*

## COMPLAINT

Plaintiff brings this Complaint and Demand for Jury Trial (the "Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania d/b/a Penn Medicine and Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively "Penn Medicine" or "Pennsylvania Hospital" or "Defendant Hospital"), together "Defendants." Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

### I. INTRODUCTION

1. This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Pennsylvania Hospital. Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner. This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products. As a result, the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2. Plaintiff brings these causes of action against Defendants to recover for injuries that are the

2

Case ID: 230900500
Control No.: 23096587

direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infant at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II.      PARTIES

3.      Plaintiff Stephanie Wilkerson is a natural adult person and a resident of Pennsylvania.  Ms. Wilkerson is the parent and natural guardian of M.F., a minor.  Ms. Wilkerson's address is 4406 Overbrook Avenue, Philadelphia, Pennsylvania 19131.

4.      Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware. Its principal place of business is Illinois.  Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company.  Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.      Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois.  Its principal place of business is in Illinois.  Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

6.      Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania.  Its principal place of business is Philadelphia, Pennsylvania. Pennsylvania Hospital is a registered name of The Pennsylvania

3

Hospital of the University of Pennsylvania Health System. The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of Pennsylvania.

7.     Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania. Its principal place of business is Philadelphia, Pennsylvania. Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

### III.     JURISDICTION AND VENUE

8.     This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931. Defendants conduct authorized business in the Commonwealth of Pennsylvania. They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9.     Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

10.     This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

### IV.     FACTUAL ALLEGATIONS

Case ID: 230900506
Case ID: 230900587
Control No.: 23096587
Control No.: 23096581

*M.F.'s NEC Diagnosis*

11.     M.F. was born prematurely at Pennsylvania Hospital in Philadelphia, Pennsylvania on December 17, 2015.

12.     At birth, M.F.'s gestational age was approximately 32 weeks and he weighed 1559 grams. Upon information and belief, M.F. was fed Similac and/or Enfamil cow's milk-based products by staff at Pennsylvania Hospital after his birth.

13.     Upon information and belief, M.F. developed NEC after ingesting Defendant Manufacturers' products.

14.     M.F.'s diagnosis of NEC occurred during his course of treatment at Defendant Hospital's NICU. M.F. suffered injuries, including but not limited to, a diagnosis of NEC, surgical treatment, growth issues, neurological injuries, short bowel syndrome, and gastrointestinal issues, and he continues to suffer other long-term health effects.

*Cow's Milk-Based Feeding Products Are Known to Cause*
*NEC*

15.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.  NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.  Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.  Up to 30 percent of NEC-diagnosed infants die from the disease.

16.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.  Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

Case ID: 230900506
Control No.: 23096587

*Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist*

17.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition.   For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide.  Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

18.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.

19.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the breast milk they could otherwise receive.   This displacement only increases infants' vulnerability to NEC.

20.     Breast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

21.     At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

22.     Despite the scientific consensus that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings.    Instead, they have continued to sell their unreasonably dangerous products.    In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge.  And, in fact,

6

the Defendant Manufacturers offer contracts to hospitals—which the hospitals accept—that actually *prevent* the health care providers from offering alternative products—even safer ones— on pain of risking the hospital's advantageous formula pricing strategy.

### *Ms. Wilkerson Discovers Her Claim*

23.     Because of the Defendants' concealment and misrepresentations, described more fully herein, Ms. Wilkerson did not know, and had no reason to know or suspect, that M.F.'s NEC could have been caused by the Defendant Manufacturers' products.

24.     Once Ms. Wilkerson learned of the direct connection between the Defendant Manufacturers' products and NEC , she contacted an attorney thereafter.

### *Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and Would Not Have Revealed a Factual Basis Earlier Because Defendants Hid the Cause of NEC from Ms. Wilkerson*

25.     Despite exercising reasonable diligence, Ms. Wilkerson was unable to have made the discovery earlier via a reasonable investigation because the Defendants in this litigation concealed the wrongful cause of M.F.'s injuries.

26.     Not one person at Penn Medicine informed Ms. Wilkerson that the Defendant Manufacturers' formula products could have caused M.F.'s injuries.  Penn Medicine's response at the time did not give Ms. Wilkrson any reason to suspect any wrongdoing on the part of the Defendants.

27.     Ms. Wilkerson is a layperson with no medical background or training that would have given her any reason to doubt the response she received from Penn Medicine's health care providers at the time

28.     Given that Penn Medicine's health care providers were in charge of the care of her newborn infant, Ms. Wilkerson had no reason to doubt their word.

Case ID: 230900500
Control No.: 23096587

29.     Additionally, the risk of necrotizing enterocolitis was not disclosed on the labeling or packaging of *any* of the Defendant Manufacturers' products.

30.     What is more, necrotizing enterocolitis is a disease that can occur in children who are *not* fed the Defendant Manufacturers' products, and the Defendant Manufacturers have worked to mislead parents into a false sense of security about the use of those products.  Publicly disseminated materials from each Defendant Manufacturer disguise the role their products play in causing the disease—and affirmatively say, even today, that their products are safe and do not cause NEC. In fact, some publicly disseminated materials from the formula manufacturers even suggest that formula may help *reduce* the risk of this terrible and potentially fatal disease.

31.     For example, Abbott's website stays that "[t]he specific cause of NEC is unknown, but it's most often seen in very low birth weight premature babies," and that "about 10% of babies who are born prematurely develop NEC."  The website suggests that "new preliminary studies" suggest for the first time that "NEC prevention may . . . be possible" with the use of human milk oligosaccharides to "dramatically curb intestinal inflammation" and reduce the risk of NEC. Abbott states that these human milk oligosaccharides are found in "certain Similac formulas" although they are "not currently available in Similac's premature infant formulas."[1]  Likewise, the website for Mead Johnson's products states that necrotizing enterocolitis is "one of the most common and serious intestinal disease[s] among premature babies."  And it deflects responsibility from Mead Johnson's products: "Necrotizing enterocolitis happens when tissue in the small or large intestine is injured or inflamed."[2]

---

[1] The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (last visited July 28, 2023).

[2] Special Feeding Concerns for Preemies, https://www.enfamil.com/articles/special-feeding-concerns-for-preemies/ (last visited July 29, 2023).

Case ID: 2309000500
Control No.: 23096581

32.     Because of the misleading information distributed by the Defendant Manufacturers, as further detailed herein, any research conducted by Ms. Wilkerson immediately after M.F.'s diagnosis, or at any time prior to seeing an advertisement, would not have led a reasonable person to suspect that the Defendant Manufacturers' products could have caused M.F.'s injuries.

33.     Ms. Wilkerson also did not know, and had no reason to know or suspect, that Penn Medicine breached its duty of care by distributing the Defendant Manufacturers' products to M.F. Not only was Ms. Wilkerson unaware that the Defendant Manufacturers' products caused M.F.'s injuries and death, but the Defendant Manufacturers' distribution agreements with Penn Medicine—which allowed Penn Medicine to secure sweetheart deals for otherwise expensive premature infant formula in exchange for product placement and access to the hospital staff—were also not public or knowable to Ms. Wilkerson, nor could any reasonable investigation outside of litigation have uncovered the terms of those agreements.

### *Despite Exercising Reasonable Diligence, the Defendants' Fraudulently Concealed the Risks of NEC from Defendant Manufacturers' Products to Divert, Prevent, and Mislead Plaintiff Regarding the Cause of Her Child's NEC Diagnosis*

34.     In addition to the averments above, the Defendants have acted in concert to fraudulently convey false and misleading information concerning the risk of NEC, and potentially death, caused by Defendant Manufacturers' preterm infant formula products.

35.     The Defendants' actions as set forth herein constitute knowing misrepresentation, omission, suppression, and concealment of material facts, made with the intent that Plaintiff would rely upon such concealment, suppression, or omission, in connection with the use of Defendants' preterm infant products.

36.     Plaintiff did not know, and could not learn, the truth concerning the uses, risks and benefits of Defendant Manufacturers' preterm infant products due to Defendants' deliberate

Case ID: 230900500
Case ID: 230900500
Control No.: 23096587
Control No.: 23096587

misrepresentations and concealment, suppression and omission of material facts and important information regarding the risks of NEC, and potentially death, from the products.

37.     Moreover, Defendant Hospital further participated in the intentional concealment—on information and belief, it allowed the Defendant Manufacturers' sales representatives into its hospital to provide samples and free products that did not warn of their serious dangers, and to provide "education" to its NICU staff that was incomplete as to the true risks of feeding their patients the Defendant Manufacturers' products.

38.     Additionally, Defendant Hospital failed to inform Ms. Wilkerson that the Defendant Manufacturers' products caused Plaintiff's child's NEC.

39.     Defendant Hospital was aware that the Defendant Manufacturers' products caused NEC in premature infants. Defendant Hospital was also aware that the Defendant Manufacturers did not provide warnings on their products. However, Defendant Hospital did not warn Ms. Wilkerson of the risks of the products. Instead, and notwithstanding the sweetheart deal Defendant Hospital agreed to in exchange for preterm infant formula at little to no cost, Defendant Hospital repeatedly informed Ms. Wilkerson that it would do everything it could possibly do to keep her infant safe. Though this was clearly not true given the known risks of preterm formula for babies like M.F., it was enough for Ms. Wilkerson to trust that Defendant Hospital was providing preterm formula in the best interest of her child.

40.     Defendants' affirmative acts of fraud and concealment, as averred herein, diverted, prevented, and/or mislead Plaintiff from discovering the medical cause of her child's NEC diagnosis.

10

41.    Plaintiff was not put on inquiry notice until she learned of the direct connection between the Defendant Manufacturers' products and NEC at a later time and contacted an attorney thereafter.

***The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products***

42.    Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

43.    Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

44.    Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message.

45.    Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

11

Case ID: 230900500
Control No.: 23096587

46.     While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears—that the nutrition they are supplying to their child will not provide the best chance of survival—while wholly failing to warn that their products come with a significantly increased risk of NEC.

47.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

48.     Abbott markets and sells multiple products specifically targeting preterm and low-birthweight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC. At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

12

Case ID: 230900500
Control No.: 23096587

49.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

50.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

51.     Formula manufacturers have long used their relationships with hospitals and the discharge

13

process to encourage parents to substitute formula for breast milk. They offer free or reduced-cost formula to hospitals for use with infants before discharge. And they offer free formula, coupons, and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

52. Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers. The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

53. Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products. The packaging appears as:

14

Case ID: 230900506
Control No.: 23096587




54.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice.   This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

55.     The Defendant Manufacturers have also designed powerful marketing campaigns to both the general public and health care providers at hospitals like Pennsylvania Hospital.   The Defendant Manufacturers know that sales made to hospitals are key drivers of brand loyalty and

15

Case ID: 230900506
Control No.: 23096587

thus are a key opportunity to drive better downstream business—*i.e.*, retail purchases by parents after they have left the hospital. On information and belief, the Defendant Manufacturers know that the products used in a hospital's NICU are related to getting and keeping the overall hospital contracts. And the Defendant Manufacturers know that just like any celebrity endorsement, when the mothers of newborn infants see medical professionals using a certain brand, the mothers are more likely to continue to purchase that same brand after discharge. The Defendant Manufacturers are thus heavily motivated to ensure that NICU departments are using their products.

56. Abbott and Mead Johnson focus their sales teams and training heavily on hospital NICU departments. They train their sales representatives how to increase the number of babies on their formula and they emphasize the need to be the dominant formula manufacturer in the NICU so they can own that profitable ground and secure a great return on their substantial investment in NICU formula and other products.

57. To leverage hospitals' NICUs and secure babies in the hospital and at retail, the Manufacturer Defendants pull out all the stops to convince hospitals, including Defendant Hospital, to purchase their products. For example: Abbott and Mead Johnson provide samples of their products to hospitals for free.

58. On information and belief, to get the hospitals on board with supplying their formula for premature infants, Abbott and Mead Johnson work with hospitals to secure contracts that have special pricing discounts if a certain level of the formula-fed babies in the hospital receive just that one manufacturer's products; similar to a restaurant being a Coke or Pepsi restaurant. And notwithstanding the increased risk of the Defendant Manufacturers' products for the hospitals' most fragile patients—the preterm infants—the decision makers at these hospitals seek out these types of contracts to better the hospitals' own bottom lines.

16

59.     On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective company's own formula products to give to the preterm infants.  The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

60.     Prior to M.F.'s birth, Abbott sent sales representatives to Defendant Hospital.  Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Abbott's products were safe to give to preterm infants like M.F.  Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants.

61.     Prior to M.F.'s birth, Mead Johnson sent sales representatives to Defendant Hospital. Those sales representatives provided information about Mead Johnson's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Mead Johnson's products were safe to give to preterm infants like M.F.  Mead Johnson maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Mead Johnson's products could cause NEC in preterm infants.

Case ID: 2309005066
Control No.: 23096587

62.     Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like M.F.

### The Defendant Manufacturers' Inadequate Warnings

63.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants.  Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

64.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

65.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

66.     Mead cites no medical literature or research to guide the use of its products.

67.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk.  Mead likewise did not provide instructions or guidance for how to avoid NEC.

68.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

Case ID: 230900500
Control No.: 23096587

69.     Mead Johnson failed to provide, and continues to fail to provide, a full accounting of the risk of NEC as documented by underrepresenting and misrepresenting the risk to the public and the medical community.

70.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.  Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

71.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

72.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

73.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

74.     Despite knowing of studies documenting an increased risk of NEC from its products, Abbott did not act to make parents or the medical community aware of those risks, and instead took steps to conceal or prevent those risks from becoming public.  Despite knowing that its

Case ID: 230900506
Control No.: 23096587

products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### *Penn Medicine's Failure to Warn*

86.     On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  It knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition.  However, instead of warning of the dangers, or supplying breast milk-based feeding products to preterm infants like the Injured Infant, Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning.

87.     To that end, Penn Medicine has participated in studies designed to increase the use of donor milk while, at the same time, reducing formula feeding in neonates.    The University of Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research into the risks associated with feeding formula to premature infants.   It recently partnered with the National Institute of Nursing Research to publish clinical determinations based on its experience "changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral feed tolerance and more rapid weaning from intravenous nutrition. . . .

Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the incidence and severity of . . . necrotizing enterocolitis (NEC)."

88.     Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration.

Case ID: 230900506
Control No.: 23096587

The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

89.     Finally, medical providers and staff at Penn Medicine have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition.   In an internal newsletter from 2012 touting donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet, quoting a staff lactation consultant:

> Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

90.     These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

91.     Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities.   As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries.   This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

21

92.     Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers.  On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free and/or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff.  These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff.  This arrangement dovetails with the Defendant Manufacturers' own marketing strategies" and use of salespersons.

### *Safer Alternative Designs*

93.     The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants.   The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

94.     Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk.  This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

95.     On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

Case ID: 230900506
Control No.: 23096587

**CAUSES OF ACTION**
**COUNT I:  STRICT LIABILITY FOR DESIGN DEFECT**
**(Against Abbott and Mead)**

96.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

97.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

98.    Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

99.    Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations.   Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

100.    The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products.  The risks of feeding those products to the Injured Infant outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

101.    Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

102.    Abbott's and Mead's products contained cow's milk at the time they left the manufacturing

Case ID: 230900506
Control No.: 23006587

facility.

103.    Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

104.    Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

105.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational

24

Case ID: 230900500
Control No.: 23096587

limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.     For interest as permitted by law;

f.     For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.     For such other and further relief as the Court deems proper.

## COUNT II:  STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott and Mead)

106.   Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

107.   Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

108.   Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses.   By designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death.   The failure to warn makes the products at issue in this litigation unreasonably dangerous.

109.        Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured

Case ID: 230900506
Control No.: 23096587

Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks.   Among other risks, the Defendant Manufacturers:

   a.    Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

   b.    Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

   c.    Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

   d.    "Black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

   e.    Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

   f.    Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

   g.    Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

26

       h.     Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

110.    Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

111.    As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

112.    The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products. Had the Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

113.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

       a.     For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

       b.     For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-

Case ID: 230900506
Control No.: 23096587

economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.     For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.     For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.     For interest as permitted by law;

f.     For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.     For such other and further relief as the Court deems proper.

## COUNT III: NEGLIGENCE
### (Against Abbott and Mead)

114.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

115.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

116.    At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

28

Case ID: 230900706
Control No.: 23096587

117.    Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

118.    Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

      a.    Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

      b.    Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

      c.    Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

      d.    Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

      e.    Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

      f.    Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided

29

Case ID: 230900506

Control No.: 23096587

information necessary to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g.  Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h.  Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

119.    In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

120.    As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

121.    Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

122.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

Case ID: 230900506
Control No.: 23096587

a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

**COUNT IV: INTENTIONAL MISREPRESENTATION**
**(Against Abbott and Mead)**

123.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

124.  At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

125.  Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this

31

litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

126.    Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

127.    Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

   a.  That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

   b.  That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

   c.  That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

   d.  That cow's milk-based products were safe for premature infants; and/or

   e.  That cow's milk-based products were necessary for optimum growth; and/or

   f.  That cow's milk-based products were similar or equivalent to breast milk; and/or

Case ID: 230900506
Control No.: 23096587

      g.     That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

      h.     That their products were based on up-to-date science, which made them safe for premature infants; and/or

      i.      Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

128.    Abbott and Mead had actual knowledge, or, at a minimum, a reckless indifference, to whether the aforementioned misrepresentations were false. The Defendant Manufacturers' misrepresentations were intended to, and in fact did, mislead physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their infant products to babies, including the Injured Infant.

129.    The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them. The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

130.    As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

131.    As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss

Case ID: 230900506
Control No.: 23096587

of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

### COUNT V:  NEGLIGENT MISREPRESENTATIONS
### (Against Abbott and Mead)

132. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth

Case ID: 230900700
Control No.: 23096587

herein.

133.    At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

134.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

135.    In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

136.    Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time the Injured Infant was fed their products:

> a.      That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or
>
> b.      That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or
>
> c.      That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

Case ID: 230900506
Control No.: 23096587

d.     That cow's milk-based products were safe for premature infants; and/or

e.     That cow's milk-based products were necessary for optimum growth; and/or

f.     That cow's milk-based products were similar or equivalent to breast milk; and/or

g.     That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.     That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.     Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

137.    Abbott and Mead were negligent or careless in not determining those representations to be false.

138.    The Defendant Manufacturers' misrepresentations were intended to and did in fact induce physicians and medical staff, including the Injured Infant's physicians and medical staff, to provide their products to babies, including the Injured Infant.

139.    The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging. Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

36

140.        As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

141.        As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.        For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.        For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.        For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.        For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.        For interest as permitted by law;

f.        For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

Case ID: 230900500
Control No.: 23095587

g.      For such other and further relief as the Court deems proper.

## COUNT VI:  FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

142.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

143.    Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

144.    At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

145.    Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their treatment of the Injured Infant.

146.    Penn Medicine and Pennsylvania Hospital negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

147.    Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.   The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals

Case ID: 230900506
Control No.: 23096587

and medical staff.   These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

148.   Penn Medicine and Pennsylvania Hospital also knowingly, and intentionally, allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

149.   Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

150.   Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

    a.    Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    b.    Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

    c.    Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

Case ID: 230900506
Control No.: 23096587

d.      Failing to provide its healthcare professionals and medical staff with the well- researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

e.      Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

f.      Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

g.      Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

151.    Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

152.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

153.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably

40

Case ID: 230900506
Control No.: 23096587

dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

154.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

155.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.    Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine's conduct;

c.    For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's

41

Case ID: 230900500
Control No.: 23096587

oppressive, outrageous, reckless, and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.    For such other and further relief as the Court deems proper.

### COUNT VII: CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Penn Medicine and Pennsylvania Hospital)

156.    Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

157.    At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff.   Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant.   Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

158.    Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply, distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

159.    At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

42

160.    Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital.    The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff.    These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

161.    Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

162.    Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

163.    Penn Medicine and Pennsylvania Hospital  knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

164.    Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

Case ID: 230900506
Control No.: 23096587

a.   Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted the use of cow's milk-based products for feeding premature babies; and/or

b.   Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

c.   Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d.   Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

e.   Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well- established studies that link cow's milk-based products to NEC and death in premature infants; and/or

f.   Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

44

g.    Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants; and/or

h.    Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

165.    A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

166.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

167.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of

45

Case ID: 230900500
Control No.: 23096587

developing NEC and significant injuries.

168.     As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent, reckless, and outrageous conduct the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

169.     In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including the Injured Infant.

170.     Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

171.     Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly, and outrageously breached its duty by:

a.     Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

b.     Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

c.     Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d.     Failing to oversee its healthcare professionals and medical staff to restrict

46

Case ID: 230900500
Control No.: 23096587

their feeding of cow's milk-based products to premature babies; and/or

e.     Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

f.     Failing to provide its healthcare professionals and medical staff with the well- researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g.     Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method reasonably calculated/expected to reach the parents of newborns; and/or

h.     Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i.     Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

172.   A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of

Case ID: 230900506
Control No.: 23096581

the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

173.    A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

174.    Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

175.    As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

176.    As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.    His life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a.    For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.    For damages for past, present, and future emotional distress, loss of

48

Case ID: 230900706
Control No.: 23096587

enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

c.   For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.   For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.   For interest as permitted by law;

f.   For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.   For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

177.   Plaintiff hereby demands a jury trial for all claims triable.

Dated: October 16, 2023

Respectfully submitted,

**KLINE & SPECTER, P.C.**

By:   /s/ Timothy A. Burke
Tobias L. Millrood, Esq.
Elizabeth A. Crawford, Esq.
Timothy A. Burke, Esq.
Philip Pasquarello, Esq.

49

CERTIFICATE OF SERVICE

I hereby certify that on October 16, 2023, I electronically filed the foregoing document with the Clerk of the Court using Electronic Efiling and that the foregoing document is being served on all counsel of record or parties registered to receive Electronic Filing.


/s/ Timothy A. Burke
Timothy A. Burke, Esq.

50

Case ID: 230900706
Control No.: 23096587

FILED
04 DEC 2023 09:39 pm
Civil Administration
J. BOEBS

# IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
### TRIAL DIVISION – CIVIL

| | |
|---|---|
| STEPHANIE WILKERSON, on her own behalf and as Parent and Natural Guardian of M.F., a Minor, : *Plaintiff,* | : : SEPTEMBER TERM, 2023 : No. 230900730 : : |
| v. : | |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL, *and* THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE. *Defendants.* | : : : : : : : : : |

## ABBOTT LABORATORIES' REPLY IN SUPPORT OF
## PRELIMINARY OBJECTIONS TO PLAINTIFFS COMPLAINT

Plaintiffs' response only confirms that Abbott's preliminary objections should be sustained, and that the claims against Abbott should be dismissed.[1] Rather than addressing the obvious pleading defects plaintiffs seek to justify them. Plaintiffs fail to identify the specific product that allegedly caused their infant's injuries, fail to differentiate between the product manufacturers, and fail to allege facts showing that plaintiffs saw, heard, or were otherwise exposed to purportedly false representations made by Abbott about its products, let alone that plaintiffs relied upon any such representations. Plaintiffs' response brief in no way justifies their failure to plead the essential elements of their causes of action, nor can plaintiff-parent save her

---

[1] Plaintiffs make a number of flawed claims and arguments in their response brief, all of which Abbott denies. For purposes of brevity, however, Abbott focuses this reply on a few dispositive issues, as well as claims and arguments that plaintiffs raised for the very first time. Abbott hereby incorporates and preserves all arguments made in its opening brief, including that plaintiffs failed to plead facts sufficient to show an unreasonably dangerous defect, and failed to plead a legally sufficient basis for punitive damages.

untimely claims by invoking the term "negligent infliction of emotional distress" for the very first time in plaintiffs' opposition. For these reasons, all of plaintiffs' claims against Abbott should be dismissed.

**I.    Plaintiffs' Strict Liability and Negligence Claims (Count I-III) Should Be Dismissed For Failure to Identify the Specific Product That Allegedly Caused Infant's Injuries**

Plaintiffs do not deny that they must identify the specific product that caused infant's injuries under Pennsylvania law. Nor could they. Pennsylvania courts have uniformly upheld the product identification requirement, confirming that to state a products liability claim, a plaintiff must allege that a *particular product* of a *particular defendant manufacturer* caused their injuries. *See Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 968–69 (1985) (holding that plaintiff's failure to identify the offending product was "a fatal deficiency to [strict liability] claim"); *Mellon v. Barre-Nat'l Drug Co.*, 636 A.2d 187, 191 (Pa. Super. Ct. 1993) (holding a defendant must be identified as the manufacturer, distributor, or seller of the offending product before the injuries suffered by the plaintiff may be found to be proximately caused by some negligent act or omission of the defendant).

During a status conference in July 2023 involving other NEC cases, which plaintiffs' counsel attended, the court recognized that the sort of "and/or" pleading plaintiffs engage in here amounted to a failure to adequately identify the products administered to their infants.  Despite having the benefit of the court's guidance on this point, plaintiff made no attempt to plead which product was administered to her infant.

Instead, plaintiffs allege that their infants were administered "Similac and/or Enfamil" products. *See* Compl. ¶ 12. These allegations are insufficient. As plaintiffs themselves recognize, "Similac" and "Enfamil" are the brand names used by Abbott and Mead Johnson to market and sell *multiple* preterm infant nutrition products. *See* Compl. ¶¶ 4-5, 48-49. In fact, these are brands

2

that apply to a large category of preterm and term nutrition products. Because plaintiffs fail to specifically allege which of the many products sold under the "Similac" and "Enfamil" brand names were administered to their infant, their strict liability and negligence claims against Abbott fail for lack of product identification. *See Klein v. Council of Chem. Assocs.*, 587 F. Supp. 213, 221 (E.D. Pa. 1984) (dismissing strict liability claim where plaintiffs did not identify the specific product sold or distributed by the defendants that caused the plaintiffs' harm).

Plaintiffs contend in their response brief that a plaintiff may be somehow excused from satisfying Pennsylvania's product identification requirement where future discovery might lead a plaintiff to this information. This is a misreading of Pennsylvania law. As courts have made clear, plaintiffs cannot escape their obligation to identify the specific product from the specific manufacturer that allegedly caused harm by mere pronouncements of their future "inten[t] to conduct extensive industry-wide discovery." *Klein*, 587 F. Supp. at 221 (holding that plaintiffs cannot rely on theories of alternative liability or joint and several liability to excuse them from identifying the specific product they claim caused their injuries); *see also* Abbott's Preliminary Objections at 8-11. This is particularly true in instances involving separate manufacturers, one of whom may not be a proper defendant. *See* Section III, infra. And the present "inability of plaintiffs to name specific products" is plaintiffs' own fault—a result of "plaintiffs' failure to investigate." *Klein*, 587 F. Supp. at 222

There is no excuse for this critical pleading failure. A "plaintiff is not excused from pleading the facts necessary to sustain [her] cause of action on the ground that the facts were known to the defendant and not to the plaintiff," particularly where, as is the case here, plaintiff has not availed herself of available discovery. *Gross v. United Engineers & Constructors Inc.*, 302 A.2d 370, 372 (1973) (affirming the trial court's dismissal for want of specificity in pleading where it

Case ID: 230900506
Control No.: 23096587

found that plaintiff failed to pursue available discovery or amend the complaint). Because plaintiffs do not—and cannot—provide any principled justification for their failure to identify the specific product that allegedly caused harm, plaintiffs' strict liability and negligence claims should be dismissed.

## II. Plaintiffs' Intentional and Negligent Misrepresentation Claims (Counts IV–V) Should Be Dismissed For Failure to Plead with Particularity

Plaintiffs' misrepresentation claims likewise warrant dismissal because plaintiffs have failed to plead specific facts supporting such fraud-based claims. Despite plaintiffs' counsel having the benefit of hearing the concerns the court expressed at a July conference in other NEC cases, plaintiffs fail to allege with any specificity that they saw or heard any Abbott representation, let alone a specific misrepresentation. Nor do plaintiffs allege any facts to support justifiable reliance on any purported statement by Abbott.

While plaintiffs generally allege that Abbott representatives did not warn hospital defendant's staff of the risk of NEC, *see* Pl.'s Memo. of Law at 9 (citing Compl. ¶¶ 60-62, 72), such generalized allegations do not come anywhere close to satisfying Pennsylvania's heightened pleading requirements for fraud. *See* Pa. R. Civ. P. 1019(b). Tellingly, plaintiffs cannot identify any actual statement made by any particular Abbott representative to any particular hospital staff member—and any such statement would not have been made to plaintiffs in any event. *See Feudale v. Aqua Pa., Inc.*, 122 A.3d 462, 466 n.5 (Pa. Commw. Ct. 2015) (concluding that plaintiff failed to "allege[ ] any justifiable reliance on his part on the [alleged false representation], nor could he, as the alleged false representation was not made to him, but instead to [a third party]").

Indeed, plaintiffs have not alleged that Abbott made any representations directly to them, or that they read, saw, heard, or were otherwise exposed to any specific product label or any other specific representation from Abbott before their infant was administered Abbott's products. *See*

4

Case ID: 230900506
Control No.: 23096587

*Youndt v. First Nat'l Bank*, 868 A.2d 539, 545 (Pa. Super. Ct. 2005) (holding, "at the very least, a plaintiff must set forth the exact statements or actions plaintiff alleges constitute the fraudulent misrepresentations"). Further, even if alleged misrepresentations to hospitals could provide the basis for a cognizable claim (they do not), plaintiffs have not alleged with specificity when these statements were made, who made them, to whom, and how they were communicated. These factual deficiencies are fatal to plaintiffs' misrepresentation claims.

## III. Plaintiffs' Claims Should Be Dismissed For Failure to Differentiate Between Abbott and Mead Johnson

Plaintiffs concede that their complaint fails to differentiate between Abbott and Mead Johnson. *See* Pl.'s Memo. of Law at 10 ("Plaintiffs' Complaints do often refer to both Abbott and Mead throughout their complaint in tandem"). But, plaintiffs contend that they are not required to differentiate their claims because their complaint alleges that Abbott and Mead Johnson "engaged in nearly identical conduct." *Id.* In making this argument, plaintiffs wholly misconstrue Pennsylvania law.

Pursuant to Rule 1020(a), plaintiffs are required to plead distinct, differentiated, and separate causes of action against defendants who, as here, are not jointly and severally liable. *See Bouchon v. Citizen Care, Inc.*, 176 A.3d 244, 260–61 (2017).[2] Because Abbott and Mead Johnson are direct competitors who manufacture different products at different locations, using different formulations and different ingredients, and market their products differently, plaintiffs have no basis for asserting joint and several liability as a matter of law. *See* Abbott's Preliminary

---

[2] *See also Gen. State Auth. v. Lawrie & Green*, 356 A.2d 851, 854 (1976) (holding that, although the plaintiff's allegations made clear that the form of action may be identical against both defendants, Rule 1020(a) required dismissal because the plaintiff relied upon separate and distinct conduct to support their respective causes of action); *Bassaro v. de Levie*, 236 A.3d 1069 (Pa. Super. Ct. 2020) (holding that a plaintiff must state clearly in a separate count each individual cause of action asserted against each individual defendant, including the facts pertaining to every element of that count).

Case ID: 230900506
Control No.: 23096587

Objections at 14-15. Plaintiffs nonetheless lump Abbott and Mead Johnson together without differentiating between the distinct acts or omissions of these distinct corporations, and the distinct products they manufacture. As a result, Abbott lacks clarity regarding its alleged role in this case, and whether it is even a proper party. Accordingly, plaintiffs' claims against Abbott should be dismissed.

### IV. Plaintiffs' Complaint Does Not Allege Viable Negligent Infliction of Emotional Distress Claims on Behalf of Plaintiff-Parent

In the response, plaintiff-parent seeks to save her untimely claims by arguing for the first time in that she has stated negligent infliction of emotional distress (NIED) claims under a "bystander" theory. *See* Pl.'s Memo. of Law at 12-17. In Pennsylvania, a bystander can recover for NIED only if: (1) the plaintiff was located near the scene of the accident; (2) the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident; and (3) the plaintiff and the victim were closely related. *See Huddleston v. Infertility Ctr. of Am.*, 700 A.2d 453, 462 (Pa. Super. Ct. 1997). In addition to these three elements, a physical injury must be averred to sustain a cause of action for NIED. *See Armstrong v. Paoli Mem'l Hosp.*, 633 A.2d 605, 609 (Pa. Super. Ct. 1993); *Abadie v. Riddle Mem'l Hosp.*, 589 A.2d 1143, 1145 (Pa. Super. Ct. 1991).

Here, as a threshold matter, plaintiffs fail to comply with the Rule 1020(a) requirement that "each cause of action" be set forth in a "separate count containing a demand for relief." Further, even if plaintiff-parent had specifically set forth a NIED claim in the complaint (she did not), these newly minted NIED claims would have failed as a matter of law. Plaintiff-parent does not allege that she suffered any physical injury. Moreover, plaintiff-parent does not allege any facts showing that she suffered "a direct emotional impact" from the "contemporaneous observance" of her infants developing NEC. Under these circumstances, Pennsylvania courts routinely dismiss NIED

6

claims. *See, e.g.*, *Mazzagatti v. Everingham by Everingham*, 516 A.2d 672, 679 (1986) (holding where plaintiff has no contemporaneous sensory perception of the injury, any claimed emotional distress results more from the particular emotional makeup of the plaintiff rather than from the nature of defendant's actions); *Tackett v. Encke*, 509 A.2d 1310, 1312 (Pa. Super. Ct. 1986) (preliminary objections to parent's claim for NIED damages properly sustained where parent did not witness a "discrete and identifiable traumatic event," but rather was injured emotionally by witnessing, over time, her son's reaction to a pulmonary fat embolism). Accordingly, plaintiff-parent's improperly-pled, time-barred NIED claims should be dismissed.

## <u>CONCLUSION</u>

For all these reasons, as well as those set forth in Abbott's opening brief, which is expressly incorporated herein, Abbott's preliminary objections should be sustained, and all claims against Abbott should be dismissed.

Case ID: 230900506
Control No.: 23096587

Dated: December 4, 2023

Respectfully Submitted:

/s/ Sean P. Fahey
Sean P. Fahey (PA Bar No. 73305)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

/s/ Ronni E. Fuchs
Ronni E. Fuchs (PA Bar No. 65561)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

/s/ Joseph E. O'Neil
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
**CAMPBELL CONROY & O'NEIL, P.C.**
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.6388
JONeil@CampbellTrialLawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

/s/ Marques Hillman Richeson
Marques Hillman Richeson (admitted *pro hac vice*)
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com
*Attorneys for Defendant Abbott Laboratories*

8

## CERTIFICATE OF SERVICE

I hereby certify that I will serve a true and correct copy of the foregoing in accordance with Pa. R. Civ. P. 440 on all parties not served electronically. All other parties will be electronically served by the court in accordance with Pa. R. Civ. P. 205.4(g).

Dated: December 4, 2023                     */s/ Ronni E. Fuchs*
                                             Ronni E. Fuchs

Case ID: 230900506
Control No.: 23096581

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Ronni E. Fuchs, hereby certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts, that require filing confidential information and documents differently than non-confidential information and documents.

*/s/ Ronni E. Fuchs*
Ronni E. Fuchs

# EXHIBIT A-74

BURNS WHITE LLC
By:    James A. Young, Esquire
       Richard S. Margulies, Esquire
       Kyle J. Generelli, Esquire
Attorney ID Nos. 00213 / 62306 / 333291
1880 John F. Kennedy Boulevard, 10th Floor
Philadelphia, PA  19103
(215) 587-1600
jayoung@burnswhite.com
rsmargulies@burnswhite.com
kjgenerelli@burnswhite.com

*Attorneys for Defendants*
The Pennsylvania Hospital of the University
of Pennsylvania Health System d/b/a
Pennsylvania Hospital and The Trustees of the
University of Pennsylvania d/b/a Penn
Medicine

| | | |
|---|---|---|
| CHRISTINA TAYLOR, on her own behalf and as Parent and natural Guardian of I.H., a Minor | : | IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| Plaintiff, | : | |
| v. | : | CIVIL ACTION |
| | : | |
| MEAD JOHNSON & COMPANY, LLC, et al. | : | MARCH TERM 2022 |
| Defendants. | : | NO. 2606 |

<u>**WITHDRAWAL OF APPEARANCE**</u>

TO THE PROTHONOTARY:

Kindly withdraw **only** the appearance of Susan Engle, Esquire as counsel on behalf of Defendants, The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine, in the above-referenced matter.

                    **BURNS WHITE LLC**
          BY:    */s/ Susan R. Engle*_____
                    Susan R. Engle, Esquire

<u>**ENTRY OF APPEARANCE**</u>

TO THE PROTHONOTARY:

Kindly enter the appearance of Kyle J. Generelli, Esquire as co-counsel on behalf of Defendants, The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine, in the above-captioned matter.

                    **BURNS WHITE LLC**
Date: <u>April 2, 2024</u>          BY:    */s/ Kyle J. Generelli*_____
                    Kyle J. Generelli, Esquire

## <u>CERTIFICATE OF SERVICE</u>

I, Kyle J. Generelli, Esquire, hereby certify that a true and correct copy of the foregoing

*Withdrawal of Appearance/Entry of Appearance* was served via the Court's electronic filing on all

counsel of record.


<div align="right">

*/s/ Kyle J. Generelli*_____
Kyle J. Generelli, Esquire

</div>

Date: <u>April 2, 2024</u>

# EXHIBIT A-75

PHILADELPHIA COURT OF COMMON PLEAS
# PETITION/MOTION COVER SHEET

| CONTROL NUMBER: |
| --- |
| 24041688 |
| **(RESPONDING PARTIES MUST INCLUDE THIS NUMBER ON ALL FILINGS)** |

## FOR COURT USE ONLY

| ASSIGNED TO JUDGE: | ANSWER/RESPONSE DATE: |
| --- | --- |
| | 04/25/2024 |

*Do not send Judge courtesy copy of Petition/Motion/Answer/Response.*
*Status may be obtained online at http://courts.phila.gov*

March Term, 2022
*Month*                                          *Year*
No. _____ 02606 _____

Name of Filing Party:
MEAD JOHNSON & COMPANY LLC-DFT
MEAD JOHNSON NUTRITION COMPANY-DFT

TAYLOR ETAL VS MEAD JOHNSON & COMPANY,
LLC ETAL

**INDICATE NATURE OF DOCUMENT FILED:**
☐ Petition *(Attach Rule to Show Cause)*   ☒ Motion
☐ Answer to Petition            ☐ Response to Motion

Has another petition/motion been decided in this case?   ☐ Yes  ☐ No
Is another petition/motion pending?            ☐ Yes  ☐ No

*If the answer to either question is yes, you must identify the judge(s):*
_____

| TYPE OF PETITION/MOTION (see list on reverse side) | PETITION/MOTION CODE (see list on reverse side) |
| --- | --- |
| MOT-FOR ADMISSION PRO HAC VICE | MTPHV |

ANSWER / RESPONSE FILED TO (Please insert the title of the corresponding petition/motion to which you are responding):

| I. CASE PROGRAM | II. PARTIES *(required for proof of service)* |
| --- | --- |
| DAY FORWARD/MAJOR JURY PROGRAM | (Name, address and **telephone number** of all counsel of record and unrepresented parties. Attach a stamped addressed envelope for each attorney of record and unrepresented party.) |
| Name of Judicial Team Leader: <u>JUDGE LINDA CARPENTER</u> | JAMES A YOUNG  BURNS WHITE LLC 1880 JOHN F. KENNEDY BOULEVARD 10TH FLOOR , PHILADELPHIA PA 19103 |
| Applicable Petition/Motion Deadline: <u>N/A</u> | SEAN P FAHEY  TROUTMAN PEPPER 3000 TWO LOGAN SQ 18TH AND ARCH STREETS , PHILADELPHIA PA 19103-2799 |
| Has deadline been previously extended by the Court: <u>N/A</u> | KENNETH A MURPHY  TUCKER LAW GROUP, LLC 1801 MARKET STREET SUITE 2500 , PHILADELPHIA PA 19103-6996 |
| | MARQUES HILLMAN RICHESON  JONES DAY 901 LAKESIDE AVENUE NORTH POINT , CLEVELAND OH 44114 |
| | EVAN GLASSMAN  STEPTOE, LLP 1114 AVENUE OF THE |

**III. OTHER**

By filing this document and signing below, the moving party certifies that this motion, petition, answer or response along with all documents filed, will be served upon all counsel and unrepresented parties as required by rules of Court (see PA. R.C.P. 206.6, Note to 208.2(a), and 440). Furthermore, moving party verifies that the answers made herein are true and correct and understands that sanctions may be imposed for inaccurate or incomplete answers.

_____   April 5, 2024   CATHERINE M. RECKER   _____
*(Attorney Signature/Unrepresented Party)*        *(Date)*        *(Print Name)*   *(Attorney I.D. No.)*

**The Petition, Motion and Answer or Response, if any, will be forwarded to the Court after the Answer/Response Date.**
**No extension of the Answer/Response Date will be granted even if the parties so stipulate.**

AMERICAS , NEW YORK NY 10036
LINDA CARPENTER
 294 CITY HALL , PHILADELPHIA PA 19107

FILED
05 APR 2024 03:37 pm
Civil Administration
J. BOYD

| | |
|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a minor** | : **COURT OF COMMON PLEAS**<br>: **PHILADELPHIA COUNTY**<br>:<br>: **APRIL TERM, 2022**<br>: **No. 02606** |
| Plaintiffs, | : |
| v. | :<br>: |
| **MEAD JOHNSON & COMPANY, LLC, et al.**, | :<br>:<br>:<br>: |
| Defendants. | : |

## ORDER

**AND NOW**, this _____ day of _____, 2024, upon consideration of the Motion for Admission Pro Hac Vice of T. Allon Renfro, Esquire, to Represent Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company, it is hereby **ORDERED** that the Motion is **GRANTED**. This Court hereby admits T. Allon Renfro, Esquire, pro hac vice in this case on behalf of Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company.

**BY THE COURT**:

_____
J.

Case ID: 220302606
Control No.: 24041688

**WELSH & RECKER, P.C.**
Catherine M. Recker (PA Bar No. 56813)
Amy B. Carver (PA Bar No. 84819)
Richard D. Walk, III (PA Bar No. 329420)
306 Walnut St.
Philadelphia, PA 19106
Tel:    (215) 972-6430
Fax:    (985) 617-1021
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

**ATTORNEYS FOR DEFENDANTS MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON NUTRITION COMPANY**

|  |  |  |
|---|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a minor** | : | **COURT OF COMMON PLEAS** |
|  | : | **PHILADELPHIA COUNTY** |
|  | : |  |
|  | : | **APRIL TERM, 2022** |
| Plaintiffs, | : | **No. 02606** |
| v. | : |  |
|  | : |  |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : |  |
|  | : |  |
| Defendants. | : |  |

## MOTION FOR ADMISSION *PRO HAC VICE* OF T. ALLON RENFRO, ESQUIRE, TO REPRESENT MEAD JOHNSON DEFENDANTS

Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, the "Mead Johnson Defendants"), by and through their counsel, Welsh & Recker, P.C., hereby move this Court for an order pursuant to Pa. R. C. P. 1012.1(b) and (e), Rule 301 of the Pennsylvania Bar Admission Rules, and the Pennsylvania Interest on Lawyer Trust Account Regulations for pro hac vice Admission (204 Pa. Code § 81.501 et seq.) admitting T. Allon Renfro, Esquire, to the bar of this Court, *pro hac vice*, for the purpose of representing the Mead Johnson Defendants, and aver the following in support thereof:

1.     Mr. Renfro is a partner of the law firm of Swanson, Martin, & Bell, LLP and a resident in its Chicago office, located at 330 N. Wabash Avenue Suite 3300,

Case ID: 220302606
Control No.: 24041688

Chicago, IL 60611. Mr. Renfro has an attorney-client relationship with Mead Johnson & Company, LLC and Mead Johnson Nutrition Company, and has special skills, knowledge and experience relating to this case. The efficient administration, prosecution and resolution of this case will be materially advanced by the admission *pro hac vice* of Mr. Renfro. A Verification Statement from Mr. Renfro, is attached hereto as Exhibit A.

2.  Mr. Renfro is a member in good standing in the state of Indiana and has been admitted to practice since 2011. See Exhibit A.

3.  Mr. Renfro's law firm serves as national trial counsel for the Mead Johnson Defendants. He is familiar with the complex, technical issues presented in this matter, and his participation in this case will help clarify the issues before the Court. See Exhibit A.

4.  The Mead Johnson Defendants have specifically requested that Mr. Renfro be permitted to participate in this matter and represent its interests in this matter. See Exhibit A.

5.  Mr. Renfro is not presently suspended or disbarred in any Court, nor is he currently subject to any disciplinary proceedings by any organization authorized to discipline attorneys at law. Further, Mr. Renfro has never received any public discipline, including, but not limited to, suspension or disbarment by any organization with the authority to discipline attorneys at law. Exhibit A.

6.  Mr. Renfro is familiar with Pennsylvania Bar Admission Rule 301 and has agreed to abide by the Rules of Professional Conduct applicable to Pennsylvania lawyers. Mr. Renfro will abide by the Rules of Court, including all disciplinary rules and, if

Case ID: 220302606
Control No.: 24041688

this motion is granted, he will serve as associate counsel with Catherine M. Recker, Esquire, counsel of record for the Mead Johnson Defendants in this matter.

7.    Mr. Renfro has applied to the Pennsylvania Interest on Lawyers' Trust Account Board (Pennsylvania IOLTA Board) and paid the appropriate fee required under 204 Pa. Code § 81.503. to be admitted pro hac vice.  Our office received a copy of the fee payment certification letter from the IOLTA Board, a copy of which is attached as Exhibit B.

8.    Mr. Renfro will be associated with Catherine M. Recker, Esquire, of Welsh & Recker, P.C., at all stages of this action.  Ms. Recker, after reasonable investigation, believes that Mr. Renfro is a reputable and competent attorney and recommends that he be considered for admission *pro hac vice*. A true Verification Statement from Ms. Recker pursuant to Pa. R. C. P. 1012.1(d)(2) is attached hereto as Exhibit C.

9.    Catherine M. Recker, Esquire, of Welsh & Recker, P.C., is a member in good standing of the Bar of the Commonwealth of Pennsylvania. Welsh & Recker and Catherine M. Recker, Esquire will be counsel of record for the Mead Johnson Defendants and will continue to participate fully in this litigation and will sign, serve, and accept service of all papers on the Mead Johnson Defendants' behalf.

10.    All the requirements to satisfy the applicable rules of Court are met.

11.    There is no good cause for denial of this motion.

   **WHEREFORE**, it is respectfully requested that this Court enter the attached Order granting T. Allon Renfro, Esquire leave to appear as counsel *pro hac vice* for Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company.

Case ID: 220302606
Control No.: 24041688

Respectfully submitted,

**WELSH & RECKER, P.C.**

Date: April 5, 2024        /s/ Catherine M. Recker
                             Catherine M. Recker (PA Bar No. 56813)
                             Amy B. Carver (PA Bar No. 84819)
                             Richard D. Walk, III (PA Bar No. 329420)
                             306 Walnut St.
                             Philadelphia, PA 19106
                             Tel:    (215) 972-6430
                             Fax:    (985) 617-1021
                             cmrecker@welshrecker.com
                             abcarver@welshrecker.com
                             rwalk@welshrecker.com

Case ID: 220302606
Control No.: 24041688

## <u>CERTIFICATE OF SERVICE</u>

I, Catherine M. Recker, Esquire certify that on this date, I caused a copy of the foregoing Motion for *Pro Hac Vice* admission of T. Allon Renfro to be electronically filed through the Court's electronic filing system and that such filing generates a notice of that constitutes service on all counsel of record.

**WELSH & RECKER, P.C.**

Date: April 5, 2024                    /s/ Catherine M. Recker
                                        Catherine M. Recker, Esquire

# EXHIBIT A

Case ID: 220302606
Control No.: 24041688

## <u>VERIFICATION OF T. ALLON RENFRO, ESQUIRE</u>

I, T. Allon Renfro, Esquire, hereby submit this Verification Statement in support of the attached Motion for Admission *pro hac vice* to represent Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, the "Mead Johnson Defendants"), in this action in the Court of Common Pleas of Philadelphia County, Pennsylvania. In support of this Motion made pursuant to pursuant to Pa. R. C. P. 1012.1(b) and (e), Rule 301 of the Pennsylvania Bar Admission Rules, and the Pennsylvania Interest on Lawyer Trust Account Regulations for pro hac vice Admission (204 Pa. Code § 81.501 et seq.), I swear and affirm that the following is true and correct based upon my personal knowledge:

1. I am a partner of the law firm Swanson, Martin & Bell, LLP and resident in its Chicago office, located at 330 N. Wabash Avenue Suite 3300, Chicago, IL 60611. Telephone: (312) 222-8525; email address: trenfro@smbtrials.com.

2. I have been licensed to practice law in the following jurisdictions with the corresponding bar license number: State of Indiana (30099-53) State of Illinois (6309991)   Additionally, I have been admitted to practice in the following courts: U.S. District Court, Northern District of Indiana, U.S. District Court, Southern District of Indiana, U.S. District Court, Northern District of Illinois, U.S. District Court, Southern District of Illinois, U.S. District Court, Eastern District of Wisconsin.

3. I am a member in good standing of all Bars to which I am admitted.

4. With respect to each jurisdiction identified in Paragraph 2 above, I have never been suspended, disbarred, or otherwise disciplined by any court, nor am I the subject of any disciplinary proceedings.

5. I am involved in the following pending actions in the Philadelphia County Court of Common Pleas in which I am applying for admission *pro hac vice:*

| Case Name | Case Number |
|---|---|
| Carter, et al. v. Mead Johnson & Company, LLC, et al. | 220302588 |
| Wieger, at al. v. Mead Johnson & Company, LLC, et al. | 220302614 |
| Wieger, et al. v. Mead Johnson & Company, LLC, et al. | 220302601 |
| Taylor, et al. v. Mead Johnson & Company, LLC, et al. | 220302606 |
| Stills, et al. v. Mead Johnson & Company, LLC, et al. | 220302617 |
| Mays, at al. v. Mead Johnson & Company, LLC, et al. | 220302963 |
| Watson, et al. v. Mead Johnson & Company, LLC, et al. | 220302967 |
| Kajuffa, et al. v. Mead Johnson & Company, LLC, et al. | 220302978 |
| Ross, et al. v. Mead Johnson & Company, LLC, et al. | 220302981 |
| Parker, et al. v. Mead Johnson & Company, LLC, et al. | 220302983 |
| Wiggins, at al. v. Mead Johnson & Company, LLC, et al. | 220302986 |
| Henderson, et al. v. Mead Johnson & Company, LLC, et al. | 220400127 |
| McMillian, et al. v. Mead Johnson & Company, LLC, et al. | 220400140 |
| Williams, et al. v. Mead Johnson & Company, LLC, et al. | 220400141 |
| Moment, et al. v. Mead Johnson & Company, LLC, et al. | 220400142 |
| Sanders, at al. v. Mead Johnson & Company, LLC, et al. | 220400153 |
| Walker-Savage, et al. v. Mead Johnson & Company, LLC, et al. | 220400156 |

Case ID: 220302606
Control No.: 24041688

| Thomas, et al. v. Mead Johnson & Company, LLC, et al. | 220400158 |
| Short, et al. v. Mead Johnson & Company, LLC, et al. | 220400159 |
| Goodmond, et al. v. Mead Johnson & Company, LLC, et al. | 220400208 |
| Goodmond, at al. v. Mead Johnson & Company, LLC, et al. | 220400212 |

6.  If admitted, I agree to comply with and be bound by the applicable statues, case law, and procedural rules of the Commonwealth of Pennsylvania, including the Pennsylvania Rules of Professional Conduct.

7.  I do not have any pending *pro hac vice* admissions that I have applied for in any other court jurisdictions.

8.  If admitted, I agree to subject myself to the jurisdiction of the Pennsylvania courts and the Pennsylvania Disciplinary Board with respect to acts or omissions occurring during my appearance in this matter for which admission *pro hac vice* is sought.

9.  I respectfully submit that there is a good cause for my admission *pro hac vice* based upon my personal knowledge.

10. Further, I have consented to the appointment of Catherine M. Recker, Esquire, of Welsh & Recker, P.C., as the agent upon whom services of process shall be made for all actions, including disciplinary actions, that may arise out of the practice of law in this matter for which admission *pro hac vice* is being sought.

I declare under the penalty of perjury the foregoing is true and correct. I hereby state that the facts above are true and correct to the best of my knowledge, information,

3

Case ID: 220302606
Control No.: 24041688

and belief.  I understand that statements herein are made subject to the penalties of 18

Pa. CS § 4904 (relating to unsworn falsification to authorities).


Date: April 5, 2024              /s/ T. Allon Renfro_____
                                 T. Allon Renfro, Esquire

4

# EXHIBIT B

Case ID: 220302606
Control No.: 24041688



SUPREME COURT OF PENNSYLVANIA
# PENNSYLVANIA INTEREST ON
# LAWYERS TRUST ACCOUNT BOARD

April 03, 2024

TIMOTHY ALLON RENFRO, Esq.
SWANSON, MARTIN & BELL, LLP
330 N. WABASH, SUITE 3300
CHICAGO, IL 60611

SENT TO TIMOTHY ALLON RENFRO VIA Email: TRENFRO@SMBTRIALS.COM

Dear Attorney RENFRO:

This letter serves as the fee payment certification referenced in 204 Pa Code §81.503 and acknowledges receipt of the $375.00 fee paid by Online Payment on this date related to your pursuit for admission *pro hac vice* in the case identified as Christina Taylor v. Mead Johnson & Company LLC, no. 220302606, filed in Court of Common Pleas of Philadelphia County.

You should refer to Pa Rule of Civil Procedure 1012.1, local court rules, and other regulations of 204 Pa Code §81.501 et. seq. concerning additional requirements related to seeking *pro hac vice* admission.

Sincerely,

*Stephanie S. Libhart*

Stephanie S. Libhart
Executive Director

cc: CATHERINE M. RECKER, Esq.

cmrecker@welshrecker.com

Pennsylvania Judicial Center
601 Commonwealth Ave., Ste. 2400
PO Box 62445, Harrisburg, PA 17106-2445
717/238-2001 · 888/PA-IOLTA (724-6582) · 717/238-2003 FAX
paiolta@pacourts.us · www.paiolta.org

Administering Pennsylvania's Interest On Lawyers Trust Account (IOLTA) Program

Case ID: 220302606
Control No.: 24041688

# EXHIBIT C

Case ID: 220302606
Control No.: 24041688

**WELSH AND RECKER, P.C.**
Catherine M. Recker (PA Bar No. 56813)
Amy B. Carver (PA Bar No. 84819)
Richard D. Walk, III (PA Bar No. 329420)
306 Walnut St.
Philadelphia, PA 19106
Tel:    (215) 972-6430
Fax:    (985) 617-1021
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

**ATTORNEYS FOR DEFENDANTS MEAD JOHNSON & COMPANY, LLC AND MEAD JOHNSON NUTRITION COMPANY**

| | |
|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a minor** | : **COURT OF COMMON PLEAS**<br>: **PHILADELPHIA COUNTY**<br>:<br>: **APRIL TERM, 2022** |
| Plaintiffs, | : **No. 02606** |
| v. | :<br>: |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | :<br>:<br>: |
| Defendants. | :<br>: |

## VERIFICATION OF CATHERINE M. RECKER, ESQUIRE

COMMONWEALTH OF PENNSYLVANIA    )
                                     ) ss:
COUNTY OF PHILADELPHIA            )

      I, Catherine M. Recker, hereby submit this Verification Statement in support of the attached Motion to Admit T. Allon Renfro, Esquire *pro hac vice* to represent Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company (collectively, the Mead Johnson Defendants), in this matter.

      1.     I am a Partner at Welsh & Recker, P.C., located at 306 Walnut St., Philadelphia, PA 19106.

      2.     I have been licensed to practice law in the following jurisdictions with the corresponding bar license number: The Commonwealth of Pennsylvania

(#56813), the State of New Jersey (#044221989). Additionally, I have been admitted to practice in the following courts: U.S. District Court, Eastern District of Pennsylvania, U.S. District Court, Middle District of Pennsylvania, U.S. District Court, Western District of Pennsylvania, U.S. District Court, District of New Jersey, U.S. District Court, Southern District of New York, U.S. Court of Appeals, Third Circuit, U.S. Court of Appeals, Fourth Circuit, United States Supreme Court.

3.  I am a member in good standing of the Bar of the Commonwealth of Pennsylvania and the other courts to which I am admitted.

4.  I am licensed to practice law in all the jurisdictions that I have been admitted and am counsel of record representing the Mead Johnson Defendants in this matter.

5.  I hereby certify and affirm that after reasonable investigation and on personal knowledge, I believe that T. Allon Renfro, is a reputable and competent attorney, and I am in a position to recommend that this candidate be admitted *pro hac vice* for practice in the Commonwealth of Pennsylvania to represent the Mead Johnson Defendants in this matter.

6.  I am not currently acting as the sponsor of any other candidate for admission pro hac vice in Pennsylvania.

7.  If applicable, at the conclusion of this matter, I affirm that any proceeds from the settlement of this cause of action in which Mr. Renfro is granted admission *pro hac vice* shall be received, held, distributed, and accounted

Case ID: 220302606
Control No.: 24041688

for in accordance with Rule 301 of the Pennsylvania Rules of Professional Conduct, including the IOLTA provisions thereof, if applicable.

I declare under the penalty of perjury the foregoing is true and correct. I hereby state that the facts above are true and correct to the best of my knowledge, information, and belief. I understand that statements herein are made subject to the penalties of 18 Pa. CS §4904 (relating to unsworn falsification to authorities).

**WELSH & RECKER, P.C.**

By:     /s/ Catherine M. Recker____
          Catherine M. Recker, Esquire

Date: April 5, 2024

3

Case ID: 220302606
Control No.: 24041688

# EXHIBIT A-76

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

*Filed and Attested by the Office of Judicial Records 24 APR 2024 04:14 pm E. TIERNEY*

| | |
|---|---|
| CHRISTINA TAYLOR, *on her own behalf and as Parent and Natural Guardian of* I.H., *a Minor*,            Plaintiffs,       v.   MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE,           Defendants. | PHILADELPHIA COUNTY COURT OF COMMON PLEAS TRIAL DIVISION<br><br>MARCH TERM, 2022<br>No. 220302606 |

## ORDER OF THE COURT

On this _____ day of _____, 2024, upon consideration of defendant Abbott Laboratories' ("Abbott's") motion to compel responses to Abbott's First Set of Interrogatories and First Set of Requests for Production to Plaintiffs, its brief in support, and any response thereto; and

WHEREAS on January 5, 2024, this Court entered an Order, to which plaintiffs and Abbott agreed, which directed that, by February 5, 2024, plaintiffs must (1) provide full and complete responses to all Interrogatories and Requests for Production, (2) serve complete sets of medical, education, and insurance authorizations, (3) serve complete sets of employment and psychiatric authorizations (where applicable), and (4) produce any medical records in their possession, custody, or control, or otherwise inform Abbott that they have provided all such records; and

WHEREAS, to date, plaintiffs have failed to comply with this Court's Order, as more fully set forth in the deficiency letters attached to Abbott's Motion to Compel, by (1) failing to serve

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

supplemental discovery responses in certain cases, (2) serving incomplete or inaccurate discovery responses in all cases, (3) failing to serve full sets of authorizations, and (4) failing to produce additional medical records in plaintiffs' possession, or otherwise state that all such records have been produced to Abbott;

It is hereby ORDERED that:[1]

1.      Plaintiffs are directed to comply with this Order, as well as the Court's prior Order dated January 5, 2024, within twenty (20) days of the date of this Order.

2.      Plaintiffs shall remedy all deficiencies outlined in the deficiency letters attached to Abbott's Motion to Compel and any joinder filed to the same.

3.      Having already failed to comply with the Court's prior Order of January 5, 2024 concerning these same discovery issues, plaintiffs are cautioned that continued failure to comply with this Court's discovery orders may occasion harsh sanctions, including barring presentation of evidence where plaintiffs failed to timely provide Abbott with discovery regarding the same.

BY THE COURT:

_____

---

[1] This Order applies to the following cases before this Court: 220302588, 220302601, 220302606, 220302614, 220302617, 220302963, 220302967, 220302978, 220302981, 220302983, 220302986, 220400127, 220400140, 220400141, 220400142, 220400153.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Sean P. Fahey (PA Bar No. 73305)
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

Ronni E. Fuchs (PA Bar No. 65561)
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

**CAMPBELL CONROY & O'NEIL, P.C.**
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.1900
JONeil@campbell-trial-lawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

**JONES DAY**
Marques Hillman Richeson (admitted *pro hac vice*)
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

| | |
|---|---|
| CHRISTINA TAYLOR, *on her own behalf and as Parent and Natural Guardian of* I.H., *a Minor*, | : |
| | : PHILADELPHIA COUNTY |
| | : COURT OF COMMON PLEAS |
| Plaintiffs, | : TRIAL DIVISION |
| | : |
| v. | : |
| | : |
| MEAD JOHNSON & COMPANY LLC; MEAD | : |
| JOHNSON NUTRITION COMPANY; ABBOTT | : MARCH TERM, 2022 |
| LABORATORIES; THE PENNSYLVANIA | : No. 220302606 |
| HOSPITAL OF THE UNIVERSITY OF | : |
| PENNSYLVANIA HEALTH SYSTEM, *d/b/a* | : |
| PENNSYLVANIA HOSPITAL; and THE | : |
| TRUSTEES OF THE UNIVERSITY OF | : |
| PENNSYLVANIA, *d/b/a* PENN MEDICINE, | : |
| | |
| Defendants. | |

## DEFENDANT ABBOTT LABORATORIES' MOTION TO COMPEL RESPONSES TO ABBOTT'S DISCOVERY REQUESTS

Defendant Abbott Laboratories ("Abbott") files this motion after several unsuccessful attempts over the course of eight months to obtain basic discovery from plaintiffs, which is critical to the parties' claims and defenses and which this Court previously ordered plaintiffs to produce.[1] Plaintiffs' ongoing failure to comply with this Court's order and fulfill their fundamental discovery obligations has prejudiced Abbott's ability to proceed with discovery in a timely fashion, undermining the parties' ability to meet the quickly approaching fact discovery deadline.

---

[1] To conserve judicial resources, and pursuant to the practice recommended by the Court at the July 24, 2023 conference, Abbott files this motion on the instant docket and incorporates by reference the arguments herein in each of the following actions in which plaintiffs have failed to provide full and complete responses to Abbott's discovery requests: 220302588, 220302601, 220302606, 220302614, 220302617, 220302963, 220302967, 220302978, 220302981, 220302983, 220302986, 220400127, 220400140, 220400141, 220400142, and 220400153.

2

On January 5, 2024, following Abbott's prior motion to compel this exact same discovery from plaintiffs, the Court entered an order by agreement reached between Abbott and plaintiffs. *See* Ex. A, Court Order (January 5, 2024). The order required plaintiffs to provide specific discovery within thirty days (*i.e.,* by February 5, 2024), including (1) complete and accurate responses to all discovery requests, (2) complete sets of authorizations for all plaintiffs, and (3) any remaining medical records in their possession (or confirmation that they otherwise possess no additional records). During a status conference before the Court on January 18, 2024, plaintiffs expressly *reaffirmed* that they would comply with this order by the February 5, 2024 deadline. Yet plaintiffs failed to serve responses on or before February 5, 2024. Instead, in the weeks following the Court-imposed deadline, some plaintiffs began submitting partially-supplemented responses. These untimely responses were neither full nor complete, as required by the Court's order.

To date, plaintiffs still have not complied with the Court's January 5, 2024 order in the following respects, as Abbott has raised in deficiency letters dating back to October 2023:

- Plaintiffs in certain cases failed to serve supplemental responses altogether;

- Plaintiffs who did serve supplemental responses universally failed to serve complete and accurate responses;

- Plaintiffs failed to serve complete sets of authorizations in all cases; and

- Plaintiffs failed to serve additional medical records, or otherwise represent that they are not in possession of any additional records.

Plaintiffs' ongoing failure to engage in the discovery process, including their failure to comply with this Court's January 5, 2024 order, has prejudiced Abbott's ability to timely complete fact depositions within the current case management deadlines. To avoid any further delay and

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

prejudice, Abbott now moves yet again to compel plaintiffs to provide full and complete discovery responses so that these cases may move forward in a timely fashion and in accordance with the Pennsylvania Rules of Civil Procedure.  In support of its motion, Abbott states the following:

1.      In these cases, plaintiffs attack—without basis—specialized preterm infant formulas and fortifiers essential to the survival and development of premature infants in NICUs. Plaintiffs filed these cases against defendants Mead Johnson, Abbott, and the infants' hospitals of birth (collectively, "defendants"), alleging that medical professionals at the hospital defendants administered Abbott's and/or Mead Johnson's cow's milk-based preterm infant nutrition products and that plaintiffs were injured and suffer long-term health effects as a result.

2.      Plaintiffs allege seven causes of action, five of which were asserted against Abbott and Mead Johnson: strict products liability design defect (Count I), strict products liability failure to warn (Count II), negligence (Count III), intentional misrepresentation (Count IV), and negligent misrepresentation (Count V). The remaining claims (Counts VI and VII) were asserted against the hospital defendant(s). The complaints were filed by parents ("plaintiff-parents") on their own behalf, and also as parent and natural guardians of the infant plaintiffs ("plaintiff") (together "plaintiffs").

3.      On July 24, 2023, the Court held a status conference in all actions.  During that conference, the Court expressed a preference that the parties begin taking plaintiffs' depositions before the end of the 2023 calendar year.

4.      To that end, on August 9, 2023, Abbott promptly served a set of interrogatories and a set of requests for production on all plaintiffs.  *See* Ex. B (Interrogatories); Ex. C (Requests for Production).  The interrogatories consisted of both Standard Form Interrogatories, propounded pursuant to Phila. Cnty. Loc. R. 4005, as well as supplemental interrogatories.

4

5.      Following a first set of deficiency letters and a motion to compel filed on December 5, 2023, Abbott and plaintiffs reached an order by agreement in an attempt to resolve the deficiencies outlined in the motion.  The resulting order required that, within thirty days of the entry of the Order, plaintiffs (1) serve complete and accurate responses to all interrogatories and requests for production, (2) provide complete sets of authorizations for all plaintiffs, and (3) produce any remaining medical records in plaintiffs' possession, or otherwise confirm that plaintiffs possess no additional records.

6.      This Court approved and entered the order on January 5, 2024, thereby requiring plaintiffs' compliance no later than February 5, 2024.  During a status conference held before this Court on January 18, 2024, plaintiffs expressly reaffirmed that they would comply with the terms of the order.

7.      As of the date of this motion, plaintiffs have failed to fully comply with the January 5, 2024 discovery order.

8.      Plaintiffs failed to serve responses on or before February 5, 2024.  Instead, over the weeks after the Court-imposed deadline had already passed, some plaintiffs began submitting partially-supplemented responses.

9.      These untimely responses were neither full nor complete, as required by the Court's order, and to date, plaintiffs still have not complied with the order.  *See* Deficiency Letters, Exs. D–S.

10.      In particular, plaintiffs have failed to comply with the Court's January 5, 2024 order in the following respects: (1) plaintiffs in certain cases failed to serve supplemental responses altogether; (2) plaintiffs who did serve supplemental responses universally failed to serve complete and accurate responses; (3) plaintiffs failed to serve complete sets of authorizations in all cases;

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

and (4) plaintiffs failed to serve additional medical records, or otherwise represent that they are not in possession of any additional records.

11.     In light of plaintiffs' continued failure to meet their basic discovery obligations, and plaintiffs' unexplained failure to comply with this Court's order, the Court's intervention is again necessary.  Abbott respectfully requests that the Court strike plaintiffs' improper objections and insufficient answers to Abbott's discovery requests, and further requests that this Court caution plaintiffs that, if they yet again violate a Court order regarding discovery, the Court may impose harsh sanctions, including barring presentation of evidence where plaintiffs failed to provide Abbott with the necessary discovery regarding the same, for the following reasons:

## I.   FAILURE TO SERVE SUPPLEMENTAL DISCOVERY RESPONSES

12.     Abbott incorporates the foregoing paragraphs as if set forth herein.

13.     As part of the Court's January 5, 2024 order, plaintiffs were required to serve complete and accurate supplemental responses to Abbott's discovery requests.

14.     Notwithstanding, plaintiffs failed to serve any supplemental responses to interrogatories in *Moment*, *Sanders*, and *Wiggins*.

15.     In addition, plaintiffs failed to serve any supplemental responses to Abbott's requests for production in *Goodmond Rya. G.*, *Goodmond Ryh. G.*, *Moment*, and *Wiggins*.

16.     Plaintiffs' failure to serve any supplemental responses whatsoever in these cases represents undisputed noncompliance with the Court's order.

## II.  FAILURE TO SERVE COMPLETE AND ACCURATE DISCOVERY RESPONSES

17.     Abbott incorporates the foregoing paragraphs as if set forth herein.

18.     As part of the Court's January 5, 2024 order, plaintiffs were required to serve complete and accurate supplemental responses to Abbott's discovery requests.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

19.     Even in those cases in which plaintiffs belatedly served supplemental responses, those supplemental responses were incomplete—and in some cases inaccurate—in several respects.

20.     In an effort to advance discovery efficiently, Abbott served case-specific deficiency letters on plaintiffs on April 8, 2024 and April 12, 2024 in the following actions: *Carter* (220302588), *Wieger S.P.* (220302601), *Taylor* (220302606), *Wieger M.P.* (220302614), and *Stills* (220302617), *Mays* (220302963), *Watson* (220302967), *Kajuffa* (220302978), *Ross* (220302981), *Parker* (220302983), *Wiggins* (220302986), *Henderson* (220400127), *McMillian* (220400140), *Williams* (220400141), *Moment* (220400142), and *Sanders* (220400153). These letters detail case-specific deficiencies that remain outstanding even after plaintiffs submitted their supplemental responses.

21.     Abbott attaches each case-specific deficiency letter to the instant motion to compel, and for the sake of brevity, incorporates into this motion all arguments and all deficiencies contained in each letter. *See* Exs. D–S.

22.     To provide an example, despite each plaintiff-parent purporting to bring claims for damages resulting from plaintiff-infant's NEC diagnosis, each of the above-listed plaintiffs failed to identify or describe any of the injuries or damages alleged by plaintiff-parents in response to Interrogatory Nos. 2 and 5.

23.     Similarly, in response to Interrogatory No. 66, which sought information regarding insurers of plaintiffs, not one plaintiff provided any information regarding any insurer. The same is true for Interrogatory No. 61, which sought information about plaintiffs' educational background. Plaintiffs did not even make an attempt to amend or supplement their responses to Interrogatory Nos. 61 or 66.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

24.     Moreover, Interrogatory No. 43 sought information regarding any packaging, labeling, product guides, or other related documents that plaintiff-parents saw prior to the alleged administration of preterm infant formula products to plaintiff-infants.  This information is directly relevant to plaintiffs' misrepresentation claims.  Indeed, each plaintiff alleges that Abbott used "misleading" names on its packaging to suggest its products were derived from breast milk.  *See, e.g.*, Taylor Amended Complaint at ¶¶ 50, 69.

25.     Notwithstanding, all but one of these plaintiffs suggested they do not recall seeing any responsive materials whatsoever.  One plaintiff-parent, Christina Taylor, responded only by saying she "recalls seeing packaging."  These responses are clearly insufficient, and, in light of plaintiffs' misrepresentation claims, plaintiffs should be ordered to respond in full to this interrogatory.

26.     Plaintiffs' failure to provide complete and accurate responses to these basic inquiries, and the many others highlighted in Abbott's deficiency letters, has hindered Abbott's ability to prepare for and complete plaintiffs' depositions, as well as depositions of other fact witnesses, unnecessarily delaying the progress of discovery in these cases.

## III.  FAILURE TO SERVE COMPLETE SETS OF AUTHORIZATIONS IN ALL CASES.

27.     Abbott incorporates the foregoing paragraphs as if set forth herein.

28.     As part of the Court's January 5, 2024 order, plaintiffs were required to provide full and complete sets of authorizations for all plaintiffs.

29.     Notwithstanding the Court's order, plaintiffs have not served complete sets of authorizations in all cases.  Indeed, the following blank authorizations remain outstanding:

- Medical authorizations: *Sanders* (parent), *Wiggins* (parent), and *Wiggins* (infant).

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

- Education authorizations (infants): *Kajuffa*, *Moment*, *Parker*, *Ross*, *Short*, *Stills*, *Taylor*, *Thomas, Watson, Wiggins*, and *Williams*.

- Insurance authorizations: *Goodmond Rya. G.* (infant), *Mays* (infant), *Sanders* (infant), *Stills* (parent), *Wiggins* (parent), and *Wiggins* (infant).

30.    In addition, plaintiffs have failed to serve blank employment and/or psychiatric authorizations in the cases listed below.  Abbott has been requesting these authorizations for over eight months; accordingly, Abbott assumes that plaintiffs' failure to serve these blank authorizations indicates that plaintiffs are not pursuing a wage loss and/or psychiatric injury claim in these cases:

- Employment (parent): *Carter, Goodmond Rya., Goodmond Ryh., Kajuffa, Moment, Parker, Ross, Sanders, Stills, Taylor, Thomas, Walker-Savage, Watson, Wieger M.P., Wieger S.P., Wiggins,* and *Williams*.

- Employment (infant, if applicable)[2]:  *Goodmond Rya., Henderson, McMillian, Sanders, Stills, Walker-Savage,* and *Williams*.

- Psychiatric (parent and infant):, *Goodmond Rya. G., Goodmond Ryh G., Henderson, Kajuffa, Moment, Parker, Ross, Short, Stills, Taylor, Thomas, Walker-Savage, Watson, Wieger M.P., Wieger S.P., Wiggins,* and *Williams*.

- Psychiatric (parent-only): *Carter (parent), Mays (parent), McMillian (parent),* and *Sanders (parent)*.

31.    Plaintiffs' failure to provide complete sets of authorizations has hindered—and continues to hinder—Abbott's efforts to collect and review plaintiffs' medical records, and to

---

[2] In its deficiency letter dated March 11, 2024, Abbott included a request for employment authorizations for infant-plaintiffs who are at least 15 years of age (if they are working).

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

thereafter complete plaintiffs' depositions, as well as those of other fact witnesses, ahead of the June 3, 2024 fact discovery deadline. For this reason, Abbott requests that this Court order plaintiffs to immediately provide complete sets of authorizations in all cases, and provide a list of any additional treaters and entities for each parent and infant or otherwise affirmatively confirm that no additional treaters or entities exist upon which Abbott should serve authorizations.

## IV. FAILURE TO PRODUCE ADDITIONAL MEDICAL RECORDS IN PLAINTIFFS' POSSESSION

32. Abbott incorporates the foregoing paragraphs as if set forth herein.

33. As part of the Court's January 5, 2024 order, plaintiffs were required to produce any additional medical records in their possession, custody, or control, or otherwise affirmatively confirm that they possess no additional records.

34. Plaintiffs did not produce any additional medical records, nor did they confirm that no additional records exist in their possession.

WHEREFORE, Abbott respectfully requests that this Court direct plaintiffs to serve, within twenty (20) days of the entry of the Court's order, complete and accurate discovery responses in all cases, provide complete sets of authorizations in all cases, and produce all remaining medical records in their possession, custody, or control.

Dated: April 24, 2024

Respectfully Submitted:

*/s/ Sean P. Fahey*
Sean P. Fahey (PA Bar No. 73305)
**TROUTMAN PEPPER HAMILTON SANDERS LLP**
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

*/s/ Joseph E. O'Neil*
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
**CAMPBELL CONROY & O'NEIL, P.C.**
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.6388
JONeil@campbell-trial-lawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

/s/ Ronni E. Fuchs
Ronni E. Fuchs (PA Bar No. 65561)
**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

/s/ Marques Hillman Richeson
Marques Hillman Richeson (admitted *pro hac
vice*)
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

| | |
|---|---|
| CHRISTINA TAYLOR, *on her own behalf and as Parent and Natural Guardian of* I.H., *a Minor*,<br><br>               Plaintiffs,<br><br>    v.<br><br>MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE,<br><br>               Defendants. | :<br>:<br>:<br>:  PHILADELPHIA COUNTY<br>:  COURT OF COMMON PLEAS<br>:  TRIAL DIVISION<br>:<br>:<br>:<br>:<br>:  MARCH TERM, 2022<br>:  No. 220302606<br>:<br>:<br>:<br>:<br>: |

**DEFENDANT ABBOTT LABORATORIES' BRIEF IN SUPPORT OF**
**MOTION TO COMPEL RESPONSES TO ABBOTT'S DISCOVERY REQUESTS**

**MATTER BEFORE THE COURT**

Defendant Abbott Laboratories ("Abbott") files this motion after several unsuccessful attempts over the course of eight months to obtain basic discovery from plaintiffs, which is critical to the parties' claims and defenses and which this Court previously ordered plaintiffs to produce.[1] Plaintiffs' ongoing failure to comply with this Court's order and fulfill their fundamental discovery

---

[1] To conserve judicial resources, and pursuant to the practice recommended by the Court at the July 24, 2023 conference, Abbott files this motion on the instant docket and incorporates by reference the arguments herein in each of the following actions in which plaintiffs have failed to provide full and complete responses to Abbott's discovery requests: 220302588, 220302601, 220302606, 220302614, 220302617, 220302963, 220302967, 220302978, 220302981, 220302983, 220302986, 220400127, 220400140, 220400141, 220400142, and 220400153.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

obligations has prejudiced Abbott's ability to proceed with discovery in a timely fashion, undermining the parties' ability to meet the quickly approaching fact discovery deadline.

On January 5, 2024, following Abbott's prior motion to compel this exact same discovery from plaintiffs, the Court entered an order by agreement reached between Abbott and plaintiffs. *See* Ex. A, Court Order (January 5, 2024). The order required plaintiffs to provide specific discovery within thirty days (*i.e.,* by February 5, 2024), including (1) complete and accurate responses to all discovery requests, (2) complete sets of authorizations for all plaintiffs, and (3) any remaining medical records in their possession (or confirmation that they otherwise possess no additional records). During a status conference before the Court on January 18, 2024, plaintiffs expressly *reaffirmed* that they would comply with this order by the February 5, 2024 deadline. Yet plaintiffs failed to serve responses on or before February 5, 2024. Instead, in the weeks following the Court-imposed deadline, some plaintiffs began submitting partially-supplemented responses. These untimely responses were neither full nor complete, as required by the Court's order.

To date, plaintiffs still have not complied with the Court's January 5, 2024 order in the following respects, as Abbott has raised in deficiency letters dating back to October 2023:

- Plaintiffs in certain cases failed to serve supplemental responses altogether;

- Plaintiffs who did serve supplemental responses universally failed to serve complete and accurate responses;

- Plaintiffs failed to serve complete sets of authorizations in all cases; and

- Plaintiffs failed to serve additional medical records, or otherwise represent that they are not in possession of any additional records.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

Plaintiffs' ongoing failure to engage in the discovery process, including their failure to comply with this Court's January 5, 2024 order, has prejudiced Abbott's ability to timely complete fact depositions within the current case management deadlines. To avoid any further delay and prejudice, Abbott now moves yet again to compel plaintiffs to provide full and complete discovery responses so that these cases may move forward in a timely fashion and in accordance with the Pennsylvania Rules of Civil Procedure.

## STATEMENT OF QUESTIONS INVOLVED

1. Should the Court order plaintiffs to serve supplemental discovery responses, as required by the Court's prior January 5, 2024 order, in those cases in which plaintiffs failed to do so altogether? Answer: Yes.

2. Should the Court order plaintiffs to serve complete and accurate discovery responses in all cases, as required by the Court's prior January 5, 2024 order? Answer: Yes.

3. Should the Court order plaintiffs to serve complete sets of authorizations, as required by the Court's prior January 5, 2024 order? Answer: Yes.

4. Should the Court order plaintiffs to serve any remaining medical records in their possession, or otherwise affirmatively represent that no additional records exist, as required by the Court's prior January 5, 2024 order? Answer: Yes.

5. Should the Court caution plaintiffs that, given their failure to comply with the Court's prior order of January 5, 2024, continued and unexplained failure to comply with subsequent orders governing this discovery may occasion harsh sanctions, including barring presentation of evidence of damages where plaintiffs failed to provide Abbott with the requisite discovery regarding the same? Answer: Yes.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

## INTRODUCTION AND FACTUAL BACKGROUND

Abbott and Mead Johnson & Company LLC, Mead Johnson Nutrition Company (together, "Mead Johnson") develop and manufacture infant nutrition products, including products tailored to address the distinct, special nutritional needs of premature, low birthweight infants.[2]  These preterm infants face complex challenges and daunting odds. For one, they typically have underdeveloped or maldeveloped gastrointestinal systems that are not prepared to receive the nutrition necessary for the rapid growth and development these infants need.  This poses a serious challenge for NICU specialists caring for the infants.  The best nutrition for a premature infant is the nutrition it would have received in the womb.  Once that is no longer possible, everything else falls short.  Milk from the infant's mother is the closest natural substitute, but it may not be available or nutritionally sufficient to meet the premature infant's extraordinary needs.  The same is true of donor milk.  Accordingly, NICU specialists use their judgment to fill the nutritional gap with specialized formula and fortifier products designed to meet the unique needs of premature, low-birth-weight infants. This litigation targets these life-saving products.

Plaintiffs in these cases allege that the preterm infants developed necrotizing enterocolitis ("NEC"), an inflammatory gastrointestinal condition that can result in death of intestinal tissue. Indeed, NEC affects up to 8% of infants in NICUs, including infants who receive only human milk, as well as those who receive no "food" at all.  Neonatologists are experts in dealing with the risks of NEC and balancing them with numerous other medical risks these premature infants face. They carefully balance these risks regardless of how nutrition is administered, and regardless of

---

[2] Abbott manufactures preterm infant nutrition products under the "Similac" brand name. Mead Johnson manufactures preterm infant nutrition products under the "Enfamil" brand name.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

whether it consists of the mother's own milk, human donor milk, specialized formula or fortifier, or a combination.

Plaintiff-parents universally allege that their infants were born prematurely at Philadelphia-area hospitals. They further allege the infants were administered Abbott and/or Mead Johnson cow's milk-based products by medical professionals at the respective hospital after birth.

Plaintiffs further claim that the infant developed NEC sometime after the administration of cow's-milk based product and experienced long-term health effects. Indeed, ***each and every*** plaintiff alleges that the infant suffers from "long-term health effects." *See, e.g.*, Compl. ¶ 14. Regardless of their age, Abbott is entitled to know the plaintiffs' current condition, their medical course from the time of birth through the present, and their developmental and/or educational course.[3] Moreover, because alternative causes of the children's claimed injuries might only be found in parent medical records, these cases place the parents' health at issue as well. Finally, to the extent the parents claim any psychologic injury or wage loss, Abbott is also entitled to those records.

## PROCEDURAL HISTORY OF THE DISPUTE

On July 24, 2023, the Court held a status conference in all actions. During that conference, the Court expressed a preference that the parties begin taking plaintiffs' depositions before the end of the calendar year. To that end, on August 9, 2023, Abbott promptly served a set of interrogatories and a set of requests for production on all plaintiffs. *See* Ex. B (Interrogatories); Ex. C (Requests for Production). The interrogatories consisted of both Standard Form

---

[3] While age is not determinative of Abbott's need for these documents, the need is particularly obvious given that all infants claim long-term injuries and over half of the infants are now between the ages of 10 and 22.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

Interrogatories, propounded pursuant to Phila. Cnty. Loc. R. 4005, as well as supplemental interrogatories.

Following a first set of deficiency letters and a motion to compel filed on December 5, 2023, Abbott and plaintiffs reached an order by agreement in an attempt to resolve the deficiencies outlined in the motion. The resulting order required that, within thirty days of the entry of the Order, plaintiffs must (1) serve complete and accurate discovery responses to all interrogatories and requests for production, (2) provide complete sets of authorizations for all plaintiffs, and (3) produce any remaining medical records in plaintiffs' possession, or otherwise confirm that plaintiffs possess no additional records.

This Court approved and entered the order on January 5, 2024, thereby requiring plaintiffs' compliance no later than February 5, 2024. During a status conference held before this Court on January 18, 2024, plaintiffs expressly reaffirmed that they would comply with the terms of the order.

As of the date of this motion, plaintiffs have failed to comply with the January 5, 2024 order. Plaintiffs failed to serve responses on or before February 5, 2024. Instead, over the weeks after the Court-imposed deadline had already passed, some plaintiffs began submitting partially-supplemented responses. These untimely responses were neither full nor complete, as required by the Court's order, and to date, plaintiffs still have not complied with the order. *See* Deficiency Letters, Exs. D–S.

In particular, plaintiffs have failed to comply with the Court's January 5, 2024 order in the following respects: (1) plaintiffs in certain cases failed to serve supplemental responses altogether; (2) plaintiffs who did serve supplemental responses universally failed to serve complete and accurate responses; (3) plaintiffs failed to serve complete sets of authorizations in all cases; and

(4) plaintiffs failed to serve additional medical records, or otherwise represent that they are not in possession of any additional records.

In light of plaintiffs' continued failure to meet their basic discovery obligations, and unexplained failure to comply with the Court's order regarding this very same discovery, the Court's intervention is again necessary. Abbott respectfully requests that the Court strike plaintiffs' improper objections and insufficient answers to Abbott's discovery requests, and further requests that this Court caution plaintiffs that, if they yet again violate a Court order regarding this discovery, the Court may impose harsh sanctions, including barring presentation of evidence where plaintiffs failed to provide Abbott with the requisite discovery.

## LEGAL STANDARD

Pennsylvania Rule of Civil Procedure 4003.1(a) provides that "a party may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party . . . ." *See* Pa. R. Civ. P. 4003.1(a). Additionally, Rule 4019(a)(1)(i) provides that "[t]he court may, on motion, make an appropriate order if a party fails to serve answers, sufficient answers, or objections to written interrogatories under Rule 4005." *See id.* R. 4019(a)(1)(i).

## I. FAILURE TO SERVE SUPPLEMENTAL DISCOVERY RESPONSES

As part of the Court's January 5, 2024 order, plaintiffs were required to serve complete and accurate supplemental responses to Abbott's discovery requests. Notwithstanding, plaintiffs failed to serve _any_ supplemental responses to Abbott's interrogatories in *Moment*, *Sanders*, and *Wiggins*. In addition, plaintiffs failed to serve _any_ supplemental responses to Abbott's requests for production in *Goodmond Rya. G.*, *Goodmond Ryh. G.*, *Moment*, and *Wiggins*. Plaintiffs' failure

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

to serve any supplemental responses whatsoever in these cases represents undisputed noncompliance with the Court's January 5, 2024 order.

Accordingly Abbott respectfully requests that this Court order plaintiffs to comply with the Court's prior order, and serve supplemental discovery responses in the above-listed cases.

## II. FAILURE TO SERVE COMPLETE AND ACCURATE DISCOVERY RESPONSES

As part of the Court's January 5, 2024 order, plaintiffs were required to serve complete and accurate supplemental responses to Abbott's discovery requests. Even in those cases in which plaintiffs belatedly served supplemental responses, those responses remain incomplete—and in some cases inaccurate—in several respects.

In an effort to advance discovery efficiently, Abbott served case-specific deficiency letters on plaintiffs on April 8, 2024 and April 12, 2024 in the following actions: *Carter* (220302588), *Wieger S.P.* (220302601), *Taylor* (220302606), *Wieger M.P.* (220302614), and *Stills* (220302617), *Mays* (220302963), *Watson* (220302967), *Kajuffa* (220302978), *Ross* (220302981), *Parker* (220302983), *Wiggins* (220302986), *Henderson* (220400127), *McMillian* (220400140), *Williams* (220400141), *Moment* (220400142), and *Sanders* (220400153). These letters detail case-specific deficiencies that remain outstanding even after plaintiffs submitted their supplemental responses.

Abbott attaches each case-specific deficiency letter to the instant motion to compel, and for the sake of brevity, Abbott incorporates into this motion all arguments and all deficiencies contained therein. *See* Exs. D–S.

As an example of some of the outstanding deficiencies that plaintiffs failed to correct, plaintiff-parents, on the whole, failed to identify and describe the injuries and damages they allegedly suffered as a result of plaintiff-infants' NEC diagnoses. Each plaintiff-parent purports to bring claims for damages resulting from infant's NEC diagnosis. Interrogatories Nos. 2 and 5 sought information regarding this very topic. Notwithstanding, as set forth more fully in the

8

attached deficiency letters, plaintiff-parents failed to identify and describe the injuries they suffered. Indeed, some plaintiff-parents responded by merely listing injuries that appear to relate to the plaintiff-infant. Accordingly, without any identification or description of the injuries/damages plaintiff-parent claims to have suffered, Abbott is without the information necessary to effectively depose plaintiff-parent on this topic.

Similarly, in response to Interrogatory No. 66, which sought information regarding insurers of plaintiffs, not one plaintiff provided any information regarding any insurer. The same is true for Interrogatory No. 61, which sought information about plaintiffs' educational background. Plaintiffs did not even make an attempt to amend or supplement their responses to Interrogatory Nos. 61 or 66.

Moreover, Interrogatory No. 43 sought information regarding any packaging, labeling, product guides, or other related documents that plaintiff-parents saw prior to the alleged administration of preterm infant formula products to plaintiff-infants. This information is directly relevant to plaintiffs' misrepresentation claims. Indeed, each plaintiff alleges that Abbott used "misleading" names on its packaging to suggest its products were derived from breast milk. *See, e.g.*, Taylor Amended Complaint at ¶¶ 50, 69. Notwithstanding, all but one of these plaintiffs suggested they do not recall seeing any responsive materials whatsoever. One plaintiff-parent, Christina Taylor, responded only by saying she "recalls seeing packaging." These responses are clearly insufficient, and, in light of plaintiffs' misrepresentation claims, plaintiffs should be ordered to respond in full to this interrogatory.

The issues described above represent just a few examples of the deficiencies that permeate plaintiffs' supplemental responses. Abbott clearly laid out these deficiencies in its April 8 letter to plaintiffs. But plaintiffs failed to respond to the letter, propose a meet and confer, or otherwise

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

serve complete and accurate supplemental responses. Accordingly, plaintiffs remain in noncompliance with this Court's prior Order , and Abbott respectfully requests that this Court direct plaintiffs to immediately comply with that order by remedying the ongoing deficiencies. *See* Exs. D–S.

## III. FAILURE TO SERVE COMPLETE SETS OF AUTHORIZATIONS IN ALL CASES

As part of the Court's January 5, 2024 order, plaintiffs were required to serve complete sets of authorizations for all plaintiff-parents and plaintiff-infants. A complete set of authorizations would include blank medical, education, and insurance authorizations for all cases. It would also include employment authorizations for any plaintiff asserting a wage loss claim and psychiatric authorizations for plaintiffs asserting a claim for psychiatric injury.

Notwithstanding the Court's order, plaintiffs have not served complete sets of authorizations in all cases. Indeed, the following blank authorizations remain outstanding:

- Medical authorizations: *Sanders* (parent), *Wiggins* (parent), and *Wiggins* (infant).
- Education authorizations (infants): *Kajuffa*, *Moment*, *Parker*, *Ross*, *Short*, *Stills*, *Taylor*, *Thomas, Watson, Wiggins*, and *Williams*.
- Insurance authorizations: *Goodmond Rya. G.* (infant), *Mays* (infant), *Sanders* (infant), *Stills* (parent), *Wiggins* (parent), and *Wiggins* (infant).

In addition, plaintiffs have failed to serve blank employment and/or psychiatric authorizations in the cases listed below. Abbott has been requesting these authorizations for over eight months; accordingly, Abbott assumes that plaintiffs' failure to serve these blank authorizations indicates that plaintiffs are not pursuing a wage loss and/or psychiatric injury claim in these cases:

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

- Employment (parent): *Carter, Goodmond Rya., Goodmond Ryh., Kajuffa, Moment, Parker, Ross, Sanders, Stills, Taylor, Thomas, Walker-Savage, Watson, Wieger M.P., Wieger S.P., Wiggins,* and *Williams*.

- Employment (infant, if applicable)[4]: *Goodmond Rya., Henderson, McMillian, Sanders, Stills, Walker-Savage,* and *Williams*.

- Psychiatric (parent and infant):, *Goodmond Rya. G., Goodmond Ryh G., Henderson, Kajuffa, Moment, Parker, Ross, Short, Stills, Taylor, Thomas, Walker-Savage, Watson, Wieger M.P., Wieger S.P., Wiggins,* and *Williams*.

- Psychiatric (parent-only): *Carter (parent), Mays (parent), McMillian (parent),* and *Sanders (parent)*.

On March 11, 2024, Abbott sent plaintiffs a deficiency letter detailing these and other deficiencies with respect to authorizations. Plaintiffs did not respond to this letter. Abbott reiterated these authorization deficiencies in the case-specific deficiency letters attached to this motion. Accordingly, Abbott respectfully requests that this Court order plaintiffs to serve the outstanding authorizations. In addition, Abbott respectfully requests that this Court order plaintiffs to provide a list of any additional treaters and entities for each parent and infant, or otherwise affirmatively confirm that no additional treaters or entities exist upon which Abbott should serve authorizations

## IV. FAILURE TO PRODUCE ADDITIONAL MEDICAL RECORDS IN PLAINTIFFS' POSSESSION

As part of the Court's January 5, 2024 order, plaintiffs were required to produce any additional medical records in their possession, custody, or control, or otherwise affirmatively

---

[4] In its deficiency letter dated March 11, 2024, Abbott included a request for employment authorizations for infant-plaintiffs who are at least 15 years of age (if they are working).

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

confirm that no additional such records exist in their possession. Plaintiffs have produced no additional records. While plaintiffs caveat their supplemental responses by preserving their right to serve additional records at an unspecified date in the future, plaintiffs were required to produce these documents, to the extent they exist, by February 5, 2024.

Accordingly, Abbott requests that this Court order plaintiffs to comply with the Court's prior order and produce any additional medical records in plaintiffs' possession, custody, and control, or otherwise affirmatively represent that no additional documents exist.

## CONCLUSION

For the foregoing reasons, Abbott respectfully requests that this Court enter Abbott's proposed order.

Dated: April 24, 2024                    Respectfully Submitted:


*/s/ Sean P. Fahey*                       */s/ Joseph E. O'Neil*
Sean P. Fahey (PA Bar No. 73305)          Joseph E. O'Neil (PA Bar No. 29053)
**TROUTMAN PEPPER HAMILTON**              Meaghann C. Porth (PA Bar No. 307629)
**SANDERS LLP**                           Ryan J. O'Neil (PA Bar No. 314034)
3000 Two Logan Square                     **CAMPBELL CONROY & O'NEIL, P.C.**
Philadelphia, PA 19103                    1205 Westlakes Drive, Suite 330
215.981.4296                              Berwyn, PA 19312
Sean.Fahey@troutman.com                   610.964.6388
                                          JONeil@CampbellTrialLawyers.com
                                          MPorth@campbell-trial-lawyers.com
*/s/ Ronni E. Fuchs*                      RONeil@campbell-trial-lawyers.com
Ronni E. Fuchs (PA Bar No. 65561)
**TROUTMAN PEPPER HAMILTON**              */s/ Marques Hillman Richeson*
**SANDERS LLP**                           Marques Hillman Richeson (admitted *pro hac*
301 Carnegie Center, Suite 400            *vice*)
Princeton, NJ 08540                       **JONES DAY**
609.951.4183                              901 Lakeside Avenue
Ronni.Fuchs@troutman.com                  Cleveland, OH 44114
                                          216.586.7195
                                          mhricheson@jonesday.com

                                          *Attorneys for Defendant Abbott Laboratories*

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

# EXHIBIT A

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

| | |
|---|---|
| NAFEESAH MAYS, on her own behalf and as Parent and Natural Guardian of A.R., a Minor, *Plaintiff*, | : MARCH TERM, 2020 : No. 220302963 : |
| v. | : |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, ALBERT EINSTEIN MEDICAL CENTER a/k/a EINSTEIN MEDICAL CENTER, and ALBERT EINSTEIN HEALTHCARE NETWORK d/b/a EINSTEIN HEALTHCARE NETWORK. *Defendants*. | : : : : : : : : : |

ORDER-Mays Etal Vs Mead Johnson

22030296300126

**ORDER BY AGREEMENT**

On this 5 ᵗʰ day of JAN. 2024, ~~2023~~, upon consideration of defendant Abbott

Laboratories' amended motion to compel and to strike improper objections and insufficient

answers to Abbott's discovery requests, its brief in support, and any response thereto, it is hereby

ORDERED that:[1]

    1.    Plaintiffs are directed to provide full and complete responses to all Interrogatories

and Requests for Production within thirty (30) days of the date of this Order.

    2.    These responses shall include complete sets of medical, insurance, and education

authorizations, as requested in Request for Production Nos. 20, 21, 23, and 24.

    3.    To the extent Plaintiffs are pursuing a wage loss claim, they are directed to

provide employment authorizations as requested in Request for Production No. 23.

---

[1] This Order applies to the following cases before this Court: 220302588, 220302601, 220302606, 220302614, 220302617, 220302963, 220302967, 220302978, 220302981, 220302983, 220302986, 220400127, 220400140, 220400141, 220400142, 220400153, 220400156, 220400158, 220400159, 220400208, and 220400212.

Certification Due Date: 05/02/2024
Case ID: 220302963
Response Due Date: 05/02/2024
Control No.: 23121104
Control No.: 24045473

4. To the extent Plaintiffs are pursuing a claim for psychiatric injury, they are directed to provide psychiatric authorizations as requested in Request for Production Nos. 20, 22, and 24.

5. Plaintiffs are directed to provide the authorizations set forth in paragraphs 2-4 above to Abbott within thirty (30) days of the date of this Order.

6. Plaintiffs are further directed to provide to Abbott any medical records in their possession, custody, or control, responsive to Request for Production Nos. 25 and 26, within thirty (30) days of the date of this Order. If Plaintiffs have no additional responsive records, they are directed to inform Abbott that they have provided all medical records in their possession, custody, or control.

BY THE COURT:

DOCKETED

JAN - 5 2024

N. SWEENEY
JUDICIAL RECORDS

2

Certification Due Date: 05/02/2024
Case ID: 220302634
Control No.: 23121096
Control No.: 24045473



**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL SECTION**

| | |
|---|---|
| NAFEESAH MAYS, on her own behalf and as Parent and Natural Guardian of A.R., a Minor, *Plaintiff,* : | MARCH TERM, 2020 No. 220302963 |
| v. : | |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, ALBERT EINSTEIN MEDICAL CENTER a/k/a EINSTEIN MEDICAL CENTER, and ALBERT EINSTEIN HEALTHCARE NETWORK d/b/a EINSTEIN HEALTHCARE NETWORK. *Defendants.* : : : : : : : : : | |

## PRAECIPE TO ENTER DISCOVERY ORDER BY AGREEMENT

To the Office of Judicial Records:

I, Ronni E. Fuchs, am counsel for the movant in the discovery motions filed November 10, 2023, with Control Number 23112426, and December 5, 2023, with Control Number 23121104.[1] Pursuant to the Court's Discovery Protocol and subject to the below certification, and after Court review, kindly enter the Order By Agreement attached hereto as Exhibit A.

To resolve the discovery motions with Control Numbers 23112426 and 23131104, Plaintiffs and Defendant Abbott Laboratories ("Abbott") hereby enter the attached Order By Agreement. I, Ronni E. Fuchs, certify that I have conferred with counsel for Plaintiffs and that the discovery motion seeking to compel full and complete responses from Plaintiffs to Abbott's discovery requests is resolved by agreement.

I make this certification subject to the penalties of 18 Pa. C.S.A. § 4904 regarding unsworn falsifications to authorities. I maintain written documentation of the agreement.

---

[1] Please be advised that this action is one of 21 nearly-identical actions filed in this Court. The discovery disputes raised in Control Numbers 23112426 and 23131104 apply to all 21 cases: 220302583, 220302588, 220302594, 220302601, 220302606, 220302614, 220302617, 220302967, 220302969, 220302978, 220302981, 220302983, 220302986, 220400127, 220400136, 220400138, 220400140, 220400141, 220400142, 220400145, 220400153, 220400156, 220400158, 220400159, 220400162, 220400208, 220400212, and 220400216.

December 19, 2023

Respectfully Submitted,

*/s/ Ronni E. Fuchs*
Ronni E. Fuchs
PA Bar #65561
**Troutman Pepper Hamilton Sanders LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

2

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that she caused a copy of the Praecipe To Enter Discovery Order By Agreement to be served upon all counsel of record via electronic filing on December 19, 2023.

/s/ Ronni E. Fuchs
Ronni E. Fuchs (PA 65561)
TROUTMAN PEPPER
HAMILTON SANDERS LLP

3

# EXHIBIT B

**TROUTMAN PEPPER HAMILTON SANDERS LLP**

Sean P. Fahey (PA Bar No. 73305)
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

Ronni E. Fuchs (PA Bar No. 65561)
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

**JONES DAY**

Marques Hillman Richeson (admitted *pro hac vice*)
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

Jennifer B. Flannery (PA Bar No. 74546)
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
404.581.8008
jbflannery@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

**CAMPBELL, CONROY & O'NEIL**

Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.1900
JONeil@CampbellTrialLawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL SECTION**

| | |
|---|---|
| CHRISTINA TAYLOR, *on her own behalf and as Parent and Natural Guardian of* I.H.*, a Minor,* | **MARCH TERM 2022** |
| Plaintiffs, | **NO. 220302606** |
| v. | |
| MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, | |
| Defendants. | |

---

**ABBOTT LABORATORIES' FIRST SET OF INTERROGATORIES
DIRECTED TO PLAINTIFF CHRISTINA TAYLOR ON HER OWN BEHALF AND ON
BEHALF OF HER MINOR CHILD I.H.**

Defendant Abbott Laboratories ("Abbott"), by and through its attorneys, serves its First

Set of Interrogatories to Plaintiff Christina Taylor ("Plaintiff") and requests that Plaintiff, on her

own behalf and on behalf of her minor child, I.H., answer the following Interrogatories

separately, in writing, and under oath within thirty (30) days of service.  The following

Interrogatories are separated into three categories.  Pursuant to Philadelphia County Local Rule

4005, the first two categories of Interrogatories are drawn, verbatim, from Philadelphia County's

Standard Interrogatories, which are propounded upon Plaintiff and I.H., respectively.  The third

category consists of Interrogatories intended to supplement the Standard Interrogatories, and they

are propounded upon both Plaintiff and I.H.

2

**<u>STANDARD FORM INTERROGATORIES TO PLAINTIFF CHRISTINA TAYLOR</u>**

When a Standard Interrogatory uses the word "identify," the party served with the interrogatory must identify all documents, things and persons known to that party or to that party's attorney, and the addresses of all persons identified must be set forth. "Accident" is defined as the events described in the Complaint alleged to have caused injuries.

**<u>INTERROGATORY NO. 1</u> (Medical Malpractice Case Standard Interrogatory No. 1):**

State:

      (a)      Your full name;

      (b)      Any other names you have used or been known by;

      (c)      Your date and place of birth;

      (d)      Your marital status at the time of the incident;

      (e)      Your present marital status;

      (f)      Your present home address; and

      (g)      Your social security number.

**RESPONSE**:

**<u>INTERROGATORY NO. 2</u> (Medical Malpractice Case Standard Interrogatory No. 2):**

If you claim a permanent injury resulting from the treatment, surgery or examination upon which this action is based, describe such injury fully and in detail.

**RESPONSE**:

**<u>INTERROGATORY NO. 3</u> (Medical Malpractice Case Standard Interrogatory No. 3):**

Were you ever in the Armed Forces? If so, state: the dates, branch of service, rank at discharge, whether you had any infirmities at discharge, whether you have any claim or are

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

receiving benefits for any infirmities from said service, your Armed Forces service number, and your Veterans "C" number.

**RESPONSE**:

**<u>INTERROGATORY NO. 4</u> (Medical Malpractice Case Standard Interrogatory No. 4):**

State the name and address of your family physician at the time of the treatment, surgery or examination upon which this action is based.

**RESPONSE**:

**<u>INTERROGATORY NO. 5</u> (Medical Malpractice Case Standard Interrogatory No. 5):**

State in detail the injuries or diseases that you allege that you suffered as a result of treatment, surgery or examination upon which this action is based.

**RESPONSE**:

**<u>INTERROGATORY NO. 6</u> (Medical Malpractice Case Standard Interrogatory No. 6):**

If you received medical treatment, tests, or examinations (including x-rays) because of injuries or diseases you suffered as a result of the treatment, surgery, or examination referred to in the complaint, state:

      (a)    The name and address of each hospital at which you were treated or examined;

      (b)    The dates on which each such treatment or examination at a hospital was rendered and the charges by the hospital for each;

      (c)    The name and address of each doctor or practitioner by whom you were treated or examined;

4

(d)    The dates on which each such treatment or examination by a doctor or practitioner was rendered and the charges for each;

(e)    The identity of all reports regarding any medical treatment or examination, setting forth the author and date of such reports; and

(f)    Please consider this as a request to produce copies of all reports referred to in the above answer.

**RESPONSE**:

**INTERROGATORY NO. 7 (Medical Malpractice Case Standard Interrogatory No. 7):**

Either prior to or subsequent to the treatment, surgery or examination referred to in the complaint, have you ever suffered any injuries, illness or diseases in those portions of the body claimed by you to have been affected by the treatment, surgery or examination referred to in the complaint?

If so, state:

(a)    A description of the injuries or diseases you suffered;

(b)    The date and place of any accident, if such an injury or disease was caused by an accident; and

(c)    The names and addresses of all hospitals, doctors or practitioners who rendered treatment or examinations because of any such injuries or diseases.

**RESPONSE**:

**INTERROGATORY NO. 8 (Medical Malpractice Case Standard Interrogatory No. 8):**

For the period of three years immediately preceding the date of the treatment, surgery or examination referred to in the complaint, state:

5

(a)     The name and address of each of your employers or, if you were self-employed during that period, each of your business addresses and the name of the business while self-employed;

(b)     The dates of commencement and termination of each of your periods of employment or self-employment;

(c)     A detailed description of the nature of your occupation and the services performed by you in each employment or self-employment; and

(d)     Your average weekly earnings from each employment or self-employment; the average number of hours worked by you per week in each employment or self-employment; and the amount of income from employment or self-employment reported on your Federal Income Tax Return for each year.

RESPONSE:

**INTERROGATORY NO. 9 (Medical Malpractice Case Standard Interrogatory No. 9):**

If you have engaged in one or more gainful occupations subsequent to the date of the treatment, surgery or examination referred to in the complaint, state:

(a)     The name and address of each of your employers or, if you were self-employed, each of your business addresses and the name of the business while self-employed;

(b)     The dates of commencement and termination of each of your periods of employment or self-employment;

(c)     A detailed description of the nature of your occupation and the services performed by you in each employment or self-employment;

6

(d)     The wage, salary or rate of earnings received by you in each

employment or self-employment and the amount of income reported on your Federal

Income Tax Return for each year subsequent to the accident; and

(e)     The dates of all absences from your occupation, the reasons

therefor and the amount of any earnings lost by you because of such absences.

**RESPONSE**:

**INTERROGATORY NO. 10 (Medical Malpractice Case Standard Interrogatory No. 10):**

State whether you, subsequent to the date of the treatment, surgery or examination, have

been unable to perform adequately any of your customary occupational duties or social or other

activities, stating with particularity (a) the duties and/or activities you have been unable to

perform, (b) the periods of time you have been unable to perform, and (c) the names and last

known addresses of all persons who have personal knowledge thereof.

**RESPONSE**:

**INTERROGATORY NO. 11 (Medical Malpractice Case Standard Interrogatory No. 11):**

State the name and last known address of each person who (a) was a witness to the

treatment, surgery or examination through sight or hearing and/or (b) has knowledge of facts

concerning the happening of the treatment, surgery or examination or conditions or cir-

cumstances at the time of the treatment, surgery or examination prior to, after, or at the time of

the accident, excepting those persons who acquired such knowledge during the course of this

litigation.

**RESPONSE**:

**INTERROGATORY NO. 12 (Medical Malpractice Case Standard Interrogatory No. 12):**

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

With respect to each person identified in the answer to interrogatory 11(a), state that person's exact location and activity at the time of the treatment, surgery or examination.

**RESPONSE**:

**INTERROGATORY NO. 13 (Medical Malpractice Case Standard Interrogatory No. 13):**

Have you or anyone acting on your behalf obtained from any person any statement concerning this action or its subject matter? If so, state:

(a)     The name and last known address of each such person;

(b)     When, where, by whom and to whom each statement was made, and whether it was reduced to writing or otherwise recorded;

(c)     The name and address of any person who has custody of any such statements that were reduced to writing or otherwise recorded; and

(d)     Please consider this a Request to Produce those statements referred to in the above answer.

**RESPONSE**:

**INTERROGATORY NO. 14 (Medical Malpractice Case Standard Interrogatory No. 14):**

Have you given any statement concerning this action or its subject matter? If so, state:

(a)     The name and last known address of each person to whom a statement was given;

(b)     When and where each statement was given; and

(c)     Please consider this a Request to Produce the statements referred to in the above answer.

**RESPONSE**:

**INTERROGATORY NO. 15 (Medical Malpractice Case Standard Interrogatory No. 15):**

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

Do you know of the existence of any photographs, diagrams or models of the surrounding area or the areas of the treatment, surgery or examination or any other matters or things involved in this treatment, surgery or examination.

If the answer is in the affirmative, state:

     (a)    The date(s) when such photographs, diagrams or models were made;

     (b)    The name and address of the party making them;

     (c)    Where they were made;

     (d)    The object(s) or subject(s) each photograph, diagram or model represents; and

     (e)    Please consider this a request to produce the photographs, diagrams and/or models referred to in the above answer.

**RESPONSE**:

**<u>INTERROGATORY NO. 16</u> (Medical Malpractice Case Standard Interrogatory No. 16):**

     (a)    Have you, or anyone on your behalf, conducted any investigations of the treatment, surgery or examination which is the subject matter of the complaint?

     (b)    If the answer to (a) is in the affirmative, state:

         (1)    the name, address, and employer of all persons who conducted any investigations;

         (2)    The dates of the investigation;

         (3)    The dates of any reports of any investigations and the identity of the persons who have possession thereof; and

9

(4)      Please consider this a request to produce your investigation reports, except those portions which are protected from discovery by Pennsylvania Rule of Civil Procedure 4003.3.

**RESPONSE**:

**INTERROGATORY NO. 17 (Medical Malpractice Case Standard Interrogatory No. 17):**

(a)      State the name and address of each person whom you expect to call as expert witnesses at trial and state the subject matter on which the expert is expected to testify.

(b)      For each such expert, state, or have the expert state, the substance of the facts and opinions to which the expert is expected to testify and summarize the grounds for each such opinion. (Experts' reports containing the same information may be attached in lieu of an answer.)

(c)      If the expert is employed and/or self-employed, identify the employer and the nature of employment hereof.

(d)      Identify all documents submitted to the expert and all products and/or locales inspected by the expert in connection with preparations for his/her testimony.

(e)      Set forth the qualifications of each expert, listing the schools attended, years of attendance, degrees received, experience in any particular field of

10

specialization or expertise, all publications authored, including the title of the work and

the book in which it was printed giving the date of publication.

**RESPONSE**:

**INTERROGATORY NO. 18 (Medical Malpractice Case Standard Interrogatory No. 18):**

State the specific facts known to you or anyone acting on your behalf upon which you

base each claim of negligence or malpractice alleged in this action.

**RESPONSE**:

**INTERROGATORY NO. 19 (Medical Malpractice Case Standard Interrogatory No. 19):**

(a)     Were the injuries you allege in this action caused in part by

sickness, disease, abnormality or injury other than the injuries you claim resulted from

the treatment, surgery or examination upon which this action is based?

(b)     If so, state specifically the nature of each such sickness, disease,

abnormality or injury and how each affected you.

(c)     Are there any medical, x-rays, hospital or other reports which

indicate the nature of each such sickness, disease or abnormality or injury and how each

affected you.

(d)     If so, where and when was each report made and what is the name

and present or last known address of the person who made each such report and each

such person who has custody or possession of each such report or any copy thereof?

(e)     Have you been furnished with any such information in any way

other than by the documents referred to in this interrogatory? If so, how, when and where

and by whom?

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**RESPONSE**:

**INTERROGATORY NO. 20 (Product Liability Standard Interrogatory No. 1):**

Identify all instruction, operating, repair, maintenance and safety manuals regarding the product actually involved in the accident and any other documents which describe the product and its use stating: titles, dates of publication, general description and amendments thereto and identify the persons who have custody thereof.

**RESPONSE:**


**INTERROGATORY NO. 21 (Personal Injury Case Standard Interrogatory No. 3):**

If you have incurred any bills or expenses in connection with the injuries or diseases which you suffered because of the accident referred to in the complaint, and such bills or expenses are not otherwise listed in answer to these interrogatories, set forth the amount of each such bill or expense, the service for which the bill or expense was incurred, and the identity of the person who rendered the bill or who was involved in the expense.

**RESPONSE:**

**STANDARD FORM INTERROGATORIES TO PLAINTIFF I.H.**

When a Standard Interrogatory uses the word "identify," the party served with the interrogatory must identify all documents, things and persons known to that party or to that party's attorney, and the addresses of all persons identified must be set forth. "Accident" is defined as the events described in the Complaint alleged to have caused injuries.

**INTERROGATORY NO. 22 (Medical Malpractice Case Standard Interrogatory No. 1):**

State:

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

     (a)      Your full name;

     (b)      Any other names you have used or been known by;

     (c)      Your date and place of birth;

     (d)      Your marital status at the time of the incident;

     (e)      Your present marital status;

     (f)      Your present home address; and

     (g)      Your social security number.

**RESPONSE**:


**INTERROGATORY NO. 23 (Medical Malpractice Case Standard Interrogatory No. 2):**

If you claim a permanent injury resulting from the treatment, surgery or examination upon which this action is based, describe such injury fully and in detail.

**RESPONSE**:

**INTERROGATORY NO. 24 (Medical Malpractice Case Standard Interrogatory No. 3):**

Were you ever in the Armed Forces? If so, state: the dates, branch of service, rank at discharge, whether you had any infirmities at discharge, whether you have any claim or are receiving benefits for any infirmities from said service, your Armed Forces service number, and your Veterans "C" number.

**RESPONSE**:

**INTERROGATORY NO. 25 (Medical Malpractice Case Standard Interrogatory No. 4):**

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

State the name and address of your family physician at the time of the treatment, surgery or examination upon which this action is based.

**RESPONSE**:

**INTERROGATORY NO. 26 (Medical Malpractice Case Standard Interrogatory No. 5):**

State in detail the injuries or diseases that you allege that you suffered as a result of treatment, surgery or examination upon which this action is based.

**RESPONSE**:

**INTERROGATORY NO. 27 (Medical Malpractice Case Standard Interrogatory No. 6):**

If you received medical treatment, tests, or examinations (including x-rays) because of injuries or diseases you suffered as a result of the treatment, surgery, or examination referred to in the complaint, state:

(a)     The name and address of each hospital at which you were treated or examined;

(b)     The dates on which each such treatment or examination at a hospital was rendered and the charges by the hospital for each;

(c)     The name and address of each doctor or practitioner by whom you were treated or examined;

(d)     The dates on which each such treatment or examination by a doctor or practitioner was rendered and the charges for each;

(e)     The identity of all reports regarding any medical treatment or examination, setting forth the author and date of such reports; and

14

       (f)     Please consider this as a request to produce copies of all reports referred to in the above answer.

**RESPONSE**:

**INTERROGATORY NO. 28 (Medical Malpractice Case Standard Interrogatory No. 7):**

Either prior to or subsequent to the treatment, surgery or examination referred to in the complaint, have you ever suffered any injuries, illness or diseases in those portions of the body claimed by you to have been affected by the treatment, surgery or examination referred to in the complaint?

If so, state:

       (a)     A description of the injuries or diseases you suffered;

       (b)     The date and place of any accident, if such an injury or disease was caused by an accident; and

       (c)     The names and addresses of all hospitals, doctors or practitioners who rendered treatment or examinations because of any such injuries or diseases.

**RESPONSE**:

**INTERROGATORY NO. 29 (Medical Malpractice Case Standard Interrogatory No. 9):**

If you have engaged in one or more gainful occupations subsequent to the date of the treatment, surgery or examination referred to in the complaint, state:

       (a)     The name and address of each of your employers or, if you were self-employed, each of your business addresses and the name of the business while self-employed;

       (b)     The dates of commencement and termination of each of your periods of employment or self-employment;

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

(c)     A detailed description of the nature of your occupation and the services performed by you in each employment or self-employment;

(d)     The wage, salary or rate of earnings received by you in each employment or self-employment and the amount of income reported on your Federal Income Tax Return for each year subsequent to the accident; and

(e)     The dates of all absences from your occupation, the reasons therefor and the amount of any earnings lost by you because of such absences.

**RESPONSE**:

**INTERROGATORY NO. 30 (Medical Malpractice Case Standard Interrogatory No. 10):**

State whether you, subsequent to the date of the treatment, surgery or examination, have been unable to perform adequately any of your customary occupational duties or social or other activities, stating with particularity (a) the duties and/or activities you have been unable to perform, (b) the periods of time you have been unable to perform, and (c) the names and last known addresses of all persons who have personal knowledge thereof.

**RESPONSE**:

**INTERROGATORY NO. 31 (Medical Malpractice Case Standard Interrogatory No. 11):**

State the name and last known address of each person who (a) was a witness to the treatment, surgery or examination through sight or hearing and/or (b) has knowledge of facts concerning the happening of the treatment, surgery or examination or conditions or cir-cumstances at the time of the treatment, surgery or examination prior to, after, or at the time of the accident, excepting those persons who acquired such knowledge during the course of this litigation.

16

**RESPONSE**:

**<u>INTERROGATORY NO. 32</u> (Medical Malpractice Case Standard Interrogatory No. 12):**

With respect to each person identified in the answer to interrogatory 11(a), state that person's exact location and activity at the time of the treatment, surgery or examination.

**RESPONSE**:

**<u>INTERROGATORY NO. 33</u> (Medical Malpractice Case Standard Interrogatory No. 13):**

Have you or anyone acting on your behalf obtained from any person any statement concerning this action or its subject matter? If so, state:

      (a)     The name and last known address of each such person;

      (b)     When, where, by whom and to whom each statement was made, and whether it was reduced to writing or otherwise recorded;

      (c)     The name and address of any person who has custody of any such statements that were reduced to writing or otherwise recorded; and

      (d)     Please consider this a Request to Produce those statements referred to in the above answer.

**RESPONSE**:

**<u>INTERROGATORY NO. 34</u> (Medical Malpractice Case Standard Interrogatory No. 14):**

Have you given any statement concerning this action or its subject matter? If so, state:

      (a)     The name and last known address of each person to whom a statement was given;

      (b)     When and where each statement was given; and

17

(c)     Please consider this a Request to Produce the statements referred to in the above answer.

**RESPONSE**:

**INTERROGATORY NO. 35 (Medical Malpractice Case Standard Interrogatory No. 15):**

Do you know of the existence of any photographs, diagrams or models of the surrounding area or the areas of the treatment, surgery or examination or any other matters or things involved in this treatment, surgery or examination.

If the answer is in the affirmative, state:

(a)     The date(s) when such photographs, diagrams or models were made;

(b)     The name and address of the party making them;

(c)     Where they were made;

(d)     The object(s) or subject(s) each photograph, diagram or model represents; and

(e)     Please consider this a request to produce the photographs, diagrams and/or models referred to in the above answer.

**RESPONSE**:

**INTERROGATORY NO. 36 (Medical Malpractice Case Standard Interrogatory No. 16):**

(a)     Have you, or anyone on your behalf, conducted any investigations of the treatment, surgery or examination which is the subject matter of the complaint?

(b)     If the answer to (a) is in the affirmative, state:

18

(1)     the name, address, and employer of all persons who conducted any

investigations;

(2)     The dates of the investigation;

(3)     The dates of any reports of any investigations and the identity of the

persons who have possession thereof; and

(4)     Please consider this a request to produce your investigation reports,

except those portions which are protected from discovery by Pennsylvania Rule of Civil

Procedure 4003.3.

**RESPONSE**:

**INTERROGATORY NO. 37 (Medical Malpractice Case Standard Interrogatory No. 17):**

(a)     State the name and address of each person whom you expect to call

as expert witnesses at trial and state the subject matter on which the expert is expected to

testify.

(b)     For each such expert, state, or have the expert state, the substance

of the facts and opinions to which the expert is expected to testify and summarize the

grounds for each such opinion. (Experts' reports containing the same information may be

attached in lieu of an answer.)

(c)     If the expert is employed and/or self-employed, identify the

employer and the nature of employment hereof.

(d)     Identify all documents submitted to the expert and all products

and/or locales inspected by the expert in connection with preparations for his/her

testimony.

19

(e)     Set forth the qualifications of each expert, listing the schools attended, years of attendance, degrees received, experience in any particular field of specialization or expertise, all publications authored, including the title of the work and the book in which it was printed giving the date of publication.

**RESPONSE**:

**INTERROGATORY NO. 38 (Medical Malpractice Case Standard Interrogatory No. 18):**

State the specific facts known to you or anyone acting on your behalf upon which you base each claim of negligence or malpractice alleged in this action.

**RESPONSE**:

**INTERROGATORY NO. 39 (Medical Malpractice Case Standard Interrogatory No. 19):**

(a)     Were the injuries you allege in this action caused in part by sickness, disease, abnormality or injury other than the injuries you claim resulted from the treatment, surgery or examination upon which this action is based?

(b)     If so, state specifically the nature of each such sickness, disease, abnormality or injury and how each affected you.

(c)     Are there any medical, x-rays, hospital or other reports which indicate the nature of each such sickness, disease or abnormality or injury and how each affected you.

(d)     If so, where and when was each report made and what is the name and present or last known address of the person who made each such report and each such person who has custody or possession of each such report or any copy thereof?

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

     (e)    Have you been furnished with any such information in any way other than by the documents referred to in this interrogatory? If so, how, when and where and by whom?

**RESPONSE**:

**INTERROGATORY NO. 40 (Product Liability Case Standard Interrogatory No. 1):**

Identify all instruction, operating, repair, maintenance and safety manuals regarding the product actually involved in the accident and any other documents which describe the product and its use stating: titles, dates of publication, general description and amendments thereto and identify the persons who have custody thereof.

**RESPONSE:**

**INTERROGATORY NO. 41 (Personal Injury Case Standard Interrogatory No. 3):**

If you have incurred any bills or expenses in connection with the injuries or diseases which you suffered because of the accident referred to in the complaint, and such bills or expenses are not otherwise listed in answer to these interrogatories, set forth the amount of each such bill or expense, the service for which the bill or expense was incurred, and the identity of the person who rendered the bill or who was involved in the expense.

**RESPONSE:**

**SUPPLEMENTAL INTERROGATORIES TO PLAINTIFFS CHRISTINA TAYLOR AND I.H.**

**DEFINITIONS AND INSTRUCTIONS**

As used herein, the following terms shall have the following meanings throughout these Interrogatories:

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

1.    "ABBOTT" means Defendant Abbott Laboratories, an Illinois corporation and a resident of Lake County, Illinois.

2.    "INFANT" means I.H.

3.    "PLAINTIFF," "YOU," or "YOUR" means Plaintiff Christina Taylor, on her own behalf and on behalf of her minor child, I.H., or anyone acting or having acted on behalf of Plaintiff, including but not limited to Plaintiff's attorney(s) in this action.

4.    "PARENTS" means the parents of the INFANT.

5.    "COMMUNICATION" or "COMMUNICATIONS" means any transmission of words or thoughts between or among two or more persons, whether written (including via electronic means, such as through e-mail, instant messenger, or text message) or oral.

6.    "COMPLAINT" means the Complaint in the above-captioned action filed in the Philadelphia Court of Common Pleas, or if that Complaint is amended, the most recent amended complaint filed on PLAINTIFF's behalf at the time these discovery Requests are served.

7.    "HEALTH CARE PRACTITIONER" means any hospital, clinic, center, physician's office, infirmary, medical or diagnostic laboratory, or other facility that provides medical, psychiatric, mental, emotional, or psychological care or advice and any doctor, physician, surgeon, neonatologist, gynecologist, oncologist, radiologist, endocrinologist, clinical geneticist, natural healthcare provider, rheumatologist, homeopath, osteopath, chiropractor, paramedic, nurse (registered or otherwise), physician's assistant, midwife, birthing assistant, physiotherapist, psychologist, psychiatrist, therapist, or any other person practicing any healing art, or performing any physical, radiological, or mental evaluation or examination, or any other

22

persons or entities involved in the evaluation, diagnosis, care and/or treatment of INFANT or PARENTS.

8.      "MEDICAL RECORDS" means all medical history or examination reports and notes, tests results, feeding and nutrition flow sheets, laboratory reports, pathology slides, pathology specimens, pathology reports and notes, radiographic films, CT scans, X-rays, MRI films, MRA films, correspondence, progress notes, prescription records, insurance, Medicare, Medicaid, and disability records, and medical bills or invoices regarding PARENTS' or INFANT's diseases, diagnoses, or treatment.

9.      "PRETERM INFANT FORMULA PRODUCTS" means Abbott preterm and exempt infant formula or fortifier product(s) at issue in this litigation "that are . . . labeled for use by an infant who has . . . low birth weight or who otherwise has an unusual medical or dietary problem," which are known as "exempt" infant formula products under the Infant Formula Act ("IFA") and the amendments thereto, and specifically include: (1) Liquid Protein Fortifier; (2) Similac Human Milk Fortifiers; (3) Similac NeoSure (formerly known as Similac NeoCare); (4) Similac Special Care 20; (5) Similac Special Care 24; (6) Similac Special Care 24 High Protein; (7) Similac Special Care 30; and (8) Similac Alimentum.

10.      "OTHER INFANT FORMULA PRODUCTS" means any liquid or powdered formula or fortifier product containing milk from any source other than PRETERM INFANT FORMULA PRODUCTS. Such term includes but is not limited to Similac, Enfamil, and Prolact+ branded products.

11.      "DOCUMENT" or "DOCUMENTS" is used in the broadest sense and means the original and all non-identical copies or reproductions of any written, printed, typed, or recorded

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

matter of any kind known to YOU or in YOUR possession, custody, or control, including but not limited to:

      a.      All letters, correspondence, memoranda, writings, instructions, calendars, desk books, records, reports, charts, studies, surveys, speeches, pamphlets, notes, drafts, proposals, minutes of meetings, drawings, recordings (audio and/or video), books, papers, computations, accounting records, inter-office and intra-office communications, email, text messages, social media posts or content, instant messages, schedules, lists, specifications, ledgers, journals, diaries, checks, memoranda, or any other written, printed, typewritten, or other graphic or photographic matter or tangible thing on which any words or phrases are affixed; and

      b.      Computer software, files, flash drives, and tapes, and any hard copies of the information stored thereon.

      12.      "RELATED TO" or "IN CONNECTION WITH" a given subject matter shall mean a document or statement that relates to, constitutes, embodies, comprises, reflects, identifies, states, refers to, comments on, responds to, describes, analyzes, contains information concerning, or is in any way pertinent to that subject matter.

      13.      The terms "IDENTIFY," or give the "IDENTITY," mean and require YOU to STATE:

      a.      With reference to an individual, STATE his or her full name and last known residential address, business address, telephone and/or facsimile number, the name and address of his or her employer, the individual's job title or job responsibilities, and his or her relationship to YOU;

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

b.      With reference to a company or organization, STATE the entity's full legal name, business addresses, telephone number, and a PERSON with whom YOU had direct contact within that entity;

c.      With reference to a DOCUMENT, DESCRIBE the DOCUMENT, STATE the date when the DOCUMENT was created, name the creator of the DOCUMENT, and name each PERSON to whom the DOCUMENT was sent;

d.      With reference to an oral COMMUNICATION, provide the date(s) of the COMMUNICATION, the names and addresses of each PERSON involved, when the COMMUNICATION occurred, the place(s) where the COMMUNICATION took place, the subject matter of the COMMUNICATION, and the general substance of the COMMUNICATION; and

e.      With reference to an occurrence or event, provide the date and location of the occurrence or event, the IDENTITY of each PERSON involved in the occurrence or event, the subject matter discussed, and the IDENTITY of any DOCUMENT that records, refers to, or relates to such occurrence or event.

14.     "STATE" or "DESCRIBE" means:

a.      To fully elucidate by reference to underlying facts rather than by reference to ultimate facts or conclusions of fact or law;

b.      Where applicable, to particularize as to time, place, and manner; and

c.      To set forth all relevant facts necessary to complete the understanding of the act, process, event, or thing in question.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

15.     "INJURY" or "INJURIES" means all medical or other conditions that YOU contend were caused, precipitated, or exacerbated by, or otherwise due to PRETERM INFANT FORMULA PRODUCTS.

16.     "LAWSUIT" means the litigation corresponding to the COMPLAINT that YOU filed in the above-captioned action.

17.     "LITIGATION FUNDING" means any and all potential or actual arrangement between YOU and/or YOUR attorneys and any third-party entity that relates in whole or part to financing the above-captioned litigation. The term "LITIGATION FUNDING" includes, but is not limited to, financial arrangements described as third-party litigation funding, litigation investment, litigation financing, pre-settlement funding, LAWSUIT loans, alternative litigation financing, corporate claim finance, claim transfer, and/or claim alienation. The term "LITIGATION FUNDING" also includes any other arrangement under which any person or entity, other than an attorney permitted to charge a contingent fee representing a party, has a right to receive compensation that is contingent on, and sourced from, any proceeds in the above-captioned litigation by settlement, judgment, or otherwise.

18.     "EVIDENCE" (including the other tense forms of that term) means describing, evidencing, constituting, reflecting, showing, comprising, considering, discussing, regarding, setting forth, studying, analyzing, commenting upon, recommending, alluding to, or mentioning, in whole or in part.

19.     "MARKETING" means any and all DOCUMENTS that EVIDENCE PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

20.     "PERSON" includes natural persons, proprietorships, partnerships, firms, trusts, estates, companies, corporations, public corporations, solo practitioners, municipal corporations, federal, state, and local governments, all departments and agencies thereof, any other governmental agencies, subdivisions, groups, associations or organizations, or any other entity, whether foreign or domestic.

21.     Any Interrogatory directed to "YOU" refers to the PLAINTIFF and any persons now or previously acting on YOUR behalf, such as agents, representatives, and, unless privileged, attorneys.

22.     The present tense includes the past and future tenses. Whenever used herein, "and" may be understood to mean "or" and vice versa whenever such construction results in a broader request for information. The singular includes the plural, and the plural includes the singular. "All" means "any and all"; "any" means "any and all." "Including" means "including but not limited to." "And" and "or" encompass both "and" and "or." Words in the masculine, feminine, and neutral form shall include each of the other genders.

23.     If YOU lack information responsive to all or any part of these Interrogatories, YOU shall STATE and provide the information about which YOU have knowledge or is in your possession.

24.     In response to these Interrogatories, YOU are required to furnish all information in your possession, custody, or control. Thus, in responding to these Interrogatories, YOU must make a diligent search of your records and of other papers and materials in your possession and provide all information available to YOU or subject to your reasonable control.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

25.     For each Interrogatory, describe with full particularity the bases for your answer and IDENTIFY and produce all DOCUMENTS that YOU refer to or rely upon in providing the answer.

26.     If YOU object to furnishing any information requested by these Interrogatories on the basis of attorney-client privilege, attorney work product, or otherwise, STATE the existence of the information, IDENTIFY the specific ground on which your objection is based (e.g., attorney work product, attorney-client privilege), and produce a privilege log for any DOCUMENTS that contain the information on which YOU base your claim of privilege. If YOU object to providing any information on grounds other than a claim of privilege, STATE the grounds upon which the objection is based with sufficient specificity to permit determination of the propriety of such objection. If any Interrogatory seeks information YOU deem objectionable also requests information that is not objectionable, YOU must provide the responsive information and answer that portion of the Interrogatory to which YOU do not object.

27.     These instructions and definitions should be construed to require answers based upon the knowledge of, and information available to, the responding party as well as his or her agents, representatives, and, unless privileged, attorneys.

28.     These Interrogatories are continuing in nature and YOU are required to supplement or revise YOUR answer promptly whenever additional information becomes available.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

## INTERROGATORIES

**INTERROGATORY NO. 42:**

IDENTIFY all PRETERM INFANT FORMULA PRODUCTS administered to the INFANT prior to the INFANT'S alleged necrotizing enterocolitis ("NEC") diagnosis, including the full product name, manufacturer name of any IDENTIFIED PRETERM INFANT FORMULA PRODUCTS, the date(s) on which each identified PRETERM INFANT FORMULA PRODUCT was allegedly administered to the INFANT, the approximate dosage/amount consumed on each of the dates each PRETERM INFANT FORMULA PRODUCT was allegedly administered to the INFANT, and the identity of any HEALTH CARE PROVIDER who administered the PRETERM INFANT FORMULA PRODUCT to the INFANT. If the PRETERM INFANT FORMULA PRODUCT was administered to the INFANT by someone other than a HEALTH CARE PROVIDER, STATE as much and IDENTIFY the administering individual.

**RESPONSE**:

**INTERROGATORY NO. 43:**

STATE whether YOU and/or PARENTS saw or read any label, packaging, product guide, or other DOCUMENTS RELATED TO the PRETERM INFANT FORMULA PRODUCTS before they were administered to the INFANT and, if so, IDENTIFY the label, packaging, or product guide, or other DOCUMENTS you saw or read and IDENTIFY the time, place, and manner in which YOU saw or read such materials.

**RESPONSE**:

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**INTERROGATORY NO. 44:**

STATE whether YOU and/or PARENTS had any COMMUNICATIONS with any HEALTH CARE PRACTITIONERS regarding the decision to administer any nutrition, including but not limited to breast milk, donor milk, or PRETERM INFANT FORMULA PRODUCTS, to the INFANT and, if so, IDENTIFY all persons with whom YOU and/or PARENTS had such COMMUNICATIONS, the date(s), time, place, and manner of those COMMUNICATIONS, and DESCRIBE the content of those COMMUNICATIONS.

**RESPONSE**:

**INTERROGATORY NO. 45:**

IDENTIFY any DOCUMENTS YOU and/or PARENTS received from any HEALTH CARE PROVIDER RELATING TO infant nutrition, any PRETERM INFANT FORMULA PRODUCTS, and any OTHER INFANT FORMULA PRODUCTS, including without limitation the name or title of the DOCUMENT, the PERSON who provided the DOCUMENT to YOU and/or PARENTS, the date YOU and/or PARENTS received the DOCUMENT, and the substance of any discussions about the DOCUMENT.

**RESPONSE:**

**INTERROGATORY NO. 46:**

IDENTIFY any gifts, coupons, PRETERM INFANT FORMULA PRODUCTS, or OTHER INFANT FORMULA PRODUCTS that YOU and/or PARENTS received from any HEALTH CARE PROVIDER, including without limitation the PERSON who provided any such items to YOU and/or PARENTS, the date YOU and/or PARENTS received such items, and the substance of any discussions about such items.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**RESPONSE:**

**INTERROGATORY NO. 47:**

IDENTIFY any and all advertising RELATING TO infant nutrition, any PRETERM INFANT FORMULA PRODUCTS, and any OTHER INFANT FORMULA PRODUCTS that YOU and/or PARENTS saw at or before the time the INFANT was allegedly diagnosed with NEC, including without limitation the date(s), time, place, and manner YOU and/or PARENTS saw the advertising, and the substance of the advertising.

**RESPONSE**:

**INTERROGATORY NO. 48:**

If YOU contend that ABBOTT should have provided different, additional, and/or other instructions and warnings relating to the use of the PRETERM INFANT FORMULA PRODUCTS, please IDENTIFY what different, additional, or other instructions and warnings ABBOTT should have given, and why it should have given those different, additional, or other instructions.

**RESPONSE**:

**INTERROGATORY NO. 49:**

DESCRIBE how and when YOU and/or PARENTS first believed there to be a connection between PRETERM INFANT FORMULA PRODUCTS and NEC, including the source(s) from which YOU and/or PARENTS learned of such information, a DESCRIPTION of the information relayed or cited by each source, and the date(s) on which YOU and/or PARENTS heard or spoke to those sources.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**RESPONSE**:

**INTERROGATORY NO. 50:**

IDENTIFY, with particularity, the mechanism(s) or interaction(s) unique to PRETERM INFANT FORMULA PRODUCTS that YOU allege cause or otherwise increase the risk for development of NEC, including the sources(s) from which YOU and/or PARENTS learned of the mechanism(s) or interaction(s), a DESCRIPTION of the information relayed or cited by each source, the date(s) on which YOU and/or PARENTS heard or spoke to these sources, and the results of any confirmatory testing that YOU and/or PARENTS are aware RELATED TO the unique mechanism or interaction.

**RESPONSE**:

**INTERROGATORY NO. 51:**

STATE whether donor milk, breast milk, or OTHER INFANT FORMULA PRODUCTS were available to be administered to INFANT at the time INFANT was in the Neonatal Intensive Care Unit. If yes, IDENTIFY which milk or formula products were available to be administered to INFANT and whether any such products were actually administered to INFANT.

**RESPONSE:**

**INTERROGATORY NO. 52:**

STATE the date on which INFANT was diagnosed with NEC, whether such diagnosis was made during the INFANT's admission in the Neonatal Intensive Care Unit, and whether any HEALTH CARE PROVIDER suggested any cause of INFANT's NEC. To the extent INFANT has not been diagnosed with NEC, so STATE.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**RESPONSE:**

**INTERROGATORY NO. 53:**

IDENTIFY all PERSONS, including HEALTH CARE PROVIDERS and any other PERSON, with whom YOU and/or PARENTS have had any COMMUNICATION(S) regarding the cause(s) of INFANT's NEC and DESCRIBE the contents of those COMMUNICATION(S). DESCRIBE the contents of all COMMUNICATIONS that YOU IDENTIFY.

**RESPONSE**:

**INTERROGATORY NO. 54:**

STATE whether YOU and/or PARENTS had any COMMUNICATIONS with any PERSONS, including but not limited to any manufacturer of PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS, and if so, IDENTIFY all persons with whom YOU and/or PARENTS had such COMMUNICATIONS, the date(s), time, place, and manner of those COMMUNICATIONS, and DESCRIBE the content of those COMMUNICATIONS.

**RESPONSE**:

**INTERROGATORY NO. 55:**

IDENTIFY any and all pregnancies that INFANT's mother has experienced, and for each pregnancy, STATE the date of conception, IDENTIFY whether the pregnancy resulted in an abortion, a miscarriage, a stillbirth, or a live birth, and for still- and/or live-births, STATE the name, birthdate, birth weight, and the gestational week at birth for each child, and IDENTIFY any and all breast milk, donor milk, PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS that were fed or administered to each child.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**RESPONSE**:

**INTERROGATORY NO. 56:**

      For each child IDENTIFIED in Interrogatory No. 55 above, IDENTIFY all PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS administered to each child, including the full product name and manufacturer name of any such products and the dates of administration.

      **RESPONSE**:

**INTERROGATORY NO. 57:**

      IDENTIFY all PERSONS, including HEALTH CARE PROVIDERS and any other PERSON, who maintains or who has maintained any MEDICAL RECORDS regarding the provision of any medical care to YOU or INFANT, and IDENTIFY any COMMUNICATIONS you have had with those IDENTIFIED PERSONS.

      **RESPONSE:**

**INTERROGATORY NO. 58:**

      IDENTIFY all non-NEC diagnoses that INFANT has received from time of birth through the present. For each diagnosis, IDENTIFY the condition diagnosed, the date of diagnosis, the HEALTH CARE PROVIDER who rendered the diagnosis, any course of treatment undertaken for the condition, and the identity of any HEALTHCARE PROVIDER who administered that course of treatment.

      **RESPONSE:**

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**INTERROGATORY NO. 59:**

STATE whether YOU and/or PARENTS ever purchased PRETERM INFANT FORMULA PRODUCTS from any online site or retail store. For each product purchased, IDENTIFY the product name, manufacturer name, date of purchase, and location of purchase. Purchase records of the specified products may be produced in lieu of a written response.

**RESPONSE:**

**INTERROGATORY NO. 60:**

IDENTIFY each home address where YOU have resided and provide the dates YOU lived at the address and IDENTIFY the persons, if any, who lived with YOU for the ten (10) years preceding the events giving rise to this LAWSUIT to the present. If INFANT has not resided with YOU at any time during that period, IDENTIFY the address(es) where INFANT has resided, provide the dates INFANT lived at the address and IDENTIFY the persons, if any, who lived with INFANT.

**RESPONSE**:

**INTERROGATORY NO. 61:**

IDENTIFY YOUR educational background, identifying all high school, secondary schools, colleges, and vocational training schools that YOU have attended. IDENTIFY INFANT's educational background, including all primary schools, secondary schools, colleges, and vocational training schools that INFANT has attended.

**RESPONSE:**

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**INTERROGATORY NO. 62:**

IDENTIFY any position of employment that YOU or INFANT have held during the ten (10) years preceding the events giving rise to this LAWSUIT to the present, whether full-time or part-time, and DESCRIBE each position of employment, including the name of the employer, compensation received, location, and dates (range) of the employment.

**RESPONSE**:

**INTERROGATORY NO. 63:**

Apart from the present LAWSUIT, DESCRIBE any prior legal proceedings in which YOU or INFANT have been a party (including administrative charges, unemployment claims, and bankruptcy petitions) including the court which handled the proceeding, the case name, the civil action or docket number associated with the legal proceeding, a description of the claims asserted in the legal proceeding, and the final result, outcome, or adjudication of the claims (e.g. whether dismissed by parties, dismissed by court, judgment granted in favor of a party).

**RESPONSE**:

**INTERROGATORY NO. 64:**

IDENTIFY all social media accounts (e.g. LinkedIn, Facebook, MySpace, Twitter, Tumbler, Pinterest, Instagram, Snapchat, etc.) and electronic accounts (including but not limited to e-mail, text messages, or messaging accounts, such as Gmail, Yahoo, Comcast, Verizon, iChat, Apple FaceTime, AOL Instant Messenger, BlackBerry Messenger, chat rooms) that YOU or INFANT have created, hosted, maintained, used and/or had access to at any time during the period of two years prior to the INFANT's birth through the present.

36

**RESPONSE**:

**INTERROGATORY NO. 65:**

IDENTIFY and itemize any damages YOU seek to recover from ABBOTT in this LAWSUIT (on behalf of YOU or others, including the INFANT), whether economic, non-economic, punitive or other and DESCRIBE each element of damage or component of recovery that YOU are seeking from ABBOTT, STATE the specific dollar amounts YOU are claiming, the manner in which each amount was computed, the dates(s) each such loss or damage was incurred, the name of the person, firm and/or company to whom such amounts are owed, whether the expense and/or loss in question has been paid and, if so, by whom it was so paid.

**RESPONSE**:

**INTERROGATORY NO. 66:**

IDENTIFY every life, health, or disability insurance company or government entity (including Medicare and Medicaid) to which YOU or INFANT or anyone on his behalf, ever applied for insurance coverage, and include the type of insurance for which she applied, the date she applied, the identity of any agency or broker through which such application was made, whether a policy was issued or denied, and, if issued, any policy numbers assigned to her/him.

**RESPONSE**:

**INTERROGATORY NO. 67:**

IDENTIFY all persons with whom YOU and/or PARENTS have communicated for the purpose of considering, investigating, pursuing, arranging, or obtaining LITIGATION FUNDING and for any such third-party PERSON or entity: STATE the date(s) YOU had such COMMUNICATIONS; STATE the amount of payments or cash advances YOU have received

37

from such third-party PERSON or entity; STATE the IDENTITY of any DOCUMENTS that

YOU provided to any such third-party PERSON or entity; STATE any facts or information YOU

shared with such third-party PERSON or entity relating to the above-captioned litigation

including, but not limited to, impressions of YOUR likelihood of receiving a monetary reward;

and STATE the results of any evaluation, assessment, valuation, and/or other analysis by such

third party PERSON or entity of the claims asserted against ABBOTT in the COMPLAINT, any

claims that were contemplated against ABBOTT but not asserted in the COMPLAINT, and/or

any claims contemplated by YOU against any other third party, including but not limited to other

manufacturers of PRETERM INFANT FORMULA PRODUCTS and HEALTH CARE

PRACTITIONERS, that YOU believe may have been responsible for YOUR alleged INJURIES

and the INFANT's alleged INJURIES.

**RESPONSE:**

**INTERROGATORY NO. 68:**

For each expert identified in response to Interrogatory Nos. 17 and 37, STATE the

following information:

(a)     The amount of any compensation to be paid to the expert;

(b)     Any and all cases in which the expert witness has testified, either at deposition or
trial, within the last four (4) years; and

(c)     A list of all publications authored by the expert witness over the last ten (10)
years.

**RESPONSE:**

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

Dated: August 9, 2023

Respectfully Submitted:

*/s/ Sean P. Fahey*
Sean P. Fahey (PA Bar No. 73305)
**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

*/s/ Ronni E. Fuchs*
Ronni E. Fuchs (PA Bar No. 65561)
**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

*/s/ Joseph E. O'Neil*
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
**CAMPBELL CONROY & O'NEIL, P.C.**
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.6388
JONeil@CampbellTrialLawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

*/s/ Marques Hillman Richeson*
Marques Hillman Richeson (admitted *pro hac vice*)
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

*/s/ Jennifer B. Flannery*
Jennifer B. Flannery (PA Bar No. 74546)
**JONES DAY**
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
404.581.8008
jbflannery@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on August 9, 2023 a copy of the foregoing was served upon all counsel of record via email.

*/s/ Sean P. Fahey*
Sean P. Fahey

# EXHIBIT C

**TROUTMAN PEPPER HAMILTON SANDERS LLP**

Sean P. Fahey (PA Bar No. 73305)
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

Ronni E. Fuchs (PA Bar No. 65561)
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

**JONES DAY**

Marques Hillman Richeson (admitted *pro hac vice*)
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

Jennifer B. Flannery (PA Bar No. 74546)
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
404.581.8008
jbflannery@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

**CAMPBELL, CONROY & O'NEIL**

Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.1900
JONeil@CampbellTrialLawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

161356055v1

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL SECTION**

| | |
|---|---|
| CHRISTINA TAYLOR, *on her own behalf and as Parent and Natural Guardian of* I.H., *a Minor*, | **MARCH TERM 2022** |
| Plaintiffs, | **NO. 220302606** |
| v. | |
| MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, | |
| Defendants. | |

## ABBOTT LABORATORIES' FIRST REQUESTS FOR PRODUCTION DIRECTED TO PLAINTIFF CHRISTINA TAYLOR ON HER OWN BEHALF AND ON BEHALF OF HER MINOR CHILD I.H.

Defendant Abbott Laboratories ("Abbott"), by and through its attorneys, serves its First Requests for Production on Plaintiff Christina Taylor ("Plaintiff") and requests that Plaintiff, on her own behalf and on behalf of her minor child, I.H., respond to the following requests for production within thirty (30) days of service.

## DEFINITIONS AND INSTRUCTIONS

As used herein, the following terms shall have the following meanings throughout these Requests:

-2-

161356055v1

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

1.      "ABBOTT" means Defendant Abbott Laboratories, an Illinois corporation and a resident of Lake County, Illinois.

2.      "INFANT" means I.H.

3.      "PLAINTIFF," "YOU," or "YOUR" means Plaintiff Christina Taylor, on her own behalf and on behalf of her minor child, I.H., or anyone acting or having acted on behalf of Plaintiff, including but not limited to Plaintiff's attorney(s) in this action.

4.      "PARENTS" means the parents of the INFANT.

5.      "COMMUNICATION" or "COMMUNICATIONS" means any transmission of words or thoughts between or among two or more persons, whether written (including via electronic means, such as through e-mail, instant messenger, or text message) or oral.

6.      "COMPLAINT" means the Complaint in the above-captioned action filed in the Philadelphia Court of Common Pleas, or if that Complaint is amended, the most recent amended complaint filed on PLAINTIFF's behalf at the time these discovery Requests are served.

7.      "HEALTH CARE PRACTITIONER" means any hospital, clinic, center, physician's office, infirmary, medical or diagnostic laboratory, or other facility that provides medical, psychiatric, mental, emotional, or psychological care or advice and any doctor, physician, surgeon, neonatologist, gynecologist, oncologist, radiologist, endocrinologist, clinical geneticist, natural healthcare provider, rheumatologist, homeopath, osteopath, chiropractor, paramedic, nurse (registered or otherwise), physician's assistant, midwife, birthing assistant, physiotherapist, psychologist, psychiatrist, therapist, or any other person practicing any healing art, or performing any physical, radiological, or mental evaluation or examination, or any other persons or entities involved in the evaluation, diagnosis, care and/or treatment of INFANT or PARENTS.

161356055v1

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

8.      "MEDICAL RECORDS" means all medical history or examination reports and notes, tests results, feeding and nutrition flow sheets, laboratory reports, pathology slides, pathology specimens, pathology reports and notes, radiographic films, CT scans, X-rays, MRI films, MRA films, correspondence, progress notes, prescription records, insurance, Medicare, Medicaid, and disability records, and medical bills or invoices regarding PARENTS' or INFANT's diseases, diagnoses, or treatment.

9.      "PRETERM INFANT FORMULA PRODUCTS" means Abbott preterm and exempt infant formula or fortifier product(s) at issue in this litigation "that are . . . labeled for use by an infant who has . . . low birth weight or who otherwise has an unusual medical or dietary problem," which are known as "exempt" infant formula products under the Infant Formula Act ("IFA") and the amendments thereto, and specifically include:  (1) Liquid Protein Fortifier; (2) Similac Human Milk Fortifiers; (3) Similac NeoSure (formerly known as Similac NeoCare); (4) Similac Special Care 20; (5) Similac Special Care 24; (6) Similac Special Care 24 High Protein; (7) Similac Special Care 30; and (8) Similac Alimentum.

10.      "OTHER INFANT FORMULA PRODUCTS" means any liquid or powdered formula or fortifier product containing milk from any source other than PRETERM INFANT FORMULA PRODUCTS.  Such term includes but is not limited to Similac, Enfamil, and Prolact+ branded products.

11.      "DOCUMENT" or "DOCUMENTS" is used in the broadest sense and means the original and all non-identical copies or reproductions of any written, printed, typed, or recorded matter of any kind known to YOU or in YOUR possession, custody, or control, including but not limited to:

161356055v1

a.      All letters, correspondence, memoranda, writings, instructions, calendars, desk books, records, reports, charts, studies, surveys, speeches, pamphlets, notes, drafts, proposals, minutes of meetings, drawings, recordings (audio and/or video), books, papers, computations, accounting records, inter-office and intra-office communications, email, text messages, social media posts or content, instant messages, schedules, lists, specifications, ledgers, journals, diaries, checks, memoranda, or any other written, printed, typewritten, or other graphic or photographic matter or tangible thing on which any words or phrases are affixed; and

b.      Computer software, files, flash drives, and tapes, and any hard copies of the information stored thereon.

12.     "RELATED TO" or "IN CONNECTION WITH" a given subject matter shall mean a document or statement that relates to, constitutes, embodies, comprises, reflects, identifies, states, refers to, comments on, responds to, describes, analyzes, contains information concerning, or is in any way pertinent to that subject matter.

13.     The terms "IDENTIFY," or give the "IDENTITY," mean and require YOU to STATE:

a.      With reference to an individual, STATE his or her full name and last known residential address, business address, telephone and/or facsimile number, the name and address of his or her employer, the individual's job title or job responsibilities, and his or her relationship to YOU;

b.      With reference to a company or organization, STATE the entity's full legal name, business addresses, telephone number, and a PERSON with whom YOU had direct contact within that entity;

161356055v1

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

c.      With reference to a DOCUMENT, DESCRIBE the DOCUMENT, STATE the date when the DOCUMENT was created, name the creator of the DOCUMENT, and name each PERSON to whom the DOCUMENT was sent;

d.      With reference to an oral COMMUNICATION, provide the date(s) of the COMMUNICATION, the names and addresses of each PERSON involved, when the COMMUNICATION occurred, the place(s) where the COMMUNICATION took place, the subject matter of the COMMUNICATION, and the general substance of the COMMUNICATION; and

e.      With reference to an occurrence or event, provide the date and location of the occurrence or event, the IDENTITY of each PERSON involved in the occurrence or event, the subject matter discussed, and the IDENTITY of any DOCUMENT that records, refers to, or relates to such occurrence or event.

14.      "STATE" or "DESCRIBE" means:

a.      To fully elucidate by reference to underlying facts rather than by reference to ultimate facts or conclusions of fact or law;

b.      Where applicable, to particularize as to time, place, and manner; and

c.      To set forth all relevant facts necessary to complete the understanding of the act, process, event, or thing in question.

15.      "INJURY" or "INJURIES" means all medical or other conditions that YOU contend were caused, precipitated, or exacerbated by, or otherwise due to PRETERM INFANT FORMULA PRODUCTS.

16.      "LAWSUIT" means the litigation corresponding to the COMPLAINT that YOU filed in the above-captioned action.

161356055v1

17.     "LITIGATION FUNDING" means any and all potential or actual arrangement between YOU and/or YOUR attorneys and any third-party entity that relates in whole or part to financing the above-captioned litigation.  The term "LITIGATION FUNDING" includes, but is not limited to, financial arrangements described as third-party litigation funding, litigation investment, litigation financing, pre-settlement funding, LAWSUIT loans, alternative litigation financing, corporate claim finance, claim transfer, and/or claim alienation.  The term "LITIGATION FUNDING" also includes any other arrangement under which any person or entity, other than an attorney permitted to charge a contingent fee representing a party, has a right to receive compensation that is contingent on, and sourced from, any proceeds in the above-captioned litigation by settlement, judgment, or otherwise.

18.     "EVIDENCE" (including the other tense forms of that term) means describing, evidencing, constituting, reflecting, showing, comprising, considering, discussing, regarding, setting forth, studying, analyzing, commenting upon, recommending, alluding to, or mentioning, in whole or in part.

19.     "MARKETING" means any and all DOCUMENTS that EVIDENCE PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

20.     "PERSON" includes natural persons, proprietorships, partnerships, firms, trusts, estates, companies, corporations, public corporations, solo practitioners, municipal corporations, federal, state, and local governments, all departments and agencies thereof, any other governmental agencies, subdivisions, groups, associations or organizations, or any other entity, whether foreign or domestic.

21.     All DOCUMENTS must be produced in a form that renders them susceptible to copying and electronic scanning.  All electronic documents and records (electronically stored

161356055v1

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

information or "ESI") must be produced in a format sufficient to render the records and information accessible and intelligible, in conformity with any ESI stipulation entered into by the parties.

22.     DOCUMENTS from any file should be produced in the same order as they were found in such file.  If copies of DOCUMENTS are produced in lieu of the originals, such copies should be produced in the same order and organization as the original and be legible and bound or stapled in the same manner as the original.  In the case of an electronic document, including but not limited to emails, such DOCUMENT should be produced with its corresponding electronic attachments.

23.     The fact that a DOCUMENT is in ABBOTT's possession does not relieve YOU of the obligation to produce all of your copies of the same DOCUMENT, even if YOU believe YOUR copies are identical in all respects to a DOCUMENT produced or held by any other PERSON.

24.     Should YOU object to any Request on any basis, please state whether YOU are withholding any responsive DOCUMENTS on the basis of such objection.

25.     The present tense includes the past and future tenses.  Whenever used herein, "and" may be understood to mean "or" and vice versa whenever such construction results in a broader request for information.  The singular includes the plural, and the plural includes the singular.  "All" means "any and all"; "any" means "any and all."  "Including" means "including but not limited to."  "And" and "or" encompass both "and" and "or."  Words in the masculine, feminine, and neutral form shall include each of the other genders.

161356055v1

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

26.     Any Request directed to "YOU" refers to the PLAINTIFF and any persons now or previously acting on YOUR behalf, such as agents, representatives, and, unless privileged, attorneys.

27.     Produce the original of each DOCUMENT requested herein, as well as any drafts, revisions, or copies of the same which bear any mark or notation not present on the original or which otherwise differ in any way from the original.

28.     Produce all DOCUMENTS as they are kept in the usual course of business or organized and labeled to correspond with the categories in this Request.  Produce all DOCUMENTS in your possession, custody, or control, including any DOCUMENTS that you have the ability to obtain from any other PERSON, including your present or former accountants, attorneys, brokers, advisors, other agents, or employer.  If production is requested of a DOCUMENT that is no longer in your possession, custody or control, your response should state when the DOCUMENT was most recently in your possession, custody, or control, the disposition of the DOCUMENT, and the identity of the PERSON, if any, presently in possession, custody, or control of such DOCUMENT.  If the DOCUMENT has been destroyed, state the reason for its destruction.

29.     YOU have a continuing duty to furnish additional DOCUMENTS in response to these Requests in accordance with the Pennsylvania Rules of Civil Procedure.  Any additional information relating in any way to these Requests that YOU acquire, or that becomes known to YOU, up to and including the time of trial, shall be furnished to ABBOTT promptly after YOU acquire or become aware of such information.

30.     If YOU object to furnishing any information requested by these Requests for production on the basis of attorney-client privilege, attorney work product, or otherwise, STATE

the existence of the information, IDENTIFY the specific ground on which your objection is based (e.g., attorney work product, attorney-client privilege), and produce a privilege log for any DOCUMENTS that contain the information on which YOU base your claim of privilege. If YOU object to providing any information on grounds other than a claim of privilege, STATE the grounds upon which the objection is based with sufficient specificity to permit determination of the propriety of such objection.

## **REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 1:**

All DOCUMENTS and COMMUNICATIONS that support, refute, or relate to any of YOUR allegations in the COMPLAINT.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 2:**

All DOCUMENTS that constitute, refer to, or relate in any way to COMMUNICATIONS related to any INJURIES or medical conditions claimed in the COMPLAINT.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 3:**

All DOCUMENTS (including, but not limited to, email or other electronic forms) containing, reflecting, or relating to any COMMUNICATIONS between YOU and any treating physician and/or other HEALTH CARE PRACTITIONER whom YOU intend to call as a witness to offer any medical opinion in this action.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 4:**

All DOCUMENTS produced to YOU by any third-party in response to a subpoena or other formal or informal request for DOCUMENTS related to this LAWSUIT.

161356055v1

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 5:**

Any written or recorded statements obtained by YOU in connection with the allegations of the COMPLAINT or regarding any facts underlying the allegations of the COMPLAINT.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 6:**

All DOCUMENTS or evidence of any kind supporting each and every act and/or omission by ABBOTT that YOU allege supports the causes of action against ABBOTT in the COMPLAINT.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 7:**

Each of the PARENTS' federal, state, and local income tax returns for the ten (10) years preceding the events giving rise to this LAWSUIT to the present, whether filed individually or jointly, including all attachments, schedules, and Wage or Earnings Statements (Forms W-2). To the extent INFANT has independently filed any federal, state, or local income tax return since birth, provide those returns as well, including all attachments, schedules, and Wages or Earnings Statements (Forms W-2).

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 8:**

All DOCUMENTS which refer or relate to any welfare benefits or claims, worker's compensation benefits or claims, social security benefits or claims, health or disability benefits or claims, or any other governmental benefits or claims that were provided to or made by or on behalf of YOU, PARENTS, or INFANT in the ten (10) years preceding the events giving rise to this LAWSUIT to the present.

**RESPONSE:**

161356055v1

**REQUEST FOR PRODUCTION NO. 9:**

All medical bills, statements, or invoices from any hospital, medical facility, doctor, therapist, social worker, counselor, psychologist, or other physical or mental health care provider for goods or services for which YOU seek damages in this LAWSUIT, and any other bills, statements, or invoices, of any nature, for which YOU seek damages.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 10:**

All DOCUMENTS supporting or in any way relating to YOUR claim for damages in this LAWSUIT, including but not limited to medical and hospital expenses, burial and funeral expenses, mental anguish, pain, suffering, loss of earnings, earning capacity, society, support, services, care, assistance, attention, protection, advice, guidance, counsel, instruction, training, education, solace, companionship, and prospective inheritance.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 11:**

All DOCUMENTS that constitute, refer to, or relate to any out-of-pocket expenses which YOU contend are RELATED TO any INJURY as alleged in this LAWSUIT.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 12:**

All DOCUMENTS reflecting, referring to, or relating to any claim, lawsuit, and/or legal proceeding for alleged personal injuries in which YOU, PARENTS, or INFANT were involved in the ten (10) years preceding the events giving rise to this LAWSUIT to the present, including, but not limited to, copies of claim forms, statements, correspondence, depositions or sworn testimony of any type given by YOU and/or PARENTS related to any claim, including claims to governmental agencies or under the terms of an insurance policy, lawsuit, or proceeding.

161356055v1

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 13:**

All DOCUMENTS relating to monetary payments received by YOU, PARENTS, or INFANT from any person, entity, or governmental body as a result of the INJURIES or medical conditions claimed in the COMPLAINT.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 14:**

Any insurance lien letter or correspondence related to the allegations of the COMPLAINT or regarding any facts underlying the allegations of the COMPLAINT.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 15:**

All DOCUMENTS relating to any liens or any subrogation interest or claims held or asserted against YOU or PARENTS by any third-party.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 16:**

Any contract or DOCUMENT evidencing an agreement of compromise, settlement, release, covenant not to sue, "Mary Carter" agreement, or any other kind of settlement, agreement, understanding, or deal which any party or potential party to this LAWSUIT has with any other person, firm, corporation, party, or potential party with respect to the events associated with the subject matter of this LAWSUIT. This Request includes any past, present, and future settlements, deals, agreements, arrangements, understandings, or conduct by or between YOU, YOUR attorneys, agents, or representatives and any other person, entity, or such person's or entity's attorneys whatsoever, including any agreements to produce or withhold any evidence, exhibits, witnesses, or testimony.

161356055v1

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 17:**

All DOCUMENTS identified in connection with YOUR or INFANT's responses to any Interrogatories in this LAWSUIT, or referenced or used in preparing such responses.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 18:**

All DOCUMENTS referenced, cited, consulted, or used in preparing the COMPLAINT.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 19:**

All DOCUMENTS YOU intend to introduce as exhibits at trial.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 20:**

The attached HIPAA-compliant Authorization to Disclose Medical Information and Authorization to Disclose Psychiatric Records and Psychotherapy Notes Information signed by YOU or INFANT for any hospital, medical facility, doctor, pharmacy, therapist, social worker, counselor, psychologist, or other physical or mental health care provider that has treated INFANT. Exhibit A includes the authorizations to be signed by YOU or INFANT if INFANT is not a minor and has capacity to sign the authorizations; Exhibit B includes the authorizations to be signed by YOU on behalf of INFANT if INFANT is a minor and/or does not have capacity to sign the authorizations).

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 21:**

The attached HIPAA-compliant Authorization to Disclose Medical Information (signed by YOU) directed to each hospital, medical facility, doctor, pharmacy, therapist, social worker, or

161356055v1

other physical or mental health care provider that treated YOU in the ten (10) years preceding the events giving rise to this LAWSUIT to the present (Exhibit A).

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 22:**

The attached HIPAA-compliant Authorization to Disclose Psychiatric Records and Psychotherapy Notes Information authorization (signed by YOU) directed to each hospital, medical facility, medical practitioner, doctor, pharmacy, therapist, social worker, or other physical or mental health care provider (including any psychiatric or psychological practitioner or facility) who treated YOU on or after INFANT's date of birth for any psychiatric, psychological, and/or emotional injuries for which YOU seek recovery in the COMPLAINT (Exhibit A).

**REQUEST FOR PRODUCTION NO. 23:**

The attached Authorization to Release Insurance Information, Authorization to Release Education Information and Authorization to Release Employment Information signed by YOU or INFANT directed to each insurance company, educational institution and employer identified in response to ABBOTT's Interrogatories to PLAINTIFF and any amendments thereto (Exhibits A and B).

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 24:**

To the extent YOU identified in your Interrogatory Responses any twin or other sibling of the INFANT carried in the same pregnancy, the attached HIPAA-compliant Authorization to Disclose Medical Information and Authorization to Disclose Psychiatric Records and Psychotherapy Notes Information (signed by YOU or the sibling of the INFANT on his or her own behalf) directed to each hospital, medical facility, doctor, pharmacy, therapist, social worker,

counselor, psychologist, or other physical or mental health care provider that treated INFANT's sibling (Exhibits A and B).

     **RESPONSE:**

**REQUEST FOR PRODUCTION NO. 25:**

     All DOCUMENTS that constitute, refer to, or relate to INFANT's personal medical history and/or treatment throughout INFANT's lifetime, including any MEDICAL RECORDS, correspondence with HEALTH CARE PRACTITIONERS, research on health conditions, and personal notes.

     **RESPONSE:**

**REQUEST FOR PRODUCTION NO. 26:**

     All DOCUMENTS that constitute, refer to, or relate to YOUR personal medical history and/or treatment in the ten (10) years preceding the events giving rise to this LAWSUIT to the present, including any MEDICAL RECORDS, correspondence with HEALTH CARE PRACTITIONERS, research on health conditions, and personal notes.

     **RESPONSE:**

**REQUEST FOR PRODUCTION NO. 27:**

     All DOCUMENTS and COMMUNICATIONS, including those sent through a patient-portal system, between YOU and any HEALTH CARE PRACTITIONER, or any PERSON acting on behalf of or assisting a HEALTH CARE PRACTITIONER, in the ten (10) years preceding the events giving rise to this LAWSUIT to the present relating to YOUR personal medical history and/or treatment or INFANT's personal medical history and/or treatment.

     **RESPONSE:**

161356055v1

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**REQUEST FOR PRODUCTION NO. 28:**

All DOCUMENTS and COMMUNICATIONS that constitute, refer to, or relate to YOUR use of, or treatment for, drugs or alcohol.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 29:**

All DOCUMENTS and COMMUNICATIONS from health, medical, disability, and life insurance providers, including, but not limited to, private providers, COBRA, Medicaid, and any plan of supplemental insurance from which INFANT has received insurance coverage.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 30:**

All DOCUMENTS and COMMUNICATIONS from health, medical, disability, and life insurance providers, including, but not limited to, private providers, COBRA, Medicaid, and any plan of supplemental insurance from which YOU have received insurance coverage.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 31:**

All DOCUMENTS that EVIDENCE YOUR and/or PARENTS' purchase of or payment for, or contemplated purchase of or contemplated payment for, any PRETERM INFANT FORMULA PRODUCTS and/or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 32:**

All DOCUMENTS that constitute MARKETING that YOU and/or PARENTS saw or read about PRETERM INFANT FORMULA PRODUCTS and/or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:**

161356055v1

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**REQUEST FOR PRODUCTION NO. 33:**

All DOCUMENTS that constitute, contain, refer to, or relate to any packaging or labeling that YOU and/or PARENTS reviewed for PRETERM INFANT FORMULA PRODUCTS and/or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 34:**

All DOCUMENTS that constitute, contain, refer to, or relate to any COMMUNICATIONS between YOU and ABBOTT.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 35:**

All DOCUMENTS that constitute, contain, refer to, or relate to any COMMUNICATIONS between YOU and any seller, manufacturer, or supplier of PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 36:**

All DOCUMENTS that constitute, contain, refer to, or relate to any COMMUNICATIONS between YOU and any governmental or public agency about PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 37:**

All DOCUMENTS that constitute, contain, refer to, or relate to any COMMUNICATIONS between YOU and any governmental or public agency about ABBOTT or any other manufacturer of PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:**

161356055v1

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**REQUEST FOR PRODUCTION NO. 38:**

All DOCUMENTS that constitute, reflect, refer to, or relate to any articles, journals, notes, news alerts, or other information about PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 39:**

All DOCUMENTS that constitute, reflect, refer to, or relate to any articles, journals, notes, news alerts, or other information about ABBOTT or any other manufacturer of PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 40:**

All DOCUMENTS and COMMUNICATIONS contained within YOUR, PARENTS' or INFANT's social media accounts that constitute, refer to, or relate to ABBOTT or any other manufacturer of PRETERM INFANT FORMULA PRODUCTS or OTHER INFANT FORMULA PRODUCTS.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 41:**

All DOCUMENTS and COMMUNICATIONS contained within YOUR, PARENTS' or INFANT'S social media accounts that constitute, refer to, or relate to INFANT or any alleged INJURY.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 42:**

All non-privileged COMMUNICATIONS and DOCUMENTS between YOU and any PERSON related to YOUR decision to initiate this LAWSUIT.

161356055v1

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 43:**

All DOCUMENTS and COMMUNICATIONS relating to LITIGATION FUNDING IN CONNECTION WITH this LAWSUIT.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 44:**

All YOUR calendars, journals, or other DOCUMENTS that reflect YOUR daily activities for the ten (10) years preceding the events giving rise to this LAWSUIT to the present.

**RESPONSE:**

**REQUEST FOR PRODUCTION NO. 45:**

For each expert identified in response to Abbott's First Set of Interrogatories to Plaintiffs, produce ALL DOCUMENTS and/or COMMUNICATIONS that reflect or contain facts or data they generated, created, or considered, along with all notes, files, literature, and other DOCUMENTS and things created, received, examined, or considered by the witness.

**RESPONSE**:

**REQUEST FOR PRODUCTION NO. 46:**

All DOCUMENTS that constitute, reflect, reference, or relate in any way to any tests or analyses that YOU or any experts identified in response to Abbott's First Set of Interrogatories, consultants, other retained agents, or anyone acting on YOUR behalf have performed on or with PRETERM INFANT FORMULA PRODUCTS. This Request includes but is not limited to any draft or final protocols, all data collected or generated, all photographs or videotapes taken or made, and all DOCUMENTS reflecting or recording the results and interpretations of these tests or analyses.

161356055v1

Dated: August 9, 2023

Respectfully Submitted:

/s/ Sean P. Fahey
Sean P. Fahey (PA Bar No. 73305)
**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

/s/ Ronni E. Fuchs
Ronni E. Fuchs (PA Bar No. 65561)
**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

/s/ Joseph E. O'Neil
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
**CAMPBELL CONROY & O'NEIL, P.C.**
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.6388
JONeil@CampbellTrialLawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

/s/ Marques Hillman Richeson
Marques Hillman Richeson (admitted *pro hac
vice*)
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

/s/ Jennifer B. Flannery
Jennifer B. Flannery (PA Bar No. 74546)
**JONES DAY**
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
404.581.8008
jbflannery@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

161356055v1

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on August 9, 2023, a copy of the foregoing was served upon all counsel of record via email.


*/s/ Sean P. Fahey*
Sean P. Fahey

161356055v1

*EXHIBIT A*

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**AUTHORIZATION TO DISCLOSE MEDICAL INFORMATION**

TO:

PATIENT: _____

DATE OF BIRTH: _____

SSN: _____

_____
PURPOSE OF DISCLOSURE:  Litigation

For informational purposes pertaining to civil litigation, and pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"), I, _____, authorize and request the Custodian of Records at the above-named entity to disclose, release, and furnish to the agents or designees of the law firms of Troutman Pepper Hamilton Sanders LLP ("Troutman Pepper"), 301 Carnegie Center, Suite 400, Princeton, NJ 08540; Jones Day, 110 N. Wacker Drive, Suite 4800, Chicago, IL 60606; Kline & Specter PC, 1525 Locust Street, Philadelphia, PA 19102; Keller Postman LLC, 150 N. Riverside Plaza, Suite 4100, Chicago, IL 60606, and/or their duly assigned agents, including Marker Group, Inc., 13105 North West Freeway, Suite 300, Houston, TX 77040; and Medical Research Consultants ("MRC"), 1336 Brittmoore Road, Suite 100, Houston, TX 77042, any and all medical records, including those that may contain Protected Health Information ("PHI"), whether created before or after the date of signature below. This authorization ("Authorization") should also be construed to permit agents or designees of Troutman Pepper, Jones Day, Kline & Specter, Keller Postman, Marker Group, Inc., and/or MRC to copy, inspect, and review any and all such records. Records requested include, but are not limited to:

all medical records, feeding schedules and records, dieticians' records, physicians' records, surgeons' records, pathology/cytology reports, physicals and histories, laboratory reports, operating room records, records from inpatient/outpatient and emergency room treatment, discharge summaries, progress notes, office notes, dieticians' and doctors' handwritten or other notes, patient intake and registration forms, questionnaires, clinical charts and documents, test results and consultations, autopsy reports, prescriptions, nurses' notes, birth certificate and other vital statistic records, communicable disease testing and treatment records, including but not limited to, information regarding AIDS and HIV status, correspondence, pharmacy and prescription records including NDC numbers and drug information handouts/monographs, medication records, orders for medications, therapists' notes, social workers' records, insurance records, consent for treatment, statements of account, itemized bills, any and all remittance advices (RAs), including, but not limited to Electronic Remittance Advice (ERA), Standard Paper Remittance Advice (SPR), 835 format, any and all explanations of benefits (EOBs), any and all billing claim forms, including but not limited to 837, Form CMS-1450, UB-92, UB-04, CMS 1500 Form, invoices and any other papers relating to any examination, diagnosis, treatment, periods of hospitalization, or stays of confinement, or documents containing information regarding amendment of PHI in the medical records. Copies, NOT originals, of all x-rays, CT scans, MRI films, photographs, and any other radiological,

1

nuclear medicine, or radiation therapy films and of any corresponding reports. I expressly request that all covered entities under HIPAA identified above disclose full and complete protected medical information.

Because this litigation is ongoing, it is imperative that you preserve the original medical records, radiology, pathology/cytology slides, tissue/cell blocks, and any recut slides that are in your possession, as an expert may need to examine these slides and blocks in the future. Please take all steps that are necessary to preserve the medical records, radiology films, slides and blocks, and any recut slides that remain in your possession.

Unless revoked in writing, this Authorization shall be valid for the period of litigation in the action entitled _____, including any and all transfers and the exhaustion of all appeals. In addition, a copy of this Authorization may be used in place of and with the same force and effect as the original. A notarized signature is <u>not</u> required.

This Authorization is being forwarded by—or on behalf of—attorneys for the defendant(s) for the purpose of litigation. You are not authorized to discuss any aspect of the above-named person's medical history, care, treatment, diagnosis, prognosis, information revealed by or in the medical records, or any other matter bearing on his or her medical or physical condition, unless you receive an additional authorization permitting such discussion. Subject to all applicable legal objections, this restriction does not apply to discussing the above-named person's medical history, care, treatment, diagnosis, prognosis, information revealed by or in the medical records, or any other matter bearing on the above-named person's medical or physical condition at a deposition or trial.

**NOTICE:**

- **The individual signing this Authorization has the right to revoke this Authorization at any time, provided the revocation is made in writing and provided to: Troutman Pepper, Jones Day, Kline & Specter, Keller Postman, Marker Group Inc., and/or MRC, except to the extent that the covered entity has already relied upon the Authorization to disclose PHI. The revocation will also not apply to the individual's insurance company when the law provides the individual's insurer with the right to contest a claim under the individual's policy.**

- **The individual signing this Authorization understands that authorizing the disclosure of this health information is voluntary and may be refused, and that the covered entity to whom this Authorization is directed may not condition treatment, payment, enrollment, or eligibility benefits on whether or not the individual signs the Authorization.**

- **The individual signing this Authorization understands that PHI disclosed pursuant to this Authorization may be subject to redisclosure by the recipients and that, in such case, the disclosed PHI will no longer be protected by 45 CFR Section 164, Subpart E. The individual can contact the covered entity regarding any questions about the disclosure of this health information. The individual may inspect or copy the information to be used or disclosed as provided in 45 CFR Section 164, Subpart E.**

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

- **The individual signing this Authorization understands that the information in the health record may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV). It may also include information about behavioral or mental health services, and treatment for alcohol and drug abuse.**

I have read this Authorization and understand that it will permit the entity identified above to disclose, release, and furnish PHI to Troutman Pepper, Jones Day, Kline & Specter, Keller Postman, Marker Group, Inc., and/or MRC.

A photocopy, facsimile, or electronic copy of this Authorization shall be valid and may be used and relied upon with the same force and effect as the signed original hardcopy.

This Authorization shall remain valid throughout the duration of the above-referenced litigation and shall expire automatically at the close of this litigation.

_____
Patient Signature

_____
Patient Name

_____
Former/Alias/Maiden Name

_____
Date of Patient Signature

_____
Date of Birth

_____
Social Security Number

_____
Address

3

## AUTHORIZATION TO DISCLOSE PSYCHIATRIC RECORDS AND PSYCHOTHERAPY NOTES INFORMATION

TO:

PATIENT: _____

DATE OF BIRTH: _____

SSN: _____

PURPOSE OF DISCLOSURE:  Litigation

For informational purposes pertaining to civil litigation, and pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"), I, _____, authorize and request the Custodian of Records at the above-named entity to disclose, release, and furnish to the agents or designees of the law firms of Troutman Pepper Hamilton Sanders LLP ("Troutman Pepper"), 301 Carnegie Center, Suite 400, Princeton, NJ 08540; Jones Day, 110 N. Wacker Drive, Suite 4800, Chicago, IL 60606; Kline & Specter PC, 1525 Locust Street, Philadelphia, PA 19102; Keller Postman LLC, 150 N. Riverside Plaza, Suite 4100, Chicago, IL 60606, and/or their duly assigned agents, including Marker Group, Inc., 13105 North West Freeway, Suite 300, Houston, TX 77040; and Medical Research Consultants ("MRC"), 1336 Brittmoore Road, Suite 100, Houston, TX 77042, any and all medical records, including those that may contain Protected Health Information ("PHI") whether created before or after the date of signature below. This authorization ("Authorization") should also be construed to permit agents or designees of Troutman Pepper, Jones Day, Kline & Specter, Keller Postman, Marker Group, Inc., and/or MRC to copy, inspect, and review any and all such records. Records requested include, but are not limited to:

> complete copies of all psychiatric records and psychotherapy notes/reports, therapists' notes, social workers' records, all medical records, physicians' records, surgeons' records, pathology/cytology reports, laboratory reports, discharge summaries, progress notes, consultations, prescriptions, records of drug abuse and alcohol abuse, physicals and histories, nurses' notes, correspondence, insurance records, consent for treatment, statements of account, itemized bills, invoices, or any other papers concerning any treatment, examination, periods or stays of hospitalization, confinement, diagnosis, or other information pertaining to and concerning the psychiatric or mental condition of this patient, or documents containing information regarding amendment of PHI in the medical records. Copies, NOT originals, of all x-rays, CT scans, MRI films, photographs, and any other radiological, nuclear medicine, or radiation therapy films and of any corresponding reports. I expressly request that all covered entities under HIPAA identified above disclose full and complete protected medical information.

Because this litigation is ongoing, it is imperative that you preserve the original medical records, radiology, pathology/cytology slides, tissue/cell blocks, and any recut slides that are in your possession, as an expert may need to examine these slides and blocks in the future. Please take all

1

steps that are necessary to preserve the medical records, radiology films, slides and blocks, and any recut slides that remain in your possession.

Unless revoked in writing, this Authorization shall be valid for the period of litigation in the action entitled _____, including any and all transfers and the exhaustion of all appeals. In addition, a copy of this Authorization may be used in place of and with the same force and effect as the original. A notarized signature is <u>not</u> required.

This Authorization is being forwarded by—or on behalf of—attorneys for the defendant(s) for the purpose of litigation. You are not authorized to discuss any aspect of the above-named person's medical history, care, treatment, diagnosis, prognosis, information revealed by or in their medical records, or any other matter bearing on his or her medical or physical condition, unless you receive an additional authorization permitting such discussion. Subject to all applicable legal objections, this restriction does not apply to discussing the above-named person's medical history, care, treatment, diagnosis, prognosis, information revealed by or in their medical records, or any other matter bearing on the above-named person's medical or physical condition at a deposition or trial.

**NOTICE:**
- **The individual signing this Authorization has the right to revoke this Authorization at any time, provided the revocation is made in writing and provided to: Troutman Pepper, Jones Day, Kline & Specter, Keller Postman, Marker Group Inc., and/or MRC, except to the extent that the covered entity has already relied upon the Authorization to disclose PHI. The revocation will also not apply to the individual's insurance company when the law provides the individual's insurer with the right to contest a claim under the individual's policy.**
- **The individual signing this Authorization understands that authorizing the disclosure of this health information is voluntary and may be refused, and that the covered entity to whom this Authorization is directed may not condition treatment, payment, enrollment, or eligibility benefits on whether or not the individual signs the Authorization.**
- **The individual signing this Authorization understands that the PHI disclosed pursuant to this Authorization may be subject to redisclosure by the recipients and that, in such case, the disclosed PHI will no longer be protected by 45 CFR Section 164, Subpart E. The individual can contact the covered entity regarding any questions about the disclosure of this health information. The individual may inspect or copy the information to be used or disclosed as provided in 45 CFR Section 164, Subpart E.**
- **The individual signing this Authorization understands that the information in the health record may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV). It may also include information about behavioral or mental health services, and treatment for alcohol and drug abuse.**

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

I have read this Authorization and understand that it will permit the entity identified above to disclose, release, and furnish my PHI to Troutman Pepper, Jones Day, Kline & Specter, Keller Postman, Marker Group, Inc., and/or MRC.

A photocopy, facsimile, or electronic copy of this Authorization shall be valid and may be used and relied upon with the same force and effect as the signed original hardcopy.

This Authorization shall remain valid throughout the duration of the above-referenced litigation and shall expire automatically at the close of this litigation.

_____    _____
Patient Signature                             Former/Alias/Maiden Name

                                           _____
                                           Date of Birth

_____    _____
Date of Patient Signature                  Social Security Number

                                           _____
                                           Address

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**AUTHORIZATION TO RELEASE INSURANCE INFORMATION**

TO:

PATIENT: _____

DATE OF BIRTH: _____

SSN: _____

PURPOSE OF DISCLOSURE:  Litigation

I, _____, hereby authorize and request the Custodian of Records at the above-named entity to disclose, release, and furnish to the agents or designees of the law firms of Troutman Pepper Hamilton Sanders LLP ("Troutman Pepper"), 301 Carnegie Center, Suite 400, Princeton, NJ 08540; Jones Day, 110 N. Wacker Drive, Suite 4800, Chicago, IL 60606; Keller Postman LLC, 150 N. Riverside Plaza, Suite 4100, Chicago, IL 60606; Kline & Specter PC, 1525 Locust Street, Philadelphia, PA 19102, and/or their duly assigned agents, including Marker Group, Inc., 13105 North West Freeway, Suite 300, Houston, TX 77040; and Medical Research Consultants ("MRC"), 1336 Brittmoore Road, Suite 100, Houston, TX 77042, any and all documents relating to any insurance policy or policies, under which I was covered and/or claimed benefits, including—but not limited to—claims made and payments received for such claims, as well as applications, forms, and correspondence or communication of any kind between me and you.

The records, documents, and information provided pursuant to this Authorization to Release Insurance Information ("Authorization") are required for the purposes of litigation in the action entitled _____.

I hereby waive and release you from any claim I might make from your release of such records, documents, and information. I understand that I may revoke this Authorization by sending a written revocation notice to Troutman Pepper, Jones Day, Kline & Specter, Keller Postman, Marker Group Inc., and/or MRC, but that this revocation notice will not apply to information already released in response to this Authorization and will not affect any actions taken in reliance on this Authorization prior to the date my written revocation is received.

I have read this Authorization and understand that it will permit the entity identified above to disclose, release, and furnish PHI to Troutman Pepper, Jones Day, Kline & Specter, Keller Postman, Marker Group, Inc., and/or MRC.

A photocopy, facsimile, or electronic copy of this Authorization shall be valid and may be used and relied upon with the same force and effect as the signed original hardcopy.

1

This Authorization shall remain valid throughout the duration of the above-referenced litigation and shall expire automatically at the close of this litigation.

_____
Plaintiff Signature

_____
Patient Name

_____
Former/Alias/Maiden Name

_____
Date of Plaintiff Signature

_____
Date of Birth

_____
Social Security Number

_____
Address

**_[IF DIFFERENT FROM ABOVE]_**

_____
Policy Holder Signature

_____
Policy Holder Name

_____
Former/Alias/Maiden Name

_____
Date of Policy Holder Signature

_____
Policy Holder Date of Birth

_____
Policy Holder Social Security Number

_____
Policy Holder Address

_____
Policy Holder Employer

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**AUTHORIZATION TO RELEASE EMPLOYMENT INFORMATION**

TO:

PATIENT: _____

DATE OF BIRTH: _____

SSN: _____

PURPOSE OF DISCLOSURE: <u>Litigation</u>

I, _____, hereby authorize and request you to release to Troutman Pepper Hamilton Sanders LLP ("Troutman Pepper"), 301 Carnegie Center, Suite 400, Princeton, NJ 08540; Jones Day, 110 N. Wacker Drive, Suite 4800, Chicago, IL 60606; Kline & Specter PC, 1525 Locust Street, Philadelphia, PA 19102; Keller Postman LLC, 150 N. Riverside Plaza, Suite 4100, Chicago, IL 60606, and/or their duly assigned agents, including Marker Group, Inc., 13105 North West Freeway, Suite 300, Houston, TX 77040; and Medical Research Consultants ("MRC"), 1336 Brittmoore Road, Suite 100, Houston, TX 77042, any and all employment records or information related to my application to, employment with, and termination or resignation from your company, including, but not limited to: information regarding the place, date, and type of employment, any evaluations, disciplinary records, testing data, employment and personnel files, pay stubs and other income records, worker's compensation records, union membership records, and records relating to military service, as well as all records relating to wage, salary or other remunerations received.

The records, documents, and information provided pursuant to this Authorization to Release Employment Information ("Authorization") are required for the purposes of litigation, in the action entitled _____.

I hereby waive and release you from any claim I might make from your release of such records, documents, and information. I understand I may revoke this Authorization by sending a written revocation notice to Troutman Pepper, Jones Day, Kline & Specter, Keller Postman, Marker Group Inc., and/or MRC, but that this revocation notice will <u>not</u> apply to information already released in response to this Authorization and will <u>not</u> affect any actions taken in reliance on this Authorization prior to the date my written revocation is received.

I have read this Authorization and understand that it will permit the entity identified above to disclose, release, and furnish PHI to Troutman Pepper, Jones Day, Kline & Specter, Keller Postman, Marker Group, Inc., and/or MRC.

A photocopy, facsimile, or electronic copy of this Authorization shall be valid and may be used and relied upon with the same force and effect as the signed original hardcopy.

1

This Authorization shall remain valid throughout the duration of the above-referenced litigation and shall expire automatically at the close of this litigation.

_____
Plaintiff Signature

_____
Date of Plaintiff Signature

_____
Former/Alias/Maiden Name

_____
Date of Birth

_____
Social Security Number

_____
Address

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**AUTHORIZATION TO RELEASE EDUCATION INFORMATION**

TO:

PATIENT: _____

DATE OF BIRTH: _____

SSN: _____

PURPOSE OF DISCLOSURE: <u>Litigation</u>

I, _____, hereby authorize and request the Custodian of Records at the above-named entity to disclose, release, and furnish to the agents or designees of the law firms of Troutman Pepper Hamilton Sanders LLP ("Troutman Pepper"), 301 Carnegie Center, Suite 400, Princeton, NJ 08540; Jones Day, 110 N. Wacker Drive, Suite 4800, Chicago, IL 60606; Kline & Specter PC, 1525 Locust Street, Philadelphia, PA 19102; Keller Postman LLC, 150 N. Riverside Plaza, Suite 4100, Chicago, IL 60606, and/or their duly assigned agents, including Marker Group, Inc., 13105 North West Freeway, Suite 300, Houston, TX 77040; and Medical Research Consultants ("MRC"), 1336 Brittmoore Road, Suite 100, Houston, TX 77042, any and all education records or information related to my application to, attendance at, and termination or graduation from, your institution, including, but not limited to: academic records, student file(s), transcripts, and degree(s).

The records, documents, and information provided pursuant to this Authorization to Release Education Information ("Authorization") are required for the purposes of litigation, in the action entitled _____.

I hereby waive and release you from any claim I might make from your release of such records, documents, and information. I understand I may revoke this Authorization by sending a written revocation notice to Troutman Pepper, Jones Day, Kline & Specter, Keller Postman, Marker Group Inc., and/or MRC, but that this revocation notice will <u>not</u> apply to information already released in response to this Authorization and will <u>not</u> affect any actions taken in reliance on this Authorization prior to the date my written revocation is received.

I have read this Authorization and understand that it will permit the entity identified above to disclose, release, and furnish PHI to Troutman Pepper, Jones Day, Kline & Specter, Keller Postman, Marker Group, Inc., and/or MRC.

A photocopy, facsimile, or electronic copy of this Authorization shall be valid and may be used and relied upon with the same force and effect as the signed original hardcopy.

1

This Authorization shall remain valid throughout the duration of the above-referenced litigation and shall expire automatically at the close of this litigation.

 

 

_____    _____

Plaintiff Signature                                    Former/Alias/Maiden Name

                                                    _____

                                                    Date of Birth

_____    _____

Date of Plaintiff Signature                          Social Security Number

                                                    _____

                                                    Address

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

*EXHIBIT B*

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**AUTHORIZATION TO DISCLOSE MEDICAL INFORMATION**

TO:

PATIENT: _____

DATE OF BIRTH: _____

SSN: _____

PURPOSE OF DISCLOSURE: Litigation

For informational purposes pertaining to civil litigation, and pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"), I, _____, as Parent and/or Guardian of _____ ("my Child") authorize and request the Custodian of Records at the above-named entity to disclose, release, and furnish to the agents or designees of the law firms of Troutman Pepper Hamilton Sanders LLP ("Troutman Pepper"), 301 Carnegie Center, Suite 400, Princeton, NJ 08540; Jones Day, 110 N. Wacker Drive, Suite 4800, Chicago, IL 60606; Kline & Specter PC, 1525 Locust Street, Philadelphia, PA 19102; Keller Postman LLC, 150 N. Riverside Plaza, Suite 4100, Chicago, IL 60606, and/or their duly assigned agents, including Marker Group, Inc., 13105 North West Freeway, Suite 300, Houston, TX 77040; and Medical Research Consultants ("MRC"), 1336 Brittmoore Road, Suite 100, Houston, TX 77042, any and all medical records, including those that may contain Protected Health Information ("PHI"), regarding my Child, whether created before or after the date of signature below. This authorization ("Authorization") should also be construed to permit agents or designees of Troutman Pepper, Jones Day, Kline & Specter, Keller Postman, Marker Group, Inc., and/or MRC to copy, inspect, and review any and all such records. Records requested include, but are not limited to:

all medical records, feeding schedules and records, dieticians' records, physicians' records, surgeons' records, pathology/cytology reports, physicals and histories, laboratory reports, operating room records, records from inpatient/outpatient and emergency room treatment, discharge summaries, progress notes, office notes, dieticians' and doctors' handwritten or other notes, patient intake and registration forms, questionnaires, clinical charts and documents, test results and consultations, autopsy reports, prescriptions, nurses' notes, birth certificate and other vital statistic records, communicable disease testing and treatment records, including but not limited to, information regarding AIDS and HIV status, correspondence, pharmacy and prescription records including NDC numbers and drug information handouts/monographs, medication records, orders for medications, therapists' notes, social workers' records, insurance records, consent for treatment, statements of account, itemized bills, any and all remittance advices (RAs), including, but not limited to Electronic Remittance Advice (ERA), Standard Paper Remittance Advice (SPR), 835 format, any and all explanations of benefits (EOBs), any and all billing claim forms, including but not limited to 837, Form CMS-1450, UB-92, UB-04, CMS

1

1500 Form, invoices and any other papers relating to any examination, diagnosis, treatment, periods of hospitalization, or stays of confinement, or documents containing information regarding amendment of PHI in the medical records. Copies, NOT originals, of all x-rays, CT scans, MRI films, photographs, and any other radiological, nuclear medicine, or radiation therapy films and of any corresponding reports. I expressly request that all covered entities under HIPAA identified above disclose full and complete protected medical information.

Because this litigation is ongoing, it is imperative that you preserve my Child's original medical records, radiology, pathology/cytology slides, tissue/cell blocks, and any recut slides that are in your possession, as an expert may need to examine these slides and blocks in the future. Please take all steps that are necessary to preserve the medical records, radiology films, slides and blocks, and any recut slides that remain in your possession.

Unless revoked in writing, this Authorization shall be valid for the period of litigation in the action entitled _____, including any and all transfers and the exhaustion of all appeals. In addition, a copy of this Authorization may be used in place of and with the same force and effect as the original. A notarized signature is not required.

This Authorization is being forwarded by—or on behalf of—attorneys for the defendant(s) for the purpose of litigation. You are not authorized to discuss any aspect of my Child's medical history, care, treatment, diagnosis, prognosis, information revealed by or in their medical records, or any other matter bearing on their medical or physical condition, unless you receive an additional authorization permitting such discussion. Subject to all applicable legal objections, this restriction does not apply to discussing my Child's medical history, care, treatment, diagnosis, prognosis, information revealed by or in their medical records, or any other matter bearing on my Child's medical or physical condition at a deposition or trial.

**NOTICE:**
- **The individual signing this Authorization has the right to revoke this Authorization at any time, provided the revocation is made in writing and provided to: Troutman Pepper, Jones Day, Kline & Specter, Keller Postman, Marker Group Inc., and/or MRC, except to the extent that the covered entity has already relied upon the Authorization to disclose PHI. The revocation will also not apply to the individual's insurance company when the law provides the individual's insurer with the right to contest a claim under the individual's policy.**
- **The individual signing this Authorization understands that authorizing the disclosure of this Child's health information is voluntary and may be refused, and that the covered entity to whom this Authorization is directed may not condition treatment, payment, enrollment, or eligibility benefits on whether or not the individual signs the Authorization.**
- **The individual signing this Authorization understands that the Child's PHI disclosed pursuant to this Authorization may be subject to redisclosure by the recipients and that,**

**in such case, the disclosed PHI will no longer be protected by 45 CFR Section 164, Subpart E. The individual can contact the covered entity regarding any questions about the disclosure of this health information. The individual may inspect or copy the information to be used or disclosed as provided in 45 CFR Section 164, Subpart E.**

- **The individual signing this Authorization understands that the information in the health record may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV). It may also include information about behavioral or mental health services, and treatment for alcohol and drug abuse.**

I have read this Authorization and understand that it will permit the entity identified above to disclose, release, and furnish my Child's PHI to Troutman Pepper, Jones Day, Kline & Specter, Keller Postman, Marker Group, Inc., and/or MRC.

A photocopy, facsimile, or electronic copy of this Authorization shall be valid and may be used and relied upon with the same force and effect as the signed original hardcopy.

This Authorization shall remain valid throughout the duration of the above-referenced litigation and shall expire automatically at the close of this litigation.

_____        _____
Parent and/or Guardian Signature         Child's Name

                                          _____
                                          Former/Alias/Maiden Name

_____        _____
Date of Parent and/or Guardian Signature  Child's Date of Birth

                                          _____
                                          Child's Date of Death (if applicable)

                                          _____
                                          Child's Social Security Number

                                          _____
                                          Child's Address

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**AUTHORIZATION TO DISCLOSE PSYCHIATRIC RECORDS AND PSYCHOTHERAPY NOTES INFORMATION**

TO:

PATIENT: _____

DATE OF BIRTH: _____

SSN: _____

PURPOSE OF DISCLOSURE:  Litigation

For informational purposes pertaining to civil litigation, and pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"), I, _____, as Parent and/or Guardian of _____ ("my Child") authorize and request the Custodian of Records at the above-named entity to disclose, release, and furnish to the agents or designees of the law firms of **Troutman Pepper Hamilton Sanders LLP** ("Troutman Pepper"), 301 Carnegie Center, Suite 400, Princeton, NJ 08540; Jones Day, 110 N. Wacker Drive, Suite 4800, Chicago, IL 60606; Kline & Specter PC, 1525 Locust Street, Philadelphia, PA 19102; Keller Postman LLC, 150 N. Riverside Plaza, Suite 4100, Chicago, IL 60606, and/or their duly assigned agents, including Marker Group, Inc., 13105 North West Freeway, Suite 300, Houston, TX 77040; and Medical Research Consultants ("MRC"), 1336 Brittmoore Road, Suite 100, Houston, TX 77042, any and all medical records, including those that may contain Protected Health Information ("PHI"), regarding my Child, whether created before or after the date of signature below. This authorization ("Authorization") should also be construed to permit agents or designees of Troutman Pepper, Jones Day, Kline & Specter, Keller Postman, Marker Group, Inc., and/or MRC to copy, inspect, and review any and all such records. Records requested include, but are not limited to:

complete copies of all psychiatric records and psychotherapy notes/reports, therapists' notes, social workers' records, all medical records, physicians' records, surgeons' records, pathology/cytology reports, laboratory reports, discharge summaries, progress notes, consultations, prescriptions, records of drug abuse and alcohol abuse, physicals and histories, nurses' notes, correspondence, insurance records, consent for treatment, statements of account, itemized bills, invoices, or any other papers concerning any treatment, examination, periods or stays of hospitalization, confinement, diagnosis, or other information pertaining to and concerning the psychiatric or mental condition of this patient, or documents containing information regarding amendment of PHI in the medical records. Copies, NOT originals, of all x-rays, CT scans, MRI films, photographs, and any other radiological, nuclear medicine, or radiation therapy films and of any corresponding reports. I expressly request that all covered entities under HIPAA identified above disclose full and complete protected medical information.

1

Because this litigation is ongoing, it is imperative that you preserve my Child's medical records, radiology, pathology/cytology slides, tissue/cell blocks, and any recut slides that are in your possession, as an expert may need to examine these slides and blocks in the future. Please take all steps that are necessary to preserve the medical records, radiology films, slides and blocks, and any recut slides that remain in your possession.

Unless revoked in writing, this Authorization shall be valid for the period of litigation in the action entitled _____, including any and all transfers and the exhaustion of all appeals. In addition, a copy of this Authorization may be used in place of and with the same force and effect as the original. A notarized signature is <u>not</u> required.

This Authorization is being forwarded by—or on behalf of—attorneys for the defendant(s) for the purpose of litigation. You are not authorized to discuss any aspect of my Child's medical history, care, treatment, diagnosis, prognosis, information revealed by or in their medical records, or any other matter bearing on his or her medical or physical condition, unless you receive an additional authorization permitting such discussion. Subject to all applicable legal objections, this restriction does not apply to discussing my Child's medical history, care, treatment, diagnosis, prognosis, information revealed by or in their medical records, or any other matter bearing on my Child's medical or physical condition at a deposition or trial.

**NOTICE:**
- **The individual signing this Authorization has the right to revoke this Authorization at any time, provided the revocation is made in writing and provided to: Troutman Pepper, Jones Day, Kline & Specter, Keller Postman, Marker Group Inc., and/or MRC, except to the extent that the covered entity has already relied upon the Authorization to disclose PHI. The revocation will also not apply to the individual's insurance company when the law provides the individual's insurer with the right to contest a claim under the individual's policy.**
- **The individual signing this Authorization understands that authorizing the disclosure of this Child's health information is voluntary and may be refused, and that the covered entity to whom this Authorization is directed may not condition treatment, payment, enrollment, or eligibility benefits on whether or not the individual signs the Authorization.**
- **The individual signing this Authorization understands that the Child's PHI disclosed pursuant to this Authorization may be subject to redisclosure by the recipients and that, in such case, the disclosed PHI will no longer be protected by 45 CFR Section 164, Subpart E. The individual can contact the covered entity regarding any questions about the disclosure of this health information. The individual may inspect or copy the information to be used or disclosed as provided in 45 CFR Section 164, Subpart E.**
- **The individual signing this Authorization understands that the information in the health record may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV). It may**

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**also include information about behavioral or mental health services, and treatment for alcohol and drug abuse.**

I have read this Authorization and understand that it will permit the entity identified above to disclose, release, and furnish my Child's PHI to Troutman Pepper, Jones Day, Kline & Specter, Keller Postman, Marker Group, Inc., and/or MRC.

A photocopy, facsimile, or electronic copy of this Authorization shall be valid and may be used and relied upon with the same force and effect as the signed original hardcopy.

This Authorization shall remain valid throughout the duration of the above-referenced litigation and shall expire automatically at the close of this litigation.

_____
Parent and/or Guardian Signature

_____
Child's Name

_____
Former/Alias/Maiden Name

_____
Date of Parent and/or Guardian Signature

_____
Child's Date of Birth

_____
Child's Date of Death (if applicable)

_____
Child's Social Security Number

_____
Child's Address

3

**AUTHORIZATION TO RELEASE INSURANCE INFORMATION**

TO:

PATIENT: _____

DATE OF BIRTH: _____

SSN: _____

PURPOSE OF DISCLOSURE:  Litigation

I, _____, as Parent and/or Guardian of _____ ("my Child") hereby authorize and request the Custodian of Records at the above-named entity to disclose, release, and furnish to the agents or designees of the law firms of Jones Day, 110 N. Wacker Drive, Suite 4800, Chicago, Illinois 60606; Troutman Pepper Hamilton Sanders LLP ("Troutman Pepper"), 301 Carnegie Center, Suite 400, Princeton, NJ 08540; Jones Day, 110 N. Wacker Drive, Suite 4800, Chicago, IL 60606; Keller Postman LLC, 150 N. Riverside Plaza, Suite 4100, Chicago, IL 60606; Kline & Specter PC, 1525 Locust Street, Philadelphia, PA 19102, and/or their duly assigned agents, including Marker Group, Inc., 13105 North West Freeway, Suite 300, Houston, TX 77040; and Medical Research Consultants ("MRC"), 1336 Brittmoore Road, Suite 100, Houston, TX 77042, any and all documents relating to any insurance policy or policies, under which my Child was covered and/or claimed benefits, including, but not limited to: claims made and payments received for such claims, as well as applications, forms, and correspondence or communication of any kind between me and you regarding my Child's policy, coverage, or claims.

The records, documents, and information provided pursuant to this Authorization to Release Insurance Information ("Authorization") are required for the purposes of litigation in the action entitled **_____**.

I hereby waive and release you from any claim I might make from your release of such records, documents, and information. I understand that I may revoke this Authorization by sending a written revocation notice to Troutman Pepper, Jones Day, Kline & Specter, Keller Postman, Marker Group Inc., and/or MRC, but that this revocation notice will <u>not</u> apply to information already released in response to this Authorization and will <u>not</u> affect any actions taken in reliance on this Authorization prior to the date my written revocation is received.

I have read this Authorization and understand that it will permit the entity identified above to disclose, release, and furnish my Child's PHI to Troutman Pepper, Jones Day, Kline & Specter, Keller Postman, Marker Group, Inc., and/or MRC.

A photocopy, facsimile, or electronic copy of this Authorization shall be valid and may be used and relied upon with the same force and effect as the signed original hardcopy.

1

This Authorization shall remain valid throughout the duration of the above-referenced litigation and shall expire automatically at the close of this litigation.

_____
Parent and/or Guardian Signature

_____
Child's Name

_____
Former/Alias/Maiden Name

_____
Date of Parent and/or Guardian Signature

_____
Child's Date of Birth

_____
Child's Date of Death (if applicable)

_____
Child's Social Security Number

_____
Child's Address


**_[IF DIFFERENT FROM ABOVE]_**

_____
Policy Holder Signature

_____
Policy Holder Name

_____
Former/Alias/Maiden Name

_____
Date of Policy Holder Signature

_____
Policy Holder Date of Birth

_____
Policy Holder Social Security Number

_____
Policy Holder Address

_____
Policy Holder Employer

2

**AUTHORIZATION TO RELEASE EMPLOYMENT INFORMATION**

TO:

PATIENT: _____

DATE OF BIRTH: _____

SSN: _____

PURPOSE OF DISCLOSURE:  Litigation

I, _____, as Parent and/or Guardian of _____ ("my Child") hereby authorize and request you to release to Troutman Pepper Hamilton Sanders LLP ("Troutman Pepper"), 301 Carnegie Center, Suite 400, Princeton, NJ 08540; Jones Day, 110 N. Wacker Drive, Suite 4800, Chicago, IL 60606; Kline & Specter PC, 1525 Locust Street, Philadelphia, PA 19102; Keller Postman LLC, 150 N. Riverside Plaza, Suite 4100, Chicago, IL 60606, and/or their duly assigned agents, including Marker Group, Inc., 13105 North West Freeway, Suite 300, Houston, TX 77040; and Medical Research Consultants ("MRC"), 1336 Brittmoore Road, Suite 100, Houston, TX 77042, any and all employment records or information related to my Child's application to, employment with, and termination or resignation from your company, including, but not limited to: information regarding the place, date, and type of employment, any evaluations, disciplinary records, testing data, employment and personnel files, pay stubs and other income records, worker's compensation records, union membership records, and records relating to military service, as well as all records relating to wage, salary or other remunerations received.

The records, documents, and information provided pursuant to this Authorization to Release Employment Information ("Authorization") are required for the purposes of litigation, in the action entitled _____.

I hereby waive and release you from any claim I might make from your release of such records, documents, and information. I understand I may revoke this Authorization by sending a written revocation notice to Troutman Pepper, Jones Day, Kline & Specter, Keller Postman, Marker Group Inc., and/or MRC, but that this revocation notice will not apply to information already released in response to this Authorization and will not affect any actions taken in reliance on this Authorization prior to the date my written revocation is received.

I have read this Authorization and understand that it will permit the entity identified above to disclose, release, and furnish PHI to Troutman Pepper, Jones Day, Kline & Specter, Keller Postman, Marker Group, Inc., and/or MRC.

A photocopy, facsimile, or electronic copy of this Authorization shall be valid and may be used and relied upon with the same force and effect as the signed original hardcopy.

1

This Authorization shall remain valid throughout the duration of the above-referenced litigation and shall expire automatically at the close of this litigation.

 

_____
Parent and/or Guardian Signature

_____
Child's Name

_____
Former/Alias/Maiden Name

_____
Date of Parent and/or Guardian Signature

_____
Child's Date of Birth

_____
Child's Date of Death (if applicable)

_____
Child's Social Security Number

_____
Child's Address

2

## AUTHORIZATION TO RELEASE EDUCATION INFORMATION

TO:

PATIENT: _____

DATE OF BIRTH: _____

SSN: _____

PURPOSE OF DISCLOSURE:  Litigation

I, _____, as Parent and/or Guardian of _____ ("my Child") hereby authorize and request the Custodian of Records at the above-named entity to disclose, release, and furnish to the agents or designees of the law firms of Troutman Pepper Hamilton Sanders LLP ("Troutman Pepper"), 301 Carnegie Center, Suite 400, Princeton, NJ 08540; Jones Day, 110 N. Wacker Drive, Suite 4800, Chicago, IL 60606; Kline & Specter PC, 1525 Locust Street, Philadelphia, PA 19102; Keller Postman LLC, 150 N. Riverside Plaza, Suite 4100, Chicago, IL 60606, and/or their duly assigned agents, including Marker Group, Inc., 13105 North West Freeway, Suite 300, Houston, TX 77040; and Medical Research Consultants ("MRC"), 1336 Brittmoore Road, Suite 100, Houston, TX 77042, any and all education records or information related to my Child's application to, attendance at, and termination, or graduation from, your institution, including, but not limited to: academic records, student file(s), transcripts and degree(s).

The records, documents, and information provided pursuant to this Authorization to Release Education Information ("Authorization") are required for the purposes of litigation, in the action entitled _____.

I hereby waive and release you from any claim I might make from your release of such records, documents, and information. I understand I may revoke this Authorization by sending a written revocation notice to Troutman Pepper, Jones Day, Kline & Specter, Keller Postman, Marker Group Inc., and/or MRC, but that this revocation notice will not apply to information already released in response to this Authorization and will not affect any actions taken in reliance on this Authorization prior to the date my written revocation is received.

I have read this Authorization and understand that it will permit the entity identified above to disclose, release, and furnish PHI to Troutman Pepper, Jones Day, Kline & Specter, Keller Postman, Marker Group, Inc., and/or MRC.

A photocopy, facsimile, or electronic copy of this Authorization shall be valid and may be used and relied upon with the same force and effect as the signed original hardcopy.

1

This Authorization shall remain valid throughout the duration of the above-referenced litigation and shall expire automatically at the close of this litigation.

| | |
|---|---|
| _____ | _____ |
| Parent and/or Guardian Signature | Child's Name |
| | _____ |
| | Former/Alias/Maiden Name |
| _____ | _____ |
| Date of Parent and/or Guardian Signature | Child's Date of Birth |
| | _____ |
| | Child's Date of Death (if applicable) |
| | _____ |
| | Child's Social Security Number |
| | _____ |
| | Child's Address |

2

# EXHIBIT D

Troutman Pepper Hamilton Sanders LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103



troutman.com

**Noël B. Ix**
D 609.951.4102
Noel.Ix@Troutman.com

April 8, 2024

**VIA E-MAIL**

Timothy Burke
Timothy.Burke@klinespecter.com

Mark Weinstein
mark.weinstein@kellerpostman.com

Re:    *Carter v. Mead Johnson, et al. (220302588) - Discovery Deficiency Letter*

Counsel:

I write on behalf of Defendant Abbott Laboratories ("Abbott") concerning the ongoing deficiencies in plaintiffs' discovery responses.  Abbott first served discovery on plaintiffs nearly eight months ago—on August 9, 2023.  The discovery included Philadelphia Standard Form interrogatories, supplemental interrogatories, and document requests.  In October 2023, plaintiffs provided very limited responses, necessitating Abbott's initial deficiency letter of October 27.  Because plaintiffs did not remedy the identified deficiencies, Abbott had to file a motion to compel on December 5.  In an effort to resolve the motion and move discovery along, the parties reached an order by agreement, entered by the Court on January 5, 2024, that, among other things, required plaintiffs to serve full and complete responses to Abbott's Interrogatories (INTs) and Requests for Production (RFPs) no later than February 5, 2024.

Plaintiffs failed to serve responses on or before February 5.  Instead, over the weeks after the Court-imposed deadline had already passed, some plaintiffs began submitting partially-supplemented responses.  These untimely responses were neither full nor complete, as required by the Court's order, and to date, plaintiffs still have not complied with the order.  Abbott requires plaintiffs' full and complete responses to Abbott's discovery requests so that the parties may proceed with plaintiffs' depositions in advance of the June 3, 2024 discovery deadline.

The letter below details specific deficiencies which relate to the responses provided to date by plaintiffs Holli Carter and J.C.  This letter is not exhaustive and is only intended to address the most significant deficiencies in plaintiffs' responses provided to date in the *Carter* case.

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter.  Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

<span style="color:red">Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473</span>

**Deficiency Letter**
**April 8,** 2024
Page 2



---

I.     **Interrogatories**

    a.  **INT No. 1**

INT No. 1 sought basic demographic information regarding ***plaintiff-parent***, including name, date of birth, address, marital status (current and at time of incident), and social security number.  In the initial response, Holli Carter only provided her address.  Ms. Carter supplemented her response by stating, "Plaintiff Alice Stills was born on February 9, 1987."  Abbott believes this response was served in error.  In addition, plaintiffs have failed to provide information regarding Ms. Carter's marital status (current and at time of incident).

Accordingly, Abbott requests that Ms. Carter amend her response to INT No. 1 to provide information regarding her marital status (current and at the time J.C.'s birth).

    b.  **INT Nos. 2, 5, 8, 9, and 26**

INT Nos. 2 and 5 sought a description of the injuries suffered by plaintiff-parent as a result of infant's NEC diagnosis.  Ms. Carter initially responded to INT Nos. 2, and 5 by offering to meet and confer.  She later supplemented her response to INT Nos. 2 and 5 by referring to authorizations and records.

Accordingly, Abbott requests that Ms. Carter amend and supplement her responses to INT Nos. 2 and 5 to identify and describe any and all injuries that Ms. Carter allegedly suffered as a result of J.C.'s NEC diagnosis.

In response to RFP No. 7, Ms. Carter suggested that she is pursuing a claim for wage loss.  INT Nos. 8 and 9 sought information regarding plaintiff-parent's employers.  In particular, INT No. 8 sought the identity of employers pre-dating the birth of infant, and INT No. 9 sought the identity of employers post-dating infants' birth.  In response to these INTs, Ms. Carter provided the name of one employer, BAYADA Pediatrics, where she has worked from 2012 to the present.  However, Ms. Carter failed to provide the other requested information regarding her employment, including a detailed description of her occupation and job responsibilities or her wage/salary.

Accordingly, Abbott requests that Ms. Carter amend and supplement her responses to INT Nos. 8 and 9 to provide the requested additional information about her employment.

INT No. 26 sought information about the injuries that plaintiff-infant allegedly suffered as a result of his or her NEC diagnosis.  Because plaintiffs allege that each infant suffers from long-term health effects, this INT necessarily seeks information regarding the specific injuries alleged. In response, J.C. referred to the brief list of injuries set out in response to INT No. 23—which included only NEC and neurological issues—and otherwise refers to authorizations and medical records.  The medical records, however, do not tell us the specific medical conditions through the present that plaintiffs contend were caused by NEC.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**Deficiency Letter**
**April 8,** 2024
Page 3



Accordingly, Abbott requests that plaintiffs supplement their response to INT No. 26 to clearly identify any and all injuries they allege were caused by NEC and whether those injuries continue through the present.

### c.  INT Nos. 15 and 35

INT Nos. 15 and 35 inquired of both plaintiff-parent and plaintiff-infant, respectively, whether either was aware of the existence of any photographs, diagrams, or models of the areas surrounding infant's NEC diagnosis as well as details regarding any such photographs, diagrams, or models.  Both Ms. Carter and J.C. initially responded to these INTs by offering to meet and confer, and both supplemented their response by reserving the right to supplement.

Accordingly, Abbott requests that plaintiffs either (a) identify any documents responsive to INT Nos. 15 and 35; or (b) otherwise affirmatively state that none exist.

### d.  INT Nos. 31 and 32

INT No. 31 sought information regarding witnesses to the infant's NEC diagnosis and/or injuries related thereto.  In response, Ms. Carter identified three potential witnesses: Jason Carter, Lucretia Olbrich, and Kenneth Olbrich; however, Ms. Carter failed to provide the last known address of any of these potential witnesses.

INT No. 32 requested the location and activity of any witnesses identified in INT No. 31.  In response, Ms. Carter stated that she "does not recall any witnesses beyond those identified above and in the medical records."  This response is insufficient as it neither identifies the location nor activity of the witnesses listed in response to INT No. 31.

Accordingly, Abbott requests that plaintiffs provide the last known address of each witness listed, their relation to Ms. Carter and J.C., a description of the knowledge or information they may have, and whether they were present during J.C.'s hospitalizations following birth.

### e.  INT No. 42

INT No. 42 sought information regarding the preterm infant formula products administered to infant prior to infant's NEC diagnosis.  Plaintiffs responded only by referring to medical records and authorizations.  The administration of an Abbott product is a key allegation in plaintiffs' complaint.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 42 to specifically identify any and all Abbott products administered to J.C. prior to NEC diagnosis.

### f.  INT No. 43

INT No. 43 sought information regarding any labels, packaging, product guides, or other related documents that plaintiff-parent saw prior to the administration of any preterm infant formula products to infant.  Ms. Carter responded only by referring to medical records and authorizations.  This response is insufficient.  Plaintiffs have alleged that Abbott's products were

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**Deficiency Letter**
**April 8,** 2024
Page 4



deficiently labeled, and therefore, Abbott is entitled to know what allegedly deficient labels, packaging, or documents Ms. Carter claims to have seen.

Accordingly, Abbott requests that Ms. Carter amend and supplement her response to INT No. 43 to specifically identify any labels, packaging, product guides, or related documents that she saw.

### g. INT No. 53

INT No. 53 sought information regarding all persons with whom plaintiffs had communications regarding the alleged causes of J.C.'s NEC. Ms. Carter initially responded that she "does not recall being told by healthcare providers that NEC is related to prematurity." Ms. Carter did not amend or supplement this response, and it is insufficient on its face. In particular, while it addresses what Ms. Carter was *not* told, it fails to address the existence or substance of any responsive communications that Ms. Carter *did* have regarding the alleged causes of J.C.'s NEC.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 53 to identify and provide all requested details regarding any responsive communications.

### h. INT No. 54

INT No. 54 sought communications between plaintiffs and any manufacturer of infant formula products, including preterm infant formula products. Ms. Carter and J.C. responded by agreeing to meet and confer. Plaintiffs, however, have not supplemented their response to this INT.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 54 to identify and describe any communications responsive thereto.

### i. INT Nos. 55 and 56

INT No. 55 sought information regarding all pregnancies experienced by plaintiff-parent. Ms. Carter responded only by referring to authorizations and records. Notwithstanding, in response to INT No. 56, which sought information regarding infant formula products administered to each child identified in INT No. 55, Ms. Carter stated that she "recalls Similac products." This response is insufficient, insofar as (1) Ms. Carter failed to identify any pregnancy in INT No. 55 to which this product relates, and (2) Ms. Carter failed to provide the additional information requested by INT No. 56, including the full product name and dates of administration.

Accordingly, Abbott requests that plaintiffs amend and supplement her response to INT No. 55 to identify any and all pregnancies experienced by Ms. Carter, and further requests that plaintiffs amend and supplement their response to INT No. 56 to provide the requested information regarding the infant formula products administered to any child identified in response to INT No. 55.

**Deficiency Letter**
**April 8,** 2024
Page 5



      **j.  INT No. 59**

INT No. 59 asked plaintiffs to state whether they had purchased preterm infant formula products from any online site or retail store. Plaintiff-parent responded only by reserving the right to amend or supplement their response.

Accordingly, Abbott requests that plaintiffs either (a) identify and describe any purchases of preterm infant formula products that are responsive to INT No. 59; or (b) otherwise affirmatively indicate that no such purchases exist.

      **k.  INT No. 61**

INT No. 61 asked plaintiffs to identify their educational background and all schools they attended. Plaintiffs objected to this INT and provided no further response. Neither Ms. Carter nor J.C. supplemented or amended their response to this INT.

Accordingly, Abbott requests that plaintiffs provide a complete and accurate response to INT No. 61.

      **l.  INT No. 64**

INT No. 64 asked plaintiffs to identify all social media accounts and electronic accounts. Ms. Carter and J.C. responded by providing one email address, which appears to relate to Ms. Carter. This response is insufficient.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 64 and identify all other social and electronic accounts of both Ms. Carter and J.C.

      **m. INT No. 65**

INT No. 65 sought an itemization of plaintiffs' damages. Plaintiffs responded only by referring to all discovery productions. Plaintiffs did not supplement their response.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 65 to either (a) specifically identify and itemize the damages they seek, or (b) confirm that they seek no other damages beyond those captured in the records produced to date.

      **n.  INT No. 66**

INT No. 66 sought information regarding life, health, or disability insurance applied for and/or obtained by plaintiffs. In response, Ms. Carter and J.C. referred broadly to all discovery productions and reserved the right to supplement. Plaintiffs did not amend or supplement this response. This response is insufficient, as it does not identify any insurance providers.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 66 to provide the requested information regarding plaintiffs' insurance providers.

**Deficiency Letter**
**April 8,** 2024
Page 6



II.      **Requests for Production**

      a.  **References to Authorizations and Records**

Plaintiffs responded to several RFPs by referring Abbott to authorizations and medical records, including RFP Nos. 2, 13, 38, 39, and 42.  This response is inappropriate as these requests seek information beyond that which would be contained in medical authorizations or medical records:

- RFP No. 2 seeks documents relating to communications related to plaintiffs' injuries.

- RFP No. 13 seeks documents relating to monetary payments plaintiffs received from any person, entity, or governmental body as a result of the injuries alleged in the complaint.

- RFP Nos. 38 and 39 seek documents, such as articles, journals, or notes, relating to infant formula products (RFP No. 38) or Abbott/any other infant formula product manufacturer (RFP No. 39).

- RFP No. 42 seeks non-privileged communications and documents relating to plaintiffs' decision to initiate this lawsuit.

- RFP No. 44 seeks calendars, journals, or other documents that reflect plaintiffs' daily activities preceding the infant's NEC diagnosis.

In further response to each of these RFPs, plaintiffs stated that they have "not identified any additional responsive, non-privileged, documents," but that they "reserve[] the right to serve additional records during the course of discovery."  Abbott served these RFPs on plaintiffs nearly eight months ago, and the fact discovery period closes in less than 90 days.  At this stage of the litigation, Abbott needs to know whether there exist any documents responsive to these requests.  Accordingly, Abbott requests that plaintiffs:

      (1)      Identify any documents responsive to these requests that are beyond the medical records referenced in plaintiffs' response; or

      (2)      If no responsive documents exist, please so indicate.

      b.  **Request for Authorizations for Twin/Sibling**

RFP No. 24 sought a signed authorization for any twin or sibling carried in the same pregnancy as plaintiff-infant.  In her initial response to this RFP, Ms. Carter indicated she would "execute relevant authorizations for records" once a protective order had been entered.  Notwithstanding, records provided to us suggest that there was no twin or sibling carried in the same pregnancy as J.C.

Accordingly, Abbott requests that plaintiffs confirm whether there was any twin or sibling carried in the same pregnancy as J.C.

<span style="color:red">Certification Due Date: 05/02/2024</span>
<span style="color:red">Response Date: 05/09/2024</span>
<span style="color:red">Case ID: 220302606</span>
<span style="color:red">Control No.: 24045473</span>

**Deficiency Letter**
**April 8,** 2024
Page 7



Abbott reserves the right to later raise additional, individualized deficiencies in plaintiffs' RFP responses.

### III. Objections to Treaters and other Entities

Following the Court's entry of the discovery order dated January 5, 2024, Abbott has sent plaintiffs several lists of treaters and other entities for which Abbott sought consent to serve signed blank authorizations. Plaintiffs have responded by specifying the providers for which they consent to serve the authorizations and those for which they object to serve the authorizations.

With respect to J.C., plaintiffs have objected to five medical providers, but provided no rationale for their objections. One of J.C.'s providers to whom plaintiffs objected is Laura M. Betancourt, Ph.D., a psychologist with the Department of Psychiatry and Behavioral Sciences at Children's Hospital of Philadelphia. In response to INT No. 23, which seeks information regarding injuries resulting from infant's NEC diagnosis, plaintiffs allege that J.C. suffers from "neurological issues." Our records indicate that Dr. Betancourt provided behavioral health treatment to J.C.; these records are relevant based on J.C.'s allegations concerning neurological issues. Abbott requests that plaintiffs withdraw their objection and confirm that plaintiffs' consent to the service of the authorization on Dr. Betancourt.

### IV. Authorizations

With regard to authorizations to collect records, on March 11, 2024, Abbott sent plaintiffs the most recent list of issues related to the authorizations, along with a request to send corrected authorizations to address those issues, so that Abbott may obtain records promptly. Outstanding requests relating to the above-named plaintiff are incorporated by reference in this letter.

In addition, plaintiffs have not provided a blank employment authorization for Ms. Carter. Accordingly, Abbott requests that plaintiffs provide the missing blank authorization.

<div align="center">*     *     *</div>

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter. Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

Very truly yours,

*/s/ Noël B. Ix*
Noël B. Ix

cc:     All counsel of record (via email)

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

# EXHIBIT E

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

Troutman Pepper Hamilton Sanders LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103



troutman.com

**Noël B. Ix**
D 609.951.4102
Noel.Ix@Troutman.com

April 8, 2024

**VIA E-MAIL**

Timothy Burke
Timothy.Burke@klinespecter.com

Mark Weinstein
mark.weinstein@kellerpostman.com

Re:     *Stills v. Mead Johnson, et al. (220302617) - Discovery Deficiency Letter*

Counsel:

I write on behalf of Defendant Abbott Laboratories ("Abbott") concerning the ongoing deficiencies in plaintiffs' discovery responses. Abbott first served discovery on plaintiffs nearly eight months ago—on August 9, 2023. The discovery included Philadelphia Standard Form interrogatories, supplemental interrogatories, and document requests. In October 2023, plaintiffs provided very limited responses, necessitating Abbott's initial deficiency letter of October 27. Because plaintiffs did not remedy the identified deficiencies, Abbott had to file a motion to compel on December 5. In an effort to resolve the motion and move discovery along, the parties reached an order by agreement, entered by the Court on January 5, 2024, that, among other things, required plaintiffs to serve full and complete responses to Abbott's Interrogatories (INTs) and Requests for Production (RFPs) no later than February 5, 2024.

Plaintiffs failed to serve responses on or before February 5. Instead, over the weeks after the Court-imposed deadline had already passed, some plaintiffs began submitting partially-supplemented responses. These untimely responses were neither full nor complete, as required by the Court's order, and to date, plaintiffs still have not complied with the order. Abbott requires plaintiffs' full and complete responses to Abbott's discovery requests so that the parties may proceed with plaintiffs' depositions in advance of the June 3, 2024 discovery deadline.

The letter below details specific deficiencies which relate to the responses provided to date by plaintiffs Alice Stills and M.E. This letter is not exhaustive and is only intended to address the most significant deficiencies in plaintiffs' responses provided to date in the *Stills* case.

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter. Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

<span style="color:red">Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473</span>

**Deficiency Letter**
**April 8,** 2024
Page 2



---

I.      **Interrogatories**

    a.   **INT No. 1**

INT No. 1 sought basic demographic information regarding ***plaintiff-parent***, including name, date of birth, address, marital status (current and at time of incident), and social security number.  In the initial response, Alice Stills only provided her address.  Ms. Stills supplemented her response by providing her date of birth.  Plaintiff, however, has failed to provide information regarding Ms. Stills' marital status (current and at time of incident).

Accordingly, Abbott requests that Ms. Stills amend her response to INT No. 1 to provide information regarding her marital status (current and at the time M.E.'s birth).

    b.   **INT Nos. 2, 5, 8, 9, and 26**

INT Nos. 2 and 5 sought a description of the injuries suffered by plaintiff-parent as a result of infant's NEC diagnosis.  Ms. Stills initially responded to INT Nos. 2, and 5 by offering to meet and confer.  She later supplemented her response to INT Nos. 2 and 5 by referring to authorizations and records.

Accordingly, Abbott requests that Ms. Stills amend and supplement her responses to INT Nos. 2 and 5 to identify and describe any and all injuries that Ms. Stills allegedly suffered as a result of M.E.'s NEC diagnosis.

In response to RFP No. 7, Ms. Stills suggested that she is pursuing a claim for wage loss.   INT Nos. 8 and 9 sought information regarding plaintiff-parent's employers.  In particular, INT No. 8 sought the identity of employers pre-dating the birth of infant, and INT No. 9 sought the identity of employers post-dating infants' birth.  In response to these INTs, Ms. Stills provided the name of one employer, The School District of Philadelphia, where she worked from 2006 to 2008.  However, Ms. Stills failed to provide the other requested information regarding her employment, including her employment history through the present, a detailed description of her occupation and job responsibilities or her wage/salary.

Accordingly, Abbott requests that Ms. Stills amend and supplement her responses to INT Nos. 8 and 9 to provide the requested additional information about her employment.

INT No. 26 sought information about the injuries that plaintiff-infant allegedly suffered as a result of his or her NEC diagnosis.  Because plaintiffs allege that each infant suffers from long-term health effects, this INT necessarily seeks information regarding the specific injuries alleged. In response, M.E. referred to the brief list of injuries set out in response to INT No. 23—which included only NEC and autism spectrum disorder—and otherwise refers to authorizations and medical records.  The medical records, however, do not tell us the specific medical conditions through the present that plaintiffs contend were caused by NEC.

Accordingly, Abbott requests that plaintiffs supplement their response to INT No. 26 to clearly identify any and all injuries they allege were caused by NEC and whether those injuries continue through the present.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**Deficiency Letter**
**April 8,** 2024
Page 3



---

    **c.  INT Nos. 31 and 32**

INT No. 31 sought information regarding witnesses to the infant's NEC diagnosis and/or injuries related thereto.  In response, Ms. Stills identified one potential witness: Lisa Stills.  Ms. Stills provided the last known address for this witness.

INT No. 32 requested the location and activity of any witness identified in INT No. 31.  In response, Ms. Stills stated that she "does not recall any witnesses beyond those identified above and in the medical records."  This response is insufficient as it neither identifies the location nor activity of the witness listed in response to INT No. 31.

Accordingly, Abbott requests that plaintiffs provide the relation of the witness to Ms. Stills and M.E., a description of the knowledge or information they may have, and whether they were present during M.E.'s hospitalizations following birth.

    **d.  INT No. 42**

INT No. 42 sought information regarding the preterm infant formula products administered to infant prior to infant's NEC diagnosis.  Plaintiffs responded only by referring to medical records and authorizations.  The administration of an Abbott product is a key allegation in plaintiffs' complaint.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 42 to specifically identify any and all Abbott products administered to M.E. prior to NEC diagnosis.

    **e.  INT No. 43**

INT No. 43 sought information regarding any labels, packaging, product guides, or other related documents that plaintiff-parent saw prior to the administration of any preterm infant formula products to infant.  Ms. Stills responded only by stating she "does not recall seeing any materials responsive to this Interrogatory."  This response is insufficient.  Plaintiffs have alleged that Abbott's products were deficiently labeled, and therefore, Abbott is entitled to know what allegedly deficient labels, packaging, or documents Ms. Stills claims to have seen.

Accordingly, Abbott requests that Ms. Stills amend and supplement her response to INT No. 43 to specifically identify any labels, packaging, product guides, or related documents that she saw.

    **f.  INT No. 46**

INT No. 46 sought information regarding gifts, coupons, or infant formula products that plaintiff-parent received from a healthcare provider.  In response, Ms. Stills stated she recalled seeing "infant formula product(s) or container(s) of infant formula product(s) in the NICU."  This response is insufficient.  Ms. Stills did not provide any of the additional information requested including whether she received the products she observed, from whom she received the products, the date on which she received the products, and/or the substance of any discussions about the products.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**Deficiency Letter**
**April 8,** 2024
Page 4



Accordingly, Abbott requests that Ms. Stills amend and supplement her response to INT No. 46 to provide the additional information requested.

### g. INT No. 53

INT No. 53 sought information regarding all persons with whom plaintiffs had communications regarding the alleged causes of M.E.'s NEC. Ms. Stills initially responded that she "recalls being told by healthcare providers that NEC is caused by the growth of bacteria." Ms. Stills did not amend or supplement this response, and it is insufficient on its face. In particular, Ms. Stills did not identify with whom she had the communication or when the communication occurred.

Accordingly, Abbott requests that Ms. Stills amend and supplement her response to INT No. 53 to identify and provide all requested details regarding any responsive communications.

### h. INT No. 54

INT No. 54 sought communications between plaintiffs and any manufacturer of infant formula products, including preterm infant formula products. Ms. Stills and M.E. responded by agreeing to meet and confer. Plaintiffs, however, have not supplemented their response to this INT.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 54 to identify and describe any communications responsive thereto.

### i. INT Nos. 55 and 56

INT No. 55 sought information regarding all pregnancies experienced by plaintiff-parent. Ms. Stills responded only by referring to authorizations and records. Notwithstanding, in response to INT No. 56, which sought information regarding infant formula products administered to each child identified in INT No. 55, Ms. Stills stated that she "recalls Similac products." This response is insufficient, insofar as (1) Ms. Stills failed to identify any pregnancy in INT No. 55 to which this product relates, and (2) Ms. Stills failed to provide the additional information requested by INT No. 56, including the full product name and dates of administration.

Accordingly, Abbott requests that Ms. Stills amend and supplement her response to INT No. 55 to identify any and all pregnancies experienced by Ms. Stills, and further requests that Ms. Stills amend and supplement her response to INT No. 56 to provide the requested information regarding the infant formula products administered to any child identified in response to INT No. 55.

### j. INT No. 59

INT No. 59 asked plaintiffs to state whether they had purchased preterm infant formula products from any online site or retail store. Plaintiff-parent responded only by reserving the right to amend or supplement their response.

Accordingly, Abbott requests that plaintiffs either (a) identify and describe any purchases of preterm infant formula products that are responsive to INT No. 59; or (b) otherwise affirmatively indicate that no such purchases exist.

**Deficiency Letter**
**April 8,** 2024
Page 5



      **k. INT No. 61**

INT No. 61 asked plaintiffs to identify their educational background and all schools they attended. Plaintiffs objected to this INT and provided no further response. Neither Ms. Stills nor M.E. supplemented or amended their response to this INT.

Accordingly, Abbott requests that plaintiffs provide a complete and accurate response to INT No. 61.

      **l. INT No. 64**

INT No. 64 asked plaintiffs to identify all social media accounts and electronic accounts. Ms. Stills and M.E. responded by providing one email address, which appears to relate to Ms. Stills. This response is insufficient.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 64 and identify all other social and electronic accounts of both Ms. Stills and M.E.

      **m. INT No. 65**

INT No. 65 sought an itemization of plaintiffs' damages. Plaintiffs responded only by referring to all discovery productions. Plaintiffs did not supplement their response.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 65 to either (a) specifically identify and itemize the damages they seek, or (b) confirm that they seek no other damages beyond those captured in the records produced to date.

      **n. INT No. 66**

INT No. 66 sought information regarding life, health, or disability insurance applied for and/or obtained by plaintiffs. In response, Ms. Stills and M.E. referred broadly to all discovery productions and reserved the right to supplement. Plaintiffs did not amend or supplement this response. This response is insufficient, as it does not identify any insurance providers.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 66 to provide the requested information regarding plaintiffs' insurance providers.

**II.**     **Requests for Production**

      **a. References to Authorizations and Records**

Plaintiffs responded to several RFPs by referring Abbott to authorizations and medical records, including RFP Nos. 2, 13, 38, 39, and 42. This response is inappropriate as these requests seek information beyond that which would be contained in medical authorizations or medical records:

    • RFP No. 2 seeks documents relating to communications related to plaintiffs' injuries.

**Deficiency Letter**
**April 8,** 2024
Page 6



- RFP No. 13 seeks documents relating to monetary payments plaintiffs received from any person, entity, or governmental body as a result of the injuries alleged in the complaint.

- RFP Nos. 38 and 39 seek documents, such as articles, journals, or notes, relating to infant formula products (RFP No. 38) or Abbott/any other infant formula product manufacturer (RFP No. 39).

- RFP No. 42 seeks non-privileged communications and documents relating to plaintiffs' decision to initiate this lawsuit.

- RFP No. 44 seeks calendars, journals, or other documents that reflect plaintiffs' daily activities preceding the infant's NEC diagnosis.

In further response to each of these RFPs, plaintiffs stated that they have "not identified any additional responsive, non-privileged, documents," but that they "reserve[] the right to serve additional records during the course of discovery." Abbott served these RFPs on plaintiffs nearly eight months ago, and the fact discovery period closes in less than 60 days. At this stage of the litigation, Abbott needs to know whether there exist any documents responsive to these requests. Accordingly, Abbott requests that plaintiffs:

      (1)     Identify any documents responsive to these requests that are beyond the medical records referenced in plaintiffs' response; or

      (2)     If no responsive documents exist, please so indicate.

### b. Request for Authorizations for Twin/Sibling

RFP No. 24 sought a signed authorization for any twin or sibling carried in the same pregnancy as plaintiff-infant. In her initial response to this RFP, Ms. Stills indicated she would "execute relevant authorizations for records" once a protective order had been entered. In a supplemental response, Ms. Stills indicated the RFP was "not applicable." Notwithstanding, records reviewed by Abbott suggest that there was an additional infant born in the same pregnancy as M.E.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to RFP No. 24 by providing the requested authorizations for the twin carried in the same pregnancy as M.E.

Abbott reserves the right to later raise additional, individualized deficiencies in plaintiffs' RFP responses.

### III.    Authorizations

With regard to authorizations to collect records, on March 11, 2024, Abbott sent plaintiffs the most recent list of issues related to the authorizations, along with a request to send corrected authorizations to address those issues, so that Abbott may obtain records promptly. Outstanding requests relating to the above-named plaintiff are incorporated by reference in this letter.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**Deficiency Letter**
**April 8,** 2024
Page 7



In addition, plaintiffs have not provided blank employment or insurance authorizations for Ms. Stills.  Plaintiffs have also have not provided blank education and, if applicable, employment authorizations for M.E.  Accordingly, Abbott requests that plaintiffs provide those missing blank authorizations.

<div align="center">*     *     *</div>

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter.  Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

Very truly yours,

*/s/ Noël B. Ix*
Noël B. Ix

cc:     All counsel of record (via email)

# EXHIBIT F

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

Troutman Pepper Hamilton Sanders LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103

troutman.com



**Noël B. Ix**
D 609.951.4102
Noel.Ix@Troutman.com

April 8, 2024

**VIA E-MAIL**

Timothy Burke
Timothy.Burke@klinespecter.com

Mark Weinstein
mark.weinstein@kellerpostman.com

Re:     *Taylor v. Mead Johnson, et al. (220302606) - Discovery Deficiency Letter*

Counsel:

I write on behalf of Defendant Abbott Laboratories ("Abbott") concerning the ongoing deficiencies in plaintiffs' discovery responses.  Abbott first served discovery on plaintiffs nearly eight months ago—on August 9, 2023.  The discovery included Philadelphia Standard Form interrogatories, supplemental interrogatories, and document requests.  In October 2023, plaintiffs provided very limited responses, necessitating Abbott's initial deficiency letter of October 27.  Because plaintiffs did not remedy the identified deficiencies, Abbott had to file a motion to compel on December 5.  In an effort to resolve the motion and move discovery along, the parties reached an order by agreement, entered by the Court on January 5, 2024, that, among other things, required plaintiffs to serve full and complete responses to Abbott's Interrogatories (INTs) and Requests for Production (RFPs) no later than February 5, 2024.

Plaintiffs failed to serve responses on or before February 5.  Instead, over the weeks after the Court-imposed deadline had already passed, some plaintiffs began submitting partially-supplemented responses.  These untimely responses were neither full nor complete, as required by the Court's order, and to date, plaintiffs still have not complied with the order. Abbott requires plaintiffs' full and complete responses to Abbott's discovery requests so that the parties may proceed with plaintiffs' depositions in advance of the June 3, 2024 discovery deadline.

The letter below details specific deficiencies which relate to the responses provided to date by plaintiffs Christina Taylor and I.H.  This letter is not exhaustive and is only intended to address the most significant deficiencies in plaintiffs' responses provided to date in the *Taylor* case.

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter.  Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

<span style="color:red">Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473</span>

**Deficiency Letter**
**April 8,** 2024
Page 2



## I.     Interrogatories

### a.  INT No. 1

INT No. 1 sought basic demographic information regarding plaintiff-parent, including name, date of birth, address, marital status (current and at time of incident), and social security number.  In the initial response, Christina Taylor only provided her address.  Ms. Taylor did not supplement her response.

Accordingly, Abbott requests that Ms. Taylor amend her response to INT No. 1 to provide information regarding her marital status (current and at the time I.H.'s birth).

### b.  INT Nos. 2, 5 and 26

INT Nos. 2 and 5 sought a description of the injuries suffered by ***plaintiff-parent*** as a result of infant's NEC diagnosis.  Ms. Taylor initially responded to INT Nos. 2, and 5 by offering to meet and confer.  She later supplemented her response to INT Nos. 2 and 5 by referring to authorizations and records and listing certain injuries including "NEC, Surgical evaluation for Stage II NEC," and "Ongoing bowel/eating issues."

Accordingly, Abbott requests that Ms. Taylor amend and supplement her responses to INT Nos. 2 and 5 to identify and describe any and all injuries that Ms. Taylor allegedly suffered as a result of I.H.'s NEC diagnosis.

INT No. 26 sought information about the injuries that plaintiff-infant allegedly suffered as a result of his or her NEC diagnosis.  Because plaintiffs allege that each infant suffers from long-term health effects, this INT necessarily seeks information regarding the specific injuries alleged.  In response, I.H. referred to the brief list of injuries set out in response to INT No. 23—which included the injuries listed in response to INT Nos. 2 and 5 —and otherwise refers to authorizations and medical records.  The medical records, however, do not tell us the specific medical conditions through the present that plaintiffs contend were caused by NEC.

Accordingly, Abbott requests that plaintiffs supplement their response to INT No. 26 to clearly identify any and all injuries they allege were caused by NEC and whether those injuries continue through the present.

### c.  INT No. 42

INT No. 42 sought information regarding the preterm infant formula products administered to infant prior to infant's NEC diagnosis.  Plaintiffs responded only by referring to medical records and authorizations.  The administration of an Abbott product is a key allegation in plaintiffs' complaint.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 42 to specifically identify any and all Abbott products administered to I.H. prior to NEC diagnosis.

**Deficiency Letter**
**April 8,** 2024
Page 3



---

   **d.   INT No. 43**

INT No. 43 sought information regarding any labels, packaging, product guides, or other related documents that plaintiff-parent saw prior to the administration of any preterm infant formula products to infant.  Ms. Taylor responded only by stating that she "recalls seeing packaging." This response is insufficient.  Plaintiffs have alleged that Abbott's products were deficiently labeled, and therefore, Abbott is entitled to know what allegedly deficient labels, packaging, or documents Ms. Taylor claims to have seen.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 43 to specifically identify any labels, packaging, product guides, or related documents that they saw.

   **e.   INT No. 54**

INT No. 54 sought communications between plaintiffs and any manufacturer of infant formula products, including preterm infant formula products.  Ms. Taylor and I.H. responded by agreeing to meet and confer.  Plaintiffs, however, have not supplemented their response to this INT.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 54 to identify and describe any communications responsive thereto.

   **f.   INT Nos. 55 and 56**

INT No. 55 sought information regarding all pregnancies experienced by plaintiff-parent.  Ms. Taylor responded only by referring to authorizations and records.  Notwithstanding, in response to INT No. 56, which sought information regarding infant formula products administered to each child identified in INT No. 55, Ms. Taylor stated that she "recalls that infant received Similac Special Care."  This response is insufficient, insofar as (1) Ms. Taylor failed to identify any pregnancy in INT No. 55 to which this product relates, and (2) Ms. Taylor failed to provide the additional information requested by INT No. 56, including the manufacturer name and dates of administration.

Accordingly, Abbott requests that plaintiffs amend and supplement her response to INT No. 55 to identify any and all pregnancies experienced by Ms. Taylor, and further requests that plaintiffs amend and supplement their response to INT No. 56 to provide the requested information regarding the infant formula products administered to any child identified in response to INT No. 55.

   **g.   INT No. 61**

INT No. 61 asked plaintiffs to identify their educational background and all schools they attended.  Plaintiffs objected to this INT and provided no further response.  Neither Ms. Taylor nor I.H. supplemented or amended their response to this INT.

Accordingly, Abbott requests that plaintiffs provide a complete and accurate response to INT No. 61.

**Deficiency Letter**
**April 8,** 2024
Page 4



---

**h.  INT No. 63**

INT No. 63 asked about prior legal proceedings to which plaintiff-parent or plaintiff-infant were a party.  Ms. Taylor responded by indicating she did not recall any prior legal proceedings.  Notwithstanding, a search of public records revealed that Ms. Taylor was party to a lawsuit filed in the Philadelphia Court of Common Pleas on or about November 16, 2012.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 64 to identify and describe the above-referenced lawsuit as well as any other responsive lawsuits.

**i.  INT No. 64**

INT No. 64 asked plaintiffs to identify all social media accounts and electronic accounts.  Ms. Taylor and I.H. responded by providing one email address, which appears to relate to Ms. Taylor.  This response is insufficient.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 64 and identify all other social and electronic accounts of both Ms. Taylor and I.H.

**j.  INT No. 65**

INT No. 65 sought an itemization of plaintiffs' damages.  Plaintiffs responded only by referring to all discovery productions.  Plaintiffs did not supplement their response.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 65 to either (a) specifically identify and itemize the damages they seek, or (b) confirm that they seek no other damages beyond those captured in the records produced to date.

**k.  INT No. 66**

INT No. 66 sought information regarding life, health, or disability insurance applied for and/or obtained by plaintiffs.  In response, Ms. Taylor and I.H. referred broadly to all discovery productions and reserved the right to supplement.  Plaintiffs did not amend or supplement this response.  This response is insufficient, as it does not identify any insurance providers.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 66 to provide the requested information regarding plaintiffs' insurance providers.

**II.  Requests for Production**

**a.  References to Authorizations and Records**

Plaintiffs responded to several RFPs by referring Abbott to authorizations and medical records, including RFP Nos. 2, 13, 38, 39, and 42.  This response is inappropriate as these requests seek information beyond that which would be contained in medical authorizations or medical records:

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**Deficiency Letter**
**April 8,** 2024
Page 5



- RFP No. 2 seeks documents relating to communications related to plaintiffs' injuries.

- RFP No. 13 seeks documents relating to monetary payments plaintiffs received from any person, entity, or governmental body as a result of the injuries alleged in the complaint.

- RFP Nos. 38 and 39 seek documents, such as articles, journals, or notes, relating to infant formula products (RFP No. 38) or Abbott/any other infant formula product manufacturer (RFP No. 39).

- RFP No. 42 seeks non-privileged communications and documents relating to plaintiffs' decision to initiate this lawsuit.

- RFP No. 44 seeks calendars, journals, or other documents that reflect plaintiffs' daily activities preceding the infant's NEC diagnosis.

In further response to each of these RFPs, plaintiffs stated that they have "not identified any additional responsive, non-privileged, documents," but that they "reserve[] the right to serve additional records during the course of discovery." Abbott served these RFPs on plaintiffs nearly eight months ago, and the fact discovery period closes in less than 90 days. At this stage of the litigation, Abbott needs to know whether there exist any documents responsive to these requests. Accordingly, Abbott requests that plaintiffs:

      (1)     Identify any documents responsive to these requests that are beyond the medical records referenced in plaintiffs' response; or

      (2)     If no responsive documents exist, please so indicate.

**III.    Objections to Treaters and other Entities**

Following the Court's entry of the discovery order dated January 5, 2024, Abbott has sent plaintiffs several lists of treaters and other entities for which Abbott sought consent to serve signed blank authorizations. Plaintiffs have responded by specifying the providers for which they consent to serve the authorizations and those for which they object to serve the authorizations.

With respect to I.H., plaintiffs objected to service of authorization on the Department of Human Services but provided no rationale for their objection. The records reviewed by Abbott suggest that these records relate to Ms. Taylor's use of controlled substances during her pregnancy. As plaintiffs are aware, this case involves I.H.'s birth and alleged subsequent diagnosis with NEC. Ms. Taylor's use of controlled substances during pregnancy, the negative effects of which are well-documented, is relevant to plaintiffs' claims and Abbott's defenses thereto.

Accordingly, Abbott requests that plaintiffs withdraw their objection and confirm that plaintiffs consent to the service of the authorization on the Department of Human Services.

**Deficiency Letter**
**April 8,** 2024
Page 6



IV.     **Authorizations**

With regard to authorizations to collect records, on March 11, 2024, Abbott sent plaintiffs the most recent list of issues related to the authorizations, along with a request to send corrected authorizations to address those issues, so that Abbott may obtain records promptly. Outstanding requests relating to the above-named plaintiff are incorporated by reference in this letter.

In addition, plaintiffs have not provided a blank education authorization for I.H.  Accordingly, Abbott requests that plaintiffs provide the missing blank authorization.

\*          \*          \*

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter.  Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

Very truly yours,

*/s/ Noël B. Ix*
Noël B. Ix

cc:     All counsel of record (via email)

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

# EXHIBIT G

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

Troutman Pepper Hamilton Sanders LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103



troutman.com

**Noël B. Ix**
D 609.951.4102
Noel.Ix@Troutman.com

April 8, 2024

**VIA E-MAIL**

Timothy Burke
Timothy.Burke@klinespecter.com

Mark Weinstein
mark.weinstein@kellerpostman.com

**Re:** *Wieger v. Mead Johnson, et al. (220302614) - Discovery Deficiency Letter*

Counsel:

I write on behalf of Defendant Abbott Laboratories ("Abbott") concerning the ongoing deficiencies in plaintiffs' discovery responses. Abbott first served discovery on plaintiffs nearly eight months ago—on August 9, 2023. The discovery included Philadelphia Standard Form interrogatories, supplemental interrogatories, and document requests. In October 2023, plaintiffs provided very limited responses, necessitating Abbott's initial deficiency letter of October 27. Because plaintiffs did not remedy the identified deficiencies, Abbott had to file a motion to compel on December 5. In an effort to resolve the motion and move discovery along, the parties reached an order by agreement, entered by the Court on January 5, 2024, that, among other things, required plaintiffs to serve full and complete responses to Abbott's Interrogatories (INTs) and Requests for Production (RFPs) no later than February 5, 2024.

Plaintiffs failed to serve responses on or before February 5. Instead, over the weeks after the Court-imposed deadline had already passed, some plaintiffs began submitting partially-supplemented responses. These untimely responses were neither full nor complete, as required by the Court's order, and to date, plaintiffs still have not complied with the order. Abbott requires plaintiffs' full and complete responses to Abbott's discovery requests so that the parties may proceed with plaintiffs' depositions in advance of the June 3, 2024 discovery deadline.

The letter below details specific deficiencies which relate to the responses provided to date by plaintiffs Gina Wieger and M.P. This letter is not exhaustive and is only intended to address the most significant deficiencies in plaintiffs' responses provided to date in the *Wieger* case.

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter. Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

170303943v2

<span style="color:red">Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473</span>

**Deficiency Letter**
**April 8, 2024**
Page 2



---

I.    **Interrogatories**

    a.  **INT No. 1**

INT No. 1 sought basic demographic information regarding plaintiff-parent, including name, date of birth, address, marital status (current and at time of incident), and social security number.  In the initial response, Gina Wieger only provided her address.  Ms. Wieger did not supplement her response.

Accordingly, Abbott requests that Ms. Wieger amend her response to INT No. 1 to provide information regarding her marital status (current and at the time M.P.'s birth).

    b.  **INT Nos. 2, 5, 8, 9, and 26**

INT Nos. 2 and 5 sought a description of the injuries suffered by ***plaintiff-parent*** as a result of infant's NEC diagnosis.  Ms. Wieger initially responded to INT Nos. 2, and 5 by offering to meet and confer.  She later supplemented her response to INT Nos. 2 and 5 by referring to authorizations and records and listing certain injuries including "NEC, Ongoing intestinal and eating issues," and "Acid reflux."

Accordingly, Abbott requests that Ms. Wieger amend and supplement her responses to INT Nos. 2 and 5 to identify and describe any and all injuries that Ms. Wieger allegedly suffered as a result of M.P.'s NEC diagnosis.

In response to RFP No. 7, Ms. Wieger suggested that she is pursuing a claim for wage loss.  INT Nos. 8 and 9 sought information regarding plaintiff-parent's employers. In particular, INT No. 8 sought the identity of employers pre-dating the birth of infant, and INT No. 9 sought the identity of employers post-dating infant's birth.  In response to these INTs, Ms. Wieger provided the names of two employers, Easterseals for Disabilities and Eden Autism Services.  However, Ms. Wieger failed to provide the other requested information regarding her employment, including the dates she worked at each employer, a detailed description of her occupation and job responsibilities, or her wage/salary.

Accordingly, Abbott requests that Ms. Wieger amend and supplement her responses to INT Nos. 8 and 9 to provide the requested additional information about her employment.

INT No. 26 sought information about the injuries that plaintiff-infant allegedly suffered as a result of his or her NEC diagnosis.  Because plaintiffs allege that each infant suffers from long-term health effects, this INT necessarily seeks information regarding the specific injuries alleged.  In response, M.P. referred to the brief list of injuries set out in response to INT No. 23—which included only NEC, ongoing intestinal and eating issues, and acid reflux—and otherwise refers to authorizations and medical records.  The medical records, however, do not tell us the specific medical conditions through the present that plaintiffs contend were caused by NEC.

Accordingly, Abbott requests that plaintiffs supplement their response to INT No. 26 to clearly identify any and all injuries they allege were caused by NEC and whether those injuries continue through the present.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473



#### c. INT No. 42

INT No. 42 sought information regarding the preterm infant formula products administered to infant prior to infant's NEC diagnosis. Plaintiffs responded only by referring to medical records and authorizations. The administration of an Abbott product is a key allegation in plaintiffs' complaint.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 42 to specifically identify any and all Abbott products administered to M.P. prior to the alleged NEC diagnosis.

#### d. INT No. 43

INT No. 43 sought information regarding any labels, packaging, product guides, or other related documents that plaintiff-parent saw prior to the administration of any preterm infant formula products to infant. Ms. Wieger responded only that she "does not recall seeing anything responsive to this Interrogatory." This response is insufficient. Plaintiffs have alleged that Abbott's products were deficiently labeled, and therefore, Abbott is entitled to know what allegedly deficient labels, packaging, or documents Ms. Wieger claims to have seen.

Accordingly, Abbott requests that Ms. Wieger amend and supplement her response to INT No. 43 to specifically identify any labels, packaging, product guides, or related documents that she saw.

#### e. INT No. 54

INT No. 54 sought communications between plaintiffs and any manufacturer of infant formula products, including preterm infant formula products. Ms. Wieger and M.P. responded by agreeing to meet and confer. Plaintiffs, however, have not supplemented their response to this INT.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 54 to identify and describe any communications responsive thereto.

#### f. INT Nos. 55 and 56

INT No. 55 sought information regarding all pregnancies experienced by plaintiff-parent. Ms. Wieger responded to INT No. 55 only by referring to authorizations and records. In response to INT No. 56, which sought information regarding infant formula products administered to each child identified in INT No. 55, Ms. Wieger again referred to authorizations and also stated that plaintiff participated in "Defendants' MILK Study." This response is insufficient, insofar as (1) Ms. Wieger failed to identify any pregnancy in INT No. 55, and (2) Ms. Wieger responded to INT No. 56 only for plaintiff M.P., not for any other pregnancies experienced, and moreover failed to provide the additional information requested by INT No. 56, including the full product name and dates of administration.

**Deficiency Letter**
**April 8, 2024**
Page 4



Accordingly, Abbott requests that plaintiffs amend and supplement her response to INT No. 55 to identify any and all pregnancies experienced by Ms. Wieger, and further requests that plaintiffs amend and supplement their response to INT No. 56 to provide the requested information regarding the infant formula products administered to any child identified in response to INT No. 55.

### g. INT No. 61

INT No. 61 asked plaintiffs to identify their educational background and all schools they attended. Plaintiffs objected to this INT and provided no further response. Neither Ms. Wieger nor M.P. supplemented or amended their response to this INT.

Accordingly, Abbott requests that plaintiffs provide a complete and accurate response to INT No. 61.

### h. INT No. 64

INT No. 64 asked plaintiffs to identify all social media accounts and electronic accounts. Ms. Wieger and M.P. responded by providing one email address, which appears to relate to Ms. Wieger. This response is insufficient.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 64 and identify all other social and electronic accounts of both Ms. Wieger and M.P.

### i. INTO No. 65

INT No. 65 sought an itemization of plaintiffs' damages. Plaintiffs responded only by referring to all discovery productions. Plaintiffs did not supplement their response.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 65 to either (a) specifically identify and itemize the damages they seek, or (b) confirm that they seek no other damages beyond those captured in the records produced to date.

### j. INT No. 66

INT No. 66 sought information regarding life, health, or disability insurance applied for and/or obtained by plaintiffs. In response, Ms. Wieger and M.P. referred broadly to all discovery productions and reserved the right to supplement. Plaintiffs did not amend or supplement this response. This response is insufficient, as it does not identify any insurance providers.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 66 to provide the requested information regarding plaintiffs' insurance providers.

## II. Requests for Production

Plaintiffs responded to several RFPs by referring Abbott to authorizations and medical records, including RFP Nos. 2, 13, 38, 39, and 42. This response is inappropriate as these requests

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**Deficiency Letter**
**April 8, 2024**
Page 5



---

seek information beyond that which would be contained in medical authorizations or medical records:

- RFP No. 2 seeks documents relating to communications related to plaintiffs' injuries.

- RFP No. 13 seeks documents relating to monetary payments plaintiffs received from any person, entity, or governmental body as a result of the injuries alleged in the complaint.

- RFP Nos. 38 and 39 seek documents, such as articles, journals, or notes, relating to infant formula products (RFP No. 38) or Abbott/any other infant formula product manufacturer (RFP No. 39).

- RFP No. 42 seeks non-privileged communications and documents relating to plaintiffs' decision to initiate this lawsuit.

- RFP No. 44 seeks calendars, journals, or other documents that reflect plaintiffs' daily activities preceding the infant's NEC diagnosis.

In further response to each of these RFPs, plaintiffs stated that they have "not identified any additional responsive, non-privileged, documents," but that they "reserve[] the right to serve additional records during the course of discovery." Abbott served these RFPs on plaintiffs nearly eight months ago, and the fact discovery period closes in less than 90 days. At this stage of the litigation, Abbott needs to know whether there exist any documents responsive to these requests. Accordingly, Abbott requests that plaintiffs:

      (1)      Identify any documents responsive to these requests that are beyond the medical records referenced in plaintiffs' response; or

      (2)      If no responsive documents exist, please so indicate.

**III.    Objections to Treaters and other Entities**

Following the Court's entry of the discovery order dated January 5, 2024, Abbott has sent plaintiffs several lists of treaters and other entities for which Abbott sought consent to serve signed blank authorizations. Plaintiffs have responded by specifying the providers for which they consent to serve the authorizations and those for which they object to serve the authorizations.

With respect to M.P., plaintiffs have objected to service of authorizations on four pharmacies:

- Optum Rx
- Sav-On Pharmacy
- Accredo Specialty Pharmacy
- Bergen Pharmacy

Plaintiffs objected on the basis of "relevancy / timeframe" because M.P. was born in 2013. Plaintiffs, however, are claiming that M.P. suffers from "long-term health effects." Pharmacy

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**Deficiency Letter**
**April 8, 2024**
Page 6



records reflecting prescriptions in the years following her birth are relevant given that plaintiffs allege continued injury. Accordingly, Abbott requests that plaintiffs withdraw their objections and confirm that plaintiffs consent to the service of authorizations on these pharmacies.

With respect to Ms. Wieger, plaintiffs objected to service of authorizations on six treaters:

- Robert Wood Johnson University Hospital
- Ambalavaner Krishnamoorthy, M.D.
- Meghan Patel, M.D.
- Daniel Berger, D.O.
- Renee Hypolite, D.O.
- Thomas Westover, M.D.

The records that Abbott has reviewed to date suggest that each of these treaters provided care relating to other pregnancies experienced by Ms. Wieger. As described above, Abbott inquired into these pregnancies in INT No. 55. As plaintiffs know, NEC is directly related to prematurity, and therefore, it is also related to maternal reproductive health. Records from these treaters are necessary to Abbott's understanding of Ms. Wieger's maternal health.

Accordingly, Abbott requests that plaintiffs withdraw their objections and confirm that plaintiffs consent to the service of authorizations on the above-listed treaters.

### IV.    Authorizations

With regard to authorizations to collect records, on March 11, 2024, Abbott sent plaintiffs the most recent list of issues related to the authorizations, along with a request to send corrected authorizations to address those issues, so that Abbott may obtain records promptly. Outstanding requests relating to the above-named plaintiff are incorporated by reference in this letter.

In addition, plaintiffs have not provided a blank employment authorization for Ms. Wieger. Accordingly, Abbott requests that plaintiffs provide the missing authorization.

<center>*      *      *</center>

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter. Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

Very truly yours,


*/s/ Noël B. Ix*
Noël B. Ix

cc:    All counsel of record (via email)


170303943v2

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

# EXHIBIT H

Troutman Pepper Hamilton Sanders LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103



troutman.com

**Noël B. Ix**
D 609.951.4102
Noel.Ix@Troutman.com

April 8, 2024

**VIA E-MAIL**

Timothy Burke
Timothy.Burke@klinespecter.com

Mark Weinstein
mark.weinstein@kellerpostman.com

**Re:** *Wieger v. Mead Johnson, et al. (220302601) - Discovery Deficiency Letter*

Counsel:

I write on behalf of Defendant Abbott Laboratories ("Abbott") concerning the ongoing deficiencies in plaintiffs' discovery responses. Abbott first served discovery on plaintiffs nearly eight months ago—on August 9, 2023. The discovery included Philadelphia Standard Form interrogatories, supplemental interrogatories, and document requests. In October 2023, plaintiffs provided very limited responses, necessitating Abbott's initial deficiency letter of October 27. Because plaintiffs did not remedy the identified deficiencies, Abbott had to file a motion to compel on December 5. In an effort to resolve the motion and move discovery along, the parties reached an order by agreement, entered by the Court on January 5, 2024, that, among other things, required plaintiffs to serve full and complete responses to Abbott's Interrogatories (INTs) and Requests for Production (RFPs) no later than February 5, 2024.

Plaintiffs failed to serve responses on or before February 5. Instead, over the weeks after the Court-imposed deadline had already passed, some plaintiffs began submitting partially-supplemented responses. These untimely responses were neither full nor complete, as required by the Court's order, and to date, plaintiffs still have not complied with the order. Abbott requires plaintiffs' full and complete responses to Abbott's discovery requests so that the parties may proceed with plaintiffs' depositions in advance of the June 3, 2024 discovery deadline.

The letter below details specific deficiencies which relate to the responses provided to date by plaintiffs Gina Wieger and S.P. This letter is not exhaustive and is only intended to address the most significant deficiencies in plaintiffs' responses provided to date in the *Wieger* case.

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter. Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

<span style="color:red">Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473</span>

**Deficiency Letter**
**April 8, 2024**
Page 2



I.      **Interrogatories**

a.   **INT No. 1**

INT No. 1 sought basic demographic information regarding plaintiff-parent, including name, date of birth, address, marital status (current and at time of incident), and social security number.  In the initial response, Gina Wieger only provided her address.  Ms. Wieger did not supplement her response.

Accordingly, Abbott requests that Ms. Wieger amend her response to INT No. 1 to provide information regarding her marital status (current and at the time S.P.'s birth).

b.   **INT Nos. 2, 5, 8, 9 and 26**

INT Nos. 2 and 5 sought a description of the injuries suffered by *plaintiff-parent* as a result of infant's NEC diagnosis.  Ms. Wieger initially responded to INT Nos. 2, and 5 by offering to meet and confer.  She later supplemented her response to INT Nos. 2 and 5 by referring to authorizations and records and listing certain injuries including "NEC, Surgery, Ongoing intestinal and eating issues, Short gut syndrome," and "Developmental delay."

Accordingly, Abbott requests that Ms. Wieger amend and supplement her responses to INT Nos. 2 and 5 to identify and describe any and all injuries that Ms. Wieger allegedly suffered as a result of S.P.'s NEC diagnosis.

In response to RFP No. 7, Ms. Wieger suggested that she is pursuing a claim for wage loss. INT Nos. 8 and 9 sought information regarding plaintiff-parent's employers. In particular, INT No. 8 sought the identity of employers pre-dating the birth of infant, and INT No. 9 sought the identity of employers post-dating infant's birth.  In response to these INTs, Ms. Wieger provided the names of two employers, Easterseals for Disabilities and Eden Autism Services.  However, Ms. Wieger failed to provide the other requested information regarding her employment, including the dates she worked at each employer, a detailed description of her occupation and job responsibilities, or her wage/salary.

Accordingly, Abbott requests that Ms. Wieger amend and supplement her responses to INT Nos. 8 and 9 to provide the requested additional information about her employment.

INT No. 26 sought information about the injuries that plaintiff-infant allegedly suffered as a result of his or her NEC diagnosis.  Because plaintiffs allege that each infant suffers from long-term health effects, this INT necessarily seeks information regarding the specific injuries alleged. In response, S.P. referred to the brief list of injuries set out in response to INT No. 23—which included NEC, surgery, ongoing intestinal and eating issues, short gut syndrome, and developmental delay—and otherwise refers to authorizations and medical records.  The medical records, however, do not tell us the specific medical conditions through the present that plaintiffs contend were caused by NEC.

Accordingly, Abbott requests that plaintiffs supplement their response to INT No. 26 to clearly identify any and all injuries they allege were caused by NEC and whether those injuries continue through the present.

<span style="color:red">Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473</span>

**Deficiency Letter**
**April 8, 2024**
Page 3



      **c. INT No. 42**

INT No. 42 sought information regarding the preterm infant formula products administered to infant prior to infant's NEC diagnosis. Plaintiffs responded only by referring to medical records and authorizations. The administration of an Abbott product is a key allegation in plaintiffs' complaint.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 42 to specifically identify any and all Abbott products administered to S.P. prior to NEC diagnosis.

      **d. INT No. 43**

INT No. 43 sought information regarding any labels, packaging, product guides, or other related documents that plaintiff-parent saw prior to the administration of any preterm infant formula products to infant. Ms. Weiger responded that she "does not recall seeing anything responsive to this Interrogatory. This response is insufficient. Plaintiffs have alleged that Abbott's products were deficiently labeled, and therefore, Abbott is entitled to know what allegedly deficient labels, packaging, or documents Ms. Wieger claims to have seen.

Accordingly, Abbott requests that Ms. Wieger amend and supplement her response to INT No. 43 to specifically identify any labels, packaging, product guides, or related documents that she saw.

      **e. INT No. 54**

INT No. 54 sought communications between plaintiffs and any manufacturer of infant formula products, including preterm infant formula products. Ms. Wieger and S.P. responded by agreeing to meet and confer. Plaintiffs, however, have not supplemented their response to this INT.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 54 to identify and describe any communications responsive thereto.

      **f. INT Nos. 55 and 56**

INT No. 55 sought information regarding all pregnancies experienced by plaintiff-parent. Ms. Wieger responded to INT No. 55 only by referring to authorizations and records. In response to INT No. 56, which sought information regarding infant formula products administered to each child identified in INT No. 55, Ms. Wieger again referred to authorizations and also stated that plaintiff participated in "Defendants' MILK Study." This response is insufficient, insofar as (1) Ms. Wieger failed to identify any pregnancy in INT No. 55, and (2) Ms. Wieger responded to INT No. 56 only for plaintiff S.P., not for any other pregnancies experienced, and moreover failed to provide the additional information requested by INT No. 56, including the full product name and dates of administration.

Accordingly, Abbott requests that Ms. Wieger amend and supplement her response to INT No. 55 to identify any and all pregnancies experienced by Ms. Wieger, and further requests that Ms.

**Deficiency Letter**
**April 8, 2024**
Page 4



Wieger amend and supplement her response to INT No. 56 to provide the requested information regarding the infant formula products administered to any child identified in response to INT No. 55.

      **g.  INT No. 59**

INT No. 59 asked plaintiffs to state whether they had purchased preterm infant formula products from any online site or retail store. Plaintiff-parent responded only by reserving the right to amend or supplement their response.

Accordingly, Abbott requests that plaintiffs either (a) identify and describe any purchases of preterm infant formula products that are responsive to INT No. 59; or (b) otherwise affirmatively indicate that no such purchases exist.

      **h.  INT No. 61**

INT No. 61 asked plaintiffs to identify their educational background and all schools they attended. Plaintiffs objected to this INT and provided no further response. Neither Ms. Wieger nor S.P. supplemented or amended their response to this INT.

Accordingly, Abbott requests that plaintiffs provide a complete and accurate response to INT No. 61.

      **i.  INT No. 64**

INT No. 64 asked plaintiffs to identify all social media accounts and electronic accounts. Ms. Wieger and S.P. responded by providing one email address, which appears to relate to Ms. Wieger. This response is insufficient.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 64 and identify all other social and electronic accounts of both Ms. Wieger and S.P.

      **j.  INT No. 65**

INT No. 65 sought an itemization of plaintiffs' damages. Plaintiffs responded only by referring to all discovery productions. Plaintiffs did not supplement their response.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 65 to either (a) specifically identify and itemize the damages they seek, or (b) confirm that they seek no other damages beyond those captured in the records produced to date

      **k.  INT No. 66**

INT No. 66 sought information regarding life, health, or disability insurance applied for and/or obtained by plaintiffs. In response, Ms. Wieger and S.P. referred broadly to all discovery productions and reserved the right to supplement. Plaintiffs did not amend or supplement this response. This response is insufficient, as it does not identify any insurance providers.

**Deficiency Letter**
**April 8, 2024**
Page 5



Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 66 to provide the requested information regarding plaintiffs' insurance providers.

## II.    Requests for Production

Plaintiffs responded to several RFPs by referring Abbott to authorizations and medical records, including RFP Nos. 2, 13, 38, 39, and 42.  This response is inappropriate as these requests seek information beyond that which would be contained in medical authorizations or medical records:

- RFP No. 2 seeks documents relating to communications related to plaintiffs' injuries.

- RFP No. 13 seeks documents relating to monetary payments plaintiffs received from any person, entity, or governmental body as a result of the injuries alleged in the complaint.

- RFP Nos. 38 and 39 seek documents, such as articles, journals, or notes, relating to infant formula products (RFP No. 38) or Abbott/any other infant formula product manufacturer (RFP No. 39).

- RFP No. 42 seeks non-privileged communications and documents relating to plaintiffs' decision to initiate this lawsuit.

- RFP No. 44 seeks calendars, journals, or other documents that reflect plaintiffs' daily activities preceding the infant's NEC diagnosis.

In further response to each of these RFPs, plaintiffs stated that they have "not identified any additional responsive, non-privileged, documents," but that they "reserve[] the right to serve additional records during the course of discovery."  Abbott served these RFPs on plaintiffs nearly eight months ago, and the fact discovery period closes in less than 60 days.  At this stage of the litigation, Abbott needs to know whether there exist any documents responsive to these requests.  Accordingly, Abbott requests that plaintiffs:

(1)    Identify any documents responsive to these requests that are beyond the medical records referenced in plaintiffs' response; or

(2)    If no responsive documents exist, please so indicate.

## III.    Objections to Treaters and other Entities

Following the Court's entry of the discovery order dated January 5, 2024, Abbott has sent plaintiffs several lists of treaters and other entities for which Abbott sought consent to serve signed blank authorizations.  Plaintiffs have responded by specifying the providers for which they consent to serve the authorizations and those for which they object to serve the authorizations.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**Deficiency Letter**
**April 8, 2024**
Page 6



With respect to S.P., plaintiffs objected to Abbott seeking records from Bayada Nursing and Home Health. These records relate to medical care that Bayada provided to S.P. in her home in the years following her birth and alleged injuries and are relevant given that plaintiffs allege continued injury. Plaintiffs also objected to Abbott seeking records from the New Jersey Child Protection and Permanency, which had an open case involving plaintiff in 2015. Again, these records are close in time to the alleged injuries and are relevant to S.P.'s health and alleged injuries.

Accordingly, Abbott requests that plaintiffs withdraw their objections and confirm that plaintiffs consent to the service of authorizations on Bayada Nursing and Home Health and New Jersey Child Protection and Permanency.

With respect to Gina Wieger, plaintiffs objected to service of authorizations on six treaters:

- Robert Wood Johnson University Hospital
- Ambalavaner Krishnamoorthy, M.D.
- Meghan Patel, M.D.
- Daniel Berger, D.O.
- Renee Hypolite, D.O.
- Thomas Westover, M.D.

The records that Abbott has reviewed to date suggest that each of these treaters provided care relating to other pregnancies experienced by Ms. Wieger. As described above, Abbott inquired into these pregnancies in INT No. 55. As plaintiffs know, NEC is directly related to prematurity, and therefore, it is also related to maternal reproductive health. Records from these treaters are necessary to Abbott's understanding of Ms. Wieger's maternal health.

Accordingly, Abbott requests that plaintiffs withdraw their objections and confirm that plaintiffs' consent to the service of the authorization on the above-listed treaters.

## IV. Authorizations

With regard to authorizations to collect records, on March 11, 2024, Abbott sent plaintiffs the most recent list of issues related to the authorizations, along with a request to send corrected authorizations to address those issues, so that Abbott may obtain records promptly. Outstanding requests relating to the above-named plaintiff are incorporated by reference in this letter.

In addition, plaintiffs have not provided a blank employment authorization for Ms. Wieger. Accordingly, Abbott requests that plaintiffs provide the missing authorization.

*       *       *

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter. Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

**Deficiency Letter**
**April 8, 2024**
Page 7



Very truly yours,

*/s/ Noël B. Ix*
Noël B. Ix

cc:     All counsel of record (via email)

# EXHIBIT I

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

Troutman Pepper Hamilton Sanders LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103



troutman.com

**Noël B. Ix**
D 609.951.4102
Noel.Ix@Troutman.com

April 12, 2024

**VIA E-MAIL**

Timothy Burke
Timothy.Burke@klinespecter.com

Mark Weinstein
mark.weinstein@kellerpostman.com

Re:    *Henderson v. Mead Johnson, et al. (220400127) - Discovery Deficiency Letter*

Counsel:

I write on behalf of Defendant Abbott Laboratories ("Abbott") concerning the ongoing deficiencies in plaintiffs' discovery responses.  Abbott first served discovery on plaintiffs nearly eight months ago—on August 9, 2023.  The discovery included Philadelphia Standard Form interrogatories, supplemental interrogatories, and document requests.  In October 2023, plaintiffs provided very limited responses, necessitating Abbott's initial deficiency letter of October 27.  Because plaintiffs did not remedy the identified deficiencies, Abbott had to file a motion to compel on December 5.  In an effort to resolve the motion and move discovery along, the parties reached an order by agreement, entered by the Court on January 5, 2024, that, among other things, required plaintiffs to serve full and complete responses to Abbott's Interrogatories (INTs) and Requests for Production (RFPs) no later than February 5, 2024.

Plaintiffs failed to serve responses on or before February 5.  Instead, over the weeks after the Court-imposed deadline had already passed, some plaintiffs began submitting partially-supplemented responses.  These untimely responses were neither full nor complete, as required by the Court's order, and to date, plaintiffs still have not complied with the order.  Abbott requires plaintiffs' full and complete responses to Abbott's discovery requests so that the parties may proceed with plaintiffs' depositions in advance of the June 3, 2024 discovery deadline.

The letter below details specific deficiencies which relate to the responses provided to date by plaintiffs Janee Henderson and S.C.  This letter is not exhaustive and is only intended to address the most significant deficiencies in plaintiffs' responses provided to date in the *Henderson* case.

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter.  Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

<span style="color:red">Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473</span>

**Deficiency Letter**
**April 12, 2024**
**Page 2**



---

I.     **Interrogatories**

a.  **INT No. 1**

INT No. 1 sought basic demographic information regarding plaintiff-parent, including name, date of birth, address, marital status (current and at time of incident), and social security number.  In the initial response, Janee Henderson only provided her address.  Ms. Henderson did not supplement her response.

Accordingly, Abbott requests that Ms. Henderson amend her response to INT No. 1 to provide information regarding her marital status (current and at the time S.C.'s birth).

b.  **INT Nos. 2, 5, 8, 9, and 26**

INT Nos. 2 and 5 sought a description of the injuries suffered by *plaintiff-parent* as a result of infant's NEC diagnosis.  Ms. Henderson initially responded to INT Nos. 2, and 5 by offering to meet and confer.  She later supplemented her response to INT Nos. 2 and 5 by referring to authorizations and records and listing certain injuries including NEC, surgery, ongoing intestinal and eating issues, cerebral palsy/neurological conditions, and Autism Spectrum Disorder.

Accordingly, Abbott requests that Ms. Henderson amend and supplement her responses to INT Nos. 2 and 5 to identify and describe any and all injuries that Ms. Henderson allegedly suffered as a result of S.C.'s NEC diagnosis.

In response to RFP No. 7, Ms. Henderson suggested that she is pursuing a claim for wage loss.  INT Nos. 8 and 9 sought information regarding plaintiff-parent's employers.  In particular, INT No. 8 sought the identity of employers pre-dating the birth of infant, and INT No. 9 sought the identity of employers post-dating infants' birth.  In response to these INTs, Ms. Henderson provided the names of two employers: the School District of Philadelphia, where she worked beginning in 2001, and the Green Tree School, where she worked approximately from 2009 to 2012.  Ms. Henderson failed to provide all other requested information regarding her employment, including a detailed description of her occupation and job responsibilities and her wage/salary.

Accordingly, Abbott requests that Ms. Henderson amend and supplement her responses to INT Nos. 8 and 9 to provide the additional requested information about her employment.

INT No. 26 sought information about the injuries that plaintiff-infant allegedly suffered as a result of his or her NEC diagnosis.  Because plaintiffs allege that each infant suffers from long-term health effects, this INT necessarily seeks information regarding the specific injuries alleged.  In response, S.C. referred to the brief list of injuries set out in response to INT No. 23—which included NEC, surgery, ongoing intestinal and eating issues, cerebral palsy/neurological conditions, and Autism Spectrum Disorder—and otherwise refers to authorizations and medical records.  The medical records, however, do not tell us the specific medical conditions through the present that plaintiffs contend were caused by NEC.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**Deficiency Letter**
**April 12, 2024**
**Page 3**



Accordingly, Abbott requests that plaintiffs supplement their response to INT No. 26 to clearly identify any and all injuries they allege were caused by NEC and whether those injuries continue through the present.

### c.  INT No. 3

INT No. 3 sought information regarding plaintiff-parent's service in the Armed Forces.  In response, Ms. Henderson indicated this INT was "not applicable."  Notwithstanding, records reviewed by Abbott suggest that Ms. Henderson served in the United States Army.

Accordingly, Abbott requests that Ms. Henderson amend and supplement her response to INT No. 3 to provide the requested information regarding her military service.

### d.  INT Nos. 15 and 35

INT Nos. 15 and 35 inquired of both plaintiff-parent and plaintiff-infant, respectively, whether either was aware of the existence of any photographs, diagrams, or models of the areas surrounding infant's NEC diagnosis as well as details regarding any such photographs, diagrams, or models.  Both Ms. Henderson and S.C. initially responded to these INTs by offering to meet and confer, and both supplemented their response to state that "Plaintiff will produce the responsive photographs."  However, plaintiffs failed to identify the responsive photographs, provide the additional requested information about these photographs, or produce them.

Accordingly, Abbott requests that plaintiffs (a) identify the photographs responsive to INT Nos. 15 and 35; (b) provide the additional information requested about these photographs; and (c) produce the responsive photographs as requested in INT Nos. 15 and 35.

### e.  INT Nos. 31 and 32

INT No. 31 sought information regarding witnesses to the infant's NEC diagnosis and/or injuries related thereto.  In response, Ms. Henderson identified two potential witnesses: Stephen Clark and Stephen Clark, Jr.; however, Ms. Henderson failed to provide the last known address of any of these potential witnesses.

INT No. 32 requested the location and activity of any witnesses identified in INT No. 31.  In response, Ms. Henderson stated that the witnesses identified in INT No. 31 are the father and grandfather of S.C. and she "does not recall any witnesses beyond those identified above and in the medical records."  This response is insufficient as it neither identifies the location nor activity of the witnesses listed in response to INT No. 31.

Accordingly, Abbott requests that plaintiffs amend and supplement their responses to INT Nos. 31 and 32 to provide the last known address of each witness listed, a description of the knowledge or information they may have, and to indicate whether they were present during S.C.'s hospitalizations following birth.

**Deficiency Letter**
**April 12, 2024**
**Page 4**



---

### f. INT No. 42

INT No. 42 sought information regarding the preterm infant formula products administered to infant prior to infant's NEC diagnosis. Plaintiffs responded only by referring to medical records and authorizations. The administration of an Abbott product is a key allegation in plaintiffs' complaint.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 42 to specifically identify any and all Abbott products administered to S.C. prior to NEC diagnosis.

### g. INT No. 43

INT No. 43 sought information regarding any labels, packaging, product guides, or other related documents that plaintiff-parent saw prior to the administration of any preterm infant formula products to infant. Ms. Henderson responded only by stating that she "recalls seeing product container." This response is insufficient. Plaintiffs have alleged that Abbott's products were deficiently labeled, and therefore, Abbott is entitled to know what allegedly deficient labels, packaging, or documents Ms. Henderson claims to have seen.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 43 to specifically identify any labels, packaging, product guides, or related documents that they saw.

### h. INT No. 44

INT No. 44 sought information regarding communications plaintiff-parent had with healthcare providers regarding the decision to administer nutrition to plaintiff-infant. In response, Ms. Henderson recalled being told "her child should receive formula but was not warned of the risk of NEC." The response is insufficient insofar as it does not identify with whom the communication was had, when it occurred, where it occurred, or otherwise describe the content of the communication with specificity.

Accordingly, Abbott requests that Ms. Henderson amend and supplement her response to INT No. 44 to include the requested information regarding her communications with healthcare providers regarding the decision to administer nutrition to S.C.

### i. INT No. 45

INT No. 45 sought information about any documents that plaintiffs received from any healthcare provider relating to infant nutrition or infant formula products. In response, Ms. Henderson stated that she "recalls receiving medical records." This response is insufficient insofar as it does not provide the other requested information including from whom she received the documents, the date on which she received the documents, and the substance of those documents.

Accordingly, Abbott requests that Ms. Henderson amend and supplement her response to INT No. 45 to include the requested information regarding any responsive documents.

**Deficiency Letter**
**April 12, 2024**
**Page 5**



### j. INT No. 46 and 47

INT No. 46 sought information regarding gifts, coupons, or infant formula products that plaintiff-parent received from a healthcare provider. Similarly, INT No. 47 sought information regarding any preterm infant formula product advertising that plaintiff-parent observed at or before the time the infant was diagnosed with NEC. In response to both INTs, Ms. Henderson stated she recalled seeing "coupons and bags." This response is insufficient. Ms. Henderson did not provide any of the additional information requested including whether she received the products she observed, from whom she received the products, the date on which she received the products and saw the advertising, the content of the advertising, and/or the substance of any discussions about the products or advertising.

Accordingly, Abbott requests that Ms. Henderson amend and supplement her response to INT No. 46 to provide the additional information requested.

### k. INT No. 51

INT No. 51 asked plaintiffs to state whether donor milk, breast milk, or other infant formula products were available to be administered to plaintiff-infant in the NICU. In response, Ms. Henderson stated "milk was available." This response is insufficient insofar as it does not identify which milk or formula products were available to be administered to S.C.

Accordingly, Abbott requests that Ms. Henderson amend and supplement her response to INT No. 51 to specifically identify the milk or formula products available to be administered to S.C. in the NICU.

### l. INT No. 53

INT No. 53 sought information regarding all persons with whom plaintiffs had communications regarding the alleged causes of S.C.'s NEC. Ms. Henderson initially responded that she "recalls being told NEC was related to having formula too soon before being able to digest it." Ms. Henderson did not amend or supplement this response, and it is insufficient on its face. In particular, while it states that Ms. Henderson had such communications, it fails to identify with whom Ms. Henderson had the communications or when the communications were made.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 53 to provide all requested details regarding responsive communications.

### m. INT No. 54

INT No. 54 sought communications between plaintiffs and any manufacturer of infant formula products, including preterm infant formula products. Ms. Henderson and S.C. responded by agreeing to meet and confer. Plaintiffs, however, have not supplemented their response to this INT.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 54 to identify and describe any communications responsive thereto.



---

**n. INT Nos. 55 and 56**

INT No. 55 sought information regarding all pregnancies experienced by plaintiff-parent. Similarly, INT No. 56 sought information regarding infant formula products administered to each child identified in INT No. 55. Ms. Henderson responded to both INTs only by referring to authorizations and records. This response is insufficient, insofar as (1) Ms. Henderson failed to identify any pregnancy in response to INT No. 55, and (2) Ms. Henderson failed to provide the information requested by INT No. 56, including the full product name and dates of administration of any infant formula product administered.

Accordingly, Abbott requests that Ms. Henderson amend and supplement her response to INT No. 55 to identify any and all pregnancies experienced by Ms. Henderson, and further requests that plaintiffs amend and supplement their response to INT No. 56 to provide the requested information regarding the infant formula products administered to any child identified in response to INT No. 55.

**o. INT No. 61**

INT No. 61 asked plaintiffs to identify their educational background and all schools they attended. Plaintiffs objected to this INT and provided no further response. Neither Ms. Henderson nor S.C. supplemented or amended their response to this INT.

Accordingly, Abbott requests that plaintiffs provide a complete and accurate response to INT No. 61.

**p. INT No. 64**

INT No. 64 asked plaintiffs to identify all social media accounts and electronic accounts. Ms. Henderson and S.C. responded by providing one email address, terraineabdullah@yahoo.com. This email address appears to relate to a different plaintiff.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 64 and identify all social and electronic accounts of both Ms. Henderson and S.C.

**q. INT No. 65**

INT No. 65 sought an itemization of plaintiffs' damages. Plaintiffs responded only by referring to all discovery productions. Plaintiffs did not supplement their response.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 65 to either (a) specifically identify and itemize the damages they seek, or (b) confirm that they seek no other damages beyond those captured in the records produced to date.

**r. INT No. 66**

INT No. 66 sought information regarding life, health, or disability insurance applied for and/or obtained by plaintiffs. In response, Ms. Henderson and S.C. referred broadly to all discovery

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**Deficiency Letter**
**April 12, 2024**
**Page 7**



productions and reserved the right to supplement.  Plaintiffs did not amend or supplement this response.  This response is insufficient, as it does not identify any insurance providers.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 66 to provide the requested information regarding plaintiffs' insurance providers.

## II.      Requests for Production

### a.  References to Authorizations and Records

Plaintiffs responded to several RFPs by referring Abbott to authorizations and medical records, including RFP Nos. 2, 13, 38, 39, 42, and 44.  This response is inappropriate as these requests seek information beyond that which would be contained in medical authorizations or medical records:

- RFP No. 2 seeks documents relating to communications related to plaintiffs' injuries.

- RFP No. 13 seeks documents relating to monetary payments plaintiffs received from any person, entity, or governmental body as a result of the injuries alleged in the complaint.

- RFP Nos. 38 and 39 seek documents, such as articles, journals, or notes, relating to infant formula products (RFP No. 38) or Abbott/any other infant formula product manufacturer (RFP No. 39).

- RFP No. 42 seeks non-privileged communications and documents relating to plaintiffs' decision to initiate this lawsuit.

- RFP No. 44 seeks calendars, journals, or other documents that reflect plaintiffs' daily activities preceding the infant's NEC diagnosis.

In further response to each of these RFPs, plaintiffs stated that they have "not identified any additional responsive, non-privileged, documents," but that they "reserve[] the right to serve additional records during the course of discovery."  Abbott served these RFPs on plaintiffs nearly eight months ago, and the fact discovery period closes in less than 90 days.  At this stage of the litigation, Abbott needs to know whether there exist any documents responsive to these requests.  Accordingly, Abbott requests that plaintiffs:

(1)      Identify any documents responsive to these requests that are beyond the medical records referenced in plaintiffs' response; or

(2)      If no responsive documents exist, please so indicate.

Abbott reserves the right to later raise additional, individualized deficiencies in plaintiffs' RFP responses.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**Deficiency Letter**
**April 12, 2024**
**Page 8**



### III.    Authorizations

With regard to authorizations to collect records, on March 11, 2024, Abbott sent plaintiffs the most recent list of issues related to the authorizations, along with a request to send corrected authorizations to address those issues, so that Abbott may obtain records promptly. Outstanding requests relating to the above-named plaintiff are incorporated by reference in this letter.

In addition, plaintiffs have not provided a blank employment authorization for S.C., if applicable. Accordingly, Abbott requests that plaintiffs provide the missing blank authorization or otherwise indicate S.C. has never held employment.

<div align="center">*    *    *</div>

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter.  Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

Very truly yours,

*/s/ Noël B. Ix*
Noël B. Ix

cc:    All counsel of record (via email)

# EXHIBIT J

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

Troutman Pepper Hamilton Sanders LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103



troutman.com

**Noël B. Ix**
D 609.951.4102
Noel.Ix@Troutman.com

April 12, 2024

**VIA E-MAIL**

Timothy Burke
Timothy.Burke@klinespecter.com

Mark Weinstein
mark.weinstein@kellerpostman.com

Re:    *Kajuffa v. Mead Johnson, et al. (220302978) - Discovery Deficiency Letter*

Counsel:

I write on behalf of Defendant Abbott Laboratories ("Abbott") concerning the ongoing deficiencies in plaintiffs' discovery responses.  Abbott first served discovery on plaintiffs nearly eight months ago—on August 9, 2023.  The discovery included Philadelphia Standard Form interrogatories, supplemental interrogatories, and document requests.  In October 2023, plaintiffs provided very limited responses, necessitating Abbott's initial deficiency letter of October 27.  Because plaintiffs did not remedy the identified deficiencies, Abbott had to file a motion to compel on December 5.  In an effort to resolve the motion and move discovery along, the parties reached an order by agreement, entered by the Court on January 5, 2024, that, among other things, required plaintiffs to serve full and complete responses to Abbott's Interrogatories (INTs) and Requests for Production (RFPs) no later than February 5, 2024.

Plaintiffs failed to serve responses on or before February 5.  Instead, over the weeks after the Court-imposed deadline had already passed, some plaintiffs began submitting partially-supplemented responses.  These untimely responses were neither full nor complete, as required by the Court's order, and to date, plaintiffs still have not complied with the order.  Abbott requires plaintiffs' full and complete responses to Abbott's discovery requests so that the parties may proceed with plaintiffs' depositions in advance of the June 3, 2024 discovery deadline.

The letter below details specific deficiencies which relate to the responses provided to date by plaintiffs Kristen Kajuffa and B.K.  This letter is not exhaustive and is only intended to address the most significant deficiencies in plaintiffs' responses provided to date in the *Kajuffa* case.

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter.  Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**Deficiency Letter**
**April 12, 2024**
**Page 2**



---

I.      **Interrogatories**

    a.   **INT No. 1**

INT No. 1 sought basic demographic information regarding plaintiff-parent, including name, date of birth, address, marital status (current and at time of incident), and social security number. In the initial response, Kristen Kajuffa only provided her address.

Accordingly, Abbott requests that Ms. Kajuffa amend her response to INT No. 1 to provide information regarding her marital status (current and at the time B.K.'s birth).

    b.   **INT Nos. 2, 5, 8, 9, and 26**

INT Nos. 2 and 5 sought a description of the injuries suffered by ***plaintiff-parent*** as a result of infant's NEC diagnosis. Ms. Kajuffa initially responded to INT Nos. 2, and 5 by offering to meet and confer. She later supplemented her response to INT Nos. 2 and 5 by referring to authorizations and records and listing certain injuries including NEC, ongoing intestinal and eating issues, Autism Spectrum Disorder, G-tube placement, and ADHD.

Accordingly, Abbott requests that Ms. Kajuffa amend and supplement her responses to INT Nos. 2 and 5 to identify and describe any and all injuries that Ms. Kajuffa allegedly suffered as a result of B.K.'s NEC diagnosis.

In response to RFP No. 7, Ms. Kajuffa suggested that she is pursuing a claim for wage loss. INT Nos. 8 and 9 sought information regarding plaintiff-parent's employers. In particular, INT No. 8 sought the identity of employers pre-dating the birth of infant, and INT No. 9 sought the identity of employers post-dating infants' birth. In response to these INTs, Ms. Kajuffa provided the name of one employer, Walgreens, where she worked from 2008 to 2014. However, Ms. Kajuffa failed to provide the other requested information regarding her employment, including a detailed description of her occupation and job responsibilities or her wage/salary.

Accordingly, Abbott requests that Ms. Kajuffa amend and supplement her responses to INT Nos. 8 and 9 to provide the requested additional information about her employment.

INT No. 26 sought information about the injuries that plaintiff-infant allegedly suffered as a result of his or her NEC diagnosis. Because plaintiffs allege that each infant suffers from long-term health effects, this INT necessarily seeks information regarding the specific injuries alleged. In response, B.K. referred to the brief list of injuries set out in response to INT No. 23—which included NEC, ongoing intestinal and eating issues, Autism Spectrum Disorder, G-tube placement, and ADHD—and otherwise refers to authorizations and medical records. The medical records, however, do not tell us the specific medical conditions through the present that plaintiffs contend were caused by NEC.

Accordingly, Abbott requests that plaintiffs supplement their response to INT No. 26 to clearly identify any and all injuries they allege were caused by NEC and whether those injuries continue through the present.

**Deficiency Letter**
**April 12, 2024**
**Page 3**



---

   c.  **INT Nos. 13**

INT No. 13 sought information regarding statements obtained by plaintiffs regarding plaintiff-infant's alleged diagnosis and injuries.  In response, plaintiffs indicated that "NICU staff told Plaintiff she had to give her infant a product but was not warned of the risk of NEC."  This response is insufficient insofar as it does not provide any of the additional requested information regarding the statement or the identity of the person who made the statement.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 13 to include the requested information regarding any statements plaintiffs obtained or provided.

   d.  **INT No. 42**

INT No. 42 sought information regarding the preterm infant formula products administered to infant prior to infant's NEC diagnosis.  Plaintiffs responded only by referring to medical records and authorizations.  The administration of an Abbott product is a key allegation in plaintiffs' complaint.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 42 to specifically identify any and all Abbott products administered to B.K. prior to NEC diagnosis.

   e.  **INT No. 44**

INT No. 44 sought information regarding communications plaintiff-parent had with healthcare providers regarding the decision to administer nutrition to plaintiff-infant.  In response, Ms. Kajuffa stated that "she was told her child needed fortifier to gain more weight but was not warned of the risk of NEC."  The response is insufficient insofar as it does not identify with whom the communication was had, when it occurred, where it occurred, or otherwise describe the content of the communication with specificity.

Accordingly, Abbott requests that Ms. Kajuffa amend and supplement her response to INT No. 44 to include the requested information regarding her communications with healthcare providers regarding the decision to administer nutrition to B.K.

   f.  **INT Nos. 55 and 56**

INT No. 55 sought information regarding all pregnancies experienced by plaintiff-parent. Similarly INT No. 56 sought information regarding infant formula products administered to each child identified in INT No. 55.  Ms. Kajuffa responded to both INTs only by referring to authorizations and records.  This response is insufficient, insofar as (1) Ms. Kajuffa failed to identify any pregnancy in response to INT No. 55, and (2) Ms. Kajuffa failed to provide the information requested by INT No. 56, including the full product name and dates of administration of any infant formula product administered.

Accordingly, Abbott requests that Ms. Kajuffa amend and supplement her response to INT No. 55 to identify any and all pregnancies experienced by Ms. Kajuffa, and further requests that plaintiffs amend and supplement their response to INT No. 56 to provide the requested



information regarding the infant formula products administered to any child identified in response to INT No. 55.

### g. INT No. 61

INT No. 61 asked plaintiffs to identify their educational background and all schools they attended. Plaintiffs objected to this INT and provided no further response. Neither Ms. Kajuffa nor B.K. supplemented or amended their response to this INT.

Accordingly, Abbott requests that plaintiffs provide a complete and accurate response to INT No. 61.

### h. INT No. 64

INT No. 64 asked plaintiffs to identify all social media accounts and electronic accounts. Ms. Kajuffa and B.K. responded by providing one email address, which appears to relate to Ms. Kajuffa. This response is insufficient.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 64 and identify all other social and electronic accounts of both Ms. Kajuffa and B.K.

### i. INT No. 65

INT No. 65 sought an itemization of plaintiffs' damages. Plaintiffs responded only by referring to all discovery productions. Plaintiffs did not supplement their response.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 65 to either (a) specifically identify and itemize the damages they seek, or (b) confirm that they seek no other damages beyond those captured in the records produced to date.

### j. INT No. 66

INT No. 66 sought information regarding life, health, or disability insurance applied for and/or obtained by plaintiffs. In response, Ms. Kajuffa and B.K. referred broadly to all discovery productions and reserved the right to supplement. Plaintiffs did not amend or supplement this response. This response is insufficient, as it does not identify any insurance providers.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 66 to provide the requested information regarding plaintiffs' insurance providers.

## II. Requests for Production

### a. References to Authorizations and Records

Plaintiffs responded to several RFPs by referring Abbott to authorizations and medical records, including RFP Nos. 2, 13, 38, 39, and 42. This response is inappropriate as these requests

**Deficiency Letter**
**April 12, 2024**
**Page 5**



seek information beyond that which would be contained in medical authorizations or medical records:

- RFP No. 2 seeks documents relating to communications related to plaintiffs' injuries.

- RFP No. 13 seeks documents relating to monetary payments plaintiffs received from any person, entity, or governmental body as a result of the injuries alleged in the complaint.

- RFP Nos. 38 and 39 seek documents, such as articles, journals, or notes, relating to infant formula products (RFP No. 38) or Abbott/any other infant formula product manufacturer (RFP No. 39).

- RFP No. 42 seeks non-privileged communications and documents relating to plaintiffs' decision to initiate this lawsuit.

- RFP No. 44 seeks calendars, journals, or other documents that reflect plaintiffs' daily activities preceding the infant's NEC diagnosis.

In further response to each of these RFPs, plaintiffs stated that they have "not identified any additional responsive, non-privileged, documents," but that they "reserve[] the right to serve additional records during the course of discovery." Abbott served these RFPs on plaintiffs nearly eight months ago, and the fact discovery period closes in less than 90 days. At this stage of the litigation, Abbott needs to know whether there exist any documents responsive to these requests. Accordingly, Abbott requests that plaintiffs:

     (1)    Identify any documents responsive to these requests that are beyond the medical records referenced in plaintiffs' response; or

     (2)    If no responsive documents exist, please so indicate.

**III.    Objections to Treaters and other Entities**

Following the Court's entry of the discovery order dated January 5, 2024, Abbott has sent plaintiffs several lists of treaters and other entities for which Abbott sought consent to serve signed blank authorizations. Plaintiffs have responded by specifying the providers for which they consent to serve the authorizations and those for which they object to serve the authorizations.

With respect to B.K., plaintiffs objected to service of an authorization on NorthEast Treatment Centers, where B.K. was treated for behavioral health. In response to INT No. 23, which seeks information regarding injuries resulting from infant's NEC diagnosis, plaintiffs allege that B.K. suffers from autism spectrum disorder and ADHD. Therefore, these records are relevant, and accordingly, Abbott requests that plaintiffs withdraw their objection and confirm that plaintiffs consent to the service of the authorization on NorthEast Treatment Centers.

**Deficiency Letter**
**April 12, 2024**
**Page 6**



### IV.     Authorizations

With regard to authorizations to collect records, on March 11, 2024, Abbott sent plaintiffs the most recent list of issues related to the authorizations, along with a request to send corrected authorizations to address those issues, so that Abbott may obtain records promptly. Outstanding requests relating to the above-named plaintiff are incorporated by reference in this letter.

In addition, plaintiffs have not provided a blank employment authorization for Ms. Kajuffa or a blank education authorization for B.K.  Accordingly, Abbott requests that plaintiffs provide the missing blank authorizations.

<p align="center">*     *     *</p>

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter.  Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

Very truly yours,

*/s/ Noël B. Ix*
Noël B. Ix

cc:     All counsel of record (via email)

# EXHIBIT K

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

Troutman Pepper Hamilton Sanders LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103



troutman.com

---

**Noël B. Ix**
D 609.951.4102
Noel.Ix@Troutman.com

April 12, 2024

**VIA E-MAIL**

Timothy Burke
Timothy.Burke@klinespecter.com

Mark Weinstein
mark.weinstein@kellerpostman.com

Re:   *Mays v. Mead Johnson, et al. (220302963) - Discovery Deficiency Letter*

Counsel:

I write on behalf of Defendant Abbott Laboratories ("Abbott") concerning the ongoing deficiencies in plaintiffs' discovery responses. Abbott first served discovery on plaintiffs nearly eight months ago—on August 9, 2023. The discovery included Philadelphia Standard Form interrogatories, supplemental interrogatories, and document requests. In October 2023, plaintiffs provided very limited responses, necessitating Abbott's initial deficiency letter of October 27. Because plaintiffs did not remedy the identified deficiencies, Abbott had to file a motion to compel on December 5. In an effort to resolve the motion and move discovery along, the parties reached an order by agreement, entered by the Court on January 5, 2024, that, among other things, required plaintiffs to serve full and complete responses to Abbott's Interrogatories (INTs) and Requests for Production (RFPs) no later than February 5, 2024.

Plaintiffs failed to serve responses on or before February 5. Instead, over the weeks after the Court-imposed deadline had already passed, some plaintiffs began submitting partially-supplemented responses. These untimely responses were neither full nor complete, as required by the Court's order, and to date, plaintiffs still have not complied with the order. Abbott requires plaintiffs' full and complete responses to Abbott's discovery requests so that the parties may proceed with plaintiffs' depositions in advance of the June 3, 2024 discovery deadline.

The letter below details specific deficiencies which relate to the responses provided to date by plaintiffs Nafeesah Mays and A.R. This letter is not exhaustive and is only intended to address the most significant deficiencies in plaintiffs' responses provided to date in the *Mays* case.

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter. Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

<div style="color:red; text-align:right">
Certification Due Date: 05/02/2024<br>
Response Date: 05/09/2024<br>
Case ID: 220302606<br>
Control No.: 24045473
</div>

**Deficiency Letter**
**April 12, 2024**
**Page 2**



---

I.      **Interrogatories**

        a.   **INT No. 1**

INT No. 1 sought basic demographic information regarding plaintiff-parent, including name, date of birth, address, marital status (current and at time of incident), and social security number.  In the initial response, Nafeesah Mays only provided her address.  Ms. Mays did not supplement this response.  In addition, plaintiffs have failed to provide information regarding Ms. Mays' marital status (current and at time of incident).

Accordingly, Abbott requests that Ms. Mays amend her response to INT No. 1 to provide information regarding her marital status (current and at the time A.R.'s birth).

        b.   **INT Nos. 2, 5, and 26**

INT Nos. 2 and 5 sought a description of the injuries suffered by ***plaintiff-parent*** as a result of infant's NEC diagnosis.  Ms. Mays initially responded to INT Nos. 2, and 5 by offering to meet and confer.  She later supplemented her response to INT Nos. 2 and 5 by referring to authorizations and records.  This response is insufficient.

Accordingly, Abbott requests that Ms. Mays amend and supplement her responses to INT Nos. 2 and 5 to identify and describe any and all injuries that Ms. Mays allegedly suffered as a result of A.R.'s NEC diagnosis.

INT No. 26 sought information about the injuries that plaintiff-infant allegedly suffered as a result of his or her NEC diagnosis.  This INT necessarily seeks information regarding the specific injuries alleged. In response, A.R. referred to the brief list of injuries set out in response to INT No. 23—which included NEC, surgery, and death—and otherwise refers to authorizations and medical records.  The medical records, however, do not tell us the specific medical conditions that plaintiffs contend were caused by NEC.

Accordingly, Abbott requests that plaintiffs supplement their response to INT No. 26 to clearly identify any and all injuries they allege were caused by NEC.

        c.   **INT No. 32**

INT No. 31 sought information regarding witnesses to the infant's NEC diagnosis and/or injuries related thereto.  In response, Ms. Mays identified one potential witnesses: Sianne Robinson.

INT No. 32 requested the location and activity of any witnesses identified in INT No. 31.  In response, Ms. Mays stated that she "does not recall any witnesses beyond those identified above and in the medical records."  This response is insufficient as it neither identifies the location nor activity of the witness listed in response to INT No. 31.

Accordingly, Abbott requests that plaintiffs provide the following information with respect to Sianne Robinson: her relation to Ms. Mays and A.R., a description of the knowledge or

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473



information she may have, and whether she was present during A.R.'s hospitalizations following birth.

### d. INT No. 42

INT No. 42 sought information regarding the preterm infant formula products administered to infant prior to infant's NEC diagnosis. Plaintiffs responded only by referring to medical records and authorizations. The administration of an Abbott product is a key allegation in plaintiffs' complaint.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 42 to specifically identify any and all Abbott products administered to A.R. prior to NEC diagnosis.

### e. INT No. 53

INT No. 53 sought information regarding all persons with whom plaintiffs had communications regarding the alleged causes of A.R.'s NEC. Ms. Mays initially responded that she "does not recall being told by healthcare providers that NEC is related to prematurity." Ms. Mays did not amend or supplement this response, and it is insufficient on its face. In particular, while it addresses what Ms. Mays was *not* told, it fails to address the existence or substance of any responsive communications that Ms. Mays *did* have regarding the alleged causes of A.R.'s NEC.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 53 to identify and provide all requested details regarding any responsive communications.

### f. INT No. 54

INT No. 54 sought communications between plaintiffs and any manufacturer of infant formula products, including preterm infant formula products. Ms. Mays and A.R. responded by agreeing to meet and confer. Plaintiffs, however, have not supplemented their response to this INT.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 54 to identify and describe any communications responsive thereto.

### g. INT No. 56

INT No. 55 sought information regarding all pregnancies experienced by plaintiff-parent. In response to INT No. 56, which sought information regarding infant formula products administered to each child identified in INT No. 55, Ms. Mays stated that she "recalls Similac products." This response is insufficient, insofar as (1) Ms. Mays failed to identify the infant in INT No. 55 to which this product relates, and (2) Ms. Mays failed to provide the additional information requested by INT No. 56, including the full product name and dates of administration.

Accordingly, Abbott requests that plaintiffs amend and supplement her response to INT No. 56 to provide the requested information regarding the infant formula products administered to any child identified in response to INT No. 55.



---

**h. INT No. 59**

INT No. 59 asked plaintiffs to state whether they had purchased preterm infant formula products from any online site or retail store. Plaintiff-parent responded only by reserving the right to amend or supplement their response.

Accordingly, Abbott requests that plaintiffs either (a) identify and describe any purchases of preterm infant formula products that are responsive to INT No. 59; or (b) otherwise affirmatively indicate that no such purchases exist.

**i. INT No. 61**

INT No. 61 asked plaintiffs to identify their educational background and all schools they attended. Plaintiffs objected to this INT and provided no further response. Ms. Mays has not supplemented or amended her response to this INT.

Accordingly, Abbott requests that plaintiffs provide a complete and accurate response to INT No. 61.

**j. INT No. 64**

INT No. 64 asked plaintiffs to identify all social media accounts and electronic accounts. Ms. Mays responded by providing one email address, which appears to relate to Ms. Mays. This response is insufficient.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 64 and identify all other social and electronic accounts owned by Ms. Mays.

**k. INT No. 65**

INT No. 65 sought an itemization of plaintiffs' damages. Plaintiffs responded only by referring to all discovery productions. Plaintiffs did not supplement their response.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 65 to either (a) specifically identify and itemize the damages they seek, or (b) confirm that they seek no other damages beyond those captured in the records produced to date.

**l. INT No. 66**

INT No. 66 sought information regarding life, health, or disability insurance applied for and/or obtained by plaintiffs. In response, Ms. Mays and A.R. referred broadly to all discovery productions and reserved the right to supplement. Plaintiffs did not amend or supplement this response. This response is insufficient, as it does not identify any insurance providers.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 66 to provide the requested information regarding plaintiffs' insurance providers.

**Deficiency Letter**
**April 12, 2024**
**Page 5**



---

II.     **Requests for Production**

a.  **References to Authorizations and Records**

Plaintiffs responded to several RFPs by referring Abbott to authorizations and medical records, including RFP Nos. 2, 13, 38, 39, and 42.  This response is inappropriate as these requests seek information beyond that which would be contained in medical authorizations or medical records:

- RFP No. 2 seeks documents relating to communications related to plaintiffs' injuries.

- RFP No. 13 seeks documents relating to monetary payments plaintiffs received from any person, entity, or governmental body as a result of the injuries alleged in the complaint.

- RFP Nos. 38 and 39 seek documents, such as articles, journals, or notes, relating to infant formula products (RFP No. 38) or Abbott/any other infant formula product manufacturer (RFP No. 39).

- RFP No. 42 seeks non-privileged communications and documents relating to plaintiffs' decision to initiate this lawsuit.

- RFP No. 44 seeks calendars, journals, or other documents that reflect plaintiffs' daily activities preceding the infant's NEC diagnosis.

In further response to each of these RFPs, plaintiffs stated that they have "not identified any additional responsive, non-privileged, documents," but that they "reserve[] the right to serve additional records during the course of discovery."  Abbott served these RFPs on plaintiffs nearly eight months ago, and the fact discovery period closes in less than 90 days.  At this stage of the litigation, Abbott needs to know whether there exist any documents responsive to these requests.  Accordingly, Abbott requests that plaintiffs:

(1)     Identify any documents responsive to these requests that are beyond the medical records referenced in plaintiffs' response; or

(2)     If no responsive documents exist, please so indicate.

Abbott reserves the right to later raise additional, individualized deficiencies in plaintiffs' RFP responses.

III.     **Objections to Treaters and other Entities**

Following the Court's entry of the discovery order dated January 5, 2024, Abbott has sent plaintiffs several lists of treaters and other entities for which Abbott sought consent to serve signed blank authorizations.  Plaintiffs have responded by specifying the providers for which they consent to serve the authorizations and those for which they object to serve the authorizations.

<span style="color:red">Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473</span>

**Deficiency Letter**
**April 12, 2024**
**Page 6**



With respect to Ms. Mays, plaintiffs objected to service of an authorization on myMatrixx, which is an insurance provider for Ms. Mays. As noted above, in response to INT No. 66, plaintiffs failed to identify any insurance providers on which Abbott should serve authorizations, and myMatrixx is likely to have information relevant to plaintiffs' claims and injuries.

Accordingly, Abbott requests that plaintiffs withdraw their objections and confirm that plaintiffs consent to the service of authorizations on the above-listed treaters.

### IV.    Authorizations

With regard to authorizations to collect records, on March 11, 2024, Abbott sent plaintiffs the most recent list of issues related to the authorizations, along with a request to send corrected authorizations to address those issues, so that Abbott may obtain records promptly. Outstanding requests relating to the above-named plaintiff are incorporated by reference in this letter.

In addition, plaintiffs have not provided a blank insurance authorization for A.R. Accordingly, Abbott requests that plaintiffs provide the missing blank authorization.

<div align="center">*     *     *</div>

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter. Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

Very truly yours,

*/s/ Noël B. Ix*
Noël B. Ix

cc:     All counsel of record (via email)

# EXHIBIT L

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

Troutman Pepper Hamilton Sanders LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103

troutman.com



**Noël B. Ix**
D 609.951.4102
Noel.Ix@Troutman.com

April 12, 2024

**VIA E-MAIL**

Timothy Burke
Timothy.Burke@klinespecter.com

Mark Weinstein
mark.weinstein@kellerpostman.com

Re:     *McMillian v. Mead Johnson, et al. (220400140) - Discovery Deficiency Letter*

Counsel:

I write on behalf of Defendant Abbott Laboratories ("Abbott") concerning the ongoing deficiencies in plaintiffs' discovery responses.  Abbott first served discovery on plaintiffs nearly eight months ago—on August 9, 2023.  The discovery included Philadelphia Standard Form interrogatories, supplemental interrogatories, and document requests.  In October 2023, plaintiffs provided very limited responses, necessitating Abbott's initial deficiency letter of October 27.  Because plaintiffs did not remedy the identified deficiencies, Abbott had to file a motion to compel on December 5.  In an effort to resolve the motion and move discovery along, the parties reached an order by agreement, entered by the Court on January 5, 2024, that, among other things, required plaintiffs to serve full and complete responses to Abbott's Interrogatories (INTs) and Requests for Production (RFPs) no later than February 5, 2024.

Plaintiffs failed to serve responses on or before February 5.  Instead, over the weeks after the Court-imposed deadline had already passed, some plaintiffs began submitting partially-supplemented responses.  These untimely responses were neither full nor complete, as required by the Court's order, and to date, plaintiffs still have not complied with the order.  Abbott requires plaintiffs' full and complete responses to Abbott's discovery requests so that the parties may proceed with plaintiffs' depositions in advance of the June 3, 2024 discovery deadline.

The letter below details specific deficiencies which relate to the responses provided to date by plaintiffs Catherine McMillian and T.M.  This letter is not exhaustive and is only intended to address the most significant deficiencies in plaintiffs' responses provided to date in the *McMillian* case.

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter.  Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

<span style="color:red">Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473</span>

**Deficiency Letter
April 12, 2024
Page 2**



---

I.      **Interrogatories**

        a.   **INT No. 1**

INT No. 1 sought basic demographic information regarding plaintiff-parent, including name, date of birth, address, marital status (current and at time of incident), and social security number.  In her initial response, Catherine McMillian provided only her address.  Ms. McMillian supplemented this response to provider her date of birth.

Accordingly, Abbott requests that Ms. McMillian amend her response to INT No. 1 to provide information regarding her marital status (current and at the time T.M.'s birth).

        b.   **INT Nos. 2, 5, and 26**

INT Nos. 2 and 5 sought a description of the injuries suffered by ***plaintiff-parent*** as a result of infant's NEC diagnosis.  Ms. McMillian initially responded to INT Nos. 2, and 5 by offering to meet and confer.  She later supplemented her response to INT Nos. 2 and 5 by referring to authorizations and records.  This response is insufficient, as the authorizations and records do not provide the specific injuries that Ms. McMillian alleges she suffered as a result of her infant's NEC diagnosis.

Accordingly, Abbott requests that Ms. McMillian amend and supplement her responses to INT Nos. 2 and 5 to identify and describe any and all injuries that Ms. McMillian allegedly suffered as a result of T.M.'s NEC diagnosis.

INT No. 26 sought information about the injuries that plaintiff-infant allegedly suffered as a result of his or her NEC diagnosis.  Because plaintiffs allege that each infant suffers from long-term health effects, this INT necessarily seeks information regarding the specific injuries alleged.  In response, T.M. referred to the brief list of injuries set out in response to INT No. 23—including only "NEC" and "Intestinal/bowel conditions"—and otherwise refers to authorizations and medical records.  The medical records, however, do not tell us the specific medical conditions through the present that plaintiffs contend were caused by NEC.

Accordingly, Abbott requests that plaintiffs supplement their response to INT No. 26 to clearly identify any and all injuries they allege were caused by NEC and whether those injuries continue through the present.

        c.   **INT No. 42**

INT No. 42 sought information regarding the preterm infant formula products administered to infant prior to infant's NEC diagnosis.  Plaintiffs responded only by referring to medical records and authorizations.  The administration of an Abbott product is a key allegation in plaintiffs' complaint.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 42 to specifically identify any and all Abbott products administered to T.M. prior to NEC diagnosis.

**Deficiency Letter**
**April 12, 2024**
**Page 3**



---

### d. INT No. 51

INT No. 51 asked plaintiffs to state whether donor milk, breast milk, or other infant formula products were available to be administered to plaintiff-infant in the NICU. In response, Ms. McMillian stated she "recalls milk in addition to Infant Formula Products." This response is insufficient insofar as it does not identify which milk or formula products were available to be administered to T.M.

Accordingly, Abbott requests that Ms. McMillian amend and supplement her response to INT No. 51 to specifically identify the milk or formula products available to be administered to T.M. in the NICU.

### e. INT No. 54

INT No. 54 sought communications between plaintiffs and any manufacturer of infant formula products, including preterm infant formula products. Ms. McMillian and T.M. responded by agreeing to meet and confer. Plaintiffs, however, have not supplemented their response to this INT.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 54 to identify and describe any communications responsive thereto.

### f. INT Nos. 55 and 56

INT No. 55 sought information regarding all pregnancies experienced by plaintiff-parent. Ms. McMillian responded only by referring to authorizations and records. Notwithstanding, in response to INT No. 56, which sought information regarding infant formula products administered to each child identified in INT No. 55, Ms. McMillian stated that she "recalls Enfamil products." This response is insufficient, insofar as (1) Ms. McMillian failed to identify any pregnancy in INT No. 55 to which this product relates, and (2) Ms. McMillian failed to provide the additional information requested by INT No. 56, including the full product name and dates of administration.

Accordingly, Abbott requests that plaintiffs amend and supplement her response to INT No. 55 to identify any and all pregnancies experienced by Ms. McMillian, and further requests that plaintiffs amend and supplement their response to INT No. 56 to provide the requested information regarding the infant formula products administered to any child identified in response to INT No. 55.

### g. INT No. 61

INT No. 61 asked plaintiffs to identify their educational background and all schools they attended. Plaintiffs objected to this INT and provided no further response. Neither Ms. McMillian nor T.M. supplemented or amended their response to this INT.

Accordingly, Abbott requests that plaintiffs provide a complete and accurate response to INT No. 61.



### h. INT No. 64

INT No. 64 asked plaintiffs to identify all social media accounts and electronic accounts. Ms. McMillian and T.M. responded by providing two email addresses. This response is insufficient.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 64 and identify all social and electronic accounts of both Ms. McMillian and T.M.

### i. INT No. 65

INT No. 65 sought an itemization of plaintiffs' damages. Plaintiffs responded only by referring to all discovery productions. Plaintiffs did not supplement their response.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 65 to either (a) specifically identify and itemize the damages they seek, or (b) confirm that they seek no other damages beyond those captured in the records produced to date.

### j. INT No. 66

INT No. 66 sought information regarding life, health, or disability insurance applied for and/or obtained by plaintiffs. In response, Ms. McMillian and T.M. referred broadly to all discovery productions and reserved the right to supplement. Plaintiffs did not amend or supplement this response. This response is insufficient, as it does not identify any insurance providers.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 66 to provide the requested information regarding plaintiffs' insurance providers.

## II. Requests for Production

### a. References to Authorizations and Records

Plaintiffs responded to several RFPs by referring Abbott to authorizations and medical records, including RFP Nos. 2, 13, 38, 39, 42, and 44. This response is inappropriate as these requests seek information beyond that which would be contained in medical authorizations or medical records:

- RFP No. 2 seeks documents relating to communications related to plaintiffs' injuries.

- RFP No. 13 seeks documents relating to monetary payments plaintiffs received from any person, entity, or governmental body as a result of the injuries alleged in the complaint.

- RFP Nos. 38 and 39 seek documents, such as articles, journals, or notes, relating to infant formula products (RFP No. 38) or Abbott/any other infant formula product manufacturer (RFP No. 39).

- RFP No. 42 seeks non-privileged communications and documents relating to plaintiffs' decision to initiate this lawsuit.

**Deficiency Letter**
**April 12, 2024**
**Page 5**



---

- RFP No. 44 seeks calendars, journals, or other documents that reflect plaintiffs' daily activities preceding the infant's NEC diagnosis.

In further response to each of these RFPs, plaintiffs stated that they have "not identified any additional responsive, non-privileged, documents," but that they "reserve[] the right to serve additional records during the course of discovery." Abbott served these RFPs on plaintiffs nearly eight months ago, and the fact discovery period closes in less than 90 days. At this stage of the litigation, Abbott needs to know whether there exist any documents responsive to these requests. Accordingly, Abbott requests that plaintiffs:

(1)     Identify any documents responsive to these requests that are beyond the medical records referenced in plaintiffs' response; or

(2)     If no responsive documents exist, please so indicate.

Abbott reserves the right to later raise additional, individualized deficiencies in plaintiffs' RFP responses.

**I.      Objections to Treaters and other Entities**

Following the Court's entry of the discovery order dated January 5, 2024, Abbott has sent plaintiffs several lists of treaters and other entities for which Abbott sought consent to serve signed blank authorizations. Plaintiffs have responded by specifying the providers for which they consent to serve the authorizations and those for which they object to serve the authorizations.

With respect to T.M., plaintiffs objected to service of an authorization on the Social Security Administration. Records suggest that plaintiffs received disability benefits from the Social Security Administration after T.M.'s birth. Records regarding any government benefits received by T.M or Ms. McMillian following T.M.'s birth are relevant to plaintiffs' alleged damages.

Accordingly, Abbott requests that plaintiffs withdraw their objections and confirm that plaintiffs consent to the service of the authorization relating to Social Security Disability.

With respect to Ms. McMillian, plaintiffs objected to service of authorizations on the following seven treaters:

- Stephen S. Greenspan, M.D.
- Gregory Nelson, M.D.
- Storkwatch Prenatal and Infant Care
- Lankenau Medical Center
- Quest Diagnostics Incorporated
- Philadelphia Department of Public Health
- Cytology Services of MD, Inc.

With respect to the first three treaters, plaintiffs object based on the timing of the services provided. T.M. was born in 2005. Records indicate that these providers treated Ms. McMillian

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**Deficiency Letter**
**April 12, 2024**
**Page 6**



between 2003 and 2005 as either primary care physicians or maternal care providers, and their records are relevant to Ms. McMillian's maternal health.

With respect to the final four treaters, records suggest that each of these treaters provided services to Ms. McMillian relating to her maternal health. Ms. McMillian's maternal health is key to this case, and records related thereto are relevant.

Accordingly, Abbott requests that plaintiffs withdraw their objections and confirm that plaintiffs consent to the service of authorizations on the seven providers listed above

**II.      Authorizations**

With regard to authorizations to collect records, on March 11, 2024, Abbott sent plaintiffs the most recent list of issues related to the authorizations, along with a request to send corrected authorizations to address those issues, so that Abbott may obtain records promptly. Outstanding requests relating to the above-named plaintiff are incorporated by reference in this letter.

In addition, plaintiffs have not provided a blank employment authorization for T.M., if applicable. Accordingly, Abbott requests that plaintiffs provide the missing blank authorization or otherwise indicate T.M. has never held employment.

*      *      *

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter. Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

Very truly yours,

*/s/ Noël B. Ix*
Noël B. Ix

cc:      All counsel of record (via email)

# EXHIBIT M

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

Troutman Pepper Hamilton Sanders LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103

troutman.com



**Noël B. Ix**
D 609.951.4102
Noel.Ix@Troutman.com

April 12, 2024

**VIA E-MAIL**

Timothy Burke
Timothy.Burke@klinespecter.com

Mark Weinstein
mark.weinstein@kellerpostman.com

Re:    *Moment v. Mead Johnson, et al. (220400142) - Discovery Deficiency Letter*

Counsel:

I write on behalf of Defendant Abbott Laboratories ("Abbott") concerning the ongoing deficiencies in plaintiffs' discovery responses.  Abbott first served discovery on plaintiffs nearly eight months ago—on August 9, 2023.  The discovery included Philadelphia Standard Form interrogatories, supplemental interrogatories, and document requests.  In October 2023, plaintiffs provided very limited responses, necessitating Abbott's initial deficiency letter of October 27.  Because plaintiffs did not remedy the identified deficiencies, Abbott had to file a motion to compel on December 5.  In an effort to resolve the motion and move discovery along, the parties reached an order by agreement, entered by the Court on January 5, 2024, that, among other things, required plaintiffs to serve full and complete responses to Abbott's Interrogatories (INTs) and Requests for Production (RFPs) no later than February 5, 2024.

Plaintiffs failed to serve responses on or before February 5.  Instead, over the weeks after the Court-imposed deadline had already passed, some plaintiffs began submitting partially-supplemented responses.  Notwithstanding, **plaintiffs Dameka Moment and A.M. failed to serve <u>any</u> supplemental INT or RFP responses**, and to date, plaintiffs still have not complied with the order.  Abbott requires plaintiffs' full and complete responses to Abbott's discovery requests so that the parties may proceed with plaintiffs' depositions in advance of the June 3, 2024 discovery deadline.

The letter below details specific deficiencies which relate to the responses provided to date by Ms. Moment and A.M.  This letter is not exhaustive and is only intended to address the most significant deficiencies in plaintiffs' responses provided to date in the *Moment* case.

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter.  Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

170432615v1

<span style="color:red">Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473</span>

**Deficiency Letter**
**April 12, 2024**
**Page 2**



---

I.      **Interrogatories**

      a.  **Interrogatories to which Plaintiffs Failed to Respond**

As detailed in Abbott's Deficiency Letter of October 27, 2023, plaintiffs objected and entirely failed to respond to several interrogatories: INT Nos. 3, 18, 19, 20, 24, 28, 29, 31, 32, 39, 40, 42, 48, 51, 52, 55, 56, 57, 58, 59, 60, 61, 62, 64, and 67.  In addition, plaintiffs objected to several other interrogatories, and in response, plaintiffs only offered to meet and confer: INT Nos. 2, 5, 7, 8, 9, 10, 14, 15, 16, 33, 34, 35, 36, and 54.  Moreover, plaintiffs responded to several other interrogatories solely by referring to authorizations and records or offering to supplement: INT Nos. 4, 6, 11, 12, 13, 17, 21, 23, 25, 26, 27, 30, 37, 41, 50, 65, 66, and 68.

With respect to each and every one of these interrogatories, Ms. Moment and A.M. have never provided complete responses, despite their obligation to do so under the Pennsylvania Rules of Civil Procedure and despite being ordered by the Court to do so on or before February 5, 2023. Over two months beyond that Court-imposed deadline, Ms. Moment and A.M. have never served supplemental responses, and thus, they are out of compliance with the Court's order.

Accordingly, Abbott requests that plaintiffs amend and supplement their responses to **all** of the above-listed interrogatories to provide complete responses in accordance with the Discovery Order dated January 5, 2024.

      b.  **INT No. 1**

INT No. 1 sought basic demographic information regarding plaintiff-parent, including name, date of birth, address, marital status (current and at time of incident), and social security number.  In the initial response, Dameka Moment only provided her address.  Plaintiffs have failed to provide information regarding Ms. Moment's marital status (current and at time of incident).

Accordingly, Abbott requests that Ms. Moment amend her response to INT No. 1 to provide information regarding her marital status (current and at the time A.M.'s birth).

      c.  **INT No. 44**

INT No. 44 sought information regarding communications plaintiff-parent had with healthcare providers regarding the decision to administer nutrition to plaintiff-infant.  In response, Ms. Moment stated that she recalled being consulted about nutrition, but provided no further detail. The response is insufficient insofar as it does not identify with whom the communication was had, when it occurred, where it occurred, or otherwise describe the content of the communication with specificity.

Accordingly, Abbott requests that Ms. Moment amend and supplement her response to INT No. 44 to include the requested information regarding her communications with healthcare providers regarding the decision to administer nutrition to A.M.

**Deficiency Letter**
**April 12, 2024**
**Page 3**



---

### d. INT No. 53

INT No. 53 sought information regarding all persons with whom plaintiffs had communications regarding the alleged causes of A.M.'s NEC. Ms. Moment initially responded that she recalls being told that NEC is an "allergic reaction." Ms. Moment did not amend or supplement this response, and it is insufficient on its face insofar as it fails to state with whom Ms. Moment had the communication, when it occurred, or provide any description of the substance of the communication.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 53 to identify and provide all requested details regarding any responsive communications.

### II. Requests for Production

As with the interrogatory responses, Ms. Moment and A.M. failed entirely to serve supplemental RFP responses. Accordingly, all deficiencies outlined in Abbott's Deficiency Letter of October 27, 2023 remain at issue.

In particular, plaintiffs responded to several RFPs, indicating they would produce responsive documents once a protective order was in place: RFP Nos. 2, 3, 5, 7, 8, 10, 11, 13, 14, 15, 24, 25, 26, 27, 28, 29, 30, and 31. The Court approved the parties' joint stipulated protective order on January 24, 2023. Notwithstanding, to date, plaintiffs have only made one production of medical records relating to A.M. Plaintiffs have produced no other documents.

Accordingly, Abbott requests that plaintiffs produce all documents responsive to **all** of the above-listed interrogatories and otherwise remedy all deficiencies outlined in Abbott's letter of October 27, 2023, consistent with the Discovery Order entered on January 5, 2024.

Abbott reserves the right to later raise additional, individualized deficiencies in plaintiffs' RFP responses.

### III. Authorizations

With regard to authorizations to collect records, on March 11, 2024, Abbott sent plaintiffs the most recent list of issues related to the authorizations, along with a request to send corrected authorizations to address those issues, so that Abbott may obtain records promptly. Outstanding requests relating to the above-named plaintiff are incorporated by reference in this letter.

In addition, plaintiffs have not provided the following blank authorizations:

- A blank employment authorization for Ms. Moment
- A blank education authorization for A.M.
- Blank psychiatric authorizations for Ms. Moment and A.M. if plaintiffs are pursuing a claim for psychiatric injury or otherwise confirm that they are not alleging such a claim

Accordingly, Abbott requests that plaintiffs provide the missing blank authorizations.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**Deficiency Letter**
**April 12, 2024**
**Page 4**



* * *

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter. Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

Very truly yours,

*/s/ Noël B. Ix*
Noël B. Ix

cc:     All counsel of record (via email)

# EXHIBIT N

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

Troutman Pepper Hamilton Sanders LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103



troutman.com

**Noël B. Ix**
D 609.951.4102
Noel.Ix@Troutman.com

April 12, 2024

**VIA E-MAIL**

Timothy Burke
Timothy.Burke@klinespecter.com

Mark Weinstein
mark.weinstein@kellerpostman.com

Re:     *Parker v. Mead Johnson, et al. (220302983) - Discovery Deficiency Letter*

Counsel:

I write on behalf of Defendant Abbott Laboratories ("Abbott") concerning the ongoing deficiencies in plaintiffs' discovery responses.  Abbott first served discovery on plaintiffs nearly eight months ago—on August 9, 2023.  The discovery included Philadelphia Standard Form interrogatories, supplemental interrogatories, and document requests.  In October 2023, plaintiffs provided very limited responses, necessitating Abbott's initial deficiency letter of October 27.  Because plaintiffs did not remedy the identified deficiencies, Abbott had to file a motion to compel on December 5.  In an effort to resolve the motion and move discovery along, the parties reached an order by agreement, entered by the Court on January 5, 2024, that, among other things, required plaintiffs to serve full and complete responses to Abbott's Interrogatories (INTs) and Requests for Production (RFPs) no later than February 5, 2024.

Plaintiffs failed to serve responses on or before February 5.  Instead, over the weeks after the Court-imposed deadline had already passed, some plaintiffs began submitting partially-supplemented responses.  These untimely responses were neither full nor complete, as required by the Court's order, and to date, plaintiffs still have not complied with the order.  Abbott requires plaintiffs' full and complete responses to Abbott's discovery requests so that the parties may proceed with plaintiffs' depositions in advance of the June 3, 2024 discovery deadline.

The letter below details specific deficiencies which relate to the responses provided to date by plaintiffs Nydia Parker and M.H.  This letter is not exhaustive and is only intended to address the most significant deficiencies in plaintiffs' responses provided to date in the *Parker* case.

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter.  Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**Deficiency Letter**
**April 12, 2024**
**Page 2**



I.     **Interrogatories**

a.   **INT No. 1**

INT No. 1 sought basic demographic information regarding plaintiff-parent, including name, date of birth, address, marital status (current and at time of incident), and social security number.  In the initial response, Nydia Parker only provided her address.  Ms. Parker did not supplement her response.

Accordingly, Abbott requests that Ms. Parker amend her response to INT No. 1 to provide information regarding her marital status (current and at the time M.H.'s birth).

b.   **INT Nos. 2, 5, 8, 9, and 26**

INT Nos. 2 and 5 sought a description of the injuries suffered by plaintiff-parent as a result of infant's NEC diagnosis.  Ms. Parker initially responded to INT Nos. 2, and 5 by offering to meet and confer.  She later supplemented her response to INT Nos. 2 and 5 by referring to authorizations and records.  This response is insufficient, as the authorizations and records do not provide the specific injuries that Ms. Parker alleges she suffered as a result of her infant's NEC diagnosis.

Accordingly, Abbott requests that Ms. Parker amend and supplement her responses to INT Nos. 2 and 5 to identify and describe any and all injuries that Ms. Parker allegedly suffered as a result of M.H.'s NEC diagnosis.

In response to RFP No. 7, Ms. Parker suggested that she is pursuing a claim for wage loss.  INT Nos. 8 and 9 sought information regarding plaintiff-parent's employers.  In particular, INT No. 8 sought the identity of employers pre-dating the birth of infant, and INT No. 9 sought the identity of employers post-dating infants' birth.  In response to these INTs, Ms. Parker stated only that she will supplement her responses to these interrogatories.  Ms. Parker failed to provide the name of any employers during the relevant time periods and all other requested information regarding her employment, including the dates of her employment, a detailed description of her occupation and job responsibilities, or her wage/salary.

Accordingly, Abbott requests that Ms. Parker amend and supplement her responses to INT Nos. 8 and 9 to provide the requested information about her employment.

INT No. 26 sought information about the injuries that plaintiff-infant allegedly suffered as a result of his or her NEC diagnosis.  Because plaintiffs allege that each infant suffers from long-term health effects, this INT necessarily seeks information regarding the specific injuries alleged.  In response, M.H. referred to the brief list of injuries set out in response to INT No. 23—which included "NEC, Ongoing intestinal and eating issues," and "Neurological conditions"—and otherwise refers to authorizations and medical records.  The medical records, however, do not tell us the specific medical conditions through the present that plaintiffs contend were caused by NEC.

**Deficiency Letter**
**April 12, 2024**
**Page 3**



Accordingly, Abbott requests that plaintiffs supplement their response to INT No. 26 to clearly identify any and all injuries they allege were caused by NEC and whether those injuries continue through the present.

### c. INT Nos. 15 and 35

INT Nos. 15 and 35 inquired of both plaintiff-parent and plaintiff-infant, respectively, whether either was aware of the existence of any photographs, diagrams, or models of the areas surrounding infant's NEC diagnosis as well as details regarding any such photographs, diagrams, or models. Both Ms. Parker and M.H. initially responded to these INTs by offering to meet and confer, and both supplemented their response to state that "Plaintiff has such photos." However, plaintiffs failed to identify the responsive photographs, provide the additional requested information about these photographs, or produce them.

Accordingly, Abbott requests that plaintiffs (a) identify the photographs responsive to INT Nos. 15 and 35; (b) provide the additional information requested about these photographs; and (c) produce the responsive photographs as requested in INT Nos. 15 and 35.

### d. INT Nos. 31 and 32

INT No. 31 sought information regarding witnesses to the infant's NEC diagnosis and/or injuries related thereto. Ms. Parker stated that she "recalls speaking with NICU staff who may have knowledge of M.H.'s NEC diagnosis or injuries resulting from NEC." INT No. 32 requested the location and activity of any witnesses identified in INT No. 31. In response, Ms. Parker listed stated that she "does not recall any witnesses beyond those identified above and in the medical records." These responses are insufficient as Ms. Parker did not provide the names or addresses of the NICU staff identified in INT No. 31 and does not provide the location and activity of these witnesses in response to INT No. 32.

Accordingly, Abbott requests that plaintiffs provide the names of any witnesses in response to INT No. 31, the last known address of each witness, a description of the knowledge or information they may have, and whether they were present during M.H.'s hospitalizations following birth.

### e. INT No. 42

INT No. 42 sought information regarding the preterm infant formula products administered to infant prior to infant's NEC diagnosis. Plaintiffs responded by stating she "recalls Similac products" and by otherwise referring to medical records and authorizations. The administration of an Abbott product is a key allegation in plaintiffs' complaint.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 42 to specifically identify any and all Abbott products administered to M.H. prior to NEC diagnosis.



---

### f. INT No. 43

INT No. 43 sought information regarding any labels, packaging, product guides, or other related documents that plaintiff-parent saw prior to the administration of any preterm infant formula products to infant. Ms. Parker responded only by stating that she "recalls Preterm Infant Formula Products at the NICU." This response is insufficient. Plaintiffs have alleged that Abbott's products were deficiently labeled, and therefore, Abbott is entitled to know what allegedly deficient labels, packaging, or documents Ms. Parker claims to have seen.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 43 to specifically identify any labels, packaging, product guides, or related documents that they saw.

### g. INT No. 53

INT No. 53 sought information regarding all persons with whom plaintiffs had communications regarding the alleged causes of M.H.'s NEC. Ms. Parker initially responded that she "recalls discussing NEC with her child's healthcare providers" Ms. Parker did not amend or supplement this response, and it is insufficient on its face. In particular, while it states that Ms. Parker had such communications, it fails to identify the person(s) with whom Ms. Parker communicated, when the communications occurred, and the contents of the communications.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 53 to provide all requested details regarding responsive communications.

### h. INT No. 54

INT No. 54 sought communications between plaintiffs and any manufacturer of infant formula products, including preterm infant formula products. Ms. Parker and M.H. responded by agreeing to meet and confer. Plaintiffs, however, have not supplemented their response to this INT.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 54 to identify and describe any communications responsive thereto.

### i. INT Nos. 55 and 56

INT No. 55 sought information regarding all pregnancies experienced by plaintiff-parent. Ms. Parker objected to this Interrogatory and did not offer a response. Notwithstanding, in response to INT No. 56, which sought information regarding infant formula products administered to each child identified in INT No. 55, Ms. Parker stated that she "recalls Similac products." This response is insufficient, insofar as (1) Ms. Parker failed to identify any pregnancy in INT No. 55 to which this product relates, and (2) Ms. Parker failed to provide the additional information requested by INT No. 56, including the full product name and dates of administration.

Accordingly, Abbott requests that plaintiffs amend and supplement her response to INT No. 55 to identify any and all pregnancies experienced by Ms. Parker, and further requests that

**Deficiency Letter**
**April 12, 2024**
**Page 5**



plaintiffs amend and supplement their response to INT No. 56 to provide the requested information regarding the infant formula products administered to any child identified in response to INT No. 55.

### j. INT No. 61

INT No. 61 asked plaintiffs to identify their educational background and all schools they attended. Plaintiffs objected to this INT and provided no further response. Neither Ms. Parker nor M.H. supplemented or amended their response to this INT.

Accordingly, Abbott requests that plaintiffs provide a complete and accurate response to INT No. 61.

### k. INT No. 64

INT No. 64 asked plaintiffs to identify all social media accounts and electronic accounts. Ms. Parker and M.H. responded by providing one email address. This response is insufficient.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 64 and identify all other social and electronic accounts of both Ms. Parker and M.H.

### l. INT No. 65

INT No. 65 sought an itemization of plaintiffs' damages. Plaintiffs responded only by referring to all discovery productions. Plaintiffs did not supplement their response.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 65 to either (a) specifically identify and itemize the damages they seek, or (b) confirm that they seek no other damages beyond those captured in the records produced to date.

### m. INT No. 66

INT No. 66 sought information regarding life, health, or disability insurance applied for and/or obtained by plaintiffs. In response, Ms. Parker and M.H. referred broadly to all discovery productions and reserved the right to supplement. Plaintiffs did not amend or supplement this response. This response is insufficient, as it does not identify any insurance providers.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 66 to provide the requested information regarding plaintiffs' insurance providers.

## II. Requests for Production

### a. References to Authorizations and Records

Plaintiffs responded to several RFPs by referring Abbott to authorizations and medical records, including RFP Nos. 2, 13, 38, 39, and 42. This response is inappropriate as these requests

**Deficiency Letter**
**April 12, 2024**
**Page 6**



seek information beyond that which would be contained in medical authorizations or medical records:

- RFP No. 2 seeks documents relating to communications related to plaintiffs' injuries.

- RFP No. 13 seeks documents relating to monetary payments plaintiffs received from any person, entity, or governmental body as a result of the injuries alleged in the complaint.

- RFP Nos. 38 and 39 seek documents, such as articles, journals, or notes, relating to infant formula products (RFP No. 38) or Abbott/any other infant formula product manufacturer (RFP No. 39).

- RFP No. 42 seeks non-privileged communications and documents relating to plaintiffs' decision to initiate this lawsuit.

- RFP No. 44 seeks calendars, journals, or other documents that reflect plaintiffs' daily activities preceding the infant's NEC diagnosis.

In further response to each of these RFPs, plaintiffs stated that they have "not identified any additional responsive, non-privileged, documents," but that they "reserve[] the right to serve additional records during the course of discovery." Abbott served these RFPs on plaintiffs nearly eight months ago, and the fact discovery period closes in less than 90 days. At this stage of the litigation, Abbott needs to know whether there exist any documents responsive to these requests. Accordingly, Abbott requests that plaintiffs:

(1)     Identify any documents responsive to these requests that are beyond the medical records referenced in plaintiffs' response; or

(2)     If no responsive documents exist, please so indicate.

**b. Request for Authorizations for Twin/Sibling**

RFP No. 24 sought a signed authorization for any twin or sibling carried in the same pregnancy as plaintiff-infant. In her initial response to this RFP, Ms. Parker indicated she would "execute relevant authorizations for records" once a protective order had been entered. Notwithstanding, records provided to us suggest that there was no twin or sibling carried in the same pregnancy as M.H.

Accordingly, Abbott requests that plaintiffs confirm whether there was any twin or sibling carried in the same pregnancy as M.H.

Abbott reserves the right to later raise additional, individualized deficiencies in plaintiffs' RFP responses.

**Deficiency Letter**
**April 12, 2024**
**Page 7**



---

### III.     Objections to Treaters and other Entities

Following the Court's entry of the discovery order dated January 5, 2024, Abbott has sent plaintiffs several lists of treaters and other entities for which Abbott sought consent to serve signed blank authorizations.  Plaintiffs have responded by specifying the providers for which they consent to serve the authorizations and those for which they object to serve the authorizations.

Plaintiffs objected to service of an authorization on the Department of Human Services. Records suggest that the Department of Human Services records relate to Ms. Parker's use of controlled substances during her pregnancy.  As plaintiffs are aware, this case involves M.H.'s birth and alleged subsequent diagnosis with NEC.  Ms. Parker's use of controlled substances during pregnancy, which directly relates to her maternal health, is relevant to plaintiffs' claims and Abbott's defenses thereto.

Accordingly, Abbott requests that plaintiffs withdraw their objection and confirm that plaintiffs consent to the service of the authorization on the Department of Human Services.

### IV.     Authorizations

With regard to authorizations to collect records, on March 11, 2024, Abbott sent plaintiffs the most recent list of issues related to the authorizations, along with a request to send corrected authorizations to address those issues, so that Abbott may obtain records promptly. Outstanding requests relating to the above-named plaintiff are incorporated by reference in this letter.

In addition, plaintiffs have not provided a blank education authorization for M.H. or a blank employment authorization for Ms. Parker.  Accordingly, Abbott requests that plaintiffs provide the missing blank authorizations.

<div align="center">*     *     *</div>

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter.  Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

Very truly yours,

*/s/ Noël B. Ix*
Noël B. Ix

cc:     All counsel of record (via email)

<div align="right">
Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473
</div>

# EXHIBIT O

Troutman Pepper Hamilton Sanders LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103

troutman.com



**Noël B. Ix**
D 609.951.4102
Noel.Ix@Troutman.com

April 12, 2024

**VIA E-MAIL**

Timothy Burke
Timothy.Burke@klinespecter.com

Mark Weinstein
mark.weinstein@kellerpostman.com

Re:     *Ross v. Mead Johnson, et al. (220302981) - Discovery Deficiency Letter*

Counsel:

I write on behalf of Defendant Abbott Laboratories ("Abbott") concerning the ongoing deficiencies in plaintiffs' discovery responses. Abbott first served discovery on plaintiffs nearly eight months ago—on August 9, 2023. The discovery included Philadelphia Standard Form interrogatories, supplemental interrogatories, and document requests. In October 2023, plaintiffs provided very limited responses, necessitating Abbott's initial deficiency letter of October 27. Because plaintiffs did not remedy the identified deficiencies, Abbott had to file a motion to compel on December 5. In an effort to resolve the motion and move discovery along, the parties reached an order by agreement, entered by the Court on January 5, 2024, that, among other things, required plaintiffs to serve full and complete responses to Abbott's Interrogatories (INTs) and Requests for Production (RFPs) no later than February 5, 2024.

Plaintiffs failed to serve responses on or before February 5. Instead, over the weeks after the Court-imposed deadline had already passed, some plaintiffs began submitting partially-supplemented responses. These untimely responses were neither full nor complete, as required by the Court's order, and to date, plaintiffs still have not complied with the order. Abbott requires plaintiffs' full and complete responses to Abbott's discovery requests so that the parties may proceed with plaintiffs' depositions in advance of the June 3, 2024 discovery deadline.

The letter below details specific deficiencies which relate to the responses provided to date by plaintiffs Alexandria Ross and B.M. This letter is not exhaustive and is only intended to address the most significant deficiencies in plaintiffs' responses provided to date in the *Ross* case.

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter. Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

<span style="color:red">Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473</span>

**Deficiency Letter**
**April 12, 2024**
**Page 2**



---

I.    **Interrogatories**

   a.   **INT No. 1**

INT No. 1 sought basic demographic information regarding plaintiff-parent, including name, date of birth, address, marital status (current and at time of incident), and social security number.  In the initial response, Alexandria Ross only provided her address.  Ms. Ross did not supplement her response.

Accordingly, Abbott requests that Ms. Ross amend her response to INT No. 1 to provide information regarding her marital status (current and at the time B.M.'s birth).

   b.   **INT Nos. 2, 5, 8, 9, and 26**

INT Nos. 2 and 5 sought a description of the injuries suffered by *plaintiff-parent* as a result of infant's NEC diagnosis.  Ms. Ross initially responded to INT Nos. 2, and 5 by offering to meet and confer.  She later supplemented her response to INT Nos. 2 and 5 by referring to authorizations and records and listing certain injuries including NEC, ongoing intestinal and eating issues, and Autism Spectrum Disorder.

Accordingly, Abbott requests that Ms. Ross amend and supplement her responses to INT Nos. 2 and 5 to identify and describe any and all injuries that Ms. Ross allegedly suffered as a result of B.M.'s NEC diagnosis.

In response to RFP No. 7, Ms. Ross suggested that she is pursuing a claim for wage loss.  INT Nos. 8 and 9 sought information regarding plaintiff-parent's employers.  In particular, INT No. 8 sought the identity of employers pre-dating the birth of infant, and INT No. 9 sought the identity of employers post-dating infants' birth.  In response to these INTs, Ms. Ross provided the name of one employer, My Independence, where she worked in 2020.  In response to INT No. 10, Ms. Ross included a few additional employers.  However, in response to all three INTs, Ms. Ross failed to provide the other requested information regarding her employment, including the dates of her employment, a detailed description of her occupation and job responsibilities, and/or her wage/salary.

Accordingly, Abbott requests that Ms. Ross amend and supplement her responses to INT Nos. 8 and 9 to provide the requested additional information about her employment.

INT No. 26 sought information about the injuries that plaintiff-infant allegedly suffered as a result of his or her NEC diagnosis.  Because plaintiffs allege that each infant suffers from long-term health effects, this INT necessarily seeks information regarding the specific injuries alleged.  In response, B.M. referred to the brief list of injuries set out in response to INT No. 23—which included NEC, eating and intestinal issues, and Autism Spectrum Disorder—and otherwise refers to authorizations and medical records.  The medical records, however, do not tell us the specific medical conditions through the present that plaintiffs contend were caused by NEC.

**Deficiency Letter**
**April 12, 2024**
**Page 3**



Accordingly, Abbott requests that plaintiffs supplement their response to INT No. 26 to clearly identify any and all injuries they allege were caused by NEC and whether those injuries continue through the present.

### c. INT No. 42

INT No. 42 sought information regarding the preterm infant formula products administered to infant prior to infant's NEC diagnosis. Plaintiffs responded only by referring to medical records and authorizations. The administration of an Abbott product is a key allegation in plaintiffs' complaint.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 42 to specifically identify any and all Abbott products administered to B.M. prior to NEC diagnosis.

### d. INT No. 43

INT No. 43 sought information regarding any labels, packaging, product guides, or other related documents that plaintiff-parent saw prior to the administration of any preterm infant formula products to infant. Ms. Ross responded only by stating that she "recalls seeing packaging." This response is insufficient. Plaintiffs have alleged that Abbott's products were deficiently labeled, and therefore, Abbott is entitled to know what allegedly deficient labels, packaging, or documents Ms. Ross claims to have seen.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 43 to specifically identify any labels, packaging, product guides, or related documents that they saw.

### e. INT No. 44

INT No. 44 sought information regarding communications plaintiff-parent had with healthcare providers regarding the decision to administer nutrition to plaintiff-infant. In response, Ms. Ross recalled being told "her child should receive formula but was not warned of the risk of NEC." The response is insufficient insofar as it does not identify with whom the communication was had, when it occurred, where it occurred, or otherwise describe the content of the communication with specificity.

Accordingly, Abbott requests that Ms. Ross amend and supplement her response to INT No. 44 to include the requested information regarding her communications with healthcare providers regarding the decision to administer nutrition to B.M.

### f. INT Nos. 46 and 47

INT No. 46 sought information regarding gifts, coupons, or infant formula products that plaintiff-parent received from a healthcare provider. Similarly, INT No. 47 sought information regarding any preterm infant formula product advertising that plaintiff-parent observed at or before the time the infant was diagnosed with NEC. In response to both INTs, Ms. Ross stated she recalled seeing "coupons and bags." This response is insufficient. Ms. Ross did not provide



any of the additional information requested including whether she received the products she observed, from whom she received the products, the date on which she received the products and saw the advertising, the content of the advertising, and/or the substance of any discussions about the products or advertising.

Accordingly, Abbott requests that Ms. Ross amend and supplement her response to INT No. 46 to provide the additional information requested.

### g. INT No. 53

INT No. 53 sought information regarding all persons with whom plaintiffs had communications regarding the alleged causes of B.M.'s NEC. Ms. Ross initially responded that she recalls being told that NEC is related to prematurity." Ms. Ross did not amend or supplement this response, and it is insufficient on its face. In particular, Ms. Ross did not identify with whom she had the communication or when the communication occurred.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 53 to provide all requested details regarding responsive communications.

### h. INT No. 54

INT No. 54 sought communications between plaintiffs and any manufacturer of infant formula products, including preterm infant formula products. Ms. Ross and B.M. responded by agreeing to meet and confer. Plaintiffs, however, have not supplemented their response to this INT.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 54 to identify and describe any communications responsive thereto.

### i. INT Nos. 55 and 56

INT No. 55 sought information regarding all pregnancies experienced by plaintiff-parent. Similarly, INT No. 56 sought information regarding infant formula products administered to each child identified in INT No. 55. Ms. Ross responded to both INTs only by referring to authorizations and records. This response is insufficient, insofar as (1) Ms. Ross failed to identify any pregnancy in response to INT No. 55, and (2) Ms. Ross failed to provide the information requested by INT No. 56, including the full product name and dates of administration of any infant formula product administered.

Accordingly, Abbott requests that Ms. Ross amend and supplement her response to INT No. 55 to identify any and all pregnancies experienced by Ms. Ross, and further requests that plaintiffs amend and supplement their response to INT No. 56 to provide the requested information regarding the infant formula products administered to any child identified in response to INT No. 55.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**Deficiency Letter**
**April 12, 2024**
**Page 5**



#### j.  INT No. 61

INT No. 61 asked plaintiffs to identify their educational background and all schools they attended.  Plaintiffs objected to this INT and provided no further response.  Neither Ms. Ross nor B.M. supplemented or amended their response to this INT.

Accordingly, Abbott requests that plaintiffs provide a complete and accurate response to INT No. 61.

#### k.  INT No. 64

INT No. 64 asked plaintiffs to identify all social media accounts and electronic accounts.  Plaintiffs responded by providing Ms. Ross' email address.  This response is insufficient.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 64 and identify all other social and electronic accounts.

#### l.  INT No. 65

INT No. 65 sought an itemization of plaintiffs' damages.  Plaintiffs responded only by referring to all discovery productions.  Plaintiffs did not supplement their response.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 65 to either (a) specifically identify and itemize the damages they seek, or (b) confirm that they seek no other damages beyond those captured in the records produced to date.

#### m.  INT No. 66

INT No. 66 sought information regarding life, health, or disability insurance applied for and/or obtained by plaintiffs.  In response, Ms. Ross and B.M. referred broadly to all discovery productions and reserved the right to supplement.  Plaintiffs did not amend or supplement this response.  This response is insufficient, as it does not identify any insurance providers.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 66 to provide the requested information regarding plaintiffs' insurance providers.

### II.  Requests for Production

#### a.  References to Authorizations and Records

Plaintiffs responded to several RFPs by referring Abbott to authorizations and medical records, including RFP Nos. 2, 13, 38, 39, and 42.  This response is inappropriate as these requests seek information beyond that which would be contained in medical authorizations or medical records:

- RFP No. 2 seeks documents relating to communications related to plaintiffs' injuries.

**Deficiency Letter**
**April 12, 2024**
**Page 6**



- RFP No. 13 seeks documents relating to monetary payments plaintiffs received from any person, entity, or governmental body as a result of the injuries alleged in the complaint.

- RFP Nos. 38 and 39 seek documents, such as articles, journals, or notes, relating to infant formula products (RFP No. 38) or Abbott/any other infant formula product manufacturer (RFP No. 39).

- RFP No. 42 seeks non-privileged communications and documents relating to plaintiffs' decision to initiate this lawsuit.

- RFP No. 44 seeks calendars, journals, or other documents that reflect plaintiffs' daily activities preceding the infant's NEC diagnosis.

In further response to each of these RFPs, plaintiffs stated that they have "not identified any additional responsive, non-privileged, documents," but that they "reserve[] the right to serve additional records during the course of discovery." Abbott served these RFPs on plaintiffs nearly eight months ago, and the fact discovery period closes in less than 90 days. At this stage of the litigation, Abbott needs to know whether there exist any documents responsive to these requests. Accordingly, Abbott requests that plaintiffs:

(1) Identify any documents responsive to these requests that are beyond the medical records referenced in plaintiffs' response; or

(2) If no responsive documents exist, please so indicate.

### III. Authorizations

With regard to authorizations to collect records, on March 11, 2024, Abbott sent plaintiffs the most recent list of issues related to the authorizations, along with a request to send corrected authorizations to address those issues, so that Abbott may obtain records promptly. Outstanding requests relating to the above-named plaintiff are incorporated by reference in this letter.

In addition, plaintiffs have not provided a blank education authorization for B.M. or a blank employment authorization for Ms. Ross. Accordingly, Abbott requests that plaintiffs provide the missing blank authorizations.

\*     \*     \*

**Deficiency Letter**
**April 12, 2024**
**Page 7**



Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter. Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

Very truly yours,

*/s/ Noël B. Ix*
Noël B. Ix
cc:     All counsel of record (via email)

# EXHIBIT P

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

Troutman Pepper Hamilton Sanders LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103

troutman.com



**Noël B. Ix**
D 609.951.4102
Noel.Ix@Troutman.com

April 12, 2024

**VIA E-MAIL**

Timothy Burke
Timothy.Burke@klinespecter.com

Mark Weinstein
mark.weinstein@kellerpostman.com

**Re:** *Sanders v. Mead Johnson, et al. (220400153) - Discovery Deficiency Letter*

Counsel:

I write on behalf of Defendant Abbott Laboratories ("Abbott") concerning the ongoing deficiencies in plaintiffs' discovery responses. Abbott first served discovery on plaintiffs nearly eight months ago—on August 9, 2023. The discovery included Philadelphia Standard Form interrogatories, supplemental interrogatories, and document requests. In October 2023, plaintiffs provided very limited responses, necessitating Abbott's initial deficiency letter of October 27. Because plaintiffs did not remedy the identified deficiencies, Abbott had to file a motion to compel on December 5. In an effort to resolve the motion and move discovery along, the parties reached an order by agreement, entered by the Court on January 5, 2024, that, among other things, required plaintiffs to serve full and complete responses to Abbott's Interrogatories (INTs) and Requests for Production (RFPs) no later than February 5, 2024.

Plaintiffs failed to serve responses on or before February 5. Instead, over the weeks after the Court-imposed deadline had already passed, some plaintiffs began submitting partially-supplemented responses. Notwithstanding, **plaintiffs Loren Sanders and Q.S. failed to serve <u>any</u> supplemental INT responses**, and to date, plaintiffs still have not complied with the order. Abbott requires plaintiffs' full and complete responses to Abbott's discovery requests so that the parties may proceed with plaintiffs' depositions in advance of the June 3, 2024 discovery deadline.

The letter below details specific deficiencies which relate to the responses provided to date by Ms. Sanders and Q.S. This letter is not exhaustive and is only intended to address the most significant deficiencies in plaintiffs' responses provided to date in the *Sanders* case.

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter. Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**Deficiency Letter**
**April 12, 2024**
**Page 2**



---

I.      **Interrogatories**

    a.  **Interrogatories to which Plaintiffs Failed to Respond**

As detailed in Abbott's Deficiency Letter of October 27, 2023, plaintiffs objected and entirely failed to respond to several interrogatories: INT Nos. 3, 18, 19, 20, 24, 28, 29, 31, 32, 39, 40, 42, 48, 51, 52, 55, 56, 57, 58, 59, 60, 61, 62, 64, and 67.  In addition, plaintiffs objected to several other interrogatories, and in response, plaintiffs only offered to meet and confer: INT Nos. 2, 5, 7, 8, 9, 10, 14, 15, 16, 33, 34, 35, 36, and 54.  Moreover, plaintiffs responded to several other interrogatories solely by referring to authorizations and records or offering to supplement: INT Nos. 4, 6, 11, 12, 13, 17, 21, 23, 25, 26, 27, 30, 37, 41, 50, 65, 66, and 68.

With respect to each and every one of these interrogatories, Ms. Sanders and Q.S. have never provided complete responses, despite their obligation to do so under the Pennsylvania Rules of Civil Procedure and despite being ordered by the Court to do so on or before February 5, 2023. Over two months beyond that Court-imposed deadline, Ms. Sanders and Q.S. have never served supplemental responses, and thus, they are out of compliance with the Court's order.

Accordingly, Abbott requests that plaintiffs amend and supplement their responses to **all** of the above-listed interrogatories to provide complete responses in accordance with the Discovery Order dated January 5, 2024.

    b.  **INT No. 1**

INT No. 1 sought basic demographic information regarding plaintiff-parent, including name, date of birth, address, marital status (current and at time of incident), and social security number.  In the initial response, Ms. Sanders only provided her address.  Plaintiffs have failed to provide information regarding Ms. Sanders' marital status (current and at time of incident).

Accordingly, Abbott requests that Ms. Wiggins amend her response to INT No. 1 to provide information regarding her marital status (current and at the time Q.S.'s birth).

II.     **Requests for Production**

Plaintiffs responded to several RFPs by referring Abbott to authorizations and medical records, including RFP Nos. 2, 13, 38, 39, 42, and 44  This response is inappropriate as these requests seek information beyond that which would be contained in medical authorizations or medical records:

- RFP No. 2 seeks documents relating to communications related to plaintiffs' injuries.

- RFP No. 13 seeks documents relating to monetary payments plaintiffs received from any person, entity, or governmental body as a result of the injuries alleged in the complaint.

- RFP Nos. 38 and 39 seek documents, such as articles, journals, or notes, relating to infant formula products (RFP No. 38) or Abbott/any other infant formula product manufacturer (RFP No. 39).

**Deficiency Letter**
**April 12, 2024**
**Page 3**



- RFP No. 42 seeks non-privileged communications and documents relating to plaintiffs' decision to initiate this lawsuit.

- RFP No. 44 seeks calendars, journals, or other documents that reflect plaintiffs' daily activities preceding the infant's NEC diagnosis.

In further response to each of these RFPs, plaintiffs stated that they have "not identified any additional responsive, non-privileged, documents," but that they "reserve[] the right to serve additional records during the course of discovery." Abbott served these RFPs on plaintiffs nearly eight months ago, and the fact discovery period closes in less than 90 days. At this stage of the litigation, Abbott needs to know whether there exist any documents responsive to these requests. Accordingly, Abbott requests that plaintiffs:

(1) Identify any documents responsive to these requests that are beyond the medical records referenced in plaintiffs' response; or

(2) If no responsive documents exist, please so indicate.

Abbott reserves the right to later raise additional, individualized deficiencies in plaintiffs' RFP responses.

### III. Authorizations

With regard to authorizations to collect records, on March 11, 2024, Abbott sent plaintiffs the most recent list of issues related to the authorizations, along with a request to send corrected authorizations to address those issues, so that Abbott may obtain records promptly. Outstanding requests relating to the above-named plaintiff are incorporated by reference in this letter.

In addition, plaintiffs have not provided a single blank authorization for Ms. Sanders. Additionally, plaintiffs have not provided an employment authorization for Q.S., if applicable. Accordingly, Abbott requests that plaintiffs provide the missing blank authorizations.

\*     \*     \*

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter. Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

Very truly yours,

*/s/ Noël B. Ix*
Noël B. Ix

cc:    All counsel of record (via email)

# EXHIBIT Q

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

Troutman Pepper Hamilton Sanders LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103

troutman.com



**Noël B. Ix**
D 609.951.4102
Noel.Ix@Troutman.com

April 12, 2024

**VIA E-MAIL**

Timothy Burke
Timothy.Burke@klinespecter.com

Mark Weinstein
mark.weinstein@kellerpostman.com

**Re:    *Watson v. Mead Johnson, et al. (220302967) - Discovery Deficiency Letter***

Counsel:

I write on behalf of Defendant Abbott Laboratories ("Abbott") concerning the ongoing deficiencies in plaintiffs' discovery responses.  Abbott first served discovery on plaintiffs nearly eight months ago—on August 9, 2023.  The discovery included Philadelphia Standard Form interrogatories, supplemental interrogatories, and document requests.  In October 2023, plaintiffs provided very limited responses, necessitating Abbott's initial deficiency letter of October 27.  Because plaintiffs did not remedy the identified deficiencies, Abbott had to file a motion to compel on December 5.  In an effort to resolve the motion and move discovery along, the parties reached an order by agreement, entered by the Court on January 5, 2024, that, among other things, required plaintiffs to serve full and complete responses to Abbott's Interrogatories (INTs) and Requests for Production (RFPs) no later than February 5, 2024.

Plaintiffs failed to serve responses on or before February 5.  Instead, over the weeks after the Court-imposed deadline had already passed, some plaintiffs began submitting partially-supplemented responses.  These untimely responses were neither full nor complete, as required by the Court's order, and to date, plaintiffs still have not complied with the order.  Abbott requires plaintiffs' full and complete responses to Abbott's discovery requests so that the parties may proceed with plaintiffs' depositions in advance of the June 3, 2024 discovery deadline.

The letter below details specific deficiencies which relate to the responses provided to date by plaintiffs Jeannate Watson and B.L.  This letter is not exhaustive and is only intended to address the most significant deficiencies in plaintiffs' responses provided to date in the *Watson* case.

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter.  Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

<span style="color:red">Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473</span>

**Deficiency Letter**
**April 12, 2024**
**Page 2**



---

I.      **Interrogatories**

        a.   **INT No. 1**

INT No. 1 sought basic demographic information regarding plaintiff-parent, including name, date of birth, address, marital status (current and at time of incident), and social security number.  In the initial response, Jeannate Watson only provided her address.  Ms. Watson supplemented her response to include her date of birth.  However, plaintiffs have failed to provide information regarding Ms. Watson's marital status (current and at time of incident).

Accordingly, Abbott requests that Ms. Watson amend her response to INT No. 1 to provide information regarding her marital status (current and at the time B.L.'s birth).

        b.   **INT Nos. 2, 5, and 26**

INT Nos. 2 and 5 sought a description of the injuries suffered by ***plaintiff-parent*** as a result of infant's NEC diagnosis.  Ms. Watson initially responded to INT Nos. 2, and 5 by offering to meet and confer.  She later supplemented her response to INT Nos. 2 and 5 by referring to authorizations and records.

Accordingly, Abbott requests that Ms. Watson amend and supplement her responses to INT Nos. 2 and 5 to identify and describe any and all injuries that Ms. Watson allegedly suffered as a result of B.L.'s NEC diagnosis.

INT No. 26 sought information about the injuries that plaintiff-infant allegedly suffered as a result of his or her NEC diagnosis.  Because plaintiffs allege that each infant suffers from long-term health effects, this INT necessarily seeks information regarding the specific injuries alleged. In response, B.L. referred to the brief list of injuries set out in response to INT No. 23—which included NEC and "intestinal/bowel conditions/eating issues"—and otherwise refers to authorizations and medical records.  The medical records, however, do not tell us the specific medical conditions through the present that plaintiffs contend were caused by NEC.

Accordingly, Abbott requests that plaintiffs supplement their response to INT No. 26 to clearly identify any and all injuries they allege were caused by NEC and whether those injuries continue through the present.

        c.   **INT Nos. 31 and 32**

INT No. 31 sought information regarding witnesses to the infant's NEC diagnosis and/or injuries related thereto.  In response, Ms. Watson identified one potential witness: Jeannate Watson Sr. Ms. Watson, however, failed to provide the last known address of this potential witness.

INT No. 32 requested the location and activity of any witnesses identified in INT No. 31.  In response, Ms. Watson stated that she "does not recall any witnesses beyond those identified above and in the medical records."  This response is insufficient as it neither identifies the location nor activity of the witness listed in response to INT No. 31.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**Deficiency Letter**
**April 12, 2024**
**Page 3**



Accordingly, Abbott requests that plaintiffs provide the last known address of the witness listed, their relation to Ms. Watson and B.L., a description of the knowledge or information they may have, and whether they were present during B.L.'s hospitalizations following birth.

### d. INT No. 42

INT No. 42 sought information regarding the preterm infant formula products administered to infant prior to infant's NEC diagnosis. Plaintiffs responded only by referring to medical records and authorizations. Plaintiffs later supplement this response to include, "Plaintiff recalls Enfamil products." The administration of an Abbott product is a key allegation in plaintiffs' complaint.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 42 to specifically identify any and all Abbott products administered to B.L. prior to NEC diagnosis.

### e. INT No. 43

INT No. 43 sought information regarding any labels, packaging, product guides, or other related documents that plaintiff-parent saw prior to the administration of any preterm infant formula products to infant. Ms. Watson responded only that she "recalls seeing packaging." This response is insufficient. Plaintiffs have alleged that Abbott's products were deficiently labeled, and therefore, Abbott is entitled to know what allegedly deficient labels, packaging, or documents Ms. Watson claims to have seen.

Accordingly, Abbott requests that Ms. Watson amend and supplement her response to INT No. 43 to specifically identify and describe any labels, packaging, product guides, or related documents that she saw.

### f. INT No. 44

INT No. 44 sought information regarding all communications with health care providers related to the decision to administer any nutrition, including but not limited to breast milk, donor milk, or preterm infant formula products to infant. Ms. Watson's supplemental response to this interrogatory indicates that she "recalls speaking with B.L.'s physician over the phone on numerous occasions regarding B.L.'s stomach problems." This response is insufficient. Ms. Watson did not provide the date, time, or place of these communications and failed to describe the content of those communications as requested in INT No. 44.

Accordingly, Abbott requests that Ms. Watson amend and supplement her response to INT No. 44 to describe with whom she had these communications, the contents of these communications, and the times, dates, and locations of each phone conversation Ms. Watson recalls.

### g. INT No. 46

INT No. 46 sought information regarding gifts, coupons, or infant formula products that plaintiff-parent received from a healthcare provider. In response, Ms. Watson stated she recalled seeing "product packaging" and also recalls "receiving coupons for infant formula products." This response is insufficient. Ms. Watson did not provide any of the additional information



requested including what type of packaging she saw, which product the coupons related to, from whom she received the coupons, the date on which she received the coupons, and/or the substance of any discussions about the coupons or packaging.

Accordingly, Abbott requests that Ms. Watson amend and supplement her response to INT No. 46 to provide the additional information requested.

### h. INT No. 53

INT No. 53 sought information regarding all persons with whom plaintiffs had communications regarding the alleged causes of B.L.'s NEC. Ms. Watson initially responded that she "does not recall being told by healthcare providers that NEC is related to prematurity." Ms. Watson did not amend or supplement this response, and it is insufficient on its face. In particular, while it addresses what Ms. Watson was **not** told, it fails to address the existence or substance of any responsive communications that Ms. Watson **did** have regarding the alleged causes of B.L.'s NEC.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 53 to identify and provide all requested details regarding any responsive communications.

### i. INT No. 54

INT No. 54 sought communications between plaintiffs and any manufacturer of infant formula products, including preterm infant formula products. Ms. Watson and B.L. responded by agreeing to meet and confer. Plaintiffs, however, have not supplemented their response to this INT.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 54 to identify and describe any communications responsive thereto.

### j. INT Nos. 55 and 56

INT No. 55 sought information regarding all pregnancies experienced by plaintiff-parent, while INT No. 56 sought information regarding infant formula products administered to each child identified in INT No. 55. For both of these INTs, Ms. Watson responded only by referring to authorizations and records. These responses are insufficient, insofar as (1) Ms. Watson failed to identify any pregnancies in INT No. 55, and (2) Ms. Watson failed to provide the information requested by INT No. 56, including the manufacturer, full product name and dates of administration for any infant formula products administered to each child identified in INT No. 55.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 55 to identify any and all pregnancies experienced by Ms. Watson, and further requests that plaintiffs amend and supplement their response to INT No. 56 to provide the requested information regarding the infant formula products administered to any child identified in response to INT No. 55.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**Deficiency Letter**
**April 12, 2024**
**Page 5**



### k. INT No. 59

INT No. 59 asked plaintiffs to state whether they had purchased preterm infant formula products from any online site or retail store. Plaintiff-parent responded only by reserving the right to amend or supplement their response.

Accordingly, Abbott requests that plaintiffs either (a) identify and describe any purchases of preterm infant formula products that are responsive to INT No. 59; or (b) otherwise affirmatively indicate that no such purchases exist.

### l. INT No. 61

INT No. 61 asked plaintiffs to identify their educational background and all schools they attended. Plaintiffs objected to this INT and provided no further response. Neither Ms. Watson nor B.L. supplemented or amended their response to this INT.

Accordingly, Abbott requests that plaintiffs provide a complete and accurate response to INT No. 61.

### m. INT No. 64

INT No. 64 asked plaintiffs to identify all social media accounts and electronic accounts. Ms. Watson and B.L. responded by providing one email address, which appears to relate to Ms. Watson. This response is insufficient.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 64 and identify all other social and electronic accounts of both Ms. Watson and B.L.

### n. INT No. 65

INT No. 65 sought an itemization of plaintiffs' damages. Plaintiffs responded only by referring to all discovery productions. Plaintiffs did not supplement their response.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 65 to either (a) specifically identify and itemize the damages they seek, or (b) confirm that they seek no other damages beyond those captured in the records produced to date.

### o. INT No. 66

INT No. 66 sought information regarding life, health, or disability insurance applied for and/or obtained by plaintiffs. In response, Ms. Watson and B.L. referred broadly to all discovery productions and reserved the right to supplement. Plaintiffs did not amend or supplement this response. This response is insufficient, as it does not identify any insurance providers.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 66 to provide the requested information regarding plaintiffs' insurance providers.

**Deficiency Letter**
**April 12, 2024**
**Page 6**



---

II.     **Requests for Production**

    a.  **References to Authorizations and Records**

Plaintiffs responded to several RFPs by referring Abbott to authorizations and medical records, including RFP Nos. 2, 13, 38, 39, and 42.  This response is inappropriate as these requests seek information beyond that which would be contained in medical authorizations or medical records:

- RFP No. 2 seeks documents relating to communications related to plaintiffs' injuries.

- RFP No. 13 seeks documents relating to monetary payments plaintiffs received from any person, entity, or governmental body as a result of the injuries alleged in the complaint.

- RFP Nos. 38 and 39 seek documents, such as articles, journals, or notes, relating to infant formula products (RFP No. 38) or Abbott/any other infant formula product manufacturer (RFP No. 39).

- RFP No. 42 seeks non-privileged communications and documents relating to plaintiffs' decision to initiate this lawsuit.

- RFP No. 44 seeks calendars, journals, or other documents that reflect plaintiffs' daily activities preceding the infant's NEC diagnosis.

In further response to each of these RFPs, plaintiffs stated that they have "not identified any additional responsive, non-privileged, documents," but that they "reserve[] the right to serve additional records during the course of discovery."  Abbott served these RFPs on plaintiffs nearly eight months ago, and the fact discovery period closes in less than 90 days.  At this stage of the litigation, Abbott needs to know whether there exist any documents responsive to these requests.  Accordingly, Abbott requests that plaintiffs:

    (1)     Identify any documents responsive to these requests that are beyond the medical records referenced in plaintiffs' response; or

    (2)     If no responsive documents exist, please so indicate.

III.    **Objections to Treaters and other Entities**

Following the Court's entry of the discovery order dated January 5, 2024, Abbott has sent plaintiffs several lists of treaters and other entities for which Abbott sought consent to serve signed blank authorizations.  Plaintiffs have responded by specifying the providers for which they consent to serve the authorizations and those for which they object to serve the authorizations.

With respect to Ms. Watson, plaintiffs objected to service of authorizations on the following three (3) treaters:

**Deficiency Letter**
**April 12, 2024**
**Page 7**



- Gerald Tadley, M.D.
- Sarah Noble, D.O.
- Einstein Gastroenterology at Klein

Records reviewed indicate that Ms. Watson was treated for anal discharge at Einstein Gastroenterology and was treated for both anal discharge and cannabis dependence by Dr. Gerald Tadley in the years following the birth of B.L. These issues may be relevant to Ms. Watson's maternal health, especially to the extent treatment for these issues extends back towards the date of B.L.'s birth. In addition, Dr. Noble treated Ms. Watson for psychiatric issues and prescribed psychiatric medications. Ms. Watson's responses to RFP Nos. 20 and 22 suggest that Ms. Watson intends to pursue a claim for psychological injuries, and therefore, records from this provider are necessary and relevant.

Accordingly, Abbott requests that plaintiffs withdraw their objections and confirm that plaintiffs consent to the service of authorization on the above-listed treaters.

### IV. Authorizations

With regard to authorizations to collect records, on March 11, 2024, Abbott sent plaintiffs the most recent list of issues related to the authorizations, along with a request to send corrected authorizations to address those issues, so that Abbott may obtain records promptly. Outstanding requests relating to the above-named plaintiff are incorporated by reference in this letter.

In addition, plaintiffs have not provided the following blank authorizations:

- Blank education authorization (infant)
- Blank psychiatric authorizations (infant and parent)

Accordingly, Abbott requests that plaintiffs provide the missing blank authorizations.

<center>*    *    *</center>

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter. Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

Very truly yours,

*/s/ Noël B. Ix*
Noël B. Ix

cc:    All counsel of record (via email)

# EXHIBIT R

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

Troutman Pepper Hamilton Sanders LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103



troutman.com

**Noël B. Ix**
D 609.951.4102
Noel.Ix@Troutman.com

April 12, 2024

**VIA E-MAIL**

Timothy Burke
Timothy.Burke@klinespecter.com

Mark Weinstein
mark.weinstein@kellerpostman.com

Re:    *Wiggins v. Mead Johnson, et al. (220302986) - Discovery Deficiency Letter*

Counsel:

I write on behalf of Defendant Abbott Laboratories ("Abbott") concerning the ongoing deficiencies in plaintiffs' discovery responses.  Abbott first served discovery on plaintiffs nearly eight months ago—on August 9, 2023.  The discovery included Philadelphia Standard Form interrogatories, supplemental interrogatories, and document requests.  In October 2023, plaintiffs provided very limited responses, necessitating Abbott's initial deficiency letter of October 27.  Because plaintiffs did not remedy the identified deficiencies, Abbott had to file a motion to compel on December 5.  In an effort to resolve the motion and move discovery along, the parties reached an order by agreement, entered by the Court on January 5, 2024, that, among other things, required plaintiffs to serve full and complete responses to Abbott's Interrogatories (INTs) and Requests for Production (RFPs) no later than February 5, 2024.

Plaintiffs failed to serve responses on or before February 5.  Instead, over the weeks after the Court-imposed deadline had already passed, some plaintiffs began submitting partially-supplemented responses.  Notwithstanding, **plaintiffs Shanita Wiggins and T.B. failed to serve <u>any</u> supplemental INT or RFP responses**, and to date, plaintiffs still have not complied with the order.  Abbott requires plaintiffs' full and complete responses to Abbott's discovery requests so that the parties may proceed with plaintiffs' depositions in advance of the June 3, 2024 discovery deadline.

The letter below details specific deficiencies which relate to the responses provided to date by Ms. Wiggins and T.B.  This letter is not exhaustive and is only intended to address the most significant deficiencies in plaintiffs' responses provided to date in the *Wiggins* case.

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter.  Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**Deficiency Letter**
**April 12, 2024**
**Page 2**



I.      **Interrogatories**

    a.  **Interrogatories to which Plaintiffs Failed to Respond**

As detailed in Abbott's Deficiency Letter of October 27, 2023, plaintiffs objected and entirely failed to respond to several interrogatories: INT Nos. 3, 18, 19, 20, 24, 28, 29, 31, 32, 39, 40, 42, 48, 51, 52, 55, 56, 57, 58, 59, 60, 61, 62, 64, and 67.  In addition, plaintiffs objected to several other interrogatories, and in response, plaintiffs only offered to meet and confer: INT Nos. 2, 5, 7, 8, 9, 10, 14, 15, 16, 33, 34, 35, 36, and 54.  Moreover, plaintiffs responded to several other interrogatories solely by referring to authorizations and records or offering to supplement: INT Nos. 4, 6, 11, 12, 13, 17, 21, 23, 25, 26, 27, 30, 37, 41, 50, 65, 66, and 68.

With respect to each and every one of these interrogatories, Ms. Wiggins and T.B. have never provided complete responses, despite their obligation to do so under the Pennsylvania Rules of Civil Procedure and despite being ordered by the Court to do so on or before February 5, 2023. Over two months beyond that Court-imposed deadline, Ms. Wiggins and T.B. have never served supplemental responses, and thus, they are out of compliance with the Court's order.

Accordingly, Abbott requests that plaintiffs amend and supplement their responses to **all** of the above-listed interrogatories to provide complete responses in accordance with the Discovery Order dated January 5, 2024.

    b.  **INT No. 1**

INT No. 1 sought basic demographic information regarding plaintiff-parent, including name, date of birth, address, marital status (current and at time of incident), and social security number.  In the initial response, Ms. Wiggins only provided her address.  Plaintiffs have failed to provide information regarding Ms. Wiggins' marital status (current and at time of incident).

Accordingly, Abbott requests that Ms. Wiggins amend her response to INT No. 1 to provide information regarding her marital status (current and at the time T.B.'s birth).

    c.  **INT No. 53**

INT No. 53 sought information regarding all persons with whom plaintiffs had communications regarding the alleged causes of T.B.'s NEC.  Ms. Wiggins initially responded that she did not recall being told NEC was related to prematurity.  Ms. Wiggins did not amend or supplement this response, and it is insufficient on its face.  In particular, while it addresses what Ms. Wiggins was *not* told, it fails to address the existence or substance of any responsive communications that Ms. Wiggins *did* have regarding the alleged causes of T.B.'s NEC.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 53 to identify and provide all requested details regarding any responsive communications.

**Deficiency Letter**
**April 12, 2024**
**Page 3**



---

## II.    Requests for Production

As with the interrogatory responses, Ms. Wiggins and T.B. failed entirely to serve supplemental RFP responses.  Accordingly, all deficiencies outlined in Abbott's Deficiency Letter of October 27, 2023 remain at issue.

In particular, plaintiffs responded to several RFPs, indicating they would produce responsive documents once a protective order was in place: RFP Nos. 2, 3, 5, 7, 8, 10, 11, 13, 14, 15, 24, 25, 26, 27, 28, 29, 30, and 31.  The Court approved the parties' joint stipulated protective order on January 24, 2023.  Notwithstanding, to date, plaintiffs have only made one production of medical records relating to T.B.  Plaintiffs have produced no other documents.

Accordingly, Abbott requests that plaintiffs produce all documents responsive to **<u>all</u>** of the above-listed interrogatories and otherwise remedy all deficiencies outlined in Abbott's letter of October 27, 2023, consistent with the Discovery Order entered on January 5, 2024.

Abbott reserves the right to later raise additional, individualized deficiencies in plaintiffs' RFP responses.

## III.    Authorizations

With regard to authorizations to collect records, on March 11, 2024, Abbott sent plaintiffs the most recent list of issues related to the authorizations, along with a request to send corrected authorizations to address those issues, so that Abbott may obtain records promptly. Outstanding requests relating to the above-named plaintiff are incorporated by reference in this letter.

In addition, plaintiffs have not provided a single blank authorization for either Ms. Wiggins or T.B.  Accordingly, Abbott requests that plaintiffs provide the missing blank authorizations.

<center>*    *    *</center>

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter.  Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

Very truly yours,

*/s/ Noël B. Ix*
Noël B. Ix

cc:    All counsel of record (via email)

# EXHIBIT S

Troutman Pepper Hamilton Sanders LLP
3000 Two Logan Square, 18th and Arch Streets
Philadelphia, PA 19103

troutman.com



**Noël B. Ix**
D 609.951.4102
Noel.Ix@Troutman.com

April 12, 2024

**VIA E-MAIL**

Timothy Burke
Timothy.Burke@klinespecter.com

Mark Weinstein
mark.weinstein@kellerpostman.com

Re:     *Williams v. Mead Johnson, et al. (220400141) - Discovery Deficiency Letter*

Counsel:

I write on behalf of Defendant Abbott Laboratories ("Abbott") concerning the ongoing deficiencies in plaintiffs' discovery responses.  Abbott first served discovery on plaintiffs nearly eight months ago—on August 9, 2023.  The discovery included Philadelphia Standard Form interrogatories, supplemental interrogatories, and document requests.  In October 2023, plaintiffs provided very limited responses, necessitating Abbott's initial deficiency letter of October 27.  Because plaintiffs did not remedy the identified deficiencies, Abbott had to file a motion to compel on December 5.  In an effort to resolve the motion and move discovery along, the parties reached an order by agreement, entered by the Court on January 5, 2024, that, among other things, required plaintiffs to serve full and complete responses to Abbott's Interrogatories (INTs) and Requests for Production (RFPs) no later than February 5, 2024.

Plaintiffs failed to serve responses on or before February 5.  Instead, over the weeks after the Court-imposed deadline had already passed, some plaintiffs began submitting partially-supplemented responses.  These untimely responses were neither full nor complete, as required by the Court's order, and to date, plaintiffs still have not complied with the order. Abbott requires plaintiffs' full and complete responses to Abbott's discovery requests so that the parties may proceed with plaintiffs' depositions in advance of the June 3, 2024 discovery deadline.

The letter below details specific deficiencies which relate to the responses provided to date by plaintiffs Melvenia Williams and R.W.  This letter is not exhaustive and is only intended to address the most significant deficiencies in plaintiffs' responses provided to date in the *Williams* case.

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter.  Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

<div style="color:red; text-align:right;">
Certification Due Date: 05/02/2024<br>
Response Date: 05/09/2024<br>
Case ID: 220302606<br>
Control No.: 24045473
</div>

**Deficiency Letter**
**April 12, 2024**
**Page 2**



---

I.    **Interrogatories**

    a.  **INT No. 1**

INT No. 1 sought basic demographic information regarding plaintiff-parent, including name, date of birth, address, marital status (current and at time of incident), and social security number.  In the initial response, Melvenia Williams only provided her address and date of birth.  Ms. Williams did not supplement her response.

Accordingly, Abbott requests that Ms. Williams amend her response to INT No. 1 to provide information regarding her marital status (current and at the time R.W.'s birth).

    b.  **INT Nos. 2, 5, 8, 9, and 26**

INT Nos. 2 and 5 sought a description of the injuries suffered by *plaintiff-parent* as a result of infant's NEC diagnosis.  Ms. Williams initially responded to INT Nos. 2, and 5 by offering to meet and confer.  She later supplemented her response to INT Nos. 2 and 5 by referring to authorizations and records.

Accordingly, Abbott requests that Ms. Williams amend and supplement her responses to INT Nos. 2 and 5 to identify and describe any and all injuries that Ms. Williams allegedly suffered as a result of R.W.'s NEC diagnosis.

In response to RFP No. 7, Ms. Williams suggested that she is pursuing a claim for wage loss.  INT Nos. 8 and 9 sought information regarding plaintiff-parent's employers.  In particular, INT No. 8 sought the identity of employers pre-dating the birth of infant, and INT No. 9 sought the identity of employers post-dating infants' birth.  In supplemental response to these INTs, Ms. Williams stated only that information was "to be supplied."  Ms. Williams failed to any of the requested information regarding her employment.

Accordingly, Abbott requests that Ms. Carter amend and supplement her responses to INT Nos. 8 and 9 to provide the requested information about her employment.

INT No. 26 sought information about the injuries that plaintiff-infant allegedly suffered as a result of his or her NEC diagnosis.  Because plaintiffs allege that each infant suffers from long-term health effects, this INT necessarily seeks information regarding the specific injuries alleged.  In response, R.W. referred to the brief list of injuries set out in response to INT No. 23—which included NEC, and surgery/bowel resection—and otherwise refers to authorizations and medical records.  The medical records, however, do not tell us the specific medical conditions through the present that plaintiffs contend were caused by NEC.

Accordingly, Abbott requests that plaintiffs supplement their response to INT No. 26 to clearly identify any and all injuries they allege were caused by NEC and whether those injuries continue through the present.

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**Deficiency Letter**
**April 12, 2024**
**Page 3**



### c. INT No. 42

INT No. 42 sought information regarding the preterm infant formula products administered to infant prior to infant's NEC diagnosis. Plaintiffs responded only by referring to medical records and authorizations. The administration of an Abbott product is a key allegation in plaintiffs' complaint.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 42 to specifically identify any and all Abbott products administered to R.W. prior to NEC diagnosis.

### d. INT No. 43

INT No. 43 sought information regarding any labels, packaging, product guides, or other related documents that plaintiff-parent saw prior to the administration of any preterm infant formula products to infant. Ms. Williams responded only by stating that she "does not remember seeing any packaging." This response is insufficient. Plaintiffs have alleged that Abbott's products were deficiently labeled, and therefore, Abbott is entitled to know what allegedly deficient labels, packaging, or documents Ms. Williams claims to have seen.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 43 to specifically identify any labels, packaging, product guides, or related documents that they saw.

### e. INT No. 46

INT No. 46 sought information regarding gifts, coupons, or infant formula products that plaintiff-parent received from a healthcare provider. In response, Ms. Williams stated she recalled seeing "infant formula product(s) or container(s) of infant formula product(s) in the NICU." This response is insufficient. Ms. Williams did not provide any of the additional information requested including whether she received the products she observed, from whom she received the products, the date on which she received the products, and/or the substance of any discussions about the products.

Accordingly, Abbott requests that Ms. Williams amend and supplement her response to INT No. 46 to provide the additional information requested.

### f. INT No. 53

INT No. 53 sought information regarding all persons with whom plaintiffs had communications regarding the alleged causes of R.W.'s NEC. Ms. Williams initially responded that she "recalls being told by healthcare providers that NEC is related to prematurity." Ms. Williams did not amend or supplement this response, and it is insufficient on its face. In particular, Ms. Williams did not identify with whom she had the communication or when the communication occurred.

Accordingly, Abbott requests that Ms. Williams amend and supplement her response to INT No. 53 to identify and provide all requested details regarding any responsive communications.



### g. INT No. 54

INT No. 54 sought communications between plaintiffs and any manufacturer of infant formula products, including preterm infant formula products. Ms. Williams and R.W. responded by agreeing to meet and confer. Plaintiffs, however, have not supplemented their response to this INT.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 54 to identify and describe any communications responsive thereto.

### h. INT Nos. 55 and 56

INT No. 55 sought information regarding all pregnancies experienced by plaintiff-parent. INT No. 56 sought information regarding infant formula products administered to each child identified in INT No. 55. Ms. Williams responded only by referring to authorizations and records. This response is insufficient.

Accordingly, Abbott requests that plaintiffs amend and supplement her response to INT No. 55 to identify any and all pregnancies experienced by Ms. Williams, and further requests that plaintiffs amend and supplement their response to INT No. 56 to provide the requested information regarding the infant formula products administered to any child identified in response to INT No. 55.

### i. INT No. 61

INT No. 61 asked plaintiffs to identify their educational background and all schools they attended. Plaintiffs objected to this INT and provided no further response. Neither Ms. Williams nor R.W. supplemented or amended their response to this INT.

Accordingly, Abbott requests that plaintiffs provide a complete and accurate response to INT No. 61.

### j. INT No. 64

INT No. 64 asked plaintiffs to identify all social media accounts and electronic accounts. Ms. Williams and R.W. responded by providing one email address, which appears to relate to Ms. Williams. This response is insufficient.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 64 and identify all other social and electronic accounts of both Ms. Williams and R.W.

### k. INT No. 65

INT No. 65 sought an itemization of plaintiffs' damages. Plaintiffs responded only by referring to all discovery productions. Plaintiffs did not supplement their response.

**Deficiency Letter**
**April 12, 2024**
**Page 5**



Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 65 to either (a) specifically identify and itemize the damages they seek, or (b) confirm that they seek no other damages beyond those captured in the records produced to date.

### I. INT No. 66

INT No. 66 sought information regarding life, health, or disability insurance applied for and/or obtained by plaintiffs. In response, Ms. Williams and R.W. referred broadly to all discovery productions and reserved the right to supplement. Plaintiffs did not amend or supplement this response. This response is insufficient, as it does not identify any insurance providers.

Accordingly, Abbott requests that plaintiffs amend and supplement their response to INT No. 66 to provide the requested information regarding plaintiffs' insurance providers.

### II. Requests for Production

#### a. References to Authorizations and Records

Plaintiffs responded to several RFPs by referring Abbott to authorizations and medical records, including RFP Nos. 2, 13, 38, 39, and 42. This response is inappropriate as these requests seek information beyond that which would be contained in medical authorizations or medical records:

- RFP No. 2 seeks documents relating to communications related to plaintiffs' injuries.

- RFP No. 13 seeks documents relating to monetary payments plaintiffs received from any person, entity, or governmental body as a result of the injuries alleged in the complaint.

- RFP Nos. 38 and 39 seek documents, such as articles, journals, or notes, relating to infant formula products (RFP No. 38) or Abbott/any other infant formula product manufacturer (RFP No. 39).

- RFP No. 42 seeks non-privileged communications and documents relating to plaintiffs' decision to initiate this lawsuit.

- RFP No. 44 seeks calendars, journals, or other documents that reflect plaintiffs' daily activities preceding the infant's NEC diagnosis.

In further response to each of these RFPs, plaintiffs stated that they have "not identified any additional responsive, non-privileged, documents," but that they "reserve[] the right to serve additional records during the course of discovery." Abbott served these RFPs on plaintiffs nearly eight months ago, and the fact discovery period closes in less than 90 days. At this stage of the litigation, Abbott needs to know whether there exist any documents responsive to these requests. Accordingly, Abbott requests that plaintiffs:

       (1)     Identify any documents responsive to these requests that are beyond the medical records referenced in plaintiffs' response; or

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**Deficiency Letter**
**April 12, 2024**
**Page 6**



---

      (2)      If no responsive documents exist, please so indicate.

### III.    Authorizations

With regard to authorizations to collect records, on March 11, 2024, Abbott sent plaintiffs the most recent list of issues related to the authorizations, along with a request to send corrected authorizations to address those issues, so that Abbott may obtain records promptly. Outstanding requests relating to the above-named plaintiff are incorporated by reference in this letter.

In addition, plaintiffs have not provided a blank employment authorization for Ms. Williams. Plaintiffs have also not provided blank education and, if applicable, employment authorizations for R.W. Accordingly, Abbott requests that plaintiffs provide the missing blank authorizations.

<div align="center">*     *     *</div>

Abbott requests that plaintiffs amend and supplement their responses within 10 days of the date of this letter. Following that supplementation, the parties can meet and confer to discuss any outstanding discovery issues.

Very truly yours,

*/s/ Noël B. Ix*
Noël B. Ix

cc:     All counsel of record (via email)

## **CERTIFICATE OF SERVICE**

I hereby certify that I will serve a true and correct copy of the foregoing in accordance with Pa. R. Civ. P. 440 on all parties not served electronically. All other parties will be electronically served by the court in accordance with Pa. R. Civ. P. 205.4(g).


Dated: April 24, 2024                         */s/ Ronni E. Fuchs*
_____
                                              Ronni E. Fuchs

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Ronni E. Fuchs, hereby certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts, that require filing confidential information and documents differently than non-confidential information and documents.

*/s/ Ronni E. Fuchs*
Ronni E. Fuchs

# EXHIBIT A-77

BURNS WHITE LLC
By:     James A. Young, Esquire
        Richard S. Margulies, Esquire
        Douglas A. Brockman, Esquire
        Kyle J. Generelli, Esquire
Attorney ID Nos. 00213/62306/67185/333291
1880 John F. Kennedy Boulevard, 10th Floor
Philadelphia, PA  19103
(215) 587-1600
jayoung@burnswhite.com; rsmargulies@burnswhite.com
dabrockman@burnswhite.com; kjgenerelli@burnswhite.com

*Attorneys for defendant*
*The Pennsylvania Hospital of*
*the University of Pennsylvania*
*Health System d/b/a*
*Pennsylvania Hospital and The*
*Trustees of the University of*
*Pennsylvania d/b/a Penn*
*Medicine*

| | | |
|---|---|---|
| CHRISTINA TAYLOR, on her own behalf and as Parent and natural Guardian of I.H., a Minor Plaintiff, | : | IN THE COURT OF COMMON PLEAS |
| | : | PHILADELPHIA COUNTY |
| | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | MARCH TERM 2022 |
| MEAD JOHNSON & COMPANY, LLC, et al. | : | NO. 2606 |
| Defendants. | : | |

## WITHDRAWAL OF APPEARANCE

TO THE PROTHONOTARY:

Kindly withdraw **only** the appearance of Kyle J. Generelli, Esquire as counsel on behalf of Defendants, The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine, in the above-referenced matter.

                                    **BURNS WHITE LLC**
                            BY:     */s/ Kyle J. Generelli*
                                    Kyle J. Generelli, Esquire

## ENTRY OF APPEARANCE

TO THE PROTHONOTARY:

Kindly enter the appearance of Douglas A. Brockman, Esquire as co-counsel on behalf of Defendants, The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a

Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine,

in the above-captioned matter.

                                          **BURNS WHITE LLC**
Date: <u>April 25, 2024</u>              BY: <u>*/s/ Douglas A. Brockman*</u>
                                          Douglas A. Brockman, Esquire

## <u>CERTIFICATE OF SERVICE</u>

I, Kyle J. Generelli, Esquire, hereby certify that a true and correct copy of the foregoing

*Withdrawal of Appearance/Entry of Appearance* was served via the Court's electronic filing on all

counsel of record.

<u>/s/ Kyle J. Generelli</u>
Kyle J. Generelli, Esquire

Date: <u>April 25, 2024</u>

# EXHIBIT A-78

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA CO.
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

Filed and Attested by the
Office of Judicial Records
26 APR 2024 09:14 pm
M. TIERNEY

| | | |
|---|---|---|
| HOLLI CARTER, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302588 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| BRANDY GOODMOND, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400208 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| BRANDY GOODMOND, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400212 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| JANEE HENDERSON, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400127 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| KRISTEN KAJUFFA, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302978 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| NAFEESAH MAYS, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302963 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| CATHERINE McMILLIAN, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400140 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

1

| | |
|---|---|
| DAMEKA MOMENT, et al.,<br>        Plaintiff,<br>    v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        Defendants. | :<br>:<br>:<br>:<br>:    APRIL TERM, 2022<br>   No. 220400142 |
| NYDIA PARKER, et al.,<br>        Plaintiff,<br>    v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        Defendants. | :<br>:<br>:<br>:<br>:    MARCH TERM, 2022<br>   No. 220302983 |
| ALEXANDRIA ROSS, et al.,<br>        Plaintiff,<br>    v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        Defendants. | :<br>:<br>:<br>:<br>:    MARCH TERM, 2022<br>   No. 220302981 |
| LOREN SANDERS, et al.,<br>        Plaintiff,<br>    v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        Defendants. | :<br>:<br>:<br>:<br>:    APRIL TERM, 2022<br>   No. 220400153 |
| SAMAYA SHORT, et al.,<br>        Plaintiff,<br>    v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        Defendants. | :<br>:<br>:<br>:<br>:    APRIL TERM, 2022<br>   No. 220400159 |
| ALICE STILLS, et al.,<br>        Plaintiff,<br>    v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        Defendants. | :<br>:<br>:<br>:<br>:    MARCH TERM, 2022<br>   No. 220302617 |
| CHRISTINA TAYLOR, et al.,<br>        Plaintiff,<br>    v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        Defendants. | :<br>:<br>:<br>:<br>:    MARCH TERM, 2022<br>   No. 220302606 |
| NATISHA THOMAS, et al.,<br>        Plaintiff,<br>    v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        Defendants. | :<br>:<br>:<br>:<br>:    MARCH TERM, 2022<br>   No. 220400158 |
| TRINA WALKER-SAVAGE and CLIFTON | : |

2

| ISAIAH SAVAGE, JR., et al., | : | MARCH TERM, 2022 |
| Plaintiff, | : | No. 220400156 |
| v. | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

| JEANNATE WATSON, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302967 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

| GINA WIEGER, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302601 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

| SHANITA WIGGINS, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302986 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

| MELVENIA WILLIAMS, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400141 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

**PROPOSED ORDER**

AND NOW this ____ day of _____, 2024, upon consideration of the Plaintiffs' Motion to Quash the Cross-Noticed Depositions of Mead Johnson, and any Opposition and Oral Argument, it is hereby ORDERED that said Motion is GRANTED.

BY THIS COURT:

_____
J.

3

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | | |
|---|---|---|
| HOLLI CARTER, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302588 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| BRANDY GOODMOND, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400208 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| BRANDY GOODMOND, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400212 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| JANEE HENDERSON, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400127 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| KRISTEN KAJUFFA, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302978 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| NAFEESAH MAYS, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302963 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| CATHERINE McMILLIAN, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400140 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| DAMEKA MOMENT, et al., | : | |

4

|  | |
|---|---|
| Plaintiff, | : APRIL TERM, 2022 |
| v. | : No. 220400142 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| NYDIA PARKER, et al., | : |
|---|---|
| Plaintiff, | : MARCH TERM, 2022 |
| v. | : No. 220302983 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| ALEXANDRIA ROSS, et al., | : |
|---|---|
| Plaintiff, | : MARCH TERM, 2022 |
| v. | : No. 220302981 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| LOREN SANDERS, et al., | : |
|---|---|
| Plaintiff, | : APRIL TERM, 2022 |
| v. | : No. 220400153 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| SAMAYA SHORT, et al., | : |
|---|---|
| Plaintiff, | : APRIL TERM, 2022 |
| v. | : No. 220400159 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| ALICE STILLS, et al., | : |
|---|---|
| Plaintiff, | : MARCH TERM, 2022 |
| v. | : No. 220302617 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| CHRISTINA TAYLOR, et al., | : |
|---|---|
| Plaintiff, | : MARCH TERM, 2022 |
| v. | : No. 220302606 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| NATISHA THOMAS, et al., | : |
|---|---|
| Plaintiff, | : MARCH TERM, 2022 |
| v. | : No. 220400158 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| TRINA WALKER-SAVAGE and CLIFTON ISAIAH SAVAGE, JR., et al., | : |
|---|---|
| Plaintiff, | : MARCH TERM, 2022 : No. 220400156 |

Certification Due Date: 05/06/2024
Response Date: 05/13/2024
Case ID: 220302606
Control No.: 24046115

|  |  |  |
|---|---|---|
| v. | : | |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| JEANNATE WATSON, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302967 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| GINA WIEGER, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302601 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| SHANITA WIGGINS, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302986 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| MELVENIA WILLIAMS, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400141 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

**PLAINTIFFS' MOTION TO QUASH DEFENDANT
MEAD JOHNSON & COMPANY LLC'S CROSS NOTICES OF DEPOSITION**

1.     Plaintiffs, through their undersigned counsel, move this Court to quash Defendant

Mead Johnson & Company LLC's and Mead Johnson Nutrition Company's (collectively "Mead

Johnson") "cross notices" of deposition that were served in this case. In support of this Motion,

Plaintiff states as follows:

2.     Late in the morning of Friday April 26, 2024, Mead Johnson surprised Plaintiff and

her counsel with four deposition notices of Mead Johnson employees, with said depositions to

occur one business day later, on April 29,  and the others to follow days later, on May 1, May 9

and May 17, 2024.

6

3. These notices were served without any warning or notice, and without any conversation or the courtesy of planning with Plaintiff's counsel.

4. These notices were styled as cross-notices of depositions of four witnesses, Christina Valentine, Cindy Hasseberg, Timothy Cooper, and Robert Cleveland to occur on April 29, 2024, May 1, and May 9, and May 17, 2024, respectively. *See* Exhibit A, attached (Cross-Notices of Videotaped Depositions).

5. Setting aside the last-minute scheduling with no adequate notice to opposing counsel, these notices were also defective. Though styled as a "Cross-Notice," each notice was defective on its face, lacking even the original deposition notice that was being "cross-noticed."

6. Plaintiff has no information about the original notice, including whether any documents were requested, or anything else about the deposition or each witness.

7. Finally, these "cross-notices" come before Mead Johnson has even answered Plaintiff's written discovery or made a complete and current production of documents, including of custodial files that may pertain to these witnesses. Plaintiff asks that the Court quash these Cross-Notices.

8. Good cause exists to quash the deposition cross-notices served here in Philadelphia. Notably, these Cross-Notices of Deposition, issued on April 26, the Friday before the first Monday Deposition, have been unilaterally noticed at the very last minute, without consulting Plaintiffs' counsel on availability, and with no facts to indicate that depositions of key witnesses should begin on such short notice and before Mead Johnson has even responded to discovery requests in the instant case.

Certification Due Date: 05/06/2024
Response Date: 05/13/2024
Case ID: 220302606
Control No.: 24046115

9.     Instant Plaintiff's counsel were not involved in scheduling those depositions, nor are they even attending those depositions.[1] After apparently scheduling depositions in other matters, that are proceeding in other states, and being taken by other counsel, Mead Johnson on Friday, April 26, the date of this filing, sent Plaintiff's counsel cross-notices to those depositions such that they would count here in Philadelphia County as well. Even setting aside that these depositions are proceeding with different counsel in different cases and different states with different rules, the unreasonably short notice and unilaterally scheduled dates makes even the most minimal participation untenable.

10.     Plaintiff's counsel are open to working cooperatively with defendants to minimize multiple depositions of the same witness. But those discussions must be bilateral and aimed at balancing the rights of Plaintiffs to pursue their case under the rules with defendants' preference for limiting any unnecessary burden.

11.     Serving eleventh-hour cross-notices of deposition for their own corporate employee witnesses being deposed in other states is not a proper path forward with discovery here, and Mead Johnson's cross-noticed depositions should be quashed.

12.     Shortly before depositions taking place, presumably in a foreign jurisdiction, under presumably different rules, with different parties and plaintiffs' counsel, and in different cases, Mead Johnson now says that whatever happens in that deposition should be the sole testimony of Mead corporate representatives and that testimony should apply to the instant cases in Philadelphia County. This is a completely unrealistic expectation creating real prejudice, especially given that

---

[1] See Letter of Tobi Millrood, Esq. dated April 26, 2024 advising Philadelphia Plaintiffs, including the instant Plaintiff, will not be attending these depositions. Exhibit B.

8

these notices were issued on a Friday for depositions scheduled to take place the next Monday, and given that Plaintiff's counsel has no reasonable opportunity to prepare, or assert questions on behalf of Plaintiff, under the theories being advanced under Pennsylvania Law.

13.    Notably, these notices were also issued prior to Mead Johnson responding to any discovery in the instant cases, and were issued during a two week extension and grace period granted by the Plaintiffs.

14.    Defendant's apparent aim for cross-noticing these depositions is to keep the witnesses from being deposed again in Philadelphia County if necessary. Mead cannot be permitted to bind Plaintiffs to discovery done in other jurisdictions. Nor should Mead be allowed to forever bar Plaintiffs in this case from taking depositions of Mead personnel just because that employee was deposed in another case, by another attorney representing different Plaintiffs.

15.    Not surprisingly, given last minute notice,  instant Plaintiff's counsel is unable to attend these depositions in person due to the short notice, and further has virtually no time to prepare on such short notice and also since no documents have yet been produced.

16.    Pennsylvania Rule of Civil Procedure 234.4 provides,

   (a) The party serving a subpoena or a notice to attend or a notice to produce may excuse compliance therewith.

   (b) A motion to quash a subpoena, notice to attend or notice to produce may be filed by a party, by the person served or by any other person with sufficient interest. After hearing, the court may make an order to protect a party, witness or other person from unreasonable annoyance, embarrassment, oppression, burden or expense.

Pa. R.C.P. 234.4.

17.    Because the depositions of these four witnesses would be untimely, burdensome,

9

and oppressive, this Court should grant Plaintiff's Emergency Motion to Quash.

18.　　Pa. R.C.P. 4012(a) authorizes a court to protect a party from whom discovery or deposition is sought from unreasonable annoyance, embarrassment, oppression, or burden. According to Pa.R.Civ.P. 4019(c)(2), "[t]he court, when acting under subdivision (a) of this rule, may make: (2) an order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting such party from introducing in evidence designated documents, things or testimony ..." Pa.R.Civ.P. 4019(c)(2).

19.　　By issuing these eleventh-hour cross-noticed of depositions, Mead Johnson is again trying usurp the Plaintiffs' ability to take the discovery to which they are entitled, or at a minimum again require Plaintiffs to come to this court to show good cause why a deposition beyond the one selected by Mead Johnson, presumably in another state, should be the deposition for each case in Philadelphia County. The Court should reject Mead Johson's misconstrued approach to discovery.

20.　　Second, Mead Johnson cannot save its request by saying Plaintiffs' counsel have an opportunity to participate in those depositions if they want, for there are practical concerns abound. Again, the first cross-noticed deposition is set just a few days after the date of service. The depositions are taking place presumably under a different state's law, which may include different rules or causes of action or even different rules, including on the length of the depositions. No agreements have been reached—or even discussed—about how much time over how many days Plaintiffs in the Philadelphia County cases would be allowed to ask questions.

21.　　Third, while Plaintiff seeks a speedy resolution of their case, and while Plaintiff will limit as much as possible additional depositions of any witness already deposed, that does not mean Mead Johnson can dictate the Philadelphia discovery schedule. At this stage of

Certification Due Date: 05/06/2024
Response Date: 05/13/2024
Case ID: 220302606
Control No.: 24046115

discovery, prior to discovery productions from Mead, and during the time period in which Plaintiffs offered them an extension to respond to same, it is entirely premature to require Plaintiffs to decide what depositions are needed for these cases.

22.      Although Defendants may argue efficiency, notice in this matter is insufficient and forcing a deposition with one day notice before even the documents are produced and other documents reviewed is inefficient. Mead's desire to race Plaintiffs in this case to depositions of employees before all of the relevant documents are produced or, if produced, impossible to review and analyze in time for use at the deposition, is perspicuous, but unfairly prejudicial.

23.      Therefore, in the light of the totality of facts of the present case, the documents withheld and the amount of documents recently produced, Plaintiffs respectfully request this Court to enter  an order quashing those cross-notices so that they may depose these four witnesses, if necessary, at a future date.

24.      WHEREFORE, Plaintiffs respectfully request that the Court quash the cross-notices of deposition for Christina Valentine, Cindy Hasseberg, Timothy Cooper, and Robert Cleveland.

Dated: April 26, 2024                                     Respectfully submitted,


                                                         KLINE & SPECTER PC

                                                          /s/ Timothy A. Burke
                                                         Thomas R. Kline, Esq.
                                                         Tobias L. Millrood, Esq.
                                                         Elizabeth Crawford, Esq.
                                                         Timothy A. Burke, Esq.


                                                         KELLER POSTMAN LLC
                                                          /s/ Ben Whiting

                                                         Ben Whiting, Esq.  *pro hac vice*
                                                         Zachary Clark, Esq.  *pro hac vice*

Certification Due Date: 05/06/2024
Response Date: 05/13/2024
Case ID: 220302606
Control No.: 24046115

150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606
(312) 741-5220 Telephone
ben.whiting@kellerpostman.com

*Attorneys for Plaintiff*

12

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

| | |
|---|---|
| HOLLI CARTER, et al., | : |
| Plaintiff, | :   MARCH TERM, 2022 |
| v. | :   No. 220302588 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| BRANDY GOODMOND, et al., | : |
| Plaintiff, | :   APRIL TERM, 2022 |
| v. | :   No. 220400208 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| BRANDY GOODMOND, et al., | : |
| Plaintiff, | :   APRIL TERM, 2022 |
| v. | :   No. 220400212 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| JANEE HENDERSON, et al., | : |
| Plaintiff, | :   APRIL TERM, 2022 |
| v. | :   No. 220400127 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| KRISTEN KAJUFFA, et al., | : |
| Plaintiff, | :   MARCH TERM, 2022 |
| v. | :   No. 220302978 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| NAFEESAH MAYS, et al., | : |
| Plaintiff, | :   MARCH TERM, 2022 |
| v. | :   No. 220302963 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| CATHERINE McMILLIAN, et al., | : |
| Plaintiff, | :   APRIL TERM, 2022 |
| v. | :   No. 220400140 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |
| Defendants. | : |

| | |
|---|---|
| DAMEKA MOMENT, et al., | : |
| Plaintiff, | :   APRIL TERM, 2022 |

Certification Due Date: 05/06/2024
Response Date: 05/13/2024
Case ID: 220302606
Control No.: 24046115

| | | |
|---|---|---|
| v. | : | No. 220400142 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| NYDIA PARKER, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302983 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| ALEXANDRIA ROSS, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302981 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| LOREN SANDERS, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400153 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| SAMAYA SHORT, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400159 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| ALICE STILLS, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302617 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| CHRISTINA TAYLOR, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302606 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| NATISHA THOMAS, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220400158 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| TRINA WALKER-SAVAGE and CLIFTON ISAIAH SAVAGE, JR., et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220400156 |

Certification Due Date: 05/06/2024
Response Date: 05/13/2024
Case ID: 220302606
Control No.: 24046115

| | |
|---|---|
| MEAD JOHNSON & COMPANY, LLC, et al.,    : <br>         Defendants.    : | |
| JEANNATE WATSON, et al.,    : <br>        Plaintiff,    : <br>     v.    : <br> MEAD JOHNSON & COMPANY, LLC, et al.,    : <br>         Defendants.    : | MARCH TERM, 2022 <br> No. 220302967 |
| GINA WIEGER, et al.,    : <br>        Plaintiff,    : <br>     v.    : <br> MEAD JOHNSON & COMPANY, LLC, et al.,    : <br>         Defendants.    : | MARCH TERM, 2022 <br> No. 220302601 |
| SHANITA WIGGINS, et al.,    : <br>        Plaintiff,    : <br>     v.    : <br> MEAD JOHNSON & COMPANY, LLC, et al.,    : <br>         Defendants.    : | MARCH TERM, 2022 <br> No. 220302986 |
| MELVENIA WILLIAMS, et al.,    : <br>        Plaintiff,    : <br>     v.    : <br> MEAD JOHNSON & COMPANY, LLC, et al.,    : <br>         Defendants.    : | APRIL TERM, 2022 <br> No. 220400141 |

## PLAINTIFFS' MOTION TO QUASH DEFENDANT
## MEAD JOHNSON & COMPANY LLC'S CROSS NOTICES OF DEPOSITION

Plaintiffs, through their undersigned counsel, move this Court to quash Defendant Mead Johnson & Company LLC's and Mead Johnson Nutrition Company's (collectively "Mead Johnson") "cross notices" of deposition that were served in this case. In support of this Motion, Plaintiff states as follows:

## **INTRODUCTION**

Late in the morning of Friday April 26, 2024, Mead Johnson surprised Plaintiff and her counsel with four deposition notices of Mead Johnson employees, with said depositions to occur one business day later, on April 29, and the others to follow days later, on May 1, May 9 and May 17, 2024. These notices were served without any warning or notice, and without any conversation

Certification Due Date: 05/06/2024 <br> Response Date: 05/13/2024 <br> Case ID: 220302606 <br> Control No.: 24046115

or the courtesy of planning with Plaintiff's counsel.  These notices were styled as cross-notices of depositions of four witnesses, Christina Valentine, Cindy Hasseberg, Timothy Cooper, and Robert Cleveland to occur on April 29, 2024, May 1, and May 9, and May 17, 2024, respectively. *See* Exhibit A, attached (Cross-Notices of Videotaped Depositions).  Setting aside the last-minute scheduling with no adequate notice to opposing counsel, these notices were also defective. Though styled as a "Cross-Notice," each notice was defective on its face, lacking even the original deposition notice that was being "cross-noticed."  Plaintiff has no information about the original notice, including whether any documents were requested, or anything else about the deposition or each witness. Finally, these "cross-notices" come before Mead Johnson has even answered Plaintiff's written discovery or made a complete and current production of documents, including of custodial files that may pertain to these witnesses. Plaintiff asks that the Court quash these Cross-Notices.

## LEGAL AUTHORITY AND ARGUMENT

Good cause exists to quash the deposition cross-notices served here in Philadelphia. Notably, these Cross-Notices of Deposition, issued on April 26, the Friday before the first Monday Deposition, have been unilaterally noticed at the very last minute, without consulting Plaintiffs' counsel on availability, and with no facts to indicate that depositions of key witnesses should begin on such short notice and before Mead Johnson has even responded to discovery requests in the instant case.

Instant Plaintiff's counsel were not involved in scheduling those depositions, nor are they even attending those depositions.[2] After apparently scheduling depositions in other matters, that are proceeding in other states, and being taken by other counsel, Mead Johnson on Friday, April

---

[2] See Letter of Tobi Millrood, Esq. dated April 26, 2024 advising Philadelphia Plaintiffs, including the instant Plaintiff, will not be attending these depositions. Exhibit  B.

Certification Due Date: 05/06/2024
Response Date: 05/13/2024
Case ID: 220302606
Control No.: 24046115

26, the date of this filing, sent Plaintiff's counsel cross-notices to those depositions such that they would count here in Philadelphia County as well. Even setting aside that these depositions are proceeding with different counsel in different cases and different states with different rules, the unreasonably short notice and unilaterally scheduled dates makes even the most minimal participation untenable.

Plaintiff's counsel are open to working cooperatively with defendants to minimize multiple depositions of the same witness. But those discussions must be bilateral and aimed at balancing the rights of Plaintiffs to pursue their case under the rules with defendants' preference for limiting any unnecessary burden. Serving eleventh-hour cross-notices of deposition for their own corporate employee witnesses being deposed in other states is not a proper path forward with discovery here, and Mead Johnson's cross-noticed depositions should be quashed.

Shortly before depositions taking place, presumably in a foreign jurisdiction, under presumably different rules, with different parties and plaintiffs' counsel, and in different cases, Mead Johnson now says that whatever happens in that deposition should be the sole testimony of Mead corporate representatives and that testimony should apply to the instant cases in Philadelphia County. This is a completely unrealistic expectation creating real prejudice, especially given that these notices were issued on a Friday for depositions scheduled to take place the next Monday, and given that Plaintiff's counsel has no reasonable opportunity to prepare, or assert questions on behalf of Plaintiff, under the theories being advanced under Pennsylvania Law. Notably, these notices were also issued prior to Mead Johnson responding to any discovery in the instant cases, and were issued during a two week extension and grace period granted by the Plaintiffs.

Defendant's apparent aim for cross-noticing these depositions is to keep the witnesses

17

from being deposed again in Philadelphia County if necessary. Mead cannot be permitted to bind Plaintiffs to discovery done in other jurisdictions. Nor should Mead be allowed to forever bar Plaintiffs in this case from taking depositions of Mead personnel just because that employee was deposed in another case, by another attorney representing different Plaintiffs. Not surprisingly, given last minute notice, instant Plaintiff's counsel is unable to attend these depositions in person due to the short notice, and further has virtually no time to prepare on such short notice and also since no documents have yet been produced.

Pennsylvania Rule of Civil Procedure 234.4 provides,

> (c) The party serving a subpoena or a notice to attend or a notice to produce may excuse compliance therewith.

> (d) A motion to quash a subpoena, notice to attend or notice to produce may be filed by a party, by the person served or by any other person with sufficient interest. After hearing, the court may make an order to protect a party, witness or other person from unreasonable annoyance, embarrassment, oppression, burden or expense.

Pa. R.C.P. 234.4.

Because the depositions of these four witnesses would be untimely, burdensome, and oppressive, this Court should grant Plaintiff's Emergency Motion to Quash.

Pa. R.C.P. 4012(a) authorizes a court to protect a party from whom discovery or deposition is sought from unreasonable annoyance, embarrassment, oppression, or burden. According to Pa.R.Civ.P. 4019(c)(2), "[t]he court, when acting under subdivision (a) of this rule, may make: (2) an order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting such party from introducing in evidence designated documents, things or testimony ..." Pa.R.Civ.P. 4019(c)(2).

By issuing these eleventh-hour cross-noticed of depositions, Mead Johnson is again trying

18

usurp the Plaintiffs' ability to take the discovery to which they are entitled, or at a minimum again require Plaintiffs to come to this court to show good cause why a deposition beyond the one selected by Mead Johnson, presumably in another state, should be the deposition for each case in Philadelphia County. The Court should reject Mead Johson's misconstrued approach to discovery.

Second, Mead Johnson cannot save its request by saying Plaintiffs' counsel have an opportunity to participate in those depositions if they want, for there are practical concerns abound. Again, the first cross-noticed deposition is set just a few days after the date of service. The depositions are taking place presumably under a different state's law, which may include different rules or causes of action or even different rules, including on the length of the depositions. No agreements have been reached—or even discussed—about how much time over how many days Plaintiffs in the Philadelphia County cases would be allowed to ask questions.

Third, while Plaintiff seeks a speedy resolution of their case, and while Plaintiff will limit as much as possible additional depositions of any witness already deposed, that does not mean Mead Johnson can dictate the Philadelphia discovery schedule. At this stage of discovery, prior to discovery productions from Mead, and during the time period in which Plaintiffs offered them an extension to respond to same, it is entirely premature to require Plaintiffs to decide what depositions are needed for these cases.

Although Defendants may argue efficiency, notice in this matter is insufficient and forcing a deposition with one day notice before even the documents are produced and other documents reviewed is inefficient. Mead's desire to race Plaintiffs in this case to depositions of employees before all of the relevant documents are produced or, if produced, impossible to review and analyze in time for use at the deposition, is perspicuous, but unfairly prejudicial.

Certification Due Date: 05/06/2024
Response Date: 05/13/2024
Case ID: 220302606
Control No.: 24046115

Therefore, in the light of the totality of facts of the present case, the documents withheld and the amount of documents recently produced, Plaintiffs respectfully request this Court to enter an order quashing those cross-notices so that they may depose these four witnesses, if necessary, at a future date.

<div align="center">

**CONCLUSION**

</div>

Plaintiffs respectfully request that the Court quash the cross-notices of deposition for Christina Valentine, Cindy Hasseberg, Timothy Cooper, and Robert Cleveland.

Dated: April 26, 2024                 Respectfully submitted,

KLINE & SPECTER PC

*/s/ Timothy A. Burke*
Thomas R. Kline, Esq.
Tobias L. Millrood, Esq.
Elizabeth Crawford, Esq.
Timothy A. Burke, Esq.


KELLER POSTMAN LLC

*/s/ Ben Whiting*

Ben Whiting, Esq. *pro hac vice*
Zachary Clark, Esq. *pro hac vice*
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606
(312) 741-5220 Telephone
ben.whiting@kellerpostman.com

*Attorneys for Plaintiff*

Certification Due Date: 05/06/2024
Response Date: 05/13/2024
Case ID: 220302606
Control No.: 24046115

## <u>**CERTIFICATE OF SERVICE**</u>

The undersigned, subject to the penalties provided by Pennsylvania Rules for Civil Procedure, certify that on April 25, 2024, the foregoing document was served on all counsel of record via email and the court's efiling system.


*/s/ Timothy A. Burke*

Certification Due Date: 05/06/2024
Response Date: 05/13/2024
Case ID: 220302606
Control No.: 24046115

## <u>CERTIFICATE OF GOOD FAITH</u>

Undersigned counsel confirms that he has had the contacts described below with opposing counsel or unrepresented party regarding discovery matter contained in the foregoing discovery motion in an effort to resolve the specific discovery dispute(s) at issue and, further, that despite all counsel's good faith attempts to resolve the dispute(s), counsel have been unable to do so.

*/s/ Timothy A. Burke*

Certification Due Date: 05/06/2024
Response Date: 05/13/2024
Case ID: 220302606
Control No.: 24046115

# EXHIBIT A



*Filed and Attested by the
Office of Judicial Records
26 APR 2024 09:14 pm
M. TIERNEY*

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
kmurphy@tlgattorneys.com

**WELSH & RECKER, P.C.**
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire
306 Walnut Street
Philadelphia, PA 19106
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

**STEPTOE, LLP**
Evan Glassman, Esquire
1114 Avenue of the Americas
New York, NY 10036
eglassman@steptoe.com
*Admitted Pro Hac Vice*

**SWANSON, MARTIN & BELL, LLP**
T. Allon Renfro, Esquire
330 N. Wabash Avenue, Suite 3300
Chicago, IL 60611
trenfro@smbtrials.com
*Pro Hac Vice Pending*

**ATTORNEYS FOR DEFENDANTS,
MEAD JOHNSON & COMPANY, LLC
AND MEAD JOHNSON NUTRITION
COMPANY**

| | |
|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** | : **COURT OF COMMON PLEAS**<br>: **PHILADELPHIA COUNTY**<br>:<br>: |
| Plaintiff,<br>v. | : **MARCH TERM, 2022**<br>: **No. 2967**<br>: |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | :<br>:<br>:<br>: |
| Defendants. | :<br>: |

<u>**CROSS-NOTICE OF VIDEOTAPED DEPOSITION OF CHRISTINA J. VALENTINE, M.D.**</u>

TO:     **Tobias Millrood, Esquire**
         Kline & Specter, P.C.
         1525 Locust Street, 19th Floor
         Philadelphia, PA 19102
         tobi.millrood@klinespecter.com

         **Benjamin Whiting, Esquire**
         Keller Postman
         150 N. Riverside Plaza, Suite 4100
         Chicago, IL 60606
         ben.whiting@kellerpostman.com

Certification Due Date: 05/06/2024
Response Date: 05/13/2024
Case ID: 220302606
Control No.: 24046115

Please take notice that the videotaped deposition of **Christina J. Valentine, M.D.** is cross-noticed and will take place on **May 9, 2024**, beginning at **9:00 AM CST** via Zoom.  The deposition will be recorded simultaneously by video and stenographic means.  The deposition will continue from day to day until completed.  You are invited to attend and ask questions of the witness if you so desire.

**TUCKER LAW GROUP, LLC**

Date:  April 26, 2024

/s/ Kenneth A. Murphy
Kenneth A. Murphy, Esquire

**WELSH & RECKER, P.C.**

/s/ Catherine Recker
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire

**STEPTOE, LLP**

/s/ Evan Glassman
Evan Glassman, Esquire

**SWANSON, MARTIN & BELL, LLP**

/s/ T. Allon Renfro
T. Allon Renfro, Esquire

## <u>CERTIFICATE OF SERVICE</u>

I, Kenneth A. Murphy, Esquire, hereby certify that I caused a true and correct

copy of the foregoing to be served upon the following individuals via electronic mail.

**Kline & Specter, P.C.**
Thomas R. Kline, Esquire
Tobias Millrood, Esquire
Elizabeth Crawford, Esquire
Melissa Merk, Esquire
Timothy A. Burke, Esquire
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
tom.kline@klinespecter.com
tobi.millrood@klinespecter.com
melissa.merk@klinespecter.com
elissa.crawford@klinespecter.com
timothy.burke@klinespecter.com
*Attorneys for Plaintiff*

**Keller Postman**
Benjamin Whiting, Esquire
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
ben.whiting@kellerpostman.com
*Attorneys for Plaintiff*

**Burns White, LLC**
James Young, Esquire
Richard Margulies, Esquire
Kyle J. Generelli, Esquire
1880 John F. Kennedy Blvd., 10th Floor
Philadelphia, PA 19103
jayoung@burnswhite.com
rsmargulies@burnswhite.com
kjgenerelli@burnswhite.com
*Attorneys for Defendants, The Pennsylvania Hospital of the University of Pennsylvania
Health System d/b/a Pennsylvania Hospital and The Trustees of the University of
Pennsylvania d/b/a Penn Medicine*

**Campbell Conroy & O'Neil, PC**
Joseph E. O'Neil, Esquire
Meghann C. Porth, Esquire
Ryan J. O'Neil, Esquire
1205 Westlakes Drive, Suite 330

Berwyn, PA 19312
joneil@campbelltriallawyers.com
mporth@campbelltriallawyers.com
roneil@campbelltriallawyers.com
*Attorneys for Defendant, Abbott Laboratories*

**Jones Day**
Jennifer B. Flannery, Esquire
Marques Hillman Richeson, Esquire
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
jbflannery@jonesday.com
mhricheson@jonesday.com
*Attorneys for Defendant, Abbott Laboratories*

**Troutman Pepper Hamilton Sanders, LLP**
Sean P. Fahey, Esquire
Ronni E. Fuchs, Esquire
Noel B. Ix, Esquire
3000 Two Logan Square
Philadelphia, PA 19103
sean.fahey@troutman.com
ronni.fuchs@troutman.com
noel.ix@troutman.com
*Attorneys for Defendant, Abbott Laboratories*

**TUCKER LAW GROUP, LLC**

Date:  April 26, 2024          /s/ Kenneth A. Murphy____
                               Kenneth A. Murphy, Esquire

Certification Due Date: 05/06/2024
Response Date: 05/13/2024
Case ID: 220302606
Control No.: 24046115

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
kmurphy@tlgattorneys.com

**WELSH & RECKER, P.C.**
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire
306 Walnut Street
Philadelphia, PA 19106
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

**STEPTOE, LLP**
Evan Glassman, Esquire
1114 Avenue of the Americas
New York, NY 10036
eglassman@steptoe.com
*Admitted Pro Hac Vice*

**SWANSON, MARTIN & BELL, LLP**
T. Allon Renfro, Esquire
330 N. Wabash Avenue, Suite 3300
Chicago, IL 60611
trenfro@smbtrials.com
*Pro Hac Vice Pending*

**ATTORNEYS FOR DEFENDANTS,
MEAD JOHNSON & COMPANY, LLC
AND MEAD JOHNSON NUTRITION
COMPANY**

| | |
|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** | : **COURT OF COMMON PLEAS**<br>: **PHILADELPHIA COUNTY**<br>:<br>: |
| Plaintiff, | : **MARCH TERM, 2022** |
| v. | : **No. 2967**<br>: |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | :<br>:<br>:<br>: |
| Defendants. | :<br>: |

### CROSS-NOTICE OF VIDEOTAPED DEPOSITION OF CINDY HASSEBERG

TO: **Tobias Millrood, Esquire**
Kline & Specter, P.C.
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
tobi.millrood@klinespecter.com

**Benjamin Whiting, Esquire**
Keller Postman
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
ben.whiting@kellerpostman.com

<span style="color:red">Certification Due Date: 05/06/2024
Response Date: 05/13/2024
Case ID: 220302606
Control No.: 24046115</span>

Please take notice that the videotaped deposition of **Cindy Hasseberg** is cross-noticed and will take place on **April 29, 2024**, beginning at **9:00 AM CST** via Zoom. The deposition will be recorded simultaneously by video and stenographic means. The deposition will continue from day to day until completed. You are invited to attend and ask questions of the witness if you so desire.

**TUCKER LAW GROUP, LLC**

Date:  April 26, 2024

/s/ Kenneth A. Murphy
Kenneth A. Murphy, Esquire

**WELSH & RECKER, P.C.**

/s/ Catherine Recker
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire

**STEPTOE, LLP**

/s/ Evan Glassman
Evan Glassman, Esquire

**SWANSON, MARTIN & BELL, LLP**

/s/ T. Allon Renfro
T. Allon Renfro, Esquire

## <u>CERTIFICATE OF SERVICE</u>

I, Kenneth A. Murphy, Esquire, hereby certify that I caused a true and correct

copy of the foregoing to be served upon the following individuals via electronic mail.

**Kline & Specter, P.C.**
Thomas R. Kline, Esquire
Tobias Millrood, Esquire
Elizabeth Crawford, Esquire
Melissa Merk, Esquire
Timothy A. Burke, Esquire
Helen Lawless, Esquire
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
tom.kline@klinespecter.com
tobi.millrood@klinespecter.com
melissa.merk@klinespecter.com
elissa.crawford@klinespecter.com
timothy.burke@klinespecter.com
helen.lawless@klinespecter.com
*Attorneys for Plaintiff*

**Keller Postman**
Benjamin Whiting, Esquire
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
ben.whiting@kellerpostman.com
*Attorneys for Plaintiff*

**Burns White, LLC**
James Young, Esquire
Richard Margulies, Esquire
Kyle J. Generelli, Esquire
1880 John F. Kennedy Blvd., 10th Floor
Philadelphia, PA 19103
jayoung@burnswhite.com
rsmargulies@burnswhite.com
kjgenerelli@burnswhite.com
*Attorneys for Defendants, The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine*

**Campbell Conroy & O'Neil, PC**
Joseph E. O'Neil, Esquire
Meghann C. Porth, Esquire

Ryan J. O'Neil, Esquire
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
joneil@campbelltriallawyers.com
mporth@campbelltriallawyers.com
roneil@campbelltriallawyers.com
*Attorneys for Defendant, Abbott Laboratories*

**Jones Day**
Jennifer B. Flannery, Esquire
Marques Hillman Richeson
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
jbflannery@jonesday.com
mhricheson@jonesday.com
*Attorneys for Defendant, Abbott Laboratories*

**Troutman Pepper Hamilton Sanders, LLP**
Sean P. Fahey, Esquire
Ronni E. Fuchs, Esquire
Noel B. Ix
3000 Two Logan Square
Philadelphia, PA 19103
sean.fahey@troutman.com
ronni.fuchs@troutman.com
noel.ix@troutman.com
*Attorneys for Defendant, Abbott Laboratories*

**TUCKER LAW GROUP, LLC**

Date:  April 26, 2024                    /s/ Kenneth A. Murphy
                                          Kenneth A. Murphy, Esquire

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
kmurphy@tlgattorneys.com

**WELSH & RECKER, P.C.**
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire
306 Walnut Street
Philadelphia, PA 19106
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

**STEPTOE, LLP**
Evan Glassman, Esquire
1114 Avenue of the Americas
New York, NY 10036
eglassman@steptoe.com
*Admitted Pro Hac Vice*

**SWANSON, MARTIN & BELL, LLP**
T. Allon Renfro, Esquire
330 N. Wabash Avenue, Suite 3300
Chicago, IL 60611
trenfro@smbtrials.com
*Pro Hac Vice Pending*

**ATTORNEYS FOR DEFENDANTS,
MEAD JOHNSON & COMPANY, LLC
AND MEAD JOHNSON NUTRITION
COMPANY**

| | | |
|---|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** | : <br> : <br> : <br> : | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| Plaintiff, <br> v. | : <br> : <br> : <br> : | **MARCH TERM, 2022 No. 2967** |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : <br> : <br> : <br> : <br> : | |
| Defendants. | : | |

**CROSS-NOTICE OF VIDEOTAPED DEPOSITION OF TIMOTHY COOPER, M.D.**

TO:   **Tobias Millrood, Esquire**
      Kline & Specter, P.C.
      1525 Locust Street, 19th Floor
      Philadelphia, PA 19102
      tobi.millrood@klinespecter.com

      **Benjamin Whiting, Esquire**
      Keller Postman
      150 N. Riverside Plaza, Suite 4100
      Chicago, IL 60606
      ben.whiting@kellerpostman.com

Certification Due Date: 05/06/2024
Response Date: 05/13/2024
Case ID: 220302606
Control No.: 24046115

Please take notice that the videotaped deposition of **Timothy Cooper, M.D.** is cross-noticed and will take place on **May 1, 2024,** beginning at **9:00 AM CST** via Zoom. The deposition will be recorded simultaneously by video and stenographic means. The deposition will continue from day to day until completed. You are invited to attend and ask questions of the witness if you so desire.

**TUCKER LAW GROUP, LLC**

Date: April 26, 2024

/s/ Kenneth A. Murphy
Kenneth A. Murphy, Esquire
**WELSH & RECKER, P.C.**

/s/ Catherine Recker
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire

**STEPTOE, LLP**

/s/ Evan Glassman
Evan Glassman, Esquire

**SWANSON, MARTIN & BELL, LLP**

/s/ T. Allon Renfro
T. Allon Renfro, Esquire

Certification Due Date: 05/06/2024
Response Date: 05/13/2024
Case ID: 220302606
Control No.: 24046115

## <u>CERTIFICATE OF SERVICE</u>

I, Kenneth A. Murphy, Esquire, hereby certify that I caused a true and correct

copy of the foregoing to be served upon the following individuals via electronic mail.

**Kline & Specter, P.C.**
Thomas R. Kline, Esquire
Tobias Millrood, Esquire
Elizabeth Crawford, Esquire
Melissa Merk, Esquire
Timothy A. Burke, Esquire
Helen Lawless, Esquire
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
tom.kline@klinespecter.com
tobi.millrood@klinespecter.com
melissa.merk@klinespecter.com
elissa.crawford@klinespecter.com
timothy.burke@klinespecter.com
helen.lawless@klinespecter.com
*Attorneys for Plaintiff*

**Keller Postman**
Benjamin Whiting, Esquire
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
ben.whiting@kellerpostman.com
*Attorneys for Plaintiff*

**Burns White, LLC**
James Young, Esquire
Richard Margulies, Esquire
Kyle J. Generelli, Esquire
1880 John F. Kennedy Blvd., 10th Floor
Philadelphia, PA 19103
jayoung@burnswhite.com
rsmargulies@burnswhite.com
kjgenerelli@burnswhite.com
*Attorneys for Defendants, The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine*

**Campbell Conroy & O'Neil, PC**
Joseph E. O'Neil, Esquire
Meghann C. Porth, Esquire

Ryan J. O'Neil, Esquire
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
joneil@campbelltriallawyers.com
mporth@campbelltriallawyers.com
roneil@campbelltriallawyers.com
*Attorneys for Defendant, Abbott Laboratories*

**Jones Day**
Jennifer B. Flannery, Esquire
Marques Hillman Richeson, Esquire
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
jbflannery@jonesday.com
mhricheson@jonesday.com
*Attorneys for Defendant, Abbott Laboratories*

**Troutman Pepper Hamilton Sanders, LLP**
Sean P. Fahey, Esquire
Ronni E. Fuchs, Esquire
Noel B. Ix, Esquire
3000 Two Logan Square
Philadelphia, PA 19103
sean.fahey@troutman.com
ronni.fuchs@troutman.com
noel.ix@troutman.com
*Attorneys for Defendant, Abbott Laboratories*

**TUCKER LAW GROUP, LLC**

Date: April 26, 2024                    /s/ Kenneth A. Murphy
                                        Kenneth A. Murphy, Esquire

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
kmurphy@tlgattorneys.com

**WELSH & RECKER, P.C.**
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire
306 Walnut Street
Philadelphia, PA 19106
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

**STEPTOE, LLP**
Evan Glassman, Esquire
1114 Avenue of the Americas
New York, NY 10036
eglassman@steptoe.com
*Admitted Pro Hac Vice*

**SWANSON, MARTIN & BELL, LLP**
T. Allon Renfro, Esquire
330 N. Wabash Avenue, Suite 3300
Chicago, IL 60611
trenfro@smbtrials.com
*Pro Hac Vice Pending*

**ATTORNEYS FOR DEFENDANTS,
MEAD JOHNSON & COMPANY, LLC
AND MEAD JOHNSON NUTRITION
COMPANY**

| | |
|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor** | : **COURT OF COMMON PLEAS**<br>: **PHILADELPHIA COUNTY**<br>: |
| Plaintiff, | : **MARCH TERM, 2022** |
| v. | : **No. 2967** |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | : |
| Defendants. | : |

<u>**CROSS-NOTICE OF VIDEOTAPED DEPOSITION OF ROBERT CLEVELAND**</u>

TO:    **Tobias Millrood, Esquire**
       Kline & Specter, P.C.
       1525 Locust Street, 19th Floor
       Philadelphia, PA 19102
       tobi.millrood@klinespecter.com

       **Benjamin Whiting, Esquire**
       Keller Postman
       150 N. Riverside Plaza, Suite 4100
       Chicago, IL 60606
       ben.whiting@kellerpostman.com

Certification Due Date: 05/06/2024
Response Date: 05/13/2024
Case ID: 220302606
Control No.: 24046115

Please take notice that the videotaped deposition of **Robert Cleveland** is cross-noticed and will take place on **May 17, 2024**, beginning at **9:00 AM CST** via Zoom.  The deposition will be recorded simultaneously by video and stenographic means.  The deposition will continue from day to day until completed.  You are invited to attend and ask questions of the witness if you so desire.

                                                        **TUCKER LAW GROUP, LLC**

Date:  April 26, 2024                    /s/ Kenneth A. Murphy
                                                  Kenneth A. Murphy, Esquire

                                          **WELSH & RECKER, P.C.**

                                          /s/ Catherine Recker
                                                  Catherine M. Recker, Esquire
                                                    Amy B. Carver, Esquire
                                                    Richard D. Walk, III, Esquire

                                          **STEPTOE, LLP**

                                          /s/ Evan Glassman
                                                  Evan Glassman, Esquire

                                          **SWANSON, MARTIN & BELL, LLP**

                                          /s/ T. Allon Renfro
                                                  T. Allon Renfro, Esquire

Certification Due Date: 05/06/2024
Response Date: 05/13/2024
Case ID: 220302606
Control No.: 24046115

## <u>CERTIFICATE OF SERVICE</u>

I, Kenneth A. Murphy, Esquire, hereby certify that I caused a true and correct

copy of the foregoing to be served upon the following individuals via electronic mail.

**Kline & Specter, P.C.**
Thomas R. Kline, Esquire
Tobias Millrood, Esquire
Elizabeth Crawford, Esquire
Melissa Merk, Esquire
Timothy A. Burke, Esquire
Helen Lawless, Esquire
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
tom.kline@klinespecter.com
tobi.millrood@klinespecter.com
melissa.merk@klinespecter.com
elissa.crawford@klinespecter.com
timothy.burke@klinespecter.com
helen.lawless@klinespecter.com
*Attorneys for Plaintiff*

**Keller Postman**
Benjamin Whiting, Esquire
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
ben.whiting@kellerpostman.com
*Attorneys for Plaintiff*

**Burns White, LLC**
James Young, Esquire
Richard Margulies, Esquire
Kyle J. Generelli, Esquire
1880 John F. Kennedy Blvd., 10th Floor
Philadelphia, PA 19103
jayoung@burnswhite.com
rsmargulies@burnswhite.com
kjgenerelli@burnswhite.com
*Attorneys for Defendants, The Pennsylvania Hospital of the University of Pennsylvania
Health System d/b/a Pennsylvania Hospital and The Trustees of the University of
Pennsylvania d/b/a Penn Medicine*

**Campbell Conroy & O'Neil, PC**
Joseph E. O'Neil, Esquire
Meghann C. Porth, Esquire

Certification Due Date: 05/06/2024
Response Date: 05/13/2024
Case ID: 220302606
Control No.: 24046115

Ryan J. O'Neil, Esquire
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
joneil@campbelltriallawyers.com
mporth@campbelltriallawyers.com
roneil@campbelltriallawyers.com
*Attorneys for Defendant, Abbott Laboratories*

**Jones Day**
Jennifer B. Flannery, Esquire
Marques Hillman Richeson, Esquire
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
jbflannery@jonesday.com
mhricheson@jonesday.com
*Attorneys for Defendant, Abbott Laboratories*

**Troutman Pepper Hamilton Sanders, LLP**
Sean P. Fahey, Esquire
Ronni E. Fuchs, Esquire
Noel B. Ix, Esquire
3000 Two Logan Square
Philadelphia, PA 19103
sean.fahey@troutman.com
ronni.fuchs@troutman.com
noel.ix@troutman.com
*Attorneys for Defendant, Abbott Laboratories*

**TUCKER LAW GROUP, LLC**

Date:  April 26, 2024

/s/ Kenneth A. Murphy
Kenneth A. Murphy, Esquire

# EXHIBIT B



Filed and Attested by the
Office of Judicial Records
26 APR 2024 09:14 pm
M. TIERNEY

Certification Due Date: 05/06/2024
Response Date: 05/13/2024
Case ID: 220302606
Control No.: 24046115

# KLINE & SPECTER PC

ATTORNEYS AT LAW
1525 LOCUST STREET
PHILADELPHIA, PENNSYLVANIA 19102
WWW.KLINESPECTER.COM

TOBIAS L. MILLROOD                                                Tobi.Millrood@Klinespecter.com

_____

215-772-1358

800-597-9585

FAX: 215-792-5502

April 26, 2024

**Via Email Only**

Kenneth A. Murphy, Esquire
TUCKER LAW GROUP, LLC
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
kmurphy@tlgattorneys.com

Catherine M. Recker (PA Bar No. 56813)
Amy B. Carver (PA Bar No. 84819)
Richard D. Walk, III (PA Bar No. 329420)
WELSH & RECKER, P.C.
306 Walnut Street
Philadelphia, PA 19106
Tel: (215) 972-6430
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

Evan Glassman, Esquire
STEPTOE LLP
1114 Avenue of the Americas
New York, NY 10036
eglassman@steptoe.com
*Admitted Pro Hac Vice*

T. Allon Renfro, Esquire
SWANSON, MARTIN & BELL, LLP
330 N. Wabash Avenue, Suite 3300
Chicago, IL 60611
trenfro@smbtrials.com
*Pro Hac Vice Pending*

Re:     Sanders, et al., v. Mead Johnson & Company, et al., Case No. 220400153
Carter, et al., v. Mead Johnson & Company, et al., Case No. 220302588
Goodmond (Rya), et al., v. Mead Johnson & Company, et al., Case No. 220400208
Goodmond (Ryh), et al., v. Mead Johnson & Company, et al., Case No. 220400212
Henderson, et al., v. Mead Johnson & Company, et al., Case No. 220400127
Kajuffa, et al., v. Mead Johnson & Company, et al., Case No. 220302978
Mays, et al., v. Mead Johnson & Company, et al., Case No. 220302963
McMillian, et al., v. Mead Johnson & Company, et al., Case No. 220400140
Moment, et al., v. Mead Johnson & Company, et al., Case No. 220400142
Parker, et al., v. Mead Johnson & Company, et al., Case No. 220302983
Ross, et al., v. Mead Johnson & Company, et al., Case No. 220302981
Short, et al., v. Mead Johnson & Company, et al., Case No. 220400159
Stills, et al., v. Mead Johnson & Company, et al., Case No. 220302617
Taylor, et al., v. Mead Johnson & Company, et al., Case No. 220302606

Certification Due Date: 05/06/2024
Response Date: 05/13/2024
Case ID: 220302606
Control No.: 24046115

Page 2

Thomas, et al., v. Mead Johnson & Company, et al., Case No. 220400158
Walker-Savage, et al., v. Mead Johnson & Company, et al., Case No.220400156
Watson, et al., v. Mead Johnson & Company, et al., Case No. 220302967
Wieger, et al., v. Mead Johnson & Company, et al., Case No. 220302601
Wiggens, et al., v. Mead Johnson & Company, et al., Case No. 220302986
Williams, et al., v. Mead Johnson & Company, et al., Case No. 220400141

Dear Counsel:

Philadelphia Plaintiffs are in receipt of Mead Johnson's unilateral notices for depositions to occur on April 29, May 1, May 9, and May 17, 2024. This is the first we have been advised of these depositions, still without answers even to Plaintiffs' written discovery requests in the case or complete and current document productions. And these notices were issued without even the courtesy of discussion on topics or scheduling. We will not be attending these unilaterally noticed eleventh-hour scheduled depositions and will take said depositions on our own schedule, at the appropriate later date. In conjunction with this letter, we are also filing a Motion to Quash, but we expect that the Court will likewise not have adequate time to address this, given your last-minute unilateral scheduling.

Very truly yours,

Tobias L. Millrood

Enclosure
cc:    All Counsel of Record (via email only)

# EXHIBIT A-79

**FILED**
05 APR 2024 03:37 pm
Civil Administration
J. BOYD

| | |
|---|---|
| **CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a minor** : | **COURT OF COMMON PLEAS PHILADELPHIA COUNTY** |
| : | |
| **Plaintiffs,** : | **APRIL TERM, 2022** |
| : | **No. 02606** |
| v. : | |
| : | |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** : | **UNCONTESTED** |
| : | |
| **Defendants.** : | |

## ORDER

**AND NOW**, this 29ᵀᴴ day of APRIL, 2024, upon consideration of the Motion for Admission Pro Hac Vice of T. Allon Renfro, Esquire, to Represent Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company, it is hereby **ORDERED** that the Motion is **GRANTED**. This Court hereby admits T. Allon Renfro, Esquire, pro hac vice in this case on behalf of Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company.

**BY THE COURT:**



J.

# EXHIBIT A-80

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

Filed and Attested by the
Office of Judicial Records
02 MAY 2024 02:41 pm
N. SWEENEY

| | |
|---|---|
| CHRISTINA TAYLOR, *on her own behalf and as Parent and Natural Guardian of* I.H.*, a Minor*, | : |
| | : PHILADELPHIA COUNTY |
| Plaintiffs, | : COURT OF COMMON PLEAS |
| | : TRIAL DIVISION |
| v. | : |
| | : |
| MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, | : MARCH TERM, 2022 : No. 220302606 |
| | : |
| Defendants. | : |

## PRAECIPE FOR CONTESTED DISCOVERY MOTION

To the Office of Judicial Records:

I, Ronni E. Fuchs, am counsel for the movant in the discovery motion filed April 24, 2024 with Control Number 24045473,[1] which asks this Court to compel plaintiffs to provide full and complete responses.

I certify that I have conferred or made reasonable attempts to confer with opposing counsel for plaintiffs in an effort to resolve the disputes set forth in the aforementioned motion.

On August 9, 2023, Abbott served a set of interrogatories and requests for production of documents on all plaintiffs.

On August 30, 2023, plaintiffs emailed Abbott, seeking a 4-week extension of time to respond to Abbott's discovery requests. Abbott responded, asking plaintiffs to provide authorizations, lists of treaters, and any medical records in their possession.

On August 31, plaintiffs responded, agreeing to provide Abbott with the records in their possession, a list of treaters, and medical, education, and insurance authorizations. Plaintiffs also

---

[1] Please be advised that this action is one of several actions filed in this Court. The discovery disputes raised in Control Number 24045473 apply to the following cases: 220302588, 220302601, 220302606, 220302614, 220302617, 220302963, 220302967, 220302978, 220302981, 220302983, 220302986, 220400127, 220400140, 220400141, 220400142, and 220400153.

agreed to supply employment authorizations, if pursuing a wage loss claim, and psychiatric authorizations, if pursuing a psychiatric injury claim.

Notwithstanding plaintiffs' representations, both the original deadline for plaintiffs' discovery responses and the extension deadline came and went without the provision of any authorizations, treater lists, or medical records.

On October 11, 2023, plaintiffs provided the deficient set of discovery responses at issue here, along with a very limited number of authorizations.

Abbott sent an email to plaintiffs on October 16, 2023 identifying several significant deficiencies. Abbott received no response to this communication.

Having received no response, on October 27, 2023, Abbott sent plaintiffs a detailed deficiency letter that identified numerous deficiencies in plaintiffs' discovery responses and authorizations. Abbott requested a response by November 3, 2023. Abbott received no response to this deficiency letter.

On November 10, 2023, Abbott filed a motion to compel and strike plaintiffs' insufficient responses to Abbott's discovery.

During the conference held before this Court on November 16, 2023, plaintiffs represented that they would be willing to cooperate with Abbott in resolving the deficient discovery.

Notwithstanding, as of December 5, 2023, plaintiffs neither responded to any of the deficiencies detailed in Abbott's communications nor amended any of their deficient discovery responses. Accordingly Abbott filed a motion to compel and strike that same day.

On December 19, 2023, plaintiffs and Abbott reached an agreement on the form of an Order, which would require plaintiffs to provide full and complete discovery responses, serve any outstanding authorizations, and produce any outstanding medical records in their possession.

On January 5, 2024, this Court entered an agreed-upon Order, and plaintiffs were required to comply with the Order by February 5, 2024.

Despite serving some supplemental responses and authorizations in the weeks following the deadline imposed by the Order, plaintiffs have yet to fully comply with the Court's Order.

As detailed in Abbott's motion to compel, plaintiffs failed to serve supplemental responses altogether in certain cases. In others, the supplemental responses largely fail to address the deficiencies that existed in plaintiffs' initial set of responses.

On March 11, Abbott sent plaintiffs a deficiency letter detailing outstanding issues with plaintiffs' authorizations. While plaintiffs served a few additional authorizations, plaintiffs did not otherwise respond to the deficiencies outlined in the letter.

On April 8, 12, and 15, Abbott sent plaintiffs case-specific deficiency letters, which detailed deficiencies in each plaintiffs' written discovery responses. Abbott received no response to any of the letters.

Abbott has made several good faith efforts to work with plaintiffs on these disputes dating back to October of 2023. Indeed, those efforts included negotiation of an agreed-upon Order, which was entered by this Court and which required plaintiffs' full compliance by February 5, 2024. Despite the passage of nearly three months since that deadline, plaintiffs have yet to fully comply with the Court's January 5, 2024 Order.

Accordingly, despite Abbott's reasonable and good faith efforts, the parties are unable to resolve these disputes without court intervention. I make this certification subject to the penalties of 18 Pa. C.S.A. § 4904 regarding unsworn falsifications to authorities.

Respondent shall file an answer by the established Response Date entered on the docket.

Dated: May 2, 2024                          Respectfully Submitted,

                                            /s/ Ronni E. Fuchs
                                            Ronni E. Fuchs
                                            PA Bar #65561
                                            Troutman Pepper Hamilton Sanders LLP
                                            301 Carnegie Center, Suite 400
                                            Princeton, NJ 08540
                                            609.951.4183
                                            Ronni.Fuchs@troutman.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I will serve a true and correct copy of the foregoing in accordance with Pa. R. Civ. P. 440 on all parties not served electronically. All other parties will be electronically served by the court in accordance with Pa. R. Civ. P. 205.4(g).

Dated: May 2, 2024

*/s/ Ronni E. Fuchs*
Ronni E. Fuchs

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Ronni E. Fuchs, hereby certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts, that require filing confidential information and documents differently than non-confidential information and documents.

<div align="center" style="text-align:right">

*/s/ Ronni E. Fuchs*

Ronni E. Fuchs

</div>

# EXHIBIT A-81

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION - CIVIL

Filed and Attested by the Office of Judicial Records 06 MAY 2024 02:46 pm N. SWEENEY

| | | |
|---|---|---|
| HOLLI CARTER, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302588 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| BRANDY GOODMOND, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400208 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| BRANDY GOODMOND, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400212 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| JANEE HENDERSON, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400127 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| KRISTEN KAJUFFA, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302978 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| NAFEESAH MAYS, et al., | : | |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302963 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| CATHERINE McMILLIAN, et al., | : | |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400140 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| Defendants. | : | |
| DAMEKA MOMENT, et al., | : | |

| | |
|---|---|
| Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | : APRIL TERM, 2022<br>: No. 220400142<br>:<br>: |
| NYDIA PARKER, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: MARCH TERM, 2022<br>: No. 220302983<br>:<br>: |
| ALEXANDRIA ROSS, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: MARCH TERM, 2022<br>: No. 220302981<br>:<br>: |
| LOREN SANDERS, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: APRIL TERM, 2022<br>: No. 220400153<br>:<br>: |
| SAMAYA SHORT, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: APRIL TERM, 2022<br>: No. 220400159<br>:<br>: |
| ALICE STILLS, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: MARCH TERM, 2022<br>: No. 220302617<br>:<br>: |
| CHRISTINA TAYLOR, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: MARCH TERM, 2022<br>: No. 220302606<br>:<br>: |
| NATISHA THOMAS, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: MARCH TERM, 2022<br>: No. 220400158<br>:<br>: |
| TRINA WALKER-SAVAGE and CLIFTON<br>ISAIAH SAVAGE, JR., et al.,<br>Plaintiff, | :<br>: MARCH TERM, 2022<br>: No. 220400156 |

Case ID: 220302606<br>Control No.: 24046115

|  | : |  |
|---|---|---|
| v. | : |  |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |  |
| Defendants. | : |  |
| JEANNATE WATSON, et al., | : |  |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302967 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |  |
| Defendants. | : |  |
| GINA WIEGER, et al., | : |  |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302601 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |  |
| Defendants. | : |  |
| SHANITA WIGGINS, et al., | : |  |
| Plaintiff, | : | MARCH TERM, 2022 |
| v. | : | No. 220302986 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |  |
| Defendants. | : |  |
| MELVENIA WILLIAMS, et al., | : |  |
| Plaintiff, | : | APRIL TERM, 2022 |
| v. | : | No. 220400141 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : |  |
| Defendants. | : |  |

**Attorney Certification of Good Faith**
**Pursuant to Phila.Civ.R. * 208.2(e)**

The undersigned counsel for movant hereby certifies and attests that:

√ a.     He or she has had the contacts described below with opposing counsel or unrepresented party regarding discovery matter contained in the foregoing discovery motion in an effort to resolve the specific discovery dispute(s) at issue and, further, that despite all counsel's good faith attempts to resolve the dispute(s), counsel have been unable to do so.

Description:

Late in the morning of Friday April 26, 2024, Mead Johnson surprised Plaintiffs their counsel with four deposition notices of Mead Johnson employees, with said depositions to occur one business day later, on April 29,  and the others to follow days later, on May 1, May 9 and May 17, 2024.  These notices were served without any warning or notice, and without any conversation or the courtesy of planning with Plaintiff's counsel.  These notices were styled as cross-notices of depositions of four witnesses, Christina Valentine, Cindy Hasseberg, Timothy Cooper, and Robert Cleveland to occur on April 29, 2024, May 1, and May 9, and May 17, 2024, respectively.

3

Late in the afternoon of Friday, April 26, 2024 Plaintiffs' Counsel, Tobias L. Millrood advised Mead Johnson that Philadelphia Plaintiffs, including the instant Plaintiff, will not be attending these depositions unilaterally noticed by Mead Johnson in correspondence served upon all counsel of record, including Mead Johnson by email.

Further, during a zoom call the afternoon of April 26, Mead Johnson did not state that the depositions would be postponed or cancelled, and indeed they continued as noticed in the other jurisdictions.

To date, Defense counsel has not provided any alternative dates for deposition. Defense counsel has failed to respond to Plaintiffs' Counsel entirely to date.

    <u>b.</u>    Plaintiffs' counsel has made good faith but unsuccessful efforts described above to contact opposing counsel or unrepresented parties in effort to resolve the discovery dispute.

Description:

N/A. See above.

CERTIFIED TO THE COURT BY:

Dated: May 6, 2024

**KLINE & SPECTER PC**

*/s/ Timothy A. Burke*
Thomas R. Kline, Esq.
Tobias L. Millrood, Esq.
Elizabeth Crawford, Esq.
Timothy A. Burke, Esq.


KELLER POSTMAN LLC

*/s/ Ben Whiting*

Ben Whiting, Esq. *pro hac vice*
Zachary Clark, Esq. *pro hac vice*
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606
(312) 741-5220 Telephone
ben.whiting@kellerpostman.com

*Attorneys for Plaintiff*

***Note: The Signature of Respondent's Counsel is Not Required***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, subject to the penalties provided by Pennsylvania Rules for Civil Procedure, certify that on May 6, 2024, the foregoing document was served on all counsel of record via the court's efiling system.

*/s/ Timothy A. Burke*

Case ID: 220302606
Control No.: 24046115

## **CERTIFICATE OF GOOD FAITH**

Undersigned counsel confirms that he has had the contacts described above with opposing counsel or unrepresented party regarding discovery matter contained in the foregoing discovery motion in an effort to resolve the specific discovery dispute(s) at issue and, further, that despite all counsel's good faith attempts to resolve the dispute(s), counsel have been unable to do so.

*/s/ Timothy A. Burke*

6

# EXHIBIT A-82

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

*Filed and Attested by the Office of Judicial Records 24 APR 2024 04:12 pm M. TIERNEY*

| | |
|---|---|
| CHRISTINA TAYLOR, *on her own behalf and as Parent and Natural Guardian of* I.H., *a Minor,* | : PHILADELPHIA COUNTY |
| Plaintiffs, | : COURT OF COMMON PLEAS |
| | : TRIAL DIVISION |
| v. | : |
| MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, | : MARCH TERM, 2022 : No. 220302606 |
| Defendants. | |

**DOCKETED**

MAY 1 3 2024

**MICHAEL TIERNEY**
**JUDICIAL RECORDS**

**ORDER OF THE COURT**

On this _13_ day of ____MAY____, 2024, upon consideration of defendant Abbott

Laboratories' ("Abbott's") motion to compel responses to Abbott's First Set of Interrogatories and

First Set of Requests for Production to Plaintiffs, its brief in support, and any response thereto; and

WHEREAS on January 5, 2024, this Court entered an Order, to which plaintiffs and Abbott

agreed, which directed that, by February 5, 2024, plaintiffs must (1) provide full and complete

responses to all Interrogatories and Requests for Production, (2) serve complete sets of medical,

education, and insurance authorizations, (3) serve complete sets of employment and psychiatric

authorizations (where applicable), and (4) produce any medical records in their possession,

custody, or control, or otherwise inform Abbott that they have provided all such records; and

WHEREAS, to date, plaintiffs have failed to comply with this Court's Order, as more fully

set forth in the deficiency letters attached to Abbott's Motion to Compel, by (1) failing to serve

ORDER-Taylor Etal Vs Mead Johnson



22030260600145

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

supplemental discovery responses in certain cases, (2) serving incomplete or inaccurate discovery responses in all cases, (3) failing to serve full sets of authorizations, and (4) failing to produce additional medical records in plaintiffs' possession, or otherwise state that all such records have been produced to Abbott;

It is hereby ORDERED that:[1]

1.    Plaintiffs are directed to comply with this Order, as well as the Court's prior Order dated January 5, 2024, within twenty (20) days of the date of this Order.

2.    Plaintiffs shall remedy all deficiencies outlined in the deficiency letters attached to Abbott's Motion to Compel and any joinder filed to the same.

3.    Having already failed to comply with the Court's prior Order of January 5, 2024 concerning these same discovery issues, plaintiffs are cautioned that continued failure to comply with this Court's discovery orders may occasion harsh sanctions, including barring presentation of evidence where plaintiffs failed to timely provide Abbott with discovery regarding the same.

**MOTION SUBMITTED**

**MAY 1 3 2024**

**UNCONTESTED**

BY THE COURT:

_____  J.

---

[1] This Order applies to the following cases before this Court: 220302588, 220302601, 220302606, 220302614, 220302617, 220302963, 220302967, 220302978, 220302981, 220302983, 220302986, 220400127, 220400140, 220400141, 220400142, 220400153.

2

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473

**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
Sean P. Fahey (PA Bar No. 73305)
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

Ronni E. Fuchs (PA Bar No. 65561)
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

**CAMPBELL CONROY & O'NEIL, P.C.**
Joseph E. O'Neil (PA Bar No. 29053)
Meaghann C. Porth (PA Bar No. 307629)
Ryan J. O'Neil (PA Bar No. 314034)
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.1900
JONeil@campbell-trial-lawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

**JONES DAY**
Marques Hillman Richeson (admitted *pro hac
vice*)
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

Certification Due Date: 05/02/2024
Response Date: 05/09/2024
Case ID: 220302606
Control No.: 24045473