# EXHIBIT A-83

| | |
|---|---|
| **HOLLI CARTER, et al.,** | **COURT OF COMMON PLEAS** |
| | **PHILADELPHIA COUNTY** |
| Plaintiffs, | |
| v. | **MARCH TERM, 2022** |
| | **NO. 2588** |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | |
| | |
| Defendants. | |

Filed and Attested by the
Office of Judicial Records
13 MAY 2024 06:26 pm
E. DIVOR

| | |
|---|---|
| **BRANDY GOODMOND, et al.,** | **COURT OF COMMON PLEAS** |
| | **PHILADELPHIA COUNTY** |
| Plaintiffs, | |
| v. | **APRIL TERM, 2022** |
| | **NO. 0208** |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | |
| | |
| Defendants. | |

| | |
|---|---|
| **BRANDY GOODMOND, et al.,** | **COURT OF COMMON PLEAS** |
| | **PHILADELPHIA COUNTY** |
| Plaintiffs, | |
| v. | **APRIL TERM, 2022** |
| | **NO. 0212** |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | |
| | |
| Defendants. | |

| | |
|---|---|
| **JANEE HENDERSON, et al.,** | **COURT OF COMMON PLEAS** |
| | **PHILADELPHIA COUNTY** |
| Plaintiffs, | |
| v. | **APRIL TERM, 2022** |
| | **NO. 0127** |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | |
| | |
| Defendants. | |

| | |
|---|---|
| **KRISTEN KAJUFFA, et al.,** | **COURT OF COMMON PLEAS** |
| | **PHILADELPHIA COUNTY** |
| Plaintiffs, | |
| v. | **MARCH TERM, 2022** |
| | **NO. 2978** |
| **MEAD JOHNSON & COMPANY, LLC, et al.,** | |

Defendants.                          :

**NAFEESAH MAYS, et al.,**            :     **COURT OF COMMON PLEAS**
                                     :     **PHILADELPHIA COUNTY**
　　　　Plaintiffs,                   :
　　　　v.                            :     **MARCH TERM, 2022**
                                     :     **NO. 2963**
**MEAD JOHNSON & COMPANY, LLC,**     :
**et al.,**                          :
                                     :
　　　　Defendants.                   :

**CATHERINE McMILLIAN, et al.,**     :     **COURT OF COMMON PLEAS**
                                     :     **PHILADELPHIA COUNTY**
　　　　Plaintiffs,                   :
　　　　v.                            :     **APRIL TERM, 2022**
                                     :     **NO. 0140**
**MEAD JOHNSON & COMPANY, LLC,**     :
**et al.,**                          :
                                     :
　　　　Defendants.                   :

**DAMEKA MOMENT, et al.,**           :     **COURT OF COMMON PLEAS**
                                     :     **PHILADELPHIA COUNTY**
　　　　Plaintiffs,                   :
　　　　v.                            :     **APRIL TERM, 2022**
                                     :     **NO. 0142**
**MEAD JOHNSON & COMPANY, LLC,**     :
**et al.,**                          :
                                     :
　　　　Defendants.                   :

**NYDIA PARKER, et al.,**            :     **COURT OF COMMON PLEAS**
                                     :     **PHILADELPHIA COUNTY**
　　　　Plaintiffs,                   :
　　　　v.                            :     **MARCH TERM, 2022**
                                     :     **NO. 2983**
**MEAD JOHNSON & COMPANY, LLC,**     :
**et al.,**                          :
                                     :
　　　　Defendants.                   :

**ALEXANDRIA ROSS, et al.,**         :     **COURT OF COMMON PLEAS**
                                     :     **PHILADELPHIA COUNTY**
　　　　Plaintiffs,                   :
　　　　v.                            :     **MARCH TERM, 2022**
                                     :     **NO. 2981**
**MEAD JOHNSON & COMPANY, LLC,**     :

Case ID: 220302606
Control No.: 24046115

| | | |
|---|---|---|
| et al., | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| **LOREN SANDERS, et al.,** | : | **COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **APRIL TERM, 2022** |
| | : | **NO. 0153** |
| **MEAD JOHNSON & COMPANY, LLC,** et al., | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| **SAMAYA SHORT, et al.,** | : | **COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **APRIL TERM, 2022** |
| | : | **NO. 0159** |
| **MEAD JOHNSON & COMPANY, LLC,** et al., | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| **ALICE STILLS, et al.,** | : | **COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **MARCH TERM, 2022** |
| | : | **NO. 2617** |
| **MEAD JOHNSON & COMPANY, LLC,** et al., | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| **CHRISTINA TAYLOR, et al.,** | : | **COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **MARCH TERM, 2022** |
| | : | **NO. 2606** |
| **MEAD JOHNSON & COMPANY, LLC,** et al., | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| **NATISHA THOMAS, et al.,** | : | **COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **MARCH TERM, 2022** |

3

Case ID: 220302606
Control No.: 24046115

| | | |
|---|---|---|
| | : | NO. 0158 |
| **MEAD JOHNSON & COMPANY, LLC,** **et al.,** | : | |
| | : | |
| Defendants. | : | |
| **TRINA WALKER-SAVAGE and** **CLIFTON ISAIAH SAVAGE, JR., et al.,** | : : | **COURT OF COMMON PLEAS** **PHILADELPHIA COUNTY** |
| | : | |
| Plaintiffs, | : | **MARCH TERM, 2022** |
| v. | : | **NO. 0156** |
| | : | |
| **MEAD JOHNSON & COMPANY, LLC,** **et al.,** | : | |
| | : | |
| Defendants. | : | |
| **JEANNATE WATSON, et al.,** | : : | **COURT OF COMMON PLEAS** **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **MARCH TERM, 2022** |
| | : | **NO. 2967** |
| **MEAD JOHNSON & COMPANY, LLC,** **et al.,** | : | |
| | : | |
| Defendants. | : | |
| **GINA WIEGER, et al.,** | : : | **COURT OF COMMON PLEAS** **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **MARCH TERM, 2022** |
| | : | **NO. 2601** |
| **MEAD JOHNSON & COMPANY, LLC,** **et al.,** | : | |
| | : | |
| Defendants. | : | |
| **SHANITA WIGGINS, et al.,** | : : | **COURT OF COMMON PLEAS** **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **MARCH TERM, 2022** |
| | : | **NO. 2986** |
| **MEAD JOHNSON & COMPANY, LLC,** **et al.,** | : | |
| | : | |
| Defendants. | : | |
| **MELVENIA WILLIAMS, et al.,** | : : | **COURT OF COMMON PLEAS** **PHILADELPHIA COUNTY** |

Case ID: 220302606
Control No.: 24046115

|                                 |   |                        |
|---------------------------------|---|------------------------|
| Plaintiffs,                     | : |                        |
| v.                              | : | **APRIL TERM, 2022**   |
|                                 | : | **NO. 0141**           |
| **MEAD JOHNSON & COMPANY, LLC,**| : |                        |
| **et al.,**                     | : |                        |
|                                 | : |                        |
| Defendants.                     | : |                        |

## <u>ORDER</u>

    **AND NOW,** this _____ day of _____ 2024, upon

consideration of Plaintiff's Motion to Quash Defendant, Mead Johnson & Company LLC's

Cross Notices of Deposition and Defendant's Opposition thereto, it is hereby **ORDERED** that

said Motion is **DENIED.**


                             **BY THE COURT:**


                           _____

                                         J.

Case ID: 220302606
Control No.: 24046115

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 875-0609
kmurphy@tlgattorneys.com

**WELSH & RECKER, P.C.**
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire
306 Walnut Street
Philadelphia, PA 19106
215-972-6430
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

**STEPTOE, LLP**
Evan Glassman, Esquire
1114 Avenue of the Americas
New York, NY 10036
(212) 506-3909
eglassman@steptoe.com

**SWANSON, MARTIN & BELL, LLP**
Timothy Allon Renfro, Esquire
300 N. Wabash, Suite 3300
Chicago, IL 60611
(312) 222-8525
trenfro@smbtrials.com

**ATTORNEYS FOR DEFENDANTS
MEAD JOHNSON & COMPANY, LLC,
AND MEAD JOHNSON NUTRITION
COMPANY**

| | | |
|---|---|---|
| **HOLLI CARTER, et al.,** | : | **COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **MARCH TERM, 2022** |
| | : | **NO. 2588** |
| **MEAD JOHNSON & COMPANY, LLC,** | : | |
| **et al.,** | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| **BRANDY GOODMOND, et al.,** | : | **COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **APRIL TERM, 2022** |
| | : | **NO. 0208** |
| **MEAD JOHNSON & COMPANY, LLC,** | : | |
| **et al.,** | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| **BRANDY GOODMOND, et al.,** | : | **COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **APRIL TERM, 2022** |
| | : | **NO. 0212** |
| **MEAD JOHNSON & COMPANY, LLC,** | : | |

Case ID: 220302606
Control No.: 24046115

et al.,                                          :
                                                 :
    Defendants.              :

| JANEE HENDERSON, et al., | : | COURT OF COMMON PLEAS |
| | : | PHILADELPHIA COUNTY |

    Plaintiffs,                 :
    v.                          :  APRIL TERM, 2022
                                                 :  NO. 0127
MEAD JOHNSON & COMPANY, LLC,                     :
et al.,                                          :
                                                 :
    Defendants.              :

| KRISTEN KAJUFFA, et al., | : | COURT OF COMMON PLEAS |
| | : | PHILADELPHIA COUNTY |

    Plaintiffs,                 :
    v.                          :  MARCH TERM, 2022
                                                 :  NO. 2978
MEAD JOHNSON & COMPANY, LLC,                     :
et al.,                                          :
                                                 :
    Defendants.              :

| NAFEESAH MAYS, et al., | : | COURT OF COMMON PLEAS |
| | : | PHILADELPHIA COUNTY |

    Plaintiffs,                 :
    v.                          :  MARCH TERM, 2022
                                                 :  NO. 2963
MEAD JOHNSON & COMPANY, LLC,                     :
et al.,                                          :
                                                 :
    Defendants.              :

| CATHERINE McMILLIAN, et al., | : | COURT OF COMMON PLEAS |
| | : | PHILADELPHIA COUNTY |

    Plaintiffs,                 :
    v.                          :  APRIL TERM, 2022
                                                 :  NO. 0140
MEAD JOHNSON & COMPANY, LLC,                     :
et al.,                                          :
                                                 :
    Defendants.              :

| DAMEKA MOMENT, et al., | : | COURT OF COMMON PLEAS |
| | : | PHILADELPHIA COUNTY |

    Plaintiffs,                 :
    v.                          :  APRIL TERM, 2022

Case ID: 220302606
Control No.: 24046115

|  | : | NO. 0142 |
|---|---|---|

**MEAD JOHNSON & COMPANY, LLC,** :
**et al.,** :
        :
    Defendants. :

---

**NYDIA PARKER, et al.,** :   **COURT OF COMMON PLEAS**
        :   **PHILADELPHIA COUNTY**
    Plaintiffs, :
    v. :   **MARCH TERM, 2022**
        :   **NO. 2983**
**MEAD JOHNSON & COMPANY, LLC,** :
**et al.,** :
        :
    Defendants. :

---

**ALEXANDRIA ROSS, et al.,** :   **COURT OF COMMON PLEAS**
        :   **PHILADELPHIA COUNTY**
    Plaintiffs, :
    v. :   **MARCH TERM, 2022**
        :   **NO. 2981**
**MEAD JOHNSON & COMPANY, LLC,** :
**et al.,** :
        :
    Defendants. :

---

**LOREN SANDERS, et al.,** :   **COURT OF COMMON PLEAS**
        :   **PHILADELPHIA COUNTY**
    Plaintiffs, :
    v. :   **APRIL TERM, 2022**
        :   **NO. 0153**
**MEAD JOHNSON & COMPANY, LLC,** :
**et al.,** :
        :
    Defendants. :

---

**SAMAYA SHORT, et al.,** :   **COURT OF COMMON PLEAS**
        :   **PHILADELPHIA COUNTY**
    Plaintiffs, :
    v. :   **APRIL TERM, 2022**
        :   **NO. 0159**
**MEAD JOHNSON & COMPANY, LLC,** :
**et al.,** :
        :
    Defendants. :

---

**ALICE STILLS, et al.,** :   **COURT OF COMMON PLEAS**
        :   **PHILADELPHIA COUNTY**

Case ID: 220302606
Control No.: 24046115

|  | |  |
|---|---|---|
| Plaintiffs, | : | **MARCH TERM, 2022** |
| v. | : | **NO. 2617** |
|  | : | |
| **MEAD JOHNSON & COMPANY, LLC,** | : | |
| **et al.,** | : | |
|  | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| **CHRISTINA TAYLOR, et al.,** | : | **COURT OF COMMON PLEAS** |
|  | : | **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **MARCH TERM, 2022** |
|  | : | **NO. 2606** |
| **MEAD JOHNSON & COMPANY, LLC,** | : | |
| **et al.,** | : | |
|  | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| **NATISHA THOMAS, et al.,** | : | **COURT OF COMMON PLEAS** |
|  | : | **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **MARCH TERM, 2022** |
|  | : | **NO. 0158** |
| **MEAD JOHNSON & COMPANY, LLC,** | : | |
| **et al.,** | : | |
|  | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| **TRINA WALKER-SAVAGE and** | : | **COURT OF COMMON PLEAS** |
| **CLIFTON ISAIAH SAVAGE, JR., et al.,** | : | **PHILADELPHIA COUNTY** |
|  | : | |
| Plaintiffs, | : | **MARCH TERM, 2022** |
| v. | : | **NO. 0156** |
|  | : | |
| **MEAD JOHNSON & COMPANY, LLC,** | : | |
| **et al.,** | : | |
|  | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| **JEANNATE WATSON, et al.,** | : | **COURT OF COMMON PLEAS** |
|  | : | **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **MARCH TERM, 2022** |
|  | : | **NO. 2967** |
| **MEAD JOHNSON & COMPANY, LLC,** | : | |
| **et al.,** | : | |
|  | : | |
| Defendants. | : | |

9

Case ID: 220302606
Control No.: 24046115

| | | |
|---|---|---|
| **GINA WIEGER, et al.,** | : | **COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **MARCH TERM, 2022** |
| | : | **NO. 2601** |
| **MEAD JOHNSON & COMPANY, LLC,** | : | |
| **et al.,** | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| **SHANITA WIGGINS, et al.,** | : | **COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **MARCH TERM, 2022** |
| | : | **NO. 2986** |
| **MEAD JOHNSON & COMPANY, LLC,** | : | |
| **et al.,** | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| **MELVENIA WILLIAMS, et al.,** | : | **COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **APRIL TERM, 2022** |
| | : | **NO. 0141** |
| **MEAD JOHNSON & COMPANY, LLC,** | : | |
| **et al.,** | : | |
| | : | |
| Defendants. | : | |

## MEAD JOHNSON'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO QUASH CROSS-NOTICED DEPOSITIONS

Defendant Mead Johnson Nutrition and Mead Johnson & Company, (collectively, "Mead Johnson"), by and through their undersigned counsel, hereby respond to Plaintiffs' Motion to Quash Cross-Noticed Depositions as follows:

1.     Plaintiffs, through their undersigned counsel, move this Court to quash Defendant Mead Johnson & Company LLC's and Mead Johnson Nutrition Company's (collectively "Mead Johnson") "cross notices" of deposition that were served in this case. In support of this Motion, Plaintiff states as follows:

10

Case ID: 220302606
Control No.: 24046115

**ANSWER**: No response required.

2.      Late in the morning of Friday April 26, 2024, Mead Johnson surprised Plaintiff and her counsel with four deposition notices of Mead Johnson employees, with said depositions to occur one business day later, on April 29, and the others to follow days later, on May 1, May 9 and May 17, 2024.

**ANSWER**: Defendant objects to this paragraph as vague and confusing. Subject to the foregoing objection, Defendant responds as follows: Defendant admits that it served four deposition notices on Friday April 26, 2024, which were scheduled for April 29, May 1, May 9, and May 17, 2024. Defendant denies the remainder of the allegations in this paragraph.

3.      These notices were served without any warning or notice, and without any conversation or the courtesy of planning with Plaintiff's counsel.

**ANSWER**: Defendant objects to this statement to the extent it suggests defendant had any obligation to involve Plaintiff's counsel in the planning of depositions they had already disclaimed any interest in taking. Nevertheless, admitted that Defendant did not involve Plaintiff's counsel in the planning or scheduling of the cross-noticed depositions..

4.      These notices were styled as cross-notices of depositions of four witnesses, Christina Valentine, Cindy Hasseberg, Timothy Cooper, and Robert Cleveland to occur on April 29, 2024, May 1, and May 9, and May 17, 2024, respectively. *See* Exhibit A, attached (Cross-Notices of Videotaped Depositions).

**ANSWER**: Admitted.

5.      Setting aside the last-minute scheduling with no adequate notice to opposing counsel, these notices were also defective. Though styled as a "Cross-Notice," each notice was defective on its face, lacking even the original deposition notice that was being "cross-noticed."

Case ID: 220302606
Control No.: 24046115

**ANSWER**: Defendant objects because this paragraph contains legal conclusions to which no response is required. To the extent a response is required, Defendant denies the allegations in this paragraph.

6. Plaintiff has no information about the original notice, including whether any documents were requested, or anything else about the deposition or each witness.

**ANSWER**: Defendant lacks knowledge or information sufficient to allow it to admit or deny the averments in this paragraph, and they are therefore denied.

7. Finally, these "cross-notices" come before Mead Johnson has even answered Plaintiff's written discovery or made a complete and current production of documents, including of custodial files that may pertain to these witnesses. Plaintiff asks that the Court quash these Cross-Notices.

**ANSWER**: Denied as stated. Defendant admits that as of April 26, 2024, it had not yet responded to the interrogatories Plaintiffs issued on March 22, 2024, because it had been granted a two-week extension to respond to them.

8. Good cause exists to quash the deposition cross-notices served here in Philadelphia. Notably, these Cross-Notices of Deposition, issued on April 26, the Friday before the first Monday Deposition, have been unilaterally noticed at the very last minute, without consulting Plaintiffs' counsel on availability, and with no facts to indicate that depositions of key witnesses should begin on such short notice and before Mead Johnson has even responded to discovery requests in the instant case.

**ANSWER**: Defendant objects to this paragraph as vague and confusing. Defendant further objects to this paragraph because whether good cause exists to quash the cross-notices is a legal conclusion to which no response is required. To the extent a response is required, Defendant denies

Case ID: 220302606
Control No.: 24046115

that good cause exists to quash the cross-notices, as explained more fully in the attached memorandum of law. Defendant further objects to this paragraph because it is procedurally improper as it violates Pennsylvania Rule of Civil Procedure 1022, which requires that one material allegation be pled per paragraph, rendering it difficult to respond. Subject to these objections, Defendant responds as follows: It is admitted that the Cross-Notices of Deposition were issued on April 26. The remaining allegations are denied.

9. Instant Plaintiff's counsel were not involved in scheduling those depositions, nor are they even attending those depositions.[1] After apparently scheduling depositions in other matters, that are proceeding in other states, and being taken by other counsel, Mead Johnson on Friday, April 26, the date of this filing, sent Plaintiff's counsel cross-notices to those depositions such that they would count here in Philadelphia County as well. Even setting aside that these depositions are proceeding with different counsel in different cases and different states with different rules, the unreasonably short notice and unilaterally scheduled dates makes even the most minimal participation untenable.

**ANSWER**: Defendant objects to this paragraph because it is procedurally improper as it violates Pennsylvania Rule of Civil Procedure 1022, which requires that one material allegation be pled per paragraph, rendering it difficult to respond. Subject to this objection, Defendant responds as follows: Defendant admits that Plaintiffs' counsel elected not to attend the three depositions that have occurred thus far. Defendant further admits that these depositions were set to occur in Missouri and were cross-noticed in Philadelphia. Plaintiffs' counsel in these cases disclaimed any intention or desire to take general liability discovery, including during a meet and

---

[1] See Letter of Tobi Millrood, Esq. dated April 26, 2024 advising Philadelphia Plaintiffs, including the instant Plaintiff, will not be attending these depositions.

Case ID: 220302606
Control No.: 24046115

confer on April 24, two days prior to the service of the cross-notices. Defendant informed Plaintiffs' counsel on that date that these cross-notices would be issued. Moreover, Plaintiffs' counsel in these cases has already deposed these witnesses numerous times, and Plaintiffs' counsel has access to their custodial files and other documents. Defendant denies the remaining allegations.

    10.    Plaintiff's counsel are open to working cooperatively with defendants to minimize multiple depositions of the same witness. But those discussions must be bilateral and aimed at balancing the rights of Plaintiffs to pursue their case under the rules with defendants' preference for limiting any unnecessary burden.

**ANSWER**: Denied. By way of further response, Plaintiffs told Defendant that they had no interest in re-deposing these witnesses the last time the parties conferred.

    11.    Serving eleventh-hour cross-notices of deposition for their own corporate employee witnesses being deposed in other states is not a proper path forward with discovery here, and Mead Johnson's cross-noticed depositions should be quashed.

**ANSWER**: Defendant objects to this paragraph as vague. Defendant further objects to this paragraph because it contains legal conclusions to which no response is required. To the extent a response is required, Defendant denies that the cross-notices should be quashed. Subject to these objections, Defendant responds as follows: Denied.

    12.    Shortly before depositions taking place, presumably in a foreign jurisdiction, under presumably different rules, with different parties and plaintiffs' counsel, and in different cases, Mead Johnson now says that whatever happens in that deposition should be the sole testimony of Mead corporate representatives and that testimony should apply to the instant cases in Philadelphia County. This is a completely unrealistic expectation creating real prejudice, especially given that

Case ID: 220302606
Control No.: 24046115

these notices were issued on a Friday for depositions scheduled to take place the next Monday, and given that Plaintiff's counsel has no reasonable opportunity to prepare, or assert questions on behalf of Plaintiff, under the theories being advanced under Pennsylvania Law.

**ANSWER**: Defendant objects to this paragraph because it is procedurally improper as it violates Pennsylvania Rule of Civil Procedure 1022, which requires that one material allegation be pled per paragraph, rendering it difficult to respond. Subject to this objection, Defendant responds as follows: Admitted that the cross-noticed depositions are occurring in Missouri under the Missouri Rules of Civil Procedure. Defendant denies remaining allegations.

13. Notably, these notices were also issued prior to Mead Johnson responding to any discovery in the instant cases, and were issued during a two week extension and grace period granted by the Plaintiffs.

**ANSWER**: Denied as stated. Defendant admits that as of April 26, 2024, it had not yet responded to the interrogatories Plaintiffs issued on March 22, 2024, because it had been granted a two-week extension to respond to them.

14. Defendant's apparent aim for cross-noticing these depositions is to keep the witnesses from being deposed again in Philadelphia County if necessary. Mead cannot be permitted to bind Plaintiffs to discovery done in other jurisdictions. Nor should Mead be allowed to forever bar Plaintiffs in this case from taking depositions of Mead personnel just because that employee was deposed in another case, by another attorney representing different Plaintiffs.

**ANSWER**: Denied.

15. Not surprisingly, given last minute notice, instant Plaintiff's counsel is unable to attend these depositions in person due to the short notice, and further has virtually no time to prepare on such short notice and also since no documents have yet been produced.

Case ID: 220302606
Control No.: 24046115

**ANSWER**: Defendant lacks knowledge or information sufficient to allow it to admit or deny the averments in this paragraph, and they are therefore denied.

16.     Pennsylvania Rule of Civil Procedure 234.4 provides,

(a)     The party serving a subpoena or a notice to attend or a notice to produce may excuse compliance therewith.

(b)     A motion to quash a subpoena, notice to attend or notice to produce may be filed by a party, by the person served or by any other person with sufficient interest. After hearing, the court may make an order to protect a party, witness or other person from unreasonable annoyance, embarrassment, oppression, burden or expense. Pa. R.C.P. 234.4.

**ANSWER**: Admitted.

17.     Because the depositions of these four witnesses would be untimely, burdensome, and oppressive, this Court should grant Plaintiff's Emergency Motion to Quash.

**ANSWER**: Denied.

18.     Pa. R.C.P. 4012(a) authorizes a court to protect a party from whom discovery or deposition is sought from unreasonable annoyance, embarrassment, oppression, or burden. According to Pa.R.Civ.P. 4019(c)(2), "[t]he court, when acting under subdivision (a) of this rule, may make: (2) an order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting such party from introducing in evidence designated documents, things or testimony ..." Pa.R.Civ.P. 4019(c)(2).

**ANSWER**: This paragraph contains legal conclusions to which no response is required. To the extent a response is required, it is only admitted that Pa.R.Civ.P. 4019(c)(2) contains the quoted language. The remaining allegations are denied.

19.     By issuing these eleventh-hour cross-noticed of depositions, Mead Johnson is again

Case ID: 220302606
Control No.: 24046115

trying usurp the Plaintiffs' ability to take the discovery to which they are entitled, or at a minimum again require Plaintiffs to come to this court to show good cause why a deposition beyond the one selected by Mead Johnson, presumably in another state, should be the deposition for each case in Philadelphia County. The Court should reject Mead Johson's misconstrued approach to discovery.

**ANSWER**: Defendant objects to this paragraph as vague and confusing. Defendant further objects to this paragraph because it is procedurally improper as it violates Pennsylvania Rule of Civil Procedure 1022, which requires that one material allegation be pled per paragraph, rendering it difficult to respond. Subject to the foregoing objections, Defendant responds as follows: Denied as stated.

20. Second, Mead Johnson cannot save its request by saying Plaintiffs' counsel have an opportunity to participate in those depositions if they want, for there are practical concerns abound. Again, the first cross-noticed deposition is set just a few days after the date of service. The depositions are taking place presumably under a different state's law, which may include different rules or causes of action or even different rules, including on the length of the depositions. No agreements have been reached—or even discussed—about how much time over how many days Plaintiffs in the Philadelphia County cases would be allowed to ask questions.

**ANSWER**: Defendant objects to this paragraph because it is procedurally improper as it violates Pennsylvania Rule of Civil Procedure 1022, which requires that one material allegation be pled per paragraph, rendering it difficult to respond. Defendant further objects because this paragraph is vague and confusing. Subject to the foregoing objections, Defendant responds as follows: Denied as stated. While Cindy Hasseberg's deposition occurred the following Monday, the other depositions occurred in the subsequent weeks. Indeed, one of the cross-noticed

Case ID: 220302606
Control No.: 24046115

depositions has yet to occur.

21.     Third, while Plaintiff seeks a speedy resolution of their case, and while Plaintiff will limit as much as possible additional depositions of any witness already deposed, that does not mean Mead Johnson can dictate the Philadelphia discovery schedule. At this stage of discovery, prior to discovery productions from Mead, and during the time period in which Plaintiffs offered them an extension to respond to same, it is entirely premature to require Plaintiffs to decide what depositions are needed for these cases.

**ANSWER**: Defendant objects to this paragraph because it is procedurally improper as it violates Pennsylvania Rule of Civil Procedure 1022, which requires that one material allegation be pled per paragraph, rendering it difficult to respond. Defendant further objects because this paragraph is vague and confusing. Subject to the foregoing objections, Defendant responds as follows: Denied as stated.

22.     Although Defendants may argue efficiency, notice in this matter is insufficient and forcing a deposition with one day notice before even the documents are produced and other documents reviewed is inefficient. Mead's desire to race Plaintiffs in this case to depositions of employees before all of the relevant documents are produced or, if produced, impossible to review and analyze in time for use at the deposition, is perspicuous, but unfairly prejudicial.

**ANSWER**: Defendant objects to this paragraph because it is procedurally improper as it violates Pennsylvania Rule of Civil Procedure 1022, which requires that one material allegation be pled per paragraph, rendering it difficult to respond. Defendant further objects because this paragraph is vague and confusing. Subject to the foregoing objections, Defendant responds as follows: Denied as stated. Plaintiffs' counsel have deposed these witnesses before and have had access to all relevant documents for months through other litigation. Additionally, Plaintiffs'

counsel was informed prior to April 26 that these cross-notices would be forthcoming.

23.     Therefore, in the light of the totality of facts of the present case, the documents withheld and the amount of documents recently produced, Plaintiffs respectfully request this Court to enter an order quashing those cross-notices so that they may depose these four witnesses, if necessary, at a future date.

**ANSWER**: Defendant objects to this paragraph as vague and confusing. Subject to the foregoing objection, Defendant responds as follows: Denied.

24.     WHEREFORE, Plaintiffs respectfully request that the Court quash the cross-notices of deposition for Christina Valentine, Cindy Hasseberg, Timothy Cooper, and Robert Cleveland.

**ANSWER**: No response required.

<div style="margin-left: 40%;">

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

/s/ Kenneth A. Murphy
Kenneth A. Murphy, Esquire


**WELSH & RECKER, P.C.**

/s/ Catherine M. Recker
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire

**STEPTOE, LLC**

/s/ Evan Glassman
Evan Glassman, Esquire

**SWANSON, MARTIN & BELL, LLP**

/s/ Timothy Allon Renfro
Timothy Allon Renfro, Esquire

</div>

Case ID: 220302606
Control No.: 24046115

Attorneys for Defendants,
Mead Johnson & Company, LLC and
Mead Johnson Nutrition Company

Case ID: 220302606
Control No.: 24046115

**TUCKER LAW GROUP, LLC**
Kenneth A. Murphy, Esquire
Ten Penn Center
1801 Market Street, Suite 2500
Philadelphia, PA 19103
(215) 875-0609
kmurphy@tlgattorneys.com

**WELSH & RECKER, P.C.**
Catherine M. Recker, Esquire
Amy B. Carver, Esquire
Richard D. Walk, III, Esquire
306 Walnut Street
Philadelphia, PA 19106
215-972-6430
cmrecker@welshrecker.com
abcarver@welshrecker.com
rwalk@welshrecker.com

**STEPTOE, LLP**
Evan Glassman, Esquire
1114 Avenue of the Americas
New York, NY 10036
(212) 506-3909
eglassman@steptoe.com

**SWANSON, MARTIN & BELL, LLP**
Timothy Allon Renfro, Esquire
300 N. Wabash, Suite 3300
Chicago, IL 60611
(312) 222-8525
trenfro@smbtrials.com

**ATTORNEYS FOR DEFENDANTS
MEAD JOHNSON & COMPANY,
LLC,
AND MEAD JOHNSON NUTRITION
COMPANY**

| | | |
|---|---|---|
| **HOLLI CARTER, et al.,** | : | **COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **MARCH TERM, 2022** |
| | : | **NO. 2588** |
| **MEAD JOHNSON & COMPANY, LLC,** | : | |
| **et al.,** | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| **BRANDY GOODMOND, et al.,** | : | **COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **APRIL TERM, 2022** |
| | : | **NO. 0208** |
| **MEAD JOHNSON & COMPANY, LLC,** | : | |
| **et al.,** | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| **BRANDY GOODMOND, et al.,** | : | **COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **APRIL TERM, 2022** |
| | : | **NO. 0212** |
| **MEAD JOHNSON & COMPANY, LLC,** | : | |

Case ID: 220302606
Control No.: 24046115

et al.,

       Defendants.

| | |
|---|---|
| **JANEE HENDERSON, et al.,** | **COURT OF COMMON PLEAS** |
| | **PHILADELPHIA COUNTY** |
| Plaintiffs, | |
| v. | **APRIL TERM, 2022** |
| | **NO. 0127** |
| **MEAD JOHNSON & COMPANY, LLC,** et al., | |
| | |
| Defendants. | |

| | |
|---|---|
| **KRISTEN KAJUFFA, et al.,** | **COURT OF COMMON PLEAS** |
| | **PHILADELPHIA COUNTY** |
| Plaintiffs, | |
| v. | **MARCH TERM, 2022** |
| | **NO. 2978** |
| **MEAD JOHNSON & COMPANY, LLC,** et al., | |
| | |
| Defendants. | |

| | |
|---|---|
| **NAFEESAH MAYS, et al.,** | **COURT OF COMMON PLEAS** |
| | **PHILADELPHIA COUNTY** |
| Plaintiffs, | |
| v. | **MARCH TERM, 2022** |
| | **NO. 2963** |
| **MEAD JOHNSON & COMPANY, LLC,** et al., | |
| | |
| Defendants. | |

| | |
|---|---|
| **CATHERINE McMILLIAN, et al.,** | **COURT OF COMMON PLEAS** |
| | **PHILADELPHIA COUNTY** |
| Plaintiffs, | |
| v. | **APRIL TERM, 2022** |
| | **NO. 0140** |
| **MEAD JOHNSON & COMPANY, LLC,** et al., | |
| | |
| Defendants. | |

| | |
|---|---|
| **DAMEKA MOMENT, et al.,** | **COURT OF COMMON PLEAS** |
| | **PHILADELPHIA COUNTY** |
| Plaintiffs, | |
| v. | **APRIL TERM, 2022** |

2

Case ID: 220302606
Control No.: 24046115

|  | : | **NO. 0142** |
|---|---|---|
| **MEAD JOHNSON & COMPANY, LLC,** et al., | : | |
| | : | |
| Defendants. | : | |

| **NYDIA PARKER,** et al., | : | **COURT OF COMMON PLEAS** |
|---|---|---|
| | : | **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **MARCH TERM, 2022** |
| | : | **NO. 2983** |
| **MEAD JOHNSON & COMPANY, LLC,** et al., | : | |
| | : | |
| Defendants. | : | |

| **ALEXANDRIA ROSS,** et al., | : | **COURT OF COMMON PLEAS** |
|---|---|---|
| | : | **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **MARCH TERM, 2022** |
| | : | **NO. 2981** |
| **MEAD JOHNSON & COMPANY, LLC,** et al., | : | |
| | : | |
| Defendants. | : | |

| **LOREN SANDERS,** et al., | : | **COURT OF COMMON PLEAS** |
|---|---|---|
| | : | **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **APRIL TERM, 2022** |
| | : | **NO. 0153** |
| **MEAD JOHNSON & COMPANY, LLC,** et al., | : | |
| | : | |
| Defendants. | : | |

| **SAMAYA SHORT,** et al., | : | **COURT OF COMMON PLEAS** |
|---|---|---|
| | : | **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **APRIL TERM, 2022** |
| | : | **NO. 0159** |
| **MEAD JOHNSON & COMPANY, LLC,** et al., | : | |
| | : | |
| Defendants. | : | |

| **ALICE STILLS,** et al., | : | **COURT OF COMMON PLEAS** |
|---|---|---|
| | : | **PHILADELPHIA COUNTY** |

3

Case ID: 220302606
Control No.: 24046115

|  |  |
|---|---|
| Plaintiffs, | : |
| v. | :   **MARCH TERM, 2022** |
| | :   **NO. 2617** |
| **MEAD JOHNSON & COMPANY, LLC,** **et al.,** | : |
| | : |
| Defendants. | : |

|  |  |
|---|---|
| **CHRISTINA TAYLOR, et al.,** | :   **COURT OF COMMON PLEAS** |
| | :   **PHILADELPHIA COUNTY** |
| Plaintiffs, | : |
| v. | :   **MARCH TERM, 2022** |
| | :   **NO. 2606** |
| **MEAD JOHNSON & COMPANY, LLC,** **et al.,** | : |
| | : |
| Defendants. | : |

|  |  |
|---|---|
| **NATISHA THOMAS, et al.,** | :   **COURT OF COMMON PLEAS** |
| | :   **PHILADELPHIA COUNTY** |
| Plaintiffs, | : |
| v. | :   **MARCH TERM, 2022** |
| | :   **NO. 0158** |
| **MEAD JOHNSON & COMPANY, LLC,** **et al.,** | : |
| | : |
| Defendants. | : |

|  |  |
|---|---|
| **TRINA WALKER-SAVAGE and** **CLIFTON ISAIAH SAVAGE, JR., et al.,** | :   **COURT OF COMMON PLEAS** |
| | :   **PHILADELPHIA COUNTY** |
| | : |
| Plaintiffs, | :   **MARCH TERM, 2022** |
| v. | :   **NO. 0156** |
| **MEAD JOHNSON & COMPANY, LLC,** **et al.,** | : |
| | : |
| Defendants. | : |

|  |  |
|---|---|
| **JEANNATE WATSON, et al.,** | :   **COURT OF COMMON PLEAS** |
| | :   **PHILADELPHIA COUNTY** |
| Plaintiffs, | : |
| v. | :   **MARCH TERM, 2022** |
| | :   **NO. 2967** |
| **MEAD JOHNSON & COMPANY, LLC,** **et al.,** | : |
| | : |
| Defendants. | : |

Case ID: 220302606
Control No.: 24046115

| | | |
|---|---|---|
| **GINA WIEGER, et al.,** | : | **COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **MARCH TERM, 2022** |
| | : | **NO. 2601** |
| **MEAD JOHNSON & COMPANY, LLC,** | : | |
| **et al.,** | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| **SHANITA WIGGINS, et al.,** | : | **COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **MARCH TERM, 2022** |
| | : | **NO. 2986** |
| **MEAD JOHNSON & COMPANY, LLC,** | : | |
| **et al.,** | : | |
| | : | |
| Defendants. | : | |

| | | |
|---|---|---|
| **MELVENIA WILLIAMS, et al.,** | : | **COURT OF COMMON PLEAS** |
| | : | **PHILADELPHIA COUNTY** |
| Plaintiffs, | : | |
| v. | : | **APRIL TERM, 2022** |
| | : | **NO. 0141** |
| **MEAD JOHNSON & COMPANY, LLC,** | : | |
| **et al.,** | : | |
| | : | |
| Defendants. | : | |

## MEAD JOHNSON'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO QUASH CROSS-NOTICED DEPOSITIONS

### I.    MATTER BEFORE THE COURT

Cindy Hasseberg, Christina Valentine, Tim Cooper, and Robert Cleveland have provided testimony *sixteen times* in the NEC litigation. The plaintiff attorneys in the above captioned cases are responsible for more than half of that testimony. None of these witnesses possess any case-specific facts uniquely relevant to the cases here. That is why, perhaps, Plaintiffs' counsel disclaimed any desire to re-depose these witnesses at the case management conference only a few weeks ago and again stated that they were not interested in redoing general liability discovery prior

5

Case ID: 220302606
Control No.: 24046115

to learning of these cross-notices. It is only now that Mead Johnson has appropriately cross noticed the latest depositions of these witnesses that Plaintiffs cry foul. In fact, Plaintiffs may participate in these depositions, the Plaintiff lawyers in this case are in possession of millions of documents relevant to their claims, and, in any event, have already deposed these witnesses ***seven times*** and participated in ***three cross examinations*** at trial. Recognizing this, another state court judge recently denied an identical request from the same Plaintiffs' attorneys to quash these notices. Like that court, this Court should deny Plaintiffs' motion to quash the cross-noticed depositions.

## II. STATEMENT OF THE QUESTION PRESENTED

Should Plaintiffs' Motion to Quash Cross-Noticed Depositions be denied because it lacks merit?

Suggested Answer: Yes, Plaintiffs' Motion to Quash Cross-Noticed Depositions should be denied.

## III. ARGUMENT

### a. Plaintiffs' Counsel Have Already Examined These Witnesses

Lawyers at Keller Postman—including the same lawyer signing Plaintiffs' pleadings in these cases—have deposed each of these witnesses at least once.[2] Keller Postman recently tried a case in St. Clair County, Illinois, the *Watson* matter, involving identical allegations to those here. Plaintiffs in the Illinois case called Ms. Hasseberg, Dr. Valentine, and Mr. Cleveland as adverse witnesses and played Dr. Cooper's deposition video.

---

[2] Two of Ms. Hasseberg's five depositions involved lawyers from Keller Postman; two of Dr. Valentine's four depositions involved lawyers from Keller Postman; two of Dr. Cooper's four depositions involved lawyer from Keller Postman; and Robert Cleveland's only deposition to date was taken by a Keller Postman lawyer, though he was also questioned at a trial in which Keller Postman was counsel of record.

Case ID: 220302606
Control No.: 24046115

Courts in Pennsylvania and around the country recognize the wasted resources of repeatedly conducting the same depositions. *E.g.*, *Bingham v. Poswistilo*, 2011 WL 8809426, at *11 (Pa. Ct. Comm. Pls. Apr. 8, 2011) (consolidating tort actions to avoid duplicate depositions); *Moore v. Consol Pa. Coal Co., LLC*, 2024 WL 1251418, at *9 (W.D. Pa. Mar. 22, 2024) (finding that bifurcation would "likely cause duplicative depositions and document review").

There is simply no reason to believe that, if Keller Postman were permitted to conduct an ***eleventh*** examination of these individuals, there would be anything different. Three of the four cross-noticed depositions have already occurred, and the redundancy is telling. For example, at Cindy Hasseberg's April 29, 2024 deposition, every exhibit was an exhibit that had previously been shown to her at trial (a trial in which Keller Postman was trial counsel) or at one of her four prior depositions.[3] There is simply no new ground to cover with these witnesses, or Plaintiffs surely would have mentioned it in their motion to quash.

This is also true because these witnesses have ***no case specific*** opinions. None of them have viewed medical records related to these cases. None are involved with decisions involving individual hospitals or patients. And none are based in or have direct responsibility for Pennsylvania. Rather, each of these individuals is relatively senior in the company and has a broad purview covering the entire United States or covering a variety of products. *See United States ex rel. Galmines v. Novartis Pharmaceuticals Corp.*, 2015 WL 4973626, at *2 (E.D. Pa. Aug. 20, 2015) (quashing deposition of senior company official when witness possessed no new or unique information); *Reif v. CNA*, 248 F.R.D. 448, 454 (E.D. Pa. 2008) (same).

---

[3] Indeed, Plaintiff's counsel expressly told Ms. Hasseberg that "every exhibit I'm using was either used with you during your recent February testimony or back in August, by the way." Ex. A, Apr. 29, 2024 Hasseberg Dep. 171:16-18.

Case ID: 220302606
Control No.: 24046115

Robert Cleveland is the Senior Vice President of Nutrition for North America. He is responsible for overseeing the entire nutrition portfolio throughout North America. As counsel in the previous trial (where Keller Postman was lead counsel) claimed, Mr. Cleveland is "one layer down from the CEO" of Reckitt Benckiser, Mead Johnson's parent company. Ex. B, Mar. 6, 2024, Trial Tr. 3400:16-24. Cindy Hasseberg is the Vice President of U.S. Medical Sales and Mr. Cleveland's direct report. As she has repeatedly testified, her role is overseeing the regional business managers who oversee the district business managers who oversee the sales representatives. *See, e.g.*, Ex. C, Feb. 22, 2024 Trial Tr. 757:9-18. Timothy Cooper is a former employee at Mead Johnson who worked as associate medical director at Mead Johnson in addition to being a practicing neonatologist until he retired in 2019. He has no involvement in patient or hospital-level decisions at Mead Johnson. *See* Ex. D, May 10, 2023, Cooper Dep. 55:2-23. Christina Valentine is the former Medical Director at Mead Johnson. Like the other witnesses at issue here, she has no role in patient or hospital-level decisions related to any of these cases. *See, e.g.*, Ex. E Jan. 5, 2023, Valentine Dep. 23:18-24:8.

There is nothing unique or relevant to this litigation that these witnesses would say that they have not previously said.[4] Any discovery that can be obtained from these witnesses is broadly applicable fact testimony about Mead Johnson's medical sales force, infant nutrition business, and its preterm product portfolio. Plaintiffs' counsel have covered the waterfront on those issues.

---

[4] Of the four cross-notices that Plaintiffs seek to quash, three of those depositions have already happened. The final deposition, Mr. Cleveland's, is set to occur on Friday, thus this issue is largely mooted. Nevertheless, Mead Johnson is willing to negotiate limited depositions if Plaintiffs can identify specific areas that they believe need to be explored and Plaintiffs could not have explored during these cross-noticed depositions.

Case ID: 220302606
Control No.: 24046115

### b. Plaintiffs' Counsel Disclaimed Any Desire to Re-Depose These Witnesses

Plaintiffs' complaint that Mead Johnson did not coordinate dates with them is belied by the fact that Plaintiffs themselves disclaimed any interest in taking these depositions during the last conference between the parties. Thus, of course Mead Johnson did not coordinate dates with Plaintiffs. They had already said they did not want to be present. And that was a reasonable position for Plaintiffs to take because they already have at least *sixteen transcripts* from these witnesses.

Plaintiffs also contend, without citing any case law or rule or statute, that Mead Johnson's cross-notices are procedurally defective both because Mead Johnson did not provide enough notice and because Mead Johnson did not attach the original notice. But this is without merit. Mead Johnson provided notices to Plaintiffs on April 26 for depositions set to occur the following three weeks. Mead Johnson also noticed these depositions in Cook County (where Keller Postman is also counsel of record), and informed Plaintiffs' counsel on April 24 that cross-notices would be forthcoming in these actions. After a hearing on the issue, the judge in Cook County denied an identical motion to quash.[5]

### c. Plaintiffs Have Millions of Pages of Discovery

Finally, the notion that Plaintiffs' counsel lacks discovery is largely a problem of their own making. Plaintiffs filed many of these cases in March of 2022. Discovery is now set to close on June 3, 2024. Plaintiffs waited two years—until March 22, 2024—to serve their first set of Requests for Production. Mead Johnson responded to Plaintiffs' first set of Requests For

---

[5] Illinois has a two-tiered depositions system. The Illinois judge denied plaintiffs' motion to quash, and permitted the depositions to be cross-noticed as discovery depositions, but suggested that he may permit those plaintiffs to take *evidence* depositions for witnesses they could not call at trial, since Illinois precludes the use of discovery depositions at trial. Pennsylvania has no such bar. 231 Pa. Code § 4020(a).

Case ID: 220302606
Control No.: 24046115

Production on May 6, 2024 and offered to make available to Plaintiffs in these cases the entire MJ_Jupiter production, which has been used in numerous other cases around the country.[6]

But more fundamentally, even with Plaintiffs' delay in seeking discovery, Plaintiffs' argument that lack relevant documents is simply inaccurate. Keller Postman, one of the plaintiffs firms involved in the instant litigation, recently *tried and won* a case involving the same claims at issue here. As trial counsel, Keller Postman has *millions of pages* of Mead Johnson documents in its possession. These are the same documents that Keller Postman used when they previously deposed and examined these witnesses. And indeed, when Mead Johnson served its responses to Plaintiffs' first set of Requests for Production, Mead Johnson offered to re-produce this entire production to Plaintiffs.

## IV. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion to quash the cross-noticed depositions and enter the proposed order submitted herewith.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

/s/ Kenneth A. Murphy
Kenneth A. Murphy, Esquire

**WELSH & RECKER, P.C.**

/s/ Catherine M. Recker
Catherine M. Recker, Esquire
Amy B. Carver, Esquire

---

[6] Further, in more than half of the active cases, Plaintiffs have not even met their initial burden under 231 Pa. Code § 1023.1(c) to show that there is a Mead Johnson product at issue, which is a subject of Mead Johnson's pending preliminary objections.

Case ID: 220302606
Control No.: 24046115

Richard D. Walk, III, Esquire

**STEPTOE, LLC**

/s/ Evan Glassman
Evan Glassman, Esquire

**SWANSON, MARTIN & BELL, LLP**

/s/ Timothy Allon Renfro
Timothy Allon Renfro, Esquire

Attorneys for Defendants,
Mead Johnson & Company, LLC and
Mead Johnson Nutrition Company

11

Case ID: 220302606
Control No.: 24046115

## CERTIFICATE OF SERVICE

I, Kenneth A. Murphy, Esquire, do hereby certify that on this day I caused a true and correct copy of the foregoing to be served via electronic filing, on the following counsel of record, addressed as follows:

**Kline & Specter, P.C.**
Thomas R. Kline, Esquire
Tobias Millrood, Esquire
Elizabeth Crawford, Esquire
Melissa Merk, Esquire
Timothy A. Burke, Esquire
Helen Lawless, Esquire
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
tom.kline@klinespecter.com
tobi.millrood@klinespecter.com
melissa.merk@klinespecter.com
elissa.crawford@klinespecter.com
timothy.burke@klinespecter.com
helen.lawless@klinespecter.com
*Attorneys for Plaintiffs*

**Keller Postman**
Ashley C. Keller, Esquire
150 N. Riverside Plaza
Suite 4100
Chicago, IL 60606
ack@kellerpostman.com

**Burns White, LLC**
James Young, Esquire
Richard Margulies, Esquire
Susan R. Engle, Esquire
1880 John F. Kennedy Blvd., 10th Floor
Philadelphia, PA 19103
jayoung@burnswhite.com
rsmargulies@burnswhite.com
sengle@burnswhite.com
*Counsel for Defendants, The Trustees of the University of Pennsylvania d/b/a The Hospital of the University of Pennsylvania and The Trustees of the University of Pennsylvania d/b/a Penn Medicine*

**Campbell Conroy & O'Neil, PC**
Joseph E. O'Neil, Esquire
Meghann C. Porth, Esquire
Ryan J. O'Neil, Esquire
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
joneil@campbelltriallawyers.com
mporth@campbelltriallawyers.com
roneil@campbelltriallawyers.com
*Attorneys for Defendant, Abbott Laboratories*

**Jones Day**
Jennifer B. Flannery, Esquire
Marques Hillman Richeson
1221 Peachtree Street, N.E., Suite 400
Atlanta, GA 30361
jbflannery@jonesday.com
mhricheson@jonesday.com
*Attorneys for Defendant, Abbott Laboratories*

**Troutman Pepper Hamilton Sanders, LLP**
Sean P. Fahey, Esquire
Ronni E. Fuchs, Esquire
3000 Two Logan Square
Philadelphia, PA 19103
sean.fahey@troutman.com
ronni.fuchs@troutman.com
*Attorneys for Defendant, Abbott Laboratories*

**Eckert Seamans Cherin Mellot**
Donald Brooks, Jr., Esquire
Brooke A. Scicchitano, Esquire
50 S. 16th Street, 22nd Floor
Philadelphia, PA 19102
dbrooks@eckertseamans.com
bscicchitano@eckertseamans.com
*Attorneys for Defendant, Thomas Jefferson University Hospitals, Inc d/b/a Thomas Jefferson University Hospital and Thomas Jefferson University d/b/a Jefferson Health System*

By:     /s/ Kenneth A. Murphy
       Kenneth A. Murphy, Esquire

Dated: May 13, 2024

2

# Exhibit A

Case ID: 220302606
Control No.: 24046115

1                    MISSOURI CIRCUIT COURT
              TWENTY-SECOND JUDICIAL CIRCUIT
2                     CITY OF ST. LOUIS

3

4    K.W., a minor, by and through his
     Next Friend, ELIZABETH WHITFIELD,
5
           Plaintiff,
6
     vs.                              Case No.
7                                     2222-CC06214
     ST. LOUIS CHILDREN'S HOSPITAL,
8    et al.,

9          Defendants.

10

11      VIDEO-RECORDED DEPOSITION OF CINDY HASSEBERG
                    APRIL 29, 2024
12
             CONFIDENTIAL - ATTORNEYS' EYES ONLY
13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential - Attorneys' Eyes Only         Cindy Hasseberg                        April 29, 2024

Page 171

1   standardized contract.

2          Q.     And you're trying to win the NICUs

3   and win the hospitals, right?

4          A.     We would like to win the hospital.

5   We'd like moms to be able to try our products.

6                 MR. CRONIN:   Zack, can you drop

7   Exhibit 8 in?

8          Q.     (BY MR. CRONIN)   Ms. Hasseberg, what

9   I'm going to show you is a presentation that was

10  part of your custodial file, the metadata says it

11  was created by Kelli Talley and sent to you.

12                Who's Kelli Talley?

13         A.     At the time, she would have been

14  director of medical marketing.

15         Q.     And you said "at the time," so you've

16  seen this -- every exhibit I'm using was either

17  used with you during your recent February testimony

18  or back in August, by the way.  So are you already

19  anticipating what I'm about to show you?

20         A.     No, and I don't see anything on the

21  screen.  Sorry.

22         Q.     Okay.  I haven't shown it to you.

23         A.     Okay.

24                MR. CRONIN:   All right.  Zack, go

25  ahead and pull that up.

Confidential - Attorneys' Eyes Only          Cindy Hasseberg          April 29, 2024

Page 393

```
 1                MISSOURI CIRCUIT COURT
             TWENTY-SECOND JUDICIAL CIRCUIT
 2                  CITY OF ST. LOUIS


 3


 4    K.W., a minor, by and through his
      Next Friend, ELIZABETH WHITFIELD,
 5
      vs.                      Case No.
 6                             2222-CC06214
      ST. LOUIS CHILDREN'S HOSPITAL,
 7    et al.

 8              CERTIFICATE OF DEPOSITION

 9    Comes now Tammie A. Heet and pursuant to Rule

10    57.03(g)(2)(a) states as follows:

11    The deposition of CINDY HASSEBERG was taken on

12    April 30, 2024.

13    The name and address of the person or firm having

14    custody of the original transcript is:

15         Mr. Timothy M. Cronin, Esq.
           THE SIMON LAW FIRM, PC
16         800 Market Street, Suite 1700
           St. Louis, Missouri 63101
17

18    At the time of delivery of the transcript, the

19    deposition charges had not been paid.  Payment

20    status will be updated at the request of the Court

21    pursuant to Section 492.590(2) RSMo.

22
                              Tammie a Heet
23              By:_____

24    Lexitas Legal
      (800) 280-3376
25
```

# Exhibit B

Case ID: 220302606
Control No.: 24046115



# Report of Proceedings - Jury Trial - AM Session

**Date:** March 6, 2024

**Case:** Jasmine Watson, as mother and next of friend for deceased minor child, Chance Dean v. Mead Johnson & Company, LLC, Mead Johnson Nutrition Company

**No.** 2021-L-1032

**Court Reporter:** Ann Marie Hollo, CSR, RDR, CRR

Paszkiewicz Court Reporting
Phone: 618-307-9320
Toll-Free: 855-595-3577
Fax: 618-855-9513
www.spreporting.com

Case ID: 220302606
Control No.: 24046115

Page 3384

IN THE CIRCUIT COURT
OF THE TWENTIETH JUDICIAL CIRCUIT
ST. CLAIR COUNTY, ILLINOIS


JASMINE WATSON, on her own
behalf and as representative
of the estate of CHANCE DEAN,

                    Plaintiff,
                              Cause No 2021-L-1032

v.

MEAD JOHNSON & COMPANY,
LLC, and MEAD JOHNSON
NUTRITION COMPANY,

                    Defendants.



RECORD OF PROCEEDINGS

JURY TRIAL

BEFORE THE

HONORABLE PATRICK R. FOLEY

MARCH 6, 2024

AM SESSION

(Held in person in Courtroom 404.)

Reported by:

Ann Marie Hollo,

CRR, RDR, CCR, CSR

ILLINOIS CSR NO. 084-003413

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3385

```
1          TRIAL BEFORE THE HONORABLE PATRICK R.
2   FOLEY, on Wednesday, March 6, 2024, between the
3   hours of 8:18 a.m. CT and 12:25 p.m. CT on that day,
4   in person at Courtroom 404, before Ann Marie Hollo,
5   an Illinois Certified Shorthand Reporter.
6
7          A P P E A R A N C E S
8
9   ON BEHALF OF THE PLAINTIFF:
10
11  THE CATES LAW FIRM, LLC
    BY: MR. DAVID CATES
12  216 West Pointe Drive, Suite A
    Swansea, Illinois 62226
13  Tel: (618) 277-3644
    Email: dcates@cateslaw.com
14
15  OLSON GRIMSLEY KAWANABE HINCHCLIFF & MURRAY
    BY: MR. SEAN GRIMSLEY
16  BY: MS. ABIGAIL HINCHCLIFF
    700 17th Street, Suite 1600
17  Denver, Colorado 80202
    Tel: (303) 535-9153
18  Email: sgrimsley@olsongrimsley.com
    Email: ahinchcliff@olsongrimsley.com
19
20  KELLER POSTMAN LLC
    BY: MR. BENJAMIN WHITING
21  1500 North Riverside Plaza, #4100
    Chicago, Illinois 60606
22  Tel: (312) 741-5220
    ben.whiting@kellerpostman.com
23
24
```

Page 3386

```
1          A P P E A R A N C E S (Continuing)
2   KELLER POSTMAN LLC
    BY: MS. AMELIA FRENKEL
3   1101 Connecticut Avenue, N.W.
    Washington, D.C. 20036
4   Tel: (202) 845-7923
    amelia.frenkel@kellerpostman.com
5
6   ON BEHALF OF THE DEFENDANT MEAD JOHNSON & COMPANY,
    LLC   and MEAD JOHNSON NUTRITION COMPANY:
7
    ARMSTRONG TEASDALE
8   BY: MR. DONALD FLACK
    115 N. Second Street
9   Edwardsville, Illinois 62025
    Tel: (618) 800-4141
10  Email: dflack@atllp.com
11
    COVINGTON & BURLING LLP
12  BY: MS. PHYLLIS JONES
    BY: MR. PAUL SCHMIDT
13  BY: MS. AMBER CHARLES
    MS. NICOLE ANTOINE
14  850 10th Street NW
    Washington, DC 20001
15  Tel: (202) 662-6000
    Email: pajones@cov.com
16  Email: pschmidt@cov.com
    Email: acharles@cov.com
17  Email: nantoine@cov.com
18
19
20
21
22
23
24
```

Page 3387

```
1                I N D E X
2          ROBERT CLEVELAND
3   Direct Examination
4      by Mr. Grimsley -- Page 3400, 3493
5   Cross Examination
6      by Ms. Jones -- Page 3456, 3507
7
8   Certificate of Court Reporter -- Page 3560
9
10            E X H I B I T S
11  ADMITTED
12  Plaintiff's Exhibit 536 -- Page 3404
13  Plaintiff's Exhibit 4502 -- Page 3416
14  Plaintiff's Exhibit 539 -- Page 3425
15  Plaintiff's Exhibit 4497 -- Page 3431
16  Plaintiff's Exhibit 2784 -- Page 3438
17  Plaintiff's Exhibit 3892 -- Page 3440
18  Plaintiff's Exhibit 541 -- Page 3443
19  Plaintiff's Exhibit 4496 -- Page 3450
20  Plaintiff's Exhibit 4363 -- Page 3496
21  Plaintiff's Exhibits 101 and 102 -- Page 3500
22  MJ Exhibit 3476 -- Page 3475
23
24
```

Page 3388

```
1          (Motions started 8:18 a.m.)
2              MS. CHARLES: Your Honor, we do have
3   one issue on a deposition.
4              THE COURT: Okay. Come on up.
5              Go ahead, Ms. Charles.
6              MS. CHARLES: Your Honor, Defendants
7   have designated a 27-minute play from Dr. Barbara
8   Warner. She's an employee at St. Louis Children's
9   Hospital. She was cross-noticed by the parties as a
10  206(a) designee.
11             In addition, there's another pending
12  case, Whitfield v. Abbott Laboratories, where the
13  parties had also served 206(a) designations -- or
14  sorry -- deposition notices.
15             For the convenience of hospital
16  counsel, those depositions were combined into one.
17  So we have a deposition play where Plaintiff's
18  counsel for Whitfield questions. Then Mead
19  Johnson's attorney questions. That questioning
20  focused on general hospital issues that were neither
21  case-specific to Whitfield or to Watson.
22             Then Ms. Frenkel questioned on Watson
23  specific case issues, and Mead Johnson's counsel
24  again did some limited follow-up on Watson-specific
```

2  (Pages 3385 to 3388)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3389

1  issues.
2          Consistent with the fact that the
3  general hospital questioning was done by Whitfield's
4  Plaintiff counsel, we have designated some of those
5  questions as well as our own questions by the Mead
6  Johnson attorney and, I believe, a very limited
7  portion of Ms. Frenkel's questioning.
8          I understand that Plaintiffs are
9  objecting to us designate questioning that was done
10 by Whitfield's Plaintiff's counsel.  At least absent
11 a stipulation in front of the jury that we have been
12 sued in another case, which we don't think is
13 appropriate, there are also issues where Plaintiff
14 has raised a scope objection to questioning of the
15 deposition.  So I'll take those issues one and then
16 the other.
17         Whitfield's Plaintiff's counsel
18 questioning, you know, all parties were present.
19 All parties had notice of this deposition.  All
20 parties actively participated in the deposition.  So
21 we really don't think there's any basis to prohibit
22 us from designating Plaintiff's questioning
23 Whitfield.
24         Ms. Frenkel was there.  She had every

Page 3390

1  right to follow up.  She had every right to object.
2  She did not object to that questioning, so this
3  isn't a case where we're trying to run in a
4  deposition from another case where Plaintiffs didn't
5  have notice.
6          We think the rules are quite clear
7  that Illinois Rule 212(a)(5) states that upon
8  reasonable notice to all parties, as evidence at
9  trial or at hearing against a party who appeared at
10 the deposition or was given proper notice thereof,
11 you can introduce a deposition.
12         That specifically references
13 discovery depositions, but Rule 212(b) says for any
14 evidence depositions can be used for any purpose of
15 discovery depositions.
16         So I don't know if you'd like
17 Ms. Frenkel to respond to that, or I can go to
18 another issue.
19         THE COURT:  When is this depo
20 intended to be played?
21         MS. CHARLES:  Probably next week.  We
22 had designated about a week ago now -- I think on
23 Saturday -- with hopes that we could play it as
24 early as tomorrow, but given that we don't have

Page 3391

1  substantive responses yet, we may make a push
2  tonight, but I think reasonably next week.
3          THE COURT:  Okay.
4          MS. FRENKEL:  Your Honor, I think
5  there are substantial portions of what Amber has
6  said that I fully agree with, but we depart on some
7  of the important specifics.
8          So this was a deposition that was
9  cross-noticed between two cases, the Watson case as
10 well as the Whitfield case which is pending in the
11 City of St. Louis.
12         THE COURT:  Okay.
13         MS. FRENKEL:  We did agree for the
14 convenience of the witness, who is a practicing
15 doctor, that parties would not specifically need --
16 would not need to ask questions twice to the extent
17 relevant to both cases.
18         However, that agreement does not
19 waive our rights under Illinois law, and in
20 particular, we are focused on two provisions here.
21         The first is Rule 212(e) which
22 concerns whether depositions are admissible from
23 another jurisdiction.  The second concerns Rule 213,
24 and actually, I think if we focus on Rule 213, that

Page 3392

1  probably resolves it, because Dr. Warner, who was
2  the corporate designee, was not identified by Mead
3  Johnson in her individual capacity as a fact witness
4  or an expert witness.
5          The only 213 notice that we got from
6  Mead was that they would be seeking to introduce
7  corporate designee testimony.  Frankly, all of the
8  testimony that was, I believe, taken by Mr. Cronin
9  and counsel for Mead Johnson in that deposition in
10 the sort of first portion falls outside the notice.
11 I do have both the 213 disclosure and the corporate
12 designee notice if it's helpful.
13         Essentially, our view is -- and I
14 think this would resolve it -- that Mead Johnson
15 should be bound to the scope of their disclosures
16 for purposes of these designations, and attempting
17 to exceed that in designating testimony from
18 Dr. Warner in her individual capacity and as an
19 expert would be in violation of their disclosure
20 requirements.  And I think that resolves the issue.
21         MS. CHARLES:  I'll respond briefly.
22         As to the first issue, we don't have
23 that much dispute.  I mean, this is not -- Whitfield
24 is an Illinois case, but this is a deposition that

3  (Pages 3389 to 3392)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3393

1  was cross-noticed under Watson that everyone was
2  present for.
3           MS. FRENKEL: Whitfield is a
4  St. Louis case.
5           MS. CHARLES: I'm sorry.
6           MS. FRENKEL: Yeah.
7           MS. CHARLES: As you know, I've been
8  crossing state lines all week.
9           As to the scope issue, we disagree.
10  I do have a copy of the plays if you'd like to look
11  at them. The parties here both cross-noticed in --
12  we have -- we have two deposition notices. One from
13  Plaintiffs, one from Mead Johnson.
14           All of the questioning we designated,
15  we believe -- and I do have a table if Your Honor
16  would like to look at it -- falls within the scope
17  of one or the other notices.
18           For example, Ms. Frenkel has objected
19  as outside the scope to questioning about a website
20  that appears on the SLCH website. That is Topic 6
21  of our notice. Actually identifies that website by
22  name.
23           And in addition, our notice itself
24  attaches a copy of the website as Exhibit H, so --

Page 3394

1  I'm sorry. Topic 4.
2           So that is absolutely within the
3  scope specifically called out in our notice and
4  provided in advance to the hospital.
5           By way of another example, there's
6  some questions about the use of Prolacta.
7  Ms. Frenkel's own deposition notice, which she
8  introduced as Exhibit 17, in the questioning, one of
9  the topics is the use of Prolacta and/or donor milk.
10  That's Topic 22.
11           So our designations are clearly
12  within the scope, but I'm not sure that Your Honor
13  needs to spend the time to go line by line through
14  this.
15           First --
16           THE COURT: Real quick. I'm more
17  concerned about -- you said that -- Ms. Frenkel, you
18  said that there was a disclosure under 213?
19           MS. FRENKEL: Only that they're
20  seeking to introduce testimony from the corporate
21  designee. And so to the extent the testimony falls
22  outside of that, that's where we would have a
23  dispute.
24           If they're willing to go line by line

Page 3395

1  with us, we may not need to be in front of Your
2  Honor. I had understood they were taking the
3  position that they could designate any and
4  everything from this deposition without doing so.
5           MS. CHARLES: Again, I do think we
6  are in the scope of our notice, so -- I mean, maybe
7  the dispute is whether we're in scope or out of
8  scope, but I do think everything we've designated is
9  in scope. We're not designating her as an expert.
10           THE COURT: Let's do this. And I
11  don't mean to cut you off. Why don't -- why don't
12  you guys keep working at it, especially if we're not
13  going to get to it today or tomorrow.
14           If you -- if you have an extra
15  copy --
16           MS. CHARLES: Sure.
17           THE COURT: -- I don't mind reading
18  it because I think it will help me to be able to --
19  do you have your disclosure?
20           MS. CHARLES: Yes.
21           THE COURT: Is it as simple as that,
22  as corporate disclosure --
23           MS. FRENKEL: I have a copy of the
24  notice. I have a copy of the 213, so I can provide

Page 3396

1  that to Your Honor. I'll just put sticky notes on
2  the --
3           MS. CHARLES: Sure.
4           THE COURT: Are these extra copies?
5           MS. CHARLES: Yes.
6           THE COURT: Okay. I'll take a look
7  at that. See if you guys can't work out the
8  disagreement. And if you can't, then I'll at least
9  have a little more substance to be able to make the
10  determination as to whether or not I think it does
11  if I'm going to allow it.
12           But I'm curious, how under 213 would
13  it not come in?
14           MS. FRENKEL: So specifically 213(e)
15  is questioning in another case. So my concern was,
16  again, to the extent that they're designating
17  testimony outside of the corporate designee notices.
18  Essentially what they're seeking to do is introduce
19  testimony from the Whitfield case.
20           THE COURT: Okay. So your position
21  is in the event that there's anything outside of
22  their designation, that that's what -- that's where
23  you want them to have to identify the fact that
24  they're being sued in another case; is that correct?

4 (Pages 3393 to 3396)

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3397

1      MS. FRENKEL:  We have a separate
2   concern about introducing testimony from Mr. Cronin
3   who has not been in front of the jury.  They are
4   seeking to introduce questioning from Mr. Cronin,
5   and so we think a brief explanation to the jury is
6   appropriate.
7      But if we can work out these other
8   issues, perhaps that's something that we can work
9   out as well.  It sounds like we may be closer than I
10   thought.
11      THE COURT:  Why don't you guys try to
12   work that out, and if you can't, bring it to me.
13      MS. FRENKEL:  Thank you, Your Honor.
14      THE COURT:  Ms. Jones, were you or
15   Mr. Schmidt paying attention when -- and I think you
16   were part of this conversation yesterday -- when we
17   were talking about who took the envelopes and who
18   didn't take the envelopes and who opened the
19   envelopes --
20      MR. SCHMIDT:  Yes, I was.
21      THE COURT:  So I had Juror 2 and
22   Juror 12 is not even taking the envelope at all.
23      MR. SCHMIDT:  That's my recollection.
24      THE COURT:  I couldn't see Juror 1 as

Page 3398

1   to whether I know she -- at first I didn't think she
2   took it because we're not on the record.
3      Off the record.
4      (Whereupon there was a short discussion
5   off the record.)
6      THE COURT:  Yesterday, on March 5th
7   during the direction examination of the Plaintiff,
8   Jasmine Watson, there were photos of the surgery,
9   specific of the surgery of Chance Dean specifically,
10   not of the actual surgery.  But a photo after the
11   surgery had been taken where the intestines had been
12   siloed.
13      Plaintiffs put the photo in an
14   envelope and handed them out -- handed -- the jurors
15   were given the option as to whether or not they
16   wanted, first, to accept the photos; secondly,
17   whether or not they wanted to look at them.  Each
18   juror accepted the photo in the envelope with the
19   exception of Juror Number 2 and Juror Number 12.
20      Off the record.
21      (Whereupon there was a short discussion
22   off the record.)
23      (The jury entered the courtroom.)
24      THE COURT:  Good morning.

Page 3399

1      For today, the morning may be shorter
2   than days past.  We're going to -- Plaintiffs are
3   going to continue -- continue hearing the testimony
4   of Mr. Cleveland, Mr. Robert Cleveland, and that may
5   be the last witness that Plaintiff presents in their
6   case in chief.  I'm not 100 percent sure of that,
7   but we will know at the conclusion of his testimony.
8      If that is the case, there will be a
9   matter that has to be taken up outside the presence
10   of the jury.  So depending on what time we get done
11   with his testimony, you may have a longer lunch.
12   And then the afternoon, we would start up at --
13   around 1:30 again and just have a regular afternoon,
14   depending on the outcome of this matter that has to
15   take place outside your presence.
16      So we'll continue with
17   Mr. Cleveland's testimony.  And we'll see how far --
18   how long it takes, and that will dictate how much of
19   a break you guys have between the morning and the
20   afternoon.  All right?  Thank you.
21      Mr. Cleveland, please raise your
22   right hand.
23      (The witness was sworn.)
24      THE COURT:  Let the record reflect

Page 3400

1   the witness has been sworn.  Please have a seat.
2      Counsel, you may proceed.
3      *  *  *  *  *
4      ROBERT CLEVELAND,
5   having been duly sworn, testifies as follows:
6      *  *  *  *  *
7      DIRECT EXAMINATION
8   BY MR. GRIMSLEY:
9      Q.  Good morning, Mr. Cleveland.
10      A.  Good morning.
11      MR. GRIMSLEY:  And good morning.
12      JURORS:  Good morning.
13   BY MR. GRIMSLEY:
14      Q.  Just to reorient the jury, it was a long
15   day yesterday.
16      So your name is Robert Cleveland, and
17   you're currently senior vice president for
18   North America Nutrition for Mead Johnson and Reckitt
19   Benckiser, correct?
20      A.  Yes.
21      Q.  You report to Susan Sholtis who reports
22   directly to the CEO, so you're only one layer down
23   from the CEO, right?
24      A.  Yes.

5  (Pages 3397 to 3400)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3401

1    Q.  Now, is it acceptable to Mead Johnson if
2  one of its products, like Enfamil Preterm
3  Formula 24, causes even one death of an infant
4  unnecessarily?
5    A.  No.
6    Q.  Now, you as part of upper level management
7  at Mead Johnson, have participated in decisions to
8  assess products for launch, right?
9    A.  Yes.
10    Q.  And one of the things that Mead Johnson
11  has to do when it's looking at whether to launch a
12  new product is identify what the potential risks of
13  that product might be, right?
14    A.  Yes.
15    Q.  And you must assess whether the benefits
16  of the product to consumers, and in your case, the
17  consumers being infants, outweigh the risks before
18  you launch that product, right?
19    A.  Yes.
20    Q.  So you do a risk benefit analysis before
21  you launch the product, correct?
22    A.  That's not quite how we describe it.
23    Q.  Okay.  But you do look at what the risks
24  are and what the benefits are, and then you made a

Page 3402

1  decision as to whether to launch the product, right?
2    A.  Yes.  I just -- the risk benefit is a very
3  formal process people usually talk about in
4  pharmaceuticals.  We don't really use the same
5  terminology.
6    Q.  Put aside the formality, and I appreciate
7  that clarification, but you do, before you put a
8  product out to the universe, think about what are
9  the risks of this product?  What are the benefits?
10  And do the benefits outweigh those risks before we
11  put it out into the world, right?
12    A.  Yes.
13    Q.  And you not only do that for new products,
14  but you do that for existing products.  I would
15  assume that you every once in a while have to take a
16  look at the current state of the science, see if the
17  science has changed somewhat, and reassess whether
18  the risks continue to -- or the benefits continue to
19  outweigh the risks of a product, right?
20    A.  Yes.
21    Q.  For instance, there are occasionally
22  product recalls in the world, right?
23    A.  Yes.
24    Q.  And so how often do you do a reassessment

Page 3403

1  like that for a product like EPF 24?
2    A.  It's a continuous process.
3    Q.  And one of the things you have to look at
4  is when you're thinking about risks, what the
5  potential costs or safety costs might be associated
6  with the product, right?
7    A.  I don't think I understand what you mean
8  by safety costs.
9    Q.  Well, you have to look at whether there
10  might be injuries that could be caused by a product
11  because any product at the end of the day can cause
12  some problems, right?
13    A.  I guess in a broad scheme, yeah.
14    Q.  And so when you're doing that and you're
15  assessing what harm a product might cause, like an
16  EPF 24, what value does Mead Johnson place on a
17  single infant's life in making that calculation?
18    A.  Infants' lives are incalculably valuable.
19  We don't do that.
20    Q.  It's more than $10 million?
21    A.  We don't use numbers for things like that.
22    Q.  More than $20 million?
23    A.  I don't have a number for things like
24  that.  We don't do it that way.

Page 3404

1        MR. GRIMSLEY:  I'd like to show you
2  and admit Plaintiff's Exhibit 536.
3        MS. JONES:  No objection, Your Honor.
4        THE COURT:  536 is it admitted.
5        (Plaintiff's Exhibit 536 was admitted into
6  evidence.)
7        MR. GRIMSLEY:  Publishing 536.
8  BY MR. GRIMSLEY
9    Q.  Do you see, Mr. Cleveland -- and if you
10  want a paper copy of anything, let me know.  I
11  suspect some of these are short.  You probably
12  recognize them, but if you want one, please let me
13  know.
14    A.  Could you, please?  This screen is blurry.
15  I can't really read everything.
16    Q.  Absolutely.
17        Yeah.  The -- I have to have my glasses.
18        THE COURT:  Thank you.
19  BY MR. GRIMSLEY
20    Q.  And it's a double-sided document, and
21  you'll see that this is your 2022 annual performance
22  plan.
23    A.  Yes.
24    Q.  And you were in your position as SVP,

6  (Pages 3401 to 3404)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3405

1  senior vice president, Nutrition North America and
2  Europe at the time?
3     A.  Yes.
4     Q.  And so this was a plan that's put together
5  at the beginning of the year, in this case 2022,
6  that is looking at what your salary would be, what
7  your potential bonus would be and setting forth
8  certain goals that you have to achieve in order to
9  earn your bonus, right?
10    A.  Yes.
11    Q.  Okay.  I want to go to Page 2, if we
12 could, of the document, and I'll blow it up here.
13 And I just want to walk through this.
14    So for 2022, your APP, what is that?
15    **A.  Annual performance plan.  It's our bonus.**
16    Q.  So APP basically stands for bonus, right?
17    **A.  Yes.**
18    Q.  And this is looking at what your bonus
19 could be if you hit certain metrics?  And the first
20 thing it says is "US dollar 408,000."  That's your
21 yearly salary?
22    A.  Yes.
23    Q.  And that's without the bonus, right?
24    **A.  Correct.**

Page 3406

1     Q.  And then this is, again, for 2022, and if
2  you hit all your metrics, you could have as much as
3  a 50 percent bonus on top of that $408,000 right?
4     **A.  Well, the target is 50 percent.  It could**
5  **be more or less than that, depending.**
6     Q.  Oh, okay.
7        So at the bottom, with that as a target,
8  your target compensation for 2022 would have been
9  $620,000, right?
10    **A.  No.  That's not quite right.**
11    **The front part of this document outlines**
12 **the possible outcomes.  What you're seeing here was**
13 **the actual.  It's not the target.**
14    Q.  Okay.  So let me understand that.
15    So what does "APP amount to be paid" refer
16 to?
17    **A.  So what the second part of this refers to**
18 **is the year has been complete.  They've compared the**
19 **results against what was on the first page, and then**
20 **based on those results and the way the formula works**
21 **on the first page, an actual amount was paid.**
22    Q.  And so you reached your target APP of
23 50 percent?
24    **A.  Yes.**

Page 3407

1     Q.  And so you were paid $620,000 -- $620,160
2  for the year of 2022?
3     **A.  That's correct.**
4     Q.  And the metrics that are set out for you
5  to try and meet in a given year, those are put
6  together by the top executives in the company along
7  with the HR department?
8     **A.  It begins with an external compensation**
9  **board that agrees to the targets for the CEO, and**
10 **the CEO rolls those down by subsequent layers.**
11    Q.  And one of the metrics that you're judged
12 on each year are revenue goals, correct?
13    **A.  Yes.**
14    Q.  And revenue goals are those at the Reckitt
15 Benckiser level?  Mead Johnson level?  Both?
16 North America?  What type of revenue goals?
17    **A.  It's kind of, yes, to all of that.  So as**
18 **it rolls down from the compensation board, the CEO**
19 **is given a revenue target, and then to be able to**
20 **achieve that revenue target, the CEO then assigns**
21 **targets out to each division, and it rolls down**
22 **layer by layer.**
23    Q.  And you're not the only person, obviously,
24 at Mead Johnson who has an opportunity for a bonus?

Page 3408

1  People below you have that opportunity as well?
2     **A.  Absolutely.**
3     Q.  And they have metrics that are set forth
4  for them, and one of their metrics typically
5  includes revenue?
6     **A.  Yes.**
7     Q.  And in addition to the salary plus bonus
8  that you're paid each year, you're also given stock
9  options and shares of stock?
10    **A.  That's highly variable, but if things go**
11 **well, yes.**
12    Q.  And you have a long-term incentive plan at
13 Mead Johnson and Reckitt Benckiser?
14    **A.  Well, the shares of stock are a long-term**
15 **incentive plan.**
16    Q.  Okay.  And how much in stock value wise
17 did you get that year?
18    **A.  I'm sorry.  I don't remember the exact**
19 **number sitting in front of me.**
20    Q.  Ballpark.
21    **A.  Ballpark, I think I received about 700**
22 **shares of stock.**
23    Q.  And how much would that have been worth?
24    **A.  In ballpark, it depends on the stock price**

7  (Pages 3405 to 3408)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3409

1   at the time, and it's in British pounds. So I think
2   the stock was somewhere in the mid 50s at the time.
3       Q.  Now, I want to talk to you about Mead
4   Johnson's business model with regard to selling
5   formula. Okay?
6       Now, substantially, all of Mead Johnson's
7   revenue comes from infant formula products; is that
8   right?
9       A.  Yes.
10      Q.  I understand that there are toddler
11  products, which maybe we wouldn't include with
12  infant products, but that only makes up about 10 to
13  11 percent of Mead Johnson's revenue?
14      A.  You're speaking specifically to United
15  States revenue, because it differs in the rest of
16  the world?
17      Q.  Yeah. And I apologize, and that's a good
18  clarification.
19      When we're talking today, I'm just
20  interested in the United States. If I want
21  something for the rest of the world, I'll hopefully
22  say it, but please correct me anytime it's unclear.
23      But for the United States, almost all of
24  Mead Johnson's revenue is attributable to infant

Page 3411

1   hospital, either from the term or the NICU, go home,
2   they're going to continue buying stuff, they buy
3   that at the store?
4       A.  If they were -- used formula in the
5   hospital, yes.
6       Q.  And un-- so you have prices and people
7   pay for that at the store, right? But for
8   hospitals, Mead Johnson in many cases does not
9   actually charge the hospital for its formula
10  products, right?
11      A.  We do not.
12      Q.  And you don't charge hospitals, in many
13  cases, for any of your infant products that the
14  hospital uses, correct?
15      A.  Generally speaking, yes.
16      Q.  And we'll get into contracts in a minute
17  because I think I can determine when there's a
18  charge versus not.
19      But the basic structure is you don't
20  charge hospitals for infant formula, correct?
21      A.  That's the basic structure, yes.
22      Q.  And so the revenue that Mead Johnson makes
23  off of hospitals is not from the hospitals; it's
24  from the posthospital purchase of Mead Johnson's

Page 3410

1   products?
2       A.  That is correct.
3       Q.  And that is almost all attributable to
4   infant formula products, correct?
5       A.  Correct.
6       Q.  So I want to discuss how Mead Johnson
7   makes that revenue.
8       So Mead Johnson sells formula -- we've
9   been talking about hospitals, but Mead Johnson sells
10  formula at retail, right? You can go to the grocery
11  store, you can go to Amazon.com, you can buy Mead
12  Johnson Enfamil formulas there, correct?
13      A.  The products that are available at any
14  particular retailer are different, but in general,
15  yes.
16      Q.  And the money that Mead Johnson makes,
17  most of the money it makes each year, the revenue is
18  off of those retail sales, right?
19      A.  Yes.
20      Q.  It's not the sales from the hospitals or
21  to the hospitals; it's the retail sales, right?
22      A.  Correct.
23      Q.  And that's parents typically who have
24  been -- or their child has been discharged from the

Page 3412

1   products, right?
2       A.  Yes.
3       Q.  And Mead Johnson gives products to the
4   hospital for free because parents who use them in
5   the hospital are more likely to use Mead Johnson's
6   products when they go home and then buy products at
7   retail?
8       A.  It's -- it's a little more nuanced than
9   that, but, in general, yes, that's -- that's true.
10      Q.  And if Mead Johnson can win a hospital,
11  meaning like a St. Louis Children's Hospital, and
12  that hospital uses Mead Johnson's products, the
13  parents who then use those products in the hospital,
14  when they go home, are more likely to buy Mead
15  Johnson's products at the store?
16      A.  That's true.
17      Q.  And I'm a little hesitant to go to the
18  flip chart, but I'm going to try it.
19      So Mead Johnson over the years has
20  measured -- done an analysis of how likely it is
21  that a parent who is -- whose child is given Mead
22  Johnson's products in the hospital will then
23  purchase those products at retail, right?
24      A.  Yes.

8  (Pages 3409 to 3412)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3413

1    Q.  And the number that Mead Johnson, at least
2    when there was a discussion at your deposition, has
3    calculated, is that it's 70 percent likely that a
4    parent whose child is given Mead Johnson's products
5    in the hospital will purchase those products at
6    retail, correct?
7        **A.  That's a rough number, but, yes.**
8            MS. JONES:  Your Honor, may I just --
9            MR. GRIMSLEY:  Yeah.  It says:
10   "70 percent likely to buy MJ."
11   BY MR. GRIMSLEY
12       Q.  And that's fair?
13       **A.  Yeah.**
14       Q.  And Mead Johnson has also done some
15   calculations regarding what the lifetime value of an
16   infant is to the company who -- whose parents after
17   they get out of the hospital buy Mead Johnson's
18   products at retail, right?
19       **A.  We don't value infants; we value how much
20   formula they would consume.**
21       Q.  Okay.  And the value that you place per
22   infant on a formula they would consume, ones that
23   have come out of the hospital and their parents have
24   decided to buy Mead Johnson products at retail,

Page 3414

1    that's $700 per infant, correct?
2        **A.  It's an average, yes.**
3        Q.  This is 700/infant?
4            MS. JONES:  Just to be clear, I'm not
5    sure that that was his actual testimony.  I think he
6    literally said "we don't value infants."
7    BY MR. GRIMSLEY
8        Q.  But it's $700 per infant in formula sales,
9    right?
10       **A.  Yes.**
11       Q.  So should I just put "in formula sales" to
12   be more accurate?
13       **A.  Please.**
14       Q.  But to be fair, you do look at that on a
15   per infant basis?  You don't look at it -- this is
16   $700 formula sales per infant, right?
17       **A.  Yes.**
18       Q.  So given these numbers, especially this
19   top one, it's really important for Mead Johnson to
20   earn a hospital's business, right?
21       **A.  It is.**
22       Q.  And in this industry where you compete
23   against Abbott, Prolacta, but in this industry,
24   there's really competition, especially between you

Page 3415

1    and Abbott, for hospitals, right?
2        **A.  Yes.**
3        Q.  You are each competing to be the infant
4    product company of choice for a particular hospital,
5    right?
6        **A.  Yes.**
7        Q.  And one of the things that you compete for
8    are contracts that have certain commitments in them
9    from hospitals, right?
10       **A.  Yes.**
11       Q.  And a typical contract -- well, are you
12   familiar with the contracts with Barnes-Jewish
13   network?
14       **A.  Not specifically, no.**
15       Q.  Okay.  And you know that
16   St. Louis Children's and Memorial East Shiloh,
17   Barnes-Jewish, those are all part of the
18   Barnes-Jewish network?
19       **A.  I know because you just told me.**
20       Q.  But you're not familiar with that specific
21   contract?
22       **A.  No.  There are many in the US.**
23       Q.  But a typical contract, in your
24   experience, is one where there's a 90 percent

Page 3416

1    commitment?  The hospital says we will buy
2    90 percent of your products, use 90 percent of your
3    products, and if we do that, we then get everything
4    for free?
5        **A.  They usually are either 80 or 90 percent.**
6        Q.  Okay.  And let's just look at a document.
7            MR. GRIMSLEY:  I'd like to admit
8    Plaintiff's 4502.
9            MS. JONES:  No objection, Your Honor.
10           THE COURT:  4502's admitted.
11           (Plaintiff's Exhibit 4502 was admitted
12   into evidence.)
13   BY MR. GRIMSLEY
14       Q.  And so to be clear, just in terms of the
15   contracts at issue with the hospitals in this case,
16   you don't know what the specific terms are or what
17   the definition of commitment is, do you, in those
18   particular contracts?
19       **A.  I do not.**
20       Q.  So you're not going to testify today about
21   what would or would not satisfy that commitment for
22   those particular hospitals, correct?
23       **A.  No.**
24       Q.  But just in terms of a typical contract on

9  (Pages 3413 to 3416)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3417

1  a -- I'm going to look at -- and this -- 4502 is a
2  presentation by a company, Advancy. They were a
3  firm that you all hire occasionally to do analyses
4  for Mead Johnson and Reckitt Benckiser?
5  **A. Yes.**
6  Q. And this is one that was presented in
7  January of 2018 called "US overdrive plans"?
8  **A. This is before my time in the role, yeah.**
9  Q. Well, let's just look at -- it's really
10  not -- I'm not going to ask you much about this
11  document, but I want to just ask if this slide, or
12  some of the stuff on the slide, at least, are
13  consistent with your understanding of the contract
14  and processes.
15  So this slide says: "If an exclusive
16  contracts" -- and when you say "exclusive," you mean
17  it's either the 80 or 90 percent with the hospital,
18  right?
19  **A. Yes.**
20  Q. And that "exclusive" means exclusively
21  Mead Johnson, not Abbott or Prolacta, correct?
22  **A. It means for that 80 percent is exclusive,**
23  **the 20 percent, the hospital can use whatever they**
24  **deem appropriate.**

Page 3418

1  Q. Or 90 percent, then it's 10 percent the
2  hospital can use, right?
3  **A. Correct.**
4  Q. Okay. So in exclusive contracts, "Infant
5  formula" --
6  That's IF, right?
7  **A. Yes, it is.**
8  Q. -- "manufacturer brings tier pricing on
9  premium items to hospital in exchange for" --
10  What's IH? In hospital?
11  **A. In hospital share.**
12  Q. -- "in-hospital share of starts."
13  "Starts" is something that Mead Johnson
14  uses, that term, to refer to infants in the hospital
15  who start on a Mead Johnson product, correct?
16  **A. Yes.**
17  Q. So "to hospital in exchange for IH share
18  of starts, contracts are fast-growing and expected
19  to reach 80 percent by '18." 2018, right?
20  **A. That's what the slide says, yes.**
21  Q. And so what this slide is saying is that
22  the 80 or 90 percent that you're looking at are --
23  is the share of starts in the hospital, right?
24  **A. I'm sorry. I haven't seen this slide**

Page 3419

1  before. **I'm just trying to...**
2  **I don't know what it means by saying**
3  **"expected to reach 80 percent by 2018."**
4  Q. Yeah. I apologize because I suspect that
5  means just -- I'm not actually sure what that means.
6  Maybe it's 80 percent share of hospitals. That
7  would seem aggressive, but maybe it just means
8  contracts are expected generally to reach 80 percent
9  commitments. I'm not sure.
10  But I don't -- I want to focus on the
11  left-hand side of the slide.
12  **A. Okay.**
13  Q. But just to be clear on my last question:
14  Starts, "share of starts," that's what the
15  80 percent or 90 percent in the contract, at least
16  generically, refers to?
17  **A. No. 80 percent refers to all of their**
18  **possible uses of our products that in any of the**
19  **defined uses in the contract, they'll use our**
20  **products 80 percent of the time.**
21  Q. Got it.
22  **A. That may or may not lead to a start.**
23  Q. Okay. So let me just blow this up, if I
24  can.

Page 3420

1  And is it the case that if a hospital
2  commits to 80 or 90 percent and meets those
3  thresholds, that it gets everything for free? Or
4  there's still things that are charged just at a
5  discount?
6  **A. It would be network by network or hospital**
7  **by hospital how that's negotiated.**
8  Q. But if they -- but to be fair, if they
9  meet the 90 percent or 80 percent threshold
10  commitment level, there is -- they get everything
11  for free or for some of the stuff, at least at a
12  very significant discount?
13  **A. That's correct.**
14  Q. And you understand that hospitals are --
15  well, first of all, these contracts are typically
16  multi-year agreements?
17  **A. Yeah.**
18  Q. And if Mead Johnson is able to win a
19  hospital and enter into an agreement with that
20  hospital, the hospital will offer Mead Johnson's
21  products for however long that contract lasts,
22  right?
23  **A. Yes.**
24  Q. And are these typically three, four years?

10  (Pages 3417 to 3420)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3421

1  What's the typical time period for them?
2      A.  They range between two to five years
3  usually.
4      Q.  And for this reason because they have this
5  multi-year component, I think you've referred to the
6  contract as having a very strong cycle for Mead
7  Johnson, right?
8      A.  I'm sorry.  I don't remember using those
9  exact words.  What do you mean by strong cycle?
10     Q.  Well, it's very good anytime Mead Johnson
11  gets a contract because you lock in a hospital for
12  some period of time, right?
13     A.  Yes.
14     Q.  Now, there are certain hospitals that Mead
15  Johnson does not enter into these types of
16  commitments with, right?  They're called "baby
17  friendly hospitals"?
18     A.  Mm-hmm, that's true.
19     Q.  And what is a baby friendly hospital?
20     A.  A baby friendly hospital just generally
21  doesn't contract for infant formula, and they leave
22  it up to the parents to either bring their own, or
23  of course, if they choose to breastfeed while
24  they're in the hospital, then they breastfeed in the

Page 3422

1  hospital.
2      Q.  Do you give baby friendly hospitals
3  formula for free?
4      A.  No.  Typically, those are charged.
5      Q.  Now, you agree that hospitals are under
6  tremendous financial pressure in this environment we
7  live in these days, right?
8      A.  It's too broad of a question for me to
9  answer specifically.
10     Q.  Well, you do understand that hospitals
11  operate under tremendous cost pressure because
12  oftentimes their revenue is not easy to earn.  And
13  as a result, hospitals have incentive to reduce the
14  cost of treatment so they can treat as many as
15  possible, correct?
16     A.  Yes.
17     Q.  And so getting stuff for free or at a huge
18  discount is a significant thing for a hospital,
19  right?
20     A.  Yes.
21     Q.  So it would be hard for a hospital to say
22  no, to an offer of getting stuff for free or getting
23  it at a significant discount rather than paying list
24  price?

Page 3423

1      A.  Well, they have many options to choose
2  from.  I don't know if it's hard to say, no.
3      Q.  Well, hard to say no to free stuff, right?
4      A.  Yes.  It's hard to say no to free stuff.
5      Q.  And I want to turn to the role the NICU
6  plays in Mead Johnson's efforts to capture
7  hospitals, okay?
8          Now, Mead Johnson competes to be the
9  formula of choice in the NICUs, correct?
10     A.  We do.
11     Q.  And the NICU, you would agree, is a key
12  driver for winning hospital contracts?
13     A.  Yes.
14     Q.  I want to show you what's been admitted
15  Plaintiff's Exhibit 8.
16         MS. JONES:  No objection, Your Honor.
17         THE WITNESS:  Thank you.
18         THE COURT:  Thanks.
19  BY MR. GRIMSLEY
20     Q.  And this is a US hospital business review
21  from November 5, 2018?
22     A.  That's what it says, yes.
23     Q.  And I'd like to go to Page 12.  And there
24  you see there's a slide titled "Hospital is critical

Page 3424

1  for US customer acquisition."
2      A.  Yes.  I see it.
3      Q.  And you agree with that statement, right?
4      A.  I do.
5      Q.  And that's critical for customer
6  acquisition because of this retail phenomenon we
7  talked about earlier?
8      A.  Yes.
9      Q.  And then below that, it says:  "The NICU
10  is key driver for winning hospital contracts."
11         Correct?
12     A.  Yes.
13     Q.  So you would agree with that as well,
14  right?
15     A.  I would.
16     Q.  And it says there in that pink box:
17  "75 percent of contract decisions are influenced by
18  the nutritional offering in the NICU," right?
19     A.  Yes.
20     Q.  Now, I want to look at a -- let's go to
21  the next page real quick.
22         13 says:  "NICU clinicians are highly
23  engaged in nutrition," right?
24     A.  Mm-hmm.

11 (Pages 3421 to 3424)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3425

1    Q. And they are oftentimes the most
2  influential of the doctors in the hospital when it
3  comes to choosing what company's formula or products
4  to use, correct?
5    A. Yes.
6    Q. So let's look at -- and I'd like to admit
7  Plaintiff's 539.
8      MS. JONES: No objection, Your Honor.
9      THE COURT: 539 is admitted.
10     (Plaintiff's Exhibit 539 was admitted into
11  evidence.)
12  BY MR. GRIMSLEY
13    Q. And you see that this is the premature
14  three-year 2020 strat plan?
15    A. I do.
16    Q. This is the document you'd be familiar
17  with?
18    A. This was a while ago, but yes.
19    Q. Okay. You would have been -- you would
20  have looked at it back at the time?
21    A. Yes.
22    Q. And what the premature three-year
23  2020 strat plan is, is you're sitting down sometime
24  in 2020, and you're saying, "What are we going to do

Page 3426

1  for the next three years? Here's our strategic
2  plan," right?
3    A. Yes.
4    Q. Let's go to Slide 2. Just trying to cull
5  this out. I don't think it's going to be helpful.
6  I'll just highlight.
7      It says: "Summary: The premature
8  portfolio is potentially one of the strongest
9  drivers of INR" -- what's INR?
10    A. Incremental net revenue.
11    Q. -- "in the US through its link to rotation
12  and can unlock hospital sales across the DVM."
13      That DVM is developing world, right?
14    A. It is.
15    Q. As we've talked about, this still works in
16  the US, too. You get the NICU. You're more likely
17  to get the hospital. You get the hospital, you're
18  more likely to get moms and dads after the hospital.
19    A. Yes.
20    Q. Incremental net revenue, what is that?
21    A. I think of it as a growth in sales. So
22  it's -- you have a base of sales, and then what's on
23  top of that if you can grow in incremental.
24    Q. The reason you say "incremental" is you

Page 3427

1  have kind of a base of revenue or sales, and
2  incremental is anything you can add to that, right?
3    A. That's fine.
4    Q. And so the premature portfolio is
5  potentially one of the strongest drivers of growing
6  Mead Johnson's revenue in the future.
7    A. Yes.
8    Q. And the reason it says that is because the
9  company -- well, I want to talk about why it's maybe
10  more important in the NICU sometimes for this. Term
11  infants, right, in the term nurseries, they're
12  typically there for only a few days; is that right?
13    A. That's true.
14    Q. And so doctors there may be less concerned
15  about the particular formula that the hospital has?
16    A. That's correct.
17    Q. But in the NICU, babies are there for
18  oftentimes a much longer period of time?
19    A. Yes.
20    Q. And so there, the hospital is more
21  concerned about what the particular options are
22  there?
23    A. Yes.
24    Q. And so if you can convince them, they say

Page 3428

1  even for the term nursery, we'll use Mead Johnson
2  products, right?
3    A. They could be the tie-breaking vote, yes.
4    Q. Yeah. And the term nursery is still the
5  biggest number of babies, right?
6    A. Yes, by far.
7    Q. Okay. So you want to get in the term
8  nursery, but one of the ways to do that is to get in
9  the NICU to get in the term nursery and, again, the
10  retail, right?
11    A. You have to meet the full hospital's
12  needs, yes.
13    Q. I want to go to Page 11, if we could. And
14  this is talking about premature nutrition and
15  revenue goals, right? It's a lot of stuff on the
16  slide.
17      I just want to look down at the bottom
18  left, if we could.
19    A. Yes.
20    Q. And it says here: "Premature acquisition
21  has an indirect impact due to the influence on
22  routine rotation contracts" --
23      Neonatologists, as you said before, are
24  the tie-breakers?

12 (Pages 3425 to 3428)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3429

1    A.  Mm-hmm.
2    Q.  -- "e.g., premature drives one-third of
3  business in the US, 233 million pounds," right?
4    A.  Yes, that's what the slide says.
5    Q.  One-third of the business in 2020 in the
6  US.  So Mead Johnson's revenue was
7  233 million pounds?
8    A.  Approximately, yes.
9    Q.  And so if you triple that for Mead
10 Johnson's revenue in the US, that's about
11 699 million pounds?
12   A.  Yes.
13   Q.  And in 2020, that would have been roughly
14 equivalent to $900 million?
15   A.  I don't remember the exchange rate in
16 2020, but that sounds reasonable.
17   Q.  Directionally right?
18   A.  Yeah.
19   Q.  And so that 900 million in revenue, NICUs
20 important to get the hospital, the hospital is
21 important to get that 900 million in revenue?
22   A.  Yes.
23   Q.  So given that, it would be really bad for
24 Mead Johnson if it didn't have an infant formula

Page 3430

1  product for the NICU?
2    A.  Yes, because we wouldn't be able to
3  provide options for them.
4    Q.  And given that, it would be really bad if
5  there were a warning on a product, Mead Johnson's
6  infant formula product, that discouraged
7  neonatologists from choosing Mead Johnson's products
8  over its competitor, right?
9    A.  Yes.
10   Q.  And we're talking about 2020 here, but you
11 also agree that in the 2016 to 2019 time frame, Mead
12 Johnson did not release any preterm product
13 innovations in the US?
14   A.  I'm sorry.  I was overseas at that time,
15 so I don't have specific recollection of those years
16 for the US.
17   Q.  But even though you were overseas for much
18 of that time, your memory is you don't think so,
19 nothing of significance in the US, right?
20   A.  Yes.  That's what I said in the
21 deposition.
22   Q.  And the market share, Mead Johnson is
23 second to Abbott in market share right now for
24 hospitals?

Page 3431

1    A.  Yes.
2    Q.  And that was true in 2020 as well?
3    A.  Yes.
4    Q.  What was the rough comparison of market
5  share -- of hospital market share for Abbott
6  hospitals versus Mead Johnson hospitals in 2020?
7    A.  Roughly, I think Abbott would have had
8  60-plus percent, and we would have had somewhere in
9  the mid to low 30s.
10   Q.  And one of your goals was to increase
11 market share, right?
12   A.  Yes.
13   Q.  So not having infant formula products for
14 the NICU would not do that, would it?
15   A.  Correct.
16   Q.  It would actually cause it to go in the
17 other direction, right?
18   A.  Yes.
19       MR. GRIMSLEY:  I want to look at --
20 or admit Plaintiff's 4497.
21       MS. JONES:  No objection, Your Honor.
22       THE COURT:  4497 is admitted.
23       (Plaintiff's Exhibit 4497 was admitted
24 into evidence.)

Page 3432

1  BY MR. GRIMSLEY:
2    Q.  And you see that 4497 is an email from you
3  from May of 2010?
4    A.  Yes.
5    Q.  And its subject matter is "Cost of
6  treating NEC in Neolac"?
7    A.  Yes.
8    Q.  Before we get into the document, to
9  orient, Neolac was a company that was making -- or
10 had designs on making a human milk-based formula and
11 fortifier product, right?
12   A.  Yes, they had designs for it.  They didn't
13 have one at the time.
14   Q.  And it was a company that Mead Johnson was
15 actually considering partnering with or even
16 acquiring so that Mead Johnson could have a human
17 milk-based product, right?
18   A.  I don't think we ever considered acquiring
19 them, just working with them.
20   Q.  Partnering with them?
21   A.  Yes.
22   Q.  But I want to look here at the cost of a
23 treating NEC.
24       And if we could, you say -- let me see if

13  (Pages 3429 to 3432)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3433

1  calling out will help here. It's probably not going
2  to.
3        At the top -- "I don't know if everyone
4  has seen a renowned" -- Carol Lynn Berseth is one of
5  the authors. She's a Mead Johnson -- or former Mead
6  Johnson medical director?
7        A. Yes.
8        Q. "But as I was working on the insights and
9  benefits, I thought again about the cost of treating
10  NEC."
11        The cost being the cost to hospitals,
12  parents, insurance companies who were paying for
13  treatment?
14        A. Yes.
15        Q. And you say: "On average" --
16        And this was back in 2010, correct?
17        A. That's the email, yes.
18        Q. Yes. So 14 years ago before, you know,
19  high inflation rates?
20        A. Yeah.
21        Q. So on average, back in 2010, it was
22  $216,000 more to treat a NEC child within the
23  neonatal community and another 208,000 in general
24  hospital charges on top of that, correct?

Page 3434

1        A. Yes.
2        Q. So when you put those together, you're
3  looking at a little over $450,000 per NEC case?
4        A. That would be the math on the slide, yeah.
5        Q. That's a lot more than $700, right?
6        A. Yes.
7        Q. Okay. "Furthermore" -- you go on to
8  say -- "they go on to estimate NEC costs the US
9  $5 billion a year, or 19 percent of the total cost
10  of all newborns in the US annually."
11        Correct?
12        A. That's what it says, yes.
13        Q. That's what you wrote based on your
14  reading of this data?
15        A. Okay.
16        Q. Correct?
17        A. Yes. I'm sorry. It was a long time ago.
18        Q. So I want to -- I don't really want to get
19  too much into Neolac or Medolac, but you are
20  familiar that over the years, Mead Johnson has
21  looked into partnering with other companies to make
22  or distribute a human milk-based preterm formula
23  product, right?
24        A. Yes.

Page 3435

1        Q. And one of those we just saw is Neolac,
2  correct?
3        A. Yes.
4        Q. And you're familiar that -- with the fact
5  that Mead Johnson before that, and before you even
6  arrived, had looked at working with Prolacta, right?
7        A. I don't know the details of what we were
8  considering with Prolacta.
9        Q. Now, when you were considering Neolac, one
10  of the reasons you were considering it in 2010 was
11  that Abbott had actually entered into a partnership
12  with Prolacta, right?
13        A. Yes. They had a joint sales agreement.
14        Q. And one of the things you were really
15  worried about was that Abbott would be going out to
16  the marketplace with Prolacta, they would have a
17  human milk-based product and you wouldn't?
18        A. Yes.
19        Q. So that's why you were looking at Neolac?
20        A. That's one of the reasons, yes.
21        Q. And then that deal didn't work out for
22  various reasons, but you then looked at another
23  company in the roughly 2017 to '20 time period
24  called "Medolac," right?

Page 3436

1        A. I am sorry. I wasn't part of that
2  discussion. I'm generally aware we -- I think it
3  was another Elena Medo company.
4        Q. Well, certainly by the time you got back
5  to the US after Indonesia and Abbott, you at least
6  knew, given your position, that there were
7  discussions with Medolac, right?
8        A. I knew there had been discussions, yes.
9        Q. And Medolac was another company that was
10  at least planning on or trying to make a human
11  milk-based product, right?
12        A. Yes.
13        Q. And that was another company founded by
14  Elena Medo, who had also founded Neolac?
15        A. Yes.
16        Q. But that one didn't work out, right?
17        A. No.
18        Q. And have there been discussions with yet
19  another company called "LactaLogics"?
20        A. I don't -- I don't know that one, no.
21        Q. Okay. Not since then, 2021, 2022 time
22  period?
23        A. No. I wasn't involved -- if there was, I
24  wasn't involved.

14 (Pages 3433 to 3436)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3437

1    Q.  You're not saying there wasn't discussion;
2  you just don't know?
3    A.  Correct.
4    Q.  Now, Mead Johnson could, in theory, rather
5  than working with other companies, try and develop
6  its own human milk-based product, right?
7    A.  Yes.
8    Q.  That would require resources to do, money?
9    A.  Yes.
10   Q.  It would require clinical trials?
11   A.  Yes.
12   Q.  And it would require all sorts of stuff.
13      Do you know how much money it might have
14  cost to develop a human milk-based product?
15   A.  No, not specifically.
16   Q.  Did you -- did you ever pencil that out on
17  the back of an envelope?
18   A.  When we were talking to Neolac, we
19  attempted to understand the cost of doing that, yes.
20   Q.  And ballpark me those costs.
21   A.  I'm sorry.  It was 14 years ago.  I don't
22  remember.
23   Q.  Was it more or less than 100 million?
24   A.  Really, I don't remember.

Page 3438

1    Q.  Do you know what Mead Johnson spent on
2  marketing in 2023 alone?  Meaning marketing of its
3  products, advertisements, give-aways, that type of
4  thing?
5    A.  Roughly speaking, yes.
6    Q.  $340 million?
7    A.  It's in the ballpark, yes.
8    Q.  I want to show you one document from the
9  Neolac process.  It's Plaintiff's 2784.
10       MR. GRIMSLEY:  Move to admit.
11       MS. JONES:  No objection.
12       THE COURT:  2784 is admitted.
13       (Plaintiff's Exhibit 2784 was admitted
14  into evidence.)
15  BY MR. GRIMSLEY
16   Q.  Do you see on Page 2, this is a
17  presentation called "Human Milk Review & Planning,"
18  dated January 13, 2012?
19   A.  I do.
20   Q.  And I just want to look at a couple pages
21  that refer to the Neolac efforts.  Go to page -- I
22  guess it's Slide 7, but it's Page 8 of the document.
23   A.  So --
24   Q.  Are you there?

Page 3439

1    A.  Yeah -- no.  The blue is --
2    Q.  It's really hard to read.
3    A.  Yeah.
4    Q.  Probably not a good PowerPoint
5  decision-making process there.  Black and blue.
6       Why human milk is important?
7    A.  Yes.
8    Q.  And in the blue, it says:  "Human milk,
9  HM, addresses the key risks of tolerance and
10  infection when treating preterms"; is that right?
11   A.  Yes.
12   Q.  And then down below under "Barriers to
13  Growth," barriers to growth there are growth of
14  children, right?
15   A.  Yes.
16   Q.  And two of the barriers are:  "Tolerance,
17  infants this small do not tolerate bovine protein
18  well, making feeding a challenge," right?
19   A.  That's what it says, yes.
20   Q.  "And infection, sick children don't eat,
21  and premature infants are highly susceptible to
22  infection," right?
23   A.  Yeah.
24   Q.  And that was one of the reasons you were

Page 3440

1  looking back at that time at Neolac for a human
2  milk-based product was to address, at least in part,
3  those two bullet points?
4    A.  Yes.
5    Q.  Let's go to Slide 13 by Page 4 of the
6  document, and this is "Neolac Recap," and I don't
7  want to go through the whole thing, other than just
8  to say the deal evaporated due to disagreements over
9  the business model, right?
10   A.  Yes.
11   Q.  And that was correct?
12   A.  Yes, that's correct.
13       MR. GRIMSLEY:  I want to go to
14  Plaintiff's 3892 and move to admit, Your Honor.
15       MS. JONES:  No objection, Your Honor.
16       THE COURT:  3892 is admitted.
17       (Plaintiff's Exhibit 3892 was admitted
18  into evidence.)
19  BY MR. GRIMSLEY
20   Q.  Let's just talk briefly about Medolac.  I
21  don't want to get too much into it.
22       You see here, Plaintiff's 3892 is a
23  presentation, a project, Vera City?
24   A.  No.  I can read it, yes.

15  (Pages 3437 to 3440)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3441

1    Q.  Is that a play on the word "veracity"?
2    **A.  I don't know.**
3    Q.  "Veracity," meaning truth?
4    **A.  You know, I understand what veracity**
5    **means, but I don't know what -- if that's why the**
6    **word was chosen.**
7    Q.  If we could just look at Page 2, this is
8    talking about a potential Medolac deal.
9        And if we go to the background and status
10   update, you'll see the US team -- and this is back
11   in 2019 -- believes the Medolac portfolio will
12   transform our ability to win in hospitals, correct?
13   **A.  Yes.**
14   Q.  And if we go to Page 4 -- let's see here,
15   size of the opportunity, "Human milk is the gold
16   standard for NICU feeding.  Mounting evidence on
17   improved clinical outcomes, fewer complications,
18   including NEC, and reduced mortality rates.
19   Recommended by all KOLs and leading HDOs," correct?
20   **A.  Yes.  That's what it says.**
21   Q.  And that's referring to a human milk-based
22   product.  It's not mother's own milk.  It would be
23   donor milk made into a human milk-based product,
24   correct?

Page 3442

1    **A.  I can't make that determination from here.**
2    **To me, the title says it's talking about human milk.**
3    Q.  Well --
4    **A.  I don't know what they referred to with**
5    **that.**
6    Q.  The thing you were looking at, though, in
7    this presentation is about as a company that was
8    making a human milk-based product?
9    **A.  Yes.**
10   Q.  It would not be directly from the mom?
11   **A.  That's true.  But I don't know whether the**
12   **evidence they're speaking to is what they're -- what**
13   **they mean.**
14       MR. GRIMSLEY:  I want to look quickly
15   at an exhibit that's already been admitted,
16   Plaintiff's Exhibit 541.
17       I may be wrong.
18       MS. JONES:  No objection, Your Honor.
19       MR. GRIMSLEY:  I apologize.  It's
20   wrong.
21       THE COURT:  541 is admitted.
22       MR. GRIMSLEY:  Yeah.  It's -- we can
23   put it in.  That's fine.  It's the Plaintiff's
24   Exhibit 13.  While we're looking at that, I'll put a

Page 3443

1    pin in it because I just wanted to ask you one
2    question about it.  It's a document we've seen
3    before.
4        (Plaintiff's Exhibit 541 was admitted into
5    evidence.)
6    BY MR. GRIMSLEY:
7    Q.  You are aware that anybody in this room
8    could go onto Mead Johnson's website and buy without
9    a prescription EPF 24, right?
10   **A.  Yes.**
11   Q.  I can pull it up right now, and we could
12   purchase it and have it sent here.  Be here next
13   week, right?
14   **A.  Yes.**
15   Q.  That's without a prescription, correct?
16   **A.  Yes.  It's not a drug.**
17   Q.  Now, as an executive in charge of
18   North America and, recently, Europe, it's your
19   responsibility to ensure that Mead Johnson and its
20   employees in the US follow Mead Johnson's policies
21   and procedures, correct?
22   **A.  Yes.**
23   Q.  And one of your jobs is to make sure that
24   people behave ethically?

Page 3444

1    **A.  Yes.**
2    Q.  It's ultimately your job, "The buck stops
3    here," so to speak, to ensure that Mead Johnson
4    employees don't violate policies regarding covertly
5    attempting to influence what should be independent
6    guidelines, right?
7    **A.  Yes.**
8    Q.  So you're familiar with something called
9    the Koletzko Guidelines?
10   **A.  I am.**
11   Q.  And those are, at least in theory, touted
12   as independent guidelines?
13   **A.  Yes.**
14   Q.  And it would be wrong and a violation of
15   Mead Johnson's policies if people within Mead
16   Johnson were attempting covertly to influence the
17   content of those guidelines, right?
18   **A.  Yes.**
19   Q.  It's fine to send some funding to Koletzko
20   as long as that funding doesn't come with strings
21   attached, right?
22   **A.  Correct.**
23   Q.  But that funding should not come with
24   people emailing behind the scenes about what the

16  (Pages 3441 to 3444)

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3445

1  contents of the guidelines should be, right?
2      A.  Correct.
3      Q.  And if you found out about that, something
4  like that happening, that would be a punishable
5  offense, wouldn't it?
6      A.  I think I'd have to understand the
7  context.
8      Q.  It could even be a fireable offense,
9  though, right?
10      A.  I don't know.
11      Q.  And the same is true for studies, I take
12  it, that it would be a violation of Mead Johnson's
13  policies for people within Mead Johnson to attempt
14  to influence what otherwise should be independent
15  studies, right?
16      A.  Yes.
17      Q.  Again, it's okay to fund studies.  That
18  happens all the time.  Research wouldn't go forward
19  without industry funding, right?
20      A.  Correct.
21      Q.  But with that funding should never come
22  strings attached or covert attempts to do things to
23  actually influence the outcome of the studies,
24  right?

Page 3446

1      A.  Correct.
2      Q.  And that, too, depending on the context,
3  would be a punishable and potentially even fireable
4  offense?
5      A.  It -- can't argue that -- answer that in
6  the abstract.  The situation itself would determine
7  what would be done.
8      Q.  Do you also agree that it would not be
9  appropriate for Mead Johnson and its marketing or
10  medical sales folks to go out and try and discredit
11  scientific studies just because those studies happen
12  to call into question some of Mead Johnson's
13  products?
14      A.  I don't know what you mean by discredit.
15      Q.  Well, if it's a legitimate study going out
16  and basically telling doctors that there are
17  problems with the study and doing it only because
18  the study happens to be bad for Mead Johnson's
19  products, that would be wrong?
20      A.  Yes.
21      Q.  I want to show you Plaintiff's Exhibit 8
22  which I think we've seen already today, even.
23          And this is the November 2018 hospital
24  business review, correct?

Page 3447

1      A.  Yes.
2      Q.  I want to go to -- and who would the
3  hospital business review be shared with?
4      A.  And this -- this was created at a time I
5  wasn't in the business, but typically, it would come
6  to somebody like me or the head of our medical sales
7  force.
8      Q.  And this is not unique to 2018?  There are
9  hospital business reviews that were being done
10  before and after?
11      A.  Yes.
12      Q.  Okay.  But you have no reason to believe
13  that the process would have been different in 2018?
14      A.  No.
15      Q.  So I want to go to Page 48.  And you see
16  that there's a slide for discussion, and it's -- the
17  thing that's highlighted there is the Schanler H2H
18  publication?
19      A.  I see that.
20      Q.  And do you recall that the Schanler H2H
21  publication -- you know, I'm not going to ask you
22  anything about the actual study -- but that was a
23  study that came out regarding Mead Johnson's
24  fortifier?

Page 3448

1      A.  I'm not familiar with it specifically.
2      Q.  Okay.  And then the second page, and
3  again, I'm not going to get into the details here,
4  talks about the outcome of the Schanler study,
5  right?
6      A.  I can read the headline.  I'm not familiar
7  with the slide specifically.
8      Q.  And it says:  "Schanler's study does not
9  achieve its growth endpoints but will fuel EHMFAL
10  misinformation if not challenged"?
11      A.  Yes.
12      Q.  And EHMFAL is the acidified liquid
13  fortifier sold by Mead Johnson?
14      A.  Yes.
15      Q.  Then on the next page -- and who is this
16  being told to:  "Challenge the misleading narrative
17  on EMHFAL in Schanler"?
18      A.  That's the headline, yes.
19      Q.  And who's going to be doing the
20  challenging, and who's going to be told the
21  challenge?
22      A.  I'm sorry.  I don't know.
23      Q.  And it says "Critical" on the left side,
24  "Important for HCPs to review."

17 (Pages 3445 to 3448)

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3449

1    HCP, health care providers?
2    A.  Yes.  To review the tables and figures.
3    Q.  Doctors, nurses, right?
4    A.  And dietitians, yes.
5    Q.  And then: "Reminder, how to disrupt
6    Schanler."
7         Do you see that?
8    A.  I do.
9    Q.  Is that a typical practice at Mead
10   Johnson, to be telling people how to disrupt a
11   particular study?
12   A.  It's not a word we use frequently, no.
13   Q.  But you used it on the next slide: "Next
14   steps to disrupting the EHMFAL narrative," right?
15   A.  Yes.
16   Q.  So, again, this is something that Mead
17   Johnson typically discusses in executive meetings,
18   how to disrupt a study?
19   A.  Not typically, no.
20   Q.  I want to now go to Plaintiff's 4496.
21        MR. GRIMSLEY:  Move to admit subject
22   to a limiting instruction.
23        MS. JONES:  He took the words right
24   out of my mouth.  We have an understanding on the

Page 3450

1    instruction on this one.
2         THE COURT:  All right.  Ms. Jones,
3    it's my understanding this limiting instruction is
4    agreed upon?  Assuming it's the same one we --
5         MS. JONES:  Assuming it's the same
6    one we've used in the past, it is, Your Honor.
7         MR. GRIMSLEY:  I'm crossing out the
8    old one because it had different exhibits numbers,
9    so I'm just writing those in.
10        MS. JONES:  Thank you, Your Honor.
11        MR. GRIMSLEY:  Sorry.
12        THE COURT:  That's all right.
13        All right.  Ladies and gentlemen of
14   the jury, the statements within Plaintiff's
15   Exhibit 4496 made by Prolacta are to be considered
16   by you solely as they relate to Mead Johnson's
17   knowledge, state of mind and notice, and should not
18   be considered for any other purpose.
19        Subject to that instruction, 4496 is
20   admitted.
21        (Plaintiff's Exhibit 4496 was admitted
22   into evidence.)
23        MR. GRIMSLEY:  Did I give you a copy?
24   I apologize.

Page 3451

1    THE WITNESS:  No.
2    BY MR. GRIMSLEY
3    Q.  And you see that Plaintiff's 4496 is an
4    email exchange in which you are a participant from
5    May of 2013?
6    A.  I do.
7    Q.  And the subject is:  "Kentucky legislation
8    on human milk diet for premies"?
9    A.  Yes.
10   Q.  And do you remember there was legislation
11   in Kentucky back in the 2013 time period regarding a
12   requirement that health insurance pay for human
13   milk-based products?
14   A.  Yeah, generally, I do.
15   Q.  And the issue there was formula companies
16   like Abbott and Mead Johnson, they're giving away
17   the formula for free, but human milk-based products,
18   hospitals had to pay for those and there was a time,
19   at least, when insurance wasn't covering that,
20   right?
21   A.  Yes.
22   Q.  And so from a hospital's perspective and a
23   patient's perspective, especially one who is of
24   limited means, the choice between whether to have

Page 3452

1    formula or human milk-based product could often be a
2    financial one?
3    A.  I don't think it ever would have been one
4    for a patient.
5    Q.  Okay.  Because the insurance is not
6    covering it so the hospital is not being reimbursed
7    for the human milk-based products, right?
8    A.  No.  But I'm not aware of instances where
9    patients ever had to pay for it.
10   Q.  Okay.  But the hospitals would have to
11   pay, at the very least?
12   A.  Yes.
13   Q.  And so that could affect, in theory, these
14   cash-strapped hospitals' decision-making process,
15   right?
16   A.  Yes.
17   Q.  And I want to look at what -- and if you
18   go to the back of the document, you'll see at the
19   bottom, we've heard a lot about this company, but
20   it's a Prolacta press release:  "Prolacta praises
21   landmark legislation"?
22   A.  Okay.
23   Q.  And then that starts off an email chain,
24   and you are one of the first, I think, to respond;

18  (Pages 3449 to 3452)

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3453

1  is that right?
2  **A. Yes.**
3  Q. And you say: "If I interpret" -- Sari and
4  Susan? Susan Sholtis who you currently report to?
5  **A. Yes.**
6  Q. You say: "If I interpret the below
7  correctly, in commercial terms, we will now be at a
8  substantial disadvantage versus Abbott in Kentucky
9  for the NICU business."
10     And the reason you say you would be at a
11  disadvantage versus Abbott is this is when Abbott
12  was in that partnership with Prolacta, so it had a
13  human milk-based product?
14  **A. Yes, I think that's correct.**
15  Q. Okay. You go on to say: "Infants at risk
16  for intestinal disease" -- because this is the
17  insurance companies that's being opened up now
18  for -- there was a requirement in this legislation
19  that insurance companies pay for human milk-based
20  products for preterm infants who are at risk for
21  intestinal disease. Do you recall that?
22  **A. Generally, yes.**
23  Q. So it says: "Infants at risk for
24  intestinal disease, is another way of saying infants

Page 3454

1  at risk for NEC, and it can probably be argued that
2  all infants less than 1500-gram birthweight are at
3  risk for NEC," correct?
4  **A. Yes, that's what it says.**
5  Q. And then you go on to say: "It's an
6  excellent example of combining pharmacoeconomics,
7  lobbying, and reimbursements to drive trial of a new
8  technology."
9     So you're talking about getting the
10  legislature to require insurance companies to pay
11  for the human milk-based product, right?
12  **A. Yeah. The different types of work that**
13  **would have to be done to do that, yes.**
14  Q. And then you go on to say: "It would" --
15  "it is also a dangerous precedent if other states
16  come on board given we have no human milk-derived
17  products in our pipeline," right?
18  **A. Yes.**
19  Q. It's not dangerous for patients; it's
20  dangerous for Mead Johnson, right?
21  **A. Yes.**
22  Q. In fact, it's good for patients?
23  **A. It could be, yes.**
24  Q. All right. Last topic.

Page 3455

1     Now, in 2020, you believed that Mead
2  Johnson's portfolio was -- for preterm products was
3  inferior to Abbott's, right?
4  **A. In 2020, yes.**
5  Q. And that was in large part because of the
6  fortifier that they had versus yours? Theirs was
7  nonacidified and yours was acidified?
8  **A. That's correct.**
9  Q. And Abbott actually marketed -- we've
10  heard this a little bit, so I'm not going to spend a
11  lot of time on it. But marketed against Mead
12  Johnson, pointing out that there's this word
13  "acidified" on Mead Johnson's product which
14  translates to a greater amount of metabolic acidosis
15  in infants, right?
16  **A. That was Abbott's claim, yes.**
17  Q. And metabolic acidosis is bad, right?
18  **A. Yes.**
19  Q. So that word on that label and Mead
20  Johnson having to respond to it, actually resulted
21  in Mead Johnson losing market share to Abbott,
22  right?
23  **A. Yes.**
24  Q. Now, in your view, was the inferiority

Page 3456

1  that Abbott was pointing out a perception issue or a
2  real issue?
3  **A. Perception.**
4  Q. All right. But regardless of whether it
5  was a perception issue, which you believed to be the
6  case, or a real issue, you agree that preterm
7  infants are really fragile infants, and any
8  language, inappropriately interpreted or not, can
9  really impact product usage, correct?
10  **A. I'm sorry. Could you ask that again,**
11  **please?**
12  Q. You agree that any language on a label
13  like that, inappropriately interpreted or not, can
14  really impact product usage?
15  **A. Yes.**
16  Q. Words on labels matter, correct?
17  **A. Yes.**
18     MR. GRIMSLEY: Pass the witness.
19     THE COURT: Ms. Jones.
20     MS. JONES: Thank you, Your Honor.
21     CROSS-EXAMINATION
22  BY MS. JONES:
23  Q. Good morning, Mr. Cleveland.
24  **A. Good morning.**

19 (Pages 3453 to 3456)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3457

1    MS. JONES:  Good morning, everyone.
2    I'm going to hand these back to you,
3    though.
4        THE COURT:  What about the flip?
5    MS. JONES:  I actually want to ask
6    him a question about this, so if it's okay, I'll
7    just leave it there for the moment.
8  BY MS. JONES
9    Q.  Mr. Cleveland, thank you so much for your
10   time, I guess both yesterday and today.  I'm going
11   to aim to be brief if I can.
12       I actually want to start by giving you a
13   chance to tell the jury a little bit more about
14   yourself.
15       Fair to say you are pretty senior at Mead
16   Johnson and Reckitt at this point; is that right?
17   A.  I am.
18   Q.  Okay.  I think counsel pointed out that
19   you are a couple of steps down from the CEO, right?
20   A.  Correct.
21   Q.  Okay.  You've not always had very, very
22   senior roles in big companies; is that fair?
23   A.  Yeah, that's fair.
24   Q.  Okay.  I want to actually ask you to tell

Page 3458

1    the jury a little bit more about your background.  I
2    think you testified that you graduated from the
3    University of California at Davis; is that right?
4    A.  That's correct, yes.
5    Q.  Okay.  Did you put yourself through
6    college?
7    A.  I did.  I had to work my way through.
8    Q.  Tell the jury how you did that.
9    A.  I had a few jobs.  I was a janitor.  I
10   worked at a tomato processing plant.  In the school
11   library.  But probably the biggest thing that got me
12   through is I was a member of the US Navy Reserve.  I
13   was a mechanic in the Navy.
14   Q.  And how long did you serve as a member of
15   the US Navy Reserve?
16   A.  For eight years.
17       MR. GRIMSLEY:  Could you speak up a
18   little bit, Mr. Cleveland?
19       THE WITNESS:  Sure.  Sorry.
20       MR. GRIMSLEY:  If I'm having trouble
21   hearing, I suspect others are, too.
22       MS. JONES:  Thank you, Counsel.
23   BY MS. JONES
24   Q.  And how did you first come to work in

Page 3459

1    consumer health care?
2    A.  So -- well, I guess the -- if you -- if
3    you determine as whenever I was working on things
4    that were for consumers, I guess you have to
5    understand the background.  I come from a family of
6    a single mother, and she was struggling.  And all
7    she knew is she wanted me to go to college, and she
8    told me there's two things you do when you go to
9    college.  You either become a lawyer or a doctor.
10       So I got the economics and political
11   science degrees because someone told me that's what
12   you do to be a lawyer.  But then as I got to the
13   end, I decided I didn't want to be a lawyer.  I was
14   out of money.  But I found a job as a pharmaceutical
15   salesman.  If you're not a lawyer, you've got to be
16   a doctor.
17       I thought that was a great way to save
18   money for school and then figure out what kind of
19   doctor I wanted to be.  I discovered working with
20   doctors, I didn't want to be a doctor, but I very
21   much liked health care.  And that's been the major
22   focus of my career since.
23   Q.  And how long have you been with Mead
24   Johnson all told?

Page 3460

1    A.  12 years.
2    Q.  And you were asked -- just to kind of get
3    it out on the table, you were asked a lot of
4    questions about your compensation.
5        Do you remember that?
6    A.  I do.
7    Q.  Okay.  Is there -- and again, you've done
8    well.  Is that fair to say?
9    A.  Yes.  That's very fair.
10   Q.  Is there any amount of money that Mead
11   Johnson or Reckitt or any other company could pay
12   you to do something that would hurt a child or an
13   infant?
14   A.  No.
15   Q.  You have children yourself; is that right?
16   A.  I do.
17   Q.  How many?
18   A.  Two.
19   Q.  What was it that made you spend such a
20   significant part of your professional life with Mead
21   Johnson?
22   A.  Part of it was, it was a good match for my
23   career skills.  I'd worked in pharmaceuticals and
24   worked a lot with physicians, and there's a part of

20  (Pages 3457 to 3460)

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3461

1  our business model that means we have to go out and
2  work with physicians either in day-to-day practice
3  or in research, and I'd had that experience.
4        But previous to Mead Johnson, I worked for
5  Procter & Gamble. They made consumer goods, so
6  things you sell at Walmart or Target, and Mead
7  Johnson was both. So it seemed like a good match
8  for the experience that I had gained.
9        But I've stayed because it's the -- it's
10 the mission and purpose. I need to be involved in
11 something I think is -- is good and brings good, and
12 I work with people who believe the same, and that's
13 kept me around.
14       Q. And have your different roles at the
15 company, which I think you went through yesterday,
16 so I won't have you repeat them, but in your
17 different roles at the company, have you been
18 responsible to some extent for preterm infant
19 products like Enfamil 24?
20       A. I've been involved with those products for
21 a long time.
22       Q. Let me actually start by just following up
23 on what counsel was talking to you about in terms of
24 some of these dollars and cents figures.

Page 3462

1        Do you remember that Q and A with him?
2        A. I do.
3        Q. Okay. And particularly, I want to ask you
4  about this -- and I'm not going to write on your
5  flip chart. I hopefully won't knock it over.
6        But this 70 percent figure that you have
7  here at the top of the page, you referred to that as
8  being the likelihood of a parent deciding to
9  continue to use a Mead Johnson product --
10       A. Mm-hmm.
11       Q. -- after leaving the hospital.
12       Do you remember that?
13       A. I do.
14       Q. Does that figure actually apply to the
15 types of preterm products like Enfamil 24 that the
16 jury has now heard about for the last three or so
17 weeks?
18       A. No.
19       Q. Okay. That number would not apply to
20 Enfamil 24?
21       A. No, it wouldn't. The patients in the NICU
22 leave the NICU with very specific discharge
23 instructions from their health care providers,
24 either their neonatologists, dietitians on what

Page 3463

1  specific regimen they need to follow.
2        It's not a matter of exposure. It's a
3  matter of doctor's order. It's a very different
4  thing than a term nursery.
5        Q. Okay. And so -- so all the discussion
6  about, well, if a baby is started on Enfamil in the
7  hospital, then there's a 70 percent likelihood that
8  that baby continues on Enfamil products, does that
9  have anything to do with preterm products like the
10 ones at issue in this case?
11       A. No, it doesn't.
12       Q. You were asked some questions about Mead
13 Johnson giving away preterm infant formulas, part of
14 its hospital contracts. Do you remember that?
15       A. I do.
16       Q. And can you just explain for those of us,
17 including me, kind of why is it that that is
18 something that the company does in terms of its
19 preterm product business?
20       A. Sure. You don't ever want the cost of a
21 product to be a deterrent to a physician being able
22 or a parent being able to feed their infant. NICU
23 infants are fragile. Their parents are going
24 through a lot. And we just -- doctors need lots of

Page 3464

1  and lots of tools to feed these kids; that the
2  biggest challenge for all premature infants is
3  they're small. They have to grow. And they're
4  incredibly hard to feed.
5        So doctors need lots of options, whether
6  it's human milk, or it's donor milk, or it's one of
7  our formulas, they need those options. And we
8  wouldn't ever want cost to be a deterrent to usage.
9        Q. And you were asked about some very large
10 revenue numbers in connection with the company's
11 preterm formula products.
12       Do you remember that?
13       A. I do.
14       Q. What part of those revenues come from
15 preterm infant formula like Enfamil 24?
16       A. The only really measurable sales for
17 preterm products outside the hospital -- because
18 everything in the hospital we wouldn't be charging
19 for -- would be our post-discharge formula called
20 "EnfaCare." And I would say this is probably less
21 than 2 percent of our sales.
22       Q. I think counsel used the phrase, "It's
23 hard to say no to free stuff."
24       Do you remember being asked that question?

21 (Pages 3461 to 3464)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3465

1     A.  I do.
2     Q.  And in all your time at the company,
3  including in very senior business roles, have you
4  ever had the sense that hospitals were entering into
5  contracts with Mead Johnson simply because they were
6  getting preterm infant formula for free?
7          MR. GRIMSLEY:  Objection.
8  Foundation.
9          THE WITNESS:  No.
10         THE COURT:  Hang on.
11         THE WITNESS:  Sorry.
12         THE COURT:  Overruled.
13  Go ahead.
14         THE WITNESS:  I apologize.
15         MS. JONES:  I'm happy --
16         THE COURT:  Answer.
17         MS. JONES:  And I'm happy to lay the
18  foundation if that would be useful, Your Honor.
19  BY MS. JONES
20     Q.  Do you have an understanding,
21  Mr. Cleveland, based on your years at the company,
22  including dealing with preterm products, including
23  dealing with the company's business around formula,
24  do you have an understanding of the extent to which

Page 3466

1  hospitals are making decisions about what contracts
2  to enter into based on whether something might be
3  provided for free or not?
4     A.  I do.
5     Q.  What is that understanding?
6     A.  The price that hospitals pay, and again,
7  the NICU, I don't think we ever charge for products
8  in the NICU, but the price to pay is a matter of
9  market competitiveness.
10         Abbott and us and Nestle over time
11  competed with hospitals and competed to be the
12  breast milk substitute of choice in those hospitals.
13  And that's brought the price down, but that's not
14  why hospitals choose.
15         For a hospital to choose a formula range
16  of products, it has to go through their pharmacy and
17  therapeutics committee, and every hospital does it a
18  little bit differently.
19         But it's a collection of doctors and
20  pharmacists who review those products technically.
21  They talk to the people who practice medicine with
22  those infants every day, and they decide, you know,
23  which one are we going to choose based on those
24  merits.

Page 3467

1          I don't recall ever hearing from any of
2  our folks who have done that work that price was
3  a -- was a factor.
4     Q.  And for example, if a hospital determined
5  based on their internal review process that Mead
6  Johnson products weren't the best products for their
7  patients, are there other options for those
8  hospitals?
9     A.  Absolutely.  I mean, Abbott is a key
10  competitor.  They could get products from them.  And
11  there are many hospitals that use Prolacta.
12         And of course, hospitals are also supplied
13  with and often have arrangements with donor milk
14  banks and have access to those products that they
15  have and need a number of different feeding tools
16  for their NICUs in their term nurseries.
17     Q.  Mr. Cleveland, I actually want to ask you
18  about Plaintiff's Exhibit 4502, which you may have
19  in front of you.  It's the Advancy document?
20         MS. JONES:  Can you also call that up
21  on the screen?
22         THE WITNESS:  The one titled -- I've
23  got it.
24  ///

Page 3468

1  BY MS. JONES
2     Q.  Yeah.  It's called "US Overdrive Plans."
3         Do you remember talking this deck with
4  counsel?
5     A.  I do.
6     Q.  I actually want to ask you a couple of
7  separate questions on this, this deck.
8         First of all, what is Advancy?
9     A.  Advancy is an outside consultancy.  And
10  when we're looking to gather information on a topic,
11  the company might employ them to go do a research
12  project for us and then come back and report it.
13     Q.  And just so it's very clear for the
14  record, the contents of this deck, Plaintiff's 4502,
15  was that created by someone at Mead Johnson?
16     A.  No.  That's coming from the group,
17  Advancy.
18     Q.  Okay.  I want to ask you about a slide
19  that was shown to the jury earlier in the trial.
20  It's actually the third page of the PowerPoint deck.
21     A.  Is this the --
22     Q.  "Hospital is a critical and must-win
23  battle."  And yours might be double-sided, so
24  it's --

22  (Pages 3465 to 3468)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3469

1    A.  I see it now.
2    Q.  -- technically the second piece of paper.
3        Do you see that?
4    A.  I do.
5    Q.  And then up on the left-hand side, there
6    is an executive summary and a heading that says:
7    "Why focus on hospitals?"
8        Do you see that?
9    A.  I do.
10       MS. JONES:  And then I'm going to ask
11   Mr. Reynolds to cull out for us that first blue box
12   and the accompanying text on the side.  That's
13   perfect.
14   BY MS. JONES
15   Q.  Do you see where it says:  "Inflection
16   point for vulnerable moms," Mr. Cleveland?
17   A.  I do.
18   Q.  Okay.  And it specifically says:
19   "Inflection point in hospital for moms who are
20   vulnerable and not prepared."
21       Do you see that?
22   A.  I do.
23   Q.  Are those words that anyone at Mead
24   Johnson wrote in this deck?

Page 3470

1    A.  No one at Mead Johnson would write this.
2    Q.  And why do you say that?
3    A.  It presumes we're preying on mothers
4    somehow because they're vulnerable in the hospitals,
5    and that's not how we think of them at all.
6    Q.  And could you explain for the jury as
7    someone who has been at the company for years --
8        MS. JONES:  And we can take that
9    down, Mr. Reynolds --
10   BY MS. JONES
11   Q.  Who's been at the company for years, what
12   is your personal reaction to seeing language like
13   that in a deck created by an outside consultancy?
14   A.  I would have corrected them immediately
15   and had them change it.
16   Q.  And if someone were to suggest in this
17   courtroom that that was something that Mead Johnson
18   had said or believed about the mothers that it tries
19   to serve, what would your reaction to that be?
20   A.  I'd start with angry, and then it would --
21   I would hope to convince that person that that's the
22   wrong way to think of our company and the people who
23   work there.
24   Q.  You explained for the jury yesterday that

Page 3471

1    you're not a regulatory expert, right?
2    A.  No.
3    Q.  But am I right in thinking that as part of
4    your more senior role, you have some understanding
5    of how the company's products are regulated; is that
6    right?
7    A.  I do.
8    Q.  Okay.  Is Enfamil Premature 24 regulated
9    by the Food and Drug Administration of the United
10   States?
11   A.  It is.
12   Q.  And do you have an understanding based on
13   your time at the company of the extent to which Mead
14   Johnson interacts with the Food and Drug
15   Administration about products like Enfamil 24?
16   A.  Yes.
17   Q.  Can you explain that for the jury?
18       MR. GRIMSLEY:  Objection.
19   Foundation.
20       THE COURT:  I think her question was
21   his knowledge of interaction -- Mead Johnson's
22   interaction with the FDA, wasn't it?
23       MS. JONES:  Yes.
24       MR. GRIMSLEY:  So if it's just his

Page 3472

1    knowledge of that, that's fine; but getting into
2    substance or requirements, then I will have a
3    foundation objection.
4        THE COURT:  Overruled.  This
5    question's fair.
6        THE WITNESS:  So in products like
7    this, which would be called exempt -- and "exempt"
8    means they're a special class of products that are
9    usually used to manage medical conditions.  Before
10   we would ever bring something to market, we have to
11   reach an agreement with the FDA that the product is
12   safe and effective for its use.
13       And the FDA often will --
14       MR. GRIMSLEY:  Objection.
15   Foundation.  This is precisely what I'm talking
16   about, Your Honor.  He's going beyond requirements.
17       THE COURT:  Do you want to respond to
18   that?
19       MS. JONES:  Well, I asked him if he
20   had an understanding of --
21       THE COURT:  Of his interactions with
22   the FDA?
23       MS. JONES:  -- of the interactions
24   with the FDA.  I think he's testifying to his

23 (Pages 3469 to 3472)

Case ID: 220302606
Control No.: 24046115

```
        Report of Proceedings - Jury Trial - AM Session
                           March 6, 2024
```

Page 3473

1  understanding.
2         THE COURT: I think he's going
3  more -- I think he's going beyond what -- his
4  understanding of the interactions with the FDA. I
5  think he's going into the process behind everything.
6  So objection sustained.
7         The last -- the jury will
8  disregard -- the jury will disregard the statement
9  made by Mr. Cleveland.
10        Ms. Jones, if you want to ask your
11 question again, we'll start again.
12        MS. JONES: Sure. Sure.
13 BY MS. JONES
14    Q. Let me ask you to take it up to a slightly
15 higher level, if that's okay, Mr. Cleveland.
16       Can you give the jury a sense, without
17 going into all the details of the back and forth,
18 but of the extent to which there is back and forth
19 with the FDA around products like Enfamil Premature
20 24.
21    **A. Yes. The -- before we bring anything to**
22 **market, we have to have their approval. And --**
23       MR. GRIMSLEY: Objection, Your Honor,
24 foundation. This is exactly it. The FDA does not

Page 3474

1  have to approve.
2         MS. JONES: Let me actually ask -- I
3  can ask another question.
4         THE COURT: Sustained.
5         Yeah, if you would --
6         MS. JONES: Let me ask another
7  question.
8  BY MS. JONES
9     Q. Is it important to you as someone who's
10 been at the company for some time and has had
11 preterm products under your umbrella of
12 responsibility that there is an exchange of
13 information with the FDA?
14    **A. Yes.**
15    Q. You were asked some questions by counsel
16 about the extent to which someone could walk into a
17 store or get on Amazon or the internet and order
18 Enfamil Premature 24.
19       Do you remember that?
20    **A. I do.**
21    Q. Okay. Just so the jury is clear, is
22 Enfamil Premature 24 generally available at the
23 retail level?
24    **A. No, it's not.**

Page 3475

1     Q. Mr. Cleveland, I'm handing you what we
2  have marked as MJ 3476.
3         MS. JONES: And we would move to
4  admit that, Your Honor, although we might need to
5  have a conversation at sidebar would be my guess.
6         MR. GRIMSLEY: We probably will.
7         THE COURT: Come on up.
8         (There was a bench conference out of
9  hearing of the jury and realtime reporter.)
10        THE COURT: Thank you.
11        MS. JONES: Your Honor, we'd move for
12 admission of MJ 3476.
13        MR. GRIMSLEY: Subject to our
14 objection.
15        THE COURT: Subject to the objection
16 at sidebar, it's admitted.
17        (Exhibit MJ 3476 was admitted into
18 evidence.)
19        MS. JONES: Can we put that up on the
20 screen, Mr. Reynolds? And we're actually going to
21 go just directly to the second page of MJ 3476.
22 BY MS. JONES
23    Q. And I want to just ask you one very quick
24 question about this document, Mr. Cleveland.

Page 3476

1         Do you, having had a chance to look at it,
2  recognize this as a submission by the company to the
3  FDA in 1986?
4     **A. I do.**
5     Q. Okay.
6         MS. JONES: And if we could just cull
7  out that at the top, Mr. Reynolds, so folks can see
8  that, the date.
9         Can you grab the date as well,
10 please? Thank you.
11 BY MS. JONES
12    Q. And then, Mr. Cleveland, I just want to
13 ask you about one sentence in this document on
14 Page 2.
15        MS. JONES: It's going to be the
16 second paragraph that begins with "Enfamil premature
17 formula is not," please, Mr. Reynolds.
18        That's it.
19 BY MS. JONES
20    Q. Do you see that language, Mr. Cleveland:
21 "Enfamil premature formula is not generally
22 available at the retail level, thus is covered by
23 regulations under 107.50C"? Do you see that?
24    **A. I do.**

24  (Pages 3473 to 3476)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3477

1    Q. And is that consistent with what you
2    testified to earlier in terms of how the product is
3    available?
4        A. That's -- it is.
5        Q. Do you have an understanding,
6    Mr. Cleveland, of why it's the case that Enfamil
7    Premature Formula 24 is available online?
8        A. Occasionally physicians will require -- or
9    ask a patient to feed their infant something from
10   the hospital after discharge, and then we have to
11   make sure that that product's available to them.
12       Historically we found that many times
13   they -- they'll have trouble getting it at a retail
14   level depending on where they live, and especially
15   in rural areas. So we've always maintained a
16   direct-consumer way that they can buy it online and
17   get it shipped to their home because they just might
18   have trouble finding it at home, and the hospital's
19   not going to give them everything they need when
20   they leave, so we just want to make sure they have a
21   way to get the product.
22       Q. And in that scenario, is the purchase
23   being made at the direction of a health care
24   professional?

Page 3478

1        MR. GRIMSLEY: Objection.
2    Foundation.
3    BY MS. JONES
4        Q. If you know.
5        THE COURT: Sustained. But --
6        MS. JONES: I'll ask him about
7    whether he knows.
8    BY MS. JONES
9        Q. Do you have an understanding,
10   Mr. Cleveland, of the circumstances under which a
11   parent might be doing what you just described, which
12   is going on the Internet and ordering the product?
13       MR. GRIMSLEY: Objection. Foundation
14   as to what every parent might be doing in that
15   circumstance.
16       MS. JONES: I don't have a problem
17   with him answering in general terms. I don't think
18   we're purporting to have him answer as to every
19   parent.
20       MR. GRIMSLEY: With that caveat,
21   objection withdrawn.
22       THE COURT: All right. Go ahead.
23   BY MS. JONES
24       Q. Do you have an understanding,

Page 3479

1    Mr. Cleveland, in the circumstances that you just
2    described when a parent might be going online and
3    buying Enfamil Premature 24, why that might happen,
4    recognizing you don't know about every parent who
5    might do it?
6        A. In general, they'd be doing it at the
7    direction of a health care professional.
8        Q. As far as you know, are Enfamil Premature
9    products such as Enfamil Premature 4 -- excuse me --
10   Enfamil Premature 24 available at retail stores,
11   like -- I love Target, so I'm going to say Target --
12   Target or Walmart or Walgreens?
13       A. You will not find that specific product on
14   the shelf at a Target or a Walgreens or any other
15   retailer. A pharmacist might be able to special
16   order it, but it wouldn't generally be available,
17   no.
18       Q. Let me just ask a clarifying question.
19       You were asked a lot of questions by
20   counsel about Mead Johnson competing for market
21   share in the NICU.
22       Do you recall that?
23       A. I do.
24       Q. And just based on your -- again, just

Page 3480

1    based on your experience as someone who's been in
2    this area for a while, do you have the sense that
3    other companies like Abbott or Prolacta similarly
4    compete for market share in the NICU?
5        A. I do. They're our competitors.
6        Q. Is it ever the case that Mead Johnson is
7    seeking to replace mom's own milk or donor milk in
8    the NICU, as far as you know?
9        A. Never. We're a breast milk substitute.
10   That's our class of products. So we're there. If
11   breast milk and donor milk cannot be used for
12   whatever reason, we're another option. We compete
13   to be that option with other similarly classified
14   products.
15       Q. And that would include things like
16   Similac?
17       A. Yeah. Similac or any other product -- but
18   yes.
19       Q. Just to go back to the flip chart for a
20   quick moment, I'm going to handle it very
21   delicately.
22       You were asked about this figure, $700 per
23   infant in formula sales.
24       Do you remember that discussion?

25 (Pages 3477 to 3480)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3481

1     A.  I do.
2     Q.  And I think you said this, but I want to
3  be sure that the jury understands.
4         When you talk about formula sales by
5  infant, are you trying to assign some kind of dollar
6  value to a baby?
7     A.  No, not ever.
8     Q.  What exactly are you actually talking
9  about when you describe things in these terms?
10    A.  Really, it's not a number we use that
11 often.  And where it comes from is every year we
12 have to do a forecast to know how much formula to
13 make.
14        So we start with the birth rate.  We make
15 assumptions about what share will have of the
16 formula-feeding infants in the United States.  That
17 gives us the forecast.
18        We usually talk about it in our supply
19 function who runs the factories.  We talk about it
20 in terms of amounts of formula they need to make,
21 metric tons, or kilograms.  And we talk about it in
22 different ways.
23        Then you have to do a business forecast.
24 So you need to dollarize that and say, "Okay, if we

Page 3482

1  make that much formula, then that's how much we
2  think we're going to sell."
3         You know, every once in a while someone
4  will say, "Okay.  If there were that many babies and
5  you were selling this much, then that's how much per
6  baby."
7         Okay.  Sure.  But there's not much you can
8  do with that number.  What we need are the --
9  mostly, we need the -- the metric tonnage or the
10 kilograms, however we're talking about production,
11 and then we need to make a financial forecast.
12        Sometimes this number comes up, which
13 there's nothing you can do with it.
14    Q.  And just to be clear, this is not the
15 company assigning a money value to a baby, correct?
16    A.  We have never assigned money value to an
17 infant.  This is just the amount of formula a baby
18 might consume in a year, and it's an average.
19 Children have a wide range of the amounts of formula
20 that they consume.
21    Q.  Counsel asked you some questions about
22 efforts by the company around the development of a
23 human milk-based product.
24        Do you remember those questions?

Page 3483

1     A.  I do.
2     Q.  And why is it, just generally speaking,
3  that Mead Johnson has made efforts to identify
4  opportunities to add a human milk-based product to
5  its overall portfolio?
6     A.  Human milk is for the -- for preterm
7  infants it's absolutely the best form of feeding.  It
8  has immunoprotective properties that our cow's milk
9  formulas do not.  And those immunoprotective
10 properties help the baby protect against infection.
11        So if we could have found a way to make a
12 product derived from human milk, then we might be
13 able to leverage those properties, and at the same
14 time, the challenge with human milk is it varies
15 greatly in the amount of nutrients that are in it.
16        Plus, premature babies, mother's milk
17 isn't designed for premature babies nutritionally.
18 They need to grow a lot faster than what's in
19 mother's milk.
20        So the dream here was we could -- we could
21 start with mother's milk, and then we could
22 consistently fortify it to the nutritional needs of
23 a preterm infant, and we'd have a better feeding
24 option than doctors have available today.  That's

Page 3484

1  why we wanted to do it.
2     Q.  Was the reason that Mead Johnson was
3  looking into human milk-based options for its
4  preterm grouping of products because it somehow
5  thought that its cow's milk-based products were
6  somehow unsafe or not working the way they should?
7     A.  Not at all.
8         Mother's milk is best because it has
9  immunoprotective properties in it.  Our fortifiers
10 are and our formulas are high-quality products.
11 They're safe.  They're effective.  But they're not
12 mother's milk.  They don't have those same
13 properties.  It doesn't mean they cause problems.
14 It just means they don't have those protective
15 properties.
16    Q.  And you were asked specifically about
17 two separate companies.  You were asked about a
18 company called "Neolac."
19        Do you remember that?
20    A.  I do.
21    Q.  And then you were asked about a company
22 called "Medolac."
23        Do you remember that?
24    A.  I do.

26 (Pages 3481 to 3484)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3485

1    Q.  Do you have an understanding of whether
2    those two companies were actually created by a
3    single person?
4        A.  Yes.  The person behind both is a woman
5    named Elena Medo.
6        Q.  And just very briefly for the jury, were
7    you focused on efforts by the company to reach some
8    kind of agreement or partnership with Ms. Medo in
9    the 2010 time period?
10       A.  I was.
11       Q.  And can you -- and that did not work out;
12   is that right?
13       A.  It did not.
14       Q.  Can you explain, again, just briefly for
15   the jury, what were the obstacles to that deal
16   getting done?
17       A.  You know, there are -- the really, really
18   hard part about doing this is you have to get a
19   consistent supply of human milk.  So I traveled all
20   over the country trying to find would mothers --
21   would they be willing to provide it?
22          And the good news is they were but in very
23   limited amounts.  And also, you had to do things in
24   a way where you're not providing them an incentive

Page 3486

1    not to provide their own child human -- their milk
2    before they move on to donating it to us so that we
3    could take and make a product out of it.
4          So Challenge Number 1, fundamentally, was
5    getting enough human milk consistently.  What moms
6    were telling us was, on average, "Well, we might
7    donate for three months."  And then some moms wanted
8    to be paid, and that's fine.  It's absolutely
9    appropriate.  But on average, still three months.
10         So how do you get a large supply of human
11   milk when everybody is only willing to donate for
12   three months among those who are willing to donate.
13   So the number one challenge was, how do we set up an
14   infant -- or a human milk infrastructure that got a
15   consistent and safe supply of human milk?  Because
16   it had to be handled safely.
17       Q.  Got it.
18       A.  So that was Challenge Number 1.
19          Challenge Number 2 is then when you
20   process it, how do you process it and retain the
21   great properties of human milk?
22          So those are all the technical challenges.
23          And then there were the challenges of
24   working with Elena.  She -- she was very difficult

Page 3487

1    to come to business terms with.  So really, the deal
2    fell apart because two reasons:  What she had
3    proposed on paper, we saw no evidence that she could
4    build.  We set milestones, talked about ways we'd
5    work through all the things we just talked about,
6    and none of those -- none of those objectives were
7    ever achieved.
8          And then while that lack of progress was
9    happening, we were just unable to reach an agreement
10   on the terms of our relationship.  Who would pay for
11   what?  Who would work in the startup?  Who would be
12   responsible for what -- and ultimately, if the
13   product came to market, and if we sold it and if
14   doctors adopted it, where would the revenue flow to?
15         And we just couldn't either make progress
16   on the technical milestones, and we couldn't reach
17   terms, and we tried many, many times, but we just
18   weren't able to bring it to fruition.
19       Q.  Let me ask you one just quick follow-up
20   question on what you just said.
21         Were there specific concerns about who on
22   Ms. Medo's side would actually be playing a role in
23   the leadership of whatever this partnership would
24   be?

Page 3488

1        A.  And there was.  Elena was proposing
2    several of her family members in key positions in
3    the company that would be set up, and it was unclear
4    what capabilities they brought, if any.
5          And then we aren't able to make any of the
6    technical milestones happen.  That brought into
7    question, did those family members really have what
8    it takes to make a company happen?
9        Q.  Let me ask you this question.
10         Is the reason that the Neolac partnership
11   didn't work because Mead Johnson just didn't care
12   enough to spend the money on it?
13       A.  No.  We would have spent enormous sums of
14   money to do this.
15         In fact, at some point in the process, we
16   gave Elena Medo money to help her just progress this
17   without a real deal present.  I don't think we ever
18   asked for that money back.  We tried everything we
19   could to get this to market.
20       Q.  Are you aware of any other preterm formula
21   manufacturer that was able to successfully partner
22   with Neolac?
23       A.  I am not.
24       Q.  Are you aware if Neolac ever successfully

27 (Pages 3485 to 3488)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3489

1 got a product onto the market?
2 A. I am not.
3 Q. Okay. What about Medolac, same questions.
4 Was there any maker of preterm infant formula that
5 was able, as far as you know, based on your
6 experience in the area, able to successfully partner
7 with Medolac?
8 A. No, I'm not aware of anybody able to do
9 that.
10 Q. And as you sit here today with whatever
11 awareness you have of the competitive landscape for
12 preterm infant formula, does Medolac have a product
13 available in NICUs in the United States, as far as
14 you know?
15 A. I don't believe so, no.
16 MS. JONES: I just have a couple more
17 things, Your Honor. Then I suspect people are
18 probably aching for a break --
19 THE COURT: I think so.
20 MS. JONES: -- so let me power
21 through. I'll be very quick.
22 THE COURT: Okay.
23 BY MS. JONES
24 Q. Mr. Cleveland, you were asked about a

Page 3490

1 PowerPoint slide that was the hospital business
2 review slide where there was a discussion of
3 something called the Schanler study.
4 Do you remember that?
5 A. I do.
6 Q. And when -- and, again, just based on what
7 understanding you have in your role, are there times
8 that the company receives new literature on topics
9 and has to determine how best to engage with health
10 care professionals around that literature?
11 A. Yes, that happens.
12 Q. Okay. Is -- and have you ever in your
13 time at the company seen anything that you viewed as
14 being inappropriate in that regard?
15 A. No.
16 Q. And what about the reference to the term
17 "disrupt"?
18 A. It's not a word we use very often, but
19 just going off the context in the slides, I suspect
20 we perceived a study was being discussed by our
21 competitors in ways that did not present the full
22 story of it, that was showing a certain angle to
23 look advantageous to them, and we wanted to disrupt
24 that effort, disrupt that stream of communications,

Page 3491

1 by showing more of the data of the study. Or I
2 think in one slide, it said "make sure they see the
3 charts and graphs," which would mean make sure
4 physicians are actually looking at the data and not
5 just accepting what a competitive sales rep is
6 saying. We want to disrupt that process to bring a
7 more complete understanding of the data in the
8 study.
9 Q. Last question on the topic of labeling,
10 Mr. Cleveland.
11 Are you aware of any maker of preterm
12 infant formula that includes on the labeling for its
13 products a warning about necrotizing enterocolitis?
14 A. I am not.
15 Q. Is that the case as to Abbott for Similac?
16 A. No.
17 Q. Is that the case for -- and this is not a
18 formula. But is that the case for a company like
19 Prolacta?
20 A. No.
21 MS. JONES: Nothing further, Your
22 Honor.
23 THE COURT: Okay.
24 MR. GRIMSLEY: I have a bit, but we

Page 3492

1 can take a break and then we'll finish up.
2 THE COURT: This is a good time to
3 take a morning break.
4 Ladies and gentlemen of the jury,
5 until this case is submitted to you for your
6 deliberations, you must not discuss this case with
7 anyone or remain within hearing of anyone discussing
8 it.
9 Please do not read any newspapers, do
10 not listen to any radio broadcasts, do not view any
11 television, internet, websites, social media, or
12 other electronic formats which discuss this case.
13 Please do not email, text, or engage
14 in any social media or any form of communication,
15 electronic, digital, or otherwise, with your fellow
16 jurors or anyone else.
17 I've got 10:34 -- 10:33. The Court's
18 in recess. Why don't you come back at 11:00 a.m. --
19 I'm sorry. 10:50. My apologies.
20 All rise.
21 (A brief recess was taken.)
22 THE COURT: Mr. Cleveland, I'll
23 remind you you remain under oath.
24 Counsel, you may proceed.

28 (Pages 3489 to 3492)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3493

1    REDIRECT EXAMINATION
2  BY MR. GRIMSLEY
3      Q.  Mr. Cleveland, I want to pull up a
4  document you talked about with your counsel.  That's
5  the Advancy document, Page 3.  I think it's
6  Plaintiff's Exhibit 4502.  And this is the one that
7  had the phrase "vulnerable moms" on it.
8      A.  Yes.
9      Q.  And you said, "Boy, that's a third party.
10  That's Advancy.  We don't use language like that at
11  Mead Johnson," right?
12      A.  Correct.
13      Q.  And you said "Somebody should have edited
14  that document to take it out," right?
15      A.  That's -- that's what I would have asked
16  for, yes.
17      Q.  Okay.  Do you know if anybody ever asked
18  to have this one edited?
19      A.  This was before my time in the US
20  business, so I don't know.
21      Q.  Do you know who was in charge at that
22  point?  Was that Susan Sholtis?
23      A.  No.  The head of the US at the time -- and
24  I don't know if he saw this study or not -- would

Page 3494

1  have been Pat Sly.
2      Q.  Pat Sly?
3      A.  I believe so.  Let me look at the date on
4  it again.
5      Q.  I'm going to hand you what's been marked
6  as Plaintiff's Exhibit 4363.
7          MR. GRIMSLEY:  And move to admit,
8  Your Honor.
9          MS. JONES:  Mr. Grimsley, was this on
10  the original list, or do I need to look at it?
11          MR. GRIMSLEY:  You need to look at
12  it.
13          MS. JONES:  Okay.
14          MR. GRIMSLEY:  And specifically I'm
15  going to be going to Page 4, Slide 4, once I -- and
16  5.  We had to print quick.  I'm sorry.
17          THE COURT:  That's all right.
18          MS. JONES:  We might have an
19  objection on foundation, Your Honor, as to this
20  witness, but I don't have a problem if he wants to
21  try to lay the foundation.
22          MR. GRIMSLEY:  He may not have seen
23  this, but he claimed that Mead Johnson doesn't use
24  certain language, Your Honor, and I'm going to show

Page 3495

1  him that they do.
2          THE COURT:  Are you just using
3  Slide 4 and 5, or are you using the entire document?
4          MR. GRIMSLEY:  I'm using just
5  Slide 4, which is 5 of the media.
6          THE COURT:  Do you have an objection
7  to that slide?  And if it's the same objection,
8  that's fine.
9          MS. JONES:  I have the same
10  objection.  I'd like to see if he can lay a
11  foundation first, but I don't have a problem with
12  him trying to do that.
13          MR. GRIMSLEY:  Your Honor, I don't
14  think I need to lay a foundation to show what Mead
15  Johnson says when he says they don't say it.
16          THE COURT:  I don't have the
17  document.  If I can take a look at it real quick.
18          MS. JONES:  Can we approach, Your
19  Honor?
20          THE COURT:  Absolutely.
21          (There was a bench conference out of
22  hearing of the jury and realtime reporter.)
23          THE COURT:  Same objection,
24  Ms. Jones?

Page 3496

1          MS. JONES:  It would be the same
2  objection, Your Honor.
3          THE COURT:  Over objection, it will
4  be admitted.
5          (Plaintiff's Exhibit 4363 was admitted
6  into evidence.)
7          MR. GRIMSLEY:  And I just want to --
8  I do want to show the front page just to orient the
9  jury.
10          THE COURT:  Understood.
11  BY MR. GRIMSLEY
12      Q.  Do you have Exhibit 4363, sir?
13      A.  I do.
14      Q.  That's a 2018 US business plan, right?
15      A.  That's what it says, yes.
16      Q.  And that's not made by a company called
17  "Advancy"?  It's got Reckitt Benckiser and Mead
18  Johnson's logos in the right-hand corner?
19      A.  That's correct.
20      Q.  And who would a US business plan go to?
21      A.  US business plan -- the US business plan
22  could go to many different audiences, and I don't
23  know where this was in terms of its development
24  cycle.

29 (Pages 3493 to 3496)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3497

1  Q. It's an important document, though, right?
2  A. By the title, it sounds like it, yes.
3  Q. All right. I want to go to Page 5 of the
4  document, 4 of the presentation, and look up here.
5  Do you see there's a learning/key
6  confirmations? Do you see that?
7  A. I do.
8  Q. It says: "Similac Pro is winning with
9  core premium consumers"?
10 A. Yes.
11 Q. And then on the next line it says: "Value
12 tier: Losing ground to Similac with vulnerable
13 consumers," right?
14 A. I see that.
15 Q. That's Mead Johnson's words, right?
16 A. I don't know who authored the document.
17 Q. Do you know if Pat Sly may have offered
18 it?
19 A. I don't.
20 Q. Now, down in the right-hand corner, I'm
21 going to be fair on this, it says: "Add premium
22 transition learning. Pat to edit," right?
23 A. It does.
24 Q. You think that's Pat Sly?

Page 3498

1  A. Probably, yes.
2  Q. And do you know if Pat edited that at all?
3  A. I have no idea.
4  Q. But certainly you wouldn't want, at least
5  you, presentations going to the very top management
6  that talk about vulnerable moms or vulnerable
7  customers, would you?
8  A. No. It's not good language.
9  Q. Okay. I'm going to show you what's being
10 marked as Plaintiff's Exhibits 101 and 102. These
11 are new exhibits.
12 Before we publish, I want to just ask you
13 if that first email is one to Rakesh Kapoor from
14 2018?
15 A. That's what it seems to say, yes.
16 Q. And does it appear to be attaching
17 presentations?
18 A. It does appear, yes.
19 Q. And Rakesh Kapoor at the time was the CEO
20 of Reckitt Benckiser?
21 A. Yes.
22 Q. These appear to be presentations that are
23 being sent to the CEO?
24 A. Yes.

Page 3499

1  MR. GRIMSLEY: Your Honor, we'd like
2  to move to admit 101 and 102, and I'm happy to do it
3  for a limited purpose, but there are a number of
4  slides. It will be Slide 2, Slide 3 -- or I'm
5  sorry -- slide -- I don't know the number. So
6  sorry. 2, 5, and I believe, 8. Actually, just
7  Slide -- just the first two.
8  THE COURT: 2 and 5.
9  MR. GRIMSLEY: 2 and 5, yes.
10 THE COURT: Same?
11 MS. JONES: Same objection.
12 Foundation.
13 THE COURT: Okay.
14 And that's 102, or is that 101?
15 MR. GRIMSLEY: 102 is the
16 presentation. 101 is the email that attaches it
17 going to the CEO.
18 THE COURT: You're moving in 101 and
19 102, but it's 102, Slides 2 and 5?
20 MR. GRIMSLEY: And I'll obviously
21 publish the first slide of it.
22 THE COURT: Understood.
23 And objection is foundation; is that
24 correct?

Page 3500

1  MS. JONES: Yes, Your Honor.
2  THE COURT: Over objection, 101 and
3  102 are admitted.
4  (Plaintiff's Exhibits 101 and 102 were
5  admitted into evidence.)
6  BY MR. GRIMSLEY
7  Q. You see that Exhibit 102 is what's titled
8  "Enfa Business Review"?
9  A. I do.
10 Q. This is from February of 2018?
11 A. Yes.
12 Q. This is one of the presentations being
13 sent to the CEO, correct?
14 A. You mean, was it attached to that email?
15 Q. Yeah.
16 A. Yeah.
17 Q. And this was not written by Advancy, was
18 it?
19 A. I don't know.
20 Q. Well, it certainly doesn't have their logo
21 on it. It says "Reckitt Benckiser" up on the top,
22 right?
23 A. Yeah. Right.
24 Q. You think the stuff that goes to the CEO

30 (Pages 3497 to 3500)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3501

1    gets reviewed typically?
2    A. Typically, yes.
3    Q. I would hope so.
4         MR. GRIMSLEY: Let's look at Page 2.
5    And if you could go -- Sam, cull out the bottom
6    right corner. Maximize.
7    BY MR. GRIMSLEY
8    Q. Do you see that it says: "Maximize value
9    tier profitability among vulnerable moms"?
10   A. I do.
11   Q. That's language that Mead Johnson used in
12   a presentation to its CEO?
13   A. Yes.
14        MR. GRIMSLEY: Let's go to Page 5.
15   And could you highlight the "Win in the value
16   segment" or cull it out, Sam.
17        And you see it says: "Win in the
18   value segment," and the first bullet point is:
19   "Build out a value tier driven by consumer
20   segmentation around vulnerable who what [sic] the
21   best nutrition at the best price."
22        That's probably "want" the best
23   nutrition, right?
24   A. Probably, yes.

Page 3502

1         But this context, I think this is very
2    different than the Advancy document.
3    Q. But the word "vulnerable" is used there,
4    correct?
5    A. The word "vulnerable" is used, but I don't
6    think it means the same thing here.
7    Q. Yes/no. The word "vulnerable" is used?
8    A. The word "vulnerable" is used.
9    Q. I want to talk about now this 70 percent
10   issue because I think there may have been some
11   sleight of hand going on.
12        Did I ask you any questions about what the
13   percentage of people who come out of the NICU buy in
14   terms of preterm -- or retail products?
15   A. No. I don't think you did.
16   Q. What I had asked you about is: When
17   somebody in the term nursery uses your product,
18   they're 70 percent likely to use it when they get
19   out of the hospital, right?
20   A. Yes.
21   Q. That's where out of the hospital Mead
22   Johnson makes all its money, right?
23   A. Yes.
24   Q. And the term unit is the biggest unit in

Page 3503

1    terms of number of babies compared to the NICU in a
2    hospital, right?
3    A. Yes.
4    Q. But what we established during your
5    initial exam was the key or one of the keys to
6    getting the term unit is getting the NICU, right?
7    A. Yes.
8    Q. And so you don't get the term without the
9    NICU, and you don't get the retail without the term,
10   right?
11   A. Generally, yes.
12   Q. And that's why there was that document we
13   looked at that said one-third of US revenue --
14   $300 million is the one-third -- is attributable to
15   getting NICUs in the hospitals?
16   A. Yes.
17   Q. Now, I don't want to go over this. You
18   talked a little bit about how Mead Johnson gives
19   away stuff for free, and you don't want cost ever to
20   be a concern for a mom or a dad in the NICU, right?
21   A. That's correct.
22   Q. You don't -- you could pay for donor milk,
23   couldn't you?
24   A. I guess we could.

Page 3504

1    Q. Yeah. And remember that email about
2    Kentucky legislation?
3    A. Yes.
4    Q. Where the legislation was basically
5    removing the cost for a human milk-based product
6    because insurance companies would pay for it?
7    A. Yes.
8    Q. And you said that that would be a
9    dangerous precedent if adopted elsewhere?
10   A. Yes.
11   Q. The FDA -- you said you're familiar with
12   Mead Johnson's communications with the FDA
13   generally?
14   A. Generally, yes.
15   Q. Are you familiar with any communication
16   from Mead Johnson where it reported an adverse
17   inference -- or an adverse event of a death with its
18   infant formula product?
19   A. So we -- I'm not entirely sure what you're
20   speaking to, but we have a constant vigilance
21   process that if that were to happen, we do report it
22   to the FDA.
23   Q. I'm asking, are you aware of any report
24   for Enfamil formula, Preterm Formula 24, to the FDA

31 (Pages 3501 to 3504)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3505

1  where Mead Johnson reports that its product --
2  there's a reasonable possibility of a causal
3  relationship to a death?
4        MS. JONES: Excuse me, Mr. Cleveland,
5  and counsel. Could we just approach real quickly?
6        THE COURT: Sure.
7        (There was a bench conference out of
8  hearing of the jury and realtime reporter.)
9        MR. GRIMSLEY: Thanks, Judge.
10  BY MR. GRIMSLEY
11       Q. I want to show you a document -- well,
12  let's start with availability of donor milk, and you
13  talked about some of the problems you ran into back
14  in 2010 getting milk from moms of the Neolac stuff.
15       Do you remember that?
16       A. Yes.
17       Q. That was 14 years ago now?
18       A. Yes.
19       Q. And you weren't involved with the Medolac
20  negotiations this time around?
21       A. No.
22       Q. And you know that the availability of
23  donor milk has grown exponentially since 2010,
24  right?

Page 3506

1        A. Yes.
2        Q. You said that you had paid Elena Medo some
3  money because you were so interested in their
4  product, and you didn't even get it back.
5        Do you remember how much it was you paid?
6        A. I think we probably had her -- no. I
7  don't remember specifically.
8        Q. 300,000?
9        A. In the range of that, I believe, is true,
10  yes.
11       Q. I can show you a document, but you
12  wouldn't dispute 300,000?
13       A. No.
14       Q. I think you started off your questioning
15  from your lawyer about how nobody could pay you
16  enough to harm a baby, right?
17       A. Correct.
18       Q. There's not enough money in the world.
19       If it turns out that this jury finds Mead
20  Johnson liable for causing the death of Chance Dean,
21  is there any amount of money Mead Johnson could pay
22  to solve that problem?
23       MS. JONES: Excuse me, Your Honor.
24  I'm going to object as argumentative and improper

Page 3507

1  question for this witness.
2        MR. GRIMSLEY: He was asked exactly
3  what they would have to pay him, and I'm -- it's a
4  fair question, Your Honor.
5        MS. JONES: I certainly did not ask
6  him that question.
7        THE COURT: Sustained.
8        MR. GRIMSLEY: No further questions.
9        MS. JONES: Very briefly, Your Honor.
10       RECROSS-EXAMINATION
11  BY MS. JONES
12       Q. Mr. Cleveland, you were asked about
13  Plaintiff's Exhibit 102.
14       Do you have that in front of you?
15       A. This one?
16       Q. Yes. And you were specifically asked
17  about Page 5 of that exhibit, and the reference to
18  the word "vulnerable" there.
19       Do you see that?
20       A. I do.
21       Q. I'm just grabbing my peepers.
22       And I think what I heard you testify to
23  was: It doesn't mean the same thing in that
24  PowerPoint deck. I want you to explain that to the

Page 3508

1  jury.
2        A. In the first use of the word "vulnerable"
3  from the Advancy deck, I interpreted that to mean a
4  state of mother's vulnerability when they go to the
5  hospital, and that's wildly inappropriate.
6        This, I believe, refers to people who are
7  economically vulnerable and the desire to bring
8  products at a lower price point to them.
9        I still don't think it's the best word,
10  but I think it means something very different than
11  the first instance.
12       Q. You were asked a question about whether
13  Mead Johnson could pay for donor milk.
14       Do you remember that?
15       A. I do.
16       Q. Do you have a reaction to whether that
17  would be practical or feasible from the company's
18  perspective?
19       A. No. In many cases, donor milk banks are
20  charitable and providing it for free any way, so
21  there's not a need to pay for it.
22       But even if we could, it's not -- it's not
23  really feasible. We wouldn't -- I wouldn't even
24  know where to begin executing something like that.

32 (Pages 3505 to 3508)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3509

1    MS. JONES: I don't have any further
2  questions.
3         Thank you, Mr. Cleveland.
4         MR. GRIMSLEY: Thank you,
5  Mr. Cleveland.
6         THE COURT: Mr. Cleveland, you can
7  step down. Thank you.
8         Mr. Grimsley, I'm going to need 101,
9  102, and 4363 whenever -- we don't have to do it
10  right now, just as a reminder.
11         MR. GRIMSLEY: We'll put them on a
12  stick.
13         THE COURT: Thank you.
14         All right. Call your next witness,
15  or do you -- do you have any additional witnesses?
16         MR. GRIMSLEY: Your Honor, the
17  Plaintiffs rest.
18         THE COURT: All right. Ladies and
19  gentlemen of the jury, we are going to take a lunch
20  break now. It's going to be slightly longer than
21  what you're used to.
22         It is -- I've got 11:09. Why don't
23  you come back at 1:30. That should give us plenty
24  of time to get done what we need to get done and

Page 3510

1  still keep us on track to complete the evidence and
2  tender the case to you for your deliberations within
3  the allotted time frame.
4         So the Court will go into recess.
5         And I remind you that until this case
6  is submitted to you for your deliberations, you must
7  not discuss this case with anyone or remain within
8  hearing of anyone discussing it.
9         Please do not read any newspapers, do
10  not listen to any radio broadcasts. Do not view any
11  television, internet websites, social media, or
12  other electronic formats which discuss this case.
13         Please do not email, text, or engage
14  in any social media or any form of communication,
15  electronic, digital, or otherwise, with your fellow
16  jurors or anyone else.
17         It is 11:10. The Court is in recess.
18  I will see you all back at 1:30.
19         All rise.
20         (The jury exited the courtroom.)
21         (A short break was taken.)
22         THE COURT: We're on the record at
23  21-L-1032.
24         Plaintiffs have completed their case

Page 3511

1  and have rested.
2         The Defendants are -- Defendant Mead
3  Johnson & Company LLC and Mead Johnson Nutrition
4  Company, are orally moving for a directed verdict
5  that -- and filing a written motion for directed
6  verdict subsequent -- at the conclusion of the
7  hearing; is that correct?
8         MS. ANTOINE: That's correct, Your
9  Honor.
10         THE COURT: Prior to testimony
11  being -- prior to the testimony this morning, there
12  was a discussion that was had off the record
13  regarding this, and it's my understanding -- I just
14  want to put this on the record.
15         It's my understanding that the
16  Plaintiffs are going to -- back up.
17         It's my understanding that Defendants
18  are going to go through their bullet points as to
19  their arguments of what -- that serve the basis for
20  the directed verdict; is that correct?
21         MS. ANTOINE: That's correct. It's a
22  little more than bullet points, but general gist.
23         THE COURT: I understand. I'm just
24  using the words that were used this morning.

Page 3512

1         In response, the Plaintiffs are going
2  to -- I'm sorry.
3         And the Defendants have handed a copy
4  to the Plaintiffs, and the Plaintiffs are deeming
5  the -- having received the copy as no arguments are
6  going to be waived if they're not raised in the oral
7  argument section; is that correct?
8         MR. GRIMSLEY: Correct. If they're
9  in the written submission, Your Honor, they're
10  preserved.
11         THE COURT: All right. And
12  Defendants are in agreement that Plaintiffs can
13  supplement their oral response by the close of
14  business on Friday with a written response; is that
15  correct?
16         MS. ANTOINE: Correct, Your Honor.
17         MR. SCHMIDT: Yes, Your Honor. My
18  understanding is we will get a ruling from Your
19  Honor before we start our case.
20         THE COURT: That is correct. That is
21  correct.
22         All right. And was there anything
23  else about that discussion that has not been made a
24  part of the record? Plaintiffs?

33  (Pages 3509 to 3512)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3513

1        MR. WHITING:  I think that's right,
2   Your Honor.  I think you have it all.
3        THE COURT:  Defendants?
4        MR. SCHMIDT:  No, I think you're
5   right, Your Honor.  That's all.
6        THE COURT:  You may proceed.
7        MS. ANTOINE:  Good morning, Your
8   Honor.
9        THE COURT:  Good morning.
10       MS. ANTOINE:  The Mead Johnson
11  Defendants move for directed verdict on all of
12  Plaintiff's claims.
13       We've now been through Plaintiff's
14  case.  They have put on their evidence.  We have
15  heard from their experts.  We have heard from their
16  fact witnesses.  We've seen the documentary
17  evidence.
18       Despite that, Plaintiffs still have
19  four fundamental holes in their case.
20       We've described using greater detail
21  in our written brief, but I'm going to focus on four
22  today.
23       Starting with design defect.  As a
24  threshold matter, expert testimony is required under

Page 3514

1   Illinois law for Plaintiffs to establish the
2   elements of their claim as to design defect.
3        Plaintiffs were required to set forth
4   opinion testimony by a qualified expert that the
5   product was defectively designed, causing it to be
6   unreasonably dangerous.
7        We've now heard from all their
8   experts, and we have not heard that testimony.
9        To the contrary, Plaintiffs' only two
10  experts to testify on the topic, Dr. Brian Sims and
11  Dr. Jonathan Swanson, testified to the opposite.
12       Dr. Brian Sims was asked:  "When you
13  leave your testimony today and head back, head back
14  to Alabama, you are going to continue to prescribe,
15  where it's appropriate, cow's milk-based preterm
16  infant formula, right?"
17       Dr. Sims responded:  "Yes."
18       He was then asked:  "You would never
19  give a baby something that you believed was
20  dangerous or somehow defective, would you?"
21       Dr. Sims answer:  "Correct."
22       According to Dr. Sims, the product is
23  not dangerous, it is not defective.
24       Dr. Jonathan Swanson was also asked:

Page 3515

1   "Do you agree with me that cow's milk-based preterm
2   formula is not defective, yes or no?"
3        He testified:  "I would not call it
4   defective, but I think there's a reason why we
5   should not use it.  I'm -- I'm a physician, I
6   don't look at nutrition as defective per se.
7        "It's very different than a device,
8   which could be defective, and so I don't know.  But
9   from a medical point of view, I wouldn't use that
10  term."
11       Their only experts testify on this
12  topic have said definitively that it's not
13  defective.
14       In addition, Dr. Brian Sims also
15  testified it's not unreasonably dangerous.  Again,
16  once before, once here.
17       "QUESTION:  You're not offering
18  opinion in this case that preterm infant formula
19  that is cow's milk-based is somehow unreasonably
20  dangerous, right?"
21       "ANSWER:  I am not saying that."
22       Dr. Swanson similarly read.
23       "QUESTION:  In fact, you would agree
24  with me that there is a role for formula, yes or no?"

Page 3516

1        "ANSWER:  Yes.
2        "QUESTION:  And not just generally,
3   but including with preterm infants?
4        "ANSWER:  Yes."
5        Those are Plaintiff's own experts
6   agreeing that this product is not unreasonably
7   dangerous and it has a role with preterm infants.
8        Indeed, they also agree that preterm
9   formula is necessary.
10       Dr. Brian Sims was asked.
11       "QUESTION:  Cow's milk-based preterm
12  infant formula as being necessary" -- sorry.
13       "From your view, is cow's milk-based
14  preterm infant formula necessary to have in the
15  toolbox for NICU doctors like yourself, right, when
16  mom's milk isn't available?"
17       He answered:  "Yes."
18       Dr. Swanson asked an almost identical
19  question.
20       He also answered:  "I would agree
21  with that."
22       I want to pause there for a second.
23  I suspect Plaintiff's counsel may get up and say,
24  "Well, sure, they said that, but there's an

34  (Pages 3513 to 3516)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3517

1  alternatives product, donor milk, and so they should
2  use that instead and, therefore, it's defective."
3       But that can't be the case. Everyone
4  agrees that mom's milk is best, donor milk is
5  second. That's what St. Louis Children's policies
6  reflect, that's what Dr. Sim's policies reflect,
7  that's what Dr. Swanson's policies reflect, and yet
8  preterm formula still has a necessary role in the
9  NICU. That's what they both testified.
10      They can't say it's defective because
11 it's not -- because it's not donor milk and also
12 it's necessary as an alternative to donor milk.
13 They can't both be true and, therefore, this
14 testimony forecloses any argument that because donor
15 milk is available, the product is defective.
16      For that same reason, they both
17 agreed they're not arguing for the withdrawal of the
18 product.
19      Simply, we have a failure of proof
20 here. They don't believe it's unreasonably
21 dangerous. They didn't testify it was defective.
22 To the contrary, they testified to the opposite.
23      The case law is precisely on point
24 here, where the expert acknowledged the design was

Page 3518

1  not unreasonably dangerous, Plaintiffs have no
2  evidence supporting the element of their claim, and,
3  therefore, their design defective claim must fail as
4  a matter of law.
5       In addition, no expert testified
6  that, say, there was a feasible alternatives design
7  or that may be, say, Enfamil premature formula is
8  different from other formulas. To the contrary,
9  they disclaimed any knowledge of preterm formula,
10 specific to Enfamil premature, or that it was
11 different from, say, an Abbott product, a Nestle
12 product, a Gerber product. That ends the inquiry
13 here. They have a fundamental failure of proof on
14 design defect, and, therefore, that claim must fail.
15      Second, Plaintiffs have a gap on
16 failure to warn because there is no duty to warn
17 here where the learned intermediary doctrine should
18 apply and where all the evidence shows that doctors
19 were generally aware of the risk of NEC associated
20 with preterm formula.
21      As a threshold matter, the learned
22 intermediary doctrine should apply here. The
23 rationale behind the doctrine is that the
24 prescribing physician can take into account the

Page 3519

1  propensities of the drug as well as the
2  susceptibilities of his patient. His is the task of
3  weighing the benefits of any medication against its
4  potential dangers.
5       The choice he makes is an informed
6  one, an individualized medical judgment, bottomed on
7  a knowledge of both the patient and the palliative
8  remedy.
9       As to the evidence in the case here,
10 makes clear that's precisely what happens with
11 preterm formula. Dr. Brian Sims, Plaintiff's own
12 expert testified that:
13      "QUESTION: When we talk about the
14 use of preterm formula in the NICU where you have
15 spent so much of your life, we are talking about a
16 feeding option that these babies receive only with
17 the order of yourself or a member of your team, a
18 qualified health care professional, right?
19      "ANSWER: Right.
20      "QUESTION: There's medical judgment
21 to be applied.
22      "ANSWER: Correct.
23      "QUESTION: Right? Based on the
24 individual circumstances of any particular baby,

Page 3520

1  right?
2       "ANSWER: Correct."
3       That's precisely the weighing of
4  individualized circumstances, medical judgment, and
5  a determination of whether or not to prescribe
6  infant formula for that patient that underlies the
7  learned intermediary doctrine.
8       For that reason, FDA regulates
9  Enfamil Premature as a formula typically prescribed
10 by a physician. And again, Dr. Sims' own testimony
11 mirrors that fact.
12      "QUESTION: We're not talking about a
13 product that someone walks into the grocery store
14 and picks up off the shelf, right?
15      "ANSWER: Correct.
16      "QUESTION: Because these babies,
17 like Chance Dean, Chase Dean, for one thing, they're
18 receiving their nutrition by a tube in some stances,
19 right?
20      "ANSWER: Correct.
21      "QUESTION: And that has to be
22 administered or should be administered by a medical
23 team in an acute care setting, right?
24      "ANSWER: Correct."

35 (Pages 3517 to 3520)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3521

1    So not only can they only receive
2    this preterm formula at the order of a doctor, but
3    it's administered by a medical team in an acute care
4    setting. That is precisely the sort of context in
5    which the learned intermediary doctrine applies.
6        And as further evidence of that,
7    Ms. Watson herself testified that she would speak to
8    her doctors when she had a question. She saw the
9    Enfamil bottle, and she asked someone about it.
10       That is precisely the kind of
11   relationship that the learned intermediary doctrine
12   is meant to address. The physician counsels the
13   patient based on their decision, and the physician
14   is the one who provides the information they
15   consider relevant to that patient.
16       "QUESTION: Similarly, Dr. Najaf
17   testified that that's what happened in this
18   instance. She had to make or approve the decision
19   for Chance to receive Enfamil premature.
20       "ANSWER: Yes.
21       "QUESTION: Could any of the care
22   team give Chance Enfamil Premature formula unless
23   you had approved it first?"
24       Again she testified: "No. They

Page 3522

1    could not have -- you could not have received it
2    absent her order."
3        Natural corollary to the learned
4    intermediary doctrine is that where the doctrine
5    applies, a manufacturer does not have a duty to warn
6    of a danger if the medical community was already
7    generally aware of those dangers or of dangers in
8    which the medical community generally appreciates.
9        Again, the evidence in this case
10   demonstrates that's precisely what happened here.
11   The medical community is generally aware of the
12   risk. This is indisputable.
13       Dr. Jonathan Swanson testified:
14   "Every other neonatologist is aware that there is
15   some risk of NEC associated with formula." That's
16   Plaintiff's own expert saying it's known in the
17   medical community.
18       Dr. Tasnim Najaf testified: "Formula
19   is associated with an increased risk of NEC."
20   That's one of Chance's treating physicians.
21       Dr. Elena Minakova testified: "It's
22   just generally accepted that formula is a higher
23   risk factor." That almost mirrors exactly the
24   language of the case law: Generally accepted in the

Page 3523

1    medical community that this is a risk.
2        She also testified: "Formula is more
3    associated with the high risk of necrotizing
4    enterocolitis." And I emphasize that because
5    Plaintiffs are suggesting that the fact that one of
6    the doctors might have used the word "slight" means
7    that they didn't know the risk.
8        First, we don't know what the doctor
9    meant when they said "slight." Second, the
10   overwhelming risk is that this was a well-known
11   risk in public literature according to their own
12   testimony, according to Dr. Elena Minakova who said
13   it was a high risk.
14       And St. Louis Children's Hospital
15   reflected that same risk in their own internal
16   policies that were intended to be used to educate
17   patients on that risk. They wrote: "We recommend
18   the use of donor milk as an alternative to mother's
19   own milk because of the increased risk for problems
20   like NEC with the use of formula."
21       So the evidence is clear in this case
22   that the medical community was generally aware of
23   that risk.
24       Now, as I mentioned earlier,

Page 3524

1    Plaintiffs are likely going to stand up and say,
2    well, they don't understand the magnitude, and so
3    therefore, they weren't sufficiently aware of the
4    risk here.
5        As a threshold matter, that argument
6    isn't what the case law reflects. They just have to
7    be generally aware of those dangers. Not a specific
8    number, not a specific range, not a specific
9    magnitude.
10       Indeed, their own expert was asked:
11   "What would you educate other neonatologists on? Is
12   there any population of premature infants that you
13   can put a number on the magnitude or even a range of
14   the magnitude of the risk of NEC from a premature
15   infant using cow's milk-based products?"
16       Dr. Swanson responded: "Again, even
17   every 24-weeker is different. Every 31-weeker is
18   different, you know. What are -- do they have any
19   other risk factors? What is the -- you know, how
20   many days of antibiotics were they on? You know,
21   all of that plays a role in the development of NEC.
22   And so the magnitude is -- the risk is different for
23   every patient."
24       So even their own neonatologist when

36 (Pages 3521 to 3524)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3525

1  asked, "Could you put a number on any population?"
2  couldn't say precisely what that magnitude should
3  be.
4          But even setting that aside, that
5  argument fails for a separate reason. All of their
6  magnitude opinions, Dr. Sims', three to ten;
7  Dr. Swanson's two to five. The various numbers
8  they've thrown out from public literature are just
9  that: Based on publicly available literature.
10         Dr. Swanson testified his opinions
11 rest on public studies that are available to the
12 neonatology community. Dr. Sims likewise
13 testified -- this is about the Lucas 1990 study,
14 particularly, which is where a three to ten times
15 risk comes from -- information that's been
16 well-known in the literature and the medical
17 community for decades. According to Dr. Sims, that
18 three to ten times risk is information well-known in
19 the medical community for decades.
20         As a matter of law, neonatologists
21 are presumed to have read this information. But the
22 evidence in this case also shows that that's true.
23         Dr. Najaf testified that she gets her
24 information from published literature. So not only

Page 3526

1  is it based on published literature, we know the
2  neonatologists in this case were aware of that.
3          Dr. Najaf testified as to that. We
4  saw in the St. Louis Children's documents that they
5  cited, the AAP 2012 Guidelines, those are the same
6  guidelines that Plaintiff's own experts cited.
7          They also cited documents from
8  Dr. Misty Good, a doctor who worked at St. Louis
9  Children's Hospital, and who had published research
10 discussing the very same studies that they say show
11 the risk of NEC and that they say neonatologists
12 were unaware of.
13         So for both of those reasons, there
14 is no duty to warn here where physicians already
15 knew generally of the dangers of NEC and, in this
16 case, the specific magnitude.
17         Plaintiff's failure to warn claim
18 fails for yet another reason, however. They have a
19 failure of evidence on proximate cause.
20         It's Plaintiff's burden to put forth
21 evidence to show that there is sufficient evidence
22 supporting a reasonable inference rather than a
23 guess that the presence of adequate warnings would
24 have prevented Plaintiff's injuries. They have no

Page 3527

1  such evidence here.
2          First, in order to show that, there
3  would have to be some evidence that one of the
4  doctors in this case would have done something
5  different. They have none. As an initial matter,
6  Dr. Sloan and Dr. O'Connor didn't testify. So we
7  don't know what they would have done, and there's no
8  evidence, let alone any, or sufficient evidence for
9  the jury to assume that they would have done
10 something different.
11         As per Dr. Najaf and Dr. Minakova, no
12 one asked them, "Would you have changed your
13 prescribing decision if someone had told you about
14 the risk of NEC? What if they had told you the
15 magnitude was X or Y or Z?"
16         There is no evidence in the record
17 whatsoever on that topic. And in fact, the only
18 evidence is the opposite. Dr. Najaf testified that
19 she still transitions preterm infants to formula
20 despite the fact that formula appears to be less
21 protective against NEC than mother's milk or donor
22 milk.
23         This is in her deposition. She
24 said -- also testified that she's still planning to

Page 3528

1  continue using Enfamil products with her patients in
2  the NICU. So not only is there no evidence she
3  would have changed her decision; the only evidence
4  is that she wouldn't have. She still prescribes
5  this product to preterm infants in the NICU.
6          Likewise, Dr. Elena Minakova
7  testified that even if there were increased
8  association of NEC, she would still prescribe
9  preterm formula when it's medically indicated. And
10 in fact, in the case of Chance here, she also
11 testified that:
12         "QUESTION: "If Chance had been in
13 your care and not already on preterm formula, would
14 you have transferred -- transitioned him to preterm
15 formula at that point?
16         "ANSWER: Yes. Because that was
17 according to our guideline so that was our
18 practice."
19         We saw those guidelines in this case.
20 Over 1500 grams, over 32 weeks. That was the point
21 at which Dr. Minakova was caring for Chance.
22         Similarly, for the same reasons as
23 the learned intermediary, we know that these
24 physicians were aware of the risk of NEC. A warning

37 (Pages 3525 to 3528)

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3529

1  about something they already knew about won't change
2  that decision because they already took it into
3  account.
4          So we know there can't be proximate
5  cause here. And in fact, Dr. Minakova testified to
6  exactly that:
7          "QUESTION: In terms of that
8  association, you're already aware of that potential
9  association she's referring to between formula and
10 NEC -- regardless of what's on the label; is that
11 right?
12          "ANSWER: Yes. For formula. That
13 there is some risk, yes, higher risk."
14          So regardless of what's on the label,
15 she was already aware of it. That means that an
16 allegedly adequate warning would not have changed
17 her decision here.
18          There's yet another independent
19 reason why proximate cause has not been established
20 here. A plaintiff who does not read an allegedly
21 inadequate warning cannot maintain a negligent
22 failure to warn action unless the nature of the
23 alleged inadequacy is such that it prevents him from
24 reading it.

Page 3530

1          That's also what we have here.
2  Dr. Najaf, the only expert who offered any
3  testimony -- excuse me -- the only treating
4  physician who offered any testimony about what she
5  saw or read or whether she'd ever looked at the
6  label testified that she'd never read the label.
7  She'd never been to the website.
8          Instead of reading the website or the
9  label, she looks at published literature and that
10 her decision was not based on any Mead Johnson
11 marketing that she read. If you don't read the
12 label, an adequate warning does nothing. That's
13 precisely what we have here with Dr. Najaf.
14          Similarly, Ms. Watson testified that
15 she also couldn't remember reading the label. She
16 didn't remember picking up the bottle. She didn't
17 remember anything about the bottle. She didn't
18 recall reading the label. More generally, she
19 didn't recall seeing any advertising or marketing
20 from Mead Johnson before the twins received Enfamil,
21 and she didn't remember getting any emails from
22 them.
23          She, too, never saw anything that
24 should have -- that could have had an allegedly

Page 3531

1  adequate warning. And to the extent that Plaintiff
2  might argue that, "Okay. Well, if the doctors had
3  known more, they would have passed on that
4  information to Ms. Watson," there's also no evidence
5  of that.
6          Dr. Najaf and Dr. Lijowska both
7  testified that they counseled Ms. Watson.
8  Dr. Lijowska with respect to the risk of NEC
9  generally and with the importance of breastfeeding
10 and Dr. Najaf said that she counseled her on -- to
11 receive her consent before she was transitioned for
12 the twins to Memorial Shiloh.
13          They also had at their availability,
14 the donor milk patient sheet that said the very
15 thing that Plaintiffs say she should have been
16 warned on. There's an increased risk of NEC from
17 formula.
18          Despite that, according to
19 Ms. Watson, they still didn't warn her. So there's
20 nothing to suggest that had the doctors received
21 different information, they would have passed that
22 along. Instead, this is a complaint at most, with
23 respect to what the hospital chose to do or what
24 these doctors did in that specific instance.

Page 3532

1          Simply without any evidence that
2  someone read the label and therefore was exposed to
3  the warning or that doctors would have done
4  something different, there's a fundamental gap in
5  proximate cause here; and for that reason,
6  Plaintiff's failure-to-warn claims fail.
7          Finally, there's a fourth fundamental
8  gap in their evidence. And that's proximate cause
9  as to the injury.
10          In order to prove their designed
11 defect or failure-to-warn claims, Plaintiff must
12 show that an alternative design or an alternative
13 warning would have prevented the injury.
14          Now, Dr. Brian Sims testified he was
15 the only person, any expert, to give any opinion
16 with respect to Chance Dean that, in his opinion,
17 his NEC was caused by preterm formula. But no
18 expert testified that had Chance received a
19 different product -- and here Plaintiff's claim is
20 premised on the fact that had there been a warning,
21 had the product not been defective, Chance would
22 have received human milk -- in that case, Chance
23 wouldn't have developed NEC.
24          That is required to be proven by

38 (Pages 3529 to 3532)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3533

1    expert testimony, and no expert offered that
2    opinion. To the contrary, the only evidence is that
3    a significant number of infants still developed NEC,
4    although they exclusively received human milk and
5    are not exposed to infant formula.
6         In fact, Dr. Brian Sims, the only
7    expert who looked at Chance Dean's care and who
8    offered an opinion specific to Chance Dean's
9    development of NEC, testified:
10        "QUESTION: And if a baby were to get
11   donor human milk plus fortifier like Chance Dean
12   received, a baby in that situation can also" -- I
13   think it's supposed to say -- "get NEC. You know
14   that, right?
15        "ANSWER: Yes."
16        And then he was also asked:
17        "QUESTION: In terms of babies who
18   had necrotizing enterocolitis, some of the things
19   that we saw in the medical records related to Chance
20   Dean, we could have equally seen those things in a
21   baby who might have been fed human breast milk,
22   correct?
23        "ANSWER: Correct."
24        So what we have here is another

Page 3534

1    fundamental gap in evidence. No expert testimony
2    that had the product not been allegedly defectively
3    designed, had the product had an allegedly adequate
4    warning, Chance would not have developed NEC.
5         Without that evidence, both the
6    design defects and the failure-to-warn claims must
7    fail.
8         For each of these reasons, we believe
9    directed verdict is warranted here in favor of Mead
10   Johnson. The rest of our arguments, as you
11   mentioned earlier, Your Honor, we've agreed that the
12   brief will cover those specific arguments which
13   include that there's no duty to warn comparative
14   risks.
15        Here Plaintiff's argument is premised
16   on the fact that preterm formula has a higher risk
17   compared to donor milk or Prolacta and also that
18   their claims are preempted by federal law.
19        Thank you, Your Honor.
20        THE COURT: Thank you.
21        Any response?
22        MR. CATES: Yes, Your Honor.
23        MR. WHITING: Yes, Your Honor.
24        THE COURT: All right.

Page 3535

1         MR. WHITING: Thank you, Your Honor.
2    I just got the brief right before Nicole came up, so
3    I don't have a PowerPoint and I will be a little bit
4    scrambling here just in terms of getting everything
5    in order, but I think we're ready to go.
6         I want to start just by addressing
7    each of the four points that Mead Johnson just
8    raised, and the first is on design defect.
9         Well, I guess it makes sense to start
10   with the standard, Your Honor. I can't remember if
11   that was discussed in Plaintiff's. Obviously, we're
12   at Rule 50. All reasonable inferences need to be
13   drawn in favor of the Plaintiff. And if there is
14   any disputed facts, then we should be allowed to
15   survive Rule 50 and move on to a jury verdict.
16        With respect to design defect, Your
17   Honor, there was testimony from Professor Swanson,
18   from Professor -- Dr. Sims and Dr. Swanson that talk
19   specifically about the risks versus the benefits
20   generally and then specifically for infants like
21   Chance that were under 34 weeks old.
22        They did obviously say that there are
23   times, rare times, where an infant formula might be
24   appropriate. They talked through some -- what those

Page 3536

1    times are. Mom's milk's not available. Donor milk
2    is not available, and there might be some reason why
3    a standard formula is not appropriate, but those are
4    rare instances.
5         This is absolutely an unreasonably
6    dangerous product based on the testimony from both
7    Dr. Swanson and Dr. Sims.
8         I think that one of the things that
9    sort of got tripped up here is that they were asked
10   questions that had to do with legal terms, not
11   medical terms. You saw on Defendant's slide some
12   testimony from Dr. Sims about -- it looks like it's
13   in their brief as well -- about that this product
14   might not be unreasonably dangerous, but they didn't
15   show you on that slide -- and I don't think it's in
16   the brief either -- is the very next sentence where
17   he said, "I actually don't know what unreasonably
18   dangerous means. That sounds like a legal term."
19        Dr. Swanson, also, when talking about
20   the word "defective," said, "That sounds like
21   something you guys use in the courtroom." he was
22   talking about when talking about the weighing of
23   benefits versus the risks. He was talking about the
24   fact that for this product in particular, the risks

39 (Pages 3533 to 3536)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3537

1 absolutely outweigh the benefits in situations like
2 you have with Chance Dean.
3 You know, for a design defect, Your
4 Honor, obviously, on it being unreasonably
5 dangerous, there are several other factors as well.
6 One of the factors and risk utility -- and, by the
7 way, I don't know if the case law -- if there's any
8 disputed fact on any of these factors, that's enough
9 to survive Rule 50, just like we talked about at the
10 summary judgment stage.
11 Some of those factors, Your Honor,
12 obviously, consumer expectations is one of them.
13 For consumer expectation test, you can point to
14 advertising and marketing. There was extensive
15 testimony from Professor Pomeranz about the way this
16 product is marketed as safe, the way it's marketed
17 from being from a company that is science-led but
18 gives a sort of veneer of safety that just isn't
19 there in this product. So that's just one factor.
20 Others, similarly, Your Honor, plenty
21 of evidence has been presented to the jury on,
22 certainly, the management of the risk. Actually,
23 both sides have presented evidence on just how
24 significant the risk is here.

Page 3538

1 You have heard evidence on
2 alternative design as well, the feasibility. In
3 fact, it was available at St. Louis Children's.
4 You've heard plenty of testimony on that.
5 That's design defect, Your Honor.
6 With respect to failure to warn, Your
7 Honor, they started with a discussion on the learned
8 intermediary doctrine. I just want to address that
9 first, and then I'll address some of their other
10 points.
11 The learned intermediary doctrine,
12 just as a threshold matter, that is an affirmative
13 defense and Mead Johnson's going to have the burden,
14 obviously as an affirmative defense, to show that
15 learned -- that the learned intermediary doctrine
16 would even apply in this context.
17 But that said, Your Honor, it
18 certainly does not apply here.
19 The learned intermediary doctrine is
20 for things like prescription drugs, medical devices.
21 You heard even the lawyers from Mead Johnson stand
22 up and talk about just how different the
23 regulatory -- I think they used the phrase "entirely
24 different" -- the regulatory regime is for things

Page 3539

1 like drugs under the FDA and things like infant
2 formula, which is a food under the FDA.
3 And that's why the one other Illinois
4 case that has looked at whether the learned
5 intermediary doctrine applies to infant formula,
6 that's the Simmons case. Again, we talked about
7 that one, I think, at the summary judgment stage,
8 found that the learned intermediary doctrine did not
9 apply here.
10 There has been, I think, plenty of
11 testimony, Your Honor, about the fact that you don't
12 need a prescription to buy this. In fact, just a
13 couple of hours ago, you had Mr. Cleveland on the
14 stand, and he clearly said that anybody can buy this
15 off their website.
16 The thing about the learned
17 intermediary doctrine, Your Honor, is that it makes
18 sure that when a prescription drug or a medical
19 device is sold, a drug or device that goes through
20 the entire strict pre-market approval process at the
21 FDA, where the label is subject to FDA approval, the
22 duty goes to ones who will be prescribing those
23 products, products you can't get without a doctor.
24 But formula and other foods that are

Page 3540

1 not subject to that approval process -- and there's
2 been plenty of evidence that these are not actually
3 subject -- maybe there's a notice requirement, but
4 not subject to an approval process.
5 Formula or foods are not subject to
6 that approval, they're not regulated in the same
7 way.
8 Again, as Mead Johnson's counsel has
9 said, it is entirely different. And so Mead Johnson
10 can't place under the F part -- its formula under
11 the F part of the FDA to avoid strict market --
12 pre-market approval, but then say they want to move
13 over to the D part of the FDA to get the protections
14 of the learned intermediary doctrine that's
15 associated with that pre-market approval.
16 You cannot both make your product
17 available to the public on your website and then
18 also they say they don't actually have a duty to
19 warn the public about those risks.
20 You can't market directly to
21 consumers so that they'll make purchase of your
22 food, of your formula, and then say that those
23 communications need not include any warnings because
24 the food is really just a drug in disguise.

40 (Pages 3537 to 3540)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3541

1    Beyond the learned intermediary
2    doctrine, you heard comments from Mead Johnson's
3    counsel saying, look, the magnitude of the risk,
4    that's just -- that's generally known. And first
5    off, I would say that the evidence here has -- I
6    would say demonstratively shown, but there's at
7    least a factual dispute, there's been evidence
8    presented that it was not generally known.
9        You have doctors talking about a
10   slight risk, you have multiple doctors saying that,
11   you have Dr. Minakova saying that she didn't even
12   pass on to Ms. Watson -- I think she said that
13   formula -- the risk of NEC from formula was not even
14   discussed.
15       And then you contrast that with all
16   of the studies that have been shown by both sides on
17   the magnitude of the risk being double, triple,
18   quadruple, quintuple, and even higher. The evidence
19   shows, or there's at least a factual dispute, that
20   the magnitude of the risk is actually not generally
21   known.
22       And, you know, I think in their
23   brief -- again, we're going to take a look at it --
24   they said, well, look, as long as you're sort of

Page 3542

1    just generally aware of a risk, it doesn't matter if
2    you know what the magnitude of the risk is.
3        And just from a common sense
4    perspective, that would not make any sense at all,
5    that a manufacturer, corporation, could get off the
6    hook if it turned out that everybody thought that
7    the risk of something was a 1 percent increase and,
8    in fact, that it was a 200 percent increase.
9        But also, Your Honor, there is a
10   case, it's Muhammad v. Abbott, it's 2022, IL App
11   (1st) 210478, pages 44 to 47. That's a case
12   specifically holding that the amount of risk is
13   important, that the greater amount of risk, that
14   that greater amount of risk needs to be known in the
15   community.
16       And there's been plenty -- again,
17   plenty, plenty evidence of that in this case.
18       One other point on failure to warn,
19   Your Honor, just on the fact that there are -- that
20   some of this data is in the published literature.
21       Two points on that, actually.
22       First of all, you heard testimony in
23   this case, and particular from Dr. Swanson and
24   others, that neonatologists, they are generalists,

Page 3543

1    and they are not all reading all of the literature.
2        Dr. Swanson, he is a specialist in
3    NEC, and so he understands the risk and he's even
4    trying to get the word out by going to conferences,
5    but as he said, if there was an issue that was
6    specific to, say, intracranial hemorrhaging, he
7    would have to go talk to one of his neonatology
8    colleagues because they're the ones that are going
9    to know all the risk. He's not keeping up on that
10   literature. So the fact that it's in the literature
11   is not enough to show that it's generally known.
12       Move on to proximate cause, Your
13   Honor.
14       You heard a couple of different
15   arguments on proximate cause with respect to failure
16   to warn. And it started with testimony that maybe
17   the argument that the label wouldn't have mattered,
18   that the words wouldn't have mattered. And there
19   has been plenty of testimony so far that the words
20   absolutely do matter.
21       The last words from Mr. Cleveland on
22   the stand is that words matter.
23       You heard from treaters talking about
24   that if they got a Dear Doctor letter, that they

Page 3544

1    would read it and that would influence their
2    decision.
3        You heard from Professor Pomeranz
4    that said once you even change the label, it creates
5    this flurry of activity. You see information from
6    people that you write, that write articles
7    about it. You see competitors highlight that for --
8    for all the decision-makers to see.
9        There absolutely is evidence in this
10   case that had they put out the warning, both through
11   the label and through other mechanisms, that it
12   absolutely would have made a difference to the
13   outcome of this case.
14       Also, Your Honor, they -- the duty
15   here -- I just want to keep this in mind. Because
16   the duty here is to Jasmine. The duty is not to the
17   doctors, and they need to do what they can to make
18   sure that Jasmine gets an adequate warning. They
19   didn't do that, but that's not a proximate cause
20   issue.
21       What you heard from Jasmine on this
22   was crystal clear. She said that she was asked:
23   "Jasmine, if you had known at St. Louis, at Memorial
24   East, anywhere, that infant formula posed a

41 (Pages 3541 to 3544)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3545

1  significant risk of death to your son, would you
2  have insisted he get something else?
3        "ANSWER: Definitely."
4        That is crystal clear evidence that a
5  different warning in this case would have made a
6  difference in the outcome. She would have stayed.
7  She would have -- she would not have let her --
8  Chance switch to the cow's milk-based formula.
9        You also heard argument that -- about
10 the labels sort of being -- it wasn't read and so
11 you can't be sure that a different label would have
12 made a difference.
13       Well, first of all, Your Honor, the
14 real inadequacy here, at least when it comes to the
15 label, is that the warning just didn't exist at all.
16       But the label -- and we said this
17 before, I just want to make that it's crystal clear
18 the warning is not the only -- sorry. The label is
19 not the only way to make sure that the warnings of
20 the true significant risks of infant formula are
21 known to people making the decision, people like
22 Jasmine Watson.
23       You can do Dear Doctor letters, you
24 can do -- you can include the warnings in your

Page 3546

1  marketing, your advertisements. You can have your
2  sales reps actually trained on what the risks of NEC
3  are, you can have your sales rep be allowed to
4  inform the people at the hospital.
5        When you get evidence of an adverse
6  event, you can actually tell someone, you can tell
7  the FDA, you can tell other hospitals.
8        Once those adverse events start to
9  get reported, once you're not just keeping them
10 internal to the company based on a unilateral
11 decision that it's not reasonably possible that it
12 was our product, people start to understand the
13 actual magnitude of the risk.
14       I think where they closed, Your
15 Honor, was on the cause or contribute to cause.
16 They said that there's no evidence of that. And as
17 we'll explain in our brief, that's just not true. I
18 mean Dr. Sims came in -- I mean you saw Dr. Swanson
19 talking about general causation. He said that
20 formula can cause or contribute to the cause of a
21 condition, NEC.
22       And you had Dr. Sims come in and
23 specifically say in this case, for Chance Dean, it
24 was EPF 24, Mead Johnson's product, that caused or

Page 3547

1  contributed to the cause of Chance Dean's NEC.
2        That alone is enough to show
3  proximate cause. But I think their concern, as I
4  understand it, is that you need to say something --
5  something else, that -- one, I don't think that's
6  the law, Your Honor. But, two, he specifically gave
7  the ranges of the increase. He said it was 3X to
8  10X. And once you -- just from a mathematical
9  perspective, once you get past even 2X, it's going
10 to be more likely than not that the cause of the
11 condition was the defective product, here, EPF 24,
12 as opposed to anything that's in -- that's sort of
13 background risk.
14       So there is testimony on cause or
15 contribute to cause as well.
16       Your Honor, those are the four
17 arguments that they -- that they highlighted with
18 their -- with their PowerPoint.
19       Just based on the table of contents,
20 it looks like they do have some other arguments as
21 well. But I will say, Your Honor, that both on the
22 law and on the facts that these other arguments fail
23 as well because there has been a -- sufficient and
24 ample evidence that has been presented in our case,

Page 3548

1  to the jury, to survive the Rule 50 standard and
2  move on to the remainder of the case.
3        THE COURT: Thank you.
4        MS. ANTOINE: Your Honor, may I
5  respond briefly?
6        THE COURT: Sure.
7        MS. ANTOINE: I'll start by going
8  through the same points that Mr. Whiting did.
9        And starting with the standard, we
10 agree that the standard is that all reasonable
11 inferences must be drawn in favor of Plaintiff, but
12 they also -- the standard also requires that there
13 be expert testimony.
14       So where there is no expert
15 testimony, it doesn't matter what the documents say,
16 it doesn't matter what someone like Mr. Cleveland
17 said, it doesn't matter what counsel argues about
18 it. If no expert testified to that fact or
19 presented that inference, there's still a
20 fundamental failure of proof. That's not a
21 reasonable inference; it's a lack of evidence.
22       THE COURT: That's for the design
23 defect, right?
24       MS. ANTOINE: That's for design

42  (Pages 3545 to 3548)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3549

1  defect, correct, Your Honor.
2      And here, Mr. Whiting said, okay,
3  Dr. Swanson said the risk outweighs the benefit
4  under 34 weeks. That, at best, is a failure to warn
5  argument. This isn't a product. This is preterm
6  formula that's the same across the board. It goes
7  up to 37 weeks, below 20 -- 34 weeks.
8      Dr. Swanson agrees it's appropriate
9  for above 34 weeks. Dr. Sims actually agrees it's
10 appropriate for above 32 weeks. That's not an
11 argument about the product being defective; that's
12 an argument about when Dr. Swanson thinks it should
13 be used with an individual patient or maybe, at
14 best, when Dr. Swanson thinks there should be a
15 warning on the product not to use it below 34 weeks.
16 That's not a defect with the product itself.
17     In fact, we know that to be the case
18 because they say it's a necessary tool. There's not
19 some way to divide it up and say, okay, this formula
20 is only for under 34 weeks, this formula is only for
21 34 to 37 weeks. Mead Johnson doesn't decide which
22 patients receive it; doctors do. And that's also
23 one of the reasons the learned intermediary applies
24 here.

Page 3550

1      As for the magic words argument, they
2  could have asked their experts any question that
3  they wanted, including: Is this product
4  unreasonably dangerous? Do you consider this to be
5  defectively designed? Why? For example, they
6  didn't do that.
7      We don't have to do that; they do.
8  To the contrary, their experts testified that it
9  wasn't defective. That it wasn't unreasonably
10 dangerous. And, in fact, when Dr. Sims was on the
11 stand, he clarified that he doesn't even find it
12 dangerous.
13     Finally, on the same topic,
14 Mr. Whiting said you have heard the evidence
15 regarding feasibility of other options. No expert
16 testified to that. No expert said, okay, if you
17 change this about formula, it will be safer. If you
18 remove this ingredient, preterm formula will be
19 safer. If you add this, preterm formula will be
20 safer.
21     Whatever the documents may or may not
22 say, whatever any fact witness may or may not have
23 said, that's not relevant to the issue here because
24 they need expert testimony on that fact, and they

Page 3551

1  have none.
2      And, in fact, their only experts
3  testified, not using magic words, that they don't
4  have an opinion between different types of preterm
5  formula, that preterm formula is necessary, and that
6  is there is a role for it in the NICU. That's
7  definitive as to the design defect argument.
8      On the learned intermediary doctrine,
9  Mr. Whiting spent a good deal of time talking about
10 FDA approval and what FDA does, but that's not what
11 the case law is premised on. The rationale behind
12 the document -- sorry -- doctrine, isn't that FDA
13 approves the warning and, therefore, physicians are
14 the ones who must receive it. It's that physicians
15 decide whether or not the patient receives it.
16     And so that physician judgment is an
17 intervening proximate cause, and that's why the
18 warning goes to the physician who decides how to
19 apply it, rather than the patient.
20     And this case is a really good
21 example of why that happens. When an infant like
22 Chance Dean is the NICU, they're receiving nutrition
23 prescribed by a neonatologist that has to go through
24 a nurse. Oftentimes that bottle is never going to

Page 3552

1  be seen by a parent. It was going to be decanted
2  into a syringe, the infant is going to be
3  hospitalized the entire time they're receiving it,
4  there's no opportunity for interaction between the
5  manufacturer and the patient because it's going
6  through that learned intermediary, the doctor who
7  makes the decision of whether or not to prescribe
8  it.
9      And, in fact, the 34-weeks argument
10 that you heard about from Mr. Swanson is a great
11 example of that. Sorry. Dr. Swanson. I don't want
12 to decredential him.
13     Dr. Swanson thinks it's good over
14 34 weeks, it's bad under 34 weeks. That's a medical
15 judgment that he applies, and he makes that
16 individualized patient choice. And that's why the
17 learned intermediary applies here.
18     As for the argument that the risk
19 isn't generally known. First, the issue of whether
20 Dr. Minakova passed on evidence of that risk is
21 completely irrelevant to whether or not she knew
22 about it and she testified that she did and, in
23 fact, her decision to pass on or not pass on that
24 information is, once again, her exercising her

43  (Pages 3549 to 3552)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3553

1 judgment as a learned intermediary.
2          And the fact that the studies are
3 public is relevant. Dr. Swanson didn't review any
4 testimony from any physician in this case. He
5 didn't speak to them. He didn't read any hospital
6 policies. He didn't speak to anyone from the
7 hospitals.
8          In fact, one of the studies that he
9 relied on was written by a doctor who treated Chance
10 at St. Louis Children's Hospital who also wrote the
11 paper about necrotizing enterocolitis that discussed
12 exactly the same studies that Dr. Swanson discussed
13 in his testimony.
14          That paper by Dr. Misty Good was
15 published in 2014, and Dr. Swanson says, "Okay.
16 Well, I'm an expert. Other neonatologists don't
17 know, but they come and they ask me."
18          Dr. Misty Good was there treating
19 Chance. Theoretically, those neonatologists could
20 have done the same thing. Certainly, what we don't
21 have is evidence that somehow neonatologists weren't
22 aware of the magnitude of the risk.
23          As for the Muhammad case, that's a
24 very different situation. There, the label said,

Page 3554

1 specifically, the risk was 1 to 2 percent. That was
2 the question about the adequacy of the label
3 specifically.
4          Here, what the issue is, are
5 neonatologists generally aware of the significance
6 of the risk and whether it exists when they
7 prescribe? The evidence here is clear that they
8 are.
9          Indeed, Dr. Minakova testified a high
10 risk of necrotizing enterocolitis. The studies, the
11 public literature that SLCH relied upon in setting
12 its guidelines recognized a 77 percent decrease.
13 All of those numbers that they say neonatologists
14 weren't aware of were already incorporated into the
15 decisions and the guidelines at St. Louis
16 Children's.
17          As for proximate cause, Mr. Whiting
18 said, "Okay. Well, we can assume they would have
19 done something different because Mr. Cleveland
20 asked -- said, 'Words matter.'"
21          That's beside the point here. The
22 question is, would these doctors, based on what they
23 knew, have made a different decision? There is no
24 evidence that any of these doctors would have

Page 3555

1 changed their decision.
2          In fact, they said they would
3 continue to prescribe Enfamil premature even with
4 the knowledge they had at the time. That ends the
5 inquiry there. They have to have evidence from
6 those physicians that they would have done something
7 differently. What Mr. Cleveland said or didn't say
8 has no bearing on that issue.
9          Similarly, that Dear Doctor letter, I
10 believe all she testified was that she would read
11 that information. It didn't say what information it
12 would be. Just "Do you read Dear Doctor letters?"
13 She does. And she takes it into account.
14          Didn't say if the Dear Doctor letter
15 said there's a risk of NEC. There's an increased
16 risk of NEC. Just nothing specific at all. And she
17 certainly didn't say, "I would have decided not to
18 prescribe, or I would change my prescribed decision
19 if I had received some information in a Dear Doctor
20 letter."
21          Mr. Whiting also argued that doctors
22 should do what they can to pass on information but
23 that the duty is to Jasmine. First, they can't have
24 it both ways. Either the duty is to Jasmine and

Page 3556

1 then what we tell doctors is irrelevant; or the duty
2 is to doctors, and therefore, that question then of
3 what they choose to pass on is up to the doctors
4 themselves.
5          But here, even if the duty is to
6 Jasmine, Jasmine didn't read the label. She didn't
7 see any marketing. She didn't receive any emails.
8 She didn't receive any coupons. So there was no
9 way, even if Mead Johnson had attempted to contact
10 her, that they could have because she didn't see
11 anything.
12          So, you know, Mr. Whiting said, "Oh,
13 they could have told the FDA. They could have told
14 hospitals. They could have included marketing on
15 their warnings. They could have told their sales
16 reps. Sales reps don't talk to patients."
17          None of these are things that
18 Ms. Watson looked at or received, and so it's just
19 discussing issues that are orthogonal to what's at
20 issue here, which is, what did Ms. Watson see? And
21 if there had been something else in that, would that
22 have changed her behavior? But she didn't see any
23 materials, and so it couldn't have.
24          And that's the failure of proximate

44 (Pages 3553 to 3556)

Case ID: 220302606
Control No.: 24046115

Report of Proceedings - Jury Trial - AM Session
March 6, 2024

Page 3557

1  cause here. Not should Mead Johnson have told FDA
2  something different or should Mead Johnson have told
3  its sales rep to tell medical professionals
4  something different.
5         What did Ms. Watson see? And here,
6  she didn't see anything because she didn't read the
7  label or any other marketing.
8         Finally, on proximate cause, I think
9  the beginning was just not responsive necessarily to
10 the argument we are making, which is we agreed
11 Dr. Sims got up there and he said it was a cause or
12 contributing cause of Chance Dean's NEC. But that's
13 not the question that we're raising here.
14        The issue is, under the law, they
15 must prove that a different design or a different
16 warning would have prevented the injury.
17 Mr. Whiting just got up there and said, "Okay.
18 Well, two times risk is more probable than not that
19 it would have."
20        Dr. Sims didn't say that.
21 Dr. Swanson didn't say that. No expert said that.
22 And without that expert testimony, there's no
23 evidence of that. Mr. Whiting can't testify on
24 behalf of Dr. Sims or Dr. Swanson, and so, you know,

Page 3558

1  that he now says that doesn't change the fact that
2  neither of them did. And therefore, that's just a
3  gap in proof.
4         Without that, both of their claims
5  have a fundamental failure of proof, and we would
6  argue that directed verdict is warranted.
7         Thank you, Your Honor.
8         THE COURT: Thank you.
9         All right. So we're now in recess.
10 The Court is in recess.
11        The jury comes back -- what did I
12 say? 1:30? So why don't you guys come on back --
13        Is there anything to take up? I
14 mean, we're just going right into your case if I
15 deny the directed verdict, right?
16        MR. SCHMIDT: Yeah. I think we need
17 to figure out some timing issues on our end, and I
18 might raise that briefly, but, yes, nothing
19 substantive.
20        THE COURT: Do you need me for that?
21        MR. SCHMIDT: It would be useful to
22 know when Your Honor plans to go to today, but then
23 I should probably confer with --
24        THE COURT: 4:30. I'd say -- well,

Page 3559

1  4:25. Obviously, depending on -- assuming that we
2  have to put a case on, 4:20, 4:25-ish. I said I
3  don't want to keep them past 4:30 only because of
4  the length we've been here so far.
5         Does that help in any way?
6         MR. SCHMIDT: A little bit. I don't
7  know if we need to talk about this on the record.
8         THE COURT: Okay. Off the record.
9
10        (End of morning session at 12:25 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3560

1         CERTIFICATE OF REPORTER
2         I, Ann Marie Hollo, Certified
3  Shorthand Reporter, Registered Diplomate Reporter,
4  and Certified Realtime Reporter, within and for the
5  State of Illinois, do hereby certify that the
6  foregoing proceeding was taken by me to the best of
7  my ability and thereafter reduced to typewriting
8  under my direction; that I am neither counsel for,
9  related to, nor employed by any of the parties to
10 the action in which this proceeding was taken, and
11 further that I am not a relative or employee of any
12 attorney or counsel employed by the parties thereto,
13 nor financially or otherwise interested in the
14 outcome of the action.
15
16        Dated this 6th day of March, 2024.
17
18 _____
19 Certified Shorthand Reporter
20 State of Illinois
21
22
23
24

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Case ID: 220302606
Control No.: 24046115

# Exhibit C

Case ID: 220302606
Control No.: 24046115



# REPORT OF PROCEEDINGS
# JURY TRIAL - P.M. SESSION

**Case:** JASMINE WATSON, on her own behalf and as representative of the estate of CHANCE DEAN, v. MEAD JOHNSON & COMPANY, LLC, and MEAD JOHNSON NUTRITION COMPANY,

**No.:** 2021-L-1032

**Date:** February 22, 2024

**Court Reporter:** ANGELA M. TAYLOR, RPR, MO-CCR, IL-CSR, LA-CCR, WA-CCR

Paszkiewicz Court Reporting
Phone: 618-307-9320
Toll-Free: 855-595-3577
www.spreporting.com

Case ID: 220302606
Control No.: 24046115

Page 743

IN THE CIRCUIT COURT
OF THE TWENTIETH JUDICIAL CIRCUIT
ST. CLAIR COUNTY, ILLINOIS

JASMINE WATSON, on her own    )
behalf and as representative )
of the estate of CHANCE DEAN,)
                             )
Plaintiff,                   )
                             )    Cause No.  2021-L-1032
v.                           )
                             )
MEAD JOHNSON & COMPANY,       )
LLC, and MEAD JOHNSON        )
NUTRITION COMPANY,           )
                             )
Defendants.                  )

RECORD OF PROCEEDINGS

JURY TRIAL

BEFORE THE

HONORABLE PATRICK R. FOLEY

FEBRUARY 22, 2024

PM SESSION

(Held in person in Courtroom 404.)
Reported by:
ANGELA M. TAYLOR, RPR, MO-CCR, IL-CSR,
LA-CCR, WA-CCR
Illinois CSR License No. 084-004538
Missouri CCR License No. 1067
Louisiana CCR License No. 202406
Washington CCR License No. 22002378

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 744

```
 1    TRIAL BEFORE THE HONORABLE PATRICK R.
 2  FOLEY, on Thursday, February 22, 2024, between the
 3  hours of 1:42 p.m. CT and 4:20 p.m. CT on that day, in
 4  person at Courtroom 408, before Angela M. Taylor, an
 5  Illinois Certified Shorthand Reporter.
 6
 7
 8           A P P E A R A N C E S
 9
10    ON BEHALF OF THE PLAINTIFF:
11
      THE CATES LAW FIRM, LLC
      BY:  MR. DAVID CATES
12    216 West Pointe Drive, Suite A
      Swansea, Illinois 62226
13    Tel:  (618) 277-3644
14    Email: dcates@cateslaw.com
15    KELLER POSTMAN LLC
      BY:  MS. AMELIA FRENKEL
16    150 N. Riverside Plaza, Suite 4100
      Chicago, Illinois 60606
17    Tel:  (312) 741-5220
      Email: amelia.frenkel@kellerpostman.com
18
      OLSON GRIMSLEY KAWANABE HINCHCLIFF & MURRAY
19    BY:  MR. SEAN GRIMSLEY
      BY:  MR. KENZO KAWANABE
20    BY:  MS. ABIGAIL HINCHCLIFF
      700 17th Street, Suite 1600
21    Denver, Colorado 80202
      Tel:  (303) 535-9153
22    Email: sgrimsley@olsongrimsley.com
      Email: kkawanabe@olsongrimsley.com
23    Email: ahinchcliff@olsongrimsley.com
24
```

Page 745

```
 1
 2        A P P E A R A N C E S (Continuing)
 3
 4  ON BEHALF OF THE DEFENDANT MEAD JOHNSON & COMPANY, LLC
    and MEAD JOHNSON NUTRITION COMPANY:
 5
 6    ARMSTRONG TEASDALE
      BY:  MR. DONALD FLACK
 7    115 N. Second Street
      Edwardsville, Illinois 62025
 8    Tel:  (618) 800-4141
      Email: dflack@atllp.com
 9
10    COVINGTON & BURLING LLP
      BY:  MS. PHYLLIS JONES
      BY:  MR. PAUL SCHMIDT
11    BY:  MS. EMILY ULLMAN
      BY:  MS. ELIZABETH FOUHEY
12    850 10th Street NW
      Washington, DC  20001
13    Tel:  (202) 662-6000
      Email: pajones@cov.com
14    Email: pschmidt@cov.com
      Email: eullman@cov.com
15    Email: efouhey@cov.com
16
17
18
19
20
21
22
23
24
```

Page 746

```
 1                I N D E X
 2  WITNESS                          PAGE
 3
 4  CINDY HASSEBERG:
 5     Direct Examination by Mr. Kawanabe   756
 6
 7
 8        INDEX OF EXHIBITS ADMITTED
 9  Plaintiff's Exhibit 3097,Mead Johnson  ..........782
                  Pediatric Product guide
10  Plaintiff's Exhibit 1,Enfamil 24 product label ..789
11  Plaintiff's Exhibit 3330,Cafcit label ...........794
    Plaintiff's Exhibit 8,US Hospital Business  .....800
                  Review
12  Plaintiff's Exhibit 3097,Master tracking of PENS 813
    Plaintiff's Exhibit 766,Mead Johnson org chart ..831
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 747

```
 1            P R O C E E D I N G S
 2       (The following proceedings were held in
 3    open court Thursday, February 22, 2024
 4    at 1:42 p.m., Central Time:)
 5             0-0-0
 6       THE COURT:  Back on the record.  The time is
 7    now 1:42.  The jury is not in the courtroom.  This is
 8    procedural or an evidentiary matter to be outside the
 9    presence of the jury.
10       MS. FRENKEL:  Your Honor, we have exchanged
11    exhibits from Ms. Hasseberg.  There's a number of
12    exhibits, specific objections and issues that we are
13    hoping we can go ahead and take up with you in the
14    interest of efficiency.
15       But preliminarily to doing that, the parties
16    had reached a stipulation regarding medical records
17    and documents produced by the parties in litigation.
18    I thought this had resolved a number of admissibility
19    issues, but it sounds like that's not the case.  And
20    so we were hoping that we could address that since
21    that is much broader, I think, than just one single
22    witness.
23       THE COURT:  Okay.
24       MS. FRENKEL:  The relevant paragraph for
```

2  (Pages 744 to 747)

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 748

1   purposes of this dispute are paragraphs 7 and 18.
2   Paragraph 7 just sets out that this relates to the
3   parties' produced documents, and then paragraph 8 was
4   the parties agreement with respect to those documents.
5   We stipulated to authenticity and
6   foundation, reserving other evidentiary -- hearsay and
7   relevance. The parties reserve the right to object to
8   testimony about any such document, including based on
9   the witnesses lack of knowledge.
10  We understood that this largely resolved
11  sort of the issue of needing a sponsoring witness for
12  every single document, but it is my understanding that
13  Mead Johnson is interpreting this agreement now
14  differently.
15  MR. SCHMIDT: We don't take [inaudible] for
16  every single document. We do take the view that if
17  it's clear that comes to use a document with a
18  witness, that there's nothing about it, then that
19  shouldn't be the witness with whom it gets admitted.
20  There shouldn't be documents floating in the record
21  with no -- no testimony upon them.
22  So, for example, on the case of some of
23  these documents, we're not going to object if they
24  show them to their experts and move them in through

Page 749

1   their expert if their experts want to testify about
2   them. We just don't think they should be floating in
3   the record. We both need a chance to question on
4   evidence, and if the only place it comes in is a
5   witness who says, "I don't know about it," just sits
6   there, then mucks up the record. That's our -- that's
7   our only position on this.
8   THE COURT: What's -- you disagree with
9   that?
10  MS. FRENKEL: So I think with that one, it
11  just presents a little bit of an oddity where parties
12  are moving in a lot of documents through experts
13  rather than witnesses, which means that we need to
14  have experts come and testify before corporate
15  witnesses to ensure that we're not reaching these --
16  these issues in this way.
17  And essentially, if it's being allowed to be
18  moved in through an expert who's not a sponsoring
19  witness, I functionally don't see the difference
20  between allowing the corporate witness to move it in
21  when we're asking the corporate witness about their
22  knowledge in relation to this document.
23  THE COURT: Is the objection foundation?
24  MR. SCHMIDT: It's foundation with that

Page 750

1   witness, yes, Your Honor.
2   THE COURT: See, the problem that I have --
3   I don't know if it was share with you -- I assume that
4   everything was shared. Any foundational issues, I --
5   in my final pretrial -- my proposed one are to be
6   brought before the Court during -- during -- in this
7   case pretrial week.
8   And when I didn't hear anything with regards
9   to foundation, in my mind, I -- I was okay. There's
10  no foundational issues. I assume that they are waived
11  or they've all been worked out, and now we have a
12  foundational issue. Is that -- am I understanding
13  that correctly?
14  THE COURT: I understand your point about --
15  the witness. I get that. And I understand -- I
16  understand your argument to be -- she shows this
17  document to the witness or if this witness is shown
18  the document, what are they going to testify with
19  regards to that document once -- once it's -- "Have
20  you seen this document before today?"
21  The answer is no, we'll see where this is
22  going to go. Is that --
23  MR. SCHMIDT: Yes, that's it.
24  THE COURT: Where it would it go? How could

Page 751

1   that witness testify about the contents of the
2   document they hadn't seen before today?
3   MS. FRENKEL: Well, Your Honor, some of
4   these documents haven't been shown previously. Some
5   of these documents may be documents that are company
6   policy. Some of these documents may be documents that
7   we think the witness probably should have been aware
8   of. And if she's saying she's not, that's actually a
9   credibility issue.
10  So I think that there's a lot of ways in
11  which when we resolved and the parties stipulated to
12  authenticity and foundation, when we revolved that, we
13  thought we were, you know, sort of clearing the
14  tables.
15  I can tell you, Your Honor, we don't have
16  any intention of spending the jury's time simply
17  asking the witness about a lot of documents that she's
18  going to have no knowledge of. That would be an
19  inefficient use of the Court and the jury's time.
20  Other than to the extent, for example, there are
21  documents that, again, we think she should have
22  knowledge, and maybe she does have knowledge, even if
23  she's not saying that on the stand.
24  But again, this is something we thought we

3 (Pages 748 to 751)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 752

1  cleared up by agreement.
2      THE COURT: You're not -- I mean, you --
3  you're stipulating to the foundation, but this is
4  knowledge of the particular document.
5      Is what you're stipulating to? Is that
6  right?
7      MR. SCHMIDT: Yes. And just using --
8  running documents in a witness doesn't know anything
9  about and having them sit in the record with no one
10 having ever testified about them.
11     MR. CATES: Well, Your Honor, just to that
12 point, if you've stipulated to foundation, the
13 document can be admitted without a sponsoring
14 witness's testimony. I don't know what Mr. Schmidt
15 means, "sit in the record," but they're going to be
16 admitted because the foundation stipulated to.
17     MS. FRENKEL: Your Honor, if I can just give
18 an example, a lot of the documents here that we have,
19 it's been described as a testimonial foundation rather
20 than just a foundation objection are sales documents,
21 and she is someone who is functionally the head of
22 medical sales for the company.
23     So regardless of whether these were in her
24 custodial file, awareness of the company's sales

Page 753

1  policies is something we think is well within her
2  ability to testify.
3      MR. SCHMIDT: I don't think they've objected
4  to this.
5      THE COURT: Probably allow it to make a
6  record.
7      MR. SCHMIDT: I think I made that record on
8  that issue.
9      THE COURT: Three minutes because I don't
10 want to be late bringing them.
11     MR. SCHMIDT: So we went through a number of
12 documents. We've given them documents pursuant to
13 yesterday they objected to. We pulled those down.
14 They give us documents. We objected to more than two.
15 Some of them we resolved, some of them we haven't.
16     We've agreed that essentially the ones we
17 don't object to, those can be moved into evidence and
18 then subject to objections in terms of how they're
19 used. We need to say for the record that a number of
20 the documents are documents we moved in limine on and
21 lost. Non-Enfamil products, caps and other drug
22 advertising never seen. So we obviously reserve that.
23 Do I need to object to that every time they try to
24 move them in?

Page 754

1      THE COURT: I'd worry if you don't. I'm not
2  going to require -- well, let's do this. Do you have
3  the number -- document numbers? If you -- if you do,
4  we can make a record right now so that way it's
5  preserved, but otherwise Mr. Schmidt [inaudible].
6      MR. SCHMIDT: Why don't I do it --
7      THE COURT: -- I'd be concerned that you
8  don't preserve the record if you don't.
9      Does that make sense?
10     MR. SCHMIDT: That makes perfect sense. I
11 will object in the moment, and I'll try to think of
12 something pursuant to the motion in limine. I think
13 Your Honor addressed preserving our objection to law.
14     THE COURT: That's fair.
15     Do you have any problem with that?
16     MS. FRENKEL: Not at all.
17     MR. SCHMIDT: On other ones, given time,
18 unless there's one you want to raise, I suggest we
19 just deal with them in the moment.
20     MS. FRENKEL: We can do that.
21     THE COURT: I'm giving the instruction I'm
22 going to give on the -- I think you're both right, but
23 I think you're both wrong all in your own -- in your
24 own ways. I'm going to give the cautionary

Page 755

1  instruction that -- just that I will instruct them on
2  the issues in the case and the law, that what was
3  said, you know, "You just heard the lawyers, the
4  attorneys give opening statements. As I indicated
5  earlier in opening statements is not -- are not
6  evidence. I'll instruct you on the issues,"
7  et cetera, et cetera, et cetera. And then we'll go
8  right into calling the witness.
9      I know that doesn't end the issue or end the
10 dispute, but that's something I feel that we'll be
11 taking up at instruction or maybe prior to closing it
12 will be circling back.
13     MR. SCHMIDT: Thank Your, Honor.
14     MS. FRENKEL: Thank Your, Honor.
15     THE COURT: Thank you.
16     (A break was taken.)
17     (The jury entered the courtroom.)
18     THE COURT: It's 1:52. We're back on the
19 record at 1:52. Good afternoon, ladies and gentlemen.
20 Prior to breaking for lunch, you know -- as you're
21 well aware, you heard the opening statements of both
22 the plaintiff and the defendant. What I want to
23 remind you, ladies and gentlemen, is that opening
24 statements are not evidence.

4 (Pages 752 to 755)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 756

1     Remember, at the conclusion of the case, I
2   will instruct you regarding the issues in this case
3   and the applicable law.  It will be your duty to
4   follow the Court's instructions.  What the attorneys
5   just said in their opening does not constitute
6   evidence.
7     Plaintiff, call your first witness.
8     MR. KAWANABE:  Thank you, Your Honor.
9   Plaintiff calls Cindy Hasseberg.
10     THE COURT:  Prior to sitting, would you
11   please raise your right hand.
12     (Witness sworn.)
13     Please have a seat.  Thank you.
14     * * * * *
15     CINDY HASSEBERG,
16   having been duly sworn, testifies as follows:
17     * * *
18
19     DIRECT EXAMINATION
20     BY MR. KAWANABE:
21   Q   You all set, Dr. Hasseberg?
22   A   Yes, thank you.
23   Q   Do you go by Dr. or Ms. Hasseberg?
24   A   Either is fine, but Ms. Hasseberg is

Page 757

1   normally what I go by.
2   Q   Okay.  Thank you very much.
3     My name's Kenzo Kawanabe, and I represent
4   the plaintiffs in this case.  We have not met before,
5   have we?
6   A   No.
7   Q   Okay.  Nice to meet you.
8   A   Nice to meet you, too.
9   Q   Dr. Hasseberg, you are the Mead Johnson's
10   vice president of medical sales for the entire
11   United States; is that correct?
12   A   Yes, it is.
13   Q   And your job at Mead Johnson is to lead the
14   medical sales force?
15   A   Yes.
16   Q   You have about 500 people working under your
17   leadership?
18   A   Yes, I do.
19   Q   And Mead Johnson has a large portfolio of
20   products, including specialty infant formulas,
21   premature infant formulas, and some fortifiers that
22   might be used in certain specialty cases; is that
23   fair?
24   A   Yes.

Page 758

1   Q   Would you tell the jury the difference
2   between a fortifier and a formula?
3   A   A formula would be a formula a baby could
4   take and survive on as a total nutrition.  They
5   wouldn't need anything else added to it.  A fortifier
6   would be something that has some micronutrients like
7   vitamins or minerals or things that could be added
8   into breast milk or something that needed to be
9   supplemented.
10   Q   Thanks, Ms. Hasseberg.  And we'll come back
11   more specifically to Mead Johnson's product line, but
12   is it fair to say that Mead Johnson helps feed infants
13   or babies?
14   A   Yes.
15   Q   Let's talk a little bit about your
16   background.  Okay?
17   A   Okay.
18   Q   You attended the University of Oklahoma; is
19   that fair?
20   A   Yes.
21   Q   You have a PhD?
22   A   Yes.
23   Q   You also have other degrees all in allied
24   health leadership; is that correct?

Page 759

1   A   The PhD is in allied health leadership, but
2   the bachelor's degree and master's degree are in
3   nutritional sciences.
4   Q   Okay.  Nutritional sciences.
5     Fair to say that you've always been
6   interested in nutrition?
7   A   Yes.
8   Q   And what is dietetics?  Or I pronounced
9   that -- mispronounced that, didn't I?
10   A   No, you did it right.
11   Q   Okay.
12   A   There's dietetic is the industry of where
13   you can become a dietitian.  So a dietitian is someone
14   who can work -- they're licensed in the state and
15   they're registered nationally to prescribe and help
16   doctors with diets.  So if someone needed a low-sodium
17   diet, a dietitian could come in and help train on
18   that.
19   Q   Understood.
20     How does diet- -- being a dietician relate
21   to nutrition?
22   A   It is all about nutrition pretty much.
23   That's -- that's what you do.  Your role is about
24   helping people set up diets or, you know, medical

5  (Pages 756 to 759)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 760

1  nutrition therapies.
2      Q   But are you a medical doctor?
3      A   No.
4      Q   Okay.  You started in Mead Johnson in 1999;
5  is that correct?
6      A   Yes, it is.
7      Q   Fair to say you've been with Mead Johnson
8  for about 20 years?
9      A   About 22.
10     Q   22 years.  Okay.
11         And you did take a break from Mead Johnson
12 for a three-year period; is that fair?
13     A   Yeah.  I -- I didn't take a break.  I was
14 sold.
15     Q   I apologize, yeah.
16     A   That's okay.
17     Q   Please go ahead and clarify.
18     A   It is a break.  I was sold.  So what
19 happened was the company had an infant division, and
20 they had an adult division.  And I was on the adult
21 division, and that was sold to Novartis Nutrition.
22     Q   Okay.
23     A   So that's the time frame I was over at
24 Novartis.

Page 761

1      Q   So you started at Mead Johnson in 1999, and
2  then your division was sold to Novartis what year?
3      A   2004.
4      Q   2004 to 2007?
5      A   I came back in 2007.
6      Q   All right.  Do you recall when in 2007 you
7  returned to Mead Johnson?
8      A   April maybe.
9      Q   And you -- let's go back to 1999.  You
10 actually began as a sales representative; is that
11 correct?
12     A   I did, yes.
13     Q   And your job as a Mead Johnson sales
14 representative was going to health care providers and
15 hospitals about Mead Johnson's products?
16     A   Yes.
17     Q   In other words, you would visit and talk
18 with doctors as well as hospital staff?
19     A   Yes.
20     Q   And what would you try and talk to them
21 about?
22     A   Well, at the time when I was a rep, I had an
23 adult portfolio, so I was responsible for tube feeding
24 products and products that would get started in a

Page 762

1  hospital like a TraumaCal or ULTRACAL and then would
2  discharge out to like a home care.
3      Q   And would you talk about the entire Mead
4  Johnson product line at that time?
5      A   I could.  I had the whole entire portfolio
6  on the adult side, and then I could speak to the
7  infant side, as well.  We were trained for both.
8      Q   I see.  Okay.
9          That was in Oklahoma City?
10     A   Yes, it was.
11     Q   And then later on you became a district
12 manager for Mead Johnson in Dallas?
13     A   Not in Mead Johnson, I became one at
14 Novartis.
15     Q   Oh, I apologize.
16     A   I'm sorry.  That's not right.  I became one
17 at Mead Johnson, yes, and then I was sold -- when we
18 sold, I wasn't a district manager, sorry.
19     Q   Let's focus on Mead Johnson then.  What did
20 you do as a district manager?
21     A   As a district manager, you are managing a
22 team of sales reps.  So at the time I had ten reps
23 that were across Colorado, Oklahoma, and Texas.
24     Q   Colorado, Oklahoma, and Texas.  So

Page 763

1  three-state region?
2      A   Yes.
3      Q   Does Mead Johnson have a name for that
4  region?
5      A   We don't have that anymore because we don't
6  have the adult side.
7      Q   Okay.  I understand.
8          A company called Reckitt Benckiser bought
9  Mead Johnson at the end of 2017; is that correct?
10     A   Yes, I believe so.
11     Q   You stayed at Mead Johnson through that
12 transition?
13     A   I did, yes.
14     Q   And fair to say, ultimately, you worked your
15 way up the corporate ladder, so to speak, at Mead
16 Johnson?
17     A   Yeah.  I've had several promotions along the
18 way in my 22 years.
19     Q   And in 2018, you became the Mead Johnson
20 vice president of sales for the United States?
21     A   Yes, correct.
22     Q   Okay.  Have you held that position since
23 2018, then?
24     A   Yes.

6 (Pages 760 to 763)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 764

1  Q  And you work for Mead Johnson today?
2  A  Yes.
3  Q  And you lead the medical sales force across
4  the United States to achieve the company's goals; is
5  that fair?
6  A  That's fair.
7  Q  And Mead Johnson's company goals include
8  making money or profit from selling its products,
9  correct?
10  A  The goals that I have for my team are mostly
11  on share, but broader goals for the company would
12  include things like that, yes.
13  Q  What's the difference between your goals on
14  share and the broader goals of the company to make
15  money?
16  A  Well, just specific to making money, I
17  guess, our role in the medical sales force is we look
18  at a few different metrics and share is one of those,
19  so share of the market.  So it would be different than
20  maybe things the organization might look at.
21  Q  I see.  But share of the market means how
22  much you're selling your product?
23  A  Yes.  Yes.
24  Q  Okay.  That would be the relationship; is

Page 765

1  that fair?
2  A  Yes, that's fair.
3  Q  Thank you.
4  You describe yourself, Ms. Hasseberg, as an
5  ambitious, tenacious lead of a large sales team with
6  successful performance record; is that correct?
7  A  Yes.
8  Q  And by "performance record," you're --
9  you're relating that performance record to sales; is
10  that correct?
11  A  Yes.
12  Q  And the -- the company makes money off of
13  those sales, correct?
14  A  Yes.
15  Q  And there's nothing wrong with that, with a
16  company making a profit off the products it sales.
17  You'd agree with me on that?
18  A  Yes.
19  Q  Okay.  Sorry.
20  A  It's business, yeah.
21  Q  If I ask a question that is confusing, just
22  let me know and I'll try and rephrase it.  Okay?
23  A  Thank you.  I appreciate that.
24  Q  Yeah.  Ms. Hasseberg, over your 20 years --

Page 766

1  over 20 years at Mead Johnson, Mead Johnson has always
2  marketed and sold its infant formula products in
3  states like Illinois as well other states across the
4  country; is that fair?
5  A  Yes.
6  Q  We'll go over your products again short- --
7  in more detail, but when -- when you -- let me start
8  over.
9  The -- the products that Mead Johnson sells
10  for infants also include preterm infants, correct?
11  A  Yes.
12  Q  Would you tell the jury the difference
13  between a term baby versus a preterm baby?
14  A  A preterm baby would be one that's born
15  early and usually is smaller in size, and so sometimes
16  they have different needs and formulas that would
17  require maybe more protein or calories or different
18  nutrients.
19  Q  Okay.  And fair to say that preterm babies
20  are -- are more fragile than term babies?
21  A  I think that's fair, yes.
22  Q  Now, you and I can certainly agree that --
23  that formula should not harm or kill babies.  We can
24  agree on that, correct?

Page 767

1  A  Absolutely.
2  Q  All right.  Do you understand this case
3  concerns the death of a premature infant named Chance?
4  A  I do.
5  Q  And that's due to necrotizing enterocolitis
6  which I'll refer to as "NEC"; is that your
7  understanding?
8  A  Yes.
9  Q  And you know Chance Dean was -- was born
10  before 32 weeks.  Were you aware of that?
11  A  Yes.
12  Q  Okay.  And that makes him a preterm infant?
13  A  Preemie, yes.
14  Q  One of the more fragile patients, correct?
15  A  Yes.
16  Q  Did you know he weighed less than 4 pounds
17  when he was born?
18  A  I didn't know that or didn't remember that,
19  but very small.
20  Q  All right.  Let's focus in on NEC.
21  A  Okay.
22  Q  And you would agree that NEC is a horrible
23  disease, correct?
24  A  Yes.

7 (Pages 764 to 767)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 768

1  Q  And that NEC primarily strikes these most
2  fragile patients, the preemies or the preterm babies?
3     A  Yes.
4     Q  In fact, it primarily strikes the preterm
5  babies, correct?
6     A  I think so.
7     Q  In other words, NEC rarely or -- rarely
8  affects term babies unless those term babies have
9  other factors called comorbidities.
10       Would you agree with that?
11    A  Yeah. I think so, yes.
12    Q  Okay. And NEC itself, it leads to the
13 intestines of a baby necrotizing. Would you agree
14 with that?
15    A  Yes.
16    Q  And -- and in informing the jury, that means
17 the intestines are dying, correct?
18    A  Yes.
19    Q  NEC often leads to death?
20    A  I think it can lead to death, yes. I don't
21 know the stats on that.
22    Q  Now, as Mead Johnson's head of sales, of
23 medical sales in the United States if one of the
24 products your sales force was selling significantly

Page 769

1  increases the chances of a premature infant getting a
2  deadly disease, you'd want to know about that, right?
3     A  I would want to know, yes.
4     Q  Ms. Hasseberg, is breast milk the gold
5  standard of infant nutrition?
6     A  Are you asking me for my opinion or for Mead
7  Johnson's opinion?
8     Q  Your understanding.
9     A  My understanding is this: I do believe that
10 mom's have a right to choose and feed their baby what
11 they want, but I think we all know that colostrum
12 that's in breast milk and things definitely have
13 benefits. Mead Johnson's stance is very much that it
14 is the gold standard, yes.
15    Q  Okay. And so let me just make sure I
16 understand.
17    A  Okay.
18    Q  Is breast milk the gold standard of infant
19 nutrition?
20    A  Mead Johnson believes it is.
21    Q  And do you agree with that?
22    A  I believe it has things in it that are
23 beneficial that make it better than formula, but I
24 believe moms have a right to choose, and I don't know

Page 770

1  that I can claim what is the gold standard to a mom,
2  not knowing her baby, and I think she has a right to
3  make that decision.
4     Q  Okay. Ms. Hasseberg, you recall being
5  deposed in this case; is that correct?
6     A  Yes.
7     Q  In fact, you were deposed four times in --
8  in the formula cases; is that fair?
9     A  Yes.
10    Q  All right. And let's just talk about what a
11 deposition is. A deposition is when an attorney asks
12 you questions, correct?
13    A  Yes.
14    Q  And you give honest and truthful answers; is
15 that right?
16    A  Yes.
17    Q  In this deposition, you're under oath and
18 you swear or affirm to tell the truth, correct?
19    A  Yes, correct.
20    Q  In each of your four depositions, did you
21 tell the truth?
22    A  Yes.
23    Q  Did you have a chance to review the
24 transcript to make any changes or corrections for each

Page 771

1  depo?
2     A  I did, yes.
3     Q  And you signed a signature sheet verifying
4  that each of your answers were accurate; is that fair?
5     A  I did, yes.
6     Q  Okay. Great.
7        Let me hand you a binder of your deposition
8  transcripts. We might be going over some of those.
9        MR. KAWANABE: Your Honor, may I approach?
10       THE COURT: Yes.
11       MR. KAWANABE: Counsel, would you like a
12 copy?
13       MR. SCHMIDT: Sure. Thank you.
14       MR. KAWANABE: You bet.
15       Your Honor, would you like a copy?
16       THE COURT: Sure. As long as you have an
17 extra one.
18       MR. KAWANABE: I do.
19    Q  (By Mr. Kawanabe) Ms. Hasseberg, I'm handing
20 you a binder. I'll -- I'll verify to you it has four
21 transcripts.
22    A  Okay.
23    Q  And each of those are behind four tabs. So
24 if you look at that just to orientate yourself to the

8  (Pages 768 to 771)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 772

1  binder, you can see that there are four tabs with sort
2  of the dater of your depos; is that fair?
3      A  Yes.
4      Q  Okay.  And would you look at that tab that
5  has a May 2023.  Do you see that deposition?  And I
6  can help you with --
7      A  I see May 18.
8      Q  Yep, May 18.  Sorry.
9      A  That's okay.
10     Q  I said the month and the year.
11     A  Sorry.
12     Q  Okay.  May 2023.  And then turn to page 14.
13     A  Okay.  I'm there.
14     Q  And there are numbers on the left side
15 there.  Can you go to line 21?
16     A  Yes.
17     Q  Okay.  Great.
18        And then just read lines 21 to 24 to
19 yourself.  Let me know when you're done.
20     A  Okay.
21     Q  Okay.  You all set?
22     A  Yeah, I am.
23
24        MR. SCHMIDT:  We'll object, Your Honor.

Page 773

1        THE COURT:  What's the objection?
2        MR. SCHMIDT:  The objection is it's not
3  proper impeachment.  It's not consistent.
4        THE COURT:  Response?
5        MR. KAWANABE:  It absolutely is
6  inconsistent.  She just testified she -- what her
7  understanding was.  Her deposition testimony was she
8  has no understanding.  That is inconsistent.
9        MR. SCHMIDT:  Her deposition testimony is
10 she has no specific understanding of whether it's the
11 gold standard which is consistent with what she said
12 on the witness stand in terms of her personal views.
13        THE COURT:  Sustained.
14        MR. KAWANABE:  All right.  Let's not play
15 that clip.
16     Q  (By Mr. Kawanabe) May I ask you,
17 Ms. Hasseberg, do you have experience with mother's
18 milk or breast milk?
19     A  No.  Not daily, no.
20     Q  In your work or in your personal life, have
21 you had experience with breast milk?
22     A  Well, I breastfed my babies in the
23 beginning, so...
24     Q  Okay.  Then let me ask you a different

Page 774

1  question.  Do you have an understanding of the
2  significance of breast milk for human nutrition?
3      A  I guess I don't know what you mean.  Like
4  breast milk -- can you ask it again?
5      Q  Sure.
6      A  Sorry.
7      Q  Do you have any understanding of the
8  significance of breast milk for human nutrition?
9
10     A  Yes.
11     Q  And what is your understanding?
12     A  That moms can breastfeed their baby or they
13 could use donor milk which is a mom's milk.  And then
14 they could -- if they couldn't do that, then there's
15 other options which is formula.
16     Q  All right.  Would you stay with that
17 transcript and now go to page 16.
18     A  Okay.
19     Q  Lines 3 to 6.
20     A  Okay.
21
22        THE COURT:  Did you say 16?
23        MR. KAWANABE:  16.
24        THE COURT:  Thank you.

Page 775

1      Q  (By Mr. Kawanabe) Are you there?
2      A  Yes.
3      Q  All right.
4        MR. SCHMIDT:  We'll object again, Your
5  Honor, on the same ground.
6        THE COURT:  Response?  Same response?
7        MR. KAWANABE:  She just said she has an
8  understanding.
9        THE COURT:  Overruled.
10        MR. KAWANABE:  Mr. Figuera, let's play
11 Clip 3.
12        (The following video clip from the
13        transcript of Cindy Hasseberg was
14        played in open court, and transcribed
15        by the reporter as follows:
16        "QUESTION:  And you're telling me
17        your testimony is you don't have an
18        understanding of the significance of
19        breast milk for human nutrition.
20        "ANSWER:  I don't have an opinion
21        either way.")
22     Q  (By Mr. Kawanabe) That was your testimony in
23 May of 2022; is that correct?
24     A  Yes.

9  (Pages 772 to 775)

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 776

1    Q  Were you aware that mother's own milk is
2  associated with a lower risk of NEC?
3    A  I was not aware. I am now.
4    Q  Sorry. So when did you become aware?
5    A  I guess I know that we train our sales
6  force. Those slides, I had not seen those slides
7  prior to, so I was not aware until I started looking
8  into it.
9    Q  Okay. So in -- when you say, "I was not
10 aware," you're talking about May of 2022, correct?
11   A  Yeah. I had not been trained on that, so I
12 was not aware at the time.
13   Q  Okay. And by seeing those slides, you're
14 talking about slides that were shown to you in that
15 deposition in May of 2022?
16   A  I don't know if it was shown to me there,
17 but I started looking into it.
18   Q  Okay.
19   A  So -- yeah.
20   Q  So before May of 2022, the Mead Johnson
21 medical sales force was unaware that mother's own milk
22 was associated with a lower risk of NEC?
23   A  That's not what I said. I didn't say the
24 medical sales force was unaware. I want to be clear.

Page 777

1  I said I did not sit through that training, so I was
2  unaware, but we do train our medical sales force.
3    Q  How do you know you train your medical sales
4  force about the risks of the NEC if you, as director
5  of the medical sales force, were unaware of that?
6    A  Because I've seen the training decks that go
7  out. I don't personally train them. We have a
8  training department that trains them, so I have seen
9  all of their trainings that go out.
10   Q  But you didn't see those trainings about NEC
11 until the deposition in May of 2022?
12   A  Yeah. Because I didn't sit through the
13 trainings, yeah, so I didn't know, right.
14   Q  So the director of medical sales force of
15 500 people for Mead Johnson is unaware of the
16 trainings that are shown to your sales force?
17   A  I was. The medical reps knew and their
18 managers knew, and then the one over manager knew. I
19 did not sit through those trainings in this role, so
20 yes.
21   Q  So what is your understanding of NEC risks,
22 the lower NEC risk due to mother's own milk today?
23   A  My understanding today is that there is a
24 lower risk of NEC if you can use mother's own milk.

Page 778

1    Q  How much lower?
2    A  I don't know.
3    Q  I thought you did some investigation?
4    A  I did. I went back and looked. I just
5  didn't memorize the stats. I -- I don't know.
6    Q  But there are stats?
7    A  Okay.
8    Q  Do you agree or disagree? Are there
9  statistics?
10   A  Yeah. I think on some of the slides there
11 were some percentages, yes.
12   Q  Now that you realize that mother's own milk
13 may decrease the risk of NEC, what actions have you
14 taken at Mead Johnson to let your sales force know
15 that?
16   A  My sales force already knew that. I did not
17 know that.
18   Q  How did you -- I'm sorry. Go ahead.
19   A  I was going to say the actions I've taken is
20 I've looked into it now and understood what we trained
21 them on and what they know.
22   Q  Okay. And so have you taken any other
23 actions with your new knowledge that mother's milk may
24 reduce the risk of NEC?

Page 779

1    A  I took the action to check and make sure it
2  is in all of our trainings and trainings to the
3  medical sales force and also trainings that we give
4  out to the physicians.
5    Q  Great. So what communications do you tell
6  physicians that mother's milk reduces that risk of
7  NEC?
8    A  I -- I don't speak to the physicians. Is
9  that -- is that what you asked?
10   Q  Well, yeah. You just said you viewed the
11 trainings of your medical sales force about what they
12 talked to physicians about. So what did they talk to
13 physicians about?
14   A  I said we have trainings that go out to
15 physicians as well, like trainings that are called
16 CMEs continuing education-type trainings and things
17 doctors can -- can sign up to see and view, and those
18 are sponsored by us, done by peers in their community,
19 and they can see those.
20   Q  Okay. Great. We'll come back to those
21 shortly.
22   A  Okay.
23   Q  Have you ever investigated the proposition
24 that babies in the NICU -- well, first what is a NICU?

10 (Pages 776 to 779)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 780

1    A   A NICU is a neonatal intensive care unit, so
2  it's a unit like a regular ICU, but it's meant for
3  preemie babies, small babies.
4    Q   These are the preterm babies we discussed?
5    A   Yes.
6    Q   Have you ever investigated the proposition
7  that babies in the NICU who are fed formula get NEC at
8  much higher rates than babies who are not fed formula?
9    A   I have not investigated that, no.
10    Q   Why not?
11    A   Well, because Dr. Valentine and our medical
12  arm, our R&D arm, our quality arm they would look into
13  those things.
14    Q   So why would you investigate that mother's
15  milk helped lower the risk of NEC but not investigate
16  Mead Johnson's formula would increase the risk of NEC?
17    A   Well, because I didn't investigate the two
18  topics. I investigated whether or not we are training
19  our people the way that we believe we're training, so
20  that's what I went back to look at.
21    Q   Oh, I see. And so did you -- do you train
22  your sales force, Mead Johnson's sales force, that
23  Mead Johnson formula increases the risk of NEC to our
24  most fragile patients?

Page 781

1    A   We train them that mother's own milk reduces
2  the risk of NEC, and that's how I've seen the
3  research.
4    Q   Understood. That's not my question.
5    A   I hadn't seen any other research.
6    Q   That's not my question. My question is --
7    MR. SCHMIDT: Your Honor, I don't think you
8  can interrupt the witness when she's giving an answer.
9    THE COURT: Let her finish her answer.
10    Q   (By Mr. Kawanabe) I apologize.
11    A   I understand.
12    Q   That wasn't -- I'm sorry. Are you done?
13  That wasn't my question. My question is: What
14  training does Mead Johnson's sales force give -- what
15  training does Mead Johnson give to its sales force
16  about the risks of its formula and NEC?
17    A   The only slides I've seen in the training
18  deck are those that show that there's a reduced chance
19  of risk with NEC if you're using mom's own milk.
20    Q   So just to be clear, Mead Johnson, to the
21  best of your knowledge as director of the medical
22  sales force, gives no training about the risks of
23  formula and NEC in preterm infants; is that correct?
24    A   Yes.

Page 782

1    Q   If you were aware that a Mead Johnson
2  product your team sold significantly increased the
3  risk of a deadly disease, you'd want Mead Johnson,
4  your company, to inform doctors and moms, right?
5    A   Yes.
6    Q   Let's take a look at Exhibit 3097. And
7  Ms. Hasseberg, we're going to pull up many documents
8  on the screen, but if you'd like a paper copy, you
9  just let me know and we'll get that to you. Okay?
10    A   Okay. Is this my screen?
11    Q   That is your screen. And also let me know
12  if something doesn't pop up on there. But first let
13  me get it into evidence.
14    MR. SCHMIDT: Counsel, can I get a paper
15  copy?
16    MR. KAWANABE: Yeah.
17    MR. SCHMIDT: Thank you.
18    MR. KAWANABE: Your Honor, I don't think
19  this is objected to. Move to admit Plaintiff's
20  Exhibit 3097.
21    THE COURT: Any objections?
22    MR. SCHMIDT: No objection, Your Honor.
23    THE COURT: Plaintiff's 3097 is admitted.
24    (Plaintiff's Exhibit 3097 has been

Page 783

1  admitted into evidence.)
2    MR. KAWANABE: May I publish, Your Honor?
3    THE COURT: Yes, you may.
4    MR. KAWANABE: I just have to press this
5  button. Hopefully that works. And then, Mr. Figuera,
6  are you able to put it up on that screen? I'm not
7  able to make this screen work. I'll press the button
8  again. Okay. Great.
9    Q   (By Mr. Kawanabe) So this is the pediatric
10  product guide for Mead Johnson; is that correct?
11    A   Yes, it is.
12    Q   And I'll represent that this is, I think,
13  from 2017. Okay?
14    A   Okay.
15    Q   All right. So is it fair to say that
16  this -- have you seen this pediatric guide before?
17    A   Yes.
18    Q   All right. And your pediatric product guide
19  contains a listing of all Mead Johnson pediatric
20  nutrition products; is that correct?
21    A   Yes. It does.
22    Q   Both its products for full-term babies as
23  well as preterm babies?
24    A   Yes.

11  (Pages 780 to 783)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 784

1    Q   And Mead Johnson advertises that its
2    products offer the best start in life, correct?
3    A   Yes.
4    Q   And you can see that bolded in the right
5    side of your product guide; is that right?
6    A   Yes.
7    Q   And the pediatric product guide is
8    distributed by your sales staff to hospitals and other
9    purchasers of Mead Johnson products; is that right?
10   A   Yes.
11   Q   Okay.  Let's turn to page 44, please.
12       And part of this product sales guide and --
13   and just to give the jury an idea fair to say the
14   product sales guide is -- is over hundred pages?
15   A   Yes.
16   Q   Okay.  And on page 44, you can see on your
17   screen starts with the premature infant formulas and
18   products section of the sales guide; is that right?
19   A   Yes.
20   Q   All right.  Let's go page 47.  And starting
21   at page 47 of this exhibit, begins Mead Johnson's
22   description of Enfamil Premature 24 Cal, correct?
23   A   Yes.
24   Q   And -- may I just refer to this as "Enfamil

Page 785

1    24"?
2    A   Sure.
3    Q   Enfamil 24 is is -- is a cow milk-based
4    product; is that fair?
5    A   Yes.
6    Q   And that differs from other products that
7    are human milk-based; is that fair?
8    A   In our portfolio, we don't have any
9    human-based products, just bovine milk.
10   Q   So in Mead Johnson's portfolio, it only has
11   cow-based products; is that correct?
12   A   Well, we're just an infant formula company,
13   so we don't have any human milk.
14   Q   Understood.
15       But you do understand that there are
16   formulas that are human milk-based not cow milk-based?
17   A   What kinds of formula?
18   Q   Like Prolacta.
19   A   Yes.  Yes.
20   Q   That's one of your competitors?
21   A   We don't compete against them, but I'm aware
22   that they're out there.
23   Q   Okay.
24       MR. KAWANABE:  Mr. Figuera, can we go ahead

Page 786

1    and blow up just parts of this one at a time.
2    Q   (By Mr. Kawanabe) That paragraph on the far
3    left, the description indication section,
4    Ms. Hasseberg, can you confirm that the description
5    indication for Enfamil 24 includes the Enfamil
6    premature nutrition portfolio is the only premature
7    infant formula line designed to meet the latest global
8    expert recommendations for all labeled nutrients?  Is
9    that what it says there?
10   A   Yes.
11   Q   And Mead Johnson, in its marketing, says
12   that this product meets 2014 global expert
13   recommendations for 100 percent of all nutrients; is
14   that fair?
15   A   Yes.
16   Q   And those 2014 global expert
17   recommendations, are those the Koletzco guidelines?
18   A   I didn't write this, but I'm assuming that
19   is what they're referring to.
20   Q   And if you look on the second column there,
21   Mead Johnson advertises things like that second bullet
22   point, the "80:20 whey to casein ratio patterned after
23   early human milk," correct?
24   A   Yes.

Page 787

1    Q   And then if you'll look at the fourth bullet
2    point, talks about DHA at 0.34 percent of total fatty
3    acids, similar to the worldwide breast milk average,
4    to help support brain and eye development and blood
5    DHA concentration; is that correct?
6    A   Yes.
7    Q   That six bullet point talks about:  "A
8    carbohydrate blend of 60 percent corn syrup solids,
9    glucose polymers and 40 percent lactose that is easily
10   digested and helps avoid overloading the premature
11   infant's capacity to digest lactose."
12       Did I read that correctly?
13   A   You did, yes.
14   Q   Okay.  Fair to say there's a number of
15   claims in this Mead Johnson product guide that
16   compares it's cow-based formula to human milk?
17   A   Was that a question?
18   Q   It was.
19   A   I apologize.
20   Q   That's okay.
21   A   Yeah.
22   Q   Fair to say that Mead Johnson, in its
23   descriptions of Enfamil 24, makes many claims that
24   it's cow-based milk product is similar to human milk?

12  (Pages 784 to 787)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 788

1    A   Yeah, we do. We believe it's the gold
2    standard at Mead Johnson, and we try to mirror it as
3    close as we can with the science that we have to do
4    so, yes.
5        Q   Nowhere on here does it say that Mead
6    Johnson's formula is dissimilar to human milk in any
7    way?
8        A   Other than all of the other things about
9    human milk that aren't written here?
10       Q   No, no. So we went over some of the
11   statements that Mead Johnson makes that its products
12   were similar to human milk, right?
13       A   Uh-huh.
14       Q   Do you see any statements here by Mead
15   Johnson saying, "Well, cow-based -- my cow-based
16   product is different from human milk" in any way?
17       A   Not called out like that, no.
18       Q   Certainly does not say that Mead Johnson's
19   formula has a higher risk of NEC than human milk,
20   correct?
21       A   No. It wouldn't.
22       Q   Let's move -- we'll come back to the product
23   guide shortly, but let's move to the Enfamil 24
24   product label. Okay?

Page 789

1    A   Okay.
2        MR. KAWANABE: Your Honor, move to admit
3    Exhibit -- Exhibit P1.
4        THE COURT: 1?
5        MR. KAWANABE: 1.
6        THE COURT: Any objections?
7        MR. SCHMIDT: No objection, Your Honor.
8        THE COURT: Plaintiff's 1 is admitted.
9    Thank you.
10           (Plaintiff's Exhibit 1 has been
11           admitted into evidence.)
12       Q   (By Mr. Kawanabe) Ms. Hasseberg, this is the
13   label for Enfamil 24, correct?
14       A   Yes, it appears to be.
15       Q   Okay. And if you look at the top in the
16   white lettering on the pink: "Designed to meet 2014
17   global expert recommendations."
18           Do you see that?
19       A   Yes.
20       Q   That was -- that tracks the language we saw
21   in the product guide --
22       A   Yes.
23       Q   -- just a minute ago.
24           And those, you think, are likely the

Page 790

1    Koletzco guidelines; is that correct?
2        A   Yeah. I don't have any role in labeling,
3    but I -- I believe that to be that, yes.
4        Q   Okay. That's okay.
5            And then if you could --
6        MR. KAWANABE: Can we turn the orientation
7    of the label so we can read what's on the sides?
8    "Instructions for use," let's blow that up.
9        Q   (By Mr. Kawanabe) And Mead Johnson writes its
10   instructions for use on the label; is that correct?
11       A   Yes.
12       Q   All right.
13       MR. KAWANABE: Let's blow that back,
14   reorientate so we can read the other side of the
15   label. Let's blow that bottom part up.
16       Q   (By Mr. Kawanabe) And Mead Johnson talks
17   about what the product contains; is that fair?
18       A   Yes.
19       Q   Okay. And does Mead Johnson on its label
20   for Enfamil 24 provide any warnings of risks of NEC?
21       A   No.
22       Q   Does Mead Johnson in its product guides
23   provide any warnings about the risks of NEC?
24       A   Not in the one we just reviewed. I -- I

Page 791

1    don't know if there's any other product guides out
2    there that do that. I don't write those, but in the
3    one we looked at, you're correct.
4        Q   Have you seen any Mead Johnson materials of
5    any kind that provide any warnings about the risks of
6    formula and NEC?
7        A   No.
8        Q   Now, Enfamil 24 is not a prescription drug,
9    correct?
10       A   Correct.
11       Q   Anyone can buy it off of Mead Johnson's
12   website?
13       A   You may be able to buy it off the website.
14   It's not at retail, but you could be able to buy it
15   off the website. I don't know.
16       Q   Okay. I mean, do you dispute that I could
17   hop on the website right now and buy some Enfamil 24?
18       A   I didn't dispute. I just said I don't know.
19       Q   Okay.
20       A   I don't have anything to do with our
21   website. I don't actually know what all is on our
22   website and where you can get it.
23       Q   Okay.
24       A   I think you could get it at a pharmacy. So

13  (Pages 788 to 791)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 792

1    if you needed to go into like a Walgreens, they can
2    order it for you.
3        Q   Right. I don't need a prescription to buy
4    it?
5        A   You don't need a prescription, no. You just
6    need someone to order it like a DME or a pharmacy.
7    It's just not on the retail shelf.
8        Q   All right. Now, Mead Johnson used to sell a
9    product called Cafcit for use with premature infants,
10   at least until 2008 time frame; is that correct?
11       A   I don't know. I wasn't there when they had
12   that product, I guess. What time was it sold from?
13       Q   It was actually sold through 2008, so let me
14   back up.
15       A   Yeah.
16       Q   In 2007, you were the national accounts
17   manager at Mead Johnson, correct?
18       A   Yeah.
19       Q   And that -- duties included contract pricing
20   including products with hospitals, correct?
21       A   Yeah. And I've never seen it on a contract.
22   So I do know that Cafcit exists, but --
23       Q   Sure.
24       A   -- it's never been anything in a portfolio

Page 793

1    I've had, so I just don't know.
2        Q   Understood. But you have knowledge as you
3    did as a sales rep of Mead Johnson's products
4    portfolio, correct?
5        A   I don't think we had it in 1999 when I was a
6    sales rep.
7        Q   No, I understand. I'm talking -- sorry.
8        A   Sorry.
9        Q   Did I cut you off?
10       A   No, you didn't. No.
11       Q   In 2007, you had an understanding of the
12   product portfolio because you would negotiate
13   contracts with hospitals, correct?
14       A   I need to be clear that I only know the
15   contracts that we put on the -- the products we put on
16   the contracts for the hospitals. Cafcit was not one
17   of those.
18       Q   Okay.
19       A   I don't know even know if we had it
20   available or how you could buy it.
21       Q   Understood.
22       A   Anything about it.
23       Q   Let me -- let me move to admit the Cafcit
24   label and ask whether or not you have any knowledge of

Page 794

1    it. Okay?
2        A   Okay.
3            MR. KAWANABE: So move to admit
4    Exhibit P3330.
5            THE COURT: 3330?
6            MR. KAWANABE: Yes, Your Honor.
7            THE COURT: Any objections?
8            MR. SCHMIDT: Yes. We'll object both on the
9    Motion in Limine No. 4 we filed that Your Honor spoke
10   to, and the witness has been clear she has no
11   knowledge of it.
12           THE COURT: Subject to the objection, 3330
13   is admitted.
14               (Plaintiff's Exhibit 3330 has been
15               admitted into evidence.)
16           MR. KAWANABE: Thank you, Your Honor.
17       Q   (By Mr. Kawanabe) Let's pull up
18   Exhibit P3330. I'll represent to you that this is the
19   Cafcit label. Okay, Ms. Hasseberg?
20       A   Okay.
21       Q   Let's turn to the second page. I know
22   that's tough to read.
23           MR. KAWANABE: Mr. Figuera, can you point
24   out the indication and important safety information,

Page 795

1    the first five paragraphs, please.
2        Q   (By Mr. Kawanabe) Ms. Hasseberg, you can see
3    that this is a Cafcit indicated for short-term
4    treatment of apnea and prematurity in infants between
5    30 -- 28 and 33 weeks gestational age, correct?
6            MR. SCHMIDT: Objection. Foundation with
7    this witness.
8        A   I can see that you're reading this.
9            THE COURT: Hang on. Hang on. Let me rule.
10   Let me rule.
11           THE WITNESS: Sorry.
12           THE COURT: You're all right.
13           Repeat your question, please.
14           MR. KAWANABE: Sure. I simply asked her to
15   confirm what it says in the indication section. I can
16   read it again.
17           THE COURT: Off the label?
18           MR. KAWANABE: Off the label.
19           THE COURT: Your objection is?
20           MR. SCHMIDT: She's already said she has no
21   knowledge of this.
22           THE COURT: And you're just asking her to
23   read off just what the label states, right?
24           MR. KAWANABE: I can rephrase, Your Honor.

14  (Pages 792 to 795)

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 796

1    THE COURT:  Please do.
2    Q   (By Mr. Kawanabe) Ms. Hasseberg, you were the
3    national accounts manager in 2007, correct?
4    A   Yes, correct.
5    Q   And you were dealing with selling Mead
6    Johnson products to hospitals?
7    A   Formula products, yes.
8    Q   Understood.
9        And in dealing with products in the
10   hospitals, would you actually -- would you help
11   promote those products, as well?
12   A   No. I did the contracts.
13   Q   Understood.
14       Were you aware that Mead Johnson, in labels
15   for some of its other products, actually warrant that
16   its products might be linked -- excuse me.
17       Were you aware that Mead Johnson as to some
18   of its other products actually warned on its label
19   that there was literature about the development of NEC
20   in the use of its products?
21   A   No.
22   Q   Does that surprise you?
23   A   I just don't even know about this product.
24   I didn't even know we had a product like this. So

Page 797

1    this whole -- this whole thing surprises me.
2    Q   Okay. Let me ask you different question.
3    A   Okay.
4    Q   Does it surprise you that Mead Johnson would
5    warrant about the risks of NEC in any of its products?
6    A   No, I think if they -- the regulatory team
7    that looks at that needed to put a warning on it, they
8    would do just that. It's out of my scope to assume
9    what they should or shouldn't do, but I do trust the
10   regulatory and the LEX team and our medical affairs.
11   That is their role.
12   Q   Okay. And if there were studies that linked
13   formula, Enfamil 24, to increased risks of NEC, then
14   do you think Mead Johnson would warn others on its
15   label for Enfamil 24?
16   A   I trust those departments, that they would
17   do the right thing. If that's what needed to happen,
18   yes. It's out of my scope, but yes, I trust that they
19   would do what's right.
20   Q   Warn about risks of NEC, correct?
21   A   If it needed to be done, yes.
22       MR. SCHMIDT: Objection. Foundation.
23   A   I don't know.
24       THE COURT: Overruled.

Page 798

1    Q   (By Mr. Kawanabe) I'm sorry. What was your
2    answer?
3    A   I don't know. It's just out of my scope. I
4    don't -- I don't know how they work. I don't know
5    what they do, but yes, I believe that if there was any
6    need for risk on their labels and if you're telling me
7    they've done it before, then yes, I believe they would
8    have done it if that's what needed to happen.
9    Q   Specifically risks of NEC, that's what I'm
10   referring to. You understand that?
11   A   Absolutely, yes. Any risk. And especially
12   that because that's what you're asking about. I do
13   believe they would have done it if that's the -- the
14   need they had, yes.
15   Q   By "they," you're referring to your company,
16   Mead Johnson, correct?
17   A   No. I'm specifically referring to the LEX
18   team within Mead Johnson, the regulatory quality
19   medical affairs teams, that's what they do.
20   Q   Right. And could you tell the jury what
21   LEX --
22   A   LEX is like a legal compliance team, and
23   they work with regulatory and people that send our
24   products through the FDA, and -- and that's where we

Page 799

1    everything goes through.
2    Q   Thank you.
3    A   Yes.
4        MR. KAWANABE: We can take that down.
5    Q   (By Mr. Kawanabe) Ms. Hasseberg, would you
6    agree that Mead Johnson sales force does not like
7    product warnings because this may dissuade people or
8    hospitals from buying its products?
9    A   No. There would be no reason for that,
10   especially 24 Cal because they get no credit for
11   anything that goes in in a premature NICU, so nothing
12   would ever dissuade them.
13   Q   I'm sorry. I was talking about the -- your
14   sales force.
15   A   Yeah, that's what I'm saying, my sales
16   force.
17   Q   Okay. So your sales force -- let me ask
18   you --
19   A   They would want us to do what's right. It
20   doesn't affect them either way if product has a
21   warning on it as far as their performance, if that's
22   what you were linking it to. They would want us to do
23   what's right, and I think they believe that we would.
24   Q   I see. And when you're saying "what's

15  (Pages 796 to 799)

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 800

1  right" are you referring to warning doctors --
2      A  Yes.
3      Q  -- or moms about known risks?
4      A  Yes, what's right.
5      Q  Okay.  Let's move topics and talk about Mead
6  Johnson's competition.  Abbott is a company in your
7  space; is that fair?
8      A  Yeah.  They're almost the only other company
9  in our space.
10     Q  That was my next question.  Abbott is Mead
11  Johnson's only competitor in hospitals; is that fair?
12     A  Yes.
13     Q  Let's take a look at Plaintiff's Exhibit 8.
14     MR. KAWANABE:  Mr. Schmidt, I don't know if
15  this is objected to.  I don't think so.
16     MR. SCHMIDT:  I need to look on a
17  preservation issue.
18     No objection, Your Honor.
19     THE COURT:  Plaintiff's Exhibit 8 is
20  admitted.
21            (Plaintiff's Exhibit 8 has been
22            admitted into evidence.)
23     Q  (By Mr. Kawanabe) Bear with me,
24  Ms. Hasseberg.

Page 801

1            Exhibit 8 is entitled "US Hospital Business
2  Review," and you see that's got a Reckitt logo on the
3  upper right; is that fair?
4      A  Yes, that's fair.
5      Q  All right.  Great.  Let's turn to page 2,
6  please.  And actually, I'm sorry.  Let's go back to
7  page 1.
8            Just to orientate the jury, this document is
9  dated November 5 of 2018; is that fair?
10     A  Yes.
11     Q  All right.  If you'll go to page 2, it talks
12  about core US business drivers; is that right?
13     A  Yes.
14     Q  And page -- page 3 talks about the medical
15  model.  Let me pause and ask you a few questions about
16  that --
17     A  Okay.
18     Q  -- and whether you disagree or agree with
19  any of this.
20     A  Okay.
21     Q  So at Mead Johnson, on the bottom there
22  there's that pink arrow.  Does Mead Johnson have as
23  its medical model acquisition retention and extension?
24     A  Yes, we do.

Page 802

1      MR. KAWANABE:  And, Mr. Figuera, can we blow
2  up that pink arrow line, please.
3      Q  (By Mr. Kawanabe) Would you please explain to
4  the jury what that means?
5      A  Yeah.  What it means is that when you're
6  acquiring someone into your family of formulas, you
7  give them a chance the trial your product.  And if
8  tolerance is good, then you hope that you retain them
9  through their life of feeding, meaning that if they
10  needed to switch to a solutions product or they needed
11  to go to like a Nutramigen, which is for allergies,
12  that you can move them along.  Their doctor can kind
13  of keep prescribing through.
14            We believe that we have a good product and
15  that patients will find the tolerance well.  And we
16  hope that when they try it, they feel like we do about
17  it.
18     Q  Thank you.
19     A  Yes.
20     MR. KAWANABE:  Blow that back down.  Blow up
21  the first third, please.  Tell us about what this
22  means, the top -- yeah, exactly.
23     Q  (By Mr. Kawanabe) Prenatal to birth to
24  postnatal, what does that mean?

Page 803

1      A  It means that like sometimes in OB offices
2  when moms are going in, if they've expressed that
3  they're not going to breastfeed or maybe they can't
4  breastfeed or they had troubles with their first child
5  breastfeeding, then it gives them a chance for the
6  doctor to have conversations in the OB office, which
7  is prenatal.
8            And then birth is whenever they're in
9  hospitals, so there is our product in hospital that if
10  doctors want to make sure a baby tolerates feeds
11  before they go home on any certain product, they have
12  that option.
13            And then postnatal is in the doctor's
14  office.  If he feels like maybe a routine product
15  wasn't tolerated, he could move them to allergy or
16  other products that they need.
17     Q  And under "birth in hospital" in bold, it
18  says, "capture FF starts."  What does that mean?
19     A  That's formula feeding starts.  Anyone who
20  needs to trial a product or a formula, we hope they
21  choose ours over Abbott's.
22     Q  Over Abbott's?
23     A  Yeah.
24     Q  Okay.  Thank you.

16  (Pages 800 to 803)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 804

1     A   Yes.
2     Q   FF stands for formula feeding; is that
3   correct?
4     A   Yes.
5     Q   Okay. Great.
6         Turn to page 9, please.
7         MR. KAWANABE: If we can blow up that slide
8   for the witness. It says "in exclusive contracts."
9     Q   (By Mr. Kawanabe) What are exclusive
10  contracts?
11    A   Exclusive contracts are things that
12  hospitals request where they might want to say, "We
13  want an exclusive contract, meaning we just want one
14  vendor in the hospital. We don't want multiple
15  vendors within the category." So they can request
16  what's called an exclusive product or contract from
17  any vendor.
18    Q   Does that mean that if they do -- if the
19  hospital, say, a hospital exclusively contracts with
20  Mead Johnson, then they would not have Abbott
21  products?
22    A   No. The contracts are like 90 percent or
23  80 percent. A hospital can dictate what -- what
24  compliance level they want. They can do 50. They can

Page 805

1   do 80. They can do 90. And then they have 10 percent
2   leeway to use anything else they want. But if they
3   order formula, it would be from us or Abbott at that
4   90 percent, 10 or 80 percent and 20.
5     Q   Okay. Focus on the 90 percent.
6     A   Okay.
7     Q   So a hospital agrees to buy 90 percent of
8   its formula from Mead Johnson. What additional
9   benefits does it get if it does that?
10    A   Well, most of the reasons hospitals do this
11  in all categories is they just don't want to deal with
12  multiple vendors for the same products, so it's just
13  called streamlining in their supply chain.
14        Benefits would be, again, they only have us
15  to deal with, unless they're ordering 10 percent from
16  Abbott. And then they get better pricing since
17  there's volume discounts associated, like with any
18  category.
19    Q   I see.
20        In addition to the volume discounts what
21  about rebates, how does that work?
22    A   They don't get rebates.
23    Q   Okay.
24    A   The only rebate they would get is if either

Page 806

1   side of the company didn't have what you might say
2   a -- a certain product. If there was a gap in the
3   product line, they could rebate for that.
4     Q   I see.
5     A   But otherwise, the hospitals don't get
6   rebates -- or at least -- I don't know about Abbott,
7   but from us.
8     Q   Understood.
9         So Mead Johnson has a hospital that agrees
10  to the 90 percent?
11    A   Uh-huh.
12    Q   It gets certain discounts, volume discounts,
13  correct?
14    A   Well, everything is no charge anyway, so
15  it's a theory of volume discounts, but all product
16  that goes in is no-charge samples.
17    Q   You actually give your product away for free
18  to the hospital?
19    A   Every infant formula company does because
20  they're samples.
21    Q   Okay. Sorry, I don't mean the cut you off.
22    A   It's okay.
23    Q   So the 90 percent you get -- they get free
24  product or samples, yeah?

Page 807

1     A   Yep.
2         THE COURT: Is that a "yes"?
3     A   Sorry, yes.
4     Q   (By Mr. Kawanabe) Okay. If there's a gap in
5   the Mead Johnson product line, they can buy somebody
6   else -- else's line and then get a rebate from Mead
7   Johnson?
8     A   Yes. And same on the other side. If Abbott
9   was missing a product and we had one, then they could
10  rebate.
11    Q   Got it.
12        And then Mead Johnson also provides other
13  benefits, right, like education to hospital staff?
14    A   Education is provided anyway. It doesn't
15  just come along with the 90 percent. Medical
16  education to doctors is something that we have, so
17  it's provided regardless.
18    Q   Okay. Mead Johnson also provides software
19  systems, correct, to hospital?
20    A   Both companies have a partnership with a
21  software system that helps track the bottles that come
22  in, which is important. You can scan the -- like the
23  nurse at the -- at the bedside could scan the bottle
24  so it records exactly what that baby was fed, and then

17 (Pages 804 to 807)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 808

1  it makes sure that the diet is never wrong.
2  Q  Okay. And then what are PENS?
3  A  That is part of that Timeless system. PENS
4  is a part of the Timeless system. PENS will run the
5  nutrient values of what's scanned. So if the -- if
6  they wanted to scan either breast milk or formula,
7  either one, they can scan it and then that puts it in
8  the nurse's chart. And the nurse can see -- like on
9  our label, it would tell them exactly which product it
10  was. They can record how much was given, and it helps
11  track the nutrients.
12  Q  I see.
13  And if -- if contract -- a hospital does a
14  90 percent contract, do they get those PENS?
15  A  They get PENS and Timeless if they choose
16  Timeless. They can have both for free. We hope that
17  they do systems like this because there's a lot of
18  safety behind tracking what formula and what feeds go
19  to each baby.
20  Q  Okay.
21  A  So that's good. I mean, it tracks
22  everything. It can track breast milk. It can track
23  Abbott's products. It can track our products. It can
24  track anything but it's -- nurses seem to like it.

Page 809

1  Q  And I've seen the term "flip the
2  hospital" --
3  A  Yeah.
4  Q  -- in Mead Johnson's documents. What does
5  that mean?
6  A  Yeah. Well, flip is a kind of a slogan that
7  we would say. If Abbott had a 90 percent and maybe we
8  didn't have as much, but we would like to have the
9  90 percent, so we would like to go in and get more
10  business from the hospital, so we'd love to flip it to
11  us.
12  We believe our products are better, and we'd
13  like to have them trying our products versus Abbott's.
14  I'm sure Abbott feels the same way.
15  Q  Understood.
16  But by "flip the hospital," it means being
17  exclusive with Mead Johnson or 90 percent?
18  A  Yeah, or even 50/50. If they're exclusive
19  with Abbott and they want to do a 50/50 because they
20  want to try both products, they can do a 50/50. That
21  could be a flip.
22  Q  Fair to say that Abbott, your main
23  competitor, has about 80 percent of the hospital
24  market share. Mead Johnson has about 20 percent?

Page 810

1  A  We're very, very small as a hospital player.
2  Yeah, they have a -- a broader portfolio and we kind
3  of had a gap in our NICU portfolio, so they have more
4  options than we have.
5  Q  So the answer is yes?
6  A  Yes.
7  Q  Abbott has 80 percent?
8  A  Yeah. No, they had 70 at the highest I'd
9  seen.
10  Q  Okay.
11  A  Yeah.
12  MR. KAWANABE: Let's go to Slide 5, please.
13  Q  (By Mr. Kawanabe) You've got -- Mead Johnson
14  has a slide that 1 point IH share of start is worth
15  7 million in net sales.
16  Do you know what that means?
17  A  I don't know what this slide is about.
18  Q  Okay.
19  A  And I don't --
20  Q  That's okay.
21  A  Acquisition is removed from --
22  Q  Do you know what a WIC -- women, infant
23  children -- program is?
24  A  I do know what that is.

Page 811

1  Q  Would you tell the jury what that is.
2  A  That would be a state or government program
3  where if mom couldn't afford formula, she could go get
4  it. In some states she would be getting our brand of
5  formula, and in other states she would be getting
6  Abbott, if Abbott had the WIC program. There's one in
7  every state.
8  Q  Thank you.
9  A  Yes.
10  MR. KAWANABE: Mr. Figuera, let's turn to
11  page 34.
12  Q  (By Mr. Kawanabe) This exhibit also includes
13  the hospital 2019 plan. Do you see that?
14  A  Yes.
15  Q  Okay. Turn to page 35, "Hospital key
16  learning and implications."
17  And the second bullet says: "The use of
18  human milk, including donor milk, continues to
19  increase in the hospital," including the AAP statement
20  from 2016, "BB-friendly certified hospitals have
21  increased from 70 to 500 since 2010."
22  What is your understanding of that?
23  A  Yeah, that the use of human milk was rising
24  and that baby-friendly was something that came out

18  (Pages 808 to 811)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 812

1  around that time that was encouraging hospitals
2  everywhere to breastfeed more, and they were becoming
3  certified that you could be a baby-friendly hospital
4  or you could have a baby-friendly hospital
5  certification.
6  Q  Understood.
7  A  Yeah.
8  Q  Also, this move towards human milk, did that
9  include human donor milk versus your cow-base formula?
10  A  I don't know in 2010 if it did, but yes,
11  over time it has, yes.
12  Q  That has only increased the hospital's move
13  to a human donor milk products versus cow-based donor
14  milk products?
15  A  Yeah.  I would agree with that, yeah.
16  Q  Let's go to page 45.  Sorry, let's go to
17  page 46.
18  So is it fair to say that Mead Johnson has
19  been investigating partnerships with human milk
20  products like Medolac?
21  A  I -- I don't know.
22  Q  Okay.  That's fine.
23  Do you have a general knowledge that Mead
24  Johnson has been investigating, at least for the past

Page 813

1  10 to 15 years, partnering or acquiring companies that
2  make human-based milk formula?
3  A  No.  I'm not aware of that.
4  Q  Okay.
5  MR. KAWANABE:  Let's take that document
6  down.  Exhibit 4395.
7  Mr. Smith, I'll hand you a paper copy in
8  just a second.
9  MR. SCHMIDT:  Which number was it?
10  MR. KAWANABE:  4395.
11  MR. SCHMIDT:  Thank you.
12  MR. KAWANABE:  I move to admit, Your Honor.
13  MR. SCHMIDT:  No objection, Your Honor.
14  THE COURT:  Plaintiff's 4395 is admitted.
15  (Plaintiff's Exhibit 3097 has been
16  admitted into evidence.)
17  Q  (By Mr. Kawanabe) Can we turn to page 31?  Is
18  this a master tracking of the PENS that you had already
19  just testified to?
20  A  Yes, it appears that it is.
21  Q  Okay.  This is part of the -- how Mead
22  Johnson -- sorry.
23  This is part of Mead Johnson's benefit
24  package for some of its hospitals; is that fair?

Page 814

1  A  Yeah.  If you're 90 percent, yes, you have
2  an option to use Timeless or PENS.
3  Q  Let's go to page 26.
4  What is the "hospital flip and win
5  competition"?  Are you aware of that?
6  A  Yeah.  Sometimes marketing will roll out
7  some contests and things to the reps.
8  Q  Yeah, but could you actually explain what --
9  what that is, "flip and win"?
10  A  Can I read it real quick?
11  Q  Yeah, of course.  And let me know if you
12  need me to blow up any part.
13  A  Thank you.
14  Okay.
15  Q  What is "flip and win"?
16  A  Flip and win was a program or a contest or
17  something that the marketing team had rolled out
18  because our in-hospital share was just really, really
19  small in the market compared to our competitors, and
20  we were trying to bring our portfolio back and make
21  the gaps in our piece of our portfolio better, and so
22  we were trying to grow our in-hospital share.
23  Q  Give me just a second.
24  A  Okay.

Page 815

1  MR. KAWANABE:  Let's go back to Exhibit 8.
2  Slide 10.  Can you blow that up?
3  Q  (By Mr. Kawanabe) As of 2018, Mead Johnson
4  was on par with Abbott regarding the value proposition;
5  is that correct?
6  A  That is what this says.  What is the value
7  proposition?
8  Q  That was my next question.
9  A  Oh, sorry.
10  Q  If you don't know, that's fine.
11  A  I don't know.
12  Q  Okay.  Would you agree that Abbott in 2018
13  had an advantage over Mead Johnson in all other
14  criteria, especially organization?
15  A  In every criteria, even portfolio.
16  Q  So you would agree with that?
17  A  Yes.
18  Q  All right.
19  MR. KAWANABE:  Let's go to Slide 12.
20  Q  (By Mr. Kawanabe) We're still focusing --
21  focusing on Mead Johnson's business model.  Okay?
22  A  Okay.
23  Q  Would you agree that it is critical to
24  get -- excuse me.

19  (Pages 812 to 815)

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 816

1    Would you agree at Mead Johnson that the
2  hospital is critical for US customer acq- --
3  acquisition?
4    A   Yeah.  I think doctors trialing our product
5  in the hospital with patients and moms is important.
6    Q   And why is that?
7    A   Because I think you want them to try it so
8  that they know if it's tolerated or not.  He has, you
9  know, the baby in house and the term a few days, in
10 the NICU a lot longer, and so it gives them time to
11 try it and make sure it's tolerated well.
12   Q   I think you told us that the NICU is where
13 those -- those preemies -- right -- preterm babies go;
14 is that correct?
15   A   Yes.
16   Q   And Mead Johnson believes that the NICU is
17 key driver for winning hospital contracts, correct?
18   A   Yeah, it is because the NICU has those
19 high-acuity babies, and you have to have specialized
20 formulas that are the higher caloric density formulas.
21 And so if you have a gap in your portfolio in that
22 area, then you couldn't be the vendor for the hospital
23 because you can't feed a multitude of babies that are
24 in there.

Page 817

1    Q   Right.
2    A   So the NICU does become very important.  You
3  need to be able to have a portfolio that doctors can
4  use where they need.
5    Q   Right.  And -- and the NICU is a key driver
6  for winning the hospital contracts, correct?
7    A   Well, it would have to be because those are
8  the specialty products.  There is no backup.  If a
9  baby couldn't breastfeed and needed a 24 Cal, you've
10 got to have a 24 Cal.  If you don't have one, then you
11 can't feed that child.  So yes, the NICU is very
12 important.
13   Q   Right.  But I'm -- I'm talking about
14 hospital contracts, the entire contracts for a
15 particular hospital, the NICU is key, right?
16   A   Yes, because you have to have the product.
17 Remember, everything goes in at no charge, so the
18 contract doesn't matter in any other way other than
19 you have to have the portfolio of product so you have
20 a product available for each baby.  Like a maple syrup
21 urine disease baby, if you don't make a maple syrup
22 urine disease product, you can't feed that child.  We
23 make one of those.
24   Q   I understand?

Page 818

1    A   You just have to have the full portfolio is
2  what I'm trying to --
3    Q   Right.  So the key to winning hospital
4  contracts would be for those babies, preterm babies in
5  the NICU to be using Mead Johnson formula, correct?
6    A   If they're not breastfeeding, they will need
7  some formula, and I hope they're trialing ours, yes.
8      MR. KAWANABE:  Slide 13.
9    Q   (By Mr. Kawanabe) Ms. Hasseberg, you
10 understand that a neonatologist -- first, what is a
11 neonatologist?
12   A   It would be doctor in the NICU who treats
13 the smallest babies that are neonates.
14   Q   And the neonatologist is the most
15 influential physician group in the hospital for
16 nutrition.
17      You agree with that?
18   A   Yes, from what I just said.
19   Q   Okay.
20   A   Just meaning that they need what they need.
21 Their babies are more acute.
22   Q   Right.
23   A   A term baby could almost take anything, any
24 formula of ours, competitors, but if you have a gap

Page 819

1  there, then that's important.
2    Q   Got it.
3      So a neonatologist is the most influential
4  physician group.  You'd agree with that?
5    A   Yep.
6    Q   Yes.  And the neonatologist works in the
7  NICU, correct?
8    A   Yes.
9    Q   And the NICU are where those preterm babies
10 are, right?
11   A   Yes.
12   Q   For Mead Johnson to win that hospital
13 contract, it needs to have those babies using Mead
14 Johnson formula, correct?
15   A   No.  That's not what I said.
16   Q   You disagree?
17   A   No.  The doctor decides who uses the
18 formula.
19   Q   No, I understand.
20   A   What I'm saying is it needs to be available
21 so that whatever the disease state the baby may have,
22 the doctor has a full portfolio to decide which
23 product --
24   Q   I understand.

20  (Pages 816 to 819)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 820

1    A  -- he needs to use.
2    Q  My question was a little different.
3       You did agree that -- that the NICU was key
4    to getting those hospital contracts?
5    A  Yes.
6    Q  Remember that?
7    A  Yes, yes.
8    Q  NICU is where the preterm babies hang out?
9    A  Yes.
10   Q  Those preterm babies are treated by
11   neonatologists, correct?
12   A  Yes.
13   Q  And for -- in order for Mead Johnson to get
14   that hospital contract, it needs to have those NICU
15   preterm babies using its formula. That's the key
16   driver?
17   A  Babies -- I guess that is still wrong, and
18   I'm sorry. I can't agree to it because I guess what
19   we're saying is different. What we're saying is that
20   your portfolio needs to be complete. So if a doctor
21   needs to write a script for a specialized product, he
22   can do that and its available.
23      I'm not saying he has to feed every baby in
24   there because there could be many other ways he choose

Page 821

1    to feed them. They could be getting vein feedings.
2    They could be getting donor milk, breast milk. But if
3    he needed formula because he didn't have those other
4    options, we have to have a full line of portfolio to
5    do that.
6       That's why it becomes so crucial for the
7    NICU and for neonatologists when they pick what
8    they're going to use in their hospitals.
9    Q  And that's to pick Mead Johnson's products?
10   A  Yes. For -- yeah, so they can watch for
11   tolerance.
12   Q  So we are saying the same thing?
13   A  You said it was so that we feed every baby
14   in the NICU. It is not about that. It's only the
15   formula feeding babies.
16   Q  Understood.
17   A  Okay. Thank you. We are saying the same
18   thing.
19   Q  With Mead Johnson products?
20   A  Yes. Yes.
21   Q  And if a hospital has that 90 percent
22   contract, then -- then they do have to feed 90 percent
23   of those babies with Mead Johnson formula, correct?
24   A  Yeah. They should be. It's close to

Page 822

1    90 percent as possible. There's actually a clause
2    that says that the 90 percent has variability because
3    we understand all census and all babies and diagnosis.
4    It's different in each hospital. Some hospitals need
5    more things than others.
6    Q  I'm sorry to cut you off. It really was
7    just a yes or no --
8       MR. SCHMIDT: Objection, Your Honor. If he
9    wants to re-ask it as a yes or no, he can, but he
10   can't cut her off in the middle of an answer.
11      THE COURT: It was a yes-or-no question and
12   that -- at that -- that question was a yes-or-no
13   question. And I feel that he's been graciously
14   allowing her to expand on other yes/no questions.
15      But ma'am, you need to answer the question
16   that's asked and stop. If he's got follow-up, he'll
17   ask his follow up. Okay?
18      THE WITNESS: Okay.
19      MR. SCHMIDT: May I bring a bottle of water
20   up.
21      THE COURT: Absolutely. Paul, here I got
22   it.
23      MR. SCHMIDT: Thank you, Your Honor.
24      THE COURT: You want to hand it this way.

Page 823

1    Hand -- hand it this way.
2       THE WITNESS: Thank you very much.
3       MR. KAWANABE: Just let me know when you're
4    ready.
5       THE COURT: We're going to take a break.
6    Not now -- not now, in a few minutes. So when you get
7    to a point where it's a good spot to take a break.
8       MR. KAWANABE: Yes, Your Honor. Just a few
9    more minutes, if that's okay.
10      THE COURT: Thank you.
11   Q  (By Mr. Kawanabe) Ms. Hasseberg, let me ask
12   the question a little differently. If Mead Johnson --
13   or I'm sorry. Are you okay?
14   A  I'm fine. Thank you.
15   Q  Okay. Good.
16      If Mead Johnson did not have a preterm
17   infant formula, it could not win the NICU and
18   therefore could not win those hospital contracts.
19      Would you agree with that?
20   A  Yes.
21      MR. KAWANABE: Let's go to Slide 14.
22   Q  (By Mr. Kawanabe) And let's talk to the jury
23   about preemie classification, right? Do you see that
24   there?

21  (Pages 820 to 823)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 824

1    A   I do.
2    Q   And it's got classification from low birth
3    weight and gives statistics, 1500 grams to 2,000
4    grams, correct?
5    A   Yes.
6    Q   Fair to say that's between -- about 3 and
7    4 pounds; is that fair?
8    A   Probably fair, yes.
9    Q   And that's 32 to 35 weeks --
10   A   Yes.
11   Q   -- correct?
12       Then there's little bit more stable, 2000 to
13   2500 grams.  Do you see that?
14   A   Yes.
15   Q   That's 36 to 40 weeks; is that right?
16   A   Yes.
17   Q   And then there's that very low birth weight.
18   Critical.  1000 to 1500 grams; is that correct?
19   A   Yes.
20   Q   And that -- that might be a little closer to
21   3 pounds; is that fair?
22   A   Yes.
23   Q   And that's 32 to 35 weeks, correct?
24   A   Yes.

Page 825

1    Q   And what's the very critical?  Do you know
2    what ELBW stand for?
3    A   Which one?  I'm sorry.
4    Q   On the far left.
5    A   The ELBW?
6    Q   Yes.
7    A   Yes, it's the extremely low weight.
8    Q   Okay.  And that's less than 1000 grams,
9    correct?
10   A   Yes.
11   Q   23 to 32 weeks?
12   A   Yes.
13   Q   Great.
14       MR. KAWANABE:  Let's go to Slide 16, please.
15   Q   (By Mr. Kawanabe)  We're almost done with this
16   document, Ms. Hasseberg, then we'll take a break okay?
17   A   Okay.
18   Q   Human milk fortifier innovation drives
19   contracted share; is that correct?
20   A   Yes.
21   Q   All right.  And at least in 2018, did -- did
22   Mead Johnson need an innovation in human milk
23   fortifier because it was loosing market share to
24   Abbott?

Page 826

1    A   It is a gap we had, yes, portfolio.
2    Q   And did Mead Johnson try to fill that gap
3    with a product that used the word "acidified"?
4    A   No.  We still have the gap.  The acidified,
5    we were the first to market with acidify.  So it came
6    out before that.  It came out in 2011, and then our
7    competitor came out with one, and then we now have the
8    gap.  We don't have a nonacidified liquid human milk
9    fortifier.
10   Q   Could you tell jury what that means?
11   A   The product -- what the product means?
12   Q   Yes, please.
13   A   The product --
14   Q   I'm sorry.  I told -- I'm really sorry I cut
15   you off.  The product and then the gap.
16   A   And then the gap, yeah.
17       The product is the fortified we were talking
18   about earlier where it's a small packet of nutrients,
19   and it goes into breast milk to fortify it so that the
20   breast milk is rich enough and has what it needs for a
21   premature baby.
22       And the gap we have right now is we don't
23   have an individual serve one.  Our competitor does,
24   and we hope to soon have an individual serve.  We have

Page 827

1    a bottle mix serve.  So ours is a bigger batch where
2    they can make it in a milk room, but we don't have
3    individual serve.  That's the gap.
4    Q   That's the gap?
5    A   Yes.
6    Q   Okay.  Great.  And we'll come back to your
7    acidified product after the break.
8        MR. KAWANABE:  So let's go to Slide 24.
9    Let's try 25.  I'm looking for the 2019 hospital plan.
10   Let's back it up two pages.  I think I might have
11   written down the wrong one.  I did.
12       Your Honor, this would be a great time for a
13   break.
14       THE COURT:  All right.  Ladies and gentlemen
15   of the jury, we're going to take about a -- we'll come
16   back at quarter after.  Stretch your legs, get your
17   blood circulating.  I know it's after lunch and -- but
18   which is what -- why I want to take a break in case
19   anyone's got a full stomach and they're having a hard
20   time staying -- eyes are getting heavy, I'll say it
21   that way.
22       I'll remind you, until this case is
23   submitted to you for your deliberations, you must not
24   discuss this case with anyone or remain within hearing

22  (Pages 824 to 827)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 828

1  of anyone discussing it. Please do not read any
2  newspapers. Do not listen to any radio broadcast. Do
3  not view any television, internet website, social
4  media, or any electronic formats.
5      Please do not discuss this case. Please do
6  not email, text, or engage in any social media or any
7  form of communication, electronic, digital or
8  otherwise, with your fellow jurors or anyone else.
9      We are going into a recess at 2:59. We'll
10 see you back here at 3:15.
11     (A break was taken.)
12     THE COURT: I trust that they know the
13 rules. I trust they know what they can and can't talk
14 to you. I always recommend to people that they just
15 try to avoid having conversations so they don't put
16 themselves in that position. But they're good
17 lawyers. They're professional. I'm not going to make
18 any presumption that anyone is doing anything improper
19 off the record right now.
20     (A break was taken.)
21     THE COURT: Ladies and gentlemen of the
22 jury, or couple of things I -- I inadvertently failed
23 to go over with each -- you guys as a group, are as
24 follows.

Page 829

1      First, if at any time you guys need a break
2  because of the -- to use the restroom or you just feel
3  like, "Hey, I -- I need to get up move around," get my
4  attention and, you know, I don't know, give me a
5  little bit of a wave or something. And as soon as we
6  get -- get to a natural stopping point, we will take
7  that break.
8      If it's an emergency, shoot your hand up and
9  we'll take a break right then and there as long as the
10 question isn't pending or the witness is [inaudible].
11     No. 2, if any of you feel like I'm staring
12 at you, like who -- "God, he's creeping me out." That
13 is not my intention. All right. Part of my job --
14 part of what I have to do is to observe each and every
15 one of you to make sure that you -- that you are
16 paying attention, not that you wouldn't be. But
17 sometimes people just -- myself included, zoning out
18 and trying to bring it back, so I don't want anything
19 to I'm, you know, creeping on you. I just have to
20 observe each and every one of you. Okay.
21     Today -- I'm sorry. And one last thing. If
22 I send -- if I ask my clerks to bring anything over to
23 you, a mint, a bottle of water or anything else, all
24 I'm doing is trying to help you out in order to

Page 830

1  stay -- keep -- keep focused, if you will.
2      I don't mean any -- I don't mean to insult
3  anyone. I promise you that. Okay. We're going the
4  break -- we're going to go back on. We're going to
5  finish -- we're not going to the finish this witness
6  this afternoon. But we will break at 4:15. We will
7  start tomorrow at 9:00 a.m. back here in this
8  courtroom, which I'll touch on again.
9      But thank you for your patience, and we got
10 about 50 minutes, and then we'll break for the day.
11     MR. KAWANABE: I --
12     THE COURT: Ms. Hasseberg, I remind you
13 are under oath.
14     Counsel, you may proceed.
15     MR. KAWANABE: Sorry about that, Your Honor.
16     THE COURT: You're okay. You don't have to
17 apologize.
18     Q  (By Mr. Kawanabe) Ms. Hasseberg, are you
19 ready to go?
20     A  Yes.
21     Q  All right. We'll end by 4:15. Okay?
22     A  Okay.
23     Q  I'm going switch subjects and talk about the
24 organization of Mead Johnson. Okay?

Page 831

1      A  Okay.
2      Q  Let's go ahead and pull up Exhibit 766.
3      MR. KAWANABE: Move to admit.
4      MR. SCHMIDT: No objection, Your Honor.
5      THE COURT: Plaintiff's Exhibit 766 is
6  admitted.
7      (Plaintiff's Exhibit 766 has been
8      admitted into evidence.)
9      Q  (By Mr. Kawanabe) Great. It's up on the
10 screen. Is it on your screen, Ms. Hasseberg?
11     A  Yes, it is.
12     Q  All right. This is a Mead Johnson org
13 chart; is that fair?
14     A  Yes.
15     Q  Okay. So let's just talk about the
16 different departments so we can orient the jury about
17 Mead Johnson. Okay?
18     A  Okay.
19     Q  At the very first page, page 1, it talks
20 about medical science liaisons. What are those at
21 Mead Johnson?
22     A  A medical science liaison is someone who
23 looks into our research and looks -- or keeps up to
24 date with research that's out in the market, so

23  (Pages 828 to 831)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 832

1  current trends, current research, and they work
2  closely with our KOLs in the market.
3     Q   Okay. And I know there are a lot of
4  acronyms. KOL what are those?
5     A   Key opinion leaders, so they would be --
6  sorry, did you want me to explain?
7     Q   Please.
8     A   They would be doctors that would have
9  expertise in a certain area. So it could be an
10 allergy doctor or someone with expertise in a specific
11 area.
12    Q   And are these key opinion leaders, if you
13 know, employees of Mead Johnson?
14    A   They can be either. I mean, all key opinion
15 leaders are their own doctor out in the world but
16 both -- any company could hire a KOL to do speaking
17 events for them so that you can give CMEs to doctors
18 continuing education credit, peer-to-peer education.
19    Q   And CMEs, that's continuing medical
20 education?
21    A   Yes, for doctors.
22    Q   Thank you.
23        And so does Mead Johnson compensate these
24 key opinion leaders to give presentations or do other

Page 833

1  things?
2     A   In some ways we do. If we hired them in, we
3  would. Otherwise, we can give grants to third-party
4  organizations that work with the doctors to set up
5  CMEs.
6     Q   I see. So if a doctor becomes a key opinion
7  leader and does a presentation that Mead Johnson
8  requests, the doctor might get paid or the doctor's
9  organization of her choosing might get a donation or
10 something like that?
11    A   Oh, no. Not like that, I'm sorry. Not like
12 that.
13    Q   Please.
14    A   It's either we can hire them to speak on a
15 topic, or we can give grant money to the foundation
16 that accredits them.
17    Q   I see?
18    A   So that accrediting foundation then is the
19 one who would, you know, pay the doctors and work on
20 whatever content the doctors wanted to present.
21    Q   Thank you.
22    A   Yep.
23    Q   Let's take a look at the medical science
24 liaisons. At this time, Christina Valentine was the

Page 834

1  medical affairs director; is that correct?
2     A   Yes.
3     Q   She no longer is the medical or is she still
4  the medical affairs --
5     A   No, she's not.
6     Q   Do you know when she left? And if you
7  don't, that's fine.
8     A   Late last year maybe.
9     Q   Recently?
10    A   Yeah. I mean within a year, I would say,
11 yeah.
12    Q   And you've referred to her as Dr. Valentine
13 or Dr. V; is that correct?
14    A   Yes. Yes.
15    Q   All right. And she manages others on that
16 list included -- including Jodee LeVin, that fourth
17 person on the bottom purple square; is that correct?
18    A   Yes.
19    Q   And she is the senior medical science
20 liaison; is that right?
21    A   Yes.
22    Q   She was actually part of your sales force
23 before then?
24    A   She had years ago, yeah.

Page 835

1     Q   All right. Let's turn to page 2. Again,
2  just to educate us about the Mead Johnson
3  organization, what is "supply"?
4     A   It would be part of our supply department.
5     Q   All right. Page 3. What is "regulatory"?
6     A   Our regulatory department that would review
7  products and work with the FDA on getting approvals
8  before products go out to market.
9     Q   And you had referred previously to the LEX
10 team. Does that include regulatory?
11    A   It does, yes.
12    Q   And does the LEX team also include those
13 medical science liaisons like Dr. V?
14    A   Yes. Dr. V is the medical affairs
15 department, yes.
16    Q   And it's the LEX team that approves of all
17 materials that your sales force actually gives to
18 doctors and hospitals, correct?
19    A   Yes, all materials and all messaging.
20    Q   Okay. Are your sales force -- is your sales
21 force allowed to present any other information besides
22 LEX-approved information?
23    A   No.
24    Q   Okay. Let's turn to the next page, please.

24 (Pages 832 to 835)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 836

1  Is the Mead Johnson legal department part of that LEX
2  team?
3      A   Yes.
4      MR. KAWANABE:  And then the next slide,
5  please.
6      Q   (By Mr. Kawanabe) "Medical sales out
7  performance," what is that?
8      A   This is our operations team that helps us
9  run the medical sales in the background.
10     MR. KAWANABE:  Next slide, please.
11     Q   (By Mr. Kawanabe) "Medical sales national
12  accounts," what is that?
13     A   This would be the contracting team that does
14  the contracts between DMEs and Mead Johnson.
15     Q   And were you previously on that team?
16     A   No.
17     Q   Okay.
18     A   Not on this one.
19     Q   Slow me done when you see your name.  Okay?
20  I don't want to miss it.  Next one, "medical sales
21  national accounts IFCN."
22     MR. KAWANABE:  And actually, I should have
23  asked you if you could flip back, Mr. Figuera.
24     Q   (By Mr. Kawanabe) "DME," what are those

Page 837

1  again?
2      A   That's like an alternate care, so it would
3  be like babies that go home on supplies to their house
4  like a home health care.
5      Q   Okay.
6      A   The DME is the durable medical equipment, so
7  it's the distributor side of the home health care.
8      Q   And IF -- if you'll turn to the next page
9  please -- "IFCN national accounts," what's the
10  difference?
11     A   IFCN is actually the legal name of Mead
12  Johnson when Reckitt purchased us, so that's infant
13  formula child nutrition.  I think that could be an
14  error on this chart because this is the national
15  account team that should be IDN, so they run the
16  hospital's contracts.
17     Q   What does IDN stand for?
18     A   IDN stands for an integrated delivery
19  network.  So when you hear of hospital system, like
20  maybe one hospital that owns three or four other
21  hospitals around them, we call them a hospital system,
22  but they're known in the industry as an integrated
23  delivery network.  They deliver health as a system.
24     Q   Next one, please.  "Medical sales south

Page 838

1  central," what is that?
2      A   It's a one of the regions in medical sales.
3      Q   I see.  And so then it's followed by medical
4  sales east was a region, southeast was a region,
5  central was a region, and pacific was a region, fair?
6      A   Yes.
7      Q   All right.
8      MR. KAWANABE:  Can you turn to beyond
9  pacific.  So keep going, please.  Keep going.  Keep
10  going.  Keep going.  Keep going.
11     Q   (By Mr. Kawanabe) Medical sales leadership.
12  That's you, correct?
13     A   That would be me.
14     Q   So medical sales leadership, are you over
15  all of those geographic areas we just flipped through?
16     A   The regions you just went through, yes.
17     Q   And that's your name, head of US medical
18  sales, correct?
19     A   Yes.
20     Q   And those are the people that work -- that
21  you supervise that are listed there?
22     A   Yes.
23     Q   All right.  And we don't need to go through
24  every name.  I'm going ask you about a few names

Page 839

1  because they will appear -- they may appear here at
2  this trial.  Okay?
3      A   Okay.
4      Q   So I'll come back to that in just a second.
5      Let's finish this chart.  Next page.  What
6  is WIC.
7      A   WIC is the department that works with the
8  states, all of the states in the US, on whether or not
9  we are interred into a contract with one of the
10  states.
11     Q   I see.
12     And is that the women, infant, children
13  program?
14     A   Yes.
15     Q   Okay.  And -- and is that -- is -- is that
16  for low-income families or is that something
17  different?
18     A   It is.
19     Q   And how -- how does -- oh, I see.  The
20  states actually pay Mead Johnson to fulfill those WIC
21  contracts?
22     A   No.  The -- all states send in an RFP, a
23  request for proposal or a request for pricing, and
24  then they -- each company would then send back a

25  (Pages 836 to 839)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 840

1  proposal.
2  Q  Okay.
3  A  Either government bids or state bids.
4  Q  Got it.
5  A  Yeah.
6  Q  Thank you.
7  A  Uh-huh.
8  Q  Then you've got human resources, next page.
9  And finance; is that correct?
10  Next page.
11  A  Yes.
12  Q  Great.
13  And I won't go through the entire document.
14  Fair to say there are other divisions at
15  Mead Johnson?
16  A  Yes.
17  Q  All right. Let me go to the flip chart. It
18  could be a little dangerous but I'm going to walk over
19  and I'm going to ask you a few names just --
20  A  Okay.
21  Q  -- to give folks a sense of where certain
22  Mead Johnson people are. Okay?
23  A  Okay.
24  Q  Okay.

Page 841

1  MR. KAWANABE: So, Your Honor, if I might
2  write here, and then I'll make sure -- go ahead,
3  please. And I'll make sure to turn it to all the jury
4  so they can see, but let's start here.
5  Q  (By Mr. Kawanabe) Can you see this?
6  A  Yes, I can.
7  Q  All right. So Mead Johnson's former CEO is
8  named Kapoor, correct?
9  A  Yes.
10  Q  K-A-P-O-O-R?
11  A  Yes, I think that's right.
12  Q  Great.
13  First -- first initial R; is that right?
14  A  Rakesh, yes.
15  Q  Great.
16  So I don't know if you can read this from
17  that far away but I'll bring it up to -- K-A-P-O-O-R.
18  And that was the CEO, chief executive
19  officer of Mead Johnson, correct?
20  A  Now of Reckitt.
21  Q  Of Reckitt. I'm sorry. Okay.
22  And Reckitt is the parent company for Mead
23  Johnson?
24  A  Yes.

Page 842

1  Q  Does Mead Johnson have a CEO?
2  A  Not -- no, not an actual title like, no.
3  Q  All right. Mead Johnson does have a
4  leadership team; is that fair?
5  A  Yes.
6  Q  You're on that leadership team, correct?
7  A  Which one?
8  Q  For the United States?
9  A  For the US, yes.
10  Q  Okay.
11  A  There's several leadership teams but I'm --
12  I'm on one that reports in to Robert Cleveland.
13  Q  Okay.
14  A  If that's the one you're referring to.
15  Q  It is.
16  A  Okay.
17  Q  So Robert Cleveland, who is he?
18  A  My boss.
19  Q  What's his title?
20  A  Oh, sorry.
21  Q  That's fair.
22  A  He is the senior vice president.
23  Q  Senior vice president.
24  A  Of North America.

Page 843

1  Q  Okay. And is he in finance, do you know?
2  A  No.
3  Q  Okay. Do you know what department he's in,
4  by any chance? Is he in your department?
5  A  No. I'm medical sales.
6  Q  Okay. I'm -- I'm just going to put him over
7  here.
8  A  Okay.
9  Q  Okay. So just do Cleveland.
10  And then underneath Cleveland, because he's
11  your direct supervisor; is that correct?
12  A  He is.
13  Q  Okay. I'm going to put your name,
14  Hasseberg. Great.
15  And then we mentioned Jodee Le- -- is it
16  LeVin?
17  A  LeVin.
18  Q  LeVin.
19  And you supervise her?
20  A  No.
21  Q  Oh, I'm sorry. She is in medical now?
22  A  She's over in the -- yeah, the medical sales
23  liaison we just covered, so she's under
24  Dr. Valentine's --

26  (Pages 840 to 843)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 844

1    Q   Okay.
2    A   -- medical affairs department.
3    Q   My apologies.  That's right.  You did tell
4    me that.
5        So I'll put over, this is separate.  A
6    separate department is Dr. Valentine, correct?
7    A   Yes, medical affairs.
8    Q   Okay.  Great.
9        And Dr. Valentine supervises others,
10   included -- including Ms. LeVin?
11   A   Yeah, the others that were on the chart,
12   yes.
13   Q   Yeah.  Okay.  Got it.
14       And Ms. LeVin's title is the -- is she the
15   interim head of medical affairs?
16   A   Right now she is, yes.
17   Q   So is she actually in Dr. Valentine's
18   position?
19   A   No.
20   Q   Okay.  What's --
21   A   Dr. Valentine's position is higher than
22   that, but she's just an interim right now interimly
23   leading the medical sales liaisons.
24   Q   I see.

Page 845

1        All right.  Who is Erika Liddle?
2    A   She's in marketing.
3    Q   Marketing.
4    A   Uh-huh.
5    Q   And is that separate from these two
6    departments?
7    A   Yes.
8    Q   Okay.  So I'll put E -- and that's
9    L-I-D-D-L-E?
10   A   I -- I -- I think so.
11   Q   All right.  Not for sure?
12   A   Not for sure but I think so.  I don't know
13   if it's E-L or L-E.  I just can't remember.
14   Q   And then do you know who Ninish Kapoor is?
15   A   Nitish?
16   Q   Nitish, I apologize.
17   A   Yes.
18   Q   And he's the executive vice president of
19   fuel for growth program; is that correct?
20   A   He's not with us anymore.
21   Q   Okay.
22   A   He might have fuel for growth.  He's below
23   Kapoor.  There's many levels below Kapoor before you
24   get to --

Page 846

1    Q   Okay.
2    A   -- those.
3    Q   But he's sort of separate?  He's apart from
4    sales, marketing and medical, if you know?
5    A   Well, he's not here now, so I don't --
6    Q   Or when he was?
7    A   When he was -- when he was here, he would
8    have been over the health department of -- of Reckitt
9    and then came over as we were transferring in when we
10   were merging over.
11   Q   Okay.
12   A   So he was kind of our guy that merged us in
13   to -- to Reckitt, so to say.
14   Q   Got it.
15   A   But he would be right under Kapoor.  He
16   was --
17   Q   So I've got him too low is what you're
18   saying.  Nitish Kapoor?
19   A   I think so because he doesn't report to
20   Erika Liddle.
21   Q   Fair.  I wrote that in the wrong place.
22   A   Oh, okay.
23   Q   And I appreciate -- I appreciate the
24   correction.

Page 847

1        Jodee Mackey, do you know who she is?
2    A   Jodee Mackey, no.
3    Q   Jessica Mackey?
4    A   Oh, yes, I do know Jessica Mackey.
5    Q   And she works in your department?
6    A   She does, yeah.  She's in -- a medical rep.
7    Q   Okay.  Medical rep.
8        And she actually is a medical rep to the
9    hospitals involved in this case, St. Louis Children's?
10   A   Yes.
11   Q   Memorial?
12   A   In this geography, yes.
13   Q   Barnes-Jewish?
14   A   Yes.
15   Q   Timothy Cooper, he was with Dr. Valentine;
16   is that right?
17   A   He was above her, I believe.
18   Q   So I'm going to put Cooper.
19       But that's on the medical side?
20   A   That's, yeah, medical affairs.
21   Q   Okay.  Great.
22   A   And R&D.  They roll up through R&D.
23   Q   Gary Rizzo, is he in marketing with
24   Ms. Liddle?

27  (Pages 844 to 847)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 848

1  A  Yes, I believe so.
2  Q  Do you know if he was her supervisor or vice
3  versa?
4  A  I don't know.
5  Q  All right. I'll just -- I'm going put her
6  above -- him above but I don't know if it's the
7  supervisor or not.
8     Steve Braun?
9  A  I don't know him.
10 Q  Okay. That's fine. I'll just put him to
11 the side.
12    Let's see. Great. I think that covers -- I
13 might add a couple more witnesses to this so sit tight
14 for me, I might go back.
15 A  Okay.
16 Q  Okay. Okay.
17    Now, what is a senior territory business
18 manager?
19 A  That's a medical sales rep.
20 Q  Okay. So that is a type of person or a
21 department?
22 A  It's a -- it's a rep, what we've been
23 talking about, the ones that roll up in my group.
24 It's a medical rep.

Page 849

1  Q  Okay.
2  A  And their title is a territory business
3  manager because the geography is their territory.
4  Q  So senior territory business manager.
5     And then underneath them are -- are regional
6  medical sales; is that right?
7  A  I don't -- I don't know what that is. A
8  regional -- can -- can you read it again. I don't
9  know what a regional medical sales --
10 Q  So, like, are regional medical sales similar
11 to territory business managers in that they talk to
12 health care providers in the hospital?
13 A  I -- I've just never heard the name. I
14 don't -- I don't know what you're referring to. I --
15 we don't have a name that's called a regional --
16 Q  Oh, I'm sorry.
17 A  -- medical sales.
18 Q  Okay. I gotcha.
19 A  What --
20 Q  Is there a different type of salesperson
21 besides a senior territory?
22 A  Yeah, there's -- there's territory business
23 managers, which are reps.
24 Q  Uh-huh.

Page 850

1  A  And that rep can be a regular TBM or a
2  senior TBM.
3  Q  Okay.
4  A  And then there's HNBM, which are called
5  hospital nutrition business managers, and that would
6  be a hospital-focused rep.
7  Q  I see.
8  A  Specialty would be a little different.
9  Yeah.
10 Q  Are there other types besides --
11 A  Yes.
12 Q  -- those?
13 A  There's HOMS, H-O-M-S, and that's a home
14 office medical sales reps and they do virtual selling.
15 H-O-M-S.
16 Q  HOMS. Got it.
17    What else?
18 A  As far as reps go, that would be it.
19 Q  Okay. And they are all under your
20 leadership?
21 A  Yeah, they're under DBMs and then directors
22 that are under my leadership, yes.
23 Q  Okay. We saw a department called national
24 accounts.

Page 851

1  A  Yes.
2  Q  That's separate from you or -- or --
3  A  No, it's in a different region but it's
4  within my organization.
5  Q  Okay. Oh, it is within your organization?
6  A  Yes, national accounts, yes.
7  Q  And they work with, and there's a couple
8  more acronyms, JPOs and IDNs. I know you told us one.
9  A  Yeah, GPOs and IDNs.
10 Q  GPOs. Okay.
11    What are those?
12 A  Group purchasing organization is a GPO. And
13 a GPO is a -- a company that gre- -- gets bids with
14 other companies to offer pricing to other people. So
15 you can -- like a hospital could say, I'd like to be a
16 member of that GPO so that I could access their
17 pricing.
18 Q  And --
19 A  And then I -- an IDN is the integrated
20 delivery network, a hospital system.
21 Q  Okay. And -- and GPOs are large purchasing
22 organizations where hospitals can become members to
23 get better pricing?
24 A  Yeah.

28  (Pages 848 to 851)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 852

1    Q   Is that what you just said?
2    A   Anyone can become members, yes.
3    Q   And GPOs or IDNs would represent hospitals
4  potentially across multiple states or across the
5  country?
6    A   Yeah, there -- yeah, there's like five,
7  maybe four big GPOs and hospitals just become members
8  of those different ones so they can access bigger
9  contracts.
10   Q   I see.
11   A   Better pricing.
12   Q   And these five large GPOs, do they have,
13  say, 90 percent of the hospitals, something like that?
14   A   Well, majority of hospitals would definitely
15  be under a GPO, yes.
16   Q   Okay.  Do you think --
17   A   That's how they work.
18   Q   Fair.  Sorry.
19   A   Yeah.  No, you're --
20   Q   Okay.  Is 90 percent a fair estimate or do
21  you know?
22   A   I think it is, yeah.
23   Q   Okay.  Great.
24       And back in 2000 -- strike that.

Page 853

1        Okay.  Great.  So I -- bear with me.  I told
2  the jury I'd -- I'd show them my chicken scratches so
3  I'm just going to do that.  We'll come back to that
4  and I'll try and clear that up.
5        But generally we talked about -- and I'll
6  just represent to you, many of the names are people
7  that may be testifying either in person or by video.
8    A   Sure.
9    Q   And so just for the record, you went over
10  sort of where some of these folks are, and it's clear
11  that medical is separate from what you do in sales,
12  correct?
13   A   Yes.
14   Q   And marketing is separate from what you do
15  in sales; is that correct?
16   A   Yes.
17   Q   But marketing -- does marketing get the
18  materials approved by LEX and then give them to sales
19  to distribute?
20   A   Yes.
21   Q   And sales distributes those marketing
22  materials to hospitals, doctors, hospital staff; is
23  that fair?
24   A   We speak off of them.  We may not distribute

Page 854

1  them.
2    Q   Okay.
3    A   So some of them there are electronic
4  visuals.
5    Q   Got it.
6    A   They may never leave it, but yes.
7    Q   Got it.  Okay.
8        And then -- okay.  Great.
9        Who else is on the leadership team for Mead
10  Johnson United States with you?
11   A   Like my peers, you mean?
12   Q   Yes, your peers.
13   A   Reporting to Robert?
14   Q   Yes.
15   A   There would be Daniel Torres.
16   Q   Okay.
17   A   And he's retail s- -- or he's -- yeah,
18  retail sales.  So sometimes you hear sales force.
19  He's sales force.  I'm medical sales force.
20   Q   Okay.  Got it.
21   A   And then -- yeah.  And then Natalie is our
22  marketing lead.  I'm trying to think of her last name,
23  sorry.  It will come to me.  I apologize.
24   Q   That's okay.

Page 855

1    A   And then Andy Lannert is over WIC.
2    Q   That's the women, infant, children program?
3    A   Yes.
4    Q   So there are about four or five --
5    A   There's five, I think, of us that -- that go
6  in.
7    Q   Okay.
8    A   I'm trying to think of the other.
9    Q   And do the five on you the leadership
10  team -- who's your boss?
11   A   Robert Cleveland.
12   Q   Is there one boss?
13   A   We go into Robert Cleveland.
14   Q   So Robert Cleveland actually is a supervisor
15  for the leadership team of Mead Johnson United States?
16   A   He actually has all of North America.  He
17  has the Canada people too, but I -- I only said US
18  because you asked me for US.
19   Q   That's fair.
20   A   But he does have all of it.
21   Q   And that includes Canada and Mexico as well?
22   A   I don't know about Mexico.
23   Q   Okay.
24   A   I think he just -- I any North America is

29  (Pages 852 to 855)

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 856

1      Canada and the US.
2          Q   Okay. Understood. Thank you.
3              Let's talk about compensation. So Mead
4      salespeople -- again, we're going to focus in on your
5      sales force, okay?
6          A   Okay.
7          Q   So Mead salespeople are compensated through
8      salary, right?
9          A   Yes.
10         Q   They also get an incentive compensation
11     plan; is that correct?
12         A   Yes.
13         Q   And then this is not a yes-or-no question.
14     Would you explain what that incentivized or bonus plan
15     is?
16         A   Yes. It's a plan based on like a pie chart.
17     We do a pie chart of the different pieces of business
18     that they work on every day. And then at the end of
19     the year, they have goals against that and their sales
20     goal attainment then would tell us where they were to
21     their goals.
22         Q   I see. All right. We're going to try this
23     again.
24             Pie chart, are there like three or four

Page 857

1      pieces of the pie?
2          A   Yes.
3          Q   All right. Can you just tell us, so this is
4      compensation?
5          A   Uh-huh.
6          Q   And we've got salary, and we've got bonus.
7              What are the pieces of the pie that go into
8      the bonus decision?
9          A   It can be three-month share. In --
10         Q   Three-month share.
11         A   Yeah. In-hospital share.
12         Q   Okay. Okay.
13         A   Retail sales and their market.
14         Q   Okay.
15         A   And then units, feeding units.
16         Q   So four pies?
17         A   Yes.
18         Q   Four pieces, I mean?
19         A   For the -- the standard reps that are up
20     there, yes. National accounts could look different.
21         Q   Okay. I'm not going to ask you to read
22     that.
23             But can you explain, of the four pieces of
24     the -- we'll just call it the pie for bonuses.

Page 858

1          A   Yes.
2          Q   Let's go through each one.
3          A   Okay.
4          Q   Three-month share, what is that?
5          A   Three-month share is the share that we have
6      in the market. So if we were talking about a -- any
7      given territory, they could have a 50/50 share maybe,
8      50 us, 50 our competitors.
9          Q   I'm sorry. I didn't quite understand that.
10     Would you -- would you do that one more time?
11         A   Sure. So it's the share that we have, that
12     Enfamil has in any given market or territory.
13         Q   Okay. Got it.
14             And so if your territory was Illinois.
15         A   Yes.
16         Q   Right.
17             And if you increased your share as compared
18     to Abbott --
19         A   Yes.
20         Q   -- you might get a bigger bonus?
21         A   Yes.
22         Q   All right. In-hospital share, what is that?
23         A   Same thing. It's share in the hospitals
24     that are within the territory or community that you

Page 859

1      would work in.
2          Q   And if you increased your share, that means
3      sales; is that fair?
4          A   In the hospital? Well, share is how many --
5      share is CTS. It's a consumer tracking system, how
6      many moms would say that they got formula in the
7      hospital and what kind of formula, if they chose to
8      it.
9          Q   I see.
10         A   So share is different than sales.
11         Q   So the more moms in a hospital that use Mead
12     Johnson formula --
13         A   Yeah.
14         Q   -- means a potential for a bigger bonus; is
15     that correct?
16         A   Yeah, their growth. It's any growth.
17         Q   Retail, what is that?
18         A   Yeah, it's the -- retail sales, it's
19     actually what scans across the register like at
20     Walmart or Target. So it not sales out of our
21     warehouse, it's just what scans across at the -- the
22     checkout.
23         Q   Right.
24         A   In their given territory.

30  (Pages 856 to 859)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 860

1    Q   And that's just me going to Walmart, buying
2  a can of Enfamil and -- and then checking it out --
3    A   Yes.
4    Q   -- and paying for it?
5    A   Yes.
6    Q   You increase that sales, you get a bigger
7  bonus?
8    A   Yes.
9    Q   And then that fourth one, feeding units?
10   A   Yep.
11   Q   What are those?
12   A   Feeding units, they would have a goal
13  against hospitals that have so many feeding units
14  going in, which are the little sample units.
15   Q   Okay.
16   A   And that would have a goal against it as
17  well.
18   Q   Okay.  And again, the more feeding units
19  that you sell or are used means a bigger bonus?
20   A   Yeah, hopefully it means you got the
21  90 percent standardized contract and that's a good
22  thing.
23       THE COURT:  Counsel, hang on one second.
24       Let's all stand up and stretch so that we

Page 861

1  can finish out the day.  We've got 30 -- 31 minutes.
2  Take a quick minute.  Everyone doing good?  All right.
3       All right.  Let's go back to the -- and I
4  apologize for interrupting.
5       MR. GRIMSLEY:  I'm just jealous of this flip
6  chart.
7       THE COURT:  Because it worked?
8       MR. GRIMSLEY:  Yes.
9       THE COURT:  You may proceed.
10      MR. KAWANABE:  Thank you.  That was a signal
11  that this has been riveting, so I'm going the move on.
12  And I get it.  It's okay.  I appreciate your
13  cooperation.
14      THE COURT:  That's not -- proceed.
15      MR. KAWANABE:  No, I -- I was just kidding.
16  I shouldn't make jokes.  The record doesn't reflect
17  that very well.
18   Q   (By Mr. Kawanabe) Okay.  Fantastic.
19      So fair to say that if your sales force
20  grows that pie, sales force makes more money; is that
21  fair?
22   A   Yes, we're in sales, yeah.
23   Q   You're in sales.  Okay.  Great.  Great.
24      Let's pull up Exhibit 4198, so I'm going to

Page 862

1  switch topics.
2    A   Okay.
3    Q   Okay.  Sorry.  I need to hand out the
4  folders.
5       MR. KAWANABE:  Is there an extra copy?
6       THE COURT:  This was 4198?  Is that 4198?
7       MS. FRENKEL:  Correct.
8       MR. KAWANABE:  And it goes along with, I
9  believe, 4199.
10      THE COURT:  Thank you.
11      MR. KAWANABE:  Let's see.  Let's pull up
12  first Exhibit 4198, please.
13      THE COURT:  Hang on.  Not yet.
14      MR. KAWANABE:  Oh, sorry.
15      THE COURT:  Did you --
16      MR. KAWANABE:  Oh, I didn't move to admit it
17  yet.
18      THE COURT:  Okay.
19      MR. KAWANABE:  Sorry.  I will -- I wanted
20  to -- is there a way to show the witness that this is
21  her email or not without --
22      THE COURT:  You can just hand her the --
23      MR. KAWANABE:  May I?
24      THE COURT:  Do you want to use mine?

Page 863

1       MR. KAWANABE:  What's that?
2       THE WITNESS:  Thank you.
3       MR. KAWANABE:  Your Honor, while the witness
4  is reading the email, I don't believe we got to this
5  exhibit during the lunch break.  It might be easier if
6  we have a bench bar to talk about this.
7       THE COURT:  Come on up.
8           (There was a bench conference out of
9            hearing of the jury and realtime
10           reporter.)
11   Q   (By Mr. Kawanabe) Ms. Hasseberg, did I hand
12  you a copy of the document or not yet?
13   A   No, just the email.
14   Q   Sorry.
15   A   Okay.  Thank you.
16   Q   You bet.
17      Ms. Hasseberg, do you have Exhibit -- and
18  we're not going to show it on the screen.  I just need
19  to ask you some foundational questions on these two
20  exhibits I handed to you.
21   A   Okay.
22   Q   So the first one, Exhibit 4198, would you
23  please confirm this is an email that you received in
24  July of 2021?

31  (Pages 860 to 863)

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 864

1   A   Yes.
2   Q   Okay.  Great.
3       And could you also confirm the next exhibit,
4   4199, it's dated September 9, 2020.
5       Do you see that?
6   A   Yes.
7   Q   And would you flip through that and tell us
8   whether or not that this plan 2021 was based on 2020
9   data.  And take your time, please.
10  A   Okay.  And will you ask me that one more
11  time?
12  Q   Sure.  Sure.
13  A   What am I looking for?  Is this -- if this
14  was done when?
15  Q   So you -- there's a date.
16  A   I see the 2020.
17  Q   Right.  And it's 2021 plan.  Do you see
18  that?
19  A   2021, yes.
20  Q   Okay.  As you look through that, is this
21  plan based on 2020 data?  And go ahead and look
22  through it.
23  A   Okay.
24      I can't tell from it, like I -- where would

Page 865

1   I look to know what it's based on?  It isn't my deck.
2   Q   No, it's okay.
3   A   I just don't now.  It's a marketing deck.
4   Where -- where should I look to see what you're
5   looking for?
6   Q   Understood.
7       I believe you previously testified to that
8   you receive many decks from -- at Mead Johnson; is
9   that fair?
10  A   Well, I receive emails where there's a link
11  to open a deck.
12  Q   Right.
13  A   I just -- if they don't apply to me, then I
14  don't open them.
15  Q   Fair.
16  A   And I don't populate this, so --
17  Q   Understood.  Understood.
18      At Mead Johnson, when they make a plan for
19  2021, in your experience, is it based on data, past
20  data, including of 2020?
21  A   It can be.  I guess some of these are
22  product innovations.  I don't know if they'd be past
23  or if they would be what's coming.
24  Q   Okay.

Page 866

1   A   So that's -- I just didn't know how to --
2   Q   Understood.
3       Let me go slide by slide and again then,
4   okay?
5   A   Okay.
6   Q   And again, let's not publish it to the jury,
7   but let's go -- I'm just going to have you flip
8   through each page.
9   A   Okay.
10  Q   So the second page, which is in the back,
11  you see how it's double sided?
12  A   Yes.
13  Q   Okay.  Great.
14      And at the top you see "Acquire, retain,
15  extend"?
16  A   Yes.
17  Q   Do you -- do you know what that means?
18  A   Yeah, the same as when you asked me earlier,
19  to acquire babies and then extend them if they
20  tolerate our products.
21  Q   Right.  And that was -- was that part of
22  Mead Johnson's sales strategy or marketing strategy
23  back in 2020?
24  A   Yeah.  We've always wanted to sample and

Page 867

1   make sure it's tolerated and -- yes, absolutely.
2   Q   Okay.  And that includes changing -- "step
3   change hospital," correct, No. 1?
4   A   That -- it says that here, yes.
5   Q   And No. 2, "elevate Enfamil"; is that
6   correct?
7   A   That's what -- yes [indiscernible].
8   Q   And it is your understanding that means to
9   sale more Enfamil?
10  A   But elevate it means they the 2FL for immune
11  health benefits.  So they were innovating it to make
12  it better in the market.
13  Q   Okay.  Got it.
14      And can you turn then to -- so that's 1, 2,
15  3, 4, please.  Under pillar 1, "step change hospital."
16  A   Yes, I see that.
17  Q   Do you see that?
18      And do you know what it means, "high return
19  per share," what that means, that second column?
20  A   I don't.  I can read it like you're reading
21  it, but I've not seen it.
22  Q   That's okay.  If you don't, that's fine.
23      Let's move to the next page.
24  A   Okay.

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

---

Page 868

1    Q    "NICU determines hospital contracts," are
2    you there?
3    A    Yes.
4    Q    Do you see that?
5    A    Yes.
6    Q    Okay.  And it says on the bottom of the
7    left: "Our acidified HMF is blocking ability to win
8    contracts."
9        Do you know what that means?
10   A    Yes.  It means that our competitor had a
11   nonacidified HMF and we had a acidified HMF and more
12   people liked the nonacidified HMF.
13   Q    Okay.  And that was Abbott?
14   A    Yes.
15   Q    And was Abbott -- not a legal term -- sort
16   of trash talking the acidified product in the market?
17   A    I mean, I don't know if they were trash
18   talking it, but they definitely described it different
19   than we did.  It -- you know, it was a production way
20   to make it, to have the acidified on it, and I don't
21   know if they described it that way.  So it seemed like
22   there was confusion.
23   Q    And do you think Abbott helped create that
24   confusion?

---

Page 869

1    A    I don't know if they helped create it or
2    maybe they didn't know how we manufactured it.
3    Q    Okay.  We'll come back to the Abbott --
4    A    Okay.
5    Q    -- shortly.
6        Great.  I appreciate that.
7        MR. KAWANABE:  Your Honor, I'm going to
8    reserve introducing these, but I'll withdraw that
9    request for admission at this time.
10       THE COURT:  Okay.
11   A    So I give this back to your or just --
12   Q    (By Mr. Kawanabe) Can you just leave that up
13   there --
14   A    Yes.
15   Q    -- for now, and I'll take all of that stuff
16   back at the end of the day.
17       As of 2020 Mead Johnson was struggling to
18   win the NICU because of its acidified human milk
19   formula.  Would you agree with that?
20   A    Well, it's because we had a gap of a
21   nonacidified, yes.
22   Q    Okay.  When you compete to be a main vendor
23   or exclusive vendor at a hospital, you have to be able
24   to feed all babies, correct?

---

Page 870

1    A    You should have the option, yeah, so if a
2    baby has a particular issue, the doctor can choose.
3    Q    And -- sorry.  Did you finish?
4    A    The doctor just could choose to use it if
5    you have one.  If you don't have one, then they didn't
6    have any choice.
7    Q    All right.  And Mead Johnson in 2020 did not
8    have a robust -- as robust a portfolio as Abbott,
9    fair?
10   A    Fair.
11   Q    And adding a Mead Johnson human milk
12   fortifier helped Mead Johnson compete for those
13   hospital contracts.  Do you agree with that?
14   A    We had one, it just acidified, so we -- we
15   added another one.
16   Q    And that helped Mead Johnson compete for
17   those hospital contracts, correct?
18   A    It helped us, yeah, close part of the gap
19   that we had in our portfolio, yes.
20   Q    But almost from the -- almost -- almost from
21   the day at launch, Mead Johnson's acidified liquid
22   human milk fortifier was an anchor on Mead Johnson's
23   hospital sales.  Do you agree with that?
24   A    Will you say that one more time?  I'm sorry.

---

Page 871

1    Q    Sure.  Almost from the day it launched, Mead
2    Johnson acidified liquid human milk fortifier was an
3    anchor on Mead Johnson's hospital sales.  Do you agree
4    with that?
5    A    Was an anchor on our sales?
6    Q    Correct.
7    A    Oh.  Well --
8    Q    It -- it drug you down, it harmed you.
9    A    Things go in no charge, so it didn't -- we
10   don't have any sales in the hospital.  But you mean
11   it -- it definitely was a gap, so it made hard for us
12   to compete in hospitals because we didn't have a full
13   portfolio.
14   Q    And Abbott conducted a smear campaign that
15   the Mead acidified liquid human milk fortifier had
16   metabolic acidosis, true?
17   A    I think they were confused on where the
18   acidosis came from, that word.  I don't think they
19   realized it was from our packaging, but...
20   Q    All right.  Take a look at your -- if you
21   would, the deposition transcript.
22   A    Yes.
23   Q    May 2023.  The same one you were at.
24   A    Yep.

---

33  (Pages 868 to 871)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 872

1  Q  Turn to page 278.
2  A  Okay.
3  Q  Let me know when you're there.
4  A  Yep, I'm there.
5  Q  Starting on Line 24.
6  A  Yes.
7  Q  And then if you'd read to yourself going to
8  279, Line 12.
9  A  I'm sorry. Oh, go onto the next page to
10 Line 12, yes.
11 Q  Correct.
12    MR. KAWANABE: And, Your Honor, may I
13 publish these pages -- deposition pages on the screen?
14    THE COURT: Hang on one second.
15    MR. KAWANABE: You bet.
16    THE COURT: Have you had a chance to review?
17    THE WITNESS: Yes, I did. I'm sorry.
18    THE COURT: No objection?
19    Yes, you may.
20    MR. KAWANABE: Mr. Figuera, can you pull up
21 Exhibit -- pages -- excuse me -- DT29 starting at
22 page 278, 279, side to side.
23    Q  (By Mr. Kawanabe) Again, this was your prior
24 deposition in May of 2022; is that correct?

Page 873

1  A  Yes.
2  Q  We're talking about the acidified liquid
3  human milk fortifier.
4     "QUESTION: Did Mead have trouble selling
5  the acidified fortifier?"
6     Your answer: "We didn't have trouble
7  selling it. Our competitors had a really nice kind of
8  smear campaign against it, so to say, that made it
9  very hard to come back from."
10    "QUESTION: This is Abbott?"
11    Your answer was: "Yes."
12    "QUESTION: And what was the basis for the
13 smear campaign?
14    "ANSWER: Well, I was just -- I think they
15 tried to build a narrative around it having metabolic
16 acidosis and Dr. V had to do a lot of clarification
17 around that."
18    Did I read that correctly?
19 A  You did.
20 Q  And did Dr. V, Dr. Valentine, help clarify
21 or fix this problem of the smear campaign?
22 A  Well, she helped clarify that the acidosis
23 process was in the production and not in the blood.
24 And I don't know if Abbott believed it was or not, so

Page 874

1  they could have just made it up as a smear campaign or
2  maybe they believed that it was in the blood, but it
3  was in the production piece of it. And she did have
4  to clear it up, yes.
5  Q  Okay. Did that work? Did clearing it up
6  work?
7  A  Yeah. And that helped a lot. There's many
8  facilities that use it, so I think it did help just to
9  explain to them why the word "acidosis" is on the
10 packaging.
11 Q  Do you know if Mead Johnson objected to
12 having the word "acidosis" --
13 A  No. Because that's --
14 Q  -- or "acidified" on the package?
15 A  No. That's how we produced it, and that's
16 part of what we did for it -- for the sterilization of
17 it, so...
18 Q  But Mead Johnson had hospitals, including
19 St. Louis Children's Hospital, concerned that Mead
20 Johnson acidic fortifier was causing metabolic
21 acidosis in infants in the NICU, right?
22 A  I think that's what Dr. V reached out to
23 talk to them about.
24 Q  But they did have those concerns, St. Louis

Page 875

1  Children's?
2  A  I think they did. I don't know which
3  facility it was, but, yes, I'd heard that.
4  Q  And what is meta- -- metabolic acidosis?
5  A  I don't know if I know that. It's -- other
6  than it has to do with the pH of the blood. So in
7  layman's terms, I believe it means that you're --
8  you're -- if your blood is acidotic, it has more acid
9  than has alkaline in it versus the acidosis, how we
10 produce the product, which is in the product --
11 production, not in your blood.
12 Q  Right. And that's -- does that include like
13 a terrible rash for infants, do you know?
14    MR. SCHMIDT: Objection.
15 A  I don't know.
16    MR. SCHMIDT: Your Honor, we raised this
17 limine, this issue. We're now well into an issue that
18 has nothing to do with this case. I object on
19 relevance.
20    THE COURT: Sustained. Move on. That will
21 be stricken.
22 Q  (By Mr. Kawanabe) Do you think having a human
23 milk product in your portfolio would help Mead Johnson
24 secure those hospital contracts?

34  (Pages 872 to 875)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 876

1    A  I don't know.  I don't do anything with our
2    innovation, so I don't know what that would do.
3    Q  Okay.  Is it fair to say you don't know much
4    about human milk products?
5    A  No.  We don't sell against them, and we
6    don't have one, so...
7    Q  So is that fair to say?  Fair --
8    A  I think so.
9    Q  Okay.  You're not sure if distributing Mead
10   Johnson's products in the NICU is key to winning
11   hospitals?
12   A  No.  I think having a full portfolio is and
13   that would means having those products you're
14   referring to.
15   Q  But you know that Mead Johnson did not have
16   the right portfolio available for hospitals?
17   A  We have a gap in our portfolio, we have for
18   about a decade.
19   Q  So Mead Johnson does not have the right
20   portfolio available for hospitals?
21   A  We have the right portfolio, but we're
22   missing a product in the NICU section of our
23   portfolio.
24   Q  Could you take a look at your October 2023

Page 877

1    deposition?
2    A  Yes.
3    Q  It's a different tab.
4    A  Okay.
5    Q  It's at the back.  And could you turn to
6    page 170, please.  Starting on page 17.
7    A  Okay.
8    Q  Going to page 171, Line 9.
9    A  Starting on Line 17 on the first page?
10   Q  Yeah.  On page 170, Line 17 to page 171,
11   Line 9, and I'm asking you about the right portfolio.
12   A  Uh-huh.
13   Q  Just let me know when you're done.
14   A  Okay.
15   Q  Are you all done?
16   A  Yes.
17       MR. KAWANABE:  Your Honor, I'd like to play
18   Clip 17.
19       MR. SCHMIDT:  This one we'll object to.  I
20   don't think it's inconsistent.
21       THE COURT:  Overruled.
22       MR. KAWANABE:  Let's play Clip 17, please.
23       (The following video clip from the
24       transcript of Cindy Hasseberg was

Page 878

1    played in open court, and transcribed
2    by the reporter as follows:
3    "QUESTION:  Do you believe that
4    distributing Mead Johnson's products in
5    the NICU is the key to winning hospitals?
6    "ANSWER:  I don't know that it's a
7    key to winning the hospitals, but for Mead
8    Johnson, it is definitely something that
9    we lacked and -- because we did not have
10   the right portfolio available.  So not
11   having products in the NICU for many
12   years, you know, definitely wasn't good.
13   We weren't able to feed all babies.  And
14   we really, if we're doing to be a company
15   like this that feeds babies, we should be
16   able to feed all babies.")
17   Q  (By Mr. Kawanabe) Was that your testimony in
18   October?
19   A  Yes, it was.
20   Q  Ms. Hasseberg, does Mead Johnson continue to
21   lose to Abbott in the hospital competition?
22   A  We're still behind them.  What do you mean
23   by continue to loose?  We -- we haven't caught up to
24   their shares, is that what you mean?  We're still the

Page 879

1    smaller player in the hospital business.
2    Q  And by "still the small player," that's Mead
3    Johnson at 20 percent, Abbott at 80 percent?
4    A  No, it's not that much.  Since we came out
5    with our batch mix nonacidified product that came out
6    in 2020, that filled part of our gap, so that was a
7    little better.
8    Q  Okay.  Would you take a look at a different
9    deposition transcript?
10   A  Yes.
11   Q  August of 2023.
12   A  Okay.
13   Q  Page 251.
14   A  Okay.
15   Q  Just let me know when you're there.
16   A  Okay.
17   Q  Line 14 through 22.
18       THE COURT:  What line?
19       MR. KAWANABE:  Line 14 through 22 on
20   page 251.
21       THE COURT:  Thank you.
22       MR. KAWANABE:  Your Honor, I'd ask --
23   Q  (By Mr. Kawanabe) Did you get a chance to
24   read that?

35  (Pages 876 to 879)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 880

1    A   I did.
2         MS. HINCHCLIFF:  All right.  I'd ask that we
3    publish this page for the jury, please?
4         MR. SCHMIDT:  No objection.
5         THE COURT:  Allowed.
6         MR. KAWANABE:  Let's go ahead and pull up --
7    I don't have the deposition transcript number,
8    Mr. Figuera, but could you pull up page 251 for me.
9    Thank you.
10        Q   (By Mr. Kawanabe) So in your deposition, the
11   question was: "And you said we need full confirmation
12   and hopefully visual proof, if we can get this, showing
13   Enfamil is on Mead Johnson standardized hospitals upon
14   discharge to mom."
15        Your answer: "Yeah.  So I think the point
16   we made to Robert in all of this is that we own less
17   than 20 percent of the entire hospital market and
18   Abbott owns almost 80 percent of the market.  So, yes,
19   their discharge would be higher than ours, so..."
20        Did I read that correctly?
21        A   You did.
22        MR. KAWANABE:  Your Honor, it's 4:15, this
23   is now a good breaking point.
24        THE COURT:  I agree.  Thank you.

Page 881

1         Ms. Hasseberg, you can step down for now.
2         THE WITNESS:  Oh, thank you.
3         THE COURT:  And we'll start with her
4    tomorrow morning?
5         MR. KAWANABE:  Yes, Your Honor.
6         THE COURT:  Ladies and gentlemen of the
7    jury, we're going to go into a recess for today.
8    Remember that you should not do any independent
9    investigation or research on any subject relating to
10   the case.  What you may see or hear outside the
11   courtroom is not evidence.  This includes any press,
12   radio, or television programs, and that also includes
13   any information available on the internet.  Such
14   programs, reports, and information are not evidence
15   and your verdict must not be influenced in any way by
16   such material.  You must not use the inter- --
17   internet, including Google, Wikipedia, Facebook,
18   Twitter, or any other sources that you might use every
19   day to search for any information about the case or
20   the law which applies to the case, or the people
21   involved in the case, including the parties,
22   witnesses, lawyers, and judge.
23        During the recess please do not discuss this
24   case with anyone, not even your own families or

Page 882

1    friends, and also not even amongst yourselves until at
2    the end of the trial when you have retired to the jury
3    room to deliberate on your verdict.  Even though this
4    is hard to do, it will be a violation of these
5    instructions and your own oath if you discuss this
6    case with anyone else.
7         You must not provide any information about
8    the case to anyone by any means at all, and this
9    includes posting information about the case or your
10   thoughts about it on any device or internet site,
11   including blogs, chat rooms, or any social networking
12   websites such as Twitter, Facebook, Snapchat,
13   Instagram, or TikTok, or any other means.  You cannot
14   use any electronic devices or services to communicate
15   about this case, including cell phones, smartphones,
16   laptops, internet, tablets, smart watches, and any
17   other tools of technology.  The use any such devices
18   or services in connection with your duties is
19   prohibited.
20        The reason for these instructions is that
21   your verdict must be based only on the evidence
22   presented in this courtroom and the law that I will
23   provide to you in my instructions.  It would be unfair
24   to the parties and a violation of your oath to base

Page 883

1    your decision on information from outside this
2    courtroom.  You should feel free to remind each other
3    that your verdict is to be based only on the evidence
4    admitted in court and that you cannot use information
5    from any other sources.  If you become aware of any
6    violation of these instructions, it is your legal duty
7    to report this to me immediately.
8         We will now recess for the day and I will
9    see you all tomorrow morning at 9:00 a.m.  Please
10   rise.
11        Please leave your envelopes in your seats.
12   My clerk will collect them after you've gone.  Thank
13   you and have a good evening.
14        (The jury exited the courtroom.)
15        THE COURT:  All right.  The clerks are
16   getting a lot of calls and/or emails about, I guess --
17   I don't know if it's lawyers from each of you -- some
18   from people that are in the courtroom or even in the
19   overflow rooms, requests to log in to Zoom to watch
20   the trial from their office or from wherever they are.
21   I've -- I've denied every single request.  I'm going
22   to continue to deny every single request.  The
23   courthouse is open.  We have two courtrooms that are
24   dedicated to this trial.  If they want to watch the

36  (Pages 880 to 883)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 884

1  trial, they can come up and sit -- looks like we have
2  room this afternoon, they can come up here, or can sit
3  in here or they can sit in 401.
4          So if you would please share with anyone --
5  if -- and I don't even know who it is.  This is just
6  something that was brought to my attention.  If you
7  want to share with your -- anyone at -- if you have
8  anyone left back at your firm, share with them that
9  there's no Zoom attendance at all.
10         MR. SCHMIDT:  We'll share that, Your Honor.
11 We appreciate that ruling --
12         THE COURT:  Thank you.
13         MR. SCHMIDT:  -- on the terms of the merits.
14         THE COURT:  Thank you.
15         Anything else we need for the record or are
16 we good?  You got that look.  Go ahead, Ken.
17         MR. KAWANABE:  Just timing.  I think if we
18 could show up early tomorrow and maybe we could finish
19 the objections and streamline the --
20         THE COURT:  I have an appointment at 8 a.m.
21         MR. KAWANABE:  Oh, I'm sorry.
22         THE COURT:  I'll be here by 8:40.
23         MR. KAWANABE:  Okay.
24         THE COURT:  So if we can do it in

Page 885

1  20 minutes, fantastic.
2          MR. KAWANABE:  Great.  Thank you, Your
3  Honor.
4          THE COURT:  But that gives you guys -- you
5  guys can show up at 8:00 and have 40 minutes to work
6  out all the objections and come to an agreement on all
7  issues for the remainder of the testimony of this
8  witness.  I'm hopeful.
9          MR. KAWANABE:  Okay.
10         MS. JONES:  Could I raise just two quick
11 things, Your Honor?
12         THE COURT:  Sure.
13         MS. JONES:  The first is just logistical.  I
14 mentioned this to Mr. Cates.  At -- at least as to our
15 workspace in particular, it seems to be the case that
16 when we wander out there are jurors seated on that
17 bench, and I wonder if there was some way to give them
18 some light guidance that if they're going to sit in
19 the hallway, maybe pick another floor.  We just want
20 to avoid any kind of inadvertent exposure on either
21 side to the jurors.
22         THE COURT:  See, I get it.  And I appreciate
23 it.
24         MS. JONES:  We don't need an answer right

Page 886

1  this moment.  I just -- I -- I noticed today in
2  particular that every time we were going in and out --
3          THE COURT:  I didn't even think about that.
4          MS. JONES:  -- out that there were folks out
5  there, and I just don't want to have an issue.
6          THE COURT:  Let me see if there's something
7  I can do.
8          MS. JONES:  Okay.  The second point that I
9  wanted to note very quickly is -- and this is not an
10 objection that's going to require corrective
11 instruction, but obviously, Your Honor, has reserved
12 ruling on our MIL No. 12 related to any reference to
13 Mead Johnson's or Reckitt Benckiser's financial
14 resources, revenue, profitability, size, or location.
15         We don't understand the Court to have ruled
16 on that yet.  Mr. Grimsley made some references to
17 that this morning in his opening.  I didn't object
18 because I don't like objecting during people's
19 openings, but we just want to make a note for the
20 record that we view that as still being a pending
21 issue, and we would like some -- just regard on that
22 issue with respect to the actual evidence that comes
23 in.
24         THE COURT:  Well, my intention on reserving

Page 887

1  that ruling was based upon whatever question was asked
2  or a document that was asked, if it wasn't relevant,
3  if it wasn't -- if it was inadmissible based upon the
4  question that was asked, then I would rule on the
5  objections made.
6          I can tell you that I appreciate no
7  objection being made during opening, and I'm sure he
8  does as well.  I will keep that in mind.  You're heard
9  for the record and your objections --
10         MS. JONES:  Understood.  That -- that's
11 helpful, Your Honor.  I just wanted to note that.
12         THE COURT:  I appreciate it.  Thank you.
13 One last thing I want to clear for the record.  With
14 regards to Plaintiffs' 33 -- Plaintiffs' Exhibit 3330,
15 the ruling of the court was it was admitted subject to
16 the objection.  That, I misspoke.  That should have
17 been admitted over objection, not subject to but over
18 the objection.
19         Anything else?
20         MR. GRIMSLEY:  I did want to say, Your
21 Honor, on that issue, we did share our slides this
22 morning at 7, so they may have just missed it, but the
23 900 million was in those slides, so I know they
24 brought up another issue that was not one of them, so

37 (Pages 884 to 887)

Case ID: 220302606
Control No.: 24046115

REPORT OF PROCEEDINGS - JURY TRIAL - P.M. SESSION
February 22, 2024

Page 888

1  I went forward expecting that there would be no
2  objection.
3         THE COURT: Okay.
4         MS. JONES: So long as we still have our
5  objection before the Court, we -- we don't have a
6  further issue on it in -- in terms of the opening.
7         THE COURT: I have not -- I mean, it remains
8  reserved.
9         MS. JONES: Understood.
10        THE COURT: Very good.
11        MS. JONES: We appreciate it. Thank you.
12        THE COURT: Anything else? No. All right.
13  Off the record at 4:20 p.m.
14        Thank you all. See you tomorrow.
15
16        (The proceedings ended at 4:20 p.m.)
17
18
19
20
21
22
23
24

Page 889

1         REPORTER CERTIFICATE
2
3
4
5         I, Angela M. Taylor, RPR, MO-CCR, IL-CSR, do
   hereby certify that there came before me at trial on
   the 22nd day of February, 2024, that the said
6  proceeding was taken at the St. Clair County
   Courthouse, 10 Public Square, Room 408, Belleville, IL
7  62220; and there were present counsel as previously
   set forth.
8
9         The undersigned is not interested in the
   within case, nor of kin or counsel to any of the
10  parties.
11        That she reported in shorthand the
   proceedings had at the foregoing trial;
12
13        And that the foregoing is a true and
   correct transcript of her shorthand notes so taken as
14  aforesaid and contains all the proceedings had at the
   said trial.
15
16        Witness my signature in and for St. Clair
   County, Illinois, on this 22nd of February, 2024.
17
18
19  _____
20        ANGELA M. TAYLOR, RPR, MO-CCR, IL-CSR,
        LA-CCR, WA-CCR
21
22
23
24

38  (Pages 888 to 889)

Case ID: 220302606
Control No.: 24046115

# Exhibit D

Case ID: 220302606
Control No.: 24046115

Tim Cooper

```
 1            IN THE CIRCUIT COURT
          OF THE THIRD JUDICIAL CIRCUIT
 2            MADISON COUNTY, ILLINOIS
 3   DESTIN JUPITER and DANA   )
     JUPITER, et al.,          )
 4                             )
              Plaintiffs,      ) Cause No.:
 5                             ) 2021-L-000560
     v.                        )
 6                             )
     ABBOTT LABORATORIES,      )
 7   et al.,                   )
                               )
 8            Defendants.      )
     _____
 9
          CAPTIONS CONTINUE ON FOLLOWING PAGE
10   _____
11
12            Wednesday, May 10, 2023
13       CONFIDENTIAL - OUTSIDE COUNSEL ONLY
14
15
16       Video-Recorded Oral Deposition of
     TIMOTHY COOPER MD held at the offices of
17   Quinn Emanuel Urquhart & Sullivan LLP,
     300 West 6th Street, Suite 2010, Austin,
18   Texas commencing at 11:02 a.m. CDT on the
     above date, before Michael E. Miller, Fellow
19   of the Academy of Professional Reporters,
     Certified Court Reporter, Registered
20   Diplomate Reporter, Certified Realtime
     Reporter and Notary Public.
21
22                — — —
23       GOLKOW LITIGATION SERVICES
         877.370.DEPS | fax 917.591.5672
24            deps@golkow.com
```

Case ID: 220302606
Control No.: 24046115

```
 1   Houston, so...

 2              As the Associate Medical

 3   Director for North America, what were your

 4   job responsibilities?

 5        A.    It -- I continued as the LEX

 6   consultant.  I picked up other

 7   responsibilities.  They would from time to

 8   time ask me to do lectures to -- Zoom

 9   lectures or Skype lectures to -- for the

10   medical sales force or for the actual

11   clients, physicians or dietitians.

12              I began at some point along

13   there, before the reorganization, actually

14   being responsible for certain types of

15   clinical trials.  Initially they were

16   independent investigator trial -- the

17   independent investigator trial portfolio.

18              I was responsible for reviewing

19   out-of-spec products for safety.  So if a

20   product had, say, more sodium than -- than

21   expected, then in that example it would be my

22   responsibility to make sure that that amount

23   of sodium wasn't of any medical consequence.

24        Q.    When you say you're responsible
```

Case ID: 220302606
Control No.: 24046115

Tim Cooper

```
 1                    CERTIFICATE
 2            I, MICHAEL E. MILLER, Fellow of
     the Academy of Professional Reporters,
 3   Registered Diplomate Reporter, Certified
     Realtime Reporter, Certified Court Reporter
 4   and Notary Public, do hereby certify that
     prior to the commencement of the examination,
 5   TIMOTHY COOPER MD was duly sworn by me to
     testify to the truth, the whole truth and
 6   nothing but the truth.
 7            I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
 8   testimony as taken stenographically by and
     before me at the time, place and on the date
 9   hereinbefore set forth, to the best of my
     ability.
10
11            I DO FURTHER CERTIFY that I am
     neither a relative nor employee nor attorney
12   nor counsel of any of the parties to this
     action, and that I am neither a relative nor
13   employee of such attorney or counsel, and
     that I am not financially interested in the
14   action.
15
16   _____
     MICHAEL E. MILLER, FAPR, RDR, CRR
17   Fellow of the Academy of Professional Reporters
     NCRA Registered Diplomate Reporter
18   NCRA Certified Realtime Reporter
     Certified Court Reporter
19
     Notary Public in and for the
20   State of Texas
     My Commission Expires:  7/9/2024
21
     Dated: May 22, 2023
22
23
24
```

Case ID: 220302606
Control No.: 24046115

# Exhibit E

Case ID: 220302606
Control No.: 24046115

Christina Valentine, MD, MS, RD

IN THE CIRCUIT COURT
OF THE THIRD JUDICIAL CIRCUIT
MADISON COUNTY, ILLINOIS

DESTIN JUPITER and DANA          )
JUPITER, et al.,                 )
                                 )
          Plaintiffs,            )
                                 ) Cause No.
vs.                              ) 2021-L-000560
                                 )
ABBOTT LABORATORIES, et al.,     )
                                 )
          Defendants.            )

THURSDAY, JANUARY 5, 2023

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS ONLY
PURSUANT TO PROTECTIVE ORDER
- - -

          Remote videotaped discovery
deposition of Christina J. Valentine, MD, MS,
RD, held remotely at the location of the
witness in Ohio, commencing at 11:35 a.m.
Eastern, on the above date, before Carrie A.
Campbell, Registered Diplomate Reporter,
Certified Realtime Reporter, Illinois
(084-004229), California & Texas Certified
Shorthand Reporter, Missouri, Kansas,
Louisiana & New Jersey Certified Court
Reporter.

Case ID: 220302606
Control No.: 24046115

Christina Valentine, MD, MS, RD

Page 23

1   everything on here.  Is your understanding

2   that everything on this CV is accurate and

3   correct?

4          A.     Yes.

5          Q.     When did you start working for

6   Mead Johnson?

7          A.     I started working for Mead

8   Johnson in 2014, in September.

9          Q.     Looking at page 2, it looks

10  like that was September 2014; is that

11  correct?

12         A.     Yes, that's correct.

13         Q.     Okay.  And your position, it

14  says, was a medical director for North

15  America Mead Johnson Nutrition/Reckitt

16  Benckiser; is that correct?

17         A.     That's correct.

18         Q.     What is -- what are your job

19  responsibilities as the medical director for

20  Mead Johnson?

21         A.     As the medical director for

22  Mead Johnson in North America, it's a

23  regional position, and your job description

24  includes insights, so medical science

Case ID: 220302606
Control No.: 24046115

Christina Valentine, MD, MS, RD

Page 24

1    insights; oversight, so governance for

2    quality and safety; as well as evidence

3    generation, so pursuing science opportunities

4    and accelerating, amplifying science in key

5    areas to support infant health.

6              And then the other main part of

7    the job is education, medical education, as

8    well as internal stakeholder education.

9         Q.    All right.  I'm going to go

10   back on those four points in a second here,

11   but I want to make sure I understand.

12             It looks like you -- according

13   to the CV, you did that until August 2021; is

14   that correct?

15        A.    That's correct.

16        Q.    All right.  And what happened

17   in August of 2021?

18        A.    I was very fortunate.  I have

19   had a National Institute of Health grant and

20   was deep-diving into the science at the time

21   and recognized that I needed to have more

22   time dedicated to completing that very

23   important trial science information, and so I

24   decided to leave the organization and

Case ID: 220302606
Control No.: 24046115

Christina Valentine, MD, MS, RD

Page 167

```
 1                    CERTIFICATE
 2            I, CARRIE A. CAMPBELL, Registered
     Diplomate Reporter, Certified Realtime
 3   Reporter and Certified Shorthand Reporter, do
     hereby certify that prior to the commencement
 4   of the examination, Christina J. Valentine,
     MD, MS, RD, was duly sworn by me to testify
 5   to the truth, the whole truth and nothing but
     the truth.
 6
              I DO FURTHER CERTIFY that the
 7   foregoing is a verbatim transcript of the
     testimony as taken stenographically by and
 8   before me at the time, place and on the date
     hereinbefore set forth, to the best of my
 9   ability.
10            I DO FURTHER CERTIFY that I am
     neither a relative nor employee nor attorney
11   nor counsel of any of the parties to this
     action, and that I am neither a relative nor
12   employee of such attorney or counsel, and
     that I am not financially interested in the
13   action.
14
16        _____
          CARRIE A. CAMPBELL,
17        NCRA Registered Diplomate Reporter
          Certified Realtime Reporter
18        California Certified Shorthand
          Reporter #13921
19        Missouri Certified Court Reporter #859
          Illinois Certified Shorthand Reporter
20        #084-004229
          Texas Certified Shorthand Reporter #9328
21        Kansas Certified Court Reporter #1715
          New Jersey Certified Court Reporter
22        #30XI00242600
          Louisiana Certified Court Reporter
23        #2021012
          Notary Public
24        Dated:  January 19, 2023
```

Case ID: 220302606
Control No.: 24046115

# EXHIBIT A-84

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

*Filed and Attested by the*
*Office of Judicial Records*
*12 JUN 2023 05:54 pm*
*E. HAURIN*

| | | |
|---|---|---|
| TERRAINE ABDULLAH, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | : <br> : <br> : <br> : <br> : | MARCH TERM, 2022<br>No. 220302583 |
| HOLLI CARTER, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | : <br> : <br> : <br> : <br> : | MARCH TERM, 2022<br>No. 220302588 |
| SHONDERA DRAYTON, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | : <br> : <br> : <br> : <br> : | MARCH TERM, 2022<br>No. 220302594 |
| BRANDY GOODMOND, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | : <br> : <br> : <br> : <br> : | APRIL TERM, 2022<br>No. 220400208 |
| BRANDY GOODMOND, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | : <br> : <br> : <br> : <br> : | APRIL TERM, 2022<br>No. 220400212 |
| TONYA GRAY, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | : <br> : <br> : <br> : <br> : | APRIL TERM, 2022<br>No. 220400216 |
| JANEE HENDERSON, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | : <br> : <br> : <br> : <br> : | APRIL TERM, 2022<br>No. 220400127 |

ORDER-Taylor Etal Vs Mead Johnson



22030260600150

Case ID: 220302606
Control No.: 23062552

| | |
|---|---|
| DELQUAN HINES, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | : APRIL TERM, 2022<br>: No. 220400136<br>:<br>: |
| SHEMIKA JOHNSON, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: APRIL TERM, 2022<br>: No. 220400162<br>:<br>: |
| KRISTEN KAJUFFA, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: MARCH TERM, 2022<br>: No. 220302978<br>: |
| NAFEESAH MAYS, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: MARCH TERM, 2022<br>: No. 220302963<br>: |
| CATHERINE McMILLIAN, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: APRIL TERM, 2022<br>: No. 220400140<br>: |
| DAMEKA MOMENT, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: APRIL TERM, 2022<br>: No. 220400142<br>: |
| ERICA PADILLA, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: MARCH TERM, 2022<br>: No. 220302969<br>: |
| NYDIA PARKER, et al.,<br>Plaintiff,<br>v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>Defendants. | :<br>: MARCH TERM, 2022<br>: No. 220302983<br>: |

2

Case ID: 220302606
Control No.: 23062552

| | |
|---|---|
| ALEXANDRIA ROSS, et al.,<br>        Plaintiff,<br>     v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        Defendants. | MARCH TERM, 2022<br>No. 220302981 |
| LOREN SANDERS, et al.,<br>        Plaintiff,<br>     v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        Defendants. | APRIL TERM, 2022<br>No. 220400153 |
| SAMAYA SHORT, et al.,<br>        Plaintiff,<br>     v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        Defendants. | APRIL TERM, 2022<br>No. 220400159 |
| ALICE STILLS, et al.,<br>        Plaintiff,<br>     v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        Defendants. | MARCH TERM, 2022<br>No. 220302617 |
| CHRISTINA TAYLOR, et al.,<br>        Plaintiff,<br>     v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        Defendants. | MARCH TERM, 2022<br>No. 220302606 |
| NATISHA THOMAS, et al.,<br>        Plaintiff,<br>     v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        Defendants. | MARCH TERM, 2022<br>No. 220400158 |
| TRINA WALKER-SAVAGE and CLIFTON<br>ISAIAH SAVAGE, JR., et al.,<br>        Plaintiff,<br>     v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        Defendants. | MARCH TERM, 2022<br>No. 220400156 |
| JEANNATE WATSON, et al.,<br>        Plaintiff,<br>     v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>        Defendants. | MARCH TERM, 2022<br>No. 220302967 |

3

Case ID: 220302606
Control No.: 23062552

| | |
|---|---|
| ROBERT WHITFIELD, et al.,<br>   Plaintiff,<br>  v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>   Defendants. | APRIL TERM, 2022<br>No. 220400145 |
| GINA WIEGER, et al.,<br>   Plaintiff,<br>  v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>   Defendants. | MARCH TERM, 2022<br>No. 220302614 |
| GINA WIEGER, et al.,<br>   Plaintiff,<br>  v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>   Defendants. | MARCH TERM, 2022<br>No. 220302601 |
| SHANITA WIGGINS, et al.,<br>   Plaintiff,<br>  v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>   Defendants. | MARCH TERM, 2022<br>No. 220302986 |
| MELVENIA WILLIAMS, et al.,<br>   Plaintiff,<br>  v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>   Defendants. | APRIL TERM, 2022<br>No. 220400141 |
| IVYANN WITHERSPOON, et al.,<br>   Plaintiff,<br>  v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>   Defendants. | APRIL TERM, 2022<br>No. 220400138 |

Case ID: 220302606
Control No.: 23062552

## ORDER

**AND NOW**, this 20th day of May, 2024, upon consideration of Defendant Abbot Laboratories' Preliminary Objections to Plaintiffs' amended Complaints, is hereby **ORDERED** that the Motion is **MOOT** without prejudice to Defendant to file renewed Preliminary Objections to the Amended Complaint.  Plaintiff shall have sixty (60) days from the date of this Order to file an Amended Complaint.

BY THE COURT:

CARPENTER, J.

# EXHIBIT A-85

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

Filed and Attested by the
Office of Judicial Records
28 SEP 2023 03:47 pm
G. IMPERATO

| | | |
|---|---|---|
| HOLLI CARTER, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302588 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| BRANDY GOODMOND, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400208 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| BRANDY GOODMOND, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400212 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| JANEE HENDERSON, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400127 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| KRISTEN KAJUFFA, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302978 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| NAFEESAH MAYS, et al., | : | |
| *Plaintiff,* | : | MARCH TERM, 2022 |
| v. | : | No. 220302963 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |
| CATHERINE McMILLIAN, et al., | : | |
| *Plaintiff,* | : | APRIL TERM, 2022 |
| v. | : | No. 220400140 |
| MEAD JOHNSON & COMPANY, LLC, et al., | : | |
| *Defendants.* | : | |

ORDER-Taylor Etal Vs Mead Johnson



22030260600151

Case ID: 220302606
Control No.: 23096781

| | | |
|---|---|---|
| DAMEKA MOMENT, et al.,<br>    *Plaintiff,*<br>      v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>    *Defendants.* | :<br>:<br>:<br>:<br>: | APRIL TERM, 2022<br>No. 220400142 |
| NYDIA PARKER, et al.,<br>    *Plaintiff,*<br>      v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>    *Defendants.* | :<br>:<br>:<br>:<br>: | MARCH TERM, 2022<br>No. 220302983 |
| ALEXANDRIA ROSS, et al.,<br>    *Plaintiff,*<br>      v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>    *Defendants.* | :<br>:<br>:<br>:<br>: | MARCH TERM, 2022<br>No. 220302981 |
| LOREN SANDERS, et al.,<br>    *Plaintiff,*<br>      v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>    *Defendants.* | :<br>:<br>:<br>:<br>: | APRIL TERM, 2022<br>No. 220400153 |
| SAMAYA SHORT, et al.,<br>    *Plaintiff,*<br>      v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>    *Defendants.* | :<br>:<br>:<br>:<br>: | APRIL TERM, 2022<br>No. 220400159 |
| ALICE STILLS, et al.,<br>    *Plaintiff,*<br>      v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>    *Defendants.* | :<br>:<br>:<br>:<br>: | MARCH TERM, 2022<br>No. 220302617 |
| CHRISTINA TAYLOR, et al.,<br>    *Plaintiff,*<br>      v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>    *Defendants.* | :<br>:<br>:<br>:<br>: | MARCH TERM, 2022<br>No. 220302606 |
| NATISHA THOMAS, et al.,<br>    *Plaintiff,*<br>      v.<br>MEAD JOHNSON & COMPANY, LLC, et al.,<br>    *Defendants.* | :<br>:<br>:<br>:<br>: | MARCH TERM, 2022<br>No. 220400158 |

Case ID: 220302606
Control No.: 23096781

| | |
|---|---|
| TRINA WALKER-SAVAGE and CLIFTON ISAIAH SAVAGE, JR., et al., *Plaintiff,* v. MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : : : : : : : | MARCH TERM, 2022 No. 220400156 |
| JEANNATE WATSON, et al., *Plaintiff,* v. MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : : : : : : | MARCH TERM, 2022 No. 220302967 |
| GINA WIEGER, et al., *Plaintiff,* v. MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : : : : : : | MARCH TERM, 2022 No. 220302614 |
| GINA WIEGER, et al., *Plaintiff,* v. MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : : : : : : | MARCH TERM, 2022 No. 220302601 |
| SHANITA WIGGINS, et al., *Plaintiff,* v. MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : : : : : : | MARCH TERM, 2022 No. 220302986 |
| MELVENIA WILLIAMS, et al., *Plaintiff,* v. MEAD JOHNSON & COMPANY, LLC, et al., *Defendants.* | : : : : : : | APRIL TERM, 2022 No. 220400141 |

Case ID: 220302606
Control No.: 23096781

## <u>ORDER</u>

**AND NOW**, this 20th day of May, 2024, upon consideration of Defendant Abbot Laboratories' Preliminary Objections to Plaintiffs' amended Complaints, is hereby **ORDERED** that the Motion is **MOOT** without prejudice to Defendant to file renewed Preliminary Objections to the Amended Complaint. Plaintiff shall have sixty (60) days from the date of this Order to file an Amended Complaint.

BY THE COURT:

CARPENTER, J.

# EXHIBIT A-86

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY**
**FIRST JUDICIAL DISTRICT OF PENNSYLVANIA**
**TRIAL DIVISION – CIVIL**

*Filed and Attested by the Office of Judicial Records 28 JUN 2024 09:21 am E. LOWELL*

| | |
|---|---|
| CHRISTINA TAYLOR, *on her own behalf and as Parent and Natural Guardian of* I.H., *a Minor*, <br><br> Plaintiffs, <br><br> v. <br><br> MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, <br><br> Defendants. | :    PHILADELPHIA COUNTY <br> :    COURT OF COMMON PLEAS <br> :    TRIAL DIVISION <br> : <br> : <br> : <br> :    MARCH TERM, 2022 <br> :    No. 220302606 <br> : <br> : <br> : <br> : <br> : |

## [PROPOSED] STIPULATED PROTOCOL GOVERNING THE PRODUCTION OF DOCUMENTS AND ELECTRONICALLY STORED INFORMATION ("ESI")[1]

To expedite the production of discovery material and to facilitate the consistency in the format of the documents to be produced by the Parties in this case, Plaintiffs and Defendants (collectively, the "Parties"), by and through their respective counsel, and pursuant to Pennsylvania Rule of Civil Procedure No. 4002, hereby stipulate and agree to the terms of this [Proposed] Stipulated Protocol Governing the Production of Documents and Electronically Stored Information ("ESI"):

---

[1] This Stipulated Protocol Governing the Production of Documents and ESI applies to the following cases pending in the Philadelphia Court of Common Pleas, along with any future-filed cases as described in Paragraph 1: 220302583, 220302588, 220302594, 220302601, 220302606, 220302614, 220302617, 220302963, 220302967, 220302978, 220302981, 220302983, 220302986, 220400127, 220400138, 220400140, 220400141, 220400142, 220400153, 220400156, 220400158, 220400159, 220400162, 220400208, 220400212, 220400216, 230900730, 230900791, 230900803, and 230900867.

**IT IS HEREBY STIPULATED**, subject to the approval of the Court:

1.      This Stipulated Protocol Governing the Production of Documents and Electronically Stored Information (the "ESI Protocol") shall govern the production of documents and ESI by the Parties in the above-captioned cases, plus all other cases now-pending or future-filed in the First Judicial District of Pennsylvania in the Court Of Common Pleas of Philadelphia County, Pennsylvania against Abbott and/or Mead involving allegations that Abbott's or Mead's preterm infant formula products caused NEC (the "Philadelphia NEC Litigation"). Notwithstanding, the production of documents and ESI shall also be subject to the provisions of the Stipulated Protective Order, including the provisions concerning confidentiality and privilege, as agreed to by the Parties and entered by the Court in the Philadelphia NEC Litigation.

2.      The production specifications in this ESI Protocol apply to Documents and ESI that are produced in the first instance in the Philadelphia NEC Litigation. The terms and specifications of this ESI Protocol shall only apply to productions made in the Philadelphia NEC Litigation after the date of entry of this ESI Protocol by the Court..  Furthermore, productions received from Non-Parties shall be produced to the other Parties in the format that such documents and /or information was produced by the third parties.[2]

3.      This ESI Protocol does not apply to any paper records or ESI first produced in another action and re-produced in the Philadelphia NEC Litigation (in which case the production is subject to the ESI protocol entered in that action).[3] This paragraph does not, however, bar requests for data fields identified in this ESI Protocol that are missing from any ESI materials

---

[2] If the Non-Party production is not Bates-stamped by the Non-Party Producer, prior to any Party reproducing the Non-Party Documents, the Parties will meet and confer to agree upon a format for designating the documents with a unique Bates prefix and numbering scheme.

[3] If reproducing documents, the Producing Party will reproduce documents from the Illinois state court where available. If not produced in the Illinois state court action, the Producing Party may re-produce documents from the Illinois federal court action. If documents were originally produced in any other related case, the Parties will meet and confer regarding their re-production in the Philadelphia NEC Litigation. Documents re-produced in the Philadelphia NEC Litigation will bear the Bates stamps of the action in which they were originally produced.

Case ID: 220302606
Control No.: 24065807

produced in related actions, or to the extent that a document is illegible and needs to be reproduced to be readable.

4.    The Parties jointly stipulate to waive the obligation of the Parties to identify documents or categories of documents produced in response to a demand for inspection, copying, testing, or sampling with the specific request number to which the documents respond under the Pennsylvania Rules of Civil Procedure, including but not limited to, Pa. R. Civ. P. 4009.12.

5.    To the extent additional obligations or rights not addressed in this ESI Protocol arise under the Pennsylvania Rules of Civil Procedure, local rules, or applicable state and federal statutes, those rules and/or statutes shall control.

<div align="center"><b><u>Definitions</u></b></div>

1.    "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Pennsylvania Rules of Civil Procedure No. 4009.1(a).

2.    "Electronically stored information" or "ESI," is defined to be synonymous in meaning and equal in scope to the usage of this term in Pennsylvania Rules of Civil Procedure No. 4009.1(b).

3.    "Family" means email and all related attachments.

4.    "Paper Records" or "Hard Copy Documents" means Documents existing in paper form at the time of collection.

5.    "Native Format" means and refers to an electronic document's associated file structure defined by the original creating application. For example, the native format of an Excel workbook is a .xls or .xslx file.

6.    "Metadata" means information describing characteristics of a file, generated by the application that created or modified it or generated automatically by a computer or network operating system on which the file is located.

7.    "Optical Character Recognition" or "OCR" means the process of recognizing, and creating a file containing, visible text within an image.

<div align="center">3</div>

Case ID: 220302606
Control No.: 24065807

8.     "Extracted Full Text" means the full text that is extracted electronically from native electronic files, and includes all header, footer, and document body information.

9.     "Hash Value" is a unique numerical identifier that can be assigned to a file, a group of files, or a portion of a file, based on a standard mathematical algorithm applied to the characteristics of the data set.

10.    "Confidentiality Designation" means the legend affixed to "Covered Information" as defined by, and subject to, the terms of the Stipulated Protective Order entered by the Court in the Philadelphia NEC Litigation.

11.    "Searchable Text" means the native text extracted from ESI and any Optical Character Recognition text ("OCR text") generated from a Hard-Copy Document or electronic image.

## A.     **Paper Records**

1.     Paper records will be scanned or otherwise converted into electronic form from paper documents in the following format:

a.     <u>TIFFs</u>.  All documents shall be scanned to single page Group 4, TIFF format, at least 300 dpi and 8 ½ x 11 inch page size, except for documents requiring higher resolution or different page size.

b.     In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized).  The Parties will make their best efforts to have their vendors unitize documents correctly and will commit to address situations where there are improperly unitized documents.

c.     Productions of the images shall be made using an image load file (.OPT or .LFP) and a delimited database/metadata load file (.DAT).  Each image file should have a unique file name which shall be the Bates number of the page.

d.     <u>Objective Coding Fields</u>.    The following objective coding fields should be provided, if applicable: (i) beginning Bates number; (ii) ending Bates number; (iii)

Case ID: 220302606
Control No.: 24065807

beginning attachment Bates number; (iv) ending attachment Bates number; (v) page count; and (vi) custodian.

e.    <u>OCR Text Files</u>.  Document level OCR should be provided as a separate text file. The file name of each text file should correspond to the file name of the first image file of the document with which it is associated.  The text files will not contain the redacted portions of the documents.

f.    For Hard-Copy Documents, the Parties need only populate the following metadata fields to the extent available: "BEGDOC," "ENDDOC," "PROD VOLUME," "CUSTODIAN "CONFIDENTIAL," "BOX NUMBER" "REDACTION," fields, as well as "BEGATTACH" and "ENDATTACH" fields where applicable. The beginning and end bates numbers from the production in another matter shall be added as distinct metadata fields for these documents and be included in the production file.

g.    Black-and-white ("B&W") hard-copy documents shall be produced as single-page, B&W group IV TIFFs imaged at 300 dpi.  To the extent that a static image has been created of any hard copy document containing color and/or grayscale, such static image containing color and/or grayscale shall be produced, except for documents requiring higher resolution or different page size.  If not previously imaged in color or grayscale, the parties will use reasonable efforts to produce hard copy documents containing color and/or grayscale as static images with grayscale and color, respectively. A Receiving Party may request that documents be re-produced with the coloration of the original document by providing a list of the Bates numbers of documents it requests to be produced in color format, and the receiving Party should reasonably produce those documents with the coloration of the original document.

Case ID: 220302606
Control No.: 24065807

In the event the Producing Party objects to re-producing the documents, the parties shall meet and confer within three (3) business days.

h. If, in the ordinary course of business, responsive documents are maintained in a file, folder, envelope, binder, notebook or similar container used to store documents, all contents therein shall be reviewed for production and privilege. The Producing Party shall describe in a general way the nature of the container in which the discoverable and responsive documents were found and state whether that container also contains non-responsive documents. Non-responsive documents need not be logged, scanned, or otherwise identified. Should the Requesting Party seek additional information concerning the nature of non-responsive documents, the court will, absent agreement of the parties, consider a request for such information, on a showing that circumstances of storage support a good faith basis for that request.

i. Nothing herein shall preclude a Party from, at its discretion, producing for inspection hard copy documents or other tangible things for which there are no electronic images. However, to the extent that a Party elects to produce for inspection hard copy documents or other tangible things, the Producing Party shall also make available to the Requesting Party any existing indices, inventories, lists, catalogs, or other data or documents that exist in the normal course of business that identify or describe the documents produced. Nothing in this paragraph, however, prevents a Party from asserting undue burden in response to a request for such documents, and nothing in this paragraph waives or dilutes such an objection.

j. Upon notice from the Requesting Party that a document or portion thereof is illegible, the Producing Party shall, if possible, produce a legible copy in the form of either a new TIFF, static image, or hard copy, or, if not possible, explain why a more legible copy of the document cannot be produced. The document's original orientation should be maintained (i.e., portrait to portrait, landscape to landscape).

Case ID: 220302606
Control No.: 24065807

No Producing Party shall be required to alter or re-create any document for which no grayscale or color version is in the Party's possession or control or for which the original hard copy document is illegible.

k.    If any original hard copy document has any note or attachment affixed to it, the Producing Party shall scan and produce copies of the original hard-copy document along with all notes and attachments to it in the same manner as other documents. If any such note or attachment obscures any information on the original hard copy document, the Producing Party shall also produce a copy of the original hard-copy document without the note or attachment affixed in order to make the underlying information visible.

**B.    Electronically Stored Information**

1.    The Parties will produce responsive, complete families of ESI in TIFF format according to the following specifications:

a.    All TIFF formatted documents will be single page, Group 4 TIFF at 300 X 300 dpi resolution and 8½ X 11 inch page size, except for documents requiring different resolution or page size.

b.    An image load file, in standard Opticon format, showing the Bates number endorsed onto the lower right corner of each page but not obscuring the content on any page and the appropriate unitization of the documents, will accompany all document images. All Bates numbers will consist of an Alpha Prefix, followed by a numeric page index. If a member of a document family that has otherwise been determined to be responsive cannot be technically processed (e.g., unsupported file format, file corruption, inaccessible password-protected document), those technical problems shall be identified and disclosed to the Receiving Party by production of a Bates-labeled slip sheet that states "Technical issue—file cannot be processed,"; the associated metadata for the file with the technical problem shall be produced if possible. A Receiving Party thereafter may raise with the Producing Party any

7

Case ID: 220302606
Control No.: 24065807

questions or concerns, and the Parties shall meet and confer to attempt to resolve any issues.

c.     Each imaged version of an electronic document will be created directly from the original electronic document.

d.     TIFFs shall be produced as black & white, single-page TIFF images in accordance with the technical specifications set out above, unless otherwise agreed with the opposing Party or ordered by a court.  Additionally, the Producing Party shall make a reasonable attempt using automated processes to identify marketing materials and advertisements and produce those in color. The Producing Party shall also produce PowerPoint files in color (to the extent they are not produced natively).  Upon written request that identifies a reasonable number of individual documents at issue by Bates number, a Party shall produce color images for those documents. Documents produced in color shall be produced as single page, 300 DPI, color JPG images with the quality setting of 75% or higher.  To the extent there is metadata that identifies a document as containing comments, tracked changes, speaker's notes, or other hidden text, or to the extent that Plaintiff identifies by Bates number such a document, and that document is not produced in native format pursuant to this Protocol, such document should be produced in color with all comments, tracked changes, speaker's notes, or other hidden text, and any other hidden content made visible in the first instance.

e.     All TIFF files are to be provided with an accompanying searchable text (.TXT) file extracted from the native, electronic file (not generated as an OCR file from the TIFF image(s)), and such text files shall contain the full text extraction.  To the extent reasonably feasible, extracted text shall provide all comments, tracked changes, speaker's notes, and text from hidden worksheets, slides, columns and rows.  In the case of files with redacted text, OCR'd text of the non-redacted portion of the documents may be provided in lieu of extracted text.  OCR software should

8

Case ID: 220302606
Control No.: 24065807

be set to the highest quality setting during processing. For documents in foreign languages, the OCR shall be performed using an OCR tool and settings suitable for the particular byte or multi-byte languages.

f.      Each text file shall be named according to the Bates number of the first page of the corresponding image files (e.g., BATES00000l .TXT).

g.      In the case of email, the corresponding text file shall include, where reasonably available: (i) the individual(s) to whom the communication was directed ("To"); (ii) the author(s) of the email communication ("From"); (iii) who was copied and blind copied on such email ("CC" and "BCC"); (iv) the subject line of the email ("RE" or "Subject"); (v) the names of any attachments; and (vi) the text (body) of the email.

h.      Hard-copy documents and ESI that contains languages other than English, in whole or in part, shall be produced in the original language(s), along with all existing translations of the searchable text.  However, no Party shall be obligated to create a translation of any document.

2.      The following metadata fields associated with each electronic document will be produced, to the extent they are available. This list of metadata fields does not create any obligation to create or manually code fields that are not automatically generated by the processing of the ESI or that do not exist as part of the original Metadata of the Document.

| Field Name | Field Description | Required for Email | Required for Non-Email ESI |
|---|---|---|---|
| Custodians | Name of custodian(s) of email(s) or file(s) produced and any de-duped file(s) not produced | X | X |
| BegBates | Beginning Bates# (including Prefix) | X | X |
| EndBates | Ending Bates# (including Prefix) | X | X |
| BegAttach | Beginning Bates number of the first document in an attachment | X | X |

9

Case ID: 220302606
Control No.: 24065807

| Field Name | Field Description | Required for Email | Required for Non-Email ESI |
|---|---|---|---|
|  | range (only in emails with attachments) |  |  |
| EndAttach | Ending Bates number of the last document in attachment range (only in emails with attachments) | X | X |
| Attachments | Names of each individual Attachment, separated by semi-colons | X |  |
| From | From field extracted from an email message | X |  |
| Author | Author field extracted from the metadata of a non-email document |  | X |
| To | To or Recipient extracted from an email message | X |  |
| Cc | Carbon Copy ("Cc") field extracted from an email message | X |  |
| Bcc | Blind Carbon Copy ("Bee") field extracted from an email message | X |  |
| Subject | Subject line extracted from an email message | X |  |
| Filename | File name - Original name of file as appeared in original location |  | X |
| Filepath | File/path of the location where the item was located at the time of collection. | X | X |
| SentOnDate | Sent date of an email message (mm/dd/yyyy hh:mm:ss a format) (a given email will have either a Date Sent or Date Recvd, but not both) | X |  |
| ReceivedDate | Received date of an email message (mm/dd/yyyy hh:mm:ss a format) (a given email will have either a DateSent or Date Recvd, but not both) | X |  |
| CreationDate | Date that a non-email file was created (mm/dd/yyyy hh:mm:ss a format) |  | X |
| SentOnDate | Sent date of an email message (mm/dd/yyyy hh:mm:ss a format) (a given email will have either a Date Sent or Date Recvd, but not both) | X |  |

Case ID: 220302606
Control No.: 24065807

| Field Name | Field Description | Required for Email | Required for Non-Email ESI |
|---|---|---|---|
| ModifiedDate | The application recorded time on which the document was last modified (mm/dd/yyyy hh:mm:ss a format) | | X |
| Filesize | Size or volume of individual file | X | X |
| Pgcount | Number of pages of document produced | X | X |
| NativeLink | Relative path to any files produced in native format | X | X |
| TextPath | Relative path to any OCR/extracted text files in the production set | X | X |
| Parentmsgid | Where the item is an email which is a REPLY or FORWARD, the MSGID of the original email which was REPLIED to or FORWARDED | X | |
| HashValue | MD5 or SHA-1 hash value used to deduplicate the data | X | X |
| ConfidentialityDesignation | Confidentiality Designation for produced documents | X | X |
| Redaction | Identifies if a document has been redacted | X | X |
| HasRevisions | Y if a Word document with revisions, otherwise N or empty | | X |
| HasComments | Y if a Word or Excel document with comments, otherwise N or empty | | X |
| HasHiddenText | Y if a Word document with hidden text, otherwise N or empty | | X |
| HasHiddenSlides | Y if a Power Point document with hidden slides, otherwise N or empty | | X |
| | | | |
| HasHiddenRows | Y if an Excel document with hidden rows, otherwise N or empty | | X |
| HasHiddenColumns | Y if an Excel document with hidden columns, otherwise N or empty | | X |
| HasHiddenWorksheets | Y if an Excel document with very hidden worksheets, otherwise N or empty | | X |

Case ID: 220302606
Control No.: 24065807

| Field Name | Field Description | Required for Email | Required for Non-Email ESI |
|---|---|---|---|
| File extension*<br>*will not be populated for emails | The suffix at the end of a filename that indicates what type of file it is (e.g., .ppt, .doc, .pdf) | X | X |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Case ID: 220302606
Control No.: 24065807

### C.     Native Format Production of Documents

1.     The Parties will produce the following ESI types in native file format: (i) Excel spreadsheets; (ii) Audio/video files; (iii) Animations; and (iv) PowerPoint presentations

2.     A Receiving Party may make a written request that a reasonable number of individual documents (identified by Bates number) be produced in native format. The producing party shall consider such requests and, accommodate them, unless it would not be practical or feasible to do so.  Any document produced in native format, will be produced according to the following specifications:

   a.     A unique Bates number and confidentiality designation shall be used as the file name and the original file name and file extension shall be preserved in the corresponding load file. An example of this convention would be: "ZF_TRW_PHL_00000l_Confidential.xls"

   b.     The native format documents shall be accompanied by reference information that sets forth for each document, sufficient information to allow the Parties to track and authenticate the native format documents produced, including: (i) the name of the custodian from whose files the electronic file is produced; (ii)  an appropriately calculated "MD-5 Hash Value"; (iii) the original name of the file; and (iv) a Bates number.

   c.     Any file produced in native format need not be imaged.  Instead, a single page placeholder image shall be provided that indicates the file was produced in native format and contains the Bates number and Confidential designation of the corresponding file.

### D.     Redacted Files

1.     The Parties reserve the right to redact any information covered by the attorney-client privilege, attorney-work product doctrine, or any other applicable privilege, prior to producing documents in this Action. To the extent a Party redacts such information, the

Case ID: 220302606
Control No.: 24065807

information redacted shall be identified by the endorsement "Redacted for Privilege" or "Redacted – Privileged."

2.      Extracted text that has been redacted on the produced TIFF will not be provided. Documents that do not render in a readable format to TIFF, such as Excel spreadsheets, may be redacted in native form as long as the Producing Party keeps a pristine, unredacted copy of the native file and identifies the natively redacted documents to the Receiving Party in the production cover letter or by way of a native redaction field.

### E.      Data Load Files/Cross-Reference Files

1.      Fielded data should be exchanged via a document-level-database load file in one of two delimited formats.  Either standard Concordance (DAT) or comma delimited (CSV).  All image data should be delivered with a corresponding image load file in one of three formats; standard IPro (LFP), Opticon (OPT) or Summation (DII).  The total number of image files referenced in the image load file should match the total number of images in the production delivery.  This section is subject to the Parties' vendors being able to process the data; if not, the Parties will meet and confer.

### F.      Deduping Documents and De-NISTing Documents

1.      Each Party will dedupe ESI globally for exact duplicate documents (based on MD5 or SHA-1 hash values at the parent document level).  This will result in the Producing Party producing only a single copy of responsive Duplicate ESI, provided that all other custodians of the Duplicate ESI are listed in the "Duplicate Custodians" (or similar name) field.  The Parties shall de-duplicate stand-alone documents against stand-alone documents and shall de-duplicate top-level  email documents against top-level email documents.  De-duplication shall not break apart families.

2.      Common system and program files as defined by the NIST library need not be processed, reviewed or produced.

Case ID: 220302606
Control No.: 24065807

### G. Proprietary or Third-Party Software

1.      To the extent that information produced pursuant to this Protocol cannot be rendered or viewed without the use of proprietary or third-party software, the Parties shall meet and confer to minimize any expense or burden associated with the production of such information in an acceptable format.

### H. Production Media

1.      The Parties shall produce documents electronically via a secure File Transfer Protocol ("FTP") rather than through physical media (e.g. CD, DVD, or hard drive), unless such electronic transmission is impracticable, or the Parties agree on a different method of transmission. The produced documents shall be password protected and/or encrypted. Each piece of Production Media shall be encrypted and assigned a production number or other unique identifying label ("Production Volume Number") corresponding to the sequence of the material in that production and shall include: (i) the name of the litigation and the case number; (ii) the identity of the Producing Party; (iii) the Bates Number range of the materials contained on such Production Media item; and (iv) the Production Volume Number of the Production Media..

### I. Defendants' Identification and Classification of Documents

1.      The Parties agree to meet and confer in good faith regarding the scope of discovery, including custodians, applicable date range restrictions, and search methodologies to include search terms and/or technology assisted review.

### J. Foreign Language Documents

1.      Hard-copy documents and ESI that contains languages other than English, in whole or in part, shall be produced in the original language(s), along with all existing translations of the searchable text.  No Party shall be obligated to create a translation of any document, however.

### K. Social Media

Social Media posts will be collected with the following information and metadata, to the extent feasible and available:

- Complete text of posts

Case ID: 220302606
Control No.: 24065807

- Complete text of comments

- Photos attached to posts

- Date and time of posts

- Social Media platform

Social Media posts and associated comments and photos will be produced on sequential Bates-stamped documents.

Social Media messages will be collected with the following information and metadata, to the extent feasible and available:

- Date and time of messages

- Identity of senders and recipients of messages

- Social Media platform

If any established forensic tools, including, but not limited to, Web Preserver, Page Vault, Magnet Axiom and/ or Oxygen Forensics, or the social media platforms' data export feature(s), are used to collect Social Media posts and messages, and the collection and/or metadata requested is not feasible via the selected tool(s), then the collection shall be presumed infeasible.

### L.     **Mobile and Handheld Device Documents and Data**

Responsive and proportional text messages, if any, will be collected with the following information and metadata, to the extent feasible and available:

1. Dates and times of text messages

2. Stored contact information for senders/recipients of text messages

Case ID: 220302606
Control No.: 24065807

### M. Photographs and Videos

Photographs and videos produced from Social Media will be produced in accordance with Paragraph I above.  All other photographs and videos will be produced in accordance with the metadata fields pursuant to the previously negotiated ESI protocol, including the creation date. No party shall be required to manually populate any metadata fields that do not exist.

### N. Production of Deposition Transcripts from Related Actions

1.  The Parties acknowledge that depositions may be taken in other related actions that could be relevant in the Philadelphia  NEC Litigation. Subject to the Court's entry of the Discovery Coordination Order, if those transcripts are to be produced in the Philadelphia  NEC Litigation, the Producing Party shall produce the transcripts with all their exhibits.

### O. General Provisions

1.  Any practice or procedure set forth herein may be varied by agreement of the Parties or Court order.

2.  Should any Party subsequently determine in good faith that it cannot proceed as required by this Order, or that doing so would be unduly burdensome, or that the Order requires modification, the Parties will meet and confer to resolve any dispute at least fourteen (14) days before seeking Court intervention.

June 28, 2024                                          By:

*/s/ Timothy A. Burke*                              */s/ Sean P. Fahey*
Thomas R. Kline                                      Sean P. Fahey
Tobi L. Millrood                                        **TROUTMAN PEPPER HAMILTON**
Timothy A. Burke                                     **SANDERS LLP**
Melissa A. Merk                                       3000 Two Logan Square
Elizabeth Crawford                                  Philadelphia, PA 19103
**KLINE & SPECTER, P.C.**                    215.981.4296
1525 Locust St.                                         Sean.Fahey@troutman.com
Philadelphia, PA 19102
215.772.1000
Tom.Kline@KlineSpecter.com

17

Tobi.Millrood@KlineSpecter.com
Timothy.Burke@KlineSpecter.com
Melissa.Merk@KlineSpecter.com
Elizabeth.Crawford@KlineSpecter.com

Ashley Keller (admitted *pro hac vice*)
Ben Whiting (admitted *pro hac vice*)
**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, IL 60606
312.741.5220
ack@kellerpostman.com
ben.whiting@kellerpostman.com

*Attorneys for Plaintiffs*

/s/ Ronni E. Fuchs
Ronni E. Fuchs
**TROUTMAN PEPPER HAMILTON
SANDERS LLP**
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

/s/ Joseph E. O'Neil
Joseph E. O'Neil
Meaghann C. Porth
Ryan J. O'Neil
**CAMPBELL CONROY & O'NEIL, P.C.**
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.6388
JONeil@campbell-trial-lawyers.com
MPorth@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

/s/ Marques Hillman Richeson
Marques Hillman Richeson (admitted *pro hac vice*)
**JONES DAY**
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

/s/ Kenneth A. Murphy
Kenneth A. Murphy
**TUCKER LAW GROUP, LLC**
Ten Penn Center 1801 Market Street, Suite 2500
Philadelphia, PA 19103
215.875.0609
kmurphy@tlgattorneys.com

18

Case ID: 220302606
Control No.: 24065807

_/s/ Catherine M. Recker_
Catherine M. Recker
**WELSH & RECKER, P.C.**
306 Walnut Street
Philadelphia, PA 19106
215.972.6430
cmrecker@welshrecker.com

_/s/ T. Allon Renfro_
T. Allon Renfro
**SWANSON, MARTIN, & BELL, LLP**
330 N. Wabash, Suite 3300
Chicago, Illinois 60611
312-222-8525
TRenfro@smbtrials.com

_Attorneys for Defendants, Mead Johnson & Company, LLC and Mead Johnson Nutrition Company_

**IT IS HEREBY ORDERED.**

DATED: _____     _____

THE HONORABLE LINDA CARPENTER

19

Case ID: 220302606
Control No.: 24065807

# EXHIBIT A-87

**KLINE & SPECTER, P.C.**
By:
    Thomas R. Klein, Esq.
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    John P. O'Neill, Esq.
Attorney I.D. Nos.: 28895 / 77764 / 313702 /
320927 / 205677
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Thomas.kline@klinespecter.com
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Timothy.burke@klinespecter.com
Jack.oneill@klinespecter.com



*Filed and Attested by the
Office of Judicial Records
18 AUG 2024 04:41 pm
S. RICE*

|  |  |
|---|---|
| CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor, | **IN THE COURT OF COMMON PLEAS** <br> **PHILADELPHIA COUNTY** |
| *Plaintiff,* | **CIVIL TRIAL DIVISION** |
| v. | **MARCH TERM 2022** <br> **NO. 02606** |
| MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENNSYLVANIA HOSPITAL, |  |
| *Defendants.* |  |

**NOTICE TO DEFEND**

| NOTICE | ADVISO |
|---|---|
| You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you. | Le han demandado a used en la corte.  Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion.  Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona.  Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion.  Ademas, la corte pueda decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda.  Usted puede perder dinero o sus propiedades u otros derechos importantes para usted. |
| YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW.  THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER. | LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL. |
| IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE. | |
| Lackawanna Bar Association<br>233 Penn Avenue<br>Scranton, PA 18503<br> (570) 961-2714 | Colegio de Abogados del Lackawanna<br>233 Penn Avenue, Scranton, PA 18503<br>(570) 961-2714 |

**KLINE & SPECTER, P.C.**
By:
    Tobias L. Millrood, Esq.
    Elizabeth A. Crawford, Esq.
    Timothy A. Burke, Esq.
    John P. O'Neill, Esq.
Attorney I.D. Nos.: 77764 / 313702 / 320927 / 205677
125 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Tobi.millrood@klinespecter.com
Elizabeth.crawford@klinespecter.com
Jack.oneill@klinespecter.com

|  |  |
|---|---|
| CHRISTINA TAYLOR, on her own behalf and as Parent and Natural Guardian of I.H., a Minor,<br><br>           *Plaintiff*,<br><br>  v.<br><br>MEAD JOHNSON & COMPANY, LLC, MEAD JOHNSON NUTRITION COMPANY, ABBOTT LABORATORIES, THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA d/b/a PENN MEDICINE, and PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM d/b/a PENNSYLVANIA HOSPITAL,<br><br>           *Defendants*. | **IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY**<br><br>**CIVIL TRIAL DIVISION**<br><br>**MARCH TERM 2022**<br>**NO. 02606** |

## SECOND AMENDED COMPLAINT

Plaintiff brings this Second Amended Complaint and Demand for Jury Trial (the "Second Amended Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition Company, and Abbott Laboratories (collectively "the Defendant Manufacturers"), and The Trustees of the University of Pennsylvania d/b/a Penn Medicine and Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital (collectively "Penn

1

Case ID: 220302606

Medicine" or "Pennsylvania Hospital"), together "Defendants."    Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including investigation conducted by Plaintiff's attorneys, as to all other matters.

## I.    INTRODUCTION

1.    This action arises out of the injuries suffered by a premature infant (the "Injured Infant") who was given the Defendant Manufacturers' cow's milk-based infant feeding products at Pennsylvania Hospital.  Pennsylvania Hospital, managed by Penn Medicine, acquired and supplied the Defendant Manufacturers' products to the Injured Infant and negligently failed to warn of their unreasonably dangerous properties in a reasonable manner.    This caused the Injured Infant to develop necrotizing enterocolitis ("NEC"), a life-altering and potentially deadly disease that largely affects premature babies who are given cow's milk-based feeding products.    As a result, the Injured Infant was seriously injured, resulting in long term health effects and accompanying harm to their parent ("the Plaintiff Parent").

2.    Plaintiff brings these causes of action against Defendants to recover for injuries that are the direct and proximate result of the Injured Infant's consumption of the Defendant Manufacturers' unreasonably dangerous cow's milk-based infant feeding products, which were acquired and supplied without adequate warning to the Injured Infant at Pennsylvania Hospital, owned and operated by Penn Medicine.

## II.    PARTIES

3.    Plaintiff Christina Taylor is a natural adult person and a resident of Delaware. Ms. Taylor is the parent and natural guardian of I.H., a minor.  Ms. Taylor's address is 9 Aidone Drive, New Castle, Delaware 19720.

4.    Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws

Case ID: 220302606

of the State of Delaware. Its principal place of business is Illinois. Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company. Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

5.       Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois. Its principal place of business is in Illinois. Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

6.       Defendant The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital is a non-profit corporation incorporated and registered to do business under the laws of the Commonwealth of Pennsylvania. Its principal place of business is Philadelphia, Pennsylvania. Pennsylvania Hospital is a registered name of The Pennsylvania Hospital of the University of Pennsylvania Health System. The sole member of The Pennsylvania Hospital of the University of Pennsylvania Health System is The Trustees of the University of Pennsylvania.

7.       Defendant The Trustees of the University of Pennsylvania d/b/a Penn Medicine is a non-profit corporation registered to do business in the Commonwealth of Pennsylvania. Its principal place of business is Philadelphia, Pennsylvania. Penn Medicine is a registered name of The Trustees of the University of Pennsylvania.

### III.       JURISDICTION AND VENUE

8.       This Court has jurisdiction in this matter pursuant to 42 Pa. C.S.A. § 931. Defendants

Case ID: 220302606

conduct authorized business in the Commonwealth of Pennsylvania. They have sufficient minimum contacts with and purposefully avail themselves of the markets of this Commonwealth. This suit arises out of Defendants' forum-related activities, such that the Court of Common Pleas of Philadelphia County's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

9. Venue is proper in the Court of Common Pleas of Philadelphia County pursuant to Rules 1006(b), 1006(c)(1), and 2179(a) of the Pennsylvania Rules of Civil Procedure because Defendants are corporations or similar entities that regularly conduct business in Philadelphia County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose.

10. This action is not subject to the Compulsory Arbitration Program of the Court of Common Pleas of Philadelphia County because the amount in controversy, excluding interest and costs, is in excess of $50,000.

### IV. FACTUAL ALLEGATIONS

#### *I.H.'s NEC Diagnosis*

11. Infant plaintiff I.H. was born premature at Pennsylvania Hospital in Philadelphia, Pennsylvania on October 9, 2010.

12. At birth, I.H.'s gestational age was approximately 25 weeks and she weighed 879 grams.

13. Starting on October 9, 2010 until November 2, 2010, I.H. was fed mother's breast milk fortified with bovine-based Human Milk Fortifier (HMF), which upon information and belief was manufactured by Defendants Abbott and/or Mead.

14. Subsequently, between November 2, 2010 and November 19, 2010 I.H. was fed full formula feeds of Abbott's Special Care 20 cal/oz or Special Care 24 cal/oz bovine-based formula.

4

Case ID: 220302606

15.     These feeds occurred despite the fact that Pennsylvania Hospital knew or should have known that cow's milk-based products increase the risk of NEC and that human milk can decrease the risk of NEC.

16.     On November 20, 2010, Dr. Kelly Wade of the NICU diagnosed I.H. with stage II Medical NEC after noticing I.H.'s severely distended stomach and other symptoms consistent with NEC.

17.      Between November 20 and November 23, Dr. Wade attempted to treat I.H.'s NEC using antibiotics without success, and on November 23 ordered for I.H. to be emergently transferred to St. Christopher's hospital for immediate surgical evaluation.

18.     Upon arrival to the St. Christopher's NICU, I.H. was diagnosed with Stage IIIB Medical NEC, the most advanced and life-threatening stage of NEC, which indicates a perforation of the infant's intestinal track.

19.     On Nov 23, 2010 I.H. underwent surgical intervention at St. Christopher's, undergoing an intestinal resection of the jejunum and distal ileum, removing part of her small intestines, as well as a primary anastomosis procedure to attach the two ends of the resected bowels together. At the end of the surgery, I.H. was placed on a wound VAC to assist in healing and blood clotting.

20.     Subsequent, and secondary to the surgery and wound VAC placement, necrosis spread to I.H.'s left hand and forearm, and the NICU physicians amputated I.H.'s lower left extremity from the forearm down on December 8, 2010.

21.     I.H. was in patient at the St. Christopher's NICU until her discharge home on February 15, 2011.

22.     As a result of Defendants' actions described *infra*, I.H. suffered injuries, including but not limited to, a diagnosis of NEC, treatment with surgery and resection of a portion of her bowels, short gut syndrome secondary to NEC, intestinal and feeding difficulties, neurological injuries,

5

left lower extremity amputation at the forearm, and she continues to suffer developmental delays and feeding difficulties secondary to bowel resection and short gut syndrome.

### *Cow's Milk-Based Feeding Products Are Known to Cause NEC*

23.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants.   NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die.   Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis.   Up to 30 percent of NEC-diagnosed infants die from the disease.

24.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems.   Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

### *Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist*

25.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition.   For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide.  Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

26.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products.

27.     The Defendant Manufacturers' products not only pose a threat to infants' health, but also displace the human milk they could otherwise receive.   This displacement only increases infants'

Case ID: 220302606

vulnerability to NEC.

28.    Human milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

29.    At the time the Injured Infant was fed the Defendant Manufacturers' products, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

30.    Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants, the Defendant Manufacturers have made no changes to their products or the products' packaging, guidelines, instructions, or warnings.    Instead, they have continued to sell their unreasonably dangerous products.    In addition, they incentivize hospitals that know the risks to use their products by providing them to the hospital for free or at a significant discount, in order that vulnerable infants and their families will become accustomed to using their products before discharge.  And, in fact, the Defendant Manufacturers offer contracts to hospitals—which the hospitals accept—that actually *prevent* the health care providers from offering alternative products—even safer ones—on pain of risking the hospital's advantageous formula pricing strategy.

31.    Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants and Pennsylvania Hospital knew or should have known of that threat, staff of Pennsylvania Hospital fed  Similac and/or  Enfamil  cow's  milk-based products after her birth instead of mother's human milk and/or donor human milk.

32.    Despite the scientific evidence that the Defendant Manufacturers' cow's milk-based products present a dire threat to the health and development of preterm infants and Pennsylvania

Case ID: 220302606

Hospital knew or should have known of that threat, staff of Pennsylvania Hospital did not properly warn Ms. Wiger of those risks and alternatives to have avoided the cow's milk-based products.

### *Ms. Taylor Discovers Her Claim*

33.     Because of the Defendants' concealment and misrepresentations, described more fully herein, Ms. Taylor did not know, and had no reason to know or suspect, that I.H.'s NEC could have been caused by the Defendant Manufacturers' products.

### *Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and Would Not Have Revealed a Factual Basis Earlier Because Defendants Hid the Cause of NEC from Ms. Taylor*

34.     Despite exercising reasonable diligence, Ms. Taylor was unable to have made the discovery earlier via a reasonable investigation because the Defendants in this litigation concealed the wrongful cause of I.H.'s injuries.

35.     Amidst the physical and emotional trauma of preterm childbirth, and having her child in the neonatal intensive care unit, shortly after learning of I.H.'s NEC diagnosis, Ms. Taylor undertook an investigation into the cause of the NEC by asking the doctors the cause of her NEC.

36.     The health care providers at Penn Medicine responded only that I.H. had gotten NEC because she was born premature.  Penn Medicine's response did not indicate that her NEC was caused by the Defendant Manufacturers' products.

37.     Not one person at Penn Medicine mentioned that the Defendant Manufacturers' formula products could have caused I.H.'s injuries.  Penn Medicine's response at the time did not give Ms. Taylor any reason to suspect any wrongdoing on the part of the Defendants.

38.     Ms. Taylor is a layperson with no medical background or training that would have given her any reason to doubt the response she received from her Penn Medicine health care providers at the time.

Case ID: 220302606

39.     Given that Penn Medicine's health care providers were in charge of the care of her newborn infant, Ms. Taylor had no reason to doubt their word.

40.     Additionally, the risk of necrotizing enterocolitis was not disclosed on the labeling or packaging of *any* of the Defendant Manufacturers' products.

41.     What is more, necrotizing enterocolitis is a disease that can occur in children who are *not* fed the Defendant Manufacturers' products, and the Defendant Manufacturers have worked to mislead parents into a false sense of security about the use of those products.  Publicly disseminated materials from each Defendant Manufacturer disguise the role their products play in causing the disease—and affirmatively say, even today, that their products are safe and do not cause NEC. In fact, some publicly disseminated materials from the formula manufacturers even suggest that formula may help *reduce* the risk of this terrible and potentially fatal disease.

42.     For example, Abbott's website stays that "[t]he specific cause of NEC is unknown, but it's most often seen in very low birth weight premature babies," and that "about 10% of babies who are born prematurely develop NEC."  The website suggests that "new preliminary studies" suggest for the first time that "NEC prevention may . . . be possible" with the use of human milk oligosaccharides to "dramatically curb intestinal inflammation" and reduce the risk of NEC. Abbott states that these human milk oligosaccharides are found in "certain Similac formulas" although they are "not currently available in Similac's premature infant formulas."[1]  Likewise, the website for Mead Johnson's products states that necrotizing enterocolitis is "one of the most common and serious intestinal disease[s] among premature babies."  And it deflects responsibility

---

[1] The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancy-childhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (last visited July 28, 2023).

9

Case ID: 220302606

from Mead Johnson's products: "Necrotizing enterocolitis happens when tissue in the small or large intestine is injured or inflamed."[2]

43.     Because of the misleading information distributed by the Defendant Manufacturers, as further detailed *infra*, any research conducted by Ms. Taylor immediately after I.H.'s diagnosis, or at any time prior to seeing an advertisement, would not have led a reasonable person to suspect that the Defendant Manufacturers' products could have caused I.H.'s injuries.

44.     Ms. Taylor also did not know, and had no reason to know or suspect, that Penn Medicine breached its duty of care by distributing the Defendant Manufacturers' products to her.  Not only was Ms. Taylor unaware that the Defendant Manufacturers' products caused I.H.'s injuries, but the Defendant Manufacturers' distribution agreements with Penn Medicine—which allowed Penn Medicine to secure sweetheart deals for otherwise expensive premature infant formula in exchange for product placement and access to the hospital staff—were also not public or knowable to Ms. Taylor, nor could any reasonable investigation outside of litigation have uncovered the terms of those agreements.

### *Despite Exercising Reasonable Diligence, the Defendants' Fraudulently Concealed the Risks of NEC from Defendant Manufacturers' Products to Divert, Prevent, and Mislead Plaintiff Regarding the Cause of Her Child's NEC Diagnosis*

45.     In addition to the averments above, the Defendants have acted in concert to fraudulently convey false and misleading information concerning the risk of NEC, and potentially death, caused by Defendant Manufacturers' preterm infant formula products.

46.     The Defendants' actions as set forth herein constitute knowing misrepresentation, omission, suppression, and concealment of material facts, made with the intent that Plaintiff would

---

[2] Special Feeding Concerns for Preemies, https://www.enfamil.com/articles/special-feeding-concerns-for-preemies/ (last visited July 29, 2023).

Case ID: 220302606

rely upon such concealment, suppression, or omission, in connection with the use of Defendants' preterm infant products.

47.     Plaintiff did not know, and could not learn, the truth concerning the uses, risks and benefits of Defendant Manufacturers' preterm infant products due to Defendants' deliberate misrepresentations and concealment, suppression and omission of material facts and important information regarding the risks of NEC, and potentially death, from the products.

48.     Moreover, Defendant Hospital further participated in the intentional concealment—on information and belief, it allowed the Defendant Manufacturers' sales representatives into its hospital to provide samples and free products that did not warn of their serious dangers, and to provide "education" to its NICU staff that was incomplete as to the true risks of feeding their patients the Defendant Manufacturers' products.

49.     Based upon information and belief, during the relevant time period, Pennsylvania Hospital, Penn Medicine, and the Hospital of the University of Pennsylvania stocked formula products from both Abbott and Mead.

50.     Additionally, Defendant Hospital failed to inform Ms. Taylor that the Defendant Manufacturers' products caused Plaintiff's NEC, even when she directly asked the cause. As noted above, after learning of Plaintiff's NEC diagnosis, Ms. Taylor was understandably concerned about the degrading health of her newborn infant. As any concerned parent would do, Ms. Taylor asked Plaintiff's health care providers at Defendant Hospital why a premature infant like I.H. was suddenly diagnosed with a terrible disease like necrotizing enterocolitis; that is, she asked Defendant Hospital what caused Plaintiff's injury. But even though Defendant Hospital knew of the increased risk of NEC from formula, it did not disclose that the formula provided to I.H. could increase the risk of NEC to preterm infants, responding only that I.H. had gotten NEC solely

Case ID: 220302606

because she was born premature. Not one person at the NICU mentioned that the Defendant Manufacturers' formula products could have been the cause of Plaintiff's injuries.

51. Defendant Hospital was aware that the Defendant Manufacturers' products caused NEC in premature infants. Defendant Hospital was also aware that the Defendant Manufacturers did not provide warnings on their products. However, Defendant Hospital did not warn Ms. Taylor of the risks of the products. Instead, and notwithstanding the sweetheart deal Defendant Hospital agreed to in exchange for preterm infant formula at little to no cost, Defendant Hospital repeatedly informed Ms. Taylor that it would do everything it could possibly do to keep her infant safe. Though this was clearly not true given the known risks of preterm formula for babies like I.H., it was enough for Ms. Taylor to trust that Defendant Hospital was providing preterm formula in the best interest of her child.

52. Defendants' affirmative acts of fraud and concealment, as averred herein, diverted, prevented, and/or mislead Plaintiff from discovering the medical cause of her child's NEC diagnosis.

### The Defendant Manufacturers' False and Misleading Marketing Regarding Cow's Milk-Based Infant Products

53. Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to the Injured Infant's birth.

54. Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that the Defendant Manufacturers' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. None of the Defendant Manufacturers' marketing materials, including their

12

promotional websites, reference the science showing how significantly their products increase the risk of NEC.

55.     For example, upon information and belief, Mead creates information booklets for parents of premature infants to help answer some of their questions and concerns about having a premature infant in the NICU that it provides to hospitals for dissemination to parents.  While Mead's booklets explain feeding options for premature infants, including formula, they do not mention that Mead's premature formula and fortifier products increase the risk of premature infants developing necrotizing enterocolitis.  Instead, the booklets advise parents that sometimes a combination of breast milk and formula may be best and that premature infants will be happy and healthy or nourished and healthy regardless of whether they are receiving breast milk or formula.

56.     Similarly, upon information and belief, Abbott publishes a pediatric nutrition product guide that is available online for anyone, including parents, to access wherein Abbott advises that "human milk alone does not meet all the nutritional needs of preterm infants" and that the formulations of its products, which are based on decades of research and scientific publications, are "specially designed to meet the nutritional requirements of preterm infants and can be fed with confidence to most of the preterm infants in the NICU."  Nowhere in its product guide does Abbott reference that its products increase the risk of necrotizing enterocolitis.

57.     Abbott also has a consumer-facing website accessible to anyone online, including parents, that specifically discusses nutrition for premature infants, wherein Abbott tells parents of premature infants that "your baby's nutrient needs are greater than what breast milk alone can provide" and that a "human milk fortifier" may be added to breastmilk to "add[] proteins, vitamins, and minerals to help support a preemie's high nutrition needs for growth and development." Nowhere in its discussion of preterm infant fortifiers or formulas does Abbott state that its products

13

Case ID: 220302606

increase the risk of necrotizing enterocolitis or that they pose more of a risk that just providing preterm infants with breast milk only. Nor does Abbott disclose that the "human milk fortifier" is actually a cow's milk based product and not a human milk-based product, which misleads consumers.

58.     Upon information and belief, both Mead and Abbott also provide materials and programs to the hospitals and the physicians and medical staff who are treating premature infants about the manufacturers' preterm products. Upon information and belief, these materials represent that the manufacturers' preterm products are safe and necessary for preterm infants. Mead and Abbott rely on the physicians and medical staff to not only use their products in the NICU, but to convey these messages to the parents of premature infants in their care.

59.     Undoubtedly aware of the impact of their advertising, the Defendant Manufacturers, along with other formula manufacturers, are willing to spend massive sums to disseminate their message.

60.     Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

61.     While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, the Defendant Manufacturers' aggressive marketing exploits new parents' darkest fears—

Case ID: 220302606

that the nutrition they are supplying to their child will not provide the best chance of survival—while wholly failing to warn that their products come with a significantly increased risk of NEC.

62.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—infant formula is the only appropriate, safe alternative to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

63.     Abbott markets and sells multiple products specifically targeting preterm and low-birthweight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC. At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

64.     Abbott's website also contains product information and a downloadable guide for each of its products specifically targeting preterm and low-birth-weight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac

Case ID: 220302606

Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. None of these pages or guides contain any mention of NEC or that the products specifically increase the risk of NEC. Indeed, a search of Abbott's website for "necrotizing enterocolitis" returns no hits. Instead, Abbott states that "enteral feeding" – which includes breast milk and donor milk – have been "associated with" things like "[s]pitting up, abdominal distension" or "other signs of intestinal dysfunction." This statement is entirely misleading, as it improperly indicates that the risk of things like "spitting up" are the same for premature infants using Abbott's products and premature infants receiving breast milk or donor milk, equates formula to non-cow's milk-based feeding options like breast milk and donor milk, fails to mention NEC, and minimizes the risk of its products.

65.     Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Mead emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and noted that Enfamil formulas include "expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

16

66.     One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research, we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of breast milk research and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive breast milk studies to date[.]"

67.     Mead's website also contains product information for each of its products specifically targeting preterm and low-birth-weight infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). None of these pages contain any mention of NEC or that the products specifically increase the risk of NEC.  Indeed, a search of Mead's website for "necrotizing enterocolitis" returns no hits. Instead, Mead advertises on its website that it "has led the way in developing safe, high-quality, innovative products" – including preterm products – "to help meet the nutritional needs of infants."

68.     Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk.  They offer free or reduced-cost formula to hospitals for use with infants before discharge.  And they offer free formula, coupons,

Case ID: 220302606

and even entire gift baskets to parents before their infants' discharge from the NICU or hospital.

69.     Through this early targeting, the Defendant Manufacturers create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for the Defendant Manufacturers.  The Defendant Manufacturers' giveaways and gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their healthcare professionals, and they have been shown to negatively impact breastfeeding rates.

70.     Further, when the Defendant Manufacturers recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier," and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products.   The packaging appears as:



71.     The Defendant Manufacturers have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm

Case ID: 220302606

infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider the Defendant Manufacturers' cow's milk-based products to be a first choice. This marketing scheme is employed despite all Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like the Injured Infant.

72.     The Defendant Manufacturers have also designed powerful marketing campaigns to both the general public and health care providers at hospitals like Pennsylvania Hospital. The Defendant Manufacturers know that sales made to hospitals are key drivers of brand loyalty, and thus are a key opportunity to drive better downstream business—*i.e.*, retail purchases by parents after they have left the hospital. On information and belief, the Defendant Manufacturers know that the formula products used in a hospital's NICU are related to getting and keeping the overall hospital contracts. And the Defendant Manufacturers know that, just like any celebrity endorsement, when mothers of newborn infants see medical professionals using a certain brand, the mothers are more likely to continue to purchase that same brand after discharge. The Defendant Manufacturers are thus heavily motivated to ensure that NICU departments are using their products.

73.     Abbott and Mead Johnson focus their sales teams and training heavily on hospital NICU departments. They train their sales representatives how to increase the number of babies on their formula, and they emphasize the need to be the dominant formula manufacturer in the NICU so they can own that profitable ground and secure a great return on their substantial investment in NICU formula and other products.

Case ID: 220302606

74. To leverage hospitals' NICUs and secure babies in the hospital and at retail, the Manufacturer Defendants pull out all the stops to convince hospitals, including Defendant Hospital, to purchase their products. For example: Abbott and Mead Johnson provide samples of their products to hospitals for free.

75. On information and belief, to get the hospitals on board with supplying their formula for premature infants, Abbott and Mead Johnson work with hospitals to secure contracts that have special pricing discounts if a certain level of the formula-fed babies in the hospital receive just that one manufacturer's products; similar to a restaurant being a Coke or Pepsi restaurant. And notwithstanding the increased risk of the Defendant Manufacturers' products for the hospitals' most fragile patients—the preterm infants—the decision makers at these hospitals seek out these types of contracts to better the hospitals' own bottom lines.

76. On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective company's own formula products to give to the preterm infants. The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that the preterm infant formula products were safe and without risk, even though that is not what the science said.

77. On information and belief, Abbott and Mead Johnson also seek promises and/or assurances that the full range of health care providers at the hospitals, including the nurse practitioners and other staff who would pull the infant formula off the shelf, are grabbing the respective companies' own formula products to give to the preterm infants. The goal of this tactic was to ensure that the Defendant Manufacturers and key people at the hospital would be sending a shared message that

20

the preterm infant formula products were safe and without risk, even though that is not what the science said.

78.     On information and belief, prior to I.H.'s birth, Abbott sent sales representatives to Defendant Hospital.  Those sales representatives provided information about Abbott's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Abbott's products were safe to give to preterm infants like I.H.  Abbott maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Abbott's products could cause NEC in preterm infants.

79.     On information and belief, prior to I.H.'s birth, Mead Johnson sent sales representatives to Defendant Hospital. Those sales representatives provided information about Mead Johnson's products to Defendant Hospital's staff via conversations, presentations, and written pamphlets. This information indicated that Mead Johnson's products were safe to give to preterm infants like I.H.  Mead Johnson maintains call logs that detail which sales representatives visited the hospitals, which days they visited, and which products they discussed.  These sales representatives did not disclose that Mead Johnson's products could cause NEC in preterm infants.

80.     Mead Johnson and Abbott believed and intended that the misrepresentations that its sale representatives shared with Defendant Hospital would be used to make feeding decisions for preterm infants like I.H.

### The Defendant Manufacturers' Inadequate Warnings

81.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants.  Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

21

82.     The Enfamil products Mead markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

83.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Mead's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

84.     Mead cites no medical literature or research to guide the use of its products.

85.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk.  Mead likewise did not provide instructions or guidance for how to avoid NEC.

86.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

87.     Mead Johnson failed to provide, and continues to fail to provide, a full accounting of the risk of NEC as documented, by underrepresenting and misrepresenting the risk to the public and the medical community.

88.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.  Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants.

Case ID: 220302606

Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

89.     The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

90.     Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

91.     Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

92.     Despite knowing of studies documenting an increased risk of NEC from its products, Abbott did not act to make parents or the medical community aware of those risks, and instead took steps to conceal or prevent those risks from becoming public.  Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### *Penn Medicine's Failure to Warn*

93.     On information and belief, Penn Medicine, which operates Pennsylvania Hospital, was aware of the significantly increased risk of NEC and death associated with providing Abbott's and Mead's cow's milk-based products to its premature infant patients.  It knew or should have known that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition. It also knew or should have known that

Case ID: 220302606

human milk decreases the risk of NEC for premature infants. However, instead of warning of the dangers, or supplying human milk-based feeding products to preterm infants like the Injured Infant, Penn Medicine has continued to source, distribute, and supply the Defendant Manufacturers' products in its hospitals without any adequate warning. Further, the Defendant Hospital created a study putting infants, such as I.H. at great risk by providing them with bovine based formula instead of exclusive human milk-based products.

94.     To that end, Penn Medicine has participated in studies designed to increase the use of donor milk while, at the same time, reducing formula feeding in neonates. The University of Pennsylvania School of Nursing, an affiliate of Penn Medicine, has conducted extensive research into the risks associated with feeding formula to premature infants.   It recently partnered with the National Institute of Nursing Research to publish clinical determinations based on its experience "changing hospital systems and influencing policy," and its findings were unequivocal:

> This is what we know about the science of human milk: it reduces the risk of necrotizing enterocolitis, reduces the risk of infection, [and] creates greater enteral feed tolerance and more rapid weaning from intravenous nutrition. . . .

95.     Other Penn Medicine research has similarly concluded that "[h]uman milk decreases the incidence and severity of . . . necrotizing enterocolitis (NEC)."

96.     Given it was known that human milk decreases the incidence and severity of NEC, it was also known or should have been known that cows milk-based formula increases the incidence and severity of NEC.

97.     Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration. The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has

Case ID: 220302606

not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

98.    Given it was known since at least the early 2000s, and as far back as the 1990s, that human milk decreases the incidence and severity of NEC, it was also known or should have been known that cows milk-based formula increases the incidence and severity of NEC.

99.    Penn Medicine also purports to adhere to the tenets of the "Baby Friendly Hospital Initiative," which seeks to increase rates of breastfeeding initiation, exclusivity, and diet duration. The "Baby Friendly Hospital Initiative" specifically targets a reduction in the rates of NEC in preterm infants by encouraging implementation of exclusive breast milk diets among new mothers. Although Pennsylvania Hospital has maintained its "Baby Friendly" designation for years, it has not eliminated or restricted the use of formula or fortifier for preterm infants in its hospitals.

100.    Finally, medical providers and staff at Penn Medicine have acknowledged the risks associated with providing the Defendant Manufacturers' cow's milk-based products to premature infant patients instead of breast milk-based nutrition.   In an internal newsletter from 2012 touting donor milk programs, Penn Medicine acknowledged the benefits of a human milk-based diet, quoting a staff lactation consultant:

> Donor milk is not inexpensive. It costs about $4.25 per ounce, but the return on investment is huge. "Preemies given mother's milk get discharged three to four days sooner and also have a six to 10 times lower risk of getting a gastrointestinal complication called necrotizing enterocolitis," Carpenter said, adding that the infection can cost up to $250,000 to treat. The average cost to provide a preemie with donor milk: $125.

101.    These statements demonstrate that Penn Medicine knew or should have known of the high increased risk of NEC for premature infants posed by the Defendant Manufacturers' products.

102.    Although Penn Medicine knew or should have known of the serious danger of the Defendant Manufacturers' products, it has continued to purchase, supply, and distribute these

Case ID: 220302606

products to preterm infants without providing full and adequate warnings of the attendant risks to parents, healthcare professionals, and other medical staff at its relevant facilities. As a result, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products at Pennsylvania Hospital, causing their injuries. This occurred even though hospitals across the country, including Pennsylvania Hospital, warn and obtain consent from parents before providing other safer forms of nutrition, such as donor breast milk.

103. Penn Medicine's failure to warn of the risks posed by the Defendant Manufacturers' products is entrenched (and compounded) by the financial benefits it accrues from its relationships with the Defendant Manufacturers. On information and belief, it has received the Defendant Manufacturers' cow's milk-based products for free and/or at a significant discount, and has granted their sales representatives access to its healthcare professionals and medical staff. These sales representatives have provided deceptive information that Penn Medicine reasonably knew or should have known would ultimately reach parents through those staff. This arrangement dovetails with the Defendant Manufacturers' own marketing strategies" and use of salespersons.

### *Safer Alternative Designs*

104. The Defendant Manufacturers' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants. The Defendant Manufacturers could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

105. Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk. This alternative design provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

26

106. On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products, and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

## CAUSES OF ACTION
### COUNT I: STRICT LIABILITY FOR DESIGN DEFECT
**(Against Abbott and Mead)**

107. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

108. Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

109. Abbott and Mead also owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

110. Abbott and Mead knew that their products would be used to feed premature infants like the Injured Infant and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations. Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

111. The Injured Infant ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products. The risks of feeding those products to the Injured Infant outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury

27

Case ID: 220302606

and death from NEC.

112.  Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that their products do.

113.  Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

114.  Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

115.  Abbott's and/or Mead's products were fed to the Injured Infant, which caused and/or increased the risk of their NEC and injuries.

116.  As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.  Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.  For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost

Case ID: 220302606

revenue, and/or lost profits, and/or lost business opportunity, lost earning

capacity, and costs related to medical or mental health treatment which have

or may be recommended;

d.    For punitive damages in excess of $50,000 and this Court's arbitrational

limit resulting from the Defendant Manufacturers' oppressive, fraudulent,

and/or malicious conduct, as permitted by law;

e.    For interest as permitted by law;

f.    For attorney's fees, expenses, and recoverable costs incurred in connection

with this action; and

g.    For such other and further relief as the Court deems proper.

## COUNT II: STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott and Mead)

117.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth

herein.

118.  Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this

litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to

provide adequate warnings or instructions about the dangers and risks associated with the use of

their products with preterm infants, specifically including but not limited to the risk of NEC,

serious injury, and death.

119.  Abbott's and Mead's duty to warn is part of their general duty to design, manufacture, and

sell their infant products in a manner that is reasonably safe for their foreseeable uses.    By

designing their products with cow's milk-based ingredients, Abbott and Mead undertook a duty to

warn of the unreasonable risk of harm posed by those ingredients, specifically including the

significantly increased risk of NEC, severe injury, and death.    The failure to warn makes the

29

Case ID: 220302606

products at issue in this litigation unreasonably dangerous.

120.      Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like the Injured Infant, and that their products might cause the Injured Infant to develop NEC, severe injury, or death, yet they failed to provide adequate warnings of those risks.      Among other risks, the Defendant Manufacturers:

   a.   Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

   b.   Failed to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

   c.   Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

   d.   "Black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infant; and/or

   e.   Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

   f.   Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed the

Case ID: 220302606

Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g. Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h. Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

121. Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

122. As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Defendant Manufacturers' products, the Injured Infant were fed cow's milk-based products, which caused and/or increased risk of their developing NEC.

123. The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and medical staff known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed the Injured Infant those products. Had the Plaintiff Parent known of the significant risks of feeding the Injured Infant cow's milk-based formula, they would not have allowed such products to be fed to the Injured Infant.

124. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

31

Case ID: 220302606

b.  For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

## COUNT III: NEGLIGENCE
### (Against Abbott and Mead)

125.  Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

126.  Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

127.  At all times relevant to this action, the Injured Infant's healthcare professionals and medical staff used the products at issue in their intended manner and for their intended purpose.

32

128.  Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and the Plaintiff Parent.

129.  Specifically, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

a.  Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death for the Injured Infant; and/or

b.  Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

c.  Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d.  Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

e.  Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.  Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary

Case ID: 220302606

to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risks; and/or

g. Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns, like the Plaintiff Parent; and/or

h. Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

130. In addition, although Abbott and Mead knew or reasonably should have known at the time of production that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

131. As a direct and proximate result of the Defendant Manufacturers' failure to act in a reasonably prudent manner and their breach of duty, the Injured Infant was fed cow's milk-based products, which caused and/or increased the risk of their developing NEC.

132. Had Abbott and Mead satisfied their duties to the consuming public in general, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

133. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of

Case ID: 220302606

life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c.  For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d.  For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendants Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e.  For interest as permitted by law;

f.  For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g.  For such other and further relief as the Court deems proper.

## COUNT IV: INTENTIONAL MISREPRESENTATION
### (Against Abbott and Mead)

134. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

135. At all times relevant to this action, the Injured Infant consumed the Defendant Manufacturers' products in their intended manner and for their intended purpose.

136. Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

137. Abbott and Mead breached their duty through misrepresentations made to consumers in their advertising and promotional materials, as described in previous paragraphs and incorporated

Case ID: 220302606

herein, each of whom were foreseeable and intended recipients of this information.

138. Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis to the public, including patient consumers and parents like Plaintiff Parent and prior to the time the Injured Infant was fed their products:

    a.  That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

    b.  That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

    c.  That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

    d.  That cow's milk-based products were safe for premature infants; and/or

    e.  That cow's milk-based products were necessary for optimum growth; and/or

    f.  That cow's milk-based products were similar or equivalent to breast milk; and/or

    g.  That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

    h.  That their products were safe for and provided better nutrition and growth to premature infants than donor milk, a non-cow's milk-based alternative to breast milk; and/or

Case ID: 220302606

    i.   That their products can fed with confidence to most of the preterm infants in the NICU and/or that premature infants would be happy and health or nourished and health on their products; and/or

    j.   That their products were based on up-to-date science, which made them safe for premature infants; and/or

    k.   Omitting the material fact that their products significantly increased the risk of NEC in premature infants, including omitting this material fact from their publicly available product information, marketing materials, and websites.

139. Abbott and Mead had actual knowledge, or, at a minimum, a reckless indifference, to whether the aforementioned misrepresentations were false.

140. In addition to the above, Abbott and Mead, upon information and belief, also made the following false statements of material fact to Plaintiff Parent:

    a.   Omitting from coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent that their products significantly increased the risk of NEC in premature infants; and/or

    b.   Omitting from the packaging and labeling of their products provided to Injured Infant that their products significantly increased the risk of NEC in premature infants; and/or

    c.   Representing that their cow's milk-based products were safe and beneficial for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

Case ID: 220302606

d.  Representing that their cow's milk-based products were safe and beneficial for premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

e.  Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

f.  Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

g.  Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

h.  Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

i.  Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on coupons,

Case ID: 220302606

gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

j.  Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

k.  Representing that their cow's milk-based products have no serious side effects on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

l.  Representing that their cow's milk-based products have no serious side effects on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

m.  Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

n.  Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

o.  Representing that their cow's milk-based products were safe for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

Case ID: 220302606

p.  Representing that their cow's milk-based products were safe for premature infants on the packaging and labeling of their products provided to Injured Infant; and/or

q.  Representing that their cow's milk-based products were necessary for optimum growth on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

r.  Representing that their cow's milk-based products were necessary for optimum growth on the packaging and labeling of their products provided to Injured Infant; and/or

s.  Representing that their products were based on up-to-date science, which made them safe for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

t.  Representing that their products were based on up-to-date science, which made them safe for premature infants on the packaging and labeling of their products provided to Injured Infant.

141.  The Plaintiff Parent was not aware that these misrepresentations were false and justifiably relied on them.  The Defendant Manufacturers' misrepresentations induced the Plaintiff Parent to allow their children to be fed Abbott's and Mead's infant products, in reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging.  Had Abbott and Mead not committed these intentional misrepresentations, the Injured Infant would not have been exposed to the Defendant Manufacturers' unreasonably dangerous cow's milk-based products.

142.  As a direct and proximate result, Abbott's and Mead's products were fed to the Injured

40

Case ID: 220302606

Infant, which caused and/or increased risk of their developing NEC and subsequent injuries.

143. As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

### COUNT V: NEGLIGENT MISREPRESENTATIONS
### (Against Abbott and Mead)

144. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth

Case ID: 220302606

herein.

145. At all times relevant to this action, the Injured Infant consumed the products at issue in their intended manner and for their intended purpose.

146. Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

147. In the course of their business, Abbott and Mead breached their duty through misrepresentations made to consumers, in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

148. Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis to the public, including consumers, and parents like Plaintiff Parent and prior to the time the Injured Infant was fed their products:

    a. That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

    b. That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

    c. That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

    d. That cow's milk-based products were safe for premature infants; and/or

Case ID: 220302606

    e.   That cow's milk-based products were necessary for optimum growth; and/or

    f.   That cow's milk-based products were similar or equivalent to breast milk; and/or

    g.   That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

    h.   That their products were safe for and provided better nutrition and growth to premature infants that donor milk, a non-cow's milk-based alternative to breast milk; and/or

    i.   Thet their products can be fed with confidence to most of the preterm infants in the NICU and/or that premature infants would be happy and healthy or nourished and health on their products; and/or

    j.   That their products were based on up-to-date science, which made them safe for premature infants; and/or

    k.   Omitting the material fact that their products significantly increased the risk of NEC in premature infants, including omitting this material fact from their publicly available product information, marketing materials, and websites.

149. In addition to the above, Abbott and Mead, upon information and belief, also made the following false statements of material fact to Plaintiff Parent.

    a.   Omitting from coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent that their products significantly increased the risk of NEC in premature infants; and/or

Case ID: 220302606

b.  Omitting from the packaging and labeling of their products provided to Injured Infant that their products significantly increased the risk of NEC in premature infants; and/or

c.  Representing that their cow's milk-based products were safe and beneficial for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

d.  Representing that their cow's milk-based products were safe and beneficial for premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

e.  Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

f.  Representing that their cow's milk-based products were necessary to the growth and nutrition of premature infants on the packaging and labeling of their products provided to Injured Infant when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

44

Case ID: 220302606

g. Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

h. Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

i. Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

j. Representing that their cow's milk-based products could be fed with confidence to premature infants and/or that premature infants would be healthy regardless of whether they were fed their cow's milk-based products or breast milk on the packaging and labeling of their products provided to Injured Infant; and/or

k. Representing that their cow's milk-based products have no serious side effects on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

l. Representing that their cow's milk-based products have no serious side effects on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

Case ID: 220302606

m.  Representing that their cow's milk-based products were similar or equivalent to breast milk on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent when they knew or should have known the contrary to be true; and/or

n.  Representing that their cow's milk-based products were similar or equivalent to breast milk on the packaging and labeling of their products provided to Injured Infant when they knew or should have known the contrary to be true; and/or

o.  Representing that their cow's milk-based products were safe for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

p.  Representing that their cow's milk-based products were safe for premature infants on the packaging and labeling of their products provided to Injured Infant; and/or

q.  Representing that their cow's milk-based products were necessary for optimum growth on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

r.  Representing that their cow's milk-based products were necessary for optimum growth on the packaging and labeling of their products provided to Injured Infant; and/or

s.  Representing that their products were based on up-to-date science, which made them safe for premature infants on coupons, gift bags, other promotional materials, and the packaging and labeling of their product samples provided to Plaintiff Parent; and/or

Case ID: 220302606

t.   Representing that their products were based on up-to-date science, which made them safe for premature infants on the packaging and labeling of their products provided to Injured Infant.

150.  Abbott and Mead were negligent or careless in not determining those representations to be false.

151.  The Defendant Manufacturers' misrepresentations induced, and were intended to induce, the Plaintiff Parent to allow their child to be fed Abbott's and Mead's infant products, in justifiable reliance on all the messaging they received about formula feeding, including, directly or indirectly, the Defendant Manufacturers' messaging.   Had Abbott and Mead not committed these negligent misrepresentations, the Injured Infant would not have been exposed to their unreasonably dangerous cow's milk-based products.

152.  As a direct and proximate result, Abbott's and Mead's products were fed to the Injured Infant, which caused and/or increased of their developing NEC and subsequent injuries.

153.  As a further direct result, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against the Defendant Manufacturers, individually, jointly and severally, as follows:

a.   For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.   For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of the Defendants Manufacturers' conduct;

Case ID: 220302606

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

## COUNT VI: FAILURE TO WARN
### (Against Penn Medicine and Pennsylvania Hospital)

154. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

155. Penn Medicine and Pennsylvania Hospital as purchaser, supplier, and/or distributor of the products at issue in this litigation, owed a duty to the consuming public in general, and the Plaintiff Parent in particular, to purchase, supply, and distribute products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose, and/or to formulate, adopt, and enforce adequate rules and policies for the same.

156. At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

157. Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare professionals and medical staff at Pennsylvania Hospital, managing these individuals during their

Case ID: 220302606

treatment of the Injured Infant.

158. Penn Medicine and Pennsylvania Hospital negligently, outrageously, and recklessly supplied and distributed the Defendant Manufacturers' milk-based infant feeding products to these healthcare professionals and medical staff for use on premature infants, including the Injured Infant.

159. Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital. The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products to consumers, such as the Plaintiff Parent.

160. Penn Medicine and Pennsylvania also knowingly, and intentionally, allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

161. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that they acquired, distributed, and supplied the Defendant Manufacturers' cow's milk-based infant products that these products significantly increased the risk of NEC, serious injury, and death.

162. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously,

Case ID: 220302606

and recklessly, and breached its duty by:

    a.   Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

    b.   Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like the Injured Infant; and/or

    c.   Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

    d.   Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

    e.   Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

    f.   Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

    g.   Failing to prevent the Defendant Manufacturers' sales representatives from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

163.  Reasonable hospitals under the same or similar circumstances would have warned of the above risks, would have instructed their healthcare professionals and medical staff—as well as patients—on the safe use of the Defendant Manufacturers' products, and would have restricted the

50

ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

164.   Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

165.   Had Penn Medicine and  Pennsylvania Hospital exercised reasonable care by satisfying its duty to warn its medical providers and patients about the Defendant Manufacturers' unreasonably dangerous products, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

166.   As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

167.   As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to warn of the Defendant Manufacturers' unreasonably dangerous products, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.    Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a.   For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b.   For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained

Case ID: 220302606

as a result of Penn Medicine's conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine and Pennsylvania Hospital's oppressive, outrageous, reckless, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

### COUNT VII: CORPORATE LIABILITY OF HEALTH-CARE PROVIDER
### (Against Penn Medicine and Pennsylvania Hospital)

168. Plaintiff incorporates by references each of the preceding paragraphs as if fully set forth herein.

169. At all relevant times, Penn Medicine and Pennsylvania Hospital owed a duty of care to the Injured Infant to ensure their safety and well-being while the Injured Infant was under the care of Pennsylvania Hospital staff. Specifically, Penn Medicine and Pennsylvania Hospital had a duty to the Injured Infant to formulate, adopt, and enforce adequate rules and policies to ensure quality care for the Injured Infant. Further, Penn Medicine and Pennsylvania Hospital owed a duty to the Injured Infant to oversee its healthcare professionals and medical staff that provided patient care to the Injured Infant.

170. Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to formulate, adopt, and enforce adequate rules and policies for the purchase, supply,

52

distribution, and use of products that were free of unreasonable risk of harm when used in their intended manner and for their intended purpose and ensured quality care for the Injured Infant.

171. At all times relevant to this action, the Injured Infant used the cow's milk-based products purchased, supplied, and/or distributed by Penn Medicine and Pennsylvania Hospital in their intended manner and for their intended purpose.

172. Moreover, at all relevant times, Penn Medicine and Pennsylvania Hospital knowingly authorized the Defendant Manufacturers' sales representatives to market, advertise, distribute, and/or sell their products at Pennsylvania Hospital. The Defendant Manufacturers' sales representatives were encouraged to interact with Pennsylvania Hospital's healthcare professionals and medical staff. These interactions provided the Defendant Manufacturers' sales representatives an opportunity to co-opt Pennsylvania Hospital's healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sale of the Defendant Manufacturers' unreasonably dangerous products.

173. Penn Medicine and Pennsylvania Hospital also knowingly allowed the Defendant Manufacturers' sales representatives to routinely misrepresent the risks and benefits of Defendants' products to Pennsylvania Hospital's healthcare professionals and medical staff, including the misrepresentation that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants.

174. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known at the time that it formulated, adopted, and enforced its rules for the acquisition, distribution, and supply of the Defendant Manufacturers' cow's milk-based infant products, including the access afforded the Defendant Manufacturer's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

Case ID: 220302606

175. Since prior to 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that premature babies are increased risk for NEC.

176. Since prior to 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that NEC increases the risk of permanent injury and death.

177. Since 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known prior to that human milk (mother's milk) was safest and best for premature infants.

178. Since 2000, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that human milk (mother's milk) decreased the risk of NEC, serious injury, and death for premature infants.

179. By no later than 2012, Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that donor human milk decreased the risk of NEC, serious injury, and death for premature infants.

180. Penn Medicine and Pennsylvania Hospital knew or reasonably should have known that its medical professionals and the parents of premature infants, including the Plaintiff Parent, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

181. Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, outrageously, and recklessly, and breached its duty by:

      a. Failing to formulate, adopt, and enforce adequate rules and policies that would have required human milk (mother's milk and/or donor milk) to be recommended to premature babies; and/or

      b. Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted or prevented the use of cow's milk-based products for feeding premature babies; and/or

Case ID: 220302606

c. Failing to formulae, adopt, and enforce adequate rules and policies that informed the Plaintiff Parent that human milk (mother's milk and/or donor milk) significantly decrease the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

d. Failing to formulate, adopt, and enforce adequate rules and policies that warned the Plaintiff Parent that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

e. Failing to formulate, adopt, and enforce adequate rules and policies that discussed the risks of cow's milk-based products significantly increasing the risk of NEC, severe injury, and death in premature babies, like the Injured Infant; and/or

f. Failing to formulate, adopt, and enforce adequate rules and policies that warned its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

g. Failing to formulate, adopt, and enforce adequate rules and policies to instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

h. Failing to formulate, adopt, and enforce adequate rules and policies to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

i. Failing to formulate, adopt, and enforce adequate rules and policies to ensure a

55

warning in a method reasonably calculated/expected to reach the parents of premature newborns, like the Plaintiff Parent; and/or

j.  Failing to formulate, adopt, and enforce adequate rules and policies to prevent the Defendant Manufacturers' sales representative from misrepresenting to Pennsylvania Hospital's healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and/or that use of donor milk was not advised for premature infants; and/or

k.  Failing to establish a donor milk program that was sufficient to meet the needs of the premature babies, like the Injured Infant.

l.  Failing to formulate, adopt, and enforce adequate rules and policies regarding the feeding of premature infants leaving it to the discretion of the medical team and parent without a discussion of risks and benefits.

m.  Allowing parental preference to be the standard for feeding premature infants;

n.  Failing to follow the American Academy of Pediatrics recommendations relating to feeding premature infants;

o.  Failing to follow the American Academy of Pediatrics recommendations to use donor milk if mother's milk was unavailable instead of cow's milk-based products;

p.  Failing to recommend donor milk if mother's milk was unavailable by no later than 2012; and

q.  Failing to transfer to a hospital by no later than 2012 where donor milk was available if there was no donor milk available.

182.  A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies, and rules to restrict the feeding of cow's milk-based

Case ID: 220302606

products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Defendants Manufacturers' cow's milk-based products, and restricting the marketing of the Defendant Manufacturers' unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

183.  Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to formulate, adopt, and enforce adequate rules and policies to ensure the quality care of its patients, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

184.  As a direct and proximate result of Penn Medicine and Pennsylvania Hospital failure to formulate and enforce adequate policies and rules related to the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

185.  As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital negligent, reckless, and outrageous conduct the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms.   Her life has been significantly affected by the Injured Infant's injuries.

186.  In the alternative, Penn Medicine and Pennsylvania Hospital owed a duty to its patients, and the Injured Infant in particular, to oversee the practicing healthcare professionals and medical staff that provided the products at issue to infants under Pennsylvania Hospital's care, including the Injured Infant.

187.  Penn Medicine and Pennsylvania Hospital employed or contracted with the healthcare

Case ID: 220302606

professionals and medical staff at Pennsylvania Hospital and was responsible for overseeing those individuals during their treatment of the Injured Infant.

188.   Nonetheless, Penn Medicine and Pennsylvania Hospital acted negligently, recklessly, and outrageously  breached its duty by:

a.   Failing to oversee its healthcare professionals and medical staff on their use of cow's milk-based products for feeding premature babies; and/or

b.   Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

c.   Failing to warn or instruct its healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like the Injured Infant; and/or

d.   Failing to oversee its healthcare professionals and medical staff to restrict their feeding of cow's milk-based products to premature babies; and/or

e.   Failing to warn or instruct its healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed the Defendant Manufacturers' products, notwithstanding their substantial risk; and/or

f.   Failing to provide its healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

g.   Failing to provide its healthcare professionals and medical staff with warnings about the dangers of the Defendants' Manufacturers products in a method

58

Case ID: 220302606

reasonably calculated/expected to reach the parents of newborns; and/or

h. Failing to provide statistical evidence to its healthcare professionals and medical staff showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products; and/or

i. Failing to oversee its healthcare professionals and medical staff to ensure that the Defendant Manufacturers' sales representatives' misrepresentations that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants had not influenced the use and/or misuse of the Defendant Manufacturers' products.

189. A reasonable hospital under the same or similar circumstances would have warned of the above risks, would have instructed its healthcare professionals and medical staff on the safe use of the Defendant Manufacturers' products, and would have restricted the ability of the Defendant Manufacturers' sales representatives to market the Defendant Manufacturers' unreasonably dangerous products without adequate warning.

190. A reasonable hospital under the same or similar circumstances would have overseen and managed its healthcare professionals and medical staff to ensure that they received proper training and updating on the risks associated with feeding cow's milk-based formula to premature infants.

191. Had Penn Medicine and Pennsylvania Hospital exercised reasonable care by satisfying its duty to oversee its healthcare professionals and medical staff who provide patient care, the Injured Infant would not have been exposed to the Defendant Manufacturers' cow's milk-based products.

192. As a direct and proximate result of Penn Medicine and Pennsylvania Hospital's failure to oversee its healthcare professionals and medical staff on the danger posed by the Defendant Manufacturers' unreasonably dangerous cow's milk-based products, the Injured Infant was fed the

Case ID: 220302606

Defendant Manufacturers' cow's milk-based products, which caused and/or increased the risk of developing NEC and significant injuries.

193. As a further direct and proximate result of Penn Medicine and Pennsylvania Hospital's negligent and reckless conduct, the Plaintiff Parent suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by the Injured Infant's injuries.

WHEREFORE, Plaintiff demands judgment against Penn Medicine and Pennsylvania Hospital, individually, jointly and severally, as follows:

a. For compensatory damages in an amount to be proven at trial and in excess of $50,000 and this Court's arbitrational limit;

b. For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as a result of Penn Medicine and Pennsylvania Hospital's conduct;

c. For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

d. For punitive damages in excess of $50,000 and this Court's arbitrational limit resulting from Penn Medicine's oppressive, fraudulent, and/or malicious conduct, as permitted by law;

e. For interest as permitted by law;

f. For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

g. For such other and further relief as the Court deems proper.

Case ID: 220302606

## DEMAND FOR JURY TRIAL

194.  Plaintiff hereby demands a jury trial for all claims triable.


Dated: <u>July 16, 2024</u>

                              Respectfully submitted,

                              **KLINE & SPECTER, P.C.**

By:    */s/ Tobias L. Millrood*
           Tobias L. Millrood, Esq.
           Elizabeth A. Crawford, Esq.
           Timothy A. Burke, Esq.
           John P. O'Neill, Esq.

           Benjamin Whiting, Esq. (pro hac vice)
           **KELLER POSTMAN LLC**
           150 N. Riverside Plaza, Suite 4100
           Chicago, IL 60606
           Telephone: (312) 741-5220
           Fax: (312) 971-3502

           *Attorneys for Plaintiffs*

Case ID: 220302606

# EXHIBIT A-88

BURNS WHITE LLC
By:    James A. Young, Esquire
       Richard S. Margulies, Esquire
       Douglas A. Brockman, Esquire
       Meredith A. Lowry, Esquire
Attorney ID Nos. 00213/62306/67185/321131
1835 Market Street, Suite 2700
Philadelphia, PA  19103
(215) 587-1600
jayoung@burnswhite.com; rsmargulies@burnswhite.com
dabrockman@burnswhite.com; malowry@burnswhite.com

*Attorneys for defendant, The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine*

| CHRISTINA TAYLOR, on her own behalf and as Parent and natural Guardian of I.H., a Minor Plaintiff, | : | IN THE COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
|---|---|---|
| | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | MARCH TERM 2022 |
| MEAD JOHNSON & COMPANY, LLC, et al. | : | NO. 2606 |
| Defendants. | : | |

## ENTRY OF APPEARANCE

TO THE PROTHONOTARY:

Kindly enter the appearance of Meredith A. Lowry, Esquire as co-counsel on behalf of Defendants, The Pennsylvania Hospital of the University of Pennsylvania Health System d/b/a Pennsylvania Hospital and The Trustees of the University of Pennsylvania d/b/a Penn Medicine, in the above-captioned matter.

Date: July 22, 2024

                                    **BURNS WHITE LLC**
                            BY: */s/ Meredith A. Lowry*
                                    Meredith A. Lowry, Esquire

## <u>CERTIFICATE OF SERVICE</u>

I, Meredith A. Lowry, Esquire, hereby certify that a true and correct copy of the foregoing

*Entry of Appearance* was served via the Court's electronic filing on all counsel of record.

|  | **BURNS WHITE LLC** |
|---|---|
| Date: July 22, 2024 | BY: */s/ Meredith A. Lowry* |
|  | Meredith A. Lowry, Esquire |

# EXHIBIT A-89

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY FIRST
JUDICIAL DISTRICT OF PENNSYLVANIA TRIAL DIVISION**

*Filed and Attested by the
Office of Judicial Records
06 AUG 2024 10:41 am
S. GILLIAM*

| | |
|---|---|
| CHRISTINA TAYLOR, *on her own behalf and as Parent and Natural Guardian of I.H., a Minor,* | : |
| Plaintiffs, | : PHILADELPHIA COUNTY : COURT OF COMMON PLEAS : TRIAL DIVISION |
| v. | : : |
| MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE, | : : MARCH TERM, 2022 : No. 220302606 : : : : : |
| Defendants. | : |

## ORDER OF THE COURT[1]

On this ____ day of _____, 2024, upon consideration of defendant Abbott Laboratories' preliminary objections to plaintiffs' amended complaints, its brief in support, and any response thereto, it is hereby ORDERED that defendant Abbott Laboratories' preliminary objections to plaintiffs' amended complaints are SUSTAINED.

It is further ORDERED that Counts IV and V of plaintiffs' amended complaints are DISMISSED as to Abbott Laboratories without leave to amend. It is further ORDERED that plaintiff-parents' claims in Counts I, II, III, IV, and V are DISMISSED as to Abbott Laboratories in the following cases: *Abdullah*, *Carter*, *Gray*, *Hollingsworth*, *Kajuffa*, *Mays*, *McMillian*, *Parker*, *Sanders*, *Short*, *Stills*, *Taylor*, *Thomas*, *Wieger*, *Wilkerson*, and *Williams*. It is also ORDERED that plaintiffs' punitive damages demands in Counts I, II, III, IV, and V are STRICKEN from plaintiffs'

---

[1] This Order applies to the following cases: 220302583, 220302588, 220302594, 220302601, 220302606, 220302617, 220302963, 220302978, 220302981, 220302983, 220400140, 220400141, 220400153, 220400158, 220400159, 220400216, 230900730, 230900791, and 230900867.

1

amended complaints. Finally, it is ORDERED that Counts I through V of the amended complaints in *McMillian* and *Tucker* are DISMISSED as to Abbott Laboratories without leave to amend.

BY THE COURT:

_____

Case ID: 220302606
Control No.: 24081504

**NOTICE TO PLEAD**

To: Plaintiffs

You are hereby notified to file a written response to the enclosed Preliminary Objections within twenty (20) days from service hereof or a judgment may be entered against you.

/s/ _____

*Counsel for Defendant Abbott Laboratories*

**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Sean P. Fahey (PA Bar No. 73305)
3000 Two Logan Square
Philadelphia, PA 19103
215.981.4296
Sean.Fahey@troutman.com

Ronni E. Fuchs (PA Bar No. 65561)
301 Carnegie Center, Suite 400
Princeton, NJ 08540
609.951.4183
Ronni.Fuchs@troutman.com

**CAMPBELL CONROY & O'NEIL, P.C.**
Joseph E. O'Neil (PA Bar No. 29053)
Ryan J. O'Neil (PA Bar No. 314034)
1205 Westlakes Drive, Suite 330
Berwyn, PA 19312
610.964.1900
JONeil@campbell-trial-lawyers.com
RONeil@campbell-trial-lawyers.com

**JONES DAY**
Marques Hillman Richeson (admitted *pro hac vice*)
901 Lakeside Avenue
Cleveland, OH 44114
216.586.7195
mhricheson@jonesday.com

*Attorneys for Defendant Abbott Laboratories*

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY FIRST JUDICIAL DISTRICT OF PENNSYLVANIA TRIAL DIVISION – CIVIL SECTION**

| | |
|---|---|
| CHRISTINA TAYLOR, *on her own behalf and as Parent and Natural Guardian of I.H., a Minor,*<br><br>                   Plaintiffs,<br><br>    v.<br><br>MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE,<br><br>                  Defendants. | :    PHILADELPHIA COUNTY<br>:    COURT OF COMMON PLEAS<br>:    TRIAL DIVISION<br>:<br>:<br>:<br>:<br>:    MARCH TERM, 2022<br>:    No. 220302606<br>:<br>:<br>:<br>:<br>:<br>: |

## <u>DEFENDANT ABBOTT LABORATORIES' PRELIMINARY OBJECTIONS TO PLAINTIFFS' AMENDED COMPLAINTS</u>

In 2022 and 2023, plaintiffs filed 34 nearly identical actions alleging that premature and low-birthweight infants developed necrotizing enterocolitis ("NEC") after healthcare professionals administered preterm infant nutrition products that were manufactured by defendants Abbott Laboratories ("Abbott") or Mead Johnson & Company LLC, Mead Johnson Nutrition Company (together, "Mead Johnson"). This Court has given plaintiffs several opportunities, spanning well over a year, to address obvious deficiencies in their complaints. But despite adding some factual allegations regarding the infants in the 19 amended complaints at issue here,[2] plaintiffs continue

---

[2] To conserve judicial resources, and pursuant to the practice recommended by the Court at the July 24, 2023 conference, Abbott files this motion on the instant docket and incorporates by reference the arguments herein in each of the following actions in which plaintiffs filed amended complaints: *Abdullah v. Mead Johnson & Company, LLC, et al.*, No. 220302583; *Carter v. Mead Johnson & Company, LLC, et al.*, No. 220302588; *Drayton v. Mead Johnson & Company, LLC, et al.*, No. 220400216; *Hollingsworth v. Mead Johnson & Company, LLC, et al.*, No. 230900791; *Kajuffa v. Mead Johnson & Company, LLC, et al.*, No. 220302978; *Mays v. Mead Johnson & Company, LLC, et al.*, No. 220302963; *McMillian v. Mead Johnson & Company, LLC, et al.*, No. 220400140; *Parker v. Mead Johnson & Company, LLC, et al.*, No. 220302983; *Ross v. Mead Johnson & Company, LLC, et al.*, No. 220302981; *Sanders v. Mead Johnson & Company, LLC, et al.*, No. 220400153; *Short v. Mead Johnson & Company, LLC, et al.*, No. 220400159; *Stills v. Mead Johnson & Company,*

2

Case ID: 220302606<br>Control No.: 24081504

to recycle the nearly identical, generic allegations they previously made—without making any attempt to differentiate among the individual cases or to describe with the required specificity how each plaintiff read, saw, heard, or was otherwise exposed to and relied upon any specific product label or any other specific representation by Abbott before their infant was administered Abbott's products. In addition, many claims are clearly time-barred, plaintiffs fail to plead facts supporting their punitive damages allegations, and in two cases plaintiffs fail even to identify an Abbott product at issue. In all of these respects, these amended complaints remain legally insufficient, and continue to fall short of Pennsylvania's fact pleading standard. The time has come for them to be dismissed in relevant part without further leave to amend.[3]

      In support of its preliminary objections, Abbott states the following:

      1.      In the above-captioned lawsuits, plaintiffs attack—without basis—specialized infant formulas and fortifiers essential to the survival and development of premature infants in Neonatal Intensive Care Units ("NICUs"). Plaintiffs filed these actions against defendants Mead Johnson, Abbott, and each infant's hospital of birth (collectively, "defendants"), alleging that

---

*LLC, et al.*, No. 220302617; *Taylor v. Mead Johnson & Company, LLC, et al.*, No. 220302606; *Thomas v. Mead Johnson & Company, LLC, et al.*, No. 220400158; *Tucker v. Mead Johnson & Company, LLC, et al.*, No. 230900867; *Wieger v. Mead Johnson & Company, LLC, et al.*, No. 220302601; *Wilkerson v. Mead Johnson & Company, LLC, et al.*, No. 230900730; and *Williams v. Mead Johnson & Company, LLC, et al.*, No. 220400141.

    [3] Fifteen cases are not at issue in these preliminary objections, as they have already been dismissed or are in the process of being dismissed. The Court dismissed 1 case on February 9, 2024, upon plaintiff's petition to discontinue: *Cotton v. Mead Johnson & Company, LLC, et al.*, No. 230900805. The Court dismissed 3 cases on February 14, 2024, upon plaintiffs' petitions to discontinue: *Hines v. Mead Johnson & Company, LLC, et al.*, No. 220400136; *Padilla v. Mead Johnson & Company, LLC, et al.*, No. 220302969; and *Whitfield v. Mead Johnson & Company, LLC, et al.*, No. 220400145. The Court further dismissed 3 cases on May 23, 2024, upon plaintiffs' petitions to discontinue: *Goodmond v. Mead Johnson & Company, LLC*, et al., No. 220400208; *Goodmond v. Mead Johnson & Company, LLC*, et al., No. 220400212, and *Wieger (M.P.) v. Mead Johnson & Company, LLC, et al.*, No. 220302614. And plaintiffs did not file amended complaints in the following 8 cases: *Greene v. Mead Johnson & Company, LLC, et al.*, No. 230900803; *Henderson v. Mead Johnson & Company, LLC, et al.*, No. 220400127; *Johnson v. Mead Johnson & Company, LLC, et al.*, No. 220400162; *Moment v. Mead Johnson & Company, LLC, et al.*, No. 220400142; *Walker-Savage et al. v. Mead Johnson & Company, LLC, et al.*, No. 220400156; *Watson v. Mead Johnson & Company, LLC, et al.*, No. 220302967; *Wiggins v. Mead Johnson & Company, LLC, et al.*, No. 220302986; and *Witherspoon v. Mead Johnson & Company, LLC, et al.*, No. 220400138. Plaintiffs' counsel has represented that they intend to file petitions to discontinue those 8 cases. Abbott reserves all rights should they fail to do so.

Case ID: 220302606
Control No.: 24081504

medical professionals administered Abbott's and/or Mead Johnson's cow's milk-based infant nutrition products to their infants and that the infants were injured as a result.

2. In their original complaints, plaintiffs alleged seven causes of action, five of which were asserted against Abbott and Mead Johnson: strict products liability design defect (Count I), strict products liability failure to warn (Count II), negligence (Count III), intentional misrepresentation (Count IV), and negligent misrepresentation (Count V). The remaining claims (Counts VI and VII) were asserted against the hospital defendant. Each complaint was filed by a parent ("plaintiff-parent") both on his or her own behalf and as a parent and guardian of the infant plaintiff ("plaintiff") (together "plaintiffs").

3. On June 12, 2023, Abbott filed preliminary objections on the grounds that plaintiffs' claims were legally insufficient and pled with insufficient specificity. Mead Johnson and certain hospital defendants filed preliminary objections as well.

4. On July 24, 2023, a case management conference was held before the Honorable Linda Carpenter. During the conference, the Court recognized obvious flaws in the original complaints, but allowed plaintiffs to file amended complaints to correct, among other things, deficiencies related to product identification and plaintiffs' misrepresentation claims.

5. On September 8, 2023, plaintiffs filed amended complaints in 21 of the then-pending 29 preterm infant nutrition cases, asserting claims against Abbott that were substantially the same as those asserted in their original complaints.

6. On May 20, 2024, the Court observed similar continued deficiencies in plaintiffs' amended complaints, sustained the hospital defendants' preliminary objections, and permitted plaintiffs to file further amended complaints. In doing so, the Court suggested that plaintiffs also address the deficiencies that had been identified by the manufacturing defendants.

Case ID: 220302606
Control No.: 24081504

7.     Between July 17 and July 22, 2024, plaintiffs filed the 19 further amended complaints that are the subject of Abbott's instant preliminary objections. These amended complaints involve the same basic claims as the original complaints. *See, e.g.*, *Carter* Second Amended Complaint (the reference "Am. Compl.").[4]

8.     Plaintiffs' amended complaints are subject to dismissal, in whole or in part, for the reasons set forth below.

## I.  PRELIMINARY OBJECTION FOR INSUFFICIENT SPECIFICITY IN PLEADING PLAINTIFFS' MISREPRESENTATION CLAIMS.

9.     Abbott incorporates the foregoing paragraphs as if set forth herein.

10.     Pursuant to Pa. R. Civ. P. 1028(a)(3), a preliminary objection may be filed by any party to a pleading regarding insufficient specificity in a pleading.

11.     Counts IV and V are claims for intentional and negligent misrepresentation; these fraud-based claims are subject to heightened pleading requirements under Pa. R. Civ. P. 1019(b).

12.     Even after multiple pleading attempts, plaintiffs still fail to allege with particularity that they saw, heard, or were otherwise exposed to any purported misrepresentations made by Abbott. They also do not specifically allege who made the supposed misrepresentations, or when they supposedly did so. Moreover, plaintiffs cannot plausibly allege reliance on misrepresentations to which they were not exposed. *See Presbyterian Med. Ctr. v. Budd*, 832 A.2d 1066, 1073 (Pa. Super. Ct. 2003) (affirming order sustaining preliminary objections to complaint where plaintiff failed to "establish every element of its fraud claim with sufficient particularity").

13.     Accordingly, this preliminary objection should be sustained, and Counts IV and V against Abbott should be dismissed.

---

[4] The substantive allegations against Abbott in all 19 amended complaints are nearly identical, although the precise paragraph numbering diverges slightly in some respects. Paragraph numbers for the other 18 complaints are cited in footnotes herein.

Case ID: 220302606
Control No.: 24081504

## II. PRELIMINARY OBJECTION REGARDING PLAINTIFF-PARENTS' TIME BARRED CLAIMS IN 16 CASES.

14.     Abbott incorporates the foregoing paragraphs as if set forth herein.

15.     Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

16.     Pennsylvania law establishes a two-year statute of limitations for negligent, intentional, or otherwise tortious conduct. *See* 42 Pa. Cons. Stat. § 5524(2) & (7).

17.     The statute of limitations began running on each plaintiff-parent's claims on or around the date of the infant-plaintiff's birth.

18.     But as reflected in the chart below, plaintiff-parents' complaints in 16 cases were not filed until many years after the limitations period had expired.

| Plaintiff Name | Alleged Dates of Birth | Date Complaints First Filed | Time Elapsed from Birth to Filing |
|---|---|---|---|
| *Abdullah, Terraine* (obo H.S.) | September 12, 2006 | March 24, 2022 | 15 years and 6 months |
| *Carter, Holli* (obo J.C.) | October 6, 2014 | March 24, 2022 | 7 years and 5 months |
| *Gray, Tonya* (obo J.M.) | March 14, 2005 | April 4, 2022 | 17 years |
| *Hollingsworth* (obo G.O.) | June 26, 2014 | October 16, 2023 | 9 years and 4 months |
| *Kajuffa, Kristen* (obo B.K.) | January 18, 2012 | March 29, 2022 | 15 years and 2 months |
| *Mays, Nafeesah* (obo A.R.) | July 15, 2005 | March 29, 2022 | 16 years and 8 months |
| *McMillian, Catherine* (obo T.M.) | November 14, 2005 | April 4, 2022 | 16 years and 4 months |
| *Parker, Nydia* (obo M.H.) | July 31, 2016 | March 29, 2022 | 5 years and 7 months |
| *Sanders, Lorenn* (obo Q.S.) | March 17, 2007 | April 4, 2022 | 15 years |
| *Short, Samaya* (obo S.M.) | October 26, 2017 | April 4, 2022 | 4 years and 5 months |
| *Stills, Alice* (obo M.E.) | September 28, 2007 | March 24, 2022 | 14 years and 5 months |
| *Taylor, Christina* (obo I.H.) | October 9, 2010 | March 24, 2022 | 11 years and 5 months |
| *Thomas, Natisha* (obo S.M.) | December 24, 2015 | April 4, 2022 | 6 years and 3 months |
| *Wieger, Wieger* (obo S.P.) | December 3, 2013 | March 24, 2022 | 8 years and 3 months |
| *Wilkerson, Stephanie* (obo M.F.) | December 17, 2015 | October 16, 2023 | 17 years and 10 months |
| *Williams, Melvenia* (obo R.W.) | June 11, 2005 | April 4, 2022 | 16 years and 10 months |

19.     Plaintiff-parents' claims in these cases are thus time-barred. And plaintiffs have not

6

Case ID: 220302606
Control No.: 24081504

alleged sufficient facts to support application of the discovery rule.

20.     Accordingly, this preliminary objection should be sustained and plaintiff-parents' claims in *Abdullah*, *Carter*, *Gray*, *Hollingsworth*, *Kajuffa*, *Mays*, *McMillian*, *Parker*, *Sanders*, *Short*, *Stills*, *Taylor*, *Thomas*, *Wieger*, *Wilkerson*, and *Williams* should be dismissed.

## III. PRELIMINARY OBJECTION REGARDING PLAINTIFFS' REQUEST FOR PUNITIVE DAMAGES.

21.     Abbott incorporates the foregoing paragraphs as if set forth herein.

22.     Pursuant to Pa. R. Civ. P. 1028(a)(3), a preliminary objection may be filed by any party to a pleading regarding insufficient specificity in a pleading.

23.     Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

24.     Without sufficient basis, plaintiffs demand punitive damages from Abbott in the ad damnum clause of each of Counts I through V.

25.     Plaintiffs' requests for punitive damages in Counts III and V are legally insufficient because these Counts sound in negligence, and punitive damages are not available for claims of "ordinary negligence" under Pennsylvania law. *See Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985) (citing RESTATEMENT OF TORTS (SECOND) § 908, comment e).

26.     In addition, plaintiffs' requests for punitive damages in Counts I through V are insufficiently specific. Plaintiffs make conclusory allegations that Abbott's conduct was "malicious" without providing any factual support. *See Whiting v. Nationwide Ins. Co.*, 9 Pa. D. & C.3d 789, 792 (1979) (dismissing plaintiffs' punitive damages request where "factual averments in support of . . . conclusory allegations are totally lacking").

27.     Accordingly, Abbott respectfully requests that plaintiffs' demands for punitive damages in each of Counts I through V be stricken.

Case ID: 220302606
Control No.: 24081504

## IV. PRELIMINARY OBJECTION FOR LEGAL INSUFFICIENCY OF PLAINTIFFS' CLAIMS IN *MCMILLIAN* AND *TUCKER.*

28.    Abbott incorporates the foregoing paragraphs as if set forth herein.

29.    Pursuant to Pa. R. Civ. P. 1028(a)(4), a preliminary objection may be filed by any party to a pleading regarding the legal insufficiency of a pleading.

30.    Pennsylvania "imposes liability for physical harm caused to the user only upon that person who sold a product in a defective condition. A plaintiff must therefore at least designate the product alleged to be defective in order to recover from the one who sells it." *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963, 968 (Pa. Super. Ct. 1985).

31.    Although plaintiffs in *McMillian* and *Tucker* designate products that they claim caused their injuries, *see McMillian* Am. Compl. ¶¶ 14–15, 114 (alleging the infant was fed "EPF24"), *Tucker* Am. Compl. ¶¶ 13, 105 (alleging the infant was fed "Enfacare and Nutramigen"), they do not allege that any specific <u>Abbott</u> product was administered to them.

32.    Accordingly, this preliminary objection should be sustained, and Counts I through V against Abbott in *McMillian* and *Tucker* should be dismissed.

WHEREFORE, pursuant to Pa. R. Civ. P. 1028(a)(3) and (a)(4), Abbott respectfully requests that this Court sustain these preliminary objections and dismiss Counts IV and V (the misrepresentation claims) against Abbott without leave to amend; dismiss as time-barred all of plaintiff-parents' claims in Counts I through V against Abbott in the *Abdullah*, *Carter*, *Gray*, *Hollingsworth*, *Kajuffa*, *Mays*, *McMillian*, *Parker*, *Sanders*, *Short*, *Stills*, *Taylor*, *Thomas*, *Wieger*, *Wilkerson*, and *Williams* cases; strike plaintiffs' punitive damages requests in Counts I through V in all cases; and dismiss Counts I through V against Abbott in the *McMillian* and *Tucker* cases for failure to identify a specific Abbott product administered to those plaintiffs.

Case ID: 220302606
Control No.: 24081504

Dated: August 6, 2024                           Respectfully Submitted:


/s/ Sean P. Fahey                               /s/ Joseph E. O'Neil
Sean P. Fahey (PA Bar No. 73305)                Joseph E. O'Neil (PA Bar No. 29053)
**TROUTMAN PEPPER HAMILTON**                    Ryan J. O'Neil (PA Bar No. 314034)
**SANDERS LLP**                                 **CAMPBELL CONROY & O'NEIL, P.C.**
3000 Two Logan Square                           1205 Westlakes Drive, Suite 330
Philadelphia, PA 19103                          Berwyn, PA 19312
215.981.4296                                    610.964.6388
Sean.Fahey@troutman.com                         JONeil@campbell-trial-lawyers.com
                                                RONeil@campbell-trial-lawyers.com


/s/ Ronni E. Fuchs                              /s/ Marques Hillman Richeson
Ronni E. Fuchs (PA Bar No. 65561)               Marques Hillman Richeson (admitted *pro hac*
**TROUTMAN PEPPER HAMILTON**                    *vice*)
**SANDERS LLP**                                 **JONES DAY**
301 Carnegie Center, Suite 400                  901 Lakeside Avenue
Princeton, NJ 08540                             Cleveland, OH 44114
609.951.4183                                    216.586.7195
Ronni.Fuchs@troutman.com                        mhricheson@jonesday.com

                                                *Attorneys for Defendant Abbott Laboratories*

9

Case ID: 220302606
Control No.: 24081504

**IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY FIRST JUDICIAL DISTRICT OF PENNSYLVANIA TRIAL DIVISION – CIVIL SECTION**

| | |
|---|---|
| CHRISTINA TAYLOR, *on her own behalf and as Parent and Natural Guardian of I.H., a Minor,*<br><br>Plaintiffs,<br><br>v.<br><br>MEAD JOHNSON & COMPANY LLC; MEAD JOHNSON NUTRITION COMPANY; ABBOTT LABORATORIES; THE PENNSYLVANIA HOSPITAL OF THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM, *d/b/a* PENNSYLVANIA HOSPITAL; and THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, *d/b/a* PENN MEDICINE,<br><br>Defendants. | :    PHILADELPHIA COUNTY<br>:    COURT OF COMMON PLEAS<br>:    TRIAL DIVISION<br>:<br>:<br>:<br>:    MARCH TERM, 2022<br>:    No. 220302606<br>:<br>:<br>:<br>:<br>: |

## DEFENDANT ABBOTT LABORATORIES' BRIEF IN SUPPORT OF PRELIMINARY OBJECTIONS TO PLAINTIFFS' AMENDED COMPLAINTS

### MATTER BEFORE THE COURT

The preliminary objections of Abbott Laboratories ("Abbott") to plaintiffs' amended complaints are before this Court. Under Pennsylvania Rules of Civil Procedure 1028(a)(3) and 1028(a)(4), Abbott respectfully requests that this Court: (1) dismiss Counts IV and V (the misrepresentation claims) in all cases for insufficient specificity; (2) dismiss plaintiff-parents' claims in Counts I through V as time-barred in the matters of *Abdullah*, *Carter*, *Gray*, *Hollingsworth*, *Kajuffa*, *Mays*, *McMillian*, *Parker*, *Sanders*, *Short*, *Stills*, *Taylor*, *Thomas*, *Wieger*, *Wilkerson*, and *Williams*; (3) strike plaintiffs' punitive damages requests in Counts I through V in all cases for insufficient specificity and legal insufficiency; and (4) dismiss Counts I through V of *McMillian* and *Tucker* as insufficiently pled for failure to identify a specific Abbott product that was administered to plaintiffs.[1]

---

[1] To conserve judicial resources, and pursuant to the practice recommended by the Court at the July 24, 2023

Case ID: 220302606<br>Control No.: 24081504

## STATEMENT OF QUESTIONS INVOLVED

1. Should the Court sustain Abbott's preliminary objections to the amended complaints and dismiss the intentional and negligent misrepresentation claims (Counts IV and V) as insufficiently pled? Answer: Yes.

2. Should the Court sustain Abbott's preliminary objections to the amended complaints and dismiss all of plaintiff-parents' claims (Counts I through V) in *Abdullah*, *Carter*, *Gray*, *Hollingsworth*, *Kajuffa*, *Mays*, *McMillian*, *Parker*, *Sanders*, *Short*, *Stills*, *Taylor*, *Thomas*, *Wieger*, *Wilkerson*, and *Williams* as time-barred and therefore legally insufficient? Answer: Yes.

3. Should the Court sustain Abbott's preliminary objections to the amended complaints and strike plaintiffs' requests for punitive damages (Counts I through V) as both legally insufficient and lacking sufficient specificity? Answer: Yes.

4. Should the Court sustain Abbott's preliminary objections to thhe amended complaints and dismiss plaintiffs' claims (Counts I through V) in *McMillian* and *Tucker* against Abbott as insufficiently pled for failure to identify a specific Abbott product that was administered to plaintiffs? Answer: Yes.

## INTRODUCTION

Abbott and Mead Johnson & Company LLC, Mead Johnson Nutrition Company (together,

---

conference, Abbott files this motion on the instant docket and incorporates by reference the arguments herein in each of the following actions in which plaintiffs filed amended complaints: *Abdullah v. Mead Johnson & Company, LLC, et al.*, No. 220302583; *Carter v. Mead Johnson & Company, LLC, et al.*, No. 220302588; *Drayton v. Mead Johnson & Company, LLC, et al.*, No. 220302594; *Gray v. Mead Johnson & Company, LLC, et al.*, No. 220400216; *Hollingsworth v. Mead Johnson & Company, LLC, et al.*, No. 230900791; *Kajuffa v. Mead Johnson & Company, LLC, et al.*, No. 220302978; *Mays v. Mead Johnson & Company, LLC, et al.*, No. 220302963; *McMillian v. Mead Johnson & Company, LLC, et al.*, No. 220400140; *Parker v. Mead Johnson & Company, LLC, et al.*, No. 220302983; *Ross v. Mead Johnson & Company, LLC, et al.*, No. 220302981; *Sanders v. Mead Johnson & Company, LLC, et al.*, No. 220400153; *Short v. Mead Johnson & Company, LLC, et al.*, No. 220400159; *Stills v. Mead Johnson & Company, LLC, et al.*, No. 220302617; *Taylor v. Mead Johnson & Company, LLC, et al.*, No. 220302606; *Thomas v. Mead Johnson & Company, LLC, et al.*, No. 220400158; *Tucker v. Mead Johnson & Company, LLC, et al.*, No. 230900867; *Wieger v. Mead Johnson & Company, LLC, et al.*, No. 220302601; *Wilkerson v. Mead Johnson & Company, LLC, et al.*, No. 230900730; and *Williams v. Mead Johnson & Company, LLC, et al.*, No. 220400141.

Case ID: 220302606
Control No.: 24081504

"Mead Johnson") manufacture specialized, life-saving, nutrition products for premature and low birthweight infants.[2] Premature infants face complex challenges and daunting odds. For one, they typically have underdeveloped or maldeveloped gastrointestinal systems that are not prepared to receive the nutrition necessary for the rapid growth these infants need. This poses a serious challenge for NICU specialists caring for premature infants. The best nutrition for a premature infant is the nutrition it would have received in the womb. Once that is no longer possible, everything else falls short. Milk from the infant's mother is the closest natural substitute, but it may not be available or nutritionally sufficient to meet a particular premature infant's extraordinary needs. The same is true of donor milk. Accordingly, NICU specialists use their judgment to fill the nutritional gap with specialized formula and fortifier products designed to meet the needs of premature, low-birthweight infants.

This litigation targets these life-saving products. These 19 nearly identical amended complaints all allege that Abbott's and Mead Johnson's specialized infant formulas and fortifiers caused premature infants to develop necrotizing enterocolitis ("NEC"), an inflammatory gastrointestinal condition. As these lawsuits proceed, the evidence will show there is no basis for plaintiffs' allegations. Abbott's products are safe and save lives. Without them, many more infants would die, suffer serious setbacks, or face lifelong impairments.

Relevant here, moreover, are blatant legal deficiencies in plaintiffs' amended complaints. Plaintiffs have already been afforded several opportunities to cure these deficiencies and failed to do so. No further chances are warranted. Abbott respectfully requests that the Court sustain its preliminary objections and dismiss plaintiffs' misrepresentation claims in all cases; dismiss

---

[2] Abbott manufactures infant nutrition products under the "Similac" brand name. Am. Compl. ¶ 5. Mead Johnson manufactures infant nutrition products under the "Enfamil" brand name. *Id.* ¶ 4. These allegations are in the same paragraphs across all amended complaints.

Case ID: 220302606
Control No.: 24081504

plaintiff-parents' claims against Abbott as time-barred in *Abdullah*, *Carter*, *Gray*, *Hollingsworth*, *Kajuffa*, *Mays*, *McMillian*, *Parker*, *Sanders*, *Short*, *Stills*, *Taylor*, *Thomas*, *Wieger*, *Wilkerson*, and *Williams*; strike plaintiffs' unsupported demands for punitive damages in all cases; and dismiss plaintiffs' claims against Abbott in *McMillian* and *Tucker* for failure to identify an Abbott product that was administered to them.

## FACTUAL BACKGROUND

As plaintiffs' own amended complaints recognize, premature infants' underdevelopment makes them "especially susceptible to NEC." *See* Am. Compl. ¶ 23.[3] As plaintiffs also acknowledge, NEC can occur in infants who receive only human milk in the NICU, as well as in those who receive no "food" at all. *See id.* ¶ 40 ("What is more, necrotizing enterocolitis is a disease that can occur in children who are *not* fed the Defendant Manufacturers' products"). Neonatologists are experts in dealing with the risks of NEC and the many other medical risks these vulnerable premature infants face. They make the decision about how best to provide nutrition to these infants in light of each hospital's protocols and the circumstances of each infant's case.

Each plaintiff-parent alleges that their infant was born prematurely at a Philadelphia-area hospital. *See id.* ¶ 11.[4] The amended complaints allege "upon information and belief" that these infants were administered "Similac and/or Enfamil cow's milk-based products" by medical professionals at a hospital after their birth. *Id.* ¶ 16.[5] Despite these general allegations, the amended

---

[3] *See* Am. Compl. ¶ 20: *Abdullah*, *Gray*, and *Sanders*; Am. Compl. ¶ 21: *Hollingsworth*, *Kajuffa*, *Parker*, *Tucker*, and *Wilkerson*; Am. Compl. ¶ 22: *Drayton*, *McMillian*, *Ross*, *Short*, and *Stills*; Am. Compl. ¶ 23: *Mays*, *Thomas*, and *Wieger*; Am. Compl. ¶ 24: *Taylor* and *Williams*.

[4] These allegations are in the same paragraphs across all amended complaints, with the exception of *Kajuffa*, *Parker*, and *Ross* where the allegations appear in Am. Compl. ¶ 10.

[5] *See* Am. Compl. ¶ 12: *Parker* and *Ross*; Am. Compl. ¶ 13: *Abdullah*, *Gray*, *Hollingsworth*, *Mays*, *McMillian*, *Short*, *Stills*, *Tucker*, and *Wieger*; Am. Compl. ¶ 14: *Kajuffa* and *Wilkerson*; Am. Compl. ¶ 15: *Thomas* and *Williams*. Plaintiffs in *Drayton* and *Sanders* do not make this allegation. Plaintiffs in *Taylor* only allege that the product was manufactured by Abbott and/or Mead.

4

Case ID: 220302606
Control No.: 24081504

complaints, for the first time, purport to identify specific Similac and/or Enfamil products that plaintiff-infants were allegedly fed. *See, e.g.*, *id.* ¶ 15[6] (alleging, upon information and belief, that infant was fed "'Similac Human Milk Fortifier Powder 24 cal/oz', manufactured by Defendant Abbott"). But in *McMillian* and *Tucker*, plaintiffs identify non-Abbott products, and do not identify any specific Abbott product fed to their infants.[7]

Plaintiffs also allege that Abbott and/or Mead Johnson made false statements of material fact "on an ongoing and repeated basis" to "the public, including patient consumers and parents like Plaintiff Parent" in their advertising and marketing materials prior to the time their infants were administered preterm infant nutrition products. Am. Compl. ¶¶ 138, 148.[8] However, noticeably absent from all of plaintiffs' amended complaints are any allegations indicating that plaintiff-parents actually saw, heard, or were otherwise exposed to the allegedly false

---

[6] *See* Am. Compl. ¶¶ 14–15: *Abdullah* (alleging infant was fed breast milk which contained bovine-based human milk fortifier and Enfacare); *Drayton* Am. Compl. ¶ 13 (alleging infant was fed Similac bovine-based human milk fortifier); *Gray* Am. Compl. ¶ 15 (alleging infant was fed Enfamil Premature Formula 20 cal, Enfamil Premature Formula 24, and human milk with Similac and/or Enfamil fortifier); Am. Compl. ¶13: *Hollingsworth* (alleging infant was fed Similac or Enfamil human milk fortifier, Enfamil Premature Formula 20 cal with Iron, Enfamil NeuroPro Infant Formula 22 cal,, and Enfamil Human Milk Fortifier); Am. Compl. ¶ 12: *Kajuffa* (alleging infant was fed Similac Special Care); Am. Compl. ¶ 13: *Mays* (alleging infant was fed Similac Special Care 20 cal/oz.); Am. Compl. ¶¶ 14–15: *McMillian* (alleging the infant was fed "EPF24"); Am. Compl. ¶¶ 12, 14: *Parker* (alleging infant was fed breastmilk fortified with either Similac or Enfamil fortifier, and later Similac Special Care); Am. Compl. ¶ 12: *Ross* (alleging infant was fed human milk that was fortified with either Similac or Enfamil fortifier); Am. Compl. ¶ 13: *Sanders* (alleging infant was fed Similac bovine-based Special Care formula 20 cal/oz.); Am. Compl. ¶ 14: *Short* (alleging infant was fed Similac Human Milk Fortifier (hydrolyzed), via total parenteral nutrition (TPN)); Am. Compl. ¶ 14: *Stills* (alleging infant was fed breast milk which was then fortified with bovine-based human milk fortifier); Am. Compl. ¶ 14: *Taylor* (alleging infant was fed Special Care 20 cal/oz or Special Care 24 cal/oz); Am. Compl. ¶¶ 13–14: *Thomas* (alleging infant was fed breast milk with 20 cal/oz bovine-based human milk fortifier and Special Care "SC" 22 cal/oz); Am. Compl. ¶ 13 *Tucker* (alleging the infant was fed "Enfacare and Nutramigen"); Am. Compl. ¶ 13: *Wieger* (alleging infant was fed study feeds of Similac and/or Enfamil); Am. Compl. ¶ 13: *Wilkerson* (alleging infant was fed Abbott and/or Mead 20 cal/oz formula); Am. Compl. ¶ 14: *Williams* (alleging infant was fed Similac "Special Care" Formula).

[7] *See* Am. Compl. ¶¶ 14–15, 114: *McMillian* (alleging the infant was fed "EPF24"); *see also* Am. Compl. ¶¶ 13, 105 *Tucker* (alleging the infant was fed "Enfacare and Nutramigen").

[8] *See* Am. Compl. ¶¶ 120, 130: *Kajuffa*, *Parker*, *Ross*; Am. Compl. ¶¶ 126, 136: *Gray*; Am. Compl. ¶¶ 127, 137: *Hollingsworth*; Am. Compl. ¶¶ 128, 138: *Tucker*; Am. Compl. ¶¶ 130, 140: *Mays*; Am. Compl. ¶¶ 135, 145: *Abdullah* and *Sanders*; Am. Compl. ¶¶ 136, 146: *Wilkerson*; Am. Compl. ¶¶ 137, 147: *Drayton*, *Short*, *McMillian*, and *Stills*; Am. Compl. ¶¶ 138, 148: *Taylor*, *Thomas*, and *Wieger*; Am. Compl. ¶¶ 139, 149: *Williams*.

Case ID: 220302606
Control No.: 24081504

representations made by Abbott and/or Mead Johnson about their products, let alone that plaintiff-parents relied upon those representations in allowing their infants to be fed Abbott's and/or Mead Johnson's products.

## LEGAL STANDARD

Rule 1028(a)(3) of the Pennsylvania Rules of Civil Procedure provides that a party may file preliminary objections asserting that a pleading is insufficiently specific. "The purpose of the pleadings is to place the defendants on notice of the claims upon which they will have to defend." *Carlson v. Cmty. Ambulance Servs.*, 824 A.2d 1228 (Pa. Super. Ct. 2003) (quoting *Yacoub v. Lehigh Valley Med.*, 805 A.2d 579, 588 (Pa. Super. 2002)). So the "complaint must give the defendants fair notice of the plaintiff's claims and a summary of the material facts that support those claims." *Id.* That standard, however, is heightened with respect to claims involving allegations of fraud. To protect against generalized and unsupported accusations of fraud, the Pennsylvania Rules of Civil Procedure require each element of fraud be "averred with particularity." *Presbyterian Med. Ctr.*, 832 A.2d at 1072-1073 (citing Pa. R. Civ. P. 1019(b)). Thus, a party raising a fraud-based claim must set forth in its pleadings specific facts to support the alleged fraud. *Id.*

Rule 1028(a)(4) of the Pennsylvania Rules of Civil Procedure provides that a party may file preliminary objections asserting that the pleading is legally deficient. "Preliminary objections in the nature of [a] demurrer test the legal sufficiency of the plaintiff's complaint." *Sexton v. PNC Bank*, 792 A.2d 602, 604 (Pa. Super. Ct. 2002). The question presented by the demurrer is whether, on the facts alleged, no recovery is possible. *Presbyterian Med. Ctr. v. Budd*, 832 A.2d 1066, 1070 (Pa. Super. Ct. 2003) (citation omitted). In answering this question, the court is "precluded from considering any conclusions of law or inferences which are not supported by the factual allegations contained in the complaint." *Hart v. O'Malley*, 647 A.2d 542, 553 (Pa. Super. Ct. 1994). Thus, a

Case ID: 220302606
Control No.: 24081504

plaintiff cannot maintain a cause of action by stating conclusions of law, argumentative allegations, and expressions of opinion. *Neill v. Eberle*, 620 A.2d 673, 675 (Pa. Commw. Ct. 1993). And a court "may not supply a fact missing [from] the complaint" in order to cure a defective pleading. *Hart*, 647 A.2d at 553.

## ARGUMENT

Despite multiple opportunities to cure their pleading deficiencies, plaintiffs' amended complaints remain fatally flawed in multiple respects: (1) plaintiffs do not plead with specificity that any misrepresentations were made to them, or that they relied on those representations; (2) plaintiff-parents' claims in 16 cases are time-barred; (3) plaintiffs fail to plead a legal or factual basis for punitive damages; and (4) plaintiffs in *McMillian* and *Tucker* never identify an Abbott product administered to them. Accordingly, these claims against Abbott should be dismissed without further leave to amend.

## I. PLAINTIFFS STILL FAIL TO PLEAD THEIR INTENTIONAL AND NEGLIGENT MISREPRESENTATION CLAIMS (COUNTS IV–V) WITH SUFFICIENT PARTICULARITY.

Despite the Court's prior concerns about the lack of specificity in their misrepresentation claims, plaintiffs fail to remedy that defect. Plaintiffs fail to allege that they saw or heard *any* specific representation by Abbott before Abbott products were administered. Nor do they allege any facts to support justifiable reliance. Accordingly, their misrepresentation claims must be dismissed.

To state a claim for intentional misrepresentation, plaintiffs must plead: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) that the resulting injury was proximately caused by the reliance. *Bortz v. Noon*, 729 A.2d 555, 560 (Pa. 1999) (internal citation

<center>7</center>

Case ID: 220302606
Control No.: 24081504

omitted). Similarly, to state a claim for negligent misrepresentation, plaintiffs must plead facts showing (1) a misrepresentation of a material fact; (2) that the representor either knew or should have known of the misrepresentation; (3) that the representor intended the representation to induce another to act; and (4) that injury resulted to the party acting in justifiable reliance on the representation. *See id.* at 561.

Misrepresentation claims are subject to the heightened pleading standard of Rule 1019(b). *N.Y. State Elec. & Gas Corp. v. Westinghouse Elec. Corp.,* 564 A.2d 919, 926-27 (Pa. Super. Ct. 1989) (heightened standard applies to fraud-based claims of negligent and intentional misrepresentation); *Shared Commc'n Servcs. of 1800-80 JFK Blvd., Inc. v. Albert M. Greenfield & Co.*, 2001 Phila. Ct. Com. Pl. LEXIS 63, at *3-5 (Nov. 19, 2001) ("Fraud is a claim easily made but difficult to support."). Under that Rule, each element of fraud must be "averred with particularity." *Presbyterian Med. Ctr.*, 832 A.2d at 1072-1073 (citing Pa. R. Civ. P. 1019(b)). That means that fraud-based claims must be "based upon facts clearly and explicitly set forth as constituting such fraud." *Dwyer v. Rothman*, 431 A.2d 1035, 1037 (Pa. Super. Ct. 1981) (citing *Hornsby v. Lohmeyer*, 72 A.2d 294 (Pa. 1950)). "Merely alleging fraud as a legal conclusion" does not suffice. *Id.*

Plaintiffs' amended complaints fail to plead the elements of intentional and negligent misrepresentation with the particularity required by Rule 1019(b). In particular, they fail to allege the contents of the supposed misrepresentations with specificity, and they fail to plead facts supporting their conclusory allegations of reliance.

*First*, plaintiffs have not "set forth the exact statements or actions [they] allege[] constitute the fraudulent misrepresentations." *Youndt v. First Nat'l Bank*, 868 A.2d 539, 545 (Pa. Super. Ct. 2005) (internal citations and quotations omitted). In their amended complaints, plaintiffs make

Case ID: 220302606
Control No.: 24081504

only conclusory allegations that Abbott made false statements of material fact in its advertising and marketing materials "on an ongoing and repeated basis" to "the public, including patient consumers and parents *like* Plaintiff Parent." Am. Compl. ¶¶ 138, 148 (emphasis added).[9] Some plaintiffs also generally allege that Abbott made false statements of material fact "to Plaintiff Parent," *id.* ¶¶ 140, 149,[10] and that they "justifiably relied" on them, *id.* ¶ 141.[11] But nowhere in their amended complaints do plaintiffs allege that they read, saw, heard, or were otherwise exposed to ***any specific product label or any other specific representation*** from Abbott before their infant was administered Abbott's products. Plaintiffs likewise do not identify the substance or wording of any such representations, where they were stated or appeared, to whom they were made, or when they were made. To the contrary, plaintiffs undermine any notion that they are attempting to plead with the requisite level of specificity by copying and pasting the exact same allegations for all 19 plaintiffs—despite the fact these 19 plaintiffs were treated with different products at different times by different providers across four different hospitals.

Such conclusory allegations in the complaint do not suffice to support plaintiffs' misrepresentation claims. *See, e.g.*, *Dwyer*, 431 A.2d at 1037 (affirming lower court's decision sustaining preliminary objections to plaintiff's intentional misrepresentation claim where plaintiff

---

[9] *See* Am. Compl. ¶¶ 120, 130: *Kajuffa*, *Parker*, *Ross*; Am. Compl. ¶¶ 126, 136: *Gray*; Am. Compl. ¶¶ 127, 137: *Hollingsworth*; Am. Compl. ¶¶ 128, 138: *Tucker*; Am. Compl. ¶¶ 130, 140: *Mays*; Am. Compl. ¶¶ 135, 145: *Abdullah* and *Sanders*; Am. Compl. ¶¶ 136, 146: *Wilkerson*; Am. Compl. ¶¶ 137, 147: *Drayton*, *Short*, *McMillian*, and *Stills*; Am. Compl. ¶¶ 138, 148: *Taylor*, *Thomas*, and *Wieger*; Am. Compl. ¶¶ 139, 149: *Williams*.

[10] *See* Am. Compl. ¶¶ 122, 131: *Kajuffa*, *Parker*, *Ross*; Am. Compl. ¶¶ 128, 137: *Gray*; Am. Compl. ¶¶ 129, 138: *Hollingsworth*; Am. Compl. ¶¶ 130, 139: *Tucker*; Am. Compl. ¶¶ 132, 141: *Mays*; Am. Compl. ¶¶ 137, 146: *Abdullah* and *Sanders*; Am. Compl. ¶¶ 138, 147: *Wilkerson*; Am. Compl. ¶¶ 139, 148: *Drayton*, *McMillian*, *Short*, and *Stills*; Am. Compl. ¶¶ 140, 149: *Taylor*, *Thomas*, and *Wieger*; Am. Compl. ¶¶ 141, 150: *Williams*.

[11] *See* Am. Compl. ¶ 123: *Kajuffa*, *Parker*, *Ross*; Am. Compl. ¶ 129: *Gray*; Am. Compl. ¶ 130: *Hollingsworth*; Am. Compl. ¶ 131: *Tucker*; Am. Compl. ¶ 133: *Mays*; Am. Compl. ¶138: *Abdullah* and *Sanders*; Am. Compl. ¶ 139: *Wilkerson*; Am. Compl. ¶ 140: *Drayton*, *McMillian*, *Short*, and *Stills*; Am. Compl. ¶ 141: *Taylor*, *Thomas*, and *Wieger*; Am. Compl. ¶ 142: *Williams*.

Case ID: 220302606
Control No.: 24081504

did not allege what facts were misrepresented, what false information was given, nor in what way he was "tricked"); *Presbyterian Med. Ctr.*, 832 A.2d at 1073 (affirming order sustaining preliminary objections to complaint where plaintiff failed to "establish every element of its fraud claim with sufficient particularity"); *Bethpage Fed. Credit Union*, 2019 WL 5303904, at *2 (sustaining preliminary objections to fraud and negligent misrepresentation claims due to plaintiff's failure to satisfy Rule 1019(b)'s particularity requirements); *Black v. Cmty. Educ. Ctrs., Inc.*, Civ. A. No. 12-6102, 2014 WL 859313, at *6 (E.D. Pa. Mar. 4, 2014) (finding plaintiff's claims of misrepresentation and fraud failed because she did not allege the instances of mischaracterization with specificity); *Scott v. Bimbo Bakeries, USA, Inc.*, Civ. A. No. 10-3154, 2012 WL 645905, at *6 (E.D. Pa. Feb. 29, 2012) (dismissing negligent misrepresentation claim where plaintiffs did not "allege when these alleged misrepresentations were made, who made them, or how they were communicated").

*Second*, there are no factual allegations to support plaintiffs' conclusory claims that they relied on any alleged misrepresentation. Instead, plaintiffs' own allegations establish that they relied on NICU doctors' judgment that formula or fortifier was a proper nutritional supplement for their infant. *See* Am. Compl. ¶¶ 37–38[12] (alleging plaintiff-parent "is a layperson with no medical background or training that would have given her any reason to doubt the response she received from her Penn Medicine health care providers at the time. Given that Penn Medicine's health care providers were in charge of the care of her newborn infant, [plaintiff-parent] had no reason to doubt their word."); *id.* ¶ 50[13] (alleging plaintiff-parent "trust[ed] that Defendant Hospital was

---

[12] *See* Am. Compl. ¶¶ 33–34: *Gray* and *Kajuffa*; Am. Compl. ¶¶ 34–35: *Abdullah, Hollingsworth, Ross, Sanders,* and *Tucker*; Am. Compl. ¶¶ 35–36: *Parker* and *Wilkerson*; Am. Compl. ¶¶ 36–37: *Drayton, Mays, McMillian, Short,* and *Stills*; Am. Compl. ¶¶ 37–38: *Thomas* and *Wieger*; Am. Compl. ¶¶ 38–39: *Taylor* and *Williams*.

[13] *See* Am. Compl. ¶ 45: *Gray* and *Kajuffa*; Am. Compl. ¶ 46: *Hollingsworth* and *Tucker*; Am. Compl. ¶ 47: *Abdullah, Ross,* and *Sanders*; Am. Compl. ¶ 48: *Mays, Parker,* and *Wilkerson*; Am. Compl. ¶ 49: *Drayton, McMillian, Short,* and *Stills*; Am. Compl. ¶ 50: *Thomas* and *Wieger*; Am. Compl. ¶ 51: *Taylor* and *Williams*.

Case ID: 220302606
Control No.: 24081504

providing preterm formula in the best interest of her child"); *id.* ¶ 57[14] ("Mead and Abbott rely on the physicians and medical staff to not only use their products in the NICU, but to convey these messages to the parents of premature infants in their care."). If plaintiffs wholly relied on the professional judgment of NICU doctors about the appropriate nutrition for their premature infants—as they claim—they cannot also plausibly allege that they relied on any representations made by Abbott.

Accordingly, plaintiffs fail to plead facts showing that their infants' claimed injuries were caused by their reliance on Abbott's representations. *See, e.g.*, *Rivello v. N.J. Auto. Full Ins. Underwriting Ass'n*, 638 A.2d 253, 257 (Pa. Super. Ct. 1994) (affirming dismissal of misrepresentation claim where plaintiff failed to sufficiently allege justifiable reliance on the alleged misrepresentation or that his injury was proximately caused by the alleged misrepresentation); *Youndt*, 868 A.2d 539 (holding that fraud claim failed where plaintiff did not plead all elements with particularity); *Feudale v. Aqua Pa., Inc.*, 122 A.3d 462, 466 n.5 (Pa. Commw. Ct. 2015) (concluding that plaintiff had failed to "allege[ ] any justifiable reliance on his part on the [alleged false representation], nor could he, as the alleged false representation was not made to him, but instead to [a third party]"); *Feingold v. Unitrin Direct*, Civ. A. No. 12-1250, 2012 WL 3866945, at *6 (E.D. Pa. Sept. 6, 2012) (dismissing negligent misrepresentation claim where plaintiff could not allege that he justifiably relied on the defendants' promises).

Because plaintiffs have failed to satisfy the heightened pleading standard for fraud-based claims, their misrepresentation claims should be dismissed. Notably, other courts have dismissed similar claims in NEC cases on similar grounds. *See, e.g.*, *Mead Johnson Products Case*, No. CJC-

---

[14] *See* Am. Compl. ¶ 52: *Gray* and *Kajuffa*; Am. Compl. ¶ 53: *Hollingsworth* and *Tucker*; Am. Compl. ¶ 54: *Abdullah*, *Ross*, and *Sanders*; Am. Compl. ¶ 55: *Mays*, *Parker*, and *Wilkerson*; Am. Compl. ¶ 56: *Drayton*, *McMillian*, *Short*, and *Stills*; Am. Compl. ¶ 57: *Thomas* and *Wieger*; Am. Compl. ¶ 58: *Taylor* and *Williams*.

Case ID: 220302606
Control No.: 24081504

23-005257 (sustaining preliminary objections to misrepresentation claims without leave to amend); *Ferry v. Mead Johnson & Co.*, 514 F. Supp. 3d 418, 446, 450–51 (D. Conn. 2021) (dismissing misrepresentation claims where plaintiffs, among other failures, did not plead facts showing that the plaintiff relied on the purported misrepresentation); *Hunte v. Abbott Lab'ys, Inc.*, 556 F. Supp. 3d 70, 92 (D. Conn. 2021) (dismissing misrepresentation claim and stating that plaintiff's "theory—that she can set forth general marketing materials over a decades-long period of time and then rely on them to support an intentional misrepresentation claim—d[id] not at all comply with Rule 9(b)'s particularity requirement"); *Davis v. Abbott Labs*, 562 F. Supp. 3d 585, 589 (C.D. Cal. 2021) (dismissing plaintiff's misrepresentation claim for failure to satisfy the heightened particularity requirements of Rule 9(b)).

Given plaintiffs' repeated and utter failure to make case-specific allegations sufficient to sustain their misrepresentation claims, dismissal should be with prejudice. *See, e.g.*, *Chester Upland Sch. Dist. v. Rossi*, 292 A.3d 629 (Pa. Commw. Ct.), *aff'd*, 306 A.3d 253 (Pa. 2023) (sustaining preliminary objections to second amended complaint with prejudice where plaintiffs "had multiple opportunities to amend their pleading"); *Pecina v. L. Offs. of Joel Sansone*, No. 901 WDA 2019, 2020 WL 917055, at *3 (Pa. Super. Ct. Feb. 25, 2020) (affirming trial court order dismissing second amended complaint with prejudice where plaintiff was afforded multiple opportunities to amend complaint but failed to plead damages with specificity).

## II. PLAINTIFF-PARENTS' CLAIMS ARE TIME-BARRED IN 16 CASES AND SHOULD BE DISMISSED.

Plaintiff-parents' claims in 16 cases are barred by the two-year statute of limitations on actions to recover damages for personal injury based on negligent, intentional, or otherwise tortious conduct. *See* 42 Pa. Cons. Stat. § 5524(2) & (7). That limitations period began to run shortly after the infants' birth dates, when the infants allegedly developed NEC. As reflected in

Case ID: 220302606
Control No.: 24081504

the chart below, 16 of these cases involve infants born between March 2005 (*Gray*) and October 2017 (*Short*). But these lawsuits were not filed until sometime between March 2022 and October 2023—long after the limitations period had expired.

| Plaintiff Name | Alleged Dates of Birth | Date Complaints First Filed | Time Elapsed from Birth to Filing |
|---|---|---|---|
| *Abdullah, Terraine* (obo H.S.) | September 12, 2006 | March 24, 2022 | 15 years and 6 months |
| *Carter, Holli* (obo J.C.) | October 6, 2014 | March 24, 2022 | 7 years and 5 months |
| *Gray, Tonya* (obo J.M.) | March 14, 2005 | April 4, 2022 | 17 years |
| *Hollingsworth* (obo G.O.) | June 26, 2014 | October 16, 2023 | 9 years and 4 months |
| *Kajuffa, Kristen* (obo B.K.) | January 18, 2012 | March 29, 2022 | 15 years and 2 months |
| *Mays, Nafeesah* (obo A.R.) | July 15, 2005 | March 29, 2022 | 16 years and 8 months |
| *McMillian, Catherine* (obo T.M.) | November 14, 2005 | April 4, 2022 | 16 years and 4 months |
| *Parker, Nydia* (obo M.H.) | July 31, 2016 | March 29, 2022 | 5 years and 7 months |
| *Sanders, Lorenn* (obo Q.S.) | March 17, 2007 | April 4, 2022 | 15 years |
| *Short, Samaya* (obo S.M.) | October 26, 2017 | April 4, 2022 | 4 years and 5 months |
| *Stills, Alice* (obo M.E.) | September 28, 2007 | March 24, 2022 | 14 years and 5 months |
| *Taylor, Christina* (obo I.H.) | October 9, 2010 | March 24, 2022 | 11 years and 5 months |
| *Thomas, Natisha* (obo S.M.) | December 24, 2015 | April 4, 2022 | 6 years and 3 months |
| *Wieger, Wieger* (obo S.P.) | December 3, 2013 | March 24, 2022 | 8 years and 3 months |
| *Wilkerson, Stephanie* (obo M.F.) | December 17, 2015 | October 16, 2023 | 17 years and 10 months |
| *Williams, Melvenia* (obo R.W.) | June 11, 2005 | April 4, 2022 | 16 years and 10 months |

These plaintiff-parents' claims are time-barred and must be dismissed. *See, e.g.*, *Hathi v. Krewstown Park Apartments*, 561 A.2d 1261, 1263 (Pa. Super. Ct. 1989); *Sayers v. Heritage Valley Md. Grp., Inc.*, 247 A.3d 1155, 1159-63 (Pa. Super. Ct. 2021).

There is no justification for plaintiffs' failure to timely file their complaints before the limitations period expired. For example, plaintiffs point to a 2020 Abbott article as purported evidence of concealment. *See* Am. Compl. ¶ 41.[15] But that article does not constitute the "clear,

---

[15] *See* Am. Compl. ¶ 36: *Gray*; Am. Compl. ¶ 37: *Hollingsworth*, *Kajuffa*, and *Tucker*; Am. Compl. ¶ 38: *Abdullah*, *Ross*, and *Sanders*; Am. Compl. ¶ 39: *Mays*, *Parker*, and *Wilkerson*; Am. Compl. ¶ 40: *Drayton*, *McMillian*,

Case ID: 220302606
Control No.: 24081504

precise, and convincing" evidence of fraudulent concealment necessary to support application of the discovery rule. *See K.A.R. v. T.G.L.*, 107 A.3d 770, 780 (Pa. Super. Ct. 2014) (noting that, for purposes of the discovery rule, the "plaintiff has the burden of proving fraudulent concealment by clear, precise, and convincing evidence"). *First*, the amended complaints do not allege that any plaintiff actually read, much less relied on, this Abbott article. *See Kingston Coal v. Felton Mining Co.*, 690 A.2d 284, 291 (Pa. Super. Ct. 1997) (justifiable reliance by plaintiff is required in order for fraudulent concealment to toll a statue of limitations). *Second*, the article was published on July 22, 2020—years after the statute of limitations had expired. *See Rice v. Diocese of Altoona-Johnstown*, 255 A.3d 237, 254 n.10 (Pa. 2021) (fraudulent concealment must occur during the limitations period). *Third*, no reasonable person could have been misled by the article, which strongly encourages the use of breastmilk with premature infants for reasons that include protection against NEC:

> If your baby is born prematurely, understanding that mother's own breastmilk is best for your baby is key to delivering not only nutrients, but also HMOs and other immune-protective factors. And since breastmilk protects against NEC, work closely with your baby's physician and dietician to understand how to support a good breastmilk supply, so that your preterm baby gets as much breastmilk as possible.

The Role of HMOs in Reducing NEC, https://www.nutritionnews.abbott/pregnancychildhood/prenatal-breastfeeding/the-promising-role-of-hmos-in-reducing-risk-of-nec/ (July 22, 2020).

Plaintiffs' other fraudulent concealment allegations fail for the same reasons: plaintiffs nowhere allege that they actually saw, much less relied on the statements in question—which were not misleading, in any event.[16] Because plaintiff-parents failed to file their claims within the

---

*Short*, and *Stills*; Am. Compl. ¶ 41: *Thomas* and *Wieger*; Am. Compl. ¶ 42: *Taylor* and *Williams*.

[16] The other statements attributed to Abbott in the amended complaints are (1) allegations that Abbott publishes a pediatric nutrition product guide stating "human milk alone does not meet all the nutritional needs of

Case ID: 220302606
Control No.: 24081504

limitations period and have pled no facts supporting their conclusory allegations of fraudulent concealment, their claims should be dismissed.

## III. PLAINTIFFS' REQUESTS FOR PUNITIVE DAMAGES ARE BOTH LEGALLY INSUFFICIENT AND INADEQUATELY PLED.

Plaintiffs' requests for punitive damages should be stricken because their allegations fail to clear the high bar for punitive damages under Pennsylvania law. In Pennsylvania, "'[p]unitive damages' are damages other than compensatory or nominal damages awarded" to punish "outrageous conduct." *See Focht v. Rabada*, 268 A.2d 157, 159 (Pa. Super. Ct. 1970) (quoting RESTATEMENT OF TORTS § 908(1)). "As the name suggests, punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct." *Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005); *see also Phillips v. Cricket Lighters*, 883 A.2d 439, 446 (Pa. 2005) ("Punitive damages may be appropriately awarded only when the plaintiff has established that the defendant has acted in an outrageous fashion due to either the defendant's evil motive or [] reckless indifference to the rights of others.").

To support a request for punitive damages, a plaintiff must sufficiently allege that "(1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and

---

preterm infants" and that the formulations of its products, which are based on decades of research and scientific publications, are "specially designed to meet the nutritional requirements of preterm infants and can be fed with confidence to most of the preterm infants in the NICU," *see* Am. Compl. ¶ 55; (2) allegations that Abbott's consumer-facing website states ""your baby's nutrient needs are greater than what breast milk alone can provide" and that a "human milk fortifier" may be added to breastmilk to "add[] proteins, vitamins, and minerals to help support a preemie's high nutrition needs for growth and development," *id.* ¶ 56; (3) allegations that Abbott's website at one point stated: "for infants *who are not breastfed* . . . infant formula is the only appropriate, safe alternative to meet babies' nutritional needs," (4) a statement that "[d]uring her first full year, feed her Similac Neosure, a nutrient-enriched formula for babies who were born prematurely, and help support her development," *see id.* ¶¶ 61–62 (emphasis added); and (5) allegations that Abbott's downloaded product guide states "enteral feeding" – which includes breast milk and donor milk – have been "associated with" things like "[s]pitting up, abdominal distension" or "other signs of intestinal dysfunction." *See id.* ¶ 63. Again, however, the amended complaints fail to allege that any plaintiff actually read or was aware of these statements, that the statements are themselves misleading, or even that any infant was fed NeoSure as opposed to something else.

Case ID: 220302606
Control No.: 24081504

that (2) [the defendant] acted, or failed to act, as the case may be, in conscious disregard of that risk." *Luddy*, 870 A.2d at 772. Conduct is "willful" when "the actor desired to bring about the result that followed, or at least was aware that it was substantially certain to ensue." *Evans v. Philadelphia Transp. Co.*, 212 A.2d 440, 443 (Pa. 1965). And "reckless indifference" occurs when "the actor has intentionally done an act of an unreasonable character, in disregard to a risk known [] or so obvious" that the defendant must be taken "to have been aware of it, and so great as to make it highly probable that harm would follow." *McClellan v. Health Maintenance Org. of Pa*., 604 A.2d 1053, 1061 (Pa. Super. Ct. 1992); *see also Smith v. Brown*, 423 A.2d 743, 745 (Pa. Super. Ct. 1980) (quoting Evans, 212 A.2d at 443).

To begin, plaintiffs' requests for punitive damages with respect to Count III (negligence) and Count V (negligent misrepresentation) are improper as a matter of law. As Pennsylvania law makes clear, "[p]unitive damages may not be awarded for misconduct which constitutes ordinary negligence[.]" *Martin v. Johns-Manville Corp.*, 494 A.2d 1088, 1097 (Pa. 1985) (citing RESTATEMENT OF TORTS (SECOND) § 908, comment e)). By plaintiffs' own admission, Counts III and V sound in ordinary negligence. *See* Am. Compl. ¶ 128 ("Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketing, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and Plaintiff Parent.");[17] *id*. ¶ 150 ("Abbott and Mead were negligent or careless in not determining those representations to be false.").[18] As a result, the accompanying demands for punitive damages are legally insufficient.

---

[17] *See* Am. Compl. ¶ 110: *Kajuffa*, *Parker*, and *Ross*;  Am. Compl. ¶ 116: *Gray*; Am. Compl. ¶ 117: *Hollingsworth*; Am. Compl. ¶ 118: *Tucker*; Am. Compl. ¶ 120: *Mays*; Am. Compl. ¶ 125: *Abdullah* and *Sanders*; Am. Compl. ¶ 126: *Wilkerson*; Am. Compl. ¶ 127: *Drayton*, *McMillian*, *Short*, and *Stills*; Am. Compl. ¶ 128: *Taylor*, *Thomas*, and *Wieger*; Am. Compl. ¶ 129: *Williams*.

[18] *See* Am. Compl. ¶ 132: *Kajuffa*, *Parker*, and *Ross*; Am. Compl. ¶ 138: *Gray*; Am. Compl. ¶ 139: *Hollingsworth*; Am. Compl. ¶ 140: *Tucker*; Am. Compl. ¶ 142: *Mays*; Am. Compl. ¶ 147: *Abdullah* and *Sanders*; Am.

Case ID: 220302606
Control No.: 24081504

Plaintiffs' requests for punitive damages in Counts I through V also fail because they are pleaded with insufficient specificity. Plaintiffs repeatedly demand judgment "[f]or punitive damages . . . resulting from the Defendant Manufacturers' oppressive, fraudulent, and/or malicious conduct . . . ." *See* Am. Compl. at Count I (prayer for relief); *id.* at Count II (prayer for relief); *id.* at Count III (prayer for relief); *id.* at Count VI (prayer for relief); *id.* at Count V (prayer for relief). But nowhere do plaintiffs even attempt to support these conclusory assertions of "malicious" conduct with any allegations of fact. Plaintiffs' stock allegations that Abbott "knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC," *see, e.g.*, Am. Compl. ¶ 110,[19] are insufficient. Plaintiffs cannot merely incant the word "knowledge"; rather, they must provide factual support for their bald assertions—particularly in a fact pleading jurisdiction like Pennsylvania. *See Whiting v. Nationwide Ins. Co.*, 9 Pa. D. & C.3d 789, 792 (1979) (dismissing plaintiffs' punitive damages request where "factual averments in support of . . . conclusory allegations are totally lacking"). They fail to do so here.

For these reasons, Abbott respectfully requests that this Court strike plaintiffs' requests for punitive damages as legally insufficient and lacking factual specificity.

## IV. PLAINTIFFS FAIL TO IDENTIFY A SPECIFIC ABBOTT PRODUCT ADMINISTERED IN *MCMILLIAN* AND *TUCKER*.

Finally, Plaintiffs fail to allege sufficient facts to support their claims against Abbott in *McMillian* and *Tucker* because they do not identify any specific Abbott product that purportedly caused their injuries. *See* Pa. R. Civ. P. 1028(a)(4). "Absent such identification, there can be no

---

Compl. ¶ 148: *Wilkerson*; Am. Compl. ¶ 149: *Drayton*, *McMillian*, *Short*, and *Stills*; Am. Compl. ¶ 150: *Taylor*, *Thomas*, and *Wieger*; Am. Compl. ¶ 151: *Williams*.

[19] *See* Am. Compl. ¶ 92: *Kajuffa*, *Parker*, and *Ross*; Am. Compl. ¶ 98: *Gray*; Am. Compl. ¶ 99: *Hollingsworth*; Am. Compl. ¶ 100: *Tucker*; Am. Compl. ¶ 102: *Mays*; Am. Compl. ¶ 107: *Abdullah* and *Sanders*; Am. Compl. ¶ 108: *Wilkerson*; Am. Compl. ¶ 109: *McMillian*, *Short*, and *Stills*; Am. Compl. ¶ 110: *Taylor* and *Thomas*; Am. Compl. ¶ 111: *Williams*.

Case ID: 220302606
Control No.: 24081504

allegations of duty, breach of duty, or legal causation, and hence there can be no liability." *Mellon v. Barre-Nat'l Drug Co.*, 636 A.2d 187, 191–92 (Pa. Super. Ct. 1993).

Despite this Court's recognition of plaintiffs' prior failures to identify the products their infants were administered, plaintiffs' amended complaints in *McMillian* and *Tucker* again fail to identify *any* specific Abbott product they maintain caused their alleged injuries. To the contrary, in *McMillian*, plaintiffs allege that the infant was fed "EPF24," *see McMillian* Am. Compl. ¶¶ 14–15, and in *Tucker*, plaintiffs allege the infant was fed "Enfacare and Nutramigen," *see Tucker* Am. Compl. ¶ 13. Neither plaintiff alleges that Abbott manufactures these products, nor could they, because they are Mead Johnson's products—not Abbott's. It thus follows that Abbott cannot be liable for any of plaintiffs' alleged injuries in *McMillian* and *Tucker*. *See, e.g.*, *Cummins*, 495 A.2d at 968–69 (holding that the plaintiff's failure to identify the offending product was "a fatal deficiency to his" claims and that "the complaint [could] not adequately aver the requisite connection between the [defendants] and the defective product"); *Klein v. Council of Chem. Assocs.*, 587 F. Supp. 213, 221 (E.D. Pa. 1984) (dismissing strict liability claim where plaintiffs did not identify the specific product sold or distributed by the defendants that caused the plaintiffs' harm).

These plaintiffs' claims against Abbott are not saved by their allegations that Abbott and Mead Johnson are "jointly and severally" liable or that defendants somehow "acted in concert." *See id.* ¶ 44.[20] No Pennsylvania court has applied any such theory of alternative liability to excuse a product liability plaintiff from identifying the specific product they claim caused their alleged harm. *See, e.g.*, *Cummins*, 495 A.2d at 970 (affirming an order sustaining preliminary objections

---

[20] *See* Am. Compl. ¶ 39: *Gray*; Am. Compl. ¶ 40: *Hollingsworth*, *Kajuffa*, and *Tucker*; Am. Compl. ¶ 41: *Abdullah*, *Ross*, and *Sanders*; Am. Compl. ¶ 42: *Mays*, *Parker*, and *Wilkerson*; Am. Compl. ¶ 43: *Drayton*, *McMillian*, *Short*, and *Stills*; Am. Compl. ¶ 44: *Thomas* and *Wieger*; Am. Compl. ¶ 45: *Taylor* and *Williams*.

Case ID: 220302606
Control No.: 24081504

to a complaint that sought to allege a theory of enterprise liability premised on a bald averment that members of the tire and rim assembly industry collaborated in the "intentional manufacture, promotion and distribution of a generically similar defective device with the knowledge that a safer [] device was available"); *Skipworth by Williams v. Lead Indus. Ass'n, Inc*., 690 A.2d 169, 174–75 (Pa. 1997) (holding that plaintiffs failed to establish a concert of action where they were unable to identify the manufacturer of the lead pigment that caused alleged injuries). And product manufacturers cannot be held jointly and severally liable as a matter of law "where the factual background underlying each defendant's liability is different." *Bouchon v. Citizen Care, Inc.*, 176 A.3d 244, 258 (Pa. Super. Ct. 2017). Abbott and Mead Johnson manufacture different products, at different locations, with different manufacturing processes, different ingredients, different formulations, and different marketing practices. Accordingly, plaintiffs have no basis for asserting joint and several liability. *See Cummins*, 495 A.2d at 972 (preliminary objections properly sustained as to complaint seeking to impose industry-wide liability where plaintiffs failed to allege that manufacturers placed fungible products with "identical" qualities on the market).

Because the plaintiffs in *McMillian* and *Tucker* fail to identify a specific Abbott product that allegedly caused their injuries, all claims against Abbott in those cases should be dismissed.

## CONCLUSION

Plaintiffs have been given multiple opportunities to cure the deficiencies in their pleadings and have repeatedly failed to do so. For the foregoing reasons, as well as those identified in Abbott's prior briefing on these issues, Abbott's preliminary objections to plaintiffs' amended complaints should be sustained, and plaintiffs' claims against Abbott should be dismissed without further leave to amend.

Case ID: 220302606
Control No.: 24081504

Dated: August 6, 2024                          Respectfully Submitted:


/s/ Sean P. Fahey                              /s/ Joseph E. O'Neil
Sean P. Fahey (PA Bar No. 73305)               Joseph E. O'Neil (PA Bar No. 29053)
**TROUTMAN PEPPER HAMILTON**                   Ryan J. O'Neil (PA Bar No. 314034)
**SANDERS LLP**                                **CAMPBELL CONROY & O'NEIL, P.C.**
3000 Two Logan Square                          1205 Westlakes Drive, Suite 330
Philadelphia, PA 19103                         Berwyn, PA 19312
215.981.4296                                   610.964.6388
Sean.Fahey@troutman.com                        JONeil@campbell-trial-lawyers.com
                                               RONeil@campbell-trial-lawyers.com


/s/ Ronni E. Fuchs                             /s/ Marques Hillman Richeson
Ronni E. Fuchs (PA Bar No. 65561)              Marques Hillman Richeson (admitted *pro hac*
**TROUTMAN PEPPER HAMILTON**                   *vice*)
**SANDERS LLP**                                **JONES DAY**
301 Carnegie Center, Suite 400                 901 Lakeside Avenue
Princeton, NJ 08540                            Cleveland, OH 44114
609.951.4183                                   216.586.7195
Ronni.Fuchs@troutman.com                       mhricheson@jonesday.com

                                               *Attorneys for Defendant Abbott Laboratories*

20

Case ID: 220302606
Control No.: 24081504

## **CERTIFICATE OF SERVICE**

I hereby certify that I will serve a true and correct copy of the foregoing in accordance with Pa. R. Civ. P. 440 on all parties not served electronically. All other parties will be electronically served by the court in accordance with Pa. R. Civ. P. 205.4(g).


Dated: August 6, 2024

*/s/ Ronni E. Fuchs*
Ronni E. Fuchs

### CERTIFICATE OF COMPLIANCE

I, Ronni E. Fuchs, hereby certify that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts, that require filing confidential information and documents differently than non-confidential information and documents.

/s/ Ronni E. Fuchs
Ronni E. Fuchs