# EXHIBIT 1

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO.:  CACE-23-020810

TIANA ENNIX, on her own behalf
and as representative of the estate of
IYIANA JOY MCLEOD, Deceased

       Plaintiff

vs.

PLANTATION GENERAL HOSPITAL,
L.P., HCA HEALTHCARE, INC., and
ABBOTT LABORATORIES

       Defendants.

_____/

## MOTION FOR LEAVE TO AMEND COMPLAINT

Plaintiff, TIANA ENNIX, on her own behalf and as representative of the estate of IYIANA JOY MCLEOD, deceased ("**Plaintiff**"), pursuant to Florida Rule of Civil Procedure 1.190(a), moves this Court for leave to amend her complaint to reassert claims against Plantation General Hospital, L.P., and HCA Healthcare, Inc. (together the "Hospital Defendants") for negligence. In support thereof, Plaintiff states as follows:

## BACKGROUND

On November 7, 2023, Plaintiff filed a seven (7) count Complaint against the Hospital Defendants and Abbott Laboratories ("Abbott").  Count I asserted claims against Abbott and the Hospital Defendants for violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") and Counts II-VII asserted claims against Abbott for strict liability design defect, strict liability failure to warn, negligence, intentional misrepresentation, negligent

misrepresentation, constructive fraud, and violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Both Abbott and the Hospital Defendants moved to dismiss the FDUTPA claims on the grounds they were claims for "personal injury or death." On May 8, 2024, the Court entered an order dismissing the FDUTPA claims against Abbott and the Hospital Defendants.

On May 31, 2024, Plaintiff filed an Amended Complaint against Abbott and the Hospital Defendants.[1] The Amended Complaint added claims against the Hospital Defendants for corporate negligence and violation of Fla. Stat. § 766.110. These claims asserted that the Hospital Defendants breached their common law and statutory duties of care to Plaintiff by failing to implement policies and procedures that would have prevented the Hospital Defendants from facilitating Abbott's marketing scheme and granting Abbott's sales representatives unfettered access to the Hospital Defendants' medical staff.

The Hospital Defendants thereafter moved to dismiss Plaintiff's claims for corporate negligence and violation of Fla. Stat. § 766.110. On September 13, 2024, the Court granted the Hospital Defendants' motion and dismissed Plaintiff's claims against the Hospital Defendants without prejudice pending completion of the presuit notice process. **Exhibit 1**. Abbott subsequently removed this action to federal court on September 14, 2024. On October 10, 2024, District Judge Rodolfo A. Ruiz II entered an order noting that Abbott's removal was "nearly frivolous" and remanded this action to this Court. **Exhibit 2**. The ninety-day presuit period expired on October 30, 2024.

---

[1] Aside from dropping the FDUTPA claim, the Amended Complaint maintained all other claims against Abbott.

## ARGUMENT

Pursuant to Florida Rule of Civil Procedure 1.190(a), "[l]eave of court shall be given freely when justice so requires." "[T]he decision to grant leave to amend is within the discretion of the trial court, and any doubts are to be resolved in favor of the amendment." *Flagship Resort Dev. Corp. v. Interval Intern., Inc.*, 28 So. 3d 915, 921 (Fla. 3d DCA 2010); *Overnight Success Const., Inc. v. Pavarini Const. Co., Inc.*, 955 So. 2d 658, 659 (Fla. 3d DCA 2007) (same). Leave to amend "should not be denied unless the privilege is abused, the opposing party will be prejudiced, or amendment would be futile." *Gerber Trade Fin., Inc. v. Bayou Dock Seafood Co., Inc.*, 917 So. 2d 964, 968 (Fla. 3d DCA 2005).

Here, the privilege to amend has not been abused as this is Plaintiff's second request to amend the pleadings. *See Cousins Rest. Assocs. ex rel. Cousins Mgmt. Corp. v. TGI Friday's, Inc.*, 843 So. 2d 980, 982 (Fla. 4th DCA 2003) (finding "[t]his is not a case where the plaintiff filed repetitive motions for leave to amend and abused the privilege" where plaintiff sought leave to file third amended complaint to assert new causes of action); *Scott v. Trevett*, 751 So. 2d 616, 618 (Fla. 4th DCA 1999) ("We find that the plaintiffs' requested third amendment was not an abuse of the privilege."). Moreover, granting Plaintiff leave to amend will not prejudice either of the Defendants. Discovery is ongoing, there are no dispositive motions pending, and Plaintiff's Second Amended Complaint will reassert the Amended Complaint's claims against the Hospital Defendants. Indeed, when the Hospital Defendants briefed their Motion to Dismiss, the Hospital Defendants acknowledged that Plaintiff may reassert her claims against the Hospital Defendants upon completion of the statutory waiting period. *See* Hospital Defendants' Motion to Stay, **Exhibit 3**. Finally, Plaintiff's amendment would not be futile as Plaintiff's claims against the

Hospital Defendants are recognized causes of action, which the Court previously declined to dismiss on the merits.

Accordingly, because Plaintiff has not abused its privilege to amend the pleadings, Defendants will not be prejudiced, and amendment would not be futile, Plaintiff is entitled file a Second Amended Complaint to reassert her claims for negligence against the Hospital Defendants. Pursuant to Florida Rule of Civil Procedure 1.190(a), a copy of the proposed pleading is attached hereto as **Exhibit 4**.

WHEREFORE, Plaintiff respectfully requests that this Court enter an Order granting Plaintiff leave to file a Second Amended Complaint and grant such other and further relief that the Court deems just and proper.

DATED:  November 26, 2024                  Respectfully submitted,

**MARK MIGDAL & HAYDEN**
80 SW 8th Street, Suite 1999
Miami, Florida 33130

By: *s/ Josh Migdal*
Josh Migdal, Esq.
Florida Bar No. 19136
Ashley Saul, Esq.
Florida Bar No. 1025690
Charles M. Garabedian, Esq.
Florida Bar No. 1000974
Josh@markmigdal.com
Ashley@markmigdal.com
Charles@markmigdal.com
eservice@markmigdal.com

**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Telephone: (312) 280-5784

By: *s/ Ben Whiting*
Ben Whiting, Esq.
*Admitted Pro Hac Vice*
Ben.whiting@kellerpostman.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 26, 2024, a copy of the foregoing was electronically filed through the Florida Courts E-Filing Portal which will send electronic notification of the above filing to all registered users.

*s/ Josh Midgal*
Josh Migdal, Esq.

# EXHIBIT 1

**IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA**

CASE NO. <u>CACE23020810</u>   DIVISION: <u>26</u>   JUDGE: <u>Phillips, Carol-Lisa (26)</u>

**TIANA ENNIX**

Plaintiff(s) / Petitioner(s)

v.

**PLANTATION GENERAL HOSPITAL LP, et al**

Defendant(s) / Respondent(s)

_____/

**<u>ORDER ON DEFENDANTS PLANTATION GENERAL HOSPITAL, L.P. AND HCA
HEALTHCARE, INC.'S MOTION TO DISMISS</u>**

**The court having reviewed the motion, the amended complaint, the response, heard argument,
and considered the applicable case law, it is hereby Ordered as follows:**

**Granted, the court finds the allegations sound in medical malpractice and are subject to Fla. Stat.
766.106's pre-suit requirement. The defendants are dismissed without prejudice.**

**DONE AND ORDERED** in Chambers at Broward County, Florida on <u>13th day of September, 2024</u>.

<u>CACE23020810 09-13-2024 11:57 AM</u>
Hon. Carol-Lisa Phillips
**CIRCUIT COURT JUDGE**
Electronically Signed by Carol-Lisa Phillips

**Copies Furnished To:**
Anna Price Lazarus , E-mail : lashgoldberg@gmail.com
Anna Price Lazarus , E-mail : alazarus@lashgoldberg.com
Anna Price Lazarus , E-mail : djester@lashgoldberg.com
Ashley Saul , E-mail : eservice@markmigdal.com
Ashley Saul , E-mail : ashley@markmigdal.com
Ben Whiting , E-mail : ben.whiting@kellerpostman.com
Charles M. Garabedian Jr. , E-mail : charles@markmigdal.com
Edward M Carter , E-mail : emcarter@jonesday.com

Etan Mark , E-mail : etan@markmigdal.com
Jeremy Alan Weberman , E-mail : jweberman@lashgoldberg.com
Joshua A Migdal , E-mail : josh@markmigdal.com
Maia Aron , E-mail : maia@markmigdal.com
Mark Weinstein , E-mail : mark.weinstein@kellerpostman.com
Martin B. Goldberg , E-mail : rdiaz@lashgoldberg.com
Martin B. Goldberg , E-mail : mgoldberg@lashgoldberg.com
Michael E Strauch , E-mail : mstrauch@lashgoldberg.com
Michael E Strauch , E-mail : obencomo@lashgoldberg.com
Stephanie Peral , E-mail : stephanie@markmigdal.com

# EXHIBIT 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-cv-61702-RAR

TIANA ENNIX, *on her own behalf
and as representative of the estate of*
IYIANA JOY MCLEOD, *Deceased*,

      Plaintiff,

v.

ABBOTT LABORATORIES,

      Defendant.

_____/

## ORDER GRANTING PLAINTIFF'S MOTION TO REMAND

      **THIS CAUSE** comes before the Court upon Plaintiff's Motion to Remand, [ECF No. 9]

("Motion"), filed on September 17, 2024.  Having reviewed the Motion; Defendant's Response,

("Response"), [ECF No. 17]; Plaintiff's Reply, ("Reply"), [ECF No. 18]; and being otherwise fully

advised, it is hereby

      **ORDERED AND ADJUDGED** that the Motion is **GRANTED** as set forth herein.

## BACKGROUND

      Tianna Ennix brings this suit on her own behalf and on behalf of her deceased infant, Iyiana

Joy Mcleod.  Mot. at 9.  Iyiana was born prematurely in 2019 at a hospital owned and operated by

Plantation General Hospital, L.P. and HCA Healthcare, Inc ("Hospital Defendants") in Broward

County, Florida.  *Id.*  Iyiana was given a cow's milk infant nutrition product at the hospital,

developed a condition called necrotizing enterocolitis, and subsequently died at 30 days old.  *Id.*

      On November 7, 2023, Ennix filed a complaint in the Circuit Court of the Seventeenth

Judicial Circuit of Broward County, Florida.  *See* Notice of Removal at 1, [ECF No. 1].  Ennix

asserted claims against Abbott for strict liability design defect, strict liability, failure to warn,

negligence, intentional misrepresentation, negligent misrepresentation, constructive fraud, and violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").  *See* Mot. at 3; Ex. A, [ECF No. 9-1].  Ennix also asserted a FDUTPA claim against the Hospital Defendants.  *Id.*

The state court dismissed the FDUPTA claims, and on May 31, 2024, Ennix filed an amended complaint, which asserted claims for corporate negligence and violation of Fla. Stat. § 766.110 against the Hospital Defendants.  *See* Mot. at 4; Ex. B, [ECF No. 9-2].  The Hospital Defendants moved to dismiss the amended complaint, arguing that Ennix's claim sounded in medical malpractice, and as such, her failure to provide pre-suit notice under Florida law warranted dismissal.  *See* Mot. at 4–5.  The state court agreed, and on September 13, 2024, granted the motion to dismiss, explaining that: "[T]he court finds the allegations sound in medical malpractice and are subject to Fla. Stat. [§] 766.106's pre-suit requirement.  The defendants are dismissed without prejudice."  *See* [ECF No. 18-2].  Within twenty-four hours, Abbott—the sole remaining defendant—removed the action to federal court.  *See* Notice of Removal, [ECF No. 1].

## **LEGAL STANDARD**

A state court action may be removed to federal court when the federal courts have diversity or federal question jurisdiction.  *Henderson v. Wash. Nat'l Ins. Co.*, 454 F.3d 1278, 1281 (11th Cir. 2006) (citing 28 U.S.C. § 1441(a)).  The removing party "bears the burden of proving that this Court has federal jurisdiction" and "establishing compliance with removal statute requirements." *Moultrop v. GEICO Gen. Ins. Co.*, 858 F. Supp. 2d 1342, 1344 (S.D. Fla. 2012); *see also Beard v. Lehman Bros. Holdings, Inc.*, 458 F. Supp. 2d 1314, 1317–1318 (M.D. Ala. 2006) ("Where a plaintiff challenges the suitability of a defendant's removal petition, the burden of confirming that removal was proper falls upon the defendant . . . .").  Federal courts are directed to construe

removal statutes strictly, and accordingly, "all doubts about jurisdiction should be resolved in favor of remand to state court." *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 411 (11th Cir. 1999).

"When a case is removed based on diversity jurisdiction . . . the case must be remanded to state court if there is not complete diversity between the parties." *Stillwell v. Allstate Ins. Co.*, 663 F.3d 1329, 1332 (11th Cir. 2011). Moreover, "only a voluntary act by the plaintiff may convert a non-removable case into a removable one"—known as the voluntary-involuntary rule. *Pretka v. Kolter City Plaza II, Inc.*, 608 F.3d 744, 761 (11th Cir. 2010). The voluntary-involuntary rule states that "an initially non-removable case cannot be converted into a removable one by evidence of the defendant or by an order of the court." *Id.* (internal citations omitted). Ergo, a case which only achieves complete diversity between the parties by an action of the defendant or an order of the court is not removable. *See Insinga v. LaBella*, 845 F.2d 249, 252 (11th Cir. 1988) (explaining that "if the dismissal was the result of either the defendant's or the court's action against the wish of the plaintiff, the case could not be removed") (internal citations omitted).

There is an exception to the voluntary-involuntary rule: fraudulent joinder. "When a plaintiff names a non-diverse defendant solely in order to defeat federal diversity jurisdiction," the joinder is fraudulent. *Henderson*, 454 F.3d at 1281. "To establish fraudulent joinder, 'the removing party has the burden of proving [by clear and convincing evidence] that either: (1) there is no possibility the plaintiff can establish a cause of action against the resident defendant; or (2) the plaintiff has fraudulently pled jurisdictional facts to bring the resident defendant into state court.'" *Stillwell*, 663 F.3d at 1332 (quoting *Crowe v. Coleman*, 113 F.3d 1536, 1538 (11th Cir. 1997) (alterations in original)). This burden is "a heavy one" because the standard by which a district court reviews assertions of fraudulent joinder is "a lax one." *Id.* at 1332–33.

Specifically, "[t]his standard differs from the standard applicable to a 12(b)(6) motion to dismiss" because "[i]n making this determination, federal courts are not to weigh the merits of a

plaintiff's claim beyond determining whether it is an arguable one under state law." *Id.* at 1333. Accordingly, "[i]f there is *even a possibility* that a state court would find that the complaint states a cause of action against any one of the resident defendants, the federal court must find that the joinder was proper and remand the case to the state court." *Coker v. Amoco Oil Co.*, 709 F.2d 1433, 1440–41 (11th Cir. 1983), *superseded by statute on other grounds as stated in Georgetown Manor, Inc. v. Ethan Allen, Inc.*, 991 F.2d 1533, 1539–40 (11th Cir. 1993) (emphasis added). However, "when a plaintiff names a non-diverse defendant solely to defeat federal diversity jurisdiction, the district court must ignore the presence of the non-diverse defendant and deny any motion to remand the case to state court." *Kimball v. Better Bus. Bureau of W. Fla.*, 613 F. App'x 821, 823 (11th Cir. 2015).

With these factors in mind, the Court must determine whether it has jurisdiction over Plaintiff's claims.

## ANALYSIS

In her Motion, Ennix asserts removal was improper because it violates the voluntary-involuntary rule given that the action only became removable when the state court dismissed the Hospital Defendants without prejudice. Mot. at 5–9. Ennix further asserts that none of the exceptions to the voluntary-involuntary rule apply and that Abbott's removal is solely to cause delay, which Ennix argues should warrant an award of attorney's fees and costs. Mot. at 9–13. Abbott counters that removal was not improper because joinder of the Hospital Defendants was fraudulent, and rather than cause delay, Abbott merely seeks to bring this action to the Northern District of Illinois for coordinated proceedings in an ongoing MDL—as such, it was not objectively unreasonable to remove the action and an award of attorney's fees is therefore unwarranted. *See generally* Resp. In reply, Ennix maintains the voluntary-involuntary rule precludes removal,

asserts there was no fraudulent joinder, maintains that Abbott's removal is untimely,[1] and expands on her request for an award of attorney's fees and costs.  *See generally* Reply.

As an initial matter, it is undisputed that the voluntary-involuntary rule applies to this action because the state court's order dismissing the Hospital Defendants resulted in complete diversity. Accordingly, the instant dispute is whether the rule requires remand—or whether the joinder was fraudulent such that removal is appropriate.

### I.  Fraudulent Joinder

The Eleventh Circuit has made clear that the standard under which a district court reviews an assertion of fraudulent joinder is not stringent, *see Stillwell*, 663 F.3d at 1333–34, and the burden on defendants to make such an assertion plausible is a heavy one, *see id.* at 1332–33.  Fraudulent joinder can be established by asserting either: that there is no possibility that the claim against the resident defendant established a cause of action, or that the plaintiff fraudulently pled jurisdictional facts.  *See Crowe*, 113 F.3d at 1538.  But "[w]here a plaintiff states even a colorable claim against the resident defendant, joinder is proper and the case should be remanded to state court."  *Pacheco de Perez v. AT & T Co.*, 139 F.3d 1368, 1380 (11th Cir. 1998).  So, "if there is any possibility that the state law might impose liability on a resident defendant under the circumstances alleged in the complaint, the federal court cannot find that joinder of the resident defendant was fraudulent, and remand is necessary."  *Florence v. Crescent Res., LLC*, 484 F.3d 1293, 1299 (11th Cir. 2007).

Here, Abbott primarily relies on the fact that the state court has dismissed both of Ennix's operative complaints in asserting that there was no possible cause of action pled.  *See* Resp. at 6–7.  There is no allegation that Ennix fraudulently pled jurisdictional facts.  Abbott argues that the

---

[1]  Because Ennix does not meaningfully raise an argument about the timeliness of removal in her opening Motion for Remand, this argument is waived and is not properly before this Court.  *See United States v. Oakley*, 744 F.2d 1553, 1556 (11th Cir. 1984) ("Arguments raised for the first time in a reply brief are not properly before the reviewing court."); *In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived.").

state court's disposition on each of those motions to dismiss is dispositive on the issue of fraudulent joinder. *Id.* at 5–6. This argument is unavailing—and nearly frivolous—for several reasons.

Starting with the second motion to dismiss, Abbott states that "the state court definitively concluded that plaintiff twice failed to state a cause of action against the Hospital Defendants." *Id.* at 6. This assertion, at least as to the second motion to dismiss, is patently false. The state court said "the court finds the allegations sound in medical malpractice and are subject to Fla. Stat. [§] 766.106's pre-suit requirement. The defendants are dismissed without prejudice." *See* [ECF No. 18-2]. The state court did not say that Ennix failed to state a claim or that it was "meritless" as Abbott claims it did; indeed, the court did not definitively conclude anything—except that Ennix failed to provide pre-suit notice. *See* Resp. at 7. That is a procedural requirement, not a substantive one, and to claim that the state court concluded anything *at all* about the merits beggars belief.

Second, Abbott's representations about the law are misguided and incomplete. Abbott relies on a non-binding case from 1989 that posits a two-prong system of review for assessing claims of fraudulent joinder that is deferential to state courts. Resp. at 5–6; *see also Katz v. Costa Armatori, S.p.A.*, 718 F. Supp. 1508 (S.D. Fla. 1989). Such reliance would be all well and good, if courts had ceased to create caselaw the year Taylor Swift was born. But unfortunately for Abbott, that did not happen. One court in particular—the Eleventh Circuit—whose rulings notably bind this Court, has ruled on issues related to fraudulent joinder. *See Stillwell*, 663 F.3d at 1332–35. Abbott cites to two Eleventh Circuit cases but fails to apply them in any way in asserting that removal was proper.

Moreover, Abbott's application of *Katz* is misleading. *Katz* does set out a two-prong system that begins in the first prong with the mechanics of Rule 12(b)(6) and a review of the complaint under state law. *Katz*, 718 F. Supp. at 1515. Abbott relies on the *Katz* court's statement that "If the state court has *denied* a motion to dismiss because the complaint stated a cause of

action, and that state's law is controlling, the federal court, out of deference to the state court, should consider the state court ruling as satisfying this first prong," to state boldly that a state court's *grant* of a motion to dismiss dispositively answers whether a claim had merit. *Id.*; *see also* Resp. at 6. Even if a grant of a motion to dismiss on substantive grounds dispositively proved fraudulent joinder (it does not), it would be quite difficult to imagine how it could be dispositive on a dismissal without prejudice based on a procedural error, as is the case here. *See, e.g.*, *Triggs v. John Crump Toyota, Inc.*, 154 F.3d 1284, 1287 (11th Cir. 1998) ("The plaintiff need not have a winning case against the allegedly fraudulent defendant; he need only have a *possibility* of stating a valid cause of action in order for the joinder to be legitimate.").

Even more, Abbott merely mentions the second prong—which states that "the court must determine whether the plaintiff's attorney has satisfied the 'continuing duty' obligation of not maintaining a frivolous suit"—without applying it. *Katz,* 718 F. Supp. at 1515; *see also* Resp. at 6. There is no discussion of the continuing duty obligation. Instead, Abbott conclusorily states that a review of the record and the two dismissals "confirms that plaintiff's claims against those Defendants have always been frivolous"—a broad and unsupported assertion. Resp. at 6.

Abbott also attempts to shift the burden to Ennix to prove the joinder was not fraudulent: "She does not even attempt to argue that she currently has a viable claim against the Hospital Defendants in light of her failure to provide the presuit notice required under Florida law." Resp. at 7. Abbott feels this failure on Ennix's part should be dispositive, having seemingly forgotten that Abbott is the one that bears the burden of proving *both* that removal is proper *and* that the voluntary-involuntary rule does not apply because of fraudulent joinder. *See Stillwell*, 663 F.3d at 1332–35. Ennix does not bear the burden. *See, e.g.*, *Ullah v. BAC Home Loans Servicing LP*, 538 F. App'x 844, 846 (11th Cir. 2013) ("The standard for evaluating whether the plaintiff can establish a cause of action against the resident defendant is *very lenient*: 'federal courts are not to weigh the

merits of a plaintiff's claim beyond determining whether it is an arguable one under state law.'") (citing *Stillwell*, 663 F.3d at 1333).

Lastly, "[i]n determining whether a possibility exists that the plaintiff could state a claim against the resident defendant, [the Court] look[s] 'to the pleading standards applicable in state court, not the plausibility pleading standards prevailing in federal court.'" *Hunt v. Nationstar Mortg., LLC*, 684 F. App'x 938, 942 (11th Cir. 2017) (citing *Stillwell*, 663 F.3d at 1334). And "[u]nder Florida's pleading standards, Plaintiffs merely had 'to state a case showing a legal liability.'" *SFM Holdings, Ltd. v. Fisher*, 465 F. App'x 820, 821 (11th Cir. 2012) (quoting *Messana v. Maule Indus.*, 50 So. 2d 874, 876 (Fla. 1951)). Here, Ennix could achieve that by "alleging the requisite elements of a cause of action and pleading factual matter sufficient to apprise Plaintiffs' adversary of what the adversary is called upon to answer." *Id.* (cleaned up).

In Florida, "[t]he elements of a medical malpractice action are: (1) a duty by the physician, (2) a breach of that duty, and (3) causation." *Saunders v. Dickens*, 151 So. 3d 434, 441 (Fla. 2014). Notably, Abbott does not even mention the elements of medical malpractice under Florida law in its brief. However, Ennix fills that gap and explains in her Reply that in the amended complaint she alleges that:

> (1) the Hospital Defendants owed Plaintiff's daughter a duty of care; (2) the Hospital Defendants breached that duty by failing to implement policies and procedures that would have prevented the Hospital Defendants from facilitating Abbott's marketing scheme to foist its products on unsuspecting parents; and (3) the Hospital Defendants' breach of their duty caused Plaintiff's daughter to be exposed to Abbott's products, develop NEC, and pass away at thirty days old.

Reply at 6–7. Having reviewed this set of allegations—without assessing the merits as federal courts at this stage must—"[i]t is [] more than possible that a Florida state court would have concluded that Plaintiffs stated a cause of action." *SFM Holdings, Ltd.*, 465 F. App'x at 821; *see*

*also Crowe*, 113 F.3d at 1538 ("[F]ederal courts are not to weigh the merits of a plaintiff's claim beyond determining whether it is an arguable one under state law.").

In sum, Abbott has not met its burden of proving that removal is proper or that Ennix's joinder was fraudulent. At no point does Abbott explain how Ennix's medical malpractice claim against the Hospital Defendants could not plausibly state a valid cause of action. *Cf., e.g.*, *Illoominate Media, Inc. v. CAIR Fla., Inc.*, 841 F. App'x 132, 135 (11th Cir. 2020) (explaining that "[t]he defendants, for their part, provided several sworn statements to buttress their claims that CAIR-Florida was fraudulently joined" to meet their burden of proving fraudulent joinder). Instead, Abbott primarily asserts that a procedural error creates a meritless claim. Resp. at 6–7. And although Abbott posits that it had "identified *three* other independent bases for dismissal" before the state court, *id*. at 7, Abbott fails to explain what those arguments are or why it is inevitable that Ennix's claims against the Hospital Defendants will be dismissed once the pre-suit notice requirement is satisfied under Florida law. Accordingly, because "defendants failed to show that the plaintiffs cannot state an arguable cause of action against the resident defendants," this Court "cannot say that the [Hospital] [D]efendants were fraudulently joined." *Pacheco de Perez*, 139 F.3d at 1381.

## II. Attorneys' Fees and Costs

Ennix requests attorneys' fees and costs associated with Abbott's removal. Mot. at 13. The federal removal statute, 28 U.S.C. § 1447(c), provides that "[a]n order remanding the case may require payment of just costs and any actual expenses including attorney fees, incurred as a result of the removal." Awarding attorneys' fees and costs is a matter of discretion and dependent on whether the removing party "lacked an objectively reasonable basis for seeking removal." *See Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 139 (2005). Here, though there are certainly issues with Abbott's removal of this action, it was not objectively unreasonable to do so. *Compare*

*Imperial Fund I, LLC v. Orukotan*, No. 21- 60162, 2021 WL 752577 (S.D. Fla. Feb. 25, 2021) (granting fees where every argument ran afoul of clearly established precedent) *with 2550 Retail LLC v. Mt. Hawley Ins. Co.*, No. 23- 22701, 2023 WL 11879557 (S.D. Fla. Oct. 18, 2023) (denying request for attorney's fees and remanding where no fraudulent joinder was found). Accordingly, the request for attorneys' fees and costs is **DENIED**.

## <u>CONCLUSION</u>

Based upon the foregoing, it is hereby **ORDERED AND ADJUDGED** that Plaintiff's Motion to Remand, [ECF No. 9], is **GRANTED**. This case is hereby **REMANDED** to the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida. Plaintiff's accompanying Motion for Attorneys' Fees and Costs is **DENIED**. The Clerk of Court is **DIRECTED** to forward a copy of this Order to the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida. The Clerk of Court is directed to **CLOSE** this case. All pending motions are **DENIED AS MOOT**.

**DONE AND ORDERED** in Miami, Florida this 10th day of October, 2024.

_____

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**

# EXHIBIT 3

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

COMPLEX LITIGATION DIVISION

CASE NO. CACE-23-020810

TIANA ENNIX, on her own behalf
and as representative of the estate of
IYIANA JOY MCLEOD, Deceased,

     Plaintiff,

v.

PLANTATION GENERAL HOSPITAL,
L.P., HCA HEALTHCARE, INC., and
ABBOTT LABORATORIES,

     Defendants.

_____/

**PLANTATION GENERAL HOSPITAL, L.P. AND HCA
HEALTHCARE, INC.'S MOTION TO STAY DISCOVERY BASED
<u>UPON PLAINTIFF'S VIOLATION OF FLORIDA STATUTES § 766.106</u>**

Defendants, Plantation General Hospital, L.P. ("PGH") and HCA Healthcare, Inc.

("HCA") (collectively "Defendants"), move for the entry of an order temporarily staying discovery

based upon Plaintiff's violation of Florida Statutes § 766.106 during the pendency of Defendants'

Motion to Dismiss Amended Complaint and during the 90-day safe harbor period required under

§ 766.106, for the following reasons.

## I.    <u>INTRODUCTION</u>

1.    Medical negligence claims require pre-suit notice and observance of a 90-day safe

harbor period before a lawsuit can be filed. *See* Fla. Stat. § 766.106 ("**<u>[B]efore filing a complaint

for medical negligence</u>**, a claimant **<u>shall notify</u>** each prospective defendant of the intent to initiate

1


LASHGOLDBERG.COM

MIAMI  100 SE 2nd St., Ste.1200 • Miami, FL, 33131• Tel: 305.347.4040 • Fax: 305.347.4050
FT. LAUDERDALE  2500 Weston Rd., Ste. 220 • Weston, FL, 33331 • Tel: 954.384.2500 • Fax: 954.384 2510
TAMPA 142 West Platt St., Ste.118 • Tampa, FL, 33606 • Tel: 813.284.4002

litigation….") and ("A suit **may not be filed** for a period of 90 days after notice is delivered to any prospective defendants."). Compliance with these requirements is a mandatory condition precedent to filing suit. *See Kukral v. Mekras*, 679 So. 2d 278, 2283 (Fla. 1996).

2.  Plaintiff filed medical negligence claims against Defendants (Counts I and II of the Amended Complaint) and has since demanded discovery from Defendants without serving the mandatory pre-suit notice or observing the 90-day safe harbor period. Those actions are straightforward violations of § 766.106. Defendants moved to dismiss the medical negligence claims based upon Plaintiff's violations of § 766.106 and for other reasons ("Motion to Dismiss").

3.  After Defendants filed the Motion to Dismiss, Plaintiff served a purported pre-suit notice pursuant to § 766.106 ("Notice Letter"). However, § 766.106 clearly precludes the filing of the claims against Defendants for lack of pre-suit notice and failure to observe the 90-day safe harbor period. The statute also necessarily prohibits Plaintiff from seeking discovery through their improvidently filed lawsuit.

4.  On account of Plaintiff's failure to comply with the mandatory conditions precedent in § 766.106 and subsequent Notice Letter pursuant to § 766.106, Defendants seek a temporary stay of discovery during the pendency of the Motion to Dismiss (presently scheduled for hearing on August 29, 2024) and, in the event the claims against Defendants are not dismissed, during the mandatory 90-day safe harbor period under § 766.106.

## II.    BACKGROUND

5.  Plaintiff initiated this action on November 7, 2023. In Count I of Plaintiff's original Complaint, she asserted a cause of action against HCA, PGH, and Defendant Abbott Laboratories ("Abbott"), for alleged violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq.* As is explained in Defendants' Motion to Dismiss,


LASHGOLDBERG.COM

MIAMI  100 SE 2nd St., Ste.1200 • Miami, FL, 33131• Tel: 305.347.4040 • Fax: 305.347.4050
FT. LAUDERDALE  2500 Weston Rd., Ste. 220 • Weston, FL, 33331 • Tel: 954.384.2500 • Fax: 954.384 2510
TAMPA  142 West Platt St., Ste.118 • Tampa, FL, 33606 • Tel: 813.284.4002

Plaintiff's inclusion of Defendants in this lawsuit is a gimmick to avoid removal and transfer of the case to a pending multi-district litigation in Illinois federal court.

6.      PGH and HCA filed a motion to dismiss the FDUTPA claim ("Original Motion to Dismiss"), in part, because the claim was impermissibly premised on personal injury and death, which Fla. Stat. § 501.212(3) *expressly precludes*. Abbott filed a Motion to Dismiss asserting the same argument.

7.      While the Original Motion to Dismiss was pending, Plaintiff served her First Set of Requests for Production and First Set of Interrogatories on PGH ("Written Discovery") on March 26, 2024.

8.      Prior to PGH's deadline to respond to the Written Discovery, the Court entered an order on May 8, 2024 granting the Original Motion to Dismiss ("Dismissal Order"). The Dismissal Order held that the FDUTPA claim was impermissibly based on personal injury and death. Thus, PGH and HCA were dismissed from the case entirely.

9.      In a clear effort at perpetuating the gimmick of avoiding removal to federal court (by keeping non-diverse defendants in the case), Plaintiff filed a motion for leave to amend the Complaint in order to assert two new claims against PGH and HCA based on medical negligence: (i) a common law corporate medical negligence claim (Count I); and (ii) statutory medical negligence under Fla. Stat. § 766.110 (Count II).

10.     The Court granted leave on June 6, 2024, and entered an order stating that "PGH shall serve its written responses to [the Written Discovery] within 30 days from the date of this order absent an extension by agreement or court order." Following an agreed extension between the parties, PGH timely served its responses to the Written Discovery on July 19, 2024.

LashGoldberg
LASHGOLDBERG.COM

MIAMI  100 SE 2nd St., Ste.1200 • Miami, FL, 33131• Tel: 305.347.4040 • Fax: 305.347.4050
FT. LAUDERDALE  2500 Weston Rd., Ste. 220 • Weston, FL, 33331 • Tel: 954.384.2500 • Fax: 954.384.2510
TAMPA 142 West Platt St., Ste.118 • Tampa, FL, 33606 • Tel: 813.284.4002

11. PGH and HCA filed their Motion to Dismiss the Amended Complaint on July 1, 2024, where they argued, in relevant part, that because Plaintiff's claims are premised on medical negligence, Plaintiff was required to provide PGH and HCA with pre-suit notice of her claims under Fla. Stat. § 766.106, and because such notice is a condition precedent to maintaining a medical negligence claim, Plaintiff's failure to do so necessitates dismissal of her claims against PGH and HCA. The Motion to Dismiss is set for hearing on August 29, 2024.

12. On August 1, 2024, Plaintiff served PGH and HCA with its purported "pre-suit" notice. A copy of the Notice Letter is attached as **Exhibit 1**. In the letter, Plaintiff explained that "this letter is being written pursuant to the provision of Section 766.106, Florida Statutes, and should be considered formal notice of intent to initiate claims for medical malpractice[.]" Moreover, Plaintiff acknowledged that the letter initiated a "screening period," pursuant to Fla. Stat. § 766.106. Notably, Plaintiff also proposed staying its medical malpractice claim "pursuant to Florida Chapter 766 until the statutory notice period has expired."

### III. <u>LEGAL DISCUSSION</u>

13. The Court should impose a temporary stay of discovery as to PGH and HCA until the Motion to Dismiss—which raises Plaintiff's failure to comply with the mandatory conditions precedent in § 766.106—is decided. In the event the case is somehow not dismissed based on the non-compliance, Defendants must be afforded the 90-day safe harbor period required under § 766.106, which would preclude, among other things, ongoing discovery efforts by Plaintiff.

14. Fla. Stat. § 766.106 unambiguously requires *pre-suit* notice and a 90-day safe harbor period to evaluate potential claims. Although PGH and HCA in no way concede that

LashGoldberg
LASHGOLDBERG.COM

MIAMI 100 SE 2nd St., Ste.1200 • Miami, FL, 33131• Tel: 305.347.4040 • Fax: 305.347.4050
FT. LAUDERDALE 2500 Weston Rd., Ste. 220 • Weston, FL, 33331 • Tel: 954.384.2500 • Fax: 954.384 2510
TAMPA 142 West Platt St., Ste.118 • Tampa, FL, 33606 • Tel: 813.284.4002

Plaintiff's letter satisfies Section 766.106's notice requirement, or waive the right to contest this later, Plaintiff's purported notice under the statute requires that this case be stayed.[1]

15.     To permit discovery to proceed in this case, while PGH and HCA engage in the independent investigation provided for in Section 766.106, would vitiate the statute's purpose.

16.     This is true despite Plaintiff having served its notice only for Count II. Plaintiff's aim in doing so is transparent: she seeks to have two parallel discovery tracks proceeding simultaneously, one under Section 766.106 and the other proceeding under the Florida Rules of Civil Procedure in this case. Never mind the fact that these parallel discovery tracks would be dealing with the same subject matter, factual background, and evidence.[2] Plaintiff seeks to have her cake and eat it too.

17.     This approach, however, is simply irreconcilable with the statutory aims set forth in Fla. Stat. § 766.106. Plaintiff's failure to follow the *pre-suit* notice requirements *prior* to initiating her lawsuit against HCA and PGH does not entitle her to simply bypass this requirement now that her suit has been filed.

18.     Moreover, PGH and HCA would be greatly prejudiced if discovery were to proceed in this matter. First, this would deprive PGH and HCA of their statutory right to independently vet Plaintiff's claims prior to litigation. Second, PGH and HCA would be forced to simultaneously

---

[1] To be clear, Plaintiff's letter is insufficient notice under the statute because it was served well-outside the applicable statutory period (repose and limitations). So, this letter does nothing to change the fact that Plaintiff's claims should be dismissed with prejudice, and therefore, there is no legal basis for discovery in this case.

[2] As noted in the Motion to Dismiss the Amended Complaint, both Count I and Count II are substantively identical, and Plaintiff's attempt to treat them differently is little more than gamesmanship.



LashGoldberg
LASHGOLDBERG.COM

MIAMI  100 SE 2nd St., Ste.1200 • Miami, FL, 33131• Tel: 305.347.4040 • Fax: 305.347.4050
FT. LAUDERDALE  2500 Weston Rd., Ste. 220 • Weston, FL, 33331 • Tel: 954.384.2500 • Fax: 954.384 2510
TAMPA  142 West Platt St., Ste.118 • Tampa, FL, 33606 • Tel: 813.284.4002

engage in two separate discovery tracks addressing the same allegations and subject matter, which would force the parties to expend substantial time and resources, and incur significant legal costs.

19.     Consequently, a stay of all discovery involving PGH and HCA is appropriate here until this Court rules on the Motion to Dismiss the Amended Complaint (which is likely to dispose of all of the claims against PGH and HCA) or until the 90-day safe harbor period expires.

20.     Additionally, PGH and HCA still strongly contend that Plaintiff's claims are set to be dismissed with prejudice for the reasons set forth in the Motion to Dismiss the Amended Complaint, including that Plaintiff's claims were filed well-outside the applicable repose and limitations periods. *See Cohen v. W. Boca Med. Ctr., Inc.*, 854 So. 2d 276, 278 (Fla. 4th DCA 200) (finding that failure to satisfy pre-suit requirements within the applicable statutory period results in dismissal with prejudice).

21.     Moreover, even if this Court were to find the letter constitutes sufficient notice under the statute (it does not as a matter of law), the case law is clear that the true appropriate remedy is for the complaint to be dismissed with leave to refile upon completion of the necessary pre-suit requirements. *See Hosp. Corp. of Am. V. Lindberg*, 571 So. 3d 446, 449 (Fla. 1990) (explaining that where the pre-suit notice is served once a complaint has already been filed, "the complaint is subject to dismissal" but the plaintiff may be given leave to amend); *Brown v. Prison Health Servs., Inc.*, 2007 WL 3340452, at *2 (M.D. Fla. Nov. 9, 2007) (dismissing case without prejudice for failure to comply with pre-suit notice requirement with leave to refile upon satisfaction of statutory requirements).

22.     At a minimum, however, a stay of all discovery related to PGH and HCA is required under Fla. Stat. § 766.106 to allow PGH and HCA engage in the statutorily mandated screening period.


LashGoldberg
LASHGOLDBERG.COM

MIAMI  100 SE 2nd St., Ste.1200 • Miami, FL, 33131• Tel: 305.347.4040 • Fax: 305.347.4050
FT. LAUDERDALE  2500 Weston Rd., Ste. 220 • Weston, FL, 33331 • Tel: 954.384.2500 • Fax: 954.384.2510
TAMPA 142 West Platt St., Ste.118 • Tampa, FL, 33606 • Tel: 813.284.4002

23.     Further, not only is a stay mandated here under Fla. Stat. § 766.106, but is appropriate under the Court's inherent authority to manage its own docket. This Court has broad discretion to manage and control its own docket. *See Fasig v. Fasig*, 830 So. 2d 839, 841 (Fla. 2d DCA 2002); *see also Villella v. Ansin*, 263 So. 3d 823, 825 (Fla. 3d DCA 2019) (noting the "[t]he trial court has broad discretion to determine the scope of allowable discovery in a civil proceeding.") (citation omitted). This includes the right to stay a case pending a dispositive motion. *Bank of Am., N.A. v. De Morales*, 314 So. 3d 528, 531 (Fla. 3d DCA 2020) (collecting cases that have found that a motion to stay is appropriate if the motion to stay is predicated upon a motion that will fully dispose of a case).

24.     Courts often stay proceedings and discovery until a case dispositive motion is resolved or until a valid operable complaint exists in the litigation. *See, e.g., Carrow v. The Fla. Bar*, 848 So. 2d 1283, 1285 (Fla. 2d DCA 2003) (noting that the trial court stayed discovery until a valid complaint existed, and, if such a complaint ever did come to be, the stay of discovery would be lifted); *see also Elsner v. E-Commerce Coffee Club*, 126 So. 3d 1261, 1264 (Fla. 4th DCA 2013) (stating that the defendants could seek a stay of discovery in the trial court pending a motion to dismiss). As such, this Court has authority to stay this case, and it is particularly appropriate here, where a meritorious motion to dismiss is pending.[3]

---

[3] Federal courts, which frequently review motions to stay pending a dispositive motion, routinely grant those motions for purposes of judicial economy and to relieve parties of the expense of litigating a case likely to be dismissed. "[C]ourts have held good cause to stay discovery exists wherein resolution of a preliminary motion may dispose of the entire action." *Nankivil v. Lockheed Martin Corp.*, 216 F.R.D. 689, 692 (M.D. Fla. 2003), aff'd, 87 F. App'x 713 (11th Cir. 2003) (citations omitted) (internal quotation marks omitted). Allowing a case to proceed through the pretrial processes with an invalid claim that increases the costs of the case does nothing but waste the resources of the litigants in the action before the Court, delay resolution of disputes between other litigants, squander scarce judicial resources, and damage the integrity and the public's perception of the federal judicial system. *See Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1368 (11th Cir. 1997) (citations omitted).

7

LashGoldberg
LASHGOLDBERG.COM

MIAMI 100 SE 2nd St., Ste.1200 • Miami, FL, 33131• Tel: 305.347.4040 • Fax: 305.347.4050
FT. LAUDERDALE 2500 Weston Rd., Ste. 220 • Weston, FL, 33331 • Tel: 954.384 2500 • Fax: 954.384 2510
TAMPA 142 West Platt St., Ste.118 • Tampa, FL, 33606 • Tel: 813.284.4002

25.     Here, not only is PGH's and HCA's Motion to Dismiss the Amended Complaint likely to dispose of all the claims against them, but requiring the two entities to engage in two parallel discovery tracks would be inefficient and a waste of the Court's and parties' time and resources.

WHEREFORE, Defendants Plantation General Hospital, L.P. and HCA Healthcare, Inc. respectfully request this Court stay discovery pending a ruling on Defendants' Motion to Dismiss the Amended Complaint or until the 90-day safe harbor period expires, and grant any other relief the Court deems just and proper.

Dated: August 15, 2024

Respectfully submitted,

**LASHGOLDBERG**
Lash Goldberg Fineberg LLP
Miami Tower, Suite 1200
100 S.E. Second Street
Miami, Florida 33131
Tel: (305) 347-4040
Fax: (305) 347-4050
*Attorneys for Defendants Plantation General
Hospital, L.P., and HCA Healthcare, Inc.*

By:  /s/ Michael E. Strauch
**MARTIN B. GOLDBERG**
Florida Bar No. 0827029
mgoldberg@lashgoldberg.com
rdiaz@lashgoldberg.com
**MICHAEL E. STRAUCH**
Florida Bar No. 13988
mstrauch@lashgoldberg.com
mvanhuss@lashgoldberg.com
**JEREMY A. WEBERMAN**
Florida Bar No. 1031755
jweberman@lashgoldberg.com
mwallace@lashgoldberg.com



MIAMI  100 SE 2nd St., Ste.1200 • Miami, FL, 33131• Tel: 305.347.4040 • Fax: 305.347.4050
FT. LAUDERDALE  2500 Weston Rd., Ste. 220 • Weston, FL, 33331 • Tel: 954.384.2500 • Fax: 954.384 2510
TAMPA 142 West Platt St., Ste.118 • Tampa, FL, 33606 • Tel: 813.284.4002

## CERTIFICATE OF SERVICE

I hereby certify that on August 15, 2024, the foregoing was served by email, by filing with the Florida E-filing Portal, on the Service List below.

By: */s/ Michael E. Strauch*

## SERVICE LIST

Joshua Migdal, Esq.
Ashley Saul, Esq.
Charles, Garabedian, Esq.
Maia Aron, Esq.
Etan Mark, Esq.
**Mark Migdal & Hayden**
80 SW 8th St., Ste. 1999
Miami, FL 33130
josh@markmigdal.com
maia@markmigdal.com
ashley@markmigdal.com
charles@markmigdal.com
etan@markmigdal.com
eservice@markmigdal.com
*Attorneys for Plaintiff*

Edward M. Carter, Esq.
**Jones Day**
325 John H. McConnell Boulevard
Suite 600
Columbus, OH 43215-2673
emcarter@jonesday.com
*Attorneys for Abbott Laboratories*

Ben Whiting, Esq.
Mark Weinstein, Esq.
**Keller Postman LLC**
150 N. Riverside Plaza
Ste. 4100
Chicago, IL 60606
ben.whiting@kellerpostman.com
mark.weinstein@kellerpostman.com
*Attorneys for Plaintiff*

NOT AN OFFICIAL COPY – PUBLIC ACCESS – NOT AN OFFICIAL COPY

LashGoldberg
LASHGOLDBERG.COM

MIAMI 100 SE 2nd St., Ste.1200 • Miami, FL, 33131• Tel: 305.347.4040 • Fax: 305.347.4050
FT. LAUDERDALE 2500 Weston Rd., Ste. 220 • Weston, FL, 33331 • Tel: 954.384 2500 • Fax: 954.384 2510
TAMPA 142 West Platt St., Ste.118 • Tampa, FL, 33606 • Tel: 813.284.4002

# EXHIBIT 1



**MM&H**

MARK MIGDAL & HAYDEN

August 1, 2024

<u>**SENT VIA USPS CERTIFIED MAIL**</u>
<u>**RETURN RECEIPT REQUESTED AND E-MAIL**</u>
Lash Goldberg
C/o Michael E. Strauch
100 Southeast 2nd Street, Suite 1200
Miami, FL 33131
*Mstrauch@lashgoldberg.com*

<u>**NOTICE OF CLAIM FOR MEDICAL MALPRACTICE**</u>
<u>**AGAINST PLANTATION GENERAL HOSPITAL L.P. AND HCA HEALTHCARE, INC.**</u>
<u>**PURSUANT TO FLORIDA STATUTE 766.106**</u>

RE:        **Claimant/Our Client:**    **Iyiana Mcleod**
               **Date of Birth:**
               **Social Security No.:**
               **Tribunal:**             **Broward County Circuit Court**
               **Date of Admission:**
               **Date of Death:**
               **Location:**             **Plantation General Hospital**
                                   **401 Northwest 42nd Avenue**
                                   **Plantation, FL 33317**

Dear Mr. Strauch:

      As you know, our firm represents the interests of Tiana Ennix, on her own behalf and as representative of the estate of Iyiana Joy Mcleod, deceased. Our client moved to amend the complaint and added a claim pursuant to Section 766.110, Florida Statutes, in the alternative to a claim for corporate negligence. The motion was granted on May 31, 2024. While we maintain our client's claims do not sound in medical malpractice, in the event the Court disagrees, this letter is being written pursuant to the provisions of Section 766.106, Florida Statutes, and should be considered formal notice of intent to initiate claims for medical malpractice against Plantation General Hospital, L.P. and HCA Healthcare, Inc. We propose staying Count II of the Amended Complaint pursuant to Florida Chapter 766 until the statutory notice period has expired.

      This claim arises out of the care received by Iyiana Joy Mcleod while she was under the care of Plantation General Hospital, L.P. and HCA Healthcare, Inc. Pursuant to Section 766.203, Florida Statutes, attached is the verified medical opinion of Dr. Joseph B. Cantey describing the specific acts of negligence that caused or contributed to Iyiana Joy Mcleod's death. Specifically, Plantation General Hospital, L.P. and HCA Healthcare, Inc., by and through their agents, servants and employees, deviated from the acceptable standard of care by (1) providing Iyiana Joy Mcleod cow's-based preterm formula products; (2) failing to inform Iyiana Joy Mcleod's caregivers of the risk posed to a child like Iyiana Joy Mcleod; (3) failing to have a policy or procedure related to the use of cow's based preterm formula products which prohibits the use of cow's based preterm formula for preterm infants like Iyiana Joy Mcleod; and (4) failing to have a policy or procedure

related to informing the caregivers of the risk posed by using cow's based preterm formula products for a child like Iyiana Joy Mcleod .

As a result of those acts of negligence, Iyiana Joy Mcleod suffered necrotizing enterocolitis which ultimately resulted in her death. We are also enclosing the curriculum vitae of Joseph B. Cantey and copies of all material reviewed as outlined in his affidavit.

If Plantation General Hospital, L.P. and HCA Healthcare, Inc. carry medical malpractice insurance that provides, or might provide, liability insurance coverage for these claims, please direct this letter immediately to its insurance company. Please consider this letter a demand, pursuant to Section 627.4137, Florida Statutes for a statement from the insurance carrier that provides the following information:

      a.      The name of each of Plantation General Hospital, L.P. and HCA Healthcare, Inc.'s insurers, including excess coverage;

      b.      The named insured on each policy which does or may provide coverage to Plantation General Hospital, L.P. and/or HCA Healthcare, Inc.;

      c.      The limits of liability coverage on each policy, including excess coverage;

      d.      A statement of any policy or coverage defenses which such insurer reasonably believes is available to such insurer at the time of filing such statement;

      e.      A copy of the policy or policies that provides coverage for Plantation General Hospital, L.P. and/or HCA Healthcare, Inc., including excess coverage.

Please consider this letter a formal request, pursuant to Florida Statutes §766.106(6) and §766.204(1), to produce the following items for inspection:

      1.      The complete chart of Plantation General Hospital, L.P. and HCA Healthcare, Inc., including, but not limited to, all medical records, billing records, correspondence, insurance forms, radiographic studies, recorded procedures and any other documents or materials in your possession or under your custody or control that pertains to Iyiana Joy Mcleod.

      2.      All documents and material, including surveillance video in the possession, custody or control of Plantation General Hospital, L.P. and HCA Healthcare, Inc. that pertain to Iyiana Joy Mcleod other than those produced in response to request #1. This includes, but is not limited to, all digital and handwritten records, notes, calendars, communications, instructions, education material, letters, documents, text messages, WhatsApp messages, social media messages and/or emails pertaining in any way to Iyiana Joy Mcleod in Plantation General Hospital, L.P. and HCA Healthcare, Inc.'s possession or control, including the possession or control of your employees, agents, and apparent agents, other than communications with counsel or insurance representatives. If

you do not produce documents responsive to this request because you contend they are privileged, please produce a privilege log describing each such document.

3.  All documents relating to the relationship between Plantation General Hospital, L.P. and HCA Healthcare, Inc. and its emergency physicians staffing the emergency and neonatal departments including but not limited to Dr. Roberto Puglisi, Dr. Laura Aviles-Medina, Dr. Marc Bedrin and any other entity or person that is authorized or pertained to the provision of health care services it rendered to Iyiana Joy Mcleod.

4.  Copies of all electronically stored information ("ESI") pertaining to Iyiana Joy Mcleod and identify the computer or other equipment where said information is currently stored. This request includes but is not necessarily limited to the audit trail.

5.  A list of all policies and procedures relating to the care and treatment of Iyiana Joy Mcleod that were in place at Plantation General Hospital, L.P. and HCA Healthcare, Inc. in 2019.

6.  All documents reflecting the identity of the entities which owned Plantation General Hospital, L.P. and HCA Healthcare, Inc. and/or were responsible for the provision of Plantation General Hospital, L.P. and HCA Healthcare, Inc.'s emergency department and neonatal services in July 2019, or a verified statement reflecting said ownership and the full legal name, address, and registered agent of Plantation General Hospital, L.P. and HCA Healthcare, Inc..

7.  All documents reflecting the full name of the entities responsible for the operation and administration of Plantation General Hospital, L.P. and HCA Healthcare, Inc. or the full legal name, address and registered agent of the entities that operated the hospital in July 2019.

8.  A complete copy of the medical staff by-laws of Plantation General Hospital, L.P. and HCA Healthcare, Inc. in effect in July 2019.

9.  Copies of all complaints or a list of all lawsuits filed against Plantation General Hospital, L.P. and HCA Healthcare, Inc. over the last five years that alleged negligent acts or omissions relative to the care and treatment of preterm infants.

10.  Copies of all advertising materials used by Plantation General Hospital, L.P. and HCA Healthcare, Inc. during the year 2019 relative to its emergency and neonatal departments, including but not limited to (1) advertising brochures, (2) advertisements in newspapers, magazines and other periodicals, (3) reduced copies of billboard displays and advertisements, (4) transcripts and audio recordings of radio advertisements, (5) videotape copies of television advertisement, and (6) web pages, home pages, web sites or other promotional material prepared for distribution over the Internet or through other on-line services.

11.  All records made or received in the course of business by Plantation General Hospital, L.P. and HCA Healthcare, Inc. pertaining to adverse medical incidents involving preterm infants. For purposes of this request, the identity of patients involved in the incidents shall not be disclosed and the names of the patients should be redacted from the records produced. The definition of "adverse medical incident" as used in this request is the same as that contained in

Article X, Section 25(c)(3) of the Florida Constitution, *i.e.,* medical negligence, intentional misconduct, and any other act, neglect, or default of a health care facility or health care provider that caused or could have caused injury to or death of a patient, including, but not limited to, those incidents that are required by state or federal law to be reported to any governmental agency or body, and incidents that are reported to or reviewed by any health care facility peer review, risk management, quality assurance, credentials, or similar committee, or any representative of any such committees.

      12.    All incident reports, or similar documents, pertaining to Necrotizing Enterocolitis in preterm infants.

      Pursuant to Sections 766.106(6) and 766.204(1), Florida Statutes please provide answers to the following inquiries:

      13.    Do Plantation General Hospital, L.P. and HCA Healthcare, Inc. contend that the actions or omissions of any person or entity caused or contributed to Iyiana Joy Mcleod's injuries? If so, state the full name and address of each such person or entity, the legal basis for your contention, the facts or evidence upon which Plantation General Hospital, L.P. and HCA Healthcare, Inc.'s contention is based, and whether or not Plantation General Hospital, L.P. and HCA Healthcare, Inc. has notified each such person or entity of its contention.

      14.    Do Plantation General Hospital, L.P. and HCA Healthcare, Inc. contend any person or entity is or may be liable in whole or part for Iyiana Joy Mcleod's injuries? If so, state the full name and address of each such person or entity, the legal basis for Plantation General Hospital, L.P. and HCA Healthcare, Inc.'s contention, the facts or evidence upon which Plantation General Hospital, L.P. and HCA Healthcare, Inc.'s contention is based and whether or not Plantation General Hospital, L.P. and HCA Healthcare, Inc. has notified each such person or entity of its contention.

      15.    Please provide the names and last known addresses of all physicians, nurses, and other health care professional who were employees or partners, agents, and/or apparent agents of Plantation General Hospital, L.P. and HCA Healthcare, Inc. who consulted or otherwise rendered any care to Iyiana Joy Mcleod during her admission beginning in July 2019. Include in your answer an identification of who the individuals were, who they were employed by and what role they played in the care, treatment or rendering of services to Iyiana Joy Mcleod.

      16.    List the names and addresses of all persons who are believed or known by Plantation General Hospital, L.P. and HCA Healthcare, Inc., its agents, apparent agents, or attorneys to have any knowledge concerning the care and treatment received by Iyiana Joy Mcleod in July 2019 while she was a patient of Plantation General Hospital, L.P. and HCA Healthcare, Inc. and specify the subject matter about which the witness has knowledge.

      17.    Has Plantation General Hospital, L.P. and HCA Healthcare, Inc. heard, or does it know about any statement or remark made by or on behalf of Iyiana Joy Mcleod concerning her care and treatment? If so, state the name and address of each person who made the statement or statements,

the name and address of each person who heard it, and the date, time, place, and substance of the statement.

18.     During the last five years, has any claim for medical malpractice ever been made against Plantation General Hospital, L.P. and HCA Healthcare, Inc. relating to Necrotizing Enterocolitis in preterm infants, and if so, state as to each such claim the names of the parties, the court in which the action was filed, the case number, the date of the incident, the name of the attorney representing the patient, and the ultimate disposition of the case.

Please pay particular attention to inquiries (15) and (16). We are relying upon your responses to determine whether to place any other health care providers on notice of this claim.

Please understand that except as to health care providers and other individuals or entities disclosed in response to inquiries (15) and (16) we intend to ask the court, should it be necessary to proceed with the filing of a lawsuit, to prohibit any argument and the introduction of any evidence regarding the negligence or fault of others.

You are required to cooperate with us in good faith during the screening period. The failure to fully and completely respond to inquiries (15) and (16) violates the good faith requirement of the law and will justify dismissal of your defenses. *See* Fla. Stat. §766.106(3)(a).

Pursuant to Section 766.106(2), Florida Statutes, please find attached an authorization.

Pursuant to Florida Rule of Civil Procedure 1.650, please be advised that Tiana Ennix, on her own behalf and as representative of the estate of Iyiana Joy Mcleod, deceased, is not currently asserting medical malpractice claims against other Defendants.

This notice does not constitute a waiver of our clients' rights under Section 456.057, Florida Statutes.

The documents and responses requested in this letter are required pursuant to statute to be provided within twenty (20) days from the date of this letter.

Very truly yours,

Joshua A. Migdal, Esq.

Enclosure(s): as specified

cc:     Martin Goldberg, Esq. (via email- mgoldberg@lashgoldberg.com)
        Jeremy Weberman, Esq. (via email jweberman@lashgoldberg.com )
        Ben Whiting, Esq. (via email- ben.whiting@kellerpostman.com)
        Amelia Frenkel, Esq. (via email- amelia.frenkel@kellerpostman.com)
        Charles Garabedian, Esq. (via email- Charles@markmigdal.com)
        Ashley Saul, Esq. (via email- Ashley@markmigdal.com)
        Stephanie Peral, Esq. (via email- Stephanie@markmigdal.com)

# EXHIBIT 4

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FLORIDA

CASE NO.:  2023CA020810AXXXCE

TIANA ENNIX, on her own behalf
and as representative of the estate of
IYIANA JOY MCLEOD, Deceased

       Plaintiff

vs.

PLANTATION GENERAL HOSPITAL, L.P.,
HCA HEALTHCARE, INC., and ABBOTT
LABORATORIES

       Defendants.

_____/

## SECOND AMENDED COMPLAINT

Plaintiff Tiana Ennix, on her own behalf and as Representative of the Estate of Iyiana Joy Mcleod, deceased ("Plaintiff"), brings this Complaint and Demand for Jury Trial (the "Complaint") against Plantation General Hospital, L.P. (d/b/a Plantation General Hospital) and HCA Healthcare, Inc. (collectively "Hospital Defendants") and Abbott Laboratories ("Abbott" and collectively with the Hospital Defendants, "Defendants"). Plaintiff alleges the following upon personal knowledge as to Plaintiff's own acts and experiences and upon information and belief, including an investigation conducted by Plaintiff's attorneys, as to all other matters.

## INTRODUCTION

1.     This case is about the devastating effects of prioritizing corporate profits over the health of our most vulnerable population – preterm infants. Abbott, together with Hospital Defendants, foist infant formula on unsuspecting parents and their newborns without bothering to warn them that it can cause necrotizing enterocolitis ("NEC"), a life-altering and potentially fatal

disease that largely affects preterm babies who ingest cow's milk based preterm infant feeding products rather than safer alternatives.

2.     The symbiosis between Abbott and Hospital Defendants is brutally transactional. Motivated by profits, Abbott enters into agreements with hospitals to provide their commercial formula to newborns. The parents of these newborns reasonably believe that the commercial formula manufactured by Abbott and then provided by Hospital Defendants is necessary for the health and well-being of preterm infants. The Hospital Defendants' early provision of this formula to these newborns gives Abbott a foothold with new parents, acquiring a customer base and obtaining the benefit of that base with years of brand loyalty. But the hospitals and Abbott never disclose that the formula is being provided pursuant to mutually beneficial agreements between the hospitals and Abbott, agreements that require a Hospital to feed the commercial formula products to nearly every one of the in-Hospital babies consuming infant formula products.

3.     Plaintiff seeks recovery from the Defendants for injuries that are the direct and proximate result of Iyiana's consumption of the Abbott's unreasonably dangerous cow's milk based preterm infant feeding products, which was acquired and supplied without adequate warning to Plaintiff.

4.     Plaintiff has complied with the notice requirements pursuant to Florida Statute § 768.28 and all statutory medical malpractice requirements pursuant to Florida Statute § 766.106 *et. seq.*

5.     Additionally, all other conditions precedent to bringing or maintaining this action have occurred, have been waived or were performed. The undersigned certifies that a reasonable investigation has been made to the extent permitted by the circumstances and the investigation supports the belief that grounds exist for the subject action.

## **PARTIES**

6. Plaintiff Tiana Ennix is a natural person and a resident of Florida. Ms. Ennix brings this suit in her personal capacity and as Representative of the Estate of Iyiana Joy Mcleod.

7. Defendant Plantation General Hospital, L.P. is a private hospital organized to do business under the laws of the State of Delaware and registered to do business in Florida. Plantation General Hospital, L.P. held itself out to the public as being an entity duly licensed under the laws of Florida to provide health care. Its principal place of business is in Tennessee.

8. Upon information and belief, Defendant Plantation General Hospital was an Abbott exclusive facility during the period that Plaintiff's child, Iyiana, was treated in the NICU.

9. Defendant HCA Healthcare, Inc. ("HCA") is organized to do business under the laws of the State of Delaware and registered to do business in Florida. Its principal place of business is in Nashville, Tennessee and it owned and operated Plantation General Hospital in Plantation, Florida during the relevant period.

10. HCA is a leading provider of healthcare services comprised of 182 hospitals and 2,300+ sites in 20 states and the United Kingdom.[1] Defendant HCA owns and operates fourteen (14) NICUs in Florida and represents that it is heavily concentrated in Florida and Texas.[2]

11. Upon information and believe, HCA is directly responsible for negotiating contracts with Abbott, creating policies, and otherwise regulating the types of formula products that can be given to preterm infants at HCA's NICUs, including Plantation General Hospital.

12. Upon information and belief, at all times material hereto, HCA has been and will continue to be an Abbott exclusive healthcare provider. In exchange for HCA's contractual commitments to Abbott, Hospital Defendants receive price discounts on formula and other related

---

[1] https://hcahealthcare.com/about/ (last accessed 10/24/2023)
[2] https://www.hcafloridahealthcare.com/specialties/nicu (last accessed 10/24/2023)

NICU products.

13.     Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois. Its principal place of business is in Illinois. Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

## JURISDICTION AND VENUE

14.     The circuit court has jurisdiction under Fla. Stat. Section 26.012(2)(c). Plaintiff seeks damages in excess of $750,000, and this action involves complex legal and case management issues which require extensive judicial management, as contemplated by Rule 1.201(a), Florida Rules of Civil Procedure.

15.     Defendants have sufficient minimum contacts with and purposefully avail themselves of the markets of the State of Florida. This suit arises out of Defendants' forum-related activities, such that the Court's exercise of jurisdiction would be consistent with traditional notions of fair play and substantial justice.

16.     Venue is proper in this Court pursuant to Fla. Stat. §§ 47.011, 47.041, and 47.051, because Defendants are corporations or similar entities that regularly conduct business in Broward County, which is also the county where Plaintiff's causes of action arose, and the county where the occurrences took place out of which Plaintiff's causes of action arose, including, but not limited to, the location of the acts and omissions related to the aforementioned Hospital agreements.

## FACT ALLEGATIONS

**I.    Iyiana's NEC Diagnosis**

17.    Iyiana was born prematurely at Hospital Defendants on July 7, 2019.

18.    Despite Iyiana's gestational weight and age, Iyiana was fed cow's milk based preterm infant feeding products by staff at Hospital Defendants shortly after her birth.

19.    Shortly after Iyiana first ingested the Abbott's products, she developed NEC.

20.    At no point prior to Iyiana ingesting Abbott's products did any of the Defendants inform Iyiana's caregivers regarding the risk of NEC that the cow's milk-based formula products pose or the relationship between Abbott and Hospital Defendants regarding Abbott's cow's milk-based preterm products.

21.    Iyiana was forced to undergo surgery and ultimately succumbed to her injuries, passing away on August 6, 2019.

**II.    Cow's Milk-Based Preterm Feeding Products Are Known To Cause NEC**

22.    NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants. NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die. Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis. Up to 30 percent of NEC-diagnosed infants die from the disease.

23.    Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems. Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based preterm feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

24. For example, in one randomized, multicenter study of 926 preterm infants, NEC was *six to ten* times more common in exclusively cow's milk formula-fed babies than in exclusively breast milk-fed babies and *three times* more common in babies who received a combination of formula and breast milk. For babies born at more than thirty weeks gestation, NEC was *20 times more common* in those only fed cow's milk formula than in those fed breast milk.

25. Another randomized controlled trial showed that preterm babies fed an exclusive breast milk-based diet were *90% less likely* to develop surgical NEC (NEC that requires surgical treatment), compared to preterm babies fed a diet that included some commercial cow's milk-based preterm infant feeding products.

26. Yet another study that analyzed the data from a 12-center randomized trial concluded that fortification of breast milk with a cow's milk-based fortifier resulted in a 4.2-fold increased risk of NEC and a 5.1-fold increased risk of surgical NEC or death, compared to fortification with a breast milk-based fortifier.

27. A Surgeon General report, *The Surgeon General's Call to Action to Support Breastfeeding*, warns that, "for vulnerable premature infants, formula feeding is associated with higher rates of necrotizing enterocolitis." The report also states that premature infants who are not breastfed are *138% more likely* to develop NEC.

28. The American Academy of Pediatrics, "an organization of 67,000 pediatricians committed to the optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults," has advised that *all* premature infants should be fed either their mother's milk or, if their mother's milk is unavailable, pasteurized human donor milk. This recommendation is based on the "potent benefits of human milk," including "lower rates of . . . NEC."

29.     A multicenter, randomized, controlled trial found that premature and low-birth-weight infants fed an exclusive breast milk-based diet suffered NEC only 3% of the time while premature and low-birth-weight infants receiving cow's milk-based formula suffered NEC ***21% of the time***.

30.     Another study conducted a randomized comparison of extremely preterm infants who were given either (a) a diet of breast milk fortified with a breast milk-based fortifier or (b) a diet containing variable amounts of cow's milk-based products. The babies given exclusively breast milk products suffered NEC 5% of the time. The babies given cow's milk products suffered NEC 17% of the time.

**III.     Safer, Nutritionally Superior Alternatives to Cow's Milk-Based Products Exist**

31.     A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human milk-based nutrition. For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide. Moreover, hospitals have access to shelf-stable formula and fortifiers derived from pasteurized breast milk.

32.     A diet based exclusively on breast milk and human-milk based formulas and fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants, and without the elevated risk of NEC associated with cow's milk-based commercial preterm products. For example, in a study analyzing preterm infants who were fed an exclusive breast milk-based diet until they reached 34 weeks, all 104 infants exceeded standard growth targets and met length and head-circumference growth targets, demonstrating that infants can achieve and exceed targeted growth standards when receiving an exclusive breast milk-based diet. This is particularly true given the ability of breast milk-based fortifiers to provide nutritional supplements where necessary for additional growth.

33.     Abbott's products not only pose a threat to infants' health, but also displace the breast milk they could otherwise receive. This displacement only increases infants' vulnerability to NEC, as studies show that breast milk protects against the disease. For example, a study analyzing 1,587 infants across multiple institutions concluded that an exclusive breast milk-based diet is associated with significant benefits for extremely premature infants and that it produced no feeding-related adverse outcomes.

34.     For the above reasons, experts acknowledge that breast milk is the best source of nutrition for preterm infants and those at risk for NEC. Breast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

35.     At the time Iyiana was fed Abbott's products at the Hospital Defendants, the science clearly demonstrated to Defendants that these products cause NEC and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

36.     Despite the scientific consensus that Abbott's cow's milk-based preterm products present a dire threat to the health and development of preterm infants, Abbott has made no changes to their products or the products' packaging, guidelines, instructions, distribution, or warnings. Instead, Abbott has continued to sell their unreasonably dangerous products to unsuspecting parents and healthcare providers, generating huge profits as a result.

### *Ms. Ennix Discovers Her Claim*

37.     Because of the Defendants' concealment and misrepresentations, described more fully herein, Ms. Ennix did not know, and had no reason to know or suspect, that Iyiana's NEC could have been caused by the Abbott's products.

### *Despite Exercising Diligence, a Reasonable Investigation Did Not Reveal and Would Not Have Revealed a Factual Basis Earlier Because Abbott Hid the Cause of NEC from Ms. Ennix*

38.     Despite exercising reasonable diligence, Ms. Ennix was unable to have made the discovery earlier by way of a reasonable investigation because the Defendants in this litigation concealed the wrongful cause of Iyiana's injuries.

39.     Amidst the physical and emotional trauma of preterm childbirth and having her child in the neonatal intensive care unit, shortly after learning of her infant's NEC diagnosis, Ms. Ennix undertook an investigation into the cause of the NEC.

40.     Hospital Defendants did not inform Ms. Ennix that Abbott's formula products could have caused her infant's injuries.

41.     Ms. Ennix is a layperson with no medical background or training that would have given her any reason to doubt the information she received from her providers at the time.

42.     Additionally, the risk of necrotizing enterocolitis was not disclosed on the labeling or packaging of any of the Abbott's products.

43.     Abbott has worked to mislead parents into a false sense of security about the use of those products. Publicly disseminated materials from Abbott disguise the role their products play in causing the disease—and affirmatively say, even today, that their products are safe and do not cause NEC. In fact, some publicly disseminated materials from the formula manufacturers even suggest that formula may help reduce the risk of this terrible and potentially fatal disease.

## IV.     Abbott's False and Misleading Marketing Regarding Cow's Milk Based Preterm Infant Products

44.     Abbott has aggressively marketed their cow's milk-based preterm products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to Iyiana's birth.

45.     Abbott's marketing approach includes targeting the parents of preterm infants while they are still in the Hospital with messages that Defendants' cow's milk preterm formulas and

fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. *None* of Abbott's marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

46.     Numerous studies have shown the detrimental impact of formula advertising on the rates of initiation and continuation of breastfeeding, including studies that show that as "hand feeding" (non-breastfeeding) advertisements increase, reported breastfeeding rates decrease in the following year.

47.     Undoubtedly aware of the impact of their advertising, Abbott, along with other formula manufacturers, are willing to spend massive sums to disseminate their message, with one study estimating that formula manufacturers collectively spent $4.48 billion on marketing and promotion in 2014 alone.

48.     Recognizing the abuse and dangers of infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes (the "Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

49.     While Abbott acknowledges the Code on their websites and claims to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, Abbott aggressive marketing exploits new parents' darkest fears—that the nutrition they

are supplying to their child will not provide the best chance of survival—while wholly failing to warn that their products come with a significantly increased risk of NEC.

50.     For example, Abbott's website, on a page titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—**infant formula is the only appropriate, safe alternative** to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

51.     Abbott markets and sells multiple products specifically targeting preterm and low-birth-weight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC.  At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

52.     When Abbott recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed "Similac Human Milk Fortifier." This name is misleading in that it suggests that the products are derived from breast milk, when, in fact, they are cow's milk-based preterm products. One study, for example, found that only 8.8

percent of parents surveyed in the NICU interpreted "human milk fortifier" as potentially meaning a cow's milk-based product.  The packaging appears as:

 

53.     Abbott has designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based preterm products are safe, including for preterm infants; (2) cow's milk-based preterm products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based preterm products are necessary for proper growth and development of preterm infants; and (4) physicians consider Abbott's cow's milk-based preterm products to be a first choice. This marketing scheme is employed despite Abbott knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like Iyiana.

**V.     Abbott's Inadequate Warnings**

54.     Although Abbott promotes an aggressive marketing campaign designed to convince parents that its' cow's milk-based preterm products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants. Similac products significantly increase the chances of a premature infant developing potentially fatal NEC.

55.     The Similac products Abbott markets specifically for premature infants are commercially available at retail locations and online.  No prescription is necessary.

56.     Despite knowing of the risk of NEC, the packaging of Abbott's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death)

associated with Abbott's products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

57. Abbott cites no medical literature or research to guide the use of its products.

58. Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

59. Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Similac products were a safe and necessary alternative, supplement and/or substitute to breast milk.

60. Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals or hospitals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

## VI. Safter Alternative Designs

61. Abbott's cow's milk-based preterm products made specifically for premature infants are unreasonably unsafe for those infants. Abbott could have used pasteurized breast milk instead of cow's milk in their preterm products, which would have produced a safer product.

62. Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk. This alternative design provides all the necessary nutrition for growth and development that cow's milk-based preterm products provide, without the same unreasonably dangerous and deadly effects.

63. On information and belief, Abbott was aware of the significantly increased risk of NEC and death associated with their cow's milk-based preterm products, and instead of

warning of the dangers, or removing them altogether, Abbott has continued to use cow's milk as the foundation of their preterm products.

**VII.  Abbott's Agreement with Defendants HCA Healthcare, Inc. and Plantation General Hospital, L.P.**

64.    The sales funnel which drives Abbott's profits begins at hospitals across the nation. To drive the sales of cow's milk-based preterm infant formula products, Abbott has concocted a customer acquisition strategy to require hospitals to nearly exclusively provide their cow's milk-based preterm formula in exchange for a discount or free formula.  Abbott has also been granted access to their newest customers via agreements with the hospitals. Specifically, based on contracts that hospitals enter with Abbott, hospitals give parents free or discounted formula, coupons, and discharge kits while they are still on premises.

65.    Through this early targeting, Abbott creates brand loyalty under the guise of a "medical blessing," knowing that new parents are highly likely to continue to use the same brand formula after they leave the hospital. This practice has been shown to negatively impact breastfeeding rates, even though Defendants will admit that a mother's own milk is best for the preterm infant. But the health of the newborn is not the concern; rather, Abbott seeks to drive customer acquisition and secure preterm discharge wins by working with Hospital Defendants to get their product to Hospital Defendants' most vulnerable patients.

66.    On information and belief, Hospital Defendants have received Abbott's cow's milk-based products for free or at a significant discount, and have granted Abbott's sales representatives access to its healthcare professionals and medical staff. These sales representatives have provided deceptive information that Hospital Defendants reasonably knew or should have known both (1) was untrue, and (2) would ultimately reach parents through those staff. Hospital

Defendants agree to facilitate Abbott's marketing scheme in exchange for free or discounted products.

67. Hospital Defendants conceal that they enter into these cost-cutting agreements with Abbott, conceal that their staff receive "training" from Abbott, and conceal that the commercial preterm products provided by Hospital Defendants were acquired through these sweetheart agreements in exchange for access and sway via these trainings.

68. This concealment results in an unsuspecting and likely sleep-deprived parent receiving the impression that the formula has a medical blessing.

69. Hospital Defendants facilitate this sales strategy with knowledge that feeding these cow's milk-based products can cause NEC in premature infants who otherwise would not have developed this devastating condition.

## COUNT I: NEGLIGENCE
### (Against Hospital Defendants)

70. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

71. Hospital Defendants owe a duty to their patients to be responsible for their care.

72. Hospital Defendants breached that duty by placing their financial interest first and entering into agreements with Abbott that require Hospital Defendants to provide Abbott's cow's milk-based preterm formula to its patients.

73. Hospital Defendants also breached that duty by knowingly authorizing Abbott sales representatives to market, advertise, distribute, and/or sell their products at the Hospitals. These interactions provided the Abbott's sales representatives an opportunity to co-opt the Hospital Defendants' healthcare professionals and medical staff into assisting with the marketing, distribution, and/or sales of Abbott's unreasonably dangerous products, including but not limited

to by:

    a.   Failing to formulate, adopt, and enforce adequate rules and policies that would have restricted the use of cow's milk-based products for feeding premature babies; and/or

    b.   Failing to formulate, adopt, and enforce adequate rules and policies that warned Plaintiff that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in premature babies, like Plaintiff's daughter; and/or

    c.   Failing to formulate, adopt, and enforce adequate rules and policies that warned their healthcare professionals and medical staff that cow's milk-based products are unsafe and/or contraindicated for premature babies like Plaintiff's daughter; and/or

    d.   Failing to formulate, adopt, and enforce adequate rules and policies to instruct their healthcare professionals and medical staff on the information that should be provided to parents in order to make an informed choice about whether to allow their babies to be fed Abbott's products, notwithstanding their substantial risk; and/or

    e.   Failing to formulate, adopt, and enforce adequate rules and policies to provide their healthcare professionals and medical staff with the well-researched and well-established studies that link cow's milk-based products to NEC and death in premature infants; and/or

    f.   Failing to formulate, adopt, and enforce adequate rules and policies to ensure a warning in a method reasonably calculated/expected to reach the parents of newborns, like Plaintiff; and/or

    g.   Failing to formulate, adopt, and enforce adequate rules and policies to prevent Abbott's sales representative from misrepresenting to Defendant Hospitals'

healthcare professionals and medical staff that premature babies would not grow adequately with human milk and human milk products and that use of donor milk was not advised for premature infants; and/or

h. Failing to establish a donor milk program that was sufficient to meet the needs of premature babies, like Plaintiff's daughter.

74. Hospital Defendants knew or reasonably should have known at the time that they formulated, adopted, and enforced their rules for the acquisition, distribution, and supply of Abbott's cow's milk based infant products, including access afforded to Abbott's sales representatives, that these products significantly increased the risk of NEC, serious injury, and death for premature infants.

75. Hospital Defendants knew or reasonably should have known that their medical professionals and the parents of premature infants, including the Plaintiff, would not have realized the risks associated with feeding cow's milk-based formula to premature infants.

76. Plaintiff's daughter was fed Abbott's cow's milk-based preterm formula pursuant to the agreement between Abbott and Defendant Hospitals.

77. A reasonable hospital under the same or similar circumstances would have formulated, adopted, and enforced adequate policies related to the use of cow's milk-based products to premature babies, and rules to restrict the feeding of cow's milk-based products to premature babies, including developing an adequate donor milk program, instructing its healthcare professionals and medical staff on the safe use of Abbot's cow's milk-based products, and restricting the marketing of Abbott's unreasonably dangerous products to its healthcare professionals, medical staff, and parents of premature infants under its care.

78. Had Defendant Hospitals exercised reasonable care by satisfying their duty to

formulate, adopt, and enforce adequate rules and policies to ensure the quality care of their patients, Plaintiff's daughter would not have been exposed to Abbott's cow's milk-based products.

79.     As a direct and proximate result of Plaintiff's daughter being fed the formula at the Hospital Defendants' NICU, she developed NEC which caused her injuries and death.

80.     As a further direct result, Plaintiff suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by Iyiana's injuries and death.

<strong><u>COUNT II: STRICT LIABILITY FOR DESIGN DEFECT</u></strong><br><strong><u>(Against Abbott)</u></strong>

81.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

82.     Abbott, as the manufacturer and/or seller of the products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiff in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

83.     Abbott also owed a duty to the consuming public in general, and Plaintiff in particular, to manufacture, sell, and distribute their products in a manner that was merchantable and reasonably suited for their intended use.

84.     Abbott knew that their products would be used to feed premature infants like Iyiana and knew (or reasonably should have known) that use of their cow's milk-based preterm products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants, not reasonably suited for the use intended, not merchantable, and had risks that exceeded a reasonable buyer's expectations. Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

85.     Plaintiff's child ingested Abbott's unreasonably dangerous cow's milk-based preterm products. The risks of feeding those products to Plaintiff's child outweighed the benefits.

An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

86.     Abbott knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that Abbott's products do.

87.     Abbott's products contained cow's milk at the time they left the manufacturing facility.

88.     Abbott did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically and technologically feasible and even though pasteurized breast milk was an available alternative.

89.     Abbott's products were fed to Iyiana, which directly and proximately caused her NEC, surgery, and death.

90.     As a further direct result, Plaintiff suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by Iyiana's injuries and death.

## COUNT III: STRICT LIABILITY FOR FAILURE TO WARN
### (Against Abbott)

91.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

92.     Abbott, as the manufacturer and/or seller of the infant products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiff in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

93.     Abbott's duty to warn is part of their general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses.  By designing their products with cow's milk-based ingredients, Abbott undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death. The failure to warn makes the products at issue in this litigation unreasonably dangerous.

94.     Specifically, Abbott breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like Iyiana, and that their products might cause those infants to develop NEC, severe injury, or death, yet failed to provide adequate warnings of those risks. Among other risks, Abbott:

   a.    Failed to warn that cow's milk-based preterm products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

   b.    Failed to warn that cow's milk-based preterm products are unsafe and/or contraindicated for premature infants like Iyiana; and/or

   c.    Inserted warnings and instructions on their products that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

   d.    Failed to insert a large and prominent "black box"-type warning that their cow's milk-based preterm products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

e.  Failed to disclose well-researched and well-established studies that linked cow's milk-based preterm products to NEC and death in premature infants; and/or

f.  Failed to insert a warning or instruction to healthcare professionals and other medical staff in the Hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed Abbott's products, notwithstanding their substantial risks; and/or

g.  Failed to provide a warning in a method reasonably calculated or expected to reach the parents of newborns; and/or

h.  Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based preterm products.

95.  Abbott's products contained cow's milk at the time they left the manufacturing facility.

96.  As a direct and proximate result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of the Manufacturer Defendant's products, Plaintiff's child was fed cow's milk-based preterm products, which caused her to develop NEC.

97.  The unwarned-of risks are not of a kind that an ordinary consumer would expect. Had physicians and healthcare providers known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed Iyiana those preterm products. Had Plaintiff known of the significant risks of feeding Iyiana cow's milk-based formula, she would not have allowed such products to be fed to her child.

98.  As a further direct result, Plaintiff suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by Iyiana's injuries and death.

## COUNT IV: NEGLIGENCE
### (Against Abbott)

99.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

100.    Abbott, as the manufacturer and/or seller of the preterm products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiff in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

101.    At all times relevant to this action, Iyiana's health care providers used the preterm products at issue in their intended manner and for their intended purpose.

102.    Abbott, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant preterm products at issue in this litigation and thereby breached their duty to the general public and Plaintiff.

103.    Specifically, although Abbott knew or reasonably should have known at the time of production that their cow's milk-based infant preterm products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

   a.     Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

   b.     Failing to warn that cow's milk-based products are unsafe and/or contraindicated for premature infants like Iyiana; and/or

c.      Inserting warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d.      Failing to insert a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

e.      Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f.      Failing to insert a warning or instruction to healthcare professionals and other medical staff in the Hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed Abbott's products, notwithstanding their substantial risks; and/or

g.      Failing to provide a warning in a method reasonably calculated/expected to reach the parents of newborns; and/or

h.      Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

104.    In addition, although Abbott knew or reasonably should have known at the time of production that their cow's milk-based preterm products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

105. As a direct and proximate result of Abbott's failure to act in a reasonably prudent manner and their breach of duty, Plaintiff's child was fed cow's milk-based preterm products, which caused her to develop NEC.

106. Had Abbott satisfied their duties to the consuming public in general, Plaintiff's child would not have been exposed to their unreasonably dangerous cow's milk-based preterm products.

107. As a further direct result, Plaintiff suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by Iyiana's injuries and death.

## COUNT V: INTENTIONAL MISREPRESENTATION
### (Against Abbott)

108. Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

109. At all times relevant to this action, Plaintiff, Plaintiff's child, and her caretakers used the preterm products at issue in their intended manner and for their intended purpose.

110. Abbott the manufacturer and/or seller of the infant preterm products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiff in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

111. Abbott breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable and intended recipients of this information.

112.    Specifically, upon information and belief, Abbott made the following false statements of material fact on an ongoing and repeated basis and prior to the time Plaintiff's child was fed their preterm products:

a.    That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b.    That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c.    That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d.    That cow's milk-based products were safe for premature infants; and/or

e.    That cow's milk-based products were necessary for optimum growth; and/or

f.    That cow's milk-based products were similar or equivalent to breast milk; and/or

g.    That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.    That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.    Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

113.    Abbott knew or reasonably should have known those misrepresentations to be false.

114.     Abbott's misrepresentations were intended to, and in fact did, induce hospitals and health care providers, including Hospital Defendants and Iyiana's health care providers, to provide their infant preterm products to babies, including Iyiana.

115.     Plaintiff was not aware that these misrepresentations were false and justifiably relied on them. Abbott's misrepresentations induced Plaintiff to allow her child to be fed Abbott's infant preterm products, in reliance on all the messaging Plaintiff received about formula feeding, including, directly or indirectly, Abbott's messaging. Had Abbott not committed these intentional misrepresentations, Plaintiff's child would not have been exposed to Abbott's unreasonably dangerous cow's milk-based products.

116.     As a direct and proximate result, Abbott's preterm products were fed to Plaintiff's child, causing her NEC, subsequent injury, and death.

117.     As a further direct result, Plaintiff suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by Iyiana's injuries and death.

## COUNT VI: NEGLIGENT MISREPRESENTATION
### (Against Abbott)

118.     Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

119.     At all times relevant to this action, Iyiana used the preterm products at issue in their intended manner and for their intended purpose.

120.     Abbott, as the manufacturer and/or seller of the preterm products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiff in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

121.     In the course of their business, Abbott breached its duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

122.     Specifically, upon information and belief, Abbott made the following false statements of material fact on an ongoing and repeated basis and prior to the time Plaintiff's child was fed their preterm products:

   a.     That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

   b.     That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

   c.     That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

   d.     That cow's milk-based products were safe for premature infants; and/or

   e.     That cow's milk-based products were necessary for optimum growth; and/or

   f.     That cow's milk-based products were similar or equivalent to breast milk; and/or

   g.     That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.      That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.      Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

123.    Abbott was negligent or careless in not determining those representations to be false.

124.    Abbott's misrepresentations were intended to and did in fact induce hospitals and health care providers, including Iyiana's Hospital and health care providers, to provide their preterm products to babies, including Iyiana.

125.    Abbott's misrepresentations induced, and were intended to induce, Plaintiff to allow her child to be fed Abbott's infant products, in justifiable reliance on all the messaging she received about formula feeding, including, directly or indirectly, Abbott's messaging. Had Abbott not committed these negligent misrepresentations, Iyiana would not have been exposed to their unreasonably dangerous cow's milk-based preterm products.

126.    As a direct and proximate result, Abbott's preterm products were fed to Iyiana, causing her NEC, subsequent injuries, and death.

127.    As a further direct result, Plaintiff suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by Iyiana's injuries and death.

## COUNT VII: CONSTRUCTIVE FRAUD
### (Against Abbott)

128.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

129. At all times relevant to this action, Plaintiff, Plaintiff's child, and her caretakers used the preterm products at issue in their intended manner and for their intended purpose.

130. Abbott, as the manufacturer and/or seller of the preterm products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiff in particular, to provide truthful, accurate, and complete information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

131. In the course of their business, Abbott breached their duty by failing to exercise due care and making misrepresentations to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein, each of whom were foreseeable recipients of this information.

132. Specifically, upon information and belief, Abbott made the following false statements of material fact on an ongoing and repeated basis and prior to the time Iyiana was fed their preterm products:

a. That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b. That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c. That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d. That cow's milk-based products were safe for premature infants; and/or

e. That cow's milk-based products were necessary for optimum growth; and/or

f.      That cow's milk-based products were similar or equivalent to breast milk; and/or

g.      That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h.      That their products were based on up-to-date science, which made them safe for premature infants; and/or

i.      Omitting the material fact that their products significantly increased the risk of NEC in premature infants.

133.    The aforementioned misrepresentations were made with the intent that persons, including Plaintiff, would rely on them.

134.    Plaintiff in fact justifiably relied on the aforementioned misrepresentations.

135.    The aforementioned misrepresentations had the tendency to deceive others—including Plaintiff—violate public or private confidence, and injure public interest.

136.    Abbott knew or should have known of the falsity of the aforementioned misrepresentations.

137.    Abbott's aforementioned misrepresentations were intended to and did in fact induce hospitals and health care providers, including Iyiana's hospitals and health care providers, to provide their products to babies, including Iyiana.

138.    Abbott's misrepresentations induced, and were intended to induce, Plaintiff to allow her child to be fed Abbott's infant preterm products, in justifiable reliance on all the messaging she received about formula feeding, including, directly or indirectly, Abbott's

messaging. Had Abbott not committed these misrepresentations, Iyiana would not have been exposed to their unreasonably dangerous cow's milk-based products.

139. Abbott had a pecuniary interest in making these misrepresentations, and in committing their breaches of duty, gained an advantage over Plaintiff by misleading her to her prejudice and pecuniary loss.

140. As a direct and proximate result, Abbott's preterm products were fed to Iyiana, causing her NEC, subsequent health impacts, and death.

141. As a further direct result, Plaintiff suffered significant emotional distress, loss of income, and/or other harms. Her life has been significantly affected by Iyiana's injuries and death.

WHEREFORE, Plaintiff prays for judgment as follows:

a.  For Count I, compensatory damages in an amount to be proven at trial as to Hospital Defendants, damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as to Hospital Defendants, past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended as to Hospital Defendants;

b.  For Counts II– VI, compensatory damages in an amount to be proven at trial as to Defendant Abbott;

c.  For Counts II – VI, damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, and other non-economic losses sustained as to Defendant Abbott;

d.　For Counts II – VI, past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended as to Defendant Abbott;

e.　For interest as permitted by law and attorneys' fees and costs for all counts;

f.　For such other and further relief as the Court deems proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a jury trial for all claims triable.


DATED: _____　　　　　　　　　　Respectfully submitted,

**MARK MIGDAL & HAYDEN**
80 SW 8th Street, Suite 1999
Miami, Florida 33130
Telephone: (305) 374-0440

By: *s/ Josh Migdal*
Josh Migdal, Esq.
Florida Bar No. 19136
Ashley Saul, Esq.
Florida Bar No. 1025690
Charles M. Garabedian, Esq.
Florida Bar No. 1000974
Josh@markmigdal.com
Ashley@markmigdal.com
Charles@markmigdal.com
eservice@markmigdal.com


**KELLER POSTMAN LLC**
150 N. Riverside Plaza, Suite 4100
Chicago, Illinois 60606
Telephone: (312) 280-5784

By: *s/ Ben Whiting*
Ben Whiting, Esq.
*Admitted Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on _____, a copy of the foregoing was electronically filed through the Florida Courts E-Filing Portal which will send electronic notification of the above filing to all registered users.

*s/ Josh Midgal*
Josh Migdal, Esq.
